# CIVIL COVER SHEET

JS-44 (Rev. 3/99)

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

RICHARD MOORE, on behalf of himself
and all others similarly situated

**(b)** County of Residence of First Listed Plaintiff    Baldwin, New York
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Marc R. Stanley and Roger L. Mandel, STANLEY, MANDEL &
IOLA, LLP, 3100 Monticello Ave., Ste. 750, Dallas, TX 75205
214.443.4300 (phone) -- 214.443.0358 (fax) -- mstanley@smi-law.com

### DEFENDANTS
HALLIBURTON COMPANY

County of Residence of First Listed Defendant    Dallas
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

3 - 0 2 C V    1 1 5 2 L

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | PERSONAL INJURY | PERSONAL INJURY | | | |
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | | | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☒ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | LABOR | SOCIAL SECURITY | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | FEDERAL TAX SUITS | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

Securities class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange
Act of 1934 and SEC Rule 10b-5

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions)
JUDGE _____    DOCKET NUMBER _____

DATE    June 3, 2002

SIGNATURE OF ATTORNEY OF RECORD

Marc R. Stanley, Texas Bar No. 19046500

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF

**FILED**

JUN 3 2002

CLERK, U.S. DISTRICT COURT
By_____
Deputy

| | | |
|---|---|---|
| RICHARD MOORE, On Behalf of Himself And All Others Similarly Situated, | § § § | CASE NO. |
| PLAINTIFF, | § § | |
| v. | § § | **3 - 0 2 C V    1 1 5 2 L** |
| HALLIBURTON COMPANY, | § § | |
| DEFENDANT. | § § § | **JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT FOR VIOLATIONS
### OF THE FEDERAL SECURITIES LAWS

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Halliburton Company ("Halliburton" or the "Company"), as well as regulatory filings and reports, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company and media reports about the Company. Plaintiff believes that further substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of Halliburton between July 22, 1999 and May 28, 2002, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and

20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated

thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act,

and 28 U.S.C. § 1391(b).   Many of the acts charged herein, including the preparation and

dissemination of materially false and misleading information, occurred in substantial part

in this District.  Additionally, Halliburton Company maintains its chief executive offices

and principal place of business within this District.

5.      In connection with the acts alleged in this complaint, defendant, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national

securities markets.

## PARTIES

6.      Plaintiff Richard Moore as set forth in the accompanying certification

incorporated by reference herein, purchased the common stock of Halliburton during the

Class Period and has been damaged thereby.

7.      Defendant Halliburton Company is a corporation organized under the laws

of Delaware with its principal executive offices located at 3600 Lincoln Plaza, 500 N. Akard

St., Dallas, Texas.  Halliburton describes itself as a provider of diverse services and products to companies in the energy, industrial sectors and the United States Government.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

8.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Halliburton between July 22, 1999 and May 28, 2002, inclusive, and who were damaged thereby.  Excluded from the Class are the Company, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Company has or had a controlling interest.

9.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Halliburton had approximately 435 million shares of common stock outstanding which were actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Halliburton or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

10.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendant's wrongful conduct in violation of federal law that is complained of herein.

- 3 -

11.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

12.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendant's acts as alleged herein;

(b)     whether statements made by defendant to the investing public during the Class Period misrepresented material facts about the business, operations, financial statements of Halliburton; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

13.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

- 4 -

## SUBSTANTIVE ALLEGATIONS

### Background Facts

14.     Halliburton provides a variety of services, products, maintenance, engineering and construction services to energy, industrial and governmental customers. The Company has two business segments, the Energy Services Group and the Engineering and Construction Group:

(a)     Energy Services Group: this segment provides services and products for the exploration, development and production of oil and gas. In addition, the Company provides what it calls "integrated solutions" to energy companies, ranging from the initial evaluation of producing formations to drilling, production and well maintenance.

(b)     Engineering and Construction Group: this segment provides a wide range of engineering and construction services to energy, industrial and governmental customers. The segment conducts its business in over 100 countries worldwide.

15.     Throughout the Class Period, Halliburton improperly recognized revenues in connection with its long-term construction projects in violation of Generally Accepted Accounting Principles ("GAAP").[1] Beginning in the fourth quarter of 1998 and without making disclosure to its investors, the Company altered its accounting policies so that it could report at least $89 million of revenues to cover disputed cost overruns on long-term construction projects, on the undisclosed assumption that its customers would pay the

---

[1]     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 CFR 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

disputed amounts.  At the time of this undisclosed accounting change, the Company had been facing a very difficult year with lower oil prices adversely impacting its business and reported a net loss of $14.7 million for the year ended December 31, 1998 as compared to net income of $722.4 million the year before.  In addition, in the third quarter of 1998, shortly before the accounting change was made, the Company had just completed its acquisition of Dresser Industries, Inc. ("Dresser"), which had been suffering from an onslaught of hundreds of thousands of asbestos-related lawsuits.

16.     For the years ended December 31,1999, December 31, 2000 and December 31, 2001, the Company reported unbilled receivables of $98 million, $113 million and $234 million, respectively, based on unapproved change orders and claims (without disclosing, in violation of GAAP, that the Company was following an altered policy and booking revenue on claims and change orders not approved by its customers).  The revenue recognition arising from the Company's undisclosed accounting change beginning in the fourth quarter of 1998 and continuing throughout the Class Period violated GAAP because the revenues recognized were not probable and could not be reliably estimated.

17.     Statement of Position 81-1, which governs the accounting for long-term construction-type contracts provides that:

> Claims are amounts in excess of the agreed contract price (or amounts not
> included in the original contract price) that a contractor seeks to collect from
> customers or others for customer-caused delays, errors in specifications and
> designs, contract terminations, change orders in dispute or unapproved as
> to both scope and price, or other causes of unanticipated additional costs.
> <u>Recognition of amounts of additional contract revenue relating to claims is
> appropriate only if it is probable that the claim will result in additional
> contract revenue and if the amount can be reliably estimated.</u> [Emphasis
> added.]

- 6 -

18.     The Company's undisclosed accounting change violated this provision of GAAP and constituted a departure from both the Company's long-standing accounting policies and general industry-wide practice, which is not to record revenue on claims or change orders absent customer approval.

19.     The effect of the Company's undisclosed accounting change, which is referred to in the accounting literature as a "change in accounting principle," was to materially inflate Halliburton's revenues and earnings throughout the Class Period. For example, in the fourth quarter of 1998, the Company reported $175 million of pre-tax operating profits. If not for the accounting change in that quarter, more than half of these reported profits would have been eliminated. Under the Company's previous, long-standing accounting policy, the cost overruns would not have been "covered" by the recognition of revenue, but recognized as losses; revenue would not have been recognized by the Company unless and until the customers agreed to pay Halliburton additional amounts to cover its disputed claims or change orders.

20.     The Company's change of accounting principle and failure to disclose that change also violated the GAAP principles set forth in Opinions of the Accounting Principles Board ("APB") No. 20. APB No. 20 states that an accounting principle should not be changed unless it can be justified that the change results in an accounting treatment that is preferable:

> The Board concludes that in the preparation of financial statements there is a presumption that an accounting principle once adopted should not be changed in accounting for events and transactions of a similar type. Consistent use of accounting principles from one accounting period to

another enhances the utility of financial statements to users by facilitating analysis and understanding of comparative accounting data.

The presumption that an entity should not change an accounting principle may be overcome only if the enterprise justifies the use of an alternative acceptable accounting principle on the basis that it is preferable. [Emphasis added.]

21.     APB No. 20 further states that the nature and justification for a change in accounting principle should be disclosed in a company's financial statements at the time it is made:

The nature and justification for a change in accounting principle and its effect on income should be disclosed in the financial statements of the period in which the change is made.  The justification for the change should explain clearly why the newly adopted accounting principle is preferable. [Emphasis added.]

APB No. 20 also requires a company making a change in accounting principle to specifically disclose "[t]he effect of adopting the new accounting principle on income."

22.     APB No. 20 defines a change in accounting principle to include not only a change from one generally accepted accounting principle to another, but also a change in the method of applying a particular accounting principle:

A change in accounting principle results from adoption of a generally accepted accounting principle different from the one used previously for reporting purposes.  The term accounting principle includes not only accounting principles and practices but also the methods of applying them.

* * *

Changes in accounting principle are numerous and varied.  They include . . . a change in the method of accounting for long-term construction-type contracts . . . . [Emphasis in original.]

- 8 -

23.     As set forth below, Halliburton's change in accounting principle was not disclosed or justified in any of the Company's Class Period financial statements nor was the enhancing effect of the change on Halliburton's net income specifically disclosed as required by GAAP.  Instead, the Company made no disclosure of any change in its 1998 Form 10-K issued shortly before the start of the Class Period.  Thereafter, in the Company's 1999, 2000 and 2001 Forms 10-K issued during the Class Period the Company merely stated that:  "Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of the work are included in revenue when collection is deemed probable."  In violation of GAAP, this statement did not reveal that a change in accounting principle had taken place, nor did the Company attempt to justify the basis for such a change, why it was preferable or disclose the effect of the change on net income.  As such, the Company's reported financial results and financial statements issued throughout the Class Period were materially false and misleading when made.[2]

24.     On May 22, 2002, <u>The New York Times</u> published an article discussing the accounting change first adopted by Halliburton during the fourth quarter of 1998. According to the article, the Company was suffering from large losses on some of its long-term construction contracts and was under tremendous pressure at the time to boost

---

[2]     A change in an accounting principle is of such material significance to an informed investment decision that the SEC specifically requires a company making such a change to provide a letter from its independent accountants supporting the preferability of the change in the first Form 10-Q filed by the company subsequent to the change.  <u>See</u> Rule 10-01(b)(6) of Regulation S-X.  Halliburton's did not file such a letter from its outside accounting firm, Arthur Andersen, LLP, in connection with the Company's undisclosed change.

revenues as its stock price swooned because of an oil-industry recession.  The article cited

interviews with former executives of Dresser, acquired by Halliburton in the third quarter

of 1998, who stated that the accounting policy was changed <u>with the specific intention of</u>

<u>masking Halliburton's declining results</u>:

> Two former executives of Dresser Industries, which merged with Halliburton
> in 1998, said that they concluded after the merger that Halliburton had
> instituted aggressive accounting practices to obscure its losses.
>
> Much of Halliburton's business comes from big construction projects, like
> natural gas processing plants, which sometimes ran over budget.  With the
> policy change, Halliburton began to book revenue on the assumption that its
> customers would pay at least part of the cost overruns, although they
> remained in dispute.  Before 1998, the company had been more conservative,
> reporting revenue from overruns only after settling with its customers.
>
>    * * *
>
> Though resolving such disputes can take months or years, the company
> decided it was reasonable to recognize at least part of the revenue from the
> claims even while they remained in dispute, [Company CFO] Foshee said.
>
>    * * *
>
> That explanation was disputed by the former Dresser executives who joined
> Halliburton after the merger.  <u>They said . . . that the company made the</u>
> <u>accounting change to obscure large losses on several important construction</u>
> <u>contracts.</u> [Emphasis added.]

<u>The New York Times</u> further reported that the accounting change was specifically

approved by David Lesar, a former director of Arthur Andersen, LLP (the Company's

outside auditor during the Class Period), who was then President of the Company and now

serves as the Chairman of the Board, Chief Executive Officer and President of the

Company.  Highlighting the importance of the accounting change for the Company, <u>The</u>

<u>New York Times</u> further reported that the change "came at an important moment for

- 10 -

Halliburton" which was "eager to win back investors' confidence after its take over of

Dresser:"

> Exactly how much of that revenue turned into profits for the company is not
> stated in Halliburton's financial reports. But the impact would have been
> significant had the company taken the alternative route of writing the cost
> overruns as losses, wiping out more than half of its $175 million in pretax
> operating profits for the fourth quarter [of 1998], when the accounting
> change took effect.

25.     Halliburton acted immediately to counter any adverse effect of this article on

the Company's stock price by making an upbeat presentation to securities analysts on the

same day regarding the Company's future business prospects. Among other things, the

Company told analysts about expected cost savings and efforts to contain the Company's

asbestos liabilities. For example, on May 23, 2002, <u>Reuters</u> issued a report quoting UBS

Warburg analyst James Stone as stating: "They did a very good job of getting people to

focus on the operating side of Halliburton for the first time in six months and what they

had to say was well received. I think people are getting more comfortable that the asbestos

problem is not intractable, is not going to be a death knell."

26.     Ultimately, however, as set forth below, on the last day of the Class Period,

the Company was forced to disclose that it had received notification from the SEC of a

preliminary investigation of the Company's accounting treatment of cost overruns on

construction projects.

## Materially False And Misleading
## Statements Made During The Class Period

27.     The Class Period begins on July 22, 1999. On that date, Halliburton issued

a press release announcing financial results for its second fiscal quarter of 1999, the period

ended June 30, 1999. According to the press release, total revenues were $3.7 billion for the quarter, net income was $83 million, or $0.19 per diluted share.

28.    On August 13, 1999, Halliburton filed its Form 10-Q with the SEC for the second quarter of 1999, the period ended June 30, 1999, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1998 Annual Report on Form 10-K.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 1999, and the results of our operations for the three and six months ended June 30, 1999, and our cash flows for the six months then ended. [Emphasis added.]

29.    On October 21, 1999, Halliburton issued a press release announcing its results for the third quarter of 1999, the period ended September 30, 1999. The Company reported net income of $58 million for the quarter, or $0.13 per diluted share, a vast improvement over the $527 million loss it incurred in the third quarter of 1998, which included a $722 million charge related to the acquisition of Dresser.

30.     On November 15, 1999, Halliburton filed its Form 10-Q with the SEC for the third quarter of 1999, the period ended September 30, 1999, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1998 Annual Report on Form 10-K.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of September 30, 1999, and the results of our operations for the three and nine months ended September 30, 1999, and our cash flows for the nine months then ended. [Emphasis added.]

31.     On January 27, 2000, Halliburton issued a press release announcing results for its fourth quarter and year ended December 31, 1999.   For the fourth quarter, Halliburton reported net income of $76 million (excluding an extraordinary gain on an asset sale), or $0.17 per diluted share -- an increase over the previous year's fourth quarter net income of $66 million ($0.15 per diluted share).  Revenues for the quarter reportedly were $3.8 billion.  For the year 1999, revenues were reported as $14.9 billion, with net income of $438 million, or $0.68 per diluted share.

32.     On March 14, 2000, Halliburton filed its Form 10-K with the SEC for the year

ended December 31, 1999, which confirmed the previously announced financial results.

The Form 10-K represented that the Company employed accounting principles in

accordance with GAAP and had prepared its financial statements in accordance with

GAAP. The "Revenue and Income Recognition" section of the 1999 10-K stated as follows:

> Revenues and income recognition.  We recognize revenues as services are
> rendered or products are shipped.  The distinction between services and
> product sales is based upon the overall activity of the particular business
> operation.  Revenues from engineering and construction contracts are
> reported on the percentage of completion method of accounting using
> measurements of progress towards completion appropriate for the work
> performed.  All known or anticipated losses on contracts are provided for
> currently.  Claims and change orders which are in the process of being
> negotiated with customers, for extra work or changes in the scope of the
> work are included in revenue when collection is deemed probable.

The "Receivables" section of the 1999 Form 10-K stated that claims and change orders

included in unbilled receivables amounted to $98 million and $89 million at December 31,

1999 and 1998 respectively and were generally expected to be collected in the following

year

33.     Halliburton's statements in paragraphs 27-32, above, regarding the

Company's 1999 financial results were materially false and misleading when made for the

reasons set forth above.  In violation of GAAP, the Company recognized as much as $98

million of revenue in 1999 which was not probable and could not be reliably estimated.  In

further violation of GAAP, the Company's 1999 financial statements did not reveal that any

change in accounting principle had taken place, nor did the Company attempt to justify the

basis for such a change or why it was preferable or disclose the effect of the change on net

- 14 -

36.     On July 26, 2000, Halliburton issued a press release announcing results for the second quarter of 2000, the period ended June 30, 2000. The Company reported net income of $75 million, or $0.17 per diluted share.

37.     On August 10, 2000, Halliburton filed its Form 10-Q with the SEC for the second quarter of 2000, the period ended June 30, 2000, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1999 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 2000, and the results of our operations for the three and six months ended June 30, 2000, and our cash flows for the six months then ended. [Emphasis added.]

38.     On October 24, 2000, Halliburton issued a press release announcing its financial results for the third quarter of 2000, the period ended September 30, 2000. According to the release, the Company reported net earnings of $157 million, or $0.35 per diluted share and revenues of $3 billion.

39.    On November 9, 2000, the Company filed a Form 10-Q with the SEC for the

third quarter of 2000, the period ended September 30, 2000, which confirmed the

previously announced financial results.  In addition, the Form 10-Q represented that the

financial statements contained therein were prepared consistently with GAAP

requirements for interim financial reports and that the filing presented Halliburton's

finances fairly, stating the following in note 1 to the quarterly financial statement, titled

"Management Representations:"

> The accompanying unaudited condensed consolidated financial statements
> were prepared using generally accepted accounting principles for interim
> financial information and the instructions to form 10-Q and applicable rules
> of Regulation S-X.  Accordingly, these financial statements do not include all
> information and footnotes required by generally accepted accounting
> principles for complete financial statements and should be read in
> conjunction with our 1999 Annual Report on Form 10-K. Prior year amounts
> have been reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present
> fairly our financial position as of September 30, 2000, and the results of our
> operations for the three and nine months ended September 30, 2000, and our
> cash flows for the nine months then ended. [Emphasis added.]

40.    On January 30, 2001, Halliburton issued a press release announcing its

financial results for the fourth quarter and year ended December 31, 2000  The Company

reported net income of $123 million, or $0.28 per diluted share. Revenues for the quarter

were $3.2 billion, a 6% increase over the 1999 fourth quarter.  For the year ended December

31, 2000, the Company reported revenues of $7.9 billion and net income of $501 million.

41.    On March 27, 2001, Halliburton filed its Form 10-K with the SEC for the year

ended December 31, 2000, which confirmed the previously announced financial results.

The Form 10-K represented that the Company employed accounting principles in

accordance with GAAP and had prepared its financial statements in accordance with GAAP. The Company's revenue recognition policy was described in the same format as the previous year's Form 10-K. The 2000 Form 10-K stated as follows:

> Revenues and income recognition. We recognize revenues as services are rendered or products are shipped. The distinction between services and product sales is based upon the overall activity of the particular business operation. Revenues from engineering and construction contracts are reported on the percentage of completion method of accounting using measurements of progress towards completion appropriate for the work performed. All known or anticipated losses on contracts are provided for currently. Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of the work are included in revenue when collection is deemed probable.

The "Receivables" section of the 2000 Form 10-K stated that claims and change orders included in unbilled receivables amounted to $113 million and $98 million at December 31, 2000 and 1999 respectively and were generally expected to be collected in the following year.

42.    Halliburton's statements in paragraphs 34-41, above, regarding the Company's 2000 financial results were materially false and misleading when made for the reasons set forth above. In violation of GAAP, the Company recognized as much as $113 million of revenue in 2000 which was not probable and could not be reliably estimated. In further in violation of GAAP, the Company's 2000 financial statements did not reveal that any change in accounting principle had taken place, nor did the Company attempt to justify the basis for such a change or why it was preferable or disclose the effect of the change on net income. The effect of Halliburton's change was material as the Company

avoided the recognition of as much as $113 million of costs as compared to a reported net income of $501 million for the 2000 year.

43.     On April 26, 2001, Halliburton issued a press release announcing an impressive 219% increase in net income for the first quarter of 2001 over the first quarter of 2001. According to the release, net earnings of $86 million, or $0.25 per diluted share, for the quarter were driven by revenues of $3.1 billion, a 10% year-over-year increase.

44.     On May 11, 2001, Halliburton filed its Form 10-Q with the SEC for the first quarter of 2001, the period ended March 31, 2001, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of March 31, 2001, and the results of our operations for the three months ended March 31,2001, and our cash flows for the three months then ended. [Emphasis added.]

45.     In a July 25, 2001, Halliburton issued a press release headlined "Halliburton Second Quarter [2001] Revenues and Earnings Continue to Soar." According to the release,

net income from continuing operations for the second quarter of 2001, ended June 30, 2001, was $143 million, or $0.33 per diluted share, an increase of 175% over the previous first quarter. Also impressive was the Company's reported revenues of $3.3 billion, a 16% year-over-year increase.

46.    On August 9, 2001, Halliburton filed its Form 10-Q with the SEC for the second quarter of 2001, the period ended June 30, 2001, which confirmed the previously announced financial results.  In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X.  Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform with the current presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 2001, and the results of our operations for the three and six months ended June 30, 2001, and our cash flows for the six months then ended. [Emphasis added.]

47.    On October 23, 2001, Halliburton issued a press release, headlined "Halliburton reports Record Profits", announcing its financial results for the third quarter of 2001, the period ended September 30, 2001.  Net income from continuing operations was

reportedly $181 million, or $0.42 per diluted share, a 39% year-over-year increase. Revenues of $3.4 billion rose by 12% from the 2000 third quarter.

48.     On November 8, 2001, the Company filed a Form 10-Q with the SEC for the third quarter of 2001, the period ended September 30, 2001, which confirmed the previously announced financial results. In addition, the Form 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing presented Halliburton's finances fairly, stating the following in note 1 to the quarterly financial statement, titled "Management Representations:"

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of September 30, 2001, and the results of our operations for the three and nine months ended September 30, 2001, and our cash flows for the nine months then ended. [Emphasis added.]

49.     On January 23, 2002, Halliburton issued a press release headlined "Halliburton Fourth Quarter [2002] 33 Cents EPS Caps Outstanding Year." The Company reported fourth quarter of 2001 (ended December 31, 2001) net income from continuing operations of $141 million, or $0.33 per diluted share. For the 2001 year, net income from continuing operations was reportedly $551 million, or $1.28 per diluted share. Revenues for the fourth quarter and 2001 were $3.2 billion and $13 billion, respectively.

50.     On March 12, 2002, Halliburton filed its Form 10-K with the SEC for the year ended December 31, 2001, which confirmed the previously announced financial results. The Form 10-K represented that the Company employed accounting principles in accordance with GAAP and had prepared its financial statements in accordance with GAAP. The Company's revenue recognition policy is set forth as follows:

> Revenues and income recognition.  We recognize revenues as services are rendered or products are shipped.  The distinction between services and product sales is based on the overall activity of the particular business operation.  Revenues from engineering and construction contracts are reported on the percentage of completion method of accounting using measurements of progress towards completion appropriate for the work performed.  Progress is generally based upon physical progress, man-hours or costs incurred based upon the appropriate method for the type of job.  All known or anticipated losses on contracts are provided for currently.  Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work are, included in revenue when collection is deemed probable.

The "Receivables" section of the 2001 Form 10-K stated that claims and change orders included in unbilled receivables amounted to $234 million and $113 million at December 31, 2001 and 2000 respectively.

51.     Halliburton's statements in paragraphs 43-50, above, regarding the Company's 2001 financial results were materially false and misleading when made for the reasons set forth above.  In violation of GAAP, the Company recognized as much as $234 million and at least $121 million of revenue in 2001 which was not probable and could not be reliably estimated.  In further violation of GAAP, the Company's 2001 financial statements did not reveal that any change in accounting principle had taken place, nor did the Company attempt to justify the basis for such a change or why it was preferable or disclose the effect

of the change on net income. The effect of the Company's change was material as Halliburton avoided the recognition of at much as $234 million and at least $121 million of costs as compared to net income from continuing operations of $551 million for 2001.

52. On May 28, 2002, the last day of the Class Period, Halliburton issued a press release after the close of trading announcing that the SEC had begun "a preliminary investigation of the Company's accounting treatment of cost overruns on construction jobs" and that the Company expected to receive a formal request for documents or a subpoena in the next few days. The Company's press release stated, however, that it believed that it has accounted for construction claims and change orders in accordance with GAAP. In reaction to the Company's announcement, the price of Halliburton common stock decreased by 3.3% on May 29, 2002, on extraordinary trading volume of over 13 million shares, many times the Company's average daily trading volume.

53. The market for Halliburton's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Halliburton's common stock traded at artificially inflated prices during the Class Period.

54. During the Class Period, the Company materially misled the investing public, thereby inflating the price of Halliburton's securities, by publicly issuing false and misleading statements in violation of GAAP and omitting to disclose material facts necessary to make defendant's statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose

material adverse information and misrepresented the truth about the Company, its business and operations, including, inter alia:

(a)    that the Company's financial statements were not prepared in accordance with GAAP and in accordance with the federal securities laws and SEC regulations concerning fair reporting; and

(b)    that the Company's financial results were the result, in part, of improper accounting entries; and

(c)    that the Company's estimates, projections and opinions as to its expected revenues, earnings, income and value of its stock were lacking in reasonable basis at all relevant times.

55.    At all relevant times, the material misrepresentations and omissions partic-ularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendant made a series of materially false or misleading statements about Halliburton's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Halliburton and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendant's materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

56.     At all relevant times, the market for Halliburton's securities was an efficient market for the following reasons, among others:

(a)     Halliburton's stock met the requirements for listing, and was listed and actively traded on the NYSE Stock Exchange, a highly efficient and automated market;

(b)     As a regulated issuer, Halliburton filed periodic public reports with the SEC and the NYSE;

(c)     Halliburton regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Halliburton was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

57.     As a result of the foregoing, the market for Halliburton's securities promptly digested current information regarding Halliburton from all publicly available sources and reflected such information in Halliburton's stock price. Under these circumstances, all purchasers of Halliburton's securities during the Class Period suffered similar injury

through their purchase of Halliburton's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

58.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint as the statements were not forward-looking statements or otherwise covered by the statutory safe harbor.

## CLAIM FOR RELIEF

### Violation Of Section 10(b) Of
The Exchange Act Against And Rule 10b-5 Promulgated Thereunder

59.     Plaintiff repeats and restates each and every allegation contained above as if fully set forth herein.

60.     During the Class Period, Halliburton carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Halliburton's securities; and (iii) cause plaintiff and other members of the Class to purchase Halliburton's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendant took the actions set forth herein.

61.     Defendant: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business

which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Halliburton's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

62.    In addition to the duties of full disclosure imposed on defendant as a result of its making of affirmative statements and reports to the investing public, defendant had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

63.    Halliburton, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about its business, operations and future prospects as specified herein.

64.    Halliburton employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Halliburton's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Halliburton and its

business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Halliburton's securities during the Class Period.

65.   Defendant's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Halliburton's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

66.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Halliburton's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Halliburton's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendant, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendant but not disclosed in public statements by defendant during the Class Period, plaintiff and the other members of the Class acquired Halliburton securities during the Class Period at artificially high prices and were damaged thereby.

67.   At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Halliburton, which were not disclosed by

defendant, plaintiff and other members of the Class would not have purchased or otherwise acquired their Halliburton securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68.     By virtue of the foregoing, defendant has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of defendant's wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)     Awarding compensatory damages in favor of plaintiff and the other Class members against defendant for all damages sustained as a result of defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

- 29 -

Dated:          June 3, 2002                         Respectfully submitted,


                                                     Marc R. Stanley
                                                     Texas Bar No. 19046500
                                                     Roger L. Mandel
                                                     Texas Bar No. 12891750
                                                     Martin Woodward
                                                     Texas Bar No. 00797693
                                                     STANLEY, MANDEL & IOLA, L.L.P.
                                                     3100 Monticello Avenue, Suite 750
                                                     Dallas, TX 75205
                                                     (214) 443-4300
                                                     (214) 443-0358 fax)

                                                     MILBERG WEISS BERSHAD
                                                     HYNES & LEACH LP
                                                     Steven G. Schulman
                                                     Salvatore J. Graziano
                                                     Andrei V. Rado
                                                     One Pennsylvania Plaza
                                                     New York, NY  10119-0165
                                                     (212) 594-5300

                                                     FARUQI & FARUQI, LLP
                                                     Nadeem Faruqi
                                                     320 East 39th Street
                                                     New York, New York  10016
                                                     (212) 983-9330

                                                     **Attorneys for Plaintiff**