ORIGINAL

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

U. S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**
APR 1 1 2003

CLERK, U.S. DISTRICT COURT
By_____
Deputy

| | |
|---|---|
| RICHARD MOORE, et al. | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| HALLIBURTON COMPANY, et al. | : |
| | : |
| Defendants. | : |

Civil Action No.: 02-CV-1152-N
THIS DOCUMENT RELATES TO:
All Actions

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs Private Asset Management, Gabriel T. Forrest, the Archdiocese of

Milwaukee Supporting Fund, Inc., and Paul J. Benec ("Plaintiffs"), individually and on behalf of

all others similarly situated, by and through their attorneys, allege the following based upon

personal knowledge as to themselves and their own acts, and as to all other matters, upon

information and belief based upon, *inter alia*, the investigation of their attorneys, including

without limitation: (a) review and analysis of the public filings made by Halliburton Company

("Halliburton" or the "Company") with the Securities and Exchange Commission ("SEC"); (b)

review and analysis of Halliburton's public conference calls, as well as press releases and other

public statements issued on behalf of Halliburton; (c) review and analysis of securities analysts'

reports concerning Halliburton; (d) interviews with former Halliburton and Dresser Industries,

Inc. ("Dresser") employees; (e) discussions with individuals with experience in Halliburton's

industry; and (f) review and analysis of other publicly available information concerning

Halliburton, including news articles. Except as alleged herein, the underlying information

concerning Defendants' misconduct, and the particulars thereof, is not available to Plaintiffs and

the public and lie within the possession and control of Defendants.  Based on the evidence already

developed, Plaintiffs believe that additional evidentiary support will exist for the allegations set

forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action for violations of the Securities Exchange Act of

1934, 15 U.S.C. § 78 et sec. (the "Exchange Act") against Halliburton and four members of its

senior management on behalf of a proposed class of public investors who purchased or otherwise

acquired the common stock of Halliburton on the open market during the period from June 3,

1999 through May 28, 2002, inclusive (the "Class Period") at artificially inflated prices, and were

damaged thereby.

2.      Prior to the Class Period, on February 26, 1998, Halliburton, one of the world's

largest diversified energy services, engineering, maintenance, and construction companies,

announced that, under the terms of a definitive merger agreement, Dresser would become a

subsidiary of Halliburton in a deal valued at $7.7 billion.  Halliburton's chief executive officer

("CEO") and chairman of the board of directors ("Chairman"), Dick Cheney ("Cheney"), and

Dresser's CEO and Chairman, William E. Bradford ("Bradford"), both touted the merger as an

"outstanding business and cultural fit" that would "create immediate and long-term value" for

shareholders.

3.      Unknown to the investing public, Halliburton was reckless in its due diligence

investigation of Dresser.  Former employees of both Halliburton and Dresser stated that

Halliburton did little, if any, due diligence investigation of Dresser, and any due diligence that did

occur prior to the two companies entering into the merger agreement and consummating the

2

merger on September 29, 1998 was carried out at the senior executive level of the companies. As a result of the lack of adequate due diligence, Halliburton overpaid for Dresser and subsequently failed to sufficiently writedown the value of the assets acquired in the Dresser acquisition, thereby overstating the Company's reported assets and income throughout the Class Period.

4.      Defendants compounded this deception on the investing public by also overstating Halliburton's reported revenues, operating profit, and net income throughout the Class Period.

5.      In the fourth quarter of 1998, after completion of the Dresser acquisition, Halliburton changed the way in which it accounted for cost overruns (also referred to by the Company as "claims" and "change orders") in its fixed-price construction contracts. Prior to the fourth quarter of 1998, Halliburton recognized cost overruns that had not been agreed to by its customers, as losses. Without disclosing the material change in accounting policy to the investing public, Halliburton immediately recognized $89 million in disputed cost overruns as revenue. The $89 million in revenue represented more than half of the Company's reported pre-tax operating profits for the fourth quarter of 1998.

6.      For the years ended December 31, 1999, December 31, 2000 and December 31, 2001, the Company reported revenue and receivables of $98 million, $113 million and $234 million, respectively, based on unapproved cost overruns without disclosing that the Company was following an altered accounting policy. The revenue recognition arising from the Company's undisclosed accounting change beginning in the fourth quarter of 1998 and continuing throughout the Class Period violated Generally Accepted Accounting Principles ("GAAP") because the revenues recognized were not probable and could not be reliably estimated, because by their very nature the purported revenues were in dispute.

3

7.      In addition, as set forth below, Halliburton's change in accounting principle was not disclosed or justified in any of the Company's Class Period financial statements nor was the enhancing effect of the change on Halliburton's net income specifically disclosed as required by GAAP. In fact, the 1998 10-K made no reference to the Company's change in accounting policy, nor did it even disclose, as it had done in previous Forms 10-K, how the Company accounted for cost overruns. Thereafter, in the Company's 1999, 2000 and 2001 Forms 10-K issued during the Class Period the Company merely stated that: "Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of the work are included in revenue when collection is deemed probable." In violation of GAAP, this statement did not reveal that a change in accounting principle had taken place in the fourth quarter of 1998, nor did the Company attempt to justify the basis for such a change or why it was preferable. The Company also failed to disclose the effect of the change on the Company's reported net income, in violation of GAAP. As such, the Company's reported financial results and financial statements issued throughout the Class Period were materially false and misleading when made.

8.      At the time of this undisclosed accounting change, the Company had been facing a very difficult year with lower oil prices adversely impacting its business. As a result, Halliburton reported a net loss of $14.7 million for the year ended December 31, 1998 as compared to net income of $722.4 million the year before. This loss would have been materially greater without the Company's undisclosed change in accounting for cost overruns.

9.      On May 22, 2002, The New York Times published an article discussing for the first time the accounting change adopted by Halliburton during the fourth quarter of 1998. According to the article, the Company was suffering from large losses on some of its long-term

4

construction contracts and was under tremendous pressure at the time to boost revenues as its stock price swooned because of an oil-industry recession. The article referenced interviews with former Dresser executives, who stated that the accounting policy was changed <u>with the specific intention of masking Halliburton's declining results</u>.

10.     On May 28, 2002, the last day of the Class Period, the Company announced that it had received notification form the SEC that the SEC had initiated a preliminary investigation into Halliburton's accounting treatment of cost overruns on construction jobs. In reaction to the Company' announcement, the price of Halliburton common stock decreased by 3.3% on May 29, 2002, on extraordinary trading volume of over 13 million shares, many times the Company's average daily trading volume.

## JURISDICTION AND VENUE

11.     The claims herein arise under Section 10(b) and 20(a) of the Exchange Act, §§78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) by the SEC (17 C.F.R. Section 240.10b-5).

12.     This Court has jurisdiction of this litigation under Section 27 of the Exchange Act, 15 U.S.C. §78aa.

13.     Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this judicial district. In addition, Halliburton maintains its executive offices in this district at  .

14.     In connection with the conduct complained of herein, Defendants, directly or

5

indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Postal

Service, interstate telephone communications, and the facilities of the New York Stock Exchange

(NYSE), a national securities exchange.

## PARTIES

15.     Plaintiffs purchased Halliburton common stock at artificially inflated prices during

the Class Period, as set forth in their Certifications previously filed with this Court, in connection

with their respective motions for appointment as lead plaintiff, and were damaged thereby.

16.     Pursuant to an Order dated December 5, 2002, the Court appointed Plaintiffs to

serve as lead plaintiffs in this action.

17.     During the Class Period, Plaintiffs purchased shares of the Company's common

stock on the open market without knowledge that (i) the value of Halliburton's assets after the

Dresser acquisition and throughout the Class Period were materially overstated; (ii) Defendants

implemented an undisclosed practice in the fourth quarter of 1998 of recognizing cost-overruns as

revenue prior to customer approval, as detailed herein; and (iii) the price of the Company's

common stock was artificially inflated as a result of Defendants' conduct.  During the Class

Period, Plaintiffs directly or indirectly relied upon Defendants' public reports, press releases,

filings with the SEC and other public statements, as more fully described below, and that the

Company's common stock was fairly priced and/or upon the integrity of the market for its shares.

As a result, Plaintiffs have been damaged by Defendants' wrongful conduct as specified herein.

18.     Defendant Halliburton Company is a corporation organized under the laws of

Delaware with its principal executive offices located at 3600 Lincoln Plaza, 500 N. Akard Street,

Dallas, Texas.  At all times relevant to this complaint, Halliburton common stock was actively and

openly traded on the NYSE under the symbol "HAL," in a well-developed and efficient market, as that phrase is construed under the federal securities laws. As of March 18, 2002, there were approximately 435,609,780 shares of Halliburton common stock outstanding.

19.     Defendant David J. Lesar ("Lesar") was the Company's executive vice president and the CFO from 1995 until 1997 and became the President of Halliburton in 1997. Effective September 29, 1998, Lesar also became Halliburton's Chief Operating Officer ("COO"). After Cheney left the Company in August 2000, Lesar succeeded Cheney as Chairman and CEO, effective August 16, 2000. In 2001, Lesar received $1.1 million in salary and $2.2 million in bonuses; in 2000, Lesar received $958,333 in salary and $2,012,709 in bonuses; in 1999, Lesar received $823,000 in salary. In 1998, Lesar received $693,255 in salary and $534,955 in bonuses.

20.     Defendant Douglas L. Foshee ("Foshee") has been Halliburton's CFO and executive vice president since August 6, 2001. In 2001, Foshee had a base salary of not less than $500,000.

21.     Defendant Gary V. Morris ("Morris") has been the executive vice president of the Company's Engineering and Construction business since May 1997 and also served as CFO from May 1997 until August 2001, when he was replaced in that position by defendant Foshee. In 2001, Morris received $550,000 in salary and $550,000 in bonuses; in 2000, Morris received $475,008 in salary and $475,008 in bonuses; in 1999, Morris received $450,000 in salary; in 1998 Morris received $337,500 in salary and $225,000 in bonuses.

22.     Defendant Robert Charles Muchmore ("Muchmore") at all relevant times has served as Halliburton's vice president, controller, and principal accounting officer.

23.     Defendants Lesar, Foshee, Morris, and Muchmore are collectively referred to

7

herein as the "Individual Defendants."

24.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false or misleading information conveyed in the Company's public statements in press releases as alleged herein, is the collective action of this narrowly defined group of Defendants. Each of the Individual Defendants, by virtue of his executive and managerial positions with, and directorship of, the Company, directly participated in the daily management of the Company, was directly involved in the day-to-day operations of the Company at the highest level, and was privy to confidential proprietary information concerning the Company and its business and operations. The Individual Defendants were involved or participated in drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein.

25.     The statements made by the Individual Defendants, as outlined below, were materially false and misleading when made. The true business and operating condition of the Company, which was known or recklessly disregarded by the Individual Defendants, remained concealed from the investing public throughout the Class Period. The Individual Defendants, who were under a duty to disclose those facts, instead misrepresented or concealed them during the relevant period herein.

26.     The Individual Defendants, as officers and directors and controlling persons of a publicly-held company, had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, finances, financial conditions, and present and future business prospects, to correct any previously issued statement that had become untrue, and to disclose any business practices that materially affected the Company's operating results and/or its

compliance with applicable industry rules and regulations, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these requirements and obligations.

27.     During the Class Period, the Individual Defendants were privy to confidential and proprietary information concerning Halliburton, its operations, finances, financial condition, and present and future business prospects. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, rendering certain of their public statements, as alleged herein, false and misleading when made.

28.     Each of the Individual Defendants is liable as a direct participant with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their  stock ownership and status as officers and/or directors of Halliburton were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause Halliburton to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of the Halliburton's business, the information contained in its filings with the SEC, and public statements about its business and financial results. Furthermore, the Individual Defendants were provided with copies of the statements and documents alleged herein to be false and misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

## SUBSTANTIVE ALLEGATIONS

9

29.    Halliburton provides a variety of services, products, maintenance, engineering and construction services to energy, industrial and governmental customers.  Prior to the Dresser acquisition, the Company has two business segments, the Energy Services Group and the Engineering and Construction Group:

    (a)    Energy Services Group: this segment provides services and products for the exploration, development and production of oil and gas.  In addition, the Company provides what it calls "integrated solutions" to energy companies, ranging from the initial evaluation of producing formations to drilling, production and well maintenance.

    (b)    Engineering and Construction Group: this segment provides a wide range of engineering and construction services to energy, industrial and governmental customers.  The segment conducts its business in over 100 countries worldwide.

**Announcement of Dresser Acquisition**

30.    On February 26, 1998, Halliburton issued a press release entitled "Halliburton and Dresser Industries Announce $7.7 Billion Stock Merger" announcing that Halliburton and Dresser had entered into a definitive merger agreement unanimously approved by the board of directors of both companies.  Pursuant to the merger agreement, Halliburton issued 175 million new shares of Halliburton's common stock and Dresser's shareholders received one newly issued share for each Dresser common share.  The transaction as of the close of the market on February 25, 1998 was valued at $44.00 per Dresser share, totaling approximately $7.7 billion.  The transaction was accounted for as a pooling of interests.  The resulting company continued to be called Halliburton

10

Company.

31.    Halliburton and Dresser had contemplated a merger for years and ultimately the

deal was put together by Cheney and Bradford during a quail hunt in South Texas on January 17,

1998.

**Halliburton's Due Diligence of Dresser**

32.    With respect to Halliburton's due diligence investigation of Dresser, Donald C.

Vaughn, Dresser's president before the merger, who then became the vice chairman of

Halliburton, stated in an August 11, 2002 <u>Washington Post</u> article that because Cheney and

Bradford were so knowledgeable about each other's companies, the due diligence process was

"easier and shorter" than usual.  "Both companies felt we could accomplish that due diligence in a

very short order," Vaughn said.  In the February 26, 1998 press release announcing the merger,

defendant Lesar, echoed these sentiments and stated, "[w]e know each other's business well and

have agreed on the organizational structure, which will facilitate a quick, smooth integration."

33.    According to a former treasurer employed by Dresser until November 1998

("Treasurer"), from the time the merger was announced in February 1998 until May 1998 all

conversations between Dresser and Halliburton employees had to go through the companies'

lawyers.  In May 1998, Dresser's and Halliburton's executive officers and employees of the

companies' accounting and risk management departments were able to communicate without a

lawyer present.  Most of the due diligence, however, was done at the senior executive level,

which limited what Halliburton could learn about Dresser.

34.    Several other former Dresser and Hallibuton employees confirmed that

Halliburton's due diligence of Dresser was minimal and kept at the senior executive level, which

11

included Cheney and Bradford and defendants Lesar and Morris. These former employees included, among others, a controller of a Dresser subsidiary, Sperry Sons Drilling Services ("Sperry Controller"); a Sperry Sons principal administrative specialist ("Sperry Specialist"); and a former Halliburton senior auditor ("Senior Auditor"). Sperry Controller stated that he was not asked to provide Halliburton with any information about Sperry Sons and that he was told the due diligence was being handled by Bradford and other high level executives. During Sperry Specialist's tenure at Dresser, she had been involved in the due diligence process for four other acquisitions/mergers, but not when Dresser merged with Halliburton. Senior Auditor stated that he was not aware of any due diligence investigation of Dresser by Halliburton, and if there had been one, he and his internal auditor colleagues would have been called upon to take part in such an investigation.

35.    Treasurer was in contact with Halliburton's treasurer during the due diligence process but did not remember a team of Halliburton employees or representatives ever coming to Dresser to have Dresser employees answer questions. At one point before the acquisition, the two companies had a get-to-know-you party for their executives, but it had nothing to do with due diligence. According to Treasurer, the two companies felt they knew each other very well and were more concerned with potential antitrust issues, regulatory approval of the merger, and the logistics of merging the two companies' numerous international operating subsidiaries, than with due diligence.

### Applicable GAAP Provisions and Defendants' Violations Thereof

36.    Statement of Position 81-1, which governs the accounting for long-term construction-type contracts, provides that:

Claims are amounts in excess of the agreed contract price (or amounts not included in the original contract price) that a contractor seeks to collect from customers or others for customer-caused delays, errors in specifications and designs, contract terminations, change orders in dispute or unapproved as to both scope and price, or other causes of unanticipated additional costs. <u>Recognition of amounts of additional contract revenue relating to claims is appropriate only if it is probable that the claim will result in additional contract revenue and if the amount can be reliably estimated.</u>[1]

37.    The Company's undisclosed practice, instituted in the fourth quarter of 1998, of recognizing amounts in excess of the agreed contract price as revenue violated this provision of GAAP and constituted a departure from both the Company's long-standing accounting policies and general industry-wide practice, which is not to record revenue on claims or change orders absent customer approval.

38.    The Company's change of accounting principle and failure to disclose that change also violated the GAAP principles set forth in Opinions of the Accounting Principles Board ("APB") No. 20. APB No. 20 states that an accounting principle should not be changed unless it can be justified that the change results in an accounting treatment that is preferable:

The Board concludes that in the preparation of financial statements there is a presumption that an accounting principle once adopted should not be changed in accounting for events and transactions of a similar type. Consistent use of accounting principles from one accounting period to another enhances the utility of financial statements to users by facilitating analysis and understanding of comparative accounting data.

<u>The presumption that an entity should not change an accounting principle may be overcome only if the enterprise justifies the use of an alternative acceptable accounting principle on the basis that it is preferable.</u>

39.    APB No. 20 further states that the nature and justification for a change in accounting principle should be disclosed in a company's financial statements at the time it is

---

[1] All emphasis herein is added unless otherwise noted.

13

made:

> The nature and justification for a change in accounting principle and its effect on income should be disclosed in the financial statements of the period in which the change is made. <u>The justification for the change should explain clearly why the newly adopted accounting principle is preferable.</u>

APB No. 20 also requires a company making a change in accounting principle to specifically disclose "[t]he effect of adopting the new accounting principle on income."

40.     APB No. 20 defines a change in accounting principle to include not only a change from one generally accepted accounting principle to another, but also a change in the method of applying a particular accounting principle:

> A change in accounting principle results from adoption of a generally accepted <u>accounting principle</u> different from the one used previously for reporting purposes. The term accounting principle includes not only accounting principles and practices but also the methods of applying them.
>
> * * *
>
> Changes in accounting principle are numerous and varied. They include . . . a change in the method of accounting for long-term construction-type contracts . . . . [Emphasis in original.]

41.     A change in an accounting principle is of such material significance to an informed investment decision that the SEC specifically requires a company making such a change to provide a letter from its independent accountants supporting the preferability of the change in the first Form 10-Q filed by the company subsequent to the change. <u>See</u> Rule 10-01(b)(6) of Regulation S-X. At no point during the Class Period did Halliburton file such a letter from its outside accounting firm, Arthur Andersen, LLP, in connection with the Company's undisclosed accounting change.

42.     As set forth below, Halliburton's change in accounting principle was not disclosed or justified in any of the Company's Class Period financial statements nor was the enhancing

14

effect of the change on Halliburton's net income specifically disclosed as specifically required by
GAAP and SEC Rule 10-01(b)(6) of Regulation S-X.  As such, the Company's reported financial
results and financial statements issued at all relevant times during the Class Period were materially
false and misleading when made.

**Pre-Class Period Events and Representations**

43.     On February 26, 1998, Halliburton announced that its board and the board of
Dresser had both unanimously approved a definitive merger agreement whereby Halliburton
would acquire Dresser in a stock-for-stock merger valued at $7.7 billion based on Dresser's share
price of $44.00 as of the close of market on February 25, 1998.  The February 26, 1998 press
release stated that the transaction would be accounted for as a pooling of interests.

44.     On May 18, 1998, Halliburton filed with the SEC its Form S-4 Registration
Statement ("Registration Statement"), which registered 177,752,928 new shares of Halliburton
stock to be issued as part of the acquisition by merger of Dresser.  The Registration statement
also contained a Joint Proxy Statement/Prospectus of Halliburton and Dresser soliciting their
respective shareholders' votes to approve the proposed merger.  The Registration statement was
signed by Cheney and defendants Muchmore and Morris among others.  On May 28, 1998,
Halliburton filed with the SEC its Form 424B3 definitive Joint Proxy Statement/Prospectus
("Proxy/Prospectus"), which served as the definitive Proxy Statement/Prospectus for the
proposed merger.   The Proxy/Prospectus explained that the Dresser acquisition would treated as
a "pooling of interests" for accounting purposes "which avoids the reduction in earnings that
would result from the creation and amortization of goodwill under purchase accounting."

45.     On June 25, 1998, Halliburton issued a press release announcing that the
Company's shareholders had approved, *inter alia,* (1) amendment to Halliburton's restated

certificate of incorporation to increase the authorized number of shares of the Company from 400 million to 600 million shares and (2) issuance of the newly issued Halliburton stock to Dresser shareholders pursuant to the companies' merger agreement.

46.     On September 29, 1998, Halliburton announced the completion of the Dresser acquisition and that it had issued 176 million new shares of its common stock to Dresser shareholders, bringing its total number of outstanding shares to 439 million from 263 million.  The press release stated that Halliburton's new executive committee included Cheney -- CEO; Bradford -- Chairman; defendant Lesar -- president and COO; and Donald C. Vaughn – vice chairman of the board of directors.  Halliburton also reconfigured its business into three business segments:

> The new organizational structure of Halliburton Company will now consist of three business segments. The Energy Services Group business segment will continue to operate with four business units. The Halliburton Energy Services business unit will now include the petroleum services business of Dresser. The Brown & Root Energy Services unit adds all of Dresser's upstream engineering and construction businesses. The Engineering and Construction Group business segment will incorporate Dresser's related units, including M.W. Kellogg, to form the new Kellogg Brown & Root business unit. The Dresser Equipment Group business segment will carry over in its entirety from Dresser to form a new a Halliburton business segment. We now move forward on a fast-track to implement cost savings, develop revenue enhancements and begin new research and development initiatives that will benefit future financial performance of the company.

47.     Commenting on the acquisition, Cheney stated: "The merger is designed to result in long-term benefits for the company's stakeholders - its customers, employees, and shareholders. . . . We expect that net synergistic benefits will add at least $250 million pretax to earnings on an annualized basis," and Bradford stated: "Halliburton's vision is to be the premier global solutions provider for energy services, engineering and construction, and energy equipment. The strategy the company has adopted to achieve this vision is based upon our

commitment to integration - both the internal integration of all business operations, as well as integration of Halliburton's core competencies with those of our customers."

48.      On October 29, 1998, Halliburton issued a press release announcing the Company's financial results for the 1998 third quarter, ended September 30, 1998. The press release made reference to the sagging oil market resulting in lower year over year revenues for the Company's Energy Services Group: "Lower crude oil and natural gas prices during 1998 have reduced customers' cash flows and influenced them to pull back on exploration, development and production spending during the third quarter." The press release also contained remarks from Bradford and Cheney regarding Halliburton's recently completed acquisition of Dresser. Specifically, Cheney stated:

> While market conditions now challenge all petroleum industry participants, I am very optimistic about the outlook for Halliburton in the year ahead and the longer term. The completion of the merger with Dresser is most timely. The merger with Dresser is expected to be accretive to Halliburton's earnings per share. Action plans now being implemented should enable the company to achieve annualized pretax benefits of $250 million by the end of the first year of combined operations. Also, the merger and restructuring will generate additional advantages by strengthening and improving Halliburton's balance sheet, technological base, product/service line offerings and integrated solutions capabilities which will mutually benefit both Halliburton and its customers. Our goal is to continue to build upon these strengths as we go forward.

49.      On November 16, 1998, Halliburton filed with the SEC its Form 10-Q for the third quarter of 1998, which was signed by defendants Muchmore and Morris ("Third Quarter 1998 10-Q"). In the Third Quarter 1998 10-Q, the Company reported total assets of $11.6 billion at September 30, 1998 and an operating loss of $577.5 million. The Third Quarter 1998 10-Q also disclosed that the Company had recorded a special pre-tax charge of $945.1 million to provide for consolidation, restructuring and merger related expenses. The $945 million special charge included $509 million of asset related writeoffs, writedowns and charges. This $509 million

component of the special charge was inadequate and as a result, the Company's reported total assets were overstated and its operating loss was materially understated. Moreover, the Third Quarter 1998 10-Q did not disclose that the Company had changed or was about to change the way in which it accounted for cost overruns on construction contracts.

50.    On January 25, 1999, Halliburton announced its financial results for the quarter and year ended December 31, 1998, reporting $90 million in net income, before special charges, for the fourth quarter of 1998 and $731 million in net income, before special charges, for the full year. This reported net income was well below the reported net income for the fourth quarter of 1997 – $257 million – and the reported net income for full year 1997 – $782 million. Defendants failed to disclose, however, that in the fourth quarter, the Company had changed its accounting for cost overruns on construction contracts in order to boost reported revenues and earnings, and that pursuant to this undisclosed accounting change, Halliburton recognized $89 million in cost overruns as revenue. Prior to the fourth quarter of 1998, Halliburton reported cost overruns as revenue only <u>after</u> a customer agreed to pay such additional charges.

51.    On March 23, 1999, Halliburton filed the 1998 10-K, signed by Cheney and Bradford and defendants Muchmore and Morris. Like the Company's January 25, 1999 press release, the 1998 10-K was materially misleading because it reported financial results for 1998 without disclosing that the Company recognized $89 million in unapproved cost overruns as revenue during the fourth quarter of 1998. Specifically, Defendants reported $514 million of "unbilled work on uncompleted contracts" as receivables, but failed to disclose that this amount included $89 million in cost overruns, or "claims and change orders," which had been immediately recognized as revenue on certain construction contracts. It was not until Defendants filed the Company's Form 10-K for 1999 on March 14, 2000 that they disclosed that "unbilled work on

18

uncompleted contracts" included "claims and change orders" of $89 million at December 31, 1998.

52.     The 1998 10-K was also materially misleading because, unlike the Company's 1997 Form 10-K, it failed to disclose how the Company accounted for cost overruns on construction contracts. The 1998 10-K also failed to disclose that in the fourth quarter of 1998, Defendants changed the way Halliburton accounted for cost overruns on construction contracts. With respect to the Company's revenue recognition practices, the Company's 1997 Form 10-K stated in pertinent part:

> Revenues from construction contracts are reported on the percentage of completion method of accounting using measurements of progress toward completion appropriate for the work performed. All known or anticipated losses on contracts are provided for currently. *Claims for additional compensation are recognized during the period such claims are resolved.*

The highlighted statement was simply removed from the 1998 10-K without explanation. Thus, in violation of GAAP and SEC rules, as described in ¶¶ 36-42, Defendants failed to disclose the Company's change in accounting policy, the effect of this change on net income, the basis for the change, and why the new policy was preferable.

**Defendants Materially False and Misleading Class Period Statements**

53.     On August 13, 1999, Halliburton filed with the SEC its Form 10-Q for the quarter ended June 30, 1999, which was signed by defendants Muchmore and Morris ("1999 Second Quarter 10-Q"). The 1999 Second Quarter 10-Q reported total revenues of $3.67 billion, operating income of $196 million, net income of $83 million for the quarter, and total assets of $10.5 billion. The 1999 Second Quarter 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing fairly presented Halliburton's financial condition and results:

The accompanying unaudited condensed consolidated financial statements <u>were</u> <u>prepared using generally accepted accounting principles for interim financial</u> <u>information and the instructions to Form 10-Q and applicable rules of Regulation</u> <u>S-X</u>. . . .

In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 1999, and the results of our operations for the three and six months ended June 30, 1999 and 1998 and our cash flows for the six months then ended.

54.     These representations were materially false and misleading due to Defendants'

failure to disclose, in violation of GAAP and SEC rules, that in the fourth quarter of 1998, the

Company had changed the way in which it accounted for cost overruns incurred on construction

contracts.  As a result of this change, an undisclosed amount of cost overruns (or claims and

change orders), which the Company's customers had not agreed to pay, were recognized as

revenue in the second quarter of 1999.  Moreover, Defendants materially overstated the

Company's reported assets by failing to properly writedown the value of the assets acquired by

Halliburton in the Dresser acquisition.

55.     On November 15, 1999, Halliburton filed with the SEC its Form 10-Q for the

quarter ended September 30, 1999, which was signed by defendants Muchmore and Morris

("1999 Third Quarter 10-Q").  The 1999 Third Quarter 10-Q reported total revenues of $2.62

billion, operating income of $114 million, net income of $58 million for the quarter, and total

assets of $10.6 billion.  The 1999 Third Quarter 10-Q represented that the financial statements

contained therein were prepared consistently with GAAP requirements for interim financial

reports and that the filing fairly presented Halliburton's financial condition and results:

The accompanying unaudited condensed consolidated financial statements <u>were</u> <u>prepared using generally accepted accounting principles for interim financial</u> <u>information and the instructions to Form 10-Q and applicable rules of Regulation</u> <u>S-X</u>. . . .

In our opinion, the condensed consolidated financial statements present fairly our

financial position as of September 30, 1999, and the results of our operations for
the three and nine months ended September 30, 1999 and 1998 and our cash flows
for the nine months then ended.

56.     These representations were materially false and misleading due to Defendants'

failure to disclose, in violation of GAAP and SEC rules, that in the fourth quarter of 1998, the

Company had changed the way in which it accounted for cost overruns incurred on construction

contracts. As a result of this change, an undisclosed amount of cost overruns (or claims and

change orders), which the Company's customers had not agreed to pay, were recognized as

revenue in the third quarter of 1999. Moreover, Defendants materially overstated the Company's

reported assets by failing to properly writedown the value of the assets acquired by Halliburton in

the Dresser acquisition.

57.     On March 14, 2000, Halliburton filed with the SEC the Company's Form 10-K for

the period ended December 31, 1999, which was signed by Cheney and defendants Morris and

Muchmore ("1999 10-K"). The 1999 10-K reported total revenues of $14.9 billion, operating

income of $650 million, and net income of $438 million for the year. The 1999 10-K disclosed

for the first time: "[C]laims and change orders, included in unbilled receivables [$625 million in

1999 and $515 million in 1998], amounted to $98 million and $89 million at December 31, 1999

and 1998, respectively and are generally expected to be collected in the following year."

58.     The 1999 10-K also disclosed for the first time: "Claims and change orders which

are in the process of being negotiated with customers, for extra work or changes in the scope of

work are included in revenue when collection is deemed probable." These statements were

materially misleading because in violation of GAAP and SEC rules, as described in ¶¶ 36-42,

Defendants failed to disclose that this new revenue recognition policy for cost overruns (or claims

and change orders) had been implemented in the fourth quarter of 1998 and replaced the

21

Company's longstanding prior policy of only recognizing claims for additional compensation during the period such claims were resolved. Defendants' statements in this regard were also materially misleading because they failed to disclose the effect of this accounting change on the Company's reported net income, the basis for the change, and why the new accounting policy was preferable.

59.    The 1999 10-K also reported total assets at the end of 1999 of $10.7 billion, which were materially overstated due to Defendants' failure to writedown the value of the assets acquired by Halliburton in the Dresser acquisition.

60.    On May 15, 2000, Halliburton filed with the SEC its Form 10-Q for the quarter ended March 31, 2000, which was signed by defendants Muchmore and Morris ("2000 First Quarter 10-Q"). The 2000 First Quarter 10-Q reported total revenues of $2.8 billion, operating income of $81 million, net income of $264 million for the quarter, including $237 million in income from discontinued operations, and total assets of $9.5 billion. The 2000 First Quarter 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing fairly presented Halliburton's financial condition and results:

> The accompanying unaudited condensed consolidated financial statements <u>were prepared using generally accepted accounting principles for interim financial information and the instructions to Form 10-Q and applicable rules of Regulation S-X.</u> . . .

> In our opinion, the condensed consolidated financial statements present fairly our financial position as of March 31, 2000, and the results of our operations for the three months ended March 31, 2000 and 1999 and our cash flows for the three months then ended.

61.    These representations were materially false and misleading due to Defendants' failure to disclose, in violation of GAAP and SEC rules, that in the fourth quarter of 1998, the

Company had changed the way in which it accounted for cost overruns incurred on construction

contracts. Moreover, Defendants materially overstated the Company's reported assets by failing

to properly writedown the value of the assets acquired by Halliburton in the Dresser acquisition.

62.     On August 10, 2000, Halliburton filed with the SEC its Form 10-Q for the quarter

ended June 30, 2000, which was signed by defendants Muchmore and Morris ("2000 Second

Quarter 10-Q"). The 2000 Second Quarter 10-Q reported total revenues of $2.9 billion,

operating income of $126 million, net income of $75 million for the quarter, and total assets of

$9.8 billion. The 2000 Second Quarter 10-Q represented that the financial statements contained

therein were prepared consistently with GAAP requirements for interim financial reports and that

the filing fairly presented Halliburton's financial condition and results:

> The accompanying unaudited condensed consolidated financial statements <u>were
> prepared using generally accepted accounting principles for interim financial
> information and the instructions to Form 10-Q and applicable rules of Regulation
> S-X</u>. . . .
>
> In our opinion, the condensed consolidated financial statements present fairly our
> financial position as of June 30, 2000, and the results of our operations for the
> three and six months ended June 30, 2000 and 1999 and our cash flows for the six
> months then ended.

63.     These representations were materially false and misleading due to Defendants'

failure to disclose, in violation of GAAP and SEC rules, that in the fourth quarter of 1998, the

Company had changed the way in which it accounted for cost overruns incurred on construction

contracts. Moreover, Defendants materially overstated the Company's reported assets by failing

to properly writedown the value of the assets acquired by Halliburton in the Dresser acquisition.

64.     On November 9, 2000, Halliburton filed with the SEC its Form 10-Q for the

quarter ended September 30, 2000, which was signed by defendants Muchmore and Morris

("2000 Third Quarter 10-Q"). The 2000 Third Quarter 10-Q reported total revenues of $3

billion, operating income of $248 million, net income of $157 million for the quarter, and total

assets of $9.9 billion. The 2000 Third Quarter 10-Q represented that the financial statements

contained therein were prepared consistently with GAAP requirements for interim financial

reports and that the filing fairly presented Halliburton's financial condition and results:

> The accompanying unaudited condensed consolidated financial statements <u>were</u>
> <u>prepared using generally accepted accounting principles for interim financial</u>
> <u>information and the instructions to Form 10-Q and applicable rules of Regulation</u>
> <u>S-X.</u> . . .
>
> In our opinion, the condensed consolidated financial statements present fairly our
> financial position as of September 30, 2000, and the results of our operations for
> the three and nine months ended September 30, 2000 and 1999 and our cash flows
> for the six months then ended.

65.     These representations were materially false and misleading due to Defendants'

failure to disclose, in violation of GAAP and SEC rules, that in the fourth quarter of 1998, the

Company had changed the way in which it accounted for cost overruns incurred on construction

contracts. Moreover, Defendants materially overstated the Company's reported assets by failing

to properly writedown the value of the assets acquired by Halliburton in the Dresser acquisition..

66.     On March 27, 2001, Halliburton filed with the SEC the Company's Form 10-K for

the period ended December 31, 2000, which was signed by defendants Lesar, Morris, and

Muchmore ("2000 10-K"). The 2000 10-K reported total revenues of $12 billion, operating

income of $462 million, and net income of $501 million for the year, including $313 million in

income from discontinued operations. With respect to the Company's revenue recognition policy

for cost overruns, the 2000 10-K, like the 1999 10-K, stated: "Claims and change orders which

are in the process of being negotiated with customers, for extra work or changes in the scope of

work are included in revenue when collection is deemed probable." The 2000 10-K further

stated: "[C]laims and change orders, included in unbilled receivables, amounted to $113 million

and $98 million at December 31, 2000 and 1999, respectively, and are generally expected to be collected in the following year."

67.    Like the 1999 10-K, the 2000 10-K was materially misleading because in violation of GAAP and SEC rules, as described in ¶¶ 36-42, Defendants failed to disclose that the Company had implemented a <u>new</u> revenue recognition policy for cost overruns (or claims and change orders) in the fourth quarter of 1998, which replaced the Company's longstanding prior policy of only recognizing claims for additional compensation during the period such claims were resolved. Defendants again also failed to disclose the effect of this accounting change on the Company's reported net income, the basis for the change, and why the new accounting policy was preferable.

68.    The 2000 10-K also reported total assets at the end of 2000 of $10.1 billion, which were materially overstated due to Defendants' failure to writedown the value of the assets acquired by Halliburton in the Dresser acquisition.

69.    On May 11, 2001, Halliburton filed with the SEC its Form 10-Q for the quarter ended March 30, 2001, which was signed by defendants Muchmore and Morris ("2001 First Quarter 10-Q"). The 2001 First Quarter 10-Q reported total revenues of $3.1 billion, operating income of $198 million, net income of $109 million for the quarter, and total assets of $10.4 billion. The 2001 First Quarter 10-Q represented that the financial statements contained therein were prepared consistently with GAAP requirements for interim financial reports and that the filing fairly presented Halliburton's financial condition and results:

> The accompanying unaudited condensed consolidated financial statements <u>were prepared using generally accepted accounting principles for interim financial information , the instructions to Form 10-Q and applicable rules of Regulation S-X.</u>. . . .

> In our opinion, the condensed consolidated financial statements present fairly our financial position as of March 31, 2001, the results of our operations for the three months ended March 31, 2001 and 2000 and our cash flows for the three months

then ended.

70.     These representations were materially false and misleading due to Defendants'
failure to disclose, in violation of GAAP and SEC rules, that in the fourth quarter of 1998, the
Company had changed the way in which it accounted for cost overruns incurred on construction
contracts.  Moreover, Defendants materially overstated the Company's reported assets by failing
to properly writedown the value of the assets acquired by Halliburton in the Dresser acquisition..

71.     On August 9, 2001, Halliburton filed with the SEC its Form 10-Q for the quarter
ended June 30, 2001, which was signed by defendants Muchmore and Morris ("2001 Second
Quarter 10-Q").  The 2001 Second Quarter 10-Q reported total revenues of $3.3 billion,
operating income of $272 million, net income of $382 million for the quarter, including $239
million in income from discontinued operations, and total assets of $10.7 billion.  The 2001
Second Quarter 10-Q represented that the financial statements contained therein were prepared
consistently with GAAP requirements for interim financial reports and that the filing fairly
presented Halliburton's financial condition and results:

> The accompanying unaudited condensed consolidated financial statements were
> prepared using generally accepted accounting principles for interim financial
> information , the instructions to Form 10-Q and applicable rules of Regulation S-
> X.. . . .

> In our opinion, the condensed consolidated financial statements present fairly our
> financial position as of June 30, 2001, the results of our operations for the three
> and six months ended June 30, 2001 and 2000 and our cash flows for the six
> months then ended.

72.     These representations were materially false and misleading due to Defendants'
failure to disclose, in violation of GAAP and SEC rules, that in the fourth quarter of 1998, the
Company had changed the way in which it accounted for cost overruns incurred on construction
contracts.  Moreover, Defendants materially overstated the Company's reported assets by failing

to properly writedown the value of the assets acquired by Halliburton in the Dresser acquisition.

73.    On November 8, 2001, Halliburton filed with the SEC its Form 10-Q for the

quarter ended September 30, 2001, which was signed by defendants Muchmore and Foshee

("2001 Third Quarter 10-Q"). The 2001 Third Quarter 10-Q reported total revenues of $3.4

billion, operating income of $342 million, net income of $179 million for the quarter, and total

assets of $10.7 billion. The 2001 Third Quarter 10-Q represented that the financial statements

contained therein were prepared consistently with GAAP requirements for interim financial

reports and that the filing fairly presented Halliburton's financial condition and results:

> The accompanying unaudited condensed consolidated financial statements <u>were</u>
> <u>prepared using generally accepted accounting principles for interim financial</u>
> <u>information , the instructions to Form 10-Q and applicable rules of Regulation S-</u>
> <u>X</u>. . . .
>
> In our opinion, the condensed consolidated financial statements present fairly our
> financial position as of September 30, 2001, the results of our operations for the
> three and nine months ended September 30, 2001 and 2000 and our cash flows for
> the nine months then ended.

74.    These representations were materially false and misleading due to Defendants'

failure to disclose, in violation of GAAP and SEC rules, that in the fourth quarter of 1998, the

Company had changed the way in which it accounted for cost overruns incurred on construction

contracts. Moreover, Defendants materially overstated the Company's reported assets by failing

to properly writedown the value of the assets acquired by Halliburton in the Dresser acquisition.

75.    On March 12, 2002, Halliburton filed with the SEC the Company's Form 10-K for

the period ended December 31, 2001, which was signed by defendants Lesar, Foshee, and

Muchmore ("2001 10-K"). The 2001 10-K reported total revenues of $13 billion, operating

income of $1.1 billion, and net income of $809 million for the year, including $257 million in

income from discontinued operations. With respect to the Company's revenue recognition policy

27

for cost overruns, the 2001 10-K, like the 2000 10-K and 1999 10-K, stated: "Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work are, included in revenue when collection is deemed probable." The 2001 10-K further stated: "The claims and change orders, included in unbilled receivables, amounted to $234 million at December 31, 2001 and $113 million at December 31, 2000." Notably, Defendants removed the statement, whihc had appeared in the Company's two prior Forms 10-K, that claims and change orders included in unbilled receivables, were "generally expected to be collected in the following year." Indeed, from the end of 1998 through the end of 2001, the amount of claims and change orders included in unbilled receivables had grown form $89 million to $234 million.

76.    Like the 1999 10-K and 2000 10-K, the 2001 10-K was materially misleading because in violation of GAAP and SEC rules, as described in ¶¶ 36-42, Defendants failed to disclose that the Company had implemented a new revenue recognition policy for cost overruns (or claims and change orders) in the fourth quarter of 1998, which replaced the Company's longstanding prior policy of only recognizing claims for additional compensation during the period such claims were resolved. Defendants again also failed to disclose the effect of this accounting change on the Company's reported net income, the basis for the change, and why the new accounting policy was preferable.

77.    The 2001 10-K also reported total assets at the end of 2001 of $11 billion, which were materially overstated due to Defendants' failure to writedown the value of the assets acquired by Halliburton in the Dresser acquisition.

78.    On May 8, 2002, Halliburton filed with the SEC its Form 10-Q for the quarter ended March 31, 2002, which was signed by defendants Muchmore and Foshee ("2002 First Quarter 10-Q"). The 2002 First Quarter 10-Q reported total revenues of $3 billion, operating

28

income of $123 million, net income of $22 million for the quarter, and total assets of $10.9 billion.

The 2002 First Quarter 10-Q represented that the financial statements contained therein were

prepared consistently with GAAP requirements for interim financial reports and that the filing

fairly presented Halliburton's financial condition and results:

> The accompanying unaudited condensed consolidated financial statements <u>were</u>
> <u>prepared using generally accepted accounting principles for interim financial</u>
> <u>information , the instructions to Form 10-Q and applicable rules of Regulation S-</u>
> <u>X.</u>. . . .
>
> In our opinion, the condensed consolidated financial statements present fairly our
> financial position as of March 31, 2002, the results of our operations for the three
> months ended March 31, 2002 and 2001 and our cash flows for the three months
> then ended.

79.     These representations were materially false and misleading due to Defendants'

failure to disclose, in violation of GAAP and SEC rules, that in the fourth quarter of 1998, the

Company had changed the way in which it accounted for cost overruns incurred on construction

contracts.  Moreover, Defendants materially overstated the Company's reported assets by failing

to properly writedown the value of the assets acquired by Halliburton in the Dresser acquisition.

**End of Class Period Disclosures**

80.     On May 22, 2002, <u>The New York Times</u> published an article discussing for the

first time the undisclosed accounting change first adopted by Halliburton during the fourth quarter

of 1998.  According to the article, the Company was suffering from large losses on some of its

long-term construction contracts at the time and was under tremendous pressure to boost

revenues as its stock price swooned because of an oil-industry recession.  The article cited

interviews with former executives of Dresser, who stated that the accounting policy was changed

<u>with the specific intention of masking Halliburton's declining results</u>:

> Two former executives of Dresser Industries, which merged with Halliburton in
> 1998, said that they concluded after the merger that Halliburton had instituted

29

aggressive accounting practices to obscure its losses. Much of Halliburton's business comes from big construction projects, like natural gas processing plants, which sometimes ran over budget. With the policy change, Halliburton began to book revenue on the assumption that its customers would pay at least part of the cost overruns, although they remained in dispute. Before 1998, the company had been more conservative, reporting revenue from overruns only after settling with its customers.

\* \* \*

Though resolving such disputes can take months or years, the company decided it was reasonable to recognize at least part of the revenue from the claims even while they remained in dispute, [Company CFO] Foshee said.

\* \* \*

That explanation was disputed by the former Dresser executives who joined Halliburton after the merger. They said . . . that the company made the accounting change to obscure large losses on several important construction contracts.

The New York Times further reported that the accounting change was specifically approved by David Lesar, a former director of Arthur Andersen, LLP (the Company's outside auditor during the Class Period), who was then President and COO of the Company and now serves as the Chairman, CEO and President of the Company. Highlighting the importance of the accounting change for the Company, The New York Times further reported that the change "came at an important moment for Halliburton" which was "eager to win back investors' confidence after its take over of Dresser." Exactly how much of that revenue turned into profits for the Company is not stated in Halliburton's financial reports. But the impact would have been significant had the company taken the alternative route of writing the cost overruns as losses, wiping out more than half of its $175 million in pretax operating profits for the fourth quarter of 1998, when, unknown to the investing public, the accounting change took effect.

81.    Halliburton acted immediately to counter any adverse effect of this article on the Company's stock price by making an upbeat presentation to securities analysts on the same day

regarding the Company's future business prospects. Among other things, the Company told analysts about expected cost savings and efforts to contain the Company's asbestos liabilities. For example, on May 23, 2002, <u>Reuters</u> issued a report quoting UBS Warburg analyst James Stone as stating: "They did a very good job of getting people to focus on the operating side of Halliburton for the first time in six months and what they had to say was well received. I think people are getting more comfortable that the asbestos problem is not intractable, is not going to be a death knell."

82.     On May 28, 2002, the last day of the Class Period, Halliburton issued a press release afer the close of trading announcing that the SEC had begun "a preliminary investigation of the Company's accounting treatment of cost overruns on construction jobs" and that the Company expected to receive a formal request for documents or a subpoena in the next few days. The Company's press release stated, however, that it believed that it has accounted for construction claims and change orders in accordance with GAAP. In reaction to the Company' announcement, the price of Halliburton common stock price decreased by 3.3% to close at $18.72 on May 29, 2002, on extraordinary trading volume of over 13 million shares, many times the Company's average daily trading volume. Thus, Halliburton's common stock price decline by $35.66, or 65%, from its Class Period high of $54.38 reached on September 12, 2000.

**Post-Class Period Disclosure**

83.     On December 19, 2002, Halliburton announced that it was advised by the SEC that the SEC had formalized its investigation of the Company's undisclosed change in accounting for cost overruns on certain engineering and construction jobs.

**Additional Scienter Allegations**

84.     The Individual Defendants, because of their positions with Halliburton, controlled

the contents of the Company's SEC filings, press releases, and presentations and statements made

to securities analysts. The Individual Defendants were provided with copies of the SEC filings

alleged herein to be misleading. As alleged herein, the Individual Defendants acted with scienter

in that they knew or recklessly disregarded that the public documents and statements, issued or

disseminated by or in the name of the Company were materially false and misleading; knew or

recklessly disregarded that such statements or documents would be issued or disseminated to the

investing public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violators of the federal securities laws.

As set forth below, the Individual Defendants -- by virtue of their receipt of information reflecting

the true facts regarding the Company's financial results, revenue recognition practices, and

regulatory compliance, and their control over and/or receipt of the materially false and misleading

statements regarding the Company-- were active and culpable participants in the fraudulent

scheme alleged herein.

85.     At all relevant times, the Individual Defendants had a duty to promptly disseminate

accurate and truthful information with respect to Halliburton's operations, financial condition, and

material Company developments or to cause and direct that such information be disseminated, and

to promptly correct any previously disseminated information that was misleading to the market.

As a result of the Individual Defendants' failure to do so, the price of the Company's common

stock was artificially inflated during the Class Period, damaging Plaintiffs and others who

purchased or otherwise acquired Halliburton common stock on the open market during the Class

Period.

**Insider Trading**

86.     While Defendants had still failed to disclose the Company's material accounting

32

change implemented in the fourth quarter of 1998 and while the price of the Company's stock was artificially inflated as a result thereof, defendants Lesar and Morris each sold a substantial portion of their personally held Halliburton common stock in 2000 for total proceeds of over $1.1 million.

87.    On May 31, 2000, defendant Lesar sold 15,000 Halliburton shares at $50.97 for total proceeds of $764,550. This was not an option related sale. This sale was unusual in amount because it represented approximately 45% of Lesar's total unrestricted Halliburton holdings as of March 20, 2000, not including options exercisable within 60 days of March 23, 2000.[2]

88.    On August 31, 2000, defendant Morris sold 7,500 Halliburton shares at $53.50 for total proceeds of $401,250. This was not an option related sale. This sale was unusual in amount because it represented approximately 45% of Morris's total unrestricted Halliburton holdings as of March 20, 2000, not including options exercisable within 60 days of March 23, 2000.[3]

89.    Other Company insiders, in addition to defendants Lesar and Morris, sold a total of 1,179,987 shares of Halliburton stock for total proceeds of $65.5 million. In sharp contrast to these sales, Company insiders only purchased 1,500 shares of Halliburton stock for a cost of $55,570 during the Class Period. During 1998, no Company insiders sold Halliburton stock.

---

[2] According to Halliburton's Form DEF 14A (Proxy Statement) filed with the SEC on April 3, 2000, as of March 20, 2000, defendant Lesar beneficially owned 432,042 shares of Halliburton common stock, including 233,669 shares of common stock that could have been purchased pursuant to outstanding stock options exercisable within 60 days of March 23, 2000. Thus, Lersar beneficially owned 198,373 shares of Halliburton common stock outright. However, as of December 31, 1999, 165,000 of these 198,373 shares were restricted and could not be sold.

[3] According to Halliburton's Form DEF 14A (Proxy Statement) filed with the SEC on April 3, 2000, as of March 20, 2000, defendant Morris beneficially owned 157,729 shares of Halliburton common stock, including 98,667 shares of common stock that could have been purchased pursuant to outstanding stock options exercisable within 60 days of March 23, 2000. Thus, Morris beneficially owned 59,062 shares of Halliburton common stock outright. However, as of December 31, 1999, 42,400 of these 59,062 shares were restricted and could not be sold.

## CLASS ACTION ALLEGATIONS AND
## THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE

90.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Halliburton common stock on the open market between June 3, 1999 and May 28, 2002, inclusive, and were damaged thereby.

91.     Excluded from the Class are the Defendants and members of their immediate families; the directors and officers of Halliburton and their immediate families; any corporation, firm, partnership, trust or other person affiliated with Defendants; and the legal representatives, agents, heirs, successors-in-interest or assigns of any excluded party.

92.     The members of the Class are so numerous that the joinder of all members is impracticable. As of March 18, 2002, there were approximately 435,609,780 shares of Halliburton common stock outstanding. Halliburton's shares were actively and openly traded on NYSE under the ticker symbol "HAL" during the Class Period. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that the members of the Class number in the thousands.

93.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have sustained damages arising out of Defendants' wrongful conduct in violation of the federal securities laws as detailed herein.

94.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. In that regard, Plaintiffs have retained counsel competent and experienced in class and securities litigation. Moreover, Plaintiffs have no interest that is contrary to or in conflict with those of the Class members that Plaintiffs seek to represent.

95.     Common questions of law and fact exist as to all members of the Class. The

common questions of law and fact include, *inter alia,*

      (a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

      (b)    Whether documents, releases and/or statements disseminated to the investing public and Halliburton's shareholders during the Class Period omitted and/or misrepresented material facts about the Company's business operations and financial results;

      (c)    Whether Defendants participated in and pursued the concerted action or common course of conduct complained of;

      (d)    Whether Defendants knowingly or recklessly made materially false statements or omitted material facts about the business operations and financial results of the Company;

      (e)    Whether the market price of the Company's common stock during the Class Period was artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein;

      (f)    Whether Defendants' misrepresentations and omissions were the cause of the damages suffered by Plaintiffs and the members of the Class;

      (g)    Whether the Individual Defendants "controlled" Halliburton, as that term is used in Section 20(a) of the Exchange Act; and

      (h)    To what extent the members of the Class have sustained damages, and the proper measure of such damages.

96.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for the Class members to individually redress the misconduct alleged by Plaintiffs.

97.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

98.    Plaintiffs and the members of the Class are entitled to the presumption of reliance upon Defendants' fraudulent misrepresentations and omissions that is provided by the fraud on the market doctrine because, at all relevant times, the market for Halliburton common stock was efficient, i.e., the market promptly digested information regarding Halliburton's operations and prospects from all publicly available sources and reflected such information in the price of Halliburton common stock.

99.    The following factors, among others, caused the market for Halliburton common stock to operate efficiently:

(a)    As a regulated issuer, Halliburton filed periodic public reports with the SEC;

(b)    Halliburton's securities volume was substantial during the Class Period;

(c)    Halliburton disseminated information on a market-wide basis through various electronic media services, including issuing press releases through its company website at http://www.halliburton.com and Business Wire; and

(d)    The market price of Halliburton's securities reacted efficiently to new information entering the market.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

100.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this

Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statements was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT I**
**[Against All Defendants For Violation Of Section 10(b) Of The Exchange Act**
**And Rule 10b-5 Promulgated Thereunder]**

101.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

102.    This claim is based upon the provisions of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and relates to the materially false and misleading statements and omissions in the statements and documents referred to herein.

103.    At all relevant times, Defendants knew or recklessly disregarded that the aforesaid acts and practices, materially misleading statements and omissions would adversely affect the integrity of the market for Halliburton common stock and would artificially inflate or maintain the price of such stock.

104.    By reason of the foregoing, Defendants, directly and indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, in that they:

37

     (a)    employed devices, schemes and artifices to defraud;

     (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

     (c)    engaged in acts, practices and a course of business which operated as a fraud or deceit upon Plaintiffs and other members of the Class in connection with their transactions in Halliburton common stock during the Class Period.

105.    As a result of the foregoing, the market price of Halliburton common stock was artificially inflated during the Class Period.  In ignorance of the materially false and misleading nature of the representations described above, Plaintiffs and other members of the Class relied, to their detriment in purchasing Halliburton common stock, upon the aforesaid materially misleading statements described herein and/or the integrity of the market price for Halliburton common stock.

106.    The price of Halliburton common stock declined materially following the public disclosure of the true facts which had been misrepresented or concealed as alleged in this Complaint.  As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs and other members of the Class have suffered substantial damages in connection with their purchases of Halliburton common stock during the Class Period.

### COUNT II
**[Violation of § 20(a) of the Exchange Act**
**Against the Individual Defendants]**

107.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

108.    The Individual Defendants acted as a controlling persons of Halliburton within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's undisclosed accounting change, as described herein, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the content and dissemination of the various statements which Plaintiffs contend are false and materially misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's public statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of statements or cause the statements to be corrected.

109.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular disclosures giving rise to the securities law violations as alleged herein, and exercised the same.

110.    As set forth in Count I, above, the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiffs on their own behalf, and on behalf of the other members of the Class, pray for judgment as follows:

(a)    Declaring this action to be a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Declaring and determining that Defendants violated the federal securities laws by

39

reason of their conduct as alleged herein;

      (c)    Awarding money damages against Defendants in favor of Plaintiffs and the other members of the Class for all losses and injuries suffered as a result of the acts complained of herein, together with pre-judgment interest on all of the aforesaid damages which the Court shall award from the date of said wrongs to the date of judgment herein at a rate the Court shall fix;

      (d)    Awarding Plaintiffs their costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees; and

      (e)    Awarding Plaintiffs such other relief as may be just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated:   April 11, 2003       **FEDERMAN & SHERWOOD**

                By:      _William B. Federman_

                            William Federman, Esq
                            Attorney In Charge
                            SBOT # 00794935
                            120 North Robinson Avenue, Suite 2720
                            Oklahoma City, OK 73102
                            Telephone: (405) 235-1560
                            Facsimile: (405) 239-2112
                             - and -
                            2926 Maple Avenue, Suite 200
                            Dallas, Texas 75201
                            Telephone: (214) 908-1311
                            Facsimile: (214) 740-0112

**THE EMERSON FIRM**
John Emerson, Jr., Esq.
Attorney In Charge
SBOT # 06602600
830 Apollo Lane
Houston, TX 77058
Telephone: (281) 488-8854
Facsimile: (281) 488-8867

**Co-Liaison Counsel for the Class**

**SCHIFFRIN & BARROWAY, LLP**
Richard S. Schiffrin, Esq.
Marc I. Willner, Esq.
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
(610) 667-7706

**Lead Counsel for Plaintiff**

**STULL STULL & BRODY**
Jules Brody, Esq.
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

**SCOTT & SCOTT, LLC**
David Scott, Esq.
P.O. Box 192
108 Norwich Avenue
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432

**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ, LLP**
Gregory Nespole, Esq.
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114

**Members of Plaintiffs' Executive Committee**

41

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 11th day of April, 2003, a true and correct copy of the above and foregoing was sent by U.S. Mail, with postage prepaid thereon, to all persons listed on the attached Service List.

William B. Federman

## SERVICE LIST

Gregory Nespole
Thomas H. Burt
Wolf Haldenstein Adler Freeman
 & Herz, LLC
270 Madison Avenue
New York, NY 10016
(212) 545-4600

Mary Jane Fait
Adam J. Levitt
Wolf Haldenstein Adler Freeman
 & Herz LLC
656 West Randolph Street
Suite 500W
Chicago, IL 60661

Richard A. Lockridge
Karen M. Hanson
Lockridge Grundal Nauen & Holstein
100 Washington Avenue, South
Suite 2200
Minneapolis, MN 55401
(612) 339-6900

Charles J. Piven
Law Offices of Charles J. Piven
World Trade Center - Baltimore
401 E. Pratt St., Suite 2525
Baltimore, MD 21202
(410) 332-0030

Steven G. Schulman
Salvatore J. Graziano
Milberg Weiss Bershad Hynes & Lerach
One Pennsylvania Plaza, 49th Floor
New York NY 10119-0165
(212) 594-5300/Fax (212) 868-1229

Nadeem Faruqi
Faruqi & Faruqi
320 East 39th Street
New York, NY 10016
(212) 983-9330

Thomas E. Bilek
Hoeffner Bilek & Eidman
440 Louisiana, Suite 720
Houston, TX 77002-1634
(713) 227-7720/Fax (713) 227-9404

Robert Schachter
Zwerling Schachter & Zwerling
767 Third Avenue
New York, NY 10017-2023
(212) 223-3900

William B. Federman
Federman & Sherwood
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/Fax (405) 239-2112

Robert J. Dyer, III
Kip B. Shuman
Jeffrey A. Berens
Trig R. Smith
Dyer & Shuman, LLP
801 E. 17th Avenue
Denver, CO 80218
(303) 861-3003/Fax (303) 830-6920

THE NYGAARD LAW FIRM
Diane A. Nygaard
Two Emanuel Cleaver II Blvd.
Suite 150
Kansas City, MO 64112
(816) 531-3100/Fax (816) 531-3600

Brian M. Felgoise
Law Office of Brian M. Felgoise
230 S. Broad Street, Suite 404
Philadelphia, PA 19102
(215) 735-6810 (215) 735-5185

Alfred G. Yates, Jr.
Law Office of Alfred G. Yates
Allegheny Building
429 Forbes Avenue, Suite 519
Pittsburgh, PA 15219
(412) 391-5164/Fax (412) 471-1033

Steven E. Cauley
Scott E. Poynter
Cauley Geller Bowman & Coates
P. O. Box 25438
Little Rock, AR 72221-5438
(501) 312-8500/Fax (501) 312-8505

Paul J. Geller
Cauley Geller Bowman & Coates
One Boca Place
2255 Glades Road, Suite 421A
Boca Raton, FL 33431
(561) 750-3000 (561) 750-3364

Brian Murray
Rabin & Peckel
275 Madison Avenue, 34th Floor
New York, NY 10016
(212) 682-1818/Fax (212) 682-1892

Marc R. Stanley
Roger L. Mandel
Martin D. H. Woodward
Stanley Mandel & Iola
3100 Monticello Avenue, Suite 750
Dallas, TX 75205
(214) 443-4300/Fax (214) 443-0358

Leo W. Desmond
Law Office of Leo W. Desmond
2161 Palm Beach Lakes Blvd., Suite 204
West Palm Beach, FL 33409
(561) 712-8000

Theodore Carl Anderson, III
Kilgore & Kilgore
3131 McKinney Ave.
Suite 700, LBJ 103
Dallas, TX 75204
(214) 969-9099/Fax (214) 953-0133

Stanley M. Grossman
Marc I. Gross
Pomerantz Haudek Block Grossman &
Gross
100 Park Avenue, 26th Floor
New York, NY 10017-5516
(212) 661-1100/Fax (212) 661-8665

Patrick V. Dahlstrom
Pomerantz Haudek Block Grossman &
Gross
One N. LaSalle St., Suite 2225
Chicago, IL 60602-3908
(312) 377-1181

Richard J. Vita
Law Office of Richard J. Vita
77 Franklin St., Suite 300
Boston, MA 02110
(617) 426-6566

Andrew L. Barroway
Stuart L. Berman
Darren J. Check
Schiffrin & Barroway
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
(610) 667-7706/Fax (610) 667-7056

John Emerson, Jr.
The Emerson Law Firm
830 Apollo Lane
Houston, TX 77058
(281) 488-8854/Fax (281) 488-8867

Donald E. Godwin, G. Michael Gruber
Brian N. Hail, Michael K. Hurst
Godwin Gruber
1201 Elm Street, Suite 1700
Dallas, TX 75270-2084
(214) 939-4400/Fax (214) 760-7332

Richard J. Zook
Cunningham Darlow
600 Travis, Suite 1700
Houston, TX 77002
(713) 659-5522/Fax (713) 659-4466

David R. Scott
Scott & Scott, LLC
P. O. Box 192
Colchester, CT 06415
(860) 537-5537/Fax (860) 537-4432

Corey D. Holzer
Holzer Holzer & Cannon, LLC
1117 Permeter Center West
Suite E-107
Atlanta, GA 30338
(770) 392-0090/Fax (770) 302-0029

Marc S. Henzel
Law Offices of Marc S. Henzel
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
(610) 660-8000/Fax (610) 660-8080

Paul J. Scarlato
Weinstein Kitchenoff Scarlato & Goldman
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
(215) 545-7200/Fax 215) 545-6535

Michael D. Donovan
Donovan Searles, LLC
1845 Walnut Street, Suite 1000
Philadelphia, PA 19103
(215) 732-6067/Fax (215) 732-8060

John H. Mathias, Jr.
David Michael Kroeger
John P. Wolfsmith
Jenner & Block
One IBM Plaza, Suite 4400
Chicago, IL 60611
(312) 222-9350

Ronald Stevens
Kirkpatrick & Lockhart
10100 Santa Monica Boulevard
Seventh Floor
Los Angeles, CA  90067
(310) 552-5000/Fax (310) 552-5001

Lindsey C. Cummings
Lea F. Courington
Gwinn & Roby
4100 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
(214) 698-4100/Fax (214) 747-2904

Timothy R. McCormick
Thompson & Knight, LLP
1700 Pacific Avenue, Suite 3300
Dallas, TX 75201
(214) 969-1700/Fax (214) 969-1751

Scott B. Schreiber
Ronald A. Schechter
Elissa J. Preheim
Arnold & Porter
555 Twelfth Street, NW
Washington, D.C. 20004-1206
(202) 952-5000/Fax (202) 942-5999

Robert Edwin Davis
Hughes & Luce, LLP
1717 Main Street, Suite 2800
Dallas, TX 75201
(214) 939-5500/Fax (214) 939-5849

Jules Brody
Stull Stull & Brody
6 East 45th Street
New York, NY 10017
(212) 687-7230/Fax (212) 490-2022