

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RICHARD MOORE, et al. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.: 02-CV-1152-N |
| | : | THIS DOCUMENT RELATES TO: |
| HALLIBURTON COMPANY, et al. | : | All Actions |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**AMS FUND'S MOTION FOR ORDER TO SHOW CAUSE**

Private Asset Management respectfully submits this memorandum of law in opposition to the AMS Fund's Motion for Order to Show Cause ("AMS Fund's Motion").

## I.  **INTRODUCTION**

Despite having all traditional remedies available to it as a class plaintiff which does not support a proposed settlement, the Archdiocese of Milwaukee Supporting Fund, Inc. ("AMS Fund") instead seeks the extraordinary relief of having the Court replace Schiffrin & Barroway, LLP with its counsel, Scott + Scott, LLC, as lead counsel. Such a drastic remedy, under the circumstances of this action, is both inappropriate and baseless.[1] As a result, the AMS Fund's Motion should be denied.

In this action, the terms of a proposed settlement have been memorialized in a Memorandum Of Understanding ("MOU") , which was discussed at length by all of the lead plaintiffs and ultimately approved by three of the four lead plaintiffs and their counsel. AMS Fund, the lone dissenter, now attempts to color its apparent dissatisfaction with the proposed settlement as a basis to ask that the Court displace lead counsel. If AMS Fund truly believes that the proposed settlement of this action is unfair, unreasonable or inadequate, the appropriate remedy is to object to the settlement. The relief it requests, however, is extraordinary under the circumstances and requires materially strong evidence that lead counsel has failed in its responsibilities in representing the class. No such evidence exists in this matter.

The duty owed by lead counsel in a class action is to the entire class and is "not dependent on the special desires of the named plaintiffs." *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir.

---

[1]     Similarly, there is no basis for the suggestion that Private Asset Management, the Court-appointed lead plaintiff with the single largest financial interest in this litigation, be removed as one of the lead plaintiffs.

1

1982). Similarly, lead counsel's duty to the class as a whole frequently will diverge from the opinion taken by a representative plaintiff. *Maywalt v. Parker*, 155 F.R.D. 494, 496 (S.D.N.Y. 1994) ("*Maywalt I*") aff'd, *Maywalt v. Parker*, 67 F.3d 1072, 1076 (2nd Cir. 1995) ("*Maywalt II*") (no abuse of discretion by district court); *see also Kincade v. General Tire and Rubber Co.*, 635 F.2d 501, 508 (5th Cir. 1981). As demonstrated herein, there is no factual basis to support an argument that lead counsel in this action has been motivated by anything other than maximizing the best interests of the class.

Because AMS Fund's Motion finds no support from the underlying facts, all applicable case law, and the three other Court-appointed lead plaintiffs, it should be denied.

## II.    BACKGROUND

On December 5, 2002, the Court approved plaintiffs' Joint Stipulation and [proposed] Pretrial Order No. 1 ("Pretrial Order No. 1"), which consolidated all related actions, appointed as lead plaintiffs Private Asset Management ("PAM"),[2] the Archdiocese of Milwaukee Supporting Fund, Inc. ("AMS Fund"), Gabriel T. Forrest ("Forrest") and Paul J. Benec ("Benec") (collectively, "Lead Plaintiffs"), and approved Lead Plaintiffs' selection of Schiffrin & Barroway, LLP ("S&B" or "Lead Counsel") as lead counsel and an executive committee comprised of three additional law firms (including the law firm of Scott + Scott) ("Executive Committee"). Pretrial Order No. 1 provided that:

> Lead Counsel in the Consolidated Action shall have authority over the following matters on behalf of all plaintiffs in those respective actions: (a) convening meetings of counsel; (b) initiation, response, scheduling, briefing, and argument of

---

[2]      PAM suffered financial losses in excess of $800,000 from defendants' alleged fraud, representing the largest financial interest (of all Lead Plaintiffs) in the relief sought in this litigation.

2

all motions; (c) the scope, order, and conduct of all discovery proceedings; (d) assigning such work assignments to other counsel as they may deem appropriate; (e) the retention of experts; (f) designation of which attorneys may appear at hearings and conferences with the Court; (g) **the timing and substance of any settlement negotiations** with defendants; and (h) other matters concerning the prosecution of or resolution of their respective cases.

Pretrial Order No. 1 at ¶15 (emphasis added). Pretrial Order No. 1 permitted for the filing of a

consolidated class action complaint ("First Amended Complaint") within 60 days of Pretrial Order

No. 1 (unless extended by parties' agreement and approved by the Court). *Id.* at ¶22.

Upon its being approved as lead counsel, S&B retained a nationally prominent

investigative firm to thoroughly investigate the facts and circumstances of the undisclosed

accounting change allegedly implemented by Halliburton Company ("Halliburton") in the fourth

quarter of 1998. Declaration of Marc I. Willner In Support Of Memorandum Of Law In

Opposition To AMS Fund's Motion For An Order To Show Cause ("Willner Declaration") at ¶5,

attached as Exhibit A to Declaration of John C. Sherwood In Support Of Memorandum Of Law

In Opposition To AMS Fund's Motion For Order To Show Cause ("Sherwood Declaration").

Also addressed in this investigation was the circumstances surrounding Halliburton's acquisition

of Dresser Industries, Inc. ("Dresser") in September of 1998. Willner Declaration at ¶5. In

connection therewith, the investigators located and spoke with potential witnesses with

knowledge of the pertinent facts and prepared three written reports detailing the progress of the

investigation. *Id.* at ¶5. Also, in preparation of the First Amended Complaint, S&B consulted

with a damages expert with substantial experience in assessing damages in securities fraud class

actions similar to the present action. *Id.* at ¶4. This consultant provided an assessment of

damages with respect to the alleged false and misleading statements made by, and on behalf of,

3

Halliburton. *Id.* at ¶4.

During the approximate four-month time period in which S&B, in its position as Lead Counsel, was actively investigating the facts, speaking with consultants, and drafting the First Amended Complaint, no member of Scott + Scott ever offered to assist in the prosecution of this litigation. *Id.* at ¶¶8, 10, 14, 18, 19.

On January 28, 2003, Lead Counsel moved for an extension of time in which to file the First Amended Complaint. *Id.* at ¶6. Lead Counsel filed a motion (rather than an agreed-upon stipulation) because defendants mistakenly believed plaintiffs were seeking a three-month extension, rather than the requested three weeks. *Id.* at ¶¶6, 9. Accordingly, this motion was styled as "opposed." *See* Lead Plaintiffs' Opposed Motion for Extension of Time to File Consolidated Amended Complaint ("Opposed Motion"); Willner Declaration at ¶7. Then, after recognizing the misunderstanding, on January 29, 2003, the parties supplemented the Opposed Motion by filing a notice alerting the Court that plaintiffs' request for an extension was no longer opposed. *See* Lead Plaintiffs' Supplement To Lead Plaintiffs' Opposed Motion For Extension Of Time To File Consolidated Amended Complaint ("Supplement To Opposed Motion"). Willner Declaration at ¶9. On January 31, 2003, the Court granted plaintiffs' request, and permitted plaintiffs to file the First Amended Complaint by February 25, 2003. Willner Declaration at ¶11.

Scott + Scott clearly had knowledge of plaintiffs' Opposed Motion seeking more time to complete their investigation. AMS Fund's Motion at p.3. Nevertheless, Scott + Scott maintained its silence and did not attempt to offer any assistance. Willner Declaration at ¶¶8, 10.

On February 20, 2003, consistent with Pretrial Order No. 1, the parties filed a stipulation which sought Court approval for a further extension until April 11, 2003, to file the First

4

Amended Complaint. *See* Joint Stipulation Extending Time To File Consolidated Amended Complaint ("Joint Stipulation"); Willner Declaration at ¶13. The Joint Stipulation did not offer a reason for the additional extension. However, by this time, the parties had begun exploring the prospects for the parameters of a resolution of the action, and they believed this extension was appropriate "to avoid duplication and inefficiency in the filing, serving and/or implementation of pleadings." Pretrial Order No. 1 at ¶18 (discussing responsibility of Lead Counsel to coordinate activities); Willner Declaration at ¶12. On February 28, 2003, the Court granted the Joint Stipulation and permitted plaintiffs to file the First Amended Complaint by April 11, 2003, but indicated that no further extensions would be granted. *See* Order Granting Joint Stipulation.

Once again, Scott + Scott has acknowledged that it was aware of the Joint Stipulation (AMS Fund's Motion at p.4), yet made no effort to engage in this important process. Willner Declaration at ¶14. Indeed, at no point during plaintiffs' investigation did Scott + Scott ever make any attempt or request to handle even a single task associated with preparing the First Amended Complaint. *Id.* at ¶¶8, 10, 14, 18, 19.

During March and April 2003, Lead Counsel, with the knowledge and consent of PAM, participated in several meaningful settlement discussions with counsel for Defendants whereupon financial terms of a potential resolution were reached, subject to approval by the parties and confirmatory discovery.[3] *Id.* at ¶15. On or about April 9, 2003, Richard S. Schiffrin of S&B discussed this preliminary agreement with members of the Executive Committee. *Id.* at ¶16.

---

[3]        Around this time period, Lead Counsel met with attorneys for Vice President Cheney to discuss the Vice President's liability, if any, with respect to defendants' alleged wrongdoing. Lead Counsel acknowledges only that these discussions were conducted at a time when this country was focused on its war efforts against Iraq.

On April 11, 2003, in compliance with the time permitted by the Court, plaintiffs filed the First Amended Complaint. *Id.* Shortly thereafter, Lead Counsel communicated to the Executive Committee its intention to seek leave to file a second consolidated amended complaint ("Second Amended Complaint") to further detail certain allegations. *Id.* at ¶17. On April 30, 2003, Lead Counsel circulated a draft Second Amended Complaint to the Executive Committee for comment.[4] *Id.* A second draft of the proposed Second Amended Complaint was sent via FedEx on May 5, 2003, to Scott + Scott shareholder, Neil Rothstein ("Mr. Rothstein"). *Id.* at ¶19. Once again, Scott + Scott offered no comments. *Id.*

On May 5, 2003, Lead Counsel circulated to the Executive Committee a first draft of an MOU which detailed the terms of the proposed settlement. *Id.* Scott + Scott offered no comments or objections to this MOU. *Id.*

The week of May 12, 2003, Lead Counsel spoke with Mr. Rothstein about the case, including a discussion about settlement. *Id.* Mr. Rothstein seemed overwhelmed by the discussion of the facts and asked that Lead Counsel speak instead with his associate, Michael Swick ("Mr. Swick"). *Id.* Lead Counsel discussed with Mr. Swick in detail all aspects of the case, including settlement negotiation strategy and opinions on settlement. *Id.* Mr. Swick explained that he understood Lead Counsel's recitations of the facts and the reasons for entertaining a potential settlement, and that he would discuss the matter with Mr. Rothstein. *Id.*

A few days later, on May 16, 2003, Lead Counsel circulated to the Executive Committee a second draft of a MOU. *Id.* Again, Scott + Scott failed to offer any comments or objections to

---

[4]     Unless otherwise noted, documents circulated by Lead Counsel to Scott + Scott were directed to David Scott, Scott + Scott's managing principal and shareholder.

this version of the MOU. *Id.*

On May 19, 2003, Lead Counsel spoke with Messrs. Rothstein and Swick at Scott + Scott regarding Lead Counsel's investigation of the claims, the substance of the draft Second Amended Complaint, and the reasons why S&B believed the proposed settlement was fair, reasonable and adequate. *Id.* Mr. Rothstein (of Scott + Scott) indicated that he was still reviewing the drafts of the Second Amended Complaint and MOU and that he had yet to determine his client's position on the proposed settlement. *Id.*

On May 23, 2003, there was a conference call between Lead Counsel and all members of the Executive Committee during which the settlement terms were discussed in great detail.[5] *Id.* at ¶20. During this call, Mr. Rothstein represented that he was still reviewing the draft documents. *Id.* Mr. Rothstein was not able to articulate any reason why he believed the settlement was not fair, reasonable, and adequate, but he did raise the fact that he objected to Lead Counsel, on behalf of the Lead Plaintiffs, having agreed to the settlement terms without his prior consent. *Id.* On May 28, 2003, Lead Counsel spoke again with Mr. Rothstein regarding the MOU. *Id.* at ¶21. Lead Counsel reiterated that the proposed MOU specifically directs that parties will engage in reasonable confirmatory discovery to afford plaintiffs an opportunity to evaluate the merits of their claims, as well as defendants' responses to those claims. *Id.* Lead Counsel also explained that the MOU specifically states that plaintiffs will have the right, after completion of discovery,

---

[5]     Scott + Scott misrepresents much of what was discussed during this call. For example, Scott + Scott references a purported admission by Lead Counsel that there was a verbal agreement with defense counsel in January 2003 to "stall the case until it could be settled quickly." AMS Fund's Motion at p.6. This erroneous assertion by Scott + Scott is factually inaccurate and makes no sense considering that defendants opposed plaintiffs' request (made on January 29, 2003) for an extension of time to file the First Amended Complaint, a fact which is highlighted by Scott + Scott in AMS Fund's Motion. *See* AMS Fund's Motion at pp.4-5.

7

to terminate the settlement if the discovery reveals that the settlement is not fair, reasonable, and adequate. *Id.*

Despite these ample protections, Mr. Rothstein refused to commit to signing the MOU. The following day there was another conference call between Lead Counsel and all members of the Executive Committee. *Id.* During this call, Scott + Scott was asked to explain why its client AMS Fund could not support the settlement. *Id.* Once again, other than complaining about the process, Scott + Scott could not articulate a single substantive reason why the proposed settlement was not fair, reasonable and adequate. *Id.* As a result, the other three Lead Plaintiffs (and their respective counsel) all agreed to execute the MOU, while Scott + Scott declined, on behalf of AMS Fund. *Id.* at ¶¶21-22.

On June 2, 2003, plaintiffs filed an Unopposed Motion for Leave to Amend the Consolidated Amended Class Action Complaint ("Unopposed Motion For Leave") and attached the proposed Second Amended Complaint. *Id.* at ¶23. Both the Unopposed Motion For Leave and the proposed Second Amended Complaint inadvertently included AMS Fund and its counsel Scott + Scott. *Id.* On June 16, 2003, Plaintiffs filed their Amended Unopposed Motion for Leave to Amend Consolidated Amended Class Action Complaint ("Amended Unopposed Motion For Leave") which, as requested, removed AMS Fund and Scott + Scott from the motion and the Second Amended Complaint. *Id.* at ¶25.

## III.   ARGUMENT

Apparently dissatisfied with the terms of the proposed settlement, Scott + Scott asks for extraordinary relief – that, without the support of three of the four Court-appointed Lead Plaintiffs in this action, the Court should substitute Scott + Scott for S&B as lead counsel. While

8

S&B was actively litigating this action, Scott + Scott sat idly on the sideline without even a hint of an offer to assist with the investigation, speak with consultants, or draft even a part of the First Amended Complaint. Willner Declaration at ¶¶9, 11, 15, 19, 20. Although Scott + Scott asserts that it is only Lead Counsel's responsibility to engage all members of the Executive Committee, keeping involved is, and always has been, a two-way street. As evidenced from the background of AMS Fund's Motion, and in direct contradiction to representations made therein, Scott + Scott was fully informed of all relevant developments, and yet failed to assert itself in any aspect of the litigation, until now. *Id.* at ¶¶9, 11, 15, 19, 20. For example, it is clear that, although Scott + Scott was aware that several requests for extensions of time were made, not once did any member of Scott + Scott even attempt to ascertain the progress of plaintiffs' investigation and preparation of the complaint. *Id.* ¶¶9, 11, 15. Now, Scott + Scott asks that the Court reward it for its own impassivity.[6]

In *Maywalt I*, one of only a few cases in which a court was ever asked to consider the extraordinary remedy of discharging a lead counsel in this context, an application was made by four of the five representative plaintiffs to displace lead counsel for failing to adequately communicate the parameters of a proposed settlement. By the time that the objecting representative plaintiffs alleged that they learned about the proposed settlement, it had already

---

[6]     Showing its true colors, Scott + Scott has already attempted to parlay the instant motion as a rationale for having another court appoint as lead counsel Scott + Scott over S&B. In that action, Scott + Scott has argued against S&B's adequacy as counsel, despite the fact that S&B's client has the greatest financial interest in that action. In this regard, Scott + Scott has argued that S&B "settled the [Halliburton] case for $6 million even though the Class suffered, according to some estimates, $6.875 billion in damages and certainly no less than hundreds of millions of dollars in damages." As explained above, the proposed settlement remains subject to confirmatory discovery and, of course, Court approval.

been preliminarily approved by the court and notice had already been published. *Maywalt I* at

495. Despite these facts, the *Maywalt I* court concluded that:

> [t]he heart of this application stems from the perceived inadequacy of
> communication between Class Counsel and the Moving Representative Plaintiffs,
> an event which is perhaps unbecoming, but based on the submissions here, **does
> not constitute a level of impropriety necessitating the drastic remedy of a
> Court ordered discharge of Class Counsel**. In the absence of concretely alleged
> acts of impropriety by the duly certified Class Counsel, or a showing abridgment of
> a significant minority of the Class' rights, this Court will not grant the hasty
> application of the Moving Representative Plaintiffs to replace Class Counsel . . . .

*Maywalt I* at 497 (emphasis added). The facts here pale in comparison to those of *Maywalt I*.

After discussing at length the proposed settlement of this action, three of the four Lead Plaintiffs

executed the MOU before taking any confirmatory discovery and before presenting the settlement

to the Court.

"The compelling obligation of class counsel in class action litigation is to the group which

makes up the class." *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982). As such, the duty

owed to a client in a class case is different from that in a case in which only one or a few are being

represented. *Id.* Further, "[b]ecause the 'client' in a class action consists of numerous unnamed

class members as well as the class representatives, and because '[t]he class itself often speaks in

several voices . . . , it may be impossible for the class attorney to do more than act in what he

believes to be the best interests of the class as a whole . . . .'" *Kincade* at 508 (quoting *Pettway

v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1216 (5th Cir. 1978)). *See also Walsh v. Great

Atl. & Pac. Tea Co.*, 726 F.2d 956, 964 (3d Cir. 1983) (class counsel are forced to make

determinations which they believe are in the best interests of the class as a whole). This unique

relationship between attorney and client in a class action renders the citations relied upon by Scott

10

+ Scott, to support the proposition that an attorney cannot settle his individual client's case without that client's authorization, inapplicable. *Kincade* at 508. *See also Parker* at 1211 ("The duty owed to the client sharply distinguishes litigation on behalf of one or more individuals and litigation on behalf of a class. . . . The prevailing principles in that [non-class litigation] situation cannot be imported wholesale into a class action setting.") The reason, quite simply, is that "named plaintiffs should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual demands." *Parker* at 1211.

Here, there is no evidence that Lead Counsel has been motivated by anything, other than trying to maximize the "best interests of the class," including its negotiation of a potential settlement. Notably, three of the four Lead Plaintiffs (and their respective counsel) have signed the MOU which details this potential settlement. Because "the assent of named plaintiffs is not a prerequisite to the approval of a settlement" (*Kincade* at 508), Scott + Scott's client's apparent dissatisfaction with the proposed terms of resolution provides no basis to displace Lead Counsel.

Furthermore, because of the unique nature of a class action settlement, plaintiffs traditionally reserve judgment on the settlement until they have had an opportunity to fully assess the merits of their case in confirmatory discovery. Here, three of the four Lead Plaintiffs, having analyzed the strengths and weaknesses of the case to date, have signed the MOU, and now embark on taking discovery on the merits to confirm the sufficiency of the settlement. If, after taking discovery, Lead Plaintiffs are sufficiently satisfied that the settlement as contemplated by the MOU is fair, reasonable and adequate, then, and only then, will they move the Court for preliminary approval of the settlement. *See Parker* at 1212 (court affirmed that "lead counsel

11

behaved appropriately in negotiating the tentative settlement as spokesman for the class, immediately advising the named plaintiffs and associate counsel of its terms by letter, and ascertaining the named plaintiffs' reaction to the settlement before presenting it to the court") (citation omitted).

Scott + Scott's client has several remedies available if it is displeased with the proposed settlement: (1) it may conclude that the settlement is indeed appropriate after taking discovery on the merits and file a claim to participate in the recovery; (2) it could object to the proposed settlement, presuming it is presented to the Court; (3) it could conclude, after taking confirmatory discovery, that the settlement is not adequate and seek to convince the remaining Lead Plaintiffs not to present the settlement for approval to the Court, if the remaining Lead Plaintiffs are still inclined to do so; or (4) it could decide to opt out of the class altogether and bring its own action against defendants.[7] As such, it is empirically inappropriate for a class plaintiff to ask for the extraordinary relief of displacing lead counsel on the basis that a settlement, which has yet to be confirmed by plaintiffs or presented to the Court, is alleged to be inadequate.[8]

---

[7]       In rejecting the application to discharge class counsel, an extreme remedy by any measure, the *Maywalt I* court properly recognized that the moving plaintiffs retained the remedy of objecting to the proposed settlement. *Maywalt I* at 497.

[8]       Indeed, "an attorney who secures and submits a fair and adequate settlement has represented the client class fairly and adequately." *Parker* at 1211.

12

## III.   CONCLUSION

Having failed to demonstrate facts sufficient to warrant the extraordinary relief requested,

PAM respectfully requests that the AMS Fund's Motion should be denied in all respects.


Dated:   July 3, 2003                          **FEDERMAN & SHERWOOD**

                          By:  _William B. Lederman w/permission dc_
                               William Federman, Esq
                               Attorney In Charge
                               SBOT # 00794935
                               John C. Sherwood
                               Attorney In Charge
                               SBOT # 18254700
                               2926 Maple Avenue, Suite 200
                               Dallas, Texas 75201
                               Telephone: (214) 696-1100
                               Facsimile: (214) 740-0112
                               -and-
                               120 North Robinson Avenue, Suite 2720
                               Oklahoma City, OK 73102
                               Telephone: (405) 235-1560
                               Facsimile: (405) 239-2112

                               **EMERSON POYNTER, LLP**
                               John Emerson, Jr., Esq.
                               Attorney In Charge
                               SBOT # 06602600
                               830 Apollo Lane
                               Houston, TX 77058
                               Telephone: (281) 488-8854
                               Facsimile: (281) 488-8867

                               **Co-Liaison Counsel for the Class**

                               **SCHIFFRIN & BARROWAY, LLP**
                               Richard S. Schiffrin, Esq.
                               Stuart L. Berman, Esq.

13

Marc I. Willner, Esq.
Sean M. Handler, Esq.
Darren J. Check, Esq.
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
(610) 667-7706

**Lead Counsel for the Class**

14