

ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RICHARD MOORE, et al., | § | |
| | § | Civil Action No. 02-CV-1152-N |
| Plaintiffs, | § | |
| | § | |
| | § | |
| vs. | § | THIS DOCUMENT RELATES TO: |
| | § | All Actions |
| HALLIBURTON COMPANY, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| JACK FRIEDBERG, | § | Case No. 3:03-CV-0537-N |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| DAVID J. LESAR, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
MAY 2 4 2004
CLERK, U.S. DISTRICT COURT
By _____
Deputy

**LEAD PLAINTIFF AMS FUND, INC., AND PLAINTIFF JOHN
KIMBLE'S OPPOSITION TO MOTION FOR PRELIMINARY SETTLEMENT
SUBMISSION**

## I.    INTRODUCTION

Specific principles govern the administration of class-action litigation. Foremost is the Court's overriding duty to "act[] as a fiduciary who must serve as guardian of the rights of absent class members ...." *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.1975); *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983); *Piambino v. Bailey*, 610 F.2d 1306 (5th Cir.1980). As a Court-appointed Lead Plaintiff, the AMS Fund, Inc., likewise is a class fiduciary, duty bound to advocate in the class's best interests. *See Cohen v. Beneficial Industries Loan Corp.*, 337 U.S. 541, 549-50, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) ("A lead plaintiff owes a fiduciary duty to the class.").

Here, while its proponents inexplicably waited almost a full year before presenting it to the Court – and then only at the Court's prodding – where a wholly suspect settlement is presented for preliminary approval, it is incumbent on the Court to carefully evaluate the proposed settlement's obvious deficiencies now and intervene before a significant percentage of the present so-called "recovery" is depleted further by expenses – likely close to or exceeding $750,000 – for class notice. To avoid significant due process and other violations, the Court should bypass Lead Counsel's submission and proceed to test the adequacy of the class's claims through the motion to dismiss process. "The shambles left by failed class action settlements would be created in fewer cases" if the Court and class-action plaintiffs carefully tested proposed settlements at the outset of the preliminary-approval stage.[1] *See Romstadt v. Apple Computer, Inc.*, 948 F. Supp. 701, 710 n.

---

[1]    One court astutely observes:

> [T]o allow participation of other class action plaintiffs at the outset [*i.e.*, at the preliminary-approval stage] would likely have some benefits beyond providing due process. Well-taken challenges to proposed settlements would become known, as would the judge's acceptance of such challenges, before the expense and delay of class notice had been undertaken. The shambles left by failed class action settlements would be created in fewer cases. The primacy of the judge's role over all phases of and aspects of a class action proceeding would be assured. ***The risk of collusion would be reduced, as would the risk ... that potential allies would become adversaries, thereby benefiting the defendant whose conduct each is challenging***. Settlement orders ... would probably enjoy a greater measure of protection against appeal ***if due process were afforded at each step – and not just the last step – along the way***.

*Romstadt*, 948 F. Supp. at 710 n. 12.

12 (N.D. Ohio 1996). Indeed, class notice and its attendant expenses become simply "futile gestures" where settlement terms are unacceptable at the outset. *See* A. Conte & H.B. Newberg, 4 *Newberg on Class Actions*, §11:25 (4ᵗʰ ed).

Setting aside significant matters going to the substantive and procedural inadequacies of the present proposed settlement – which matters will be addressed in earnest by the AMS Fund on the class's behalf at or prior to any final approval hearing should the present settlement proceed to that point – no less than three factors require rejection of preliminary approval now under these circumstances. First, because it is Lead Counsel's admitted failure or inability to state a claim through a sustainable complaint that led to the proposed settlement, the sufficiency of the Kimble allegations – which are resplendent with detail and particularized facts corroborating the class's claims – should be properly and fully tested prior to preliminary approval. Next, the proposed settlement is of doubtful fairness and suffers from obvious deficiencies, including significant preferential treatment for the common-stock-purchaser segment of the class, completely excluding other represented securities purchasers, including, *e.g.*, damaged options purchasers.[2] Finally, the present proffered notice is deficient in that it fails to fully and fairly inform the class of all factors necessary for them to make an informed decision as to the strength of their claims and the adequacy of the present proposed settlement in addressing them.

Accordingly, Lead Counsel AMS Fund and plaintiff John Kimble respectfully request that the Court deny the proffered preliminary-settlement-approval motion.[3]

## II. ARGUMENT

### a. The Kimble Allegations Facilitate The Court's Assessment Of The Proposed Settlement And Should Be Tested Prior To Preliminary Approval And Notice

---

[2] The Kimble complaint adequate addresses the claims of all securities holders as identified in its Class Action Allegations.

[3] Further reasons why preliminary approval should be denied, as well as the pertinent background, are also set forth in Lead Plaintiff AMS Fund, Inc., and Plaintiff John Kimble's February 27, 2004 Opposition to Motion to Stay Actions Pending Settlement Hearing, as well as the papers submitted by the AMS Fund in conjunction with its show-cause motion and the transcript of the show-cause hearing, which arguments and facts are incorporated herein by specific reference.

It is the sufficiency and strength of the class's claims, as set forth in exhaustive and particularized facts in the Kimble complaint, which best illustrate the obvious deficiencies of both the present proposed settlement's terms, as well as the manner in which it was reached. Lead Counsel admits that their inability to state a claim against the defendants was central to their willingness to enter into the proposed settlement. *See* August 25, 2003 Hearing Transcript at p. 25 ("The last thing I [Richard Schiffrin] wanted in this case was for the court to rule on a motion to dismiss.") In the face of Lead Counsel's inability – or unwillingness – to undertake a full and proper investigation or to try to articulate valid claims and allegations sufficient to state a claim under the Private Securities Litigation Reform Act of 1995's pleading standards, Lead Plaintiff AMS Fund undertook its own investigation and uncovered significant facts which corroborate the class's claims and continues to do so. Thereafter, in order to place the fruits of its investigation before the Court – as well as Lead Counsel – those facts were set forth in a highly specific and particularized complaint on the class's behalf by plaintiff John Kimble in August 2003. The Kimble complaint is presently the subject of a pending motion to dismiss and will withstand scrutiny under prevailing Fifth Circuit authority.

As the final guardian of the class and its best interests, it is incumbent on the Court to fully inform itself of all facts and matters by which it can effectively monitor the litigation and protect the class's due process right to adequate representation. *Berger v. Compaq Computer Corp.,* 257 F. 3d 475, 480 (5th Cir. 2001) ("[B]ecause absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times.")[4] The Court's obligation to be fully informed is particularly important in the realm of gauging the propriety and fairness of class settlements.

Indeed, prior to approving a preliminary settlement, a court must "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.41 at 88-89 (3d ed. 1992). Judges to whom proposed settlements are presented for initial approval "are bound to scrutinize the fairness of the

---

[4]     This opinion is attached hereto for the Court's convenience as Exhibit A.

settlement agreement with even more than the usual care ... to meet the concerns, ..., regarding the possibilities of collusion or of undue pressure by the defendants on would-be class representatives." _Weinberger v. Kendrick,_ 698 F.2d 61, 73 (2d Cir.1982).[5]    Moreover, when preliminarily approving a class settlement "[t]here also has to be a clearer showing of the settlement's fairness, reasonableness and adequacy, and the propriety of negotiations leading to it." _First Com. Corp. of Boston Customer Accounts Litigation,_ 119 F.R.D. 301, 308 (D.Mass.1987).

When the court performs its role as the class's protector "without the benefit of a _**full adversarial briefing**_," the judge has less information and "cannot as effectively monitor for collusion, individual settlements, buy-offs ... and other abuses." _In re General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation,_ 55 F.3d 768, 787 (3d Cir. 1995).[6]  By requiring defendants to respond to the allegations against them – under the present posture of the action – the Court and the class gain the benefit of full, adversarial briefing. Moreover, if fully informed of all pertinent factors as the action progresses – including the sufficiency and strength of the allegations against defendants – the Court is better equipped to evaluate the most efficient means of proceeding in light of substantial questions as to the settlement's adequacy and the manner in which lead counsel has proceeded and to correct its deficiencies.

Indeed, it is the class that will suffer if class counsel, as they have done so here, are able to engage immediately in settlement discussions without fully and properly investigating the class's claims' full strength, refuse to acknowledge information and claims developed by additional counsel that are clearly able to withstand a motion to dismiss, thereby enhancing settlement value for the class, and then have that settlement preliminarily approved without a proper testing of the full allegations' strength. _See Amchem Products, Inc., v. Windsor,_ 521 U.S. 591, 621, 117 S. Ct. 2231, 138 L.Ed 2d 689 (1997) ("Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer ... and the court would face a bargain proffered for its approval without the benefit of adversarial investigation, see, _e.g.,Kamilewicz v. Bank of Boston Corp.,_ 100 F.3d 1348, 1352 (C.A.7 1996) (Easterbrook, J., dissenting from denial of rehearing en banc) (parties "may even put one over on the court, in a staged performance"), cert. denied, 520 U.S. 1204, 117 S.Ct. 1569, 137 L.Ed.2d 714 (1997)." (Ginsberg, J., joined by Rhenquist, CJ, Scalia, Kennedy, Souter and Thomas, JJ., Breyer and Stevens, JJ., concurred in part and dissented in part, O'Conner took no part in opinion)).[7]

### b.  The Proposed Settlement Suffers From Obvious Unfairness

The _Manual for Complex Litigation, Third_, §30.41, at 285, states that preliminary approval should only be granted where "the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, _**such as unduly preferential treatment of ... segments of the class** ...._" Here, the proffered settlement suffers obvious deficiencies including its preferential treatment of only one segment of the class.

---

[5]    This opinion is attached hereto for the Court's convenience as Exhibit B.

[6]    This opinion is attached hereto for the Court's convenience as Exhibit C.

[7]    In _Amchem_, the Supreme Court upheld the Third Circuit's remand of a settlement to the District Court. "The Third Circuit found no assurance here – either in terms of the settlement or in the structure of the negotiations – that the named plaintiffs operated under a proper understanding of their representational responsibilities. That assessment, we conclude, is on the mark." _Id._ at 627 (citation omitted).  Such is the case at hand.  A copy of this opinion is attached hereto for the Court's convenience as Exhibit D.

This action was brought on behalf of all persons who purchased or otherwise acquired *securities* of Halliburton Co., not simply open-market common-stock purchasers. *See, e.g.,* June 3, 2002 *Moore* Class Action Complaint for Violations of the Federal Securities Laws at ¶8 ("Plaintiff brings this action as a class action ... on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Halliburton ....")    However, while Lead Counsel was charged by the Court and is ethically bound to represent the best interests of all such securities purchasers, without explanation, Lead Counsel systematically excluded a significant portion of the securities class (*e.g.*, options purchasers) and arrived at a proposed settlement which prefers exclusively open-market common-stock purchasers.  This deficiency warrants denial of preliminary approval, further compounds the impropriety of Lead Counsel's conduct in this action, and demands that the parties revisit settlement negotiations.  To do otherwise, would result in significant economic waste through a futile notice procedure.

### c.  The Proffered Notice Fails to Fully and Properly Inform Class Members Of All Information Required For Them To Make Informed Decisions

Should the Court determine that notice should be sent to the class, as the class's representative, Lead Plaintiff AMS Fund's substantial concerns as to the settlement's adequacy and the manner in which it was reached are significant matters of which the class should fairly be aware in order for class members to make informed decisions as to whether to remain in the class, object or opt out.

As it was excluded during settlement "negotiations," the AMS Fund was provided no input into the proposed notice's language or terms – despite Lead Counsel's obligation to ensure that the class has sufficient information to assess the adequacy of the proposed settlement.  Indeed, the present notice fails to inform the class of AMS Fund's concerns and provides no meaningful basis for the class to ascertain the strength of their claims.  Indeed, the notice's central theme is what Lead Counsel perceives to be monumental weaknesses of *their* claims – with no reference to the pendency of the Kimble allegations or their specificity and despite that the Kimble allegations have been consolidated into and are now operative allegations against defendants in this action.

The AMS Fund requests that the Court – should it decide to entertain preliminary approval – require the Lead Counsel afford this Lead Plaintiff input into any notice ultimately sent to the class. To that end, the AMS Fund would request that the Court order Lead Counsel and defendants to meet and confer with the AMS Fund to prepare a mutually agreeable class notice for submission to the Court. Alternatively, the AMS Fund, as a Lead Plaintiff and representative of the class, requests that the Statement submitted herewith as Exhibit E be sent to class members with class notice.

## IV. CONCLUSION

Inexplicably waiting almost an entire year after they and defendants secretly agreed to a proposed settlement, Lead Counsel finally submitted a "settlement" to this Court for preliminary approval, asking that the Court approve the notice process and set the matter for a final, evidentiary approval hearing. While Lead Counsel sat on the settlement for obvious reasons, Lead Plaintiff the AMS Fund set about to prove the strength of the class's claims and to pursue a valid recovery for the class. Indeed, it is only the AMS Fund – of all Lead Plaintiffs in this action – that has once submitted any opinion, statement or affidavit directly to this Court. Indeed, the AMS Fund is the only Lead Plaintiff to have carefully undertaken its duties to the class as set forth in *Berger*. Accordingly, the Kimble complaint was filed and now will be tested through a full adversarial motion to dismiss proceeding. Because the ability of the class to state a claim is at the heart of Lead Counsel's decision to enter into the proposed settlement and is equally at the heart of the AMS Fund's opposition to the proposed settlement, a fair testing of the settlement requires a ruling on the sufficiency of the Kimble complaint.

Moreover, under accepted standards for preliminary approval, the proposed settlement must be rejected. A significant portion of the class of securities purchasers is excluded and the proposed notice fails to fully inform the class of their representative Lead Plaintiff's concerns about the settlement Lead Counsel wishes to bind them to.

Lead Plaintiff AMS Fund and plaintiff John Kimble respectfully request that preliminary approval be denied, that Lead Counsel's submission be rejected and that that defendants be required to answer for their alleged wrongs either on the merits or by a fair, just and reasonable settlement.

DATED:     May 24, 2004

Respectfully submitted,
KILGORE & KILGORE PLLC

THEODORE C. ANDERSON
State Bar No. 01215700
3109 Carlisle
Dallas, TX 75204
Tel:  214/969-9099
Fax:  214/953-0853

SCOTT + SCOTT, LLC
DAVID R. SCOTT
NEIL ROTHSTEIN
ARTHUR L. SHINGLER, III
108 Norwich Ave.
P.O. Box 192
Colchester, CT 06415
Tel:  860/537-3818
Fax:  860/537-4432

**ATTORNEYS FOR THE AMS FUND AND JOHN KIMBLE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via facsimile and certified mail return receipt requested upon the following counsel of record in the attached Service List on ___ day of May, 2004.

_____
Theodore C. Anderson

## SERVICE LIST

Richard Schiffrin
Marc Wilner
Schiffrin & Barroway LLP
Three Bala Plaza East
Suite 400
Bala Cynwood, PA  19004

William Federman
Federman & Sherwood
2926 Maple Avenue, Suite 200
Dallas, TX  75201

John Emerson, Jr.
The Emerson Firm
830 Apollo Lane
Houston, TX  77058

Jules Brody
Stull Stull & Brody
6 East 45th Street
New York, NY  10017

Gregory Nespole
Wolf Haldenstein Adler Freeman & Herz
270 Madison Ave
New York, NY  10016

Marcos G. Ronquillo
Jose L. Gonzales
Godwin Gruber
Renaissance Tower
1201 Elm St., Suite 1700
Dallas, TX  75270

Ronald W. Stevens
Kirkpatrick & Lockhart
10100 Santa Monica Blvd.
Seventh Floor
Los Angeles, CA  90067

Timothy R. McCormick
Thompson & Knight
1700 Pacific Ave, Suite 3300
Dallas, TX  75201

Robert Edwin Davis
Hughes & Luce
1717 Main Street, Suite 2800
Dallas, TX  75201

# EXHIBIT A

*reau*, 996 F.2d 734, 744 (5th Cir.1993). We construe this requirement liberally, however, and a brief may serve as the "functional equivalent" of an appeal if it is filed within the time specified by FED. R.APP. P. 4 and gives the notice required by FED. R.APP. P. 3. *Smith v. Barry*, 502 U.S. 244, 247–49, 112 S.Ct. 678, 116 L.Ed.2d 678 (1992).

[9] Even under this liberal construction, Taylor's brief does not constitute a timely notice of appeal. The rule 60(b) motion was denied on January 3, 2001. Under rule 4(a)(1)(A), the notice of appeal must be filed within thirty days. Taylor's appellate brief is dated February 3 and was filed on February 7. We consider a prisoner's *pro se* notice of appeal as timely filed "if it is deposited in the institution's internal mail system on or before the last day for filing." FED. R.APP. P. 4(c)(1). Taylor, however, missed the February 2 deadline by either reckoning. Therefore, we have no jurisdiction to consider whether the district court properly denied his rule 60(b) motion.

The dismissal, as frivolous, of Taylor's free exercise claim is AFFIRMED, the appeal from the denial of the motion for reconsideration is DISMISSED for want of jurisdiction, and the dismissal of the equal protection claim is VACATED and REMANDED for further fact-finding and other proceedings consistent with this opinion. We express no view on how the district court should resolve this claim on remand.



**Mark BERGER, etc., et al., Plaintiffs,**

**Mark Berger, on Behalf of Himself and All Others Similarly Situated, Plaintiff–Appellee,**

**v.**

**COMPAQ COMPUTER CORPORATION, et al., Defendants,**

**Compaq Computer Corporation; Eckhard Pfeiffer; Earl L. Mason; John T. Rose; John W. White; Robert W. Stearns; Michael Winkler; Thomas J. Perkins; J. David Cabello; Michael Heil; Gregory E. Petsch; Kenneth L. Lay; Benjamin Rosen; and Rodney Schrock, Defendants–Appellants.**

**No. 00–20875.**

United States Court of Appeals, Fifth Circuit.

July 25, 2001.

In securities litigation, the United States District Court for the Southern District of Texas, Vanessa D. Gilmore, J., entered order certifying plaintiff class and appointing class representatives, and defendant petitioned for interlocutory review. On grant of such review, the Court of Appeals, Jerry E. Smith, Circuit Judge, held that: (1) adequacy of putative class representatives and of representatives' counsel was improperly presumed; and (2) Private Securities Litigation Reform Act (PSLRA) raised standard "adequacy" threshold for class representatives in securities fraud class litigation.

Vacated and remanded.

**1. Federal Courts** ⬤=817
    Court of Appeals reviews district court's class certification decisions for abuse of discretion. Fed.Rules Civ.Proc. Rule 23, 28 U.S.C.A.

**2. Federal Civil Procedure ⚌162**
    **Federal Courts ⚌817**

District court has great discretion in certifying and managing class action, and Court of Appeals will reverse district court's decision to certify class only upon a showing that court abused its discretion, or that it applied incorrect legal standard in reaching its decision. Fed.Rules Civ. Proc.Rule 23, 28 U.S.C.A.

**3. Federal Courts ⚌776**

Whether district court applied correct legal standard in reaching decision on class certification is legal question, which Court of Appeals reviews de novo. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**4. Federal Civil Procedure ⚌172**

Party seeking class certification bears burden of proof. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**5. Federal Civil Procedure ⚌164**

"Adequate representation" requirement for certification of class mandates inquiry into: (1) zeal and competence of representative's counsel; and (2) willingness and ability of representative to take active role in and control litigation and to protect interests of absentees. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**6. Federal Civil Procedure ⚌164**

"Adequate representation" requirement for certification of class serves to uncover conflicts of interest between the named plaintiffs and the class which they seek to represent. Fed.Rules Civ.Proc. Rule 23(a)(4), 28 U.S.C.A.

**7. Constitutional Law ⚌309(1.5)**
    **Federal Civil Procedure ⚌164**

Because absent class members are conclusively bound by judgment entered in any class action brought on their behalf, courts must be especially vigilant to ensure that due process rights of all class members are safeguarded, by adequate representation at all times. U.S.C.A. Const.Amends., 5, 14; Fed.Rules Civ.Proc. Rule 23(a)(4), 28 U.S.C.A.

**8. Federal Civil Procedure ⚌172**

Adequacy of putative class representatives and of representatives' counsel is not presumed in absence of specific proof to contrary; rather, party seeking class certification bears burden of establishing that all requirements for certification, including "adequacy" requirement, have been satisfied. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**9. Federal Civil Procedure ⚌164**

To qualify as "adequate representative" for class, as required for certification, named class representative must possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting litigation. Fed.Rules Civ. Proc.Rule 23(a)(4), 28 U.S.C.A.

    See publication Words and Phrases for other judicial constructions and definitions.

**10. Federal Civil Procedure ⚌174**

Determination as to whether to certify plaintiff class generally involves considerations that are enmeshed in factual and legal issues comprising plaintiff's cause of action. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**11. Federal Civil Procedure ⚌164**

While class representatives need not be legal scholars in order to qualify as "adequate representatives," and while they are entitled to rely upon counsel, they must know more than that they were involved in bad business deal. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

    See publication Words and Phrases for other judicial constructions and definitions.

**12. Federal Civil Procedure ⊸187**

Private Securities Litigation Reform Act raises the standard "adequacy" threshold for class representatives in securities fraud class litigation. Securities Exchange Act of 1934, § 21D et seq., as amended, 15 U.S.C.A. § 78u–4 et seq.; Fed.Rules Civ. Proc.Rule 23(a)(4), 28 U.S.C.A.

**13. Federal Civil Procedure ⊸187**

In complex class action securities cases governed by the Private Securities Litigation Reform Act (PSLRA), "adequacy" standard for class representatives must reflect governing principles of PSLRA and, particularly, Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases. Securities Exchange Act of 1934, § 21D et seq., as amended, 15 U.S.C.A. § 78u–4 et seq.; Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

––––––––

Thomas Emerson Bilek, Hoeffner, Bilek & Eidman, Houston, TX, Jules H. Brody, Stull, Stull & Brody, David A. Brower (argued), Jeffrey G. Smith, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for Plaintiff–Appellee.

John Loyd Carter, Vinson & Elkins, Houston, TX, Daniel F. Kolb (argued), William E. Wurtz, Michael S. Flynn, Davis, Polk & Wardwell, New York City, for Defendants–Appellants.

Appeal from the United States District Court for the Southern District of Texas.

Before SMITH, DUHÉ, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this securities litigation, the district court certified a plaintiff class and appointed class representatives. Because of legal error, we reverse and remand.

## I.

On March 6, 1998, Compaq Computer Corporation announced that sales from one of its North American commercial channels were not meeting expectations and that there would be price reductions and aggressive promotions to reduce inventories. About a month later, Mark Berger, on behalf of all purchasers of Compaq stock between July 10, 1997, and March 6, 1998 (the "Investors"), sued Compaq and its directors (collectively "Compaq") complaining of violations of §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The Investors allege, *inter alia,* that Compaq attempted to inflate the price of its stock by fraudulently engaging in "channel stuffing," *i.e.,* "overselling" products to distributors with the knowledge that they would not be able to resell the products to end-users at rates consistent with the company's own sales.

Thirty-nine members of the putative class collectively moved for (1) appointment as lead plaintiffs, (2) approval of their selection of lead counsel, and (3) consolidation of all related actions.[1] The

––––––––

1. Under the "lead plaintiff" provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff seeking to represent the class must file, together with the complaint, a sworn certification stating, *inter alia,* that the plaintiff (1) is not acting at the behest of counsel, (2) is familiar with the

subject matter of the complaint, and (3) has authorized initiation of the action. 15 U.S.C. § 78u–4(a)(2)(A). The plaintiff then must give notice of the filing of the class action, advising class members of their right to move to serve as lead plaintiffs. *Id.* at § 78u–4(a)(3)(A)(i). The court then must appoint a

court granted the motion and appointed all movants as lead plaintiffs.[2] The Investors then filed a consolidated amended complaint, which Compaq moved to dismiss on various grounds, including failure to meet the pleading requirements of the PSLRA and FED.R.CIV.P. 9(b);[3] the court denied the motion to dismiss and a motion for reconsideration.

While the motion to dismiss was pending, the Investors moved for class certification. Although they initially proposed that all thirty-nine lead plaintiffs serve as class representatives, that number eventually was whittled to seven, only four of whom appeared at depositions. Compaq filed a motion opposing class certification on the ground that the Investors "had not satisfied their burden of showing that the proposed representatives were directing and controlling this litigation as required by rule 23 and the Reform Act." The district court granted the motion for class certification and appointed as class representatives the four plaintiffs who had appeared at depositions.

Shortly after the certification, Compaq sought a writ of mandamus from this court directing the district court to dismiss the complaint on the ground that it did not satisfy the pleading requirements of the PSLRA. Compaq also petitioned this court to permit an interlocutory appeal of the certification order pursuant to FED. R.CIV.P. 23(f). We denied mandamus but granted interlocutory review, and that appeal is before us now.

## II.

[1–3] "We review a district court's class certification decisions for abuse of discretion." *Pederson v. La. State Univ.,* 213 F.3d 858, 866 (5th Cir.2000). "[T]he district court maintains great discretion in certifying and managing a class action. We will reverse a district court's decision to certify a class only upon a showing that the court abused its discretion, or that it applied incorrect legal standards in reaching its decision." *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 624 (5th Cir.1999) (citations omitted), *cert. denied,* 528 U.S. 1159, 120 S.Ct. 1169, 145 L.Ed.2d

---

"lead plaintiff," adopting the rebuttable presumption that the "most adequate plaintiff" (1) has either filed the complaint or made a motion to be appointed lead plaintiff, (2) has the largest financial interest in the relief sought by the putative class, and (3) otherwise satisfies FED RULE CIV P. 23. *Id.* at § 78u–4(a)(3)(B)(i)–(iii).

**2.** Although the appointment of such a large group to serve as lead plaintiff is not before this court, it is notable that the Securities and Exchange Commission has taken the position that a group of investors appointed to serve as lead plaintiffs ordinarily should comprise no more than three to five persons. *See In re Baan Co. Sec. Litig.,* 186 F.R.D. 214, 224 (D.D.C.1999). In that case, the district court refused to appoint a twenty-member group, citing the "particular concern [which] arises when lead plaintiff status is sought by a 'group' of persons who were previously unaffiliated, each of whom have [*sic*] suffered

modest losses, and who thus have no demonstrated incentive or ability to work together to control the litigation." *Id.* Likewise, in *In re Waste Mgmt., Inc. Sec. Litig.,* 128 F.Supp.2d 401, 413 (S.D.Tex.2000), the court concluded that "the strictest approach, requiring at maximum a small group with the largest financial interest in the outcome of the litigation and a pre-litigation relationship based on more than their losing investment, satisfies the terms of the [PSLRA] and serves the purpose behind its enactment[.]"

**3.** Under the PSLRA, plaintiffs no longer are permitted to plead scienter generally; rather, they must "with respect to each act or omission ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u–4(b)(2). Rule 9(b) provides, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

1078 (2000). "Whether the district court applied the correct legal standard in reaching its decision on class certification, however, is a legal question that we review de novo." *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 408 (5th Cir.1998).

[4] An action may proceed as a class action only if the party seeking certification[4] demonstrates that all four of the familiar requirements of rule 23(a) are satisfied:

(1) the class be so numerous that joinder of all members is impracticable;

(2) there be questions of law or fact common to the class;

(3) the claims or defenses of the representative parties be typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

FED.R.CIV.P. 23(a). The main issue in this appeal is whether the Investors carried their burden on the fourth requirement.[5]

Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two. *See* 7A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1769.1, at 375 (2d ed.1986). Compaq neither challenges the adequacy of class counsel nor contends that any conflict between the representatives and the class members precludes certification, so the question is whether the court applied the correct legal standard in determining the adequacy of the class representatives under rule 23, *i.e.,* whether the putative class representatives are "willing" and "able" to "take an active role in and control the litigation and to protect the interests of absentees."[6]

[5–7] This court has determined that [t]he adequacy requirement mandates an inquiry into [1] the zeal and competence of the representative[s'] counsel and . . . [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]

*See Horton v. Goose Creek Indep. Sch. Dist.,* 690 F.2d 470, 484 (5th Cir.1982) (citations omitted).[7] The adequacy inquiry

---

**4.** The party seeking certification bears the burden of proof. *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 740 (5th Cir.1996); *see also In re Am. Medical Sys.,* 75 F.3d 1069, 1086 (6th Cir.1996) (reversing the district court because "the practical effect of the proceeding below was to place the burden on defendants to disprove plaintiffs' 'entitlement' to class certification.").

**5.** Compaq does not challenge the rulings that the Investors have satisfied the numerosity, commonality, and typicality requirements of rule 23(a), or that certification is appropriate under rule 23(b)(3), which provides that an action may be maintained as a class action if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

**6.** The district court's observation that Compaq's decision not to challenge the adequacy of class counsel "tends to undermine [Compaq's] argument that the class will be inadequately represented" evinces a misunderstanding of the nature of the adequacy inquiry and of Compaq's contention that class representatives, not class counsel, must direct the litigation.

**7.** The task of defining the precise contours of rule 23(a)'s adequacy requirement was largely left to the lower courts after *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). *See generally* 7A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1765, at 269 (2d ed.1986). Consequently, there is a lack of uniformity in the various formulations of the requirements for adequacy.

also "serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent." *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Furthermore, because absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded

through adequate representation at all times.[8] Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only where those differences create conflicts between the named plaintiffs' and the class members' interests.[9]

Although we do not know whether the named plaintiffs could meet the adequacy standard,[10] we do know that the district

---

**8.** *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) ("[T]he Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members."); *see also Hervey v. City of Little Rock,* 787 F.2d 1223, 1227 (8th Cir. 1986) (noting that even if the parties stipulate to certification, the court still must conduct a thorough rule 23(a) inquiry: "While class stipulations by the parties may be helpful, they are not complete substitutes for 'rigorous analysis.' The purpose of this analysis is to protect unknown or unnamed potential class members, and by definition those people do not and cannot participate in any stipulations concocted by the named parties.").

**9.** *See Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986) (considering, in evaluating the requirement of adequate representation, whether named plaintiffs have "an insufficient stake in the outcome or interests antagonistic to the unnamed members"); *see also Mullen,* 186 F.3d at 626 (noting that although the differences described by defendant might create variances in the ways that the named plaintiffs and class members prove causation and damages, this did not affect the alignment of their interests)).

**10.** Compaq argues that the four named class representatives fall far short of meeting the standard. Set forth below are excerpts from Compaq's brief in this regard:

   ... [T]he [deposition] testimony of these representatives shows indifference to and ignorance of key facts, a willingness to speculate without foundation, decisions based on misinformation and blind reference on counsel. The proposed representatives could not give any basis for their conclusory "channel stuffing" allegations and could not explain, except through specula-

tion, why they accused Compaq's Chief Executive Officer and twelve other individuals of fraud. They could not articulate one fact to suggest that excess channel inventory was due to fraud rather than to an unforeseen change in market conditions or a mistake in business judgment, and instead relied on what they themselves admitted was pure supposition and hindsight reasoning.

  . .

   Their shortcomings include taking positions in conflict with the Complaint, basing allegations on misinformation, and speculating without foundation about accusations of fraud against individuals.

  ...

   [N]one could articulate a distinction between legitimate and fraudulent sales to the channel or identify a single specific fact supporting their allegation that excess channel inventory in this case was the result of channel "stuffing" rather than of a non-fraudulent cause, such as demand or competition.

   When asked to give a basis for their allegations regarding what supposedly motivated the Company's chief executive, Eckhard Pfeiffer, to commit fraud, the representatives were not able to identify any supporting facts, and simply resorted to speculation, irrelevant personal experiences, and undifferentiated citation to the Complaint.

   One representative not only had no knowledge regarding why Pfeiffer allegedly committed fraud, but disavowed the allegations in the Complaint that Pfeiffer committed fraud in order to receive higher bonus compensation.

   ... Such conflicts between what the proposed class representatives believe and what the Complaint and class counsel allege indicate that the lawyers ..., and not the plaintiffs themselves, are driving this litigation.

court erred in two respects. First, it improperly shifted the burden of proof to the defendants by adopting a presumption that the class representatives and their counsel are adequate in the absence of specific proof to the contrary. Second, it applied an impermissibly lax standard for adequacy that ignores the PSLRA's mandate that class representatives, and not lawyers, must direct and control the litigation. The Investors' arguments to salvage both rulings are unpersuasive.[11]

### A.

[8] The district court unquestionably adopted an incorrect legal standard by stating that "[t]he adequacy of the putative representatives and of plaintiffs' counsel is presumed in the absence of specific proof to the contrary." This is error; the party seeking certification bears the burden of establishing that *all* requirements of rule 23(a) have been satisfied. *See Castano,* 84 F.3d at 740. *Falcon v. General Telephone Co.,* 626 F.2d 369 (5th Cir.1980), *vacated on other grounds,* 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981), cited by the district court, is not to the contrary.

In *Falcon, id.* at 376 n. 8, this court merely approved the practice of taking judicial notice of the competence of class counsel.[12] Taking judicial notice of the fact that counsel is competent, however, is not the same as holding that class representatives therefore are presumed to be

adequate under rule 23(a)(4). Indeed, the district court's presumption inverts the well-established rule that the party seeking certification bears the burden of establishing all elements of rule 23(a). Even more unsettling is that the district court's presumption ignores the constitutional dimensions of the adequacy requirement, which implicates the due process rights of all members who will be bound by the judgment.

The Investors' words belie the error. They characterize the district court's action not as shifting the burden of proof, but rather as a full consideration of "defendants' objections to the certified representatives' adequacy as well as evidence to the contrary presented by plaintiffs." The argument's structure confesses the error: Adequacy is for the plaintiffs to demonstrate; it is not up to defendants to disprove the presumption of adequacy.

The Investors' offer of supporting precedent also fails. Neither case they cite supports their argument that once they establish (1) the lack of conflict between the representatives and the absent class members and (2) the adequacy of class counsel, adequacy of class representation is "presumed." In *Kalodner v. Michaels Stores, Inc.,* 172 F.R.D. 200, 211 (N.D.Tex. 1997), for example, the court merely presumed the adequacy of class counsel. Likewise, in *Longden v. Sunderman,*[13]

---

11. First, they claim that the court merely concluded that "the skill and experience of plaintiffs' counsel is more important" in assessing adequacy than are "the personal qualifications of the named parties." Second, they aver that the court properly rejected Compaq's argument regarding the PSLRA's effect on the stringency of rule 23(a)'s adequacy requirements.

12. *See also* 7A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1765, at 277–78 (2d ed. 1986)

("Moreover, a few courts have indicated that if the opposing party fails to challenge the ability of representatives' counsel to conduct the action, his competence will be assumed.").

13. 123 F.R.D. 547, 557–58 (N.D.Tex.1988) ("In order to satisfy the requirements of rule 23(a)(4) that the representative parties fairly and adequately protect the interests of the class, the interests of the class representative must not be antagonistic to those of the remaining class members, and the representa-

even though the court concluded that "the qualifications and experience of class counsel is of greater consequence than the knowledge of class representatives," there is no mention of any "presumption" whereby evidence of a lack of conflict together with evidence of counsel's competency, without more, conclusively establishes the adequacy of class representation.

In sum, the district court's "presumption" of adequate class representation "in the absence of any specific proof to the contrary" is reversible error on two grounds. First, it inverts the requirement that the party seeking certification bears the burden of proving all elements of rule 23(a). Second, it effectively abdicates—to a self-interested party—the court's duty to ensure that the due process rights of the absent class members are safeguarded.

### B.

Compaq also argues that the district court applied an impermissibly lax adequacy standard. We address this issue to guide the district court on remand.

Compaq's basic contention is that when assaying whether the named plaintiffs are adequate, a court must account for PSLRA's substantive goals. In responding to this assertion, we analyze the PSLRA and our precedent. Although the extent of the PSLRA's impact on the rule 23 inquiry is a matter of first impression in this circuit, we are guided by analogous precedent involving other statutes. Additionally, we consider the particular statutory change effected by the PSLRA.

As an initial matter, we articulate the adequacy standard outside of any specific statutory context. The district court cited

tive parties, through their attorneys, must be prepared to prosecute the action vigorously.").

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966), for the notion that "[a]dequacy is a low threshold." This is a misapplication of *Surowitz.*

Although "often cited inaccurately to support arguments that plaintiffs with little understanding of the facts or theories of their claims and little incentive to monitor the litigation can nonetheless be adequate class representatives,"[14] *Surowitz* did not address the adequacy requirement, but concerned only the verification of a complaint. Just as *Surowitz* did not hold, this circuit has never read *Surowitz* so broadly as to support the proposition that a class representative who does not understand any of the legal relationships or comprehend any of the business transactions described in the complaint nonetheless may be "adequate" for purposes of class certification.

[9] To the contrary, we have described "[t]he adequacy requirement [as one that] mandates an inquiry into ... the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Horton*, 690 F.2d at 484. Likewise, even in *Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir.1973), which interpreted rule 23(a)'s adequacy requirement somewhat more loosely, we insisted that "it must appear that the representative[s] will vigorously prosecute the interests of the class through qualified counsel." *Id.* at 72 (5th Cir.1973). Both understandings—even accepting the variance between them—require the class representatives to possess a sufficient level of knowledge and under-

14. *See* Elliot J. Weiss and John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 YALE L.J. 2053, 2127 n. 254 (1995).

standing to be capable of "controlling" or "prosecuting" the litigation.[15]

[10]   Once the generic standard is understood, the indagation becomes whether, and to what extent, the statute affects the standard. "[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *See Castano*, 84 F.3d at 744 (citing*Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (internal quotation marks and citation omitted)).[16] Likewise, we have called for rule 23 to be interpreted to accommodate the substantive policies of the governing statute.[17]

[11]   Indeed, this court's pre-Reform Act precedent outside the context of securities fraud litigation already has recognized the importance, when making the adequacy determination, of assessing "the willingness and ability of the representatives to take an active role in and control the litigation." *See Horton*, 690 F.2d at 484. Although, certainly, class represen-

tatives need not be legal scholars and are entitled to rely on counsel, plaintiffs do need to know more than that they were "involved in a bad business deal." *Kelley v. Mid–America Racing Stables, Inc.*, 139 F.R.D. 405, 410 (W.D.Okla. 1990).[18]   Unoccupied space exists between these positions for the purpose of preserving meaningful consideration of the class representatives' knowledge about, or control of, the litigation.

[12]   Any lingering uncertainty, with respect to the adequacy standard in securities fraud class actions, has been conclusively resolved by the PSLRA's requirement that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation. In this way, the PSLRA raises the standard adequacy threshold.

The Investors, in response, rely on legislative history: "The provisions of the bill relating to the appointment of a lead plaintiff are not intended to affect current law

---

**15.** The Investors' proffered cases undermine their claim. Even those opinions that privilege the counsel's qualifications over the class representatives' knowledge admit that the representatives' level of knowledge remains a relevant factor. *See, e.g., Longden*, 123 F.R.D. at 558 ("In analyzing the 'vigorous prosecution' element of the adequacy requirement, the Court concludes that the qualifications and experience of class counsel is of *greater* consequence than the knowledge of class representatives.") (emphasis added).

**16.** *Coopers & Lybrand* involved securities fraud, albeit in the context of pre-Reform Act law. Whether the case was pre- or post-Reform Act does not affect the principle at issue here: When making a class certification determination, courts should consider the applicable legal landscape. It would be somewhat inconsistent for us to rely on *Coopers & Lybrand* when creating precedent such as *Castano* and then not apply—or at least not inquire as to the applicability of—*Coopers &*

*Lybrand* in a securities fraud case such as this one.

**17.** *See Redditt v. Miss. Extended Care Ctrs.*, 718 F.2d 1381, 1388 (5th Cir.1983) (stating that courts must interpret rule 23 to accommodate the substantive policies of title VII) (citations omitted).

**18.** *Kelley* provides a useful example for this circuit. There the court noted, and we agree, that it is not enough that plaintiff's counsel are competent if the plaintiffs themselves almost totally lack familiarity with the facts of the case. *See Kelley*, 139 F.R.D. at 409–11. The *Kelley* court was concerned not only that the plaintiffs lacked familiarity with the facts, but also that counsel apparently was the source of plaintiffs' information. We see these as two separate requirements: Plaintiffs should understand the actions in which they are involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel.

with regard to challenges to the adequacy of the class representative or typicality of the claims among the class." H.R. Conf. Rep. No. 104–67, at 34–35 (1995). Assuming, *arguendo*, that we should even look to such legislative history here, it appears that because defendants are not entitled to challenge the appointment of lead plaintiffs, this reference merely reflects recognition by Congress that its overlay of the lead plaintiff provisions in class actions should not be interpreted to limit defendants' ability to challenge the adequacy or typicality of the proposed class representatives in the context of class certification. The district court erred in failing to consider the adequacy requirement through the lens of Congress's activity in this area.

### III.

[13] In summary, it follows that in complex class action securities cases governed by the PSLRA, the adequacy standard must reflect the governing principles of the Act and, particularly, Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases. Accordingly, to the extent that the district court's adequacy analysis failed to assess the representatives' own qualifications "to take an active role in and control the litigation," the court departed from the correct legal standard.

We reverse for the above error and for the improper shift, from plaintiff to defendant, of the burden of proof regarding an element of rule 23. Precedent and due process concerns require that courts protect potential class members by ensuring that the named plaintiffs demonstrate their adequacy. Class action lawsuits are intended to serve as a vehicle for capable, committed advocates to pursue the goals of the class members through counsel, not for

capable, committed counsel to pursue their own goals through those class members.

VACATED and REMANDED.



OWENS CORNING, Plaintiff–Appellee,

v.

NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PENNSYLVANIA, Defendant–Appellant.

No. 99–4275.

United States Court of Appeals, Sixth Circuit.

Argued: Dec. 5, 2000.

Decided and Filed: July 5, 2001.

Delaware corporation brought action against its insurer under directors and officers policy seeking to recover amounts corporation paid to indemnify its directors and officers for settlement of shareholder class action. The District Court granted summary judgment for insurer, and corporation appealed. The Court of Appeals, 1998 WL 774109, Gilman, Circuit Judge, reversed and remanded. On remand, the United States District Court for the Northern District of Ohio, David A. Katz, J., entered judgment for corporation, and insurer appealed. The Court of Appeals, Boggs, Circuit Judge, held that: (1) policy was ambiguous as to method of allocation required to determine insurer liability to reimburse corporation; (2) insurer could not show that there were separate claims attributable to corporation in underlying shareholders' action; (3) corporation could not avoid requirement that directors and

# EXHIBIT B

the railroad's operation. The legal fee was $250.00. The railroad had the choice of paying the excessive fee or suffering grave penalties. The railroad's choice was not voluntary, and the payment did not estop the railroad from recovering the illegal fee.

[2] Plaintiff's next claim is that the Board denied him due process when it refused to hear his petition for reinstatement. That argument starts with the premise that a license to practice medicine, once acquired, is a valuable property right protected by the fourteenth amendment. That is true, but this plaintiff has resigned and does not now have a right to practice medicine. The fact that his resignation was final means that no due process rights can ever arise in support of an application for reinstatement. It is not a denial of due process when the finality of an order or judgment cuts off the right to have issues redetermined. Were the regulation requiring finality unconstitutional, some due process argument would be tenable, but we see no constitutional infirmity in the regulation. We think that any board having powers of discipline has the power to require a hearing when charges are made. The party charged has no right without the consent of the Board to dispense with the hearing, nor has he a right to postpone it indefinitely. It follows that, if the person charged in effect requests that there be no hearing, the Board has the power to grant the request on the condition that the resignation be final, as required by the regulations governing the Board here. Finality may be harsh, but the public has a right to have the facts of illegal conduct developed by a criminal trial and by a board hearing at a time when such conduct is recent history—when the witnesses are alive, the records extant, and the memories undiminished by time. If the resignation is not final, then, when a claimant gets around to filing an application for reinstatement, the state may find itself trying to prove charges that are true, but which, because of the passage of time, cannot be proved to be true. The requirement of finality, as it appears here, is entirely reasonable, is well within the authority of the Board, is not unfair, and in all respects is constitutional.

*The judgment is affirmed.*



William B. WEINBERGER, et al.,
Plaintiffs-Appellees,

v.

James C. KENDRICK, et al.,
Defendants-Appellees,

Charles M. Coyne, et al., Appellants.

Nos. 956–959, Dockets 81–7317, 81–7629,
81–7827, 81–7829.

United States Court of Appeals,
Second Circuit.

Argued April 19, 1982.

Decided July 14, 1982.

Order on Petitions for Rehearing
Jan. 26, 1983.

Final judgment of the United States District Court for the Southern District of New York, Kevin Thomas Duffy, J., 91 F.R.D. 494, approved settlement of two class actions against banks that had been large lenders to debtor and officer of the lead bank who had been director of the bankrupt corporation. Holders of securities of the bankrupt appealed. The Court of Appeals, Friendly, Circuit Judge, held that: (1) notice of proposed settlement met requirements; (2) that class was certified and class representatives recognized after settlement, with notice simultaneous with that of the settlement, did not preclude approval; (3) there is no rigid rule against addition of new claims shortly before submission of proposed settlement of class action provided that proper notice and opportunity for opting out are afforded and that settlement fairly and adequately provides for the new claims; (4) common-law fraud claims

could be found to be generally less valuable than Rule 10b-5 claims of actual purchasers of securities, and it was not unfair for distribution formula for settlement to reflect same; (5) treatment of state law claims by proposed settlement was fair and adequate; (6) district court did not err in refusing to conduct evidentiary hearing preceded by additional discovery on adequacy of settlement; but (7) sanction of fee award for issuance of subpoenas was not shown to be justified.

Judgment approving settlement affirmed; order imposing sanctions reversed.

**1. Federal Civil Procedure ☞1699**

In passing on settlements of class actions under rule, judge should not regard himself as umpire in typical adversary litigation but, rather, he sits also as guardian for class members who have not received notice or who lack intellectual or financial resources to press objections. Fed.Rules Civ.Proc. Rule 23, 28 U.S.C.A.

**2. Federal Civil Procedure ☞1698**

No rigid standards govern contents of notice to class members of proposed settlement, but notice must fairly apprise prospective members of class of terms of proposed settlement and of options that are open to them in connection with the proceedings, and it must be neutral. Fed.Rules Civ.Proc. Rule 23, 28 U.S.C.A.

**3. Federal Civil Procedure ☞1698**

Notice of proposed settlement of class action was sufficient to meet requirements. Fed.Rules Civ.Proc. Rule 23, 28 U.S.C.A.

**4. Federal Civil Procedure ☞1698**

Rule requiring notice of proposed settlement of class action requires only that each class member who can be identified through reasonable effort be notified. Fed. Rules Civ.Proc. Rule 23(c)(2), 28 U.S.C.A.

**5. Federal Civil Procedure ☞1698**

Notice to class action members of proposed settlement of class action must be reasonably calculated, under all circumstances, to apprise interested parties of pendency of action and afford them opportunity to present their objections and it must afford reasonable time for those interested to make their appearance. Fed.Rules Civ.Proc. Rule 23(c)(2), 28 U.S.C.A.

**6. Federal Civil Procedure ☞1698**
**Federal Courts ☞895**

Where prospective class members had some six weeks in which to decide whether or not to accept proposed settlement, notices allowed sufficient time, and although it would have been preferable if affidavits and other papers in support of settlement had been required to be available at date earlier than eve of hearing, failure of district court to demand same did not require reversal. Fed.Rules Civ.Proc. Rule 23(c)(2), 28 U.S.C.A.

**7. Federal Civil Procedure ☞1697**

Court would permit, but could not require, use of procedure whereby class action settlement is reached by means of settlement classes certified after settlement, but clearer showing of settlement's fairness, reasonableness and adequacy and propriety of negotiations leading to it in such cases would be required than where class has been certified and class representatives have been recognized at earlier date. Fed. Rules Civ.Proc. Rule 23, 28 U.S.C.A.

**8. Federal Civil Procedure ☞1699**

Central question raised by proposed settlement of class action is whether compromise is fair, reasonable and adequate. Fed.Rules Civ.Proc. Rule 23, 28 U.S.C.A.

**9. Federal Civil Procedure ☞1699**

In determining whether proposed class action settlement is fair, reasonable and adequate, primary concern is with substantive terms of settlement, and trial judge must apprise himself of facts necessary for intelligent and objective opinion of probabilities of ultimate success should claim be litigated, but "all" does not really mean "all." Fed.Rules Civ.Proc. Rule 23, 28 U.S. C.A.

**10. Federal Civil Procedure ☞1699**

In determination whether proposed class action settlement was fair and reason-

able, important indicia of propriety of settlement included absence of any indication of collusion, protracted negotiations, ability and experience of plaintiffs' counsel, extensive discovery preceding settlement and fact that counsel for all parties, including objectors, had access to materials produced in discovery. Fed.Rules Civ.Proc. Rule 23, 28 U.S.C.A.

**11. Federal Courts** ⊕117

As concerns a class member who had purchased securities prior to and during the "class period," federal district court clearly had jurisdiction to entertain claims arising from mere holding as well as those arising from purchase as a matter of pendent jurisdiction. Securities Exchange Act of 1934, §§ 10(b), 20(a), 15 U.S.C.A. §§ 78j(b), 78t(a).

**12. Federal Courts** ⊕117

Securities Exchange Act's conferral of exclusive jurisdiction on federal courts for violations of that Act permits adjudication of all related claims only in those courts. Securities Exchange Act of 1934, § 27, 15 U.S.C.A. § 78aa.

**13. Federal Civil Procedure** ⊕1697

There is no rigid rule against addition of new claims shortly before submission of proposed settlement of class action provided that proper notice and opportunity for opting out are afforded and providing that settlement fairly and adequately provides for the new claims. Fed.Rules Civ.Proc. Rule 23, 28 U.S.C.A.

**14. Fraud** ⊕58(1)
**Securities Regulation** ⊕117

Plaintiff's burden of proof in common-law fraud case, i.e., clear and convincing evidence, is more demanding than in Rule 10b–5 case, and, similarly, Rule 10b–5 is typically regarded as better suited than common-law fraud principles for application to novel theories of securities frauds. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**15. Federal Civil Procedure** ⊕1696

Common-law fraud claims against defendants could be found to be generally less

valuable than Rule 10b–5 claims of actual purchasers of securities, and it was not unfair for distribution formula for settlement of class action to reflect same. Fed.Rules Civ.Proc. Rule 23, 28 U.S.C.A.; Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**16. Fraud** ⊕58(1)

Where application of principle under New York law that plaintiff's burden of proving fraud is somewhat relaxed where fiduciary relation exists between parties to transaction and where one has dominant and controlling force over the other, plaintiffs must affirmatively show existence of fiduciary relationship between defendants and themselves, which requires judicial inquiry into legitimate expectations of parties and, more generally, practical implications of recognition of fiduciary relationship.

**17. Federal Civil Procedure** ⊕1699

Fairness of treatment of claims added on eve of settlement of class action is subject to special scrutiny, but, in case at bar, state law claims were extremely weak, and treatment of such claims by proposed settlement was thus fair and adequate. Fed. Rules Civ.Proc. Rule 23, 28 U.S.C.A.

**18. Federal Civil Procedure** ⊕1699

On record of class action, trial court did not err in declining to furnish evidentiary hearing, preceded by additional discovery, on adequacy of settlement. Fed.Rules Civ. Proc. Rule 23, 28 U.S.C.A.; Bankr.Act, § 301 et seq., 11 U.S.C. (1976 Ed.) § 701 et seq.; Rules Bankr.Proc. Rule 205, 11 U.S. C.A.

**19. Federal Civil Procedure** ⊕2737

Court has exceptional power to shift fees where action has been commenced or conducted in bad faith, vexatiously, wantonly or for oppressive reasons, but there must be high degree of specificity in factual findings of lower courts when attorneys' fees are awarded on the basis of bad faith, and there must be clear evidence that challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes.

**20. Federal Civil Procedure ⟵⟶2737.5**

In view of fact that district court offered little by way of explanation for its attorneys' fee award and that scope of document was narrowed by telephone conversation and trial judge erroneously relied upon assumption that there were no objections to settlement in determining that issuance of subpoenas was improper, record failed to support finding that there was clear evidence of bad faith or vexatiousness in issuing subpoenas which trial court described as "on their face, grossly overbroad," and sanction of fee award was not shown to be justified.

---

Benedict Wolf and Lester L. Levy, New York City (Wolf, Popper, Ross, Wolf & Jones, and Wolf, Haldenstein, Adler, Freeman & Herz, New York City), for plaintiffs-appellees.

Philip C. Potter, Jr., Ogden N. Lewis and Denny Chin, New York City (Davis, Polk & Wardwell, New York City), for defendants-appellees.

Bradley R. Brewer, New York City (Brewer & Soeiro, New York City), for appellants Coyne, Collins and 580 other named appellants.

I. W. Bader, White Plains, N. Y. (Bader & Bader, White Plains, N. Y.), for appellants Lewy, Anderson, Barrie, Pine, Lapham, Garson, Howe, Barnes & Johnson and Jurkiewicz.

Before WATERMAN, FRIENDLY and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

These consolidated appeals are from a final judgment of Judge Duffy of the District Court for the Southern District of New York, entered on October 16, 1981, 91 F.R.D. 494, approving, pursuant to F.R. Civ.P. 23, the settlement of two securities class actions consolidated below—*Weinberger, et al. v. Kendrick, et al.*, and *Panzirer v. Peterkin, et al.* The complaints in these actions, filed on October 3, 1975, and October 22, 1976, respectively, asserted claims on behalf of classes consisting of persons who had purchased securities of W. T. Grant Company (Grant) during the 34 months prior to that company's bankruptcy on October 2, 1975 (sometimes referred to hereafter as the class period). The defendants named in the actions were financial institutions (the banks) that loaned Grant more than $600 million prior to its bankruptcy,[1] and Dewitt Peterkin, Jr., a former vice-chairman of Morgan Guaranty and a Grant director. The complaints alleged that the defendants had dominated the management of Grant in the years preceding its bankruptcy and had concealed from the public both the seriousness of Grant's financial predicament and the inflated value of Grant securities. The plaintiffs asserted, among other things, claims against the defendant-appellees based on § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-10b–5, and common law fraud. The complaints in *Weinberger* and *Panzirer* were superseded by a consolidated amended complaint, filed July 25, 1980, along with the proposed settlement. In addition to the claims previously asserted, this advanced state law breach of fiduciary duty claims; the new complaint also expanded the plaintiff class to include persons who merely held Grant securities during the class period. The settlement approved by Judge Duffy would extinguish a number of these

---

1. The principal lender to Grant was Morgan Guaranty Trust Company of New York (Morgan Guaranty), a wholly owned subsidiary of J. P. Morgan & Co., Inc. The banks named as defendants in the actions below, in addition to Morgan Guaranty are Citibank, N. A., The Sanwa Bank, Ltd., The Chase Manhattan Bank, N. A., Chemical Bank, Irving Trust Company, Marine Midland Bank, Bankers Trust Company, Manufacturers Hanover Trust Company and The Bank of New York. The settlement also applies to a number of other banks that had been major lenders to Grant, because the suits below were brought against Morgan Guaranty both individually and as agent for these banks and also because the loan agreements among the banks and Grant provide for the sharing of obligations and recoveries on the loans to Grant.

claims [2] in return for some $2.84 million,[3] which, after allowance of attorneys' fees, would be distributed to the plaintiff class. While no determination has been made how even the gross amount of the settlement compares to the amounts claimed, estimated by objectors' counsel as between $250 million and $1 billion, it is not disputed that the recovery will be only a negligible percentage of the losses suffered by the class. Both the plaintiffs and the defendants below are here as appellees defending the settlement's adequacy.

The appellants are a number of persons who purchased or held Grant securities during the class period. One group, the Coyne appellants, allegedly 583 in number, represented by Bradley R. Brewer, fit the above description *simpliciter.* The other group, the Lewy appellants, are the eight named plaintiffs in a class action, Index No. 17857–75, filed in September 1975 in the Supreme Court of New York County which is now against three of the lending banks, Morgan Guaranty, Chase Manhattan and Citibank, asserting some of the claims asserted in the *Weinberger/Panzirer* actions but only under state law. Appellants raise a number of procedural and substantive challenges to the determination that the settlement is fair, reasonable and adequate. We affirm.

I. Background

On October 2, 1975, Grant, with recorded liabilities of well over a billion dollars, filed a petition in bankruptcy court in the Southern District of New York for an arrangement under Chapter XI of the former Bankruptcy Act. Grant's petition came after two years of declining earnings and credit ratings. When the company's publicly reported earnings for the year ending January 31, 1974, declined by some $85,000,-000, rating agencies downgraded Grant's commercial paper, thereby effectively denying the company access to the commercial paper market. As a result, in the spring of 1974, Grant began to obtain financing from commercial banks, first on an *ad hoc* basis with credit lines from numerous lenders throughout the country, and later, in the fall of 1974, under a $600,000,000 committed revolving credit agreement arranged by the company's principal banks. Morgan Guaranty was the lead lender and acted as agent for the other banks, see note 1, *supra.* The revolving credit was secured by Grant's accounts receivable and certain securities it held in a subsidiary.

Despite the new credit, and various other steps taken by its lenders to ameliorate Grant's situation,[4] and contrary to rosy predictions by Grant's management, the company's financial position continued to deteriorate. The seriousness of this became fully apparent when an internal study ordered in the summer of 1975 by a new Grant president, Robert Anderson, was completed in late September: this revealed that the company had a negative net worth. The evidence indicates that the news came as a surprise to the banks and Grant's board. Grant's Chapter XI petition quickly followed.

---

2. Federal securities and state common law claims asserted against a number of defendants, including certain officers and directors of Grant and Grant's auditors, are not involved in the settlement. In addition, claims against Mr. Peterkin that do not relate to insider trading (Count III of the consolidated amended complaint) are not included in the settlement. Finally, the settlement does not affect claims against Chase Manhattan as Indenture Trustee for Grant's 4¾% Debentures, see note 8, *infra,* or claims asserted in Grant's bankruptcy proceedings on behalf of present debenture holders.

3. This was deposited in an interest-bearing account and by the date of oral argument had increased to approximately $3.5 million.

4. For example, the banks agreed to the granting of a senior security interest to Grant's vendors in early 1975, extended the maturity of the revolving credit agreement from June 2, 1975, to March 31, 1976, permitted the early repayment of loans due to a number of small banks, and subordinated payments of $300,000,000 of the outstanding bank loans to the payment of Grant's vendors. The last action was taken less than a month before Grant filed its Chapter XI petition. Naturally the objectors place a quite different interpretation upon those actions.

Even more quickly came the first complaint in the *Weinberger* action, filed October 3, 1975. The complaint alleged that, as a result of their large loans, Grant's principal lenders had been in a position to, and in fact did, exercise considerable control over the management of the company in its final years. It further charged that the defendant banks and Grant's management had cooperated in presenting a misleadingly optimistic picture of the company's future to the public. The *Panzirer* complaint, filed on October 22, 1976, elaborated on this theme. It alleged that Peterkin became aware of Grant's true financial predicament in March, 1973, and passed this information to Morgan Guaranty, including the Trust and Investment Division, which thereafter sold virtually its entire holding of Grant securities on the open market. Motions for class certification were filed in *Weinberger* in June, 1977, and in *Panzirer* in August, 1977; the motions were later adjourned during settlement discussions and were not renewed until agreement had been reached.

The development and settlement of the *Weinberger/Panzirer* action require an understanding of Grant's bankruptcy proceedings. Some six months after the filing of Grant's Chapter XI petition, the Bankruptcy Court, on April 13, 1976, determined that the company could not be reorganized and ordered its liquidation. On July 2, 1976, the principal banks commenced an adversary proceeding seeking enforcement of security interests they held in property of Grant's estate, see p. 64, *supra*. In his September 24, 1976, answer, the trustee in bankruptcy challenged these security interests on the grounds that they were preferential transfers and fraudulent conveyanc-

es; more important for our purposes, he also claimed that, because of the control they allegedly exercised over Grant's affairs during the years 1973–75, the company's principal lenders should be equitably subordinated [5] to other claimants.

In an effort to substantiate his charges, particularly his claim to equitable subordination, the trustee conducted investigations throughout the remainder of 1976 and 1977 into the relationship between Grant and its lenders during the class period. He relied principally on testimony taken under Bankruptcy Rule 205 and on documents subpoenaed from various parties.[6] Rule 205 examinations were taken of all the principal officers and directors of Grant, the principal officers at Morgan Guaranty responsible for dealings with Grant, and two officers of other major lending banks. The testimony ran to some 10,000 pages. The trustee also subpoenaed those files of Grant's principal lenders which related to the company—comprising hundreds of thousands of documents.[7] In short, the trustee conducted a far-reaching and intensive probe of the banks' involvement in Grant's affairs during the class period.

Despite his extensive investigations, Grant's trustee concluded that his chances of proving any fraud or other wrongdoing by the lending banks were extremely slim, cf. 4 B.R. at 73–79 (Judge Galgay's approval of similar determinations by the trustee). Accordingly, he attempted, ultimately successfully, to settle the banks' claims. On February 24, 1978, the trustee and the banks entered into a settlement whereby the banks released their security interests in Grant's property in return for allowance

5. The Bankruptcy Court defined equitable subordination as requiring proof that "the claimant sought to be subordinated (a) has acted in a fiduciary capacity; (b) has breached a fiduciary duty; [and] (c) that breach resulted in detriment to those claimants to whom a duty was owed," *In re W. T. Grant Co.*, 4 B.R. 53, 74 (Bkrtcy.N.Y.1980). See *Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939) ("The essence of the [equitable subordination] test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.").

6. The trustee was assisted by the law firm of Weil, Gotshal & Manges and the accounting firm of Price Waterhouse & Co.

7. On March 20, 1976, Bankruptcy Judge Galgay ordered that various of Grant's business records be preserved and made available to counsel for the plaintiffs below; Grant's employees also were enjoined from disposing of or destroying any of these documents.

of principal and interest on all prepetition loans which it was estimated would result in their receiving distributions of 55% or more of their claims, 4 B.R. at 59. The Bankruptcy Court, in a careful decision, 4 B.C.D. 597, issued on July 20, 1978, approved the settlement, and shortly thereafter the banks began receiving distributions. The appellees have averred that, despite the settlement, the banks will have lost more than $250,000,000 on their loans to Grant by the time the estate is fully liquidated.

Following approval of the settlement of the banks' claims, negotiations commenced regarding claims of holders of Grant's subordinated debt.[8] By April, 1979, an agreement had been reached and the trustee applied to the Bankruptcy Court for permission to offer the proposed settlement to holders of Grant's subordinated debt. On February 20, 1980, after six days of hearings on the proposed settlement, including cross-examination of the trustee, his counsel, and his chief staff assistant regarding the fairness of the settlement, Judge Galgay, in a second lengthy decision, 4 B.R. 53, approved the settlement. He expressly found, among other things, that the banks' relationship with Grant during the class period had been one of "arm's-length negotiations" and that Grant's actions "reflected independent policy decisions", 4 B.R. at 76–77. Eleven bondholders appealed this order to the District Court for the Southern District of New York (Conner, J.), which stayed consideration of the appeals so that Bankruptcy Judge Galgay could supervise continuing negotiations among the bankruptcy trustee, the indenture trustee, the banks, and the debentureholders for an improved offer to the latter. Counsel for the debentureholders who had appealed from the order approving the earlier offer stipulated that these appeals be withdrawn with prejudice, and this was so ordered. On June 23, 1981, an amended offer was approved by Judge Galgay. Two groups of debentureholders appealed to the District

Court (Duffy, J.) from the order approving the amended offer. In an opinion and order dated March 15, 1982, Judge Duffy affirmed the order, 20 B.R. 186. He rested his decision primarily on the ground of res judicata, although he also stated that the appeals were without merit. Two groups of debentureholders have appealed to this court.

After agreement in principle was reached regarding the claims of Grant's major creditors, efforts focused, in the fall of 1979, on settling the *Weinberger* and *Panzirer* actions. Plaintiffs' counsel had engaged in a wide range of discovery during the four years prior to the commencement of settlement discussions. They had access to, and reviewed, both the bank documents subpoenaed by the trustee and the testimony from the Rule 205 examinations he conducted. In addition, plaintiffs' counsel deposed several officers of Morgan Guaranty, paying particular attention to the relationship between that bank and Grant during the class period. Like Grant's trustee and Judge Galgay, however, plaintiffs' counsel found virtually nothing to substantiate their allegations against the banks: "[o]n the basis of all the evidence we were compelled to the conclusion that our chance of prevailing against the banks, while not nonexistent, was slim." With this in mind, and after rejecting as inadequate one settlement offer by the banks, plaintiffs' counsel agreed in late 1979 to the settlement of a number of the class action claims asserted in the *Weinberger/Panzirer* actions. An original settlement fund of $2.6 million agreed upon in May of 1980 was later increased to $2.84 million, which, with interest, now exceeds $3.5 million.

This proposed settlement was submitted to Judge Duffy for approval on July 25, 1980. It was accompanied by a consolidated amended complaint. Count I of the consolidated amended complaint, brought

---

8. These were holders of Grant's 4¼% convertible subordinated debentures due 1996 ($92,-507,000 face amount outstanding) and 4% convertible subordinated debentures due 1990

($834,000 face amount outstanding). The settlement covered only claims of persons then holding the debentures.

on behalf of all purchasers of Grant securities during the class period, alleged, as had the *Weinberger* complaint, that the banks "were in a position to, and did, control, influence and participate in Grant's operations, including the disclosure and nondisclosure of information relating to Grant's financial condition," ¶ 28, and that, using this control the banks "engaged in a scheme, plan and continuous course of conduct to present a falsely inflated and optimistic picture of Grant's ... financial condition, and to conceal the true nature of Grant's operations and deteriorating financial condition from the investing public ...." ¶ 30. It also asserted that the purchasers of Grant securities during the class period had relied in purchasing the allegedly overvalued Grant securities upon false or misleading disclosures and nondisclosures resulting from the defendants' "course of conduct." Based on these allegations Count I of the complaint claimed violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, ¶ 42, as well as of common law fraud principles, ¶ 44.

Count II of the consolidated amended complaint asserted claims on behalf of a broader class of plaintiffs. In addition to purchasers of Grant securities, the class included persons not previously included in either the *Panzirer* or *Weinberger* classes—persons who merely *held*, rather than *purchased*, Grant securities during the class period, ¶ 48(B). In addition to alleging the claims described above under the federal securities laws, ¶ 49, the complaint charged that the defendants "have committed common law fraud and have breached their fiduciary duties to plaintiffs ....", ¶ 58, the latter theory not having previously been expressly advanced by plaintiffs. All these claims were based upon factual allegations almost identical to those underlying the federal securities law claims. The banks were charged with having "caused Grant to delay disclosing facts relating to the financial condition of Grant" and having caused

Grant "to delay for their own benefit the filing of a petition in bankruptcy by Grant," ¶ 56.

Count III of the consolidated amended complaint, asserted on behalf of a class limited to purchasers of Grant common stock during the class period, alleged that Morgan Guaranty and Peterkin had violated Rule 10b–5 by engaging in insider trading during the class period. It also alleged that, during the class period, Morgan Guaranty was a controlling person of Grant under § 20(a) of the Securities Exchange Act of 1934.

The proposed settlement agreement submitted to the district court along with the consolidated amended complaint, was accompanied by the parties' consent to the filing of the new complaint. In addition, the agreement requested the district court to enter an order determining, "for the purpose of effectuating the settlement", ¶ 8(a), that the action be maintained as a class action on behalf of the previously discussed classes of purchasers and holders of Grant securities. Substantively, the settlement agreement provided for the release of the above-described class claims asserted in the consolidated amended complaint, as well as any related claims arising out of the same transactions which might have been asserted, *cf.* note 2, *supra*, in return for the payment to the class of some $2.84 million.

Submitted to Judge Duffy on July 25, 1980, along with the consolidated amended complaint and the proposed settlement agreement, were notices of the pendency of class action, the class action determination, the proposed settlement and settlement hearing, which were to be mailed to prospective class members. These notices, among other things, described the *Weinberger/Panzirer* action, set out the terms of the proposed settlement, defined the class that approval of the settlement would bind, and informed class members that they could opt out of the settlement, by so requesting before January 24, 1981,[9] or enter an appearance through counsel. Objections to

---

9. Judge Duffy later extended the deadline for opting out as to states represented by Mr.

Brewer whose pension funds had invested in

the proposed settlement were required to be filed not later than two weeks before the scheduled February 18, 1982, fairness hearing; no deadline was set for submission of affidavits supporting the proposed settlement. Pursuant to the July 28, 1980, order of Judge Duffy, these notices were mailed to class members on December 9, 1980, and were published in the *Wall Street Journal.* In a January 19, 1981, motion to vacate the July 25 order, counsel for appellants alleged that the settlement was inadequate and that the class notification procedure was defective in a number of respects. Judge Duffy denied the motion on February 6, 1981.

On February 17, 1981, the appellees filed papers supporting the settlement, including lengthy affidavits from counsel for both plaintiffs and defendants attesting to the fairness and adequacy of the settlement. Judge Duffy conducted the fairness hearing the next day; appellants tell us that this took no more than 10 minutes. At this hearing counsel for appellants submitted a memorandum requesting that the court treat their January 19 motion and certain letters counsel had written to the court as timely objections to the settlement. Judge Duffy refused to do so, although in his opinion approving the settlement, 91 F.R.D. at 495 n.3, he also rejected the objections as without merit. By May 19, 1981—the deadline for filing proofs of claim—some 26,000 claims had been filed.

[1] On August 13, 1981, Judge Duffy issued an opinion approving the proposed

Grant securities, but not as to other class members, until February 16, 1981.

10. In addition to the January 19 motion, a letter by Mr. Brewer to Judge Duffy dated September 16, 1980, with copies to counsel for the plaintiffs and for the defendants in the *Weinberger* action, clearly raised the objections as to the inclusion of state law claims not previously pleaded and as to the making of class determination only as incident to a settlement considered below. Objections which have been brought to the attention of the court and of counsel for proponents of a settlement by counsel for objectors should not be disregarded simply because they do not precisely comply with the procedures for the filing of individual objections specified in the notice of settlement. See

settlement as fair, reasonable and adequate. He found that "able and experienced" counsel for the class had conducted protracted arm's-length negotiations in good faith; that "extensive" pre-trial discovery had enabled the parties to "fully . . . evaluate the strengths and weaknesses of the class claims"; that both he and the parties properly could rely on factual and legal findings made by Bankruptcy Judge Galgay, *In re W. T. Grant Co.,* 4 B.R. 53 (Bkrtcy.S.D.N.Y. 1980), which dealt with the circumstances underlying the settlement and which indicated that the plaintiffs' "chances of prevailing were slim"; that the plaintiffs' claims were "complex" and "not easily proven", particularly in view of the "heavy burdens of proof" faced by plaintiffs and "vigorous defenses" asserted by defendants; and that a trial would inevitably involve "lengthy and costly litigation". He concluded that, "[i]n view of the difficulties plaintiffs would confront if this case went to trial, the recommendation of experienced counsel and the lack of individual objections to the settlement, I find that the sum offered by the defendants is acceptable". The opinion did not discuss most of the procedural objections considered in this opinion, perhaps because of the judge's finding that no timely objections were filed.[10]

II.  Discussion

A.  *The Class Notice*

[2] We deal first with appellants' numerous challenges to the notice of class

3 Newberg, Class Actions § 5660d (1977). In passing on settlements of class actions under F.R.Civ.P. 23 the judge should not regard himself as an umpire in typical adversary litigation. He sits also as a guardian for class members who have not received a notice or who lack the intellectual or financial resources to press objections, *National Super Spuds v. New York Mercantile Exchange,* 660 F.2d 9, 20 (2nd Cir.1981) (citing cases); *Mandujano v. Basic Vegetable Products, Inc.,* 541 F.2d 832, 834-36 (9 Cir. 1976). Here the judge evidently did consider all the objections, see 91 F.R.D. at 495 n.4 and the February 6 order, although erroneously believing he was not required to do so and accordingly not discussing many of them or doing so only conclusorily.

action and proposed settlement mailed to prospective class members on December 9, 1980. Appellants initially argue that the notice failed adequately to describe the proposed settlement. They also contend that it should have contained a wide variety of additional information more fully describing the terms of the proposed settlement and the manner in which the negotiations leading to it had been conducted.[11]

Although no rigid standards govern the contents of notice to class members, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), the notice must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings", *Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8 Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), *quoting Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 323 F.Supp. 364, 378 (E.D.Pa.1970), *aff'd sub nom., Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30 (3 Cir. 1971); see *Mullane v. Central Hanover Bank & Trust Co., supra*, 339 U.S. at 314, 70 S.Ct. at 657, and it must be neutral, see *Grunin, supra*, 513 F.2d at 122. Numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved "very general description[s] of the proposed settlement," *Grunin v. International House of Pancakes, supra*, 513 F.2d at 122. See *In re Equity*

Funding Corp. of America Securities Litigation*, 603 F.2d 1353, 1361–62 (9 Cir. 1979); *Mendoza v. United States*, 623 F.2d 1338, 1351–52 (9 Cir. 1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.E.2d 336 (1981), *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 223–24 (5 Cir. 1981).

[3] The December 9, 1980, class action notice, met the foregoing requirements. It fairly, accurately and neutrally described the claims and parties in the *Weinberger/Panzirer* litigation, as well as the terms of the proposed settlement and the identity of persons entitled to participate in it. The notice described in detail a related state court action—*Lewy v. The Chase Manhattan Bank, N.A., et al.*, App.Div. 437 N.Y. S.2d 263—brought by counsel for the appellants.[12] It explicitly informed class members that "[p]articipation in the present settlement would preclude any participation in the *Lewy* case." The notice also explained that class members could exclude themselves from the settlement by requesting this prior to January 24, 1981, or could enter an appearance at the fairness hearing through counsel. Finally, it informed the class that the recovery would be subject to the district court's allowance of attorney's fees and expenses and that counsel expected to apply for fees not exceeding 25% of the settlement fund. There is little question that all this "fairly apprise[d]" prospective class members of the class action's pendency, the relevant terms of the proposed settlement, and their options in con-

---

11. Appellants also argue that the notice was defective because it did not state what proportion of the class's total loss the settlement fund represented. Appellees meet this by noting that any estimate as to class losses—much less individual losses—would have been highly speculative and more likely to hinder informed decision-making by class members than advance it.

12. The Second Amended Complaint in *Lewy* served in March, 1979, named only Chase Manhattan, Morgan Guaranty and Citibank as defendants. The complaint, which relies on factual allegations almost identical to those in the consolidated amended complaint, asserts that the defendants "exercised dominance and control over the board of directors and manage-

ment of Grant." ¶ 9. In addition, the complaint alleges that the defendants "conceal[ed] negative facts concerning the financial condition and unlawful mismanagement of Grant" thus effecting a manipulation of the securities market. ¶ 11. The complaint goes on to describe numerous acts allegedly committed in furtherance of defendants' conspiracy, dwelling principally upon those set out in the *Weinberger/Panzirer* papers. Like the consolidated amended complaint, the *Lewy* complaint asserts causes of action based on common law fraud, ¶ 1, and on breach of fiduciary duties, ¶¶ 1, 31. So far as we can tell, the *Lewy* action would require proof of fault identical to what would be demanded in the *Weinberger/Panzirer* cases.

nection with that case. Those who wanted to probe more deeply could, as the notice plainly told them, examine "[t]he settlement stipulation and the papers and documents filed in this action . . . ." [13]

[4] Appellants next contend that the mailing of individual notices to the last known addresses of all class members, as determined from the records of Grant and various brokerage houses and nominees, was inadequate since the addresses of many security-holders might have changed during the period since Grant's bankruptcy. Federal Rule of Civil Procedure 23(c)(2) [14] and *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974), require only that "each class member who can be identified through *reasonable effort*" (emphasis added), be notified. In *In re Franklin National Bank Securities Litigation*, 574 F.2d 662, *modified*, 599 F.2d 1109 (1978), we discussed the application of the *Eisen* requirement to classes consisting of purchasers of securities, noting the difficulty of ensuring that notice is received by persons whose purchases are recorded in "street names"—typically banks or brokerage houses. We disapproved the practice of sending class notices to street name addresses with a request that the recipient forward the notice to the beneficial holder of the securities but without an offer to defray the resulting expenses, 574 F.2d at 669–70. We indicated approval, however, of the use of bank and brokerage house records to compile a list of actual holders of securities to whom individual notices would be mailed, 574 F.2d at 672. Here appellees compiled such a list, mailed individual notices, and, in addition, published notice of the class action and settlement in the *Wall Street Journal*. Some 26,000 proofs of claim have been filed as a result of these notice procedures. The district court, in its

July 28, 1980, order, expressly found this procedure adequate and we see no reason to disturb its finding, particularly since no alternative method of ascertaining class members' identities has been suggested to us, see *Grunin v. International House of Pancakes, supra*, 513 F.2d at 121–22 (individual mailing to last known address, without supplemental newspaper publication, approved, despite evidence that one third of prospective class did not receive notices).

[5, 6] Likewise, the timing of the notices, which were mailed on December 9, 1980; the opt-out deadline, January 24, 1981; the deadline for the filing of objections, February 4; the date affidavits in support of the settlement were filed, February 17; and the fairness hearing, February 18, were not beyond the authority of the court. According to Professor Moore, "[t]he manner of giving notice is committed to the sound discretion of the court," 3B Moore's Federal Practice ¶ 23.80[3], at 23–513 (1982), as is suggested by Rule 23's statement that notice of settlement shall be "in such manner as the court directs". The notice, however, must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections", *Mullane v. Central Hanover Bank & Trust Co., supra*, 339 U.S. at 314, 70 S.Ct. at 657, and it must "afford a reasonable time for those interested to make their appearance," *id.* Prospective class members had some six weeks in which to decide whether or not to accept the settlement. Although we think it would have been preferable if appellees' affidavits and other papers in support of the settlement had been required to be available at a date earlier than the eve of the hearing, the failure of the district court to demand this does not require reversal.

13. Appellants also allege that the notice was "substantially incorrect and seriously misleading" in a number of respects, Appellants' Br. in No. 81–7829, at 19–21. The defects cited by appellants either do not exist—owing to misreadings by appellants' counsel of the notice or other publicly filed documents—or are immaterial.

14. The subsection provides, in pertinent part, that

In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

Objectors were fully apprised of the terms of the proposed settlement and, although they did not avail themselves of the opportunity, had complete access to materials discovered in the case; this provided an adequate base from which objections could be developed. See 3 Newberg, Class Actions § 5660d (1977). The requirement, challenged by appellants, that requests to opt-out be filed prior to the fairness hearing placed prospective objectors in no worse position than occurs when formal class certification precedes settlement; indeed, their position was better in that they knew the terms of the proposed settlement before having to decide whether to opt out.

Appellant's final procedural objections relate to appellees' having engaged in and concluded settlement negotiations prior to class certification and notice. Closely related to this, they challenge the simultaneous notification of class members of the class determination (for purposes of settlement) and the proposed settlement. We shall discuss this initially as if the class certification related solely to the class named in the earlier *Weinberger/Panzirer* complaints, i.e., claims arising from the purchase of Grant securities during the class period, and will deal later with the added problems arising from the inclusion of other claims.

In *In re Franklin National Bank Securities Litigation, supra,* 574 F.2d at 671–72 n.6, we questioned in dictum the practice of bypassing the formal class certification procedure and of sending simultaneous notice of the pendency of a class action and of a proposed settlement to prospective class members. We voiced concern that the practice might be "inconsistent with the requirement [of Rule 23] that certification as a class action be determined 'as soon as practicable after the commencement of the action' and the implication that the initial class notice should follow promptly after the certification," *id.,* and said that "[s]o far as we are aware the only cases in which this question has been specifically passed upon have held that the sending of the initial class notice should not be postponed," *id.* Our hesitation to approve the practice echoed the concerns expressed in the *Manual*

*for Complex Litigation* § 1.46, at 60–61 (1977) (*Manual*), which argues that the practice may create the possibility of collusion or improper pressure by defendants on "unofficial" counsel for the class. The *Manual* recommends a firm prophylactic rule prohibiting the bypassing of an early formal class certification and the formation of temporary classes for settlement purposes.

Despite the *Manual's* concerns and the misgivings expressed in the *Franklin National Bank* footnote, we concluded in *Plummer v. Chemical National Bank,* 668 F.2d 654, 656 (2 Cir. 1982), that "[a]lthough negotiations in the instant case were conducted by undesignated class representatives without pretrial discovery, this, standing alone, did not preclude judicial approval", 668 F.2d at 658. See also *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 464–66 (2 Cir. 1974). A similar view is taken in Judge Wisdom's thorough opinion in *In re Beef Industry Antitrust Litigation,* 607 F.2d 167, 173–78 (5 Cir. 1979), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981), which carefully reviews the authorities and commentary on the question. Much like our decision in *Plummer v. Chemical Bank,* the Fifth Circuit concluded that:

A blanket rule prohibiting the use of temporary settlement classes may render it virtually impossible for the parties to compromise class issues and reach a proposed class settlement before a class certification. Such a firm restriction does not appear necessary or desirable. The hallmark of Rule 23 is the flexibility it affords to the courts to utilize the class device in a particular case to best serve the ends of justice for the affected parties and to promote judicial efficiencies.

\*   \*   \*   \*   \*   \*

Temporary settlement classes have proved to be quite useful in resolving major class action disputes. While their use may still be controversial, most courts have recognized their utility and have authorized the parties to seek to compromise their differences, including class action issues, through this means.

*In re Beef Industry Antitrust Litigation, supra,* 607 F.2d at 177–78, *quoting* 3 Newberg, Class Actions § 5570c, at 479–80 (1977).

Other circuits have held that the absence of class certification prior to the notice of the settlement is not an absolute bar to approval. See *Ace Heating & Plumbing Co. v. Crane Co., supra,* 453 F.2d at 33; *In re Corrugated Container Antitrust Litigation, supra,* 643 F.2d at 223 ("Rule 23 includes no language proscribing combined notice of a class action and a proposed settlement."); *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1176 (9 Cir. 1977); *Valerio v. Boise Cascade Corp.,* 80 F.R.D. 626, 639 (N.D.Cal.1978), *aff'd,* 645 F.2d 699 (9 Cir. 1981), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981).

[7] Although we thus refuse to adopt a *per se* rule prohibiting approval when a class action settlement has been reached by means of settlement classes certified after the settlement, with notice simultaneous with that of the settlement, we emphasize that we are permitting, not requiring, use of this procedure, and also underscore that, as intimated by us in *Plummer, supra,* 668 F.2d at 658, district judges who decide to employ such a procedure are bound to scrutinize the fairness of the settlement agreement with even more than the usual care. This is necessary in order to meet the concerns, noted in the *Manual,* regarding the possibilities of collusion or of undue pressure by the defendants on would-be class representatives. Accordingly, we will demand a clearer showing of a settlement's fairness, reasonableness and adequacy and the propriety of the negotiations leading to it in such cases than where a class has been certified and class representatives have been recognized at an earlier date. As discussed below, we are satisfied that the settlement in this case meets these requirements.

B. *The Fairness, Reasonableness and Adequacy of the Proposed Settlement*

[8] The central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable and adequate. There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation, 3 Newberg, Class Actions § 5570c, at 479–80 (1977); cf. *Williams v. First National Bank,* 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910). In part to realize these advantages of settlements negotiated by litigants, we have long recognized that a district court's disposition of a proposed class action settlement should be accorded considerable deference, *West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1085 (2 Cir.), *cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co.,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *Newman v. Stein,* 464 F.2d 689, 692 (2 Cir.), *cert. denied sub nom., Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 454–55 (2 Cir. 1974); *Patterson v. Newspaper & Mail Delivery Union,* 514 F.2d 767, 771 (2 Cir. 1975). The trial judge "is exposed to the litigants, and their strategies, positions and proof. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly." *Ace Heating & Plumbing Co. v. Crane Co., supra,* 453 F.2d at 34. While this principle does not apply in full force when settlement of a class action has been negotiated before a class has been certified and a higher degree of judicial scrutiny is required, particularly when, as here, there is nothing to indicate that the district judge felt compelled to do this, it is not wholly deprived of force.

[9] Determination whether a proposed class action settlement is fair, reasonable and adequate involves consideration of two types of evidence. The primary concern is with the substantive terms of the settlement: "Basic to this . . . is the need to compare the terms of the compromise with the likely rewards of litigation." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). See also *Newman v.*

*Stein, supra*, 464 F.2d 689; *City of Detroit v. Grinnell Corp., supra*, 495 F.2d at 455. In order to make this comparison, the trial judge must "apprise[ ] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, supra*, 390 U.S. at 424, 88 S.Ct. at 1163. However, "all" cannot really mean "all". The Supreme Court could not have intended that, in order to avoid a trial, the judge must in effect conduct one. *Saylor v. Lindsley, supra*, 456 F.2d at 904; *Newman v. Stein, supra*, 464 F.2d at 691–92; *City of Detroit v. Grinnell Corp., supra*, 495 F.2d at 462. In order to supplement the thus necessarily limited examination of the settlement's substantive terms, attention also has been paid to the negotiating process by which the settlement was reached, and courts have demanded that the compromise be the result of arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests, *City of Detroit v. Grinnell Corp., supra*, 495 F.2d at 463–66.

[10] The appellants, citing *Protective Committee v. Anderson, supra*, argue at great length that the lower court's two page opinion demonstrates that it did not adequately scrutinize either the substantive terms of the proposed settlement or the propriety of the process of negotiations. We see nothing in the latter point. The district court noted the absence of any indication of collusion, the protracted settlement negotiations, the ability and experience of plaintiffs' counsel, the extensive discovery preceding settlement and the fact that counsel for all parties—including the objectors—had access to materials produced in discovery, including the extensive and detailed discovery of Grant's trustee, who commanded financial resources and professional assistance, see note 6, *supra*, not always available to plaintiffs' counsel in class actions. All these considerations, as previous decisions have noted, *City of Detroit v.*

*Grinnell Corp., supra*, 495 F.2d at 465; *In re Beef Industry Antitrust Litigation, supra*, 607 F.2d at 176; *Plummer v. Chemical Bank, supra*, 668 F.2d at 658, are important indicia of the propriety of settlement negotiations. Indeed, as discussed more fully below, plaintiffs' presettlement preparation and discovery efforts in this case were substantially more thorough than those in many other decisions where settlements have been approved.

We are almost equally confident as regards the substantive terms of the proposed settlement. Although the district court's discussion of this was rather cursory, our own examination of the record leads us to conclude that the court had before it sufficient materials to evaluate the settlement and came to the correct conclusion.

Both the defendants and plaintiffs in *Weinberger/Panzirer* submitted lengthy affidavits to the district court. These carefully described the history of the litigation and, more important, thoroughly canvassed the evidence, both that supporting and that refuting plaintiffs' claims. As noted above, this evidence included the materials amassed in the trustee's investigation. Since his claim of equitable subordination required a detailed inquiry into the relationship between the banks and Grant, which is precisely the issue raised in the *Weinberger/Panzirer* actions, his discovery efforts were extremely relevant to the plaintiffs' claims. The lower court also had the unusual and important benefit of several careful and well-reasoned opinions by Bankruptcy Judge Galgay, see pp. 7–8, *supra*. These opinions, particularly as they related to the equitable subordination question, provided excellent guidance from a disinterested source on questions central to the fairness and adequacy of the proposed settlement. Taken together, these materials provided a satisfactory record on which the district court could base its decision.

Moreover, from what we have distilled from the record, we think the district court's decision met the higher standard of scrutiny we believe appropriate in this case.

As plaintiffs' counsel observed, "[i]n weighing the class' chance of prevailing on the merits in the case against the banks it was ... important to differentiate between proving the liability of a bankrupt Grant to the class and proving any liability on the part of the defendant banks, who themselves lost hundreds of millions of dollars by reason of their transactions with Grant during the class period." Levy Affidavit ¶ 59. Central to plaintiffs' claims against the banks under both the federal securities laws and the common law was the allegation that the defendants "were in a position to, and did, control, influence and participate in Grant's operations." Consolidated Amended Complaint ¶ 28. This precise point had been considered by Judge Galgay in Grant's bankruptcy proceedings. He said:

I am satisfied that in the case of Grant the transactions between the Bank Claimants and Grant are the result of arm's-length negotiations conducted in good faith and governed by the dictates of sound business judgment. I have reviewed the evidence and, in particular, the portions of testimony elicited in examinations pursuant to Bankruptcy Rule 205(a) which the [objectants] claim establish control and domination on the part of the Bank Claimants. The excerpts referred to by the [objectants] constitute but a small portion of the vast amount of information, facts and materials considered by the Trustee. To a considerable extent, the "facts" presented by the [objectants] are based upon hearsay testimony, distortions of testimony, out-of-context statements or misstatements.

The record establishes the converse. It appears that the action taken by Grant reflected independent policy decisions and not rigid submission to the dictates of the Bank Claimants. Mr. Sundman, a chief financial officer of Grant who had been appointed a director in 1974, testified that he operated without instructions from the Bank Claimants and that the advisory group organized by the Bank Claimants in 1974 offered neither suggestions nor opinions as to the business operations of Grant. There has been no evidence introduced by the [objectants] which would tend to establish that the Bank Claimants prevented Grant from initiating a proceeding under the Bankruptcy Act in 1974 or 1975. The record demonstrates that prior to the decision made by the Grant Board of Directors during the end of September 1975 to seek relief under the Bankruptcy Act, both the Bank Claimants and Grant management viewed Grant as a turnaround situation and not insolvent.

Accordingly, it must be concluded that the probabilities of success as to the prosecution of claims of equitable subordination are very remote. In that context, the Trustee's recommendation is well founded.

4 B.R. at 76–77 (footnote omitted).

Likewise the affidavit of plaintiffs' counsel described the uncontradicted deposition statements of various officers of Morgan Guaranty to the effect that the bank was "not capable or desirous of making management decisions and did not attempt to tell Grant how to run its business."

The evidence adduced in discovery had also failed to support plaintiffs' claims in other respects. Counsel for the plaintiffs averred that the evidence indicated that "the banks themselves were misled by Grant's management's statements and projections that the fortunes of Grant would recover." Levy Affidavit ¶ 56. The allegation, advanced in the *Panzirer* action, and Count III of the consolidated amended complaint, that Morgan Guaranty's Trust and Investment Division had sold approximately one million shares of Grant common stock in 1973 based on inside information obtained from Peterkin regarding Grant's financial condition, was also belied by the evidence. Peterkin testified that in 1973 he had not foreseen Grant's later troubles. Harrison U. Smith, Vice-Chairman of Morgan Guaranty's Trust and Investment Committee, testified that the decision to sell Grant securities had been reached in 1972 and that no discussions with Peterkin had occurred. Plaintiffs' counsel frankly con-

ceded, "[w]e do not have any hard evidence to contradict Smith" and admitted that the fact that Morgan commenced selling Grant shares in 1972 severely cut against his case.

We should thus have no difficulty in affirming the approval of the settlement were it not for appellants' contentions based on the inclusion in the consolidated amended complaint and thus in the settlement of "state law" claims arising from the purchase of Grant securities prior to the "class period" but held into or beyond the period—a subject to which we now turn.

### C. *The Inclusion of Claims Arising Out of the Mere Holding of Grant Securities*

[11, 12] So far as concerns a class member who had purchased Grant securities prior to and during the class period, the court clearly had jurisdiction to entertain the claims arising from mere holding as well as those arising from purchase as a matter of pendent jurisdiction. The requirement of *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), that federal and state claims share a "common nucleus of operative fact" before the doctrine may apply is satisfied, as our discussion of the similarities between the rule 10b–5 and the state common law claims, pp. 31–35, *infra*, demonstrates. Likewise, there is no question that plaintiffs' Rule 10b–5 claims are constitutionally "substantial". The requirement of "an examination of the posture in which the nonfederal claim is asserted and of the specific statute that confers jurisdiction over the federal claim, in order to determine whether 'Congress ... has ... expressly or by implication negated' the exercise of jurisdiction over the particular nonfederal claim," *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 373, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978), is readily met since the Securities Exchange Act's conferral of exclusive jurisdiction on federal courts, § 27, for violations of that act permits adjudication of all related claims only in those courts, see *International Controls Corp. v. Vesco*, 593 F.2d 166, 175 n.5 (2 Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2884, 61 L.Ed.2d 311 (1979).

[13] A more difficult jurisdictional question would be raised by the inclusion of persons having only claims arising from purchases prior to the class period, if such there be. Such a person would lack the federal claim necessary as a predicate to pendent jurisdiction; federal jurisdiction with respect to him seemingly would have to rest on the notion that when there is federal jurisdiction over the claims of many parties having both federal and state claims with a common nucleus of law and fact, a federal court, in the exercise of sound discretion, may also join as plaintiffs persons holding only state claims having such a nexus.

The law on this subject, including the Supreme Court's decision in *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), is fully discussed in 3A Moore, Federal Practice ¶ 20.07 [5.–1]–[5.–3] (1982). Although the *Aldinger* Court disapproved of the joinder of a pendent party defendant in the case before it, the Court explicitly limited its conclusion to "the issue of so-called 'pendent party' jurisdiction with respect to a claim brought under [28 U.S.C.] §§ 1343(3) and [42 U.S.C.] 1983", *id.* at 18, 96 S.Ct. at 2422, and noted that "[o]ther statutory grants and other alignments of parties and claims might call for a different result," *id.*, and that "it would be as unwise as it would be unnecessary to lay down any sweeping pronouncement upon the existence or exercise of such jurisdiction", *id.*

The circumstances here are about as powerful for the exercise of pendent party jurisdiction as can be imagined. The exclusivity of federal jurisdiction over claims for violation of the Securities Exchange Act makes a federal court the only one where a complete disposition of federal and related state claims can be rendered. Cf. the Court's comment in *Aldinger* that "[w]hen the grant of jurisdiction to a federal court is exclusive, for example, as in the prosecution of tort claims against the United States under 28 U.S.C. § 1346, the argument of judicial economy and convenience can be coupled with the additional argu-

ment that *only* in federal court may all of the claims be tried together," 427 U.S. at 18, 96 S.Ct. at 2422. The concern most frequently voiced with regard to the pendent party doctrine is that it requires a party not otherwise subject to suit in federal court to defend himself in that forum, see *Aldinger v. Howard, supra*, 427 U.S. at 18, 96 S.Ct. at 2422. In this case pendent party jurisdiction serves, see *Almenares v. Wyman*, 453 F.2d 1075, 1084–85 (2 Cir. 1971), *cert. denied*, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972), to extend federal jurisdiction to a new group of *plaintiffs*. Pursuant to the opt-out procedures established by the district court, plaintiffs who did not wish to have their claim settled in a federal forum and in fact received notice of the settlement needed only to request exclusion. Finally, the state law claims asserted on behalf of the pendent plaintiffs are already before the federal courts, having been asserted on behalf of persons who purchased Grant securities during the class period.[15]

Appellants contend further that what was done here with respect to claims arising out of purchases of Grant securities before the class period was, for all practical purposes, what we condemned in *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2 Cir. 1981). We disagree. In that case class certification had been ordered fairly early in the game; the class was limited to persons who had purchased May 1976 Maine Potato Future Contracts and were damaged in liquidating such contracts between April 13, 1976, and the close of trading on May 7, 1976. The settlement, executed a year after notice of the certification had been sent and long after the opting out period had expired,

purported to settle claims going beyond those asserted on behalf of this class and including the objector's claims for losses on contracts which were not liquidated on or before May 7, 1976, but on which he claimed to have suffered a loss thereafter. However, the proceeds of the settlement were to go solely to persons who had suffered losses on contracts which were liquidated on or before May 7, 1976.

The situation here is quite different. Before the class was certified, it was expanded to include persons holding state as well as federal claims. The notice sent to security holders clearly stated this and afforded an opportunity to opt out. Moreover, the settlement made provision for payments to holders of state claims although these were generally less than to holders of federal claims. We have no intention to depart in any way from *National Super Spuds*; we simply find it inapplicable to the facts here and hold, in agreement with other courts, that there is no rigid rule against the addition of new claims shortly before submission of a proposed settlement provided that proper notice and opportunity for opting out are afforded, see *Cherner v. Transitron Electronic Corp.*, 221 F.Supp. 48, 50 (D.Mass.1958); *Heddendorf v. Goldfine*, 167 F.Supp. 915, 921, 928 (D.Mass.1958); *Pergament v. Frazer*, 93 F.Supp. 13, 20 (E.D.Mich. 1950), aff'd sub nom. *Masterson v. Pergament*, 203 F.2d 315 (6 Cir.), *cert. denied*, 346 U.S. 832, 74 S.Ct. 33, 98 L.Ed. 355 (1953), and that the settlement fairly and adequately provides for the new claims. See also *National Super Spuds v. New York Mercantile Exchange, supra*, 660 F.2d at 18 n.7; *TBK Partners Ltd. v. Western Union Corp.*, 675 F.2d 456 (2nd Cir. 1982).

15. Our holding regarding pendent party jurisdiction is also limited to the peculiar "alignment of parties and claims" involved here, namely, the joinder of plaintiffs in a *settlement* of an action involving Rule 10b–5 and state law claims. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 might be read as discerning a congressional intent to preclude the joinder of mere holders of securities in Rule 10b–5 cases in federal court, because of a desire to prevent disruption of the nation's businesses and to reduce vexa-

tious litigation, 421 U.S. at 739–49, 95 S.Ct. at 1927–31. Whatever the strength of this argument as to claims that are proceeding to litigation, it surely is inapplicable when, as here, extension of pendent party jurisdiction permits the comprehensive settlement of plaintiffs' claims, thus furthering the policies underlying *Blue Chip Stamps*. We need not now decide how *Blue Chip Stamps* would affect the assertion of pendent plaintiff jurisdiction in a case not involving a settlement.

[14, 15] In considering whether the settlement discriminated unfairly against the state versus the federal claims, we confront the reiterated contention by appellants that the state law fraud and breach of fiduciary duty claims faced less worrisome legal obstacles than did the federal securities law claims. Such a position runs counter to generally received learning. 5 Jacobs, Litigation and Practice under Rule 10b–5, § 11.01, at 1–272 to 1–273 (1981) (footnotes omitted) ("it is now generally agreed that [rule] 10b–5 is procedurally more advantageous and substantively broader than the common law.") (citing cases); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 239 (2 Cir. 1974) (citing cases). For example, the plaintiff's burden of proof in a common law fraud case—clear and convincing evidence—is more demanding than in a Rule 10b–5 case. *Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972); *Pierce v. Richard Ellis & Co.,* 62 Misc.2d 771, 773, 310 N.Y.S.2d 266, 269 (Civ.Ct. 1970); *Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.,* 569 F.2d 181, 186 (2 Cir. 1977); 5 Jacobs, *supra,* at 1–277. Similarly, Rule 10b–5 is typically regarded as better suited than common law fraud principles for application to novel theories of securities frauds—which is admittedly the type of action involved in *Weinberger/Panzirer,* see, e.g., Frohling, The Promoter and Rule 10b–5; Basis for Accountability, 48 Cornell L.Q. 274, 290 (1963). The one element in which Rule 10b–5 is more rigorous against a plaintiff than New York law, which appellants assume would apply to the common law fraud claims, is its requirement that the fraud be "in connection with" the purchase or sale of a security, see *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1976), in contrast to the rule of New York law whereby persons who merely held Grant securities would have been permitted to show reliance by proving that defendants' alleged misrepresentations and nondisclosures caused them to hold securities they would otherwise have sold. *Continental Insurance Co. v. Mercadante,* 222 A.D. 181,

225 N.Y.S. 488 (1927); 24 N.Y.Jur.Fraud and Deceit § 165, at 233–34 (1962 & 1982 Supp.). This, however, simply shows which claims get into the federal basket, not that those that don't are more valuable than those that do. In the light of all this, we conclude that the common law fraud claims against the defendants were generally less valuable than the Rule 10b–5 claims of actual purchasers of Grant securities, and that it was not unfair for the settlement's distribution formula to reflect this.

[16] We are similarly unimpressed by the appellants' contentions as to the strength of their common law breach of fiduciary duty claims. Appellants make much of the point that under New York law the general rule that plaintiff has the burden of proving fraud is "somewhat relaxed in cases where a fiduciary relation exists between the parties to a transaction, and where one has a dominant and controlling force over the other", 24 N.Y.Jur. § 278, at 360 (1962 & 1982 Supp.). Application of this principle ordinarily has been limited to relationships such as those between "guardian and ward, trustee and cestui que trust, attorney and client, and physician and patient", *id.,* with more recent extensions to relationships such as those between social worker and client, *Hector M. v. Commissioner of Social Services,* 102 Misc.2d 676, 425 N.Y.S.2d 199 (Family Ct. N.Y.City 1980) (ad hoc application only), and nursing home and patient, *Gordon v. Bialystoker Center & Bikur Cholim, Inc.,* 45 N.Y.2d 692, 412 N.Y. S.2d 593, 385 N.E.2d 285 (1978). In order for the principle to apply plaintiffs must affirmatively show the existence of a fiduciary relationship between defendants and themselves, which requires judicial inquiry into the legitimate expectations of the parties and, more generally, the practical implications of recognition of a fiduciary relationship, 24 N.Y.Jur. § 278 (1962 & 1982 Supp.); see *Diamond v. Oreamuno,* 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969); *Frigitemp Corp. v. Financial Dynamics Fund,* 524 F.2d 275, 278–79 (2 Cir. 1975). Plaintiffs would have faced serious difficulties in establishing the existence of a

fiduciary relationship between a lending bank and the security holders of a borrowing corporation. While such a development is not beyond the realm of possibility, it would have required a significant extension of existing procedures. The fiduciary relation recognized in *Diamond v. Oreamuno, supra*—between a manager of a corporation and its shareholders—has been accorded such status for nearly a century. In contrast, appellants have cited us to no decisions in which a fiduciary relationship was found to exist between a bank and its borrower's security holders. Moreover, the extension of fiduciary principles to this relationship would face serious obstacles, such as arguments that lending relations between banks and large corporations are the product of arm's-length bargaining and that it would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table.[16] Similarly, Bankruptcy Judge Galgay's findings that "the transaction between the Bank Claimants and Grant are the result of arms-length negotiations" and "the action taken by Grant reflected independent policy decisions", 4 B.R. at 76–77, would cut strongly against the application of fiduciary principles to the banks in this case.

[17] Even assuming that the banks could be shown to stand in a fiduciary relation to Grant's security holders, the record indicates that neither they nor Peterkin, who as a director concededly was in such a relation, engaged in any wrong-doing. Indeed, as the above-quoted findings of Judge Galgay on the closely-related subject of equitable subordination show, see pp. 24–26, *supra*, there is virtually no evidence that the defendants engaged in any wrongdoing in their dealings with Grant. In light of all this, we agree with appellees that the state law claims were extremely weak and that the proposed settlement's treatment of such claims was fair and adequate, even though the fairness of the treatment of claims add-

ed on the eve of settlement is subject to especial scrutiny. Finally, as to the settlement's release of unasserted class claims arising out of the facts underlying the consolidated amended complaint, appellants have suggested no such claims, and we are aware of none, which would have had even the slight chance of success that the Rule 10b–5 and common law claims possessed.

### D. *The Lack of an Evidentiary Hearing*

[18] We next deal with appellants' contention that the district court erred in refusing to conduct an evidentiary hearing preceded by additional discovery on the adequacy of the settlement. As the court below observed, counsel for appellants have had complete access to the extensive materials compiled in this litigation in the bankruptcy proceedings, and their state court claim provided them with yet another route for discovery. Appellants appear to have done little to explore any of these options. In addition, they came forward with no specific objections to the substantive fairness of the settlement, and they have provided no specific criticisms of Judge Galgay's careful examination of the relationship between the banks and Grant. Moreover, aside from expressing a desire to cross-examine plaintiffs' counsel regarding their efforts in the litigation, appellants did not suggest what further efforts at discovery might be pursued.

On these facts we see no reason to require an evidentiary hearing preceded by discovery. The only objections raised by appellants which have required serious consideration deal with points of law. Given the adequacy of the existing record and the absence of cogent factual objections to the settlement, we do not see what purpose an evidentiary hearing would have served. As we said in *City of Detroit v. Grinnell Corp., supra*, 495 F.2d at 464:

---

**16.** Cf. *Rader v. Boyd,* 252 F.2d 585, 587 (10 Cir. 1958) ("Parties may assuredly deal at arm's length for their mutual benefit without raising a confidential relationship between them.") In passing on a settlement we are "not to ...

resolve unsettled legal questions", *Carson v. American Brands Inc.,* 450 U.S. 79, 88 n.14, 101 S.Ct. 993, 998 n.14, 67 L.Ed.2d 59 (1981), which a theory of recovery based on breach of fiduciary duty by the lenders surely would be.

Although the parties reaching the settlement have the obligation to support their conclusion to the satisfaction of the District Court, once they have done so, they are not under any recurring obligation to take up their burden again and again *ad infinitum* unless the objectors have made a clear and specific showing that vital material was ignored by the District Court.

### III. Propriety of the Fee Award against Appellants

One other matter requires discussion. On February 13, 1981, five days before the scheduled February 18 fairness hearing, Mr. Brewer served subpoenas *duces tecum* on counsel for both plaintiffs and defendants. The subpoena served on lead counsel for the banks, Davis Polk & Wardwell, sought production of "[a]ll documents and records ... relating to the commencement, prosecution and settlement" of the *Weinberger/Panzirer* action, and listed ten categories of documents. Mr. Brewer claims that in a subsequent phone conversation with an attorney at Davis Polk he limited the scope of the subpoena; the attorney averred that even if Mr. Brewer's recollection was correct, he continued to seek production of an extremely wide range of materials, many of which he must have known to be privileged.

On February 17 Davis Polk applied for an order to show cause why an order quashing the subpoena and awarding Morgan Guaranty $1,800 in attorneys' fees and expenses should not be issued. Counsel for the plaintiffs also moved to quash the subpoena, but did not seek a fee award. Judge Duffy did not sign the Davis Polk order, but, in an endorsement on the application, stayed the subpoena. A copy of Judge Duffy's endorsement was delivered to Mr. Brewer on February 17, although it appears he was not then informed of Davis Polk's request for fees. At the February 18 fairness hearing, Judge Duffy briefly questioned Mr. Brewer as to why he had served the February 13 subpoenas. Not satisfied with Mr. Brewer's responses, he imposed two $2,500 fee awards against him, one to plaintiffs' attorneys, and the other to Davis Polk. These were later reduced to a single $1,800 award to Davis Polk.

Appellees argue that the award against Mr. Brewer was warranted because he acted "vexatiously both in issuing subpoenas seeking obviously privileged materials ... and in doing so without having properly identified any client or having properly filed any objections." Mr. Brewer vigorously denies these charges, averring that "the subpoenas in question were issued by my office in good faith on my part and in the honest belief and expectation that the proceedings at the hearing on the fairness and adequacy of the proposed settlement would be evidentiary and adversary in nature." Brewer Affidavit ¶ 4. He stated that he intended to use the documents produced to attack the adequacy of plaintiffs' preparations for the case.

[19] "The general American rule governing allocation of the costs of litigation places the burden of counsel fees on each party ...." *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2 Cir. 1980), *citing Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). There is, however, an "exceptional power to shift fees where an action has been commenced or conducted 'in bad faith, vexatiously, wantonly or for oppressive reasons.'" *F. D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974); *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078 (2 Cir. 1977). We have previously found that a procedural step such as the issuance of "dragnet subpoenas", *id.* at 1088–89, may constitute bad faith or vexatiousness. We have required, however, a high degree of specificity in the factual findings of lower courts when attorneys' fees are awarded on the basis of bad faith, *id.* at 1089, and that there be "clear evidence" that the challenged actions "are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes", *Nemeroff v. Abelson, supra,* 620 F.2d at 348, *quoting Browning Debenture Holders' Committee v. DASA Corp., supra,* 560 F.2d at 1088. These requirements are a sound means of ensuring that persons with colora-

ble claims will not be deterred from pursuing their rights by the fear of an award of attorneys' fees against them, see *id.* at 1088.

[20] The district court offered little by way of explanation for its fee award. At the February 18 fairness hearing, when the awards were initially imposed—even in favor of the plaintiffs who had not sought one—no reasons were stated. In a brief order of March 26, 1981, the court characterized the subpoenas as "on their face, grossly overbroad". The order also relied on the fact that "there were no objections" to the settlement in determining that the issuance of the subpoenas was improper.

The record does not support a finding that there was "clear evidence" of bad faith or vexatiousness. Mr. Brewer contends that he was expecting an evidentiary hearing to be held on February 18 and that he needed to have the documents in court, particularly since the affidavits supporting the settlement were not yet available. His phone conversation with Mr. Lewis narrowing the scope of the document request was at least some evidence that he had not in fact been acting in bad faith in issuing the February 13 subpoenas. As noted previously, the judge erred with respect to the absence of any objections to the proposed settlement. Davis Polk contends that Mr. Brewer had no standing to be heard on February 18 since all his clients who had filed objections had withdrawn them. The judge did not so find and this is not plain to us. In short, while not applauding Mr. Brewer's conduct, we do not think it reached the level at which the sanction of a fee award would be justified.

The judgment approving the settlement is affirmed. The order imposing sanctions on Brewer is reversed. No costs.

## FURTHER ORDER ON PETITIONS FOR REHEARING

On September 10, 1982, we entered an unpublished order on petitions for rehearing and suggestions for rehearing in banc filed by both sets of appellants with respect to our opinion of July 14, 1982, slip opinions at 61, in which we affirmed an order of Judge Duffy, in the District Court for the Southern District of New York, approving the settlement of class actions brought by purchasers of W.T. Grant Co. securities alleging violations of federal and state securities law. We corrected a factual statement, slip opinions at 67, full paragraph, last sentence, in a manner stated therein. Beyond that we noted the contention made on behalf of the Coyne appellants that by affirming Judge Duffy's order approving the settlement despite his failure to render more than a cursory opinion, we had placed ourselves in conflict with *In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106 (7 Cir.), *cert. denied sub nom. Oswald v. General Motors Corp.,* 444 U.S. 870 (1979), and *Girsh v. Jepson,* 521 F.2d 153 (3 Cir.1975), and indeed had ignored the command of *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414 (1968). We stated that we had no intention of doing anything of the sort but rather had regarded this as a unique situation where, because of the careful and well-reasoned opinions of Bankruptcy Judge Galgay on closely related issues arising in the bankruptcy liquidation of Grant, the district judge could properly have considered himself relieved of what would otherwise have been his obligation to make a detailed assessment of the settlement. See slip opinions at 74. However, because the point had not been adequately brought to our attention, we had not sufficiently focused on the fact that Judge Galgay's findings and conclusions were being seriously attacked in an appeal in the Grant bankruptcy proceedings that would shortly reach this court. We therefore directed that argument on the appeal from the order of Judge Duffy affirming Bankruptcy Judge Galgay's order in the Grant bankruptcy proceedings (hereinafter the Cosoff and Miller appeals) be heard before this same panel and ordered that issuance of the mandate in this case be stayed pending further order of this court.

Because of the number of issues raised in the Cosoff and Miller appeals, the need to supplement the inadequate record that had been filed, and the fact that Judge Duffy had rested his approval in that case primari-

ly on *res judicata*, disposition of those appeals has taken longer than we had anticipated. However, by decision filed today, *In re W.T. Grant Co.*, we have generally approved Judge Galgay's findings of fact and conclusions of law in his opinion of February 20, 1980, 4 B.R. 53, as supplemented by his order of June 23, 1981, approving the settlement with the subordinated debentureholders there at issue. Specifically, after examining the findings and conclusions submitted by counsel for the trustee in bankruptcy in that case, we have rejected the assertions made by attorney Brewer, both in that case and in this, that Judge Galgay had simply rubber-stamped the submissions of counsel for the trustee, a practice disapproved by *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656–67 (1964). Taking note of that decision Judge Galgay said he had adopted the trustee's proposed findings of fact where he had found no reason to do otherwise; however, he formulated his own discussion of the law of equitable subordination, the issue that is of particular moment here. In light of his opinion and our own examination of much of the evidence, we find that the chances of plaintiffs' establishing that the banks promoted a public belief in the viability of Grant which the banks did not share are extremely problematic.

We thus adhere to our opinion of July 14, 1982. In doing so we reaffirm the duty of district judges in this circuit to make a considered and detailed assessment of the reasonableness of proposed settlements of class actions, as held by the Third Circuit in *Girsh, supra*, 521 F.2d 153, 157–58, 159–60, and by the Seventh Circuit in *General Motors, supra*, 594 F.2d 1106, 1132 n. 44.

The factual correction made by our order of September 10, 1982, is further revised as follows: Strike last sentence of the full paragraph on p. 67 and substitute:

Eleven bondholders appealed this order to the District Court for the Southern District of New York (Conner, J.), which stayed consideration of the appeals so that Bankruptcy Judge Galgay could supervise continuing negotiations among the bankruptcy trustee, the indenture trustee, the banks, and the debenture-

holders for an improved offer to the latter. Counsel for the debentureholders who had appealed from the order approving the earlier offer stipulated that these appeals be withdrawn with prejudice, and this was so ordered. On June 23, 1981, an amended offer was approved by Judge Galgay. Two groups of debentureholders appealed to the District Court (Duffy, J.) from the order approving the amended offer. In an opinion and order dated March 15, 1982, Judge Duffy affirmed the order, 20 B.R. 186. He rested his decision primarily on the ground of *res judicata*, although he also stated that the appeals were without merit. Two groups of debentureholders have appealed to this court.

The petitions for rehearing are thus granted insofar as concerns the correction of the factual statement but are otherwise denied. The clerk will take appropriate steps with respect to appellants' suggestion for rehearing in banc. The stay of the mandate will be revoked if no judge in regular active service requests rehearing in banc or, if this is done, such a request is denied.



**Thomas CUSANELLI,
Plaintiff-Appellant,**

v.

**Leonard KLAVER, Defendant-Appellee,**

and

**Perko Manufacturing Corp., Perkins Marine Lamp & Hardware Corp., and Perko, Inc., Defendants.**

**No. 457, Docket 82–6179.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 4, 1982.

Decided Jan. 4, 1983.

On appeal from a judgment entered in the Eastern District of New York, Thomas

# EXHIBIT C

with appellants. Nothing in the allegations may reasonably be read to suggest that the target of appellees' conduct was Seven–Up Brooklyn's contractual arrangements with appellants, any more than the target was Seven–Up Brooklyn's contracts with phone or electric companies. As alleged, Honickman's sole interest was to achieve the soft-drink bottling monopoly, and the distribution system utilized by the target of his allegedly predatory behavior was irrelevant to that goal.

[9] The distributors' claim for tortious interference with prospective business relations was also properly dismissed by the district court for failure to state a claim. To prevail on this claim, under New York law, "a plaintiff must demonstrate that the defendant interfered with business relations existing between a plaintiff and a third party, either with the purpose of harming the plaintiff or by means that are dishonest, unfair, or improper." *Volvo N. Am. Corp.*, 857 F.2d at 74. The distributors contend that appellees interfered with their relationships with retailers and other final purchasers of soft drinks. As noted, however, appellees' alleged goal was to obtain a monopoly in bottling, and the distributors' relationship with their retail customers is irrelevant to that goal. The distributors thus make no allegations that appellees had any contact with the distributors' customers or that appellees tried to convince the customers to make contracts with them rather than the distributors. It is axiomatic that, in order to prevail on this claim, the distributors would have to show that the appellees intentionally caused the retailers not to enter into a contractual relation with them. *See Marilyn Miglin, Inc. v. Gottex Indus.*, 790 F.Supp. 1245, 1254 (S.D.N.Y.1992); *see also Volvo N. Am. Corp.*, 857 F.2d at 74. The distributors cannot allege such intentional interference, and their claim therefore fails.

CONCLUSION

For the foregoing reasons, we affirm the dismissal of the complaint.



In re GENERAL MOTORS CORPORA-TION PICK–UP TRUCK FUEL TANK PRODUCTS LIABILITY LITIGATION.

Jack French, Robert M. West, Charles E. Merritt, Gary Blades, Dawn and Tracey Best, Gary and Jackie Barnes, Betty Marteny, John and Mary Southands, Edmund Berning, Dale W. Plummer, Edmund and Anneta Casey, John and Connie Yonki, Carl and Kathryn Corona, Dallas and Patricia Nelson, Mynard and Mildred Duncan, Kirby L. Stegman, De-Wayne Anderson, Morris and Barbara Betzold, Appellants in No. 94–1064.

Rudolph Jenkins, William D. Cunningham, Mather Johnson, Forrest Charles Ginn, Buren William Jones and Martin D. Parkman, Appellants in No. 94–1194.

Parish of Jefferson, Appellant in No. 94–1195.

The State of New York, Appellant in No. 94–1198.

Elton Wilson, individually, and Frank I. Owen, individually and on behalf of the residents of the State of Alabama, Appellants in No. 94–1202.

City of New York, Appellant in No. 94–1203.

Betty Youngs, Barbara Phillips, Margaret Engel, Larry Swope, Robbin Maxwell and Center for Auto Safety, Appellants in No. 94–1207.

Betty Youngs, Barbara Phillips, Margaret Engel, Larry Swope, Robbin Maxwell and Center for Auto Safety, Appellants in No. 94–1208.

Commonwealth of Pennsylvania, Department of Transportation, Appellant in No. 94–1219.

Nos. 94–1064, 94–1194, 94–1195, 94–1198, 94–1202, 94–1203, 94–1207, 94–1208 and 94–1219.

United States Court of Appeals, Third Circuit.

Argued Aug. 11, 1994.

Decided April 17, 1995.

Plaintiffs in multidistrict products liability action against manufacturer of pickup

trucks based on alleged defect in fuel tanks on trucks sought approval of proposed class settlement, and the United Stated District Court for the Eastern District of Pennsylvania, William H. Yohn, Jr., J., 846 F.Supp. 330, certified settlement class and approved settlement. Objecting members of class appealed, and the Court of Appeals, Becker, Circuit Judge, held that: (1) settlement classes are cognizable in class actions; but (2) courts which use settlement classes in resolution of proposed class action must make formal finding that requisites of rules governing certification of class have been met; (3) failure of district court to make findings required settlement to be set aside; (4) proposed class settlement did not meet adequacy of representation requirement for class certification; (5) district court erred in determining that proposed class settlement was fair, adequate, and reasonable; and (6) district court erred in calculating fee award by applying multiplier to lodestar amount.

Orders vacated, and remanded.

John R. Gibson, Senior Circuit Judge, sitting by designation, concurred in central holding and with judgment and filed opinion.

## 1. Federal Courts ⟜850.1

Finding of fact is "clearly erroneous" when, although there is evidence to support it, reviewing court, based on entire evidence, concludes with firm conviction that mistake has been made.

> See publication Words and Phrases for other judicial constructions and definitions.

## 2. Federal Civil Procedure ⟜161

Class certification enables courts to treat common claims together, obviating need for repeated adjudications of same issues. Fed. Rules Civ.Proc.Rule 23, 28 U.S.C.A.

## 3. Compromise and Settlement ⟜2

Law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.

## 4. Compromise and Settlement ⟜2

Courts should favor use of devices that tend to foster negotiated solutions to complex class actions; this includes settlement classes. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

## 5. Federal Civil Procedure ⟜161

Procedural requirements governing class actions were designed so that court can assure, to greatest extent possible, that actions are prosecuted on behalf of actual class members in way that makes it fair to bind their interests; rule represents measured response to issues of how due process rights of absentee interests can be protected and how absentees' represented status can be reconciled with litigation system premised on traditional bipolar litigation. Fed.Rules Civ. Proc.Rule 23, 28 U.S.C.A.

## 6. Federal Civil Procedure ⟜175

Requirement in rule governing class actions that court decide certification motions as soon as practicable aims to reduce possibility that party could use ill-founded threat of class action to control negotiations or possibility that absentees' interests could be unfairly bound. Fed.Rules Civ.Proc.Rule 23(c), 28 U.S.C.A.

## 7. Federal Civil Procedure ⟜171

Procedural formalities of certification of class actions are important even if case appears to be headed for settlement rather than litigation. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

## 8. Compromise and Settlement ⟜55
## Federal Civil Procedure ⟜171

Expanded role of court in class actions relative to conventional bipolar litigation continues even after certification; while parties in normal suit do not ordinarily require judge's approval to settle action, class action parties do. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

## 9. Compromise and Settlement ⟜70

Preliminary approval by court of settlement in class action establishes presumption of fairness of settlement where court finds that negotiations occurred at arms length, there was sufficient discovery, proponents of

settlement are experienced in similar litigation, and only small fraction of class objected. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**10. Compromise and Settlement ⊕57, 70**

Under *Girsh* test for determining whether proposed settlement in class action is fair, reasonable, and adequate, courts look at complexity and duration of litigation, reaction of class to settlement, stage of proceedings, risks of establishing liability, establishing damages, and maintaining class action, ability of defendants to withstand greater judgment, and range of reasonableness of settlement in light of best recovery and in light of all attendant risks of litigation; proponents of settlement bear burden of proving that factors weigh in favor of approval. Fed. Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**11. Compromise and Settlement ⊕71**
    **Federal Courts ⊕870.1**

Findings required to be made by district court in analyzing fairness of proposed settlement in class action under *Girsh* test are factual, and will be upheld on appeal unless they are clearly erroneous. Fed.Rules Civ. Proc.Rule 23(e), 28 U.S.C.A.

**12. Federal Civil Procedure ⊕161**

Provision of Federal Rules of Civil Procedure governing class actions, which is carefully constructed scheme intended to protect rights of absentees and which necessarily relies on active judicial participation to protect those interests, does not authorize separate category of class certification that would permit dilution of or dispense with class certification criteria. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**13. Federal Civil Procedure ⊕173**

Provision of Federal Rules of Civil Procedure governing class actions enables court to certify class if it complies with its duty to assure that class meets requisites for certification by making appropriate findings. Fed. Rules Civ.Proc.Rule 23(d), 28 U.S.C.A.

**14. Federal Civil Procedure ⊕173**

Under provision of Federal Rules of Civil Procedure governing class actions, court retains authority to redefine or decertify class until entry of final judgment on merits;

this capacity renders all certification orders "conditional" until entry of judgment. Fed. Rules Civ.Proc.Rule 23(c)(1), 28 U.S.C.A.

See publication Words and Phrases for other judicial constructions and definitions.

**15. Compromise and Settlement ⊕67**
    **Federal Civil Procedure ⊕161**

Settlement classes are cognizable in class actions under Federal Rules of Civil Procedure. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**16. Compromise and Settlement ⊕67**

Courts which use settlement classes in resolution of proposed class action must make formal finding that requisites of rules governing certification of class have been met; legitimacy of settlement classes depends upon fidelity to fundaments of rules. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**17. Constitutional Law ⊕309(1.5)**
    **Federal Civil Procedure ⊕161**

Class inquiries into numerosity, commonality, typicality, and adequacy of representation required prior to certification of class constitute multipart attempt to safeguard due process rights of absentees; thus, ultimate focus in making inquiries falls on appropriateness of class device to assert and vindicate class interests. Fed.Rules Civ. Proc.Rule 23(a), 28 U.S.C.A.

**18. Compromise and Settlement ⊕67**

Court cannot infer that rights of entire class were vindicated by settlement in class action without having assured that commonality and typicality requirements for certification of class were satisfied. Fed.Rules Civ. Proc.Rule 23(a), 28 U.S.C.A.

**19. Compromise and Settlement ⊕67**

While provisional certification of settlement class to facilitate settlement discussions is permissible in class actions, final settlement approval depends on finding that settlement class met all requisites for certification under rules governing class actions. Fed. Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**20. Federal Civil Procedure** ⟨=164, 165

Provision of Federal Rules of Civil Procedure governing class actions is designed to assure that courts will identify common interests of class members and evaluate named plaintiff's and counsel's ability to fairly and adequately protect class interests. Fed. Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**21. Compromise and Settlement** ⟨=67
**Federal Civil Procedure** ⟨=161

Actions in which classes are certified as settlement classes must meet same requirements for certification under Federal Rules of Civil Procedure as litigation classes. Fed. Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**22. Compromise and Settlement** ⟨=59, 67

Where settlement classes are recognized in resolution of class action, need of court to assure absence of collusion and alignment of interests among parties assumes especially crucial rule. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**23. Compromise and Settlement** ⟨=67
**Federal Courts** ⟨=633

Failure of district court to make findings that settlement classes in proposed settlement in products liability class action against truck manufacturer complied with provisions of Federal Rules of Civil Procedure governing certification of classes constituted plain error of law and required that certification of settlement be set aside, even though use of provisional certification of settlement classes was acceptable means of facilitating settlement negotiations. Fed.Rules Civ.Proc.Rule 23(a, b), 28 U.S.C.A.

**24. Federal Civil Procedure** ⟨=182.5

Numerosity requirement for certification of class action was satisfied in class action brought against manufacturer of trucks based on alleged defect in trucks involving fuel tanks where class consisted of nearly six million truck owners. Fed.Rules Civ.Proc. Rule 23(a), 28 U.S.C.A.

**25. Federal Civil Procedure** ⟨=164

Adequacy of representation inquiry in determining whether proposed class may be certified in class action has two components intended to assure that absentees' interests are fully pursued; it considers whether named plaintiffs' interests are sufficiently aligned with absentees, and it tests qualifications of counsel to represent class. Fed. Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**26. Compromise and Settlement** ⟨=61

Proposed settlement in class action against truck manufacturer based on alleged defect in fuel tanks of trucks, under which owners of trucks would receive coupon for discount on purchase of new truck from manufacturer, did not meet adequacy of representation test for certification of class actions; proposed settlement created conflict between interests of owners of fleets including manufacturer's trucks and individual owners as fleet owners would not enjoy benefits of settlement such as options to transfer coupons and may have been unable to receive full benefit of discount of coupon. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**27. Attorney and Client** ⟨=64

Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe entire class fiduciary duty once complaint in class action is filed.

**28. Federal Civil Procedure** ⟨=164

Large fee awards to class counsel, standing alone, do not suffice to show that representation of counsel in class action was inadequate or unethical, even though large fees may create impression of ethical violation since it may appear that counsel has economic stake in clients' case.

**29. Compromise and Settlement** ⟨=61

Counsel for proposed settlement class in products liability action against manufacturer of trucks based on alleged defect in fuel tank of trucks did not sufficiently pursue interests of class and did not meet adequacy of representation requirement for certification of class action where settlement called for class members to receive coupon the value of which could only be realized by purchasing new truck, counsel received $9.5 million fee for what was in comparison little work, settlement involved only noncash relief, and evidence indicated that settlement and attorney

fee were negotiated simultaneously. Fed. Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

## 30. Federal Courts ⟐813

Approval by district court of proposed settlement in class action as fair, reasonable, and adequate is reviewed for abuse of discretion. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

## 31. Compromise and Settlement ⟐57
### Federal Civil Procedure ⟐161

Provisions of Federal Rules of Civil Procedure governing class actions impose on trial judge duty of protecting absentees, which is executed by court's assuring that settlement represents adequate compensation for release of class claims; where court fails to comply with duty, absentees have action to enjoin settlement. Fed.Rules Civ. Proc.Rule 23(e), 28 U.S.C.A.

## 32. Compromise and Settlement ⟐57

Inquiry by district court into adequacy of settlement in class action measures value of settlement itself to determine whether decision to settle represents good value for relatively weak case or sell-out of otherwise strong case. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

## 33. Compromise and Settlement ⟐57

Under *Girsh* test for determining whether proposed settlement in class action is fair and reasonable, courts make evaluation of whether decision to settle represents sound decision from two slightly different vantage points; court should determine range of reasonable settlements in light of best possible recovery, and range in light of all attendant risks of litigation. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

## 34. Compromise and Settlement ⟐57

In assessing whether proposed settlement in class action is fair, reasonable, and adequate in cases primarily seeking monetary relief, present value of damages plaintiffs would likely recover if successful, appropriately discounted for risk of not prevailing, should be compared by court analyzing settlement with amount of proposed settlement; figure should generate range of reasonableness within which district court approving or

rejecting settlement will not be set aside. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

## 35. Compromise and Settlement ⟐57

Primary touchstone of inquiry of court in determining whether proposed settlement in class action is fair, reasonable, and adequate is economic valuation of proposed settlement; evaluating court must guard against demanding too large a settlement based on its view of merits of litigation, as settlement is compromise and yielding of highest hopes in exchange for certainty and resolution. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

## 36. Compromise and Settlement ⟐61

District court erred in determining that proposed class settlement in products liability action against manufacturer of trucks based on alleged defect in truck fuel tank, in which class members would receive coupons for $1,000 purchase of new truck from manufacturer, was fair, adequate, and reasonable; case was settled too quickly with too little development on merits, certificates may have been worth significantly less than $1.98 billion to $2.18 billion total value estimate, class members would in some cases be unable to use certificates, and relief granted did not address alleged safety defect that formed basis of action. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

## 37. Compromise and Settlement ⟐57

One sign that proposed class settlement may not be fair, precluding certification of class and settlement by district court, is that some segments of class are treated differently from others. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

## 38. Compromise and Settlement ⟐56.1

Decision to settle that occurs at too incipient a stage of proceedings weighs against approval by court of settlement in class action. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

## 39. Compromise and Settlement ⟐61, 70

District court abused its discretion in summarily dismissing testimony of former engineer for truck manufacturer that manufacturer could have implemented retrofit to correct defect involving fuel tanks in trucks

but did not and in determining that settlement in which class members received only coupons for discounts on purchase of new truck in products liability action against truck manufacturer had appropriate value relative to relief requested and was fair, adequate, and reasonable; testimony of engineer might have been important had case proceeded to trial. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**40. Compromise and Settlement ⬡61**

Factor of complexity of suit weighed in favor of approval of proposed class settlement in products liability action against truck manufacturer based on alleged defect in truck fuel tank where trial would have involved complex web of state and federal warranty, tort, and consumer protection claims even if class had been subdivided, discovery would have to have been conducted into background of six million trucks owned by class members, and manufacturer would undoubtedly have contested action at every step, leading to plethora of pretrial motions. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**41. Compromise and Settlement ⬡58**

In measuring class' own reaction to proposed settlement's terms for purposes of determining whether proposed settlement in class action is fair, adequate, and reasonable, court looks to number and vociferousness of objecting class members. Fed.Rules Civ. Proc.Rule 23(e), 28 U.S.C.A.

**42. Compromise and Settlement ⬡58**

District court abused its discretion in determining that reaction of class members weighed in favor of approval of proposed class settlement in products liability action against truck manufacturer in which class members would receive coupon for discount on purchase of new truck where poll of members indicated that 63% definitely or probably would not use coupon, seemingly low number of objectors included some fleet owners owning as many as 1,000 trucks, and those who objected did so vigorously, even though only 6,450 members objected out of class of approximately 5.7 million. Fed. Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**43. Compromise and Settlement ⬡56.1**

Stage-of-proceedings facet of *Girsh* test for approval of proposed settlement in class action captures degree of case development that case counsel have accomplished prior to settlement; through this lens, courts can determine whether counsel had adequate appreciation of merits of case before negotiating. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**44. Compromise and Settlement ⬡57**

In considering stage of proceedings at which settlement was reached for determining under *Girsh* test whether proposed settlement in class action is fair, adequate, and reasonable, it is more appropriate to measure stage by reference to commencement of proceedings either in class action at issue or in some related proceeding. Fed.Rules Civ. Proc.Rule 23(e), 28 U.S.C.A.

**45. Compromise and Settlement ⬡61**

District court clearly erred in finding that stage of proceedings at which settlement was reached in proposed class action against truck manufacturer based on alleged defect in truck fuel tank weighed in favor of approval of settlement where approximately four months elapsed from filing of consolidated complaint to reaching of settlement of agreement, nothing in record indicated that class counsel had conducted significant discovery or investigation relative to merits of case, and no determination had been made by court that proper class existed. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**46. Compromise and Settlement ⬡56.1**

In cases where there has been no determination by district court that proper class exists, mere fact that settlement negotiations transpired does not tend to prove that class' interests were pursued, as will support approval of proposed class settlement under *Girsh* based on consideration of stage of proceedings at which settlement is reached. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**47. Compromise and Settlement ⬡56.1**

By evaluating risks of establishing liability in determining under *Girsh* test whether to approve proposed settlement in class action, court can examine what potential re-

wards, or downside, of litigation might have been had class counsel elected to litigate claims rather than settle them. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**48. Compromise and Settlement ☞61**

District court abused its discretion in failing to distinguish between groups of plaintiffs that did and those that did not confront difficult state law defenses in establishing liability against truck manufacturer in determining under *Girsh* test that risks of establishing liability weighed in favor of approving proposed class settlement in products liability action against truck manufacturer based on alleged fuel tank defect in trucks where class of plaintiffs included residents of all states and numbered approximately 5.7 million. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**49. Compromise and Settlement ☞61**

District court erred in finding that risks of proving damages were so great that they strongly favored approval under *Girsh* test of proposed class settlement in products liability action against manufacturer of trucks based on alleged fuel tank defect where determination by court that class members could not adequately prove diminished value of vehicles was based solely on "blue book" value of vehicles and court refused to consider alternative measures that appeared to provide concrete and substantial damage figures. Fed.Rules Civ.Proc.Rule 23(b), 28 U.S.C.A.

**50. Federal Civil Procedure ☞161**

Value of class action depends largely on certification of class because, not only does aggregation of claims enlarge value of suit, but often combination of individual cases also pools litigation resources and may facilitate proof on merits; thus, prospects for obtaining certification have great impact on range of recovery one can expect to obtain from action. Fed.Rules Civ.Proc.Rule 23(b), 28 U.S.C.A.

**51. Federal Civil Procedure ☞164, 165**

Rules governing class actions does not require that class members share every factual and legal predicate to meet commonality and typicality standards; because separate

proceedings can if necessary be held on individualized issues such as damages or reliance, individualized questions do not ordinarily preclude use of class action device. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**52. Federal Civil Procedure ☞2737.4**

"Lodestar method" calculates award of attorney fees to counsel in class action by multiplying number of hours expended by some hourly rate appropriate for region and experience of lawyer.

> See publication Words and Phrases for other judicial constructions and definitions.

**53. Federal Civil Procedure ☞2737.4**

"Percentage of recovery method" for determining award of attorney fees to counsel in class action resembles contingent fee in that it awards counsel variable percentage of amount recovered for class.

> See publication Words and Phrases for other judicial constructions and definitions.

**54. Federal Civil Procedure ☞2737.13**

Thorough judicial review of attorney fee applications is required in all class action settlements. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**55. Attorney and Client ☞155**

"Common fund doctrine" provides that private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve fund to which others also have claim, is entitled to recover from fund costs of his litigation, including attorney fees.

> See publication Words and Phrases for other judicial constructions and definitions.

**56. Federal Civil Procedure ☞2737.4**

Lodestar and percentage of recovery methods for determining amount of attorney fees each have distinct attributes suiting them to particular types of cases; ordinarily court making or approving fee award should determine what sort of action court is adjudicating and then primarily rely on corresponding method of awarding fees, although there is advantage to using alternative method to double-check fee.

**57. Federal Civil Procedure ⊚2737.4**

Lodestar method, which uses number of hours reasonably expended as its starting point, is generally used as appropriate method of determining attorney fee in statutory fee shifting cases.

**58. Attorney and Client ⊚155**

Percentage of recovery method of calculating attorney fee award is used in common fund cases, on theory that class would be unjustly enriched if it did not compensate counsel responsible for generating valuable fund bestowed on class.

**59. Federal Civil Procedure ⊚2737.13**

District court erred in applying multiplier to lodestar amount in determining award of attorney fees under lodestar method in approving proposed class settlement in products liability action.

**60. Attorney and Client ⊚155**

In common fund cases, district judge can award attorney fees as percentage of fund recovered.

---

James A. Schink, (argued), J. Andrew Lanagan, Robert B. Ellis, Kirkland & Ellis, Chicago, IL, George J. Lavin, Jr., Francis P. Burns, III, Lavin, Coleman, Finarelli & Gray, Philadelphia, PA, Lee A. Schutzman, Edward C. Wolfe, General Motors Corp., Detroit, MI, for General Motors Corp., appellee.

Andrew M. Hutton, Derek S. Casey, Paul Benton Weeks, III, Michaud, Hutton, Fisher & Anderson, Wichita, KS, for Jack French, Robert M. West, Charles E. Merritt, Gary Blades, Dawn Best, Tracey Best, Gary Barnes, Jackie Barnes, Betty Marteny, John Southards, Mary Southards, Edmund Berning, Dale W. Plummer, Edmund Casey, Anneta Casey, John Yonki, Connie Yonki, Carl Corona, Kathryn Corona, Dallas Nelson, Patricia Nelson, Mynard Duncan, Mildred Duncan, Kirby L. Stegman, Dewayne Anderson, Morris Betzold, Barbara Betzold, Dennis Acuma, appellants.

Diane M. Nast (argued), William E. Hoese, Kohn, Swift & Graf, P.C., Philadelphia, PA, Elizabeth J. Cabraser (argued), Michael F. Ram, Lieff, Cabraser & Heimann, San Francisco, CA, for Dennis Acuma, John E. Martin, plaintiff class/appellees.

John W. Barrett, Barrett Law Offices, Lexington, MS, for John Mayhall, Brendan Hayes, Jimmy Benson, Jimmy Haddock, Dennis Nabors, Marcia Baldwin, appellees.

William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, for William A. Lewis, David Grubbs, Raymond Carver, Johnny S. Martinez, Robert A. Flowers, Stone Ridge Agri, Inc., James McKinnish, Douglas A. Livingston, appellees.

Richard S. Schiffrin, Schiffrin & Craig, Bala Cynwyd, PA, for Johnny S. Martinez, Joseph St. Clair, appellees.

Patricia J. Clancy, Sr. Deputy County Counsel, County of Santa Barbara, Santa Barbara, CA, for City of Los Angeles, Alameda City, Santa Barbara City, Utah City, Washington City, amicus-appellee.

James E. Butler, Jr. (argued), Robert D. Cheeley, Peter J. Daughtery, Butler, Wooten, Overby & Cheeley, Columbus, GA, for Rudolph Jenkins, William D. Cunningham, Mather Johnson, Forrest Charles Ginn, Buren William Jones, Martin D. Parkman.

Hans J. Liljeberg, Jefferson Parish Atty.'s Office, Gretna, LA, Jeron J. LaFargue, Jefferson Parish Atty.'s Office, Harahan, LA, for Parish of Jefferson, appellant.

G. Oliver Koppell, Atty. Gen. of the State of N.Y., Peter H. Schiff, Deputy Sol. Gen., Nancy A. Spiegel, Andrea Oser, Asst. Attys. Gen., Albany, NY, for State of N.Y., appellant.

Michael J. Evans, Steven D. King, Longshore, Evans & Longshore, Birmingham, AL, for Elton Wilson, individually, Frank I. Owen, individually and on behalf of the residents of the State of Alabama, appellants.

John Hogrogian, New York, NY, for City of New York, appellant.

Brian S. Wolfman (argued), David C. Vladeck, Public Citizen Litigation Group, C. Ray Gold, Center for Auto Safety, Washington, DC, for Betty Youngs, Barbara Phillips, Margaret Engel, Larry Swope, Robbin Maxwell, Center for Auto Safety, appellants.

Stephen F.J. Martin (argued), Asst. Counsel In–Charge, Steven I. Roth, Asst. Counsel, Robert J. Shea, Asst. Chief Counsel, John L. Heaton, Chief Counsel, Office of Chief Counsel, Dept. of Transp., Harrisburg, PA, for Com. of Pa., appellant.

Before BECKER, ALITO, and GIBSON,* Circuit Judges.

## TABLE OF CONTENTS

I. FACTS, PROCEDURAL HISTORY, AND STANDARD OF REVIEW.....................779
    A. General Background........................................779
    B. The Settlement Agreement................................780
    C. Approval of the Settlement and Fees....................781
    D. The NHTSA Investigation ...............................782
    E. Standard of Review .....................................782

II. ANATOMY OF THE CLASS CLAIMS ...........................................783

III. RULE 23—RELEVANT FUNDAMENTAL PRINCIPLES............................783

IV. SETTLEMENT CLASSES ......................................................786
    A. Nature of the Device....................................786
    B. Perceived Problems of Settlement Classes...............787
    C. Arguments Favoring Settlement Classes .................790
    D. Are Settlement Classes Cognizable Under Rule 23?......792
    E. Are the Rule 23(a) and (b) Findings Required for Settlement Classes? Does Finding the Settlement to Be Fair and Reasonable Serve as a Surrogate for the Findings?........................................794
    F. Can There Be a Valid Settlement Class That Would Not Serve as a Valid Litigation Class?...............................................797

V. IS THE SETTLEMENT CLASS PROPER HERE? ...................................800
    A. Were There Adequate Findings Under Rule 23(a)? ........800
    B. Could the Class Requisites Have Been Met on the Current Record?.....800
        1. Numerosity, Commonality, and Typicality............800
        2. Adequacy of Representation .......................800
            a. The Situation of the Fleet Owners ..............800
            b. Did Counsel Adequately Represent the Interests of the Entire Class? ................................................801

VI. IS THE SETTLEMENT FAIR, REASONABLE, AND ADEQUATE?......................804
    A. Adequacy of Settlement—General Principles ............806
        1. Valuation of the Settlement—Introduction ..........807
            a. Plaintiffs' Witness Dr. Itmar Simonsen ..........807
            b. Inability of Class Members to Use Certificates..................808
            c. Value of the Transfer Option ...................809
            d. GM's Implicit Valuation of the Claim............810

        2. Valuing this Settlement Relative to the Relief Requested ...........810
            a. The Retrofit Issue .............................810
            b. Availability of Other Remedies.................811

    B. Complexity of the Suit .................................812
    C. Reaction of the Class ..................................812
    D. Stage of Proceedings ..................................813
    E. Risks of Establishing Liability ........................814
    F. Risks of Establishing Damages.........................816
    G. Risks of Maintaining Class Status .....................817
    H. Ability to Withstand Greater Judgment ................818

* Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

I.   Summary ........................................................... 818

VII.  APPROVAL OF THE ATTORNEYS' FEE AWARD .................................. 819

VIII.  OTHER ISSUES; CONCLUSION ........................................... 823

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal from an order of the District Court for the Eastern District of Pennsylvania approving the settlement of a large class action following its certification of a so-called settlement class. Numerous objectors challenge the fairness and reasonableness of the settlement. The objectors also challenge: (1) the district court's failure to certify the class formally; (2) its denial of discovery concerning the settlement negotiations; (3) the adequacy of the notice as it pertained to the fee request; and (4) its approval of the attorneys' fee agreement between the defendants and the attorneys for the class, which the class notice did not fully disclose, thereby (allegedly) depriving the class of the practical opportunity to object to the proposed fee award at the fairness hearing.

The class members are purchasers, over a 15 year period, of mid- and full-sized General Motors pick-up trucks with model C, K, R, or V chassis, which, it was subsequently determined, may have had a design defect in their location of the fuel tank. Objectors claim that the side-saddle tanks rendered the trucks especially vulnerable to fuel fires in side collisions. Many of the class members are individual owners (i.e., own a single truck), while others are "fleet owners," who own a number of trucks. Many of the fleet owners are governmental agencies. As will become apparent, the negotiated settlement treats fleet owners quite differently from individual owners, a fact with serious implications for the fairness of the settlement and the adequacy of representation of the class.

While all the issues we have mentioned are significant (except for the discovery issue), the threshold and most important issue concerns the propriety and prerequisites of settlement classes. The settlement class device is not mentioned in the class action rule, Federal Rule of Civil Procedure 23.[1]  Rather

1. Rule 23 provides, in pertinent part:

   *(a) Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

   *(b) Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

   (1) the prosecution of separate actions by or against individual members of the class would create a risk of
   (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
   (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

   (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

   (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

   *(c) Determination by Order Whether Class Action to be Maintained; Notice; Judgment; Actions Conducted Partially as Class Actions.*

   (1) As soon as practicable after the commencement of an action brought as a class

it is a judicially crafted procedure. Usually, the request for a settlement class is presented to the court by both plaintiff(s) and defendant(s); having provisionally settled the case before seeking certification, the parties move for simultaneous class certification and settlement approval. Because this process is removed from the normal, adversarial, litigation mode, the class is certified for settlement purposes only, not for litigation. Sometimes, as here, the parties reach a settlement while the case is in litigation posture, only then moving the court, with the defendants' stipulation as to the class's compliance with the Rule 23 requisites, for class certification and settlement approval. In any event, the court disseminates notice of the proposed settlement and fairness hearing at the same time it notifies class members of the pendency of class action determination. Only when the settlement is about to be finally approved does the court formally certify the class, thus binding the interests of its members by the settlement.

The first Manual for Complex Litigation [hereinafter MCL] strongly disapproved of settlement classes. Nevertheless, courts have increasingly used the device in recent years, and subsequent manuals (MCL 2d and MCL 3d (in draft)) have relented, endorsing settlement classes under carefully controlled circumstances, but continuing to warn of the potential for abuse. This increased use of settlement classes has proven extremely valuable for disposing of major and complex national and international class actions in a variety of substantive areas ranging from toxic torts (Agent Orange) and medical devices (Dalkon Shield, breast implant), to antitrust cases (the beef or cardboard container industries). But their use has not been problem free, provoking a barrage of criticism that the device is a vehicle for collusive settlements that primarily serve the interests of defendants—by granting expansive protection from law suits—and of plaintiffs' counsel—by generating large fees gladly paid by defendants as a quid pro quo for finally disposing of many troublesome claims.

After reflection upon these concerns, we conclude that Rule 23 permits courts to achieve the significant benefits created by settlement classes so long as these courts abide by all of the fundaments of the Rule. Settlement classes must satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation, as well as the relevant 23(b) requirements, usually (as in this case) the (b)(3) superiority and predominance standards. We also hold that settlement class status (on which settlement approval depends) should not be sustained unless the record establishes, by findings of the district judge, that the same requisites of the Rule are satisfied. Additionally, we hold that a finding that the settlement was fair and reasonable does not serve as a surrogate for the class findings, and also that there is no lower standard for the certification of settlement classes than there is for litigation classes. But so long as the four requirements of 23(a) and the appropriate requirement(s) of 23(b) are met, a court may legitimately certify the class under the Rule.

In this case the district judge made no Rule 23 findings, and significant questions remain as to whether the class could have met the requisites of the rule had the district court applied them. Principally at issue is adequacy of representation. In particular, the objectors contend that there is a conflict between the positions of individual owners on the one hand and fleet owners on the other hand. The disparity in settlement benefits enjoyed by these different groups, objectors argue, creates an intra-class conflict that precludes the finding of adequacy of representation required by the rule. Moreover, they submit, the large number of different defenses available under the laws of the several states involved also creates a potentially serious commonality and typicality problem.

---

action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits....

*(e) Dismissal or Compromise.* A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

We conclude that the objectors' adequacy of representation claim probably has merit. At all events, the district court did not properly evaluate the differential impact of the settlement on individual fleet owners, and should determine on remand whether the conflicts among class members are so great as to preclude certification (or at least sufficient to require the creation of subclasses). The district court should also focus on the commonality and typicality problems, to determine whether the national scope of the class litigation and the plethora of defenses available in different jurisdictions prevent these requirements from being met.

For the reasons that follow at some length, we conclude that, although settlement classes are valid generally, this settlement class was not properly certified. We also conclude that the settlement is not fair and adequate; more precisely, we hold that the district court abused its discretion in determining that it was, primarily because the district court erred in accepting plaintiffs' unreasonably high estimate of the settlement's worth, in over-estimating the risk of maintaining class status and of establishing liability and damages, and in misinterpreting the reaction of the class. Finally, although our disposition of the foregoing issues makes it unnecessary for us to pass on the approval of the attorneys' fees, we clarify the governing standards for these fee awards to guide the district court on remand. We therefore reverse the challenged order of the district court and remand for further proceedings.

## I. FACTS, PROCEDURAL HISTORY, AND STANDARD OF REVIEW

### A. General Background

Between 1973 and 1987, General Motors sold over 6.3 million C/K pickup trucks with side-mounted fuel tanks.[2] In late October 1992, after the public announcement of previously undisclosed information regarding the safety of the fuel tank placement in GM pickups, consumer class action lawsuits were filed in several jurisdictions. The National Highway Traffic Safety Administration

("NHTSA") commenced an investigation of the alleged defects relating to side-impact fires on these trucks, and consumer advocacy groups sought a recall.[3]

On November 5, 1992, plaintiffs in one action sought to enjoin allegedly misleading communications to putative class members and filed an application for expedited discovery. On November 8 and 9, 1992, GM filed notices of removal of this and other state court actions, and a motion with the Judicial Panel on Multidistrict Litigation ("MDL Panel") to transfer and consolidate all actions for pretrial purposes under 28 U.S.C. § 1407 (1993). The MDL Panel transferred all related actions to the District Court for the Eastern District of Pennsylvania on February 26, 1993. Ultimately, dozens of actions were filed in various courts throughout the United States on behalf of consumer classes; the federal cases were dismissed, remanded to state court, or transferred to the Eastern District of Pennsylvania.

On March 5, 1993, pursuant to an order of the (transferee) District Court, plaintiffs filed a Consolidated Amended Class Action Complaint seeking equitable relief and damages that consolidated all of the actions under the MDL caption and listed nearly 300 representative plaintiffs, including both individual and fleet owners. The Complaint alleged violations of two federal statutes; the Magnuson–Moss Act and the Lanham Trademark Act; a variety of common law and statutory claims, including negligence, fraud, breach of written and implied warranty; and violations of various state consumer statutes. The complaint sought, inter alia, an order remedying the alleged abnormally high incidence of fuel-fed fires following side-impact collisions by requiring GM to recall the trucks or pay for their repair. GM answered this complaint, denying all substantive allegations and raising numerous affirmative defenses.

Also on March 5, 1993, plaintiffs filed a consolidated motion for nationwide class certification. The court set July 19, 1993, the hearing date on this motion. On March 30, 1993, GM moved to stay this litigation pend-

---

2. The class includes both mid-and full-size trucks with chassis model types C, K, R, or V.

3. See note 5 infra.

ing the outcome of the NHTSA investigation, initiated in December 1992. This motion was denied on June 4, 1993. Pursuant to a scheduling order issued by the court, discovery during the spring of 1993 focused on class certification issues. During this discovery, GM produced more than 100,000 pages of documents from prior C/K pickup product liability lawsuits and GM's responses to NHTSA information requests. Plaintiffs also had access to the depositions and trial testimony in other cases involving the fuel tank design of C/K pickups, including the jury trial in *Moseley v. GM*, No. 90–V–6276 (Fulton County, Ga.). Plaintiffs consulted with their own experts to evaluate this information. In addition, depositions were taken of some GM personnel and certain named plaintiffs. Discovery on the merits of the case had been postponed until autumn 1993. Nothing in the record indicates that, as of the spring of 1993, counsel had identified expert witnesses for trial or deposed GM's engineering experts.

In the midst of these proceedings, the parties began exploring a possible settlement of the litigation. These discussions intensified in June 1993, at which time face-to-face and telephonic meetings, both between the parties and among plaintiffs' counsel, took place on virtually a daily basis. On July 19, 1993, the parties reached a settlement in principle, reduced the terms to writing, and informed the district court.[4] For purposes of settlement only and without prejudice to GM's substantial opposition to class certification, the named parties agreed to the certification of a settlement class of C/K pickup owners, described below.

### B.  The Settlement Agreement

In general terms, the settlement agreement provides for members of the settlement class to receive $1,000 coupons redeemable toward the purchase of any new GMC Truck or Chevrolet light duty truck. Settlement

certificates are transferable with the vehicle. They are redeemable by the then current owner of the 1973–86 C/K and 1987–91 R/V light duty pickup trucks or chassis cabs at any authorized Chevrolet or GMC Truck dealer for a fifteen month period. Settlement class members do not have to trade in their current vehicle to use the certificate, and the certificates can be used in conjunction with GM and GMAC incentive programs.

The class members can freely transfer the certificate to an immediate family member who resides with the class member. Class members can also transfer the $1000 certificate to a family member who does not reside with the class member by designating the transferee family member within sixty days, running from the date that GM mailed notice of the proposed settlement. Additionally, the $1000 certificate can be transferred with the title to the settlement class vehicle, that is, to a third party who purchases the class member's vehicle.

In lieu of a $1,000 certificate, and without transferring title to the settlement class vehicle, a class member may instead request that a nontransferable $500 certificate (counterintuitively known as the "transfer certificate") be issued to any third party except a GMC dealer or its affiliates. This $500 certificate is redeemable with the purchase of a new C or K series GMC or Chevrolet full-size pickup truck or its replacement model. The $500 certificate cannot be used in conjunction with any GMC or GMAC marketing incentive, must be used on the more expensive full size models, and is subject to the same fifteen-month redemption period as the $1,000 certificates. The class member must make a notarized request to GM, and GM will mail the $500 certificate to the transferee within 14 days of its receipt of the request for transfer.

Under the terms of the agreement, the approval of the settlement and corresponding entry of final judgment would have no effect

---

4.  GM reached a substantially identical agreement with counsel representing a class of C/K pickup truck purchasers who are Texas residents in *Dollar v. General Motors*, No. 92–1089 (71st Judicial District, Marshall, Tex.) (JA 1708, 1746). That settlement was approved in November 1993, but was overturned on appeal on June 22,

1994. *See Bloyed v. General Motors Corporation*, 881 S.W.2d 422 (Tex.Ct.App.1994), discussed infra at VI(I). The Texas Supreme Court granted GM's Application for Writ of Error on February 16, 1995 and set the case for oral argument on March 21, 1995.

upon any accrued or future claims for personal injury or death, nor would it affect the rights of settlement class members to participate in any future remedial action that might be required under the National Traffic and Motor Safety Act of 1966, 15 U.S.C. §§ 1381 et seq. (1995).[5]

The settlement agreement before us also provides that plaintiffs' counsel would apply to the district court for an award of reasonable attorneys' fees and reimbursement of expenses, both to be paid by GM. GM reserved the right to object to any fees or expenses it deemed to be excessive and to appeal any amount awarded by the court over its objection. Plaintiffs' counsel filed their fee applications on or about September 15, 1993; the fee applications remained in the files of the clerk of the district court where class members could theoretically review them, but no information about attorneys' fees other than the fact that a fee application would be made was included in the class notice. GM did not file any formal objections to the fee applications.

### C. Approval of the Settlement and Fees

The district court reviewed the substantive terms of the settlement on July 12, 1993 and made the preliminary determination, in Pretrial Order No. 7, entered July 20, 1993, that the proposed settlement appeared reasonable. Also in pretrial order no. 7, the court "provisionally" certified the class of GM truck owners as a settlement class (i.e., for settlement purposes only) pursuant to Rule 23(b)(3); however, the court did not make findings that the requisites of Rule 23(a) or 23(b) were satisfied. The court approved the form of and dissemination to putative class members of the combined notice of the pendency of the action and the proposed settlement pursuant to Rules 23(c)(2) and 23(e). The class definition included all persons and entities who purchased in the United States (except for residents of the State of Texas) and were owners as of July 19, 1993 of (1) a

1973–1986 model year General Motors full-size pickup truck or chassis cab of the "C" or "K" series; or (2) a 1987–1991 model year General Motors full-size pickup truck or chassis cab of the "R" or "V" series. On August 20 and 21, 1993, GM mailed the notice to all registered owners of class vehicles (including nearly 5.7 million vehicles), and it published the full text of the notice in USA Today and The Philadelphia Inquirer on August 27, 1993.

In response to the notice, over 5,200 truck owners elected to opt out of the class, and approximately 6,500 truck owners (a number which includes fleet owners who own as many as 1,000 vehicles each) objected to the settlement. The objectors' filings contained many overlapping claims. The recurring contentions were that: (1) the settlement does nothing to fix the trucks; (2) even with the $1,000 coupon, many owners would be unable to purchase a new truck given their high cost (with list prices from $11,000 to $33,000); (3) state and local government fleet owners would not be able to redeem all of their certificates (by buying new vehicles) within the short redemption period (fifteen months), and they might be further restricted from using the coupons by competitive bidding procurement rules; and (4) GM and class counsel colluded in a manner that compromised the interests of the class and that would preclude a finding of adequate representation. GM rejoined with voluminous material emphasizing the substantial risks plaintiffs faced not only in maintaining this treatment but also in establishing liability and damages.

A settlement fairness hearing was held on October 26, 1993 during which the objectors who submitted written briefs were permitted to speak. The district court approved the settlement in a Memorandum and Order dated December 16, 1993. In that order, the court confirmed its Pretrial Order No. 7, which had provisionally certified the settlement class. Although the court still made no

---

5. After oral argument in this case, United States Transportation Secretary Federico Pena announced that NHTSA had settled the proceeding involving the C/K trucks at issue here without ordering a recall, finding an acceptable retrofit, or giving any compensation to the truck owners.

The settlement provided that GM would contribute $51 million to general safety programs unrelated to the trucks' alleged problems. See Statement by Secretary Federico Pena on Dec. 2, 1994, Settlement Regarding DOT Investigation of General Motors C/K Pickup Trucks.

findings that the requisites of Rules 23(a) and (b) were met, it did set forth findings of fact and conclusions of law to justify its approval of the settlement as fair, reasonable and adequate based on the nine-factor test established in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir.1975).

The court found that the total economic value of the settlement was "between $1.98 billion and $2.18 billion." Against the prospect of settlement, the court weighed each of the nine *Girsh* factors. It concluded that "the complexity, expense and likely duration of the litigation would be mammoth." Although the settlement was reached at an early stage of the litigation, just four months after the consolidated complaint was filed, the court found that this did not weigh against the settlement because the court believed that the parties had access to "extensive discovery on the same issues of product defect that was previously conducted in the various personal injury actions that have been litigated throughout the country." The district court also found that the reaction of class members to the proposed settlement supported approval citing "the infinitesimal number of truck owners who have either objected to or sought exclusion from the settlement."

Noting the divided results of the personal-injury jury trials and the numerous defenses GM could raise, the court found that "a substantial risk in establishing liability" weighed in favor of approval. Similarly, the court found that "[p]erhaps the greatest weakness in the plaintiffs' case is the lack of proof of economic damages." The court also addressed the objection that the settlement did not provide for a recall or a "fix," explaining that "no objector that complains that the settlement fails to retrofit the alleged defect has been able to come forth with a practical and safe modification for the trucks that has been designed, evaluated and tested."

On December 20, 1993, four days after approving the settlement, the district court also approved the class counsel's request for attorneys' fees in the amount of $9.5 million. Although the court did not believe at that time that it needed to review that fee award,

to which GM had agreed, it subsequently, on February 2, 1994, issued an "amplified order" evaluating the award in greater detail. The court determined that the fee request was reasonable under both a lodestar analysis and the percentage-of-recovery method (*see* Part VII *infra*).

### D. The NHTSA Investigation

While this case was under submission to this court, the NHTSA investigation continued. Over the objections of some of NHTSA's engineers who had determined that the trucks complied with relevant safety standards, on October 17, 1994, Secretary of Transportation Federico Pena announced the agency's finding that the trucks contained a safety defect creating an increased and unreasonable risk of side-impact fires. The determination was based on the allegedly enhanced risk of side-impact fires relative to Ford pickups that resulted from GM's placement of the fuel tanks outside the frame rails. GM challenged the propriety of the public meeting NHTSA planned to hold and NHTSA's authority to order a recall of vehicles that met all relevant safety standards. On December 2, 1994, Secretary Pena announced the settlement of the C/K pickup investigation wherein GM contributed over $51 million for a variety of safety programs unrelated to the pickups, and admitted no liability.[6]

### E. Standard of Review

[1] Each of the issues presented here is reviewable for abuse of discretion. *See Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974) (approval of proposed class action settlement); *In re School Asbestos Litig.*, 921 F.2d 1338, 1341 (3d Cir.1990), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1623, 113 L.Ed.2d 720 (1991) (class certification); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 115 (3d Cir.1976) (award of reasonable attorney's fees); *Marroquin–Manriquez v. INS*, 699 F.2d 129, 134 (3d Cir.1983), *cert. denied*, 467 U.S. 1259, 104

6. *See* note 5 *supra.*

S.Ct. 3553, 82 L.Ed.2d 855 (1984) (scope of discovery). An appellate court may find an abuse of discretion where the "district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *International Union, UAW v. Mack Trucks, Inc.,* 820 F.2d 91, 95 (3d Cir.1987), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court, based on the entire evidence, concludes with firm conviction that a mistake has been made. *Oberti v. Board. of Ed. of Borough of Clementon Sch. Dist.,* 995 F.2d 1204, 1220 (3d Cir.1993).

## II. ANATOMY OF THE CLASS CLAIMS

The consolidated class complaint filed on behalf of the nationwide class of GM truck owners (except those from Texas) alleged violations of the Magnuson–Moss Warranty Act, 15 U.S.C.A. § 2310(d)(1) (1995); and the Lanham Act, 15 U.S.C.A. § 1125(a) (1995); and a variety of state common law and statutory claims, including strict liability in tort for selling a dangerously defective product; negligent design; negligent misrepresentation; fraud (based on defendants' alleged course of conduct in the advertising, promotion, and sale of the GM pickups intentionally concealing material facts about a dangerous latent defect); breach of warranty, including written (from vehicle warranties), express (from public representations by GM), implied (warranties of merchantability) and statutory warranties; and finally violations of various state consumer protection statutes. The case did not involve any pickup trucks that had actually experienced fuel tank fires caused by side-impact collisions. Moreover, personal injury or death claims were expressly omitted from the complaint as well as from the settlement—class members remain free to pursue such claims if any should accrue.

The aggregated treatment of these claims was potentially complicated by the differences in underlying facts. The trucks at issue had nineteen different fuel tank systems; proof might thus be required for each design on relevant issues. Furthermore, un-

like the federal securities laws where there is a presumption of reliance on a material misrepresentation, *see Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), plaintiffs would likely have had to prove individual reliance on the allegedly misleading materials under the various state laws applicable to most of these claims. More fundamentally, the complaint itself invoked state laws that implicated different legal standards on, for example, the warranty claims (the laws contain various privity requirements or the need for an allegedly defective product to fail in service before a warranty claim can be sustained), negligent misrepresentation, negligence, and strict products liability. The state laws implicated by the filing of the nationwide class action also differed on such issues as statutes of limitations; whether pickup trucks are "consumer products;" the application of durational limits on implied warranties; the requirement of reliance to recover for fraud, misrepresentation, and warranty claims; whether intent is a required element of negligent misrepresentation claims; whether comparative fault is a defense; and the relevant test for plaintiffs' design defect claims.

## III. RULE 23—RELEVANT FUNDAMENTAL PRINCIPLES

[2] Before turning to the precise questions at issue on this appeal, it is important that we consider the several basic purposes served by class actions in our contemporary, complex litigation-laden legal system. One of the paramount values in this system is efficiency. Class certification enables courts to treat common claims together, obviating the need for repeated adjudications of the same issues. *See* 1 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 1.06 (3d Ed.1992); *General Tel. Co. v. Falcon,* 457 U.S. 147, 149, 102 S.Ct. 2364, 2366, 72 L.Ed.2d 740 (1982).

The Supreme Court has articulated other important objectives served by class actions. Class actions achieve "the protection of the defendant from inconsistent obligations, the protection of the interests of absentees, the provision of a convenient and economical means for disposing of similar lawsuits, and

the facilitation of the spreading of litigation costs among numerous litigants with similar claims." *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 402–03, 100 S.Ct. 1202, 1211–12, 63 L.Ed.2d 479 (1980). The Court has explained the significance of the last goal as

> an evolutionary response to the existence of injuries unremedied by the regulatory action of government. Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.

*Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980); *see also* 1 NEWBERG & CONTE § 1.06 at 1–19. Cost spreading can also enhance the means for private attorney general enforcement and the resulting deterrence of wrongdoing. *Id.* § 1.06 at 1–18 to 1–20.

[3] The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation. *See* NEWBERG & CONTE § 11.41 at 11–85 (citing cases); *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977); *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 950 (9th Cir.1976). The parties may also gain significantly from avoiding the costs and risks of a lengthy and complex trial. *See First Com. Corp. of Boston Customer Accts Litig.,* 119 F.R.D. 301, 306–07 (D.Mass.1987). These economic gains multiply when settlement also avoids the costs of litigating class status—often a complex litigation within itself. Furthermore, a settlement may represent the best method of distributing damage awards to injured plaintiffs, especially where litigation would delay and consume the available resources and where piecemeal settlement could result, in the Rule 23(b)(1)(B) limited fund context, in a sub-optimal distribution of the damage awards. *See, e.g., In re Dennis Greenman Secur. Litig.,* 829 F.2d 1539, 1542 (11th Cir. 1987).

[4] Thus, courts should favor the use of devices that tend to foster negotiated solutions to these actions. Prima facie, this would include settlement classes. True, it was once thought that mass tort actions were ordinarily not appropriate for class treatment, *see* Fed.R.Civ.P. 23 Advisory Committee's note, subdivision (b)(3), 39 F.R.D. 69, 103 (1966). It has also been argued that mass tort cases strain the boundaries of Rule 23. *See* Bruce H. Nielson, *Was the 1966 Advisory Committee Right?: Suggested Revisions of Rule 23 to Allow More Frequent Use of Class Actions in Mass Tort Litigation,* 25 HARV.J.LEGIS. 461 (1988) (suggesting necessity of rule revisions to accommodate class action treatment of mass torts). However, the applicability of Rule 23 to mass tort cases has become commonplace, and the use of the class action device, specifically the (b)(3) class, has created some of the largest and most innovative settlements in these contexts. Prominent examples include the recent $4.2 billion settlement of the breast implant litigation. *See In re Silicone Gel Breast Implant Prods. Liab. Litig.,* 1994 WL 578353 (N.D.Ala.1994).

Despite the potential benefits of class actions, there remains an overarching concern—that absentees' interests are being resolved and quite possibly bound by the operation of res judicata even though most of the plaintiffs are not the real parties to the suit. The protection of the absentees' due process rights depends in part on the extent the named plaintiffs are adequately interested to monitor the attorneys (who are, of course, presumed motivated to achieve maximum results by the prospect of substantial fees), and also on the extent that the class representatives have interests that are sufficiently aligned with the absentees to assure that the monitoring serves the interests of the class as a whole. In addition, the court plays the important role of protector of the absentees' interests, in a sort of fiduciary capacity, by approving appropriate representative plaintiffs and class counsel.

Another problem is that class actions create the opportunity for a kind of legalized blackmail: a greedy and unscrupulous plaintiff might use the *threat* of a large class action, which can be costly to the defendant, to extract a settlement far in excess of the

individual claims' actual worth. Because absentees are not parties to the action in any real sense, and probably would not have brought their claims individually, *see Mars Steel v. Continental Illinois Nat'l Bank & Trust*, 834 F.2d 677, 678 (7th Cir.1987), attorneys or plaintiffs can abuse the suit nominally brought in the absentees' names. As one court has noted, "[t]his fundamental departure from the traditional pattern in Anglo-American litigation generates a host of problems...." *Id.*

[5–7] The drafters designed the procedural requirements of Rule 23, especially the requisites of subsection (a), so that the court can assure, to the greatest extent possible, that the actions are prosecuted on behalf of the actual class members in a way that makes it fair to bind their interests. The rule thus represents a measured response to the issues of how the due process rights of absentee interests can be protected and how absentees' represented status can be reconciled with a litigation system premised on traditional bipolar litigation. Moreover, the requirement in Rule 23(c) that the court decide certification motions "as soon as practicable," *see* note 1 *supra*, aims to reduce even further the possibility that a party could use the ill-founded threat of a class action to control negotiations or the possibility that absentees' interests could be unfairly bound. Hence, the procedural formalities of certification are important even if the case appears to be headed for settlement rather than litigation.

[8] This expanded role of the court in class actions (relative to conventional bipolar litigation) continues even after certification. While the parties in a normal suit do not ordinarily require a judge's approval to settle the action, class action parties do. Rule 23(e) provides: "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." FED.R.CIV.P. 23(e). Courts and commentators have interpreted this rule to require courts to "independently and objectively analyze the evidence and circumstances before it in order to determine

whether the settlement is in the best interest of those whose claims will be extinguished." 2 NEWBERG & CONTE § 11.41 at 11–88 to 11–89. "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983); *Sala v. National RR Passenger Corp.*, 721 F.Supp. 80 (E.D.Pa.1989); *see also Piambino v. Bailey*, 610 F.2d 1306 (5th Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980).

[9] Before sending notice of the settlement to the class, the court will usually approve the settlement preliminarily. This preliminary determination establishes an initial presumption of fairness when the court finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected. *See* 2 NEWBERG & CONTE § 11.41 at 11–91.

[10, 11] As noted above, this court has adopted a nine-factor test to help district courts structure their final decisions to approve settlements as fair, reasonable, and adequate as required by Rule 23(e). *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). Those factors are: (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation. *Id.* The proponents of the settlement bear the burden of proving that these factors weigh in favor of approval. *See GM Interchange*, 594 F.2d 1106, 1126 n. 30 (7th Cir.

1979); *Holden v. Burlington Northern, Inc.,* 665 F.Supp. 1398, 1407 (D.Minn.1987); MCL 2d § 30.44. The findings required by the *Girsh* test are factual, *see Malchman v. Davis,* 706 F.2d at 434; *Plummer v. Chemical Bank,* 668 F.2d 654, 659 (2d Cir.1982), which will be upheld unless they are clearly erroneous, *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 207 (5th Cir.1981).

## IV. SETTLEMENT CLASSES

This appeal challenges (among other things) the district court's class certification order. Before we may address the propriety of the court's order we must first decide whether it is ever proper to certify a class for settlement purposes only. We therefore begin our analysis with a closer look at how settlement classes operate.

### A. Nature of the Device

As we have explained above, a settlement class is a device whereby the court postpones the formal certification procedure until the parties have successfully negotiated a settlement, thus allowing a defendant to explore settlement without conceding any of its arguments against certification. Despite the directive of Rule 23(c) that courts certify actions as soon as practicable, when a class action has been filed before the settlement has been arrived at courts will often delay the certification determination during the pendency of settlement discussions. If the settlement negotiations succeed, courts will certify the class for settlement purposes only and send a combined notice of class pendency and settlements to the class members. Thus, by the time the court considers certification, the defendant has essentially stipulated to the existence of the class requirements since it now has an interest in binding an entire class with its proffered settlement.

By specifying certification for settlement purposes only, however, the court preserves the defendant's ability to contest certification should the settlement fall apart. Because the court indulges the assumption of the class's existence only until a settlement is reached or the parties abandon the negotiations, settlement classes are also sometimes referred to as temporary or provisional classes. Sometimes the specification may also be seen as assuming that the class may only meet the requirements of Rule 23 if the action is settled, and that certification may in fact be inappropriate if the action will actually be litigated. In any event, notwithstanding that there is an absence of clear textual authorization for settlement classes, many courts have indulged the stipulations of parties by establishing temporary classes for settlement purposes only. *See, e.g., Mars Steel v. Continental Illinois Nat'l Bk. & Trust,* 834 F.2d 677 (7th Cir.1987); *Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *In re A.H. Robins Co.,* 880 F.2d 709, 738–39 (4th Cir.1989); *In re Dennis Greenman Sec. Litig.,* 829 F.2d 1539, 1543 (11th Cir.1978); *Plummer v. Chemical Bank,* 668 F.2d 654 (2d Cir.1982); *In re Beef Industry Antitrust Litig.,* 607 F.2d 167, 173 (5th Cir.1979); *Malchman v. Davis,* 706 F.2d 426, 433–34 (2d Cir.1983); *In re Taxable Mun. Bond Sec. Litig.,* 1994 WL 643142 (E.D.La. Nov. 15, 1994); *In re Silicone Gel Breast Implant Prod. Liab. Litig.,* 1994 WL 578353 (N.D.Ala.1994); *In re First Commodity Corp. of Boston,* 119 F.R.D. 301, 306–08 (D.Mass.1987); *In re Bendectin,* 102 F.R.D. 239, 240 (S.D.Oh.1984), *rev'd on other grounds,* 749 F.2d 300 (6th Cir.1984); *In re Mid–Atlantic Toyota Antitrust Litig.,* 564 F.Supp. 1379, 1388–90 (D.Md.1983); *In re Chicken Antitrust Litig.,* 560 F.Supp. 957, 960 (N.D.Ga.1980).

There has been a great deal of commentary, both critical [7] and laudatory,[8] of the use of these "settlement classes." And some courts have criticized these accommodations

---

7. *See, e.g.,* John C. Coffee, Jr., *The Corruption of the Class Action,* WALL ST. J. Sept. 7, 1994, at A15.

8. 2 NEWBERG & CONTE § 11.27 (First) § 1.46; Roger H. Transgrud, *Joinder Alternatives in Mass Tort Litigation,* 70 CORNELL L.REV. 779 (1985);

Bruce H. Nielson, *Was the 1966 Advisory Committee Right?: Suggested Revisions of Rule 23 to Allow More Frequent Use of Class Actions in Mass Tort Litigation,* 25 HARV.J.LEGIS. 461, 480.

of the negotiating parties and expressed their ambivalence while continuing nonetheless to use them. *See, e.g., Mars Steel,* 834 F.2d 677 (7th Cir.1987) (describing considerable dangers of settlement classes but ultimately upholding the settlement). Before we interpret the dictates of Rule 23 with respect to settlement classes, it will be useful to survey both the criticism and the praise.

### B. Perceived Problems of Settlement Classes

[12] A number of commentators, particularly the authors of the first edition of the Manual for Complex Litigation, have voiced serious concerns about settlement classes. These criticisms have focused on the fact that Rule 23, a carefully constructed scheme intended to protect the rights of absentees that necessarily relies on active judicial participation to protect those interests, does not authorize a separate category of class certification that would permit a dilution of or dispense with the subsection (a) criteria. § 1.46; *see also Mars Steel v. Continental Ill. Nat'l Bank & Trust,* 834 F.2d 677, 680 (7th Cir.1987); *In re Baldwin United,* 105 F.R.D. 475 (S.D.N.Y.1984). Other criticisms focus on the potential prejudice to the parties and the institutional threat posed to the court. *See, e.g., Coffee, supra* note 7.

Rule 23 does not in terms authorize the deferral of class certification pending settlement discussions. Indeed, Rule 23(c) provides: *"As soon as practicable* after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Fed. R.Civ.P. 23(a) (emphasis supplied). Deliberately delaying a class certification determination so that settlement discussions can proceed clearly does not represent an effort to resolve the issue "as soon as practicable." As Judge Posner has noted, "[i]t is hard to see why the propriety of maintaining the suit as a class action could not 'practicably' have been determined much earlier. And, common though the practice of deferring class certification while settlement negotiations are going on is, it not only jostles uneasily with the language of Rule 23(c)(1) but also creates practical problems." *Mars Steel,* 834 F.2d at 680.

The danger here is that the court cannot properly discharge its duty to protect the interests of the absentees during the disposition of the action. Because the class has not yet been defined, the court lacks the information necessary to determine the identity of the absentees and the likely extent of liability, damages, and expenses of preparing for trial. *See* MCL 2d § 30.45 at 243 ("No one may know how many members are in the class, how large their potential claims are, what the strengths and weaknesses of the parties' positions are, or how much the class will benefit under the settlement."); *In re Baldwin United,* 105 F.R.D. 475, 481 (S.D.N.Y.1984). Moreover, the court performs its role as supervisor/protector without the benefit of a full adversarial briefing on the certification issues. With less information about the class, the judge cannot as effectively monitor for collusion, individual settlements, buy-offs (where some individuals use the class action device to benefit themselves at the expense of absentees), and other abuses. *See In re Beef Indus. Antitrust Litig.,* 607 F.2d at 174. For example, if the court fails to define the class before settlement negotiations commence, then during the settlement approval phase the judge will have greater difficulty detecting if the parties improperly manipulated the scope of the class in order to buy the defendant's acquiescence.

Settlement classes also make it more difficult for a court to evaluate the settlement by depriving the judge of the customary structural devices of Rule 23 and the presumptions of propriety that they generate. Ordinarily, a court relies on class status, particularly the adequacy of representation required to maintain it, to infer that the settlement was the product of arm's length negotiations. *Cf. Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir.1983) (noting protracted nature of negotiations in approving settlement); *City of Detroit v. Grinnell,* 495 F.2d 448, 463 (2d Cir.1974) (same); *In re Baldwin–United,* 105 F.R.D. 475, 482 (S.D.N.Y.1984) (same). Where the court has not yet certified a class

or named its representative or counsel, this assumption is questionable.

In effect, settlement classes can, depending how they are used, evade the processes intended to protect the rights of absentees. Indeed, the draft of the MCL (Third), although considerably more receptive to settlement classes than the earlier editions of the Manual, explains that "[t]he problem presented by these requests is not the lack of sufficient information and scrutiny, but rather the possibility that fiduciary responsibilities of class counsel or class representatives may have been compromised." MCL (Third) (draft) at 193. Even some courts successfully using these devices to achieve settlements apparently recognize these dangers since they certify these actions more cautiously than ordinary classes. *See, e.g., Ace Heating & Plumbing Co. v. Crane Co.,* 453 F.2d 30, 33 (3d Cir.1971) (court must be doubly careful where negotiation occurs before certification and designation of a class counsel); *In re Beef Antitrust Litig.,* 607 F.2d 167, 176–77 (5th Cir.1979) (examining though ultimately rejecting the charge that collusion precluded the certification of the settlement class); *Simer v. Rios,* 661 F.2d 655, 664–66 (7th Cir.1981) (requiring a higher showing of fairness where settlement negotiated prior to certification); *Weinberger v. Kendrick,* 698 F.2d 61, 69 (2d Cir.1982) (judge made findings about discovery and counsel).

In particular, settlement classes create especially lucrative opportunities for putative class attorneys to generate fees for themselves without any effective monitoring by class members who have not yet been apprised of the pendency of the action. Moreover, because the court does not appoint a class counsel until the case is certified, attorneys jockeying for position might attempt to cut a deal with the defendants by underselling the plaintiffs' claims relative to other attorneys.[9] Unauthorized settlement negotiations occurring before the certification determination thus "create the possibility of negotiation from a position of weakness by the attorney who purports to represent the class." *GM Interchange Litigation,* 594 F.2d 1106, 1125 (7th Cir.1979). Pre-certification negotiations also hamper a court's ability to review the true value of the settlement or the legal services after the fact. *See supra* at 31. In addition, unauthorized negotiations also result in denying other plaintiffs' counsel information that is necessary for them to make an effective evaluation of the fairness of any settlement that results. *See id.* at 1125.

Framed as an issue of Rule 23(a) requisites, these considerations implicate adequacy of representation concerns: "[a]rguments in opposition to settlement classes have merit when they are addressed to the problem of inadequate representation or possible collusion among the named plaintiffs and some or all defendants." *In re Baldwin–United Corp.,* 105 F.R.D. 475, 480 (S.D.N.Y.1984). Another court has warned that the "danger of a premature, even a collusive, settlement [is] increased when as in this case the status of the action as a class action is not determined until a settlement has been negotiated, with all the momentum that a settlement agreement generates...."; *Mars Steel,* 834 F.2d at 680; *see also Malchman,* 706 F.2d at 433 (recognizing special potential for collusion or undue pressure by defendants in settlement negotiations); *Weinberger,* 698 F.2d at 73 (requiring a higher showing of fairness to accommodate greater potential for improper settlement). Settlement classes, which constitute ad hoc adjustments to the carefully designed class action framework constructed by Rule 23, lack the regulatory mechanisms that ordinarily check this improper behavior: "There is in fact little or no individual client consultation and no judicial oversight of a hidden process of wheeling and dealing to maximize overall recovery and fees for hundreds and thousands of massed cases." *In re Joint Eastern & Southern District Asbestos Litig.,* 129 B.R. 710, 802 (E. & S.D.N.Y.1991) (discussing the ramifications of class treatment of mass torts).

In addition to these procedural problems (and the problems created for a judge trying to evaluate both class status and the adequa-

---

9. These sorts of dynamics have led some critics to accuse class action attorneys of ethical violations. While we emphasize that counsel here committed no such violations, we do not preclude the possibility that these violations could occur.

cy of a class settlement simultaneously) the earlier achievement of settlement through the use of a settlement class also can lead to a settlement that may provide inadequate consideration in exchange for the release of the class's claims. With early settlement, both parties have less information on the merits. That is, they have less information on the membership of the class, on the size of potential claims, on whether the settlement purports to resolve class or individual claims, on the strengths and weaknesses of the case, and on how class members will benefit from the settlement. See MCL 2d § 30.45 at 243–44; 2 NEWBERG & CONTE § 11.09 at 11–13. Without the benefit of more extensive discovery, both sides may underestimate the strength of the plaintiffs' claims.

Turning to the question of due process rights, we note that class members may, as a result of these information deficiencies, not be in a fair position at this early stage to evaluate whether or not the settlement represents a superior alternative to litigating. Perhaps more troubling in light of the reality that absentees tend to lack a real understanding of the actions supposedly pursued in their names is that, "where notice of the class action is ... sent simultaneously with the notice of the settlement itself, [the settlement class paradigm], the class members are presented with what looks like a fait accompli." Mars Steel, 834 F.2d at 680–81. Thus, even if they have enough information to conclude the settlement is insufficient and unsatisfactory, see In re Beef Antitrust Litig., 607 F.2d 167, 173 n. 4 (5th Cir.1979), cert. denied, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981), the mere presentation of the settlement notice with the class notice may pressure even skeptical class members to accept the settlement out of the belief that, unless they are willing to litigate their claims individually—often economically infeasible—they really have no choice.

In a different vein, a number of cases have also criticized settlement classes on the grounds that they create an opportunity for "one-way intervention," allowing putative class members to wait to see whether they think the settlement is favorable before deciding whether they want to be bound by it.

See McDonald v. Chicago Milw. Corp., 565 F.2d 416, 420 (7th Cir.1977); Watkins v. Blinzinger, 789 F.2d 474, 475 n. 3 (7th Cir. 1986) ("A deferred ruling [on certification] converts the class action to an opportunity for one-way intervention, which Rule 23 is designed to avoid...."); Premier Electrical Constr. Co. v. National Elec. Contractors Ass'n, Inc., 814 F.2d 358, 363 (7th Cir.1987) (criticizing delay of certification). Because class members have the opportunity to wait until the outcome is known (i.e., the settlement's terms are determined) to decide whether they want to be bound by the result, courts and defendants are exposed to the same potential for multiple lawsuits that class actions are designed to avoid, and the supposed advantages of settlement classes are largely eroded.

Perhaps more troubling, the possibility of pre-certification negotiation and settlement may facilitate the filing of strike suits. Since settlement classes can involve a settlement achieved either before or after the filing of class claims, recognition of the settlement class device allows plaintiffs to file as class actions cases that counsel never intended to have certified, but instead only to settle the claims individually. Mars Steel, 834 F.2d at 681 ("[P]laintiffs will be tempted to add class claims in order to intimidate the defendant, then delete them by way of compromise."). Knowing that they would not face judicial scrutiny if they settle before certification, plaintiffs' lawyers face no deterrent from attempting to extract larger settlements by threatening class litigation than they could with the cases filed individually.

In many respects then, the failings of settlement classes are a function of the dearth of information available to judges attempting to scrutinize the settlements in accordance with their Rule 23(e) duties. Because the issue of certification is never actively contested, the judge never receives the benefit of the adversarial process that provides the information needed to review propriety of the class and the adequacy of settlement. This problem is exacerbated where the parties agree on a settlement of the case before the class action is filed, since a motion for certifi-

cation and settlement are presented simultaneously.

Last, but by no means least, the use of settlement classes also risks transforming the courts into mediation forums. See Coffee, supra note 7, at A15. Cases could be filed without any expectation or intention of litigation, with the foreknowledge that the natural hydraulic pressure for settlement may in fact lead to a class settlement, especially given the incentive a defendant has to bind as many potential claimants as possible with an approved class settlement. Courts may approve these class settlements even if the case is highly inappropriate for class treatment, since judges confronting the reality of already over-taxed judicial resources, see Proposed Long Range Plan for the Federal Courts (March 1995) at 9–12, may feel constrained to dispose of such onerous litigation through the settlement class device. The losers in this type of scenario are not only inadequately represented class members but also the federal courts as an institution, because their resources are further sapped by entertaining cases that arguably do not belong there.[10] This increased burden will be especially problematic if the standards for certification are relaxed for settlement classes; as this appeal demonstrates, proceedings attendant to settlement class certification can consume considerable federal judicial time.

### C. Arguments Favoring Settlement Classes

Although settlement classes are vulnerable to potent criticisms, some important dynamics militate in favor of a judge's delaying or even substantially avoiding class certification determinations. Because certification so dramatically increases the potential value of the suit to the plaintiffs and their attorneys as well as the potential liability of the defendant, the parties will frequently contest certification vigorously. As a result, a defendant considering a settlement may resist agreeing to class certification because, if the settlement negotiations should fail, it would be left

exposed to major litigation. See In re Beef Indus. Antitrust Litig., 607 F.2d at 177–78 ("[A blanket rule against settlement classes] may render it virtually impossible for the parties to compromise class issues and reach a proposed class settlement before a class certification...."); In re Baldwin–United, 105 F.R.D. 475 (S.D.N.Y.1984).

In mass tort cases, in particular, use of a settlement class can help overcome certain elements of these actions that otherwise can considerably complicate efforts to settle. These hurdles include "the large number of individual plaintiffs and lawyers; ... the existence of unfiled claims by putative plaintiffs; and ... the inability of any single plaintiff to offer the settling defendant reliable indemnity protection...." Transgrud, 70 Cornell L.Rev. at 835. By using the courts to overcome some of the collective action problems particularly acute in mass tort cases, the settlement class device can make settlement feasible. The use of settlement classes can thus enable both parties to realize substantial savings in litigation expenses by compromising the action before formal certification. See 2 Newberg & Conte § 11.09 at 11–13. Through settlement class certification, courts have fostered settlement of some very large, complex cases that might otherwise never have yielded deserving plaintiffs any substantial remuneration.

Settlement classes also increase the number of actions that are amenable to settlement by increasing the rewards of a negotiated solution, in at least four ways. First, the prospect of class certification increases a defendant's incentive to settle because the settlement would then bind the class members and prevent further suits against the defendant. Second, settlement classes may reduce litigation costs by allowing defendants to stipulate to class certification without forfeiting any of their legal arguments against certification should the negotiations fail. Third, because the payment of settlement proceeds, even relatively small amounts, may palliate class members, settlement can reduce differences among class members, and

---

**10.** Because the parties do not come before the court until the action has settled, some courts have even expressed concern that such cases do

not present a case or controversy for Article III purposes. Cf. Carlough v. Amchem Products, Inc., 834 F.Supp. 1437, 1462–67 (E.D.Pa.1993).

thus make class certification more likely, increasing the value of settlement to the defendant, since a larger number of potential claims can thus be resolved.

Fourth, the use of settlement classes reduces the probability of a successful subsequent challenge to the class-wide settlement. By treating the class as valid pending settlement, a temporary class facilitates notice to those persons whom the court might consider part of the class. The expanded notice afforded by access to the customary class action notification process protects both the absentees and the defendants by eliminating negotiations between the defendants and the named plaintiffs with respect to the class definition that could leave the defendant vulnerable to additional suits by absentees whose interests, a court later determines, were not adequately served or protected. 2 NEWBERG & CONTE § 11.27 at 11–40 (citing Midland Mut. Life Ins. Co. v. Sellers, 101 B.R. 921 (Bankr.S.D.Ohio 1989)). Increasing the certainty that the settlement will be upheld augments the value of settling to the defendant and consequently the amount defendants will be willing to pay. Thus, delaying certification, in contravention of a strict reading of Rule 23, encourages settlement, an important judicial policy, by increasing the prospective gains to the defendant (and thus potentially to the plaintiffs as well) from exploring a negotiated solution.

Moreover, critics of settlement classes may underestimate the safeguards that still inhere. Although courts are often certifying settlement classes with sub-optimal amounts of information, and without the full benefit of the processes meant to protect the absentees' interests, the provisional certification of a settlement class does not finally determine the absentees' rights. When the simultaneous notice of the class and the settlement is distributed to the proposed class, objecting class members can still challenge the class on commonality, typicality, adequacy of representation, superiority, and predominance grounds—they are not limited to objections based strictly on the settlement's terms. 2 NEWBERG & CONTE § 11.27 at 11–40 (citing Midland Mut. Life Ins. Co. v. Sellers, 101 B.R. at 921).

Furthermore, the view that, in settlement class cases, the court lacks the information necessary to fulfill its role as protector of the absentees, may reflect an assumption that the court's approval always comes early in the case. See 2 NEWBERG & CONTE § 11.27 at 11–43 to 11–44. While it often does, the certification decision is sometimes made later in the case, when the parties have presumably developed the merits more fully (in discovery or in the course of wrangling over the settlement terms) and when prior governmental procedures or investigations might have also yielded helpful information. Id. Whatever the timing of the certification ruling, the judge has the duty of passing on the fairness and adequacy of the settlement under Rule 23(e) and also of determining whether the class meets the Rule's requisites under 23(a).[11] Whether or not the court certifies the class before settlement discussions, these duties are the same. 2 NEWBERG & CONTE § 11.27, at 11–46.

Although a judge cannot presume that the putative class counsel actively represented the absentees' interests, the court can still monitor the negotiation process itself to assure that both counsel and the settlement adequately vindicate the absentees' interests. Thus, there is no reason to inflexibly limit the use of settlement classes to any specified categories of cases (for example, those cases with few objectors, those which do not involve partial settlements,[12] or those which do not involve an expanded class). Even apparently troublesome litigation activity, such as expanding the class just before settlement approval at the defendant's request, is no more free from judicial scrutiny in a settlement class context than it would be otherwise. The court still must give notice to the

---

11. We are somewhat dubious of the court's ability to discharge its duties completely under these circumstances. See Part IV.E infra.

12. MCL2d expressed concern about partial settlements (settlements only as to certain plaintiffs or certain defendants) since "[m]embers of the settlement class will almost certainly find it difficult to understand their position in the litigation." MCL2d § 30.45.

now-expanded class and satisfy itself that the requisites of class certification are met. *Id.* at 11–49. Since the party advocating certification bears the burden of proving appropriateness of class treatment, *Davis v. Romney,* 490 F.2d 1360 (3d Cir.1974), where the procedural posture is such that the court lacks adequate information to make those determinations, it can and should withhold the relevant approvals. 2 NEWBERG & CONTE § 11.27 at 11–46.

But even if the use of settlement classes did reduce a judge's capacity to safeguard the class's interests, it does not necessarily impair the ability of absentees to protect their own interests. Individual class members retain the right to opt out of the class and settlement, preserving the right to pursue their own litigation. *See Premier Elec. Const. Co. v. N.E.C.A., Inc.,* 814 F.2d 358 (7th Cir.1987) (criticizing settlement classes because they create opportunities for one-way intervention). In fact, the use of the settlement class in some sense enhances plaintiffs' right to opt out. Since the plaintiff is offered the opportunity to opt out of the class simultaneously with the opportunity to accept or reject the settlement offer, which is supposed to be accompanied by all information on settlement, the plaintiff knows exactly what result he or she sacrifices when opting out. *See* 2 NEWBERG & CONTE § 11.27 at 11–51. *See In re Beef Indust. Antitrust Litig.,* 607 F.2d at 174.

In sum, settlement classes clearly offer substantial benefits. However, the very flexibility required to achieve these gains strains the bounds of Rule 23 and comes at the expense of some of the protections the rulewriters intended to construct. As Judge Schwarzer has explained:

one way to see [the settlement class] is as a commendable example of the law's adaptability to meet the needs of the time—in the best tradition of the Anglo–American common law. But another interpretation might be that it is an unprincipled subver-

sion of the Federal Rules of Civil Procedure. True, if it is a subversion, it is done with good intentions to help courts cope with burgeoning dockets, to enable claimants at the end of the line of litigants to recover compensation, and to allow defendants to manage the staggering liabilities many face. But as experience seems to show, good intentions are not always enough to ensure that all relevant private and public interests are protected. The siren song of Rule 23 can lead lawyers, parties and courts into rough waters where their ethical compass offers only uncertain guidance.

William W. Schwarzer, *Settlement of Mass Tort Class Actions: Order Out of Chaos,* CORNELL L.REV. (forthcoming).

## D. Are Settlement Classes Cognizable Under Rule 23?

Although not specifically authorized by Rule 23, settlement classes are not specifically precluded by it either; indeed, Judge Brieant has read subsection (d), giving the court power to manage the class action, as authorizing the creation of "tentative", "provisional", or "conditional" classes through its grant of power to modify or decertify classes as necessary. *See, e.g., In re Baldwin–United Corp.,* 105 F.R.D. 475, 478–79 (S.D.N.Y. 1984). And because of the broad grant of authority in Rule 23(d), at least one commentator has noted that the validity of temporary settlement classes is usually not questioned. 2 NEWBERG & CONTE § 11.22 at 11–31. Courts apparently share this confidence. Indeed, one court believed that "[i]t is clear that the Court may provisionally certify the Class for settlement purposes." *South Carolina Nat'l Bank v. Stone,* 749 F.Supp. 1419 (D.S.C.1990).

[13, 14] We believe that the "provisional"[13] or "conditional"[14] conception of the settlement class device finds at least a colorable textual basis in the Rule. Rule 23(d) enables

---

**13.** The terms "tentative" and "provisional" appear to be used interchangeably.

**14.** "Conditional" is actually a term that can be properly applied to *all* class actions, even those that are certified in the normal process. Under

Rule 23(c)(1), the court retains the authority to re-define or decertify the class until the entry of final judgment on the merits. This capacity renders all certification orders conditional until the entry of judgment. *See* MCL2d § 30.18.

a court to certify a class, if it complies with its duty to assure that the class meets the rule's requisites by making appropriate Rule 23 findings (*see* Part IV(E) *infra* ). Some courts appear to have concluded that the built-in flexibility of the Rule, which enables the court to revisit the requisites and modify or decertify the class should its nature change dramatically during the negotiation process, renders it acceptable to determine class status after settlement and thus avoid scrutinizing and adjudicating class status at an earlier stage when the outcome is unknown. *See, e.g., In re Baldwin–United,* 105 F.R.D. at 483; *In re Beef Antitrust Litig.,* 607 F.2d at 177 ("[T]he Court finds that a conditional class should be certified for the purpose of considering the proposed settlements.")

Alternatively, some courts have conceived of settlement classes as a "temporary assumption" by the court to facilitate settlement. *See Mars Steel,* 834 F.2d at 680; *In re Beef Indust. Antitrust Litig.,* 607 F.2d at 177; 2 NEWBERG & CONTE § 11.27 at 11–50. The arguments of the late Herbert Newberg, one of the leading advocates of settlement classes, reflect an assumption that the Rule 23 determinations are merely postponed, not eliminated:

> On analysis, however, it would appear that this argument [that courts using settlement classes circumvent the need to test the propriety of the class action according to the specific criteria of Rule 23] may be rebutted by perceiving the temporary settlement class as nothing more than a tentative assumption indulged in by the court.... The actual class ruling is deferred in these circumstances until after hearing on the settlement approval.... At that time, the court in fact applies the class action requirements to determine whether the action should be maintained as a class action....

2 NEWBERG & CONTE § 11.27 at 11–50.[15] Newberg posits, therefore, that the temporary assumption conception of the settlement

needs no special authorization since the court eventually follows the ordinary certification process, only deferring it until the settlement approval stage.

Courts have also relied on the more general policies of Rule 23—promoting justice and realizing judicial efficiencies—to justify this arguable departure from the rule.

> [T]he hallmark of Rule 23 is flexibility.... Temporary settlement classes have proved to be quite useful in resolving major class action disputes. While their use may still be controversial, most Courts have recognized their utility and have authorized the parties to compromise their differences, including class action issues through this means.

*Weinberger,* 698 F.2d at 72–73. One commentator found implicit authorization for settlement classes under a settlement-oriented interpretation of Rule 23:

> [Rule 23] provides that a court may certify a common question class action when it will prove "superior to other available methods for the fair and efficient adjudication of the controversy." A judicially supervised and approved class action settlement, like a judicially supervised trial, is a means of hearing and determining judicially, in other words "adjudicating," the value of claims arising from a mass tort. As a result, if conditional certification of the case as a common question class action for settlement purposes would enhance the prospects for a group settlement, then Rule 23 authorizes certification.

Roger H. Transgrud, *Joinder Alternatives in Mass Tort Litig.,* 70 CORNELL L.REV. 779, 835 (1985) (footnotes omitted).

It is noteworthy that resistance to more flexible applications of Rule 23 has diminished over time. *See In re Taxable Mun. Bond Secur. Litig.,* 1994 WL 643142, *4 (E.D.La. 1994) (commenting upon this trend). The evolution of the reception accorded settlement classes has manifested itself in the

---

**15.** *See also In re Mid-Atlantic Toyota Antitrust Litig.,* 564 F.Supp. 1379, 1388 n. 13 (D.Md.1983) ("Completely ancillary to the proposed settlement, [a temporary settlement class] lasts only as long as the period between the preliminary ap-

proval of the settlement and the court's final determination on the settlement. In effect, a temporary settlement class serves only as a procedural vehicle for providing notice to putative members of a proposed class....").

successive versions of the Manual for Complex Litigation. The first edition of the Manual criticized the initiation of settlement negotiations before certification, and discouraged all such negotiations. *See* MCL 1st § 1.46. The second edition recognizes the potential benefits of settlement classes but still cautioned that "the court should be wary of presenting the settlement to the class." MCL § 30.45 at 243. The (draft) third version acknowledges that "[s]ettlement classes offer a commonly used vehicle for the settlement of complex litigation" and aims only to supervise rather than discourage their use. *See* MCL § 30.45 at 192.

A survey of the caselaw confirms the impression that resistance to settlement classes has diminished: few cases since the late 1970's and early 1980's even bother to squarely address the propriety of settlement classes. Moreover, no court of appeals that has had the opportunity to comment on the propriety of settlement classes has held that they constitute a per se violation of Rule 23. *See, e.g., Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir.1971) (finding no prohibition but granting absentees standing to appeal settlement approval); *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1176 (9th Cir.1977) (describing how court approved combined notice of the pendency of the class and the terms of the proposed settlement); *In re Beef Antitrust Litig.*, 607 F.2d at 167; *Corrugated Container Antitrust Litig.*, 643 F.2d 195, 223 (5th Cir.1981) (upholding settlement despite precertification negotiations with some defendants); *Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir.1982); *Mars Steel*, 834 F.2d at 681 (criticizing settlement classes but ultimately approving settlement). But some courts recognize that this practice represents a significant departure from the usual Rule 23 scenario and thereby counsel that courts should scrutinize these settlements even more closely.

[15] We acknowledge that settlement classes, conceived of either as provisional or conditional certifications, represent a prac-

tical construction of the class action rule. Such construction affords considerable economies to both the litigants and the judiciary and is also fully consistent with the flexibility integral to Rule 23. A number of other jurisdictions have already accepted settlement classes as a reasonable interpretation of Rule 23 and thereby achieved these substantial benefits. Although we appreciate the concerns raised about the device, we are confident that they can be addressed by the rigorous applications of the Rule 23 requisites by the courts at the approval stages, as we discuss at greater length herein. For these reasons, we hold that settlement classes are cognizable under Rule 23.

*E. Are the Rule 23(a) and (b) Findings Required for Settlement Classes? Does Finding the Settlement to Be Fair and Reasonable Serve as a Surrogate for the Findings?*

[16] There is no explicit requirement in Rule 23 that the district judge make a formal finding that the requisites of the rule have been met in order to certify a class. However, most district judges have routinely done so, assuming that it was required, and in published opinions, a number of courts have endorsed or at least acknowledged the compelling policy reasons for doing so. *See, e.g., Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.1985); *Plummer*, 668 F.2d at 659; *Interpace Corp. v. Philadelphia*, 438 F.2d 401, 404 (3d Cir.1971); MCL2d § 30.13 ("The judge should enter findings and conclusions after the hearing, addressing each of the applicable requirements of Rule 23(a) and (b)."). For example, where there has been some dispute over certification, a court should give the litigants, particularly the absentees, some statement of the reasons for its decision. *Eisenberg*, 766 F.2d at 785. Articulated findings also simplify the review of complex cases generally. *Id.* With respect to settlement classes, we hold that courts must make the findings because the legitimacy of settlement classes depends upon fidelity to the fundaments of Rule 23.[16]

---

16. This conclusion is supported by the text of Rule 23(e). That section provides that "class action" may not be compromised without court

approval, and arguably a case is not a "class action" in the absence of such findings.

Inasmuch as collusion, inadequate prosecution and attorney inexperience are the paramount concerns in precertification settlements, *see Malchman*, 706 F.2d at 433; *Beef*, 607 F.2d at 174, the need for the adequacy of representation finding is particularly acute in settlement class situations, given the inquiry's purpose of detecting cases where there is a "likelihood that the litigants are involved in a collusive suit...." *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir.1968).

There appears to be no authority contra this practice. Indeed, the courts and commentators that have endorsed settlement classes have seemed to assume that the approving court made the requisite class determinations at some point. For example, Newberg's argument rebutting the charge that the "tentative assumption" of class status by the court to foster settlement evades the Rule's strictures continues:

> The actual class ruling is deferred in these circumstances until after [the] hearing on the settlement approval, following notice to the class. At that time, the court in fact applies the class action requirements to determine whether the action should be maintained as a class action....

2 NEWBERG & CONTE § 11.27 11–50. *See also Whitford v. First Nationwide Bk.*, 147 F.R.D. 135, 142 (WD Ky.1992) (disregarding even the possibility that these classes would not have to meet all of the normal certification requisites). Even the cases where the courts did not recognize a need to make the determinations demonstrate a heightened concern for fairness and a more cautious approach to settlement approval. *See Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir.1971) (court must be doubly careful where negotiation occurs before certification and designation of a class counsel); *Mars Steel*, 834 F.2d at 681 (applying a higher standard of fairness); *Simer v. Rios*, 661 F.2d 655, 664–66 (7th Cir.1981) (requiring a higher demonstration of fair-

ness); *Weinberger v. Kendrick*, 698 F.2d 61, 69 (2d Cir.1982) (emphasizing the extensive discovery and ability and experience of counsel).

Some courts have certified settlement classes "without articulating or consciously applying Rule 23 tests." 2 NEWBERG & CONTE § 11.27 at 11–52. *See, e.g., Mars Steel*, 834 F.2d at 681 (suggesting that the certification procedure may not be necessary to combat the potential for abuse created by the use of settlement classes since that potential is "held in check by the requirement that the judge determine the fairness of the settlement ..."); *Weinberger v. Kendrick*, 698 F.2d at 73 (determination that proposed settlement is fair, reasonable and adequate substitutes for Rule 23 findings); *In re Beef Antitrust Litig.*, 607 F.2d 167, 177 (5th Cir. 1979); *City of Detroit v. Grinnell*, 495 F.2d 448, 464–65 (2d Cir.1974) (rejecting contention that the court erred when it approved a settlement and acquiesced in the settlement's assumption of the existence of a proper class). Some courts neglecting the findings have taken the view that the notice of proposed settlement, which must be preliminarily approved by the court, "carries the necessary implication that the action complies with Rule 23." *Beef*, 607 F.2d at 177.

We disagree both with this suggestion and with the conclusion that a fairness determination is a surrogate for Rule 23 findings.[17] Even if we set aside the problem of the court's inadequate information, the inquiry into the settlement's fairness cannot conceptually replace the inquiry into the propriety of class certification. Normally, a court makes the required commonality and typicality determinations by referencing the original class complaints in order to assure that the claims alleged by the named plaintiffs are common to the class (although the class need not share every claim in common, *Hassine v. Jeffes*, 846 F.2d 169, 177–78 (3d Cir.1988)), and that the claims alleged by the named

---

17. We note in this regard that other courts have made the determinations of adequacy of representation and homogeneity of the class when evaluating the fairness of the settlement for the express purpose of assuring that they possess enough information to execute their Rule 23(e) duty. *See In re Beef Industry Antitrust Litig.*, 607

F.2d at 173 n. 4 (quoting ARTHUR R. MILLER, AN OVERVIEW OF FEDERAL CLASS ACTIONS: PAST, PRESENT AND FUTURE (Federal Judicial Ctr.1977)); *see also In re Baldwin–United Corp.*, 105 F.R.D. 475, 483 (S.D.N.Y.1984) (making findings in the opinion which preliminarily approved the settlement).

plaintiff occupy approximately the same position of centrality to the named plaintiffs as they do to the rest of the class. *Weiss v. York Hosp.,* 745 F.2d 786, 810 (3d Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). Neither the existence of a settlement nor the terms of settlement affect the nature of this important inquiry.

[17, 18] The Rule 23(a) class inquiries (numerosity, commonality, typicality, and adequacy of representation) constitute a multipart attempt to safeguard the due process rights of absentees. Thus, the ultimate focus falls on the appropriateness of the class device to assert and vindicate class interests. Conversely, however, the process of negotiation does not reveal anything about commonality and typicality. One might argue that these requisites are merely means to the end of vindicated rights, and that observing the process of negotiation could demonstrate adequate vindication—the true aim of the Rule. In our view, a court cannot infer that the rights of the *entire* class were vindicated without having assured that commonality and typicality were satisfied.

The 23(b)(3) determination is also important in the regulatory scheme. To be certified as a (b)(3) class, the judge must determine that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED.R.CIV.P. 23(b)(3).[18] But the settlement approval inquiry is far different from the certification inquiry. In settlement situations, the superiority requirement arguably translates into the question whether the settlement is a more desirable outcome for the class than individualized litigation, and may assure that the settlement has not grossly undervalued plaintiffs' interests. But even if this is so, a point we neither concede nor decide, there remains the concern about conflicts between those appointed to represent class interests—the lawyers and named plaintiffs—and the rest of the class. These

concerns, particularly acute with settlement classes, concentrate the focus of the certification inquiries on the representational elements.

Certainly, evaluating the settlement can yield some information relevant to the adequacy of representation determination under 23(a)(4). The settlement evaluation involves two types of evidence: a substantive inquiry into the terms of the settlement relative to the likely rewards of litigation, *see Weinberger,* 698 F.2d at 73; *Protective Comm. for Indep. Stockholders v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968), and a procedural inquiry into the negotiation process. The focus on the negotiation process results from the realization that a judge cannot really make a substantive judgment on the issues in the case without conducting some sort of trial on the merits, exactly what the settlement is intended to avoid. *See Malchman v. Davis,* 706 F.2d at 433. Instead, the court determines whether negotiations were conducted at arms' length by experienced counsel after adequate discovery, in which case there is a presumption that the results of the process adequately vindicate the interests of the absentees. *Weinberger,* 698 F.2d at 74; *City of Detroit v. Grinnell,* 495 F.2d at 463; *Baldwin–United,* 105 F.R.D. at 482 ("In order to supplement judicial examination of the substance of a compromise agreement, and because a court cannot conduct a trial in order to avoid a trial, attention must be paid to the process by which a settlement has been reached.").

Although the procedural focus on the fairness determination yields information pertinent to the adequacy of representation inquiry, it cannot fully satisfy the inquiry. That is because reliance on the negotiation process used to approve the settlement to satisfy the class certification requirements puts excessive pressure on the settlement approved determinations, and, more fundamentally, such a reliance may be circular. *Cf.* 2 NEWBERG & CONTE § 11.28 at 11–54 (suggesting a greater need for a court to carefully articu-

18. As the case before us involves a damages class under Rule 23(b)(3), we do not address the application of the (b)(1) and (b)(2) requisites which,

without the important right to opt out, involve different considerations.

late if reasons for settlement approval where the class was not separately certified).

Courts approving settlements have examined the negotiating process in light of the "experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983) (citing *Weinberger*, 698 F.2d at 73; *Grinnell*, 495 F.2d at 465.). Some of these courts have suggested that the fact that vigorous, arm's length negotiations occurred should allay concerns about adequacy of representation. But these inferences depend on the implicit assumption that the lawyers actually negotiating really were doing so on behalf of the *entire* class, *see* 2 NEWBERG & CONTE § 11.28 at 11–59, assumptions which are clearly unjustified in a context where the potential for intra-class conflict further emperils the class's representation. Far too much turns on the adequacy of representation to accept it on blind faith.

Without determining that the class actually was adequately represented, the district judge has no real basis for assuming that the negotiations satisfactorily vindicated the interests of all the absentees. The focus on the negotiation process also cannot address the part of the adequacy of representation inquiry intended to detect situations where the named plaintiffs are unsuitable representatives of the absentees' claims. To state that class members were united in the interest of maximizing over-all recovery begs the question. Although that observation might allay some concern about a conflict between the attorney and the class, a judge must focus on the settlement's distribution terms (or those sought) to detect situations where some class members' interests diverge from those of others in the class. For example, a settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group.

[19] In short, the prophylactic devices used by judges to approve these pre-certification settlements without ever formally certifying the class fail to satisfy the requirements of Rule 23. Without determining that the class claims are common and typical of the entire putative class and that the class representatives and their counsel are adequate representatives, we have no assurance that the district court fully appreciated the scope and nature of the interests at stake.[19] Finally, we note that courts adopting the view that the formal class determinations are not necessary for settlement classes may be contravening not only the language of the rule but also the Supreme Court's requirement in *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982) (disapproving the trial court's insufficient scrutiny of the named plaintiff's capacity to adequately represent the class), that "[a]ctual, not presumed, conformance with Rule 23(a) remains, however, indispensable." Thus, while we approve the provisional certification of a settlement class to facilitate settlement discussions, final settlement approval depends on the finding that the class met all the requisites of Rule 23.

### F. Can There be a Valid Settlement Class That Would Not Serve as a Valid Litigation Class?

As we have previously explained, courts using the settlement class device must at some point definitively certify the class and satisfy themselves that the requisites of Rule 23 have been satisfied. To avoid that pro-

---

19. In *Malchman v. Davis*, 706 F.2d at 433, the court was satisfied by the district court's determination that the settlement class satisfied the adequacy of representation inquiry noting: "There is no doubt that the district court must make an independent evaluation of whether the named plaintiffs were adequate representatives of the class.... A judge has an obligation to consider whether the interest of the class are adequately represented." (citing *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403–06, 97 S.Ct. 1891, 1896–98, 52 L.Ed.2d 453 (1977)); *see also Plummer*, 668 F.2d at 659 & n. 4. We agree that this is an appropriate focus given the heightened potential for collusion, buy-offs and other abuses in settlement class situations where the negotiations occur before the court appoints class representatives and counsel. We still believe, however, that courts should assure that settlement classes meet *all* of the requirements of 23(a) and (b). This prescription is consistent with the heightened duty of courts in class action settlements to assure that the absentees' rights are adequately protected.

cess entirely would dismantle the rule's carefully constructed mechanism that serves to protect absentees' due process rights. Moreover, despite some courts' suggestions that the standards are less rigorous for settlement classes, we do not believe that Rule 23 authorizes separate, liberalized criteria for settlement classes.

At the outset we note that, while some other courts have nominally complied with the rule, they appear to have assumed that lower standards apply in settlement class cases. *See Officers for Justice v. Civil Serv. Comm'n of San Francisco,* 688 F.2d 615, 633 (9th Cir.1982), *cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983) ("[C]ertification issues raised by class action litigation that is resolved short of a decision on the merits must be viewed in a different light."); *Fisher Bros. v. Phelps Dodge Indus. Inc.,* 604 F.Supp. 446, 450 (E.D.Pa.1985); *In re Dennis Greenman Secur. Litig.,* 829 F.2d 1539, 1543 (11th Cir.1987) ("In reviewing settlement certifications, a special standard has been employed."); *A.H. Robins,* 880 F.2d at 740 (in deciding whether to certify a class, settlement is at least an important factor in favor and might even be a per se ground for certification); Manual.2d at § 30.45. Other courts have stated that settlement reduces the potential conflicts among the class and thus enhances the likelihood of meeting the criteria, presumably the same criteria a litigation class must satisfy. *See, e.g., Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 159 (S.D.Oh. 1992). Newberg is of this view. *See* 2 NEWBERG & CONTE § 11.28, at 11–58.

According to Newberg, though settlement does not impact the numerosity requirement it may indeed increase the likelihood of meeting the commonality and typicality inquiries. "Typicality of claims in a settlement class context requires proof that the interests of the class representative and the class are commonly held for the purposes of receiving similar or overlapping benefits from a settlement." 2 NEWBERG & CONTE § 11.28 at 11–58. On this theory, because the court has delayed the findings until the outcome of the litigation (i.e., the settlement agreement) is known, the judge conducts the inquiry based on the relative rewards to the class members rather than based on the various legal claims of class members. So long as all plaintiffs get similar benefits from the settlement, irrespective of the different strengths of their initial claims, the commonality and typicality inquiries are viewed as likely to be satisfied.

Under this approach, the adequate representation inquiry is also simplified in the settlement class context by a result-oriented approach toward the class requirement findings. Rather than asking whether the lawyers have sufficient resources and skills to prosecute the action (as would be the case with customary class certification procedures), courts, it is said, need only determine, in hindsight, whether the settlement was negotiated at arms' length, and whether the negotiations were long, thorough and deliberative. *See In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 212 (5th Cir.1981) (adequacy judged by sufficiency of settlement); *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 341 (N.D.Ga.1993) (inequitable distribution). Courts adopting this approach require proof only that named plaintiffs' and class interests are not antagonistic. *See, e.g., Goodman v. Lukens Steel Co.,* 777 F.2d 113, 123 (3d Cir.1985) (relying on absence of conflict to find adequate representation); *Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir.1982) (finding named plaintiff an adequate representative despite small stake in litigation and ignorance of facts and claims); *Steiner v. Equimark Corp.,* 96 F.R.D. 603, 610 (W.D.Pa.1983) ("The key question [for the adequacy of representation inquiry] is whether their interests are antagonistic."). In these cases, courts have effectively relied on the settlement's terms—the outcome of the action—to find the required absence of antagonism.[20]

20. For example, in finding adequate representation, one court noted: "[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.,* 1980–1 Trade Cas. (CCH) ¶ 63, 163 at 77,788 n. 10, 1979 WL 1751 (S.D.Tex.1979), *aff'd,* 643 F.2d 195 (5th Cir.1981) (citing WRIGHT & MILLER, FED. PRACTICE & PROCEDURE CIVIL § 1768, at n. 7 & 8).

[20–22] We disagree with this approach, championed primarily by Newberg. There is no language in the rule that can be read to authorize separate, liberalized criteria for settlement classes.[21] Although we acknowledge the need for flexible interpretation of Rule 23 to enable it to achieve its broader purposes of vindicating difficult individual claims and conserving judicial resources, *see Beef,* 607 F.2d at 177–78 (discussing the policy needs for flexibility); *Ace Heating,* 453 F.2d at 33 (recognizing need to give small claimants who did not opt out the right to appeal a settlement approval), we emphasize that Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiffs and counsel's ability to fairly and adequately protect class interests. *See Katz v. Carte Blanche Corp.,* 496 F.2d 747, 757 (3d Cir. 1974). Thus, actions certified as settlement classes must meet the same requirements under Rule 23 as litigation classes. To allow lower standards for the requisites of the rule in the face of the hydraulic pressures confronted by courts adjudicating very large and complex actions would erode the protection afforded by the rule almost entirely.

Judge Posner has explained the animating concern behind this strict application. "The danger of a premature, even a collusive, settlement is increased when as in this case the status of the action as a class action is not determined until a settlement has been negotiated, with all the momentum that a settlement agreement generates. . . ." *Mars,* 834 F.2d at 680.

The foregoing discussion has focused on adequacy of representation, but the presence of commonality and typicality are equally important to the class action regime. Certifying a class without the existence of questions common to the class (or where the class representatives' claims are not typical) perverts the class action process and converts a federal court into a mediation forum for cases that belong elsewhere, usually in state court. On the other hand, the cases that make the settlement class device appear most useful are cases presenting the most unwieldy substantive and procedural issues, i.e., those diversity cases in which plaintiffs from many states are confronted with differing defenses, differing statutes of limitations, etc.—precisely those cases that stretch the Rule to its outer-most limits.

This is a troublesome issue—and a close one. Many mass tort actions have this problem. The School Asbestos cases and the Breast Implant cases had it, and this case does, as well. It may initially seem difficult to envision an actual trial of these cases because of the differing defenses certain to be raised under the various bodies of governing law. While the problem may be overstated,[22] settlement classes still serve the useful purpose of ridding the courts—state and federal—of this albatross even though the case may never have been triable in class form. But if that were the primary function of the settlement class, the federal courts would have become a mediation forum, a result inconsistent with their mission and limited resources. In sum, "a class is a class is a class," and a settlement class, if it is to qualify under Rule 23, must meet all of its

---

21. Indeed, if any difference in standards is warranted, pre-certification settlement may raise the adequacy of representation standard. Since this inquiry must ascertain "whether there has been any collusion or undue pressure by the defendants on would be class representatives," *see First Comm. Corp. of Boston Consumer Accts. Litig.,* 119 F.R.D. 301, 308 (D.Mass.1987); *Alvarado Partners LP v. Mehta,* 723 F.Supp. 540, 546 (D.Colo.1989), it must carry greater weight in the settlement class context where there is an enhanced potential for those evils. Thus, while the other 23(a) findings remain important when the action settles, the need to assure an absence of collusion and an alignment of interests assumes an especially crucial role. Reliance, for the class requisites analysis, on the settlement's terms and

process also increases the importance of an independent conclusion of adequate representation (i.e., one not derived solely by reference to the nature of the negotiations).

22. In the *School Asbestos* case, 789 F.2d at 996, the panel asked counsel to analyze all the claims and defenses and write a report reflecting whether the differing claims and defenses evidence a small number of patterns that would be amenable to trial through a series of special verdicts. The plaintiffs came up with a demonstration that the claims and defenses were reducible to four patterns. That, in our view, was sufficient to satisfy the commonality and typicality inquiries. The same might be true in this case.

requirements. The district court should keep these matters in mind on remand.

## V. Is the Settlement Class Proper Here?

### A. Were There Adequate Findings Under Rule 23(a)?

Certain of the objectors in this case contend that the district court committed plain error by never actually certifying this class as required by Rule 23. *See* Brief of French Objectors, at 18. This, of course, would be a serious error, since without certification there is no class action, and "[i]n a settlement entered without class certification the judgment will not have res judicata effect on the claims of absent class members." *Simer v. Rios,* 661 F.2d 655, 664 (7th Cir.1981).

[23] The district court certified the class provisionally in a pretrial order. *See* Pretrial Order No. 7. We have already noted that provisional certification constitutes an acceptable means of facilitating settlement negotiations. *See* 2 Newberg & Conte § 11.27, at 55–56. It appears that the court believed that it certified the class by "confirming" the provisional certification in its order approving the settlement. However, the court did not make the findings we today hold that Rule 23 requires, not even upon approving the settlement. Because we hold that courts employing settlement classes must still make findings that the class complies with Rule 23(a) and the appropriate parts of Rule 23(b), the court's failure to comply with the rule in this respect is a plain error of law, and hence an abuse of discretion, requiring that the certification be set aside.

Our conclusion that the settlement class was not properly certified does not mean that the class could not be certified on remand. Accordingly, we must consider whether the existing record is adequate to support class certification, or whether further record development is required.

### B. Could the Class Requisites Have Been Met on the Current Record?

#### 1. Numerosity, Commonality, and Typicality

[24] As we have explained, a class action—whether certified for settlement or litigation purposes—must meet the class requisites enunciated in Rule 23. The district court did not make findings on these issues. The numerosity requirement of Rule 23(a) is plainly satisfied in this action encompassing nearly six million truck owners. The commonality and typicality inquiries of 23(a), however, raise substantial concerns about the sufficiency of this class. The record currently lacks the facts needed to establish these requisites, and the defendants also ardently maintain that the applicability of different defenses to different groups of plaintiffs would prevent the class from satisfying the commonality and typicality requirements. At this juncture, we leave open the possibility that, on remand, the district court may indeed find facts sufficient to support these elements.

#### 2. Adequacy of Representation

##### a. The Situation of the Fleet Owners

[25, 26] This settlement class appears to fail to meet Rule 23(a)'s adequacy of representation test. The adequacy of representation inquiry has two components intended to assure that the absentees' interests are fully pursued: it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees, and it tests the qualifications of the counsel to represent the class. *See Weiss v. York Hospital,* 745 F.2d 786, 811 (3d Cir.1984); 2 Newberg & Conte § 11.28, at 11–58. On the first prong, we are not satisfied that the interests of various class members were sufficiently aligned; indeed the settlement appears to create antagonism within the class. While some courts have been satisfied that there is no intraclass conflict where "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class," *In re Corrugated Container Antitrust Litig.,* 1980–1 Trade Cas. (CCH) ¶ 63,-163 at 77,788 n. 10 (S.D.Tex.1979), *aff'd,* 643 F.2d 195 (5th Cir.1981), we disapprove such a myopic focus on the settlement terms.

In this case in particular, the conclusion that the settlement—which (supposedly) maximized class recovery—satisfied the requirement that class members' interests not

be antagonistic ignores the conspicuous evidence of such an intra-class conflict in the very terms of this settlement. The substantial impediments to fleet owners' using these certificates creates a conflict between their interests in this settlement and those of individual owners. (The named plaintiffs are all individual owners.) Moreover, the dubious value of the transfer option, *see* Part VI.A.1.c *infra*, one of the principal responses to the fleet owners' objection, does little to reduce the disparity in the prospective value to the different sections of the class.

This is not a case where some plaintiffs share the prospect of a future claim with other class members who currently have such a claim. The fleet owners will never enjoy the benefits of the settlement terms, such as the intra-household transfer option, intended specifically for the benefit of individual owners. Thus, we must be concerned that the individual owners had no incentive to maximize the recovery of the government entities; they could skew the terms of the settlement to their own benefit. Not surprisingly, the settlement leaves fleet owners with significantly less value than individual owners. At the very least, the class should have been divided into sub-classes so that a court examining the settlement could consider settlement impacts that would be uniform at least within the sub-classes.

### b. Did Counsel Adequately Represent the Interests of the Entire Class?

The other aspect of the adequacy of representation test, whether counsel are qualified and serve the interests of the entire class, also gives us reason to pause. Courts examining settlement classes have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant. *See, e.g., Malchman,* 706 F.2d at 433; *Alvarado Partners,* 723 F.Supp. at 546. The first criterion is no problem, for these counsel clearly possess the experience and skills to qualify them to pursue these sorts of actions. But the second and third points require attention in view of the lack of significant discovery and the the extremely expedited settlement of

questionable value accompanied by an enormous legal fee.

Before addressing the latter points, it is necessary to begin with some legal theory discussing the structural nature of fee arrangements in class actions of this type, having in mind that even honorable counsel—like class counsel here—may be compromised by the possibility of a large fee.

### (1) Class Action Attorneys' Fees Theory and Structure

[27, 28] Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed. *See* 2 NEWBERG & CONTE § 11.65 at 11-183; *Greenfield v. Villager Indus., Inc.,* 483 F.2d 824, 832 (3d.Cir.1973). The large fees garnered by some class lawyers can create the impression of an ethical violation since it may appear that the lawyer has an economic stake in their clients' case. But class actions cannot be analyzed in the same framework as conventional bipolar litigation. Because of the collective action problems associated with cases where individual claims are relatively small, *see* 7A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, *Federal Practice and Procedure* § 1754, at 49, and the social desirability of many class suits (the private enforcement model), *id.* at 51; *Sprogis v. United Air Lines, Inc.* 444 F.2d 1194 (7th Cir.1971), large attorneys' fees serve to motivate capable counsel to undertake these actions. Thus, large fee awards standing alone do not suffice to show that the representation was inadequate or unethical. These allowances generally reflect the realization that the lawyer represents numerous individuals with somewhat varying interests, not acceptance of a situation where the lawyer's personal interests trump the interests of the entire class.

Some commentators blame the system of compensating class action lawyers in a manner that fails to confront fully the differences between class action litigation and classical bipolar litigation for creating incentives that diverge markedly and predictably from their clients' interests. The leading critic is Professor Coffee. *See* John C. Coffee, Jr., *Un-*

derstanding the Plaintiff's Attorney: The Implications of Economic Theory For Private Enforcement of Law Through Class and Derivative Actions, 86 COLUM.L.REV. 669, 671–72 (1986) (noting that critics "have argued that the legal rules governing the private attorney general have created misincentives that unnecessarily frustrate the utility of private enforcement. These critics have focused chiefly on the conflicts that arise between the interests of these attorneys and their clients in class and derivative actions....") ( [hereinafter] Understanding the Plaintiff's Attorney ); id. at 677 ("Ultimately, the most persuasive account of why class actions frequently produce unsatisfactory results is the hypothesis that such actions are uniquely vulnerable to collusive settlements that benefit plaintiffs attorneys rather than their clients."); John C. Coffee, Rescuing the Private Attorney General: Why the Model of the Lawyer As Bounty Hunter Is Not Working, 42 MD.L.REV. 215 (1983); John C. Coffee, The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation 48 LAW & CONTEMP. PROBS., 5 (1985); Kevin M. Clermont & John D. Currivan, Improving on the Contingent Fee, 63 CORNELL L.REV. 529 (1978); Murray L. Schwartz & Daniel J.B. Mitchell, An Economic Analysis of the Contingency Fee in Personal–Injury Litigation, 22 STAN.L.REV. 1125 (1970).

Economic models have shown how conventional methods of calculating class action fee awards give class counsel incentives to act earlier than their clients would deem optimal. See Coffee, Understanding the Plaintiff's Attorney, 86 COLUM.L.REV. at 688. Because, under a percentage of recovery award mechanism, the attorney will only enjoy a relatively small portion of whatever incremental award he can extract from the defendant, the defendant can pressure the plaintiffs' attorney into early settlement by threatening to expend large sums on dilatory tactics that would run the expenses up beyond what plaintiffs' attorneys can expect to profit. Id. at 690. Rather than presenting a possible solution, the lodestar method seemingly exacerbates the problem of cheap settlement by divorcing the fee award from the settlement's size, since plaintiffs' attorneys have no incentive to take the risk on a trial for a potentially larger award to the class where their own

fees will not necessarily reflect the greater risk taken at trial. See also id. at 718 (discussing how lodestar method may create structural collusion).

Coffee also blames the principal-agent problem endemic to class actions for creating a situation where the defendants and plaintiffs can collusively settle litigation in a manner that is adverse to the class's interest: "At its worst, the settlement process may amount to a covert exchange of a cheap settlement for a high award of attorney's fees. Although courts have long recognized this danger and have developed some procedural safeguards intended to prevent collusive settlements, these reforms are far from adequate to the task." Id. at 714 n. 121 (citing cases). A number of commentators have identified settlements that afford only nonpecuniary relief to the class as prime suspects of these cheap settlements. See Coffee, Understanding The Plaintiff's Attorney, 86 COLUM.L.REV. at 716 n. 129; Jonathan R. Macey & Geoffrey P. Miller, The Plaintiffs' Attorneys Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 U.CHI.L.REV. 1, 45 n. 10 (1991); Nancy Morawetz, Bargaining, Class Representation, and Fairness, 54 OHIO ST.L.J. 1, 5 n. 40 (1993).

While courts may fail to appreciate adequately the distinction between conventional bipolar litigation and class actions in many respects, they may over-emphasize these differences in other respects. To be sure, courts will be willing to award fees in class actions that would appear extraordinary and arguably improper in conventional litigation. Nevertheless, some of the critiques based on ethical or collusive concerns remain instructive. Although subsequent versions seem to avoid a discussion, the Manual for Complex Litigation (First) acknowledged the potential for attorney-class conflict. It condemned fees that are paid separate and apart from the settlement funds paid to the class because amounts "paid by the defendant(s) are properly part of the settlement funds and should be known and disclosed at the time the fairness of the settlement is considered." MCL 1st § 1.46.

One court has noted that the "effect of such an arrangement [where the counsel fees are not resolved and the details not included in the class notice] may be to cause counsel for the plaintiffs to be more interested in the amount to be paid as fees than in the amount to be paid to the plaintiffs." *In re General Motors Corp. Engine Interchange,* 594 F.2d at 1131. Commentators have also noted how, where there is an absence of objectors, courts lack the independently-derived information about the merits to oppose proposed settlements. *See* Coffee, *Understanding the Plaintiff's Attorney,* 86 COLUM.L.REV. at 714 n. 131. Of course, by endorsing a practice where the class is, for practical purposes, deprived of information concerning the fees, courts foster a situation where there will be fewer objectors.[23]

### (2) The Stewardship of Counsel Here

[29] A number of factors militate against the conclusion that the class's interests were sufficiently pursued here. First, the settlement arguably did not maximize the class members' interests. Every owner received a coupon whose value could only be realized by purchasing a new truck. Significant obstacles existed to the development of a secondary market in the transfer certificates given that the transfer restrictions and the certificates' limited lifespan minimize the value of the transfer option. Second, class counsel effected a settlement that would yield very substantial rewards to them after what, in comparison to the $9.5 million fee, was little work.

Third, the fact that the settlement involves only non-cash relief, which is recognized as a prime indicator of suspect settlements, increases our sense that the class's interests

were not adequately vindicated. The separate negotiation of the fee agreement and the failure to disclose the amount of the award in the class notice only enhance this sense that counsel may have pursued a deal with the defendants separate from, and perhaps competing for the defendant's resources with, the deal negotiated on behalf of the class. And although the degree to which a settlement hurts a defendant is not ordinarily a measure of the settlement's adequacy, the fact that this settlement might actually benefit GM by motivating current owners to buy new trucks from the company (the settlement may arguably be viewed as a GM sales promotion device) certainly does little to allay the concern that the settlement did not advance the interests of the class as much as it might have.

Fourth, our concern about the vigor of counsels' prosecution of the class claims, specifically the possibility that counsel did not do right by the class, is buttressed by the legacy of *Prandini v. National Tea Co.,* 557 F.2d 1015, 1021 (3d Cir.1977). In *Prandini,* this court recognized the potential for attorney class conflicts where the fees, while ostensibly stemming from a separate agreement, were *negotiated* simultaneously. We characterized simultaneity of fee and settlement negotiations as a "situation ... having, in practical effect, one fund divided between the attorney and client." *Id.* To respond to this danger of collusion between the class counsel and defendant, *Prandini* and the Third Circuit Task Force Report on court awarded attorneys' fees disapproved fee discussions until after the achievement and approval of settlement. *See Prandini,* 557 F.2d at 1021; *Court Awarded Attorney's Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 238, 266 (1985) [hereinafter *Task Force* ].[24]

---

23. The information on fee agreements may prompt potential objectors to oppose not only the awards but, also, to the extent they conclude that arm's length negotiations were compromised, the adequacy of the settlement and the propriety of the class.

24. Other cases and authorities have followed this guide. *See, e.g., Ashley v. Atlantic Richfield Co.,* 794 F.2d 128 (3d Cir.1986); MCL2d § 30.41; 2 NEWBERG & CONTE § 11.29, at 11–62 (recognizing potential for conflict where settlement and fees to be paid by defendant simultaneously negotiat-

ed). To implement this prophylactic bar fully, courts would have to require class counsel to disclose all understandings as to fees, not simply concluded, formal agreements. *See* MCL2d § 34.42, at 237–39. Although it recognized that this prophylactic rule could impede some settlements by making it impossible for the defendant to size up its total liability (i.e. the sum of the settlement amount and any fees the defendant agrees to pay), *Task Force,* 108 F.R.D. at 267–69, the Task Force concluded that avoiding the conflicts justified this cost.

In this case, there were strong indications that such simultaneous negotiations in fact transpired. Indeed, there was evidence in a letter from class counsel that at least some portion of the fees and expenses had to have been negotiated simultaneously with the settlement. The court justified its dismissal of the allegation of simultaneous negotiation by citing (1) a statement in the letter that the "attorneys' fees were negotiated separately, after we agreed on everything else," and (2) GM's reservation of the right to contest any award of fees that it deemed unreasonable. Even though we assume that these are factual findings, thus ordinarily deserving deference, we think these findings were made by reference to an erroneous legal standard. Indeed, neither of these bases is persuasive, especially in view of GM's acquiecence in a patently baseless ground for augmenting the counsel fee, *see* Part VII *infra*.

In considering the adequacy of representation, we are loath to place such dispositive weight on the parties' self-serving remarks. And even if counsel did not discuss fees until after they reached a settlement agreement, the statement would not allay our concern since the *Task Force* recommended that fee negotiations be postponed until the settlement was judicially approved, not merely until the date the parties allege to have reached an agreement. We recognize that *Evans v. Jeff D.*, 475 U.S. 717, 734–38, 106 S.Ct. 1531, 1541–43, 89 L.Ed.2d 747 (1986), overruled *Prandini's* strict rule prohibiting simultaneous negotiations. However, many of the concerns that motivated the *Prandini* rule remain, and we see no reason why *Jeff D.* or its underlying policy of avoiding rules that impede settlement preclude us from considering the timing of fee negotiations as a factor in our review of the adequacy of the class's representation. Consequently, the likelihood that the parties did negotiate the fees concurrently with the settlement in this case increases our concern about the adequacy of representation.[25]

Nor would GM's reservation of the right to appeal the fee award establish that the fee

was negotiated separately since the likelihood that GM would want to contest an award based on a fee petition to which it agreed is quite small. The fact is confirmed by GM's "lay down" position with respect to the fee application. Although the Supreme Court clearly invalidated the use of multipliers in lodestar awards in 1992, *see City of Burlington v. Dague*, — U.S. —, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), GM did not apprise the district court of this fact when it was approving the fee award, or complain when the district court used a multiplier in the calculations. This posture of GM suggests that its reservation of the right to appeal the fee award should not be given great weight in determining whether the settlement and attorneys' fee were negotiated separately. But we hasten to add that we have not resolved these factors. We only hold today that the court did not make the necessary findings, and we remand to the district court so that it can make the necessary Rule 23 findings.

The thrust of the foregoing discussion is that the circumstances under which the settlement evolved, made possible by the settlement class device, may have compromised class counsel in a manner raising doubts as to adequacy of representation. The district court will examine this aspect of the matter on remand. Perhaps, on a more developed record, the adequacy of representation will be established. These concerns underscore the importance of having the district court make Rule 23 findings. Although we do not believe that the class would meet the requirements for certification on the current record, we do not preclude the possibility that certification could be properly supported on a more developed record. Thus, we will remand this action to the district court so that it can re-examine the class certification and the settlement and, if appropriate, certify the class by making the findings required by Rules 23(a) and (b).

## VI. IS THE SETTLEMENT FAIR, REASONABLE, AND ADEQUATE?

[30, 31] Invoking the correct standard of review under *Girsh v. Jepson*, 521 F.2d 153,

---

**25.** While the parties could have sought a waiver pre-approving simultaneous negotiations, *Task*

*Force* at 269, the parties did not seek one here.

157 (3d Cir.1975), the objectors also argue that the district court abused its discretion when it approved the settlement as fair, reasonable, and adequate. Because we leave open the possibility that the district court may on remand properly certify the class pursuant to Part V of this opinion, we address the district court's approval of the settlement. Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring that the settlement represents adequate compensation for the release of the class claims. *See* 2 NEWBERG & CONTE § 11.46, at 11–105 to 11–106. Some courts have described their duty under Rule 23(e) as the "fiduciary responsibility" of ensuring that the settlement is fair and not a product of collusion. *In re Warner Commun. Secur. Litig.,* 798 F.2d 35, 37 (2d Cir.1986); *see also Plummer v. Chemical Bank,* 668 F.2d 654, 658 (2d Cir.1982); *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Alvarado Partners L.P. v. Mehta,* 723 F.Supp. 540, 546 (D.Colo.1989). At all events, where the court fails to comply with this duty, absentees have an action to enjoin the settlement. 2 NEWBERG & CONTE § 11.23.

In order for the determination that the settlement is fair, reasonable, and adequate "to survive appellate review, the district court must show it has explored comprehensively all relevant factors." *Malchman,* 706 F.2d at 434 (citing *Protective Committee,* 390 U.S. at 434, 88 S.Ct. at 1168; *Plummer,* 668 F.2d at 659). A number of courts have recognized the need for a special focus on precluding the existence of collusion. *See Malchman,* 706 F.2d at 433 (advocating a focus on the negotiation process to uncover possible collusion); *General Motors Interchange,* 594 F.2d at 1125 (finding a need for heightened scrutiny of the settlement stemming from the potential for collusive settlement).

The topic of class action settlement has received much attention, which is understandable given the growing frequency of the settlement of increasingly large claims through the class action device. *See In re A.H. Robins Co.,* 880 F.2d 709, 739–40 (4th Cir.1989) (discussing the use of the device to settle various mass tort cases); *In re Taxable Municipal Bond Secur. Litig.,* 1994 WL 643142 at *5 (noting the dramatic change in attitudes of courts and commentators toward the settlement class). The drive to settle class actions has also grown, notwithstanding the potential for collusive settlements to compromise absentee interests. Courts undertaking the special role of supervising class action settlements are apparently heeding the public policy in favor of settlement, *see* 2 NEWBERG & CONTE § 11.41, at 11–85, and acknowledging the urgency of this policy in complex actions that consume substantial judicial resources and present unusually large risks for the litigants.

We have already noted the special difficulties the court encounters with its duties under Rule 23(e) in approving settlements where negotiations occur before the court has certified the class. Because of such difficulties, many courts have required the parties to make a higher showing of fairness to sustain these settlements. *See, e.g., Ace Heating & Plumbing Co. v. Crane Co.,* 453 F.2d 30, 33 (3d Cir.1971) ("[W]hen the settlement is not negotiated by a court designated class representative the court must be doubly careful in evaluating the fairness of the settlement to the plaintiff's class."); *General Motors Interchange,* 594 F.2d at 1125 (attributing a need for heightened scrutiny of the settlement to the potential for collusive settlement); *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982) (higher showing of fairness required in pre-certification settlements, and special focus on assuring adequate representation and the absence of collusion); *Malchman v. Davis,* 706 F.2d 426, 434 (2d Cir. 1983); *Mars Steel v. Continental Ill. Nat'l Bank & Trust,* 834 F.2d 677, 681 (7th Cir. 1987); *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1323 (2d Cir. 1990); 2 NEWBERG & CONTE § 11.23; MCL 2d § 30.42 (citing the informational deficiencies faced by the court and counsel in pre-certification settlements). We affirm the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified.

Settlements that have survived this heightened standard have involved much stronger

indications of sustained advocacy by the de facto class counsel than we observe in this case. *See Weinberger,* 698 F.2d 61 (settlement discussions did not commence until after four years of discovery supplemented by another investigation by a trustee and after plaintiffs rejected first settlement offer); *In re Beef Indus. Antitrust Litig.,* 607 F.2d at 177–78 (settlement discussions began after six months of discovery; action pending for three years, court fully briefed); *City of Detroit v. Grinnell,* 495 F.2d 448, 464 (2d Cir. 1974) (approving settlement after several counsel vied for position for four years and voiced strenuous objections, explaining that Manual's concerns about settlement classes articulated by the Manual for Complex Litigation only pertained to settlement in the early stages of litigation); *cf. Plummer,* 668 F.2d 654 (rejecting settlement where plaintiffs' counsel relied on information voluntarily furnished by defendants).

There are certain basic questions that courts can ask to detect those cases settled in the absence of sustained effort by class representatives sufficient to protect the interests of the absentees. *See MCL* 2d § 30.41. For instance: Is the relief afforded by the settlement *significantly* less than what appears appropriate in light of the preliminary discovery? Have major causes of action or types of relief sought in the complaint been omitted by the settlement? Did the parties achieve the settlement after little or no discovery? Does it appear that the parties negotiated simultaneously on attorneys' fees and class relief? Even acknowledging the possibility of some overpleading, these questions raise a red flag in this case.

With the courts' heightened duty to scrutinize this precertification settlement and some of these rudimentary indicators in mind, we now apply our nine-factor *Girsh* test, *see* Part III *supra,* and conclude from the balance of these factors that the district court's conclusion that the settlement was fair and reasonable constitutes an abuse of discretion. Coincidentally, this result tracks the conclusions of a Texas appeals court that, based on an analysis similar to that of *Girsh,* set aside an order approving a substantially identical settlement of similar claims brought by resi-

dents of Texas. *See Bloyed v. General Motors,* 881 S.W.2d at 422.

### A. Adequacy of Settlement— General Principles

[32, 33] This inquiry measures the value of the settlement itself to determine whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case. The *Girsh* test calls upon courts to make this evaluation from two slightly different vantage points. According to *Girsh,* courts approving settlements should determine a range of reasonable settlements in light of the best possible recovery (the eighth *Girsh* factor) and a range in light of all the attendant risks of litigation (the ninth factor). *See Girsh v. Jepson,* 521 F.2d at 157; *see also Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir.1983) (identifying a similar test); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974) (same).

[34, 35] In formulaic terms we agree that "in cases primarily seeking monetary relief, the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." MCL 2d § 30.44, at 252. This figure should generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside. *See Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972). The evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution. *See Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977). The primary touchstone of this inquiry is the economic valuation of the proposed settlement.

[36] We turn to this analysis. As will appear, the district court's conclusion that the settlement was within the range of reasonableness rests heavily on the proposition that the class had never proven any diminution in value of the trucks. It ignored the fact that the coupons provided no cash value

and made no provision for repairing the allegedly life-threatening defect. For the reasons that follow, we believe that the district court did not sufficiently scrutinize the valuations of the settlement, and that, on this record, the settlement appears to be inadequate. Consequently, we will conclude that the district court erred when it found that the settlement fell within the range of reasonableness.

### 1. Valuation of the Settlement—Introduction

The value of the $1,000 certificates is sharply disputed. GM argues that the certificates are worth close to their face value since they can be redeemed for a broad array of GM trucks and can be used in combination with dealer incentives. For those unable or unwilling to purchase another GM truck, GM argues, cash can be realized from transferring the certificate within the household for full value or selling the certificate for $500. Plaintiffs presented an expert, Dr. Itamar Simonson, who placed the value of the certificates between $1.98 and $2.18 billion, based on an estimate that 34% to 38% of the class would redeem the certificate in purchasing a new truck and an additional 11% of the class would sell their certificates for $500. Objectors contest these estimates and many of the assumptions used to generate them.

We therefore analyze several of the foundations for the district court's evaluation. First, we inquire about the reliability of plaintiffs' witness's valuation. Second, we explore the adequacy of the district court's consideration of the possibility that some class members would not be able to use the coupons at all. Third, we inquire as to whether the quite significant restrictions on transfer of the certificates present obstacles to the development of a market so as to render the estimates of their worth unreasonably inflated. Finally, we consider whether the size of the attorneys' fees agreement suggests that GM attached a greater value to the class claims than proponents of the settlement would have us believe. These factors lead ineluctably to the conclusion that the district court overvalued this settlement, which in turn gives credence to the contention of the objectors that the proffered settlement was, in reality, a sophisticated GM marketing program.

### a. Plaintiffs' Witness Dr. Itmar Simonsen

Dr. Simonsen's methods and assumptions raise serious doubts about the reliability of the valuations they generated. Although Simonsen's conclusion was based on his estimate that between 34% and 38% of the class members would use the certificate, his own telephone survey revealed that only 14% of the class reported that they would "definitely" or "probably" buy a new truck. Apparently Simonsen only excluded those who responded that they would "definitely not buy" or "probably not buy" a new truck, a methodological choice which is questionable. Furthermore, Simonsen discounted the statistics by seemingly arbitrary factors in an effort to be "conservative," but without some basis or explanation for the derivation of those factors, we have no way of judging whether they were conservative or aggressive.

Even more importantly, the raw survey data probably overstate the prospects that the certificates will be used since there are substantial obstacles to obtaining and transferring the certificates, none of which Simonsen deals with. Finally, Simonsen supposed that a higher percentage of fleet owners than individual owners would redeem the certificates, but this seems to disregard the statutory and regulatory constraints that often restrict fleet buyers' purchase decisions. Indubitably all of these concerns reduce the value of the settlement, yet Simonsen appears simply to have multiplied his estimated number of users by the coupon amount or transfer value.

On the other hand, although various objectors have made a good argument that the net value of the certificates will also be eroded by rising truck prices (which would allegedly be influenced both by the huge number of certificates that would need to be redeemed within a relatively brief time and by the fact that dealers may take advantage of customers they know to be somewhat tied to the purchase of a GM truck by their desire to realize value from the coupon), we will, to be conservative, not take this factor into ac-

This is page 86 of 133

count. Even so, Simonsen's methodology undermines his conclusion to the extent that his valuation cannot support the settling parties' case.

### b. Inability of Class Members to Use Certificates

[37] The district court also erred by not adequately accounting for the different abilities (not inclinations) of class members to use the settlement. One sign that a settlement may not be fair is that some segments of the class are treated differently from others. *See Piambino v. Bailey,* 610 F.2d at 1329; *In re GM Corp. Engine Interchange Litig.,* 594 F.2d at 1128; MCL 2d § 30.41, at 236. Consequently, the fact that the coupon settlement benefits certain groups of the class more than others suggests that the district court did not adequately discharge its duties to safeguard the interests of the absentees. *See In re Fine Paper Antitrust Litig.,* 617 F.2d 22 (3d Cir.1980) (ongoing duty of the judge to protect absentees); *Piambino v. Bailey,* 610 F.2d at 1329 (duty to assure the settlement is fair, reasonable, and adequate with respect to *each* category of the class).

People of lesser financial means will be unable to benefit comparably from the settlement. GM cites a number of other judicially approved class action settlements that awarded coupons and argues that, since this coupon provides far more consideration, it necessarily merits approval. *See, e.g., New York v. Nintendo of Am. Inc.,* 775 F.Supp. 676, 679 (S.D.N.Y.1991) ($5 discount coupon for video game purchase of approximately $200); *In re Cuisinart Food Processor Antitrust Litig.,* 1983–2 Trade Cas. (CCH) ¶ 65, at 680, 1983 WL 153 (D.Conn.1983) (discount coupons with maximum value of $100 for machines costing approximately $100 to $300); *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 331 (N.D.Ga.1993) (certificates worth between $10 and $200 for flights costing between $50 and $1500).

These cases, however, differ dramatically in the amount of money required to purchase

the good—i.e. to realize the certificate's value—and in the frequency with which a typical consumer might expect to purchase the good. Whether a new truck costs between $20,000 and $33,000 as some objectors claim or some amount "far less" than that, as GM claims, this purchase is not comparable to buying a new food processor or even an airline ticket. As the district court acknowledged, "a substantial number of class members" would not be able to afford a new truck within the fifteen month coupon period. Both the high cost of the trucks and the infrequency of a consumer's purchase of a new truck (relative to the fifteen month redemption period) make using these certificates significantly more difficult than those in the other coupon settlements, for all class members but particularly for the poorer ones.

Even where class members do manage to use the certificates, we are concerned about their real value. It may not be the case that the certificates saved those class members $1,000 on something they would have otherwise bought; those class members may only have purchased new GM trucks because they felt beholden to use the certificates. Thus, rather than providing substantial value to the class, the certificate settlement might be little more than a sales promotion for GM, in just the way that the *Bloyed* court characterized the settlement as a "tremendous sales bonanza" for GM. *Bloyed v. General Motors Corp.,* 881 S.W.2d at 431.

We turn then to the fleet buyers, who constitute a readily identifiable category of plaintiffs arguably disadvantaged by the settlement. Budgetary constraints prevent some of them from replacing their entire fleets within the fifteen month redemption period.[26] Competitive bidding requirements also apparently impede many of these entities from being able to use the certificates. Because there is no assurance that GM will be the lowest bidder, the government entities bound by these requirements may not be able to use the certificates. *See, e.g. The*

---

**26.** This is true of, for example, the State of Iowa; State of Indiana; West Virginia Department of Transportation; State of New York; Commonwealth of Pennsylvania Department of Transportation and Department of General Services; County of Los Angeles, California; Jefferson Parish, Louisiana; and the City of New York.

Louisiana Public Bid Law, La.R.Stat. § 38:2212(A)(1)(a). The district court dismissed these objections saying it was "confident that ingenious counsel will be able to structure bidding requirements so that the governmental entities can take full advantage of the certificates." The district court's observation, while perhaps partially accurate, represents far too cavalier a dismissal of a potentially serious intra-class conflict and inequity.

The named plaintiffs argue that, if certain fleet buyers and individuals were dissatisfied with the settlement's terms, they could simply opt out of the class and pursue their own relief individually. While such an argument might theoretically be true, it ignores the realities of pursuing small claims. It would cost considerably more to litigate individual claims than the litigant could recover, using either a retrofit or a warranty theory to measure damages. And the district court apparently did not consider the possibility of a subclass of fleet owners, though that might alter the anatomy of the settlement. At all events, the right of parties to opt out does not relieve the court of its duty to safeguard the interests of the class and to withhold approval from any settlement that creates conflicts among the class. In sum, the relative inability of class members to use the certificates militates against settlement approval.

### c. Value of the Transfer Option

In order to support its conclusion that the settlement was reasonable and fair, the district court cited the ability of fleet buyers and those consumers with budget constraints to realize value from the certificates by transferring them. We believe that the value of the transfer option is dubious, and consequently that the settlement was unfair to substantial portions of the class.

Simonsen's valuation of the settlement includes $157 million attributable to transferred certificates. Simonsen calculated that holders of the certificates could realize $250 from the sale of the transferred certificates (with a $500 face value). He gave no explanation for his assumption of a $250 market value. To the extent that this methodology

is also dubious, it compounds the skewing of the valuation wrought by his usage estimates, see Part VI(A)(1)(a) supra.

The value of this option depends on the development of a secondary market for these certificates. But there is no assurance that a market will develop; indeed, the restrictions on transfer, which GM claims are necessary to prevent fraud, pose significant barriers to the creation of such a market. The requirement that holders send in their $1,000 or original certificate to exchange for the $500 transfer certificate imposes very significant transaction costs since the parties must agree on a price before the original holder initiates the transfer process (which could easily last several weeks). During that process, there is substantial market risk, for the price of the transfer certificate could well move dramatically and induce a breach in the purchase agreement by one of the parties. Breaches would pose a real problem in this case because the transfer certificate cannot be reissued in another's name and thus cannot be resold. Because of these risks, individuals will be quite reluctant to contract for these transfer certificates. Even worse, the one-time transfer restriction also precludes the development of a market-making clearing house mechanism. In our view, therefore, it is quite possible that holders will be unable to realize any significant value from the transfer option.

Aside from the effect of the transfer restrictions, we also question Simonsen's valuation on the basis that it did not account for the inability to use the transfer certificates in conjunction with other incentive plans. For example, the incremental value of the $500 transfer certificate to class members would be completely eroded if GM offers a $1,000 dealer rebate program, since the class member would be forced to choose between the plans and would therefore be no better off than the general public.

The district court did not take cognizance of these factors. It erred when it presumed development of a liquid market for these transfer certificates with very little support in the record for it, and when it relied on a putative value of the transfer option arbitrarily ascribed by plaintiffs' expert to find

that the settlement was fair and reasonable. Although objectors might have made out an even stronger case by proffering their own expert on this valuation, the court has an independent duty to scrutinize the settlement's value and any evidence offered to support it. Accordingly, we find that evidence pertaining to the incremental value created by the transfer option does not support the valuation of the settlement.

### d. GM's Implicit Valuation of the Claim

Our concerns about the adequacy of the settlement are complicated by the generous attorneys' fees GM agreed to pay in this case. Although originally GM vigorously contested the viability of the class claims and the class, the company, in view of its willingness to pay attorneys' fees of $9.5 million, may, at the time of settlement, have valued the claims at some substantial multiple of the fee award.[27] This $9.5 million attorney's fee award seems unusually large in light of the fact that the settlement itself offered no cash outlay to the class. GM's apparent willingness to pay plaintiffs' counsel close to $9.5 million indicates that the party in perhaps the best position to evaluate the claim may have thought the action, which both plaintiffs' counsel and the defense contend was not worth much, posed a significant enough threat to cause GM to strike a lucrative deal with plaintiff's counsel.

[38] On the other hand, perhaps GM's valuation results only from the class counsel's decision to settle the action at an early stage and GM's desire to encourage that decision. Of course, a decision to settle that occurs at too incipient a stage of the proceedings also weighs against settlement approval. In short, while the settlement certainly presented difficult valuation issues, we believe that the district court erred when it uncritically

accepted such high estimates of the settlement's value.

### 2. Valuing This Settlement Relative to the Relief Requested

The ninth *Girsh* factor also undermines the district court's decision. In the class action context, "the relief sought in the complaint" serves as a useful benchmark in deciding the reasonableness of a settlement. *See Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977). Here the adequacy of the certificate settlement is particularly dubious in light of the claims alleged and the relief requested in the original complaint. The coupons offered by GM simply do not address the safety defect that formed the central basis of the amended complaint filed barely four months before the settlement.[28] The district court gave two justifications for its conclusion that, notwithstanding this discrepancy, the settlement was fair. First, the court explained, "no objector that complains that the settlement fails to retrofit the alleged defect has been able to come forth with a practical and safe modification for the trucks that has been designed, evaluated and tested." Second, the court also relied on the fact that "[t]he proposed class settlement does not affect the rights of settlement class members to participate in any recall that NHTSA orders."

Having considered the validity of these arguments, we conclude that they do not alleviate the substantial concerns created by the dramatic divergence of the settlement terms from the relief originally sought. This factor, therefore, strengthens our conviction that the settlement was not fair, reasonable, or adequate.

### a. The Retrofit Issue

It is true that there does not appear to be a consensus retrofit. For each of the sug-

---

27. GM was apparently so eager to have this $9.5 million fee approved that its counsel did not even object when the district court applied a multiplier notwithstanding clear Supreme Court precedent invalidating the use of multipliers. *See City of Burlington v. Dague,* — U.S. at —, 112 S.Ct. at 2638. In our view, the fact that counsel to this large multinational corporation did not object to this clear error raises a smoking gun

signaling GM's awareness of the questionable settlement it made.

28. In the amended consolidated complaint, class counsel described the trucks as "rolling firebombs" and estimated that an additional 200 deaths would occur unless GM took prompt corrective action.

gested retrofits—relocation of the gas tank to the spare tire location, installation of a tank with a rubber bladder, or installation of a metal cage around the gas tank—there was evidence that the retrofit either was ineffective or caused other performance problems for at least some model years. On the other hand, there was also evidence supporting the efficacy of various retrofits. For instance, GM's own documents ,considered all three options and found that *all* would enhance the safety of the fuel systems. In addition, there was also potentially damaging testimony by Ronald E. Elwell, an engineering analyst at GM for fifteen of his twenty-eight years with the company and its chief expert in defending the fuel tank location and design on the full-size trucks in a number of significant product liability cases, *see, e.g., Bowman v. General Motors*, 427 F.Supp. 234, 236 (E.D.Pa.1977).

[39] In his deposition, Elwell testified that GM designed a retrofit using a steel cage which prevented the gas tanks from rupturing in side impact testing. He further testified that GM abandoned the retrofit (knowing, because of its own secret crash tests, of the increased fire danger) only because GM feared that it would give the public the wrong impression. GM attempted to impeach Elwell by characterizing him as a "disgruntled," (former) employee. By way of rehabilitation, objectors explain Ellwell's reduced duties as a result of health problems. Whether or not Ellwell's testimony could itself establish that the steel cage enhances safety, his testimony might have been important if the case had proceeded to trial. As a consequence, the district court abused its discretion when it *summarily* dismissed Ellwell's testimony.

### b. *Availability of Other Remedies*

The district court also relied on the existence of the NHTSA recall mechanism and

the class members' unencumbered right to bring personal injury suits to justify its approval of a settlement that did not secure any of the equitable relief originally requested. While individual tort suits are not barred, the court's approval of this settlement (which does nothing to redress the alleged danger) foregoes the opportunity presented by the pleadings [29] to prevent injuries that tort suits can at best address only retrospectively. More importantly, the NHTSA remedy may be extremely limited in that it can only require a manufacturer to repair a vehicle first purchased within eight calendar years of the investigation. The court's observation that "all the plaintiffs may have statute of limitations problems in this action that may be equally as severe or worse than the eight year NHTSA limitation" does nothing to increase the value of the theoretical access to a NHTSA recall remedy to the owner or others who may be injured by the trucks at some future point. Hence, the potential existence of a partial recall under NHTSA does not dispel our doubts about the settlement terms' diverging so far from the original complaint. In so concluding, we do not rely on the subsequent resolution of the NHTSA investigation, which did not include any recall.

In sum, we agree with the district court that the evidence of the existence of an effective retrofit to be contradictory; nevertheless, we think that the very murkiness of this evidence and the fact that certain key evidence was wrongly excluded, especially in light of the magnitude of the alleged safety defect, militate against approving a settlement attained at such an early stage of the litigation which does nothing to repair the vehicles, not even creating a fund to finance retrofits.[30]

---

29. The pleadings alleged a dominant control theory which, if successful, would have required GM, the manufacturer and distributor of these vehicles, to remedy the allegedly unreasonable safety defects before they could cause or exacerbate the damage and injury resulting from a side impact collision.

30. The district court also based its conclusion that the settlement was reasonable relative to the

best possible recovery (i.e., relative to the relief requested) on its doubts that a court could or should award the recall/retrofit remedy requested. The court expressed some doubt that it had the power to order a recall by injunction, citing *Walsh v. Ford Motor Co.*, 130 F.R.D. 260 (D.D.C. 1990), and *National Women's Health Network Inc. v. A.H. Robins Co.*, 545 F.Supp. 1177 (D.Mass.1982). Neither of these cases, however, conclusively establishes that the district court

### B. Complexity of the Suit

This factor is intended to capture "the probable costs, in both time and money, of continued litigation." *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974). By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably. The district court here concluded that the litigation "would be mammoth" and would have resulted in a "substantial delay in . . . recovery."

[40] While it is true, as the Youngs objectors argue, that the district court's conclusion in part depended on the ambitious definition of the class in terms of both geography and truck models included, the action would still involve a complex web of state and federal warranty, tort, and consumer protection claims even if the class had been subdivided and some of the legal issues simplified. Had the case not been settled, both plaintiffs and GM would have had to conduct discovery into the background of the six million vehicles owned by class members, including any representations allegedly made to plaintiffs. Each side would also have needed to hire or produce a retinue of experts to testify on a variety of complex issues. Undoubtedly, GM would have ardently contested the action at every step, leading to a plethora of pretrial motions. In contrast, this settlement made its remedies immediately available and avoided the substantial delay and expense that would have accompanied the pursuit of this litigation. The district court thus correctly concluded that the complexity factor weighed in favor of approving the settlement.

### C. Reaction of the Class

[41] In an effort to measure the class's own reaction to the settlement's terms di-rectly, courts look to the number and vociferousness of the objectors. Courts have generally assumed that "silence constitutes tacit consent to the agreement." *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1313 n. 15 (3d Cir.1993). However, a combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement. *See, e.g., In re Corrugated Container Antitrust Litig.*, 643 F.2d at 217–18; *GM Interchange Litig.*, 594 F.2d at 1137.

In a class action case involving securities litigation, this court has recognized the possibility that the assumption that silence constitutes tacit consent "understates potential objectors since many shareholders have small holdings or diversified portfolios, . . . and thus have an insufficient incentive to contest an unpalatable settlement agreement because the cost of contesting exceeds the objector's pro rata benefit." *Bell Atlantic Corp. v. Bolger*, 2 F.3d at 1313 n. 15. Although this is not a securities class action and the amounts at stake could be significant, the absentees may not fully appreciate the size of their potential claims since, by excluding those owners whose trucks have already experienced some mishap related to the fuel tank design, the class may include only those who have no reason (outside of media coverage) to know of the latent defect or the claim based on the alleged existence of that defect.

Even where there are no incentives or informational barriers to class opposition, the inference of approval drawn from silence may be unwarranted. As we noted earlier, Judge Posner has explained that "where notice of the class action is . . . sent simulta-

---

would lack the power to order a recall. The fact that no court has done it before and that there may be some logistical issues to surmount do not themselves support the court's conclusion; other class actions and complex litigation settlements have developed mechanisms for supervising and enforcing compliance with detailed affirmative injunctions. *See, e.g.,* MCL2d § 33.55 ("The court may also decide to appoint a master under Rule 53 to monitor future implementation of injunctive features of the settlement."). Al-

though we intimate no view on the matter, it does seem to warrant further consideration. At all events, the district court could clearly have awarded relief that would require GM to set up a fund to finance retrofits initiated by the owners individually. *See Bloyed*, 881 S.W.2d at 433. The district court, therefore, did not lack the power to order a remedy that would have been more responsive to the class's concern about leaving the trucks on the road.

neously with the notice of the settlement itself, the class members are presented with what looks like a fait accompli." *Mars Steel*, 834 F.2d at 681. In this case especially, the combined notice largely defeats the potential for objection since the notice did not inform the class that the original complaint had sought a retrofit.[31] Without information about the original complaint, absentees lacked any basis for comparing the settlement offered to them to the original prayer. It is instructive that many of the better-informed absentees, the fleet owners, did object.

[42] The fact that a poll conducted by class counsel's marketing expert reported that a minimum of sixty-three percent of the class would probably or definitely not use the coupon to purchase a new truck also suggests that the class could not possibly have so wholeheartedly endorsed the settlement. Moreover, one cannot infer approval of the settlement from requests for the transfer of the certificates, as the district court did. Those requests only signify that certain class members attempted to maximize the value they could realize from the settlement with which they were presented and thus might illustrate how futile class members thought objecting would be.

Although the absolute number of objectors was relatively low,[32] there are other indications that the class reaction to the suit was quite negative: The seemingly low number of objectors includes some fleet owners who each own as many as 1,000 trucks, and those who did object did so quite vociferously. In conjunction with the already-noted problems associated with assuming that the class members possessed adequate interest and information to voice objections, the appeals of those who actually objected demonstrate that the reaction of the class was actually negative, and not supported by the "vast majority of the class members" as the district court concluded. The class reaction factor plainly

does not, contrary to the district court's conclusion, weigh in favor of approving the settlement.

### D.  Stage of Proceedings

[43] The stage-of-proceedings facet of the *Girsh* test captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating. The district court found that this factor favored settlement approval, relying on the fact that settlement was presented for approval less than six months prior to the scheduled trial date.

[44] Given the purpose of this inquiry, however, it is more appropriate to measure the stage by reference to the *commencement* of proceedings either in the class action at issue or in some related proceeding. *See In re Beef Antitrust*, 607 F.2d at 180 (court referred to discovery in companion cases); *City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1880, 1886 (S.D.N.Y.1972), *rev'd on other grounds*, 495 F.2d 448 (2d Cir.1974) (noting the extensive discovery in that and parallel cases); *In re Baldwin–United Corp.*, 105 F.R.D. at 483 (access to expert testimony and other evidence from parallel state court proceedings as well as to relevant public documents led court to believe counsel "availed themselves of all of these sources of information and conducted full adversarial negotiations ..."); 2 NEWBERG & CONTE § 11.45, at 11–102 n. 247.

[45] The relevant period of time this case was in litigation was quite brief; approximately four months elapsed from the filing of the consolidated complaint to the reaching of the settlement agreement. To be sure, we cannot measure the extent of counsel's effort from the time of the litigation alone; class counsel in this case are known to be quite industrious, and the district court properly considered class counsel's review of the ma-

---

**31.** There may also have been other deficiencies in the notice. The fact that the notice did not disclose the attorneys fees that the class counsel and defendants agreed to, and the fact that the notice suggested that class members could also have a recall remedy from NHTSA (though many of the trucks were so old that NHTSA lacked the

power to recall them), may also have helped suppress potential objection.

**32.** Of approximately 5.7 million class members, 6,450 owners objected and 5,203 opted out.

terials from prior product liability proceedings and from the *Moseley* personal injury case, *Mosley v. General Motors Corp.*, No. 90–v–6276 (Fulton County, Ga. Feb. 4, 1993). However, mere access to the materials from other proceedings does not establish that counsel developed the merits, particularly where the other cases were premised on different theories of recovery. While we have no doubt that class counsel diligently reviewed those materials during the relevant period, nothing in the record demonstrates that they had conducted significant independent discovery or investigations to develop the merits of their case (as opposed to supporting the value of the settlement), that they had retained their own experts, or that they had deposed a significant number of the individuals implicated in the materials from these other proceedings. It is particularly noteworthy that the plaintiffs did not depose Ronald Elwell, although he could potentially have offered evidence that would have substantially bolstered the plaintiffs' case. *See* Part VI.A.2.a *supra.*

At all events, the inchoate stage of case development reduces our confidence that the proceedings had advanced to the point that counsel could fairly, safely, and appropriately decide to settle the action. While the district court may have, laudably, been attempting to minimize the funds expended on discovery in order to maximize the funds available to the class, we think that the district court erred by not assuring that adequate discovery had been taken.

[46] Beyond the incipient stage of the case and the modest indications of substantive development, there is little basis for presuming vigorous prosecution of the case from the fact that settlement negotiations occurred. In ordinary class action settlements (i.e., where the court certifies the class before settlement negotiations commence) courts can presume that the negotiations occurred at arm's length because they have already determined that the counsel negotiating on behalf of the class adequately represents the class's interests. *See* Part IV.E *supra,* (discussion of adequacy of representation). In cases such as this one, however, where there has been no determination by

the court that a proper class exists, the mere fact that negotiations transpired does not tend to prove that the class's interests were pursued. *Id.* In short, the incipient stage of the proceedings poses an even larger obstacle to settlement approval in settlement class situations than it would in normal class action settlements since courts have no other basis on which to conclude that counsel adequately developed the claims before deciding to settle.

Furthermore, to the extent that this stage-of-proceedings factor also aims to assure that courts have enough exposure to the merits of the case to enable them to make these evaluations, it cannot support settlement approval here. With little adversarial briefing on either class status or the substantive legal claims, the district court had virtually nothing to aid its evaluation of the settlement terms. We therefore conclude that the district court clearly erred in finding that this factor weighed in favor of settlement approval.

*E. Risks of Establishing Liability*

[47] By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them. *See In re Baldwin–United Corp.*, 105 F.R.D. 475, 482 (S.D.N.Y.1985) (comparing advantages of an immediate cash payment with risks involved in long and uncertain litigation). The district court here concluded that this factor also weighed in favor of approving the settlement since "there appear[ed] to be a substantial risk in establishing liability because of the complexity and size of the case along with the legal and factual problems raised by GM." While we agree with the district court that, on balance, the prospective difficulty faced by a nationwide class of establishing liability favored settlement, we believe the question is much closer than it thought, and thus the factor does not weigh heavily in favor of settlement as the district court believed.

We do not gainsay that the plaintiff class faced considerable obstacles in establishing liability. First, it is not clear that the plain-

tiffs could maintain the federal causes of action (the Lanham Act and Magnuson–Moss Act claims) without some proof that the trucks suffered some decline in value, which the class was unable to demonstrate by published Kelley Blue Book figures. Second, the trucks complied with the applicable federal safety standards during the relevant times. This would undoubtedly be strong, though not necessarily conclusive, evidence that the trucks were not (legally) defective. Statistics offered by GM also suggest that the trucks presented no greater risk than other trucks or vehicles. Moreover, data from actual accidents, as opposed to crash tests, failed to reveal any statistically significant difference in post-collision fires, injuries or death relative to Ford or Dodge full-size pickups. Finally, to the extent that state law requires proof of individualized reliance for the misrepresentation claims, that would seem to pose a substantial barrier to proving class-wide liability (though, as noted below, that issue can be the subject of separate proceedings).

On the other hand, we are not impressed by some of the factors relied upon by the district court to support its finding of substantial risk in proving liability. The court cited the legal obstacles faced by the class, such as statutes of limitations varying in different states, the lack of vertical privity for the warranty claims (required in some states), the varying expiration of warranty durational limits, and the bar under some state laws to recovery for economic losses on tort claims. In response to these concerns, we point out that variations in the state procedural rules applicable to the class members have not prevented courts, including this one, from adjudicating class claims. *See Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 924 (3d Cir.1992) (affirming finding of (b)(3) predominance despite differences in state law). Moreover, even if these variations precluded the successful prosecution of the class claims, qua class claims, in this case they would not necessarily doom the action to failure.

Many of the difficulties posed by these variations could have been surmounted (or were more likely to be surmounted) if the

action were not treated as a national class. Hence, the fact that the only other national automotive product defect class action ended in a defense verdict does not weigh heavily in favor of settlement. Indeed, to the extent that state-by-state variations in procedural laws created legal obstacles, the district court should have considered dividing the action into geographic sub-classes instead of considering the entire nationwide class to be hobbled. Additionally, the court should have considered making the inquiry we made in *In re School Asbestos Litig.,* 789 F.2d at 1011, as to whether the case in terms of claims and defenses might fall into three or four patterns so that, with the use of special verdict forms, the case might have been manageable.

We also note that, in other cases, courts have certified nationwide mass tort class actions, which also include myriad individual factual and legal issues, relying on the capacity for a court to decertify or redefine the class subsequently if the case should become unmanageable. *See, e.g., In re School Asbestos Litig.,* 789 F.2d at 1011 (3d Cir.1986). *See also* Bruce H. Nielson, *Was the Advisory Committee Right?: Suggested Revisions of Rule 23 to Allow More Frequent Use of Class Actions in Mass Tort Litigation,* 25 HARV.J.LEGIS. at 469 ("Some federal district court judges have suggested that this problem could be overcome and that multistate and nationwide classes could be certified by . . . using Rule 23(c)(4) subclasses to account for variances in state law. . . ."); *see infra* discussion on Risks of Maintaining Class Status. In any event, the failure of the district court to analyze the applicability of these various defenses to the different groups of plaintiffs may itself constitute an abuse of discretion. *See Piambino v. Bailey,* 610 F.2d 1306, 1329 (5th Cir.1980) ("[Vacatur] is demanded by the failure to assess the interests of the categories of plaintiffs and whether the settlement was fair, adequate and reasonable *as to each.*" (emphasis in original)); *see also Piambino v. Bailey,* 757 F.2d 1112, 1140 (11th Cir.1985).

In addition, a plethora of other evidence buttressed the class claims. First, the depositions and affidavits from GM engineers, including Elwell, characterizing the design as

indefensible would have strongly supported the class claims notwithstanding the fact that Elwell was arguably vulnerable to impeachment on the basis of his own employment history. Second, the evidence from *Zelenuk v. GM*, No. 96–131262 (Tex.1992), that GM concealed crash tests might have been admitted in this proceeding. Third, the fact that GM has prevailed in three of the eight C/K pickup product liability trials does not support the settlement by confirming the weakness of the underlying claims, for at least two other plausible interpretations could explain this statistic. The fact that plaintiffs *prevailed* in five of the eight actions suggests that the claim alleged here was not so weak after all, at least if alleged by suitable plaintiffs. Moreover, such a statistic understates plaintiffs recoveries for these types of claims by not accounting for the individual settlements that have been reached.

[48] While we recognize that establishing liability would by no means have been easy or certain for the plaintiffs, the district court over-emphasized the importance of defenses applicable to only some class members under certain state laws and incorrectly discounted a significant body of evidence pertinent to proving liability. Therefore, it is not clear that plaintiffs faced the grave prospects on the merits that the district court apparently believed existed when it approved this settlement. In any event, the district court's failure to distinguish between groups of plaintiffs that did and those that did not confront difficult state law defenses constitutes an abuse of discretion. *Piambino*, 610 F.2d at 1329.

### F. *Risks of Establishing Damages*

Like the previous factor, this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time. The district court relied heavily on this factor in approving the settlement: "[B]ecause the plaintiffs cannot adequately prove diminished value [of the pickups], the court concludes that risks of proving damages weigh strongly in favor of approval of the proposed class settlement." We do not share the district court's confi-

dence, and conclude that this factor does not weigh strongly in favor of settlement.

GM argues that the class's warranty claim amounts to a claim for diminished resale value. Some United States Courts of Appeals and some state courts have rejected such claims either on the grounds that a warranty of merchantability does not include any guarantee about the product's resale value, *see, e.g., Carlson v. General Motors Corp.*, 883 F.2d 287, 298 (4th Cir.1989), *cert. denied*, 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 287 (1990), or on the basis that the tort law of many states precludes tort claims for purely economic loss. In assessing this *Girsh* factor, the district court relied on its belief that the class could not demonstrate any diminution of the trucks' value relative to Ford and Dodge trucks by referring to the Kelley Blue Book.

We do not, however, believe that this is the only permissible approach to measuring the value of the defect. According to the Uniform Commercial Code, "the measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." UCC § 2–714(2). Although diminished resale value might represent one method of measuring the damage suffered by owners from the publicity about the fuel tanks, it does not fully measure the difference between the value the defect-free truck would have had at delivery and the actual value of the truck as delivered. Measuring damages with a focus on resale value confounds the effects of varying rates of depreciation with the effect of the defect on the market value. The comparisons to the trucks of other manufacturers are similarly deficient measures since they fail to gauge the effect of the defect on the value of the trucks at delivery.

The cost of a retrofit, which effectively puts the truck in the condition in which it allegedly should have been delivered, may constitute an alternative measure of the damages arising from the breach of warranty. It

has the advantage of avoiding the speculative exercise of ascertaining the hypothetical value of defect-free trucks. *See, e.g., McGrady v. Chrysler Motors Corp.,* 46 Ill.App.3d 136, 4 Ill.Dec. 705, 360 N.E.2d 818, 821–22 (1977) (affirming an award of actual repair expenses where measuring value of vehicles as warranted upon delivery would be speculative); *Nelson v. Logan Motor Sales, Inc.,* 179 W.Va. 539, 370 S.E.2d 734, 737 (1988) (reversing a ruling that repair costs were not evidence relevant to the value of the goods as accepted). Nothing in the UCC precludes such a measure; in fact, § 2–714(1) of the Uniform Commercial Code provides:

> Where the buyer has accepted goods and given notification he may recover as damages for any nonconformity the loss resulting in the ordinary course of events from the seller's breach as determined *in any manner* which is reasonable.

(emphasis added) (citation omitted).[33]

[49] Because the district court based its appraisal of this factor on its exclusive reference to the Kelley Blue Book and refused to consider alternative measures that appear to provide concrete (and substantial) damage figures, we believe that the court erred in finding that the risks of proving damages were so great that they strongly favored settlement approval.

### G. Risks of Maintaining Class Status

[50] The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate

proof on the merits. Thus, the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the action.

The district court found that this factor favored settlement, although it did not place great weight on it. The court cited the "myriad factual and legal issues"[34] and the vigorous contest waged by GM prior to settlement negotiations as the basis for this finding. *Id.* Two observations, which the district court appeared to ignore, weaken the basis for its finding that the risk involved in maintaining class status favored settlement.

[51] First, Rule 23(a) does not require that class members share every factual and legal predicate to meet the commonality and typicality standards. *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994); *Hassine v. Jeffes,* 846 F.2d 169 (3d Cir.1988). Indeed, a number of mass tort class actions have been certified notwithstanding individual issues of causation, reliance, and damages. *See, e.g., In re School Asbestos Litig.,* 789 F.2d at 1009. Because separate proceedings can, if necessary, be held on individualized issues such as damages or reliance, such individual questions do not ordinarily preclude the use of the class action device. *See, e.g., Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir. 1985).

For example, in *School Asbestos,* the court certified a nationwide (b)(3) class after counsel demonstrated to the court how the laws of the 50 states could be reduced to four general patterns, providing the framework for subclasses if the nationwide action had proven unmanageable.[35] *School Asbestos,*

---

**33.** GM argues that a repair remedy is available only when it is less costly to the defendant than diminution in value. We think that such rigid rules are inappropriate, and that the court should carefully consider all of the proffered measures of damages. In any event, the costs of retrofit, though unsettled by the district court as of this juncture, will be less than the diminution in value (if the settling parties' valuation of the certificates is any indication of that diminution).

**34.** The legal issues that might vary among class members included the claims of breach of warranty, negligent misrepresentation, and negligence and products liability, which would be based on the various state laws. Potentially vari-

able factual issues included the fact that the disputed trucks did not use a single gas tank design, and the individualized proof of reliance required in some jurisdictions for fraud, negligent misrepresentation, and breach of warranty claims.

**35.** The district court could retain the sub-classes although they might not have properly been brought in that court originally. *Cf. In re Agent Orange Prod. Liab. Litig.,* 100 F.R.D. 718, 724 (E.D.N.Y.1983) (recognizing hypothetical need of the court to apply the laws of different states); *In re Agent Orange Prod.,* 580 F.Supp. 690 (E.D.N.Y. 1984) (performing choice of law analysis).

789 F.2d at 1011. Although there was no such demonstration in this case, we have no reason to doubt that such a demonstration would have been possible, for we cannot conceive that each of the forty-nine states (excluding Texas) represented here has a truly unique statutory scheme, or that all of the model years possessed distinct fuel tank designs. Damage issues, moreover, are not as individualized as the district court seemed to assume: the cost of repair could have served as the measure, and that cost would not vary much among class members. Hence, it is quite possible that a nationwide class could have been properly certified here.

Second, even if the action could not be certified as it was originally filed, the district court disregarded the possibility that there were other ways to aggregate the litigation and/or adjudication of these claims. The court might have considered dividing the class into geographic or model-year subclasses or allowing the case to continue as a multi-district litigation for the remainder of pre-trial discovery. Each of those alternatives could have surmounted some of the individual issues while retaining some of the substantive advantages of the class action as framed here. Thus, the court's conclusion that this factor favored settlement may have reflected its mistaken all-or-nothing approach to certifying this national class.

Additionally, some of the district court's bases for finding such a significant risk in the ability to maintain class status undermine our confidence in the appropriateness of the district court's certification of the settlement class. For instance, if the district court correctly concluded that there were insurmountable barriers to class treatment, it could not certify the class for settlement purposes. See Part IV.F supra. It is true that settlement can reduce the differences among class members. But as we have explained, the standard for certification is the same for settlement classes as for conventional classes.

Moreover, if the class members' claims differed so much as to preclude certification even of geographic subclasses, a settlement

that treats all class members alike cannot be adequate and fair to all of them. For reasons stated above, this settlement does not even appear to treat all members of the class equitably. See Parts V.B and VI.A.1.b supra. Indeed, the settlement arguably affords the least relief to those class members with the most valuable claims, i.e., the fleet owners. See Part VI.A.1.b supra. The district court's concern, therefore, that the class could not maintain its class status, is somewhat inconsistent with its certification of the class for settlement purposes.[36]

We must agree that this class, even if appropriately crafted, confronted significant difficulties in maintaining its status in light of the claims alleged. Nevertheless, we are once again left with the impression that the district court too hastily approved a settlement because of its perhaps exaggerated concern that the quite ambitious initial nationwide definition of the class made it too difficult to form a class or group of classes capable of litigating these claims.

### H. Ability to Withstand Greater Judgment

We find no error in the district court's resolution of this final *Girsh* factor—whether the defendant has the ability to withstand a greater judgment. The district court determined that GM "could withstand a judgment greater than the proposed settlement," although it did not attribute any significance to this finding "under these facts."

### I. Summary

Assuming arguendo that the district court had validly certified the settlement class (i.e., properly determined that it met the requisites of Rule 23), we hold that the settlement is not fair, reasonable, or adequate under the nine factor *Girsh* test of this circuit. The case was simply settled too quickly with too little development on the merits for certificates that may well be worth significantly less than the $1.98 to $2.18 billion estimate accepted by the district court. We conclude that the district court erred by accepting plaintiffs' witness's estimated valuations

---

36. This anomaly is at least partially attributable to the court's failure to certify the class in the manner required by Rule 23. But some part of

the inconsistency signals that the district court ignored the various ways that the class claims could be manageably litigated.

when those so clearly lacked a sound methodological basis and when there were so many other indications—including the inability of fleet owners and less wealthy class members to use the certificates, the dubious value of the transfer option, and GM's own apparent valuation of the claim—that the settlement was inadequate and unreasonable, and may even have been a marketing boon to GM.

Additionally, the failure of this settlement to abate the lingering safety problem, despite the vociferousness of the arguments for some recall or retrofit in the initial complaint, enhances our conviction that this settlement is inadequate. Beyond its dubious valuation of the settlement, the district court also overestimated the risks of proving liability and damages and of maintaining class-status, and under-estimated the true degree of opposition to the settlement. The district court, however, correctly applied the complexity-of-suit and defendant's-capacity-for-greater-judgment factors.

Although we are not bound in any way by the proceedings in the separate Texas action, our decision today shares many of the concerns expressed by the Texas appellate court which set aside an approval of a very similar coupon settlement. *See Bloyed,* 881 S.W.2d at 422. Rule 42 of the Texas Rules of Civil Procedure, which governs class actions, is patterned after Federal Rule of Civil Procedure 23. The *Bloyed* court also was concerned about a settlement that provided absolutely nothing to those unwilling or unable to purchase another GM truck and that did nothing about the allegedly dangerous vehicles left on the road. The Texas court objected as well to the $9.5 million in attorneys' fees negotiated between that class's counsel and GM.

Balancing the *Girsh* factors, on the current record, this settlement clearly fails to meet the standards required for judicial approval. We leave open the possibility, however, that the district court on remand might develop the record more fully, properly approve the settlement, in either its original or a re-negotiated form, and, following the guidance offered by this opinion, certify the settlement class.

## VII. APPROVAL OF THE ATTORNEYS' FEE AWARD

[52, 53] The French and Young objectors also contest the district court's award of attorneys' fees. (Order dated Dec. 20, 1993, 1993 WL 533155 and Feb. 2, 1994, 1994 WL 30301.) The court initially awarded fees without an independent review of the agreement, explaining its refusal to review the award: "[The fee agreement] is a matter of contract between the parties, rather than a statutory fee case, . . . and payment of the fees will have no impact on the class members. . . ." Subsequently, on February 2, 1994, the court issued an "amplification" of its prior ruling, which justified the award under both the lodestar [37] and the percentage of recovery [38] methods. Class counsel maintain that the objectors lack standing to contest the agreement made between GM and themselves, and that the objectors waived their right to appeal the award by not raising their objections below. Although our disposition of the certification and settlement approval issues obviates the need for a review of the fee award at this stage (and moots the waiver question), we highlight some of the primary issues in analyzing the appropriateness of a particular fee agreement for the district court on remand (in the event that the record is expanded, the class certified, and the settlement approved).

[54] At the outset, we note that a thorough judicial review of fee applications is required in all class action settlements. The district court did not accommodate practical realities here when, rationalizing its initial refusal to review the fee, it stated that the fee award was "to be paid by General Motors Corporation and will in no way reduce the recovery to any of the settlement class members." Indeed, this court has recognized that "a defendant is interested only in dispos-

---

**37.** The lodestar method calculates fees by multiplying the number of hours expended by some hourly rate appropriate for the region and for the experience of the lawyer.

**38.** The percentage of recovery method resembles a contingent fee in that it awards counsel a variable percentage of the amount recovered for the class.

ing of the total claim asserted against it; ... the allocation between the class payment and the attorneys' fees is of little or no interest to the defense." *Prandini v. National Tea Co.,* 557 F.2d 1015, 1020 (3d Cir.1977); 2 NEW-BERG & CONTE § 11.09 (purpose of judicial review is to police abuses even where defendant pays plaintiff's fees). In light of these realities, class counsel's argument that objectors have no standing to contest the fee arrangement is patently meritless: the fee agreement clearly does impact their interests, as it is, for practical purposes, a constructive common fund.

[55] Moreover, as discussed at length in the adequacy of representation section, *see* Part V.B.3 *supra,* the divergence in financial incentives present here creates the "danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees," *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 524 (1st Cir.1991). *See also Prandini,* 557 F.2d at 1020 ("When the statute provides that a fee is to be paid as a separate item, the conflict between client and attorney may not be as apparent. ... It is often present nonetheless."). This generates an especially acute need for close judicial scrutiny of fee arrangements that implicate this concern. *See In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 216, 224 (2d Cir.1987) ("The test to be applied is whether, at the time a fee sharing agreement is reached, class counsel are placed in a position that might endanger the fair representation of their clients and whether they will be compensated on some basis other than for legal services performed."); *Piambino v. Bailey,* 757 F.2d at 1139 ("Because of the potential for a collusive settlement, a sellout of a highly meritorious claim, or a settlement that ignores the interests of minority classes members, the district judge has a heavy duty to ensure that ... the fee awarded plaintiffs' counsel is entirely appropriate."). We have previously acknowledged that the potential for conflict between the class and its counsel is not limited to

situations meeting the strict definitions of a common fund.[39]

As we have also explained in this opinion, courts must be especially vigilant in searching for the possibility of collusion in pre-certification settlements. *See* Part IV.E *supra.* In addition, the court's oversight task is considerably complicated by the fact that these attorney-class conflicts are often difficult to discern in the class action context, "where full disclosure and consent are many times difficult and frequently impractical to obtain." *Agent Orange,* 818 F.2d at 224 (citations omitted). Finally, we emphasize that the court's oversight function serves not only to detect instances of "the actual abuse [that potential attorney-class conflicts] may cause, but also [the] potential public misunderstandings they may cultivate in regard to the interests of class counsel." *Agent Orange,* 818 F.2d at 225 (citing *Susman v. Lincoln American Corp.,* 561 F.2d 86, 95 (7th Cir. 1977), and *Prandini v. National Tea Co.,* 557 F.2d 1015, 1017 (3d Cir.1977)); *see also Grinnell I,* 495 F.2d at 469; MODEL CODE OF PROFESSIONAL RESPONSIBILITY Canon 9 (1975). On remand, therefore, the district court must be alert to the presence in the fee agreement of any actual abuse or appearance of abuse capable of creating a public misunderstanding.

Having emphasized the necessity for judicial review of fee awards in all class action settlements, we will briefly clarify some principles of fee approval for the district court to apply on remand if it certifies a class and approves a settlement.

Because the district court purported to use both the lodestar and the percentage-of-recovery methods, the actual grounds for its approval of the fee are not entirely clear. Although it is sensible for a court to use a second method of fee approval to cross check its conclusion under the first method, we believe that each method has distinct advantages for certain kinds of actions, which will make one of the methods more appropriate as a primary basis for determining the fee.

---

**39.** The common fund doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is enti-

tled to recover from the fund the costs of his litigation, including attorneys' fees. *Vincent v. Hughes Air West, Inc.,* 557 F.2d 759 (9th Cir. 1977).

Here, for the reasons that follow, the court should probably use the percentage-of-recovery rather than the lodestar method as the primary determinant, although the ultimate choice of methodology will rest within the district court's sound discretion.

[56] The lodestar and the percentage of recovery methods each have distinct attributes suiting them to particular types of cases. See Task Force, 108 F.R.D. at 250–53. Ordinarily, a court making or approving a fee award should determine what sort of action the court is adjudicating and then primarily rely on the corresponding method of awarding fees (though there is, as we have noted, an advantage to using the alternative method to double check the fee).[40]

[57] Courts generally regard the lodestar method, which uses the number of hours reasonably expended as its starting point, as the appropriate method in statutory fee shifting cases. Because the lodestar award is decoupled from the class recovery, the lodestar assures counsel undertaking socially beneficial litigation (as legislatively identified by the statutory fee shifting provision) an adequate fee irrespective of the monetary value of the final relief achieved for the class.

This de-coupling has the added benefit of avoiding subjective evaluations of the monetary worth of the intangible rights often litigated in civil rights actions. Outside the pure statutory fee case, the lodestar rationale has appeal where as here, the nature of the settlement evades the precise evaluation needed for the percentage of recovery method. The lodestar method has the added benefit of resembling modes of fee determination in conventional bipolar litigation. On the other hand, the lodestar method has been criticized as giving class counsel the incentive to delay settlement in order to run up fees while still failing to align the interests of the class and its counsel, and for not rewarding counsel incrementally for undertaking the risk of going to trial. See Coffee, Understanding the Plaintiff's Attorney, 86 COLUM.L.REV. at 691.

[58] Courts use the percentage of recovery method in common fund cases on the theory that the class would be unjustly enriched if it did not compensate the counsel responsible for generating the valuable fund bestowed on the class. See Task Force, 108 F.R.D. at 250. Because these cases are not presumed to serve the public interest (as evidenced by the lack of a fee statute), there is no social policy reason that demands an adequate fee. Instead, the court apportions the fund between the class and its counsel in a manner that rewards counsel for success and penalizes it for failure. Courts have relied on "common fund" principles and the inherent management powers of the court to award fees to lead counsel in cases that do not actually generate a common fund. See, e.g., In re Air Crash Disaster at Florida Everglades, 549 F.2d 1006 (5th Cir.1977) (using common fund principles in settlement of consolidated cases). The rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source.

We believe that this case presents a situation more closely aligned with the common fund paradigm than the statutory fee paradigm. Although class counsel and GM contend (and the district court believed) that the fee was a separate agreement, thus superficially resembling the separate awards in statutory fee cases, private agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case. Certainly, the court may select the lodestar method in some non-statutory fee cases where it can calculate the relevant parameters (hours expended and hourly rate) more easily than it can determine a suitable percentage to award. But the court must vigilantly guard against the lodestar's potential to exacerbate the misalignment of the attorneys' and the class's interests. See Coffee, Understanding

---

40. For example, a court can use the lodestar method to confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate; similarly, the percentage of recovery method can be used to assure that counsel's fee does not dwarf class recovery.

*the Plaintiff's Attorney,* 86 COLUM.L.REV. at 717.

In this case, the fee clearly was not made pursuant to a statute; therefore no legislatively endorsed policy favors assuring counsel an adequate fee. And the settlement, though difficult to value, did not award the even more hard-to-value intangible rights that could in some limited circumstances justify using the lodestar method. In sum, although this case presents a hybrid, we believe that it more closely resembles a common fund case.

[59] At all events, to the extent that the district court relied on the lodestar method, it erred by applying a multiplier. In the lodestar section of its analysis, the district court calculated the multiplier needed to apply to the simple lodestar result, $3,158,182, to obtain the requested amount, $9,500,000. (see Feb. order, 1994 WL 30301 at *2.) After estimating the multiplier to be between 2.5 and 3, the court proceeded with a "contingent nature of the success" analysis of the multiplier's appropriateness from *Lindy*. *See Lindy Bros. Builders Inc., v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 116–17 (3d Cir.1976). The Supreme Court, however, has rejected the use of multipliers to enhance the lodestar's hourly rate amount. *See City of Burlington v. Dague,* — U.S. at —, 112 S.Ct. at 2638. Notwithstanding this clear Supreme Court precedent, GM's counsel failed to apprise the district court about *Dague* even though its pertinence was patent.

[60] To the extent that the district court construed the fee agreement as a common fund, its analysis also appears to misapprehend key aspects of the percentage of recovery method. In common fund cases, a district judge can award attorneys' fees as a percentage of the fund recovered. *See Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541 n. 16, 79 L.Ed.2d 891 (1984); *In re Smithkline Beckman Corp. Secur. Litig.,* 751 F.Supp. 525 (E.D.Pa.1990). One court has noted that the fee awards have ranged from nineteen percent to forty-five percent of the settlement fund. *Id.* at 533. Here, the district court summarily asserted that, although it could not value the settlement precisely,

"whatever method is used in computing the ultimate value of the settlement, the attorneys' fees sought in this action will constitute an extremely small percentage of the total value and will be minute compared to the aforesaid 19–45% range." (Feb. order, 1994 WL 30301 at *4.)

Given our skepticism of the settlement's value generally and of Simonsen's estimates in particular (*see supra* discussion on settlement fairness), we are much less sanguine that the $9,500,000 fee actually constitutes an acceptable percentage of the class recovery. On the current record, we are constrained to reject that conclusion. At the very least, the district court on remand needs to make some reasonable assessment of the settlement's value and determine the precise percentage represented by the attorneys' fees. The problem, however, is not simple, for arguably, any settlement based on the award of certificates would provide too speculative a value on which to base a fee award. (*See Task Force,* 108 F.R.D. at 250–53 (discussing the preferability of the lodestar method for civil rights actions where the difficulty of valuing injunctive relief complicates the calculation of a fee using the percentage method.))

On remand, the district court might wish to examine the fee primarily under the percentage of recovery scheme. If so, the court will need to determine a precise valuation of the settlement on which to base its award. The court may however, as a check, want to use the lodestar method to assure that the precise percentage awarded does not create an unreasonable hourly fee.

## VIII. OTHER ISSUES; CONCLUSION

Objectors also appealed the district court's denial of discovery into the settlement negotiations and the adequacy of the notice with respect to the attorneys' fees. In light of our holding on the certification and settlement approval issues and its effect on the need for us to judge the fee award, we need not reach these issues.

For the foregoing reasons, we will vacate the orders certifying the provisional class and approving the settlement and remand for

further proceedings consistent with this opinion. Parties to bear their own costs.

JOHN R. GIBSON, Senior Circuit Judge, concurring in the central holding and with the judgment.

The court today issues a truly masterful opinion. I concur fully in the central holding of the court that the district court failed to make adequate findings under Rule 23(a) to justify class certification, and that the case must be remanded to the district court for further proceedings, and amplification of the record. I concur fully in the reasoning of the court that supports this conclusion and holding, and concur specifically in Parts I, II, III, IV.A, D, E, F, and V.A. and B.1 of the opinion.

In addition, I certainly agree that it follows that the district court on remand must consider further the issues of the adequacy of representation, whether the settlement is fair, reasonable and adequate, and if reached, issues relating to attorneys' fees.

With respect to the remainder of the opinion, I am of the thought that some of the discussion is simply not required to support the holding we reach, specifically Part IV.B and C. In view of the fact that we are remanding for adequate findings under Rule 23(a), I think we need not reach the issue of whether the class requisites have been made on the current record, as we can anticipate that the district court will conduct further proceedings and make additional record in order to fully support such findings. Thus, I think Part V.B.2 dealing with adequacy of representation, Part VI dealing with whether the settlement is fair, reasonable and adequate on the record before us, and Part VII dealing with issues relating to the attorneys' fees simply need not be addressed in detail as they may come before this court on a far different record after remand.

I must make clear that I have misgivings about not joining in the full opinion. The opinion is a most thorough and scholarly analysis of the numerous issues surrounding settlement of class actions and approval of settlement classes. It will stand as the opinion of the court. My concerns are simply

that the court has discussed areas that it need not reach.



**88 TRANSIT LINES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**88 TRANSIT LINES, INC., Respondent.**

Nos. 94–3492, 94–3550.

United States Court of Appeals,
Third Circuit.

Submitted Pursuant to Third Circuit
LAR 34.1(a)
May 1, 1995.

Decided May 3, 1995.

The National Labor Relations Board (NLRB), 1990 WL 161275, found that employer discriminated against its employees by making scheduling change shortly after union representation election and issued order. The Court of Appeals, 937 F.2d 598, enforced order. The NLRB, 1994 WL 363571, then ordered back pay, and employer petitioned for review. The NLRB cross-applied for enforcement. The Court of Appeals, Sloviter, Chief Judge, held that: (1) back pay specification was not speculative; (2) NLRB could order back pay for workers who were hired after schedule change went into effect; and (3) NLRB was not required to treat as interim earnings amount by which discriminatees' postunfair labor practice earnings exceeded their base-period year earnings.

Petition denied; cross-application granted.

521 U.S. 591      **AMCHEM PRODUCTS, INC. v. WINDSOR**      **2231**

Cite as 117 S.Ct. 2231 (1997)

judgment of the Court as it relates to respondent's mail-fraud convictions.



521 U.S. 591, 138 L.Ed.2d 689

₅₉₁AMCHEM PRODUCTS, INC.,
et al., Petitioners,

v.

George WINDSOR et al.

No. 96–270.

Argued Feb. 18, 1997.

Decided June 25, 1997.

Asbestos products manufacturers who were members of Center for Claims Resolution (CCR), and whose stipulation of proposed global settlement of claims by persons exposed to asbestos had been court-approved, moved to enjoin actions against them by individuals who failed to timely opt out of class. The United States District Court for the Eastern District of Pennsylvania, Lowell A. Reed, Jr., J., 878 F.Supp. 716, granted injunction under All-Writs Act and Anti-Injunction Act. Parties objecting to class certification appealed, and the Court of Appeals for the Third Circuit, 83 F.3d 610, vacated and remanded with directions to decertify class. Certiorari was granted, and the Supreme Court, Justice Ginsburg, held that: (1) district court faced with request for settlement-only class certification need not inquire whether case would present intractable problems of trial management, but other requirements for certification must still be satisfied, abrogating *In re Asbestos Litigation*, 90 F.3d 963, *White v. National Football League*, 41 F.3d 402, *In re A.H. Robins Co.*, 880 F.2d 709, and *Malchman v. Davis*, 761 F.2d 893, and (2) requirements for class certification of commonality of issues of fact and law and adequacy of representation were not met.

Affirmed.

the supposed policy justifications for today's decision and makes more baffling the majority's

Justice Breyer filed an opinion concurring in part and dissenting in part in which Justice Stevens joined.

Justice O'Connor took no part in the consideration or decision of the case.

**1. Federal Civil Procedure ⊂⇒161**

Requirements of rule governing class actions must be interpreted in keeping with both Article III constraints on federal jurisdiction and Rules Enabling Act, which instructs that rules of procedure shall not abridge, enlarge, or modify any substantive right. U.S.C.A. Const. Art. 3, § 2, cl. 2; 28 U.S.C.A. § 2072(b); Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**2. Federal Civil Procedure ⊂⇒161.1**

Rule allowing certification of class action where separate actions by or against individual class members would risk establishing incompatible standards of conduct for party opposing class takes in cases where party is obliged by law to treat members of class alike, such as a utility acting toward customers or a government imposing a tax, or where party must treat all alike as matter of practical necessity, such as riparian owner using water as against downriver owners. Fed.Rules Civ.Proc.Rule 23(b)(1)(A), 28 U.S.C.A.

**3. Federal Civil Procedure ⊂⇒165**

While text of rule allowing certification of class action were questions of law and fact common to class members predominate and class action is superior to other methods of resolution does not exclude from certification cases in which individual damages run high, drafters of rule had dominantly in mind vindication of rights of groups of people who individually would be without effective strength to bring their opponents into court at all. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**4. Federal Civil Procedure ⊂⇒161.1**

Policy at very core of class action mechanism is to overcome problem that small

willingness to go to such great lengths to save the Commission from itself.

recoveries do not provide incentive for any individual to bring a solo action prosecuting his or her rights; class action solves this problem by aggregating relatively paltry potential recoveries into something worth someone's, usually an attorney's, labor. Fed. Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**5. Federal Civil Procedure ☞161.1**

Settlement is relevant to certification of proposed class action. Fed.Rules Civ.Proc. Rule 23, 28 U.S.C.A.

**6. Compromise and Settlement ☞67**
    **Federal Civil Procedure ☞161.1**

While district court which is confronted with request for settlement-only class certification need not inquire whether case, if tried, would present intractable management problems, for proposal is that there be no trial, other specifications of rule establishing requirements for certification, which are designed to protect absentees by blocking unwarranted or overbroad class definitions, demand undiluted, even heightened, attention in settlement context; such attention is of vital importance, for court asked to certify settlement class will lack opportunity, present when case is litigated, to adjust class, informed by proceedings as they unfold; abrogating *In re Asbestos Litigation*, 90 F.3d 963; *White v. National Football League*, 41 F.3d 402; *In re A.H. Robins Co.*, 880 F.2d 709; *Malchman v. Davis*, 761 F.2d 893. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**7. Federal Civil Procedure ☞21**

Federal rules take effect after extensive deliberative process involving many reviewers, and text of rule thus proposed and reviewed limits judicial inventiveness, as courts are not free to amend rule outside process Congress ordered, which is properly tuned to instruction of Rules Enabling Act that rules of procedure shall not abridge any substantive right. 28 U.S.C.A. § 2072(b).

**8. Compromise and Settlement ☞55, 68**
    **Federal Civil Procedure ☞177.1, 1696, 1708**

Rule providing that class action shall not be dismissed or compromised without approval of court, and that notice of proposed dismissal or compromise shall be given to all members of class in such manner as court directs, was designed to function as additional requirement, not superseding direction, for "class action" to which rule is one qualified for certification as class action. Fed.Rules Civ.Proc.Rule 23(a, b, e), 28 U.S.C.A.

**9. Compromise and Settlement ☞67**
    **Federal Civil Procedure ☞161.1**

Rules provisions which establish prerequisites to certification of class action and types of class actions which are maintainable focus court attention on whether proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives, and that dominant concern persists when settlement, rather than trial, is proposed. Fed.Rules Civ.Proc.Rule 23(a, b), 28 U.S.C.A.

**10. Compromise and Settlement ☞67**
    **Federal Civil Procedure ☞161.1**

Safeguards provided by criteria for qualification of action as class action are not impractical impediments, or checks shorn of utility, in context of proposed settlement class; standards set for protection of absent class members serve to inhibit appraisals of chancellor's foot kind, or class certifications dependent upon court's gestalt judgment or overarching impression of settlement's fairness, and if fairness inquiry controlled certification and permitted class designation despite impossibility of litigation, both class counsel and the court would be disarmed. Fed.Rules Civ.Proc.Rule 23(a, b, e), 28 U.S.C.A.

**11. Federal Civil Procedure ☞181**

Requirement for certification of class action that common questions of law or fact predominate over any questions affecting only individual members was not met in proposed class action which sought to achieve global settlement of current and future asbestos-related claims; benefits asbestos-exposed persons might gain from establishment of compensation scale was not pertinent to predominance inquiry, fact that all members had been exposed to asbestos products was insufficient to meet predominance standard, as different members were exposed to differ-

ent products for different amounts of time in different ways, and differences in state law compounded those disparities. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

### 12. Federal Civil Procedure ⏛165

Inquiry into whether common questions of law or fact predominate over any questions affecting only individual members of class, as will allow certification of class action, tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

### 13. Compromise and Settlement ⏛55
### Federal Civil Procedure ⏛1696

Inquiry appropriate under rule which prohibits dismissal or compromise of class action without approval of court and notice to all class members protects unnamed class members from unjust or unfair settlements affecting their rights when representatives become fainthearted before action is adjudicated or are able to secure satisfaction of their individual claims by compromise. Fed. Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

### 14. Compromise and Settlement ⏛55
### Federal Civil Procedure ⏛1696

It is not mission of rule which prohibits dismissal or compromise of class action without approval of court and notice to class members to assure class cohesion that legitimizes representative action in the first place, and if common interest in fair compromise could satisfy predominance requirement for certification, that vital prescription would be stripped of any meaning in settlement context. Fed.Rules Civ.Proc.Rule 23(b)(3), (e), 28 U.S.C.A.

### 15. Federal Civil Procedure ⏛165

Requirement for certification of class action that common questions of law or fact predominate over any questions affecting only individual members is test readily met in certain cases alleging consumer or securities fraud or violations of antitrust laws, and also may, depending upon the circumstances, be satisfied in mass tort cases arising from common cause or disaster. Fed.Rules Civ. Proc.Rule 23(b)(3), 28 U.S.C.A.

### 16. Federal Civil Procedure ⏛181

Requirement for certification of class action that named parties will fairly and adequately protect interests of class was not met in proposed class action which sought to achieve global settlement of current and future asbestos-related claims; named parties sought to act on behalf of single giant class rather than on behalf of discrete subclasses, goal of class members who were currently injured of receiving generous immediate payments conflicted with interest of exposure-only plaintiffs in ensuring ample, inflation-protected fund for the future, and proposed settlement had no structural assurance of fair and adequate representation for diverse groups and individuals affected. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

### 17. Federal Civil Procedure ⏛164

Requirement for certification of class action that named parties will fairly and adequately protect interests of class serves to uncover conflicts of interest between named parties and class they seek to represent. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

### 18. Federal Civil Procedure ⏛164

In order to satisfy requirement for certification of class action that named parties will fairly and adequately protect interests of class, class representative must be part of class and possess same interest and suffer same injury as class members. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

### 19. Federal Civil Procedure ⏛164

Adequacy-of-representation requirement for certification of class action tends to merge with commonality and typicality criteria of rule, which serve as guideposts for determining whether maintenance of class action is economical and whether named plaintiff's claim and class claims are so interrelated that interests of class members will be fairly and adequately protected in their absence, and adequacy heading also factors in competency and conflicts of class counsel. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**2234**              **117 SUPREME COURT REPORTER**              **521 U.S. 591**

*Syllabus* *

This case concerns the legitimacy under Rule 23 of the Federal Rules of Civil Procedure of a class-action certification sought to achieve global settlement of current and future asbestos-related claims. Never intending to litigate, the settling parties—petitioners and the representatives of the plaintiff class described below—presented to the District Court a class-action complaint, an answer, a proposed settlement agreement, and a joint motion for conditional class certification. The complaint identifies nine lead plaintiffs, designating them and members of their families as representatives of a class comprised of all persons who had not previously sued any of the asbestos-manufacturing companies that are petitioners in this suit, but who (1) had been exposed—occupationally or through the occupational exposure of a spouse or household member—to asbestos attributable to a petitioner, or (2) whose spouse or family member had been so exposed. Potentially hundreds of thousands, perhaps millions, of individuals may fit this description. All named plaintiffs alleged exposure; more than half of them alleged already manifested physical injuries; the others, so-called "exposure-only" claimants, alleged that they had not yet manifested any asbestos-related condition. The complaint delineated no subclasses; all named plaintiffs were designated as representatives of the entire class.

The exhaustive agreement, *inter alia*, (1) proposed to settle, and to preclude nearly all class members from litigating, claims not previously filed against petitioners; (2) detailed an administrative mechanism and a schedule of payments to compensate class members who meet defined exposure and medical criteria; (3) described four categories of compensable cancers and nonmalignant conditions, and specified the range of damages to be paid qualifying claimants for each; (4) did not adjust payments for inflation; (5) capped the number of claims payable annually for each disease; and (6) denied compensation for family members' loss-

of-consortium claims, for exposure-only plaintiffs' claims for emotional distress, enhanced risk of disease, and medical monitoring, and for "pleural" claims involving lung plaques but no physical impairment, even if otherwise applicable state law recognized such claims.

The District Court approved the settling parties' plan for giving notice to the class and certified the proposed class for settlement only. The court found, over numerous challenges raised by the objectors, that the settlement was fair, the court's jurisdiction properly invoked, and representation and notice adequate. Pending the issuance of a final order, the District Court enjoined class members from separately pursuing asbestos suits in any federal or state court. The Third Circuit ultimately vacated the District Court's orders. Although the objectors maintained that the case was not justiciable and that the exposure-only claimants lacked standing to sue, the Court of Appeals declined to reach these issues, reasoning that they would not exist but for the class certification. The court acknowledged that a class action may be certified for settlement only, but held that the certification requirements of Rule 23 must be met as if the case were going to be litigated, without taking the settlement into account. The court nevertheless homed in on the settlement's terms in examining aspects of the case under Rule 23 criteria. The Court of Appeals explained that certification was inappropriate because the class failed to satisfy, among other provisions, Rule 23(b)(3)'s requirement that questions common to the class "predominate over" other questions, and Rule 23(a)(4)'s adequacy of representation requirement. The court therefore ordered the class decertified.

*Held:*

1. The class certification issues are dispositive here in that their resolution is logically antecedent to the existence of any Article III issues. This Court therefore declines to resolve objectors' assertions that no justiciable case or controversy is presented and that the exposure-only claimants lack stand-

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

ing to sue. Cf. *Arizonans for Official English v. Arizona,* 520 U.S. 43, 66–67, 117 S.Ct. 1055, 1068, 137 L.Ed.2d 170. The Court follows this path mindful that Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act's instruction that procedural rules not abridge, enlarge, or modify any substantive right. P. 2244.

2. The sprawling class the District Court certified does not satisfy Rule 23's requirements. Pp. 2245–2252.

(a) Rule 23 gained its current shape in a 1966 revision. Its subdivisions (a) and (b) enumerate criteria that must be met for a class to be certified. Rule 23(b)(3) was the most adventuresome innovation of the 1966 Amendments, permitting judgments for money that would bind all class members save those who opt out. To gain certification under Rule 23(b)(3), a class must satisfy the requirements of Rule 23(a), among them, that named class representatives will fairly and adequately protect class interests; the class must also meet the Rule 23(b)(3) criteria $\lfloor_{596}$that common questions "predominate over any questions affecting only individual members" and that class resolution be "superior to other available methods for the fair and efficient adjudication of the controversy." To alert Rule 23(b)(3) class members to their right to "opt out," Rule 23 requires "the best notice practicable under the circumstances." Rule 23(c)(2). Finally, Rule 23(e) specifies that a class action cannot be settled without the court's approval, and that notice of the proposed compromise must be given to all class members in such manner as the court directs. Pp. 2245–2247.

(b) Because settlement is relevant to the propriety of class certification, the Third Circuit's statement that Rule 23(a) and (b)(3) "must be satisfied without taking into account the settlement" bears modification. But the Third Circuit did not, in fact, ignore the settlement. The court homed in on settlement terms in explaining why it found absentees' interests inadequately represented. The Third Circuit's inspection of the settlement agreement in that regard was altogether proper. Whether trial would present intractable management problems, see

Rule 23(b)(3)(D), is not a consideration when settlement-only certification is requested, for the proposal is that there be no trial. But other specifications of the Rule designed to protect absentee class members by blocking unwarranted or overbroad class definitions are of vital importance in the settlement context, for the court in such a case will lack the opportunity to adjust the class as litigation unfolds. See Rule 23(c) and (d). And, of overriding importance, courts must be mindful that they are bound to enforce the Rule as now composed, for Federal Rules may be amended only through the extensive deliberative process Congress prescribed. Rule 23(e)'s settlement prescription was designed to function as an additional requirement, not a superseding direction, to the class-qualifying criteria of Rule 23(a) and (b). Cf. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176–177, 94 S.Ct. 2140, 2151–2152, 40 L.Ed.2d 732. The dominant concern of Rule 23(a) and (b)—that a proposed class have sufficient unity so that absentees can fairly be bound by class representatives' decisions—persists when settlement, rather than trial, is proposed. Those subdivisions' safeguards provide practical checks in the settlement context. First, their standards serve to inhibit class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness. Second, if a Rule 23(e) fairness inquiry controlled certification, eclipsing Rule 23(a) and (b), and permitting certification despite the impossibility of litigation, both class counsel and court would be disarmed. Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer, and the court would face a bargain proffered for its approval without benefit of adversarial investigation. Federal courts, in any case, lack authority to substitute$_{594}$ for Rule 23's certification criteria a standard never adopted by the rulemakers—that if a settlement is "fair," then certification is proper. Pp. 2247–2249.

(c) Rule 23(b)(3)'s predominance requirement is not met by the factors relied on by the District Court and the settling parties: class members' shared experience of asbestos exposure; their common interest in

receiving prompt and fair compensation, while minimizing the risks and transaction costs inherent in the tort system's asbestos litigation process; and the settlement's fairness. The benefits asbestos-exposed persons might gain from a grand-scale compensation scheme is a matter fit for legislative consideration, but it is not pertinent to the predominance inquiry. That inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement, and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. In contrast, the Rule 23(e) inquiry protects unnamed class members from unjust or unfair settlements agreed to by fainthearted or self-interested class representatives; the Rule 23(e) prescription was not designed to assure the class cohesion that legitimizes representative action in the first place. If a common interest in a fair compromise could satisfy Rule 23(b)(3)'s predominance requirement, that vital prescription would be stripped of any meaning in the settlement context. The predominance criterion is not satisfied by class members' shared experience of asbestos exposure, given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions. No settlement class called to the Court's attention is as sprawling as the one certified here. Although mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement, the Advisory Committee for the 1966 Rule 23 revision advised that such cases are ordinarily not appropriate for class treatment, and warned district courts to exercise caution when individual stakes are high and disparities among class members great. The certification in this case does not follow the counsel of caution. That certification cannot be upheld, for it rests on a conception of Rule 23(b)(3)'s predominance requirement irreconcilable with the Rule's design. Pp. 2249–2250.

(d) Nor can the class approved by the District Court satisfy Rule 23(a)(4)'s adequate representation inquiry. That inquiry serves to uncover conflicts of interest between named parties and the class they seek to represent. See *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157–158, n. 13, 102 S.Ct. 2364, 2370–2371, n. 13, 72 L.Ed.2d 740. Representatives must be part of the class and possess the same interest and suffer the same injury as the class members. *E.g., East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896–1897, 52 L.Ed.2d 453. In this case, named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future. Cf. *General Telephone Co. of Northwest v. EEOC*, 446 U.S. 318, 331, 100 S.Ct. 1698, 1706–1707, 64 L.Ed.2d 319. The disparity between the currently injured and exposure-only categories of plaintiffs, and the diversity within each category, are not made insignificant by the District Court's finding that petitioners' assets suffice to pay settled claims. Although this is not a Rule 23(b)(1)(B) "limited fund" case, the settlement's terms—*e.g.*, no inflation adjustments, only a few claimants per year permitted to opt out at the back end, and loss-of-consortium claims extinguished—reflect essential allocation decisions designed to confine compensation and to limit defendants' liability. Thus, the settling parties achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected. The Third Circuit found no assurance here that the named parties operated under a proper understanding of their representational responsibilities. That assessment is on the mark. Pp. 2250–2251.

(e) In light of the conclusions that the class does not satisfy the requirements of common issue predominance and adequacy of representation, this Court need not rule, definitively, on the adequacy of the notice given here. The Court recognizes, however, the gravity of the question whether class-action

notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous as the class certified by the District Court. P. 2252.

(f) The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution. Rule 23, which must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view, cannot carry the large load the settling parties and the District Court heaped upon it. P. 2252.

83 F.3d 610, affirmed.

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. BREYER, J., filed an opinion concurring in part and dissenting in part, in which |596STEVENS, J., joined, *post*, p. 2252. O'CONNOR, J., took no part in the consideration or decision of the case.

---

Stephen M. Shapiro, for petitioners.

Laurence H. Tribe, Cambridge, MA, for respondents.

For U.S. Supreme Court briefs, see:

1996 WL 721641 (Pet.Brief)

1996 WL 721635 (Resp.Brief)

1997 WL 13204 (Resp.Brief)

1997 WL 13207 (Resp.Brief)

1997 WL 13208 (Resp.Brief)

|597Justice GINSBURG delivered the opinion of the Court.

This case concerns the legitimacy under Rule 23 of the Federal Rules of Civil Procedure of a class-action certification sought to achieve global settlement of current and future asbestos-related claims. The class proposed for certification potentially encompasses hundreds of thousands, perhaps millions, of individuals tied together by this commonality: Each was, or some day may be, adversely affected by past exposure to asbestos

products manufactured by one or more of 20 companies. Those companies, defendants in the lower courts, are petitioners here.

The United States District Court for the Eastern District of Pennsylvania certified the class for settlement only, finding that the proposed settlement was fair and that representation and notice had been adequate. That court enjoined class members from separately pursuing asbestos-related personal-injury suits in any court, federal or state, pending the issuance of a final order. The Court of Appeals for the Third Circuit vacated the District Court's orders, holding that the class certification failed to satisfy Rule 23's requirements in several critical respects. We affirm the Court of Appeals' judgment.

I

A

The settlement-class certification we confront evolved in response to an asbestos-litigation crisis. See *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 618, and n. 2 (C.A.3 1996) (citing commentary). A United States Judicial Conference|598 Ad Hoc Committee on Asbestos Litigation, appointed by THE CHIEF JUSTICE in September 1990, described facets of the problem in a 1991 report:

"[This] is a tale of danger known in the 1930s, exposure inflicted upon millions of Americans in the 1940s and 1950s, injuries that began to take their toll in the 1960s, and a flood of lawsuits beginning in the 1970s. On the basis of past and current filing data, and because of a latency period that may last as long as 40 years for some asbestos related diseases, a continuing stream of claims can be expected. The final toll of asbestos related injuries is unknown. Predictions have been made of 200,000 asbestos disease deaths before the year 2000 and as many as 265,000 by the year 2015.

"The most objectionable aspects of asbestos litigation can be briefly summarized: dockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transac-

tion costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether." Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation 2–3 (Mar.1991).

Real reform, the report concluded, required federal legislation creating a national asbestos dispute-resolution scheme. See *id.,* at 3, 27–35; see also *id.,* at 42 (dissenting statement of Hogan, J.) (agreeing that "a national solution is the only answer" and suggesting "passage by Congress of an administrative claims procedure similar to the Black Lung legislation"). As recommended by the Ad Hoc Committee, the Judicial Conference of the United States urged Congress to act. See Report of the Proceedings of the Judicial Conference of the United States 33 (Mar. 12, 1991). To this date, no congressional response has emerged.

⎿₅₉₉In the face of legislative inaction, the federal courts—lacking authority to replace state tort systems with a national toxic tort compensation regime—endeavored to work with the procedural tools available to improve management of federal asbestos litigation. Eight federal judges, experienced in the superintendence of asbestos cases, urged the Judicial Panel on Multidistrict Litigation (MDL Panel), to consolidate in a single district all asbestos complaints then pending in federal courts. Accepting the recommendation, the MDL Panel transferred all asbestos cases then filed, but not yet on trial in federal courts to a single district, the United States District Court for the Eastern District of Pennsylvania; pursuant to the transfer order, the collected cases were consolidated

for pretrial proceedings before Judge Weiner. See *In re Asbestos Products Liability Litigation (No. VI),* 771 F.Supp. 415, 422–424 (Jud.Pan.Mult.Lit. 1991).[1] The order aggregated pending cases only; no authority resides in the MDL Panel to license for consolidated proceedings claims not yet filed.

**B**

After the consolidation, attorneys for plaintiffs and defendants formed separate steering committees and began settlement negotiations. Ronald L. Motley and Gene Locks—later appointed, along with Motley's law partner Joseph F. Rice, to represent the plaintiff class in this action—cochaired the Plaintiffs' Steering Committee. Counsel for the Center for Claims Resolution (CCR), the consortium of ⎿₆₀₀20 former asbestos manufacturers now before us as petitioners, participated in the Defendants' Steering Committee.[2] Although the MDL Panel order collected, transferred, and consolidated only cases already commenced in federal courts, settlement negotiations included efforts to find a "means of resolving ... future cases." Record, Doc. 3, p. 2 (Memorandum in Support of Joint Motion for Conditional Class Certification); see also *Georgine v. Amchem Products, Inc.,* 157 F.R.D. 246, 266 (E.D.Pa.1994) ("primary purpose of the settlement talks in the consolidated MDL litigation was to craft a national settlement that would provide an alternative resolution mechanism for asbestos claims," including claims that might be filed in the future).

In November 1991, the Defendants' Steering Committee made an offer designed to settle all pending and future asbestos cases by providing a fund for distribution by plain-

---

1. In a series of orders, the MDL Panel had previously denied other asbestos-case transfer requests. See *In re Asbestos and Asbestos Insulation Material Products Liability Litigation,* 431 F.Supp. 906, 910 (JPML 1977); *In re Asbestos Products Liability Litigation (No. II),* MDL–416 (JPML Mar. 13, 1980) (unpublished order); *In re Asbestos School Products Liability Litigation,* 606 F.Supp. 713, 714 (JPML 1985), *In re Ship Asbestos Products Liability Litigation,* MDL–676 (JPML Feb. 4, 1986) (unpublished order); *In re Leon Blair Asbestos Products Liability Litigation,* MDL–702 (JPML Feb. 6, 1987) (unpublished order).

2. The CCR Companies are Amchem Products, Inc.; A.P. Green Industries, Inc.; Armstrong World Industries, Inc.; Asbestos Claims Management Corp.; Certainteed Corp.; C.E. Thurston & Sons, Inc.; Dana Corp.; Ferodo America, Inc.; Flexitallic, Inc.; GAF Building Materials, Inc.; I.U North America, Inc.; Maremont Corp.; National Services Industries, Inc.; Nosroc Corp.; Pfizer Inc.; Quigley Co.; Shook & Fletcher Insulation Co.; T & N, PLC; Union Carbide Corp.; and United States Gypsum Co. All of the CCR petitioners stopped manufacturing asbestos products around 1975.

tiffs' counsel among asbestos-exposed individuals. The Plaintiffs' Steering Committee rejected this offer, and negotiations fell apart. CCR, however, continued to pursue "a workable administrative system for the handling of future claims." *Id.,* at 270.

To that end, CCR counsel approached the lawyers who had headed the Plaintiffs' Steering Committee in the unsuccessful negotiations, and a new round of negotiations began; that round yielded the mass settlement agreement now in controversy. At the time, the former heads of the Plaintiffs' Steering Committee represented thousands of plaintiffs with then-pending asbestos-related claims—claimants the parties to this suit call "inventory" plaintiffs. CCR indicated in these discussions that it would resist settlement of inventory cases absent "some kind of protection for the future." *Id.,* at 294; see also *id.,* at 295 (CCR communicated to the inventory plaintiffs' attorneys that once the CCR defendants saw a rational way to deal with claims expected to be filed in the future, those defendants would be prepared to address the settlement of pending cases).

Settlement talks thus concentrated on devising an administrative scheme for disposition of asbestos claims not yet in litigation. In these negotiations, counsel for masses of inventory plaintiffs endeavored to represent the interests of the anticipated future claimants, although those lawyers then had no attorney-client relationship with such claimants.

Once negotiations seemed likely to produce an agreement purporting to bind potential

plaintiffs, CCR agreed to settle, through separate agreements, the claims of plaintiffs who had already filed asbestos-related lawsuits. In one such agreement, CCR defendants promised to pay more than $200 million to gain release of the claims of numerous inventory plaintiffs. After settling the inventory claims, CCR, together with the plaintiffs' lawyers CCR had approached, launched this case, exclusively involving persons outside the MDL Panel's province—plaintiffs without already pending lawsuits.[3]

C

The class action thus instituted was not intended to be litigated. Rather, within the space of a single day, January 15, 1993, the settling parties—CCR defendants and the representatives of the plaintiff class described below—presented to the District Court a complaint, an answer, a proposed settlement agreement, and a joint motion for conditional class certification.[4]

The complaint identified nine lead plaintiffs, designating them and members of their families as representatives of a class comprising all persons who had not filed an asbestos-related lawsuit against a CCR defendant as of the date the class action commenced, but who (1) had been exposed—occupationally or through the occupational exposure of a spouse or household member—to asbestos or products containing asbestos attributable to a CCR defendant, or (2) whose spouse or family member had been so exposed.[5] Untold numbers of individuals

---

3. It is basic to comprehension of this proceeding to notice that no transferred case is included in the settlement at issue, and no case covered by the settlement existed as a civil action at the time of the MDL Panel transfer.

4. Also on the same day, the CCR defendants filed a third-party action against their insurers, seeking a declaratory judgment holding the insurers liable for the costs of the settlement. The insurance litigation, upon which implementation of the settlement is conditioned, is still pending in the District Court. See, *e.g., Georgine v. Amchem Prods., Inc.,* No. 93–0215, 1994 WL 502475 (E.D.Pa., Sept.2, 1994) (denying motion of insurers to compel discovery)

5. The complaint defines the class as follows:

"(a) All persons (or their legal representatives) who have been exposed in the United States or its territories (or while working aboard U.S. military, merchant, or passenger ships), either occupationally or through the occupational exposure of a spouse or household member, to asbestos or to asbestos-containing products for which one or more of the Defendants may bear legal liability and who, as of January 15, 1993, reside in the United States or its territories, and who have not, as of January 15, 1993, filed a lawsuit for asbestos-related personal injury, or damage, or death in any state or federal court against the Defendant(s) (or against entities for whose actions or omissions the Defendant(s) bear legal liability).

"(b) All spouses, parents, children, and other relatives (or their legal representatives) of the class members described in paragraph (a) above

may fall within this description. All named plaintiffs alleged that they or a member of their family had been exposed to asbestos-containing products of $|_{603}$CCR defendants. More than half of the named plaintiffs alleged that they or their family members had already suffered various physical injuries as a result of the exposure. The others alleged that they had not yet manifested any asbestos-related condition. The complaint delineated no subclasses; all named plaintiffs were designated as representatives of the class as a whole.

The complaint invoked the District Court's diversity jurisdiction and asserted various state-law claims for relief, including (1) negligent failure to warn, (2) strict liability, (3) breach of express and implied warranty, (4) negligent infliction of emotional distress, (5) enhanced risk of disease, (6) medical monitoring, and (7) civil conspiracy. Each plaintiff requested unspecified damages in excess of $100,000. CCR defendants' answer denied the principal allegations of the complaint and asserted 11 affirmative defenses.

A stipulation of settlement accompanied the pleadings; it proposed to settle, and to preclude nearly all class members from litigating against CCR companies, all claims not filed before January 15, 1993, involving compensation for present and future asbestos-related personal injury or death. An exhaustive document exceeding 100 pages, the stipulation presents in detail an administrative mechanism and a schedule of payments to compensate class members who meet defined asbestos-exposure and medical requirements. The stipulation describes four categories of compensable disease: mesothelioma; lung cancer; certain "other cancers" (colon-rectal, laryngeal, esophageal, and stomach cancer); and "non-malignant conditions" (asbestosis and bilateral pleural thickening). Persons with "exceptional" medical claims—claims

that do not fall within the four described diagnostic categories—may in some instances qualify for compensation, but the settlement caps the number of "exceptional" claims CCR must cover.

For each qualifying disease category, the stipulation specifies the range of damages CCR will pay to qualifying claimants.$_{604}$ Payments under the settlement are not adjustable for inflation. Mesothelioma claimants—the most highly compensated category—are scheduled to receive between $20,000 and $200,000. The stipulation provides that CCR is to propose the level of compensation within the prescribed ranges; it also establishes procedures to resolve disputes over medical diagnoses and levels of compensation.

Compensation above the fixed ranges may be obtained for "extraordinary" claims. But the settlement places both numerical caps and dollar limits on such claims.[6] The settlement also imposes "case flow maximums," which cap the number of claims payable for each disease in a given year.

Class members are to receive no compensation for certain kinds of claims, even if otherwise applicable state law recognizes such claims. Claims that garner no compensation under the settlement include claims by family members of asbestos-exposed individuals for loss of consortium, and claims by so-called "exposure-only" plaintiffs for increased risk of cancer, fear of future asbestos-related injury, and medical monitoring. "Pleural" claims, which might be asserted by persons with asbestos-related plaques on their lungs but no accompanying physical impairment, are also excluded. Although not entitled to present compensation, exposure-only claimants and pleural claimants may qualify for benefits when and if they develop a compensable disease and meet the relevant exposure and medical criteria. Defendants forgo de-

---

who have not, as of January 15, 1993, filed a lawsuit for the asbestos-related personal injury, or damage, or death of a class member described in paragraph (a) above in any state or federal court against the Defendant(s) (or against entities for whose actions or omissions the Defendant(s) bear legal liability)." 1 App. 13–14.

**6.** Only three percent of the qualified mesothelioma, lung cancer, and "other cancer" claims, and only one percent of the total number of qualified "non-malignant condition" claims can be designated "extraordinary." Average expenditures are specified for claims found "extraordinary"; mesothelioma victims with compensable extraordinary claims, for example, receive, on average, $300,000.

fenses to liability, including statute of limitations pleas.

Class members, in the main, are bound by the settlement in perpetuity, while CCR defendants may choose to withdraw[605] from the settlement after ten years. A small number of class members—only a few per year—may reject the settlement and pursue their claims in court. Those permitted to exercise this option, however, may not assert any punitive damages claim or any claim for increased risk of cancer. Aspects of the administration of the settlement are to be monitored by the AFL–CIO and class counsel. Class counsel are to receive attorneys' fees in an amount to be approved by the District Court.

### D

On January 29, 1993, as requested by the settling parties, the District Court conditionally certified, under Federal Rule of Civil Procedure 23(b)(3), an encompassing opt-out class. The certified class included persons occupationally exposed to defendants' asbestos products, and members of their families, who had not filed suit as of January 15. Judge Weiner appointed Locks, Motley, and Rice as class counsel, noting that "[t]he Court may in the future appoint additional counsel if it is deemed necessary and advisable." Record, Doc. 11, p. 3 (Class Certification Order). At no stage of the proceedings, however, were additional counsel in fact appointed. Nor was the class ever divided into subclasses. In a separate order, Judge Weiner assigned to Judge Reed, also of the Eastern District of Pennsylvania, "the task of conducting fairness proceedings and of determining whether the proposed settlement is fair to the class." See 157 F.R.D., at 258. Various class members raised objections to the settlement stipulation, and Judge Weiner granted the objectors full rights to participate in the subsequent proceedings. *Ibid.*[7]

[606]In preliminary rulings, Judge Reed held that the District Court had subject-matter jurisdiction, see *Carlough v. Amchem Products, Inc.,* 834 F.Supp. 1437, 1467–1468 (E.D.Pa.1993), and he approved the settling parties' elaborate plan for giving notice to the class, see *Carlough v. Amchem Products, Inc.,* 158 F.R.D. 314, 336 (E.D.Pa.1993). The court-approved notice informed recipients that they could exclude themselves from the class, if they so chose, within a three-month opt-out period.

Objectors raised numerous challenges to the settlement. They urged that the settlement unfairly disadvantaged those without currently compensable conditions in that it failed to adjust for inflation or to account for changes, over time, in medical understanding. They maintained that compensation levels were intolerably low in comparison to awards available in tort litigation or payments received by the inventory plaintiffs. And they objected to the absence of any compensation for certain claims, for example, medical monitoring, compensable under the tort law of several States. Rejecting these and all other objections, Judge Reed concluded that the settlement terms were fair and had been negotiated without collusion. See 157 F.R.D., at 325, 331–332. He also found that adequate notice had been given to class members, see *id.,* at 332–334, and that final class certification under Rule 23(b)(3) was appropriate, see *id.,* at 315.

As to the specific prerequisites to certification, the District Court observed that the class satisfied Rule 23(a)(1)'s numerosity requirement,[8] see *ibid.,* a matter no one debates. The [607]Rule 23(a)(2) and (b)(3) requirements of commonality[9] and prepon-

---

7. These objectors, now respondents before this Court, include three groups of individuals with overlapping interests, designated as the "Windsor Group," the New Jersey "White Lung Group," and the "Cargile Group." Margaret Balonis, an individual objector, is also a respondent before this Court. Balonis states that her husband, Casimir, was exposed to asbestos in the late 1940's and was diagnosed with mesothelioma in May 1994, after expiration of the opt-out

period, see *infra,* at 2241, 2242. The Balonises sued CCR members in Maryland state court, but were charged with civil contempt for violating the Federal District Court's antisuit injunction. Casimir Balonis died in October 1996. See Brief for Balonis Respondents 9–11.

8. Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."

derance [10] were also satisfied, the District Court held, in that

> "[t]he members of the class have all been exposed to asbestos products supplied by the defendants and all share an interest in receiving prompt and fair compensation for their claims, while minimizing the risks and transaction costs inherent in the asbestos litigation process as it occurs presently in the tort system. Whether the proposed settlement satisfies this interest and is otherwise a fair, reasonable and adequate compromise of the claims of the class is a predominant issue for purposes of Rule 23(b)(3)." *Id.,* at 316.

The District Court held next that the claims of the class representatives were "typical" of the class as a whole, a requirement of Rule 23(a)(3),[11] and that, as Rule 23(b)(3) demands,[12] the class settlement was "superior" to other methods of adjudication. See *ibid.*

Strenuous objections had been asserted regarding the adequacy of representation, a Rule 23(a)(4) requirement.[13] Objectors maintained that class counsel and class representatives had disqualifying conflicts of interests. In particular, objectors urged, claimants whose injuries had become manifest and claimants without manifest injuries should not have common counsel and should not be aggregated in a single ₍₆₀₈₎class. Furthermore, objectors argued, lawyers representing inventory plaintiffs should not represent the newly formed class.

Satisfied that class counsel had ably negotiated the settlement in the best interests of all concerned, and that the named parties served as adequate representatives, the District Court rejected these objections. See *id.,* at 317–319, 326–332. Subclasses were unnecessary, the District Court held, bearing

in mind the added cost and confusion they would entail and the ability of class members to exclude themselves from the class during the three-month opt-out period. See *id.,* at 318–319. Reasoning that the representative plaintiffs "have a strong interest that recovery for *all* of the medical categories be maximized because they may have claims in *any,* or several categories," the District Court found "no antagonism of interest between class members with various medical conditions, or between persons with and without currently manifest asbestos impairment." *Id.,* at 318. Declaring class certification appropriate and the settlement fair, the District Court preliminarily enjoined all class members from commencing any asbestos-related suit against the CCR defendants in any state or federal court. See *Georgine v. Amchem Products, Inc.,* 878 F.Supp. 716, 726–727 (E.D.Pa.1994).

The objectors appealed. The United States Court of Appeals for the Third Circuit vacated the certification, holding that the requirements of Rule 23 had not been satisfied. See 83 F.3d 610 (1996).

### E

The Court of Appeals, in a long, heavily detailed opinion by Judge Becker, first noted several challenges by objectors to justiciability, subject-matter jurisdiction, and adequacy of notice. These challenges, the court said, raised "serious concerns." *Id.,* at 623. However, the court observed, "the jurisdictional issues in this case would not exist but for the [class-action] certification." *Ibid.* Turning to the class-certification₍₆₀₉₎ issues and finding them dispositive, the Third Circuit declined to decide other questions.

---

**9.**  Rule 23(a)(2) requires that there be "questions of law or fact common to the class."

**10.**  Rule 23(b)(3) requires that "the [common] questions of law or fact .. predominate over any questions affecting only individual members."

**11.**  Rule 23(a)(3) states that "the claims . of the representative parties [must be] typical of the claims .. of the class."

**12.**  Rule 23(b)(3) requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy "

**13.**  Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."

On class-action prerequisites, the Court of Appeals referred to an earlier Third Circuit decision, *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, cert. denied, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995) (hereinafter *GM Trucks* ), which held that although a class action may be certified for settlement purposes only, Rule 23(a)'s requirements must be satisfied as if the case were going to be litigated. 55 F.3d, at 799–800. The same rule should apply, the Third Circuit said, to class certification under Rule 23(b)(3). See 83 F.3d, at 625. But cf. *In re Asbestos Litigation,* 90 F.3d 963, 975–976, and n. 8 (C.A.5 1996), cert. pending, Nos. 96–1379, 96–1394. While stating that the requirements of Rule 23(a) and (b)(3) must be met "without taking into account the settlement," 83 F.3d, at 626, the Court of Appeals in fact closely considered the terms of the settlement as it examined aspects of the case under Rule 23 criteria. See *id.,* at 630–634.

The Third Circuit recognized that Rule 23(a)(2)'s "commonality" requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class "predominate over" other questions. The court therefore trained its attention on the "predominance" inquiry. See *id.,* at 627. The harmfulness of asbestos exposure was indeed a prime factor common to the class, the Third Circuit observed. See *id.,* at 626, 630. But uncommon questions abounded.

In contrast to mass torts involving a single accident, class members in this case were exposed to different asbestos-containing products, in different ways, over different periods, and for different amounts of time; some suffered no physical injury, others suffered disabling or deadly diseases. See *id.,* at 626, 628. "These factual differences," the Third Circuit explained, "translate[d] into significant legal differences." *Id.,* at 627. State law governed and varied widely[610]on such critical issues as "viability of [exposure-only] claims [and] availability of causes of

action for medical monitoring, increased risk of cancer, and fear of future injury." *Ibid.*[14] "[T]he number of uncommon issues in this humongous class action," the Third Circuit concluded, *ibid.,* barred a determination, under existing tort law, that common questions predominated, see *id.,* at 630.

The Court of Appeals next found that "serious intra-class conflicts preclude[d] th[e] class from meeting the adequacy of representation requirement" of Rule 23(a)(4). *Ibid.* Adverting to, but not resolving charges of attorney conflict of interests, the Third Circuit addressed the question whether the named plaintiffs could adequately advance the interests of all class members. The Court of Appeals acknowledged that the District Court was certainly correct to this extent: " '[T]he members of the class are united in seeking the maximum possible recovery for their asbestos-related claims.' " *Ibid.* (quoting 157 F.R.D., at 317). "But the settlement does more than simply provide a general recovery fund," the Court of Appeals immediately added; "[r]ather, it makes important judgments on how recovery is to be *allocated* among different kinds of plaintiffs, decisions that necessarily favor some claimants over others." 83 F.3d, at 630.

In the Third Circuit's view, the "most salient" divergence of interests separated plaintiffs already afflicted with an asbestos-related disease from plaintiffs without manifest injury (exposure-only plaintiffs). The latter would rationally want protection against inflation for distant recoveries. See *ibid.* They would also seek sturdy back-end opt-out rights and "causation provisions that can keep pace with changing[611]science and medicine, rather than freezing in place the science of 1993." *Id.,* at 630–631. Already injured parties, in contrast, would care little about such provisions and would rationally trade them for higher current payouts. See *id.,* at 631. These and other adverse interests, the Court of Appeals carefully explained, strongly suggested that an undivided set of representatives could not adequately

**14.** Recoveries under the laws of different States spanned a wide range. Objectors assert, for example, that 15 percent of current mesothelioma claims arise in California, where the state-wide average recovery is $419,674—or more than 209 percent above the $200,000 maximum specified in the settlement for mesothelioma claims not typed "extraordinary." See Brief for Respondents George Windsor et al. 5–6, n. 5 (citing 2 App. 461).

protect the discrete interests of both current-ly afflicted and exposure-only claimants.

The Third Circuit next rejected the District Court's determination that the named plaintiffs were "typical" of the class, noting that this Rule 23(a)(3) inquiry overlaps the adequacy of representation question: "both look to the potential for conflicts in the class." *Id.,* at 632. Evident conflict problems, the court said, led it to hold that "no set of representatives can be 'typical' of this class." *Ibid.*

The Court of Appeals similarly rejected the District Court's assessment of the superiority of the class action. The Third Circuit initially noted that a class action so large and complex "could not be tried." *Ibid.* The court elaborated most particularly, however, on the unfairness of binding exposure-only plaintiffs who might be unaware of the class action or lack sufficient information about their exposure to make a reasoned decision whether to stay in or opt out. See *id.,* at 633. "A series of statewide or more narrow-ly defined adjudications, either through consolidation under Rule 42(a) or as class actions under Rule 23, would seem preferable," the Court of Appeals said. *Id.,* at 634.

The Third Circuit, after intensive review, ultimately ordered decertification of the class and vacation of the District Court's antisuit injunction. *Id.,* at 635. Judge Wellford concurred, "fully subscrib[ing] to the decision of Judge Becker that the plaintiffs in this case ha[d] not met the requirements of Rule 23." *Ibid.* He added that in his view, named exposure-only plaintiffs had no standing to pursue the ₍₆₁₂₎suit in federal court, for their depositions showed that "[t]hey claimed no damages and no present injury." *Id.,* at 638.

We granted certiorari, 519 U.S. 957, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996), and now affirm.

## II

Objectors assert in this Court, as they did in the District Court and Court of Appeals, an array of jurisdictional barriers. Most fun-damentally, they maintain that the settlement proceeding instituted by class counsel and CCR is not a justiciable case or controversy within the confines of Article III of the Federal Constitution. In the main, they say, the proceeding is a nonadversarial endeavor to impose on countless individuals without currently ripe claims an administrative compensation regime binding on those individuals if and when they manifest injuries.

Furthermore, objectors urge that exposure-only claimants lack standing to sue: Either they have not yet sustained any cognizable injury or, to the extent the complaint states claims and demands relief for emotional distress, enhanced risk of disease, and medical monitoring, the settlement provides no redress. Objectors also argue that exposure-only claimants did not meet the then-current amount-in-controversy requirement (in excess of $50,000) specified for federal-court jurisdiction based upon diversity of citizenship. See 28 U.S.C. § 1332(a).

[1] As earlier recounted, see *supra,* at 2242, the Third Circuit declined to reach these issues because they "would not exist but for the [class-action] certification." 83 F.3d, at 623. We agree that "[t]he class certification issues are dispositive," *ibid.;* because their resolution here is logically antecedent to the existence of any Article III issues, it is appropriate to reach them first, cf. *Arizonans for Official English v. Arizona,* 520 U.S. 43, 66–67, 117 S.Ct. 1055, 1068–1069, 137 L.Ed.2d 170 (1997) (declining to resolve definitively question whether petitioners had standing because mootness issue was dispositive of the case). We therefore follow the path taken by the Court of Appeals, mindful that ₍₆₁₃₎Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure "shall not abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b). See also Fed. Rule Civ. Proc. 82 ("rules shall not be construed to extend ... the [subject-matter] jurisdiction of the United States district courts").[15]

---

**15.** The opinion dissenting in part does not find the class-certification issues dispositive—at least

not yet, and would return the case to the Third Circuit for a second look. See *post,* at 2253,

### III

To place this controversy in context, we briefly describe the characteristics of class actions for which the Federal Rules provide. Rule 23, governing federal-court class actions, stems from equity practice and gained its current shape in an innovative 1966 revision. See generally Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv. L.Rev. 356, 375–400 (1967) (hereinafter Kaplan, Continuing Work). Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical ... of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").

[2] ₆₁₄In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). Rule 23(b)(1) covers cases in which separate actions by or against individual class members would risk establishing "incompatible standards of conduct for the party opposing the class," Fed. Rule Civ. Proc. 23(b)(1)(A), or would "as a practical matter be dispositive of the interests" of nonparty class members "or substantially impair or impede their ability to protect their interests," Rule 23(b)(1)(B). Rule 23(b)(1)(A) "takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." Kaplan, Continuing Work 388 (footnotes omitted). Rule 23(b)(1)(B) includes, for example, "limited fund" cases, instances in which numerous persons make claims

against a fund insufficient to satisfy all claims. See Advisory Committee's Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C.App., pp. 696–697 (hereinafter Adv. Comm. Notes).

Rule 23(b)(2) permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class." Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples. Adv. Comm. Notes, 28 U.S.C.App., p. 697; see Kaplan, Continuing Work 389 (subdivision (b)(2) "build[s] on experience mainly, but not exclusively, in the civil rights field").

In the 1966 class-action amendments, Rule 23(b)(3), the category at issue here, was "the most adventuresome" innovation. See Kaplan, A Prefatory Note, 10 B.C. Ind. & Com. L.Rev. 497, 497 (1969) (hereinafter Kaplan, Prefatory Note). Rule 23(b)(3) added to the complex-litigation arsenal class actions for damages designed to secure judgments binding all class members save those who affirmatively elected to be ₆₁₅excluded. See 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1777, p. 517 (2d ed.1986) (hereinafter Wright, Miller, & Kane); see generally Kaplan, Continuing Work 379–400. Rule 23(b)(3) "opt-out" class actions superseded the former "spurious" class action, so characterized because it generally functioned as a permissive joinder ("opt-in") device. See 7A Wright, Miller, & Kane § 1753, at 28–31, 42–44; see also Adv. Comm. Notes, 28 U.S.C.App., p. 695.

Framed for situations in which "class-action treatment is not as clearly called for" as it is in Rule 23(b)(1) and (b)(2) situations, Rule 23(b)(3) permits certification where class suit "may nevertheless be convenient and desirable." Adv. Comm. Notes, 28 U.S.C.App., p. 697. To qualify for certification under Rule 23(b)(3), a class must meet

---

2258. If certification issues were genuinely in doubt, however, the jurisdictional issues would loom larger. Concerning objectors' assertions that exposure-only claimants do not satisfy the $50,000 amount-in-controversy and may have no currently ripe claim, see *Metro–North Commuter R. Co. v. Buckley,* 521 U.S. 424, 117 S.Ct. 2113,

138 L.Ed.2d 560 (Federal Employers' Liability Act, 35 Stat. 65, as amended, 45 U.S.C. § 51 *et seq.,* interpreted in light of common-law principles, does not permit "exposure-only" railworker to recover for negligent infliction of emotional distress or lump-sum damages for costs of medical monitoring).

two requirements beyond the Rule 23(a) prerequisites: Common questions must "predominate over any questions affecting only individual members"; and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." In adding "predominance" and "superiority" to the qualification-for-certification list, the Advisory Committee sought to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Ibid.* Sensitive to the competing tugs of individual autonomy for those who might prefer to go it alone or in a smaller unit, on the one hand, and systemic efficiency on the other, the Reporter for the 1966 amendments cautioned: "The new provision invites a close look at the case before it is accepted as a class action. . . ." Kaplan, Continuing Work 390.

Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's "close look" at the predominance and superiority criteria: ₍₆₁₆₎"(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

In setting out these factors, the Advisory Committee for the 1966 reform anticipated that in each case, courts would "consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit." Adv. Comm. Notes, 28 U.S.C.App., p. 698. They elaborated:

"The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prose-

cution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable." *Ibid.*

See also Kaplan, Continuing Work 391 ("Th[e] interest [in individual control] can be high where the stake of each member bulks large and his will and ability to take care of himself are strong; the interest may be no more than theoretic where the individual stake is so small as to make a separate action impracticable." (footnote omitted)). As the Third Circuit observed in the instant case: "Each plaintiff [in an action involving claims for personal injury and death] has a significant interest in individually controlling the prosecution of [his case]"; each "ha[s] a substantial stake in making individual decisions on whether and when to settle." 83 F.3d, at 633.

[3, 4] ₍₆₁₇₎While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." Kaplan, Prefatory Note 497. As concisely recalled in a recent Seventh Circuit opinion:

"The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (1997).

To alert class members to their right to "opt out" of a (b)(3) class, Rule 23 instructs the court to "direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. Rule Civ. Proc. 23(c)(2); see *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173–177, 94 S.Ct. 2140, 2150–

2152, 40 L.Ed.2d 732 (1974) (individual notice to class members identifiable through reasonable effort is mandatory in (b)(3) actions; requirement may not be relaxed based on high cost).

No class action may be "dismissed or compromised without [court] approval," preceded by notice to class members. Fed. Rule Civ. Proc. 23(e). The Advisory Committee's sole comment on this terse final provision of Rule 23 restates the Rule's instruction without elaboration: "Subdivision (e) requires approval of the court, after notice, for the dismissal or compromise of any class action." Adv. Comm. Notes, 28 U.S.C.App., p. 699.

In the decades since the 1966 revision of Rule 23, class-action practice has become ever more "adventuresome" as a means of coping with claims too numerous to secure their [618]"just, speedy, and inexpensive determination" one by one. See Fed. Rule Civ. Proc. 1. The development reflects concerns about the efficient use of court resources and the conservation of funds to compensate claimants who do not line up early in a litigation queue. See generally J. Weinstein, Individual Justice in Mass Tort Litigation: The Effect of Class Actions, Consolidations, and Other Multiparty Devices (1995); Schwarzer, Settlement of Mass Tort Class Actions: Order out of Chaos, 80 Cornell L.Rev. 837 (1995).

Among current applications of Rule 23(b)(3), the "settlement only" class has become a stock device. See, *e.g.*, T. Willging, L. Hooper, & R. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 61–62 (1996) (noting large number of such cases in districts studied). Although all Federal Circuits recognize the utility of Rule 23(b)(3) settlement classes, courts have divided on the extent to which a proffered settlement affects court surveillance under Rule 23's certification criteria.

In *GM Trucks*, 55 F.3d, at 799–800, and in the instant case, 83 F.3d, at 624–626, the Third Circuit held that a class cannot be certified for settlement when certification for trial would be unwarranted. Other courts have held that settlement obviates or reduces the need to measure a proposed class against the enumerated Rule 23 requirements. See, *e.g.*, *In re Asbestos Litigation*, 90 F.3d, at 975(C.A.5) ("in settlement class context, common issues arise from the settlement itself") (citing H. Newberg & A. Conte, 2 Newberg on Class Actions § 11.28, p. 11–58 (3d ed.1992)); *White v. National Football League*, 41 F.3d 402, 408 (C.A.8 1994) ("adequacy of class representation . . . is ultimately determined by the settlement itself"), cert. denied, 515 U.S. 1137, 115 S.Ct. 2569, 132 L.Ed.2d 821 (1995); *In re A.H. Robins Co.*, 880 F.2d 709, 740(C.A.4) ("[i]f not a ground for certification *per se*, certainly settlement should be a factor, and an important factor, to be considered when determining certification"), cert. denied *sub nom. Anderson* [619]*v. Aetna Casualty & Surety Co.*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *Malchman v. Davis*, 761 F.2d 893, 900 (C.A.2 1985) (certification appropriate, in part, because "the interests of the members of the broadened class in the settlement agreement were commonly held"), cert. denied, 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986).

A proposed amendment to Rule 23 would expressly authorize settlement class certification, in conjunction with a motion by the settling parties for Rule 23(b)(3) certification, "even though the requirements of subdivision (b)(3) might not be met for purposes of trial." Proposed Amendment to Fed. Rule Civ. Proc. 23(b), 117 S.Ct. No. 1 CXIX, CLIV to CLV (Aug.1996) (Request for Comment). In response to the publication of this proposal, voluminous public comments—many of them opposed to, or skeptical of, the amendment—were received by the Judicial Conference Standing Committee on Rules of Practice and Procedure. See, *e.g.*, Letter from Steering Committee to Oppose Proposed Rule 23, signed by 129 law professors (May 28, 1996); Letter from Paul D. Carrington (May 21, 1996). The Committee has not yet acted on the matter. We consider the certification at issue under the Rule as it is currently framed.

## IV

We granted review to decide the role settlement may play, under existing Rule 23, in determining the propriety of class certifica-

tion. The Third Circuit's opinion stated that each of the requirements of Rule 23(a) and (b)(3) "must be satisfied without taking into account the settlement." 83 F.3d, at 626 (quoting *GM Trucks*, 55 F.3d, at 799). That statement, petitioners urge, is incorrect.

[5] We agree with petitioners to this limited extent: Settlement is relevant to a class certification. The Third Circuit's opinion bears modification in that respect. But, as we earlier observed, see *supra*, at 2243, the Court of Appeals in fact did not ignore the settlement; instead, that court homed in on settlement terms in explaining why it found the absentees' |₆₃₀interests inadequately represented. See 83 F.3d, at 630–631. The Third Circuit's close inspection of the settlement in that regard was altogether proper.

[6] Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial. But other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold. See Rule 23(c), (d).[16]

[7] And, of overriding importance, courts must be mindful that the Rule as now composed sets the requirements they are bound to enforce. Federal Rules take effect after an extensive deliberative process involving many reviewers: a Rules Advisory Committee, public commenters, the Judicial Conference, this Court, the Congress. See 28 U.S.C. §§ 2073, 2074. The text of a rule thus proposed and reviewed limits judicial

inventiveness. Courts are not free to amend a rule outside the process Congress ordered, a process properly tuned to the instruction that rules of procedure "shall not abridge . . . any substantive right." § 2072(b).

[8, 9] Rule 23(e), on settlement of class actions, reads in its entirety: "A class action shall not be dismissed or compromised |₆₂₁without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." This prescription was designed to function as an additional requirement, not a superseding direction, for the "class action" to which Rule 23(e) refers is one qualified for certification under Rule 23(a) and (b). Cf. *Eisen*, 417 U.S., at 176–177, 94 S.Ct., at 2151–2152 (adequate representation does not eliminate additional requirement to provide notice). Subdivisions (a) and (b) focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed.

[10] The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments—checks shorn of utility—in the settlement-class context. First, the standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind—class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness.

Second, if a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed. Class counsel confined to settlement negotiations could not use the threat of litiga-

---

**16.** Portions of the opinion dissenting in part appear to assume that settlement counts only one way—in favor of certification. See *post*, at 2252–2253, 2258. But see *post*, at 2255. To the extent that is the dissent's meaning, we disagree. Settlement, though a relevant factor, does not inevitably signal that class-action certification should

be granted more readily than it would be were the case to be litigated. For reasons the Third Circuit aired, see 83 F.3d 610, 626–635 (1996), proposed settlement classes sometimes warrant more, not less, caution on the question of certification.

tion to press for a better offer, see Coffee, Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L.Rev. 1343, 1379–1380 (1995), and the court would face a bargain proffered for its approval without benefit of adversarial investigation, see, *e.g.*, *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1352 (C.A.7 1996) (Easterbrook, J., dissenting from denial of rehearing en banc) (parties "may even put one over on the court, in a staged performance"), cert. denied, 520 U.S. 1204, 117 S.Ct. 1569, 137 L.Ed.2d 714 (1997).

|₆₂₃Federal courts, in any case, lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is "fair," then certification is proper. Applying to this case criteria the rulemakers set, we conclude that the Third Circuit's appraisal is essentially correct. Although that court should have acknowledged that settlement is a factor in the calculus, a remand is not warranted on that account. The Court of Appeals' opinion amply demonstrates why—with or without a settlement on the table—the sprawling class the District Court certified does not satisfy Rule 23's requirements.[17]

A

[11] We address first the requirement of Rule 23(b)(3) that "[common] questions of law or fact … predominate over any questions affecting only individual members." The District Court concluded that predominance was satisfied based on two factors: class members' shared experience of asbestos exposure and their common "interest in receiving prompt and fair compensation for

their claims, while minimizing the risks and transaction costs inherent in the asbestos litigation process as it occurs presently in the tort system." 157 F.R.D., at 316. The settling parties also contend that the settlement's fairness is a common question, predominating over disparate legal issues that might be pivotal in litigation but become irrelevant under the settlement.

The predominance requirement stated in Rule 23(b)(3), we hold, is not met by the factors on which the District Court relied. The benefits asbestos-exposed persons might gain from the establishment of a grand-scale compensation scheme is a matter fit for legislative consideration, see *supra,* |₆₂₃at 2237–2238, but it is not pertinent to the predominance inquiry. That inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement.[18]

[12–14] The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. See 7A Wright, Miller, & Kane 518–519.[19] The inquiry appropriate under Rule 23(e), on the other hand, protects unnamed class members "from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise." See 7B Wright, Miller, & Kane § 1797, at 340–341. But it is not the mission of Rule 23(e) to assure the class cohesion that legitimizes representative action in the first place. If a common interest in a fair compromise could satisfy the predominance requirement of Rule 23(b)(3), that

---

17. We do not inspect and set aside for insufficient evidence District Court findings of fact. Cf. *post*, at 2254, 2256–2257. Rather, we focus on the requirements of Rule 23, and endeavor to explain why those requirements cannot be met for a class so enormously diverse and problematic as the one the District Court certified.

18. In this respect, the predominance requirement of Rule 23(b)(3) is similar to the requirement of Rule 23(a)(3) that "claims or defenses" of the named representatives must be "typical of the claims or defenses of the class." The words "claims or defenses" in this context—just as in the context of Rule 24(b)(2) governing permissive

intervention—"manifestly refer to the kinds of claims or defenses that can be raised in courts of law as part of an actual or impending law suit." *Diamond v. Charles*, 476 U.S. 54, 76–77, 106 S.Ct. 1697, 1711, 90 L.Ed.2d 48 (1986) (O'CONNOR, J., concurring in part and concurring in judgment)

19. This case, we note, involves no "limited fund" capable of supporting class treatment under Rule 23(b)(1)(B), which does not have a predominance requirement. See *Georgine v. Amchem Products, Inc.*, 157 F.R.D. 246, 318 (E.D.Pa.1994); see also *id.*, at 291, and n. 40. The settling parties sought to proceed exclusively under Rule 23(b)(3).

vital prescription would be stripped of any meaning in the settlement context.

The District Court also relied upon this commonality: "The members of the class have all been exposed to asbestos products supplied by the defendants...." 157 F.R.D., at 316. Even if Rule 23(a)'s commonality requirement may be satisfied₆₂₄ by that shared experience, the predominance criterion is far more demanding. See 83 F.3d, at 626–627. Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard.

The Third Circuit highlighted the disparate questions undermining class cohesion in this case:

"Class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods. Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling asbestosis, or from mesothelioma.... Each has a different history of cigarette smoking, a factor that complicates the causation inquiry.

"The [exposure-only] plaintiffs especially share little in common, either with each other or with the presently injured class members. It is unclear whether they will contract asbestos-related disease and, if so, what disease each will suffer. They will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories." *Id.*, at 626.

Differences in state law, the Court of Appeals observed, compound these disparities. See *id.*, at 627 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 823, 105 S.Ct. 2965, 2980, 86 L.Ed.2d 628 (1985)).

[15]  No settlement class called to our attention is as sprawling as this one. Cf. *In re Asbestos Litigation*, 90 F.3d, at 976, n. 8 ("We would likely agree with the Third Cir-

cuit that a class action requesting individual damages for members of a global class of asbestos claimants would not satisfy [Rule 23] requirements due to the huge number of individuals and ₆₂₅their varying medical expenses, smoking histories, and family situations."). Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws. See Adv. Comm. Notes, 28 U.S.C.App., p. 697; see also *supra*, at 2245–2246. Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement. The Advisory Committee for the 1966 revision of Rule 23, it is true, noted that "mass accident" cases are likely to present "significant questions, not only of damages but of liability and defenses of liability, ... affecting the individuals in different ways." Adv. Comm. Notes, 28 U.S.C.App., p. 697. And the Committee advised that such cases are "ordinarily not appropriate" for class treatment. *Ibid.* But the text of the Rule does not categorically exclude mass tort cases from class certification, and District Courts, since the late 1970's, have been certifying such cases in increasing number. See Resnik, From "Cases" to "Litigation," 54 Law & Contemp.Prob. 5, 17–19 (Summer 1991) (describing trend). The Committee's warning, however, continues to call for caution when individual stakes are high and disparities among class members great. As the Third Circuit's opinion makes plain, the certification in this case does not follow the counsel of caution. That certification cannot be upheld, for it rests on a conception of Rule 23(b)(3)'s predominance requirement irreconcilable with the Rule's design.

**B**

[16–19]  Nor can the class approved by the District Court satisfy Rule 23(a)(4)'s requirement that the named parties "will fairly and adequately protect the interests of the class." The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. See *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157–158, n. 13, 102 S.Ct. 2364, 2370–2371, n. 13, 72 L.Ed.2d 740 (1982). "[A] class repre-

sentative must be part of the class and 'possess[626] the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974)).[20]

As the Third Circuit pointed out, named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future. Cf. *General Telephone Co. of Northwest v. EEOC,* 446 U.S. 318, 331, 100 S.Ct. 1698, 1707, 64 L.Ed.2d 319 (1980) ("In employment discrimination litigation, conflicts might arise, for example, between employees and applicants who were denied employment and who will, if granted relief, compete with employees for fringe benefits or seniority. Under Rule 23, the same plaintiff could not represent these classes.").

The disparity between the currently injured and exposure-only categories of plaintiffs, and the diversity within each category are not made insignificant by the District Court's finding that petitioners' assets suffice to pay claims under the settlement. See 157 F.R.D., at 291. Although[627] this is not a "limited fund" case certified under Rule 23(b)(1)(B), the terms of the settlement reflect essential allocation decisions designed to confine compensation and to limit defendants' liability. For example, as earlier described, see *supra,* at 2240–2241, the settlement includes no adjustment for inflation; only a few claimants per year can opt out at the

back end; and loss-of-consortium claims are extinguished with no compensation.

The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected. Although the named parties alleged a range of complaints, each served generally as representative for the whole, not for a separate constituency. In another asbestos class action, the Second Circuit spoke precisely to this point:

"[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups." *In re Joint Eastern and Southern Dist. Asbestos Litigation,* 982 F.2d 721, 742–743 (1992), modified on reh'g *sub nom. In re Findley,* 993 F.2d 7 (1993).

The Third Circuit found no assurance here— either in the terms of the settlement or in the structure of the negotiations—that the named plaintiffs operated under a proper understanding of their representational responsibilities. See [628]83 F.3d, at 630–631. That assessment, we conclude, is on the mark.

---

**20.** The adequacy-of-representation requirement "tend[s] to merge" with the commonality and typicality criteria of Rule 23(a), which "serve as gudeposts for determining whether .. maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157, n. 13,

102 S Ct. 2364, 2370, n. 13, 72 L.Ed.2d 740 (1982). The adequacy heading also factors in competency and conflicts of class counsel. See *id.,* at 157–158, n. 13, 102 S.Ct., at 2370–2371, n. 13. Like the Third Circuit, we decline to address adequacy-of-counsel issues discretely in light of our conclusions that common questions of law or fact do not predominate and that the named plaintiffs cannot adequately represent the interests of this enormous class.

C

Impediments to the provision of adequate notice, the Third Circuit emphasized, rendered highly problematic any endeavor to tie to a settlement class persons with no perceptible asbestos-related disease at the time of the settlement. *Id.,* at 633; cf. *In re Asbestos Litigation,* 90 F.3d, at 999–1000 (Smith, J., dissenting). Many persons in the exposure-only category, the Court of Appeals stressed, may not even know of their exposure, or realize the extent of the harm they may incur. Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out.

Family members of asbestos-exposed individuals may themselves fall prey to disease or may ultimately have ripe claims for loss of consortium. Yet large numbers of people in this category—future spouses and children of asbestos victims—could not be alerted to their class membership. And current spouses and children of the occupationally exposed may know nothing of that exposure.

Because we have concluded that the class in this case cannot satisfy the requirements of common issue predominance and adequacy of representation, we need not rule, definitively, on the notice given here. In accord with the Third Circuit, however, see 83 F.3d, at 633–634, we recognize the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous.

V

The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos[629] exposure.[21] Congress, however, has not adopted such a solution. And Rule 23, which must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view, cannot carry the large load CCR, class counsel, and the District Court heaped upon

it. As this case exemplifies, the rulemakers' prescriptions for class actions may be endangered by "those who embrace [Rule 23] too enthusiastically just as [they are by] those who approach [the Rule] with distaste." C. Wright, Law of Federal Courts 508 (5th ed.1994); cf. 83 F.3d, at 634 (suggesting resort to less bold aggregation techniques, including more narrowly defined class certifications).

\* \* \*

For the reasons stated, the judgment of the Court of Appeals for the Third Circuit is *Affirmed.*

Justice O'CONNOR took no part in the consideration or decision of this case.

Justice BREYER, with whom Justice STEVENS joins, concurring in part and dissenting in part.

Although I agree with the Court's basic holding that "[s]ettlement is relevant to a class certification," *ante,* at 2248, I find several problems in its approach that lead me to a different conclusion. First, I believe that the need for settlement in this mass tort case, with hundreds of thousands of lawsuits, is greater than the Court's opinion suggests. Second, I would give more weight than would the majority to settlement-related issues for purposes of determining whether common issues predominate. Third, I am uncertain about the Court's determination of adequacy of representation,[630] and do not believe it appropriate for this Court to second-guess the District Court on the matter without first having the Court of Appeals consider it. Fourth, I am uncertain about the tenor of an opinion that seems to suggest the settlement is unfair. And fifth, in the absence of further review by the Court of Appeals, I cannot accept the majority's suggestions that "notice" is inadequate.

These difficulties flow from the majority's review of what are highly fact-based, complex, and difficult matters, matters that are inappropriate for initial review before this Court. The law gives broad leeway to district courts in making class certification deci-

21. The opinion dissenting in part is a forceful          statement of that argument.

sions, and their judgments are to be reviewed by the court of appeals only for abuse of discretion. See *Califano v. Yamasaki*, 442 U.S. 682, 703, 99 S.Ct. 2545, 2558–2559, 61 L.Ed.2d 176 (1979). Indeed, the District Court's certification decision rests upon more than 300 findings of fact reached after five weeks of comprehensive hearings. Accordingly, I do not believe that we should in effect set aside the findings of the District Court. That court is far more familiar with the issues and litigants than is a court of appeals or are we, and therefore has "broad power and discretion ... with respect to matters involving the certification" of class actions. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S.Ct. 2326, 2334, 60 L.Ed.2d 931 (1979); cf. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402, 110 S.Ct. 2447, 2459, 110 L.Ed.2d 359 (1990) (district court better situated to make fact-dependent legal determinations in Rule 11 context).

I do not believe that we can rely upon the Court of Appeals' review of the District Court record, for that review, and its ultimate conclusions, are infected by a legal error. *E.g., Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 626 (C.A.3 1996) (holding that *"considered as a litigation class,"* the class cannot meet Federal Rule of Civil Procedure 23's requirements (emphasis added)). There is no evidence that the Court of Appeals at any point considered the settlement as something that would help the class meet Rule 23. I find, moreover, the fact-related issues presented here sufficiently |632close to warrant further detailed appellate court review under the correct legal standard. Cf. *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 486, 117 S.Ct. 1491, 1501, 137 L.Ed.2d 730 (1997). And I shall briefly explain why this is so.

### I

First, I believe the majority understates the importance of settlement in this case. Between 13 and 21 million workers have been exposed to asbestos in the workplace—over the past 40 or 50 years—but the most severe instances of such exposure probably occurred three or four decades ago. See Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation, pp. 6–7

(Mar.1991) (Judicial Conference Report); App. 781–782, 801; B. Castleman, Asbestos: Medical and Legal Aspects 787–788 (4th ed.1996). This exposure has led to several hundred thousand lawsuits, about 15% of which involved claims for cancer and about 30% for asbestosis. See *In re Joint Eastern and Southern Dist. Asbestos Litigation*, 129 B.R. 710, 936–937 (E. and S.D.N.Y.1991). About half of the suits have involved claims for pleural thickening and plaques—the harmfulness of which is apparently controversial. (One expert below testified that they "don't transform into cancer" and are not "predictor[s] of future disease," App. 781.) Some of those who suffer from the most serious injuries, however, have received little or no compensation. *In re School Asbestos Litigation*, 789 F.2d 996, 1000 (C.A.3 1986); see also Edley & Weiler, Asbestos: A Multi–Billion–Dollar Crisis, 30 Harv. J. Legis. 383, 384, 393 (1993) ("[U]p to one-half of asbestos claims are now being filed by people who have little or no physical impairment. Many of these claims produce substantial payments (and substantial costs) even though the individual litigants will never become impaired"). These lawsuits have taken up more than 6% of all federal civil filings in one recent year, and are subject to a delay that is twice that of other civil suits. Judicial Conference Report 7, 10–11.

|632Delays, high costs, and a random pattern of noncompensation led the Judicial Conference Ad Hoc Committee on Asbestos Litigation to transfer all federal asbestos personal-injury cases to the Eastern District of Pennsylvania in an effort to bring about a fair and comprehensive settlement. It is worth considering a few of the Committee's comments. See Judicial Conference Report 2 (" 'Decisions concerning thousands of deaths, millions of injuries, and billions of dollars are entangled in a litigation system whose strengths have increasingly been overshadowed by its weaknesses.' The ensuing five years have seen the picture worsen: increased filings, larger backlogs, higher costs, more bankruptcies and poorer prospects that judgments—if ever obtained—can be collected" (quoting Rand Corporation Institute for Civil Justice)); *id.*, at 13 ("The transaction

costs associated with asbestos litigation are an unconscionable burden on the victims of asbestos disease." "[O]f each asbestos litigation dollar, 61 cents is consumed in transaction costs.... Only 39 cents were paid to the asbestos victims" (citing Rand finding)); *id.,* at 12 ("Delays also can increase transaction costs, especially the attorneys' fees paid by defendants at hourly rates. These costs reduce either the insurance fund or the company's assets, thereby reducing the funds available to pay pending and future claimants. By the end of the trial phase in [one case], at least seven defendants had declared bankruptcy (as a result of asbestos claims generally)")); see also J. Weinstein, Individual Justice in Mass Tort Litigation 155 (1995); Edley & Weiler, *supra,* at 389–395.

Although the transfer of the federal asbestos cases did not produce a general settlement, it was intertwined with and led to a lengthy year-long negotiation between the cochairs of the Plaintiff's Multi–District Litigation Steering Committee (elected by the Plaintiff's Committee Members and approved by the District Court) and the 20 asbestos defendants who are before us here. *Georgine v. Amchem Products, Inc.,* 157 F.R.D. 246, 266–267 (E.D.Pa.1994); App. 660–662. |₆₃₃These "protracted and vigorous" negotiations led to the present partial settlement, which will pay an estimated $1.3 billion and compensate perhaps 100,000 class members in the first 10 years. 157 F.R.D., at 268, 287. "The negotiations included a substantial exchange of information" between class counsel and the 20 defendant companies, including "confidential data" showing the defendants' historical settlement averages, numbers of claims filed and settled, and insurance resources. *Id.,* at 267. "Virtually no provision" of the settlement "was not the subject of significant negotiation," and the settlement terms "changed substantially" during the negotiations. *Ibid.* In the end, the negotiations produced a settlement that, the District Court determined based on its detailed review of the process, was "the result of arms-length adversarial negotiations by extraordinarily competent and experienced attorneys." *Id.,* at 335.

The District Court, when approving the settlement, concluded that it improved the plaintiffs' chances of compensation and reduced total legal fees and other transaction costs by a significant amount. Under the previous system, according to the court, "[t]he sickest of victims often go uncompensated for years while valuable funds go to others who remain unimpaired by their mild asbestos disease." *Ibid.* The court believed the settlement would create a compensation system that would make more money available for plaintiffs who later develop serious illnesses.

I mention this matter because it suggests that the settlement before us is unusual in terms of its importance, both to many potential plaintiffs and to defendants, and with respect to the time, effort, and expenditure that it reflects. All of which leads me to be reluctant to set aside the District Court's findings without more assurance than I have that they are wrong. I cannot obtain that assurance through comprehensive review of the record because that is properly the job of the Court of Appeals and that court, understandably, but as we now hold, mistakenly, believed that settlement₆₃₄ was not a relevant (and, as I would say, important) consideration.

Second, the majority, in reviewing the District Court's determination that common "issues of fact and law predominate," says that the predominance "inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Ante,* at 2249 (footnote omitted). I find it difficult to interpret this sentence in a way that could lead me to the majority's conclusion. If the majority means that these presettlement questions are what matters, then how does it reconcile its statement with its basic conclusion that "settlement is relevant" to class certification, or with the numerous lower court authority that says that settlement is not only relevant, but important? See, e. g., *In re A.H. Robins Co.,* 880 F.2d 709, 740(C.A.4), cert. denied *sub nom. Anderson v. Aetna Casualty & Surety Co.,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *In re Beef Industry Antitrust Litiga-*

*tion,* 607 F.2d 167, 177–178 (C.A.5 1979), cert. denied *sub nom. Iowa Beef Processors, Inc. v. Meat Price Investigators Assn.,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981); 2 H. Newberg & A. Conte, Newberg on Class Actions § 11.27, pp. 11–54 to 11–55 (3d ed.1992).

Nor do I understand how one could decide whether common questions "predominate" in the abstract—without looking at what is likely to be at issue in the proceedings that will ensue, namely, the settlement. Every group of human beings, after all, has some features in common, and some that differ. How can a court make a contextual judgment of the sort that Rule 23 requires without looking to what proceedings will follow? Such guideposts help it decide whether, in light of common concerns and differences, certification will achieve Rule 23's basic objective—"economies of time, effort, and expense." Advisory Committee's Notes on Fed. Rule Civ. Proc. 23(b)(3), 28 U.S.C.App., p. 697. As this Court has previously observed, "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); see also 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1785, p. 107, and n. 34 (1986). I am not saying that the "settlement counts only one way." *Ante,* at 2248, n. 16. Rather, the settlement may simply "add a great deal of information to the court's inquiry and will often expose diverging interests or common issues that were not evident or clear from the complaint" and courts "can and should" look to it to enhance the "ability ... to make informed certification decisions." *In re Asbestos Litigation,* 90 F.3d 963, 975 (C.A.5 1996).

The majority may mean that the District Court gave too much weight to the settlement. But I am not certain how it can reach that conclusion. It cannot rely upon the Court of Appeals, for that court gave no positive weight at all to the settlement. Nor can it say that the District Court relied solely on "a common interest in a fair compromise," *ante,* at 2249, for the District Court did not do so. Rather, it found the settlement rele-

vant because it explained the importance of the class plaintiffs' common features and common interests. The court found predominance in part because:

"The members of the class have all been exposed to asbestos products supplied by the defendants and all share an interest in receiving prompt and fair compensation for their claims, while minimizing the risks and transaction costs inherent in the asbestos litigation process as it occurs presently in the tort system." 157 F.R.D., at 316.

The settlement is relevant because it means that these common features and interests are likely to be important in the proceeding that would ensue—a proceeding that would focus primarily upon whether or not the proposed settlement fairly and properly satisfied the interests class members had in common. That is to say, the settlement underscored the importance_{636} of (a) the common fact of exposure, (b) the common interest in receiving *some* compensation for certain rather than running a strong risk of *no* compensation, and (c) the common interest in avoiding large legal fees, other transaction costs, and delays. *Ibid.*

Of course, as the majority points out, there are also important differences among class members. Different plaintiffs were exposed to different products for different times; each has a distinct medical history and a different history of smoking; and many cases arise under the laws of different States. The relevant question, however, is *how much* these differences matter in respect to the legal proceedings that lie ahead. Many, if not all, toxic tort class actions involve plaintiffs with such differences. And the differences in state law are of diminished importance in respect to a proposed settlement in which the defendants have waived all defenses and agreed to compensate all those who were injured. *Id.,* at 292.

These differences might warrant subclasses, though subclasses can have problems of their own. "There can be a cost in creating more distinct subgroups, each with its own representation.... [T]he more subclasses created, the more severe conflicts bubble to

the surface and inhibit settlement.... The resources of defendants and, ultimately, the community must not be exhausted by protracted litigation." Weinstein, Individual Justice in Mass Tort Litigation, at 66. Or these differences may be too serious to permit an effort at group settlement. This kind of determination, as I have said, is one that the law commits to the discretion of the district court—reviewable for abuse of discretion by a court of appeals. I believe that we are far too distant from the litigation itself to reweigh the fact-specific Rule 23 determinations and to find them erroneous without the benefit of the Court of Appeals first having restudied the matter with today's legal standard in mind.

┌₆₇Third, the majority concludes that the "representative parties" will not "fairly and adequately protect the interests of the class." Rule 23(a)(4). It finds a serious conflict between plaintiffs who are now injured and those who may be injured in the future because "for the currently injured, the critical goal is generous immediate payments," a goal that "tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future." *Ante,* at 2251.

I agree that there is a serious problem, but it is a problem that often exists in toxic tort cases. See Weinstein, *supra,* at 64 (noting that conflict "between present and future claimants" "is almost always present in some form in mass tort cases because long latency periods are needed to discover injuries"); see also Judicial Conference Report 34–35 ("Because many of the defendants in these cases have limited assets that may be called upon to satisfy the judgments obtained under current common tort rules and remedies, there is a 'real and present danger that the available assets will be exhausted before those later victims can seek compensation to which they are entitled'" (citation omitted)). And it is a problem that potentially exists whenever a single defendant injures several plaintiffs, for a settling plaintiff leaves fewer assets available for the others. With class actions, at least, plaintiffs have the consolation that a district court, thoroughly familiar with the facts, is charged with the responsibility of ensuring that the interests of no class members are sacrificed.

But this Court cannot easily safeguard such interests through review of a cold record. "What constitutes adequate representation is a question of fact that depends on the circumstances of each case." 7A Wright, Miller, & Kane, Federal Practice and Procedure § 1765, at 271. That is particularly so when, as here, there is an unusual baseline, namely, the "'real and present danger'" described by the Judicial Conference Report above. The majority's use of the ┌₆₈lack of an inflation adjustment as evidence of inadequacy of representation for future plaintiffs, *ante,* at 2251, is one example of this difficulty. An inflation adjustment might not be as valuable as the majority assumes if most plaintiffs are old and not worried about receiving compensation decades from now. There are, of course, strong arguments as to its value. But that disagreement is one that this Court is poorly situated to resolve.

Further, certain details of the settlement that are not discussed in the majority opinion suggest that the settlement may be of greater benefit to future plaintiffs than the majority suggests. The District Court concluded that future plaintiffs receive a "significant value" from the settlement due to a variety of its items that benefit future plaintiffs, such as: (1) tolling the statute of limitations so that class members "will no longer be forced to file premature lawsuits or risk their claims being time-barred"; (2) waiver of defenses to liability; (3) payment of claims, if and when members become sick, pursuant to the settlement's compensation standards, which avoids "the uncertainties, long delays and high transaction costs [including attorney's fees] of the tort system"; (4) "some assurance that there will be funds available if and when they get sick," based on the finding that each defendant "has shown an ability to fund the payment of all qualifying claims" under the settlement; and (5) the right to additional compensation if cancer develops (many settlements for plaintiffs with noncancerous conditions bar such additional claims). 157 F.R.D., at 292. For these reasons, and others, the District Court found that the distinc-

tion between present and future plaintiffs was "illusory." *Id.,* at 317–318.

I do not know whether or not the benefits are more or less valuable than an inflation adjustment. But I can certainly recognize an argument that they are. (To choose one more brief illustration, the majority chastises the settlement for extinguishing loss-of-consortium claims, *ante,* at 2251, 2252, but does not note that, as the District Court found, the "defendants' historical [settlement] averages, upon which the compensation values are based, include payments for loss of consortium claims, and, accordingly, the Compensation Schedule is not unfair for this ascribed reason," 157 F.R.D., at 278.) The difficulties inherent in both knowing and understanding the vast number of relevant individual fact-based determinations here counsel heavily in favor of deference to district court decisionmaking in Rule 23 decisions. Or, at the least, making certain that appellate court review has taken place with the correct standard in mind.

Fourth, I am more agnostic than is the majority about the basic fairness of the settlement. *Ante,* at 2250–2252. The District Court's conclusions rested upon complicated factual findings that are not easily cast aside. It is helpful to consider some of them, such as its determination that the settlement provided "fair compensation . . . while reducing the delays and transaction costs endemic to the asbestos litigation process" and that "the proposed class action settlement is superior to other available methods for the fair and efficient resolution of the asbestos-related personal injury claims of class members." 157 F.R.D., at 316 (citation omitted); *see also id.,* at 335 ("The inadequate tort system has demonstrated that the lawyers are well paid for their services but the victims are not receiving speedy and reasonably inexpensive resolution of their claims. Rather, the victims' recoveries are delayed, excessively reduced by transaction costs and relegated to the impersonal group trials and mass consolidations. The sickest of victims often go uncompensated for years while valuable funds go to others who remain unimpaired by their mild asbestos disease. Indeed, these unimpaired victims have, in many states, been forced to assert their claims prematurely or risk giving up all rights to future compensation for any future lung cancer or mesothelioma. The plan which this Court approves today will correct that unfair result for the class members and the . . . defendants");640 *id.,* at 279, 280 (settlement "will result in less delay for asbestos claimants than that experienced in the present tort system" and will "result in the CCR defendants paying more claims at a faster rate, than they have ever paid before"); *id.,* at 292; Edley & Weiler, 30 Harv. J. Legis., at 405, 407 (finding that "[t]here are several reasons to believe that this settlement secures important gains for both sides" and that they "firmly endorse the fairness and adequacy of this settlement"). Indeed, the settlement has been endorsed as fair and reasonable by the AFL–CIO (and its Building and Construction Trades Department), which represents a " 'substantial percentage' " of class members, 157 F.R.D., at 325, and which has a role in monitoring implementation of the settlement, *id.,* at 285. I do not intend to pass judgment upon the settlement's fairness, but I do believe that these matters would have to be explored in far greater depth before I could reach a conclusion about fairness. And that task, as I have said, is one for the Court of Appeals.

Finally, I believe it is up to the District Court, rather than this Court, to review the legal sufficiency of notice to members of the class. The District Court found that the plan to provide notice was implemented at a cost of millions of dollars and included hundreds of thousands of individual notices, a wide-ranging television and print campaign, and significant additional efforts by 35 international and national unions to notify their members. *Id.,* at 312–313, 336. Every notice emphasized that an individual did not currently have to be sick to be a class member. And in the end, the District Court was "confident" that Rule 23 and due process requirements were satisfied because, as a result of this "extensive and expensive notice procedure," "over six million" individuals "received actual notice materials," and "millions more" were reached by the media campaign. *Id.,* at 312, 333, 336. Although the majority, in principle, is reviewing a Court of Appeals' conclusion, it seems to me that its opinion

# EXHIBIT D

might call into question the fact-related determinations of the District [641]Court. *Ante,* at 2252. To the extent that it does so, I disagree, for such findings cannot be so quickly disregarded. And I do not think that our precedents permit this Court to do so. See *Reiter,* 442 U.S., at 345, 99 S.Ct., at 2334; *Yamasaki,* 442 U.S., at 703, 99 S.Ct., at 2558–2559.

## II

The issues in this case are complicated and difficult. The District Court might have been correct. Or not. Subclasses might be appropriate. Or not. I cannot tell. And I do not believe that this Court should be in the business of trying to make these fact-based determinations. That is a job suited to the district courts in the first instance, and the courts of appeals on review. But there is no reason in this case to believe that the Court of Appeals conducted its prior review with an understanding that the settlement could have constituted a reasonably strong factor in favor of class certification. For this reason, I would provide the courts below with an opportunity to analyze the factual questions involved in certification by vacating the judgment, and remanding the case for further proceedings.



521 U.S. 702, 138 L.Ed.2d 772

[702]**WASHINGTON, et al., Petitioners,**

v.

**Harold GLUCKSBERG et al.**

**No. 96–110.**

Argued Jan. 8, 1997.

Decided June 26, 1997.

Three terminally ill patients, four physicians, and nonprofit organization brought action against state of Washington for declaratory judgment that statute banning assisted suicide violated due process clause. The United States District Court for the Western District of Washington, Barbara J. Rothstein, Chief Judge, 850 F.Supp. 1454, granted summary judgment for plaintiffs, and state appealed. The Court of Appeals, Noonan, Circuit Judge, 49 F.3d 586, reversed. On rehearing en banc, the Court of Appeals, Reinhardt, Circuit Judge, 79 F.3d 790, affirmed, and physicians petitioned for writ of certiorari. The Supreme Court, Chief Justice Rehnquist, held that: (1) asserted right to assistance in committing suicide was not fundamental liberty interest protected by due process clause, and (2) Washington's ban on assisted suicide was rationally related to legitimate government interests.

Reversed and remanded.

Justice O'Connor filed concurring opinion, in which Justice Ginsburg and Justice Breyer joined in part.

Justices Stevens, Souter, Ginsburg and Breyer filed separate concurring opinions.

For concurring opinions of O'Connor, Stevens, Ginsburg and Breyer see 117 S.Ct. 2302.

**1. Constitutional Law ⟨⫫⟩251, 254.1**

Due process clause guarantees more than fair process, and "liberty" it protects includes more than absence of physical restraint. U.S.C.A. Const.Amends. 5, 14.

**2. Constitutional Law ⟨⫫⟩252.5, 254.1**

Due process clause provides heightened protection against government interference with certain fundamental rights and liberty interests. U.S.C.A. Const.Amends. 5, 14.

**3. Constitutional Law ⟨⫫⟩254.2, 274(2, 5)**

In addition to the specific freedoms protected by Bill of Rights, "liberty" specially protected by due process clause includes rights to marry, have children, direct education and upbringing of one's children, marital privacy, use contraception, bodily integrity, and abortion. U.S.C.A. Const.Amends. 5, 14.

# EXHIBIT E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RICHARD MOORE, et al., | § | Civil Action No. 02-CV-1152-N |
| Plaintiffs, | § | |
| | § | |
| vs. | § | THIS DOCUMENT RELATES TO: |
| | § | All Actions |
| HALLIBURTON COMPANY, et al., | § | |
| Defendants. | § | |
| JACK FRIEDBERG, | § | Case No. 3:03-CV-0537-N |
| Plaintiff, | § | |
| vs. | § | |
| DAVID J. LESAR, et al., | § | |
| Defendants. | § | |

**LEAD PLAINTIFF AMS FUND, INC.'S STATEMENT
CONCERNING PROPOSED SETTLEMENT**

1

The Court appointed four Lead Plaintiffs, including the AMS Fund, Inc., to represent the best interests of the Class in this action. Lead Plaintiff the AMS Fund opposes both the proposed settlement and the manner in which it was reached for the following reasons, among others:

- The proposed settlement was negotiated on an uninformed basis by class counsel as to the strength of the class's claims against defendants and without input from all Court-appointed Lead Plaintiffs.

- The AMS Fund, after being presented with the proposed settlement as a *fait accompli* and without the AMS Fund's prior knowledge, took it upon itself to undertake its own investigation. The result of that investigation was that significant facts – facts undeveloped by class counsel – exist which corroborate the class's claims and illustrate the inadequacy of the proposed settlement to remedy defendants' alleged wrongs.

- The proposed settlement does not fairly compensate the class for the claims against defendants, providing – after deduction of class and derivative counsel's requested fees and expected settlement administration and other expenses of approximately $3,000,000 – something between 0.5 cents and 0.6 cents per share for class members.

The AMS Fund is represented by:

SCOTT + SCOTT, LLC
DAVID R. SCOTT
NEIL ROTHSTEIN
108 Norwich Ave.
P.O. Box 192
Colchester, CT 06415
Tel (toll free): 800/404-7770
Fax: 860/537-4432
www.scott-scott.com

SCOTT + SCOTT, LLC
ARTHUR L. SHINGLER III
Wells Fargo Plaza
401 B Street
Suite 307
San Diego, CA 92101
Tel (toll free): 800/332-2259
Fax: 619/233-0508

If you have questions about the Proposed Settlement Notice, Lead Plaintiff AMS Fund's concerns about the adequacy of the proposed settlement or have any other questions concerning settlement or your rights as a class member, please feel free to contact Scott + Scott directly.

**PLEASE DO NOT CONTACT THE COURT DIRECTLY WITH INQUIRIES**