

ORIGINAL

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

AUG 1 9 2004

CLERK, U.S. DISTRICT COURT
By _____
Deputy

|  |  |
|---|---|
| RICHARD MOORE, *et al.*, | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| HALLIBURTON COMPANY, *et al.*, | : |
| | : |
| Defendants. | : |
| | : |

Civil Action No. 02-CV-1152-M

THIS DOCUMENT RELATES TO:
All Actions

---

## MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION

**SCHIFFRIN & BARROWAY, LLP**
Richard S. Schiffrin
Marc I. Willner
Kay E. Sickles
Three Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004
(610) 667-7706

*Plaintiffs' Lead Counsel*

**FEDERMAN & SHERWOOD**
William Federman (SBOT #00794935)
2926 Maple Avenue, Suite 200
Dallas, Texas 75201
(214) 908-1311
-and-
120 North Robinson Avenue, Suite 2720
Oklahoma City, Oklahoma 73102

**EMERSON POYNTER, LLP**
John Emerson, Jr. (SBOT #06602600)
830 Apollo Lane
Houston, Texas 77058
(281) 488-8854

*Co-Liaison Counsel for Plaintiffs*

Dated: August 19, 2004

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.     SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    HISTORY AND BACKGROUND OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . 4

III.   THE SETTLEMENT AND PLAN OF ALLOCATION . . . . . . . . . . . . . . . . . . . . . . 9

IV.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE
       AND SHOULD BE APPROVED BY THE COURT . . . . . . . . . . . . . . . . . . . . . . . . 10

       A.    The Law Favors and Encourages Settlements . . . . . . . . . . . . . . . . . . . . . . 10

       B.    The Settlement Satisfies the Criteria for Approval . . . . . . . . . . . . . . . . . . . 13

             1.    Plaintiffs' Likelihood of Success, the Range of
                   Possible Recovery, and the Relief Offered in the
                   Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                   a.    The Contract Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                   b.    The Asbestos Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                   c.    Proving Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

             2.    The Absence of Fraud or Collusion . . . . . . . . . . . . . . . . . . . . . . . 23

             3.    The Complexity, Expense, and Likely Duration of
                   Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

             4.    The Stage of the Proceedings and the Amount of
                   Discovery Completed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

             5.    The Opinions of Class Counsel, Class
                   Representatives, and Absent Class Members . . . . . . . . . . . . . . . . . 27

             6.    The Objection Submitted By Movants Does Not
                   Provide Sufficient Basis for This Court to Conclude
                   that the Settlement Is Not Fair, Reasonable and
                   Adequate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i

V.      THE PLAN OF ALLOCATION OF THE SETTLEMENT FUND IS FAIR AND
        REASONABLE AND SHOULD BE APPROVED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VI.     CERTIFICATION OF A SETTLEMENT CLASS IS APPROPRIATE AND
        WARRANTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        A.      The Requirements of Federal Rule of Civil Procedure 23(a) Are
                Satisfied  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

                1.      Numerosity  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

                2.      Commonality  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

                3.      Typicality  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

                4.      Adequacy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        B.      Rule 23(b)(3) Is Also Satisfied  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

                1.      Common Questions of Law and Fact Predominate  . . . . . . . . . . . . . . . 42

                2.      A Class Action is Superior to Numerous Individual
                        Actions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

VII.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                <u>Page(s)</u>

*In re Aetna Inc. Sec. Litig.*,
   No. 1219, 2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) .................................. 13

*Alvarado v. Memphis-Shelby County Airport Auth.*,
   Nos. 99-5159, 99-5162, 2000 U.S. App. LEXIS 21259 (6th Cir. 2000) ................. 12

*Batchelder v. Kerr-McGee Corp.*,
   246 F. Supp. 2d 525 (N.D. Miss. 2003) ........................................................ 6

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ................................................................................... 4, 5

*In re Catfish Litig.*,
   939 F. Supp. 493 (N.D. Miss. 1996) .......................................................... 6, 14

*In re Combustion, Inc.*,
   No. 94MDL4000, 1997 U.S. Dist. LEXIS 18249 (W.D. La. 1997) .................... 5, 14

*Cullen v. Whitman*,
   197 F.R.D. 136 (E.D. Pa. 2000) ..................................................................... 6

*Di Giacomo v. Plains All Am. Pipeline*,
   Nos. H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532
   (S.D. Tex. 2001) ................................................................................... 5, 6, 14

*Donovan v. Estate of Frank E. Fitzsimmons,*,
   778 F.2d 298 (7th Cir. 1985) ........................................................................ 7

*Faircloth v. Certified Fin., Inc.*,
   No. 99-3097, 2001 U.S. Dist. LEXIS 6793 (E.D. La. 2001) ........................... 5

*FirstPlus Fin. Group, Inc. Sec. Litig.*,
   No. 3:98-CV-2551-M (Oct. 14, 2003) ......................................................... 5

*Forbush v. J.C. Penney Co.*,
   98 F.3d at 817 (5th Cir. 1996) ...................................................................... 15

*Garza v. Sporting Goods Props.*,
   No. SA-93-CA-1082, 1996 U.S. Dist. LEXIS 2009 (W.D. Tex. Feb. 6, 1996) ........ 15

iii

*Gaskill v. Gordon*,
   942 F. Supp. 382 (N.D. Ill. 1996) ............................................................................. 6

*Goldsmith v. Technology Solutions Co.*,
   92 C 4374, 1995 U.S. Dist. LEXIS 15093 (N.D. Ill. October 11, 1995)

*Goldstein v. MCI Worldcom*,
   340 F.3d 238 (5th Cir. 2003) .................................................................................... 7

*In re Greenwich Pharm. Sec. Litig.*,
   No. 92-3097, 1995 U.S. Dist. LEXIS 5717 (E.D. Pa. Apr. 25, 1995) ....................... 6

*In re Harrah's Entm't Sec. Litig.*,
   No. 95-3925, 1998 U.S. Dist. LEXIS 18774 (E.D. La. 1998) .................................... 5

*In re Ikon Office Solutions Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000) ......................................................................... 12, 13

*Johnson v. Georgia Highway Express*,
   488 F.2d 714 (5th Cir. 1974) ......................................................................... 6, 7, 15

*Kisilenko v. STB Sys.*,
   No. 3:99-CV-2872-M (N.D. Tex. Nov. 3, 2000) ................................................. 14, 16

*Longden v. Sunderman*,
   979 F.2d 1095 (5th Cir. 1992) ................................................................................... 5

*In re Lease Oil Antitrust Litig. (No. II)*,
   186 F.R.D. 403 (S.D. Tex. 1999) ........................................................................... 4, 5

*Newby v. Enron Corp.*,
   No. H-01-3624, 2004 U.S. Dist. LEXIS 7490
   (S.D. Tex. 2004) ...................................................................................................... 16

*Prandini v. National Tea Co.*,
   557 F.2d 1015 (3d Cir. 1977) .................................................................................... 8

*Purdie v. Ace Cash Express*,
   No. 3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547 (N.D. Tex. 2003) .............. 6, 14

*Ressler v. Jacobson*,
   149 F.R.D.651 (M.D. Fl. 1992) ............................................................................... 15

iv

*In re Safety Components Int'l,*
   No. 00-0082, 2001 U.S. Dist. LEXIS 16670 (D.N.J. 2001) ...................................... 6

*Shaw v. Toshiba Am. Info. Sys.,*
   91 F. Supp. 2d 942 (E.D. Tex. 2000) ........................................................................ 5

*Strong v. BellSouth Telecomm, Inc.,*
   137 F.3d 844 (5th Cir. 1998) .................................................................................... 5

*In re Unistar Fin. Servs. Corp. Sec. Litig.,*
   No. 3:99-CV-1857-M (N.D. Tex. Aug. 17, 2001) ............................................. 14, 16

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs Private Asset Management, Gabriel T. Forrest, and Paul J. Benec (the "Settling Lead Plaintiffs"), by and through Lead Counsel Schiffrin & Barroway, LLP ("S&B"), and Executive Committee Members Stull, Stull & Brody, and Wolf Haldenstein Adler Freeman & Herz (collectively, with Lead Counsel, "Plaintiffs' Counsel"), respectfully move this Court for final approval of the proposed settlement of the above-captioned action (the "Action") with defendants Halliburton Company ("Halliburton" or the "Company"), David J. Lesar, Douglas L. Foshee, Gary V. Morris, and Robert Charles Muchmore (collectively, "Defendants") and the proposed Plan of Allocation, which Judge Godbey preliminarily approved by Order dated June 7, 2004.

## I.   SUMMARY OF THE ARGUMENT

Under the terms of the proposed settlement (the "Settlement"), set forth in the Stipulation of Settlement dated May 10, 2004 (the "Stipulation"), attached as Exhibit 1 to the Declaration of Marc Willner ("Willner Decl.") submitted with this memorandum, Defendants caused to be paid six million dollars ($6,000,000) in cash into an interest-bearing escrow account maintained on behalf of the Class (the "Settlement Fund") in exchange for the dismissal and full release of all claims brought in this Action. *See* Willner Decl. ¶ 4.[1] The Settling Lead Plaintiffs respectfully submit that the Settlement represents a favorable recovery for the Class and should be approved. As set forth in Section IV below, courts in the Fifth Circuit consider six factors to determine whether a proposed settlement should be approved. An analysis of those six factors in this case illustrates that the

---

[1] The proposed Class is defined as all persons and entities who purchased the common stock of Halliburton during the period from May 18, 1998 through May 28, 2002, inclusive (the "Class Period"). Excluded from the Class are the Settling Securities Defendants and all present and former officers and directors of Halliburton, members of the immediate families (parents, spouses, siblings, and children) of each of the Individual Settling Securities Defendants, each Settling Securities Defendant's Legal Representatives, heirs, successors or assigns and any entity in which any Defendant has had a controlling interest.

Settlement is fair, adequate, and reasonable, particularly when viewed in light of the plaintiffs' likelihood of success on the merits. Without the Settlement, the Class faces the expense, risks and delay of litigating and trying a complex action, including the risks that the Action could be denied class certification, or dismissed on motion or after a trial on the merits. In addition, even if plaintiffs ultimately prevailed at trial on all liability issues, they would still face the considerable challenge of proving that plaintiffs were damaged and the proper measure of those damages. Given the advantages this $6 million Settlement provides, the benefits of settling this Action greatly outweigh the risks of continuing it. In short, approval of the Settlement will result in Class members recovering a portion of their damages *now*, rather than recovering nothing, or substantially similar damages years from now, if plaintiffs were able to defeat a motion to dismiss and summary judgment.

The Archdiocese of Milwaukee Supporting Fund, Inc. ("AMSF"), an entity appointed by Judge Godbey as one of the four lead plaintiffs, appears to have attempted to simultaneously opt-out and file an objection to the proposed Settlement.[2] Numerous steps have been taken by AMSF and their counsel, Scott + Scott, LLC ("Scott + Scott"), to derail the Settlement, including filing a motion to remove Plaintiffs' Lead Counsel from that position, filing additional complaints with varying class periods after the Consolidated Amended Complaint was filed, objecting to preliminary approval of the Settlement, making representations to newspaper reporters, and issuing a press release encouraging Class members to object to the Settlement. These filings, the procedural history of the

---

[2] Although not technically styled as an objection and not in compliance with the requirements set forth in the Notice approved by Judge Godbey for either opting-out or objecting, the Settling Lead Plaintiffs will treat the filing by AMSF and the two individuals represented by Scott + Scott as both a request for an exclusion and an objection.

2

case, and the Settling Lead Plaintiffs' responses are fully set forth below.  In sum, the Settling Lead Plaintiffs strongly believe that once the true nature of the Scott + Scott objection to the Settlement is explained, the Court will concur that the Settlement should be finally approved.

The overall reaction to the Settlement by the Class members confirms the Settling Lead Plaintiffs' decision to resolve the litigation in exchange for the payment of the Settlement Fund.  On June 7, 2004, Judge Godbey entered an Order preliminarily approving the Settlement and directing that a hearing be held on August 26, 2004 to determine the fairness, reasonableness and adequacy of the Settlement, as proposed (the "Preliminary Approval Order").  Pursuant to the Preliminary Approval Order, commencing on June 21, 2004, Notice of Proposed Settlement (the "Notice") was mailed to approximately 869,000 potential Class members. *See* Willner Decl. ¶ 78, citing ¶ 4 of the Affidavit of Jack DiGiovanni, Director of Security Operations of The Garden City Group, Inc., the Claims Administrator in this Action (the "DiGiovanni Affidavit"), attached as Exhibit 2 to the Willner Declaration.  Also in accordance with the Preliminary Approval Order, on June 24, 2004, summary notice was published in the national edition of *The Wall Street Journal. See* Willner Decl. ¶ 78 (citing DiGiovanni Aff. ¶ 6).  To date, only AMSF and three putative Class members, two of whom are represented by Scott + Scott, have voiced objection to the Settlement.  The absence of any significant objection from the Class as a whole strongly supports the proposition that the Settlement and Plan of Allocation are fair, reasonable and adequate and should receive final approval from the Court.

The Notice sent to the Class contained a detailed description of the nature and procedural history of the Action, as well as the material terms of the Settlement, including without limitation: (i) estimated per share recovery; (ii) the manner in which the Settlement Fund will be allocated

3

among participating Class members; (iii) a description of the investigation and discovery that plaintiffs undertook in the Action; (iv) a description of the defenses that Defendants would be asserting if plaintiffs were to continue to pursue the Action;(v) a description of the claims that will be released in the Settlement; (vi) the right and mechanism for Class members to opt-out or exclude themselves from the Class; and (vii) the right and mechanism for Class members to object to the Settlement.   The Notice also explained in detail that AMSF opposed the Settlement and had attempted to have Plaintiffs' Lead Counsel removed from that position, and that Scott + Scott had filed the *Kimble* Action (defined below) against Defendants on behalf of another of its clients.  *See* Exhibit 2(A1) to the Willner Declaration.   Furthermore, the Notice advised that the Stipulation is on file with the Court, and provided the contact information for Lead Counsel and a toll free number for Class members requiring additional information.

In light of Plaintiffs' Counsel's informed assessment of the strengths and weaknesses of the claims and defenses asserted, and the approval of the Settlement by the Class, as well as the analysis of the additional factors set forth below in Section IV, the Settling Lead Plaintiffs submit that the Settlement and Plan of Allocation are fair, reasonable and adequate.  Accordingly, the Settling Lead Plaintiffs respectfully request that the Court certify the Class for settlement purposes and grant final approval to the Settlement and Plan of Allocation.

## II.   HISTORY AND BACKGROUND OF THE ACTION

On June 3, 2002, a complaint was filed in this Court against Halliburton and certain of its then-current or former officers and directors, generally alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78, *et seq.*, and Rule 10b-5 promulgated thereunder, on behalf of a class who purchased or otherwise acquired the

4

common stock of Halliburton on the open market at artificially inflated prices and were damaged thereby. More particularly, plaintiffs alleged that Defendants knowingly or recklessly failed to disclose that in the fourth quarter of 1998, Halliburton changed its method of accounting for unapproved claims for cost overruns on long-term, fixed-price design, engineering, procurement and construction projects predominately performed overseas so as to record revenue on such claims when the expected recovery could not be reliably estimated, and that Defendants allegedly knew or recklessly disregarded that Halliburton's reported revenues were overstated due to the inclusion of the unapproved claim revenue (the "Contract Claims").

Subsequently, eighteen other similar actions were filed. By an Order dated August 12, 2002 (the "Consolidation Order"), the Honorable Samuel A. Lindsey consolidated eleven of the securities class actions that had been filed in the District Court for the Northern District of Texas, Dallas Division. At the same time, the consolidated cases were transferred to the Honorable David Godbey. Subsequently, by Joint Stipulation and Pretrial Order No. 1 ("Pretrial Order No. 1") dated December 5, 2002, the Court consolidated the remainder of the initially-filed eighteen actions under the caption *Moore, et al. v. Halliburton, et al.*

On April 11, 2003, pursuant to the terms of Pretrial Order No. 1, Lead Plaintiffs filed the Consolidated Amended Class Action Complaint, which alleged with greater specificity the Contract Claims. Pretrial Order No. 1 authorized Plaintiffs' Lead Counsel, S&B, to conduct settlement negotiations with Defendants. Lead Plaintiffs' Counsel has a direct representation relationship with only one of the four court-appointed lead plaintiffs, Private Asset Management. Each of the remaining three lead plaintiffs have direct representation relationships with other law firms, each of which was appointed as members of Plaintiffs' Executive Committee pursuant to Pretrial Order

5

No. 1. Effective on May 29, 2003, following lengthy settlement negotiations between and among Plaintiffs' Lead Counsel, plaintiff's counsel in the Derivative Action (defined in the Stipulation), and counsel for Defendants, the parties other than AMSF executed a written Memorandum of Understanding ("MOU") setting forth the principal terms of the Settlements of the Securities and Derivative Actions. Lead plaintiff AMSF did not sign the MOU and through Scott + Scott expressed their belief that the Settlement was not adequate.

Soon thereafter, on June 16, 2003, Plaintiffs' Counsel moved the Court to amend the Consolidated Amended Class Action Complaint – to file a Second Consolidated Amended Class Action Complaint (the "SCAC"). The SCAC generally alleges not only the Contract Claims, but also that: (i) Defendants failed to perform adequate due diligence in connection with Halliburton's 1998 merger with Dresser Industries, Inc. ("Dresser"); (ii) as a consequence of such failure, Halliburton acquired substantial, potential and actual, asbestos liability exposure; (iii) Defendants knowingly or recklessly failed to disclose until June 28, 2001 the true nature and scope of Halliburton's acquired asbestos liability exposure; and (iv) Defendants improperly accounted for the Dresser merger after it became effective by knowingly or recklessly overstating and failing to write down the value of the assets acquired from Dresser (collectively, the "Asbestos Claims").

In August 2003, two months after Plaintiffs' Counsel sought to amend the complaint, Scott + Scott, on behalf of a purchaser of 100 shares of Halliburton common stock, filed a putative federal securities class action against Defendants in this Court, captioned *Kimble v. Halliburton, et al.* (the "*Kimble* Action"). The complaint in the *Kimble* Action includes a class period of September 29, 1998 through July 24, 2002 and alleges the Contract Claims and the Asbestos Claims, as well as

other related allegations. On or about March 30, 2004, the Court consolidated the *Kimble* Action with this Action.

Prior to the filing of the *Kimble* Action, AMSF filed a motion with the Court to have Lead Plaintiffs' Counsel removed from that position on the grounds that Lead Plaintiffs' Counsel had not kept AMSF adequately informed of the settlement negotiations and requested that the Court appoint Scott + Scott as lead counsel. AMSF further argued in support of their motion that the Settlement was not fair, adequate and in the best interests of the proposed Class because Plaintiffs' Counsel did not properly value the settled claims. AMSF's further assertions were made without any formal discovery or access to the confirmatory discovery taken by the Settling Lead Plaintiffs. The Court denied AMSF's motion after a hearing on August 25, 2003, without prejudice. The Court noted that AMSF's arguments went primarily to the issue of the fairness of the Settlement, and that the Court would not have a sufficient understanding of the Settlement to properly evaluate the merits until the matter was formally put before it at a fairness hearing held for that purpose.[3]

On August 3, 2004, in conjunction with their opposition to the Settlement and its motion to be appointed lead counsel, Scott + Scott filed a motion for leave to file another putative federal securities class action against Defendants in this Court, captioned *Murphey v. Halliburton, et al.* (the "*Murphey* Action"). The complaint in the *Murphey* Action includes a class period of September 29,

---

[3] At the settlement preliminary approval hearing held on May 20, 2004 and in their Opposition to Motion for Preliminary Settlement Submission filed May 24, 2004, AMSF and plaintiff Kimble again raised the issue of the Settlement's adequacy and fairness. Judge Godbey rejected these arguments in preliminarily approving the Settlement.

1998 through December 7, 2001, and asserts the Contract Claims and the Asbestos Claims, as well as other related allegations.[4]

On August 11 and 16, 2004, Scott + Scott issued press releases soliciting Class members' objections to the Settlement and explaining the purported grounds for AMSF's objection. Scott + Scott's August 16, 2004 press releases advised Class members that they could object to the Settlement by completing a form on Scott + Scott's website and sending it to the firm by facsimile or e-mail. *See* Exhibit 4 to the Willner Declaration.

On August 12, 2004, putative class member Patricia A. Magruder submitted an objection to the Settlement and the proposed *Murphey* Action.

The Settling Lead Plaintiffs have entered into this Settlement with an understanding of the strengths and weaknesses of the claims asserted in the SCAC. This understanding is based on: 1) the investigation relating to the events and transactions underlying plaintiffs' claims, including, (a) review and analysis of the public filings made by Halliburton with the SEC; (b) review and analysis of Halliburton's public conference calls, as well as press releases and other public statements issued on behalf of Halliburton; and c) review and analysis of securities analysts' reports concerning Halliburton; and 2) extensive confirmatory discovery, consisting of: (a) the review and analysis of sworn deposition testimony of current and former Halliburton officers, directors and employees, and members of Halliburton's outside auditing firm during the Class Period, taken by members of the enforcement staff of the SEC's Ft. Worth, Texas Regional Office in connection with their investigation of the Contract Claims and related matters; (b) interviews with Burt Cornelison and

---

[4] No explanation has been provided regarding why Scott + Scott is simultaneously advocating two different class periods, each of which purportedly ends with a truthful disclosure regarding Halliburton's asbestos liability.

Charles Muchmore, current Halliburton employees regarding the contract claims and claims arising out of and relating to the Dresser merger; (c) review and analysis of the Halliburton documents marked as exhibits at the SEC depositions of Halliburton officers, directors, and employees; (d) review and analysis of documents produced to the SEC by Halliburton regarding the Contract Claims and other matters; (e) review and analysis of documents relating to the Dresser merger and related issues, including the Asbestos Claims; and (f) review and analysis of other publicly available information concerning Halliburton, including news articles. Based upon their consideration of all of these factors, the Settling Lead Plaintiffs and their counsel have concluded that the Settlement is fair, adequate, and reasonable, and that it is in the best interest of the Class to settle this Action on the terms described herein.

## III.   THE SETTLEMENT AND PLAN OF ALLOCATION

As detailed in the Notice, Defendants have caused six million dollars ($6,000,000) in cash to be paid into an interest-bearing escrow account maintained on behalf of the Class.[5] Upon approval of the Settlement and entry of an Order approving distribution, the Settlement Fund, less the costs of notice and administration of the Settlement and any fees and costs as the Court may award (the "Net Settlement Fund") shall be distributed to Class members who are not otherwise excluded and who timely submit valid Proof of Claim forms to the Claims Administrator ("Authorized Claimants") according to the Plan of Allocation.   If the total recognized claims (as discussed in the Notice) for all Authorized Claimants exceeds the Net Settlement Fund, each Authorized Claimant's share of the Net Settlement Fund will be determined based on the percentage that his or her

---

[5]   The Settlement was funded on July 1, 2003 and has been accruing interest for the benefit of the Class since that time.  Willner Decl. ¶ 4.

recognized loss bears to the total recognized losses for all Authorized Claimants. The Plan of Allocation is discussed in greater detail below in Section V.

## IV.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED BY THE COURT

### A.   The Law Favors and Encourages Settlements

Settlements are favored generally, and settlements of class actions are viewed especially favorably. *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement."); *Henderson v. Eaton*, No. 01-0138, 2002 U.S. Dist. LEXIS 20840, at *7 (E.D. La. Oct. 28, 2002) (same). *See also* Newberg & Conte, NEWBERG ON CLASS ACTIONS § 11.41 (3d ed. 1992). Indeed, some courts in this Circuit presume a class action settlement is fair. *See Purdie v. Ace Cash Express*, No. 3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547, at *16 (N.D. Tex. Dec. 11, 2003).

The basic issue before the Court is whether the proposed Settlement is fair, adequate, and reasonable. *See Ayers v. Thompson*, 358 F.3d 356, 368 (5th Cir. 2004). The Settlement must be in the interest of the Class, not unfairly impinge on the rights and interests of any dissenters, and in cases where it is an appropriate consideration, not merely dismantle oppression. *Id.* at 368-69. Courts in the Fifth Circuit are guided by six factors when determining whether a Settlement is fair, adequate, and reasonable is:

1.   the existence of fraud or collusion behind the settlement;

2.   the complexity, expense, and likely duration of the litigation;

3.   the stage of the proceedings and the amount of discovery completed;

10

4.      the probability of plaintiffs' success on the merits;

5.      the range of possible recovery; and

6.      the opinions of the class counsel, class represen-
tatives, and absent class members.

*Id.* at 369.[6]

Although the burden of proving the fairness, reasonableness and adequacy of the settlement rests with its proponents, *Free v. Abbott Labs.*, 953 F. Supp. 751, 754 (M.D. La. 1997), the Court should not "make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'" *Cotton*, 559 F.2d at 1330. *See also Williams v. Vukovich*, 720 F.2d 909, 922 (6th Cir. 1983) (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y. 1972)) ("A court may not withhold approval simply because the benefits accrued from the [settlement] are not what a successful plaintiff would have received in a fully litigated case."). Rather, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

> The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. . . . In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."

---

[6]  These factors are not exclusive; district courts may consider other relevant factors. *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 527 (N.D. Miss. 2003).

*San Antonio Hispanic Police Officers' Org. v. City of San Antonio*, 188 F.R.D. 433, 472 n.13 (W.D. Tex. 1999) (internal quotation marks and citation omitted).  In light of the circumstances, the Settlement proposed in this Action clearly falls within the "range of reasonableness."

Moreover, if the settlement was reached through arm's-length negotiations, the settlement is presumed fair.  *See Murillo v. Texas A&M Univ. Sys.*, 921 F. Supp. 443, 445 (S.D. Tex. 1996) (citing Newberg & Conte, NEWBERG ON CLASS ACTIONS § 11.42 (3d ed. 1992)).  *See also* 3B James Wm. Moore, *et al.*, MOORE'S FEDERAL PRACTICE ¶ 23.1.24[2] (2d ed. 1992);  Newberg & Conte, NEWBERG ON CLASS ACTIONS § 11.51 (3d ed. 1992).  In addition, the district court should not, in effect, try the case during the fairness hearing.  To do so would eviscerate one of the purposes of a settlement – namely, avoiding the delay and expense of a trial.  *See Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir. 1982); *see also Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971).

In this case, because it was reached through arm's-length negotiations, the Settlement is entitled to the presumption of fairness.  As explained in the accompanying Willner Declaration, the Settlement was negotiated by fully-informed and experienced counsel.  Throughout the settlement discussions, Plaintiffs' Lead Counsel and counsel for Defendants each vigorously advanced their respective claims and defenses.  Willner Decl. ¶¶ 50, 55.  In addition, the Settling Lead Plaintiffs were able to test the reasonableness and fairness of the Settlement through an extensive confirmatory discovery process.  Thus, this Settlement is entitled to the presumption of fairness.

Moreover, the Settlement satisfies each of the criteria set forth by the Fifth Circuit in *Ayers*. Indeed, in the judgment of Plaintiffs' Counsel, there is serious doubt that a more favorable monetary result could be obtained if this case were litigated through trial and the inevitable post-trial motions and appeals.

**B.     The Settlement Satisfies the Criteria for Approval**

**1.     Plaintiffs' Likelihood of Success, the Range of Possible Recovery, and the Relief Offered in the Settlement**

Arguably, the most significant factor for the Court's assessment of the Settlement is the Action's likelihood of success on the merits. In other words, "'If the settlement offer was grossly inadequate . . . it can be inadequate only in light of the strength of the case presented by the plaintiffs.'" *Parker*, 667 F.2d at 1209 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974)).

The adequacy analysis is a three-step process:

1.     The district court must evaluate the likelihood that plaintiffs will succeed at trial.

2.     The district court must establish the range of possible recovery if plaintiffs succeeded at trial.

3.     Using the likelihood of success as a guide, the district court must establish the level above which the settlement is fair and adequate.

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981).

While the Settling Lead Plaintiffs believe they have a triable case, they also are aware that there are issues in the Action that, given the uncertainties of litigation, might prevent the case from ever getting to trial. Plaintiffs faced a considerable risk that the Contract Claims would be dismissed on a Rule 12(b)(6) motion by Defendants for failure to plead the necessary elements of materiality, loss causation, and scienter, and that the Court would find that the Asbestos Claims were time-barred.

### a.    The Contract Claims

With respect to loss causation, Defendants asserted that the Class suffered no discernible damages stemming from the Contract Claims.[7] The SCAC alleges that Defendants violated generally accepted accounting principles ("GAAP") by failing to disclose that in the fourth quarter of 1998, Halliburton changed its long-standing accounting policy of recognizing as losses cost overruns on fixed price construction contracts that had not been agreed to by its customers and began recognizing some cost overruns as revenue. The SCAC further alleges that this undisclosed accounting change and its effect on Halliburton's reported revenues were revealed for the first time by an article published in the *New York Times* on the morning of May 22, 2002. On May 22, 2002, the market price of Halliburton common stock *increased* by $0.57 per share over its previous closing price, thus potentially undermining, as Defendants argue, any inference that the allegedly undisclosed accounting change and revenue recognized pursuant to this change were material to investors.

While the Settling Lead Plaintiffs believe they could have established loss causation for pleading purposes by pointing to the 3.3% drop in the price of Halliburton's common stock following the Company's May 28, 2002 disclosure concerning the SEC's initiation of an investigation of Halliburton, there exists a substantial uncertainty regarding whether Plaintiffs would have ultimately prevailed at trial.[8] Defendants were likely to argue that the 3.3% drop in the price

---

[7]  "The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted." *Huddleston v. Herman and MacLean,* 640 F.2d 534, 549 (5th Cir. 1981).

[8]  On May 28, 2002, the last day of the Class Period, Halliburton disclosed after the market close that the SEC had begun "a preliminary investigation of the Company's accounting treatment of cost overruns for construction jobs." On August 3, 2004, the SEC announced that it had concluded its investigation. The SEC

14

of the Company's stock reflected the market's concern about the SEC's investigation of Halliburton and does not establish that plaintiffs purchased Halliburton common stock at prices that were artificially inflated by the alleged misstatements and omissions.[9]

There was also the risk of defeat on the loss causation issue at the summary judgment stage of the proceedings. Absent the Settlement, plaintiffs would have been required to submit an expert report to establish that any losses suffered by investors in Halliburton stock were caused by the alleged misrepresentations and omissions. Given the factual shortcomings with respect to loss causation described above and the uncertainties inherent in expert testimony, plaintiffs faced a serious risk that their case would be dismissed on a motion for summary judgment. *See In re Zonagen, Inc. Sec. Litig.*, No. H-98-0693, 2003 U.S. Dist. LEXIS 25594, at *48 (S.D. Tex. June 13, 2003) (granting summary judgment where plaintiffs' expert report was insufficient to establish loss causation as a matter of law).

---

did not find any errors or fraud in Halliburton's accounting, and Halliburton was not required to restate any of its previously issued financial statements. The SEC found, however, that Halliburton should have disclosed its accounting treatment of cost overruns on fixed-price construction contracts prior to March 14, 2000 when the Company issued its Form 10-K for 1999 ("1999 10-K"). The SEC imposed a $7.5 million fine against Halliburton for failing to cooperate fully with the SEC's investigation. *See* Willner Decl. Footnote 6.

[9]   In the *Kimble* and *Murphey* Actions, Scott + Scott's clients assert a variety of accounting related allegations in addition to the Contract Claims included in the SCAC. However, only the Contract Claims were ever disclosed to the public and investigated by the SEC, and Halliburton has not restated its financial results as a result of any accounting impropriety alleged in the *Kimble* or *Murphey* Actions. In fact, there has not been any disclosure by the Company, securities analysts, or the media that recognizes the other accounting fraud theories advanced by Kimble and Murphey, and, as a result, there could not possibly be a drop in the price of Halliburton's stock that could be linked to this alleged misconduct in either of the inconsistent class periods they advocate. Thus, even if Scott + Scott's clients were able to sufficiently plead material misrepresentations and scienter with respect to these additional accounting allegations, they would be unable to plead the necessary element of loss causation.

Even if plaintiffs were able to establish loss causation, plaintiffs would have also had to raise a strong inference that Defendants issued the allegedly misleading statements and financial results with fraudulent intent, or scienter, to get past a Rule 12(b)(6) motion. In private securities actions brought under the Exchange Act, plaintiffs face the considerable hurdle of pleading scienter in compliance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") without the benefit of discovery. *See, e.g., Goldstein v. MCI Worldcom*, 340 F.3d 238, 259 (5th Cir. 2003) (upholding dismissal of securities fraud complaint on Rule 12(b)(6) motion for failing to raise a strong inference of defendants' scienter).

In the case at bar, only two of the four individual defendants sold any shares of their personally held Halliburton stock during the Class Period, and the Settling Lead Plaintiffs recognize the difficulty inherent in proving that the selling was suspicious enough in timing or amount to establish an inference of these defendants' scienter. Even if these allegations established a motive for the alleged fraud, motive and opportunity allegations, standing alone, are not enough to establish scienter in the Fifth Circuit. *Id.* at 246. Moreover, Defendants disclosed in Halliburton's 1999 10-K that the Company, in some instances, was recognizing cost overruns on fixed price contracts as revenue, and disclosed the amount of this revenue for years 1998 and 1999. *See* Willner Decl. ¶ 10. In settlement discussions, Defendants consistently raised the point that these facts would undermine any inference of scienter, because Defendants never would have made such disclosures in the 1999 10-K if their true intent was to report inflated revenues pursuant to an undisclosed accounting change.

Proving Defendants' fraudulent intent also would have been difficult. Through confirmatory discovery, including review of SEC deposition transcripts, Settling Lead Plaintiffs learned that

16

Halliburton had only a few fixed price contracts before 1998 and had in some instances recognized unresolved claims revenue on these contracts. Therefore, the Company could colorably argue that it did not change its revenue recognition policy in 1998 as alleged, but rather, as the Company began entering into more fixed price contracts beginning in the fourth quarter of 1998, the issue simply became more prevalent. As Halliburton took on more fixed price contracts in 1998 this revenue increased, but Defendants have strongly asserted that the amount was still not material. As a result, Halliburton, with the knowledge of its outside auditors, chose not to separately disclose this revenue until March 14, 2000 with the issuance of the 1999 10-K. In addition, Defendants have also argued that the recognition of unresolved contract claims as revenue is permissible under GAAP so long as collection is deemed probable. In fact, an independent study of Halliburton's revenue recognition practices during the periods in question by accounting firm KPMG found Halliburton's accounting methodology to be in conformity with GAAP. These facts would have made it difficult for plaintiffs to prove Defendants' fraudulent intent. *See* Willner Decl. ¶ 43.

### b.      The Asbestos Claims

During preparation of the first amended complaint, Plaintiffs' Lead Counsel discovered the existence of potential securities claims (the Asbestos Claims) concerning Defendants' incomplete disclosures related to Halliburton's increased asbestos liability exposure resulting from its merger with Dresser. The Settling Lead Plaintiffs alleged in the SCAC, which was filed with the Court on June 16, 2003, that it was not until June 28, 2001 that Halliburton revealed the true extent of its exposure to asbestos claims then pending against Dresser's former subsidiary, Harbison-Walker. [10]

---

[10] The motion for leave to file the SCAC was filed on June 16, 2003. However, the Court did not grant leave to file until January 28, 2004.

Defendants have consistently asserted that the Asbestos Claims are barred by the applicable statute of limitations because such claims were not brought within one year of their discovery, *i.e.*, the claims were not filed prior to June 28, 2002. Willner Decl. ¶¶ 25, 46. In light of the statute of limitations argument raised by Defendants, the Settling Lead Plaintiffs have opted to settle the Asbestos Claims along with the Contract Claims, to avoid the considerable risk of no recovery on these claims. *Smith v. Crystian*, No. 03-60339, 2004 U.S. App. LEXIS 4955 (5th Cir. Mar. 16, 2004) (holding settlement not inadequately low where statute of limitations would possibly bar some claims).

Like the *Kimble* action, the *Murphey* Action seizes on this theory of liability set forth in the SCAC. It would be unfair to say, however, that the *Murphey* Action contains no new allegations, as this complaint asserts for the first time that from September 12, 2001 through December 7, 2001 the Company failed to disclose that a Texas state court jury had returned a $130 million verdict against the Company in favor of five asbestos plaintiffs.[11] *See* Halliburton press release dated October 30, 2001, and Forms 8-K filed on November 29, 2001, and December 5, 2001, attached as Exhibit 5 to the Willner Declaration. Specifically, the *Murphey* Action alleges that Defendants were obligated to immediately disclose the jury verdict rendered against Dresser on September 12, 2001. The *Murphey* Action further alleges that on an October 23, 2001 conference call with analysts to discuss the Company's third quarter 2001 results, an analyst asked defendants Foshee and Lesar to comment on the Company's "settlements related to asbestos." In response to this question, defendant Foshee stated that there was "not anything new to report" and defendant Lesar stated that

---

[11] The *Murphey* complaint is internally inconsistent with respect to the amount of the September 12, 2001 jury verdict, sometimes contending it was for $130 million, and other times stating the verdict was for $65 million. In actuality, the verdict was for $65 million.

there were "no adverse developments at all with respect to Harbison-Walker situation." Murphey alleges that in light of the failure to disclose the Texas jury verdict, these statements were materially false and misleading.

Despite all their bluster, these last minute *Murphey* Action allegations are unsustainable and do not warrant rejection of the Settlement before the Court. Indeed, until now, not a single plaintiffs' firm in the entire securities bar filed claims based on these *Murphey* allegations, because they are not viable. Even Scott + Scott, after conducting their own independent investigation of Halliburton since May 2003 and after filing the 162-page *Kimble* Action, have only now come up with this purportedly "novel" theory of liability.[12]

However, it is abundantly clear from the conference call transcription set forth in the *Murphey* complaint that Defendant Foshee's and Lesar's comments of October 23, 2001 did not even concern jury verdicts. Instead, their comments in response to an analyst's specific question, were solely related to new asbestos claims *filed* in the third quarter of 2001 and Halliburton's actual and pending *settlements* of asbestos claims. Thus, when taken in their proper context, Foshee's and Lesar's comments were neither false nor misleading.

Furthermore, as set forth in the *Murphey* Action, the September 2001 $65 million verdict was not entered as a judgment by the Texas state court until November 29, 2001, and the Company publicly disclosed the entry of the judgment in a Form 8-K filed December 4, 2001. In response to the Company's December 4, 2001 disclosure, the price of the Company's common stock increased

---

[12]   The *Kimble* Action alleged that Defendants' misrepresentations concerning the Company's asbestos liability exposure continued until July 24, 2002. The *Murphey* Action dramatically shortens this previously alleged class period by more than seven months, contending that the truth came out on December 7, 2001. These inconsistencies demonstrate the futility of the *Kimble* and *Murphey* Actions.

on December 5, 2001. Thus, even under the *Murphey* Action's theory of liability, when defendant Lesar's October 23, 2001 "misstatement" was corrected, the market did not react adversely, making it extremely difficult for a plaintiff to establish the required Section 10(b) element of the materiality of the allegedly misleading statement.

Further undermining the viability of any claim stemming from the conference call statements, Defendants did not have a duty to disclose the September 12, 2001 jury verdict when it was rendered. Item 103 of Regulation S-K (17 C.F.R. § 229.103), requires companies to report pending litigation meeting certain criteria relating to materiality. The regulation states:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought.

17 C.F.R. § 229.103. Instruction number 2 to this regulation states: "No information need be given with respect to any proceeding that involves primarily a claim for damages if the amount involved, exclusive of interest and costs, does not exceed 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis." Assuming that the suit was not "ordinary routine litigation incidental to the business," *Murphey* fails to allege that Halliburton was required by federal regulation to disclose the verdict because the verdict exceeded the 10% of current assets materiality threshold of § 229.103. Indeed, *Murphey* fails to provide any information regarding Halliburton's current assets at the time the verdict was rendered because $65 million did not even come close to exceeding 10% of Halliburton's then-current assets. Thus, Halliburton was not required to disclose

the September 12, 2001 jury verdict absent any affirmative statements by Defendants related to that particular litigation.

In addition, the significant drop in the price of Halliburton's common stock on December 7, 2001 that ends the class period in the *Murphey* Action was not caused by the correction of Defendants' allegedly misleading statements of October 23, 2001. On December 7, 2001, several analysts issued reports that downgraded Halliburton common stock in light of the Company's December 7, 2001 announcement of a $30 million verdict rendered against Dresser by a Maryland jury on December 5, 2001. Willner Decl. ¶ 66. This December 7, 2001 announcement by the Company followed its December 4, 2001 announcement regarding the Texas judgment and an earlier announcement by the Company on October 30, 2001 that a Mississippi jury had entered a $21.25 million verdict against Dresser on October 26, 2001. Willner Decl. ¶ 68. Thus, the drop in Halliburton's stock price on December 7, 2001 was caused by the market's reaction to multiple recent jury verdicts against Halliburton. It was not any particular jury verdict that led to the resulting analyst downgrades issued on December 7, 2001, but rather it was the fact that analysts were beginning to view this as a trend which could negatively impact the Company. *See* securities analyst reports dated December 7, 2001, attached as Exhibit 6 to the Willner Declaration. In sum, these additionally new allegations of disclosure failure cannot support a securities law violation and should not serve to overcome an otherwise fair, reasonable and adequate settlement.

### c.   Proving Damages

Additionally, even if plaintiffs were to overcome the aforementioned obstacles and successfully establish Defendants' liability, plaintiffs would still be required to prove damages. *See, e.g., Alvarado v. Memphis-Shelby County Airport Auth.,* Nos. 99-5159, 99-5162, 2000 U.S. App.

LEXIS 21259, at *17 (6th Cir. Aug. 15, 2000) (highlighting risk of proving damages in assessing and approving settlement). Defendants have argued that plaintiffs' damage estimates are unprovable and that the damages suffered by the Class, if any, are minimal at best. While Plaintiffs' Counsel believe that there is some basis for an expert to opine on the measure and amount of total damages, substantial obstacles still remain. First, the Court must determine that plaintiffs' damages model is admissible, and only then may a jury determine whether plaintiffs' or Defendants' model is more accurate. The Class is by no means assured of a ruling in its favor. *See, e.g., Kaufman v. Motorola, Inc.*, No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627 (N.D. Ill. Sept. 21, 2000) (precluding in part plaintiffs' expert testimony).

It is then possible that, in the unavoidable "battle of experts," a jury might disagree with the Class's expert, or merely find Defendants' expert more persuasive. *See, e.g., Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000) (stating jury can believe whichever expert it finds more credible). As a result of the aforementioned considerations, the Class's likely recovery, even assuming it prevailed on the liability issues discussed above, is highly speculative.[13]

The Settling Lead Plaintiffs recognize that, in light of the difficulties they faced in successfully pleading and proving Defendants' liability, and the difficult task of proving damages, success in this litigation was far from assured, and believe that the proposed Settlement, the payment of $6 million plus accrued interest, is fair, reasonable, and adequate. *See Smith*, 2004 U.S. App. LEXIS 4955, at *6 (holding that district court properly approved settlement, when settlement was compared to relief available after full litigation, discounted by risk of losing). This recovery

---

[13] Of course, decisions concerning the inevitable post-trial motions and appeals could also negatively impact the scope of recovery by the Class.

22

represents approximately 5.13% of Plaintiffs' damages calculation of $117,010,994. Under the circumstances, the Settlement is an excellent result, which may not ultimately be duplicated or matched many years down the road, at the conclusion of lengthy and costly litigation, including a full trial and post-trial appeals. *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 434 n.7 (S.D. Tex. 1999) (noting various studies showing recoveries of between 4% and 14% of damages) (citation omitted); *See In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 498 (N.D. Miss. 1996) (approving $27 million settlement for "damage calculations in the range of several hundreds of millions of dollars"); *see, e.g., Kurzweil v. Philip Morris Cos., Inc.*, Nos. 94 Civ. 2373 (MBM), 94 Civ. 2546 (BMB), 1999 U.S. Dist. LEXIS 18378, at *4 (S.D.N.Y. Nov. 30, 1999) (noting that academic studies conclude that average damages recoveries in securities class actions are 7% to 15%); *see also* Ethan G. Zelizer, *The Sarbanes-Oxley Act: Accounting for Corporate Corruption?*, 15 Loy. Consumer L. Rev. 27, 53 (2002) ("Over the last 12 years, the average securities class-action lawsuit has settled for 12 cents on the dollar, not taking into account attorneys' fees." (citing Walter Hamilton, *Bill Offers Little to Defrauded Investors*, L.A. TIMES, July 26, 2002, at 2D)).

Therefore, Plaintiffs respectfully submit that this Court should find that this factor favors approval of the Settlement.

### 2.    The Absence of Fraud or Collusion

This factor focuses on the nature of the parties' settlement negotiations and inquires into whether the negotiations were free from fraud and collusion. The negotiations are presumed free of fraud or collusion unless affirmative evidence indicates otherwise. *Purdie*, 2003 U.S. Dist. LEXIS 22547, at *17-*18 (rejecting claim of fraud or collusion as "long on speculation [but] short on

evidentiary support."). *See also* Newberg & Conte, NEWBERG ON CLASS ACTIONS § 11.51 (3d ed.1992).

Here, nothing suggests fraud or collusion. Even though Scott + Scott asserts that the Settlement is not fair, reasonable and adequate, even it does not suggest that the negotiations were not arms' length. Plaintiffs' Counsel has submitted an unrebutted Declaration that the negotiations were at arms' length. Willner Decl. ¶ 50. The settlement negotiations were at arms' length and took place over the course of many weeks, and also involved Derivative Counsel. During that time, counsel for both sides strenuously advocated their respective positions, and the parties ultimately negotiated a fair and reasonable compromise that yields a significant recovery for Class members now.[14]

In addition, if the terms of the proposed settlement are fair, courts generally will assume the negotiations were proper. *See Corrugated Container*, 643 F.2d at 212. In addition, the Settlement is objectively fair in that it does not favor any party or sub-group of class members over any other party or sub-group of class members. Therefore, the Court may presume that there was no fraud or collusion in reaching the Settlement.

---

[14] Pursuant to Pretrial Order No. 1, Plaintiffs' Lead Counsel took the lead in settlement negotiations with defense counsel. After several weeks of negotiations, Plaintiffs' Lead Counsel and defense counsel were able to reach an agreement in principle to settle the Action for $6 million. However, Plaintiffs' Lead Counsel explained to opposing counsel that the signing of the MOU was contingent on approval by the Lead Plaintiffs. All Lead Plaintiffs, with the exception of AMSF, approved the proposed settlement. Plaintiffs' Lead Counsel committed almost two months to communicating with Scott + Scott, to explain why the proposed settlement was in the best interest of the Class and to try to understand why AMSF opposed it. Ultimately, with three of four Lead Plaintiffs in favor of the Settlement and AMSF unable to articulate why the Settlement was unreasonable, Plaintiffs' Counsel executed the MOU. *See* Willner Decl. ¶¶ 25-28. As explained in Section IV.B.5 below, in the context of a class action, class counsel's responsibilities are to the Class and not its particular clients. Consequently, it is appropriate to recommend a settlement over the objection of a lead plaintiff if the settlement is fair, reasonable, and adequate.

**3.    The Complexity, Expense, and Likely Duration of Litigation**

Courts have consistently held that the expense and possible duration of litigation are significant factors to be considered in evaluating the reasonableness of a settlement. *See Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 942, 959 (E.D. Tex. 2000) (stating settlement serves purpose of avoiding costs and time of continued litigation); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 371 (S.D. Ohio 1990) (approving settlement and considering that less than one year into litigation, attorney time had already reached $1,000,000 and expenses already exceeded $100,000).

The claims advanced on behalf of the Class involve numerous complex legal and financial issues, requiring extensive expert testimony, which would have certainly added considerably to the expense and duration of the litigation.  In addition, because this case is settling prior to full discovery, motions for dismissal and summary judgment, and trial preparation, there is no question that continued litigation would greatly increase the expense and duration of this action. *See* Willner Decl. ¶¶ 51-52.

Moreover, even if the Class could recover a larger judgment after trial (which is doubtful in light of the questions surrounding liability and the nature and extent of damages), the additional delay through trial, post-trial motions and the appellate process could deny the Class any recovery for years. *See In re Aetna Inc. Sec. Litig.*, No. 1219, 2001 U.S. Dist. LEXIS 68, at *22 (E.D. Pa. Jan. 4, 2001) (risk of delay could have deleterious effects on future recovery).  Avoiding this unnecessary expenditure of time and resources clearly benefits all parties and the Court.

Thus, continued litigation would be complex, time consuming and expensive with a substantial likelihood that, even if plaintiffs ultimately prevail on liability, the Class would not recover a significantly greater amount than the amount presently provided for in the proposed Settlement. Furthermore, the Settlement secures for the Class an immediate benefit undiminished by further expenses, and without the delay, risk and uncertainty of continued litigation. Therefore, this Court should find that this factor also favors the proposed Settlement.

### 4.    The Stage of the Proceedings and the Amount of Discovery Completed

These factors focus on the amount of information available to Settling Lead Plaintiffs when they agreed to the Settlement. Although, hypothetically speaking, counsel in a given case may lack all of relevant information necessary to evaluate a proposed settlement, ultimately the amount of information available to counsel is less important than the terms of the settlement itself. "In general, . . . a settlement should stand or fall on the adequacy of its terms." *Corrugated Container*, 643 F.2d at 211.

These factors also touch upon Settling Lead Plaintiffs' responsibility to provide the Court with sufficient information to evaluate the Settlement:

> There is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact. It is clear that the court need not possess evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation. At a minimum, the court must possess sufficient information to raise its decision above mere conjecture.

Newberg & Conte, Newberg on Class Actions § 11.45 (3d ed. 1992).

The volume and substance of Plaintiffs' Counsel's knowledge of this case are unquestionably adequate to support the settlement. As detailed in the Willner Declaration, prior to filing the initial

26

complaint, plaintiffs obtained and reviewed public filings, annual reports, and other public statements, and hired an investigator to locate and interview former Halliburton employees. *See* Willner Decl. ¶¶ 40, 54. In addition, pursuant to the terms of the MOU, Plaintiffs' Counsel conducted confirmatory discovery, including the interview of Halliburton's General Counsel, Burt Cornelison, who was also informally interviewed during the negotiation process, and defendant Charles Muchmore. Plaintiffs' Counsel also analyzed tens of thousands of documents produced by Defendants, including documents produced by Halliburton to the SEC, as well as the transcripts of depositions conducted by the SEC. *See* Willner Decl. ¶¶ 40, 55. Furthermore, the parties engaged in several negotiations and discussions of the merits of the Action. *See* Willner Decl. ¶¶ 25, 26, 48, 50, 55. All of the aforementioned provided the parties with a strong basis to assess the strengths and weaknesses of their respective cases and their positions on liability and damages.

This litigation has clearly advanced to a stage where the Court possesses sufficient information "to raise its decision above mere conjecture." The parties have a very clear view of the strengths and weaknesses of their cases, especially in light of the challenges to the adequacy of the Settlement posed by AMSF. *See Dun & Bradstreet*, 130 F.R.D. at 372 (finding litigation sufficiently advanced for parties to evaluate respective positions despite no ruling on motions to dismiss or for class certification, and discovery could be characterized as "fairly extensive"). Therefore, plaintiffs respectfully submit that this Court should find that this factor also favors the Settlement.

> **5.     The Opinions of Class Counsel, Class Representatives, and Absent Class Members**

To determine whether to approve a class action settlement, "the court 'is entitled to rely upon the judgment of experienced counsel for the parties.'" *Batchelder*, 246 F. Supp. 2d at 530 (quoting

*Cotton*, 559 F.2d at 1330). "The greater experience that class counsel possesses, the greater weight a court tends to attach to counsel's opinions on fairness, adequacy, and reasonableness." 5 James Wm. Moore, *et al.*, MOORE'S FEDERAL PRACTICE ¶ 23.85[2] (3d ed. 2002). Counsel in this case have extensive experience in complex securities class actions, and therefore counsel's opinion that this Settlement is fair, adequate, and reasonable is entitled to significant weight.

The reaction of the Class, other than putative Class member Patricia Magruder and those Class members represented by Scott + Scott, underscores the propriety of the Settlement and assures that this Court should approve the Settlement. Pursuant to the Preliminary Approval Order, copies of the Notice were mailed to approximately 869,000 potential Class members. Willner Decl. ¶ 78; DiGiovanni Aff. ¶ 8. The Notice describes the nature and procedural history of the Action, and the terms of the Settlement. *See* Willner Decl. Ex. 2. Despite repeated efforts by Scott + Scott to garner support for their clients' objection through press releases and statements to the media, *as of the date preceding the filing of this Memorandum, only one Class member, other than those represented by Scott + Scott, has objected to the Settlement.*[15] Willner Decl. ¶ 75.

Indeed, while they should certainly be taken seriously by the Court, objections to the Settlement by some Class members, and even lead or named plaintiffs, does not preclude approval of the Settlement. *See In re BankAmerica Corp. Sec. Litig.*, 350 F.3d 747 (8th Cir. 2003) (affirming judgment approving settlement despite objections by some lead plaintiff group members); *In re Digital Lightwave Inc. Sec. Litig.* No. 98-152-CIV-T-24E (M.D. Fla. Apr. 30, 1999) (approving settlement over objection of one of lead plaintiffs) (attached to the Willner Decl. as Ex. 9); *Ayers*,

---

[15] AMSF's, Kimble's, and Murphey's objection is addressed in Section IV.B.6, *infra*. The objection filed by Class member Patricia Magruder is addressed in Section IV.B.7, *infra*.

28

358 F.3d at 373 ("Our jurisprudence, however, makes clear that a settlement can be approved despite

opposition from class members, including named plaintiffs.") (citing *Reed v. General Motors Corp.,*

703 F.2d 170, 174-75 (5th Cir. 1983) (affirming district court's approval of settlement despite "the

objections of twenty-three of twenty-seven named plaintiffs and nearly forty percent of the 1,517

member class")); *Parker,* 667 F.2d at 1207-08, 1214 (affirming district court's approval of

settlement of class action suit even though ten of eleven named plaintiffs opposed settlement); *see*

*also Cotton,* 559 F.2d at 1331 ("A settlement can be fair notwithstanding a large number of class

members who oppose it.");

> **6.      The Objection Submitted By Movants Does Not
> Provide Sufficient Basis For This Court to
> Conclude that the Settlement Is Not Fair,
> Reasonable and Adequate**

Lead Plaintiff AMSF and putative Class members John Kimble and Ben Alan Murphey

(collectively, "Movants") have asked the Court to take the extraordinary steps of extending the

opt-out deadline, denying final approval of the Settlement, and permitting Movants to file an

additional complaint against Defendants. They also seek to replace S&B as lead counsel. These

measures are all unwarranted, the motion should be denied, and to the extent the Court treats

Movants' papers as an objection, the objection should be overruled.

The basic thrust of Movants' position is that they have information that supports

additional claims against Halliburton that Plaintiffs' Counsel and the Settling Lead Plaintiffs

have failed to discover or disclose to the Class. This is the same argument that AMSF presented

to the Court one year ago, and Movants have provided no reason for this Court to revisit Judge

29

Godbey's decision.[16]  As set forth in Section IV.B.1, the *Kimble* complaint, and most recently, the *Murphey* complaint, fail to set forth new allegations that are sufficiently pled to meet the pleading and evidentiary requirements of the federal securities laws.  Movants simply want to rehash old issues.  If they believe they can obtain a larger recovery than the Settlement provides, they have the right to opt out of the Class Settlement and to pursue their own litigation against Defendants.    Notably,  however,  Movants  have  not  opted-out,  but  instead  have  curiously requested that the Class' time to opt-out be extended.

Movants fail to present either case law or a rational argument supporting such an action by the Court.  First, the cases Movants cite, *In re Vitamins Antitrust Class Actions*, 327 F.3d 1207 (D.C. Cir. 2003) (upholding district court's decision to permit late filing of request for exclusion based on finding that failure was due to excusable neglect), and *Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994) (remanding to district court for reconsideration of one class member's request for extension of opt-out period for one class member who received Notice after opt-out deadline), do not support Movants' request.   In each of those cases, the Court granted, or considered granting, an extension to the opt-out deadline to *one Class member for a specific reason.*   In this case, Movants request an extension of the opt-out deadline *for every Class*

---

[16]   AMSF filed a Motion for an Order to Show Cause seeking to replace Plaintiffs' Lead Counsel, S&B, with its counsel, Scott + Scott, because of a purported dissatisfaction with the Settlement in light of the evidence it claimed to have against Halliburton.  Plaintiffs' Lead Counsel have repeatedly requested the information AMSF alleges supports a greater recovery.  *See, e.g.*, August 12, 2003 letter from Richard S. Schiffrin to Arthur L. Schingler, III of Scott + Scott (requesting information that AMSF believed would force Lead Plaintiff to re-evaluate the settlement).  The only response Plaintiffs' Lead Counsel received to these requests at that time - which they received through the press - was that the SCAC should have named Vice President Cheney as a defendant. *See* Willner Decl. Ex. 7.  Now, two complaints later, Movants have failed to name Vice President Cheney as a defendant, thus demonstrating that their objection was groundless from the beginning.  Movants' failure to cooperate with Plaintiffs' Counsel, and to timely come forward with supporting evidence, significantly weakens their assertions that the Settlement is inadequate.

*member*, which in order to be effective, would require a repeat of the Notice process and cost hundreds of thousands of dollars, to the detriment of the Class. The circumstances of *In re Vitamins* and *Silber* can hardly be analogized to the case at bar.

In addition, the Notice provides sufficient information to evaluate the Settlement, and to make a decision to opt-out. Notice was widely distributed, to over 869,000 persons and entities, beginning on June 21, 2004 and published in *The Wall Street Journal* on June 24, 2004.[17] For those Class members who required additional information, Plaintiffs' Lead Counsel provided its own phone number for Class members to call, as well as a toll free number that Class members were able to call to obtain additional information about the Settlement. Additional negative information concerning the Settlement was provided to the media by Movants through press releases. *See* Willner Decl. Ex. 4. In fact, Scott + Scott has been practically begging Class members in unauthorized communications (*see* Rule 23(e)) to join in its clients' objections. As of the date of the filing of these papers, the actual deadline for opting-out, only 77 Class members have submitted requests for exclusion and none have specifically referred to Scott + Scott's activities as a reasonable for their decision to opt-out.[18] This number demonstrates, on the one hand, that a fair number of people have understood the Notice and determined that they do not want to participate, though it indicates that a minuscule percentage of the Class is dissatisfied with the Settlement. *See* Section IV.B.5 above.

---

[17] As a result, Class members have had 59 days to consider the Settlement and an ample opportunity to opt-out.

[18] Not all of these requests are effective because some failed to include the information required by the Notice.

31

Furthermore, Movants fail to explain the good that extending the opt-out deadline would serve. Movants themselves clearly do not want to participate in this Settlement. Therefore, their best remedy is to file a request for exclusion now, and be excused from participating in the Settlement. If the Settlement is not approved, as Movants demand, the request for exclusion has no force or effect and Movants, as well as all of the other Class members who sought exclusion, share the same status as the remainder of the absent Class members as purported members of a Class that has not even been certified. If the Settlement is approved, Class members who have submitted requests for exclusion will not be prejudiced by the Settlement because they will have preserved their rights to pursue their own litigation.

Therefore, the Settling Lead Plaintiffs respectfully submit that this Court should deny Movants' motion in all respects, and to the extent that this Court considers the motion to be an objection to the Settlement, overrule the objection.

### 7. The Objection Submitted By Patricia Magruder Does Not Provide Sufficient Basis For This Court to Conclude that the Settlement Is Not Fair, Reasonable and Adequate

In her objection filed August 12, 2004, Ms. Magruder, a purchaser of 200 shares of Halliburton common stock, contends that the Settlement is inadequate.[19] This contention is based on her belief that 1) in light of the size of Halliburton's ultimate payments with respect to asbestos related claims, Defendants' disclosures regarding the Company's asbestos liability exposure were insufficient and 2) in light of Halliburton's payment of a $7.5 million fine to the

---

[19] Ms. Magruder also objects to the *Murphey* Action because she would not be included in the class proposed by Murphey.

SEC related to the SEC's investigation of Halliburton's accounting methods and disclosures, the Settlement should be approximately $15 million.

In support of her objection, Ms. Magruder argues that Halliburton's disclosures regarding its asbestos liability exposure were somehow incomplete, but does not even indicate which of the Company's numerous disclosures she takes issue with, let alone how these disclosures were misleading. Her contentions with respect to the Contract Claims fare no better. Based on the outcomes of a completely unrelated securities class action and SEC prosecution involving Bristol-Myers Squibb, Ms. Magruder concludes that the Settlement in this action should be twice as much as the $7.5 million fine Halliburton paid to the SEC. As already noted herein, the SEC fine was not levied against Halliburton for violations of securities regulations, but rather for its failure to cooperate fully with the SEC's investigation. Moreover, even if the SEC fine is this case was germane, the fines the SEC is able to collect from defendants should have no bearing on the adequacy of settlements in securities class actions brought by investors. Simply put, Ms. Magruder's unfounded conclusions cannot form the basis of a cognizable objection to the Settlement.

## V.     THE PLAN OF ALLOCATION OF THE SETTLEMENT FUND IS FAIR AND REASONABLE AND SHOULD BE APPROVED

The approval of a plan of allocation of settlement proceeds under Federal Rule of Civil Procedure 23 and is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable, and adequate. *Dartley v. Ergobilt, Inc.*, No. 3:98-CV-1442-M, 2002 U.S. Dist. LEXIS 23359, at *4 (N.D. Tex. Dec. 5, 2002). Generally, "a plan of allocation that reimburses class members based on the type and

33

extent of their injuries is reasonable." *In re Ikon Office Solutions Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000); *see also In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 435 n.48 (S.D. Tex. 1999) (approving plan of allocation that gave different rates of recovery based on extent of injury).

The Plan of Allocation (the "Plan") was fully disclosed in the Notice and appropriately affords varying degrees of recovery based on when putative Class members bought and sold their Halliburton common stock. *See* Willner Decl. ¶¶ 82-83. As of the date preceding the filing of this Memorandum, there have been no objections to the Plan. Willner Decl. ¶ 83. The Loss Amounts under the Plan are based on the level of artificial inflation in the price of Halliburton common stock, as determined by Lead Plaintiffs' Counsel in consultation with a damages expert. Differences in treatment of Class members are made solely with respect to the timing of transactions. Overall, if the total recognized losses for all Authorized Claimants exceeds the Net Settlement Fund, each Authorized Claimant's share of the Net Settlement Fund will be determined based upon the percentage that the recognized loss bears to the total recognized losses for all Authorized Claimants. Courts view favorably such plans of allocation. *See, e.g.*, *Ikon*, 194 F.R.D. at 184 (finding similar plan reasonable). Plaintiffs' Counsel believe that the Plan is fair and reasonable to all Class members and recommend that it be approved.

The Plan of Allocation is based on the artificial inflation which was removed from the value of the stock upon the two significant disclosures during the Class Period - June 28, 2001 and May 28, 2002. On June 28, 2001, Halliburton issued a press release announcing that Harbison-Walker had requested that Dresser provide Harbison-Walker with claims management and financial assistance for asbestos claims Harbison-Walker assumed when it was spun-off from

34

Dresser in 1992. The press release also stated that if Halliburton determined that it was in the best interest of the Company to honor this request, Halliburton would be required to take a reserve for estimated known claims of approximately $50 to $60 million, after-tax, recordable as a discontinued operations expense. Plaintiffs' Counsel, in consultation with their economic consultant, determined that because the reserve addition was a non-recurring item, its financial impact should be estimated as a "one-time" expense. The impact is quantified in the Plan of Allocation as $0.15 per share, which is the projected $60 million charge to earnings divided by Halliburton's common shares outstanding as of June 2001. For shares of common stock purchased or otherwise acquired between May 18, 1998 and June 28, 2001, inclusive, and sold between June 29, 2001 and May 28, 2002, the Recognized Loss is the lesser of: (1) $0.15 per share; or (2) the difference between the purchase price per share and the sales price per share for each share sold.

On May 28, 2002, Halliburton issued a press release which reported that it had received notification from the SEC that the SEC had initiated a preliminary investigation of the Company's accounting treatment of cost overruns on construction jobs. The press release noted that the Company believed that the investigation resulted from an article in the *New York Times* on May 22, 2002, regarding this issue. On May 29, 2002, in response to the Company's disclosures, the price of Halliburton common stock declined by $0.63 per share, or 3.3%, from a closing price of $19.35 on May 28, 2002 to a closing price of $18.72 on May 29, 2002. Because information regarding allegations of Halliburton's accounting impropriety had originally been made public in the May 22, 2002 *New York Times* article, as well as the fact that the *New York Times* published another article regarding the Company's change in accounting policies on May

30, 2002, Plaintiffs' Counsel, in conjunction with their economic consultant, determined that a reasonable estimate of the stock price decline associated with this issue for purposes of the Plan of Allocation would incorporate Halliburton's market and industry-adjusted stock price movements on all three dates (May 22, 2002, May 29, 2002, and May 30, 2002).   As a result, the impact is quantified in the Plan of Allocation as $0.25 per share.  For shares of common stock purchased or acquired between June 29, 2001 and May 28, 2002, inclusive, and retained at the end of trading on May 28, 2002, the Recognized Loss is the lesser of:  (1)  $0.25 per share; or (2) the difference between the purchase price per share and the sales price per share for each share sold between May 29, 2002 and August 26, 2002; or (3) the difference between the purchase price per share and $14.71 for each share still held at the close of trading on August 26, 2002. Finally, for shares of common stock purchased or acquired between May 18, 1998 and June 28, 2001, inclusive, and retained throughout the Class Period, to the end of trading on May 28, 2002, the Recognized Loss is derived from the damages calculated as arising from both drops, as the lesser of: (1) $0.40 per share; or (2) the difference between the purchase price per share and the sales price per share for each share sold between May 29, 2002 and August 26, 2002; or (3) the difference between the purchase price per share and $14.71 for each share still held at the close of trading on August 26, 2002.

Plaintiffs' Counsel believe that the Plan is fair and reasonable to all Class members and recommend that it be approved.

## VI.   CERTIFICATION OF A SETTLEMENT CLASS IS APPROPRIATE AND WARRANTED

A vital part of the settlement process in any class action is class certification before or at the time the settlement is approved by the court.  For the class to be certified, plaintiffs must meet the four requirements of Rule 23(a), as well as the requirements of one of the three subsections of Rule 23(b).  *See* Fed. R. Civ. P. 23; *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997).  Here, the Settling Lead Plaintiffs and the Class meet all prerequisites for class certification.

### A.   The Requirements of Federal Rule of Civil Procedure 23(a) Are Satisfied

Federal Rule of Civil Procedure 23(a) establishes that class certification is appropriate when the following four criteria are met:

> (1)   The class is so numerous that joinder of all members is impracticable;
>
> (2)   There are questions of law or fact common to the class;
>
> (3)   The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)   The representative parties will fairly and adequately protect the interests of the class.

*Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003).  As discussed below, the Settling Lead Plaintiffs submit that they and the Class meet the requirements of Rule 23(a).

37

## 1.    Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable. *Bell Atlantic,* 339 F.3d at 301.  To determine whether joining all class members would be impracticable, the court should consider the "size of the class, ease of identifying its members and determining their addresses, facility of making service on them if joined[,] and their geographic dispersion." *Murillo v. Musegades*, 809 F. Supp. 487, 502 (W.D. Tex. 1992) (quoting *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980), *cert. denied*, 449 U.S. 113 (1981)). Numerosity "is generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981).

Numerosity is easily satisfied here.  Because this is a securities fraud case involving a security traded on a national exchange, it is presumptively appropriately certified as a class action.  *Id.*  In addition, given that 485,276,561 shares of Halliburton common stock were traded during the Class Period, there are, at a minimum, thousands of potential class members.  *See In re Universal Access, Inc.*, 209 F.R.D. 379, 385 (E.D. Tex. 2002) ("The precise number and identity of class members need not be shown for certification of the class; good faith and common sense estimates suffice.").  The large number of potential Class members would make joinder impracticable.  *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.), *cert. denied*, 479 U.S. 883 (1986) (explaining that class of more than 40 members generally satisfies numerosity requirement under Rule 23(a)).  The relatively small size of each Class member's individual claim and the geographical diversity of the members of the proposed nationwide Class also make joinder unfeasible.  *See Murillo*, 809 F. Supp. at 502.

## 2.   Commonality

Rule 23(a)(2) is satisfied where at least one issue of law or fact affects all or a significant number of the putative class members. *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 625 (5th Cir. 1999), *cert. denied*, 528 U.S. 1159 (2000). Here, at least the following questions are common to the Class:

> 1.   whether the federal securities laws were violated by Defendants' acts as alleged in the SCAC;
>
> 2.   whether Defendants issued false and misleading financial statements during the Class Period;
>
> 3.   whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
>
> 4.   whether, during the Class Period, the market price of Halliburton's common stock was artificially inflated due to the material misrepresentations and/or non-disclosures complained of; and
>
> 5.   whether the Class has sustained damages and, if so, the proper measure of damages.

Securities fraud actions containing common questions such as the ones listed above have repeatedly been held to be "prime candidates" for class certification. *See, e.g.*, *Universal Access*, 209 F.R.D. at 385 (finding commonality met in securities class action where defendants acted in uniform manner toward all putative class members); *McNamara v. Bre-X Minerals Ltd.*, 214 F.R.D. 424, 428-29 (E.D. Tex. 2002) (finding commonality met where plaintiffs alleged they bought defendants' shares at artificially inflated prices). In short, because the core complaint of all Class members is that they purchased Halliburton stock at artificially inflated prices, the commonality requirement of Rule 23(a)(2) is satisfied.

39

### 3. Typicality

"The test for typicality [under Rule 23(a)(3)] is not demanding." *James v. City of Dallas*,

254 F.3d 551, 571 (5th Cir. 2001) (quoting *Mullen*, 186 F.3d at 625), *cert. denied*, 534 U.S. 1113

(2002). Typicality does not require that the claims of all Class members be identical. Rather, the

test is satisfied if a named plaintiff's claims arise from a similar course of conduct and share the

same legal theory as those of the proposed class. *Id.*; *see also Stirman v. Exxon Corp.*, 280 F.3d

554, 562 (5th Cir. 2002).

Settling Lead Plaintiffs' claims and the claims of the prospective Class all arise out of the

same events and practices perpetrated by Defendants. Settling Lead Plaintiffs allege that they,

like the Class, purchased Halliburton common stock at prices that were inflated because

Defendants, in violation of the federal securities laws, caused Halliburton to issue materially

misleading statements and make material omissions during the Class Period. The proof Settling

Lead Plaintiffs would be required to present to establish their claims would also prove the claims

of the rest of the Class. *See Universal Access,* 209 F.R.D. at 386 (finding typicality met for

purposes of appointing lead plaintiff where claims were based on same legal theory and same

series of events in securities class action). Therefore, Settling Lead Plaintiffs' claims are typical

of the claims of the Class.

### 4. Adequacy

A proposed class representative must satisfy Rule 23(a)'s adequacy requirement by

showing that they will fairly and adequately protect the interests of the Class. This requirement

is satisfied if the putative class representatives are willing and able to take an active role in the

litigation and to protect the interests of absentee Class members. *Berger v. Compaq Computer*

40

*Corp.*, 257 F.3d 475, 479 (5th Cir. 2001). "The adequacy-of-representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a)." *Amchem Prods.*, 521 U.S. at 626 n.20 (internal quotation marks and citation omitted). The overlap exists because "'in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members.'" *Stirman*, 280 F.3d at 563 (quoting *In re American Med. Sys.*, 75 F.3d 1069, 1083 (6th Cir. 1996)).

Here, as described above, Settling Lead Plaintiffs' claims are typical of and coextensive with those of the Class, and therefore they adequately represent the Class. *See Basco v. Walmart Stores*, 216 F. Supp. 2d 592, 600 (E.D. La. 2002) (finding adequacy met where plaintiff's interests were "directly aligned" with those of proposed class). Settling Lead Plaintiffs do not have any interests that are antagonistic to those of the Class and have pursued this litigation and the settlement negotiations vigorously. *See Universal Access*, 209 F.R.D. at 386. Moreover, Settling Lead Plaintiffs are represented by counsel highly experienced in securities class action litigation. Because Settling Lead Plaintiffs have retained competent counsel and there are no disabling conflicts, the requirements of Rule 23(a)(4) are met.

In light of the foregoing, all the requirements of Rule 23(a) are satisfied.

**B.     Rule 23(b)(3) Is Also Satisfied**

In addition to meeting the requirements of Rule 23(a), the Action also satisfies the requirements of Rule 23(b)(3), which states:

> (b)     Class Actions Maintainable.   An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

> *     *     *

41

> (3)   the court finds that the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## 1.   Common Questions of Law and Fact Predominate

To ensure that the class action is more efficient than individual actions, Rule 23(b) requires that common issues predominate over issues that are particular to a class representative. Generally, the common questions predominate if the common issue constitutes a significant part of each of the Class members' individual cases. *Jenkins v. Raymark Indus.*, 782 F.2d 468, 470 (5th Cir. 1986). "[C]ommon issues need only predominate, not outnumber individual issues." *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 359, 374-75 (N.D. Ohio 2001). *See also Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("To be sure, individual issues will likely arise in this as in all class action cases. But, to allow various secondary issues of plaintiffs' claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws."). Predominance "'is readily met in certain cases alleging consumer or securities fraud or violations of antitrust law.'" *McNamara*, 214 F.R.D. at 429 (quoting *Amchem Prods.*, 521 U.S. at 625) (finding common questions predominated in securities class action certified for settlement). The test for predominance is met in this case. Here, the same set of operative facts and a single proximate cause applies to each member of the Class. Each Class member purchased Halliburton common stock during the Class Period at prices that were artificially inflated as a result of Defendants' misrepresentations

42

and omissions in violation of sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5, and was harmed when the facts came to light. If Settling Lead Plaintiffs and each of the Class members were to bring individual actions, they would each be required to prove the same wrongdoing by Defendants in order to establish liability.

Moreover, there are few, if any, individual issues in this case. The only possible individual issues are reliance and damages, which courts have uniformly held do not defeat class certification in securities cases. *See Universal Access*, 209 F.R.D. at 386; *see also Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976). And individual reliance is not even an issue here. Reliance is properly presumed here for two reasons: (1) plaintiffs assert a fraud-on-the-market theory, which permits a presumption of reliance, *see Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988); and (2) plaintiffs allege Halliburton failed to disclose material information, which does not have a reliance element, *see Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972).

As for damages, because this Class is for settlement purposes only, concerns that individual questions of damages would complicate a trial will not materialize. *See Amchem Prods.*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial." (citation omitted)).

### 2.    A Class Action is Superior to Numerous Individual Actions

A class action is superior to other available methods for the fair and efficient adjudication of this case because:

43

(I)     absent class action certification, the Court is faced with the potential burden of litigating thousands of individual lawsuits arising out of the same set of operative facts alleged in the SCAC;

(ii)    class certification will both produce an efficient use of judicial resources and result in a single outcome that is binding on all Class members;

(iii)   any administrative difficulties in handling potential individual issues in a class action are less burdensome than the problems that are likely to arise in thousands of separate actions; and

(iv)    without class certification, the cost of litigation would effectively prevent numerous individuals from asserting their claims against the Defendants and render the private actions provided by federal securities law meaningless.

Accordingly, a class action is the superior method to litigate the claims alleged in this Action. *See Lease Oil*, 186 F.R.D. at 429 (stating that small monetary value of individual claims gave little incentive for individual litigation and made class action superior); *Phillips Petroleum Co. v. Schutts*, 472 U.S. 797, 809 (1985) (class action plaintiffs pool claims uneconomical to litigate individually); *Rosen v. Fidelity Fixed Income Trust*, 169 F.R.D. 295, 301 (E.D. Pa. 1995) ("[C]lass certification remains a desirable method of seeking redress under the securities laws, particularly where, as here, a large number of individuals [allegedly] have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf." (internal quotation marks and citation omitted)).

Defendants' violations of the federal securities laws caused economic injury to large numbers of geographically dispersed persons, such that the cost of pursuing individual claims is not feasible. Granting class status will adequately protect the interests of the individual Class

44

members.  Furthermore, the alternatives to a class action are either no recourse for most of the Class members, or the inefficient litigation of thousands of individual actions, which will indisputably burden the judicial system.  Accordingly, the litigation of this Action as a class action is far superior to other available methods for the fair and efficient adjudication of this controversy and the requirements of Rule 23(b)(3) have been met.

For all of the foregoing reasons, the Court should find that this Class meets the requirements of both 23(a) and 23(b) and should certify the Class.

## VII.    CONCLUSION

For the foregoing reasons, the Settling Lead Plaintiffs believe that the Settlement and Plan of Allocation are fair, reasonable, and adequate.   Accordingly, Settling Lead Plaintiffs respectfully request that the Court certify the Class and grant final approval of the Settlement and the Plan of Allocation over the objections.

Dated: August 19, 2004                            Respectfully submitted,

                                                  **FEDERMAN & SHERWOOD**

                                 By:   _____
                                       William Federman
                                       SBOT #00794935
                                       2926 Maple Avenue, Suite 200
                                       Dallas, Texas  75201
                                       Telephone: (214) 908-1311
                                       Facsimile:   (214) 740-0112

                                       **EMERSON POYNTER, LLP**
                                       John Emerson, Jr.
                                       SBOT #06602600
                                       830 Apollo Lane
                                       Houston, TX  77058
                                       Telephone: (281) 488-8854
                                       Facsimile: (281) 488-8867

                                       ***Co-Liaison Counsel for Plaintiffs***

                                       **SCHIFFRIN & BARROWAY, LLP**
                                       Richard S. Schiffrin
                                       Marc I. Willner
                                       Kay E. Sickles
                                       Three Bala Plaza East, Suite 400
                                       Bala Cynwyd, PA  19004
                                       Telephone: (610) 667-7706
                                       Facsimile:  (610) 667-7056

                                       ***Plaintiffs' Lead Counsel***

46

**STULL STULL & BRODY**
Jules Brody
Patrick Slyne
6 East 45th Street
New York, NY  10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ, LLP**
Fred Isquith
270 Madison Avenue
New York, NY  10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114

*Members of Plaintiffs' Executive Committee*

47

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this _18_ day of _August_ , 2004, a true and correct copy of the above and foregoing was sent by U.S. Mail, with postage prepaid thereon, to the following:

Gregory Nespole
Thomas H. Burt
Wolf Haldenstein Adler Freeman
 & Herz, LLC
270 Madison Avenue
New York, NY 10016

Theodore Carl Anderson, III
Kilgore & Kilgore
3109 Carlisle
Dallas, TX 75204

Richard Schiffrin
Marc Willner
Schiffrin & Barroway
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004

John Emerson, Jr.
Emerson & Poynter
830 Apollo Lane
Houston, TX 77058

Donald E. Godwin, G. Michael Gruber
Brian N. Hail, Michael K. Hurst
Godwin Gruber
1201 Elm Street, Suite 1700
Dallas, TX 75270-2084

Ronald Stevens
Kirkpatrick & Lockhart
10100 Santa Monica Boulevard, 7th Fl
Los Angeles, CA  90067

Timothy R. McCormick
Thompson & Knight, LLP
1700 Pacific Avenue, Suite 3300
Dallas, TX 75201

Robert Edwin Davis
Hughes & Luce, LLP
1717 Main Street, Suite 2800
Dallas, TX 75201

Jules Brody
Stull Stull & Brody
6 East 45th Street
New York, NY 10017

John Gilliam, Esq.
Jenkens & Gilchrist, P.C.
1445 Ross Avenue, Suite 3200
Dallas, Texas 75202-2770

David R. Scott
Scott & Scott, LLC
P. O. Box 192
Colchester, CT 06415

William B. Federman
Federman & Sherwood
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102

William B. Federman