

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

SEP - 9 2004

CLERK, U.S. DISTRICT COURT
By _____
                    Deputy

| | | |
|---|---|---|
| RICHARD MOORE, *et al.*, | § | |
| Plaintiffs, | § | |
| v. | § | 3:02-CV-1152-M |
| | § | |
| | § | |
| HALLIBURTON COMPANY, *et al.*, | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff's "Motion for Final Approval of Class Action Settlement and

Plan of Allocation," filed August 19, 2004.  On August 26, 2004, the Court held a hearing to

determine whether to approve the settlement proposed by three of the four Lead Plaintiffs

appointed by the Court on December 6, 2002, and opposed by the fourth Lead Plaintiff,

Archdiocese of Milwaukee Supporting Fund ("AMSF").[1]  For the reasons stated below, the Court

**DENIES** the Motion for Final Approval.

## I. BACKGROUND

On June 3, 2002, a Complaint was filed against Halliburton Company ("Halliburton") and

certain of its former officers and directors (collectively "Defendants").  The Complaint asserted a

---

[1] Appearing at the hearing were Lead Counsel Schiffrin & Barroway, as well as Liaison
Counsel for the Lead Plaintiffs; counsel for Objector Patricia Magruder; counsel for Lead
Plaintiff AMSF; Paula John, representative of AMSF; counsel for Defendant David Lesar;
counsel for Defendant Gary Morris; counsel for Defendant Halliburton Company; counsel for
Lead Plaintiff Gabriel T. Forrest; counsel for Defendant Charles Muchmore; counsel for
Defendant Douglas Foshee; counsel for Objector William Hoffman; and Brian Felgoise,
Plaintiffs' counsel in the Friedberg Derivative Action.

1

"Contracts Claim," alleging violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78 *et seq.,* and Rule 10b-5.  The suit was purportedly brought on behalf of a class of investors who purchased common stock of Halliburton on the open market at allegedly artificially inflated prices, and who were damaged as a result. Specifically, it was contended that Defendants knowingly or recklessly failed to disclose that in the fourth quarter of 1998 Halliburton changed its accounting methodology for unapproved claims for cost overruns on long-term, fixed-price, design, engineering, procurement, and construction projects, in order to record revenue on those claims when liability for them was only probable, and when the expected recovery could not reliably be estimated.  Plaintiffs allege that Defendants knew, or recklessly disregarded, that Halliburton's reported revenue was overstated, due to the improper inclusion of unapproved cost overrun revenue.  Eighteen lawsuits were filed and on August 12, 2002, the suits were consolidated into this case.

On August 2, 2002, AMSF and Paul J. Benec filed separate applications to be appointed Lead Plaintiff, and moved to have their selection of Lead Counsel approved.  On August 5, 2002, Private Asset Management Group ("PAM") filed an application to be appointed Lead Plaintiff and to have its selection of Lead Counsel approved by the Court.  On December 6, 2002, pursuant to a stipulation between the movants, the Court appointed PAM, Gabriel T. Forrest, Paul J. Benec, and AMSF as Lead Plaintiffs, Schiffrin & Barroway as Lead Counsel, Federman & Sherwood and Emerson and Poynter as Co-Liaison Counsel, and Stull, Stull & Brody, Scott + Scott, and Wolf Haldenstein Adler Freeman & Herz as members of an Executive Committee formed to oversee the litigation.

On February 6, 2003, only two months after Lead Plaintiffs and Schriffrin & Barroway

2

("Lead Counsel") were appointed, and before any formal discovery could be taken, Richard

Schiffrin, of Schiffrin & Barroway, commenced settlement negotiations with counsel for the

Defendants, in Houston, Texas. These discussions continued through March and April and an

agreement in principle was reached in April 2003. On April 9, 2003, this agreement was

presented to some of the members of the Executive Committee. A Memorandum of

Understanding ("MOU") was signed on May 29, 2003, by counsel for PAM, Gabriel T. Forrest,

and Paul J. Benec (collectively "Pro-Settlement Plaintiffs") and by counsel for the Defendants.

As acknowledged by Mr. Schiffrin at the fairness hearing, despite the fact that AMSF was a Lead

Plaintiff appointed by the Court, Lead Counsel did not seek its approval to institute settlement

discussions, nor was AMSF even advised that settlement discussions were underway. It learned

of the settlement negotiations in April 2003, from another member of the Executive Committee,

not from Lead Counsel. It refused to approve the MOU.

Upon learning of the proposed settlement, AMSF moved to have Schiffrin & Barroway

removed from its position as Lead Counsel. AMSF correctly contended that Schiffrin &

Barroway had not kept Scott + Scott, counsel for AMSF, informed of the settlement negotiations

until an agreement was reached in principle. Further, AMSF alleged that in the settlement

negotiations, Schiffrin & Barroway had underestimated the value of the lawsuit. After a hearing,

AMSF's motion to remove Lead Counsel was denied without prejudice by the judge then

presiding, who indicated that the issues raised in the Motion to Remove Lead Counsel could be

raised at a later hearing to determine whether the settlement should be approved.

On June 2, 2003, as required by the MOU, the Pro-Settlement Plaintiffs moved for leave

to amend the complaint to add the "Asbestos Claim." This claim alleges that (1) the Defendants

failed to perform adequate due diligence in connection with Halliburton's 1998 merger with Dresser Industries, Inc. ("Dresser"); (2) due to this failure, Halliburton acquired substantial potential and actual asbestos liability; (3) until June 28, 2001, Defendants knowingly or recklessly failed to disclose the true nature and scope of Halliburton's acquired asbestos liability exposure; and (4) Defendants improperly accounted for the Dresser merger by knowingly or recklessly overstating and failing to write-down the value of assets acquired from Dresser.  Leave was granted on January 28, 2004.  In August 2003, Scott + Scott filed a new Complaint, *Kimble v. Halliburton et al.,* asserting the Asbestos Claims.  This Complaint was consolidated into this suit on March 30, 2004.

After execution of the MOU, the Pro-Settlement Plaintiffs, their counsel, and all or some of defense counsel then engaged in a process which they described as "confirmatory discovery." AMSF and their counsel were not privy to the information furnished during this process.[2] Schiffrin & Barroway, along with counsel for some of the individual Lead Plaintiffs, and Plaintiffs's counsel in the *Friedberg* derivative action, met with Bert Cornelison, General Counsel of Halliburton, and Defendant Robert Charles Muchmore, Jr., the Controller of Halliburton, and were given access to documents produced, and depositions given, in an SEC enforcement action brought against Halliburton, Muchmore, and Gary Morris.[3]  That action was

---

[2]  Scott + Scott was not permitted to participate because its client, Lead Plaintiff AMSF, would not agree to conditions required of AMSF by counsel for the other Lead Plaintiffs and Defendants.

[3]  During the fairness hearing, the parties were not able to respond to the Court's inquiry as to whose depositions and what documents were provided during "confirmatory discovery," nor was any information given to the Court as to the time spent by Lead Counsel on review of such documents and depositions.  A list of those depositions and documents was furnished to the Court after the hearing.

4

partially resolved on August 3, 2004, for a $7.5 million penalty against Halliburton and a

$50,000 penalty against Muchmore, and the entry of a Cease and Desist Order against

Halliburton and Muchmore.[4]   The enforcement action continues as to Gary Morris.

The settlement talks and confirmatory discovery culminated in a proposed settlement

preliminarily approved by this Court on June 7, 2004.  This proposed settlement, which is

contested by AMSF, is now before the Court for final approval.

## II. FAIRNESS, REASONABLENESS AND ADEQUACY OF THE PROPOSED SETTLEMENT TERMS

It is the Court's task to determine whether the settlement proposed should be approved.

The Court must protect the interests of the absent class members who would be bound by a

settlement in this matter.  As such, the Court "owes a fiduciary duty to the class to ensure that the

interests of every member of the class are adequately represented." *In re Quintus Securities*

*Litigation,* 148 F.Supp.2d 967, 970 (N.D. Cal. 2001).  That duty becomes even more compelling

when the Court has concern, as it does here, that Lead Counsel may not be acting as carefully as

Lead Counsel should in also assuring that protection.  The Court takes its role as protector of the

right of absent class members very seriously.  For obvious reasons, the hearing to determine

---

[4] The Cease and Desist Order found, among other things, that "the amounts attributable to Halliburton's undisclosed change in accounting were material to the Company's income as reported in its 1998 and 1999 Commission filings," and that "Halliburton's ultimate disclosure of its accounting change was misleading."

In its press release announcing the settlement of the SEC enforcement action against Halliburton and Muchmore, the SEC concluded that the undisclosed accounting change had an $87.9 million impact on Haliburton's 1998 10-K and a more than $40 million impact in the first three quarters of 1999.

whether approval will be given is called a "fairness hearing." Evaluating the fairness of a

proposed class action settlement does not and cannot involve a trial on the merits. *In re*

*Corrugated Container Antitrust Litigation,* 643 F.2d 195, 212 (5th Cir. 1981). Instead, the Court

examines the arguments and evidence submitted by the Pro-Settlement Plaintiffs, who have the

burden of proving a proposed settlement to be fair, adequate, and reasonable to the class

members who will be bound by it. *Foster v. Boise-Cascade, Inc.*, 420 F.Supp. 674, 680

(S.D.Tex. 1976) ("[t]he burden should be placed on the parties, especially the class

representative, to prove to the district court and class members that the recommended

compromise and all of its components are fair, reasonable and adequate"), *aff'd*, 577 F.2d 335

(5th Cir. 1978).

   At the fairness hearing, Mr. Schiffrin advocated on behalf of the Pro-Settlement

Plaintiffs. According to Mr. Schiffrin, none of the Plaintiffs' claims are likely to succeed.

Without presenting any evidence at the hearing, but rather resting on an Declaration submitted by

Marc Willner, an associate in his firm who has been practicing law for seven years, Mr. Schiffrin

argued that the Contract Claim would be difficult, if not impossible, to prove, and that the

Asbestos Claim was likely time-barred. In response to the Court's question about whether the

Asbestos Claim could relate back to the original filing for limitations purposes, Mr. Schiffrin

contended that the Plaintiffs would not have the benefit of relation back for the Asbestos Claim,

but if Lead Counsel did substantial research on that issue, it did not so communicate to the Court.

   None of the Pro-Settlement Plaintiffs appeared at the hearing to articulate their own

views as to why settlement was advisable for the members of the class preliminarily certified.

This was despite the fact that "[a] lead plaintiff in a class action owes a fiduciary duty to the

6

class." *In re Quintus Securities Litigation,* 148 F.Supp.2d 970, 969 (N.D. Cal. 2001).  As fiduciaries to the absent class members, the Pro-Settlement Plaintiffs should have either appeared at the fairness hearing or expressed themselves in affidavits or declarations to assure that the interests of the absent class members were properly represented, and to explain why they believed that the settlement was in the best interests of the class.  Only the opposing Lead Plaintiff, AMSF, expended the effort to appear at the hearing, through its representative, Paula John.

The most animated and vigorous argument against the tenability of the Plaintiffs' claims came from the Defendants.  Ron Stevens, counsel for Halliburton, presented arguments and documents which he urged show the insupportability of the claims asserted in the Moore Complaint, the Kimble Complaint, and in the Murphey Complaint, which Scott + Scott seeks permission to file.  In summary, Mr. Stevens argues that the Contract Claim will not succeed, because Halliburton previously accounted for such overruns in exactly the same manner as it did in 1998 and 1999.  *Compare* SEC Cease and Desist Order.  Further, he contends that the Asbestos Claim is untenable because Halliburton properly disclosed its contingent asbestos liability, because Halliburton's actual asbestos liabilities were actually revealed to the public by various reporting services and, in any case, the Asbestos Claim is time-barred.  Mr. Stevens was a very effective advocate at the fairness hearing, however, it is not surprising that the Defendants think little of the Plaintiffs' case, think positively about their potential defenses, nor that they advocate a settlement which would extinguish all potential claims against the Defendants arising during a four-year period, for what could be less than $1 per affected share.

AMSF, through Scott + Scott, declined to call any witnesses to support its contention that

7

the Plaintiffs' claims are meritorious and that the proposed settlement is inadequate. Instead of

proof or persuasive argument that the case was actually worth more than the settlement proposed,

AMSF relied on what it claimed were deficiencies in Mr. Schiffrin's presentation.

Virtually no evidence, other than conclusory declarations, was presented to the Court by

the Pro-Settlement Plaintiffs. Although they have the burden of proof, they did not provide the

Court with sufficient information to fairly evaluate their likelihood of success on the merits. The

Court cannot and does not accept "mere boiler-plate [advocacy] phrased in appropriate language

but unsupported by evaluation of facts or analysis of the law." *In re Corrugated Container*

*Antitrust Litigation,* 643 F.2d at 212.

Lead Counsel and the Pro-Settlement Plaintiffs advocate settlement for a gross amount

of $6,000,000, less costs of administration and attorneys fees. In response to questions from the

Court at the fairness hearing, Lead Counsel advised that the cost of administration is expected to

amount to $1,400,000. In documents submitted to the Court after the hearing, that figure has

risen to $1,500,000. Attorney's fees in the amount of $1,500,000,[5] and expenses of $117,238.92,

are also requested to be deducted from the proposed settlement fund. The net recovery to the

class if the Court approves the settlement, and claimed attorney's fees and expenses, will thus be

less than $3,000,000, and more than 800,000 persons are potential claimants.

Lead Counsel offered no analysis of the likely recovery to any individual class member

pursuant to the settlement. Mr. Schiffrin alluded to a determination that recovery of damages is

unlikely, which he says was made by his damages expert, who he identified only by the name of

---

[5] As structured, another $100,000 for attorney's fees incurred by Plaintiffs' counsel in the
derivative suit was also to come out of the class action settlement fund.

that person's firm, Financial Economics, Inc., and from whom he presented no report or testimony. In response to a question from the Court as to how much time the expert spent on this matter, Mr. Schiffrin estimated that the expert spent twenty hours working on the case.

At the fairness hearing, the Court attempted to determine the approximate dollar amount that an individual class member might recover, by asking Mr. Schiffrin what his original client, Lead Plaintiff PAM, might recover if this settlement were approved. Mr. Schiffrin replied that there were too many variables present to allow for a definitive answer, but he accepted the Court's guess that PAM would recover no more than $1,000 on its asserted loss of approximately $870,000.

According to documents submitted to the Court, 485,276,561 shares of Halliburton were traded during the class period. The Court calculates that if none of the class members were to opt-out of this settlement (and some 134 class members have done so) and all class members were to submit proper claims to the settlement fund, the Court calculates that a class member with 100 affected shares would recover approximately $.62 from the net settlement fund. At the hearing, Mr. Schiffrin opined that holders of anywhere between 5% and 50% of the affected shares could be expected to make claims. If 50% did so, a holder of 100 affected shares would receive approximately $1.24, and if only 5% did so, that shareholder would receive approximately $12.36. The Court recognizes that a variety of factors could impact the recovery, but believes this analysis to be reasonably accurate for the purposes of the consideration of the proposed settlement.

Lead Counsel asserts that the proposed settlement confers a substantial benefit upon the class. The Pro-Settlement Plaintiffs allege damage to the class in the amount of $117,010,994.

9

No evidence was presented at the hearing as to how that figure was determined. If this damages estimate is correct, the settlement would award the class a net recovery of approximately 2.56% of the damages suffered by the class members. Lead Counsel argued that in continued litigation, the class members would be able to recover little, if anything, for their claims because the causal link between the Defendants' alleged conduct and Plaintiffs' injury is tenuous.

In its objection to the proposed settlement, AMSF estimates that the proper range for a settlement in this case is between $799 million and $4.036 billion. As part of its objections, AMSF submitted to the Court the Declaration of its damages expert, Dr. Scott Hakala. AMSF's counsel declined to call Dr. Hakala to testify at the fairness hearing, even though he was present in Court. AMSF stands by Dr. Hakala's Declaration as a "conservative estimate" of the value of the class claims. This damages estimate is contested by Defendants and Pro-Settlement Plaintiffs, who argue that the premises and assumptions of Dr. Hakala's analysis are wrong.

If it could do so, the Court would assess whether the class recovery from the proposed settlement is within a range of acceptable settlements by measuring it against the potential recovery for what is alleged in the Complaint. "One method of assessing the possible range of recovery is to juxtapose the relief sought in the complaint realistically against that provided by the settlement". *Smith v. Tower Loan of Mississippi, Inc.,* 216 F.R.D. 338, 361-62 (S.D.Miss. 2003); *see also, Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977). Here, however, the Court is not satisfied that the damage analyses before it are sufficient to permit it to conduct this analysis.

Had the proof before it been adequate, the Court would also conduct a full analysis of other factors in determining whether to approve the settlement: (1) whether the settlement was a

10

product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation;

(3) the stage of proceedings and the amount of discovery completed; and (4) the opinions of the

participants, including class counsel, class representatives, and the absent class members. *See*

*generally, In re Corrugated Container Antitrust Litigation,* 643 F.2d at 212; *Lelsz v. Kavanagh,*

783 F.Supp. 286, 294 (N.D.Tex. 1991). To the extent the Court has sufficient information to

address these factors, the Court will comment on them.

1. WHETHER THE SETTLEMENT WAS A PRODUCT OF FRAUD OR COLLUSION

The Court does not have evidence that this settlement was the product of fraud.

However, the Court is not satisfied that the way in which the settlement negotiations were

conducted assured a fair, reasonable, and adequate recovery to the class. Although the Court

does not conclude that this conduct constitutes "collusion," its deficiencies certainly raise

questions. "[I]n reviewing a proposed settlement the district court should always consider the

possibility that an agreement reached by the class attorney is not in the best interests of the class.

This is particularly true where . . . the class attorney settles the case without the participation or

consent of the active class members." *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157,

1216 (5th Cir.1978).

Shortly after being appointed, Lead Counsel entered into settlement negotiations and held

secret meetings with defense counsel, without the knowledge of all the Lead Plaintiffs or the

Executive Committee.[6]  The Private Securities Litigation Reform Act of 1995 was enacted "to

---

[6] AMSF's counsel, Scott + Scott, was a member of the Executive Committee, but it had no prior or simultaneous notice that settlement talks had commenced in February 2003 and continued into March and April of 2003. The structure for handling the litigation was so lacking that the Executive Committee did not have its first meeting until May of 2003, a month after

empower investors so that they, not their lawyers, control securities litigation." S. Rep. No. 104-98, at 6 (1995). It was Congress's expectation "that the lead plaintiff – not lawyers – should drive the litigation." *Id.* at 10; *see also, Gluck v. CellStar Corp.*, 976 F.Supp. 542, 544 (N.D.Tex.1997) ("Specifically, Congress intended "to increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel.").

Lead Plaintiffs appointed by the Court are expected to exercise that control over the litigation. Taking AMSF, one of the Lead Plaintiffs, out of the decision-making loop deprived the class of the benefits of multiple Lead Plaintiffs. In particular, the class lost "the substantial benefits of joint decision-making." *Pirelli Armstrong Tire Corp. v. LaBranche & Co., Inc.*, No. 03 Civ.8264 RWS, 2004 WL 1179311, at *22 (S.D.N.Y. May 27, 2004). The Court is dismayed that Lead Counsel here felt at liberty to exclude any of the Lead Plaintiffs from significant involvement in material activities in the case, which settlement surely is. No one can know how active involvement of AMSF in the negotiations might have affected the outcome of the negotiations.

In addition to its concerns about the secret manner in which the negotiations commenced and proceeded, the Court is concerned about two of the terms of the negotiated settlement, both of which disadvantaged the class and for which Lead Counsel gave no explanation. First, the settlement as presented to the Court for approval provided for Plaintiffs' counsel in the derivative

---

Lead Counsel and the Defendants had reached a settlement in principle.

action to be paid from the $6 million settlement of the class action lawsuit.  When questioned by the Court at the fairness hearing, counsel for the derivative Plaintiffs was unaware that the settlement of the class action was the source of his fees.  When the Court expressed concern over that fact, defense counsel immediately offered to have the Defendants directly pay those attorney's fees.  This singular inquiry added $100,000 to the amount available to the class members from the settlement fund.  This result certainly suggests that Lead Counsel might have obtained this concession from the Defendants if Lead Counsel had insisted upon it, and raises a question as to how vigorously the interests of the class were advocated in the settlement by Lead Counsel.

Second, the Court is similarly concerned with the negotiation for the Release required of the class members who make claims to the settlement fund.  The Release in the Stipulation and Agreement of Settlement, which is attached to the Willner Declaration filed on August 19, 2004, is extremely broad.  It would extinguish "any and all Claims ... arising out of or relating in any way to any transaction, fact, occurrence, conduct, act, event, representation, statement or omission *alleged or that could have been alleged*....".[7](emphasis added)  No explanation was given at the fairness hearing as to why Schiffrin & Barroway had agreed to a settlement with such a broad form of release, which releases all claims of any class member against Halliburton and the other Defendants for any of their conduct during the class period, as well as any claims of class members against Lead Counsel for their activities in the settlement negotiations and

---

[7] At the hearing, Mr. Stevens took strong issue with the Court's expressed concern over the breadth of the Release, to which AMSF, through Scott + Scott, had objected.  At the Court's direction, Mr. Stevens read the Release and then expressed surprise as to the scope of the Release, and a willingness to modify it to limit it to the issues raised in this litigation.

litigation of this case.

"[A] federal district court may not approve a class-action settlement that seeks to release claims that are inadequately represented by the named plaintiffs." *International Union of Electronic, Electrical., Salaried, Mach, and Furniture Workers, AFL-CIO v. Unisys Corp.*, 155 F.R.D. 41, 48 (E.D.N.Y. 1994). In this case, the Release would extinguish claims that have not even been alleged and that do not relate to the claims in the suit. There is no basis for this Court to determine that the Lead Plaintiffs and Lead Counsel are adequate representatives for claims that have not been alleged. Again, the failure of Lead Counsel to resist an expected effort by Halliburton and the other Defendants to obtain a release of all conceivable claims arising during the class period naturally causes the Court to question the vigor of Lead Counsel's settlement advocacy.

## 2. THE COMPLEXITY, EXPENSE, AND LIKELY DURATION OF THE LITIGATION:

By all accounts, this is a complex and intricate securities lawsuit. If this case were to continue on to trial a considerable amount of time and expense would be incurred by all parties to the litigation. The Plaintiffs' attorneys' fees are contingent, and the class members will not have to pay fees or expenses unless there is a recovery. The Plaintiffs' case may not withstand Motions to Dismiss, Motions for Summary Judgment, or Motions for Class Certification. These factors suggest that a resolution of this lawsuit by settlement could be in the best interests of the class, but it must be a fair, reasonable, and adequate settlement.

3. THE STAGE OF PROCEEDINGS AND THE AMOUNT OF DISCOVERY COMPLETED

"This factor 'captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating.'" *In re Cendant Corp. Litigation,* 264 F.3d 201, 235 (3d Cir. 2001) (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 813 (3d Cir. 1995)). In this case, no discovery occurred prior to negotiations. After a settlement was reached, confirmatory discovery was performed. The results of the confirmatory discovery have been made available to only three of the four Lead Plaintiffs. Confirmatory discovery, by its very nature, is not adversarial. In contrast, "pretrial negotiations and discovery must be sufficiently adversarial so that they are not 'designed to justify a settlement ... [but are] an aggressive effort to ferret out facts helpful to prosecution of the suit.'" *Martens v. Smith Barney, Inc.* 181 F.R.D. 243, 263 (S.D.N.Y. 1998) (quoting *Saylor v. Lindsley,* 456 F.2d 896, 899 (2d Cir. 1972)). The absence of any adversarial discovery is a negative factor in persuading the Court of the wisdom of settlement, at this time, on these terms, although the Court notes that formal discovery cannot be undertaken at the early stages of the litigation under the PSLRA.

4. OPINION OF CLASS COUNSEL, LEAD PLAINTIFFS, AND THE ABSENT CLASS MEMBERS

Finally, the Court considers the opinions of those affected by this proposed settlement. Lead Counsel and the Pro-Settlement Plaintiffs are of the opinion that this is a fair, reasonable and adequate settlement. Approximately 860,000 notices were sent out to potential class

members, and only 134 opted out. Only six filed objections (and several of those were not in accordance with the requirements set out in the Notice sent to class members.) The Pro-Settlement Plaintiffs contend that these facts demonstrate that the settlement is acceptable to the class. However, "a low level of vociferous objection is not necessarily synonymous with jubilant support. In many class actions, the vast majority of class members lack the resources either to object to the settlement or to opt out of the class and litigate their individual cases." *In re Corrugated Container Antitrust Litigation*, 643 F.2d at 217-18. This is true of the case at bar. The Court will not construe the absence of a chorus of objections as equivalent to a symphony of support, particularly in light of the vigorous objection of Lead Plaintiff AMSF. The Court will, however, consider the number of objections and opt outs for what it demonstrates – few class members have expressed opposition to the proposed settlement.

### III. CONCLUSION

The record is "[in]adequate to [allow the Court to] reach an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated and form an educated estimate of the complexity, expense and likely duration of such litigation, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Scardelletti v. Debarr,* 265 F.3d 195, 204 (4th Cir. 2001). Since the Court is not satisfied that the settlement proposed is fair, reasonable, and adequate, and since the Court has concerns both about the manner in which settlement was reached, and the terms of the proposed settlement, the Court will not approve it at this time.

However, because a fair, reasonable and adequate settlement may still be achievable, the

16

Court stays this case through December 3, 2004, for all but the following activities:

1.     On or before September 28, 2004, Counsel for the Defendants and Schiffrin & Barroway are to make available to Scott + Scott any and all documents and depositions made available to Schiffrin & Barroway as "confirmatory discovery." As for any oral interviews conducted by Schiffrin & Barroway, they shall provide to Scott + Scott any and all recordings made of such interviews, or, if they are not available, counsel's notes of such interviews, which Scott + Scott may share with no one other than their clients, Kimble, Murphey, and AMSF.

2.     On or before October 8, 2004, Scott + Scott and, if he wishes, Craig Walker, as counsel for Patricia Magruder, shall meet with counsel for Halliburton, and any other defense counsel who wish to participate, to discuss the claims contained in the Moore and Kimble Complaints, and in the proposed Murphey Complaint, as well as the issues raised in Ms. Magruder's Objections, so that counsel may exchange views on why such claims and objections are tenable or untenable. If they choose to do so, Lead Plaintiffs, including AMSF, Ms. Magruder, and the Defendants may attend any such meeting(s).

3.     On or before November 1, 2004, all of the Lead Plaintiffs, Schiffrin & Barroway, and, if they wish, the members of the Executive Committee, shall meet in person to engage in a mediation, with a mediator to be appointed by the Court. If by September 24, 2004, all of the Lead Plaintiffs and the Defendants reach agreement

17

on selection of a mediator, and advise the Court in writing as to their agreement, the Court will appoint that person. Otherwise, the Court will select the mediator. The Court will also appoint a guardian *ad litem* to represent the preliminarily certified class at the mediation, to advise the Court as to the fairness, reasonableness and adequacy of any settlement proposal reached in that mediation[8]. The parties are all directed to cooperate fully with the guardian *ad litem* so he or she may be prepared to participate in the mediation. The fees of the mediator and the guardian *ad litem*, will be paid one-half by the Defendants and one-half from any fees approved by the Court as attorney's fees for Plaintiffs' counsel.

4.      No later than December 1, 2004, Schiffrin & Barroway, Scott + Scott, and counsel for the Defendants shall advise the Court in writing as to whether Defendants and Schiffrin & Barroway, with or without Scott + Scott, recommend a different settlement and if so, its terms. The Court will then advise the parties as to how it will handle any such proposal.

---

[8] In order to facilitate the protection of absent class members, the Court may appoint a guardian *ad litem*. *See, e.g., Ahearn v. Fibreboard Corp.,* 162 F.R.D. 505 (E.D. Tex. 1995) *aff'd sub nom. In re Asbestos Litigation,* 90 F. 3d 963 (5th Cir. 1996) *rev'd on other grounds sub nom. Ortiz et al. v. Fibreboard Corp.,* 527 U.S. 815 (1999). "The function of the guardian *ad litem* is to review the settlement from the point of view of members of the class and thereby to afford the class additional assurance that their interest will be adequately protected." *In re Asbestos Litigation,* 90 F. 3d at 972. This is especially appropriate in cases such as this, where the record supporting settlement is "sparse." *Manual for Complex Litigation,* § 21.644 (4th ed. 2004). The Court finds that the appointment of a guardian *ad litem* is not only appropriate, but also necessary for the protection of the more than 860,000 class members who would be bound by a settlement in this case.

18

5.     Because the activities in this case during the period of the stay relate to the

potential for settlement, and the members of the preliminarily certified class

already received notice of potential settlement pursuant to the Order Preliminarily

Approving the Settlement, no new notice to the class is required.

6.     If the case is not resolved by December 3, 2004, the Court will consider whether

the appointment and terms of appointment of Lead Plaintiffs and Lead Counsel

should be modified, and will otherwise establish a schedule for determining other

matters pending or to be resolved.

**SO ORDERED** this _9th_ day of September, 2004.


BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS

19