ORIGINAL



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAR 8

CLERK, U.S. DISTRICT COURT
By _____
Deputy

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| RICHARD MOORE, On Behalf of Himself and All Others Similarly Situated, et al., | § § § | Civil Action No. 3:02-CV-1152-M |
| | § | CLASS ACTION |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| HALLIBURTON COMPANY, et al., | § § | |
| | § | |
| Defendants. | § | |
| | § | |

**APPENDIX TO MOTION TO INTERVENE**

**Document**                                                                     **Tab**

Federal Securities Class Action Complaint-in-Intervention ........................................................... 1

Lerach Coughlin Stoia Geller Rudman & Robbins LLP Firm Resumé........................................... 2

C:\DOCUME~1\change\LOCALS~1\Temp\MetaSave\app00017590.doc

## DECLARATION OF SERVICE BY UPS DELIVERY

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 401 B Street, Suite 1600, San Diego, California 92101.

2.    That on January 24, 2005, declarant served by UPS, next day delivery, the **APPENDIX TO MOTION TO INTERVENE** to the parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of January, 2005, at San Diego, California.

_Bonnie M. Naiditch_

BONNIE M. NAIDITCH

## HALLIBURTON SERVICE LIST

Arthur L. Shingler, III*
SCOTT + SCOTT, LLC
401 B Street, Ste. 307
San Diego, CA 92101
Fax: 619/233-0508

John Emerson, Jr.
THE EMERSON FIRM
830 Apollo Lane
Houston, TX 77058
Fax: 281/488-8867

Richard Schiffrin
Marc Wilner
SCHIFFRIN & BARROWAY, LLP
Three Bala Plaza East, Ste. 400
Bala Cynwood, PA 19004
Fax: 610/667-7056

Jules Brody
STULL STULL & BRODY
6 East 45th Street
New York, NY 10017
Fax: 212/490-2022

Timothy R. McCormick
THOMPSON & KNIGHT
1700 Pacific Ave., Ste. 3300
Dallas, TX 75201
Fax: 214/969-1751

Mr. Gregory Nespole
WOLD HALDENSTEIN ADLER
FREEMAN & HERZ
270 Madison Avenue
New York, NY 10016
Fax: 212/686-0114

William Federman
FEDERMAN & SHERWOOD
2926 Maple Avenue, Ste. 200
Dallas, TX 75201
Fax: 214/740-0112

Marcos G. Ronquillo
Jose L. Gonzales
GODWIN GRUBER
Renaissance Tower
1201 Elm Street, Ste. 1700
Dallas, TX 75270
Fax: 214/760-7332

Robert Edwin David
HUGHES & LUCE
1717 Main Street, Ste. 2800
Dallas, TX 75201
Fax: 214/939-5849

Ronald Stevens
KIRKPATRICK & LOCKHART
10100 Santa Monica Blvd.
Seventh Floor
Los Angeles, CA 90067
Fax: 310/552-5001

Robb Voyles
BAKER BOTTS, LLP
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, TX 78701-4039
Fax: 512/322-8326

Rod Phelan
Samara L. Kline
BAKER BOTTS, LLP
2001 Ross Avenue
Dallas, TX 75201-2980
Fax: 214/953-6501

Fred Isquith
WOLF HALDENSTEIN ADLER FREEMAN
  & HERTZ, LLC
270 Madison Avenue
New York, NY 10016
(212) 545-4600

Theodore Carl Anderson, III
KILGORE & KILGORE PLLC
3109 Carlisle
Dallas, TX  75204
Telephone:  214/969-9099
214/953-0583 (fax)

Craig Walker
WalkerLaw LLP
3196 High Ridge Road
Stamford, CT 06903

Gary V. McGowan
1 Riverway, Ste. 2070
Houston, TX 77056
Telephone:  713/552-1855
713/552-1859

J. Lawrence Irving*
Butz Dunn DeSantis & Bingham,
101 West Broadway, Suite 1700
San Diego, California 92101
Fax:  619/702-6093

*  Service via hand delivery

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| RICHARD MOORE, On Behalf of Himself and All Others Similarly Situated, | § § § | Civil Action No. 3:02-CV-1152-M |
| Plaintiff, | § § | **FEDERAL SECURITIES CLASS ACTION COMPLAINT-IN-INTERVENTION** |
| – and – | § § | |
| LABORERS NATIONAL PENSION FUND, PLUMBERS & PIPEFITTERS NATIONAL PENSION FUND and CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE RETIREMENT SYSTEM, On Behalf of Themselves and All Others Similarly Situated, | § § § § § § § § § | |
| Intervenors, | § § | |
| vs. | § § | |
| HALLIBURTON COMPANY, DAVID J. LESAR, DOUGLAS L. FOSHEE, GARY V. MORRIS and ROBERT C. MUCHMORE, | § § § § | |
| Defendants. | § § § | |
| | § § | DEMAND FOR JURY TRIAL |

Copyright © 2005 by William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Scott + Scott LLC. William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Scott + Scott LLC will vigorously defend all of their rights to this writing/publication. No copyright is claimed in the text of statutes, regulations, and any excerpts from news articles or analysts' reports quoted within this work.

All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Scott + Scott LLC is prohibited.

## INTRODUCTION

1.      This is a securities class action complaint-in-intervention on behalf of purchasers of the common stock of Halliburton Company ("Halliburton" or the "Company") between 9/29/98 and 12/7/01 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act").  The defendants include Halliburton, David J. Lesar, Halliburton's President and COO during 96-7/00 and who succeeded Richard Cheney as Halliburton's Chairman/CEO in 7/00, Gary V. Morris, Halliburton's EVP/CFO through 8/01, and Douglas L. Foshee, Halliburton's EVP/CFO after 8/01, and Charles C. Muchmore, EVP, Principal Accounting Officer/Controller (the "Individual Defendants").  These Individual Defendants were Halliburton's top executives and *were each Certified Public Accountants*. They controlled the accounting policies and practices and public statements of the Company. They operated under the leadership of Richard Cheney, who became CEO/Chairman of Halliburton in 8/95 and served as its CEO/Chairman until 7/00, when he left to run for Vice President – hailed on his departure as a successful corporate executive who had turned Halliburton around, reorganized its construction businesses, made a very successful acquisition, *i.e.*, Dresser Industries, Inc. ("Dresser"), led Halliburton to record profitability and positioned Halliburton to continue to achieve growing profits going forward.

2.      This action arises out of a series of false and misleading statements that misrepresented the condition and success of Halliburton's business, especially its construction operations, the benefits of its acquisition of Dresser, Halliburton's financial condition and results of operations and its future business and financial prospects.  These misstatements stressed the supposed successful restructuring of Halliburton's construction businesses during 97-98, Halliburton's new practice of accepting more large fixed-price/lump-sum contracts which were improving its profitability due to its expertise in managing and successfully performing these

- 1 -

large fixed-price/lump-sum construction contracts, including the $2.5 billion Barracuda/ Caratinga contract (the largest contract in Halliburton's history), Halliburton's success in obtaining large liquefied natural gas ("LNG") contracts in the major oil-producing nation of Nigeria, the beneficial impact of Halliburton's acquisition of Dresser (including the successful integration of Dresser's construction operation (Kellogg) into Halliburton's construction operation (Brown & Root)), and the balance sheet strengthening and net income enhancements to be and being achieved as a result of that acquisition. However, by these false statements, defendants were concealing ever increasingly serious operational problems with Halliburton's construction businesses, huge unpaid change orders and cost overruns ("Unapproved Claims") it was suffering on several of its large fixed-price/lump-sum contracts, the negative impact of the Dresser acquisition – including the true extent of the financial liabilities Halliburton was facing due to asbestos suits/claims Halliburton inherited via the Dresser acquisition – and some $180 million in improper/illegal payments made in connection with obtaining the Bonny Island, Nigeria LNG plant contract. In truth, pervasive accounting manipulations were being engaged in at Halliburton to conceal mounting losses on several of Halliburton's large fixed-price/lump-sum construction contracts, including ever-increasing losses being suffered on Halliburton's huge $2.5 billion Barracuda/Caratinga offshore drilling contract in Brazil and Halliburton's truly gargantuan financial liabilities arising out of its exposure to asbestos suits/claims.

3.     As a result of defendants' scheme to defraud and the resulting artificial inflation in Halliburton's stock price due to defendants' financial falsifications and other misleading statements, investors who purchased Halliburton stock during the Class Period suffered significant damages. As at least some of the true facts came out in 12/01-1/02, Halliburton's stock collapsed to as low as $8-$10 per share – a 15-year low and well below the stock's Class Period high of $55. Calculated in accordance with accepted securities class action damage

methodologies, class-wide damages suffered by investors are approximately $3.1 billion. By contrast, Halliburton's top insiders did quite well for themselves. During the Class Period they sold off 1.34 million shares of their Halliburton stock – 61% of the Halliburton stock they owned – for illegal insider trading proceeds of $68 million. In addition, during 97-01, Halliburton's top executives (Cheney, Lesar, Morris, Coleman, Bradford and Vaughn) collected aggregate salaries and bonus payments of $17 million and $19 million, respectively, which were based upon the appearance of business success and profits reported by Halliburton and *which have subsequently been all but wiped out by the recognition of Halliburton's actual losses on fixed-price construction contracts (including Barracuda/Caratinga) and Halliburton's actual asbestos liabilities*! Halliburton's stock, which soared to a Class Period high of $56 per share in 9/00 based on Halliburton's false earnings reports, false positive statements and false forecasts of future success, collapsed to $10 per share at the end of the Class Period and to as low as $8 per share a few weeks later – *a 15-year low* – as shown in the following graph:



**Halliburton**
**September 1, 1998 - January 15, 2002**
**Daily Share Prices**

## SUMMARY OF COMPLAINT

**Pre-Class Period Events**

4.     After years of mediocre business performance, in 8/95 Halliburton hired Richard Cheney as its new CEO/Chairman.   When Cheney took over the reins at Halliburton, Halliburton's stock was trading at around $20 per share.  Cheney's challenge was to lead a new executive team and successfully manage Halliburton's business so that it could achieve strong, profitable growth, which would cause its stock to reach higher levels.  Cheney elevated Lesar, who had been Halliburton's CFO, to be Halliburton's President and Chief Operating Officer ("COO").  They, along with Morris (CFO) and Muchmore (Controller), became Halliburton's new executive team.

- 4 -

5.     Prior to 8/95, Cheney had been a politician.  He had never been an executive at a public corporation, let alone the Chairman/CEO of a multi-billion dollar New York Stock Exchange-listed company.  Thus, there was considerable skepticism in the financial community as to whether or not Cheney and his new executive management team could successfully oversee and manage Halliburton's worldwide operations.  According to a *Wall Street Journal* article reporting Cheney's selection as Halliburton's CEO:

> [S]ome questioned if Mr. Cheney has the business background for the job.
>
> "There's a pretty big difference between the world of government and the private sector," said James Stone, who follows Halliburton for Schroder Wertheim & Co.  ***Whether or not he is capable of running" a $6 billion-a-year company, "clearly is an issue that must be addressed in the next couple of months."***

*Bloomberg* reported:

> **Halliburton Choice of Cheney as CEO Prompts Analyst Downgrade**
>
> A NatWest Securities Corp. analyst ***cut his rating on Halliburton Co.*** after the oilfield service company named former Defense Secretary Dick Cheney as chief executive.
>
> \*       \*       \*
>
> NatWest analyst Wes Maat said he downgraded Halliburton ... ***because he expects disappointment over Cheney's hiring to drive the stock down ... during the next three months.***
>
> ***"Most industry observers believed that the company would select a candidate with extensive senior management experience in the oil services or oil and gas sectors,"*** Maat said in a report.

6.     This skepticism placed pressure on Cheney to demonstrate his executive competence and the effectiveness of his management team by producing successful results – growing Halliburton into a larger and more profitable company.  Cheney and his executive team had additional compelling motives to produce results that appeared to be successful, as this would allow them to pocket large bonus payments and if such profitable results pushed

Halliburton's stock higher, it would enable them to pocket millions of dollars via stock option profits.

     7.     During 95-97, according to the Cheney executive team, Halliburton achieved success, reporting improved earnings per share ("EPS") of $1.00 in 95, $1.30 in 96 and $1.79 in 97. Cheney and Lesar assured investors that Halliburton's construction operations, the most important part of Halliburton's business, had been successfully restructured and that Halliburton would achieve *increased profits due to several large, fixed-price construction contracts which were being pursued by Halliburton*, purportedly as part of an important change in business strategy decided upon by the Cheney team and undertaken at their direction, because Halliburton had the skills, resources and management to successfully, *i.e.*, profitably, perform such contracts, which gave Halliburton a competitive advantage. As Halliburton continued to report solid results and forecast future success, its stock moved higher, reaching over $60 per share in late 97. It continued to trade as high as $56 per share in 5/98. Cheney's executive team appeared to be succeeding.

**Class Period Events**

     8.     The highlight of the Cheney executive team's efforts to grow Halliburton occurred in early 98 when Halliburton announced it was going to acquire its competitor, Dresser – *a $7 billion deal. This was the largest and most important acquisition in Halliburton's history.* This acquisition, driven by Cheney's determination to grow Halliburton, was undertaken at his insistence – his "pet project." Halliburton and Dresser had previously discussed a merger, but rejected the idea due to the differences in the "culture" of the two corporations and the lack of a good business "fit," *i.e.*, the perceived difficulties in integrating their respective construction operations. Nevertheless, during 98, Halliburton assured investors that the Dresser acquisition was a "*win*" for Halliburton shareholders, that Halliburton and

- 6 -

Dresser were "*an outstanding business and cultural fit*," that Dresser's operations would be quickly and effectively integrated into Halliburton's operations and that the acquisition of Dresser would *strengthen Halliburton's balance sheet and immediately boost Halliburton's "bottom-line" by $250 million in the first year following the acquisition and by $500 million annually later on.*

9.      However, during 98, lower oil prices and reduced capital spending by oil exploration and production companies negatively impacted Halliburton's construction businesses. These negative industry conditions were exacerbated by investor concerns as to whether Dresser's operations could be effectively integrated into Halliburton's and the promised annual "bottom-line" gains achieved. As a result, Halliburton's stock plummeted, falling from $56 in 5/98 to as low as $26 by 8/31/98 – *a 53% decline in a few months! This huge decline wiped out all the stock's gains in the prior two years, took the stock back down to near where it was when Cheney took over and severely impaired the value of Cheney's, Lesar's and other Halliburton executives' stock options, which had been worth many millions of dollars at the stock's peak in late 97 but by 8/98 were for the most part "under water!"*[1]  This collapse in

---

[1]      The stock option grants to and exercise prices of the grants to Halliburton's top executives during 95-97 are set forth below:

| Name | Year | Options Granted | Exercise Price ($/share) |
|------|------|-----------------|--------------------------|
| Cheney | 1995 | 400,000 | $21.00 |
|  | 1996 | 160,000 | $26.44 |
|  |  | 200,000 | $29.56 |
|  | 1997 | 100,000 | $54.50 |
| Lesar | 1996 | 30,000 | $26.43 |
|  |  | 80,000 | $29.56 |
|  | 1997 | 60,000 | $54.50 |
| Morris | 1996 | 35,000 | $29.56 |
|  | 1997 | 20,000 | $54.50 |
| Muchmore | 1996 | 24,000 | $29.56 |
|  | 1997 | 6,000 | $54.50 |

Halliburton's stock created a crisis for the Cheney executive team, which became determined to convince investors that the Dresser acquisition was a success and that even with negative industry conditions Halliburton's business operations and financial performance were better than its peer competitors, as were its future prospects. They hoped this would halt the stock's decline and push it back up higher.

10.     In truth, by late 98, things regarding Halliburton were not at all as Cheney's executive team was representing them to be to the investment community. Halliburton's construction operations were encountering serious difficulties with at least seven of its new large fixed-price/lump-sum construction contracts, encountering cost overruns and delays in performance on them, resulting in *an inability to collect millions of dollars in change orders/cost overruns, i.e., Unapproved Claims, from customers. As a result, Halliburton was incurring foreseeable losses in escalating amounts on these contracts*. While Halliburton could always submit claims to its customers for part of these change order/cost overrun charges, the customers were not legally obligated to pay for them under lump-sum/fixed-price contracts and had told Halliburton they would not do so. Cheney and Halliburton's other top executives knew that if they disclosed the true extent of these escalating unpaid Unapproved Claims and the doubtful nature of their collectability *and took the required write-offs or recognized the losses they created*, this would expose the fact that Halliburton's construction operations had not, in fact, been successfully reorganized and restructured, but were encountering serious problems with Halliburton's exceptionally important new large fixed-price contracts. Investors would then see that, in fact, Halliburton and its construction operations were not actually achieving the

| All Optionees | 1995 | 2,713,000 | $21.30 * |
|---|---|---|---|
| | 1996 | 3,218,000 | $28.98 * |
| | 1997 | 1,263,600 | $52.19 * |

\* The exercise price is the weighted average price of all options granted during fiscal year.



operating profits, net income and EPS being publicly reported – which positive results were necessary to make the Cheney-led executive team appear successful.

11. Knowing Halliburton was having problems with these large construction projects, Halliburton's top executives – including the Individual Defendants – *secretly changed the way Halliburton was accounting for Unapproved Claims on construction contracts* to conceal these problems. Any such change in accounting policy impacting the largest and most important part of Halliburton's business and involving many millions of dollars required the assent of Cheney and Halliburton's other top operating and accounting officers, *i.e.*, Lesar, Morris and Muchmore. For several years, Halliburton had consistently represented that all *"anticipated" losses on contracts were provided for currently* and that revenues represented by cost overrun/change order charges, *i.e.*, Unapproved Claims, *were recognized only when the customer had agreed to pay the Unapproved Claim*. But, without disclosing it, in late 97 or early 98, Halliburton began to record unpaid Unapproved Claims as revenue even if the customer had not agreed to pay the claim. They did this even though they knew that the collection of those Unapproved Claims was dubious, as Halliburton was obligated under fixed-price/lump-sum contracts to do the contracted work for a set price/lump sum within a set period of time, and *Halliburton's customers were voicing objections to paying these Unapproved Claims. Halliburton's executives made this secret change at a time when they were actually encountering increased customer resistance to paying Unapproved Claims on certain older contracts that would result in Halliburton taking a $60 million charge at year-end 98! In other words, they secretly changed Halliburton's accounting practices in a manner directly inconsistent with the actual conditions prevailing in Halliburton's business operations at the time they made the change*!

12. In connection with reporting its year-end 98 results, Halliburton disclosed it had taken a $60 million charge in the 4thQ 98 for Unapproved Claims for which its customers would

not agree to pay. Halliburton told analysts the charge-off was *not* due to premature recognition of Unapproved Claims as revenue, but rather to client refusals to pay for the Unapproved Claims, purportedly a change of attitude. ***Halliburton told analysts that as a result it had changed its procedures and in the future it would not accept or perform change orders unless the customer agreed up front to pay for the extra work, i.e., Unapproved Claims***. These statements indicated to analysts that Halliburton was still following its stated policy of recognizing Unapproved Claims as revenue *only* after the customer agreed to pay for such claims. In fact, Halliburton had made no such change and was continuing to perform millions of dollars of Unapproved Claims just hoping customers would later pay for them.

13.    This manipulation and contrivance was part of a scheme whereby Cheney and Halliburton's other top executives fraudulently converted by financial alchemy what were, in fact, *losses* into profits and thus falsely inflated Halliburton's Energy Services ("ES") and Engineering and Construction ("E&C") Groups' reported operating incomes, as well as Halliburton's reported operating income, net income and EPS. This was a particularly insidious accounting trick because not only was Halliburton now accounting for Unapproved Claims in a manner different from the way in which it had long represented it accounted for such claims, but, ***because there were no costs of performance associated with the recognition of these claims as revenue, the entire amount (100%) of the bogus revenue flowed directly to the "bottom line," i.e., magnifying the impact on the reported amount of operating income and profit margins of Halliburton and its ES and E&C Groups.***

14.    All during 98 and 99, Cheney and Halliburton's other top executives continued to conceal that they had secretly changed the manner by which Halliburton accounted for Unapproved Claims. They told investors that the favorable financial results of Halliburton's construction operations were due to their "***successful consolidation and restructuring***" and,

when negative industry conditions emerged, that the "benefits of [Halliburton's] ... restructuring activies allowed [them] to remain profitable during this most difficult period." Halliburton said that the integration of Dresser's and Halliburton's construction operations had been "*particularly effective*" and had resulted in "*strength in all facets of construction and project management.*" They also told investors that the "*keys*" to improving Halliburton's "*profit margins ... will be ... acceptance of more ... fixed-price contracts*" and "*reiterated their confidence in the integrity (i.e., margins)*" of Halliburton's construction backlog.  Not until Halliburton issued its 99 Annual Report in 3/00 did it insert a sentence in the notes to Halliburton's financial statements stating that Halliburton recognized claims for construction cost overruns or change orders when collection of such items *was deemed probable*.  However, this belated disclosure itself was misleading because Halliburton had already recognized hundreds of millions of dollars of such claims even though its executive team *knew they were very unlikely to be collected, and, in any event, the amount to be collected could not be accurately estimated – two strict requirements under Generally Accepted Accounting Principles ("GAAP") for recognizing Unapproved Claims as revenue under any set of circumstances.  Going forward, throughout the balance of the Class Period, Halliburton continued to improperly record as revenue millions of dollars of such Unapproved Claims every quarter, even though Halliburton's top executives knew collection of them was not probable and that without doubt the recoverable claims could not be accurately estimated.*

15.     With respect to the Dresser acquisition – when it was first announced, Halliburton told investors they had "*agreed upon [an] organizational structure, which will facilitate a quick, smooth integration,*" that the merger would "*lower costs,*" resulting in "*very significant savings ... in excess of $1/4 billion*" per year, and result in "*strengthening and improving Halliburton's balance sheet.*" At the same time, Halliburton assured investors the "*combination*

- 11 -

*will be especially effective.*" Later, it represented the integration of the two firms' construction businesses was "*particularly effective*," resulting in "*strength in all facets of construction and project management*." The Cheney executive team represented that the acquisition of Dresser would be and had been a huge success for Halliburton and that the completion of the merger resulted in the successful integration of Dresser's construction unit (Kellogg) into Halliburton's construction operations (Brown & Root). They said the acquisition was contributing in a positive fashion to Halliburton's financial results, initially generating bottom-line benefits of $250 million annually (later stated to have increased to $500 million annually), *had significantly strengthened Halliburton's financial condition and that Halliburton's accrued liabilities for asbestos suits/claims (mostly against Harbison-Walker, a former Dresser subsidiary), had been properly calculated and the resolution of such suits/claims would not have any material impact on Halliburton's financial condition or results from operations.*

16.    When Halliburton addressed its potential financial exposure to asbestos-related claims due to the involvement of a former subsidiary of Dresser (Harbison-Walker Refactories) in asbestos claims/suits in Halliburton's financial statements, it consistently assured investors that due to substantial insurance coverage, defenses to the suits, the age of the claims and the effective management of those suits/claims, *they would be resolved without any material impact on Halliburton's financial condition or results from operations.* Consistent with these representations, Halliburton at 12/31/98, 6/30/99, 12/31/99 and 6/30/00 had established accrued liabilities for asbestos suits/claims of only $12 million, $8 million, $25 million and $24 million, respectively. *The Cheney-led executive team consistently represented that these accrued liabilities, i.e., reserves for Halliburton's potential asbestos liability, were adequate.*

17.    However, even by the Fall of 98, the situation with respect to the impact of the Dresser acquisition, the integration of Dresser's construction operations into Halliburton's and

the true extent of Dresser's legacy asbestos liabilities on Halliburton was quite different from –
and far worse than – what was being publicly represented.  In fact, even by the time the Dresser
acquisition closed on 9/29/98, Halliburton's top executives knew (or recklessly disregarded) that
the representations and forecasts made in connection with that acquisition were false.  In fact,
Cheney and Halliburton's other top executives had been warned about Dresser's potentially huge
asbestos liabilities, but decided to go ahead with the acquisition and take the risk of the
liabilities, because disclosure of those potential asbestos liabilities would likely mean that
Halliburton's shareholders would not vote to approve the merger.  So, in order to avoid creating
a documentary trail of the significant risk of huge financial exposure to Dresser's legacy asbestos
claims they knew existed and the serious differences in how Halliburton and Dresser operated
their construction businesses and the likely difficulties to be encountered in integrating their
operations, Halliburton's executives – especially Cheney – had insisted on proceeding with the
Dresser acquisition *without performing any due diligence examination or investigation of
Dresser's business and finances – an unprecedented step in a $7 billion merger*!  According to
the *Baltimore Sun* in a 6/10/02 article written after the revelations of Halliburton's actual huge
asbestos liabilities, "*[a]ccording to executives at Halliburton, Mr. Cheney knew about the
asbestos liability before the merger and considered the risk.*"  On 8/1/02, *The New York Times*
reported that evidence existed to prove that Dresser and Halliburton knew of the existence of
significant additional asbestos liability from the time of the Dresser merger:

> At issue now is whether Halliburton ... was aggressive enough in
> investigating the asbestos liabilities it was taking on in acquiring Dresser, and
> whether it adequately informed shareholders of the risks at the time they were
> asked to approve the deal.
>
> Previously undisclosed court documents show Dresser was notified a
> month before the merger that it might face greater asbestos liability from its
> former subsidiary than it had disclosed.

- 13 -

18.    Not only did Halliburton's executives know (or recklessly disregard) that Halliburton was assuming very substantial (probably unquantifiable) asbestos liability in acquiring Dresser, they also knew that the forecast of $250 million in annual net income enhancements was little more than a pipedream, which was extremely unlikely to be achieved. In fact, the attempted integration of Dresser's construction operations into Halliburton's construction operations immediately resulted in severe and protracted difficulties, as the culture of the conservative and restrained Dresser executives immediately came into severe conflict with the overly aggressive, risk-oriented and fraud-prone Halliburton executives. Top officials in Dresser's construction operations discovered that Halliburton's construction operations were increasingly plagued with millions of dollars of uncollectible Unapproved Claims on fixed-price contracts – *yet Halliburton was improperly recognizing such Unapproved Claims as revenue*! Even worse, Halliburton executives immediately began to draw down upon previously established conservative reserves for overruns and change orders in the Dresser operations to help cushion and conceal the poor results of the Halliburton construction operations, further infuriating Dresser managers. Instead of successful integration, there was turf, cultural and operational warfare, resulting in confusion, delay and excessive costs.

19.    The cultural clashes and fallout between the Dresser and Halliburton executives after the acquisition were reported by *The New York Times*:

> In early 1998, Mr. Cheney went quail hunting in South Texas with William E. Bradford, chairman and chief executive of Dresser Industries. The two companies, industry leaders in oil services, *had looked several times at the possibility of merging but had been unable to make a deal*.... [Now, however] ... [w]ithin weeks, the two companies had plans to join forces, *creating a company that would be headed by Mr. Cheney*.

> Mergers typically include a process of what is known in the business world as "due diligence," in which both companies look hard at each other's pending projects to make sure their assumptions about each other's value are based on solid numbers.

- 14 -

> *In this case, however, the two chief executives felt so comfortable with each other they decided this would not be necessary, according to Mr. Vaughn, who was then Dresser's president.*

The deal closed in September 1998 *and cultural clashes quickly emerged.*

One of the most jarring, present and former executives said, was over the arcane art of how to account for the profits produced by long-term projects. Dresser's Kellogg unit was known in the industry for its conservative approach and its executives prided themselves on never having to erase profits once they were entered in the ledgers. Halliburton officials, the executives said, were quicker to log the profits, relying on their ability to forecast how projects would turn out. This stirred resentment among Dresser managers who joined the new company. "They would work you through the meat grinder," said one former executive. "They would always opt for the most aggressive treatment."

> *Tensions between the two management teams deepened in the months after the merger with the discovery of large losses on some of the Halliburton projects.*

Dresser's construction unit had forecast a banner year for 1999, expecting profits of more than $200 million, including gains from the Halliburton contracts. But a spate of unexpected losses after the merger, mostly from Halliburton projects, shrunk those profits to roughly $100 million, a former company official said.

20.     Throughout the Class Period, Halliburton represented it had an effective Code of Business Conduct throughout its worldwide operations which were conducted in a strong ethical setting. Also in 3/99, Halliburton told the investment community that a consortium it was part of had received very large contracts for the expansion of the huge LNG terminal at the Bonny Island, Nigeria project, originally participated in by Dresser's construction arm, Kellogg. Obtaining this extension/expansion of the LNG contract in Nigeria was especially important for Halliburton, as gaining international contracts was indispensable to the appearance of Halliburton's success, especially in Nigeria, which had become one of the largest oil and gas producing nations in the world. Halliburton said it was *"proud"* to be awarded the contract extension which *"extends [its] track record in the LNG market."* However, Halliburton concealed that to obtain the contract extension it had, in violation of its own Code of Business Conduct, continued an ongoing practice of making improper illegal payments to obtain the LNG

- 15 -

contracts in Bonny Island, Nigeria. By 99, these improper or illegal payments totaled an astonishing $180 million, millions of which were paid during the Cheney team's reign. These massive illicit payments were funneled through a London-based sole practitioner lawyer, purportedly to pay for his consulting services, when, in fact, the sole practitioner (who had been to Nigeria only once in his entire career) distributed the money, via secret Swiss bank accounts, to top Halliburton officials to reward them for their participation in this dangerous and illegal activity and to Nigerian officials to steer the contract extension to the Halliburton consortium. Payments of this size, which blatantly violated Halliburton's Code of Business Conduct and required circumvention of its internal controls to assure compliance with the Foreign Corrupt Practices Act, were made only with the approval of Halliburton's top executive team.

21.     Due to the foregoing problems, by the Fall of 99, Cheney was well aware of his executive team's trail of concealed failures and improper conduct. The failed restructuring of Halliburton's construction businesses, the growing fiasco with regard to the escalating uncollectible Unapproved Claims on Halliburton's large fixed-price contracts, the failure to successfully integrate Dresser's construction operations into Halliburton's, Halliburton's much larger than disclosed asbestos liabilities, and the Nigerian payoffs were all ticking "time bombs" which Cheney knew could not be concealed forever. Cheney thus wanted to get away from Halliburton and return to politics, hopefully securing a major position in a new administration if George W. Bush, the then Republican Governor of Texas, was elected President. By late 99 or early 00, Cheney, who was heading Bush's Vice Presidential selection task force, knew that he had a significant chance to be picked by Bush for a major position in a new Bush Administration, possibly even as his Vice Presidential running mate.

22.     So, during the first half of 00, Halliburton kept up the stream of positive assurances to investors. Halliburton said that the Dresser acquisition, which Cheney had

- 16 -

championed and spearheaded, was *"behind us,"* that *"integrating [its] operations [was] an important part of our transition to the future,"* that *"costs have been permanently reduced in-line with prior guidance"* and that the *"potential rewards to our shareholders are vast."* Halliburton's *"engineering excellence and construction experience make it possible to take on end-to-end projects of any size [including the] ability to take on massive international lump-sum projects that are beyond the range of smaller companies,"* and Halliburton's construction operations *"will continue to generate good profits."* In sum, according to Cheney, Halliburton's stock is *"one of the best investment opportunities."*

23.    Cheney knew that any disclosure of his team's management failures, bad decisions, improper or illegal overseas payments and the financial chicanery and manipulation they were using to cover up Halliburton's problems would have undermined any opportunity Cheney had to be a top level member of a new Bush Administration. Such revelations would also cause Halliburton's stock to plunge, which would cost Cheney, Lesar and other top Halliburton executives millions and millions of dollars in valuable stock option profits, which profits were now available to them as their false statements about the success of Halliburton's business and accounting manipulations to boost its reported financial results had succeeded in driving Halliburton's stock back up to near its all-time highs of $52 per share in the Spring of 00.

24.    Disclosure of the financial chicanery and serious operational problems inside Halliburton was no mere hypothetical possibility. Former Dresser executives who had joined Halliburton's construction operations in connection with the merger were increasingly scandalized by and increasingly voicing objections to Halliburton's improper accounting manipulations, *i.e.,* turning losses into profits, as well as other accounting improprieties that Halliburton's executives were engaging in, including reversing previously established, conservative reserves in the old Dresser part of the business so as to artificially boost

- 17 -

Halliburton's construction operations' reported operating income and Halliburton's reported net income. Also, the Cheney executive team's actions to try to achieve "bottom line" gains for Halliburton as a result of the Dresser acquisition had resulted in the firing of hundreds of Dresser managers, greatly increasing the risk of exposure of Halliburton's illicit practices.

25. In addition, by 99-00, the situation with respect to public revelations of Halliburton's probable asbestos liability was also increasingly threatening. Growing awareness in the investment community of the dangers of possible asbestos liabilities to public companies with exposure to such claims was increasing. Several companies with such exposure had either filed for bankruptcy or taken huge financial write-downs and/or reserves for such liabilities, causing Wall Street analysts to press Cheney and Lesar as to whether Halliburton's accrued liabilities, *i.e.*, reserves, for such suits/claims were adequate. Halliburton's executives repeatedly asserted that Halliburton's $24-$25 million in accrued liability for asbestos suits/claims during the Cheney era was adequate and an accurate reflection of Halliburton's actual financial exposure, when, in fact, they knew Halliburton's probable asbestos liabilities were much, much larger than that – likely unquantifiable. In fact, they had deliberately never had any expert, objective or independent study evaluate or quantify Halliburton's asbestos liabilities – *because they knew any such study would show Halliburton's existing accrued liabilities were grossly inadequate*.

26. Thus, by early 00, the business and financial situation with respect to Halliburton internally was constantly worsening and the Halliburton executives, including Cheney, knew there was an ever-increasing risk of at least some of these negative conditions and illicit practices becoming public. In fact, they knew it was likely just a question of time until Halliburton itself had to admit to the reality of its fixed-price/lump-sum contract fiasco, the accounting manipulations being used to cover up its increasing construction operation losses and its multi-

billion dollar financial exposure to asbestos claims, which would require Halliburton to take giant write-downs to properly account for these concealed liabilities and losses. This would crush the price of Halliburton stock and, if it occurred before Cheney left to return to politics, impair, if not destroy, his new and valuable reputation as a successful corporate business executive and badly damage his political ambitions.

27. During mid-00, as a result of their increasing knowledge of these accumulating and escalating negative conditions that were adversely impacting Halliburton's businesses and operations – during 5/00 through 8/00 – Cheney and several of Halliburton's other top executives bailed out of their Halliburton stock at highly inflated prices. In the aggregate, during these three months, as Halliburton's stock soared higher based on the surprisingly high profits Halliburton reported and increased future profitable growth it forecast, Halliburton's insiders sold off over 1.1 million of their Halliburton shares at as high as $53.93 per share, pocketing $61 million in illegal insider trading proceeds! During this time period, Cheney sold 760,000 shares for $40 million – over 80% of his Halliburton stock holdings. Bradford, Halliburton's Chairman, sold 137,375 shares for $7.1 million – over 32% of his Halliburton stock holdings. Vaughn, Halliburton's Vice Chairman, sold 150,500 shares for $7.6 million. *All of these sales were completely voluntary, including those of Cheney*. To the extent these sellers exercised options to acquire the stock they sold, those options were in no danger of expiring any time soon. Cheney himself was under no obligation, legal or otherwise, to divest himself of his Halliburton holdings, even if he were to be selected to run for Vice President. In fact, later on, Lesar was quoted as stating: *"The future Vice President Cheney did not have to sell at that time, did not have to sell his stock or his options, but he insisted ...."* And, in fact, Cheney held onto shares of stock in other public companies he was affiliated with even though he resigned his positions with those companies when he ran for Vice President. Had their positive statements about

- 19 -

Halliburton's business, finances and future prospects been true, the Halliburton executives' shares would have increased in value in the future had they held onto them. Yet they sold.

28.      During the 2ndQ 00, Cheney knew Republican Presidential candidate Bush would likely select him as his Vice Presidential candidate.   So he and his colleagues made sure Halliburton reported much better-than-expected 2ndQ 00 results in 7/00 due to what they said was the stronger-than-expected performance of Halliburton's ES Group.   These results were reported just as Cheney announced he would resign from Halliburton to run for Vice President. At the time of his announcement and in his last conference call as Halliburton's Chairman/CEO on 7/26/00, Halliburton reported *much better-than-expected 2ndQ 00 results – net income of $75 milion/$.17 per share – a 50% increase in operating income, driven by especially strong results from Halliburton's construction operations in its ES unit*.

29.      On 7/26/00, Halliburton held a conference call for investors, analysts and money managers to discuss its financial results, the success of its construction businesses and Halliburton's future prospects.   During the call, Cheney, Lesar and Morris stated:

> Cheney: ... I have got every confidence that Halliburton *has a very bright future ahead of it.   I think we have done a good deal over the last several years to strengthen the company* ....

> Lesar: ... *Halliburton is well positioned* ....   If you look at our engineering and construction group, *we continue to have good quality backlog in those businesses.... That backlog continues to provide us profitable work* ....

> Morris: ... We have got a lot of big numbers to talk about today ....   Halliburton Company's operating income up 50% ....

*      *      *

> [D]uring June we finalized negotiations to develop the Barracuda and Caratinga oil fields in deep water Brazil for Petrobras and, on July 5th we signed the contract. This contract is a turn-key fixed-price EOC contract.... This contract is a major win for Halliburton and clearly demonstrates the numerous integrated offshore capabilities and technologies that we have been developing....

*      *      *

- 20 -

> *[T]he indications are positive for BRES' future, revenues and profits from the Barracuda project will begin to be recognized in the late, in the fourth quarter and will contribute to continued momentum in 2001.*

A few weeks later, Lesar publicly stated that the Barracuda/Caratinga contract was a *"model demonstrating the capabilities of the entire Halliburton Group"* and that *"[t]he direction now seems to be toward [a] fixed price for projects"* and *"Halliburton has the advantage here."* Just a few days later, Halliburton's stock hit is Class Period high of $55.18 per share.

30.     Thus, with Halliburton's stock back to near all-time high levels and its business reporting strong and better-than-expected profits and forecasting increased profitability going forward, Cheney left Halliburton, *appearing to epitomize the successful corporate CEO returning to "public service."* The importance of Cheney leaving Halliburton on a high note amid apparently successful corporate operations and profits is highlighted by the fact that Karen Hughes, communications director of the Bush presidential campaign, said in 8/00: "The American people should be pleased they have a vice-presidential candidate *who has been successful in business."* Cheney himself said when he left to run for Vice President: *"[O]ne of the things that I'll bring to this time in government that wasn't there before is that for five years I've run a Fortune 500 company."* Another Bush spokesperson said, *"Governor Bush values a team member who has met great success in business."*

31.     But, very shortly after Cheney left Halliburton to return to politics, some of the serious and pervasive financial manipulations and misrepresentations that had secretly permeated his tenure at Halliburton began to unravel and become public. In early 10/00, Lesar, the new Chairman/CEO, quietly met with selected analysts and leaked to them that there were serious operational problems in Halliburton's construction businesses (which had supposedly been successfully restructured in 97-98 and into which Dresser's construction operations had supposedly been successfully integrated during 98-99) and that a new major

restructuring/reorganization (which would inevitably result in large charge-offs) was necessary. As this information leaked into the market and was absorbed into Halliburton's stock price, the stock, which traded at over $51 per share on 10/2/00, fell to as low as $40.75 per share by 10/24/00, closing at $41.62 – *a decline of about 20% in just a few weeks.*

32.     After the close on 10/24/00, Halliburton shocked the investment community at large by publicly revealing that, due to serious operational problems, management inefficiencies and excessive costs, Halliburton would have to restructure and reorganize its construction operations, which would reduce Halliburton's net income and EPS during the balance of 00 and during 01.   Analysts said this was a *"shock"* and a *"big surprise"* and they down graded Halliburton's stock.   Since Halliburton's construction operations had supposedly been successfully restructured and reorganized in 97-98 and were supposedly successfully and profitably performing several large fixed-price contracts all over the world, this shocking public revelation crushed Halliburton's stock, driving it down from a high of $42.68 on 10/24/00 to as low as $34.18 on 10/25/00, a further one-day *decline of 20% – on extraordinary volume of 25.3 million shares, compared to Halliburton's average daily trading volume of 3-4 million shares, the largest one-day trading volume in Halliburton's stock up to that point in time*!

33.     Shortly thereafter, Halliburton confirmed that it was taking huge charge-offs in its construction operations (on several fixed-price contracts Halliburton refused to specifically identify) *of $193 million, some $157 million of which was to write off uncollectible cost overruns and change order claims – the very items which the Cheney-led executive team had been improperly recognizing as revenue to boost Halliburton's operating and net income and EPS to make the Cheney-led executive team look successful, enable them to pocket large cash performance-based bonuses and boost Halliburton's stock price so the executives could personally profit by selling off their shares at artificially inflated prices*!   Now that

Halliburton's stock had collapsed and continued to languish in the low- to mid-$30 range during late 00 and through early 4/01, the Halliburton executive team – now led by Lesar, who succeeded Cheney as Chairman and CEO – stopped their insider selling.

34.   These Fall 00 partial revelations of the problems in Halliburton's overall business and its construction operations and the losses actually being incurred on several large fixed-price construction contracts caused a substantial decline in the price of Halliburton stock.  However, the price of Halliburton stock continued to trade at artificially inflated levels because defendants did not make full and complete disclosure of the true extent of the operational and financial problems plaguing Halliburton and continued to misrepresent Halliburton's financial condition, operations, business success and future prospects, including Halliburton's actual asbestos liabilities, its Bonny Island, Nigeria LNG contract and the status and circumstances of its $2.5 billion Barracuda/Caratinga offshore drilling project in Brazil.

35.   Once the partial disclosures of 10/00 had occurred, Cheney was gone and some of the excesses and financial manipulations of the Cheney era had been disclosed, Lesar, Morris and Muchmore needed to boost Halliburton's stock price to demonstrate their own managerial success and also to restore the value of the stock options they held, which had been greatly impaired by the 10/00 decline in Halliburton's stock price upon the partial disclosure of the problems with and losses in Halliburton's construction businesses detailed above.[2]   So,

---

[2]   During 98 and 99, Lesar, Morris and Muchmore had been awarded the following options:

| Name | Year | Options Granted | Exercise Price ($/share) |
|------|------|-----------------|--------------------------|
| Lesar | 1998 | 65,000 | $28.13 |
| | 1999 | 260,100 | $39.50 |
| Morris | 1998 | 25,000 | $28.13 |
| | 1999 | 45,000 | $39.50 |
| Muchmore | 1998 | 6,900 | $28.13 |
| | 1999 | 10,500 | $39.50 |

beginning in 3/01 or 4/01, through a series of extremely positive statements, they drove Halliburton's stock back up to as high as $49.20 by 5/21/01.

36.     During this part of the Class Period, Lesar and Morris told investors and analysts that Halliburton was *"confident"* its new, *i.e.*, latest, restructuring of its construction operations would be completed by 1stQ 01, that ES's operating profit would ***double in 01*** and that the Barracuda/Caratinga contract, which ***"demonstrate[ed] Halliburton's end-to-end project management and execution capability,"*** would *"contribute significantly"* to Halliburton's 01 results.   When Halliburton reported its 1stQ 01 results, they were exceptionally strong – *"an excellent quarter,"* in which ES's operating income *"quadrupled,"* ***"benefit[ing] from ... the ramp up of Barracuda-Caratinga,"*** leaving management *"encouraged with the progress resulting from the restructuring."*   As a result, Halliburton sharply increased its earnings forecast for 01.   Throughout late 00 and early 01, Halliburton assured investors its asbestos liabilities remained under control – leading analysts to describe them as a *"minor concern."* Consistent with this, Halliburton increased its accrued liabilities for asbestos liability by just $2 million in the 3rdQ 00, just $3 million in the 4thQ 00 and just $1 million in the 1stQ 01 – resulting in an accrued liability at 3/31/01 of only $30 million, assuring analysts Halliburton had *"fully accrued"* for any asbestos liabilities.

37.     As Halliburton's stock soared higher again, Halliburton executives, knowing that Halliburton was still grossly understating its asbestos liabilities and concealing that any conceivable resolution of those claims would have a material adverse impact on Halliburton's financial condition and results, that Halliburton had obtained the Bonny Island, Nigeria LNG contracts via $180 million in improper payments, and that Halliburton was suffering serious problems, performance delays and excessive costs on the giant Barracuda/Caratinga fixed-price contract in Brazil, Halliburton insiders took advantage of the again inflated price of Halliburton

stock by selling off 113,823 shares at as high as $48.79 per share during 4/01-5/01, pocketing over $4.6 million in additional illegal insider trading proceeds.

38.    On 6/28/01, just a few weeks after the Halliburton insiders had completed their second spurt of Class Period insider trading, Halliburton for the first time revealed that a former Dresser subsidiary had been requesting Halliburton's financial help in dealing with an increasing number of asbestos claims, even though they had known this throughout the Class Period. As investors digested this negative information and its implications for Halliburton's financial exposure to asbestos suits/claims, Halliburton's stock declined to as low as $29.24 on 7/18/01. Halliburton belatedly increased its net reserves for asbestos claims in the 2ndQ 01 to $125 million. However, Halliburton's executives continued to represent that due to substantial insurance coverage and other factors its exposure to asbestos claims was *"manageable,"* and those claims were *"adequately"* reserved for and would be resolved *without any material impact on Halliburton's financial condition or results of operations*. Through the end of the Class Period, defendants intentionally concealed and affirmatively misrepresented the true significance of Halliburton's actual exposure to asbestos liabilities in Halliburton's SEC filings, press releases and communications with analysts and investors.

39.    The intentional nature of the defendants' now years-long asbestos-related misrepresentations is highlighted by the events of 9/01-12/01. On 9/12/01, defendants learned that a jury had returned a $130 million verdict against Halliburton and a co-defendant for five asbestos plaintiffs – stunning confirmation that Halliburton's prior reassurances and representations regarding its asbestos liability exposure were completely false. However, Halliburton did not publicly disclose this verdict or correct those false reassurances regarding Halliburton's asbestos liability exposure. On 10/23/01, *five weeks after they had learned of the verdict*, Lesar and Foshee hosted a conference call with analysts and investors to discuss

Halliburton's 3rdQ 01 results. In this call, *neither Lesar nor Foshee (Halliburton's new CFO effective 8/01) revealed the verdict; rather, they stated that the news regarding Halliburton's asbestos liability in the quarter was "positive."* In response to a question regarding asbestos claims relating to Harbison-Walker (such as the claims leading to the 9/12 verdict), they stated as follows:

> Foshee: ... *There really is not any, anything new to report on Harbison-Walker* other than the fact that, that new claims, during the quarter, naming Dresser as a defendant were *only* 1,300....

> Lesar: *...[T]here have been no adverse developments, at all with respect to the Harbison-Walker situation .... [C]laims are coming down ... and more importantly, our settlement rate continues to be at historical levels [of $200 per claim]....* [A]nd the third point is that we keep getting paid by our insurers for those that we do settle. *And I think those are three really positive data points that people need to start putting into their thinking ....*

When a few analysts independently learned of the Texas verdict and then questioned Halliburton about it, Lesar and Foshee assured them the verdict was an aberration and was not indicative of any change in Halliburton's asbestos liability exposure. In Halliburton's next 3rdQ 01 10-Q, filed on 11/8/01, *two months after defendants learned of the Texas verdict, Halliburton maintained its accrued liability for asbestos claims/suits at $125 million and again represented that Halliburton's exposure to asbestos claims/suits would have no material adverse effect on its financial condition or results from operations.*

40. During the first few days of 12/01, in SEC filings, Halliburton publicly revealed recent large asbestos verdicts against it, but made no further public comment or explanation. Then, on 12/7/01, Halliburton issued a release detailing the recent asbestos verdicts against it, which made it clear to all that Halliburton's existing $125 million accrued liability for its asbestos exposure was grossly inadequate and that the Company's prior reassurances regarding the financial impact of its exposure to asbestos liabilities were false. Investors instantly realized

that the Company had been affirmatively misleading them in its assurances regarding the Company's asbestos exposure. ***Thus, Halliburton shares collapsed from $21 to as low as $10.94 on 12/7/01, on astonishingly huge volume of 76.8 million shares, its largest one-day stock volume ever.*** *TheStreet.com* reported: ***"Halliburton Buried as Investors Stop Believing"***: ***"Halliburton's shares dove to nine-year lows Friday as investors lost faith in the company's claims ...."*** As investors digested the extremely negative implications of these revelations and tried somehow to compute Halliburton's now disclosed vast asbestos liability, rumors of bankruptcy circulated and Halliburton's stock continued to fall to as low as $8.60 per share on 1/4/02 – ***a 15-year low***! According to Cedric Burgher, Halliburton's director of investor relations:

> "Unfortunately the stock is not trading on the basis of its oil operations ... the specter of asbestos lawsuits is hanging over it. We're really just trying to understand how these issues will play out."

41. Several analysts also downgraded the stock. For instance, on 12/7/01, Salomon Smith Barney issued a report on Halliburton:

**HAL: Downgrading on Mounting Asbestos Liabilities**

**Summary**

- We are downgrading Halliburton ... due to mounting asbestos liabilities ....

42. On 12/7/01, Jefferies & Company issued a report on Halliburton, written by Sen, which stated:

**Halliburton: Update On Asbestos Litigation; Stay Cautious**

\*     \*     \*

- This morning Halliburton indicated that a Baltimore jury has awarded $30 million in damages against its Dresser subsidiary. This follows two recent significant adverse verdicts against the company.

- ***These are surprising developments following management's rather positive asbestos update during its 3Q01 conference call on October 23....***

- 27 -

- ***We now believe that HAL's asbestos-related net liabilities could be significantly higher than currently estimated (estimated at $125 million by the company).***

\*     \*     \*

Clearly, these are surprising developments following management's rather positive asbestos update during its 3Q01 conference call on October 23.... [W]e now believe that the net asbestos liability reserves of $125 at the end of 3Q01 (gross liability $704) probably needs to be increased.

43.     During the relevant portions of the Class Period, defendants concealed and failed to disclose the following facts:

(a)     Due to intense competitive pressures brought about by lowered capital spending budgets by oil exploration companies, Halliburton's construction operations were being forced to make dangerously low bids providing for only razor-thin margins, while accepting fixed-price terms on huge contracts, making it very likely that due to the inevitable Unapproved Claims which occur on any large construction contract, Halliburton would likely suffer losses on those contracts.

(b)     It was not true that Halliburton had switched to fixed-price contracts because they would create greater profits for Halliburton or because Halliburton had a competitive advantage in such contracts.  In truth, the switch to fixed-price contracts was driven by intensifying competition, whereby Halliburton and its competitors were fighting to obtain a shrinking number of contracts available from oil exploration companies which were curtailing their capital expenditures; thus, the fixed-price contracts were, in fact, forced upon Halliburton by competitive pressures and undertaken by Halliburton without sufficient controls, procedures, monitoring systems and personnel to perform such contracts profitably.

(c)     Halliburton did not have in place adequate contract performance monitoring, cost control and accounting systems that would enable it to effectively monitor the progress being made toward contract completion, the actual costs being incurred or the current

- 28 -

state of performance of large contracts and also lacked an adequate system of internal financial and accounting controls to permit the proper monitoring, control of and accounting for costs on fixed-price/lump-sum construction projects.

(d)     Halliburton had secretly changed the way it was accounting for Unapproved Claims on construction contracts and was now recognizing them as revenue when the claims were asserted, even though the customer had not yet agreed to pay the Unapproved Claims and more and more customers were refusing to pay millions of dollars of existing Unapproved Claims.

(e)     Halliburton was recording millions of dollars of Unapproved Claims as revenue, including on the Barracuda/Caratinga contract, even though its top executives knew that collection of those Unapproved Claims was not probable and that they were not capable of accurately estimating what amount could ultimately be collected under any circumstances.

(f)     Contrary to its claims, Halliburton had not changed the way it was dealing with or its procedures for customer change work orders/Unapproved Claims and was not securing advance agreement to pay for such work as it had claimed, but rather, was continuing its traditional process of accepting and performing change orders as demanded by customers or required by the progress of the contract work, without any agreement to pay, merely hoping to later collect on those Unapproved Claims.

(g)     Halliburton knew from the outset that it was likely to suffer a significant loss on the Barracuda/Caratinga contract because, in order to obtain this huge fixed-price/lump-sum contract, Halliburton had been forced to submit a "low-ball" bid with a dangerously thin projected profit margin, which was all but certain to be wiped out by the change orders/Unapproved Claims that would be unavoidable in a project of this size and which Halliburton knew the customer (Petrobras) would refuse to pay for, as this customer had refused

to pay millions in Unapproved Claims on an earlier contract completed in 98, which was part of the reason Halliburton had to take a $60 million charge for uncollectible Unapproved Claims at year-end 98.

(h)     Halliburton's construction operations had not been effectively reorganized and restructured during 97-98 as claimed; in fact, in the field, these operations were disorganized and lacked adequately skilled personnel and the procedures necessary to perform fixed-price contracts of the size and scope being undertaken by Halliburton, which greatly increased the probability of performance delays, cost overruns, Unapproved Claims and thus losses on those contracts.

(i)     Halliburton's financial results issued during the Class Period were false, having been manipulated and artificially inflated higher due to the fraudulent and illicit accounting practices detailed in ¶¶219-314 of this Complaint.

(j)     Halliburton's Code of Business Conduct and Ethics was not, in fact, being enforced or followed in the Company's international operations, and in order to obtain and retain the Bonny Island, Nigeria LNG contract and extension thereof, the consortium of which Halliburton was the dominant member had made and was making substantial payoffs and bribes, including payments to Nigerian officials to get the contract and its extension and payoffs to top executives of Halliburton's Kellogg unit to reward them for participating in this risky and illegal activity, which payments were being funneled through Swiss bank accounts controlled by a London lawyer.

(k)     Halliburton had acquired Dresser without doing due diligence into Dresser's business, operations, financial condition and potential liabilities, in part because Cheney demanded that the acquisition be completed in an unreasonably expedited fashion and because he did not want to create a paper trail documenting what he and other Halliburton

- 30 -

executives knew were liabilities of potentially hundreds of millions of dollars for existing and anticipated asbestos suits/claims against entities for which Dresser was legally responsible, a significant amount of which would likely not be covered by insurance.

(l)     The award of the Barracuda/Caratinga contract was not a result of, nor did it demonstrate, Halliburton's unique ability to manage and execute large offshore fixed-price construction contracts, but rather, it reflected Halliburton's willingness to submit a low-ball bid with razor-thin margins to get a fixed-price contract with a customer that it knew had a track record of refusing to pay for the inevitable Unapproved Claims and cost overruns that would inevitably occur on a $2.5 billion contract.

(m)     The acquisition of Dresser was not a "win" for Halliburton's shareholders. In fact, it represented an enormous risk due to Dresser's concealed potential asbestos liabilities and because, contrary to the representations that the two companies were a good cultural and business fit and that there were plans in place to achieve a smooth, quick transition and successful integration of the operations of both companies, there were no transition plans in place and the Dresser executives and managers were known to be conservative, system and process oriented managers with a very conservative approach to percentage-of-completion/contract accounting, while the Halliburton executives and managers were just the opposite – virtually guaranteeing a cultural clash.

(n)     In fact, the construction operations of Dresser were not being successfully integrated into the construction operations of Halliburton, as the managers and executives of the two companies had very divergent approaches to business and accounting and constantly fought with one another, resulting in distracting turf battles, operating inefficiencies and duplicative layers of management – all resulting in an inability to integrate the two operations and thus in excessive costs.

(o) Halliburton, in fact, had not adequately reserved or accounted for its accrued asbestos liabilities as represented – in truth, Halliburton's potential liabilities for asbestos claims and suits were unquantifiably large, but certainly exceeded the stated reserves as disclosed throughout the Class Period by a huge multiple.

(p) Halliburton's reserve for its accrued asbestos liabilities had not been objectively measured or determined or subjected to any expert review or consultation and thus represented nothing more than a self-interested management's claim, which management knew was grossly inadequate. Given the foregoing, there was absolutely no basis in fact for any representation that management believed that Halliburton's asbestos claims and suits would be resolved without any material impact on Halliburton's financial condition or results of operations. Management did not believe this representation or statement of opinion when it was made and knew that it was highly likely that the ultimate resolution of the asbestos claims involving Halliburton would, in fact, materially adversely impact Halliburton's balance sheet and results of operations as, in fact, it did.

(q) Because of the existence of Dresser's very substantial potential asbestos liabilities and due to the known difficulties of attempting to blend the management of the two companies and integrate their construction operations, it was not true that the acquisition of Dresser would strengthen Halliburton's balance sheet or lead to bottom-line profit improvements either in the first year after the merger or thereafter.

(r) As a result of the foregoing undisclosed problems and practices, the defendants actually knew that their statements regarding Halliburton's future business prospects and performance and their forecasts of improved future financial performance were false when made and would not be achieved.

- 32 -

44.     At the end of the Class Period, Halliburton's stock was just one-half the $20 per share the stock sold at when Cheney joined Halliburton as its CEO in 8/95.   In the interim, Halliburton's executives had driven Halliburton's stock to a Class Period high of $55 by falsifying Halliburton's financial results and misrepresenting the state of its business, the success of the Dresser merger and Halliburton's future prospects – allowing them to sell off 1,344,064 shares of their Halliburton stock – *61% of the shares they owned – pocketing $68.2 million in illegal trading proceeds before adverse revelations drove the stock down to as low as $10 and then to $8.60*.   Halliburton insiders' Class Period stock sales are set forth below:

| Name | Common Shares Owned | Common Shares Sold | Proceeds | Percent of Shares Owned Sold |
|------|--------------------:|-------------------:|---------:|-----------------------------:|
| Jerry Blurton | 70,156 | 44,592 | $  2,182,051 | 63.6% |
| William Bradford | 422,564 | 137,375 | $  7,146,798 | 32.5% |
| Richard Cheney | 949,800 | 760,000 | $40,055,750 | 80.0% |
| Lester Coleman | 133,064 | 82,001 | $  3,604,880 | 61.6% |
| John Kennedy | 21,520 | 6,520 | $     331,666 | 30.3% |
| David Lesar | 218,373 | 35,000 | $  1,644,550 | 16.0% |
| James Martin | 91,446 | 71,345 | $  3,417,671 | 78.0% |
| Gary Morris | 59,052 | 7,500 | $     401,250 | 12.7% |
| Donald Vaughn | 230,645 | 199,731 | $  9,478,142 | 86.6% |
| Totals: | 2,196,620 | 1,344,064 | $68,262,758 | 61% |

As the graph below shows, these stock sales were markedly out of line with these individuals' prior sales of Halliburton stock and most took place at or near the Class Period high of Halliburton's stock price.[3]

---

[3]     Pre-Class Period sales of Dresser stock by Dresser executives are reflected in this chart.

- 33 -



**Halliburton Co.**
**All Defendants**
**Quarterly Insider Sales: 1997 - 2001**

## Post-Class Period Events

45.   Events subsequent to the revelations of 12/7/01, which end the Class Period, have confirmed the existence, and serious nature of, the undisclosed adverse information during the Class Period, as well as the Halliburton executives' manipulation of Halliburton's financial reports and statements to cover up those problems.

46.   In 3/02, after learning that *The New York Times* was working on a story to expose Halliburton's fraudulent accounting practices in 98-00, Halliburton's Board of Directors forced out four executives, including the head of its ES unit and Morris, who had been Halliburton's CFO during most of the Class Period.   Then, in 5/02, *The New York Times* published an exposé on Halliburton's accounting manipulations, reporting how it turned losses from cost overruns and unpaid change order claims into profits after secretly changing how it accounted for Unapproved Claims.   This forced the SEC to undertake an investigation, notwithstanding that

Cheney was, by then, the Vice President of the United States. When this article appeared, Foshee (Halliburton's current CFO) said *"he was certain that the accounting change was approved by ... David Lesar."* Later, Lesar said, *"Cheney was aware Halliburton was counting projected cost-overrun payments as revenue. 'The Vice President was aware of who owed us money, and he helped us collect it.'"* According to Paul Brown, Chairman of the Accounting Department at the Stern School of Business at New York University, the change was *"clearly a way of pumping up revenues and receivables."* *"If it looks like they were just fabricating the numbers, that verges on fraud,"* said J. Edward Ketz, Professor of Accounting at Penn State University. Nevertheless, Halliburton vehemently denied any impropriety, insisted the amounts involved were immaterial and that its disclosure and accounting practices were correct.

47.     However, after a long, extensive investigation, in 8/04, the SEC filed suit, alleging extensive accounting violations in connection with Halliburton's construction businesses, instituted Cease and Desist proceedings and issued a Cease and Desist Order, which included findings that Halliburton and its top financial officers had, in fact, violated the reporting and disclosure requirements of the federal securities laws by failing to disclose in 98 that Halliburton had changed the manner in which it was accounting for cost overruns and change order claims, thus improperly inflating its ES unit's operating income (and Halliburton's operating income, net income and EPS) for several quarters during 98 and 99, fining Halliburton $7.5 million, in part because Halliburton refused to cooperate with the SEC during its investigation. The SEC Complaint/Cease and Desist Order are attached as Exhibits A and B hereto.

48.     As to Halliburton's heralded shift into "fixed-price/lump-sum" projects, like Barracuda/Caratinga, which supposedly gave it a competitive advantage and would increase its profits and Halliburton's expertise and management and execution capabilities, just a few



months after the end of the Class Period, Halliburton *abandoned acceptance of fixed-price contracts and exited the fixed-price offshore engineering, procurement and commissions ("EPC") business*. According to Lesar in 7/02, Halliburton

> would no longer pursue lump sum engineering procurement and commissioning contracts, EPC contracts, for the offshore oil and gas business....
>
> ***Our bottom line is we're no longer going to accept that lump sum risk....*** [T]he potential rewards [are] unacceptable, and are [sic] no longer going to take them on.

In Halliburton's 02 Annual Report, Halliburton stated it had decided

> it will no longer pursue lump-sum engineering, procurement, installation and commissioning (EPIC) projects for the offshore oil and gas industry until and unless the *current business model* improves to allow for reasonable profits at reasonable risks.

49.    During 01, the Barracuda/Caratinga $2.5 billion lump-sum/fixed-price contract, which Halliburton trumpeted as an example of its expertise and ability to successfully manage and execute giant oil service/construction contracts and which Halliburton consistently represented was proceeding successfully and driving Halliburton's better-than-expected financial performance during 01, was, in fact, a disaster – *the worst contract catastrophe in Halliburton's history – increasingly behind schedule and awash in cost overruns that would result in over $760 million in losses – the largest loss Halliburton ever suffered on a single contract*!

50.    In 7/02, just a few months after the Class Period ended, Halliburton announced an initial $119 million loss on Barracuda/Caratinga due to unpaid Unapproved Claims. In 2/03, Halliburton admitted the "project *continues* to experience significant cost increases and time delays" and that Halliburton had incurred another $81 million in losses. In 4/03, Halliburton admitted to further "*scheduling delays*," "*higher cost trends*" and "*actual and committed costs exceeding estimated costs*," resulting in an additional $55 million loss on the project. 6/03 brought an additional $104 million loss on Barracuda/Caratinga. By this point in time, with the

project only 75% completed, Halliburton had suffered a $345 million loss on Barracuda/ Caratinga, including an increased 2ndQ 03 loss of $173 million. Early 04 brought an additional $62 million loss. 7/04 brought another $200 million loss on the project, which Halliburton, with remarkable understatement, described as "***disappointing***," indicating it had "***enhanced [its] project management and increased [its] effort to complete this difficult project***."

51.     Thus, this showcase project, which Halliburton represented during the Class Period was proceeding successfully and contributing to increased ES operating profits and Halliburton's net income/EPS, has, to date, lost $762 million (or $1.08 per share). And there are likely to be further losses before the project is completed. While Halliburton told investors during the Class Period that fixed-price/lump sum contracts gave it a competitive advantage and would increase Halliburton's profits, in fact, it lacked the construction project management monitoring and oversight capabilities and systems and internal cost and accounting controls to successfully undertake and perform large fixed-price contracts like Barracuda/Caratinga. And, in fact, Halliburton knew that it would never collect any cost overruns/change order claims on Barracuda/Caratinga because in a prior fixed-price contract with Petrobras, its customer on the Barracuda/Caratinga contract, Petrobras had absolutely refused to pay millions of dollars of Unapproved Claims, resulting in Halliburton taking a $60 million charge at year-end 98. This Barracuda/Caratinga fiasco contributed in no small part to Halliburton's admission in 7/02 that it was abandoning fixed-price/lump sum EPC contracts.

52.     During most of the Class Period through 6/30/01, Halliburton maintained only a minimal accrued liability for asbestos claims of between $8-$30 million and consistently represented that these asbestos provisions were adequate and that "we believe that the open asbestos liability claims pending against us will be resolved without a material adverse effect on our financial position or the results of our operations." Then, even when Halliburton revealed in

6/01 that a former subsidiary of Dresser had requested that Halliburton provide it with claims management and financial assistance regarding the asbestos claims/suits being asserted against it, Halliburton told analysts that this development exposed Halliburton to *"worst case"* asbestos liability costs of $60 million.   Even when Halliburton then increased its asbestos accrued liabilities in the Fall of 01 to $125 million, it continued to assure investors the *"asbestos claims asserted against us will be resolved without a material adverse effect on our financial position or results of operations"* and that, due to Halliburton's *"substantial amount of coverage,"* the asbestos claims were a *"manageable problem."*   But then, in early 12/01, Halliburton, in SEC filings and a release, disclosed that it had suffered huge verdicts in a number of asbestos cases, demonstrating to investors that Halliburton's prior representations regarding its exposure to asbestos litigations and claims, including its representation that known claims against it would be resolved without any material adverse impact on its financial condition or results from operations, were false and that its previously reported accrued liabilities for those suits/claims had been grossly inadequate.

     53.   In 7/02, just months after the stunning revelations of early 12/01, Halliburton admitted that after it had its asbestos liabilities looked at by an independent expert, *its asbestos liabilities were at least $2.2 billion, some 73 times more than the highest amount of accrued liability for asbestos liabilities it reported until almost the end of the Class Period*, less some amount of hoped-for insurance recoveries, resulting in Halliburton later taking hundreds of millions of dollars of charge-offs/losses.   Combined with the first revelations of $119 million in Barracuda/Caratinga losses, Halliburton's 7/02 asbestos charges resulted in Halliburton suffering a 2ndQ 02 loss of $498 million ($1.15 per share).   Credit Suisse First Boston wrote on 7/25/02, in terming Halliburton's stock "unattractive":

> *Management finally admitted, following the appointment of an independent third party to conduct a study, that it has underestimated the extent*



*of asbestos exposure.* Accordingly, management has taken a further charge for asbestos liabilities over the next 15 years until 2017 of approximately $700 million, taking the total estimated (undiscounted) asbestos liability to $2.2 billion.

54.    *Then, a few months later, Halliburton revealed it had agreed to pay $4 billion to settle the asbestos suits/claims against it, resulting in another $781 million charge, causing an additional 4thQ 02 loss of $129 million ($0.33 per share), warning that further multi-hundred million dollar losses were likely.* In fact, Halliburton's recoveries from insurance companies have been hundreds of millions of dollars less than hoped for. As a result, Halliburton recorded *another huge $615 million charge ($1.40 per share) in the 2ndQ 04 which,* combined with continuing huge losses of $200 million ($.46 per share) on the Barracuda/Caratinga project, resulted in Halliburton suffering a $663 million ($1.51 per share) 2ndQ 04 loss. In the 3rdQ 04, Halliburton recognized additional large losses of $44 million, including charges of $230 million to settle asbestos liabilities. Most recently, on 1/3/05, Halliburton announced it had finally resolved the asbestos liabilities. A settlement calls for Halliburton to set up a $4.8 billion trust to pay asbestos and silica claimants by the end of 1/05. The trust will be funded with $2.78 billion of cash, 59.5 million shares of common stock and a $54 million note. *It is quite clear that Halliburton's acquisition of Dresser did not strengthen Halliburton's balance sheet and did not boost Halliburton's bottom line by $250-$500 million per year, and that the resolution of the asbestos claims/suits involving Halliburton had an adverse impact on its financial condition and its results from operations.*

55.    During the Class Period, Halliburton frequently mentioned the Bonny Island, Nigeria LNG contract that it, as part of the TSKJ consortium, was performing, stressing that this contract showed Halliburton's ability to successfully compete for large overseas LNG construction contracts – a very important market. The Bonny Island, Nigeria LNG contract was originally signed by a Dresser subsidiary (Kellogg) in 95. However, after the Dresser

acquisition, in 5/99, the TSKJ consortium (and Halliburton) received a new huge follow-on contract to expand the facility. Halliburton's agent in getting and holding on to this huge contract was Jeffrey Tessler, a London-based sole practitioner attorney. The day-to-day oversight and management of this contract was under Albert "Jack" Stanley, the CEO of Halliburton's Kellogg Brown & Root, Inc. ("KBR") subsidiary, and William Chaudan, a high-ranking KBR executive.

56.    In 5/03, Halliburton admitted to improper payments of $2.4 million to a Nigerian official in connection with the LNG contract, which payments it admitted *"clearly violated our Code of Business Conduct and internal control procedures."* It later was revealed that Halliburton's consortium had made $180 million in illegal payments to obtain and retain the Nigerian LNG contract. Some $5 million of this money ended up in a Swiss bank account belonging to Stanley, while $1 million ended up in Chaudan's Swiss bank account – payoffs to reward them for their participation in these risky, illegal practices – payments Halliburton admitted violated its Code of Business Conduct. However, most of the money went into and through Swiss bank accounts maintained in the name of Tri-Star Investments – an entity owned by Jeffrey Tessler, the London-based sole practitioner attorney who practices out of a storefront office and has no associates or partners, but is well-known for his connection to top government officials in Nigeria and has worked with Halliburton for over 10 years. Tessler has been to Nigeria only once in 20 years, yet was paid $180 million as a fee by TSKJ consortium for "consulting services," although they have never been documented. Lesar has admitted that *"criticism on an issue such as this one is expected"* and that these payments and the conduct of Stanley and Chaudan *violated Halliburton's "code of business conduct."* Halliburton has also admitted that there are internal corporate documents discussing paying bribes to public officials in Nigeria in connection with the LNG contract.



57.    So far, French investigators have traced $30 million of these illicit funds to a "close associate" of the former President (dictator) of Nigeria, General Sani Abacha – a country noted for its corrupt business practices, coming in second in Transparency International's 2003 survey of most corrupt countries.  On 10/13/04, the *Los Angeles Times* reported:

**Investigation Widens In Nigeria Oil Case Involving Halliburton**

\*        \*        \*

[I]nformation obtained by The Times, including documents from a French investigation, ***shows that Halliburton, through a subsidiary, was more involved in some of the suspicious deals than it has acknowledged***.  In his deposition to an investigating judge, Jeffrey Tesler – a British lawyer who served as the consortium's agent in Nigeria and the central figure in the alleged bribery scandal – stated that Halliburton fought to retain him even after a consortium partner moved to have him dismissed.

\*        \*        \*

Payments are alleged to have come from $176 million that the consortium paid to Tesler in five contracts signed between 1995 and 2002.  ***Four of the five contracts were signed after Halliburton joined the consortium in 1998 through its purchase of Dresser Industries***.

\*        \*        \*

An attorney for Georges Krammer, a former executive with another consortium member ... said ... Tesler made questionable payments after Halliburton became involved in the project.

"***The plan was to corrupt Nigerian officials***," Olivier Schnerb, Krammer's attorney, said in an interview at his Paris office.

\*        \*        \*

The project began in the early 1990s, when M.W. Kellogg, a subsidiary of Dresser Industries, formed a consortium with Technip, Snamprogetti of Italy and JGC of Japan to bid on a contract for the natural gas complex in energy-rich Nigeria.

The consortium, known as TSKJ, won a $2.2 billion contract in 1995 .... That same year, according to the copies of Tesler's deposition and other documents obtained by The Times, Tesler was retained to find subcontractors and help arrange meetings with Nigerian officials – including its military ruler at the time, Gen. Sani Abacha, who was notorious for corruption and human rights abuses.

*Tesler is little known in British legal circles. His office, a rundown storefront in a poor North London neighborhood of African and Caribbean immigrants, sits next to a Somali butcher shop.*

\*    \*    \*

Documents show that he was hired – over the objections of Technip, which preferred another candidate – after meeting with A. Jack Stanley, the head of Kellogg's operations in Nigeria, and other company officials. According to an internal consortium memo, he *"reported directly to Kellogg" and had worked on projects for that company since the 1980s.*

The original contract called for payments of $60 million to Tri-Star Investments, a Gibraltar-based firm Tesler established to help manage the consortium's Nigerian business.

The consortium paid Tri-Star through LNG Services, a company set up on the Portuguese island of Madeira.

"Madeira was picked [by the consortium] because it is a tax paradise with rigid secrecy laws," said Schnerb, the French attorney. "LNG Services was a corrupting machine."

He said that in Abacha's Nigeria, winning a contract without paying bribes was "as rare as a flying fish" and that the dictator "was the No. 1 person to be paid off."

Halliburton became part of the consortium in September 1998, when it acquired Dresser. After the Dresser takeover, Kellogg was merged with Brown & Root, a Halliburton unit, to form Kellogg Brown & Root.

Cheney named Stanley chairman of the Kellogg Brown & Root subsidiary, and he continued to oversee the Nigeria project.

In March 1999, TSKJ won a second contract, worth $1.4 billion, to build additional facilities at the natural gas complex. Twelve days after that contract was finalized, the consortium signed its second deal with Tri-Star, this one for $37.5 million, the copies of the documents show.

*That same year, Tesler said in his deposition, Technip sought to replace him with one of its own consultants but was overruled by the other consortium members, led by Kellogg Brown & Root, at a meeting in London.*

\*    \*    \*

In 2002, ... the consortium won a third contract for the project, this one worth $1.7 billion. The bribery allegations emerged that year after Krammer told French investigators that the consortium had established a "slush fund" to bribe Nigerian officials.

An ensuing investigation uncovered the first two contracts between the consortium and Tri-Star, as well as three others in July 2001, December 2001 and June 2002, the copies of the documents show.

The French investigation triggered inquiries in Nigeria and the United States, where the Justice Department and the Securities and Exchange Commission have ongoing investigations.

\*     \*     \*

*Le Figaro*, a Paris daily, reported this year that Tesler deposited several million dollars in a Swiss bank account controlled by Stanley, who retired last year as chairman of KBR – as Kellogg Brown & Root is now known – but remained on contract as a consultant.

Tesler acknowledged in his deposition that he made payments to Stanley and to an offshore account controlled by Wojciech Chodan, a KBR consultant involved in the Nigerian project.

Most of the money to Stanley came from funds paid to Tri-Star under the March 1999 contract, according to the deposition.

\*     \*     \*

In June, Halliburton severed all ties with Stanley and Chodan. Hall said in an e-mail that the two men were dismissed because they had violated the company's codes of business conduct.

58.    As a result of this fiasco, a Nigerian parliamentary report *has recommended that Halliburton be suspended from receiving any more Nigerian contracts* – a severe blow to Halliburton, as Nigeria is now one of the most important oil-producing nations. Halliburton is also now subject to a formal SEC investigation into these matters and a DOJ inquiry as well. French criminal authorities are also investigating the matter. In early 11/04, Halliburton, in an SEC filing, disclosed that the DOJ has expanded its investigation of the matter and has determined that bribes may have been made in Nigeria, involving Stanley. Halliburton has conceded that there can be no assurance that U.S. officials will not conclude these payments violated the U.S. Foreign Corrupt Practices Act.

59.    As a result of the artificial inflation in Halliburton's stock price during the Class Period due to defendants' financial manipulations and other false statements, purchasers of

- 43 -



Halliburton stock during the Class Period have suffered significant damages – some $3.1 billion as measured by standard methodologies.   In contrast to the huge damage they inflicted on investors, Halliburton's top insiders did quite well for themselves during this period of fraud. Halliburton top insiders sold off over 1.3 million shares of their Halliburton stock for illegal insider trading proceeds of $68 million.   In addition, during 97-01, Halliburton's top executives (Cheney, Lesar, Coleman, Morris, Vaughn and Bradford) collected aggregate salaries and bonus payments of over $36 million – bonuses which were based largely upon the contrived and false appearance of business success and faked profits alleged herein and which have subsequently been wiped out by recognition of Halliburton's actual asbestos liabilities, its construction operations' losses and charge-offs and the huge losses on the Barracuda/Caratinga project to date, and undermined by the revelations of huge illegal payments made in connection with the Bonny Island, Nigeria LNG contract.   When Cheney became CEO/Chairman of Halliburton its stock sold for about $20 per share.   After the revelations of 12/7/01 were absorbed by the market, the stock sold for as low as $8.60 per share – *its lowest level in 15 years*!   This collapse also took Halliburton's stock down *to less than 50% of the level it had been at when Cheney took over leadership of Halliburton in 8/95, as shown by the chart below:*



Not surprisingly, Cheney's résumé on the White House Web site no longer contains any mention of his tenure as CEO/Chairman of Halliburton.

    60.    The fold-out graph below sets forth these events and Halliburton's stock price:



**Hallibu**

**January 9, 19**



Copyright © 2005 by William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP. William S. Lerach and
... Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.

