

**Halliburton Co.**
Richard B. Cheney - Chairman of the Board
Quarterly Insider Sales: 1997 - 2001

Cheney received bonuses for 97-00 of $4.5 million based on Halliburton's apparent business success and false profits and a departure bonus worth millions when he left the Company in 7/00, also justified by Halliburton's apparent business success and false profits. While Cheney made false and misleading statements as alleged herein on behalf of Halliburton during the Class Period for which Halliburton is liable, Cheney is not sued herein as the statute of limitations as to him has expired.

(b)     William Bradford ("E. Bradford") was Chairman and CEO of Dresser when Halliburton acquired Dresser. Bradford became Chairman of Halliburton in 9/98 when the Dresser acquisition was completed and held that position until 2/00. During the Class Deception Period, Bradford sold 137,375 shares of Halliburton stock (32.5% of the shares he owned) for $7.1 million

- 50 -

in illegal insider trading proceeds. Bradford's stock sales were unusual in timing and amount and out of line with his historical Halliburton stock sales, as the chart below shows:[45]



**Halliburton Co.**
William E. Bradford - Chairman of the Board
Quarterly Insider Sales: 1997 - 2001

Bradford is not sued because the statute of limitations as to him has expired.

    (c)    Defendant David J. Lesar ("Lesar") was the President and Chief Operating Officer of the Company as of the beginning of the Class Period. Lesar may be served at 5110 San Felipe, Unit 233W, Houston, Texas 77056. During this period, he was one of three members of Halliburton's Executive Committee, along with CEO Cheney and Donald Vaughn, former head of Dresser, which was acquired by Halliburton at the beginning of the ClassDeception Period. Upon

---

[45]    In the case of former Dresser officers named herein who joined Halliburton upon the merger, their pre-Class Period sales are sales of their *Dresser* stock. Records show no such sales during 97-

Cheney's resignation in 7/00, Lesar assumed the roles of Chairman, ~~Chief Executive Officer~~CEO and President of Halliburton, in which positions he remained until the end of the Class Period. Prior to the Class Period, he had served from 95 to 97 as Halliburton's ~~Chief Financial Officer~~CFO. In addition, ~~as of the beginning of the Class Period~~ until 1/~~99~~,99 Lesar was President and ~~Chief Executive Officer~~CEO of Halliburton's principal subsidiary, KBR, the locus of the majority of the accounting improprieties detailed herein. From 1/99 to 8/00, his title at KBR shifted from President and ~~Chief Executive Officer~~CEO to Chairman of the Board, although according to Halliburton's SEC filings, no one replaced ~~Individual Defendant~~individual defendant Lesar as President and ~~Chief Executive Officer~~CEO of KBR until 10/00, implying that he retained principal executive control of KBR until 8/00 despite the change in title. Prior to joining the Company, Lesar was Halliburton's auditor at Arthur Andersen, LLC ("Andersen"). His former partners at Andersen continued to audit the Company throughout the Class Period. Statements by former Halliburton executives procured in plaintiff's attorneys' investigations indicate that, throughout the Class Period, Lesar was the "mastermind" of the accounting schemes detailed herein. He was paid $8.3 million in salary and bonuses by the Company during the ~~Class~~Deception Period, his bonuses being based on Halliburton's apparent business success and false profits. During the ~~Class~~Deception Period, Lesar sold 35,000 shares of his Halliburton common stock, 16% of his holdings, for $1.6 million in illegal insider trading proceeds. These sales were unusual in timing and amount and out of line with Lesar's historical sales of Halliburton stock, as shown by the following graph:

98.



**Halliburton Co.**
David J. Lesar - Chairman of the Board/President/Chief Executive Officer
Quarterly Insider Sales: 1997 - 2001

In a 9/1/00 *Offshore* interview, Lesar was quoted as follows:

Offshore:  How important is the stock price to your business plan?

Lesar:  *You have to please the analysts and shareholders on a quarterly basis . . . .*

(d)  Defendant Gary V. Morris ("Morris") served as Chief Financial OfficerCFO of the Company from 5/97 to 8/01. From 8/01 to the end of the Class Period, Morris was Executive Vice PresidentEVP with ultimate executive control of KBR (renamed the "Engineering and Construction Group" for the purposes of segment reporting beginning 1/01), the locus of the majority of the accounting improprieties detailed herein. Prior to the Class Period, Morris had served as head of Finance for KBR during 95-96. He then served as head of Finance for Halliburton as a whole in 97, after which he became CFO of Halliburton, and then president of KBR in 01, as described above. Defendant Morris may be served at 19214 Kessington, Houston,

- 53 -

Texas 77094. During the ~~Class~~Deception Period, Morris sold 7,500 shares of his Halliburton common stock, 12.7% of the stock he owned, for $401,250 in illegal trading proceeds. These sales were unusual in timing and amount and out of line with Morris' historical sales of Halliburton stock, as shown by the following graph:



**Halliburton Co.**
Gary V. Morris - Chief Financial Officer/Executive Vice President
Quarterly Insider Sales: 1997 - 2001

(e)      Defendant Douglas L. Foshee ~~("Foshee")~~ from 8/01 to the end of the Class Period served as ~~Executive Vice President and Chief Financial Officer~~EVP and CFO of the Company. He sold no stock because he owned no Halliburton stock outright and had no vested Halliburton stock options during the Class Period. Defendant Foshee may be served at 1001 Louisiana Street, Houston, Texas 77002.

(f)      Defendant Robert C. Muchmore ~~("Muchmore")~~ was, throughout the Class Period, the Principal Accounting Officer, Controller and an ~~Executive Vice President~~EVP of

Halliburton, a position that placed him in direct control, along with the other Individual Defendants, of the Company's accounting activities and financial reporting. Defendant Muchmore may be served at 201 Vanderpool Lane, Unit 29, Houston, Texas 77024.

(g)     Donald C. Vaughn (~~"Vaughn"~~) was Vice Chairman of Halliburton after the Dresser acquisition. During the ~~Class~~<ins>Deception</ins> Period, Vaughn sold 199,731 shares of his Halliburton stock, 86% of the shares he owned, for $9.4 million in illegal insider trading proceeds. These sales were out of line with Vaughn's historical sales of Halliburton stock, as shown by the following graph:



**Halliburton Co.**
Donald C. Vaughn - Vice Chairman
Quarterly Insider Sales: 1997 - 2001

Vaughn is not sued because the statute of limitations as to him has expired.

(h)     James L. Martin ("Martin") was a director of Halliburton during the Class Period. ~~He~~<ins>During the Deception Period, he</ins> sold 71,345 shares of his Halliburton stock, 78% of the

shares he owned, for $3.4 million in illegal insider trading proceeds. These sales were out of line with his historical sales of Halliburton stock, as shown by the following graph:



**Halliburton Co.**
James L. Martin - Director
Quarterly Insider Sales: 1997 - 2001

Martin is not sued because the statute of limitations as to him has expired.

    (i)    Lester ~~Coleman~~ ("~~L.~~ Coleman~~"~~) was the EVP and General Counsel of Halliburton during the Class Period. ~~He~~During the Deception Period, he sold 82,001 shares of his Halliburton stock, 61% of the shares he owned, for $3.6 million in illegal insider trading proceeds. These sales were out of line with Coleman's historical sales of Halliburton stock, as shown by the following graph:



**Halliburton Co.**
Lester L Coleman - Executive Vice President/General Counsel
Quarterly Insider Sales: 1997 - 2001

Coleman is not sued because the statute of limitations as to him has expired.

(j)     Jerry H. Blurton ("Blurton") was VP/Treasurer of Halliburton during the

Class Period. HeDuring the Deception Period, he sold 44,592 shares of his Halliburton stock, 63%

of the shares he owned, for $2.1 million in illegal insider trading proceeds. These sales were out of

line with Blurton's historical sales of Halliburton stock, as shown by the following graph:



**Halliburton Co.**
Jerry H. Blurton - Vice President/Treasurer
Quarterly Insider Sales: 1997 - 2001

Blurton is not sued because the statute of limitations as to him has expired.

(k)     John W. Kennedy ("Kennedy") was EVP Global of Halliburton during the Class Period. HeDuring the Deception Period, he sold 6,520 shares of his Halliburton stock, 30% of the shares he owned, for $331,666 in illegal insider trading proceeds. These sales were out of line with Kennedy's historical sales of Halliburton stock, as shown by the following graph:



**Halliburton Co.**
John W. Kennedy - Executive Vice President Global
Quarterly Insider Sales: 1997 - 2001

Kennedy is not sued because the statute of limitations as to him has expired.

57. 64. During the Class Period, Halliburton's outside auditor was Arthur Andersen, which certified Halliburton's 98-00 annual financial statements. However, Andersen did not properly audit or review Halliburton's financial statements in significant part because Lesar, Morris and Muchmore, as former Andersen partners, had close relationships with the current Andersen personnel in charge of the audit. In addition, Andersen was the auditor of choice for many notorious fraudulent public companies, including Enron, WorldCom, Dynegy, Global Crossing, Qwest and Waste Management – especially in Texas, where the Andersen office in charge of the Halliburton audit was located. Andersen was criminally convicted for charged with destroying evidence to conceal the full extent of its involvement in the Enron fraud – one of the worst and most widespread

accounting frauds in history – and was disqualified from continuing to operate as a public accounting firm.

    58. 65. Andersen is a repeat offender with a history of failed audits, conflicts of interest and document destruction in some of the most egregious cases of accounting fraud in history. Moreover, Andersen's conduct in these cases often shares the same underlying themes as its conduct in the Enron and WorldCom debacles. Such cases include:

    (a)    Waste Management. In 98, Waste Management restated its 92-96 financial statements which had been audited by Andersen's Houston office, revealing a massive fraud that included the overstatement of profits by as much as $1.7 billion. At the time, this was the largest restatement of earnings in history. In 6/01, as a result of its egregious behavior associated with its audits of its Waste Management client, the SEC hit Andersen with the first anti-fraud injunction in 20 years and the largest civil penalty ($7 million) in SEC history for an accounting firm. The SEC also required Andersen to sign a consent decree promising to refrain from wrongdoing in the future. As with Enron, Andersen's willingness to keep quiet about fraudulent accounting to protect the huge fees it earned played a significant role in Waste Management's ability to perpetrate one of the largest accounting frauds in history. Andersen recognized Waste Management's "aggressive" accounting as early as 88, according to SEC documents, and by 93, Andersen had documented that Waste Management was a "high-risk client" and that the client inflated profits by more than $100 million. However, during the same time frame, Andersen was relentlessly marketing its consulting services to the client, resulting in consulting fees more than double the size of the audit fees. Even when Waste Management refused to fix the improper accounting practices recommended by Andersen in prior years, Andersen caved in and continued to sign off on the company's annual audits. This went on for the next three years. According to the SEC, those decisions were backed at the highest levels of Andersen's Chicago office, including Andersen's Practice Director, the

- 60 -

firm's Managing Partner and the Audit Division Head for the firm's National office in Chicago. In addition to the SEC penalty, according to media reports, Waste Management and Andersen paid $220 million to settle class action lawsuits brought by shareholders.

(b)     Sunbeam.  In 5/01, the SEC filed an injunctive action against Andersen partner Phillip E. Harlow, the former engagement partner on the Sunbeam account, for authorizing the issuance of unqualified audit opinions on Sunbeam's 96 and 97 financial statements, even though he was aware of many of the company's accounting improprieties and disclosure failures. In 01, Andersen paid $110 million to settle shareholder lawsuits in connection with Sunbeam's restatement of six quarters of financial results.  Indeed, the SEC stated that Sunbeam's purported turnaround was little more than accounting gimmicks, accomplished through the creation of inappropriate "cookie-jar" reserves.  In this case, as in Enron, Andersen's document destruction was a common theme. In fact, an Andersen partner testified that months after the restatements were announced and after shareholder lawsuits had been filed, the firm ordered its Fort Lauderdale employees to dispose of any work papers or correspondence that did not agree with the final documentation of the Sunbeam restatement.

(c)     Baptist Foundation of Arizona.  In a suit filed by the Arizona Attorney General, Andersen had recently agreed to pay investors $217 million to settle a suit in connection with the 99 failure of The Baptist Foundation of Arizona ("Foundation"), where an ongoing Ponzi scheme wiped out $590 million of investors' savings, many of them retirees. Three key individuals associated with the Foundation have pleaded guilty to felony charges, five others have been indicted, and Arizona authorities are in the process of revoking the licenses of three Andersen auditors.  Jay Steven Ozer, one of the senior partners on Andersen's audits of the Foundation, audited Charles Keating's Lincoln Savings & Loan, described below. Ozer has recently agreed to give up his Arizona accounting license. The Foundation used accounting artifices that were

- 61 -

strikingly similar to Enron's. For example, the Foundation used off-balance-sheet entities to hide significant losses in its real estate investments. Unbeknownst to investors, the Foundation sold the real estate at artificially inflated prices to a company called ALO in exchange for a mere IOU instead of cash. In a theme common to many Enron special purpose entities, unknown to investors, ALO was a related-party entity created, financed and controlled by the Foundation. Particularly egregious was the fact that outside CPAs and professionals continued to warn Andersen for two years that they highly suspected fraudulent accounting at the Foundation, yet Andersen completely ignored them. An accountant for the Foundation testified that more than two years before the bankruptcy she met with Andersen and openly explained the nature of the Foundation and ALO relationship. Subsequently, a Texas Baptist group became suspicious, called Andersen, spoke with partners and told them about the suspected fraudulent accounting at the Foundation. Additionally, Dee Griebel, a sole practitioner CPA, figured the fraud out in an afternoon by conducting a simple search of ALO's public records, revealing that ALO had a negative net worth of approximately $106 million and could not possibly make good on the debt to the Foundation. Griebel then called Andersen's Chicago headquarters and the Phoenix office twice, stating, "'You must withdraw your unqualified opinion immediately. The company's effectively broke. Call me.'" Neither the Chicago or Phoenix Andersen ~~office~~offices ever called her back. From the first warning until the Foundation's failure, Andersen issued two more unqualified opinions, allowing the Foundation to take in another $200 million of investor savings.

(d) Colonial Realty Company. In the mid 90s, the State of Connecticut revoked Andersen's license to practice after investigating Andersen's conduct in its audits surrounding the collapse of Colonial Realty Company ("Colonial Realty"), a national real estate syndication firm. Central to the Colonial Realty fraud was a Ponzi scheme that involved deliberate and grossly exaggerated valuation of Colonial Realty properties. Andersen furnished unqualified opinions

- 62 -

supporting Colonial Realty's extravagant valuations and claims, and assisted in preparing private placement memoranda in connection with the public offerings that resulted in investors sustaining substantial losses. As with Enron, after conducting an extensive investigation, Connecticut's Attorney General concluded that Andersen employees destroyed incriminating documents under the auspices of complying with Andersen's document retention policy.

        (e)    <u>Lincoln Savings/ACC</u>. Andersen was also associated with this infamous fraud perpetrated by Charles Keating. In 84 and 85, Andersen improperly issued "clean" or unqualified audit opinions on the ACC/Lincoln financial statements. Those opinions were included in ACC/Lincoln SEC filings and helped Keating promote an illusion of prosperity that was used to market notes to investors. Thus, Andersen participated in the Charles Keating fraud that bilked investors out of over $500 million. In 92, Andersen paid $30 million to settle the securities fraud action. Andersen of course, did not learn a lesson from this experience. In fact, partner Jay Ozer, a member of the Andersen audit team on Lincoln/ACC, went on to be a key Andersen auditor on the aforementioned ~~Baptist~~ Foundation ~~of Arizona~~ scandal.

    <u>59.</u>    ~~66.~~ These cases demonstrate that for years Andersen has demonstrated a callous, reckless disregard for its duty to investors and the public trust. Andersen's conduct throughout this period displays an uncaring, calculated cost/benefit approach to ignoring fraud and improper accounting in its audit engagements.

<div align="center">

**JURISDICTION AND VENUE**

</div>

    <u>60.</u>    ~~67.~~ The claims asserted in this complaint arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [(15 U.S.C. §§78j(b) and 78t(a)]) and Rule 10b-5 promulgated thereunder by the SEC [(17 C.F.R. §240.10b-5]).

    <u>61.</u>    ~~68.~~ This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the 1934 Act [(15 U.S.C. §78aa]).

<div align="center">

- 63 -

</div>

62. 69. Venue is proper in this ~~district~~District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Many of the acts and practices complained of herein occurred in substantial part in this ~~district~~District.

63. 70. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## BACKGROUND TO THE CLASS PERIOD

~~71. In 3/97, Halliburton issued its 96 Annual Report—the Cheney executive team's first full year of control of Halliburton—which contained a letter from Cheney, stating:~~

~~I am pleased with the overall progress of Halliburton in 1996.~~

~~*      *      *~~

~~While we aligned Brown & Root Energy Services with the new Energy Group, we placed the remaining Brown & Root businesses into the Engineering and Construction Group, which now consists of Brown & Root Engineering and Construction and Brown & Root Government Services. *We initiated a restructuring program of Brown & Root similar to the one we successfully implemented at Halliburton Energy Services several years ago that proved effective in streamlining operations. The restructuring is continuing and I expect to see positive results from it in 1997.*~~

~~72. The 96 Annual Report contained a section entitled "Questions and Answers With Dick Cheney," which stated:~~

~~Q: What are your expectations for the restructured Engineering and Construction Group?~~

~~A: Streamlining of the Engineering and Construction Group ... *puts us in a more competitive position.*.... I am confident that our Engineering and Construction Group will show substantial improvement in terms of revenue growth and profitability.~~

64. 73. On 1/22/98, Halliburton reported its 4thQ 97 and full year 97 results – strong net income and EPS growth:

Halliburton Company today reports 1997 fourth quarter net income of $148.4 million ($.56 per share diluted), an increase of 38 percent compared to the 1996 fourth

- 64 -

quarter's earnings of $107.6 million ($.43 per share diluted). The strong earnings growth was driven by substantially higher levels of profitability at both of Halliburton's business segments. . . .

For the full year of 1997, Halliburton's net income increased 51 percent to $454.4 million ($1.75 per share diluted) compared to 1996, while revenues increased 19 percent above 1996 results to $8.8 billion.

*     *     *

The Energy Services Group business segment's operating income for the 1997 fourth quarter was $226.7 million, 42 percent higher than the year ago period.

*     *     *

The Engineering and Construction Group segment's operating income doubled to $43.2 million, compared to the 1996 fourth quarter. *The segment's operating income and margins are continuing to benefit from restructuring and other cost efficiency initiatives which have been implemented during the past year*.

Dick Cheney . . . said, "Halliburton made excellent financial performance progress in 1997, and the company was also able to substantially improve its future outlook and competitive position through the execution of several significant strategic programs during the year."

"*Some of the significant programs achieved in 1997 included the successful consolidation and restructuring of the Engineering and Construction Group business segment . . . .*"

Cheney concluded, "*Halliburton will utilize its financial and strategic successes of 1997 as the foundation for driving continued growth and progress in 1998. I am optimistic about the coming year . . . .*"

65. 74. On 2/26/98, Halliburton announced the acquisition of a major competitor,

Dresser. *This was the largest and most important acquisition in Halliburton's history, valued at*

*$7.7 billion*. Halliburton's release stated:

Dick Cheney . . . said, "Halliburton and Dresser are an outstanding business and cultural fit. *This is a win-win combination for both companies' shareholders*."

*     *     *

David J. Lesar . . . said, "*We* know each other's business well and *have agreed on the organizational structure, which will facilitate a quick, smooth integration. . . . [W]e expect the transaction to be accretive to earnings per share in the first full year . . . .*"

- 65 -

66. ~~75.~~ On 2/26/98, Halliburton held a conference call for analysts, money managers and others to discuss the Dresser acquisition. Cheney and Lesar participated. During the call, Lesar stated with respect to the acquisition that *"we believe . . . there is a minimum of a net $250 million-plus to the bottom line with the combination."*

67. ~~76.~~ In 4/98, Halliburton issued its 97 Annual Report to ~~Shareholders~~shareholders reporting Halliburton's 97 EPS of $1.79, a large increase over its 96 EPS of $1.30 and 95 EPS of $1.00. The 97 Halliburton Annual Report included a letter signed by Cheney which stated:

> *[Halliburton's] future is bright. . . . we successfully completed the restructuring of our engineering and construction business and realized a strong turnaround within the segment.*
>
> \*      \*      \*
>
> *Halliburton and Dresser are an outstanding business and cultural fit. This is a win-win combination for both companies' shareholders.*

68. ~~77.~~ Elsewhere, Halliburton's 97 Annual Report discussed Halliburton's business:

> At the end of 1997 Halliburton wrapped up a great year of growth and financial success. Halliburton is a financially strong, high-performance company with six business units working together as a cohesive, synergistic team. The company has reorganized, realigned, and streamlined its operations in recent years to substantially improve operating efficiencies . . . . *In 1997, we continued to consolidate our organizational structure and our internal processes for maximum operating efficiency.*

In discussing Halliburton's construction operations, the 97 Annual Report stated:

> *The company believes the keys to increasing its revenue and improving profit margins . . . will be . . . acceptance of more . . . fixed price contracts . . . .*

69. ~~78.~~ With regard to Halliburton's "Significant Accounting Policies," the 97 Annual Report stated:

> Revenues and Recognition. . . . *All known or anticipated losses on contracts are provided for currently. Claims for additional compensation are recognized during the period such claims are resolved.*

Halliburton's 95 and 96 Annual Reports had contained the same representations.

79.   The Halliburton 97 Annual Report stressed Halliburton's commitment to legal compliance and ethical behavior throughout its business operations, stating:

### CODE OF BUSINESS CONDUCT

The Code of Business Conduct of Halliburton Company consists of policies relating to the ethical and legal standards of conduct to be followed by employees and agents of the company in the conduct of its business. *The Code of Business Conduct applies to all company employees and agents and all company activities throughout the world, except where specifically indicated.*

Because Halliburton's international operations were a large part of its construction business where the risk of bribes and other payments in violation of the U.S. Foreign Corrupt Practices Act are especially acute, and the consequences of paying bribes to foreign officials or violating the U.S. Foreign Corrupt Practices Act can be very negative for any business, these representations of worldwide honest and ethical business practices were especially important.

70.   80. Yet unknown to the investing public, defendants recklessly disregarded or ignored that Halliburton was acquiring a tremendous potential liability due to numerous pending and prospective asbestos lawsuits against Dresser and its former subsidiary, Harbison-Walker. As a result, Halliburton overpaid for Dresser and subsequently failed to sufficiently write down the value of the assets acquired in the Dresser acquisition, thereby overstating the Company's reported assets and income throughout the Class Period.

71.   81. Asbestos litigation, which had bankrupted almost two dozen companies by 1998, was a red flag issue in any due diligence investigation of Dresser. A former employee of Dresser at the time of the merger stated that he and Dresser's then-CFO, George Juetten ("Juetten"), both spoke openly with Halliburton's risk management director about Dresser's potential exposure to asbestos liability. Yet appropriate provisions for this huge liability were not made.

72.   82. In 1992, Dresser spun-off Harbison-Walker into a separate company, with the agreement that the new entity would assume asbestos claims filed after the spin-off date and

- 67 -

indemnify and defend Dresser against those claim (the "Spin-off Agreement"). Notwithstanding this agreement, Dresser, as a co-defendant in each asbestos suit brought against Harbison-Walker, remained liable if the new Harbison-Walker collapsed financially and was unable to honor the Spin-off Agreement.

73. 83. A month before the scheduled 6/25/98 special meetings for the companies' respective shareholders to vote on the merger, Dresser received a letter dated 5/20/98 from Harbison-Walker's parent at the time, Global Industrial Technologies ("Global"), disclaiming, *inter alia*, certain liabilities for asbestos claims under the Spin-off Agreement and demanding full coverage rights against Dresser's insurers and reinsurers. In light of the contentions made by Global, Dresser's asbestos liability exposure was greatly expanded. Moreover, the Global letter signaled to defendants that Harbison-Walker was facing considerable financial strain from the mounting asbestos claims against it and Dresser.

74. 84. The dispute between Dresser and Global was first disclosed by Halliburton in its 1998 Form 10-K filed with the SEC on 3/23/99 ("1998 10-K"), nearly a year after the merger was approved by Halliburton and Dresser shareholders. The 1998 10-K described the assertions by Global as being "without merit" and went on to state that the asbestos claims pending against Dresser at the end of 98 would "be resolved without material effect on Halliburton's financial position or results of operations." However, regardless of the merits of Global's assertions, it was clear to defendants that Halliburton would be forced to shoulder the responsibility for the asbestos claims filed against Harbison-Walker and Dresser if Harbison-Walker was financially unable to honor the Spin-off Agreement. This risk was never fully disclosed to the investing public; nor was it properly accounted for during the Class Period.

75. 85. Dresser's Treasurer through 98 ("Treasurer"), who also headed Dresser's risk management department, stated that Halliburton had several conversations with Dresser both before

and after the merger was completed about Dresser's exposure to asbestos liability. Treasurer stated that he personally spoke with Halliburton's risk management director and described Dresser's possible asbestos liability exposure from Harbison-Walker. Treasurer also attended a meeting before the merger with Halliburton's risk management director and Juetten, who was the "point man" on Dresser's asbestos problems, at which meeting Juetten was very open with Halliburton's risk management director about Dresser's asbestos liability exposure. Treasurer believes the information concerning asbestos was shared with Halliburton before the merger was announced in 2/98.

76.   86. Treasurer was also familiar with the Global Letterletter. Treasurer stated that during 98, defendant Bradford and Global's Chairman had many conversations, in addition to correspondence, concerning the issues raised in the Global Letterletter. Defendant Bradford also had several discussions with Juetten about Dresser's asbestos liability exposure. In 5/98, Treasurer was in Juetten's office when Bradford came to Juetten with the Global Letterletter. Treasurer stated that Bradford was very concerned about the issues raised by the Global Letterletter and remarked that he thought the Harbison-Walker issues had been resolved – indicating that he now knew they had not been.

77.   87. Halliburton's 97 Annual Report also contained the following section, signed by Cheney and Morris, accepting responsibility for the appropriateness of Halliburton's accounting practices, policies and the accuracy of its financial reports:

**Responsibility For Financial Reporting**

Halliburton Company is responsible for the preparation and integrity of its published financial statements. The financial statements have been prepared in accordance with accounting principles generally accepted in the United States and, as such, include amounts based on judgments and estimates made by management. The Company also prepared the other information included in the annual report and is responsible for its accuracy and consistency with the financial statements.

*        *        *

- 69 -

The Company maintains a system of internal control over financial reporting, which is intended to provide reasonable assurance to the Company's management and Board of Directors regarding the preparation of financial statements. The system includes a documented organizational structure and division of responsibility, established policies and procedures, ***including a code of conduct to foster a strong ethical climate***, which are communicated throughout the Company, and the careful selection, training and development of our people. Internal auditors monitor the operation of the internal control system and report findings and recommendations to management and the Board of Directors, and corrective actions are taken to address control deficiencies . . . as they are identified.

* * *

The Company addressed its internal control system in relation to criteria for effective internal control over financial reporting described in "Internal Control-Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon that assessment, the Company believes that, as of December 31, 1997, its system of internal control over financial reporting met those criteria.

78. 88. In late 97 or early 98, in order to boost Halliburton's reported results,

Halliburton's top executives secretly changed the way Halliburton was accounting for Unapproved

Claims, counting them as revenue/profit even though the customer had not agreed to pay for them.

On 4/22/98, Halliburton reported 1stQ 98 net income of $117.8 million/$.44 per share, a 42%

increase over 1stQ 97 results (net income $83 million/$.32 per share). The release stated:

Strong financial performance by the Energy Group business segment positively impacted the company's consolidated revenues and net income.

The Energy Group's . . . 1998 first quarter operating income increased to $185 million, 58 percent higher than last year's first quarter. The strong operating income increase improved the Energy Group's operating margin to 11.6 percent in the 1998 first quarter, compared to 10.5 percent last year. The Energy Group's financial results benefited from strong revenue growth by the Halliburton Energy Services and Brown & Root Energy Services business units during the 1998 first quarter.

* * *

Dick Cheney said, . . . ***"Our Engineering and Construction business is positioned for improved performance as the year progresses***. The total . . . backlog at March 31, 1998 was $7.0 billion, an increase of 20 percent compared to a year ago, ***which will contribute favorably to future financial results***.

"In summary, the management team at Halliburton *believes the opportunities for the future are excellent....*"

79. 89. In early 5/98, Halliburton filed its 1stQ 98 10-Q with the SEC signed by Morris and Muchmore, which included the same financial results as contained in the 4/22/98 release. It stated:

Operating Income

Consolidated operating income increased 47% to $204.0 million for the three months ended March 31, 1998 from $138.7 million for the three months ended March 31, 1997....1997....

Energy Group operating income increased 58% to $185.0 million in the first quarter of 1998 compared with $117.2 million in the same quarter of the prior year. The operating income margin for the first quarter of 1998 was 11.6% compared with 10.5% for the first quarter of 1997. The increase in operating income was largely due to ... *improved margins on completion products* ....

Engineering and Construction Group operating income decreased 2% .... *The decrease in operating income [was] ... partially offset by improved margins on engineering and construction services contracts.*

It also stated:

In the opinion of the Company, the financial statements include all adjustments necessary to present fairly the Company's financial position as of March 31, 1998, and the results of its operations and cash flows for the three months ended March 31, 1998 and 1997.

80. 90. On 7/22/98, Halliburton reported its 2ndQ 98 results (net income of $136.5 million/$.51 per share), up 34% compared to the 2ndQ 97. The release stated:

Halliburton Company reports 1998 second quarter net income of $136.5 million ($.51 per share diluted), an increase of 34 percent compared to $101.9 million ($.40 per share diluted) earned in the 1997 second quarter. *Strong profitability improvements were experienced by both of the company's business segments....*

For the six month period ending June 30, 1998, net income increased 38 percent to $254.3 million ($.95 per share diluted) ....

\*   \*   \*

*The Energy Group's 1998 second quarter operating income increased 24 percent to $198.3 million compared to the prior year period....* [T]he segment's

- 71 -



operating margin improved to 11.6 percent for the 1998 second quarter compared to 11.0 percent in the 1997 quarter.

The Engineering and Construction Group business segment's 1998 second quarter operating income increased 66 percent to $49.9 million compared to the 1997 quarter . . . . The 1998 second quarter operating margin for the segment improved to 6.5 percent compared to last year's 3.9 percent. . . .

Dick Cheney . . . said, *"Halliburton continues to make good financial progress despite uncertainty over future oil demand and the slowing of some of our customers' exploration and production activities during the quarter. . . . Prospects for a continuation for future growth in the company's engineering and construction related activities are enhanced by a total backlog of $7.3 billion at the end of the 1998 second quarter . . . .*

81.    91. In mid-8/98, Halliburton filed its 2ndQ 98 10-Q signed by Morris and Muchmore.

It contained the same financial information about Halliburton as the 7/98 release:

Consolidated operating income increased 31% to $238.4 million in the second quarter of 1998 compared with $182.0 million in the same quarter of the prior year. . . .

Energy Group operating income increased 24% to $198.3 million in the second quarter of 1998 compared with $160.1 million in the same quarter of the prior year. The operating margin for the second quarter of 1998 was 11.6% compared to the prior year second quarter operating margin of 11.0%. . . .

*            *            *

Engineering and Construction Group operating income increased 66% to $49.9 million in the second quarter of 1998 compared to $30.0 million in the second quarter of the prior year. Operating margins were 6.5% in the second quarter of 1998 compared to 3.9% in the prior year second quarter.

It also stated:

In the opinion of the Company, the financial statements include all adjustments necessary to present fairly the Company's financial position as of June 30, 1998, and the results of its operations for the three and six months ended June 30, 1998 and 1997 and its cash flows for the six months then ended.

## ~~CLASS PERIOD STATEMENTS~~

82.    92. On As of 9/29/98, the start of the Class Period, the pre-Class Period statements set

forth above were alive, uncorrected and reflected in the market price of Halliburton's stock. The

statements made between 3/97 1/98-8/98 were false and misleading. The statements were affirmatively false. They were also misleading in failing to disclose the following facts which were then existing, known to or recklessly disregarded by defendants to be false, and necessary to be disclosed to make the statements made not misleading, including the following:

(a)     Due to intense competitive pressures brought about by lowered capital spending budgets by oil exploration companies, Halliburton's construction operations were being forced to make dangerously low bids providing for only razor-thin margins, while accepting fixed-price terms on huge contracts, making it very likely that due to the inevitable Unapproved Claims which occur on any large construction contract, Halliburton would likely suffer losses on those contracts.

(b)     Halliburton did not have in place adequate contract performance monitoring, cost control and accounting systems that would enable it to effectively monitor the progress being made toward contract completion, the actual costs being incurred or the current state of performance of large contracts and also lacked an adequate system of internal financial and accounting controls to permit the proper monitoring, control of and accounting for costs on construction projects.

(c)     Halliburton had secretly changed the way it was accounting for Unapproved Claims on construction contracts and was now recognizing them as revenue when the claims were asserted, even though the customer had not yet agreed to pay the Unapproved Claims and more and more customers were refusing to pay millions of dollars of existing Unapproved Claims.

(d)     Halliburton was recording millions of dollars of Unapproved Claims as revenue, even though its top executives knew that collection of those Unapproved Claims was not probable and they were not capable of accurately estimating what amount could ultimately be collected under any circumstances.

- 73 -

(e)     Halliburton's construction operations had not been effectively reorganized and restructured during 97-98 as claimed; in fact, in the field these operations were disorganized and lacked adequately skilled personnel and the procedures necessary to perform fixed-price contracts of the size and scope being undertaken by Halliburton, which greatly increased the probability of performance delays, cost overruns, Unapproved Claims and, thus, losses on those contracts.

(f)     Halliburton's financial results for the 1stQ and 2ndQ of 98 were false, having been manipulated and artificially inflated higher due to the fraudulent and illicit accounting practices detailed in ¶¶226-321203-287 of this Complaint.

(g)     Halliburton's Code of Business Conduct and Ethics was not, in fact, being enforced or followed in the Company's international operations and, in order to obtain and retain the Bonny Island, Nigeria LNG contract and extensions thereof, the consortium of which Halliburton was the dominant member had made and was making substantial payoffs and bribes, including payments to Nigerian officials to get the contract and its extension and payoffs to top executives of Halliburton's Kellogg unit to reward them for participating in this risky and illegal activity, which payments were being funneled through Swiss bank accounts controlled by a London lawyer.

(g)     (h) It was not true that Halliburton had switched to fixed-price contracts because they would create greater profits for Halliburton or because Halliburton had a competitive advantage in such contracts. In truth, the switch to fixed-price contracts was driven by intensifying competition whereby Halliburton and its competitors were fighting to obtain a shrinking number of contracts available from oil exploration companies which were curtailing their capital expenditures; thus, the fixed-price contracts were, in fact, forced upon Halliburton by competitive pressures and

undertaken by Halliburton without sufficient controls, procedures, monitoring systems and

personnel to perform such contracts profitably.

83. 93. On 9/29/98, Halliburton issued a release announcing the completion of the

Dresser acquisition. It stated:

> Dick Cheney . . . said, "The merger . .: ‗improves our position as the leader
> in providing integrated project management services . . . . The combination of M.W.
> Kellogg's engineering expertise with Brown & Root's project management and
> construction strengths enhances the competitive position of the new Kellogg Brown
> & Root organization. . . . *The merger will both lower Halliburton's cost structure
> and increase its operating income from added revenues. We expect that net
> synergistic benefits will add at least $250 million pretax to earnings on an
> annualized basis.*"

As a result of the merger, Bill Bradford, Dresser's former CEO/Chairman, became Chairman of

Halliburton with Cheney and Lesar acting as CEO and EVP/CFO, respectively.

84. 94. On 9/29/98, Cheney and Bradford were interviewed on CNBC by Maria

Bartiromo, regarding the Dresser acquisition. They stated:

> Cheney: . . . *[T]his'll be . . . accretive right away, if you look at the
> combination of the two companies. Clearly we expect to achieve very significant
> savings from putting the two companies together, in excess of $1/4 billion.* And we
> think the combination will be especially effective, as we go through this down time
> in the market. We'll be able to get a lot of costs out of the operations and become
> more efficient.
>
>          *     *     *
>
> *[A]s we go through the process of combining our two companies into the new
> Halliburton, we will be able, by virtue of reducing costs, to increase earnings per
> share* . . . .
>
>          *     *     *
>
> Bradford: . . . [O]ur focus really will be on earnings growth . . . as Dick has
> mentioned, *there are very significant synergies; something on the order of $1/4
> billion that we intend to get to very, very quickly, within the next 60 to 90 days.*

85. 95. The statements made on 9/29/98 were false and misleading. The statements were

affirmatively false. They were also misleading in failing to disclose the following facts which were

then existing, known to or recklessly disregarded by defendants to be false, and necessary to be disclosed to make the statements made not misleading, including the following:

(a)      Halliburton had acquired Dresser without doing due diligence into Dresser's business, operations, financial condition and potential liabilities, in part because Cheney demanded that the acquisition be undertaken and completed in an unreasonably expedited fashion and because he did not want to create a paper trail documenting what he and other Halliburton executives knew were liabilities of potentially hundreds of millions of dollars for existing and anticipated asbestos suits/claims against entities for which Dresser was legally responsible, a significant amount of which would likely not be covered by insurance.

(b)      The acquisition of Dresser was not a "win" for Halliburton's shareholders. In fact, it represented an enormous risk due to Dresser's concealed potential asbestos liabilities and because, contrary to the representations that the two companies were a good cultural and business fit and that there were plans in place to achieve a smooth, quick transition and successful integration of the operations of both companies, there were no transition plans in place and the Dresser executives and managers were known to be conservative, system and process oriented managers with a very conservative approach to percentage-of-completion/contract accounting while the Halliburton executives and managers were just the opposite – virtually guaranteeing a cultural clash and lack of successful integration of operations.

(c)      Because of the existence of Dresser's very substantial potential asbestos liabilities and due to the known difficulties of attempting to blend the management of the two companies and integrate their construction operations, it was not true that the acquisition of Dresser would strengthen Halliburton's balance sheet or lead to bottom-line profit improvements either in the first year after the merger or thereafter.

86.      96. On 10/29/98, Halliburton issued a release reporting its 3rdQ 98 results. It stated:

- 76 -

Halliburton Company announces that the company earned $195 million ($.44 per diluted share) in the 1998 third quarter, compared to $218 million ($.50 per diluted share) in the 1997 third quarter . . . .

\*       \*       \*

The worldwide rotary rig count declined by 21 percent in the 1998 third quarter, compared to a year ago. Lower crude oil and natural gas prices during 1998 have reduced customers' cash flows and influenced them to pull back on exploration, development and production spending . . . . ***Despite weaker market conditions, the . . . construction activities of Brown & Root Energy Services registered higher revenues for the quarter.***

The Energy Services Group's 1998 third quarter operating income was $263 million, off eight percent from the 1997 quarter. . . .

The Engineering and Construction Group business segment's . . . [o]perating income was $54 million in the quarter . . . .

\*       \*       \*

Bradford . . . commented, "Completion of the merger with Dresser positions Halliburton as the premier company providing both oilfield and engineering and construction services to the upstream and downstream petroleum industry. The company is now uniquely positioned in the energy industry . . . ."

. . . Cheney . . . said, "While market conditions now challenge all petroleum industry participants, I am very optimistic about the outlook for Halliburton in the year ahead and the longer term. The completion of the merger with Dresser is most timely. ***The merger with Dresser is expected to be accretive to Halliburton's earnings per share. Action plans now being implemented should enable the company to achieve annualized pretax benefits of $250 million by the end of the first year of combined operations. Also, the merger and restructuring will generate additional advantages by strengthening and improving Halliburton's balance sheet . . . .***"

87.    97.—In mid-11/98, Halliburton filed its 3rdQ 98 10-Q, signed by Morris and Muchmore, which contained the same financial information as contained in the 10/29/98 press release. It also stated:

In the opinion of the Company, the condensed consolidated financial statements include all adjustments necessary to present fairly the Company's financial position as of September 30, 1998, and the results of its operations for the three and nine months ended September 30, 1998 and 1997 and its cash flows for the nine months then ended.

The 3rdQ 98 10-Q also stated:

- 77 -



Consolidated operating income excluding special charges decreased 6% to $367.6 million in the third quarter of 1998 compared with $390.5 million in the same quarter of the prior year. . . .

Energy Services Group operating income decreased 8% to $262.7 million in the third quarter of 1998 compared with $287.0 million in the same quarter of the prior year. . . . The operating margin for the third quarter of 1998 was 12.1% compared to the prior year third quarter operating margin of 12.9%. . . .

Engineering and Construction Group operating income increased slightly to $54.0 million in the third quarter of 1998 compared to $53.2 million in the third quarter of the prior year. Operating margins were 3.9% in the third quarter of 1998 compared to 4.2% in the prior year third quarter.

88. 98. The 3rdQ 98 10-Q included a discussion of Halliburton's potential financial exposure for asbestos suits/claims. It stated:

Asbestosis Litigation. . . . *[M]anagement continues to believe that provisions recorded are adequate to cover the estimated loss from asbestosis litigation*.

89. 99. On 1/25/99, Halliburton reported its 4thQ 98 and full year 98 results:

Halliburton Company today announces that the company earned $90 million ($.20 per diluted share) in the 1998 fourth quarter, compared to $257 million ($.58 per diluted share) in the 1997 fourth quarter. . . .

For the 1998 full year, Halliburton's net income before special charges was $731 million ($1.67 per diluted share), down seven percent from 1998, while revenues increased seven percent to $17.4 billion.

\*   \*   \*

The Energy Services Group's operating income was $121 million in the 1998 fourth quarter, a decline of 62 percent from the year earlier.

\*   \*   \*

Dick Cheney . . . said, ". . . I remain optimistic about the long term outlook for . . . Halliburton . . . ."

90. 100. In connection with reporting its year-end 98 results, Halliburton disclosed it had taken a $60 million charge in the 4thQ 98 for Unapproved Claims customers would not agree to pay. Halliburton told analysts the charge-off was not due to premature recognition of Unapproved Claims as revenue, but rather to client refusals to pay for the Unapproved Claims, purportedly a change of

attitude. Halliburton told analysts that as a result it had changed its procedures and in the future *it would not accept or perform change orders unless the customer agreed up front to pay for the extra work, i.e., Unapproved Claims*. These statements indicated to analysts that Halliburton was still following its stated policy of recognizing Unapproved Claims as revenue *only* after the customer agreed to pay for such claims. In fact, Halliburton was continuing to perform millions of dollars of Unapproved Claims just hoping customers would later pay for them.

91. ~~101.~~ On 2/9/99, Cheney and Morris made a joint presentation to analysts and money managers at the 12th Annual PaineWebber Energy Conference. On 2/10/99, PaineWebber reported these remarks:

- *Halliburton presented at the 12th annual PaineWebber Energy Conference yesterday*.

- The company indicated that . . . *it is pleased with the progress of both the cost rationalization and revenue synergy generation elements of the consolidation process*.

- CEO Dick Cheney and CFO Gary Morris *also reiterated their confidence in the integrity (i.e., margins) of the downstream backlog, which stood at over $11 billion at the end of the December quarter*. . . .

- The company also expanded on the circumstances of the $60 million provision it recorded in Q4:98 at Brown & Root Energy Services (offshore engineering and construction), which was driven by customers becoming unwilling to compensate BRES for changes in project scope . . . . *HAL has adjusted to the change in customer philosophy by requiring assurances of payment for changes in work scope "along the way" instead of at the end of the project, which was the typical practice because it expedited project execution. We believe this . . . explains management confidence in downstream margins going forward*.

92. ~~102.~~ On 2/17/99, Prudential Securities issued a report on Halliburton which reflected the Cheney/Morris 2/9/99 presentation, as well as follow-up conversations with them:

**$60 Million Provision for BRES Was Not Expected, Although Understandable**

We should note that the $60 million provision recognized by BRES covers additional costs that HAL incurred due to change orders that typically occur in large engineering and construction jobs. *The provision is not, as some parties have*

*speculated, due to aggressive revenue booking or errors in cost estimation and
bidding by Halliburton.*

.*     *     *

[T]he $60 million provision relates not to BRES's performance *but to the mood of its
clients*.

93. ~~103.~~ On 3/1/99, Donaldson, Lufkin & Jenrette ("DLJ") issued a report on Halliburton,

rating Halliburton stock DLJ's "Top Pick." This report was based on DLJ analyst Arvind Sanger's

("Sanger") conversations with Cheney, ~~Lesar or~~ and Morris. The report stated:

Halliburton is one of the best positioned oilfield service companies to create
value even in a difficult oil price and spending environment. There are several key
reasons why HAL *is well-positioned to outperform over the next 12 months*:

• **Significant cost cuts will cushion margins** – *Cost savings from the merger
and the downturn in activity should yield over $500 million by the end of
1999* . . . .

*     *     *

*Halliburton's merger with Dresser Industries was a brilliant strategic move
for the company*. . . . The merger . . . expands Halliburton's position as the leading
engineering and construction company . . . . Halliburton is one of our *Top Picks* and
is our best investment idea for 1999 . . . .

*     *     *

• *Leading engineering and construction company in the world – The
combination of Dresser's M.W. Kellogg subsidiary and Halliburton's
Brown & Root subsidiary creates one of the largest and best positioned
E&C companies with a worldwide presence* . . . .

*     *     *

*Margins should also continue to benefit from the company's move away from cost-
plus business to more lump-sum contracts.*

~~104.    The statements made between 10/29/98-3/1/99 were false and misleading.   The~~

~~statements were affirmatively false. They were also misleading in failing to disclose the following~~

~~facts which were then existing, known to or recklessly disregarded by defendants to be false, and~~

~~necessary to be disclosed to make the statements made not misleading, including the following:~~

- 80 -

(a) ~~Due to intense competitive pressures brought about by lowered capital spending budgets by oil exploration companies, Halliburton's construction operations were being forced to make dangerously low bids providing for only razor-thin margins, while accepting fixed-price terms on huge contracts, making it very likely that due to the inevitable Unapproved Claims which occur on any large construction contract, Halliburton would likely suffer losses on those contracts.~~

(b) ~~Halliburton did not have in place adequate contract performance monitoring, cost control and accounting systems that would enable it to effectively monitor the progress being made toward contract completion, the actual costs being incurred or the current state of performance of large contracts and also lacked an adequate system of internal financial and accounting controls to permit the proper monitoring, control of and accounting for costs on construction projects.~~

(c) ~~Halliburton had secretly changed the way it was accounting for Unapproved Claims on construction contracts and was now recognizing them as revenue when the claims were asserted, even though the customer had not yet agreed to pay the Unapproved Claims and more and more customers were refusing to pay millions of dollars of existing Unapproved Claims.~~

(d) ~~Halliburton was recording millions of dollars of Unapproved Claims as revenue, even though its top executives knew that collection of those Unapproved Claims was not probable and they were not capable of accurately estimating what amount could ultimately be collected under any circumstances.~~

(e) ~~Halliburton had not changed the way it was dealing with or its procedures for customer change work orders/Unapproved Claims and was not securing advance agreement to pay for such work as it had claimed, but rather, was continuing its traditional process of accepting and performing change orders as demanded by customers or required by the progress of the contract~~

- 81 -

~~work, without any actual agreement to pay, merely hoping to later collect on those Unapproved Claims.~~

~~(f)   It was not true that Halliburton had switched to fixed-price contracts because they would create greater profits for Halliburton or because Halliburton had a competitive advantage in such contracts. In truth, the switch to fixed-price contracts was driven by intensifying competition whereby Halliburton and its competitors were fighting to obtain a shrinking number of contracts available from oil exploration companies which were curtailing their capital expenditures; thus, the fixed-price contracts were, in fact, forced upon Halliburton by competitive pressures and undertaken by Halliburton without sufficient controls, procedures, monitoring systems and personnel to perform such contracts profitably.~~

~~(g)   Halliburton's construction operations had not been effectively reorganized and restructured during 97-98 as claimed; in fact, in the field these operations were disorganized and lacked adequately skilled personnel and the procedures necessary to perform fixed-price contracts of the size and scope being undertaken by Halliburton, which greatly increased the probability of performance delays, cost overruns, Unapproved Claims and thus losses on those contracts.~~

~~(h)   Halliburton's financial results for the 3rdQ 98 were false, having been manipulated and artificially inflated higher due to the fraudulent and illicit accounting practices detailed in ¶¶226-321 of this Complaint.~~

~~(i)   Halliburton had acquired Dresser without doing due diligence into Dresser's business, operations, financial condition and potential liabilities, in part because Cheney demanded that the acquisition be undertaken and completed in an unreasonably expedited fashion and because he did not want to create a paper trail documenting what he and other Halliburton executives knew were liabilities of potentially hundreds of millions of dollars for existing and anticipated asbestos~~

- 82 -

suits/claims against entities for which Dresser was legally responsible, a significant amount of which would likely not be covered by insurance.

(j)     The acquisition of Dresser was not a "win" for Halliburton's shareholders. In fact, it represented an enormous risk due to Dresser's concealed potential asbestos liabilities and because, contrary to the representations that the two companies were a good cultural and business fit and there were plans in place to achieve a smooth, quick transition and successful integration of the operations of both companies, there were no transition plans in place and the Dresser executives and managers were known to be conservative, system and process oriented managers with a very conservative approach to percentage-of-completion/contract accounting, while the Halliburton executives and managers were just the opposite.  As a result, a cultural clash was occurring resulting in inefficiencies and an inability to integrate operations.

(k)     In fact, the construction operations of Dresser were not being successfully integrated into the construction operations of Halliburton, as the managers and executives of the two companies had very divergent approaches to business and accounting and constantly fought with one another, resulting in distracting turf battles, operating inefficiencies and duplicative layers of management—all resulting in an inability to integrate the two operations and thus in excessive costs.

(l)     Halliburton, in fact, had not adequately reserved or accounted for its accrued asbestos liabilities as represented—in truth, Halliburton's potential liabilities for asbestos claims and suits were unquantifiably large, but certainly exceeded the actual reserve by a huge multiple.

(m)     Halliburton's reserve for its accrued asbestos liabilities had not been objectively measured or determined or subjected to any expert review or consultation and thus represented nothing more than a self-interested management's claim, which management knew was grossly inadequate.  Given the foregoing, there was absolutely no basis in fact for any

- 83 -

representation that management believed that Halliburton's asbestos claims and suits would be resolved without any material impact on Halliburton's financial condition or results of operations. Management did not believe this representation or statement of opinion when it was made and knew that it was highly likely that the ultimate resolution of the asbestos claims involving Halliburton would, in fact, materially adversely impact Halliburton's balance sheet and results of operations as, in fact, it did.

(n) Because of the existence of Dresser's very substantial potential asbestos liabilities and due to the known difficulties of attempting to blend the management of the two companies and integrate their construction operations, it was not true that the acquisition of Dresser would strengthen Halliburton's balance sheet or lead to bottom-line profit improvements either in the first year after the merger or thereafter.

(o) As a result of the foregoing undisclosed problems and practices, the defendants actually knew that their statements regarding Halliburton's future business prospects and performance and their forecasts of future financial performance were false when made and would not be achieved.

105. On 3/11/99, Halliburton issued a release headlined and stating:

**Halliburton's Kellogg Brown & Root Joint Venture Will Execute Major LNG Expansion in Nigeria**

... Nigeria LNG Limited has awarded a turn-key engineering and construction contract for a major expansion of its Liquified Natural Gas complex at Bonny Island to a joint venture ... [including] Halliburton ....

\*       \*       \*

"We are proud to continue our work with NLNG to expand the world-class facility we are building in Nigeria," said Dave Lesar, president of Halliburton Co.

"*This win extends Kellogg Brown & Root's track record in the LNG market and demonstrates our ability to team with our partners in bringing our world-class engineering, construction, and project execution skills to complex projects," added A.J. (Jack) Stanley, president of Kellogg Brown & Root.*

- 84 -

94. ~~106.~~ In 3/99, Halliburton issued its 98 Annual Report, which contained its previously released 98 financial results. It also contained a letter signed by Cheney and Bradford, which stated:

> 1998 was a historic year for Halliburton, highlighted by the merger between Halliburton Company and Dresser Industries. Because of the combined company's expanded capabilities and financial resources, we can more ably compete in the markets we serve, particularly in the energy services and engineering construction industries.
>
> <div align="center">*　　*　　*</div>
>
> The Energy Services . . . group's . . . operating income fell 5% to $971 million. The group was especially hard hit by the downturn in upstream oilfield activities, particularly in the fourth quarter.
>
> <div align="center">*　　*　　*</div>
>
> The Engineering and Construction Group's . . . operating income climbed 8% to $237 million.

95. ~~107.~~ The 98 Annual Report also contained the following graphs showing the performance of the ES operations:



Revenues
($ Billions)



Operating Income
($ Millions)



Operating Margin

96. ~~108.~~ Halliburton's 98 Annual Report also stated:

Kellogg Brown & Root (KBR) combines two of the most widely recognized names in the engineering and construction industry – The M.W. Kellogg Company and Halliburton's Brown & Root. The merger of these two industry leaders is particularly effective because it brings together Kellogg's leadership in the technology-based engineering and design *with Brown & Root's particular strength in all facets of construction and project management*.

97. ~~109.~~ Elsewhere, Halliburton's 98 Annual Report stated:

*Engineering and Construction Group* operating income for 1998 of $237.2 million increased 8% over 1997 and 77% over 1996. Operating margins were 4.3% in 1998 compared with 4.4% for 1997 and 2.8% for 1996. Operating income in 1998 includes a favorable settlement of a claim on a Middle Eastern construction project. . . *. Improvement in operating income in 1997 over 1996 was realized through overhead reductions [and] a focus on higher margin business lines* . . . .

98. ~~110.~~ This section of the Annual Report also contained the following graphs highlighting the performance of the E&C Group:



Revenues
($ Billions)



Operating Income
($ Millions)



Operating Margin

99. ~~111.~~ Halliburton's 98 Annual Report contained it 98 financial statements. With respect to Halliburton's "Significant Accounting Policies," the 98 Annual Report stated:

*Revenues and Income Recognition.* . . . Revenues from engineering and construction contracts are reported on the percentage of completion method of

- 86 -

accounting . . . . *All known or anticipated losses on contracts are provided for currently.*

100.   ~~112.~~ Halliburton's 98 Annual Report contained the following information about its

ES and E&C businesses:

| **Revenue** (millions of dollars) | 1998 | 1997 | 1996 |
|---|---|---|---|
| Energy Services Group | $9,009.5 | $8,504.7 | $6,515.4 |
| Engineering & Construction Group | $5,494.8 | $4,992.8 | $4,720.7 |

<div align="center">*       *       *</div>

| **Operating Income** * (millions of dollars) | 1998 | 1997 | 1996 |
|---|---|---|---|
| Energy Services Group | $ 971.0 | $1,019.4 | $ 698.0 |
| Engineering & Construction Group | $ 237.2 | $ 219.0 | $ 134.0 |

* Before Special Charges

<div align="center">*       *       *</div>

Energy Services Group operating income in 1998 was $971.0 million, a decrease of 5% from 1997 operating income of $1,019.4 million and an increase of 39% over 1996 operating income of $698.0 million. Operating margins were 10.8% in 1998 compared with 12.0% in 1997 and 10.7% in ~~1996....~~ 1996. . . .

Engineering and Construction Group operating income for 1998 of $237.2 million increased 8% over 1997 and 77% over 1996. Operating margins were 4.3% in 1998 compared with 4.4% for 1997 and 2.8% for 1996.

101.   ~~113.~~ Halliburton's 98 financial statements also including a discussion regarding

Halliburton's financial exposure to asbestos suits/claims showing an accrued liability of just $12

million and stating:

*[M]anagement believes that the pending asbestos claims will be resolved without material effect on Halliburton's financial position or results of operations.*

102.   ~~114.~~ The 98 Annual Report also stated, over the signature of Cheney and Morris, that:

## RESPONSIBILITY FOR FINANCIAL REPORTING

Halliburton Company is responsible for the preparation and integrity of its published financial statements. The financial statements have been prepared in accordance with accounting principles generally accepted in the United States and, as such, include amounts based on judgments and estimates made by management. The

Company also prepared the other information included in the annual report and is responsible for its accuracy and consistency with the financial statements.

\*       \*       \*

The Company maintains a system of internal control over financial reporting, which is intended to provide reasonable assurance to the Company's management and Board of Directors regarding the preparation of financial statements. The system includes a documented organizational structure and division of responsibility, established policies and procedures, ***including a code of conduct to foster a strong ethical climate which is communicated throughout the Company***, and the careful selection, training and development of our people. Internal auditors monitor the operation of the internal control system and report findings and recommendations to management and the Board of Directors. Corrective actions are taken to address control deficiencies . . . as they are identified.

\*       \*       \*

The Company assessed its internal control system in relation to criteria for effective internal control over financial reporting described in "Internal Control–Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon that assessment, the Company believes that, as of December 31, 1998, its system of internal control over financial reporting met those criteria.

~~115.    The statements made during 3/99 were false and misleading. The statements were affirmatively false. They were also misleading in failing to disclose the following facts which were then existing, known to or recklessly disregarded by defendants to be false, and necessary to be disclosed to make the statements made not misleading, including the following:~~

~~(a)    Due to intense competitive pressures brought about by lowered capital spending budgets by oil exploration companies, Halliburton's construction operations were being forced to make dangerously low bids providing for only razor-thin margins, while accepting fixed-price terms on huge contracts, making it very likely that due to the inevitable Unapproved Claims which occur on any large construction contract, Halliburton would likely suffer losses on those contracts.~~

~~(b)    Halliburton did not have in place adequate contract performance monitoring, cost control and accounting systems that would enable it to effectively monitor the progress being~~

- 88 -

~~made toward contract completion, the actual costs being incurred or the current state of performance of large contracts and also lacked an adequate system of internal financial and accounting controls to permit the proper monitoring, control of and accounting for costs on construction projects.~~

~~(c) Halliburton had secretly changed the way it was accounting for Unapproved Claims on construction contracts and was now recognizing them as revenue when the claims were asserted, even though the customer had not yet agreed to pay the Unapproved Claims and more and more customers were refusing to pay millions of dollars of existing Unapproved Claims.~~

~~(d) Halliburton was recording millions of dollars of Unapproved Claims as revenue, even though its top executives knew that collection of those Unapproved Claims was not probable and they were not capable of accurately estimating what amount could ultimately be collected under any circumstances.~~

~~(e) Halliburton had not changed the way it was dealing with or its procedures for customer change work orders/Unapproved Claims and was not securing advance agreement to pay for such work as it had claimed, but rather, was continuing its traditional process of accepting and performing change orders as demanded by customers or required by the progress of the contract work, without any actual agreement to pay, merely hoping to later collect on those Unapproved Claims.~~

~~(f) It was not true that Halliburton had switched to fixed-price contracts because they would create greater profits for Halliburton or because Halliburton had a competitive advantage in such contracts. In truth, the switch to fixed-price contracts was driven by intensifying competition whereby Halliburton and its competitors were fighting to obtain a shrinking number of contracts available from oil exploration companies which were curtailing their capital expenditures; thus, the fixed-price contracts were, in fact, forced upon Halliburton by competitive pressures and~~

undertaken by Halliburton without sufficient controls, procedures, monitoring systems and personnel to perform such contracts profitably.

(g)     Halliburton's construction operations had not been effectively reorganized and restructured during 97-98 as claimed; in fact, in the field these operations were disorganized and lacked adequately-skilled personnel and the procedures necessary to perform fixed-price contracts of the size and scope being undertaken by Halliburton, which greatly increased the probability of performance delays, cost overruns, Unapproved Claims and thus losses on those contracts.

(h)     Halliburton's financial results for the 4thQ 98 and fiscal year 98 were false, having been manipulated and artificially inflated higher due to the fraudulent and illicit accounting practices detailed in ¶¶226-321 of this Complaint.

(i)     Halliburton's Code of Business Conduct and Ethics was not, in fact, being enforced or followed in the Company's international operations, and in order to obtain and retain the Bonny Island, Nigeria LNG contract and extension thereof, the consortium of which Halliburton was the dominant member had made and was making substantial payoffs and bribes, including payments to Nigerian officials to get the contract and its extension and payoffs to top executives of Halliburton's Kellogg unit to reward them for participating in this risky and illegal activity, which payments were being funneled through Swiss bank accounts controlled by a London lawyer.

(j)     Halliburton had acquired Dresser without doing due diligence into Dresser's business, operations, financial condition and potential liabilities, in part because Cheney demanded that the acquisition be undertaken and completed in an unreasonably expedited fashion and because he did not want to create a paper trail documenting what he and other Halliburton executives knew were liabilities of potentially hundreds of millions of dollars for existing and anticipated asbestos

suits/claims against entities for which Dresser was legally responsible, a significant amount of which would likely not be covered by insurance.

(k)     The Dresser acquisition represented an enormous risk due to Dresser's concealed potential asbestos liabilities and because, contrary to the representations that the two companies were a good cultural and business fit and there were plans in place to achieve a smooth, quick transition and successful integration of the operations of both companies, there were no transition plans in place and the Dresser executives and managers were known to be conservative, system and process oriented managers with a very conservative approach to percentage-of-completion/contract accounting, while the Halliburton executives and managers were just the opposite, resulting in a cultural clash which was resulting in inefficiencies and lack of success in the integration efforts.

(l)     In fact, the construction operations of Dresser were not being successfully integrated into the construction operations of Halliburton. The managers and executives of the two companies had very divergent approaches to business and accounting and constantly fought with one another resulting in distracting turf battles, operating inefficiencies and duplicative layers of management – all resulting in an inability to integrate the two operations and thus in excessive costs.

(m)     Halliburton, in fact, had not adequately reserved or accounted for its accrued asbestos liabilities as represented – in truth, Halliburton's potential liabilities for asbestos claims and suits were unquantifiably large, but certainly exceeded the $12 million reserve by a huge multiple.

(n)     Halliburton's reserve for its accrued asbestos liabilities had not been objectively measured or determined or subjected to any expert review or consultation and thus represented nothing more than a self-interested management's claim, which management knew was

~~grossly inadequate. Given the foregoing, there was absolutely no basis in fact for any representation~~
~~that management believed that Halliburton's asbestos claims and suits would be resolved without~~
~~any material impact on Halliburton's financial condition or results of operations.  Management did~~
~~not believe this representation or statement of opinion when it was made and knew that it was~~
~~highly likely that the ultimate resolution of the asbestos claims involving Halliburton would, in~~
~~fact, materially adversely impact Halliburton's balance sheet and results of operations as, in fact, it~~
~~did.~~

~~(o)    Because of the existence of Dresser's very substantial potential asbestos~~
~~liabilities and due to the known difficulties of attempting to blend the management of the two~~
~~companies and integrate their construction operations, it was not true that the acquisition of Dresser~~
~~would strengthen Halliburton's balance sheet or lead to bottom-line profit improvements either in~~
~~the first year after the merger or thereafter.~~

~~(p)    As a result of the foregoing undisclosed problems and practices, the~~
~~defendants actually knew that their statements regarding Halliburton's future business prospects~~
~~and performance and their forecasts of future financial performance were false when made and~~
~~would not be achieved.~~

103.    ~~116.~~ On 4/26/99, Halliburton issued a release reporting its 1stQ 99 results.  The
release stated:

> Halliburton Company today announces that the company earned $81 million ($.18
> per diluted share) in the 1999 first quarter . . . .
>
> . . . [L]ower earnings for the company in the 1999 first quarter are attributable
> to petroleum industry customers' sharp reduction of spending in response to very low
> crude oil and natural gas prices in the latter part of 1998 and the 1999 first quarter.
>
> *      *      *
>
> The Energy Services Group business segment's revenues were down 23
> percent to $1,753 million in the 1999 first quarter, as compared to the 1998 quarter,

- 92 -

while activity levels as measured by the worldwide rotary rig count declined by 35 percent over the same time period.

<div align="center">*　　　*　　　*</div>

The Engineering and Construction Group business segment's revenues were $1,058 million, up 12 percent compared to the 1998 first quarter. Both of the segment's business units, Kellogg Brown & Root and Brown and Root Services, increased revenues more than 10 percent. Operating income for the segment in the 1999 first quarter was $58 million, a decline of two percent from last year's quarter, and operating margins were 3.8 percent in the 1999 first quarter compared to 4.4 percent a year ago.

While these results reflected adverse industry conditions, Cheney and Lesar stressed to analysts that

the results were better than expected – supposedly due to their superior skillful management of

Halliburton and the superiority of Halliburton's business model and operations.

104. 117. On 4/27/99, DLJ issued a report on Halliburton, which reflected what Cheney,

Lesar and Morris had told analysts on a 4/26/99 conference call and confirmed to DLJ analyst

Sanger in follow-up conversations:

- . . . Brown & Root Energy Services (BRES) had another disappointing quarter with revenues down 18% and barely profitable . . . . However, prospects are better in the future with better terms on recent contracts . . . .

- E&C results continue to be strong, *running counter to industry trends*: . . . operating income down only 2% . . . better than expected. . . . *This business is likely to do well over the next several quarters in contrast to the problems at most other E&C companies*.

<div align="center">*　　　*　　　*</div>

BRES. BRES revenues were down 18% from last year *which was better than expected. . . . In addition, HAL has changed its contract terms to better account for change orders which should help margins going forward*.

105. 118. On 5/14/99, Halliburton filed its 1stQ 99 10-Q, signed by Morris and

Muchmore, which reported the same financial results as in the 4/26/99 release. The 10-Q also

stated:

In the opinion of the Company, the condensed consolidated financial statements include all adjustments necessary to present fairly the Company's

<div align="center">- 93 -</div>

financial position as of March 31, 1999, and the results of its operations and cash flows for the three months ended March 31, 1999 and 1998.

The 10-Q also discussed Halliburton's exposure to asbestos suits/claims, showing an accrued liability of only $11 million and stating:

> Asbestosis Litigation. . . . ***The Company continues to believe that provisions recorded are adequate to cover the estimated loss from asbestosis litigation***.

106.    ~~119.~~ With respect to Halliburton's results from operations, Halliburton's 1stQ 99 10-Q stated:

First Quarter of 1999 Compared with the First Quarter of 1998

| REVENUES (Millions of dollars) | 1stQ | |
| --- | --- | --- |
| | 1999 | 1998 |
| Energy Services Group | $1,753 | $2,285 |
| Engineering and Construction Group | $1,508 | $1,347 |

        *      *      *

| OPERATING INCOME (millions of dollars) | 1stQ | |
| --- | --- | --- |
| | 1999 | 1998 |
| Energy Services Group | $ 57 | $ 283 |
| Engineering and Construction Group | $ 58 | $ 59 |

107.    ~~120.~~ The statements made from ~~4/26/99~~1/22/98-5/14/99 were false and misleading. The statements were affirmatively false. They were also misleading in failing to disclose the following facts which were then existing, known to or recklessly disregarded by defendants to be false, and necessary to be disclosed to make the statements made not misleading, including the following:

(a)    Due to intense competitive pressures brought about by lowered capital spending budgets by oil exploration companies, Halliburton's construction operations were being forced to make dangerously low bids providing for only razor-thin margins, while accepting fixed-price terms on huge contracts, making it very likely that due to the inevitable Unapproved Claims

- 94 -

which occur on any large construction contract, Halliburton would likely suffer losses on those contracts.

(b)     Halliburton did not have in place adequate contract performance monitoring, cost control and accounting systems that would enable it to effectively monitor the progress being made toward contract completion, the actual costs being incurred or the current state of performance of large contracts and also lacked an adequate system of internal financial and accounting controls to permit the proper monitoring, control of and accounting for costs on construction projects.

(c)     Halliburton had secretly changed the way it was accounting for Unapproved Claims on construction contracts and was now recognizing them as revenue when the claims were asserted, even though the customer had not yet agreed to pay the Unapproved Claims and more and more customers were refusing to pay millions of dollars of existing Unapproved Claims.

(d)     Halliburton was recording millions of dollars of Unapproved Claims as revenue, even though its top executives knew that collection of those Unapproved Claims was not probable and they were not capable of accurately estimating what amount could ultimately be collected under any circumstances.

(e)     Halliburton had not changed the way it was dealing with or procedures for customer change work orders/Unapproved Claims and was not securing advance agreement to pay for such work as it had claimed, but rather, was continuing its traditional process of accepting and performing change orders as demanded by customers or required by the progress of the contract work, without any actual agreement to pay, merely hoping to later collect on those Unapproved Claims.

(f)     It was not true that Halliburton had switched to fixed-price contracts because they would create greater profits for Halliburton or because Halliburton had a competitive

- 95 -

advantage in such contracts.  In truth, the switch to fixed-price contracts was driven by intensifying competition whereby Halliburton and its competitors were fighting to obtain a shrinking number of contracts available from oil exploration companies which were curtailing their capital expenditures; thus, the fixed-price contracts were, in fact, forced upon Halliburton by competitive pressures and undertaken by Halliburton without sufficient controls, procedures, monitoring systems and personnel to perform such contracts profitably.

       (g)    Halliburton's construction operations had not been effectively reorganized and restructured during 97-98 as claimed; in fact, in the field these operations were disorganized and lacked adequately skilled personnel and the procedures necessary to perform fixed-price contracts of the size and scope being undertaken by Halliburton which greatly increased the probability of performance delays, cost overruns, Unapproved Claims and, thus, losses on those contracts.

       (h)    Halliburton's financial results for the periods reported in ¶¶86-106, *i.e.*, 98 and the 1stQ 99 were false, having been manipulated and artificially inflated higher due to the fraudulent and illicit accounting practices detailed in ¶¶226-321 203-287 of this Complaint.

       (i)    Halliburton had acquired Dresser without doing due diligence into Dresser's business, operations, financial condition and potential liabilities, in part because Cheney demanded that the acquisition be undertaken and completed in an unreasonably expedited fashion and because he did not want to create a paper trail documenting what he and other Halliburton executives knew were liabilities of potentially hundreds of millions of dollars for existing and anticipated asbestos suits/claims against entities for which Dresser was legally responsible, a significant amount of which would likely not be covered by insurance.

       (j)    The Dresser acquisition was not a "win" for Halliburton and it represented an enormous risk due to Dresser's concealed potential asbestos liabilities and because, contrary to the

representations that the two companies were a good cultural and business fit and there were plans in place to achieve a smooth, quick transition and successful integration of the operations of both companies, there were no transition plans in place and the Dresser executives and managers were known to be conservative, system and process oriented managers with a very conservative approach to percentage-of-completion/contract accounting, while the Halliburton executives and managers were just the opposite, resulting in a cultural clash, causing inefficiencies and lack of success in integration efforts.

(k)    In fact, the construction operations of Dresser were not successfully integrated into the construction operations of Halliburton. The managers and executives of the two companies had very divergent approaches to business and accounting and constantly fought with one another, resulting in distracting turf battles, operating inefficiencies and duplicative layers of management – all resulting in an inability to integrate the two operations and, thus, in excessive costs.

(l)    Halliburton, in fact, had not adequately reserved or accounted for its accrued asbestos liabilities as represented – in truth, Halliburton's potential liabilities for asbestos claims and suits were unquantifiably large, but certainly exceeded Halliburton's reserve of less than $13 million by a huge multiple.

(m)    Halliburton's reserve for its accrued asbestos liabilities had not been objectively measured or determined or subjected to any expert review or consultation and, thus, represented nothing more than a self-interested management's claim, which management knew was grossly inadequate. Given the foregoing, there was absolutely no basis in fact for any representation that management believed that Halliburton's asbestos claims and suits would be resolved without any material impact on Halliburton's financial condition or results of operations. Management did not believe this representation or statement of opinion when it was made and knew that it was

- 97 -

highly likely that the ultimate resolution of the asbestos claims involving Halliburton would, in fact, materially adversely impact Halliburton's balance sheet and results of operations as, in fact, it did.

(n)     Because of the existence of Dresser's very substantial potential asbestos liabilities and due to the known difficulties of attempting to blend the management of the two companies and integrate their construction operations, it was not true that the acquisition of Dresser would strengthen Halliburton's balance sheet or lead to bottom-line profit improvements either in the first year after the merger or thereafter.

(o)     As a result of the foregoing undisclosed problems and practices, the defendants actually knew that their statements regarding Halliburton's future business prospects and performance and their forecasts of future financial performance were false when made and would not be achieved.

## CLASS PERIOD STATEMENTS

108.    On 6/3/99, the start of the Class Period, the pre-Class Period statements set forth above in ¶¶64-69, 77-81, 83-84, and 86-106 were alive, uncorrected and reflected in the market price of Halliburton's stock. Those statements were false and misleading in that they were affirmatively false. They were also misleading in failing to disclose the following facts which were then existing, known to or recklessly disregarded by defendants to be false, and necessary to be disclosed to make the statements made not misleading, as detailed earlier.

109.    121. On 7/22/99, Halliburton reported its 2ndQ 99 results. According to the release which was reviewed and approved by Cheney, Lesar, Muchmore and Morris:

> Halliburton Company reported today that the company's 1999 second quarter net income was $83 million ($.19 per share diluted) compared to $243 million ($.55 per share diluted) earned in the 1998 second quarter.

- 98 -

Although these results continued to reflect adverse industry conditions, again the results were better

than expected, which Cheney and Lesar told analysts was due to their superior management of

Halliburton~., via a release they drafted, approved and released, which stated:

> Financial results of each of Halliburton's three business segments . . . were
> negatively impacted by sharply lower worldwide levels of capital . . . expenditures by
> the company's petroleum industry customers.

> *       *       *

> Energy Services Group's operating income declined to $49 million in the 1999
> second quarter, down from $304 million a year earlier.

> *       *       *

> Operating income from the Engineering and Construction Group in the 1999 second
> quarter was $64 million compared to $74 million in the 1998 quarter~...

> *       *       *

> Dick Cheney . . . said, "The 1999 second quarter was a tremendous challenge
> for Halliburton's industry conditions reached historic lows. ***However, the benefits of
> our aggressive cost reduction program and restructuring activities allowed us to
> remain profitable during this most difficult period. . . . [W]e remain optimistic . . .
> .***"

110.   ~~122.~~ On 7/23/99, Dain Rauscher Wessels ("Dain Rauscher") issued a report on

Halliburton, based on what ~~Cheney, Lesar and/or Morris~~Halliburton's officers had said during a

7/22/99 conference call for analysts and money managers and in follow-up conversations with Dain

Rauscher analyst James Wicklund.  The report stated:

> ***Halliburton reported better-than-expected earnings for the quarter from
> both a reported and continued operations perspective, and management stated that
> sequential quarterly results should continue to improve with significant
> improvement in 2000.***

> *       *       *

> ***The merger results from the Halliburton-Dresser merger are on or ahead of
> schedule. . . . Management [now] expects that annualized merger cost savings are
> approximately $500 million.***