IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| THE ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, INC., et al., On Behalf of itself and All Others Similarly Situated, | § § § § | Master Docket No. 3:02-CV-1152-M<br><br>CLASS ACTION |
| Lead Plaintiff, | § § | |
| vs. | § § | |
| HALLIBURTON COMPANY, et al., | § § | |
| Defendants. | § § | |
| This Document Relates to: | § § § | |
| ALL ACTIONS. | § § | |

**LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
AND INCORPORATED MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ................................................................................................ 1

SUMMARY OF CLAIMS ................................................................................... 3

PROPOSED CLASS REPRESENTATIVES ...................................................... 7

ARGUMENT ....................................................................................................... 8

    A.    Legal Standards for Class Certification Pursuant to Fed. R. Civ. Proc. 23 ........... 8

    B.    The Proposed Class Satisfies the Requirements of Rule 23(a) ............................. 10

        1.    Numerosity ...................................................................................... 10

        2.    Commonality .................................................................................... 11

        3.    Typicality ......................................................................................... 12

        4.    Adequacy ......................................................................................... 13

    C.    This Action Satisfies Rule 23(b)(3) ...................................................................... 14

        1.    Common Questions of Law or Fact Predominate ..................................... 15

        2.    The Issue of Reliance Will Not Defeat Certification ................................ 16

            a.    Halliburton's Common Stock Traded in an Efficient Market ....... 16

            b.    Loss Causation ............................................................................. 19

        3.    The Class Action is Superior to Other Available Methods For the
            Fair and Efficient Adjudication of This Action ...................................... 23

CONCLUSION ................................................................................................... 24

21693 v1

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alison v. Ciigo Petroleum Corp.,*
151 F.3d 402 (5th Cir. 1998) ...................................................................................15

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ...............................................................................................15

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) ...............................................................................................16

*Bell v. Ascendant Solutions, Inc.,*
422 F.3d 307 (5th Cir. 2005) ...........................................................................passim

*Berger v. Compaq Computer Corp.,*
257 F.3d 475 (5th Cir. 2001) ........................................................................8, 13, 14

*Califano v. Yamasaki,*
442 U.S. 682 (1979) .................................................................................................9

*Cammer v. Bloom,*
711 F. Supp. 1276 (D.N.J. 1989) ...........................................................................16

*Castano v. American Tobacco Co.,*
84 F.3d 734 (5th Cir. 1996) .....................................................................................9

*Durrett v. John Deere Co.,*
150 F.R.D. 555 (N.D. Tex. 1993) ...........................................................................15

*Eisen v. Carlisle & Jacquelin,*
94 S. Ct. 2140 (1974) ...............................................................................................9

*Fine v Am. Solar King Corp.,*
919 F.2d 290 (5th Cir. 1990) ..................................................................................16

*Greenberg v. Crossroads Systems, Inc.,*
364 F.3d 657 (5th Cir. 2004) ..................................................................................20

*Henry v. Cash Today, Inc.,*
199 F.R.D. 566 (S.D. Tex. 2000) ..................................................................10, 12, 24

*In re Bank One Sec. Litig.,*
No. 00 CV 0767, 2002 U.S. Dist. LEXIS 8709 (N.D. Ill. May 9, 2002) ...................15

*In re Dynegy, Inc. Sec. Litig.,*
226 F.R.D. 263 (S.D. Tex. 2004) ...........................................................................2

*In re Electronic Data Sys. Corp. Sec. Litig.,*
226 F.R.D. 559 (E.D. Tex. 2005) ...........................................................................2

*In re Firstplus Fin. Group, Inc. Sec. Litig.,*
Civ. Action No. 3:98-CV-2551-M, 2002 U.S. Dist. LEXIS 20446 (N.D. Tex. Oct. 23, 2002)..2

*In re Reliant Sec. Litig.,*
No. H-02-1810, 2005 U.S. Dist. LEXIS 9716 (S.D. Tex. Feb. 18, 2005).........................passim

*In re Xcelera.com Sec. Litig.,*
430 F.3d 503 (1st Cir. 2005)..................................................................................18

*James v. City of Dallas,*
254 F.3d. 551 (5th Cir. 2001) ..........................................................................11, 13

*Kalodner v. Michaels Stores, Inc.,*
172 F.R.D. 200 (N.D. Tex. 2007)..........................................................................15

*Keasler v. Natural Gas Pipeline Co.,*
84 F.R.D. 364 (E.D. Tex. 1979) ............................................................................24

*Keele v. Wexler,*
149 F.3d 589 (7th Cir. 1998) ................................................................................12

*Lehocky v. Tidel Techs., Inc.,*
220 F.R.D. 491 (S.D. Tex. 2004) .......................................................................2, 13

*Levitan v. McCoy,*
No. 00 C 5096, 2003 U.S. Dist. LEXIS 5078 (N.D. Ill. Mar. 28, 2003)....................24

*Lightbourn v. County of El Paso,*
118 F.3d 421 (5th Cir. 1997) ...........................................................................11, 12

*Longden v. Sunderman,*
123 F.R.D. 547 (N.D. Tex. 1988).......................................................................12, 24

*Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999) ............................................................................................10

*Oscar Private Equity Investment v. Allegiance,*
487 F.3d 261 (5th Cir. 2007) ...........................................................................passim

*Phillips Petroleum Co. v. Shutts,*
 472 U.S. 797 (1985) ............................................................................................... 9

*Phillips v. Joint Legislative Comm. on Performance & Expenditure Review,*
 637 F.2d 1014 (5th Cir. 1981) ............................................................................. 12

*Unger v. Amedisys Inc.,*
 401 F.3d 316 (5th Cir. 2005) ................................................................... 13, 16, 19

*Vizena v. Union Pacific R. R. Co.,*
 360 F.3d 496 (5th Cir. 2004) .................................................................................. 9

*Watson v. Shell Oil Co.,*
 979 F.2d 1014 (5th Cir. 1992) .............................................................................. 10

*Zeidman v. J. Ray McDermott & Co., Inc.,*
 651 F.2d 1030 (5th Cir. 1981) .............................................................................. 10

## **Federal Rules**

Fed. R. Civ. Pro. 23(a) ............................................................... 1, 8, 10, 14, 15, 24
Fed. R. Civ. Pro. 23(a)(1) .................................................................................... 10
Fed. R. Civ. Pro. 23(a)(2) ............................................................................... 11, 12
Fed. R. Civ. Pro. 23(a)(3) .................................................................................... 13
Fed. R. Civ. Pro. 23(a)(4) .................................................................................... 13
Fed. R. Civ. Pro. 23(b) .......................................................................................... 8
Fed. R. Civ. Pro. 23(b)(2) .................................................................................... 14
Fed. R. Civ. Pro. 23(b)(3) ........................................................... 1, 8, 9, 14, 15, 24

## **Other Authorities**

Securities Exchange Act of 1934, 15 U.S.C. § 78a ....................................................... 1

21693 v1

## INTRODUCTION

This is a securities class action brought on behalf of persons who purchased the common stock of Halliburton Company ("Halliburton" or the "Company") between June 3, 1999, through and including December 7, 2001, (the "Class Period"), against Halliburton and David J. Lesar, (collectively, "Defendants" or "Halliburton"). Lead Plaintiff, the Archdiocese of Milwaukee Supporting Fund, Inc. ("AMS Fund") seeks an order under Fed. R. Civ. P. 23(a) and 23(b)(3) certifying a plaintiff class of all persons and entities who purchased or otherwise acquired Halliburton's common stock during the Class Period. The Lead Plaintiff AMS Fund requests that it be appointed a Class Representative and that another injured party, Lt. Col. Ben Alan Murphey, who filed a complaint and timely objected to a previous settlement that was found to be inadequate, also be named as a Class Representative. While the AMS Fund is adequate to serve as the sole Class Representative, it believes that the Class will benefit from Mr. Murphey serving as well. Finally, Lead Plaintiff requests that current Lead Counsel, Boies, Schiller & Flexner LLP, ("Boies Schiller" or "Lead Counsel") be designated as Class Counsel.

The Fourth Consolidated Amended Complaint for violation of the federal securities laws (the "FCAC") alleges that during the Class Period, Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, by deliberately falsifying Halliburton's financial results and deliberately and/or recklessly misleading the public about the financial condition and success of Halliburton's business, including its construction operations, the benefits of its acquisition of Dresser, Inc., its exposure to asbestos liability and its future business and financial prospects. ¶¶ 2, 4-44[1]. Such securities fraud class actions are routinely certified by the courts of the Fifth Circuit. *In re Electronic Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559 (E.D. Tex. 2005); *In re Reliant Sec. Litig.*, No. H-02-1810, 2005 U.S. Dist. LEXIS 9716 (S.D. Tex.

---

[1] Unless otherwise indicated, all paragraph ("¶") references are to the FCAC.
21693 v1

Feb. 18, 2005).[2]  As is the case here, each of the foregoing certified cases involved false and

misleading statements and/or omissions of material facts which caused investors to purchase

stock at inflated prices during the Class Period.  In those cases, as it should be here, a Class was

certified despite the fact that investors purchased different amounts of stock on different days

during the Class Period.

The primary issue for class certification in a securities case like this is whether there is a

basis for a claim of loss causation.  *Oscar Private Equity Investment v. Allegiance*, 487 F.3d 261

(5th Cir. 2007).  In this case, the facts alleged, along with the Report of Jane D. Nettesheim,

Appendix at 001 - 557 ("Nettesheim" and the "Report"), establish, among other things:

- On October 24, 2000, the Company announced that it would be restructuring its construction units.  As alleged in the FCAC, the restructuring was necessitated due to the problems with the Dresser integration.  FCAC ¶ 144.  This partial disclosure caused Halliburton's stock price to decline from $41.63 to $37.06, a statistically significant decline.  Report at ¶ 93.

- On December 21, 2000, Halliburton pre-announced its fourth quarter earnings and announced that it would be taking $120 million after tax charge, $95 million of which was required to write-off previously undisclosed losses on fixed price construction contracts.  FCAC ¶ 150.  This partial disclosure caused Halliburton's stock price to decline from $37.00 to $36.00, a statistically significant decline.  Report at ¶ 106.

- On June 28, 2001, Halliburton disclosed, for the first time, that Harbison, a former Dresser subsidiary, had asked for financial assistance for asbestos claims.  FCAC ¶ 170-171.  This partial disclosure regarding Halliburton's potential asbestos liability caused Halliburton's stock price to decline from $37.17 to $35.60, a statistically significant decline.  Report at ¶ 115-116.

- On December 4-7, 2001, Halliburton disclosed information regarding recent adverse asbestos verdicts, making clear that the Company's existing $125 million in asbestos reserves were not, as previously represented, adequate.  FCAC ¶ 191.  This disclosure caused the price of Halliburton stock to decline, on December 7, 2001 alone, from $20.85 to $12.00, a statistically significant decline.  Report at ¶ 133.

---

[2] *See also In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263 (S.D. Tex. 2004); *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004); *In re Firstplus Fin. Group, Inc. Sec. Litig.*, Civ. Action No. 3:98-CV-2551-M, 2002 U.S. Dist. LEXIS 20446 (N.D. Tex. Oct. 23, 2002).

21693 v1

## SUMMARY OF CLAIMS

The key facts are set forth in the FCAC.  Briefly summarized below, the FCAC alleges a series of false and misleading statements relating, among other things, to Halliburton's accounting practices with respect to 1) its improper booking of unapproved claims as revenue; 2) its knowingly inadequate reserves for asbestos liability; and, 3) its severe but undisclosed problems associated with the acquisition and integration of Dresser.

Accounting for Unapproved Claims

Prior to mid-1997, the business unit Brown Root Energy Services ("BRES") and the reporting segment Engineering and Construction ("E&C") principally entered into cost-plus or segmented fix fee contracts.  In the 1997 Annual Report, Halliburton stated that "the keys to increasing revenue and improving profit margins . . . will be . . . acceptance of more . . . fixed price contracts." ¶ 68. Far from leading to improved revenue and profit margins, the fixed-price contracts accepted by the Company resulted in cost overruns and delays, and customers' refusal to pay millions in unapproved claims. ¶ 10.

Prior to the second fiscal quarter of 1998, as disclosed in public statements and filings with the Securities and Exchange Commission ("SEC"), Halliburton did not report unapproved claims as revenue until the claim was resolved. ¶ 69.  However, in second quarter 1998 the Company began to record unapproved claims as revenue even if customers had not agreed to pay and were not legally obligated to do so. ¶ 11.  Under the new, undisclosed accounting policy, Halliburton's losses on these contracts appeared as revenue and falsely inflated Halliburton's reported operating incomes and margins and overall financial health.  ¶¶ 11-14, 204-236.  FCAC ¶¶ 11-72, 210-219.

Knowing the change in accounting for unapproved claims falsely represented the Company's revenue, profit and financial health, Halliburton nevertheless continued to claim

21693 v1

3

success on these large fixed-price contracts.  On July 22, 1998, Halliburton reported that the

"Engineering and Construction Group business segments second quarter, 1998, operating income

increased 66 percent . . . operating margin for the segment improved to 6.5 percent compared to

last year's 3.9 percent . . . ."  ¶ 80.  Similar claims of financial success were made when

Halliburton issued a release reporting its third quarter, 1998 results on October 29, 1998, stating

that "[d]espite weaker market conditions, the . . . construction activities of Brown & Root Energy

Services registered higher revenues for the quarter."  ¶ 86.  In fact, the higher revenues were not

due to improved operations, but were the result of the change in accounting for unapproved

claims.

Despite Halliburton's claims of success, in connection with its year-end 1998 results,

Halliburton was forced to take a $60 million charge for unapproved claims.  While announcing

the charge, the Company assured analyst that the charge was not necessitated by the premature

booking of unapproved claims as revenue, but rather was required because of customers' change

of attitude about paying unapproved claims.  ¶ 90.  The Company further reiterated that it would

not accept or perform change orders unless the customer agreed in advance to pay for the extra

work, thereby indicating that it would continue its practice of not booking revenue on

unapproved claims until the claim was resolved.  This statement was false and misleading

because Halliburton had in fact changed its accounting practice, and further, the statement

indicated the problem resulting in the $60 million charge, had been addressed, and therefore,

there would be no such future charges.

Thereafter, on June 9, 1999, Richard B. Cheney ("Cheney") and Gary V. Morris

("Morris") made a joint presentation at the 12th Annual Paine Webber Energy Conference.  On

behalf of the Company, Cheney and Morris explained that "Hal has adjusted to the change in

customer philosophy" and requires that customers provide "assurance of payment . . . along the

21693 v1

way . . ."; and, restated management's "confidence in downstream margins going forward."
¶ 91. These statements were relied upon and repeated in subsequent analyst reports. ¶¶ 92-93.

By including the unapproved claims in the Company's reported revenue, profit and margins were more favorable than they would have been if the accounting policy had not been changed. The Company invoked these overstated numbers to perpetuate the perception of success, and boasted the year-over-year improvements in revenue but failed to disclose that the improved financials were the result of the accounting change, not of improved operations.

It was not until March, 2000, in Halliburton's 1999 Annual Report, that the Company slipped a sentence into the notes to its financial statements that it was now recognizing revenue on unapproved claims when it deemed collection "probable." ¶ 124.  However, this belated disclosure was still misleading because it did not disclose that the Company had already, over the prior six quarters, secretly and improperly recognized at least tens of millions in unapproved claims as revenue, even though they were unlikely to be collected and could not be accurately estimated, two strict requirements under Generally Accepted Accounting Principles ("GAAP") for recognizing Unapproved Claims as revenue. ¶¶ 13-14, 204-209.  Moreover, Halliburton continued the practice of comparing the inflated post-change financial results to the pre-change financial results, without disclosing the inflating effects of the new accounting method.

In public statements and filings with the SEC subsequent to its 1999 Annual Report, Halliburton repeated that its accounting practice was not to book revenue on unapproved claims until it deemed collection was probable.  Each of these statements however was false and misleading because Halliburton continued to improperly record millions in uncollectible and inestimable Unapproved Claims as revenue every quarter. ¶¶ 11-14, 204-209, 234-236.

Asbestos Liability

Halliburton also repeatedly assured investors that the resolution of Dresser's legacy of asbestos suits would not have a material impact on Halliburton's finances. Halliburton's 1998 Annual Report assured investors that the $12 million then reserved was adequate, and "that the pending asbestos claims will be resolved without a material effect on Halliburton's financial position or results of operations." ¶ 101. While over time the Company made slight increases to the actual amount of reserves, Halliburton continued throughout the Class Period to falsely represent that it had adequately reserved for potential asbestos liability. For example, on November 15, 1999, Halliburton filed its third quarter, 1999 10Q, which stated that reserves had been increased to $13 million, and assured investors that $13 million asbestos reserves were adequate.

Similarly, on May 15, 2000, Halliburton filed its first quarter, 2000 10Q. Regarding Halliburton's potential asbestos litigation, the Company announced that it had accrued $25 million, and that management believed that pending asbestos claims would be resolved without material effect on Halliburton's financial position. As detailed in the FCAC, such unequivocal assurances were repeated in every SEC filing through May, 2001[3]. ¶¶ 88, 101, 113, 126, 130, 148, 160, 166. In fact, as the Company knew, or was severely reckless in not knowing, Halliburton had potential liability of hundreds of millions of dollars, and was in litigation with various insurance carriers who were denying coverage.

Integration of Dresser Operations

In early 1998, Halliburton announced the $7 billion Dresser acquisition, assuring investors it was a "win," which would strengthen Halliburton's balance sheet and boost its

---

[3] Halliburton increased its accrual for asbestos by just $2 million in 3rd Q 00, $3 million in 4th Q 00 and $1 million in lst Q 01, resulting in accrued liabilities at March 31, 2001 of only $30 million while assuring analysts that Halliburton had "fully accrued" for all asbestos liabilities. ¶ 35.

21693 v1

"bottom-line" because Halliburton and Dresser were "an outstanding business and cultural fit."

¶ 8. Halliburton told investors the merger would result in the "strengthening [of Halliburton's]

balance sheet," "lower costs" and "very significant savings . . . in excess of $1/4 billion" per

year, *i.e.*, the "combination will be especially effective." ¶ 15. Thereafter, on September 13,

1999, Lesar told analysts and money managers at an energy conference that the Dresser merger

would bring a $500 million annual benefit to the Company, up from the $250 million annual

benefit the Company had previously stated would result from the acquisition. ¶ 115.

Halliburton continued to represent that the integration had been successful and would

confer substantial benefits to Halliburton's home line. For example, Halliburton's 1999 Annual

Report assured investors that "[t]he merger with Dresser Industries is now behind us. Integrating

the operations of the two companies . . . [has] been an important part of our transition to the

future . . . . The potential rewards to our shareholders are vast." ¶ 21, 122. According to

Cheney, Halliburton's stock was "one of the best investment opportunities." ¶¶ 21-22.

These positive but false statements inflated Halliburton's stock price to $52 by the Spring

of 2000. *Id.* In fact, however, throughout the Class Period, there were ongoing and persistent

problems with the integration of Dresser, costing the Company at least tens if not hundreds of

millions of dollars.

## PROPOSED CLASS REPRESENTATIVES

Lead Plaintiff AMS Fund proposes that it, along with Ben Alan Murphey, serve as Class

Representatives. During the Class Period, Lead Plaintiff and proposed Class Representative

AMS Fund purchased shares of Halliburton stock and, as of the end of the Class Period, suffered

damages of approximately $71,000 as a result of Defendants' material misrepresentations and

omissions. ¶ 54(a). AMS Fund, a charitable institution, has already expended substantial time

and effort, and amply demonstrated its commitment to vigorously prosecute this litigation on

behalf of the proposed Class.  The AMS Fund has ably represented the Class by overseeing and

communicating with appointed Lead Counsel, and keeping apprised of the ongoing

developments in the case.  Lead Plaintiff has undertaken an extensive investigation into

Defendants' fraudulent schemes, and when former lead counsel sought approval of an inadequate

settlement, AMS Fund, joined by proposed Class Representative Ben Alan Murphey, objected to,

and defeated that settlement.

During the Class Period, proposed Class Representative Ben Alan Murphey purchased

shares of Halliburton stock, and, as of the end of the Class Period, suffered damages of

approximately $11,000 as a result of Defendants' material misrepresentations and omissions.

¶ 54(f).  Mr. Murphey filed his class action complaint in this action on March 9, 2005.  Mr.

Murphey has actively monitored this action through his communications with Special Counsel

Neil Rothstein, and when former lead counsel sought approval of the inadequate settlement, Mr.

Murphey joined in the AMS Fund in objecting to that settlement.

Mr. Murphey and AMS Fund stand ready, willing and able to perform the duties of a

Class Representative, including testifying at depositions and responding to discovery requests.

## **ARGUMENT**

A.    Legal Standards for Class Certification Pursuant to Fed. R. Civ. Proc. 23

The party seeking certification bears the burden of proof and must demonstrate that the

proposed class and its representative(s) satisfy the requirements of Rule 23(a) and one of the

requirements of Rule 23(b).  *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir.

2001), *clarified on rehearing en banc*, 279 F.3d 313 (5th Cir. 2002).  Here Lead Plaintiff moves

for certification under Rule 23(b)(3), in that "questions of law or fact common to the members of

the class predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

On a motion for class certification "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin,* 94 S. Ct. 2140, 2153 (1974); *accord Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307, 311 (5th Cir. 2005) *citing Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir. 1996) ("the strength of a plaintiff's claim should not affect the certification decision."). While the Fifth Circuit's recent opinion in *Oscar Private Equity Investment v. Allegiance,* 487 F.3d 261 (5th Cir. 2007) requires a showing of loss causation in order for a Lead Plaintiff to avail upon a fraud-on-the-market presumption of reliance, under *Allegiance* the inquiry is whether Plaintiff had offered "some empirically-based showing that the corrective disclosure was more than just present at the scene." *Id.* at 271.

A class action affords a single forum in which to litigate the same or similar claims, and affords an indispensable mechanism to conserve judicial resources. The Supreme Court, as well as courts throughout the country, have endorsed class actions in securities fraud claims. *Califano v. Yamasaki,* 442 U.S. 682, 701 (1979); *see, e.g., Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available."). A district court has great discretion in deciding whether certification is proper. *Vizena v. Union Pacific R. R. Co.,* 360 F.3d 496, 502 (5th Cir. 2004).

This case has all the elements of a certifiable, securities class action. The proposed Class is defined as all purchasers of Halliburton common stock during the Class Period, excluding defendants, officers and directors of the Company, as well as their families.[4] The Class consists

---

[4] In accordance with Local Rule 23.2, counsel provides the following additional information: Plaintiffs' counsel has agreed to advance the money to fund this action. Counsel anticipates providing notice to all class members for whom they are able to obtain a valid address by U.S. mail, and supplementing that notice with publication notice in

21693 v1

9

of tens, if not hundreds of thousands of investors who acquired Halliburton's stock over a 31-month period and were damaged by the same fraudulent schemes and false and misleading statements and omissions of material facts. Accordingly, as demonstrated below, certification is appropriate.

B.    The Proposed Class Satisfies the Requirements of Rule 23(a)

Rule 23(a) sets forth four prerequisites for class certification: (1) The Class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the Class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the Class; and, (4) the representative parties will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a). The requirements of Fed. R. Civ. P. 23(a) are commonly referred to as the "numerosity," "commonality," "typicality," and "adequacy", respectively. *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999).

1.    Numerosity

Numerosity is satisfied when a potential Class is so numerous that joinder of all members is impracticable. *Watson v. Shell Oil Co.,* 979 F.2d 1014, 1022 (5th Cir. 1992). Because a reasonable estimate of the number of purported members satisfies the numerosity requirement, a precise numeration is not required. *Henry v. Cash Today, Inc.,* 199 F.R.D. 566, 569 (S.D. Tex. 2000) (Harmon, J.). In the Fifth Circuit, "the prerequisite expressed in Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1039 (5th Cir. 1981).

---

a national newspaper such as the Wall Street Journal. As part of the Stipulation and Agreement of Settlement, filed on May 10, 2004, initial Lead Counsel estimated that the cost of such a notice program would be $150,000. Lead counsel believes that figure is a rough approximation of the cost of a notice program, and is in the process of trying to gather the information needed for a more precise estimate. Plaintiffs' counsel has been retained in this action on a contingency basis and should plaintiffs prevail in this action, counsel is entitled both to payment of attorneys fees and to reimbursement of advanced costs. Plaintiffs do not believe any discovery is necessary for the class certification hearing other than deposition of expert witnesses unless defendants raise factual defenses to class certification. Counsel believes the depositions can be conducted within a few weeks of service of all relevant expert reports.

21693 v1

The Class consists of those who purchased Halliburton's publicly traded securities during the Class Period. At the start of the Class Period, Halliburton had approximately 440.6 million shares outstanding, with members of the Class scattered throughout the United States. *See* Report ¶ 22. While the exact number of class members is presently unknown, and can be ascertained only through discovery, based on the Company's reported shares outstanding and trading volume during the Class Period, Lead Plaintiff estimates there are tens, if not hundreds of thousands of class members nationwide.

2.      Commonality

To satisfy the commonality requirement, Lead Plaintiff must show that there are questions of law or fact common to the class. The "commonality" requirement is satisfied "when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn v. County of El Paso,* 118 F.3d 421, 426 (5th Cir. 1997). Rule 23(a)(2) does not require perfect harmony throughout the class and the presence of some factual variations among class members' experiences will not defeat class certification. *In re Reliant,* 2005 U.S. Dist. LEXIS 9716, at *20. That some plaintiffs have different claims or claims that require some individualized analysis does not defeat commonality. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001).

This proposed Class satisfies the "commonality" requirement. At least the following issues of law and fact are common to the proposed Class Representatives and the Class:

(i)      whether Defendants violated federal securities laws;

(ii)     whether Defendants' undisclosed schemes, false statements and omissions of material facts misrepresented the business, financial and operational results and future performance of the Company;

(iii)    whether Defendants acted willfully, knowingly, or recklessly in concealing their schemes and misrepresenting and omitting material facts;

(iv)    whether the market price of the Company's common stock was artificially inflated during the Class Period due to Defendants' schemes, material misrepresentations, deceptions and nondisclosures; and

(v)    whether class members sustained economic loss causally connected to Defendants' misconduct, and if so, the proper measure of such damages.

In addition, all Class members were damaged by Defendants' "standardized conduct" during the Class Period. *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998). Defendants' fraudulent accounting schemes, and false and misleading statements and omissions to the market inflated the Company's stock price and injured class members in a uniform manner. ¶¶ 18-126. The proposed Class Representatives, like all members of the Class, purchased Halliburton shares based on the integrity of the market when defendants' misconduct inflated Halliburton's stock price. This common nucleus of facts and law unite all class members, irrespective of when and how many shares they purchased. Nothing more is required to show commonality under Rule 23(a)(2). *In re Reliant,* 2005 U.S. Dist. LEXIS 9716, at *20.

3.    Typicality

"The test for typicality, like the test for commonality, is not demanding." *Lightbourn,* 118 F.3d at 426. "The court focuses on the legal and remedial theories of the named plaintiffs and the class members they seek to represent." *Henry,* 199 F.R.D. at 569. Typicality does not require that all claims must be identical. *Phillips v. Joint Legislative Comm. on Performance & Expenditure Review,* 637 F.2d 1014, 1024 (5th Cir. 1981). "The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Longden v. Sunderman,* 123 F.R.D. 547, 556 (N.D. Tex. 1988).

The claims of the proposed Class Representatives are typical of those of the class members. Defendants' common schemes and "standardized" course of wrongful conduct caused damage to class members who purchased shares at artificially inflated prices during the Class

21693 v1

12

Period.  The proposed Class Representatives, like all other class members, suffered economic losses from their transactions in Halliburton's stock when the artificial inflation was removed from the stock price through, *inter alia,* partial disclosures of adverse facts concerning the true financial state of the Company.  ¶ 3.  Simply put, the proposed Class Representatives' claims are typical under Rule 23(a)(3) because "the claims of named and unnamed plaintiffs have a common source and rest upon the same legal and remedial theories." *In re Reliant,* 2005 U.S. Dist. LEXIS 9716, at *22 (*citing Lehocky,* 220 F.R.D. at 500).

     4.    Adequacy

"The Court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).  The adequacy requirement has three elements: (1) the chosen Class Representative cannot have antagonistic or conflicting claims with other members of the class; (2) the named representative must have sufficient interest in the outcome to ensure vigorous advocacy; and (3) designated counsel must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously. *Berger v. Compaq Computer Corp.,* 257 F.3d at 479-80.  The proposed Class Representatives satisfy the "adequacy" requirements of Rule 23(a)(4).

There are no conflicts of interest between the proposed Class Representatives and the other members of the Class.  The proposed Class Representatives will have to prove the same legal theory and standardized conduct as the absent class members to establish Defendants' liability. Further, there are no defenses unique to the proposed Class Representatives. Differences between the Class Representatives and the class members do not defeat adequacy unless these differences create conflicts between the representatives and the class members. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001).  Here there is no such conflict.

21693 v1

An adequate representative must be willing to take an active role in and exercise ultimate control of the litigation in order to protect the interests of the absent class members. *Berger v Compaq Comp. Corp.*, 257 F.3d at 479. The proposed Class Representatives have demonstrated their interest and vigor by actively prosecuting this case. When the initial lead counsel proposed an inadequate settlement, the proposed Class Representatives joined in objecting to, and ultimately defeating, the settlement. Mr. Murphey has continued to monitor the case through consultation with Special Counsel Neil Rothstein.

Finally, the proposed Class Representatives have retained attorneys with considerable experience in complex litigation and securities class actions. The proposed Class is represented by Boies, Schiller & Flexner LLP, whose attorneys have been appointed as Class Counsel in numerous class actions, including securities class actions.[5] The firm resume of Boies, Schiller & Flexner LLP evidences its ability to vigorously prosecute this action with the guidance and assistance of the proposed Class Representatives. *See App.* at 558 - 586.

C.    This Action Satisfies Rule 23(b)(3)

In addition to satisfying the requirements of Rule 23(a), the proposed Class Representatives must also meet the requirements of Rule 23(b)(2) or (3). Lead Plaintiff seeks certification under Rule 23(b)(3), which states that an action may be maintained as a class action if:

> [T]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

*Id.* The proposed Class satisfies both the predominance and superiority requirements.

---

[5]   On February 23, 2007, this Court approved Lead Plaintiff's selection of Boies, Schiller & Flexner LLP ("Boies Schiller") as Lead Counsel.

21693 v1

1.      Common Questions of Law or Fact Predominate

To satisfy the predominance requirement, Lead Plaintiff must establish that issues that are subject to generalized proof, and thus applicable to the Class as a whole, predominate over issues that are subject only to individualized proof. *See Alison v. Ciigo Petroleum Corp.*, 151 F.3d 402, 419-420, 425 (5th Cir. 1998). Rule 23(b)(3)'s predominance requirement is "more stringent" than the commonality requirement of Rule 23(a) but, in analyzing predominance, courts generally focus on liability, therefore "predominance is a test readily met in certain cases alleging consumer or securities fraud or antitrust violations." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Common issues, including those identified in section B.2. above, predominate in this action. Defendants' liability arises from their fraudulent accounting schemes and dissemination of materially false and misleading statements and omissions during the Class Period. *See In re Bank One Sec. Litig.*, No. 00 CV 0767, 2002 U.S. Dist. LEXIS 8709, at *22 (N.D. Ill. May 9, 2002) ("The issues of law and fact that flow from Defendants' alleged misstatements and omissions predominate over any individual issue."). Each member of the Class purchased Halliburton stock at prices artificially inflated as a result of Defendants dissemination of false and misleading statements and, because the same set of operative facts and the same issues of proximate cause apply to each class member, common questions of law and fact predominate and a class action is appropriate. *Durrett v. John Deere Co.,* 150 F.R.D. 555, 560 (N.D. Tex. 1993). Indeed, the only possible individual issues in this case are reliance and damages, the latter of which courts uniformly hold, absent a conflict that is imminent and "at the very heart of the suit", will not defeat class certification in securities cases. *Kalodner v. Michaels Stores, Inc.*, 172 F.R. D. 200 (N.D. Tex. 2007) (internal citations omitted).

2.   The Issue of Reliance Will Not Defeat Certification

Lead Plaintiff relies on the fraud-on-the-market theory recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) for of a class-wide presumption of reliance. The fraud-on-the-market presumption provides that:

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

*Id.* at 247.

Under the Fifth Circuit's recent interpretation of *Basic*, in order to avail upon the fraud-on-the-market presumption, plaintiffs must show that Halliburton stock traded on an efficient market and that the corrective disclosure affected the stock price. *Oscar Private Equity Investments v. Allegiance*, 487 F.3d 261. The *Allegiance* court made clear however, that plaintiffs need not quantify damages, or prove that some percentage of the drop was attributable to the corrective disclosure, but need only offer some empirically based showing that "the corrective disclosure was more than just present on the scene." *Id.* at 271. Once the proposed Class establishes entitlement to the fraud-on-the-market presumption of reliance, Defendants can rebut that presumption only "by showing that the nondisclosures did not" affect the Halliburton's stock price. *Fine v Am. Solar King Corp.*, 919 F.2d 290, 299 (5th Cir. 1990).

a.   Halliburton's Common Stock Traded in an Efficient Market

The court in *Unger v Amedisys*, 401 F.3d 316 (5th Cir. 2005), expanding upon the five factors recognized by *Cammer v. Bloom*, 711 F. Supp. 1276 (D.N.J. 1989), identified eight factors for determining market efficiency:  (1) average weekly trading volume expressed as a percentage of total outstanding shares; (2) number of securities analysts following and reporting on the stock; (3) extent to which market makers and arbitrageurs trade in the stock; (4)

Company's eligibility to file SEC registration Form S-3 (as opposed to Form S- or S-2); (5)

existence of empirical facts "showing a cause and effect relationship between unexpected

corporate events or financial releases and an immediate response in the stock price;" (6)

Company's market capitalization; (7) bid-ask spread for stock sales; and (8) float, the stock's

trading volume without counting insider-owned stock. *See also*, *Bell*, 422 F.3d at 313.  Under

each of these factors it is clear that the market for Halliburton stock was efficient.  Report, ¶¶ 9-

24.

<u>Factor 1:  Trading Volume</u>

Halliburton's stock traded at an average weekly volume of over 16,796,502 shares during

the Class Period.  Report, ¶ 22.  Weekly trading volume for Halliburton was on average, 3.8% of

the outstanding shares, significantly more than the 2% volume courts have found sufficient to

raise a "strong presumption" of market efficiency for stocks traded on the NASDAQ, and more

than the 1% volume courts have deemed sufficient for stocks traded on the NYSE.  Report, ¶ 21,

fn.16.

<u>Factor 2:  Analyst Coverage</u>

Securities analysts from several firms covered and reported on Halliburton during the

Class Period.[6]  Such expansive analyst coverage is an indicator of market efficiency.  Report,

¶ 27.

<u>Factor 3:  Opportunity for Arbitrage</u>

For stocks traded on the NYSE, the function of market makers – that is, to ensure the

competitive, orderly and efficient market for securities, is performed by a single specialist.

---

[6] Halliburton was covered by at least ABN Amro Bank N.V. U.S.A; A.G. Edwards & Sons, Inc.; Argus Research Corporation; Bear, Stearns & Co., Inc.; Brown Brothers Harriman & Co.; Capital One Southcoast, Inc; CIBC World Markets Corp.; Deutsche Bank Securities Inc.; ING Financial Markets USA; Jefferies & Company, Inc.; Johnson, Rice & Co.; Painewebber Inc.; PNC Institutional Investment Service; Prudential Equity Group, Inc.; RBC Capital Markets; Sanford C. Bernstein & Co., Inc.; Smith Barney Citigroup; Southwest Securities; Stephens Inc.; SunTrust Robinson Humphrey Capital Markets; UBS (US); and Wachovia Securities.
21693 v1

Report, ¶ 28.  Specialists achieve this function by performing four critical roles:  (1) as an auctioneer, continually showing the best bids and offers, and maintaining order in the crowd; (2) as an agent for SuperDot orders (direct electronic routing system to and from the trading floor) as well as for brokers; (3) as a catalyst for order flow by informing interested parties of items available in the market; and (4) as a principal, where the specialist has an obligation to enter into a transaction using its own capital if there is a willing buyer or seller with no counterparty in the marketplace.  Specialists thus facilitate continuous trading during market hours.  Report, ¶ 29. As with the market makers, the role of the specialist assures the existence of arbitrage opportunities.  Report, ¶ 31.  As evidenced by the level of short interest, the short-selling of Halliburton's stock was not constrained during the Class Period, and arbitrage opportunities could be exploited, which is evidence in support of market efficiency.  Report, ¶¶ 32-37.

Factor 4:  Form S-3 Eligibility

The Company was eligible to file an SEC registration Form S-3 during the Class Period. Indeed, Halliburton filed an amended Form S-3 before the Class Period, on September 25, 1998, and during the Class Period, filed a Form S-3 on December 3, 2001.  Thus, this factor supports a finding of market efficiency.  Report, ¶¶ 38-39.

Factor 5:  Cause and Effect Relationship

The cause and effect relationship between unexpected information released to the market and movement of the stock price is the essence of an efficient market and the foundation for the fraud-on-the-market theory.  *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 508 (1st Cir. 2005) (stating that the cause and effect relationship between pricing and new information is implicit in an efficient market).  The movement of Halliburton's stock price during the Class Period when unexpected news was disseminated shows that Halliburton's stock traded in an efficient market. Report, ¶¶ 40-46.

21693 v1

### Factor 6:  Market Capitalization

During the Class Period, the market capitalization for Halliburton stock ranged from $5.1 billion, on the last day of the Class Period, to a Class Period high of $24 billion.  Report, ¶ 47. Even at the lower end of this range, Halliburton's market capitalization supports a finding that the market for Halliburton stock was efficient.  Report, ¶ 48.

### Factor 7:  Bid/Ask Spread

Bid/ask spreads are a measure of transaction costs; low transactions costs indicate that arbitrage opportunities can be exploited readily.  Report, ¶ 49.  During the Class Period, the average bid/ask spread as a percentage of the mean bid/ask price for Halliburton was 0.22%; the average for Halliburton's competitors was 0.36%.  Such a low bid/ask spread indicates that arbitrage opportunities could be exploited, which is evidence of market efficiency.  Report, ¶ 50.

### Factor 8:  Public Float

Courts have held that a large float percentage (percentage of shares held by the public) can be an indicator of market efficiency.  *Unger*, 401 F.3d at 323; *Bell*, 422 F.3d 307 and 313, n.10.  During the Class Period, there were between 429.0 million and 445.5 million shares of Halliburton stock outstanding, of which approximately 99% were held by the public.  This large public float indicates an efficient market.  Report, ¶ 51.

Each of the *Unger* factors supports the conclusion that Halliburton stock traded in an efficient market.  In addition, Halliburton's listing on a national exchange; the presence of sophisticated investors; and, the coverage of Halliburton by wire services, financial press, and general media also support a finding of market efficiency.  Report, ¶¶ 52-64.

> b.    Loss Causation

The Fifth Circuit, in *Oscar Private Equity Investment v. Allegiance*, recently held that to avail itself of the benefits of the fraud-on-the-market presumption of reliance at the class

certification stage, the Lead Plaintiff must show loss causation. *Id.* at 269. More specifically, the *Allegiance* court found that, where there are multiple negatives, not all of which are alleged to be culpable, the Lead Plaintiff has the burden of showing that it was the culpable statement(s) that caused a significant amount of the decline in the stock price:

> when unrelated negative statements are announced contemporaneous of a corrective disclosure, the plaintiff must prove " that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline.

*Id.* at 270. In clarifying this burden, *Allegiance* affirmed that, at this stage, the Lead Plaintiff need not quantify damages:

> While counsel is correct that *quantification* of damages is presently unnecessary-- *i.e.* proof that some percentage of the drop was attributable to the corrective disclosure--the plaintiffs must, in order to establish loss causation at this stage, offer some empirically-based showing that the corrective disclosure was more than just present at the scene.

*Id.* at 271. (Emphasis original).

In addressing the dissent's concerns that *Allegiance* does not provide adequate guidance as to "what form such proof might take[]", the court reiterated that such proof could come in the form of an events study and leaves open the possibility of other "options, subject to scrutiny in the first instance by opposing experts and the district courts." *Id.* at 265, n.22. *Allegiance* further suggests that such an event study could be based on "public data and public filings." *Id.* at 267. *Allegiance* confirms that analysts' opinions may be evidence of the cause of a stock decline, but will not be sufficient to carry Lead Plaintiff's burden "without reference to any post-mortem data they have reviewed or conducted." *Id.* at 271. In some circumstances, it is sufficiently evident that the stock was driven down by the culpable disclosure that no empirical analysis is necessary to disaggregate the effect of the culpable and the non-culpable disclosures. *See Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657 (5th Cir. 2004) (disclosure that

revenue would be 66% below estimates sufficient to establish loss causation notwithstanding simultaneous release of non-culpable news).

Lead Plaintiff here has satisfied the *Allegiance* burden through the submission of the Nettesheim expert report.  In preparation of the Report, Nettesheim reviewed all publicly available, relevant information for the Class Period, and determined that there were 24 instances of statistically significant declines in the company-specific return on Halliburton stock during the Class Period.  Of those instances, eleven days corresponded to the release of culpable news, and only one of those days, January 5, 2000, involved multiple pieces of news, some culpable and some not.

As discussed in the Nettesheim Report, there are six instances (October 5, 1999, June 29, 2001, August 9, 2001, October 31, 2001, December 4, 2001 and December 7, 2001) in which there was but one piece of news that caused a statistically significant decline in the company-specific return on Halliburton stock during the Class Period.  Report, ¶¶ 84, 115, 119, 125.  As explained in the Report, the company-specific return nets out the change in the price attributable to changes in the relevant index and the market as a whole.  Report, ¶ 81.  As there is no other news or information that can explain the company-specific stock price decline on these days, as Nettesheim concluded, the decline in the price of Halliburton stock could only have been caused by the partial disclosure of the single piece of culpable news, and as to these instances, Lead Plaintiff has satisfied its burden of establishing loss causation.  Report, ¶ 87, 118, 121, 133. *See Allegiance*, 487 F.3d. at 267 (a greater showing of loss causation is warranted in the instance of simultaneous disclosure of multiple pieces of negative news).

In addition, there are two instances (October 25, 2000 and December 22, 2000) in which there is more than one negative piece of news, all alleged to be culpable.  Report, ¶¶ 93, 106.  It is Lead Plaintiff's burden to attribute the cause of a decline among culpable and non-culpable

negative statements. *Allegiance* does not require a Lead Plaintiff to attribute the cause of a decline among multiple culpable negative statements. *See Allegiance*, 487 F.3d at 265 ("we address here only the simultaneous disclosure of multiple negatives, not all of which are alleged culpable."). Accordingly, even without more, Lead Plaintiff has carried its burden of showing loss causation as to these instances.

And even though doing so is not required by *Allegiance,* Nettesheim has opined on the significance of each piece of news associated with this statistically significant decline in the price of Halliburton stock for these instances, utilizing the event study, and an empirical analysis of all of the information surrounding the news, including the analyst reports and the information utilized by those analysts. For example, after the market closed on Thursday, December 21, 2000, Halliburton pre-announced fourth-quarter earnings, formally unveiling the restructuring of its engineering and construction units and stated that it planned to take a charge of $120 million in the fourth quarter. Report ¶ 106. Of the $120 million special charge, $95 million (or 79%) was related directly to the cost overruns alleged by Lead Plaintiff, with the remaining $25 million related to the restructuring necessitated by the ongoing problems with the Dresser integration. Both of these "negatives" are culpable under the allegations of the FCAC.

This disclosure, and the analyst reports that disseminated the information, caused a statistically significant decline in Halliburton's share price. On December 22, 2000, Halliburton's stock price declined 2.7%, to close at $36.00. The company-specific return that day was negative 3.9%. Although the industry was down that day, the overall market was up more than 3.0%. While not required under *Allegiance,* Nettesheim opines that the significant cause of this decline was due to the "surprise" charge of $95 million to cover cost over runs. Report ¶¶ 106-111.

Finally, there is one instance (January 5, 2000), in which there is a mix of culpable and non-culpable negatives on a day in which there was a statistically significant decline in the company-specific return on Halliburton stock. Report ¶ 88. For this day, Nettesheim performed a rigorous empirical analysis whereby she 1) used econometric analysis to determine how much of the day's stock return is attributed to company-specific news and events, and how much of the day's stock return can be attributed to market and industry news and events; (2) examined all of the news surrounding the day on which the alleged disclosure was made to determine what the company said and what market participants said; 3) reviewed all of the analyst reports surrounding the day on which the alleged disclosure was made to determine how the company's statements or communications impacted market participants' assessments of the company's value; 4) conducted an empirical analysis of the information on and surrounding the disclosure date to determine what specific news items were important on the day of the alleged disclosure; and 5) conducted an empirical analysis to determine the relative importance of different pieces of news with respect to impact on stock valuation.

On January 5, 2000, Halliburton's stock price declined 4.38%, from $38.50 to $36.81. The company-specific return that day was negative 4.3%. Report ¶ 88. Nettesheim opines that a significant portion of the stock price decline on January 5, 2000 was caused by information that partially corrected investors' erroneous assessments of the profitability of overseas construction projects and the benefits of the Dresser merger. Report ¶ 92.

3. The Class Action is Superior to Other Available Methods For the Fair and Efficient Adjudication of This Action

The matters pertinent to finding superiority include: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the

21693 v1

particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. Pro. 23(b)(3). Applying each of these four factors shows that class certification in this case is both useful and necessary.

First, with the possible exception of the Laborers National Pension Fund, Plumbers and Pipefitters National Pension Fund, and City of Dearborn Heights Act 345 Police & Fire Retirement System, who sought to be appointed as Lead Plaintiffs, there has been no indication that any other Class Members would prefer to try his or her own case. Second, other than the consolidated cases, there are no known cases concerning this controversy. Third, it "is desirable that securities fraud cases involving a large number of plaintiffs with small individual claims proceed as class actions." *Keasler v. Natural Gas Pipeline Co.,* 84 F.R.D. 364, 368 (E.D. Tex. 1979); *Longden,* 123 F.R.D. at 551. Finally, Lead Counsel knows of no exceptional difficulties regarding trying this case as a class action. There will be no difficulties in managing the class because liability will be determined by common evidence and misstatements and omissions, and loss causation will be determined through common effect of disclosures on the stock price.

In such circumstances, class representation is the only way to afford relief to those plaintiffs whose claims are too small to permit them to bring individual suits, and is superior to other available methods for the fair and efficient adjudication of this controversy *Henry,* 199 F.R.D. at 573; *see also Levitan v. McCoy,* No. 00 C 5096, 2003 U.S. Dist. LEXIS 5078, at *6 (N.D. Ill. Mar. 28, 2003) ("securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits.").

## CONCLUSION

For the reasons set forth herein, an Order should be entered (i) certifying this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure; (ii)

appointing AMS Fund and Ben Alan Murphey as Class Representatives; and (iii) appointing

Lead Counsel, Boies, Schiller & Flexner LLP as Class Counsel.

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

/s/ Caryl L. Boies
David Boies
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Caryl L. Boies, TSB # 02565420
Sashi B. Boruchow, FSB #0398276
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
**LEAD COUNSEL FOR LEAD PLAINTIFF,
THE ARCHDIOCESE OF
MILWAUKEE SUPPORTING FUND, INC.**

Neil Rothstein, Esq.
Truth in Corporate Justice LLC
8721 Santa Monica Blvd., Suite 41
Los Angeles, CA 90069
Telephone: (800) 610-4998
Facsimile: (310) 246-1175
**SPECIAL COUNSEL TO LEAD PLAINTIFF,
THE ARCHDIOCESE OF
MILWAUKEE SUPPORTING FUND, INC.**

E. Lawrence Vincent, SBN 20585590
208 N. Market Street, Suite 200
Dallas, Texas 75202
Telephone: (214) 680-1668
Facsimile: (972) 491-2417
**ATTORNEY FOR LEAD PLAINTIFF,
THE ARCHDIOCESE OF
MILWAUKEE SUPPORTING FUND, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on September 17th, 2007, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-

mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

have mailed the foregoing document or paper via the United States Postal Service to the non-

CM/ECF participants indicated on the attached Manual Notice List.


/s/ Caryl L. Boies
Caryl L. Boies

BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, FL  33301
Tel:  (954) 356-0011
Fax: (954) 356-0022

21693 v1

*pArchdiocese of Milwaukee Supporting Fund, Inc., et al.,*
*v.*
*Halliburton Company, et al.,*

**In the United States District Court**
**Fort the Northern District of Texas**
**(Dallas Division)**

**Civil Action No. 3:02-CV-1152-M**

**<u>SERVICE LIST</u>**

The following parties were served electronically via the CM/ECF System:

| | |
|---|---|
| **Theodore Carl Anderson, III**<br>Kilgore & Kilgore<br>3109 Carlisle<br>Suite 200<br>Dallas, TX 75204<br>214/969-9099<br>Fax: 214/292-8758<br>Email: tca@kilgorelaw.com | **Stuart L. Berman**<br>Schiffrin Barroway Topaz & Kessler LLP<br>280 King of Prussia Rd.<br>Radnor, PA 19087<br>610/667-7706<br>Email: ecf_filings@sbclasslaw.com |
| **Thomas E. Bilek**<br>Hoeffner & Bilek<br>1000 Louisiana St.<br>Suite 1302<br>Houston, TX 77002<br>713/227-7720<br>Fax: 713/227-9404<br>Email: tbilek@hb-legal.com | **Caryl L. Boies**<br>Boies, Schiller & Flexner LLP<br>401 E. Las Olas Blvd., Suite 1200<br>Fort Lauderdale, FL 33301<br>954/356-0011<br>Fax: 954/356-0022<br>Email: clboies@bsfllp.com |
| **David Boies**<br>Boies, Schiller & Flexner LLP<br>333 Main Street<br>Armonk, NY 10504<br>914/749-8200<br>Fax: 914/749-8300<br>Email: dboies@bsfllp.com | **Willie Briscoe**<br>Provost Umphrey Law Firm<br>3232 McKinney Ave.<br>Suite 700<br>Dallas, TX 75204<br>214/744-3000<br>Email: Provost_Dallas@yahoo.com |

| | |
|---|---|
| **Jules Brody**<br>Stull Stull & Brody<br>6 East 45th St.<br>New York, NY 10017<br>212/687-7230<br>Fax: 212/490-2022<br>Email: jbrody@ssbny.com | **Andrew J. Brown**<br>Lerach Coughlin Stoia Geller Rudman &<br>Robbins<br>655 W. Broadway<br>Suite 1900<br>San Diego, CA 92101<br>619/231-1058<br>Email: andrewb@lerachlaw.com |
| **Lea F. Courington**<br>Gwinn & Roby<br>1201 Elm St.<br>Suite 4100<br>Dallas, TX 75270<br>214/698-4131<br>Fax: 214/747-2904<br>Email: lcourington@gwinnroby.com | **Lindsey C. Cummings**<br>Gwinn & Roby<br>1201 Elm St.<br>Suite 4100<br>Dallas, TX 75270<br>214/698-4100<br>Email: lcummings@gwinnroby.com |
| **John G. Emerson, Jr.**<br>Emerson Poynter<br>830 Apollo Ln.<br>Houston, TX 77058<br>281/488-8854<br>Fax: 281/488-8867<br>Email: john@emersonpoynter.com | **William B. Federman**<br>Federman & Sherwood<br>10205 N Pennsylvania Ave.<br>Oklahoma City, OK 73120<br>405/235-1560<br>Fax: 405/239-2112<br>Email: wfederman@aol.com |
| **Dennis D. Gibson**<br>Gibson McClure Wallace & Daniels<br>8080 N Central Expwy.<br>Suite 1300 LB 50<br>Dallas, TX 75206-1838<br>214/891-8001<br>Fax: 214/891-8010<br>Email: gibson@gmwdlaw.com | **Jose L. Gonzalez**<br>Godwin Pappas Ronquillo, LLP<br>1201 Elm St.<br>Suite 1700<br>Dallas, TX 75270-2084<br>214/939-4400<br>Fax: 214/760-7332<br>Email: jgonzalez@godwinpappas.com |
| **Fred T. Isquith**<br>Wolf Haldenstein Adler Freeman & Herz<br>270 Madison Ave.<br>Ninth Floor<br>New York, NY 10016<br>212/545-4600<br>Email: isquith@whafh.com | **Mark V. Jackowski**<br>Scott + Scott<br>108 Norwich Ave.<br>PO Box 192<br>Colchester, CT 06415<br>860/537-5537<br>Email: mvjackowski@scott-scott.com |

Service List

| | |
|---|---|
| **Joe Kendall**<br>Provost Umphrey Law Firm<br>3232 McKinney Ave.<br>Suite 700<br>Dallas, TX 75204<br>214/744-3000<br>Fax: 214/744-3015<br>Email: Provost_Dallas@yahoo.com | **Jeffrey R. Krinsk**<br>Finkelstein & Krinsk<br>Koll Center<br>501 West Broadway<br>Suite 1250<br>San Diego, CA 92101-3579<br>619/238-1333<br>Fax: 619/238-5425<br>Email: jrk@classactionlaw.com |
| **William S. Lerach**<br>Lerach Coughlin Stoia Geller Rudman &<br>Robbins<br>655 W. Broadway<br>Suite 1900<br>San Diego, CA 92101<br>619/231-1058<br>Fax: 619/231-7423<br>Email: e_file_sd@lerachlaw.com | **Roger L. Mandel**<br>Stanley Mandel & Iola<br>3100 Monticello Ave.<br>Suite 750<br>Dallas, TX 75205<br>214/443-4302<br>Email: rmandel@smi-law.com |
| **James M. McCoy**<br>Gibson McClure Wallace & Daniels<br>8080 N Central Expwy.<br>Suite 1300 LB 50<br>Dallas, TX 75206-1838<br>214/891-8040<br>Fax: 214/891-8003<br>Email: jmccoy@gmwdlaw.com | **Frederick Linton Medlin**<br>K&L Gates LLP<br>2828 N Harwood St.<br>Suite 1800<br>Dallas, TX 75201-6966<br>214/939-4900<br>Fax: 214/939-4949<br>Email: frederick.medlin@klgates.com |
| **Rod Phelan**<br>Baker Botts<br>2001 Ross Ave.<br>Suite 600<br>Dallas, TX 75201-2980<br>214/953-6609<br>Fax: 214/661-4609<br>Email: rod.phelan@bakerbotts.com | **Scott Daniel Powers**<br>Baker Botts<br>98 San Jacinto Blvd.<br>Suite 1600<br>Austin, TX 78701<br>512/322-2678<br>Fax: 512/322-8392<br>Email: scott.powers@bakerbotts.com |

Service List

| | |
|---|---|
| **Scott E. Poynter**<br>Emerson Poynter<br>The Museum Center<br>500 President Clinton Ave., Suite 305<br>Little Rock, AR 72201<br>501/907-2555<br>Fax: 501/907-2556<br>Email: scott@emersonpoynter.com | **Jessica B. Pulliam**<br>Baker Botts<br>2001 Ross Ave.<br>Suite 600<br>Dallas, TX 75201-2980<br>214/953-6500<br>Fax: 214/661-4677<br>Email: jessica.pulliam@bakerbotts.com |
| **Marcos G.Ronquillo**<br>Godwin Pappas Ronquillo, LLP<br>1201 Elm St.<br>Suite 1700<br>Dallas, TX 75270-2084<br>214/939-4400<br>Fax: 214/760-7332<br>Email: mronquillo@godwinpappas.com | **Neil Rothstein**<br>Truth in Corporate Justice<br>8721 Santa Monica Blvd., Suite 41<br>Los Angeles, CA 90069<br>800-610-4998<br>Fax: 310/246-1175<br>Email: neil.rothstein@worldwidetree.org |
| **Edmund W. Searby**<br>Scott + Scott<br>33 River St.<br>Chagrin Falls, OH 44022<br>440/247-8200<br>Email: esearby@scott-scott.com | **Arthur L. Shingler, III**<br>Scott + Scott<br>600 B Street, Suite 1500<br>San Diego, CA 92101<br>619/233-4565<br>Fax: 619/233-0508<br>Email: ashingler@scott-scott.com |
| **Kay E. Sickles**<br>Schiffrin Barroway Topaz & Kessler LLP<br>280 King of Prussia Rd.<br>Radnor, PA 19087<br>610/667-7706<br>Email: ksickles@sbclasslaw.com | **Marc R. Stanley**<br>Stanley Mandel & Iola<br>3100 Monticello Ave.<br>Suite 750<br>Dallas, TX 75205<br>214/443-4301<br>Fax: 214/443-0358<br>Email: mstanley@smi-law.com |
| **Ronald W. Stevens**<br>Kirkpatrick & Lockhart Preston Gates Ellis<br>10100 Santa Monica Blvd.<br>Seventh Floor<br>Los Angeles, CA 90067<br>310/552-5521<br>Fax: 310/552-5001<br>Email: rstevens@klng.com | **Robert M. Thornton**<br>Kilgore & Kilgore<br>3109 Carlisle<br>Suite 200<br>Dallas, TX 75204<br>214/969-9099<br>Fax: 214/953-0133<br>Email: rmt@kilgorelaw.com |

Service List

| | |
|---|---|
| **E. Lawrence Vincent**<br>Law Office of Emery L Vincent<br>208 N. Market St., Suite 200<br>Dallas, TX 75202<br>214/680-1668<br>Fax: 972/491-2417<br>larryvin@gmail.com | **Robb L. Voyles**<br>Baker Botts<br>2001 Ross Avenue<br>Dallas, TX 75201-2980<br>214/953-6949<br>Fax: 214/661-4949<br>Email: robb.voyles@bakerbotts.com |
| **Craig M.Walker**<br>Walker Law<br>3196 High Ridge Road<br>Stamford, CT 06903<br>917/880-7686<br>Email: craig_m_walker@sbcglobal.net | **Thomas G. Wilhelm**<br>Lerach Coughlin Stoia Geller Rudman &<br>Robbins<br>655 W. Broadway<br>Suite 1900<br>San Diego, CA 92101<br>619/231-1058<br>Email: TWilhelm@lerachlaw.com |
| **Martin Woodward**<br>Stanley Mandel & Iola<br>3100 Monticello Ave.<br>Suite 750<br>Dallas, TX 75205<br>214/443-4304<br>Email: mwoodward@smi-law.com | **Alfred G. Yates, Jr.**<br>Law Office of Alfred G Yates Jr.<br>519 Allegheny Building<br>429 Forbes Ave.<br>Pittsburgh, PA 15219<br>412/391-5164<br>Email: yateslaw@aol.com |
| **Richard J. Zook**<br>Cunningham Darlow Zook & Chapoton<br>600 Travis Suite 1700<br>Houston, TX 77002<br>713/255-5500<br>Email: rzook@cdzc.com | |

The following parties were served via U.S. Mail:

| | |
|---|---|
| **Eric J Belfi**<br>Murray Frank & Sailer<br>275 Madison Ave<br>Suite 801<br>New York, NY 10016<br>212/682-1818<br>Fax: 212/682-1892 | **Aaron Brody**<br>Stull Stull & Brody<br>6 East 45th Street<br>New York, NY 10017<br>212/687-7230 |
| **Thomas Burt**<br>Wolf Haldenstein Adler Freeman & Herz<br>270 Madison Ave<br>Ninth Floor<br>New York, NY 10016<br>212/545-4600 | **Steven E Cauley**<br>Cauley Geller Bowman & Coates<br>PO Box 25438<br>Little Rock, AR 72221-5438<br>501/312-8500<br>Fax: 501/312-8505 |
| **Darren J Check**<br>Schiffrin Barroway Topaz & Kessler LLP<br>280 King of Prussia Rd<br>Radnor, PA 19087<br>610/667-7706 | **Patrick V Dahlstrom**<br>Pomerantz Haudek Block Grossman &<br>Gross<br>One N LaSalle St<br>Suite 2225<br>Chicago, IL 60602-3908<br>312/377-1181 |
| **Leo W Desmond**<br>Law Office of Leo W Desmond<br>2161 Palm Beach Lakes Blvd<br>Suite 204<br>West Palm Beach, FL 33409<br>561/712-8000 | **Robert J Dyer, III**<br>Dyer & Shuman<br>801 E 17th Ave<br>Denver, CO 80218-1417<br>303/861-3003 |
| **Nadeem Faruqi**<br>Faruqi & Faruqi<br>320 East 39th Street<br>New York, NY 10016<br>212/983-9330 | **Brian M Felgoise**<br>Law Offices of Brian M Felgoise<br>PO Box 706<br>261 Old York Rd Suite 423<br>Jenkintown, PA 19046<br>215/886-1900 |

| | |
|---|---|
| **Paul J Geller**<br>Lerach Coughlin Stoia Geller Rudman &<br>Robbins<br>120 E Palmetto Park Rd<br>Suite 500<br>Boca Raton, FL 33432 | **Donald E Godwin**<br>Godwin Pappas Ronquillo, LLP<br>1201 Elm St<br>Suite 1700<br>Dallas, TX 75270-2084<br>214/939-4400<br>Fax: 214/760-7332 |
| **Marc I Gross**<br>Pomerantz Haudek Block Grossman &<br>Gross<br>100 Park Avenue<br>26th Floor<br>New York, NY 10017-5516<br>212/661-1100 | **Stanley M Grossman**<br>Pomerantz Haudek Block Grossman &<br>Gross<br>100 Park Avenue<br>26th Floor<br>New York, NY 10017-5516<br>212/661-1100<br>Fax: 212/661-8665 |
| **Corey D Holzer**<br>Holzer Holzer & Cannon LLC<br>1117 Perimeter Center West<br>Suite E-107<br>Atlanta, GA 30338<br>770/392-0090<br>Fax: 770/392-0029 | **Adam J Levitt**<br>Wolf Haldenstein Adler Freeman & Herz<br>55 W Monroe St<br>Suite 1111<br>Chicago, IL 60603<br>312/984-0000 |
| **Gary McGowan**<br>One Riverway<br>Suite 2070<br>Houston, TX 77056 | **Brian Murray**<br>Rabin & Peckel<br>275 Madison Ave<br>34th Floor<br>New York, NY 10016<br>212/682-1818<br>Fax: 212/682-1892 |
| **Gregory M Nespole**<br>Wolf Haldenstein Adler Freeman & Herz<br>270 Madison Ave<br>Ninth Floor<br>New York, NY 10016<br>212/545-4600 | **Charles J Piven**<br>Law Office of Charles J Piven<br>World Trade Center Baltimore<br>401 E Pratt St<br>Suite 2525<br>Baltimore, MD 21202<br>410/332-0030 |

Service List

| | |
|---|---|
| **Robert Schachter**<br>Zwerling, Schachter & Zwerling<br>41 Madison Avenue<br>New York, NY 10010<br>212/223-3900 | **Richard S Schiffrin**<br>Schiffrin Barroway Topaz & Kessler LLP<br>280 King of Prussia Rd<br>Radnor, PA 19087<br>610/667-7706<br>Fax: 610/667-7056 |
| **David R Scott**<br>Scott + Scott<br>108 Norwich Ave<br>PO Box 192<br>Colchester, CT 06415<br>860/537-5537<br>Fax: 860/537-4432 | **Patrick Slyne**<br>Stull Stull & Brody<br>6 East 45th St<br>New York, NY 10017<br>212/687-7230 |
| **Marc A Topaz**<br>Schiffrin Barroway Topaz & Kessler LLP<br>280 King of Prussia Rd<br>Radnor, PA 19087<br>610/667-7706 | **Richard J Vita**<br>Law Office of Richard J Vita<br>77 Franklin St<br>Suite 300<br>Boston, MA 02110<br>617/426-6566 |
| **Marc I Willner**<br>Schiffrin Barroway Topaz & Kessler LLP<br>280 King of Prussia Rd<br>Radnor, PA 19087<br>610/667-7706 | |

Service List