IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| THE ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, INC., et al., On Behalf of itself and All Others Similarly Situated, | § § § | Master Docket No. 3:02-CV-1152-M |
| | § § | CLASS ACTION |
| Lead Plaintiff, | § § | |
| vs. | § § | |
| HALLIBURTON COMPANY, et al., | § § | |
| Defendants. | § § § | |
| | § § | |
| This Document Relates to: | § § | |
| ALL ACTIONS. | § § | |

**APPENDIX IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION AND INCORPORATED MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

## TABLE OF CONTENTS

**Appendix**

Report of Jane D. Nettesheim...........................................................................App. at 001 - 557

Firm Resume of Boies, Schiller & Flexner LLP ............................................App. at 558 - 586

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| THE ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, INC., et al., On Behalf of Itself and All Others Similarly Situated, | § Master Docket No. 3:02-CV-1152-M<br>§<br>§ <u>CLASS ACTION</u><br>§ |
| Lead Plaintiff, | § |
| vs. | § |
| HALLIBURTON COMPANY, et al., | § |
| Defendants. | § |
| This Document Relates To: | § |
| ALL ACTIONS. | § |

## REPORT OF JANE D. NETTESHEIM

September 17, 2007

**Table of Contents**

I.      Background and Qualifications ...................................................................................1

II.     Scope of Engagement ................................................................................................1

III.    Bases for Opinions....................................................................................................2

IV.     Summary of Opinions................................................................................................3

V.      Market Efficiency:  Securities prices in efficient markets reflect the market's consensus
        as to fair value given all publicly available information at the time of purchase or sale ....4

VI.     Application of the *Cammer/Unger/Bell* Factors and Additional Factors as Indicia of the
        Efficiency of the Market for Halliburton's Stock................................................................9

        A.   *Cammer/Unger/Bell* Factor 1: Weekly Trading Volume ....................................9

        B.   *Cammer/Unger/Bell* Factor 2: The Number of Securities Analysts Following and
             Reporting on Halliburton.................................................................................10

        C.   *Cammer/Unger/Bell* Factor 3: The Number of Market Makers in Halliburton's Stock ...11

        D.   *Cammer/Unger/Bell* Factor 4: Whether Halliburton was Eligible to File SEC Form S-3 15

        E.   *Cammer/Unger/Bell* Factor 5: Empirical Facts Showing a Cause-and-Effect Relationship
             between Unexpected Corporate Events or Financial Releases and an Immediate Response
             in the Stock Price ...........................................................................................16

        F.   *Unger/Bell* Factor 6: Market Capitalization ....................................................22

        G.   *Unger/Bell* Factor 7: Bid/Ask Spread...........................................................23

        H.   *Unger/Bell* Factor 8: Public Float................................................................24

        I.   Factor 9: Listing Exchange.............................................................................24

        J.   Factor 10: Institutional Ownership and Trading.................................................26

        K.   Factor 11: Dissemination of News ..................................................................27

VII.    Summary Regarding the Market Efficiency of Halliburton's Stock ................................29

VIII.   Materiality .............................................................................................................30

IX.     Loss Causation.......................................................................................................34

        A.   Summary of Events Related to the Misrepresentations, and the Effect on the Price of
             Halliburton's Stock.......................................................................................37

        B.   Summary of the Decline in Halliburton's Stock Price during the Class Period.............63

I, JANE D. NETTESHEIM, declare:

## I.    Background and Qualifications

1.    I am a financial economist and vice president of Stanford Consulting Group, Inc. ("SCG"), which provides research, consulting, and expert services in financial economics and related areas to clients, including government agencies, corporations, and law firms.  I have a B.A. in biology from the University of Colorado and an M.B.A. from the University of Hawaii, and I completed the coursework in the Ph.D. program in finance at the London Business School, University of London.  My curriculum vitae and the list of the expert testimony I have provided by deposition or at trial are attached as Exhibit 1.  The fees charged for this project are the standard hourly rates of employees of SCG.  My current hourly rate is $475.

2.    I have served as a consultant and expert in the areas of market efficiency, materiality, loss causation and the calculation of damages in many securities class actions.  I have examined the relationship between stock price movements and changes in market and industry indices for a number of stocks in a variety of industries.  I also have examined the relationship between information releases and changes in stock prices for a number of companies in a variety of industries.  I have analyzed various data sources for information about shareholdings and trading activity for different types of market participants.

## II.    Scope of Engagement

3.    Counsel for Lead Plaintiff has asked me to examine and opine on the efficiency of the market for the common stock of Halliburton Company, Inc. ("Halliburton" or the "Company")[1] during the period June 3, 1999, through December 7, 2001, inclusive (the "Class

---

[1] Herein, "Halliburton's stock" refers to the common stock of Halliburton.

Period").[2]  I have also been asked to conduct an analysis of materiality and loss causation pertaining to the alleged misrepresentations and omissions in this matter, and to address the causes of the decline in Halliburton's stock price during the Class Period.[3]

4.     The opinions offered in this Report are subject to refinement or revision based on continuing analysis of the documents and materials listed below, as well as new or additional information which may be provided to or obtained by me in the course of this matter.  I expect to review additional information and documents, including information and documents that may become available through discovery and the reports and depositions of other expert witnesses.

**III.    Bases for Opinions**

5.     My opinions expressed in this Report are based upon my professional knowledge and experience, as well as on a review of documents and information relevant to this matter.  Exhibit 2 lists the materials I have obtained from Counsel or other identified sources.  The materials I have relied upon in forming my opinions in this Report are identified in this Report and its Exhibits.  Such documents and information are typically relied upon by financial experts in securities class actions or by financial economists in their research.  I reserve the right to modify or supplement my opinions expressed herein in the event that further information becomes available to me.

---

[2] During the Class Period, Halliburton's common stock traded on the New York Stock Exchange ("NYSE") under the ticker "HAL."

[3] Because discovery is just beginning in this action, this analysis is preliminary and based on the public information available to me at this time.  I assume that the allegations outlined in the Complaint are true.

App. 004

IV.    **Summary of Opinions**

6.      Based on my review of the evidence in this matter and analysis of data specific to Halliburton and its stock, I conclude that the market for Halliburton's stock during the Class Period was open, developed, and efficient.

7.      Based on my review of the evidence in this matter and analysis of data and information specific to Halliburton during the Class Period, I conclude that:

•      A significant part of the decline in Halliburton's stock price during the Class Period was caused by disclosures that Halliburton's exposure to liability in asbestos litigation was far larger than previously revealed to the public. Had Halliburton disclosed reasonable estimates of its asbestos exposure—that Lead Plaintiff alleges could have been and should have been disclosed earlier—Halliburton's stock price would have traded at prices materially lower than prices at which it did trade during the Class Period.

•      A significant part of the decline in Halliburton's stock price during the Class Period was caused by disclosures related to Halliburton's representations and omissions concerning the condition and success of its engineering and construction operations related to large overseas fixed-price/lump sum contracts and the benefits resulting from its merger with Dresser Industries, Inc. ("Dresser"). Had Halliburton 1) not included unapproved claims in its reported revenues for certain quarters in 1998, 1999 and 2000—that Lead Plaintiff alleges Halliburton should not have included during the Class Period; and 2) disclosed that it was not going to realize the benefits it had originally anticipated from the Dresser merger—that Lead Plaintiff alleges could have and should have been disclosed earlier—Halliburton's operating income would have been lower

App. 005

for certain quarters and for the years 1998, 1999 and 2000, and Halliburton's stock price would have traded at prices materially lower than prices at which it did trade during the Class Period.

8.      The misrepresentations and omissions alleged by Lead Plaintiff caused Halliburton's stock price to be inflated during the Class Period as evidenced by the partial disclosures during the Class Period. Those disclosures revealed information about Halliburton's financial condition, which Lead Plaintiff alleges was previously misrepresented and/or omitted by Defendants, that caused the prices of Halliburton's stock to decline.

**V.      Market Efficiency: Securities prices in efficient markets reflect the market's consensus as to fair value given all publicly available information at the time of purchase or sale**

9.      Over the past thirty years, the efficient capital market hypothesis ("ECMH") has risen to a prominent position in financial and economic theory. In its most commonly held form—known as "semi-strong"—the ECMH states that the securities markets incorporate all publicly available information. This hypothesis has been empirically validated in numerous studies.[4] The ECMH also has stood up against its critics; while anomalies have occurred in financial markets, they are random and do not allow for trading strategies that would create abnormal profits.[5,6]

---

[4] *See, e.g.,* Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*; Volume 25, Issue 2; May, 1970; pp. 383–417. In this article, Fama provides an overview of a number of studies supporting the efficiency of capital markets.

[5] Fama, Eugene F., "Market Efficiency, Long-term Returns, and Behavioral Finance," *Journal of Financial Economics* Vol. 49, 283–306 (1998). As Fama states: "Consistent with the market efficiency hypothesis that the anomalies are chance results, apparent overreaction to information is about as common as underreaction, and post-event continuation of pre-event abnormal returns is about as frequent as post-event reversal. Most important, consistent with the market efficiency prediction that apparent anomalies can be due to methodology, most long-term return anomalies tend to disappear with reasonable changes in technique."

App. 006

10.     The fraud-on-the-market theory relies on informational efficiency, specifically that the price of the security reflects publicly available information.  For defendants' statements to have impacted stock prices, the market must be informationally efficient.  Informational efficiency also has been cited recently by Courts as an appropriate measure of market efficiency in certain securities cases.[7]

11.     In an efficient market, investors can rely on the market price as reflecting all publicly available information.  In other words, the price at which an investor can buy or sell a security is the market's consensus as to that security's fair value given all of the publicly available information at the time of purchase or sale.

12.     The seminal Rule 10b-5 case of the 1980's, *Basic Inc. v. Levinson*, clarified that because most publicly available information is reflected in the market price, an investor's reliance on any public material misrepresentations may be presumed for purposes of a Rule 10b-5 action.

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. …

---

[6] Malkiel, Burton G., "The Efficient Market Hypothesis and Its Critics," *Journal of Economic Perspectives* Vol. 17, 59–82 (Winter 2003).  Malkiel writes "Before the fact, there is no way in which investors can reliably exploit any anomalies or patterns that might exist. … [T]hese patterns are not robust and dependable in different sample periods, and some of the patterns based on fundamental valuation measures of individual stocks may simply reflect better proxies for measuring risk. … Many of the predictable patterns that have been discovered may simply be the result of data mining." He further quotes Richard Roll, an eminent academic financial economist and portfolio manager, "I have personally tried to invest money, my client's money and my own, in every single anomaly and predictive device that academics have dreamed up. … I have attempted to exploit the so-called year-end anomalies and a whole variety of strategies supposedly documented by academic research.  And I have yet to make a nickel on any of these supposed market inefficiencies … a true market inefficiency ought to be an exploitable opportunity.  If there's nothing investors can exploit in a systematic way, time in and time out, then it's very hard to say that information is not being properly incorporated into stock prices."

[7] *See In re PolyMedica Corp. Securities Litigation*, No. 05-1220, slip op. (1st Cir. Dec. 13, 2005); *See also In re Xcelera.com Securities Litigation*, No. 05-1221, slip op. (1st Cir. Dec. 13, 2005).

App. 007

> Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. ... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[8]

13.    The fraud-on-the-market theory permits investors in an efficient market to rely on the market price, even though that price may contain the effects of misrepresentations or omissions. The *Basic* court noted:

> In an open and developed market, the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchasers generally rely on the price of the stock as a reflection of its value.[9]

14.    A direct empirical test of market efficiency is to examine price responsiveness to the release of new and material information. If the security price responds quickly, the response supports a conclusion that the market for the security is efficient. As an indirect test of efficiency, one can examine whether market conditions promote efficiency. Case precedent exists on such indirect indicators of market efficiency. The *Cammer* Court found that for the market for a particular security to be efficient, the following two criteria should be met:[10]

- it should trade in an open market in which anyone, or at least a large number of persons, can buy or sell;

- it should trade in a developed market which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available. It usually, but not necessarily, has continuity and liquidity

---

[8] *Basic Inc. v. Levinson*, 485 U.S. 224 p. 241–242 (1988). Quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir. 1986).

[9] *Basic Inc. v. Levinson*, 485 U.S. 224 at 244 (1988).  Quoting *Peil v. Speiser*, 806 F.2d 1154, 1161 (3d Cir. 1986).

[10] *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 n. 17 (D.N.J. 1989): "Definitions of the key terms which underlie the fraud on the market theory were offered by commentators Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud,* §8.6 (Aug.1988)."

(the ability to absorb a reasonable amount of trading with relatively small price changes).

15.     Specifically, the *Cammer* Court identified five factors that may be considered in determining whether a market for a stock is efficient and, therefore, whether security prices respond quickly to new relevant information. These factors include both a direct empirical test, as well as indirect indicators, of the efficiency of a market for a security. The *Unger* Court and the *Bell* Court also considered these five factors in evaluating market efficiency.[11] In forming my opinion, I have considered each of the five *Cammer/Unger/Bell* Factors as applied to the market for Halliburton stock:[12]

i.      whether the security trades at a large weekly volume;

ii.     whether analysts follow and report on the security;

iii.    whether the security has market makers and whether there is a potential for arbitrage activity;

iv.     whether the company is eligible to file Securities and Exchange Commission ("SEC") Form S-3; and

v.      whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial information releases, and an immediate response in the security's price.

16.     The *Cammer/Unger/Bell* factors address informational efficiency, *i.e.*, whether the market conditions exist such that when material, new, unexpected information is released, the price of the company's security changes to reflect the new mix of public information.

---

[11] *Unger v. Amedisys, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005); *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 311 (5th Cir. 2005).

[12] *Cammer*, 711 F. Supp. pp. 1285–87.

App. 009

17.     I also have considered additional factors that were considered by the *Unger* and

*Bell* Courts (as well as the *Krogman* Court) in evaluating market efficiency:[13]

vi.     the Company's market capitalization;

vii.    the bid/ask spread for stock sales; and

viii.   the security's float, or shares outstanding excluding insider-owned stock.

18.     In addition to the factors discussed above, I have considered the following

factors which have been addressed in the economic literature, and/or have been considered by

Courts:

ix.     the principal exchange on which the security was listed and traded;

x.      institutional ownership of the security; and

xi.     news coverage and dissemination of information by news sources pertaining to

the Company and its securities during the Class Period.

19.     Consideration of the *Cammer/Unger/Bell* factors (the first five factors discussed

below), the *Unger/Bell* factors (factors six through eight discussed below), and these additional

factors (factors nine through eleven discussed below) supports my conclusion that the market

for Halliburton stock during the Class Period was informationally efficient.[14]

---

[13] *Unger*, 401 F.3d 316 at 323, HN10; *Bell*, 422 F.3d 307 at 313, n10; *Krogman v. Sterritt* 202 F.R.D. 467 (N.D. Tex. 2001) pp. 474, 478; *See also, O'Neil v. Appel* 165 F.R.D. 479 (W.D. Michigan 1995) at 503.

[14] *See also, Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, --- F.3d ----, No. 05-10791, 2007 WL 1430225 (C.A.5 May 16, 2007), FN42.  Here, Judge Higginbotham refers to the *Cammer/Unger/Bell* Factors and the *Unger/Bell* Factors as the usual indicia of market efficiency, citing *Bell*.

App. 010

## VI.   Application of the *Cammer/Unger/Bell* Factors and Additional Factors as Indicia of the Efficiency of the Market for Halliburton's Stock

### A.   *Cammer/Unger/Bell* Factor 1: Weekly Trading Volume

20.   A market is liquid if investors can trade a large number of shares on demand and, absent new information, an individual investor can buy and sell without affecting the price. The high level of trading activity associated with trading in Halliburton's stock during the Class Period indicates that Halliburton's stock traded in a liquid market. High trading volume generally indicates that there is sufficient interest in the company and its stock such that analysts will conduct research and report their analysis to market participants. Liquidity and high trading volume also allows investors to quickly buy and sell shares when their assessments about the value of a company's stock have changed.

21.   According to one authority, "turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[15, 16]

22.   During the Class Period, the average weekly reported trading volume for Halliburton's stock was 16,796,502 shares. (See Exhibit 3 for the daily reported closing prices and volume of Halliburton's stock, and Exhibit 4 for a summary of weekly trading of

---

[15] *Cammer* at 1293, citing Bromberg.

[16] The *Cammer* Court examined a stock that traded on the NASDAQ; Halliburton common stock traded on the NYSE during the Class Period. On the NASDAQ, a dealer is on one side of every transaction. When an investor sells one share on the NASDAQ, it is sold to a dealer and a transaction of one share is reported; then another investor buys that same share from the same dealer, and it is reported as another transaction of one share. Only one share has changed hands between the two investors, but trading volume of two shares has been reported. All else being equal, the same share trade on the NYSE would be reported as trading volume of one share. The *Cammer* Court's benchmark of average weekly trading turnover applies to stocks trading on the NASDAQ. All else being equal, as a result of the "double-counting" on NASDAQ, a benchmark of average weekly trading turnover of 2% for a NASDAQ traded stock would be 1% for a NYSE traded stock.

App. 011

Halliburton's stock.)  Halliburton's shares issued and outstanding totaled approximately 440.6 million shares at the start of the Class Period and approximately 429.4 million shares at the end of the Class Period.  (See Exhibit 5 for data on shares outstanding for Halliburton.)  Weekly trading volume for Halliburton was, on average, 3.8% of shares outstanding.

23.    The annualized turnover ratio is the annual reported trading volume divided by the number of shares outstanding.  Total trading volume of Halliburton's stock during the Class Period was 2.187 billion shares, compared to 429.4 million shares outstanding at the end of the Class Period.  This is an annualized turnover ratio (share volume during the Class Period divided by shares outstanding divided by the time period in years) of 202.7%.  In 1999, 2000 and 2001, the average annualized turnover ratio for NYSE listed stock was 78%, 88% and 94%, respectively.[17]

24.    Given the volume of trading relative to the number of shares outstanding, Halliburton's stock experienced high weekly trading volumes and annualized turnover ratio. Halliburton's high trading volume indicates that the market for Halliburton's stock was efficient during the Class Period.

**B.    *Cammer/Unger/Bell* Factor 2: The Number of Securities Analysts Following and Reporting on Halliburton**

25.    Securities analysts research and report to investors on the financial condition and prospects of a covered company.  In conducting their research, analysts typically have greater resources available to them than do individual investors.  Analysts are conduits to the market for information collected from management from on-site visits, conference calls accompanying key company announcements, and other contacts with senior management. Analysts can channel new information to the market rapidly through their published reports,

---

[17] NYSE 2001 Fact Book.

App. 012

online reporting services such as First Call, and alerts given to clients and other employees of

the same investment firm.  Analysts thus facilitate the dissemination of new information to

investors and share price reaction to new information.

26.    During the Class Period, securities analysts from numerous firms reported on

Halliburton, including, for example: ABN Amro Bank N.V. U.S.A; A.G. Edwards & Sons,

Inc.; Argus Research Corporation; Bear, Stearns & Co., Inc.; Brown Brothers Harriman & Co.;

Capital One Southcoast, Inc; CIBC World Markets Corp.; Deutsche Bank Securities Inc.; ING

Financial Markets USA; Jefferies & Company, Inc.; Johnson, Rice & Co.; Painewebber Inc.;

PNC Institutional Investment Service; Prudential Equity Group, Inc.; RBC Capital Markets;

Sanford C. Bernstein & Co., Inc.; Smith Barney Citigroup; Southwest Securities; Stephens

Inc.; SunTrust Robinson Humphrey Capital Markets; UBS (US); and Wachovia Securities.

Exhibit 6 contains a list of analyst reports for Halliburton issued during the Class Period.[18]

27.    The large number of analysts reporting on Halliburton and analysts' reports

published about Halliburton during the Class Period supports my conclusion that there was an

efficient market for Halliburton's stock during that time.

## C.    *Cammer/Unger/Bell* Factor 3: The Number of Market Makers in Halliburton's Stock

28.    This third *Cammer/Unger/Bell* factor applies directly to stocks traded on the

NASDAQ because that exchange uses market makers to facilitate market efficiency.  The

NYSE, where Halliburton stock was traded prior to and during the Class Period, uses

---

[18] Exhibit 6 contains a list of 397 reports that are available from Thomson Research (www.investext.com) from a search of "Halliburton CO" in the "Company" field, and from Reuters from a search of "HAL" in the Primary Ticker (Exhibit 6 excludes duplicative reports between the two sources).  This is only a partial list of analyst reports on Halliburton.  Several firms, *e.g.*, Merrill Lynch and Goldman Sachs, do not make their analysts' reports available through public databases.

App. 013

specialists to facilitate an orderly and efficient market for each security. As there is but one specialist for NYSE listed stocks, rather than look at the number of market makers, I have examined the role of the specialist as well as arbitrage opportunities for Halliburton's stock. Market makers and specialists enable investors to trade promptly upon the arrival of new relevant information, and thereby new information can be rapidly reflected in securities prices.

29.     The NYSE assigns one dealer, known as the specialist, to each security traded on the NYSE. These specialists are independent companies in corporate or partnership structures whose responsibilities require them to maintain a fair, competitive, orderly and efficient market for the securities assigned to them. Specialists achieve this function by performing four critical roles: (1) as an auctioneer, continually showing the best bids and offers, and maintaining order in the crowd; (2) as an agent for SuperDot orders (direct electronic routing system to and from the trading floor) as well as for brokers; (3) as a catalyst for order flow by informing interested parties of items available in the market; and (4) as a principal, where the specialist has an obligation to enter into a transaction using its own capital if there is a willing buyer or seller with no counterparty in the marketplace. Specialists thus facilitate continuous trading during market hours.[19]

30.     Halliburton's reported specialist during the Class Period was LaBranche & Co. LLC ("LaBranche"). According to their website::

> [LaBranche] is one of the largest Specialists in equity securities listed on the New York and American Stock Exchanges. As a Specialist, we play an integral role in both the NYSE and the AMEX floor-based trading auction model by acting as the exclusive broker (*i.e.*, agent) or market-maker (*i.e.*, principal) in our portfolio of listed company stocks and options. The Specialist facilitates all buying and selling of securities of the companies it represents by bringing timely information,

---

[19] The Fifth Circuit has certified a class of purchasers of common stock traded on the NYSE. *See, e.g., In Re Enron Corporation Securities § Derivative & "ERISA" Litigation*, Civil Action Number H-01-3624 Consolidated Cases.

App. 014

critical expertise, and needed liquidity to the forefront of the auction market place.[20]

31.     The third *Cammer/Unger/Bell* factor also addresses the existence of

arbitrageurs, generally understood to be sophisticated investors who can act rapidly to take

advantage of pricing discrepancies.  Arbitrage has been defined as:

> ... the process of earning riskless profits by taking advantage of differential
> pricing for the same physical asset or security.  As a widely applied investment
> tactic, arbitrage typically entails the sale of a security at a relatively high price and
> the simultaneous purchase of the same security (or its functional equivalent) at a
> relatively low price.

> Arbitrage activity is a critical element of modern, efficient security markets.
> Because arbitrage profits are by definition riskless, all investors have an incentive
> to take advantage of them whenever they are discovered.  Granted, some investors
> have greater resources and inclination to engage in arbitrage than others.
> However, it takes relatively few of these active investors to exploit arbitrage
> situations and, by their buying and selling actions, eliminate these profit
> opportunities.[21]

32.     Short interest may be an indicator of arbitrage activity as arbitrageurs act to take

advantage of and thereby eliminate any mispricing which may exist by simultaneously buying

and selling securities, and/or by borrowing and selling short.  A short sale is the sale of a stock

that an investor does not own.  When an investor holds the belief that a stock price will decline,

he can borrow the stock, sell the stock, and then buy the stock back later to return it to the

lender.  If the price drops between the time that short seller sold the stock and he buys it back,

the short seller realizes a gain.  Thus, short-selling can facilitate market efficiency by allowing

borrowing and selling of stock when investors believe that the price could decline.  I have

examined the level of short interest in Halliburton's stock in order to determine if there were

any impediments to short selling or arbitrage opportunities.

---

[20] www.labranche.com/invrel.html

[21] Sharpe, William F., *et al.*, *Investments*, (NJ: Prentice Hall) 1999, 6th ed., p. 284.

App. 015

33.     Throughout the Class Period, there were at least 429 million Halliburton shares outstanding, held by more than 800 institutions and many other investors who could have sold their shares of Halliburton.  In addition, shares held by institutions are often available for borrowing by short sellers; thus the large number of institutional shareholders and their large shareholdings could facilitate market efficiency by permitting whatever short sales arbitrageurs wished to make.

34.     During the Class Period there was substantial short interest in Halliburton and large changes in short interest.  (See Exhibit 7.)  However, the level of short interest is not large relative to Halliburton's shares outstanding.  The average short interest in Halliburton's stock represented approximately 2.3% of total shares outstanding.  The level of short interest during the Class Period indicates that shares should have been available to borrow for short-selling.

35.     Economist Gene D'Avolio, while preparing his dissertation for his Ph.D. in Business Economics (awarded 2004) at Harvard University, summarized the market for short-selling in the United States by examining data from April 2000 to September 2001.[22]  The specific data for Halliburton's stock, or any stock, are not available from this database; however, D'Avolio examined a very large sample of data over a period of time that includes part of the Class Period.

36.     D'Avolio estimated that in the second quarter of 2001, as much as one-quarter of the U.S. market capitalization was available as loan supply for short-selling and that 7% of

---

[22] Gene D'Avolio, "The market for borrowing stock," *Journal of Financial Economics*, November 2002, vol. 66, pp. 271–306.

App. 016

that capacity was utilized. In the database that he examined,[23] D'Avolio found that short interest was, on average, 2.3% of shares outstanding. During 2001, Halliburton's stock was the type of stock that in D'Avolio's database had excess supply available for borrowing for short-selling, *i.e.*, companies with large market capitalization and substantial institutional ownership. D'Avolio also found that common stock issued by large companies such as Halliburton had low implied loan fees, which indicated that short-selling was not restricted and that arbitrage opportunities could be exploited. The level of short interest in Halliburton's stock relative to the public float indicates that short-selling of Halliburton's stock was not constrained during the Class Period and that arbitrage opportunities could be exploited, which is evidence in support of market efficiency.

     37.     Trading in Halliburton stock on the NYSE during the Class Period, where the market in the stock was facilitated by a specialist, indicates that the market for Halliburton stock was efficient during the Class Period, as does the possibility of arbitrage activity via short sales.

**D.**     *Cammer/Unger/Bell* **Factor 4: Whether Halliburton was Eligible to File SEC Form S-3**

     38.     Form S-3 is a simplified registration form that may be used if a company has been subject to Securities Exchange Act of 1934 reporting requirements for more than one year, has filed all documents in a timely manner during the prior twelve months, and has not, since the last audited statements, failed to pay required dividends or sinking funds, nor defaulted on debts or material leases.[24] Thus, companies that have previously provided what

---

[23] One of the largest security lenders in the world that accounts for significantly more than 10% of the total market short interest (and for many stocks the lender had sufficient supply to cover total short interest on its own) provided a proprietary database to D'Avolio.

[24] www.sec.gov/info/edgar/forms.htm

App. 017

the SEC deems to be sufficient public information may incorporate prior filings by reference into current filings, and need not repeat such information since it is already widely publicly available.

39.     Halliburton filed amended Form S-3 prior to the Class Period on September 25, 1998. During the Class Period, Halliburton filed Form S-3 on December 3, 2001. That Halliburton was eligible to file Form S-3 with the SEC prior to and during the Class Period is another factor which supports my conclusion that the market for Halliburton's stock was efficient.

**E.     *Cammer/Unger/Bell* Factor 5: Empirical Facts Showing a Cause-and-Effect Relationship between Unexpected Corporate Events or Financial Releases and an Immediate Response in the Stock Price**

40.     According to the ECMH, securities prices in efficient markets incorporate all available public information. A direct test of market efficiency is to conduct an event study to identify dates on which material new information was released to the market, and to examine whether the stock price responded to that information. It is important to note that material new information is new once, *i.e.*, once incorporated into the market mix of information with subsequent price reaction, successive announcements of the same information will have no additional effect on share price.

41.     I performed an event study to examine the publicly available company-specific information contemporaneous with statistically significant common stock price returns[25]—in other words, to determine whether material news affecting Halliburton promptly caused a measurable share price reaction after accounting for general market and industry effects. A

---

[25] Herein, the stock price return on a given day is equal to: (that day's closing price plus the dividend, if any, divided by the previous trading day's closing price) minus 1.

App. 018

description of the regression analysis used for this event study is described in the Appendix to this Report.

42.     The table below includes the days during the Class Period with statistically significant changes in Halliburton's stock price and the relevant information that was disseminated to the market.  There are a total of 7 days during the Class Period that have statistically significant positive returns and 24 days during the Class Period that have statistically significant negative returns (there are a total of 31 days with statistically significant stock price returns).  In general, large significant changes in Halliburton's stock price are associated with material, new and unexpected information about the Company.

43.     I noted that on certain days with significant stock price returns, there was no company-specific news and the statistically significant returns occur because the Halliburton stock return is not consistent with relatively large market or industry-specific returns.  This occurs on four days, specifically, February 10, 2000, October 24, 2000, December 18, 2000, and February 12, 2001.  On at least one of these days, the large market or industry-specific returns reflect material news releases from another company.  Therefore, it is consistent with the ECMH that Halliburton's stock return would not necessarily move with the market or industry, *i.e.*, its relatively stable stock price, although statistically correlated with the market and industry indices, is not unexpected.

44.     I also noted that there are five days with significant stock price changes for which I have found little or no "new news" pertaining to Halliburton, specifically, June 18, 1999, October 15, 1999, February 25, 2000, May 19, 2000, and November 6, 2001.  This is not unexpected as I do not have access to all of the information that was disclosed about the Company during the Class Period.  Certain information, including oral communications,

- 17 -

information from online reporting services such as First Call, and private investment alerts and

analyst reports given to clients and other employees of the same investment firm, are not

publicly available or are not maintained in historical databases. Moreover, Halliburton's stock

price may be affected by news that I did not capture in my searches, such as news pertaining to

one or more of Halliburton's major clients or competitors (that does not refer specifically to

Halliburton). On certain dates, the fact that I have not located news pertaining to Halliburton

that explains the Company's stock price reaction does not preclude me from concluding that

the market for Halliburton's stock was efficient during the Class Period.

45.     Following is a summary of all days that have statistically significant stock price

returns. A further discussion of the news on each day is included in the Appendix to this

Report.

| Date | Actual Return | Company-Specific Return | News |
|------|--------------|-------------------------|------|
| 6/18/1999 | -3.7% | -4.1% | No company-specific news on that day to explain the movement of the stock. However, on the following trading day, Monday, June 21, there was news that oil inventories were high and that this could put pressure on oil prices and, therefore, on values of oil companies and oil services companies. |
| 10/5/1999 | -13.2% | -9.0% | The Company warned that it expected its 1999 third-quarter earnings to be in the range of 11 to 13 cents per diluted share. The previous average analyst estimates was 19 cents per share. The Company attributed the reduction, in large part, to the lower than expected profits of the joint ventures of its engineering construction units and many of the other business units of the Dresser Equipment Group. |
| 10/15/1999 | -5.8% | -3.6% | No company-specific news on that day to explain the movement of the stock. On October 18, Schlumberger Ltd., which at that time was the world's second biggest oilfield services company (second by revenues to Halliburton), |

App. 020

| | | | |
|---|---|---|---|
| | | | reported third quarter earnings which fell 60 percent compared with the prior year but rose four percent from the previous quarter. |
| 10/27/1999 | -3.4% | -3.5% | An analyst at Brown Brothers Harriman lowered her estimates for fourth quarter 1999 and for the year 2000. |
| 1/5/2000 | -4.4% | -4.3% | Analysts cut their estimates of Halliburton's earnings for 2000 and 2001 following a conversation with the company. |
| 1/10/2000 | -4.0% | -3.9% | An analyst reduced his earnings estimates for 2000. |
| 1/12/2000 | -6.8% | -3.6% | The Houston Chronicle reported that "Oil-field service companies' earnings are also expected to be a mixed bag. Weatherford International, Smith International, Halliburton and Schlumberger are all projected to earn less in the 1999 fourth quarter than they did the year before." |
| 2/10/2000 | -0.2% | -5.1% | This company-specific decline is driven by the market and the industry, which were up that day. No company-specific news on that day to explain the movement of the stock. |
| 2/25/2000 | -4.9% | -3.6% | There was no company-specific information to explain the decline that day in the stock; however, analysts commented on the recent poor performance in the stock prices of oil service companies. |
| 5/2/2000 | 7.1% | 3.7% | News commentators attributed the gain in Halliburton's stock price to OPEC's anticipated decision to not increase production quotas. |
| 5/19/2000 | 2.5% | 3.9% | There was no company-specific information to explain the increase in the stock, although analysts later commented on the recent increase in the stock prices of oil service companies. |
| 5/30/2000 | 4.7% | 3.6% | On Saturday, May 27, the weekly financial newspaper *Barron's* issued a positive report on Halliburton, stating it expected Halliburton's stock price to recover over the next 18 months. On Tuesday, May 30, 2000, an analyst raised his price target for Halliburton. |
| 6/8/2000 | -1.8% | -3.5% | An analyst met with the Company on June 7. The analyst's report was issued on June 8, and based on that meeting, he lowered his estimate for second-quarter operating earnings for the Company by a penny to 64 cents. |
| 10/6/2000 | -5.0% | -3.8% | On October 5, 2000, Owens-Corning filed for |

App. 021

| | | | |
|---|---|---|---|
| | | | bankruptcy protection "after it ran out of options to pay asbestos lawsuit claims that could eventually cost the company $7 billion." The October 9 edition of *Barron's* discussed Halliburton's asbestos litigation exposure in light of the Owens-Corning situation. |
| 10/23/2000 | -6.5% | -3.5% | Halliburton reported that its Brown & Root Services unit was a target of the federal grand jury investigation. |
| 10/24/2000 | 1.1% | 4.2% | This is a statistically significant increase because both the market and the industry were down that day. While there is no company-specific news on that day to explain the movement of the stock, it is likely a partial correction from the prior day's news. |
| 10/25/2000 | -11.0% | -6.6% | Halliburton announced that it intended to restructure and shrink its engineering and construction units into a single unit, which prompted certain analysts to cut earnings forecasts. |
| 12/18/2000 | 4.0% | -3.8% | The company-specific return that day is a statistically significant decline because the industry was up sharply that day. |
| 12/22/2000 | -2.7% | -3.9% | On December 21, Halliburton pre-announced fourth-quarter earnings and formally unveiled the restructuring of its engineering and construction units and stated that it planned to take a charge of $120 million in the fourth quarter, the bulk of which was due to cost overruns at several overseas projects. On December 22, the overall market was up more than 3.0% such that this was a statistically significant decline. |
| 2/12/2001 | 0.4% | 4.6% | The company-specific return is a statistically significant increase because the industry was down that day. The industry move was due to a significant decline in Schlumberger stock (12%), a major Halliburton competitor, on news of a proposed cash purchase of Sema PLC, a British technology information firm. |
| 4/26/2001 | 9.1% | 3.7% | Halliburton released its first-quarter 2001 financial results, reporting earnings on the low end of analysts' estimates, but stating that the company expected 2001 earnings per share ("EPS") to be at or above $1.30, which was higher than analysts' consensus forecast of |

- 20 -

App. 022

| | | | |
|---|---|---|---|
| | | | $1.20. Some analysts raised their estimates and/or rating for Halliburton. |
| 6/29/2001 | -4.2% | -4.6% | Halliburton announced that a former subsidiary of Dresser, Harbison-Walker ("Harbison"), had been requesting the Company's financial assistance with asbestos claims Harbison agreed to assume in 1992 after it was spun off from Dresser. Certain analysts expressed concern over the Company's potential exposure to asbestos liability. |
| 7/26/2001 | 3.7% | 3.4% | Halliburton released its second quarter financial results, reporting strong revenue and earnings and, as a result, several analysts raised their estimates. |
| 8/9/2001 | -4.5% | -5.2% | Halliburton filed Form 10-Q with the SEC, in which it increased its accrued net liability for known open asbestos claims to $124 million (from $30 million on March 31, 2001, and $29 million on Dec. 31, 2000). Certain analysts responded that the situation was now more complex and uncertainty was increased. |
| 10/31/2001 | -6.3% | -4.9% | A jury in Mississippi found Dresser (through Harbison) liable in two of six asbestos cases for total compensatory damages of $21.3 million. One analyst was surprised by the size of the award. |
| 11/1/2001 | -2.9% | -3.7% | While there is no company-specific news on that day to explain the movement of the stock, it may reflect further concerns related to the October 31, 2001 news. The market was up that day. |
| 11/6/2001 | -3.9% | -3.5% | There was no company-specific news on that day consistent with the price decline. |
| 11/9/2001 | 0.2% | -3.4% | Salomon Smith Barney issued a report on Halliburton in which the analyst lowered his earnings estimates for fourth quarter 2001. The industry was up that day. |
| 12/4/2001 | -0.7% | -3.7% | A Texas District Court had entered a judgment against Dresser on a $65 million jury verdict rendered in September 2001. The same district court also entered three additional judgments against Dresser in favor of 100 other asbestos plaintiffs in the aggregate amount of $35.7 million related to an alleged breach of a purported settlement agreement. |
| 12/5/2001 | 0.5% | -3.8% | This is a statistically significant negative return because both the market and the industry are up |

App. 023

| | | | |
|---|---|---|---|
| | | | that day. While there is no company-specific news on that day to explain the movement of the stock, it likely reflects further concerns related to the December 4, 2001 news. |
| 12/7/2001 | -42.4% | -42.7% | A Maryland jury had awarded a $30 million verdict against Dresser in favor of five plaintiffs in an asbestos litigation. Several analysts issued reports that day in response; some downgraded ratings and lowered price targets citing mounting asbestos liabilities. |

46.     The events on dates of significant Halliburton stock price movement described above clearly illustrate that large changes in Halliburton's stock price generally are associated with important new information, which supports my conclusion that the market for Halliburton's stock was efficient during the Class Period.

**F.     *Unger/Bell* Factor 6: Market Capitalization**

47.     Courts have found that a large market capitalization can be an indicator of market efficiency.[26] Halliburton's stock had substantial market capitalization (calculated as the number of shares multiplied by the prevailing share price) throughout the Class Period. The market capitalization for Halliburton ranged from $15 billion to $23 billion in 1999; from $15 billion to $24 billion in 2000; and from $5.1 billion to $21 billion in 2001. Even on the last day of the Class Period, December 7, 2001, after a decline in the value of Halliburton's market capitalization of more than 42%, its market capitalization was greater than $5.1 billion. See Exhibit 8. The average market capitalization of a NYSE stock was $5.6 billion, $6.0 billion, and $5.7 billion in 1999, 2000, and 2001, respectively.[27]

---

[26] *Unger*, 401 F.3d 316 at 323, HN10; *Bell*, 422 F.3d 307 at 313, n10; *Krogman* 202 F.R.D. 467 at 478; *O'Neil* 165 F.R.D. 479 at 503.

[27] NYSE Factbook Online http://www.nysedata.com/nysedata/Default.aspx?tabid=115 (select NYSE Historical Statistics then NYSE Overview Statistics).

App. 024

48.     Halliburton's market capitalization was substantially greater than the average for a NYSE stock throughout the Class Period prior to December 7, 2001.  The relatively large market capitalization of Halliburton stock supports my conclusion that the market for Halliburton's stock was efficient during the Class Period

## G.     *Unger/Bell* Factor 7: Bid/Ask Spread

49.     Bid/ask spreads are a measure of transaction costs and low transactions costs indicate that arbitrage opportunities can be exploited readily.  Exhibit 9 contains the median and mean bid/ask spread, both as a dollar amount and percentage of the mean bid/ask prices, during the Class Period for Halliburton and its competitors.  The more relevant analysis is to examine the bid/ask spread quotes from the listing exchange rather than all exchanges (including the non-listing exchanges).  Bid/ask spread quotes from non-listing exchanges frequently include quotes that are so large as to be obvious errors or meaningless, *i.e.*, not reflective of actual transactions.

50.     During the Class Period, the average bid/ask spread as a percentage of the mean bid/ask price for Halliburton was 0.22%; the average for Halliburton's competitors was 0.36%.[28]  Halliburton's bid/ask spreads are comparable to its competitors during the Class Period.  That bid/ask spreads are not large indicates that arbitrage opportunities could be exploited, which is evidence in support of market efficiency.

---

[28] The figures are for quotes on each company's listing exchange.  In Exhibit 9, I have also provided the bid/ask spread for all quotes included in the TAQ database.

App. 025

### H.   *Unger/Bell* **Factor 8: Public Float**

51.     Courts have held that a large float percentage (percentage of shares held by the public) can be an indicator of market efficiency.[29]  During the Class Period, there were between 429.0 million and 445.5 million shares of Halliburton stock outstanding.  Insider holdings ranged between approximately 2.0 million and 3.6 million shares during the Class Period.  The public float was approximately 99% of shares outstanding throughout the Class Period.  See Exhibit 10.

### I.   **Factor 9: Listing Exchange**

52.     A security's listing on a national exchange means that financial information about that company is readily available to investors, at a minimum, through the company's SEC filings.  Listing on the NYSE, AMEX or NASDAQ, means that investors have access to trading prices and volumes throughout the trading day.  Rules of the national exchanges require that investors buy at the lowest ask price and sell at the highest bid price prevailing at the time of their trade.[30]  Because a national exchange brings together many thousands (or millions) of investors, trading prices reflect a consensus opinion as to securities' values.  At least one authority has said the following:

> ... at a minimum, there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[31]

In the *Cammer* decision, the Court stated:

---

[29] *Unger*, 401 F.3d 316 at 323, HN10; *Bell*, 422 F.3d 307 at 313, n10; *Krogman* 202 F.R.D. 467 at 478; *O'Neil* 165 F.R.D. 479 at 503.

[30] Market Structure and Trading Volume, Anderson & Dyl, p. 3 (March 2003), available at www.nyse.com

[31] Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, Section 8.6 (Aug. 1988) (quoted in *Cammer*, 711 F. Supp at 1292).

App. 026

... some may concur with [Defendant's] suggestion ... that companies listed on national stock exchanges or companies entitled to issue new securities using SEC Form S-3 would almost by definition involve stock trading in an "open and developed" market.[32]

53.     Halliburton was traded on the NYSE and, as noted above, did file Forms S-3 with the SEC before and during the Class Period. The NYSE is a New York City-based stock exchange. During the Class Period, the NYSE was the largest equities marketplace in the world as measured by dollar volume. During 1999 to 2001, there were 2,798 to 3,025 companies listed on the NYSE. As of December 31, 2001, the combined capitalization of all NYSE listed companies was $16 trillion.

54.     The NYSE is an agency auction market where most trading is conducted by brokers acting on behalf of customers, rather than by dealers trading for their own account. Competitive price discovery at the point of sale results from this broker interaction. Aided by NYSE-assigned brokers known as specialists, the NYSE marketplace provides all customer orders an equal opportunity to interact and receive the best price.[33]

55.     NYSE's Letter to Our Constituents at page two of its 2002 Annual Report notes that "investors must be guaranteed a fair and level playing field." At page 21, it discusses market quality and states that "Investors enjoy fast, reliable and efficient access to unsurpassed liquidity, the narrowest spreads anywhere, and the best possible execution."[34] NYSE's Chief Regulatory Officer states in his letter to investors in NYSE's 2004 Annual Report that the

---

[32] *Cammer*, 711 F. Supp. at 1276-77 (D.N.J. 1989).

[33] www.nyse.com

[34] http://www.nyse.com/pdfs/2002ar_NYSE-2002.pdf

App. 027

exchange is "committed to do everything in our power to protect investors and ensure that the New York Exchange remains the fairest, most open securities market in the world."[35]

56.     Available from NYSE is the Trade and Quote ("TAQ") database which provides all reported trades and quotes for all issues traded on all U.S. exchanges, *e.g.*, NYSE, NASDAQ (OTC), and regional exchanges. The TAQ database contains over 1.3 million trades for Halliburton stock during the Class Period; the average number of trades per day was 2,086.

57.     The fact that Halliburton traded on a major exchange during the Class Period, supports a conclusion that the market for the stock was efficient during that period.

## J.     Factor 10: Institutional Ownership and Trading

58.     Institutional investors such as pension funds, mutual funds, and investment banks, typically have ready access to minute-to-minute financial news and to online bulletins from analysts such as those disseminated through First Call. They also expend resources in analyzing the value of stocks in which they invest. Thus, the fact of significant institutional ownership is a signal that knowledgeable investors are closely and rapidly scrutinizing sources of company information and forming investment opinions that affect share price accordingly.

59.     There was substantial institutional ownership of Halliburton stock throughout the Class Period. According to data provided by Thomson Financial, institutional holdings of Halliburton's stock ranged from a low of 273.5 million shares at the end of the fourth quarter of 2001 to a high of 315 million shares at the end of the third quarter of 2000.[36]  (See Exhibit 11.) During the Class Period, institutional ownership of Halliburton stock ranged between

---

[35] http://www.nyse.com/pdfs/2004editorial.pdf at 7.

[36] Institutions which file Form 13F with the SEC report shares held as of the end of each calendar quarter.

App. 028

64% and 73% of the Company's reported shares outstanding and the number of institutional investors reported holding Halliburton stock ranged from 416 to 539.

60.    During the Class Period, institutional investors actively traded Halliburton stock, as indicated by data from reporting institutions' filings of Form 13F with the SEC. Changes in institutional holdings of Halliburton shares from quarter-end to quarter-end for quarters falling in whole or in part within the Class Period, are substantial.  This indicates institutions were actively trading Halliburton stock.  (See Exhibit 12.)  Institutional investors, reporting at each quarter-end, increased their holdings of Halliburton shares during the Class Period by at least 20 million (during the quarter ended September 30, 1999) and by as much as 53 million shares (during the quarter ended December 31, 2000).  Thus, a substantial number of shares changed hands among the institutional investors throughout the Class Period.

61.    The presence and trading activity of institutional investors in the market for Halliburton's stock during the Class Period support a conclusion that the market for the stock was efficient during that period.

## K.    Factor 11: Dissemination of News

62.    Coverage of a company by wire services, financial press, and general media ensures that investors have ready access to new information about a company's condition and prospects, and facilitates rapid share price reaction to new information about the company. There was extensive news coverage of Halliburton during the Class Period, including reports on Halliburton's financial condition, its prospects for growth, and its revenues and earnings trends.

63.    Prior to, during, and after the Class Period, articles concerning Halliburton appeared in major news media in the United States, such as: *AP Online*; *Associated Press Newswires*; *Barron's*; *Business Week*; *Business Wire*; *Capital Markets Report*; *CCN Newswire*;

- 27 -

App. 029

*Chicago Tribune; CNBC: Business Center; Companies & Commodities; Corporate Financing Week; Daily Petroleum Report; Defense Daily International; Denver Post; Dow Jones Business News; Dow Jones Capital Markets Report; Dow Jones Energy Service; Dow Jones News Service; Factiva Press Release Service; Financial Disclosure Wire; Financial Times; Houston Chronicle; Knight Ridder Tribune Business News; Los Angeles Times; Money Magazine; Moody's Investor Service Press Release; New York Daily News; New York Post; Newsday; Oil & Gas Investor; Oil & Gas Journal; Petroleum Economist; Petroleum Finance Week; Pipeline & Gas Journal; PR Newswire; Reuters News; The Accountant; The Atlanta Constitution; The Baltimore Sun; The Boston Globe; The Christian Science Monitor; The Daily Telegraph; The Economist; The New York Times; The Oil and Gas Journal; The Philadelphia Inquirer; The San Francisco Chronicle; The Wall Street Journal; The Washington Post;* and *U.S. Newswire.* During the Class Period, more than 12,100 electronic and/or printed articles were published with "Halliburton" mentioned in the article; more than 2,900 were published with "Halliburton" appearing in the headline or first paragraph.[37]

64.     In addition, Halliburton held regular conference calls with members of the investment community. After each quarter's earnings announcement was released, the Company held a conference call at which management described Halliburton's financial performance and condition, answered questions from participants, and often provided guidance on expected future financial performance. During the Class Period, Halliburton management also occasionally held conference calls to discuss new business developments and other pertinent information.

---

[37] Source: www.factiva.com (from Dow Jones)

App. 030

65.    The extensive news coverage of Halliburton within the Class Period supports my conclusion that the market for Halliburton stock was efficient during the Class Period.

**VII.    Summary Regarding the Market Efficiency of Halliburton's Stock**

66.    In summary, the following indicia of market efficiency are bases for my opinion that the market for Halliburton stock was efficient throughout the Class Period:

- the considerable trading volume in Halliburton stock during the Class Period;

- the significant number of securities analysts who reported on Halliburton;

- the fact that trading in Halliburton stock was facilitated by a specialist on the NYSE, a sophisticated and developed principal exchange;

- the Company's eligibility for and filing of SEC Form S-3 prior to and during the Class Period;

- the demonstrable relationships between company-specific news releases and prompt share price reactions;

- Halliburton's large market capitalization;

- Halliburton's bid/ask spreads comparable to other companies in its industry;

- Halliburton's sizeable public float;

- the fact that Halliburton traded on a major exchange;

- significant institutional ownership during the Class Period; and

- the extent of news coverage of Halliburton available to investors.

67.    The fact of market efficiency does not preclude the information about Halliburton disseminated to the market by Defendants from being false and misleading. Rather, it means that information disseminated by Defendants about Halliburton and its prospects, whether true or false, was reflected in Halliburton's share price.

- 29 -

App. 031

## VIII.   Materiality

68.    Material information is any information that investors would want to know about a company that might affect their investment decisions with respect to that company,[38] or information that can reasonably be expected to affect the value of that company's securities. Material information may concern the market as a whole, the industry in which a company operates, or specifically the company (company-specific information).  Clearly, material information includes information concerning a company's current revenues, expenses, and earnings.  Market participants also may rely upon expected future revenues, expenses, and earnings, information on accounting policies and procedures, reserves and estimates, in addition to demand for a firm's products and services, information concerning a firm's ability to compete and the effects of competition, information on management's effectiveness in managing the enterprise, and many other items of information which may affect market participants' evaluations of a firm's revenue and earnings prospects.

69.    Share price is a function of a company's expected future economic earnings, *i.e.*, of expected future cash flow to shareholders.  Cash flow to shareholders is that cash flow on which there are no other claims—not from suppliers, creditors, employees, government in the form of taxes, or from others—and hence is a return to equity investors for their investment and the risk they have borne.  This cash flow can be distributed to equity investors as dividends or special distributions and/or as appreciation in share price realized at sale of the stock.  In other words, a firm's share price is the present value of future economic earnings expected by its equity investors, discounted for risk and the time value of money.[39]

---

[38] *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (quoting *TSC Indus.*, 426 U.S. at 449).

[39] Richard A. Brealey and Steward C. Myers, *Principles of Corporate Finance*. 7th edition, c2003, pp. 60–61.

App. 032

70.     Market participants rely on statements made by company managers and representatives.  Market participants also rely on the opinions of a company's independent auditors for assurance that the company's financial statements accurately and reliably report its financial performance.  Unless the market has reason to believe a company's future financial performance will be significantly different from its present financial performance, the market will look to the company's periodic reports of financial performance as important indicators of its financial health and earnings prospects.  For example, a company's financial reports provide the level of revenues from which market participants project future growth.

71.     If market expectations for a company's future economic earnings change, the company's share price will change.  If the level of earnings used in projections or the expected growth rate of future economic earnings increases, share price increases; if the level of earnings for the market's projection or expected growth rate decreases, share price decreases.

72.     The statements of a company's management and of its external auditors are particularly important in shaping the market's information mix because management and auditors have special access to and control of information about earnings, prospects for growth, and conditions within the company.  For example, analysts participate in conference calls, report on conversations with management, and summarize a company's financial statements in analyst reports.  The mix of information in the market about a firm is rarely, if ever, uniform, and the mix often includes some diversity in forecasts for financial performance.  The market assimilates all the information available to arrive at an equilibrium price.  Unless the general market recognizes notable defects in management's and auditors' credibility, their statements will weigh heavily in establishing that equilibrium price.

73.     It must be noted that a statistically significant change in a company's security's

price (net of market and industry effects) is an indicator that new company-specific

information has dramatically changed the total mix of information about a company, but is

itself not the only indicator of materiality. A security price movement of any size can be

material. Statistical significance measures the relative size of the security's price adjustment to

the new information, *i.e.*, statistical significance only indicates that the price change was

among the largest price changes over a period of time. Information that does not cause a very

large price adjustment, *i.e.*, one that is not statistically significant, also can be material. Price

changes are caused by information; the market is not a collection of whimsical expressions of

an irrational force. Price changes may appear random because new information arrives

randomly, *i.e.*, we cannot predict the future. Nevertheless, those price changes have causes.

Information "important enough to affect security prices when publicly released provides

compelling evidence that a reasonable investor would consider the information important in

making an investment decision."[40]

74.     Stock prices reflect publicly available information and this is the economic

theory underlying an event study. Certain of the case-relevant events from an event study are

discussed in Sections V.E. (addressing *Cammer* factor 5) and IX. (addressing Loss Causation)

of this Report. A partial disclosure is corrective with respect to alleged misrepresentations and

omissions when that disclosure changes the mix of fraud-related information available to

investors. Specifically, if a company makes an announcement that misrepresents some aspect

of its business or omits information that should not have been omitted and later the company

"corrects" the misrepresentation (or omission), even though it did not admit its earlier

---

[40] Mitchell, Mark L. and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud
Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, 49, 545.

App. 034

misrepresentation (or omission), then that is a partial disclosure. Thus, a partial disclosure can

be new information regarding the true condition or prospects of a company that has the effect

of correcting the prior misrepresentation (or omission) even when the company does not admit

to the fraud. Though the company may portray the information as new to the company, it

would be a partial disclosure if it was, in fact, information previously known to the company

but misrepresented to the market.

75.     An example will illustrate. A company reports overstated revenues over several

quarters. Analysts and investors, relying on those overstated revenues, make assessments

about the company's revenue-generating capabilities, and assess the value of the company's

stock.[41] Later, the company reports revenues that are below investors' expectations (those

expectations based on the prior revenue overstatements) and the stock price falls. The fraud is

not that the company reported disappointing revenues in the later quarter and the stock price

fell in that quarter, the fraud is that the company hid its disappointing revenues in earlier

quarters, when the stock price would have declined had the company reported its revenues

accurately. If the company had earlier reported its revenues appropriately, then analysts and

investors would have had correct information upon which to make their assessments regarding

the value of the company's stock, which would have resulted in the stock price decline earlier

rather than later. The fraud is not that the stock price declined but that the stock price declined

later than it would have if correct financial information had been reported. The corrective

disclosure has a direct causal link to the alleged misrepresentations even though the company

had not admitted to prior misrepresentations or to fraud. Furthermore, it may be the case that

---

[41] In this case, it is alleged that each time Halliburton released earnings, such earnings were
overstated because they failed to disclose that the earnings included unapproved claims that
Halliburton had erroneously recognized as revenues on its large fixed-price construction
contracts.

App. 035

the company, while reporting disappointing revenues in the later quarter, may still be overstating its revenues such that the price inflation[42] from the initial misrepresentations is reduced but it is not eliminated.

## IX.    Loss Causation

76.    The above section of this Report titled "Materiality" explains that investors use disclosures about the financial performance and condition of a company to make assessments about future cash flows that will accrue to investors in a firm's securities, and that investors use this information in valuing those securities.  This section on "Loss Causation" describes certain disclosures by the Company that Lead Plaintiff intends to prove at trial corrected false or misleading information, or that revealed information that was wrongly omitted, regarding Halliburton's financial performance, earnings prospects, and potential asbestos liability; such disclosures caused the prices of Halliburton's stock to decline.

77.    Certain announcements during the Class Period, while they did not admit the alleged fraud at that time, are partial disclosures of information that changed investors' perceptions of the true value of Halliburton.  Lead Plaintiff alleges that had Halliburton's financial statements not been false and misleading during the Class Period, investors would have lower and more realistic expectations regarding Halliburton's earnings and revenue generating capabilities during the Class Period.  Thus, information during the Class Period that partially corrected investors' previously erroneous perceptions as to Halliburton's value are partial disclosures of the alleged fraud.

78.    This analysis is ongoing.  This analysis does not attempt to illustrate all of the misrepresentations or partial disclosures of the fraud through the end of the Class Period.  In

---

[42] Price inflation refers to that portion of the price of a share of stock in excess of its true value, *i.e.*, the difference between a reported stock price and its price had the fraud not occurred.

App. 036

the future, I may consider additional and/or different dates as partial disclosures of the alleged

fraud based on additional analyses, materials, further discovery, and/or the opinions of other

experts in this matter.

79.     This "Loss Causation" section is based on, and summarizes the results of, an

event study analysis based on widely accepted statistical techniques and a review of

information releases of many kinds relevant to Halliburton and issued during the Class Period.

Information releases include news articles and wire service reports, reports of securities

analysts, and Company press releases, conference calls, interviews and presentations, and SEC

filings.  The event study enables me to identify news during the Class Period—both related to

Halliburton's partial disclosures concerning its potential asbestos liability, its booking of

unapproved claims on fixed-price contracts and the lack of benefits from the Dresser merger,

and other unrelated news—which led to a significant change in Halliburton's share price.  This

event study demonstrates that during the Class Period the prices of Halliburton's stock reacted

to material, new, and unexpected information.

80.     Regression analysis is used to show how a company's stock price moves in

relation to market and industry movements and how it responds to news and information. The

regression analysis I performed is able to explain 77% of the total variance in Halliburton's

stock return during the control period.  This is a very high correlation for this type of

regression analysis; in my experience, market and industry indices returns generally explain

less than 50% of the variation in a particular company's stock returns.  (See Section V.E. and

the Appendix to this Report for additional information regarding the event study.)

81.     Similar to the methods I commonly employ when conducting an analysis of

damages in securities cases such as this, I have conducted the following analyses to determine

App. 037

the effect the disclosures of the alleged fraud (discussed below) had on Halliburton's stock price.

- Conducted an econometric analysis of the company's stock returns, *i.e.*, regression analysis in order to separate the portion of the return caused by company-specific news and events from the portion of the return caused by market and/or industry news and events.

- Reviewed all of the news surrounding the day on which the alleged disclosure was made to determine what the company said and what market participants said.

- From the regression analysis, determined how much of the day's stock return can be attributed to company-specific news and events, and how much of the day's stock return can be attributed to market and industry news and events.

- Reviewed all of the available analyst reports surrounding the day on which the alleged disclosure was made to determine how the company's statements or communications impacted market participants' assessments of the company's value. Analyst reports provide information on what the company said if the company's statements were made outside of a press release, *e.g.*, conference call.

- Conducted an empirical analysis of the information on and surrounding the disclosure date. Based on commentary by the company, news articles, and statements from analysts, determined what specific news items were important on the day of the alleged disclosure or on the days surrounding the day of the alleged disclosure, *e.g.*, the particular disclosure to which news articles attributed stock price movements; reasons in analyst reports for changes in estimates, ratings or target prices; commentary by the company with respect to what it noted was important.

App. 038

- Conducted an empirical analysis to determine the relative importance of different pieces of news with respect to impact on stock valuation, *i.e.*, how different pieces of news impacted the stock price, examined contemporaneous assessments (both qualitative and quantitative) as to the impact on value.  For example, reasons underlying the company's changes to its guidance, estimates and forecasts, and reasons underlying all or parts of analysts' changes to their valuation models, estimates, ratings, and target prices.

A.      **Summary of Events Related to the Misrepresentations, and the Effect on the Price of Halliburton's Stock**

82.      Following is a discussion of certain disclosures during the Class Period which revealed that previous alleged representations and omissions by Defendants had been false and misleading, causing the prices of Halliburton's stock to decline.  (See Exhibit 13 for a chart of Halliburton's stock price and a summary of the events related to the disclosures.)

Partial Disclosures Related to Booking of Unapproved Claims and Unrealized Benefits from the Dresser Merger:

83.      The following events are examples of information disclosed during the Class Period that brought, in part, investors' perceptions of the Company's financial condition related to its booking of unapproved claims on fixed-price contracts and the benefits from the Dresser merger more in-line with its alleged true condition at that time.  My analysis has identified at least four instances of partial disclosures related to these allegations; these disclosures caused a total company-specific decline in Halliburton's stock price of as much as 21.8%, or $9.42 (other non-culpable information was disclosed on one of these days, January 5, 2000, although, as discussed, below, a significant portion of the information on that day related to the Company's booking of unapproved claims on fixed-price contracts and the lack of benefits from the Dresser merger).

- 37 -

App. 039

84.     October 5, 1999: On October 5, 1999, Halliburton's stock price dropped 13.2%,

from $39.75 to $34.50. The company-specific return is -9.0%, a statistically significant

negative return. After market close, on Monday, October 4, 1999, Halliburton announced that

Dresser had elected to sell its interests in two joint ventures.[43] The Company also warned that

it expected its 1999 third-quarter earnings to be in the range of 11 to 13 cents per diluted share.

The previous average analyst estimates was 19 cents per share. The Company attributed the

reduction, in large part, to the lower than expected profits of the joint ventures and many of the

other business units of the Dresser Equipment Group.[44] This is an instance where the

Company released negative news, which concerned the lack of benefits arising from the

Dresser merger.

> [Halliburton] shares could slip in Tuesday morning trading due to its earnings
> warning. The oil driller said that its Dresser Equipment Group business segment
> and its Engineering and Construction business segment are warning of lower
> profits. As a result, Halliburton expects a third quarter profit between 11 and 13
> cents a share, while analysts currently expect a profit of 19 cents a share.
> Halliburton also announced that its subsidiary Dresser Industries will sell its
> interests in two joint ventures to Igersoll-Rand [sic] Co. for a total of $1.1 billion.
> The sales will result in a one-time fourth-quarter gain of 84 cents a share. Shares
> closed down 2 1/16 to 39 3/4 ahead of the news.[45]

85.     News commentary and analysts attributed the decline in Halliburton's stock

price that day to the reduction in the Company's near-term expected earnings:[46]

> Shares of Halliburton Co. plunged 13.2 percent Tuesday after the company said
> its Dresser Industries unit will sell its stake in two joint ventures to Ingersoll-Rand

---

[43] Halliburton held an invitation-only conference call with analysts. *Dow Jones Business News*,
"Halliburton Sells Stakes In Joint Ventures For $1.1 Billion," October 4, 1999, 7:43 pm.

[44] *Reuters News*, "Halliburton to Exit Two Ventures, Sees Lower Q3 EPS," October 4, 1999,
5:23 pm.; Halliburton SEC Form 8-K filed October 4, 1999.

[45] *CBS MarketWatch.com*, "Earnings Advisories," October 4, 1999, 6:11 pm.

[46] *See, e.g.*, Dain Rauscher Wessels, "Halliburton Selling Joint-Venture Interests; Expects To
Miss Previous Third-Quarter Guidance," October 5, 1999; *Dow Jones Business News*, "Earnings
Warning Pressures Shares Of Oil-Services Firm Halliburton," October 5, 1999, 11:26 am.

App. 040

for $1.1 billion, after poor performance by the businesses hurt third quarter results.

Dresser Industries decided to sell the interests amid the Dresser Equipment Group segment's poor current and projected financial performance at D-R and at IDP. D-R is expected to report an operating loss in the third-quarter while the entire business segment forecasts weaker operating results, compared to previous predictions, for the third and fourth quarters.

Analysts appear to agree that Halliburton's sale of the poor-performing joint ventures was a good move and that the earnings shortfall will be temporary.

In a research note, analyst James Stone of Schroders said Halliburton's move is "a better-than-expected outcome" for the company and even though "it will negatively affect earnings in the fourth quarter and for at least part of 2000, it is a much better scenario than having bought out Ingersoll-Rand."

Stone reduced his third-quarter earnings-per-share estimate to 12 cents from 21 cents, but noted that the sale's impact on the company is short-term and will ultimately be to Halliburton's advantage.

Additionally, Arvind Sanger, analyst at Donaldson, Lufkin & Jenrette downgraded his third-quarter estimate to 12 cents a share from 18 cents, fourth-quarter earnings-per-share estimate to 18 cents from 28 cents. However, in his research note, he maintained a "buy" rating on the company's stock, viewing the sales as "a good strategic move."[47]

86.      Analysts lowered their forecasts after the Company's earnings warning.  For

example:

CIBC:

We have revised our estimates for 3Q and 4Q99 to $0.12 and $0.18 from $0.18 and $0.25, respectively.  We are preliminarily raising our 2000 and 2001 estimates to $1.56 and $2.15 from $1.49 and $2.08, respectively.  We reiterate our Buy rating and 12- to 18-month price target of $56.

The sale of the joint-venture interest comes as a major surprise to Wall Street, which assumed [Halliburton] wanted to own the compressor and pump businesses. …Reducing financial leverage and creating potentially accretive earnings transactions made the sale decision mandatory, from the point of view of shareholder value creation.

---

[47] *CBS MarketWatch.com*, "Halliburton to sell interests in two joint ventures; issues third-quarter earnings warning," October 5, 1999, 8:06 pm.

App. 041

The company's announcement of weakness across virtually every business line in 3Q is not surprising, given the slower than anticipated oilfield industry recovery. [Halliburton] is merely the latest company to confess to this situation.

We believe a significant disconnect exists between oilfield service stock prices and improving industry fundamentals. ...[48]

Dain Rauscher Wessels:

HAL announced that third-quarter EPS would come in $0.06-$0.07 less than expected and attributed the entire shortfall to the disappointing performance of the two joint ventures.

We are lowering our third-quarter EPS estimate to $0.12 from $0.21, our 1999 estimate to $0.66 from $0.85, and our 2000 estimate to $1.14 from $1.39. We are maintaining our Neutral rating.[49]

Jefferies & Company:

Lowering Estimates – We are lowering our 3Q99 EPS estimate to $0.12 from $0.23 to reflect the weak operational environment in HAL's Dresser Equipment Group and its downstream Engineering and Construction segment. In addition, we are lowering our 1999 EPS estimate to $0.65 from $0.85 and our 2000 EPS estimate to $1.05 from $1.50 to reflect the sale of its Dresser-Rand and Ingersoll-Dresser Pump divisions and the adjusted outlook for other divisions.[50]

87.    I have reviewed all of the news and analysts reports from October 5, 1999, that are available to me at this time; I do not see other news or information that can explain the company-specific stock price decline on October 5 other than the reduction in the Company's near-term expected earnings. The reductions in earnings estimates are based at least in part on lower than expected profits of the joint ventures and many of the other business units of the Dresser Equipment Group. Lead Plaintiff alleges that during the Class Period Defendants misrepresented the integration of Dresser's construction operation, and the benefits the merger

---

[48] CIBC World Markets, October 5, 1999.

[49] Dain Rauscher Wessels, "Halliburton Selling Joint-Venture Interests; Expects To Miss Previous Third-Quarter Guidance," October 5, 1999.

[50] Jefferies & Company, Inc., "Stock Collapses On Profit Warning; Underperforming Assets To Be Sold," October 5, 1999.

App. 042

would have to Halliburton's bottom line, and the operational problems at the Company's engineering and construction units.[51] Thus, a significant portion of the stock price decline on October 5, 1999, was caused by information that partially corrected prior misstatements and omissions regarding the Dresser merger and the Company's related operational problems.

88.     January 5, 2000: On Wednesday, January 5, 2000, Halliburton made a partial disclosure related to the Company's booking of unapproved claims on fixed-price contracts and the lack of benefits realized from the Dresser merger as revealed in a conversation with analyst Carol Lau with Brown Brothers Harriman & Co.  On this day, which included both culpable and non-culpable news, there was a statistically significant decline in Halliburton's share price.  Halliburton's stock price dropped 4.38% from $38.50 to $36.81.  The company-specific return was negative 4.3% that day.  Following this conversation with Halliburton, Lau reduced her 2000 EPS estimates.[52]  Year 2000 estimates were reduced by 20 cents (from $1.10 to $0.90), related to the following segments:

| Operating Segment: | Reduction to EPS: |
| --- | --- |
| Energy Services | $0.13 |
| Engineering and Construction | $0.06 |
| Dresser Equipment | $0.01 |
| Total | $0.20 |

89.     On the same day, Merrill Lynch analyst K. Simpson ("Simpson") cut his estimates of Halliburton's earnings for 2000 and 2001, and downgraded the Company's intermediate-term rating on the stock to "Accumulate" from "Buy," while retaining the long-term "Buy" rating.  Simpson attributed the cut to "reduced expectations for offshore construction results, a reduced growth estimate for oilfield spending outside North America

---

[51] Fourth Consolidated Amended Complaint for Violation of the Securities Exchange Act of 1934, filed April 4, 2006 (the "Complaint"), pp. 1–2.

[52] Brown Brothers Harriman & Co., January 5, 2000, 2:02 pm.

App. 043

and 'less powerful synergies from the Dresser merger than [h]e had envisioned.'"[53]  His

earnings per share estimates were cut to $0.85 from $1.15 for 2000 and to $1.50 from $1.90 for

2001.  I do not have Simpson's breakout of his reduction of 2000 and 2001 earnings estimates

between the segments; however, the reasons Simpson cites for cutting his rating for

Halliburton are—except for his concerns about oilfield spending—related to Halliburton's

alleged misstatements and omissions—specifically those concerning revenues and profitability

from large fixed-price construction contracts and the benefits of the Dresser merger.  The news

article that reported on Simpson's change to estimates and rating noted that in the first half

hour of trading the stock was down $1.4375, to $37.0625.

90.     Industry-wide disclosures are captured by the industry index and are not

reflected in the company-specific returns.  Oilfield spending was an industry-wide concern for

oil services companies that day.  Thus, while the disclosure related to industry oilfield

spending is non-culpable it is unlikely to be a contributing factor to the significant company-

specific decline in Halliburton's stock price that day.  For example, the impact of spending by

major oil companies on the industry was discussed that day in a *Dow Jones Business News*

article:

> ... [I]ndustry observers say oil-services giants such as Halliburton Co. (HAL),
> Baker Hughes Inc. (BHI) and Schlumberger Ltd. (SLB) will report fourth-quarter
> results substantially below a year earlier.  Oil-services, or oil-field, companies
> provide equipment, such as drilling rigs and services, to search for and produce
> oil and gas. ...
>
> Overall, analysts said, the oil-services group should show substantial declines
> from fourth quarter 1998 because the most notable oil-industry trend of 1999—
> rising crude prices—has yet to spur major increases in production and
> exploration.  This spending by major oil companies is the oil-services group's
> bread and butter. ...

---

[53] *Reuters News*, "Research Alert—Halliburton Estimates Cut," January 5, 2000, 9:59 am.

App. 044

"You're starting to see some increases in spending [by oil companies], but it's still very conservative," said Poe Fratt of A.G. Edwards & Sons Inc.[54]

91.     CIBC World Markets also discussed oilfield spending that day:

The oilfield service industry is driven by the need for oil and gas companies to develop new reserves and increase their current deliverability to satisfy the world's growing energy demand.

The bottom of the industry cycle occurred in either 3Q99 or 4Q99, depending on whether a company's business is primarily North America, or internationally, oriented.

We anticipate this cyclical uptrend to strengthen as 2000 unfolds. With increased oilfield activity, given the downsizing within the service companies, revenue and profit margins should experience a healthy recovery this year and into 2001, driving EPS growth. ...

Our strategy for investing in this industry recovery has been, and remains, to focus on the largest-cap service companies such as Schlumberger (SLB-$67 target price), Halliburton (HAL-$56 target price), and Baker Hughes (BHI-$41 target price), because that is where we believe investors' money will flow initially during the early stage of the upturn.[55]

92.     I have reviewed all of the news and analysts reports from January 4–6, 2000, that are available to me at this time; I do not see other news or information that can explain the company-specific stock price decline on January 5 other than the reductions to earnings estimates made by the two analysts after, at least in the case of Lau, a conversation with Halliburton management.  The reductions in earnings estimates are based at least in part on the problems with the large fixed-price contracts and the lack of benefits from the Dresser merger.  Lead Plaintiff alleges that had Halliburton not included in its operating income in certain quarters of 1998, 1999 and 2000 unapproved claims revenue, in contrast to its earlier accounting policies, investors would have been on notice with respect to the unsatisfactory

---

[54] *Dow Jones Business News*, "Oil-Service Firms' 4th-Quarter Results May Signal Start Of A Recovery," January 5, 2000, 9:15 am.

[55] CIBC World Markets, "Oilfield Svc & Offshore Drilling; Oilfield Services Investment Thesis," January 5, 2000.

App. 045

profitability of the certain large fixed-price contracts.[56]  Thus, a significant portion of the stock price decline on January 5, 2000 was caused by information that partially corrected investors' erroneous assessments of the profitability of overseas construction projects and the benefits of the Dresser merger.  This is the type of information that would affect stock prices because it relates to value and is used, at least by analysts, in models to assess the value of Halliburton's stock.

93.   October 24–25, 2000:  After market close on October 24, 2000, while announcing its third quarter earnings release, the Company made a partial disclosure concerning the Company's booking unapproved claims on fixed-price contracts and lack of benefits from the Dresser merger.  Specifically, it disclosed that it would be restructuring its engineering and construction units, causing a statistically significant decline on October 25 of 11.0% in Halliburton's stock price from $41.63 down to $37.06 (the company-specific decline was 6.6%; this was a statistically significant decline).  Trading volume was 25.35 million shares that day, more than 7 times the average daily trading volume for Halliburton stock during the Class Period.[57]  The price decline on October 25, 2000, was caused by revelations related to operational problems at the engineering and construction units and, to a lesser extent, some analysts' concerns regarding potential asbestos exposure.  This is an instance where the Company released negative news concerning operational problems at its engineering and construction units.   Analysts revised their forecasts as a result of the negative news discussed on October 24 and 25, 2000.  A significant portion of the negative news, as attributed to the Company, in news reports and by analysts, was related to the problems with the engineering

---

[56] Complaint, pp. 140–141.

[57] The average daily trading volume for Halliburton stock during the Class Period was 3.46 million shares.

App. 046

and construction units that Lead Plaintiff alleges could have been and should have been revealed earlier.  Thus, a significant portion of the stock price decline on October 25, 2000 was related to the Company's booking unapproved claims on fixed-price contracts and lack of benefits from the Dresser merger alleged in the Complaint.

94.     According to the Complaint, Halliburton's then-Chairman and chief executive David Lesar ("Lesar") leaked information regarding the Company's "serious operational problems in Halliburton's construction business ... and that a new major restructuring/reorganization ... was necessary" to certain analysts in "early" October 2000.[58] The Complaint cites a Salomon Smith Barney report released October 25, 2000, which states:

> During the conference call, management indicated their desire to merge [Brown & Root Energy Services] with its construction peers in [Engineering and Construction] and rationalize the entire business.  This confirms the message we heard from management several weeks ago during our company visit.[59]

95.     The subsequent restructuring charge taken in fourth quarter (as revealed later in the December 22, 2000 partial disclosure) was predominantly due to the delays and cost overruns of Halliburton's large fixed-price construction projects.  According to news reports, Lesar said on October 24 or 25, 2000, that:

> [T]he engineering and construction units have been hurt because customers have been slow to move ahead with major construction projects and that profits have been unsatisfactory.
>
> ... Kellogg Brown & Roots profits have been adequate so far because that unit has been working through a backlog of projects.
>
> However, its profit margins will erode as it finishes projects and customers continue to delay decisions on major new construction.[60]

---

[58] Complaint, p. 101.

[59] Salomon Smith Barney, "HAL: 3Q in line; E&C Outlook weak; Trimming Estimates," October 25, 2000.

[60] *Knight Ridder Tribune Business News*, "Dallas-Based Halliburton Co. to Combine Engineering, Construction Units," October 25, 2000.

App. 047

Lead Plaintiff alleges that during the Class Period had Halliburton not included unapproved claims in its construction units' revenues, or disclosed that it had included unapproved claims in its financial reporting for its construction units, investors would have been on notice of those units' reduced profitability or that reported profits might not be realized if customers failed to pay the unapproved claims, with subsequent charges for cost overruns as a result.

96.     The announcement by the Company on October 24 prompted certain analysts to cut earnings forecasts based on the partial disclosures related to the large fixed-price construction contracts.[61] Some analysts mention other negative news but the overwhelming consensus behind all downgrades is the problems at Halliburton's Engineering and Construction unit and the restructuring related to same.

> Shares of oil-services firm Halliburton Co. slumped Wednesday after the company announced a restructuring of its engineering and construction units. ...
>
> ING Barings lowered its rating on the stock from "buy" to "hold," Southwest Securities downgraded from "buy" to "accumulate," and Dain Rauscher Wessels said that because of "too many uncertainties" in the non-oilfield units investors should focus on purely oil-service stocks.
>
> In trading Wednesday morning, Halliburton shares were down $5.13, or more than 12 percent, to $37.06. ...
>
> The company made the announcement while releasing its third-quarter results. Halliburton said excluding one-time items, it earned $109 million, or 24 cents per share, a penny better than expected by analysts surveyed by First Call/Thomson Financial.  Revenue was $3 billion.[62]

---

[61] The charges for cost overruns that were announced in December 2000 make clear that the problems in the engineering and construction were related to the large, fixed-price contracts and, therefore, the negative news on October 24 and 25, 2000, is a partial disclosure related to the Company's booking unapproved claims on fixed-price contracts and the lack of benefits from the Dresser merger alleged in the Complaint.

[62] *Associated Press Newswires*, "Halliburton stock slides on news of restructuring, slowing projects," October 25, 2000, 12:24 pm.

App. 048

97.     Several analyst reports were released on October 25.  Merrill Lynch analyst Kevin Simpson said he had cut his estimate of Halliburton's 2001 earnings per share to $1.30 from $1.50 due to problems with the Company's construction segment, but was maintaining an accumulate rating on the stock.  "The engineering and construction side of the business is turning much more slowly than they had expected and than I had expected," he said.[63]

98.     Also, "ING Barings analyst Stephen Gengaro lowered his rating on Halliburton's stock to hold from buy rating and his 2001 earnings estimate to $1.50 from $1.80, citing weakness in the engineering and construction business and, to a lesser extent, outstanding asbestos liability claims against the company."[64]

99.     Analyst James K. Wicklund with Dain Rauscher Wessels released a report that day that stated that Halliburton's third-quarter EPS beat expectations, but "[m]ore interestingly, the company announced a major restructuring of its Engineering and Construction Group which continues to show disappointing results."  He reduced his fourth-quarter estimates to "reflect the increasing weakness in the engineering and construction business and the slower-than-expected increase in international activity."  He stated:

> We applaud the company's attempt to improve the results of the ECG [construction segment] and believe that the ESG [oilfield services segment] is well positioned to benefit from the continued oilfield services cyclical recovery with strong market positions in several products/services segments.  However, we believe there are too many uncertainties regarding the recovery in the non-oilfield service businesses.  We recommend investor's focus on pure-play oilfield service stocks that are more highly leveraged to the continued cyclical recovery.  We continue to rate the stock Neutral.[65]

---

[63] *Reuters News*, "Update 2-Halliburton stock hit by engineering slowdown," October 25, 2000, 4:26 pm.

[64] *Ibid.*

[65] Dain Rauscher Wessels, "Halliburton Reports: Announces Major Restructuring Initiative," October 25, 2000.

100.   Analyst Allen Brooks with CIBC stated in his report that day:

We are maintaining our Buy rating but reducing our price target to $50 from $56.
...

The shock in the conference call was management's statement that, given the
outlook for customer spending in the shallow water marine construction market
and the downstream [Engineering and Construction] business, it is not sure that
Halliburton has the critical mass to generate consistent and predictable
profitability and profit growth from these sectors. Management believes the stock
is being punished for the lack of this predictability. Therefore, it will look to a
significant restructuring of these businesses with an eye to achieving this goal
during 2001.[66]

101.   Analyst Fratt with A.G. Edwards & Sons, Inc. stated that Halliburton's EPS was

ahead of expectations "due to strong North American drilling market," but that the "near-term

outlook [was] less robust." Fratt lowered his estimates for the Company to "reflect weaker

[Engineering and Construction] business," concluding that the "[r]estructuring is positive and

oilfield service recovery continues." Fratt reiterated his "Accumulate/Aggressive" rating for

the Company.[67]

102.   Analyst Asit K. Sen with ABN AMRO stated:

Strong performance from the oil field services business ... were essentially offset
by weaker results from the Engineering and Construction (E&C) business. ...
The company indicated that it is embarking on a strategic restructuring program to
improve results from the E&C business that we view positively. ... We are
lowering our 2000 EPS estimate to $0.55 (from $0.58) and 2001 estimate to $1.35
(from $1.50).[68]

103.   As clearly illustrated above, each analyst cites the problems within

Halliburton's construction segment as the cause for downgrades and concerns. Indeed, most

---

[66] CIBC, "Weak E&C Outlook Prompts Restructuring; Reducing Estimates," October 25, 2000.

[67] A.G. Edwards & Sons, Inc., "North America Drives Positive Earnings Surprise—Lowering
Estimates to Reflect Weaker E&C Business," October 25, 2000.

[68] ABN AMRO, "HAL: Lowering 2000 and 2001 Earnings Estimates," October 25, 2000. Later
that day, Sen issued another report where he lowered his 2001 EPS estimate even further to
$1.15. AMRO, "HAL: Bruised But Not Broken—Sensitivity Analysis," October 25, 2000.

App. 050

analysts discuss positive news for the Company's oilfield services segment, which would be positively reflected in the stock's returns, strengthening my opinion that the decline in the stock price was due to the partial disclosure related to the Company's booking unapproved claims on fixed-price contracts and lack of benefits from the Dresser merger.

104.    I have reviewed all of the analyst reports available to me at this time.  The following table summarizes their adjustments to earnings following the Company's third quarter 2000 earnings release and conference call with management.

| Analyst | Prior 2001 EPS | New 2001 EPS | Reason for change |
|---|---|---|---|
| ABN-AMRO | $1.50 | $1.15 | Continued weakness in E&C business, both upstream (BRES) and downstream (KBR) services.  Change in 2001 estimates for operating income from previous earnings model:<br><br>  ES      Prior: $1,029 million    New: $929 million<br>  E&C    Prior: $207 million      New: $76.5 million<br><br>More than 50% of the reduction in estimated operating earnings for 2001 comes from E&C. |
| A. G. Edwards & Sons | $1.55 | $1.35 | More conservative operating assumptions for the E&C business. |
| CIBC | $1.71 | $1.50 | Weakness in E&C business.  Change in 2001 estimates for operating income from previous earnings model:<br><br>  ES         Prior: $1,046.2 million   New: $1,029.2 million<br>  E&C       Prior: $203.5 million     New: $80.0 million<br>  Dresser   Prior: $174.2 million     New: $164.8 million<br><br>More than 80% of the reduction in estimated operating earnings for 2001 comes from E&C. |
| Dain Rauscher Wessels | $1.57 | $1.42 | Increasing weakness in E&C business and slower-than-expected increase in international activity.  Change in 2001 estimates for operating income from previous earnings model:<br><br>  Prior:           New: |

- 49 -

App. 051

| | | | |
|---|---|---|---|
| | | | ES $987.4 million  $988.9 million<br>E&C $189.4 million  $90.0 million<br>Other income -$86.4 million  -$98.5 million<br><br>Other income is interest expense/income. More than 80% of the reduction in estimated operating earnings for 2001 comes from E&C. |
| Jefferies & Co. | $1.65 | $1.65 | No change |
| Salomon Smith Barney | $1.45 | $1.10 | "Largely" due to weak E&C outlook |

105.    For the three analysts that provide detailed earnings models, 50% to 80% (a significant portion) of the reduction in estimates for 2001 operating income is from the engineering and construction business (E&C).[69] This is the type of information that would affect stock prices because it relates to value and is used directly by, for example, analysts in models to assess the value of Halliburton's stock. I have reviewed all of the news and reports from October 24 and 25, 2000, that are available to me at this time and find that the negative news and sentiment is predominately about the operational problems, delays and cost overruns for large construction projects.[70] Thus, a significant portion, if not all, of the significant price decline on October 25 was caused by the partial disclosures related to the operational problems at the engineering and construction units and is related to the Company's booking unapproved claims on fixed-price contracts and lack of benefits from the Dresser merger that are alleged by Lead Plaintiff.

106.    December 21–22, 2000: On Thursday, December 21, 2000, Halliburton pre-announced fourth-quarter earnings and formally unveiled the restructuring of its engineering

---

[69] Various studies have demonstrated that earnings surprises, *i.e.*, when earnings are lower or higher than expected, have an impact on stock prices. Thus, it has been empirically demonstrated that changes in earnings and earnings expectations can and do affect stock prices.

[70] It is my understanding that to date there has been no discovery that would identify specifically what projects were affected.

App. 052

and construction units.  The press release stated that it planned to take a charge of $120 million in the fourth quarter, the bulk of which was due to cost overruns at several overseas projects.[71] This is an instance where the Company released negative news, all of which appears to be related to cost overruns on the fixed-price contracts at its engineering and construction units. Lead Plaintiff alleges that information related to cost overruns on overseas projects could have been and should have been disclosed earlier.

> [Halliburton will] record[] approximately $120 million after tax charges in the fourth quarter related to restructuring and charges on projects of the engineering and construction businesses.  Both Brown & Root Energy Services and Kellogg Brown & Root are impacted by the charges and reorganization.
>
> The portion of the charges related to reorganization costs is expected to be approximately $25 million after tax and primarily relate to severance costs associated with a reduction in the number of senior management positions and costs to exit several facilities no longer required, while the remaining charges primarily relate to project specific matters.
>
> During the quarter, several large fixed fee engineering and construction projects, including two projects where Kellogg Brown & Root participates as a member of a construction joint venture, incurred significant additional costs related to projected completion of the projects.  Much of the additional costs relate to labor disturbances in Venezuela and West Africa that have significantly affected productivity on the projects.  While claims will be made for a large portion of the additional costs, management does not believe that all the claims will be recovered.  In addition, negotiations with customers regarding cost increases on seven other projects have not resulted in resolution of certain claims as originally anticipated.[72]

107.    In general, analysts were surprised by the charges related to the cost overruns.

Halliburton said approximately $25 million of the charge will cover costs of the restructuring, which analysts said could foreshadow spinning off the engineering and construction units into a separate company.  But the bulk of the charge, about $95 million, was related to delays and cost overruns.  The company blamed some

---

[71] Aftermarket close, on January 30, 2001, Halliburton released its fourth-quarter 2000 earnings results in which the Company increased the $120 million charge announced December 21 to $193 million (of which, $157 million was attributed to project losses).

[72] *PR Newswire*, "Halliburton Announces New Structure and Engineering and Construction Charges," December 21, 2000, 8:59 am.

App. 053

on labor problems in Venezuela and West Africa and said it will make claims to recoup the money. It is also negotiating, so far unsuccessfully, to recover extra costs on seven other projects.

The Dallas-based company had hinted about the restructuring two months ago, but the cost overruns caught observers off-guard.

"There are nine projects (with overruns). That points more to a problem with the bidding process," said Jim Wicklund, an analyst with Dain Rauscher Wessels who rates Halliburton stock "neutral."

Allen Brooks, an analyst with CIBC World Markets Corp., attributed the overruns to doing business in places such as Nigeria.

"It was a little bit of a surprise, but I don't raise too high a flag about it," said Brooks.[73]

108.    Analysts continued to express concerns on December 22:

Two investment analysts who follow Halliburton expressed some unhappiness about the write-off from cost overruns and higher expenses, which came as a surprise to them.

"I knew there would be charges," said Fred A. Mutalibov with Southwest Securities Inc. in Dallas. "But one of the problems with the big companies like Baker Hughes, Halliburton and Schlumberger within my industry is that what are called one-time or non-recurring charges keep coming again and again."

Jim Wicklund, analyst with Dain Rauscher Wessels in Dallas, said excluding the charges makes it difficult for investors to compare Halliburton's earnings from quarter to quarter. It isn't the first time Halliburton has written off cost overruns on projects, he said.

"This is $95 million in charges where they had significant cost overruns and seven projects that they had cost increases that they haven't been able to pass along. With no offense meant toward Halliburton, that's a lack of good contingency consideration," he said.

Halliburton shares, after trading off as much as $1.31, closed down 75 cents to $37 Thursday on the New York Stock Exchange.

Guy Marcus, Halliburton's vice president of investor relations, declined to identify the projects or customers with which Halliburton has incurred the higher costs.

---

[73] *Associated Press*, "Halliburton to split into two divisions," December 21, 2000, 5:31 pm.

App. 054

Halliburton said "several large fixed-fee" projects, including two where its Kellogg Brown & Root unit is part of a construction joint venture, "incurred significant additional costs" coming up to completion.

It said "labor disturbances" in Venezuela and West Africa "have significantly affected productivity on the projects."

"While claims will be made for a large portion of the additional costs, management does not believe that all the claims will be recovered," Halliburton said.

The company also said that on seven other projects, it has been unable to resolve claims over cost increases as it had first anticipated.[74]

109.    Although the stock fell 2.0% on December 21, this was not a statistically significant return.  On December 22, 2000, Halliburton's stock price declined 2.7%, down from $37.00 to close at $36.00.  The company-specific return that day is negative 3.9%, a statistically significant decline (although the industry was down that day, the overall market was up more than 3.0%).  The price reactions on December 21 and 22 are consistent with the charge for cost overruns at various projects that was a surprise to the market.

110.    Several analysts issued reports on December 21 and 22 in response to the Company's announcement.

A.G. Edwards & Sons:

Although these project adjustments will undoubtedly have a positive impact on [Engineering and Construction] profitability in 2001–2, the extent of the adjustments is much wider than previously thought, in our view, and is evidence that execution problems have also had a negative impact on [Engineering and Construction] operating results.  With the restructuring and project adjustments, we believe that [Halliburton's] [Engineering and Construction] business should be on track to meet its 3% margin goal in 2001 and generate closer to 5% margins in the future.  We point out that the [Engineering and Construction] backlog has

---

[74] *Texas*, "Dallas-Based Oil Services Firm Halliburton to Take $120 Million Charge," December 22, 2000.

App. 055

improved slightly since the end of 3Q2000 and additional activity should materialize as integrated oil companies increase capital spending in 2001.[75]

CIBC:

The struggling [Engineering and Construction] division has been a drag on [Halliburton's] stock performance. Based on our 2001 EPS estimates, [Halliburton] currently trades at a 35% valuation discount to other major oil services companies. Although part of this discrepancy is warranted due to the weak performance of the [Engineering and Construction] business, we believe [Halliburton] can narrow the valuation gap with a successful reorganization. Additionally, the strength of the recovery in the oilfield service industry should also enhance stock price appreciation.[76]

111.    Of the $120 million special charge announced by Defendants, $95 million (or 79%) is related directly to the misrepresentations of cost overruns alleged by Plaintiffs. The remaining $25 million is related to the restructuring necessitated by the severe operational problems arising from the failed Dresser merger and cost overruns for large fixed-price construction contracts, and does not appear to have been a surprise or a concern to analysts as some charge was expected after the Company announced the restructuring plan in its third quarter earnings conference call.

112.    Halliburton's stock price reaction that day is consistent with the charge for cost overruns at various projects being a surprise and a concern to the market. I have reviewed all of the news and analysts reports available to me at this time from December 21 and 22, 2000, and find that the negative news and sentiment is predominately about the operational problems, delays and cost overruns for large construction projects. As there was no other negative news released that day, all of the price decline on December 22 was caused by the partial disclosures related to the operational problems at the engineering and construction units and is related to

[75] AG Edwards & Sons, Inc. "E&C Business Restructuring Formally Announced—4Q2000 EPS ON Track," December 21, 2000.

[76] CIBC, "4Q Outlook In Line With Prior Guidance, Restructuring Charge Announced," December 21, 2000.

App. 056

the Company's booking unapproved claims on fixed-price contracts and lack of benefits from the Dresser merger alleged by Lead Plaintiff.

113.    My conclusions with respect to the causes of significant portions of the company-specific price declines in Halliburton stock on October 5, 1999, January 5, October 25 and December 21-22, 2000, are based on statements made by the Company and by analysts (that are for the most part attributed to or based on communications from the Company).  I reserve the right to revise my conclusions if, based on discovery, additional information would cause me to alter my conclusions.

Partial Disclosures Related to the Company's Exposure to Asbestos Litigation:

114.    Lead Plaintiff alleges that Defendants "intentionally concealed and affirmatively misrepresented the true significance of Halliburton's exposure to asbestos liabilities in Halliburton's financial statements, [SEC] filings, press releases and communications with analysts and investors."[77]  The following events are examples of information disclosed during the Class Period that corrected, in part, these misrepresentations, in that they brought investors' perceptions of the Company's exposure to asbestos liability more in-line with its alleged true exposure at that time.  My analysis has identified at least four instances of partial disclosures related to these allegations; these disclosures caused a total company-specific decline in Halliburton's stock price of as much as 56%, or $16.19.

115.    June 29, 2001: On June 28, after market close, Halliburton made a partial disclosure related to the asbestos claims.  This is an instance where the Company released negative news, all of which concerned the asbestos claims.  It announced that Harbison had requested the Company's financial assistance with asbestos claims Harbison agreed to assume

---

[77] Complaint, pp. 23–24.

in 1992 after it was spun off from Dresser. Dresser had agreed to handle asbestos claims filed

prior to the split, and Harbison agreed to handle asbestos claims filed afterward. Dresser was

named as a defendant in the claims, and the companies were in effect co-insured. The

Company stated that:

> Based on the information it has developed to date and its own experience in
> managing asbestos claims, Halliburton believes that if such a decision is made it
> would require an additional reserve for estimated known claims at June 30, 2001,
> net of insurance recoveries, of approximately $50 to $60 million, after-tax.

Halliburton stated that it had "substantial interest" in resolving the claims, and that this

development exposed the Company, net of insurance recoveries, to a worst case asbestos

liability cost of $60 million.[78]

116.   This disclosure caused a statistically significant decline in Halliburton's share

price. On Friday, June 29, 2001, Halliburton's stock price declined 4.22%, down from $37.17

to close at $35.60. The company-specific return that day is negative 4.6%.

117.   Certain analysts expressed some concern over the Company's potential

exposure to asbestos liability and its impact on Halliburton's stock price, which is reflected in

the decline in the stock price. For example, on June 29, Goldman Sachs removed Halliburton

from its list of top recommendations, citing anticipated pressure on the Company's stock price

due to this asbestos related disclosure:

> Analyst Terry Darling ["Darling"] wrote in a report, "Although [Halliburton's]
> operating performance is improving (second quarter upside surprise likely) and
> it's unlikely that this event substantially increases [Halliburton's] financial risk
> from asbestos liabilities, we believe the incremental uncertainty created by this
> new development is likely to place further pressure on [Halliburton]  shares.[79]

---

[78] *PR Newswire*, "Harbison-Walker Asks Halliburton For Asbestos Claims," 4:45 pm, June 28, 2001.

[79] *Reuters News*, "Research Alert—Goldman cuts Halliburton from recommended list," June 29, 2001, 8:04 am.

CNBC discussed the Goldman Sachs downgrade:

> [Halliburton] was downgraded today by Goldman Sachs. The bottom line from Goldman is that Goldman says the company has issues with w—asbestos [*sic*] liabilities. That's going to be a problem, even though the fundamentals appear to be improving for Halliburton. The firm is taking the stock off of its recommend list. They make it a market performer on the heels of the company, saying it may assume asbestos liabilities of Harbison Walker, which was spun off by Dresser Industries as Indresco back in 1992.[80]

The reasons cited by Darling for removing the Company from its recommendation list are related to Halliburton's misstatements—specifically the misstatements concerning the significance of Halliburton's exposure to asbestos liabilities.

118.    I have reviewed all of the news and analysts reports surrounding June 29, 2001, that are available to me at this time; I do not see other news or information that can explain the company-specific stock price decline on June 29, 2001, other than the asbestos-related disclosure. The stock price decline on June 29 was caused by information that partially corrected investors' erroneous assessments Halliburton's asbestos liability. Lead Plaintiff alleges that this is the type of information that could have been and should have been disclosed earlier.

119.    August 9, 2001: On August 9, 2001, Halliburton filed Form 10-Q with the SEC, in which it increased its accrued net liability for known open asbestos claims to $124 million (from $60 million on June 28, 2001, $30 million on March 31, 2001, and $29 million on Dec. 31, 2000). This is an instance where the Company released negative news, all of which concerned its potential asbestos liability. This disclosure caused a statistically significant decline in Halliburton's share price. That day Halliburton's stock price declined 4.48%, down from $33.50 to close at $32.00. The company-specific return that day is negative

---

[80] *CNBC Squawk Box*, "Newscast: Squawk Box, 9:30 AM; today's business news," June 29, 2001.

App. 059

5.2%, a statistically significant decline. This disclosure is related to Halliburton's

misstatements and omissions—specifically those concerning the significance of Halliburton's

exposure to asbestos liabilities.

120.    The decline in Halliburton's stock price on August 9, 2001, was attributed to the

information released in the 10-Q related to the Company's asbestos liability:

> Halliburton Co, the world's No. 1 oilfield services firm, saw its stock fall 4.5
> percent on Thursday after the company released information showing a sharp
> increase in its asbestos litigation liability.
>
> Dallas-based Halliburton, headed until August 2000 by U.S. Vice President Dick
> Cheney, said it estimated its net liability for open asbestos claims against current
> and former Halliburton subsidiaries at $124 million as of June 30, 2001, up from
> $30 million on March 31, 2001 and $29 million on Dec. 31, 2000.
>
> The information, contained in a 10-Q filing with the Securities and Exchange
> Commission (SEC), hit Halliburton's stock which closed $1.50 lower at $32.
>
> "When you look at the growth in claims and you look at these numbers, we're
> concerned," said Scott Gill, an analyst with Houston-based energy investment
> bank Simmons & Co.
>
> Gill said the information about the asbestos claims–which date back to the 1970s–
> was far more detailed than the company had made in 10-Q statements in previous
> quarters.[81]

121.    I have reviewed all of the news and analysts reports surrounding August 9,

2001, that are available to me at this time; I do not see other news or information that can

explain the company-specific stock price decline on August 9, 2001, other than the asbestos-

related disclosure.  The stock price decline on August 9 was caused by information that

partially corrected investors' prior erroneous assessments Halliburton's asbestos liability.

Lead Plaintiff alleges that this is the type of information that could have been and should have

been disclosed earlier.

---

[81] *Reuters News*, "Halliburton stock down as asbestos liability rises," August 9, 2001, 7:12 pm.

App. 060

122.   October 31–November 1, 2001: After market close, on Tuesday, October 30, 2001, Halliburton announced that on October 26, 2001, a jury in Mississippi found Dresser (through Harbison) liable in two of six asbestos cases for total compensatory damages of $21.3 million ($10.7 million per plaintiff).   The case was against three companies, and the total verdict was $150 million.   This verdict had not yet been affirmed and a judgment had not yet been entered against the Company.   The Company stated that it would "file post trial motions and vigorously appeal if the verdict is not set aside"[82]   This is an instance where the Company released negative news, all of which related to Halliburton's misstatements—specifically the misstatements concerning the significance of Halliburton's exposure to asbestos liabilities. This disclosure caused a statistically significant decline in Halliburton's share price.   On October 31, 2001, Halliburton's stock price declined 6.3%, down from $26.35 to close at $24.69.   The company-specific return that day is negative 4.9%, a statistically significant decline.   The Company's stock continued to decline 2.88% on November 1, 2001, to close at $23.98.   The company-specific decline is 3.7%, a statistically significant decline because the market was up that day.

123.   One analyst was surprised by the size of the award, and expected the news to have a negative impact on the Company's stock price:

> Six plaintiffs were each awarded $25 million and Dresser (through the Harbison-Walker (H-W) subsidiary) was found liable in two of the six cases for total compensatory damages of $21.25 million ($10.675 million per plaintiff). Potential 4Q2001E impact is small: $5mil or $3mil tax effected = less than $0.01/share hit.  If appeal is unsuccessful, reserves could move up sharply.

> This jury award sets new precedents; the size of award is enormous ....

> Size of jury award was unexpected and is likely to have a negative impact on stock price tomorrow.  We expect a vigorous defense by [Halliburton's] and

---

[82] *PR Newswire*, "Halliburton Disputes Asbestos Claims," October 30, 2001, 8:05 pm.

App. 061

remain optimistic that the asbestos liability will remain under control. Given the significant discount relative to its peer group, we believe that [Halliburton's] current stock price adequately discounts potential asbestos liability risk.[83]

124.    I have reviewed all of the news and analysts reports surrounding the October 30 disclosure that are available to me at this time; I do not see other news or information that can explain the company-specific stock price decline on October 31 and November 1, 2001, other than the Company's asbestos-related disclosure on October 30. The stock price declines on October 31 and November 1, 2001 were caused by information that partially corrected investors' erroneous assessments Halliburton's asbestos liability. Lead Plaintiff alleges that this is the type of information that could have been and should have been disclosed earlier.

125.    December 4–7, 2001: During the period December 4 through December 7, 2001, Halliburton disclosed recent adverse asbestos jury verdicts in Form 8-K SEC filings and there was substantial discussion in the news and by analysts related to Halliburton's potential asbestos exposure. This is an instance where the Company released several pieces of negative news, all of which were concerning the asbestos claims. These disclosures caused statistically significant declines in Halliburton's share price.

126.    On Tuesday, December 4, the Company filed Form 8-K with the SEC, in which it disclosed that a Texas District Court had entered a judgment against Dresser on a $65 million jury verdict rendered in September 2001.[84] In the same filing, the Company disclosed that the same district court also entered three additional judgments against Dresser in favor of 100 other asbestos plaintiffs in the aggregate amount of $35.7 million related to an alleged breach of a purported settlement agreement. The Company stated that it intended to appeal the three

---

[83] A.G. Edwards, "Asbestos Case in Small Mississippi Town Yields $150 Million Jury Award Against HAL, MMM and Others—Vigorous Appeal Expected," October 31, 2001.

[84] This verdict was known to the public before December 4. For example, an analyst for Salomon Smith Barney referred to this verdict in his November 9, 2001 report.

App. 062

judgments "on the grounds that it wasn't a party to the settlement agreements and that it didn't

authorize anyone to settle on its behalf. The company said it believes its appeal will be

successful."[85]

127.    On December 3, 2001, Halliburton's stock price closed at $22.06. On

December 4, Halliburton's stock price declined 0.73%. This is a statistically significant

negative return because both the market and the industry were up that day. On December 5,

Halliburton's stock price increased 0.46%, which also is a statistically significant negative

return because both the market and the industry were up that day. On December 6, the stock

declined 5.23%. This is not a statistically significant return because both the market and the

industry were down that day. Halliburton closed at $20.85 on December 6.

128.    On the morning of December 7, 2001, the Company filed Form 8-K with the

SEC disclosing that on December 5 a Maryland jury had awarded a $30 million verdict against

Dresser in favor of five plaintiffs in an asbestos litigation. The Company stated that it intended

to "aggressively" appeal the verdict:

> The company said it believes the trial court committed numerous errors and that
> the evidence didn't support the verdict, according to the filing. The company
> intends to challenge the verdicts by post trial motion and, if those motions aren't
> successful, to pursue an appeal "aggressively."[86]

129.    Several analysts issued reports that day in response to the Company's SEC

filing. Analyst Geoff Kieburtz with Salomon Smith Barney downgraded his rating for

Halliburton (to 3H from 1M ) and dropped his price target to $20 from $36 citing mounting

asbestos liabilities:

---

[85] *Dow Jones Corporate Filings Alert*, "Texas Court Enters $65M Verdict Against Halliburton,"
December 4, 2001, 8:45 am.

[86] *Dow Jones Corporate Filings Alert*, "Jury Returns $30M Verdict against Halliburton
Subsidiary," 8:17 am.

App. 063

This verdict comes on the heels of a $21 million Mississippi jury verdict, a $65 million judgement in Orange, Texas, and an additional $36 million, representing a settlement previously negotiated by Harbison-Walker. All of these cases pertain to Harbison-Walker, a former subsidiary. The company has indicated that in all cases that it believes the trial courts have committed numerous errors, and that it expects to prevail on appeal. While the stock heavily discounts Halliburton's asbestos exposure, the specter of lawsuits spiraling out of control is likely to adversely impact the stock for the foreseeable future, and thus we cannot recommend it at this time.[87]

130.   Analyst Sen with Jefferies & Co. put his rating for Halliburton under review citing uncertainty regarding the asbestos litigations and near-term earnings risk:

We have remained cautious on Halliburton for two main reasons: 1) uncertainty surrounding ongoing asbestos litigation, and 2) near-term earnings risk. ... These [asbestos related disclosures] are surprising developments following management's rather positive asbestos update during its 3Q01 conference call on October 23. During the conference call management had provided further assurances that current reserves are adequate to cover projected asbestos liabilities. We now believe that [Halliburton's] asbestos-related net liabilities could be significantly higher than currently estimated (estimated at $125 million by the company). We continue to remain cautious on the stock. Our rating is under review (with a negative bias) pending further update from management on asbestos.[88]

131.   UBS Warburg analyst, James Stone, downgraded his rating for Halliburton to "Hold" from "Strong Buy" and reduced his 12-month target price to $24 from $38:

While we do not anticipate that every claim filed against Halliburton will end up in court, in fact the vast majority of claims should continue to be settled at or near the company's historical settlement rates. Nevertheless, if only 1% of cases resulted in jury verdicts of a similar magnitude and the awards were upheld at the appellate level, the future liability would be significantly greater than our previous expectations.[89]

132.   On December 7, 2001, Halliburton's stock price declined 42.4%, down from $20.85 to close at $12.00. The company-specific return that day is negative 42.7%, a

---

[87] Salomon Smith Barney, "HAL: Downgrading on Mounting Asbestos Liabilities," December 7, 2001.

[88] Jefferies, "Halliburton: Update On Asbestos Litigation; Stay Cautious," December 7, 2001.

[89] UBS Warburg, "Halliburton: Downgraded to Hold from Strong Buy," December 7, 2001.

App. 064

statistically significant decline. Trading volume was almost 77 million shares that day, more than 22 times the average daily trading volume for Halliburton stock during the Class Period. Several news articles attributed the decline in Halliburton's stock price on December 7 to the recent asbestos disclosures.[90] I have reviewed all of the news and analysts reports surrounding December 4-7, 2001, that are available to me at this time; I do not see other news or information that can explain the company-specific stock price declines during December 4-7, 2001, other than the asbestos-related disclosures. The cause of the large decline in Halliburton's stock price on December 7 was directly related to the disclosures regarding its asbestos exposure and subsequent market assessments at to the possible financial consequences to the Company of that asbestos exposure. Lead Plaintiff alleges that this is the type of information that could have been and should have been disclosed earlier.

### B.    Summary of the Decline in Halliburton's Stock Price during the Class Period

133.    The total decline in Halliburton's stock price was 72.0% from the start of the Class Period through December 7, 2001: from June 3, 1999, (the closing price was $42.88) to December 7, 2001 (the closing price was $12.00). (See Exhibit 14.) As can be seen in Exhibit 14, during the same period, Halliburton's industry rose 14.2% (from $10.50 to $12.00) and the market fell 6.2% (from $12.80 to $12.00). (In Exhibit 14, the market and industry indices are indexed to $12.00 on December 7, 2001.[91]) Thus, the full decline in Halliburton's stock price during the Class Period cannot be attributed to the decline in the market or to the increase in the industry. Moreover, Lead Plaintiff does not allege that Halliburton's stock price should not

---

[90] See, e.g., The Wall Street Journal, "Halliburton Stock Falls Nearly 43% After Recent Asbestos Verdicts," December 10, 2001.

[91] The value of Halliburton stock was $12.00 after at least several partial disclosures. It would be misleading to use Halliburton's stock price at the start of the Class Period as the point at which to anchor the market and industry indices because Lead Plaintiff alleges that if the stock price would have been at its true value, but for the alleged fraud, it would have been much lower.

App. 065

have declined; Lead Plaintiff contends that Halliburton's stock price would have declined earlier had Halliburton's financial results been reported correctly and accurately and Defendants had correctly characterized Halliburton's potential asbestos liabilities.

134.   My analysis shows that the partial disclosures related to the accounting and asbestos claims made by Halliburton during the Class Period caused the price of Halliburton to decline. Specifically, the partial disclosures related to its undisclosed losses from large fixed-price construction contracts and unrealized benefits from the acquisition of Dresser, caused a decline in Halliburton's stock price on October 5, 1999, January 5, 2000, October 25, 2000 and December 22, 2000. The partial disclosures related to Halliburton's asbestos liability caused a decline in Halliburton's stock price on June 29, 2001, August 9, 2001, October 31, 2001, November 1, 2001, December 4, 5 and 7, 2001. If Halliburton had timely reported its operational problems and the full extent of its exposure to asbestos liability, the decline in the value of Halliburton stock that occurred during the Class Period would have occurred earlier when Lead Plaintiff alleges that Halliburton should have reported its operational problems and the full extent of its exposure to asbestos liability.

App. 066

Jane D. Nettesheim

**Appendix: Regression Analysis and Event Study**

1.     I used regression analysis to determine the dates on which Halliburton's daily stock price returns are significantly different from the returns which would have been expected based on the returns on a market index and on an industry index of companies comparable to or competitors of Halliburton, and on the correlation of Halliburton's returns with market and industry returns.[1]

2.     Regression analysis is a statistical tool commonly used by economists to estimate the relationships between two or more variables. In this case, the regression analysis is used to measure the relationship between the Halliburton stock returns and (1) changes in market-wide factors that would be expected to impact all stocks and (2) changes in industry-wide factors that would be expected to impact all stocks in a particular industry. By measuring how the stock returns of Halliburton move in relation to an overall market index and an industry index, I can also measure how it responds to news.

3.     A period of time over which to estimate the regression equation, a control period, must be selected. It is important to select a control period that is representative of the Company during the Class Period. It also is important to select a control period with as little impact as possible from the fraud in determining the normalized relationship between a company's stock returns and the returns on a market index and an industry index.[2] In this case, I used a control period from October 1, 1998 through September 30, 1999. This is a one-year period that begins shortly after the Dresser Merger, and overlaps approximately the first four months of the Class Period. The control period is typically a one-year period that occurs prior

---

[1] A daily return is the percentage change in Halliburton's closing share price from its closing share price on the previous trading day.

[2] *See, e.g.,* Cornell, Bradford and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, 37 (June 1990) 883, p. 898.

to the start of the Class Period. However, in this case, the control period must start after the Dresser Merger in order to reflect the stock price of the combined companies. The regression equation from the control period explains the expected variation in the Halliburton stock returns based on changes in the market and industry. The explained variation is measured by the square of the correlation coefficient, or $r^2$,[3] and the regression equation is statistically significant, as measured by the F-statistic.[4] The regression analysis and regression equation are provided in Exhibit 15.

     4.     The market index is a market capitalization weighted composite of all stocks traded on the NYSE, American Stock Exchange ("Amex"), and NASDAQ (the NYSE/Amex/NASDAQ composite index, or "NAN"). This broad-based market index is commonly used by economists as a representation of the market and the data are provided by CRSP.[5]

     5.     Many companies were considered for use in an industry index. Companies considered for the industry index include those that are referred to in analysts' reports as competitors or comparables to Halliburton, and constituents in certain Halliburton industry

---

[3] The correlation coefficient, r, is a dimensionless index that ranges from -1.0 to 1.0 inclusive and reflects the extent of a linear relationship between two data sets. The r-squared value can be interpreted as the proportion of the variance in the dependent variable attributable to the variance in the independent variables and ranges from 0 to 1.0. In this case, the dependent variable is Halliburton stock returns and independent variables are market index returns and industry index residual returns. The r-squared value measures the percentage of the total variance in Halliburton's stock return that is explained by the market and industry index returns. The $r^2$ is 77% for this regression; in these types of regressions, the usual range is from 0.10 to 0.50.

[4] The F-statistic is the result of a statistical test to determine whether a significant relationship exists between the dependent variable and the set of independent variables. Here the F-statistic is 415 and is significant at greater than the 99% level of confidence, *i.e.*, there is a greater than 99% probability that there is a statistically significant relationship between Halliburton stock returns and returns on the market and industry indices.

[5] CRSP is the Center for Research in Securities Prices at the Graduate School of Business, University of Chicago.

indices.[6,7]  A list of companies considered for, and those included in, the industry index is provided in Exhibit 16.

6.       First, the daily stock returns for each company considered for the industry index were regressed on the market index returns during the control period, October 1, 1998 to September 30, 1999.  The residual returns[8] from each of these regression equations were calculated.  Halliburton stock's daily returns then were regressed as a dependent variable against the residual returns from each of these regressions as the independent variable, to determine whether they were significantly correlated (i.e., to determine whether after excluding market effects each company's daily residual returns helped to explain the daily returns on Halliburton stock).  Those companies whose daily residual returns are significantly and positively correlated with Halliburton stock's daily returns are included in the index.[9]

---

[6] A company was considered for the industry index if it was listed in at least four of the following indices: Bloomberg Oil & Gas Services Index; Bloomberg United States Oil & Gas Services Index; FactSet's Index of Oil Service and Equipment Companies; Morgan Stanley Oil Services Index; Oil Service HOLDRS Index; Philadelphia Oil Service Sector Index; S&P 150 Super Composite Oil & Gas Equipment & Services Index; Standard and Poor's Supercomposite Energy Equipment & Services Index.  A company was considered for the industry index if it was included in an analyst report as comparable to or a competitor to Halliburton.

[7] Halliburton did not list specific competitors in its SEC filings: "We conduct business worldwide in over 100 countries.  Since the markets for our services and products are vast and cross numerous geographic lines, a meaningful estimate of the number of competitors cannot be made." (Halliburton's SEC Form 10-K for 2001).

[8] The residual return is the difference between the actual return on each day and the day's expected return calculated from a regression equation and is a measure of the portion of each daily return not explained by changes in the market index.

[9] Statistical significance is measured by the t-statistic of the of the regression coefficient of the residual returns of the competitor or comparable company in the regression equation.  If the t-statistic is greater than 1.98, there is a 95% probability that the regression coefficient is not equal to zero, i.e., it is not a spurious result, and that Halliburton stock returns are correlated with the residual returns of the competitor or comparable company.  The 95% level of confidence is a measure frequently employed by economists to determine statistical significance.

7.      The industry index is formed from the returns of each of the companies whose residual returns are statistically correlated with Halliburton stock returns.  The individual companies weighting in the industry index are according to their market capitalization.  The industry index is regressed on the market index and the residual returns of the industry index are used in the final regression analysis.

8.      Finally, daily Halliburton stock returns are regressed on daily market index returns and daily residual industry index returns for the control period.  Halliburton stock's daily returns are statistically significantly correlated with the daily returns of both the market and industry indices, as indicated by the t-statistics for each index in Exhibit 15.  The result of this regression is the regression equation that is used to estimate expected Halliburton stock returns; the results of the regression analysis and the regression equation appear in Exhibit 15.

9.      Expected Halliburton stock returns are those changes in Halliburton stock prices due to market and industry factors, *i.e.*, stock prices can and do change when new information or valuation assessments can potentially change the values of all stocks in an economy (market effects) or in a particular industry (industry effects).  On each day of the Class Period, the expected returns for Halliburton stock are calculated from the regression equation.  The formula demonstrating how expected returns are calculated is shown on Exhibit 17.  On each day of the Class Period, the difference between the actual Halliburton stock return and its expected return is a measure of the change in the stock price due to company-specific events.[10]

---

[10] The measure of significance is the z-statistic and is equal to: (actual return – expected return) / standard error.  The standard error of the prediction measures the relative volatility of Halliburton stock returns compared to the predicted returns on Halliburton stock.  The larger the standard error, the greater the residual return must be in order to be considered statistically different from its predicted return.  If the z-statistic is greater than or equal to 1.96 or less than or equal to -1.96, the difference between the two returns is significantly difference from zero at the

Company-specific events include any news, analyst coverage, oral commentary, or other information that changes market participants' perceptions about the value of a company.

  10. An event study is used to disentangle the effects of company-specific information from market and industry information—in other words, to determine whether news affecting Halliburton promptly caused a measurable share price reaction after accounting for general market and industry effects.  An event study as applied to litigation has been described as:

> The execution of an event study is quite simple.  It involves the identification of an event that causes investors to change their expectations about the value of a firm.  The investigator compares a stock price movement contemporaneous with the event to the expected stock price movement if the event had not taken place.  There are three basic steps in conduction an events study: (i) define the event window; (ii) calculate abnormal stock price performance around the event; and (iii) test for statistical significance of the abnormal stock price performance. ...
>
> For those events that are subject to leakage, defining the beginning of the event window can be problematic. ...  Ideally, the first day of the event window corresponding to a[n event] would be the date on which investors began trading on news about the upcoming [event], regardless of whether the news was based on rumors, inside information, a Schedule 13D filing, or a public announcement [about the event].  In practice, this date is difficult to define and some degree of judgment is required generally based on price and volume movements prior to the [event] announcement.
>
> ... [I]n many securities fraud cases the relevant information is revealed slowly over time, while during the same period investors receive other, sometimes unrelated, information about the firm(s) in question.  In the latter case, it is relatively difficult to choose an appropriate window.  The main advice is to carefully identify the exact dates during which the information is in question reached the market, and then restrict the window to a short period, if possible, generally two or three days around each release of new information. ...
>
> In general, a test of significance aims to answer the question of whether an observed difference is real or simply occurred by chance.

---

95% level of confidence, *i.e.*, there is a 95% probability that the difference between the actual return and expected return is not equal to zero.

... An often used convention is the five percent rule—[z-statistics] greater than or equal to 1.96 standard deviations from the mean value are considered significantly different from the typical value because there is only a five percent chance that a randomly selected value will be 1.96 or more standard deviations from the true mean. ... The decision rule may be more stringent. For example, ... a one percent likelihood ... if the z-statistic is greater than or equal to 2.58 ... A third commonly used decision rule is ten percent ... a randomly selected value will lie 1.65 standard deviation or more from the mean value. Generally, researchers use a decision rule based on one percent, five percent, or ten percent significance levels.

... the finding that the associated stock return is large enough to be statistically significant implies the information is material.[11]

11.    The event study is provided as Exhibit 18. Exhibit 18 shows each day during the Class Period with the day's closing stock price, volume, stock return, titles of news articles,[12] indication of SEC filings, and titles of analyst reports. Based on the event study, I identified a total of 31 days with statistically significant stock price returns during the Class Period—seven with statistically significant positive returns and 24 days with statistically significant negative returns. A discussion of the news and analysis from these dates follows.

12.    June 18, 1999: On Friday, June 18, 1999, Halliburton's stock price declined 3.7% to close at $45.88. The company-specific decline is 4.1%, a statistically significant decline.[13] There was no company-specific news on that day to explain the movement of the stock. However, on the following trading day, Monday, June 21, there was news that oil inventories were high and that this could put pressure on oil prices and, therefore, on values of oil companies and oil services companies.

---

[11] Mitchell, Mark L. and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, 49, 545.

[12] Headlines were obtained from www.factiva.com. The entire articles are publicly available and are not included in Exhibit 18 in order to reduce the length of Exhibit 18. This Exhibit includes only those articles where "Halliburton" is mentioned in the title or lead paragraph.

[13] The company-specific return is the stock return net of the expected return based on market index and industry index returns.

13.    On Monday, June 21, Halliburton's stock price continued to decline another

4.5% (the company-specific decline is not a significant decline because the industry was down

that day).  Monday's decline in the stock prices of oil companies and oil services companies

was attributed to "the perception that recent price gains were at odds with current supply

fundamentals:"

> Oil shares slipped as oil prices fell and as investors worried over second-quarter
> profits after a Wall Street analyst cut second-quarter earnings estimates for Exxon
> Corp. and Chevron Corp. ...  Last week, the American Petroleum Institute (API)
> reported a 4.4-million-barrel increase in U.S. crude stocks, which pushed
> inventories to a two-month high of 337.3 million barrels.

> One Midwestern oil trader said the trading community thinks there is still too
> much oil around to justify the current high prices.

> Oil prices peaked at $19.05 on May 5 and then fell as low as $16.21 on June 1.
> Crude oil has since climbed back up, but last week, it started slipping down again
> after the most recent weekly buildup in crude stocks and, as refiners, plagued by
> low margins, adopted economic cuts in production runs.

> The shares of oil companies followed oil future contract prices lower, especially
> after ABN AMRO Inc. analyst Eugene Nowak said he cut second-quarter
> earnings estimates for Exxon and Chevron, due to poor refining conditions.

> Oil-service stocks that lost ground Monday included Halliburton Co., down
> $2.0625 to $43.8125; Kerr McGee Corp., down $1.50 to $49.9375, and
> Schlumberger Ltd., down $1.4375 to $63.[14]

Halliburton stock price declines on June 18 and 21, 1999 are consistent with reported

concerns related to declines in oil prices.

14.    October 5, 1999:  After market close, on Monday, October 4, 1999, Halliburton

announced that Dresser had elected to sell its interests in two joint ventures.[15]  The Company

said it would receive approximately $1.1 billion in cash in the deal.  The Company also warned

---

[14] *Reuters News*, "Oil prices retreat, dragging share prices down," June 21, 1999, 6:36 pm.
(Times listed herein are Eastern Time.)

[15] Halliburton held an invitation-only conference call with analysts. *Dow Jones Business News*,
"Halliburton Sells Stakes In Joint Ventures For $1.1 Billion," October 4, 1999, 7:43 pm.

that it expected its 1999 third-quarter earnings to be in the range of 11 to 13 cents per diluted

share.  The previous average analyst estimates was 19 cents per share.  The Company

attributed the reduction, in large part, to the lower than expected profits of the joint ventures

and many of the other business units of the Dresser Equipment Group.[16]

> [Halliburton] shares could slip in Tuesday morning trading due to its earnings
> warning.  The oil driller said that its Dresser Equipment Group business segment
> and its Engineering and Construction business segment are warning of lower
> profits.  As a result, Halliburton expects a third quarter profit between 11 and 13
> cents a share, while analysts currently expect a profit of 19 cents a share.
> Halliburton also announced that its subsidiary Dresser Industries will sell its
> interests in two joint ventures to Igersoll-Rand [sic] Co. for a total of $1.1 billion.
> The sales will result in a one-time fourth-quarter gain of 84 cents a share.  Shares
> closed down 2 1/16 to 39 3/4 ahead of the news.[17]

15.     On October 5, 1999, Halliburton's stock price dropped 13.2% to $34.50.  The

company-specific return is -9.0%, a statistically significant negative return.  News commentary

and analysts attributed the decline in Halliburton's stock price that day to the reduction in the

Company's near-term expected earnings.[18]

> Shares of Halliburton Co. plunged 13.2 percent Tuesday after the company said
> its Dresser Industries unit will sell its stake in two joint ventures to Ingersoll-Rand
> for $1.1 billion, after poor performance by the businesses hurt third quarter
> results.
>
> Dresser Industries decided to sell the interests amid the Dresser Equipment Group
> segment's poor current and projected financial performance at D-R and at IDP. D-
> R is expected to report an operating loss in the third-quarter while the entire
> business segment forecasts weaker operating results, compared to previous
> predictions, for the third and fourth quarters.

---

[16] *Reuters News*, "Halliburton to Exit Two Ventures, Sees Lower Q3 EPS," October 4, 1999,
5:23 pm.; Halliburton SEC Form 8-K filed October 4, 1999.

[17] *CBS MarketWatch.com*, "Earnings Advisories," October 4, 1999, 6:11 pm.

[18] *See, e.g.*, Dain Rauscher Wessels, "Halliburton Selling Joint-Venture Interests; Expects To
Miss Previous Third-Quarter Guidance," October 5, 1999; *Dow Jones Business News*, "Earnings
Warning Pressures Shares Of Oil-Services Firm Halliburton," October 5, 1999, 11:26 am.

Analysts appear to agree that Halliburton's sale of the poor-performing joint ventures was a good move and that the earnings shortfall will be temporary.

In a research note, analyst James Stone of Schroders said Halliburton's move is "a better-than-expected outcome" for the company and even though "it will negatively affect earnings in the fourth quarter and for at least part of 2000, it is a much better scenario than having bought out Ingersoll-Rand."

Stone reduced his third-quarter earnings-per-share estimate to 12 cents from 21 cents, but noted that the sale's impact on the company is short-term and will ultimately be to Halliburton's advantage.

Additionally, Arvind Sanger, analyst at Donaldson, Lufkin & Jenrette downgraded his third-quarter estimate to 12 cents a share from 18 cents, fourth-quarter earnings-per-share estimate to 18 cents from 28 cents. However, in his research note, he maintained a "buy" rating on the company's stock, viewing the sales as "a good strategic move."[19]

Analysts lowered their forecasts after the Company's earnings warning. For example:

<u>Deutsche Banc Alex. Brown</u>:

We view the recent announcement by Halliburton that the company will sell its interests in [Dresser-Rand and Ingersoll-Dresser Pumps] as a strategic positive given that oil services will account for an increasing proportion of Halliburton's future earnings. We estimate that the sales of the interests to Ingersoll Rand will be dilutive to Halliburton's estimated 2000 earnings given that projected net cash proceeds of about $630 million will likely be used near term to pay-down the company's short-term debt.

In light of the company's 3Q99 earnings pre-announcement on October 4, we are reducing our 1999 EPS estimate from $0.69 to $0.59 to primarily reflect likely lower Energy Service and Dresser Equipment Group earnings. Of the $98 million (or 15%) reduction in Halliburton's estimated 1999 operating income, about $34 million (or 35%) was attributable to lower Energy Services income (due to lower non-North American rig activities) and $62 million (or 63%) was due to lower estimated Energy Equipment earnings (due to much lower results at D-R and IDP).[20]

<u>CIBC</u>:

We have revised our estimates for 3Q and 4Q99 to $0.12 and $0.18 from $0.18 and $0.25, respectively. We are preliminarily raising our 2000 and 2001 estimates to $1.56

---

[19] *CBS MarketWatch.com*, "Halliburton to sell interests in two joint ventures; issues third-quarter earnings warning," October 5, 1999, 8:06 pm.

[20] Deutsche Banc Alex. Brown, October 5, 1999.

and $2.15 from $1.49 and $2.08, respectively.  We reiterate our Buy rating and 12- to 18-month price target of $56.

The sale of the joint-venture interest comes as a major surprise to Wall Street, which assumed [Halliburton] wanted to own the compressor and pump businesses. ...Reducing financial leverage and creating potentially accretive earnings transactions made the sale decision mandatory, from the point of view of shareholder value creation.

The company's announcement of weakness across virtually every business line in 3Q is not surprising, given the slower than anticipated oilfield industry recovery. [Halliburton] is merely the latest company to confess to this situation.

We believe a significant disconnect exists between oilfield service stock prices and improving industry fundamentals. ...[21]

16.     October 15, 1999: On Friday, October 15, 1999, Halliburton's stock price was down 5.78% to close at $34.63.  The company-specific return was -3.6%, a statistically significant decline.  The stock price continued to decline another 2.17% on Monday, October 18 (this is not a statistically significant decline).  There was no company-specific news on that day to explain the movement of the stock.  On October 18, Schlumberger Ltd., which at that time was world's second biggest oilfield services company (second by revenues to Halliburton), reported third quarter earnings which fell 60 percent compared with the prior year but rose four percent from the previous quarter "as firm oil and gas prices fuelled a modest industry recovery."[22]  While Schulmberger's stock rose that day, news commentators noted that "Most other stocks in the same sector closed lower, with the OSX oilfield services index down down [sic] 2.43 points at 68.17."[23]

---

[21] CIBC World Markets, October 5, 1999.

[22] *Reuters News*, "Schlumberger says Q3 earns fall but worst is over," October 18, 1999, 1:27 pm.

[23] *Reuters News*, "FOCUS—Schlumberger says earns fall but worst over," October 18, 1999, 5:12 pm.

17.   <u>October 27, 1999</u>: On October 27, 1999, Halliburton's stock price declined

3.4%; the company-specific return was -3.5%, a statistically significant decline.  On that day,

an analyst at Brown Brothers Harriman lowered her estimates for fourth quarter 1999 and for

the year 2000.

> Following the company's third quarter earnings announcement last week, we are
> making the following adjustments to our earnings estimates: For 1999, we are
> increasing our full-year estimate by a penny to $0.66 from $0.65 to reflect the
> $0.02 better-than-expected third quarter results ($0.13 compared to our $0.11
> estimate), offset by a $0.01 reduction to our fourth quarter estimate (to $0.16 from
> $0.17).  For 2000, we are reducing our 2000 EPS estimate to $1.10 from $1.25 to
> reflect lower earnings contributions from the company's Dresser Equipment
> Group and, to a lesser extent, lower projections for the Energy Services group.
> For 2001, we are lowering our forecast modestly to $1.75 from $1.80, reflecting
> lower earnings at the Dresser Equipment Group.  The estimate reductions in the
> Dresser Equipment Group reflect Halliburton's planned sale of its interests in its
> two joint ventures (51%-owned Dresser Rand and 49%-owned Ingersoll Dresser
> Pump); we now forecast operating income of $136 million versus $236 million
> previously.  The estimate reduction in the Energy Services area reflects less
> aggressive margin assumptions in 2000 (7.6% versus 8.8% previously).  In
> comparison, consensus estimates currently are at $0.16 for fourth-quarter 1999;
> $1.19 for 2000 and $1.78 for 2001.  Despite our estimate reductions, we remain
> enthusiastic about the recovery and Halliburton's earnings prospects.
> Consequently, we are reiterating our Buy/Buy ratings on the shares.[24]

18.   The small but significant price decline on October 27, 1999 is consistent with

the analyst's reduction in estimates while maintaining her Buy ratings.

19.   <u>January 5, 2000</u>: On Wednesday, January 5, 2000, Merrill Lynch analyst

Simpson cut his estimates of Halliburton's earnings for 2000 and 2001, and downgraded the

Company's intermediate-term rating on the stock to "Accumulate" from "Buy," while retaining

the long-term buy rating.  Simpson attributed the cut to "reduced expectations for offshore

construction results, a reduced growth estimate for oilfield spending outside North America

---

[24] Brown Brothers Harriman & Co., "HAL: Reducing Estimates; Maintaining Buy," October 27,
1999.

and 'less powerful synergies from the Dresser merger than he had envisioned.'"[25] Analyst Carol Lau with Brown Brothers Harriman & Co. also reduced her fourth-quarter 1999 and 2000 EPS estimates following a conversation with the company that morning.[26] On January 5, 2000, Halliburton's stock price dropped 4.38% to $36.81. The company-specific return was -4.3% that day, a statistically significant negative return.

20. <u>January 10, 2000</u>: On Monday, January 10, 2000, an analyst at A.G. Edwards reduced his earnings estimates for 2000.[27] Halliburton's stock price was down 4.0% to close at $39.06. The company-specific decline that day is -3.9%, which is a statistically significant decline.

> We believe the sequential improvement that Halliburton has experienced in its ES segment in late 1999 has positive implications for oilfield service activity levels in 2000. We believe that the industry is turning the corner and North America will continue to drive near-term quarterly earnings growth. In the second half of 2000, we expect Halliburton's international ES business and [Engineering and Construction] businesses to add fuel to the recovery. Although major oil companies are increasing upstream budgets, the underlying commodity price assumptions appear very conservative and the year could get off to a slow start. If commodity prices are favorable, which we expect, a positive surprise in the trend in capital spending is likely. Although we expect a pickup in international markets in 2000, it will be heavily weighted toward 2H2000. As a result, we are lowering our 2000 EPS to $1.00 from $1.05.[28]

---

[25] *Reuters News*, "Research Alert—Halliburton Estimates Cut," January 5, 2000, 9:59 am.

[26] Brown Brothers Harriman & Co., "HAL: Reducing Estimates; Maintaining Buy Ratings," January 5, 2000.

[27] On Friday, January 7, 2000, BJ Services, a major competitor in the pressure pumping business, pre-announced its quarterly earnings, stating earnings would be stronger than expected due to a strong recovery in North American drilling activity. Analysts stated on Monday that they expected that Halliburton would also benefit from the stronger market. On Friday, Halliburton's stock price was up 6.02% (this is not a significant increase because both the market and the industry were up that day).

[28] A.G. Edwards & Sons, Inc., "North America Continues to Lead—Positive BJS EPS Pre-Announcement," January 10, 2000; SunTrust Robinson Humphrey Capital Markets, "Oil Services Industry—BJS Pre-Release & Positive Implications," January 10, 2000.

21.    January 12, 2000:  On Wednesday, January 12, the Houston Chronicle reported that "Oil-field service companies' earnings are also expected to be a mixed bag.  Weatherford International, Smith International, Halliburton and Schlumberger are all projected to earn less in the 1999 fourth quarter than they did the year before."[29]  On January 12, Halliburton's stock price was down 6.79% to close at $37.75.  The company-specific decline that day is -3.6%; this is a statistically significant decline.

22.    On Tuesday, January 11, an analyst with Deutsche Banc Alex. Brown reduced his 2000 and 2001 EPS estimates for Halliburton to $0.94 (from $1.05) and to $2.00 (from $2.15), respectively, "based on a recent conversation with Halliburton management."  The reductions were "entirely due to a likely slower earnings recovery at Brown & Root Energy Services (BRES), Halliburton's offshore construction (marine fabrication/installation and pipelay services), subsea services, pipecoating services, and flexible pipe manufacturing division."[30]

23.    February 10, 2000:  On Thursday, February 10, 2000, Halliburton's stock price was down 0.18% to close at $35.44.  The company-specific decline is -5.1%, a statistically significant decline.  This company-specific decline is driven by the industry and the market, both of which were up that day.[31]  There is no other company-specific information at this time that can explain why Halliburton's stock price was down, if modestly, when the market and industry were up.

---

[29] *Houston Chronicle*, "How energy industry fared / Oil profits reveal mixed results / Major integrated companies best at riding out energy cycles," January 12, 2000.

[30] Deutsche Banc Alex. Brown, "Halliburton—Reducing 2000/01 EPS Estimates," January 11, 2001.

[31] Also that day, ING Barings issued a positive report regarding Halliburton's earnings results which were released on January 27, 2000 (entitled "Strong U.S. Oilfield Boosts Results Above Expectations").

24.  <u>February 25, 2000</u>: On Friday, February 25, 2000, Halliburton's stock price

declined 4.9% to close at $33.69.  The company-specific decline is 3.6%, a statistically

significant decline.  There was speculation regarding an upcoming meeting between the then-

U.S. Energy Secretary and the oil minister for Saudi Arabia:

> Oil stocks performed well in anticipation of Saturday's meeting between Ali al-
> Naimi, the oil minister for Saudi Arabia, the world's biggest oil producer, and
> U.S. Energy Secretary Bill Richardson.  The two leaders will meet to discuss a
> wide range of oil supply issues that recently have sent oil and gasoline prices sky-
> high. ...

> Oil services companies closed down for the day, with Halliburton (NYSE:HAL)
> falling 1 3/4 (-4.94%) to 33 11/16 and Schlumberger (NYSE:SLB) dropping 1
> 7/16 (-2.10) to 67.[32]

Although there was no company-specific information on February 25 to explain the decline

that day in the stock, analysts commented on the recent poor performance in the stock prices of

oil service companies:

> We like oil stocks and oil service stocks, companies like ARCO and Phillips,
> Baker Hughes, Schlumberger and Halliburton.  These stocks haven't moved
> because of nervousness over long-term oil prices.  But it looks like oil will hold
> above $20 a barrel for a good while.[33]

25.  <u>May 2, 2000</u>:  On Tuesday, May 2, 2000, Halliburton's stock price rose 7.06%,

to close at $47.38.  The company-specific return was 3.7%, a statistically significant increase.

News commentators attributed the gain in Halliburton's stock price to OPEC's anticipated

decision to not increase production quotas:

> [Traders] did have some opportunities to play off one piece of encouraging news,
> as crude-oil prices rose on expectations that the Organization of Petroleum
> Exporting Countries won't increase production quotas at its June meeting.  An
> output increase, of course, would have hurt pricing. ...

---

[32] *Business Wire*, "SmartPortfolio.Com Announces Investment Opinion," February 26, 2000,
8:25 am ("Stock prices are reflective of February 25, 2000 at 5:30 PM, EST").

[33] *Austin American-Statesman*, "When less will become more: Looking for value stocks'
rebound," February 26, 2002.

Oil-service stocks also improved in the session.  Halliburton rose 3 1/8 to 47 3/8.
Schlumberger gained 2 9/16 to 77 9/16.  Transocean Sedco Forex moved up 2 to
49 5/16.[34]

26.   May 19, 2000:  On Friday, May, 19, 2000, Halliburton's stock price rose 2.52%

to close at $50.88.  The company-specific return that day is 3.9%, which is a statistically

significant increase because the market was down that day.  There was no company-specific

information on May 19 to explain the increase that day in the stock, although analysts later

commented on the recent increase in the stock prices of oil service companies.  For example,

on the following Monday, May 22, an analyst with Donaldson, Lufkin & Jenrette raised his 12-

month price target for the Company to $57 from $51, and raised his EPS estimate for 2001 "to

reflect the assumption of more accretive acquisitions than [his] prior assumptions and

secondarily to reflect a stronger oilfield recovery than [he] had anticipated."[35]

27.   May 30, 2000:  On Saturday, May 27, the weekly financial newspaper *Barron's*

issued a positive report on Halliburton, stating it expected Halliburton's stock price to recover

over the next 18 months:

> Oilfield stocks are rallying.  The major energy companies will likely reopen their
> wallets soon.  So why do shares of Halliburton, the world's second-largest oil-
> service outfit, lag?  The short answer is that the Dallas-based company gets about
> 70% of its revenues from the international market, where exploration and
> production have yet to take off.  Moreover, a large part of Halliburton's business
> is in engineering and construction activities that traditionally begin to pay off late
> in the oil cycle.  In other words, the very things that are holding the stock back
> now are likely to power it higher over the next 18 months or so.[36]

---

[34] *The Wall Street Journal*, "AT&T's Profit Warning Reverses Gains Seen in Tech, Telecom
Issues," May 3, 2000.

[35] Donaldson, Lufkin & Jenrette, "Raising 2001 Ests. and Target Price Based on Acquisition and
Stronger Oilfield Recovery Assumptions; Lowering Rating to Market Performance on
Valuation," May 22, 2000.

[36] *Dow Jones International News*, "Barron's: Gusher Ahead: Expect Halliburton's Profits—And
Its Share Price—To Continue Rising," May 27, 2000, 2:01 am.

On Tuesday, May 30, 2000,[37] an analyst at Jefferies & Company, Inc. raised its price target for

Halliburton:

> We are maintaining our Accumulate rating on Halliburton Company, however, we
> are raising our price target on Halliburton to $56 per share from $50 per share
> based on recent positive developments at the Company and continuing signs that
> the Company's earnings are poised to turn higher. ... There is no question that
> most of the investment news surrounding Halliburton has been very positive in
> the last six months, however, Halliburton must continue to demonstrate that the
> Company can achieve projected peak earnings potential due to higher drilling, and
> engineering and construction activity, favorable management decision making
> and the favorable reinvestment of free cash flow into new opportunities. Should
> Halliburton meet these criteria, the stock can reach or exceed our new price
> target.[38]

On May 30, 2000, Halliburton's stock price rose 4.7%, to $49.00. The company-specific return

was 3.6% that day, a statistically significant positive return.

      28.    June 8, 2000: On Thursday, June 7, 2000, an analyst with Donaldson, Lufkin &

Jenrette met with the Company. The analyst's report was issued on Friday, June 8, based on

that meeting, in which he lowered his estimate for second-quarter operating earnings for the

Company by a penny to 64 cents:

> Donaldson, Lufkin & Jenrette analyst Arvin Sanger on Friday lowered his second
> quarter operating earnings on oil exploration giant Halliburton by a penny after a
> meeting with the company's management Thursday.
>
>  In a research report, Sanger lowered his estimate to 11 cents to reflect a still-
> sluggish engineering and construction environment, bringing the full-year
> estimate down a penny to 64 cents.
>
>  "We are a little ahead of the Street," said an analyst in the group about the
> adjustment to Halliburton's second quarter earnings.[39]

---

[37] The U.S. stock markets were closed Monday, May 29, 2000, in observance of Memorial Day.

[38] Jefferies & Company. Inc., "Halliburton Company: Raising Price Target To $56," May 30,
2000.

[39] *Reuters*, "Research Alert—DLJ trims Halliburton Q2 operating earns by a pen [*sic*]," June 9,
2001, 9:21 am.

On June 8, 2000, Halliburton's stock price was down 1.84%, to $46.63. The company-specific return was -3.5% that day, a statistically significant negative return because the industry index was up that day.

     29.    October 6, 2000: On October 5, 2000, Owens-Corning, a maker of fiberglass insulation and other building products, filed for bankruptcy protection "after it ran out of options to pay asbestos lawsuit claims that could eventually cost the company $7 billion."[40] The October 9 edition of Barron's discussed Halliburton's asbestos litigation exposure in light of the Owens-Corning situation:

> Halliburton's exposure so far has been slight compared to Owens-Corning and others. The oil-services concern paid out a total of $99 million in claims through the end of 1999, with all but $23 million covered by insurance. In its 10K and latest 10Q filing, Halliburton says Dresser has insurance covering "in whole or in part" its asbestos liability, and that it believes "pending asbestos claims will be resolved without material effect on our financial position or results of operations." This language and the relatively modest claims payments to date suggest the company doesn't have a meaningful problem.
>
> One potential thorn could come from a former division of Halliburton, Highlands insurance, which provided coverage to Brown & Root. Highlands sued Halliburton in April, arguing that Halliburton assumed liability for asbestos claims filed after the Highlands spinoff in 1996. Halliburton has countersued, arguing that the Brown & Root exposure is Highlands' problem. Highlands has $162 million in statutory capital, an amount Halliburton says should be enough to pay remaining asbestos claims. Halliburton had 107,000 open cases at the end of June.
>
> Given Halliburton's market value of $20 billion and its financial strength, even a worst-case asbestos scenario probably wouldn't be significant. But the asbestos issue could get more attention in the months to come at Halliburton and elsewhere.[41]

---

[40] *Associated Press Newswire*, "Owens Corning seeks bankruptcy protection to cope with asbestos claims," October 5, 2000, 9:36 am.

[41] *Barron's*, "Financials, Broadcasters Sideswiped in Latest Tech Wreck," October 9, 2000.

On October 6, 2000, Halliburton's stock price was down 5.0%, to $43.94. The company-specific return was -3.8% that day, a statistically significant negative return.

30.   October 23, 2000: On Monday, October 23, 2000, Halliburton reported that its Brown & Root Services unit was a target of the federal grand jury investigation. On that day, Halliburton's stock price was down 6.5%, to close at $41.19. The company-specific return was -3.5% that day; this is a statistically significant decline.

> Halliburton Company (NYSE: HAL) stated today that one of its business units, Brown & Root Services ("BRS"), is a defendant in civil litigation pending in federal court in Sacramento, California, alleging that it violated certain provisions of the False Claims Act while performing work for the U.S. Army at Ft. Ord in California (the "Qui Tam" litigation). This lawsuit was filed by a former employee in 1997. BRS has denied the allegations and is preparing to defend itself at trial, which is expected to occur in late 2001. Halliburton believes that the outcome of this civil litigation will not have a material adverse impact on it.
>
> Although in 1998 the U.S. Department of Justice declined to join the Qui Tam litigation, it has now advised BRS that BRS is the target of a federal grand jury investigation regarding the contract issues raised in the Qui Tam litigation. In addition, BRS has been served with grand jury subpoenas, which require the production of certain documents relating to the Ft. Ord contract. BRS is cooperating in the investigation and believes that it has acted in accordance with the law and the Ft. Ord contract. At the present, the Department of Justice has not made any specific allegations against BRS.[42]

31.   October 24, 2000: On October 24, 2000, Halliburton's stock price was up 1.06%, to close at $41.63. The company-specific return was 4.2% that day; this is a statistically significant increase because both the market and the industry were down that day. There is no company-specific news on this day.

32.   October 25, 2000: After market close, on October 24, 2000, Halliburton announced that it intended to restructure and shrink its engineering and construction units into

---

[42] *PR Newswire,* "Brown & Root Services to Defend Civil Litigation," October 23, 2000, 2:00 pm.

a single unit.  The changes would "put some major businesses, including construction giant

Kellogg Brown & Root and Brown & Root Services, under one management."  Lesar said that:

> [T]he engineering and construction units have been hurt because customers have been slow to move ahead with major construction projects and that profits have been unsatisfactory.
>
> … Kellogg Brown & Roots profits have been adequate so far because that unit has been working through a backlog of projects.
>
> However, its profit margins will erode as it finishes projects and customers continue to delay decisions on major new construction.
>
> The announcement, made toward the end of Halliburton's discussion of third-quarter earnings, overshadowed the company's sharply improved profits.  The company said it earned $157 million in the three months ended Sept. 30, up 171 percent from the same period in 1999.  The results equaled 35 cents per share diluted on $3.02 billion in revenue.  In third quarter 1999, Halliburton earned $58 million, or 13 cents a share, on revenue of $2.97 billion.[43]

33.    The announcement by the Company on October 24 prompted certain analysts to

cut earnings forecasts.

> Shares of oil-services firm Halliburton Co. slumped Wednesday after the company announced a restructuring of its engineering and construction units.
>
> Company officials said after the close of markets Tuesday that a slowdown in new orders was threatening profits in the units.
>
> ING Barings lowered its rating on the stock from "buy" to "hold," Southwest Securities downgraded from "buy" to "accumulate," and Dain Rauscher Wessels said that because of "too many uncertainties" in the non-oilfield units investors should focus on purely oil-service stocks.
>
> In trading Wednesday morning, Halliburton shares were down $5.13, or more than 12 percent, to $37.06.
>
> The Dallas-based company, which was led until August by Republican vice presidential candidate Dick Cheney, said it plans to restructure and shrink its engineering and construction businesses into a single unit.

---

[43] *Knight Ridder Tribune Business News*, "Dallas-Based Halliburton Co. to Combine Engineering, Construction Units," October 25, 2000.

App. 086

The company made the announcement while releasing its third-quarter results. Halliburton said excluding one-time items, it earned $109 million, or 24 cents per share, a penny better than expected by analysts surveyed by First Call/Thomson Financial. Revenue was $3 billion.

Chairman and chief executive Dave Lesar the company is not satisfied with profits in the engineering and construction business, as customers have delayed major projects.

Lesar said profit margins at Kellogg Brown & Root will shrink as it finishes a backlog of jobs and customers delay decisions on major new construction.[44]

34.    Several analyst reports were released on October 25.

Merrill Lynch analyst Kevin Simpson said he had cut his estimate of Halliburton's 2001 earnings per share to $1.30 from $1.50 but was maintaining an accumulate rating on the stock.

"The engineering and construction side of the business is turning much more slowly than they had expected and than I had expected," he said.

Mark Kellstrom, an analyst with Jefferies & Co., said he thought the market had overreacted by driving down Halliburton's stock so much. He maintained a buy rating for the stock and kept his 2001 earnings per share estimate unchanged at $1.65.

"At this point engineering and construction is not a big driver of the company's earnings," he said.

Kellstrom said continuing recovery at Halliburton's oilfield services business could more than make up for the decline in earnings from engineering and construction.

"The company's long-term earnings power is still intact," he said.[45]

35.    Analyst James K. Wicklund with Dain Rauscher Wessels released a report that

day that stated that Halliburton's third-quarter EPS beat expectations, but "[m]ore

---

[44] *Associated Press Newswires*, "Halliburton stock slides on news of restructuring, slowing projects," October 25, 2000, 12:24 pm.

[45] *Reuters News*, "Update 2—Halliburton stock hit by engineering slowdown," October 25, 2000, 4:26 pm.

interestingly, the company announced a major restructuring of its Engineering and

Construction Group which continues to show disappointing results." He stated:

> We applaud the company's attempt to improve the results of the ECG and believe
> that the ESG is well positioned to benefit from the continued oilfield services
> cyclical recovery with strong market positions in several products/services
> segments. However, we believe there are too many uncertainties regarding the
> recovery in the non-oilfield service businesses. We recommend investor's focus
> on pure-play oilfield service stocks that are more highly leveraged to the
> continued cyclical recovery. We continue to rate the stock Neutral.[46]

The report also states that the "expected increase in international activity is materializing at a

much slower rate than originally anticipated [and i]nvestor concerns of asbestos liabilities may

dampen investor's interest in the stock until the ultimate outcome becomes more clear.

Wicklund reduced his fourth-quarter estimates to "reflect the increasing weakness in the

engineering and construction business and the slower-than-expected increase in international

activity."

36.     Analyst Allen Brooks with CIBC stated in his report that day:

> We are maintaining our Buy rating but reducing our price target to $50 from $56.
> We anticipate much market confusion due to the uncertainty about future
> earnings, the valuation of the stock and what Halliburton may look like in the
> future. ... Our basic conclusion is that the stock price can move higher over the
> next 12 months given the strength of the oilfield service industry recovery,
> especially internationally where Halliburton derives 64% of its business. The
> stock price may go lower first, however.

> The shock in the conference call was management's statement that, given the
> outlook for customer spending in the shallow water marine construction market
> and the downstream [Engineering and Construction] business, it is not sure that
> Halliburton has the critical mass to generate consistent and predictable
> profitability and profit growth from these sectors. Management believes the stock
> is being punished for the lack of this predictability. Therefore, it will look to a
> significant restructuring of these businesses with an eye to achieving this goal
> during 2001. We could envision a substantial shrinking of these operations as
> they are presently constituted. In the end, the company should produce better

---

[46] Dain Rauscher Wessels, "Halliburton Reports: Announces Major Restructuring Initiative,"
October 25, 2000.

returns on capital that should produce an improved valuation. The issue is how long it will take to accomplish this goal and what the nearterm costs are.[47]

37.     Analyst Fratt with A.G. Edwards & Sons, Inc. stated that Halliburton's EPS was ahead of expectations "due to strong North American drilling market," but that the "near-term outlook [was] less robust." Fratt lowered his estimates for the Company to "reflect weaker [Engineering and Construction] business," concluding that the "[r]estructuring is positive and oilfield service recovery continues." Fratt reiterated his "Accumulate/Aggressive" rating for the Company.[48]

38.     Analyst Asit K. Sen with ABN AMRO stated:

Strong performance from the oil field services business ... were essentially offset by weaker results from the Engineering and Construction (E&C) business. ... The company indicated that it is embarking on a strategic restructuring program to improve results from the E&C business that we view positively. ... We are lowering our 2000 EPS estimate to $0.55 (from $0.58) and 2001 estimate to $1.35 (from $1.50).[49]

39.     In a later report that day, Sen of ABN AMRO stated that the Company's shares "were off as much as 18% this morning following management's cautious comments on the outlook of the Engineering and Construction (E&C) business. We view this as an overreaction."[50]

40.     On October 25, 2000, Halliburton's stock price declined 10.96%, to close at $37.06. The company-specific return that day is negative 6.6%, a statistically significant

---

[47] CIBC, "Weak E&C Outlook Prompts Restructuring; Reducing Estimates," October 25, 2000.

[48] A.G. Edwards & Sons, Inc., "North America Drives Positive Earnings Surprise—Lowering Estimates to Reflect Weaker E&C Business," October 25, 2000.

[49] ABN AMRO, "HAL: Lowering 2000 and 2001 Earnings Estimates," October 25, 2000.

[50] ABN AMRO, "HAL: Bruised But Not Broken—Sensitivity Analysis," October 25, 2000.

decline. Trading volume was 25.35 million shares that day, more than 7 times the average daily trading volume for Halliburton stock during the Class Period.[51]

41.    December 18, 2000:  On December 18, 2000, Halliburton's stock price was up 4.03% to close at $38.75.  However, the company-specific return that day is negative 3.76%, a statistically significant decline because the industry was up sharply that day.  There was considerable positive industry news on December 18, 2000, which was reflected in Halliburton's share price, but not to the same extent as industry peers.

42.    Moody's Investors Service issued a press release stating it expected the oil services industry to recover by the end of 2001:

> Improving fundamentals have created a generally stable to positive rating outlook for the oil services industry, according the new Moody's Investors Service annual outlook for the sector.  Moody's also believes consolidation among these companies will continue.
>
> "We expect the overall sector to recover by the end of 2001, based on strong oil and natural gas prices and higher budgeted capital spending by major oil companies, national oil companies, and independent E&P companies," says Moody's vice president and senior credit officer Alexandra Parker, author of the outlook [52]

43.    Also that day, analyst Geoff B. Kieburtz with Salomon Smith Barney issued a positive report on the oilfield equipment and services industry in which he recommended Halliburton's stock for investors seeking exposure to the accelerating international recovery.[53]

> The investment bank's comments contributed to a jump in oilfield service stocks, with the main index for the volatile sector showing a gain of almost 8 percent by early afternoon. ...[54]

---

[51] The average daily trading volume for Halliburton stock during the Class Period was 3.46 million shares.

[52] *Dow Jones Newswire*, "Moody's: Stable To Positive Outlook For Oil Service Indus," December 18, 2000, 11:21 am.

[53] Salomon Smith Barney, "Oilfield Equipment & Services; 19th Annual E&P Spending Survey Forecasts 20.2% Growth in 2001, " December 18, 2000.

Lehman Brothers Holdings Inc. also issued a positive sector report that day.

> The positive outlook from analysts at Lehman Brothers Holdings Inc. and
> Citigroup's Salomon Smith Barney touched off a rally among the stocks of
> oilfield-service and equipment companies, which make their profit from spending
> on exploration-and-drilling projects. ... Sector bellwethers Schlumberger Ltd.
> (SLB) and Halliburton Co. (HAL) also posted gains of $5.06, or 7%, to $77 and
> $1.50, or 4%, to $38.75, respectively. [55]

    44.    December 22, 2000: On Thursday, December 21, 2000, Halliburton pre-

announced fourth-quarter earnings and formally unveiled the restructuring of its engineering

and construction units.   The press release stated that it planned to take a charge of $120

million in the fourth quarter, the bulk of which was due to cost overruns at several overseas

projects.[56]

> [Halliburton will] record[] approximately $120 million after tax charges In the
> fourth quarter related to restructuring and charges on projects of the engineering
> and construction businesses.  Both Brown & Root Energy Services and Kellogg
> Brown & Root are impacted by the charges and reorganization.
>
> The portion of the charges related to reorganization costs is expected to be
> approximately $25 million after tax and primarily relate to severance costs
> associated with a reduction in the number of senior management positions and
> costs to exit several facilities no longer required, while the remaining charges
> primarily relate to project specific matters.
>
> During the quarter, several large fixed fee engineering and construction projects,
> including two projects where Kellogg Brown & Root participates as a member of
> a construction joint venture, incurred significant additional costs related to
> projected completion of the projects.  Much of the additional costs relate to labor
> disturbances in Venezuela and West Africa that have significantly affected
> productivity on the projects.  While claims will be made for a large portion of the
> additional costs, management does not believe that all the claims will be

---

[54] *Reuters News*, "Research Alert—Salomon sees E&P spending growth, "December 18, 2000,
1:03 pm.

[55] *Factiva Energy Digest*, December 19, 2000, 8:59 am.

[56] Aftermarket close, on January 30, 2001, Halliburton released its fourth-quarter 2000 earnings
results in which the Company increased the $120 million charge announced December 21 to
$193 million (of which, $157 million was attributed to project losses).

recovered.  In addition, negotiations with customers regarding cost increases on seven other projects have not resulted in resolution of certain claims as originally anticipated.[57]

45.     In general, analysts were surprised by the charges related to the cost overruns.

Halliburton said approximately $25 million of the charge will cover costs of the restructuring, which analysts said could foreshadow spinning off the engineering and construction units into a separate company.  But the bulk of the charge, about $95 million, was related to delays and cost overruns.  The company blamed some on labor problems in Venezuela and West Africa and said it will make claims to recoup the money.  It is also negotiating, so far unsuccessfully, to recover extra costs on seven other projects.

The Dallas-based company had hinted about the restructuring two months ago, but the cost overruns caught observers off-guard.

"There are nine projects (with overruns).  That points more to a problem with the bidding process," said Jim Wicklund, an analyst with Dain Rauscher Wessels who rates Halliburton stock "neutral."

Allen Brooks, an analyst with CIBC World Markets Corp., attributed the overruns to doing business in places such as Nigeria.

"It was a little bit of a surprise, but I don't raise too high a flag about it," said Brooks.[58]

46.     Analysts continued to express concerns on December 22:

Two investment analysts who follow Halliburton expressed some unhappiness about the write-off from cost overruns and higher expenses, which came as a surprise to them.

"I knew there would be charges," said Fred A. Mutalibov with Southwest Securities Inc. in Dallas. "But one of the problems with the big companies like Baker Hughes, Halliburton and Schlumberger within my industry is that what are called one-time or non-recurring charges keep coming again and again."

Jim Wicklund, analyst with Dain Rauscher Wessels in Dallas, said excluding the charges makes it difficult for investors to compare Halliburton's earnings from quarter to quarter. It isn't the first time Halliburton has written off cost overruns on projects, he said.

---

[57] *PR Newswire*, "Halliburton Announces New Structure and Engineering and Construction Charges," December 21, 2000, 8:59am.

[58] *Associated Press*, "Halliburton to split into two divisions," December 21, 2000, 5:31 pm.

"This is $95 million in charges where they had significant cost overruns and seven projects that they had cost increases that they haven't been able to pass along. With no offense meant toward Halliburton, that's a lack of good contingency consideration," he said.

Halliburton shares, after trading off as much as $1.31, closed down 75 cents to $37 Thursday on the New York Stock Exchange.

Guy Marcus, Halliburton's vice president of investor relations, declined to identify the projects or customers with which Halliburton has incurred the higher costs.

Halliburton said "several large fixed-fee" projects, including two where its Kellogg Brown & Root unit is part of a construction joint venture, "incurred significant additional costs" coming up to completion.

It said "labor disturbances" in Venezuela and West Africa "have significantly affected productivity on the projects."

"While claims will be made for a large portion of the additional costs, management does not believe that all the claims will be recovered," Halliburton said.

The company also said that on seven other projects, it has been unable to resolve claims over cost increases as it had first anticipated.[59]

47.     Although the stock fell 2.0% on December 21, this was not a statistically significant return.  On December 22, 2000, Halliburton's stock price declined 2.7%, to close at $36.00.  The company-specific return that day is negative 3.9%, a statistically significant decline (although the industry was down that day, the overall market was up more than 3.0%). The price reactions on December 21 and 22 are consistent with the charge for cost overruns at various projects that was a surprise to the market.

48.     Several analysts issued reports on December 21 and 22 in response to the Company's announcement.

---

[59] *Texas*, "Dallas-Based Oil Services Firm Halliburton to Take $120 Million Charge," December 22, 2001.

A.G. Edwards & Sons:

Although these project adjustments will undoubtedly have a positive impact on
[Engineering and Construction] profitability in 2001–2, the extent of the
adjustments is much wider than previously thought, in our view, and is evidence
that execution problems have also had a negative impact on [Engineering and
Construction] operating results.  With the restructuring and project adjustments,
we believe that [Halliburton's] [Engineering and Construction] business should be
on track to meet its 3% margin goal in 2001 and generate closer to 5% margins in
the future.  We point out that the [Engineering and Construction] backlog has
improved slightly since the end of 3Q2000 and additional activity should
materialize as integrated oil companies increase capital spending in 2001.[60]

CIBC:

The struggling [Engineering and Construction] division has been a drag on
[Halliburton's] stock performance.  Based on our 2001 EPS estimates,
[Halliburton] currently trades at a 35% valuation discount to other major oil
services companies.  Although part of this discrepancy is warranted due to the
weak performance of the [Engineering and Construction] business, we believe
[Halliburton] can narrow the valuation gap with a successful reorganization.
Additionally, the strength of the recovery in the oilfield service industry should
also enhance stock price appreciation.[61]

    49.    February 12, 2001:  On February 12, Halliburton's stock price rose 0.42%.  The

company-specific return is 4.6%, a statistically significant increase because the industry was

down that day.  Schlumberger stock, a major Halliburton competitor, was down 12% that day

on news of a proposed cash purchase of Sema PLC, a British technology information firm,

which dragged down the overall industry return.[62]

    50.    April 26, 2001:  After market close on April 25, 2001, Halliburton released its

first-quarter 2001 financial results, reporting earnings on the low end of analysts' estimates,

---

[60] AG Edwards & Sons, Inc. "E&C Business Restructuring Formally Announced—4Q2000 EPS
ON Track," December 21, 2000.

[61] CIBC, "4Q Outlook In Line With Prior Guidance, Restructuring Charge Announced,"
December 21, 2000.

[62] *Chicago Tribune*, "Schlumberger Buying Firm to Help Diversify Oil Field Giant to Pay $5.2
Billion for Sema," February 13, 2001.

and stating that the company expected 2001 EPS to be at or above $1.30, which was higher than analysts' consensus forecast of $1.20, "as a recovery in demand for oilfield services gradually spreads beyond North America. Halliburton said its customers stepped up their drilling activity in response to high oil and natural gas prices."[63]

51.     In response to the Company's first quarter earnings results, certain analysts raised their estimates and/or rating for Halliburton. For example, on April 26, 2001, analyst Tom Escott with Robinson Humphrey raised his estimates for Halliburton's EPS and raised his rating to "Outperform" from "Neutral," stating: "After downgrading [Halliburton] to Neutral last August at $53.50, we are upgrading our rating to Outperform based on the improved earnings outlook."[64] Credit Suisse First Boston Corporation ("CSFB") raised its 2001 and 2002 estimates for Halliburton "to reflect company guidance and incorporate stronger revenue and margin growth in the oilfield operations."[65] Prudential Securities raised its investment recommendation on Halliburton to "Strong Buy" from "Accumulate" on increased earnings forecasts.[66]

52.     Some analysts maintained the ratings and estimates for the Company. CIBC maintained its estimates and rating for Halliburton, stating "Business trends and outlook comments by management support our thesis of a recovery of international activity becoming the principal driver of [Halliburton's] earnings in 2H01 and thereafter."[67] UBS Warburg

---

[63] *Reuters News*, "UPDATE 2—Halliburton earnings more than triple," April 25, 2001, 7:33 pm; *Reuters News*, "Halliburton sees 2001 EPS at or above $1.30," April 25, 2001, 5:46 pm.

[64] Robinson-Humphrey, "HAL: Estimates Raised: Rating Boosted to OUTPERFORM," April 26, 2001.

[65] CSFB, "HAL: MWR: Q101 In-Line, Forward Guidance Raised," April 26, 2001.

[66] *Reuters News*, "RESEARCH ALERT-Prudential ups Halliburton," April 26, 2001, 10:13 am.

[67] CIBC World Markets, "Halliburton Co.: 1Q01 EPS In Line; Broadening Recovery Under Way," April 26, 2001.

maintained its ratings for Halliburton, stating: "Although the outlook for [Halliburton's] core business is improving, we still do not find the risk/reward ratio as attractive as that of some of its peers. Our rating remains Hold."[68]

53.    On April 26, Halliburton's stock price rose 9.09%, to close at $42.13. The company-specific return was 3.7%, a statistically significant increase. News commentators attributed the Company's stock price gain to its positive earnings release.[69]

54.    <u>June 29, 2001</u>: On Thursday, June 28, 2001, after market close, Halliburton announced that Harbison had been requesting the Company's financial assistance with asbestos claims Harbison agreed to assume in 1992 after it was spun off from Dresser. Dresser had agreed to handle asbestos claims filed prior to the split, and Harbison agreed to handle asbestos claims filed afterward. Dresser was named as a defendant in the claims, and the companies were in effect co-insured. Halliburton stated that it had "substantial interest" in resolving the claims, and that this development exposed the Company, net of insurance recoveries, to a worst case asbestos liability cost of $60 million.[70] On June 29, 2001, Halliburton's stock price declined 4.22%, to close at $35.60. The company-specific return that day is negative 4.6%, a statistically significant decline.

55.    Certain analysts expressed concern over the Company's potential exposure to asbestos liability, which is reflected in the decline in the stock price. On June 29, Goldman Sachs removed Halliburton from its list of top recommendations, citing anticipated pressure on the Company's stock price due to this asbestos related disclosure:

---

[68] UBS Warburg Research Note, "Halliburton: Below Expectations for 1Q; Guides Higher for 2Q," April 26, 2000.

[69] *Reuters News*, "Oil services shares surge on rosy outlook," April 26, 2001, 2:28 pm.

[70] *Dow Jones News Service*, "Harbison-Walker Asks Halliburton For Asbestos Claims Help," 4:47 pm, June 28, 2001.

Analyst Terry Darling ["Darling"] wrote in a report, "Although [Halliburton's] operating performance is improving (second quarter upside surprise likely) and it's unlikely that this event substantially increases [Halliburton's] financial risk from asbestos liabilities, we believe the incremental uncertainty created by this new development is likely to place further pressure on [Halliburton] shares.[71]

CNBC discussed the Goldman Sachs downgrade:

[Halliburton] was downgraded today by Goldman Sachs. The bottom line from Goldman is that Goldman says the company has issues with w--asbestos [sic] liabilities. That's going to be a problem, even though the fundamentals appear to be improving for Halliburton. The firm is taking the stock off of its recommend list. They make it a market performer on the heels of the company, saying it may assume asbestos liabilities of Harbison Walker, which was spun off by Dresser Industries as Indresco back in 1992.[72]

56.     Analyst Geoff Kieburtz with Salomon Smith Barney, stated:

There is risk from the company's asbestos liability on three fronts. First, the possibility of a dramatic increase in the number of new claims filed. The first quarter of 2001 saw 18,000 new claims filed, versus a total of 45,000 during all of 2000, indicating a potential annual total this year of 72,000 new claims. Second, claimants could become more aggressive in terms of the amount of money being sought, as has been the case with other asbestos defendants, such as McDermott International. Third, the Delaware Supreme Court could uphold the lower court ruling that Highlands is not obligated to provide insurance coverage for asbestos claims filed against Kellogg Brown & Root, thereby removing Halliburton's primary insurance coverage for these claims.

Despite the risks detailed above, we do not expect that Halliburton's asbestos exposure presents a material risk to the company's existence as a going concern. Firstly, the magnitude of the company's exposure is an order of magnitude lower than that of McDermott International, while Halliburton is a significantly larger and more profitable company. With $278 million of cash at the end of the first quarter, against an $84 million accrued liability for open claims, assuming no insurance coverage, Halliburton appears to have sufficient financial resources to manage this exposure. Thus, we reiterate our Buy rating on the stock.[73]

57.     Analyst Sanger with Deutsche Banc Alex. Brown stated:

---

[71] *Reuters News*, "Research Alert—Goldman cuts Halliburton from recommended list," June 29, 2001, 8:04 am.

[72] *CNBC Squawk Box*, "Newscast: Squawk Box, 9:30 AM; today's business news," June 29, 2001.

[73] Salomon Smith Barney, "HAL: Possible Additional Asbestos Exposure," June 29, 2001.

This charge, if taken, will be in Q2 for discontinued operations, and will be easily offset by the $300 million after-tax gain on the sale of Dresser Equipment Group. While insignificant by itself, it does remind people of [Halliburton's] asbestos liabilities and could depress its multiple as these concerns rear their head again. We continue to rate [Halliburton] a Buy because of its recent sharp pull back but prefer RIG, BHI and SLB (all Strong Buy rated) among the large caps. Our target price remains unchanged at $54 ....[74]

58.     July 26, 2001:  After market close on July 25, 2001, Halliburton released its

second quarter financial results, reporting strong revenue and earnings:

[S]econd-quarter earnings from continuing operations more than doubled as oil and gas companies stepped up their drilling activity in response to strong energy prices during the quarter.

Dallas-based Halliburton, headed until August 2000 by U.S. Vice President Dick Cheney, said second-quarter earnings from continuing operations and excluding one-time items rose to $143 million, or 33 cents per share, from $52 million, or 12 cents a share, in the same period of 2000.

Analysts' earnings estimates had ranged from 28 to 32 cents per share, with a mean estimate of 30 cents, according to research firm Thomson Financial/First Call.[75]

59.     Several analysts raised their estimates for Halliburton in response to the results.

For example, analyst Sanger raised EPS estimates for the Company, stating:

Although we expect a drilling slowdown in the US to negatively impact [Halliburton], the near term strength there and the longer-term leverage to the international recovery are higher than we had assumed.  Consequently, we are raising our EPS estimates for 2001 from $1.19 to $1.32, leaving 2002 unchanged at $1.63.  We are also maintaining our target price of $44 based on a 27 multiple of 2002 EPS (implying an 11.9 multiple of 2002 EBITDA), and we continue to rate [Halliburton] a Buy.[76]

ABN AMRO also raised their EPR targets for the Company:

---

[74] Deutsche Banc Alex. Brown, "Halliburton Increases Asbestos Reserve. Reiterate Buy, but Renewed Concerns Could Impact Valuation," June 29, 2001.

[75] *Reuters News*, "Halliburton operating earnings more than double," July 25, 2001, 4:11 pm.

[76] Deutsche Banc Alex. Brown, "Q2 Earnings Higher Than Expected; Raising Ests, but Maintaining 2002 Ests, Target Price and Strong Buy Rating Because of Rapidly Improving Fundamentals," July 26, 2001.

> We are raising our 2001 EPS estimate to $1.40 from $1.25 to reflect the upside
> surprise, as well as a more rapid improvement in the international markets than
> we had previously anticipated. In addition, we are increasing our 2002 EPS
> estimate to $2.10 from $2.00. [77]

That day, Halliburton's stock price rose 3.65% to close at $35.50. The company-specific return was 3.4%, a statistically significant increase.

60.    August 9, 2001: On August 9, 2001, Halliburton filed Form 10-Q with the SEC, in which it increased its accrued net liability for known open asbestos claims to $124 million (from $30 million on March 31, 2001 and $29 million on Dec. 31, 2000). In response to the Company's filing, an analyst at A.G. Edwards stated that the situation was now more complex and uncertainty increased, although it appeared manageable:

> With these recent developments the scope of Halliburton's potential asbestos
> liabilities has expanded and uncertainty has increased. The inherent uncertainty
> of litigation as well as the possibility that a series of adverse court rulings or new
> legislation could quickly alter [Halliburton's] position, makes it very difficult for
> the company accurately predict the outcome. However, based on its: historical
> experience with similar claims; understanding of the facts and circumstances that
> gave rise to asbestos claims; and estimate of amounts that will be recovered from
> insurance companies; along with the time elapsed since Halliburton and its former
> divisions or subsidiaries discontinued sale of products containing asbestos; and
> the time elapsed since Kellogg Brown & Root used materials containing asbestos
> in any construction process; [Halliburton] believes that the known open asbestos
> claims are manageable and will be resolved without a material adverse effect on
> its financial position or results of operations. Regardless, the situation should be
> monitored closely and the uncertainty could continue to hamper Halliburton's
> valuation relative to its peers (BHI and SLB). [78]

61.    On August 9, 2001, Halliburton's stock price declined 4.48%, to close at $32.00. The company-specific return that day is negative 5.2%, a statistically significant decline. The decline was attributed to the information released in the 10-Q:

---

[77] ABN AMRO, "International Stength [sic] Drives Upside Surprise," July 26, 2001.

[78] A.G. Edwards, "Net Liability for Asbestos Claims Rises—More Complex Situation Appears Manageable but Uncertainty Increases," August 10, 2001.

Halliburton Co, the world's No. 1 oilfield services firm, saw its stock fall 4.5 percent on Thursday after the company released information showing a sharp increase in its asbestos litigation liability.

Dallas-based Halliburton, headed until August 2000 by U.S. Vice President Dick Cheney, said it estimated its net liability for open asbestos claims against current and former Halliburton subsidiaries at $124 million as of June 30, 2001, up from $30 million on March 31, 2001 and $29 million on Dec. 31, 2000.

The information, contained in a 10-Q filing with the Securities and Exchange Commission (SEC), hit Halliburton's stock which closed $1.50 lower at $32.

"When you look at the growth in claims and you look at these numbers, we're concerned," said Scott Gill, an analyst with Houston-based energy investment bank Simmons & Co.

Gill said the information about the asbestos claims—which date back to the 1970s—was far more detailed than the company had made in 10-Q statements in previous quarters.[79]

62.  October 31–November 1, 2001:  After market close, on Tuesday, October 30, 2001, Halliburton announced that on October 26, 2001, a jury in Mississippi found Dresser (through Harbison) liable in two of six asbestos cases for total compensatory damages of $21.3 million ($10.7 million per plaintiff).  The case was against three companies, and the total verdict was $150 million.  This verdict had not yet been affirmed and a judgment had not yet been entered against the Company.  The Company stated that it would "file post trial motions and vigorously appeal if the verdict is not set aside"[80]

63.  One analyst was surprised by the size of the award, and expected the news to have a negative impact on the Company's stock price:

Six plaintiffs were each awarded $25 million and Dresser (through the Harbison-Walker (H-W) subsidiary) was found liable in two of the six cases for total compensatory damages of $21.25 million ($10.675 million per plaintiff). Potential 4Q2001E impact is small: $5mil or $3mil tax effected = less than $0.01/share hit.  If appeal is unsuccessful, reserves could move up sharply.

---

[79] *Reuters News*, "Halliburton stock down as asbestos liability rises," August 9, 2001, 7:12 pm.

[80] *PR Newswire*, "Halliburton Disputes Asbestos Claims," October 30, 2001, 8:05 pm.

This jury award sets new precedents; the size of award is enormous ....

Size of jury award was unexpected and is likely to have a negative impact on stock price tomorrow. We expect a vigorous defense by [Halliburton's] and remain optimistic that the asbestos liability will remain under control. Given the significant discount relative to its peer group, we believe that [Halliburton's] current stock price adequately discounts potential asbestos liability risk.[81]

64.     Another analyst noted the risks:

We continue to monitor the situation closely and we recognize the unpredictability and apparent irrationality of the asbestos litigation environment in general. For example, at least 95% of the claims filed against Halliburton are by claimants that have no symptoms of illness and a very small fraction, under 3%, have diagnosed cancer. Notably, the five claimants in the Orange County case all had been diagnosed with cancer. In addition, each case that is filed against Halliburton has many other co-defendants, creating a degree of competition between defendants to avoid being tagged with a liability. However, because of these factors and others, we cannot confidently develop a "worst case scenario" for Halliburton's ultimate asbestos liability.[82]

65.     On October 31, 2001, Halliburton's stock price declined 6.3%, to close at $24.69. The company-specific return that day is negative 4.9%, a statistically significant decline. The Company's stock continued to decline 2.88% on November 1, 2001, to close at $23.98. The company-specific decline is -3.7%, a statistically significant decline because the market was up that day.

66.     November 6, 2001: On November 6, 2001, Halliburton's stock price declined 3.85%, to close at $21.72. The company-specific return that day is negative 3.5%, a statistically significant decline. There was no company-specific news on that day consistent with the price decline.

---

[81] A.G. Edwards, "Asbestos Case in Small Mississippi Town Yields $150 Million Jury Award Against HAL, MMM and Others—Vigorous Appeal Expected," October 31, 2001.

[82] Salomon Smith Barney, "HAL: Further Asbestos Developments," October 31, 2001.

67.    After market close on November 6, 2001, based on the Company's third quarter earnings, which were released after market close on October 23, 2001, investment firm Hibernia Southcoast Capital reduced its EPS estimates and 12-month price target for Halliburton (to $34 from $60). The firm maintained its "Buy/Strong Buy" rating for the Company's shares.[83]

68.    November 9, 2001: On November 9, 2001, Halliburton's stock price rose 0.18%, to close at $22.76. However, the company-specific return that day is negative 3.4%, a statistically significant decline, because the industry was up that day.

69.    On November 9, 2001, Salomon Smith Barney issued a report on Halliburton that was generally positive but in which the analyst lowered his earnings estimates for fourth quarter 2001 and maintained his 2002 estimate and Buy rating.

70.    December 4–7, 2001: During the period December 4 through December 7, 2001, Halliburton disclosed recent adverse asbestos jury verdicts in Form 8-K SEC filings and there was substantial discussion in the news and by analysts related to Halliburton's potential asbestos exposure.

71.    On Tuesday, December 4, the Company filed Form 8-K with the SEC, in which it disclosed that a Texas District Court had entered a judgment against Dresser on a $65 million jury verdict rendered in September 2001.[84] In the same filing, the Company disclosed that the same district court also entered three additional judgments against Dresser in favor of 100 other asbestos plaintiffs in the aggregate amount of $35.7 million related to an alleged breach of a purported settlement agreement. The Company stated that it intended to appeal the three

---

[83] Hibernia Southcoast Capital, "Halliburton Co.," November 6, 2001.

[84] This verdict was known to the public before December 4. For example, an analyst for Salomon Smith Barney referred to this verdict in his November 9, 2001 report.

judgments "on the grounds that it wasn't a party to the settlement agreements and that it didn't authorize anyone to settle on its behalf. The company said it believes its appeal will be successful."[85]

72.    On December 3, 2001, Halliburton's stock price closed at $22.06. On December 4, Halliburton's stock price declined 0.73%. The company-specific return is -3.7%; this is a statistically significant negative return because both the market and the industry are up that day. On December 5, Halliburton's stock price increased 0.46%, which also is a statistically significant negative return because both the market and the industry are up that day (the company-specific return is -3.8%). On December 6, the stock declined 5.23%. This is not a statistically significant return because both the market and the industry are down that day. Halliburton closed at $20.85 on December 6.

73.    Analysts recognized the market's concern with Halliburton's asbestos exposure but continued to recommend the stock. This is consistent with the net stock price decline over December 4–6. Analyst Fratt with A.G. Edwards lowered his price target for Halliburton and reiterated his "Strong Buy/Speculative" rating:

> In our view, these large jury awards are troubling due to the size of awards and jury findings appear to based [sic] on the possibility of development of asbestos-related illnesses, not actual presence of asbestosis, a form of asbestos-related lung cancer, or mesothelioma, a cancer that is caused by exposure to asbestos. Nonetheless, [Halliburton's] asbestos liability remains large and the overhang could remain in place for the next several years in spite of [Halliburton's] vigorous defense (in part due to the lengthy appeals process). ...
>
> Although disappointing earnings, a weak engineering & construction (E&C) business environment and exposure to asbestos litigation have weighed on the stock price, an extensive restructuring in the E&C business, the sale of Dresser Equipment Group and improving Energy Service operating results, especially outside of North America, should enable Halliburton to perform better in the near-

---

[85] *Dow Jones Corporate Filings Alert*, "Texas Court Enters $65M Verdict Against Halliburton," December 4, 2001, 8:45 am.

term.  In addition, a slowing of asbestos litigation claims could help the stock perform better.[86]

74.    Analyst Sanger of Deutsche Banc Alex. Brown reiterated his Strong Buy rating for Halliburton, stating that the market was over-discounting the Company's potential asbestos liability:

> Improved disclosure does not mean improved clarity: The asbestos issue continues to overhang [Halliburton] and better disclosure of its liabilities, a strategy which [Halliburton] has now decided to pursue, does not provide investors with comfort on either the upper-end or the potential ultimate liability or on the timing of the development of a clearer definition of what that liability might be.
>
> Recommendation: We continue to rate [Halliburton] a strong Buy and we believe that the current valuation over-discounts the asbestos liability ....[87]

75.    On the morning of December 7, 2001, the Company filed Form 8-K with the SEC disclosing that on December 5 a Maryland jury had awarded a $30 million verdict against Dresser in favor of five plaintiffs in an asbestos litigation.  The Company stated that it intended to "aggressively" appeal the verdict:

> The company said it believes the trial court committed numerous errors and that the evidence didn't support the verdict, according to the filing.  The company intends to challenge the verdicts by post trial motion and, if those motions aren't successful, to pursue an appeal "aggressively."[88]

76.    Several analysts issued reports that day in response to the Company's SEC filing.  Analyst Geoff Kieburtz with Salomon Smith Barney downgraded his rating for

---

[86] A. G. Edwards, "Asbestos News Continues to Develop—North American Drilling Market Weak and 2001–2 EPS Estimates Lowered," December 5, 2001.

[87] Deutsche Banc Alex. Brown, "Better Asbestos Disclosure Does Not Help Stock Price," December 5, 2001.

[88] *Dow Jones Corporate Filings Alert*, "Jury Returns $30M Verdict against Halliburton Subsidiary," 8:17 am.

Halliburton (to 3H from 1M ) and dropped his price target to $20 from $36 citing mounting

asbestos liabilities:

> This verdict comes on the heels of a $21 million Mississippi jury verdict, a
> $65 million judgement in Orange, Texas, and an additional $36 million,
> representing a settlement previously negotiated by Harbison-Walker.  All of these
> cases pertain to Harbison-Walker, a former subsidiary.  The company has
> indicated that in all cases that it believes the trial courts have committed
> numerous errors, and that it expects to prevail on appeal.  While the stock heavily
> discounts Halliburton's asbestos exposure, the specter of lawsuits spiraling out of
> control is likely to adversely impact the stock for the foreseeable future, and thus
> we cannot recommend it at this time.[89]

77.    Analyst Sen with Jefferies & Co. put his rating for Halliburton under review

citing uncertainty regarding the asbestos litigations and near-term earnings risk:

> We have remained cautious on Halliburton for two main reasons: 1) uncertainty
> surrounding ongoing asbestos litigation, and 2) near-term earnings risk. ... These
> [asbestos related disclosures] are surprising developments following
> management's rather positive asbestos update during its 3Q01 conference call on
> October 23.  During the conference call management had provided further
> assurances that current reserves are adequate to cover projected asbestos
> liabilities.  We now believe that [Halliburton's] asbestos-related net liabilities
> could be significantly higher than currently estimated (estimated at $125 million
> by the company).  We continue to remain cautious on the stock.  Our rating is
> under review (with a negative bias) pending further update from management on
> asbestos.[90]

78.    UBS Warburg analyst, James Stone, downgraded his rating for Halliburton to

"Hold" from "Strong Buy" and reduced his 12-month target price to $24 from $38:

> While we do not anticipate that every claim filed against Halliburton will end up
> in court, in fact the vast majority of claims should continue to be settled at or near
> the company's historical settlement rates.  Nevertheless, if only 1% of cases
> resulted in jury verdicts of a similar magnitude and the awards were upheld at the
> appellate level, the future liability would be significantly greater than our previous
> expectations.  From a value standpoint, it is arguable that the stock is still quite
> undervalued. ... When all is said and done, we still believe that our analysis and
> our conclusions are reasonable.  However, the current climate is sufficiently

---

[89] Salomon Smith Barney, "HAL: Downgrading on Mounting Asbestos Liabilities," December 7,
2001.

[90] Jefferies, "Halliburton: Update On Asbestos Litigation; Stay Cautious," December 7, 2001.

uncertain to merit more caution on our part.  If we were to see several signs that would allow us to believe that the liability is confinable at the level of our previous analysis, we would be inclined to re-evaluate the stock.  Since the value gap that results from our previous analysis is so great, we are not uncomfortable missing some of the initial upside if we wait for better signals.[91]

79.    On December 7, 2001, Halliburton's stock price declined 42.4%, to close at $12.00.  The company-specific return that day is negative 42.7%, a statistically significant decline.  Trading volume was almost 77 million shares that day, more than 22 times the average daily trading volume for Halliburton stock during the Class Period.  Several news articles attributed the decline in Halliburton's stock price on December 7 to the recent asbestos disclosures.[92]

---

[91] UBS Warburg, "Halliburton: Downgraded to Hold from Strong Buy," December 7, 2001.

[92] *See, e.g., The Wall Street Journal*, "Halliburton Stock Falls Nearly 43% After Recent Asbestos Verdicts," December 10, 2001.