**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, INC., et al., On Behalf Of Itself and All Others Similarly Situated, | § § § § § | |
| Lead Plaintiff, | § | Civil Action No. 3:02-CV-1152-M |
| vs. | § § | |
| HALLIBURTON COMPANY and DAVID J. LESAR, | § § § | |
| Defendants. | § | |

## DEFENDANTS' RESPONSE TO
## LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Respectfully submitted,

GODWIN PAPPAS RONQUILLO, LLP                BAKER BOTTS L.L.P.

/s/  Donald E. Godwin                        /s/  Robb L. Voyles
Donald E. Godwin                             Robb L. Voyles
State Bar No. 08056500                       State Bar No. 20624100
Marcos G. Ronquillo                          Jessica B. Pulliam
State Bar No. 17226000                       State Bar No. 24037309
Jose L. Gonzalez                             2001 Ross Avenue, Suite 600
State Bar No. 08129100                       Dallas, Texas 75201-2980
Renaissance Tower                            Telephone: 214.953.6500
1201 Elm, Suite 1700                         Facsimile: 214.953.6503
Dallas, Texas  75270-2084
Telephone:  214.939.4400                     David Sterling
Facsimile:  214.760.7332                     State Bar No. 19170000
                                             Rebecca Robertson
**COUNSEL FOR DEFENDANT**                    State Bar No. 00794542
**DAVID J. LESAR**                           Jeff McNabb
                                             State Bar No. 24046406
                                             One Shell Plaza
                                             910 Louisiana
                                             Houston, Texas 77002-4995
                                             Telephone: 713.229.1234
                                             Facsimile: 713.229.1522

                                             **COUNSEL FOR DEFENDANT**
                                             **HALLIBURTON COMPANY**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................. iii

LEAD PLAINTIFF'S BURDEN OF PROOF ....................................................... 1

BACKGROUND ................................................................................................... 4

   I.   The only two alleged class period representations regarding the Dresser merger merely repeated information disclosed to the market before the class period. ........................................................................................................ 5

   II.   Halliburton's disclosures regarding accounting for unapproved claims were not accompanied by any decline in Halliburton's stock price. ...................... 5

   III.   Halliburton accurately disclosed its asbestos liability for pending claims. ... 8

ARGUMENT ........................................................................................................ 10

   I.   Class certification must be denied because AMSF has failed to prove loss causation. ...................................................................................................... 10

      A.   AMSF failed to prove that any class period misrepresentation inflated Halliburton's stock price. ........................................................................ 12

      B.   AMSF does not prove any link between a potentially actionable, nonconfirmatory misrepresentation and corrective disclosure that reveals its falsity and causes a decline in the stock price. .................................... 13

          1.   Nettesheim failed to isolate any actionable misrepresentations, and AMSF's reliance on confirmatory and other nonactionable statements to support loss causation is contrary to Fifth Circuit authority. ............................................................................................. 14

          2.   Nettesheim's claimed corrective disclosures do not reveal the falsity of any prior misrepresentation and therefore do not support loss causation. ...................................................................................... 16

      C.   AMSF provides no empirical evidence that the alleged corrective disclosures, as opposed to other unrelated news, caused a significant amount of the stock price decline. .................................................... 21

      D.   Nettesheim neither links the eight alleged "corrective disclosures" to previously released nonconfirmatory information nor provides empirical evidence that they caused a significant portion of the decline in stock price. ........................................................................................................ 22

   II.   A class should not be certified as to Lesar because AMSF has not and cannot prove loss causation as to any misrepresentation attributed to him. ............ 31

   III.   Proposed class representatives Murphey and AMSF are neither typical nor adequate. ........................................................................................................ 32

      A.   Rule 23(a)'s requirements for typicality and adequacy. ..................... 32

B.    Murphey is neither typical nor adequate as required by Rule 23(a). ..................34

    1.   Murphey cannot satisfy the typicality requirement. ....................................34

    2.   Murphey cannot satisfy the adequacy requirement. ....................................35

C.    AMSF cannot satisfy the typicality and adequacy requirements. .......................37

    1.   AMSF's complete reliance on money managers renders it atypical and/or inadequate. ......................................................................................37

    2.   AMSF Is Not an Adequate Representative of the Putative Class. ...............39

**CONCLUSION** ......................................................................................................................40

**CERTIFICATE OF SERVICE** ............................................................................................41

## TABLE OF AUTHORITIES

**PAGE**

### CASES

Basic Inc. v. Levinson,
    485 U.S. 224 (1988)..................................................................................3

Berger v. Compaq Computer Corp.,
    257 F.3d 475 (5th Cir. 2001) ......................................................1, 2, 33, 34, 36

Castano v. Am. Tobacco Co.,
    84 F.3d 734 (5th Cir. 1996) ......................................................................2

Congregation of Ezra Sholom v. Blockbuster, Inc.,
    504 F. Supp. 2d 151 (N.D. Tex. 2007) ........................................................17

Dorchester Invs. v. Peak Trends Trust,
    2002 WL 272404 (S.D.N.Y. Feb 26, 2002)....................................................37

Dura Pharmaceuticals, Inc. v. Broudo,
    544 U.S. 336 (2005)............................................................................17, 18

Fry v. UAL Corp.,
    136 F.R.D. 626 (N.D. Ill. 1991) ............................................................37-39

Gen. Tel. Co. v. Falcon,
    457 U.S. 147 (1982)................................................................................2

Greenberg v. Crossroads Sys., Inc.,
    364 F.3d 657 (5th Cir. 2004) ......................................3, 5, 11-20, 22, 23, 26, 28, 30-32, 35

Griffin v. GK Intelligent Sys., Inc.,
    196 F.R.D. 298 (S.D. Tex. 2000)................................................................2

Horton v. Goose Creek Indep. Sch. Dist.,
    690 F.2d 470 (5th Cir. 1982) ..............................................................34, 36

In re Caremark Int'l, Inc. Sec. Litig.,
    1996 WL 351182 (N.D. Ill. June 24, 1996)..........................................37, 38, 39

In re FirstPlus Fin. Group, Inc., Sec. Litig.,
    2002 WL 31415951 (N.D. Tex. Oct. 28, 2002)..............................................33

*In re Organogenesis Sec. Litig.*,
   241 F.R.D. 397 (D. Mass 2007)......................................................................35

*In re Safeguard Scientifics*,
   216 F.R.D. 577 (E.D. Pa. 2003)..............................................................34, 35

*In re Vicuron Pharm., Inc. Sec. Litig.*,
   233 F.R.D. 421 (E.D. Pa. 2006)......................................................................37

*In re Zonagen, Inc. Sec. Litig.*,
   322 F. Supp. 2d 764 (S.D. Tex. 2003) ..............................12, 13, 14, 16, 32

*Jenkins v. Raymark Indus., Inc.*,
   782 F.2d 468 (5th Cir. 1986) ..........................................................................37

*Kas v. Fin. Gen. Bankshares, Inc.*,
   105 F.R.D. 453 (D.D.C. 1984).........................................................................33

*Kase v. Salomon Smith Barney, Inc.*,
   218 F.R.D. 149 (S.D. Tex. 2003)...............................................................1, 2, 36

*Krim v. pcOrder.com, Inc.*,
   210 F.R.D. 581 (W.D. Tex. 2002) ..............................................................34, 36

*Martin v. Home Depot U.S.A., Inc.*,
   225 F.R.D. 198 (W.D. Tex. 2004) ....................................................................33

*Nathenson v. Zonagen, Inc.*,
   267 F.3d 400 (5th Cir. 2001) ..........................................................................12

*Ogden v. AmeriCredit Corp.*,
   225 F.R.D. 529 (N.D. Tex. 2005)................................................................33, 34

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*,
   487 F.3d 261 (5th Cir. 2007) .............................. 1, 2, 3, 10, 11, 21, 22, 23-27, 29

*Ryan v. Flowserve Corp.*,
   __ F.R.D. __, 2007 WL 3357692 (N.D. Tex. Nov. 13, 2007) ...........1, 3, 5, 10-12, 13-20,
   .........................................................................................23-24, 26, 28-32

*SEC v. Morris*,
   2007 WL 614210 (S.D. Tex. Feb. 26, 2007) .............................................7, 27

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ...........................................................................1, 2

*Vodak v. City of Chicago,*
2006 WL 1037151 (N.D. Ill. Apr. 17, 2006) .....................................................................37

*Warren v. Reserve Fund, Inc.,*
728 F.2d 741 (5th Cir. 1984) .........................................................................................34

*Weikel v. Tower Semiconductor, Ltd.,*
183 F.R.D. 377 (D.N.J. 1998)........................................................................................33

**STATUTES**

15 U.S.C. § 78u-4(a)(3)(bb) (2000) ...............................................................................37

The Court should deny Lead Plaintiff Archdiocese of Milwaukee Supporting Fund, Inc.'s ("AMSF") Motion for Class Certification ("Motion"). As in two recent decisions of the Fifth Circuit and the Northern District of Texas, the proposed class fails because AMSF has failed to prove loss causation by a preponderance of the admissible evidence. *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 262, 269 (5th Cir. 2007); *Ryan v. Flowserve Corp.*, ___ F.R.D. ___, No. 3:03-CV-1769-B, 2007 WL 3357692, at *8 (N.D. Tex. Nov. 13, 2007) (Boyle, J.). The Expert Report of Jane Nettesheim—AMSF's only evidence of loss causation—fails to satisfy loss causation requirements in the Fifth Circuit and is based on unreliable methodology and analysis. Nettesheim repeatedly admits that she did not conduct the type of inquiry the Fifth Circuit requires, and the evaluation she did conduct fails to meet basic standards for experts in her field.[1] AMSF's Motion also fails because the proposed class representatives, Ben Alan Murphey and AMSF, do not satisfy the requirements of adequacy and typicality under Federal Rule of Civil Procedure 23.

## LEAD PLAINTIFF'S BURDEN OF PROOF

The issue of class certification should not be considered lightly. In *Oscar*, Judge Higginbotham recently noted the "lethal force of certifying a class of purchasers of securities enabled by the fraud-on-the-market doctrine." *Oscar*, 487 F.3d at 262. A court must conduct a "rigorous analysis" to determine whether there is sufficient evidence to satisfy each of the requirements of class certification. *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005). In doing so, a court must look beyond the pleadings to "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the

---

[1] *See* Defendants' Motion to Strike the Report of Jane Nettesheim ("Motion to Strike"), filed contemporaneously with this Response and fully incorporated herein.

certification issues." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996); *Griffin v. GK Intelligent Sys., Inc.* 196 F.R.D. 298, 300 (S.D. Tex. 2000).

AMSF bears the burden of establishing each requirement of Rule 23 and is entitled to no presumptions. *Unger*, 401 F.3d at 321 ("The plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification."); *see also Berger v. Compaq Computer Corp.*, 257 F.3d 475, 481 (5th Cir. 2001); *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982). "Unsupported allegations that the case satisfies the requirements of Rule 23 are an insufficient basis for certifying a class action." *Kase v. Salomon Smith Barney, Inc.*, 218 F.R.D. 149, 152 (S.D. Tex. 2003). If AMSF has not satisfied the requirements for class certification, it is improper to certify a class on the possibility that it might make the required showing at a later stage in the litigation.[2]

Rule 23's requirements include that: (1) the proposed class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the proposed class; (3) the claims or defenses of the representatives are typical of those of the proposed class; and (4) the representative parties will fairly and adequately protect the interests of the proposed class. FED. R. CIV. P. 23(a). Under Rule 23(b)(3), AMSF must also show that common questions of law or fact "predominate over" individual issues and that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* at 23(b)(3).

To satisfy Rule 23(b)(3), AMSF relies on the fraud-on-the-market presumption, without which individual issues of reliance would predominate and the class would fail. The reliance

---

[2]    *See Oscar*, 487 F.3d at 268 ("[A] district court must resolve factual disputes relevant to each Rule 23 requirement and find that whatever underlying facts are relevant to a particular Rule 23 requirement have been established. . . . The obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue . . . .") (internal citations omitted); *Castano*, 84 F.3d at 742 ("Given the plaintiffs' burden, a court cannot rely on assurances of counsel that any problems . . . can be overcome.").

element of a plaintiff's securities claim is presumed for a company whose shares are traded in an efficient market. *Basic Inc. v. Levinson*, 485 U.S. 224, 244 (1988).   Under the Fifth Circuit's interpretation of *Basic*, classwide reliance is presumed if there is proof that: "(1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiff[] traded shares between the time the misrepresentations were made and the time the truth was revealed." *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 661 (5th Cir. 2004).   To benefit from the presumption of reliance, however, a plaintiff must also prove that the material "misstatement *actually moved* the market" and therefore caused the alleged losses. *Oscar*, 487 F.3d at 265; *see also Greenberg*, 364 F.3d at 665.   The Fifth Circuit thus requires "plaintiffs to establish loss causation in order to trigger the fraud-on-the-market presumption." *Oscar*, 487 F.3d at 265.

Recognizing the gravity of certifying a securities class action relying on the fraud-on-the-market presumption, the Fifth Circuit has held that the district court must make a "find[ing]" that "loss causation [is] established at the class certification stage." *Id.* at 269.   Elaborating on the reasons for this requirement, the Fifth Circuit stated:

> In short, the efficient market doctrine facilitates an extraordinary aggregation of claims.  We cannot ignore the *in terrorem* power of certification, continuing to abide the practice of withholding until "trial" a merit inquiry central to the certification decision, and failing to insist upon a greater showing of loss causation to sustain certification, at least in the instance of simultaneous disclosure of multiple pieces of negative news.  Nor is there sound reason for an early "tentative" certification, which leaves loss causation for later more focused examination.

*Id.* at 267.   Under *Oscar*, it is AMSF's burden to establish, and the Court must find, loss causation by a preponderance of the evidence. *Id.* at 269.   Absent such a finding, the proposed class cannot rely on the fraud-on-the-market presumption, and the class therefore fails. *Id.*; *Flowserve*, 2007 WL 3357692, at *8, *16.

## BACKGROUND

The Fourth Consolidated Class Action Complaint ("Fourth Complaint") alleges that a class of plaintiffs suffered damages because Halliburton's "financial falsifications and other misleading statements" inflated Halliburton's stock price throughout the class period from June 3, 1999 to December 7, 2001.[3]  Specifically, AMSF's Motion premises its argument on alleged misrepresentations concerning:  (1) the success of its acquisition of Dresser Industries, Inc., including projected cost savings from the integration of Dresser's and Halliburton's operations; (2) its accounting for unapproved claims (claims that were in the process of being negotiated with customers); and (3) the Company's liability for asbestos lawsuits.[4]

AMSF's own expert, however, affirmatively disproved the most basic element of securities fraud—inflation of the stock price.  For example, she could not identify any instances before April 2001 when Halliburton's stock price increased in connection with a Company announcement in a way significantly different from an index of similar companies.[5]  AMSF made all its purchases prior to this date, and the other proposed class representative, Ben Alan Murphey, made all his purchases and sales prior to that date.[6]  Neither AMSF nor its expert contend that the two instances of a stock price increase in the over 600-day class period provide any support whatsoever to their failed attempt to prove loss causation.  The expert also fails to link any corrective disclosure causing a decline in the stock price with a prior misstatement by Halliburton or Lesar.  The timing and content of Halliburton's disclosures demonstrate the absence of loss causation and AMSF's failure to prove the requirements of class certification.

---

[3]    Fourth Compl. ¶ 3.

[4]    *See* Motion at 3-8.

[5]    AMSF App. 96 (Nettesheim Rep. ¶ 53); App. 49 (Nettesheim Dep. 77).

[6]    App. 15-18 (AMSF Dep. 115-17; 120; 125-27); App. 39, 42-44 (Murphey Dep. 152-53; 165-66; 171).

**I.**  **The only two alleged class period representations regarding the Dresser merger merely repeated information disclosed to the market before the class period.[7]**

AMSF alleges two class period statements regarding Dresser; both statements, if even actionable, merely repeat nonactionable statements prior to the class period.[8]  Lesar's alleged September 13, 1999 projection that the Dresser merger would result in "annual benefits of $500 million" mirrored a report issued on March 1, 1999—three months before the class period began.[9]  Likewise, Cheney's statement in paragraph 122 of the Fourth Complaint describing the successful merger and integration of Dresser confirmed pre-class period statements that projected positive and synergystic effects of the merger and integration.[10]  There is no evidence that Halliburton's stock price reacted to these alleged representations.  As AMSF's own expert admits, "successive announcements of the same information will have no additional effect on share price."[11]

**II.**  **Halliburton's disclosures regarding accounting for unapproved claims were not accompanied by any decline in Halliburton's stock price.**

An understanding of Halliburton's various business segments is instructive in evaluating AMSF's claim of loss causation regarding the unapproved claims allegations.  The Fourth Complaint and AMSF's Motion frequently refer generally to the Company's engineering and construction operations when discussing the unapproved claims allegations.  As detailed below, however, the major fixed-price construction projects on which the Company accrued unapproved

---

[7]    The Fifth Circuit has held that only non-confirmatory statements—those that disclose information not already known to the market—can provide the basis for loss causation.  *Greenberg*, 364 F.3d at 663; *see also Flowserve*, 2007 WL 3357692, at *10 (holding that confirmatory statements are not "capable of moving the market" and provide no support for loss causation).

[8]    As the Motion demonstrates, the statement that the Dresser merger was a "win" for shareholders was made in 1998, and claims based on that statement are time-barred.  *See* Motion at 6; March 14, 2006 Order at 3.

[9]    *Compare* Fourth Compl. ¶ 115 *with id.* ¶ 93 (quoting report that "[c]ost savings from the merger . . . should yield over $500 million").

[10]    *See, e.g., id.* ¶¶ 83-84.

[11]    AMSF App. 18 (Nettesheim Rep. ¶ 40).

claims were not part of the Company's Engineering Construction Group. For that reason, disclosures related generally to engineering and construction, or "E&C," do not necessarily relate, as AMSF and Nettesheim suggest, to the unapproved claims allegations.

Halliburton is one of the world's largest providers of services and products to the energy industry.[12] During the proposed class period from June 3, 1999 to December 7, 2001,[13] Halliburton provided two types of services—energy services and engineering and construction services.[14] The Company's Energy Services Group serviced companies involved in the exploration, development, and production of oil and gas.[15] Until 2001, one of the Energy Services Group's business units, Brown & Root Engineering Services ("BRES"), provided engineering and construction services, such as oil-field development, to the *upstream* oil and gas industry.[16] With the exception of BRES, the Energy Services Group provided non-construction related energy services.[17]

The Company's Engineering and Construction Group, which included the Kellogg Brown & Root ("KBR") and Brown & Root Services business units, provided engineering and construction services to *downstream* energy customers involved in processing and refining petroleum, and to non-energy and governmental customers involved in such industries as mining and forestry.[18] At the end of 2000, the Company announced plans to combine its engineering and construction operations into one company, KBR, reporting as the Engineering and

---

[12]   App. 124-25 (Apr. 5, 2007 Press Release, *Halliburton Completes Separation of KBR*).

[13]   The Court previously dismissed "all claims asserted by Plaintiffs for actions of any Defendant predating June 3, 1999" as time-barred. March 14, 2006 Order at 3.

[14]   *See* App. 100-01 (June 2001 Form 10-Q at 5-6).

[15]   *See* App. 101 (June 2001 Form 10-Q at 6).

[16]   App. 72 (1999 10-K at 2); *see infra* note 20.

[17]   App. 71-73 (1999 10-K at 1-3).

[18]   App. 73-74 (1999 10-K at 3-4).

Construction Group.[19]   As a result of this reorganization, the BRES business unit was moved from the Energy Services Group to the Engineering and Construction Group.[20]

To support loss causation, AMSF points to unapproved claims allegations in the Fourth Complaint that pre-date the reorganization of Halliburton's construction operations in 2001.[21] The major projects for which Halliburton accrued unapproved claims were BRES projects.[22]   At the time, BRES was a part of Halliburton's Energy Services Group, not its Engineering and Construction Group.[23]   Thus, any disclosures concerning the non-construction related services of the Energy Services Group and the downstream construction operations of the Engineering and Construction Group have little, if any, relevance to the unapproved claims allegations.

Prior to the class period, Halliburton's BRES unit began to recognize revenue from unapproved claims when the revenue was deemed probable of recovery and the amount could be estimated.[24]   Accordingly, in its 1998 Form 10-K, issued before the class period, Halliburton deleted a statement in prior reports that the Company's claims for additional compensation were recognized when resolved.[25]   Allegations regarding this change, the propriety of the amounts recorded, or other unapproved claims disclosures referenced on pages 3-4 of AMSF's Motion predate the class period, are barred by limitations, and thus provide no basis for class

---

[19]   *See* App. 114-16 (Dec. 21, 2000 Press Release, *Halliburton Announces New Structure and Engineering and Construction Charges*).

[20]   *See id.*; App. 100 (June 2001 Form 10-Q at 5).

[21]   *See* Motion at 1-5.

[22]   *See SEC v. Morris*, No. Civ. A. H-04-3096, 2007 WL 614210, at *1 (S.D. Tex. Feb. 26, 2007).

[23]   *See* App. 65 (1998 Form 10-K at 1).

[24]   *See Morris*, 2007 WL 614210, at *2.

[25]   App. 66 (1998 Form 10-K at 26).

certification or any claim in this litigation.[26]  *See* March 14, 2006 Order at 3 (dismissing as time-barred all claims based on pre-June 3, 1999 conduct).

In March 2000, Halliburton's 1999 Form 10-K specifically informed shareholders that "[c]laims and change orders, which are in the process of being negotiated with customers, for extra work or changes in the scope of work are included in revenue when collection is deemed probable."[27]  At the same time, Halliburton also disclosed in the notes to its financial statements that its unbilled receivables included $89 million in unapproved claims in 1998 and $98 million in 1999.[28]  As AMSF's own expert demonstrates, however, these disclosures regarding the accounting change and its effect had no impact on the price of Halliburton stock.[29]  There was no statistically significant change in the stock price following the March 2000 disclosure.[30]

### III.     Halliburton accurately disclosed its asbestos liability for pending claims.

Halliburton made meaningful and truthful disclosures during the class period concerning its expected liability for pending asbestos claims.  Halliburton informed investors both quarterly and annually of the actual number of then-pending asbestos claims and the precise amount of reserves Halliburton had accrued for those claims.[31]  Far from downplaying its asbestos liability,

---

[26]    The Paine Webber Energy Conference and subsequent analyst reports referenced on pages 4-5 of the Motion did not occur on June 9, 1999 as the Motion states.  Rather, according to the Fourth Complaint, that conference occurred on February 9, 1999, and the related analyst reports were released in February and March 1999, all well before the class period.  *See* Fourth Complaint ¶¶ 91-93.

[27]    App. 76 (1999 Form 10-K at 34); *see also* App. 82 (2000 Form 10-K at 28); App. 88 (2001 Form 10-K at 35).

[28]    *See* App. 76 (1999 Form 10-K at 34); *see also* App. 82 (2000 Form 10-K at 28 ($113 million)); App. 88 (2001 Form 10-K at 35 ($234 million)).

[29]    *See* AMSF App. 124 (Nettesheim Rep., Ex. 3 at 8) (showing that the stock price *increased* following the release of the 1999 10-K on March 30, 2000).  Although the Fourth Complaint alleges that the March 2000 disclosure was partially misleading, AMSF does not contend loss causation exists as to this allegation, for which there is no alleged corrective disclosure causing any decline in the stock price.

[30]    AMSF App. 124 (Nettesheim Rep., Ex. 3 at 8).

[31]    *See* App. 77-78 (1999 Form 10-K at 43-44); App. 83 (2000 Form 10-K at 37); App. 96 (June 2000 Form 10-Q at 10).

Halliburton regularly reported estimates of multiple millions of dollars.[32]   Halliburton's estimates were predictive in nature, and the Company expressly warned that future events could negatively affect its estimates:  "We recognize the uncertainties of litigation and the possibility that a series of adverse court rulings . . . could materially impact the expected resolution of asbestos related claims."[33]

Thus, Halliburton cautioned investors both in formal disclosures and in press releases that if actual amounts paid on claims or recovered from insurance companies differed from projections, it may have to take a loss.  Before the class period, for example, Halliburton disclosed a dispute with a former Dresser affiliate, Harbison-Walker, related to its contractual obligation to indemnify Dresser for certain asbestos claims.[34]   Further, in June 2001, the Company issued a press release announcing that its potential asbestos liability could increase by at least $50-60 million because Harbison-Walker had asked Dresser for financial assistance in meeting its indemnity obligations.[35]   There is no allegation in the Fourth Complaint—and certainly no evidence—that Harbison-Walker required Dresser's assistance prior to this disclosure.  Additionally, in late 2001, Halliburton told investors about a recent judgment and two jury verdicts, which were significant departures from the Company's previous experience concerning its asbestos liability.[36]   There is no evidence of any prior representation regarding the potential outcomes of these lawsuits.  Rather, disclosure of them was in line with the Company's

---

[32]   *See* App. 72-78 (1999 Form 10-K at 43-44); App. 83 (2000 Form 10-K at 37).

[33]   App. 84 (2000 Form 10-K at 38).

[34]   App. 67 (1998 Form 10-K at 39).

[35]   App. 117-18 (June 28, 2001 Press Release, *Harbison-Walker Asks Halliburton for Assistance*).

[36]   App. 121-23 (Dec. 7, 2001 Press Release, *Halliburton Comments on Asbestos Judgments*).

previous warning that a series of such results "could materially impact" its expectations regarding resolutions of its asbestos claims.[37]

AMSF's Motion misconstrues the content of the Company's asbestos disclosures in an attempt to fabricate a misrepresentation. AMSF contends that Halliburton falsely represented that it had "adequately reserved for *potential* asbestos liability."[38] Halliburton plainly and repeatedly disclosed, however, that its reserves were only for *pending* claims and that *reserves were not accrued for potential claims* that might be filed in the future.[39] AMSF provides no evidence in the form of analyst statements or otherwise that investors somehow believed that Halliburton's reserves were for anything other than pending claims.

## ARGUMENT

## I.     Class certification must be denied because AMSF has failed to prove loss causation.

In *Oscar*, the Fifth Circuit expressly held that "loss causation must be established at the class certification stage by a preponderance of all admissible evidence." *Oscar*, 487 F.3d at 269. "[A]ny showing that severs the link between the misrepresentation and the plaintiff's loss," including the absence of any element of loss causation, "rebuts on arrival the plaintiff's fraud-on-the-market theory." *Id.* at 265 (internal quotation marks omitted). If the fraud-on-the-market presumption fails, questions of individual reliance by each class member then predominate, and a motion for class certification must be denied. *Id.* at 271; *Flowserve*, 2007 WL 3357692, at * 7.

AMSF has not met and cannot meet its burden to prove loss causation. Specifically, AMSF must show that an alleged misstatement "*actually* moved the market." *Oscar*, 487 F.3d at 265. In other words, there must be proof that the alleged misrepresentations inflated the stock

---

[37]   *See* App. 78 (1999 Form 10-K at 44).

[38]   Motion at 6 (emphasis added).

[39]   App. 83 (2000 Form 10-K at 37); App. 92 (March 2000 Form 10-Q at 10); App. 96 (June 2000 Form 10-Q at 10).

price, which later decreased when the truth was revealed. *See Greenberg*, 364 F.3d at 665. Courts in the Fifth Circuit have held that plaintiffs must prove the fraud's effect on the market in at least one of two ways: (1) "an increase in stock price immediately following the release of positive information";[40] or (2) proof of "actual negative movement in the stock price following the release of the alleged 'truth' of the earlier misrepresentation." *Id.*; *Flowserve*, 2007 WL 3357692, at *10. Additionally, when multiple pieces of information are released contemporaneously with the corrective disclosure, there must be empirical proof that the corrective disclosure, as opposed to other unrelated information, caused a significant amount of the decline in stock price. *Oscar*, 487 F.3d at 270-71; *Greenberg*, 364 F.3d at 666.

AMSF's only proof of loss causation is Nettesheim's report, which fails to demonstrate loss causation:

- Nettesheim admitted that she "did not find any statements by Halliburton which had a statistically significant positive impact on Halliburton's stock price" except for April and June 2001 earnings releases that Nettesheim does not link to any subsequent corrective disclosure.[41]

- To the extent Nettesheim identified any "corrective" disclosure causing a statistically significant decline in the stock price, she admitted repeatedly that she "didn't . . . match[] particular prior statements to [such alleged corrective] disclosures."[42]

- Nettesheim did not attempt to analyze what portion of any statistically significant stock price decline was attributable to Halliburton's correction of a potentially actionable prior disclosure (as opposed to the simultaneous disclosure of other nonactionable, negative news). In fact, although she explained she has conducted

---

[40]  Proof of stock price inflation is a necessary, but not sufficient, component of loss causation. *See infra* note 46.

[41]  App. 49 (Nettesheim Dep. 77).

[42]  App. 54 (Nettesheim Dep. 121); *see also* App. 57, 58, 59A, 59B, 60A (Nettesheim Dep. 137, 138, 164-65, 167, 168, 180).

such an empirical inquiry in the past, she "was not asked to do" so in this case.[43]

In addition to expressly rejecting the very standards the Fifth Circuit has imposed for loss causation, Nettesheim's report and testimony fails to satisfy the basic requirements of reliability for experts in her field.[44] Nettesheim claims to have conducted an "event study"—a method of determining the effect of an event on a company's stock price—but she fails even to follow the methodology of the experts that she cites in her report.[45] Because AMSF has failed to meet its burden of proving that Halliburton's alleged misrepresentations caused any losses during the class period, class certification must be denied.

### A.   AMSF failed to prove that any class period misrepresentation inflated Halliburton's stock price.

Loss causation requires a plaintiff to show that the defendant made an actionable, nonconfirmatory, positive statement that inflated the stock price. *Greenberg*, 364 F.3d at 666. To meet this requirement, plaintiffs "ordinarily show[] an increase in stock price immediately following the release of positive information."[46] *Id.* at 665; *see also Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 419 (5th Cir. 2001); *In re Zonagen, Inc. Sec. Litig.*, 322 F. Supp. 2d 764, 775-82 (S.D. Tex. 2003).

---

[43] App. 51 (Nettesheim Dep. 91-92).

[44] *See* Motion to Strike at 2-10 (including in its Appendix the Expert Report of Dr. Lucy Allen of NERA).

[45] *See* Motion to Strike at 3-4. This and other methodological problems with Nettesheim's report are reviewed in detail in the Motion to Strike and provide independent grounds for the Court to deny class certification.

[46] Proof that the misrepresentation caused inflation of the stock price is a necessary, but not sufficient, component of loss causation. *Flowserve*, 2007 WL 3357962, at *10 (holding that evidence of disclosures accompanying stock price increases were no evidence of loss causation because "there was no statistically significant price reaction" and "[w]ithout any price reaction, particularly a negative one, no investor could have suffered a loss"); *Zonagen*, 322 F. Supp. 2d at 781 ("Merely showing that the stock price was inflated when plaintiff purchased it, however, is not sufficient to demonstrate loss causation.").

The premise of AMSF's entire case is that Halliburton's stock traded at prices significantly inflated because of multiple misrepresentations throughout the class period.[47]   Yet AMSF's expert—who provides AMSF's only proof of loss causation—examined every single day in the class period and found only two instances of a statistically significant stock price increase that she connected to any Company-specific information.[48]   Both instances were late in the class period, and neither AMSF's Motion nor Nettesheim's Report even contends that these instances demonstrate loss causation.[49]   Nettesheim essentially disproves the entire premise of AMSF's case.   Her failure to demonstrate the central aspect of any securities case—that a misrepresentation inflated the stock price—is a fatal flaw.  *See, e.g., Zonagen*, 322 F. Supp. 2d at 775-82 (granting summary judgment for defendant because the plaintiffs' expert failed to present any evidence that the alleged misrepresentation at issue inflated the defendant's stock price).

**B.     AMSF does not prove any link between a potentially actionable, nonconfirmatory misrepresentation and corrective disclosure that reveals its falsity and causes a decline in the stock price.**

AMSF attempts to prove loss causation through the second method the *Greenberg* court identified: linking "an allegedly false, non-confirmatory positive statement" with "negative 'truthful' information" that later "caus[es] the decrease in [the stock] price."  *Greenberg*, 364 F.3d at 666.  AMSF's Motion looks solely to Nettesheim's testimony to satisfy this requirement.  Nettesheim, however, admitted during her deposition that she did not conduct the required

---

[47]     Fourth Compl. ¶ 3.

[48]     AMSF App. 96, 99 (Nettesheim Rep. ¶¶ 53, 59).

[49]     *See* Motion at 19-23; AMSF App. 37-66 (Nettesheim Rep. ¶¶ 79-134).  These instances occurred at the tail end of the class period in April and July 2001, and Nettesheim does nothing to link them to any corrective disclosure of any alleged culpable information causing a decline in the stock price.  They therefore cannot serve as any basis for loss causation.  *See Flowserve*, 2007 WL 3357962, at *10 (holding that earnings statements accompanying a stock price increase provided no evidence of loss causation because there was no relationship between them and subsequent price drops).

analysis. She explained repeatedly that she "didn't . . . match[] particular prior statements to [alleged corrective] disclosures."[50]

### 1.   Nettesheim failed to isolate any actionable misrepresentations, and AMSF's reliance on confirmatory and other nonactionable statements to support loss causation is contrary to Fifth Circuit authority.

The *Greenberg* and *Flowserve* cases demonstrate the proper procedure for linking an alleged corrective disclosure with a prior actionable misrepresentation. The first step is to isolate the alleged actionable, nonconfirmatory misstatements. *Id.* at 666 ("Of the alleged misrepresentations made by Crossroads regarding the features of its products, only those made on [particular dates] are non-confirmatory and therefore actionable."); *see also Zonagen*, 322 F. Supp. 2d at 778-81 (granting summary judgment because plaintiff's expert failed to demonstrate a link between the corrective disclosure and an actionable misrepresentation, as opposed to an alleged misrepresentation that did not survive the motion to dismiss). Thus, at "the threshold of class certification," the *Flowserve* court "look[ed] for alleged falsehoods that are capable of moving the market." *Flowserve*, 2007 WL 3357692, at *10. The court then held that almost half of the alleged misrepresentations were "confirmatory, had already been digested by the market, and [could not] serve as the basis for a fraud-on-the-market presumption." *Id.*

Nettesheim's entire analysis is flawed because she categorically refused to pinpoint any "particular statement" for which she claimed to have found loss causation.[51] Nettesheim's analysis merely references broad categories of allegations in the Fourth Complaint and does not identify specific representations made at any particular time by any particular Halliburton

---

[50]   App. 53 (Nettesheim Dep. 121); *see also* App. 57, 58, 59A, 59B, 60A (Nettesheim Dep. 137, 138, 164-65, 167, 168, 180).

[51]   App. 52A (Nettesheim Dep. 114); *see also* App. 57, 58 (Nettesheim Dep. 137, 138); App. to Motion to Strike (Allen Report at 15-18, 29-31, 33-39).

official.[52] Nettesheim thus failed to complete the first essential step of the analysis under *Greenberg* and *Flowserve*.

Setting aside Nettesheim's failure to identify *any* specific misrepresentations, even AMSF's Motion plainly argues that loss causation exists as to alleged misrepresentations that the Court has previously dismissed and to non-actionable confirmatory statements. Almost all of the alleged misrepresentations regarding unapproved claims to which AMSF points (including those it describes on pages 3-4 of its Motion) predate June 3, 1999, are time-barred, and do not provide any basis for loss causation.[53] *See* March 14, 2006 Order at 3 (dismissing as time-barred all claims based on pre-June 3, 1999 conduct). AMSF also relies on several time-barred statements related to the Dresser merger and asbestos in its Motion.[54] These statements (and any allegations in paragraphs 64-107 in the Fourth Complaint) cannot serve the basis of loss causation. *Id.* Similarly, AMSF's Motion points only to two statements in the class period concerning the success of the Dresser merger.[55] These statements, however, are confirmatory and therefore not actionable. *See supra* p. 5; *Greenberg*, 364 F.3d at 666; *Flowserve*, 2007 WL 3357692, at *10. To summarize, there can be no loss causation as to: (1) almost all of the unapproved claims

---

[52]   AMSF App. 39-65 (Nettesheim Rep. ¶¶ 82-132). Nettesheim conducted her statistical analysis backwards. Rather than starting with the potentially actionable misrepresentations and corrective disclosures alleged in the Fourth Complaint and determining whether they caused a statistically significant movement of the stock, Nettesheim analyzed each and every day during the nearly 3-year-long class period to find any day on which the stock had a statistically significant movement. As to all of those days, she then combed the news sources to see if she could find any disclosure relating in any fashion to any topic at issue in the Fourth Complaint. This methodology is unreliable and contrary to the very authority Nettesheim cites in her own report. *See* Motion to Strike at 3-4.

[53]   In fact, all of the claims asserted in the Fourth Complaint are time-barred and cannot support loss causation. The Fourth Complaint alleges in no uncertain terms that there was a "shocking public revelation" of Halliburton's prior alleged fraudulent conduct on October 24, 2000. Fourth Compl. ¶ 31; *see also id.* ¶¶ 144-45. Nettesheim also states that there was a statistically significant drop in the stock price following what she claims to be corrective disclosures on October 25 and December 22, 2000. Plaintiffs were then required to "proceed with a reasonable and diligent investigation" and file a complaint no later than October 24, 2001. Because the first complaint was not filed until June 3, 2002, all of the claims are time-barred. *See* March 14, 2006 Order at 3 (dismissing as time-barred all claims based on pre-June 3, 1999 conduct).

[54]   Motion at 6-7 (citing ¶¶ 8, 88, 101 of the Fourth Complaint, all of which pre-date June 3, 1999).

[55]   Motion at 7.

allegations to which AMSF's Motion points; (2) the pre-June 3, 1999 asbestos-related statements; (3) and all of the Dresser merger-related statements.[56]

Additionally, neither AMSF's Motion nor Nettesheim's Report even mentions the hodgepodge of alleged "accounting irregularities" in paragraphs 247-87 of the Fourth Complaint, let alone attempt to prove loss causation with respect to them. As a result, these claims cannot provide any basis for class certification.

> **2.     Nettesheim's claimed corrective disclosures do not reveal the falsity of any prior misrepresentation and therefore do not support loss causation.**

The next task is to determine whether there is a link between any remaining misstatements and a later corrective disclosure that (1) revealed the falsity of the prior statement; and (2) caused a decrease in the stock price. *Greenberg*, 364 F.3d at 666-67; *Flowserve*, 2007 WL 3357692, at *11-15. Under *Greenberg*, the necessary relationship between the corrective disclosure and the earlier misstatement is satisfied only if the corrective disclosure "specifically reveal[s]" the prior misstatement. *Greenberg*, 364 F.3d at 666.

Proof that a disclosure merely concerns the same general subject as the supposed misrepresentation is no evidence that the later disclosure is *corrective*. For example, in *Greenberg*, the plaintiffs alleged that the defendants made a number of misrepresentations related to its business of designing, manufacturing, and selling storage routers. An alleged misrepresentation regarding router speed, however, was not actionable because the alleged

---

[56]   Only misrepresentations for which the Fourth Complaint properly alleges materiality, falsity, and scienter are potentially actionable for the purposes of loss causation. *See Zonagen*, 322 F. Supp. 2d at 777, 779; *see also Flowserve*, 2007 WL 3357962, at *7 ("The predominance query begins with a review of the basic elements of a § 10(b) and Rule 10b-5 actions . . . [which include] (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which they *relied*; and (5) that proximately caused their injuries"). For example, any alleged misrepresentations attributed only to the former individual defendants are not actionable because the Court has held that the Fourth Complaint does not demonstrate that those statement were uttered with scienter. *See* Fourth Compl. ¶¶ 28, 38, 46, 132, 175, 181, 183, 185 (all containing statements attributed only to defendants that have been dismissed).

corrective disclosure discussed problems with a competitor in the router business and reported that earnings would be below analysts expectations, but made "no reference to increased router speed." *Id.* at 667.   Likewise, there was no proof of loss causation as to misrepresentations regarding *first* quarter results and *second* quarter analyst expectations because the alleged corrective disclosure mentioned only expected *third* quarter earnings.   *Id.*   Thus, even if the disclosure discusses the same concept or business as the prior misrepresentation, it is not a corrective disclosure unless it "specifically" corrects the prior misrepresentation and reveals the "truth[]."   *Id.* at 666; *Flowserve*, 2007 WL 3357692, at *11-12 (holding that revised earnings per share guidance was not sufficiently related to a previous alleged misrepresentation discussing projected earnings per share because it did not reveal any prior fraud); *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 167-68 (N.D. Tex. 2007) (dismissing suit because plaintiff failed to "explicitly allege a corrective disclosure—*i.e.*, a statement that corrects a previous misrepresentation or discloses a prior omission").

The *Flowserve* court further elaborated on the requirement that a corrective disclosure must reveal the prior fraud.   The court rejected an expert's claim that acute drops in the stock price reveal the "true financial condition" of a company and are proof loss causation "even if the fraudulent conduct itself is not revealed." *Flowserve*, 2007 WL 3357692, at *13.   Under that expert's logic, the court explained, "a plaintiff . . . with debatable evidence of fraud can pick the largest stock drop irrespective of the actual reason and still relate the fraud" to a prior disclosure. *Id.*   The court held that this approach to loss causation would "undermine the objectives of securities law and disregard[] precedent" in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) and *Greenberg. Id.*

Additionally, the court held that even if the alleged "corrective disclosure" had a "*negative* effect on the price of [the] stock," that alone does not "demonstrate a *corrective* effect on the price of [the] stock." *Id.*, at *18-19 (emphasis in original). The *Flowserve* court found analysis from the Southern District of New York instructive on the distinction between a *negative* disclosure and a *corrective* disclosure:

> The fact that an event—in this case, a failure to meet earnings forecasts or a statement foreshadowing such a failure—disabused the market of that belief [that the securities were valuable] does not mean that the event disclosed the alleged scheme to the market. In other words, a failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect. Such a failure does not imply that defendants concealed a scheme to depress earnings estimates and drive up prices. It does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme.

*Id.*, at *18 n.31 (quoting *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (emphasis in original)). Under *Greenberg* and *Flowserve*, it is not enough that the disclosure mentions the same subject matter as the prior alleged misrepresentation omission and causes a decline in the stock price. AMSF must also prove that the disclosure actually revealed the prior fraud to the market. *See Flowserve*, 2007 WL 3357692, at *13, *19.

Nettesheim's approach to loss causation is directly contrary to this standard. Just as the expert in *Flowserve*, she premises her entire analysis on the invalid theory that disclosures, which she concedes do not reveal the alleged fraud, are somehow "corrective."[57] She attempts to prove loss causation through "partial disclosures of information," which "changed investors' perceptions of the *true value of Halliburton*," but that "*did not admit the alleged fraud*."[58] Under

---

[57] *See* App. to Mot. to Strike (NERA Report at 15-18, 29-31, 33-39).

[58] AMSF App. 36 (Nettesheim Rep. ¶ 77) (emphasis added); *see also* AMSF App. 35 (Nettesheim Rep. ¶ 75) (admitting that in her view "[t]he corrective disclosure has a causal link to the alleged misrepresentations even though the company had not admitted to prior misrepresentations or to fraud").

*Greenberg* and *Flowserve*, her "true value of Halliburton" theory is no evidence of loss causation and, if accepted, would undermine the objectives of the securities laws. *Id.*, at *13 (rejecting expert's similar "true financial health" theory).

Even when Nettesheim attempts to link alleged corrective disclosures to prior (but unspecified) misrepresentations, her approach is contrary to Fifth Circuit authority. Nettesheim identifies 24 days during the class period with statistically significant decreases in Halliburton's stock price.[59] As to those 24 dates, Nettesheim identifies only eight involving a statement by Halliburton (as opposed to news about a competitor, oil prices, or other such information not specific to the Company).[60] As to each such date, she nakedly asserts that a Company disclosure, regardless of its content, has some unspecified relationship with the general subjects of the Complaint, such as unapproved claims, asbestos liability, or the Dresser merger.[61] For example, in answering a deposition question about the link between the December 2000 stock price decline and a prior misrepresentation, she stated:

> Q.  [I]n your mind, [the December 2000 press release, which contained multiple pieces of news[62]] is a corrective disclosure or partial corrective disclosure of what statements made by Halliburton?
>
> A.  This is related to the – what's generally called the unapproved claims or the cost overruns in the engineering and construction units.
>
> Q.  And how in your mind is it related to the unapproved claims issue?
>
> A.  It's my understanding that those relate to cost overruns.
>      . . .
>
> Q.  And I take it in your mind if there is a negative stock price movement of a statistically significant amount, and in the day preceding that movement there was some company announcement about fixed price contracts, whatever it may be, that is a sufficient relationship in your mind to make this a corrective disclosure or partial corrective disclosure?

---

[59]   AMSF App. 19 (Nettesheim Rep. ¶ 42).

[60]   AMSF App. 20-23 (Nettesheim Rep. ¶ 45).  It is unclear if AMSF is alleging loss causation as to each of these eight dates.  AMSF's Motion only refers to four of the dates.  *See* Motion at 2.

[61]   AMSF App. 42-43, 46, 52, 56-57, 65 (Nettesheim Rep. ¶¶ 87, 92, 105, 112, 132); see also App. to Motion to Strike (Allen Report at 15-18, 29-31, 33-39).

[62]   *See infra* pp. 27-28.

A.    In this case, yes.[63]

Nettesheim fails to demonstrate that any disclosure corrected and "specifically reveal[ed]" any particular prior misrepresentation.[64]  *See Greenberg*, 364 F.3d at 666-67 (rejecting evidence of disclosure merely mentioning the same general subject as a prior misstatement as not probative of loss causation).

Like the expert in *Flowserve*, Nettesheim takes a "results-oriented approach," and "discount[s] inconvenient but relevant facts" along the way. *See Flowserve*, 2007 WL 3357962, at *12. For example, she reviewed an October 4, 1999 disclosure containing *positive* news about Dresser and claimed it somehow revealed alleged fraud concerning the Dresser merger. The October 4, 1999 press release, which is not even mentioned in the Fourth Complaint, reported that Dresser had elected to sell its interest in two joint ventures and predicted that the sale would "result in net cash inflow of approximately $630 million which will be used to repay short-term debt" and "significantly strengthen[] Halliburton's balance sheet."[65]  Analysts reacted to this news *positively*.[66]  Nettesheim's conclusion that this information somehow corrected an unidentified prior fraudulent statement concerning the Dresser merger demonstrates the unreliability of her methodology and conclusions.[67]

Nettesheim's report is AMSF's only evidence of loss causation. Her opinions are premised on a theory that is directly contrary to Fifth Circuit authority, and her analysis demonstrates the absence of loss causation. Class certification must be denied.

---

[63]    App. 56 (Nettesheim Dep. 130-31); *see also* App. 53-54 (Nettesheim Dep. 119, 121, 124) (contending disclosures concerning asbestos, regardless of their content, correct all prior disclosures concerning asbestos).

[64]    *See* App. to Motion to Strike (Allen Report at 15-18, 29-31, 33-39).

[65]    App. 109-10 (October 4, 1999 Press Release, *Halliburton to Sell Two Joint Ventures, Announces Earnings Outlook*).

[66]    *See, e.g.*, App. 126-27 (October 4, 1999 Dow Jones Business News, *Halliburton Sells Stakes in Joint Venture for $1.1 Billion*).

[67]    See App. 60 (Nettesheim Dep. 175-76).

**C.    AMSF provides no empirical evidence that the alleged corrective disclosures, as opposed to other unrelated news, caused a significant amount of the stock price decline.**

When an alleged corrective disclosure is released with other negative news, a plaintiff must show "'that it is more probable than not that it was [the corrective disclosure of the alleged misrepresentation], and not other unrelated negative statements, that caused a significant amount of the decline.'"  *Oscar*, 487 F.3d at 266 (quoting *Greenberg*, 364 F.3d at 666).  Nettesheim failed to conduct this analysis.  In fact, she admits that she "was not asked to do" so.[68]

The *Oscar* case demonstrates the rigor of this requirement.  The issuer in that case, Allegience, was a national telecommunications provider.  Claimants alleged that the defendants fraudulently misrepresented Allegiance's line-installation count.  The defendants later restated the line-installation count in a disclosure containing various other items of bad news.  *Id.* at 263.  Plaintiff's expert conducted a study demonstrating that the company's stock price declined in a statistically significant amount after the disclosure.  The Fifth Circuit vacated and remanded, however, holding that the expert's report did not establish loss causation, and the district court abused its discretion in certifying the class.  *Id.* at 262, 270.  The Fifth Circuit explained that "when unrelated negative statements are announced contemporaneous of a corrective disclosure, the plaintiff must prove that 'it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline.'"  *Id.* at 270 (quoting *Greenberg*, 364 F.3d at 666).

The Fifth Circuit also discussed the kind of proof necessary to meet this requirement.  An event study showing only that the "stock reacted to the *entire bundle* of negative information" in the corrective disclosure is insufficient.  *Id.* at 271.  Rather, a plaintiff's evidence must be

---

[68]    App. 51 (Nettesheim Dep. 91-92); *see also* App. 50A (Nettesheim Dep. 89).

"empirically-based" and "more than well-informed speculation." *Id.* at 270-71. In *Oscar*, as here, the plaintiff's evidence of the amount of the stock price decline attributable to the revelation of the prior misstatement "consist[ed] chiefly of analyst commentary," which the court held was no evidence of loss causation. *Id.* at 270. Rather, the Fifth Circuit requires an "empirical" showing "that some percentage of the drop was attributable to the corrective disclosure" and "demands a peek at the plaintiff's damages model." *Id.* at 270-71.

Just as in *Oscar*, Nettesheim relied on the opinion of market analysts to supply the evidence that the stock price drop was attributable to the revelation of an alleged misrepresentation as opposed to other unrelated negative information.[69] Nettesheim, like the *Oscar* expert, failed to provide an "empirically-based" showing that Halliburton's stock price dropped in response to revelation of the prior misstatements, and not other negative news about the company. *Id.* at 270.[70] Her report therefore provides no evidence of loss causation; and under *Oscar*, the Court must refuse to certify the class.

**D.    Nettesheim neither links the eight alleged "corrective disclosures" to previously released nonconfirmatory information nor provides empirical evidence that they caused a significant portion of the decline in stock price.**

Nettesheim repeated the very mistakes that the Fifth Circuit determined to be fatal in *Greenberg* and *Oscar*. She conducted a methodologically flawed analysis that neither links a corrective disclosure with a potentially actionable misrepresentation, nor proves that the stock price reacted negatively to correction of the alleged fraud as opposed to other items of bad news. *See Oscar*, 487 F.3d at 270-71; *Greenberg*, 364 F.3d at 666-67. Specifically, the following disclosures, the only support in her report for loss causation, cannot be construed as "corrective":

---

[69]   App. 50A, 51 (Nettesheim Dep. 89-92)

[70]   *See also* App. to Motion to Strike (Allen Report at 22-27, 40-41).

*October 4, 1999.* After the market closed on October 4, 1999, Halliburton issued a press release that, as Nettesheim admits, discusses multiple pieces of news.[71] The Fourth Complaint does not mention this press release and certainly does not claim that it reveals any prior fraud. Nettesheim's report does not link any disclosures in the release with any particular misrepresentation. Instead, her report references pages 1-2 of the Fourth Complaint,[72] which contain no alleged misrepresentations at all, much less allegations regarding any of the subjects of the press release. In fact, nowhere in the Fourth Complaint are there any allegations whatsoever regarding these subjects, including Dresser Equipment Group or any joint ventures it owned. As in *Flowserve*, there is no apparent relationship between the disclosures in the press release and any potentially actionable prior misrepresentation (which Nettesheim does not identify). *Flowserve*, 2007 WL 3357692, at *11. Additionally, as discussed above, Nettesheim's testimony that the *positive* news about the sale of Dresser's joint ventures somehow discloses previous (unidentified) fraudulent statements regarding the Dresser merger[73] demonstrates her refusal to apply the requirement that a corrective disclosure "specifically reveal[]" the prior fraud. *Greenberg*, 364 F.3d at 666.

Because Nettesheim's report characterized the press release as containing only one piece of news, she never attempted to evaluate whether a significant portion of the stock price decline was attributable to alleged culpable versus nonculpable news. Thus, even if the press release

---

[71]   *See* App. 50 (Nettesheim Dep. 82). The October 4, 1999 press release relates to the following subjects, none of which are mentioned in the Fourth Complaint: (1) Dresser's election to sell its interests in two joint ventures; (2) under performance of the Dresser Equipment Group business segment; (3) lower than expected profits in Dresser Equipment Group's joint ventures and other business units; (4) 1999 third quarter results, which were affected by a decline in downstream Engineering and Construction business segment; (5) 1999 third quarter earnings in the Energy Service Group segment, which would remain flat to slightly up due to continued low spending levels by the company's energy industry customers. App. 109-10 (October 4, 1999 Press Release, *Halliburton to Sell Two Joint Ventures, Announces Earnings Outlook*).

[72]   AMSF App. 42-43 (Nettesheim Rep. ¶ 87 & n.51).

[73]   App. 60 (Nettesheim Dep. 175-76).

revealed the falsity of a prior misrepresentation, it would still not support loss causation. Nettesheim conducted no empirical analysis concluding that revelation of the truth, as opposed to other negative news—such as the decline in the *downstream* Engineering and Construction Group and the low spending by customers in the Energy Services Group—caused a significant portion of the stock price decline. *Oscar*, 487 F.3d at 270. This press release is not corrective of anything and is no evidence of loss causation.[74]

*January 5, 2000.* On January 5, 2000, analyst Carol Y. Lau issued a report after she had an alleged call with Halliburton. The report reduced earnings per share projections for various Halliburton segments, including Energy Services, and discussed lower oilfield services profits.[75] The Fourth Complaint does not mention Lau's report or claim that it is a corrective disclosure.[76] Nettesheim admits that she did not link any piece of news in Lau's report to any prior statement by Halliburton.[77] A reduced earnings per share estimate—in this case, one emanating from an analyst, not the Company—that does not specifically reveal prior fraud is no evidence of loss causation. *See Flowserve*, 2007 WL 3357962, at *13, *18-19.

Although Nettesheim admits that the Lau report contained nonculpable news,[78] she concludes that news and analyst reports suggest that the "reductions in earnings estimates *are based at least in part* on the problems with the large fixed-price contracts and the lack of benefits from the Dresser merger."[79] This conclusion is a far cry from the *Oscar* requirement of an

---

[74]  *See also* App. to Motion to Strike (Allen Report at 23-24, 29).

[75]  App. 128-29 (Jan. 5, 2000 Brown Brothers Harriman & Co. Report).

[76]  Under *Flowserve*, Lau's report could not constitute a corrective disclosure because there is no proof that the market recognized any relationship between the disclosure and the alleged fraud. *Flowserve*, 2007 WL 3357692, at *19 (holding that "[w]hen fraud is revealed through indirect disclosure, 'plaintiffs must provide proof that the market recognized a relationship between the event disclosed and the fraud' in order to establish loss causation").

[77]  App. 59 (Nettesheim Dep. 142-43).

[78]  AMSF App. 43 (Nettesheim Rep. ¶ 88).

[79]  AMSF App. 45 (Nettesheim Rep. ¶ 92) (emphasis added).

*"empirically-based"* analysis (as opposed to a review of news or analyst reports) concluding that a *"significant amount"* of the decline was due to the correction of prior fraud. *Oscar*, 487 F.3d at 270 (emphasis added). This is particularly true considering that the Lau report does not even mention unapproved claims or the Dresser merger.[80] The January 5, 2000 stock price drop is not evidence of loss causation.

***October 24, 2000.*** After the market close on October 24, 2000, Halliburton issued a press release and held a conference call with analysts. The press release disclosed the following negative news: (1) BRES's operating income of $10 million in the 2000 third quarter was negatively impacted by continuing low capacity utilization and by delayed customer projects; (2) Engineering and Construction Group business segment's revenues in the 2000 third quarter was a declined 21 percent from the previous year; (3) the Engineering and Construction Group's revenue decline was attributable to reduced customer spending associated with KBR's downstream petroleum industry; (4) operating income for the Engineering and Construction Group was flat compared to the previous year.[81]

Analyst reports following the October 24, 2000 conference call indicate the market's awareness of the following news: (1) lower earnings in the Engineering and Construction segment;[82] (2) depressed outlook for customer spending and the lack of profit predictability in

---

[80]   App. 128-29 (Jan. 5, 2000 Brown Brothers Harriman & Co. Report). Nettesheim cites a Merrill Lynch report by analyst K. Simpson in which Simpson explains that he cut earnings estimates for a number of reasons, some of which Nettesheim admits are nonculpable. AMSF App. 42 (Nettesheim Rep. ¶ 89). Simpson references "less powerful synergies from the *Dresser* merger than *[h]e* had envisioned." AMSF App. 42 (Nettesheim Rep. ¶ 89) (emphasis added). A single analyst report referencing *his own* prior expectation about Dresser (and not Halliburton's), does not even rise to the level of "well-informed speculation," which the Fifth Circuit held is *not* probative of loss causation. *See Oscar*, 487 F.3d at 271. Under *Oscar*, Nettesheim's mere review of Simpson's report is no evidence of loss causation. *Id.; see also* App. to Motion to Strike (Allen Report at 24-25, 29-30).

[81]   App. 111-13 (Oct. 24, 2000 Press Release, *Halliburton Releases Third Quarter Earnings, Up Significantly Over Prior Year and Previous Quarter*).

[82]   App. 149-54 (Oct. 25, 2000 CIBC World Markets Report); App. 138-41 (Oct. 25, 2000 Morgan Stanley Report); App. 142-44 (Oct. 25, 2000 Paine Webber Report); App. 145-48 (Oct. 25, 2000 Salomon Smith Barney Report).

the shallow water marine construction market;[83] (3) reduced customer spending in the KBR downstream petroleum business;[84] (4) plans for restructuring of the Engineering and Construction segment;[85] (5) lower than expected international revenues and decreased international spending by major oil companies;[86] (6) increased concerns about exposure to asbestos liability.[87]

Nettesheim admits that she "did not go back and match this partial disclosure with any particular statement."[88] Rather, she concludes with no explanation that the variety of news percolating in the market somehow related to unapproved claims and the lack of benefits from the Dresser merger.[89] And *presto*, loss causation! Under *Greenberg*, *Oscar*, and *Flowserve*, it is not that easy. First, neither the Company's statements nor the analyst reports say a single thing about unapproved claims or the Dresser merger. This is another instance in which the disclosure and the prior (unspecified) misrepresentation have no apparent relationship and loss causation is therefore absent. *See, e.g.*, *Flowserve*, 2007 WL 3357962, at *13 (holding that a disclosure accompanying a stock price drop is not corrective simply because it revealed the true financial condition of a company).

Second, there is no proof that a significant amount of the stock price drop is due to the revelation of the truth regarding any prior misrepresentation. *See Oscar*, 487 F.3d at 270. Again, Nettesheim relies on her review of analyst reports and news stories to determine the cause

---

[83]   App. 149-54 (Oct. 25, 2000 CIBC World Markets Report); App. 142-44 (Oct. 25, 2000 Paine Webber Report).

[84]   App. 149-54 (Oct. 25, 2000 CIBC World Markets Report); App. 142-44 (Oct. 25, 2000 Paine Webber Report).

[85]   App. 149-54 (Oct. 25, 2000 CIBC World Markets Report); App. 135-37 (Oct. 25, 2000 Dain Rauscher Wessels Report); App. 138-41 (Oct. 25, 2000 Morgan Stanley Report); App. 145-48 (Oct. 25, 2000 Salomon Smith Barney Report).

[86]   App. 135-37 (Oct. 25, 2000 Dain Rauscher Wessels Report).

[87]   App. 135-37 (Oct. 25, 2000 Dain Rauscher Wessels Report).

[88]   App. 57 (Nettesheim Dep. 137).

[89]   AMSF App. 47, 51 (Nettesheim Rep. ¶¶ 93, 103).

of the price decline.[90]  Her analysis of that news, however, bears little relation to the facts.  For example, she contends that because analysts reported on problems with the Engineering and Construction segment (specifically, KBR), that showed that a significant portion of the stock price decline on October 25, 2000 was related to the Company's booking of unapproved claims and the lack of benefits of the Dresser merger.[91]  She fails to recognize, however, that the BRES business unit, not KBR, conducted the majority of projects on which the Company booked unapproved claims.[92]  She also fails to consider that the challenges facing the KBR business unit were driven by reduced customer spending, not alleged problems with the Dresser merger.[93]

If the analyst reports show anything, they reveal that a variety of negative information existed in the marketplace.  Most, if not all, of that information—low customer spending in KBR's downstream petroleum business[94] and decreased international spending by major oil companies,[95] for example—bears no relation to the allegations regarding unapproved claims or the Dresser merger.  Nettesheim does not provide any empirical evidence that the stock price decline was due to revelation of any alleged misrepresentation as opposed to this nonculpable information.  *See Oscar*, 487 F.3d at 270.  In fact, Nettesheim does not even prove that there was *any* corrective disclosure on October 24, 2000, much less that such disclosure caused the stock price decline.[96]

***December 22, 2000.***   On December 21, 2000, the company issued a press release formally announcing the restructuring of its engineering and construction units into one business

---

[90]   AMSF App. 46-47 (Nettesheim Rep. ¶ 93).

[91]   AMSF App. 47-52 (Nettesheim Rep. ¶¶ 95-105).

[92]   *Morris*, 2007 WL 614210, at *1.

[93]   App. 135-37 (October 25, 2000 Dain Rauscher Wessels Report).

[94]   App. 135-37 (October 25, 2000 Dain Rauscher Wessels Report).

[95]   App. 135-37 (October 25, 2000 Dain Rauscher Wessels Report).

[96]   *See* App. to Motion to Strike (Allen Report at 25-27, 30).

segment and stating that the company would take an after-tax charge.  The charge related to (1) restructuring costs (such as severance costs associated with reduction of senior management positions); (2) current losses during the quarter on KBR's construction joint ventures, much of which was caused by labor disturbances in Venezuela and West Africa; (3) and some unapproved claims, which the company was unable to favorably resolve with customers.[97]

Nettesheim cannot connect this release, which makes no mention of the Dresser merger, to any nonconfirmatory prior statement about Dresser.[98]  Her claim that this disclosure relates generally to allegations regarding unapproved claims and cost overruns[99] is contrary to *Greenberg's* requirement of a specific corrective connection.  *See Greenberg*, 364 F.3d at 668 (holding that a disclosure concerning third quarter expectations had no relationship with a prior alleged misrepresentation concerning first and second quarter results).  Additionally, as the *Flowserve* court held, a disclosure of a change in circumstances—here, an unfavorable resolution of unapproved claims with its customers—does not constitute a correction of a prior statement.[100] *See Flowserve*, 2007 WL 3357692, at *18 & n.31.

Nettesheim does not explain how losses during the quarter on KBR joint venture projects never mentioned in the Fourth Complaint could possibly relate to any alleged prior misrepresentation.  Analyst commentary indicates that these losses related to labor disturbances, a shrinking customer base resulting from consolidations, and financially troubled competitors

---

[97]     App. 114-16 (December 21, 2000 Press Release, *Halliburton Announces New Structure and Engineering and Construction Charges*).  Recording of current losses is not and cannot be a correction of any prior misstatement.  Additionally, the Company's decision to take a charge for prior unapproved claims does not mean that the prior recording of such unapproved claims was improper.

[98]     As discussed above, there is no allegation of a nonconfirmatory statement during the class period about Dresser.  *See supra* p. 5.

[99]     App. 56 (Nettesheim Dep. 130).

[100]     AMSF has not presented evidence of when the company originally recorded the unapproved claims discussed in this release and whether that recording was even during the class period and therefore actionable.

who were driving down prices.[101]   The release plainly contains nonculpable negative news.[102]

But when Nettesheim responded to a question about whether she conducted any statistical

analysis of the various factors affecting the stock price decline, she explained that she reviewed

news reports (which themselves contain multiple pieces of negative news).[103]   She conducted no

empirical analysis separating the various potential reasons for the stock-price decline as required

by *Oscar*.   The December 22, 2000 decline in stock price is therefore no evidence of loss

causation.

 *June 28, 2001.*   On June 28, 2001, Halliburton issued an after-market press release

stating that Harbison-Walker Refractories Company, a former subsidiary of Dresser had

requested Halliburton's financial assistance for asbestos claims Harbison-Walker assumed

financial responsibility for when it was spun off from Dresser in 1992.[104]   Halliburton could not

have disclosed this information until June 2001 because Halliburton had only then received

Harbison-Walker's request for assistance.[105]

 Nettesheim contended there was a sufficient link between this disclosure and a prior—but

unidentified—misstatement merely because the disclosure "talk[ed] about asbestos claims."[106]

She could not, however, provide any evidence that the disclosure revealed the falsity of any

specific prior misrepresentation, as required by *Greenberg*.   In fact, she refused to testify that the

disclosure contained information that Halliburton should have disclosed earlier.[107]   There is no

such evidence.   The release itself states that Harbison-Walker's request was an "unexpected

---

[101]   App. 151 (December 22, 2000 CIBC World Markets Report at 3).

[102]   *See* App. to Motion to Strike (Allen Report at 27-28, 31).

[103]   App. 55 (Nettesheim Dep. 128).

[104]   App. 117-18 (June 28, 2001 Press Release, *Harbison-Walker Asks Halliburton for Assistance*).

[105]   App. 102 (June 2001 10-Q at 11).

[106]   App. 54 (Nettesheim Dep. 124).

[107]   App. 54 (Nettesheim Dep. 123).

development" and that Harbison-Walker had recently reaffirmed its responsibility for the relevant asbestos claims.[108] There is no proof that this disclosure is corrective, and it is therefore no evidence of loss causation. *See Flowserve*, 2007 WL 3357962, at *18 (holding that an unexpected disclosure's negative effect on the price of the stock does not demonstrate any corrective effect).[109]

     *August 9, 2001, October 31, 2001, and December 4-7, 2001.* On August 9, 2001, Halliburton filed its Form 10-Q, which Nettesheim admits contained a "lot of information"[110] including that the Company increased its reserves for known asbestos claims. The Fourth Complaint does not allege that this 10-Q contained any corrective disclosure. On October 30, 2001, the Company issued a press release concerning a jury verdict in a Mississippi asbestos suit against Harbison-Walker.[111] The Fourth Complaint does not mention this press release or claim that it resulted in losses to the class. On December 4, 2007, the Company announced that a Texas court entered judgment in asbestos litigation against Dresser.[112] On December 7, 2001, the Company issued a press release concerning a Maryland jury verdict in an asbestos suits against Dresser.[113]

     Nettesheim merely contends that these disclosures generally relate to prior, unidentified statements about asbestos.[114] Despite the requirement in *Greenberg* that there be evidence that such disclosures "specifically reveal[]" a prior misrepresentation, Nettesheim provided no testimony of any such prior misrepresentation and could not explain when or why Halliburton

---

[108]   App. 117-18 (June 28, 2001 Press Release, *Harbison-Walker Asks Halliburton for Assistance*).

[109]   *See also* App. to Motion to Strike (Allen Report at 33-39).

[110]   App. 53 (Nettesheim Dep. 121).

[111]   App. 119-20 (Oct. 30, 2001 Press Release, *Halliburton Disputes Asbestos Claims*).

[112]   App. 107 (Dec. 4, 2001 Form 8-K at 2).

[113]   App. 121-23 (Dec. 7, 2001 Press Release, *Halliburton Comments on Asbestos Judgments*).

[114]   App. 52, 53 (Nettesheim Dep. 110-11, 120, 121).

should have disclosed this information earlier.[115]  Halliburton's increase of its asbestos reserves in the August 2001 10-Q results from the previously announced inability of Harbison-Walker to satisfy its indemnitee obligations, reflects a change Halliburton's estimation of its liability on pending claims, and is no evidence of a corrective disclosure.[116]  Further, disclosures of adverse jury verdicts—particularly when, as here, the disclosure occurred within days of the verdict—corrects nothing. *Flowserve*, 2007 WL 3357692, at *19 (holding that a negative disclosure is not necessarily a corrective disclosure).[117]  In fact, the disclosures merely confirmed the Company's previous and repeated warning that a series of such results "could materially impact" its expectations regarding resolutions of its asbestos claims.[118]

For all these reasons, and the reasons in the Expert Report of Dr. Lucy Allen, these eight disclosures cannot be construed as corrective and provide no evidence of loss causation. Because AMSF has provided no evidence of loss causation, class certification must be denied.

**II.      A class should not be certified as to Lesar because AMSF has not and cannot prove loss causation as to any misrepresentation attributed to him.**

AMSF did not even attempt to prove the most basic element of its securities claim against Lesar—that a statement he made inflated the stock price.  Nettesheim identifies only two dates late in the more than 600-day class period on which the stock price increased. On neither of those dates did Lesar make a factual statement that AMSF has alleged to be false.  Nor does AMSF or its expert claim that either of these statements support loss causation.  Nettesheim's failure to demonstrate inflation of the stock price due to a statement by Lesar during the class period is fatal. *See Zonagen,* 322 F. Supp. 2d at 776.

---

[115]    App. 53 (Nettesheim Dep. 120).

[116]    App. 103 (June 2001 10-Q at 12); App. to Motion to Strike (Allen Report at 37).

[117]    *See also* App. to Motion to Strike (Allen Report at 34-38).

[118]    *See* App. 78 (1999 Form 10-K at 44).

Likewise, Nettesheim fails to identify any disclosure accompanying a stock price drop that corrects any prior actionable statement by Lesar.  As discussed above, his statement concerning benefits from the Dresser merger is confirmatory and thus not actionable, and none of the eight disclosures Nettesheim identifies could possibly be construed as correcting the statement. *See supra* pp. 5, 23-31.  As Nettesheim freely admits, she did not link any of the eight disclosures to any prior particular statement, including any statement by Lesar.  Her analysis does not pass muster in the Fifth Circuit, and class certification must be denied as to Lesar. *See Greenberg,* 364 F.3d at 667; *Flowserve,* 2007 WL 3357692, at *11-12.  AMSF has failed to prove loss causation (which Defendants contend it never pleaded) as to Lesar. The Court should not only refuse to certify a class as to him but should also grant the pending motion for reconsideration and dismiss any claims in the Fourth Complaint against Lesar.

## III.    Proposed class representatives Murphey and AMSF are neither typical nor adequate.

Neither Murphey nor AMSF have made the requisite showings to satisfy the typicality and adequacy requirements imposed under Rule 23(a).  Murphey has not been appointed by the Court as a lead plaintiff, and AMSF's Motion offers no reason whatsoever for appointing him as class representative.  His vulnerability to a number of unique defenses, his unfamiliarity with and lack of control over the litigation, and his small stake in the outcome of the litigation make him an improper representative.  Similarly, unique defenses that may be asserted against AMSF render it an atypical and inadequate class representative.

### A.    Rule 23(a)'s requirements for typicality and adequacy.

A plaintiff's claims lack typicality if his legal or factual position is "markedly different from that of other [class] members, even though common issues of law or fact are raised." *Kas v. Fin. Gen. Bankshares, Inc.,* 105 F.R.D. 453, 461 (D.D.C. 1984).  Thus, "the typicality

requirement is not met when the circumstances of the representatives or the legal theory upon which their claims are premised are notably different from circumstances or claims of the class members." *Weikel v. Tower Semiconductor, Ltd.*, 183 F.R.D. 377, 390 (D.N.J. 1998). Similarly, when the representatives' claims and the defendants' defenses thereto "will be dominated by individual evidence," the typicality requirement of Rule 23(a)(3) is not satisfied. *Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 201 (W.D. Tex. 2004); *In re FirstPlus Fin. Group, Inc., Sec. Litig.*, No. Civ. A. 3:98-CV-2551-M, 2002 WL 31415951, at *5 (N.D. Tex. Oct. 28, 2002).

The typicality requirement of Rule 23(a)(4) is heightened in securities cases because "the PSLRA raises the standard adequacy threshold," requiring that "competent plaintiffs, rather than lawyers, direct such cases." *Berger*, 257 F.3d. at 483-84. "[B]ecause absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times." *Id.* at 480; *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 532 (N.D. Tex. 2005). Accordingly, the Fifth Circuit has interpreted Rule 23(a)(4) to mandate an inquiry not only into the "zeal and competence of the representative[s'] counsel," but also into "the willingness and ability of the *representative[s]* to take an *active role in and control* the litigation and to protect the interests of the absentees." *Berger,* 257 F.3d at 479 (quoting *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982) (emphasis added). A class representative is inadequate when the evidence demonstrates that his or her understanding of the case is "limited to derivative knowledge acquired solely from counsel." *Berger*, 257 F.3d at 483 n.18; *Ogden*, 225 F.R.D. at 535; *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 587 (W.D. Tex. 2002).

### B.     Murphey is neither typical nor adequate as required by Rule 23(a).

#### 1.     Murphey cannot satisfy the typicality requirement.

Murphey—basically a day-trader, who profited from buying Halliburton stock and whose class period trades occurred before any alleged artificial inflation in the stock price—fails to satisfy the typicality requirement because he is subject to unique defenses concerning his reliance. *See Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984) (affirming denial of class certification because, among other reasons, of "concern that representation of the class will suffer if the named plaintiff is preoccupied with a defense . . . applicable only to himself").

First, as a day-trader, he looked at short-term price patterns of Halliburton stock, rather than the market price, to determine whether to buy or sell the stock.[119] He frequently bought and sold Halliburton stock on the same day.[120] Evidence that a person "focuses on technical price movements rather than price" is a "compelling reason to rebut the [fraud on the market] reliance presumption." *See In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003).[121]

Second, Murphey profited from every trade he made during the class period, and is therefore not a typical representative.[122] *See In re Organogenesis Sec. Litig.*, 241 F.R.D. 397, 401 (D. Mass 2007) (concluding that the plaintiff would not be a typical representative if he actually benefited from an artificially inflated price). The only shares that he held at the end of the class period—the 300 shares he bought on September 13, 2000 for $15,843.75—he still holds

---

[119]   App. 37-40 (Murphey Dep. 149-51; 156-58).

[120]   App. 37-40 (Murphey Dep. 149-51; 156-58).

[121]   Murphey also admits that he relied on non-market information in making the decision to purchase Halliburton stock. Unlike other class members, he bought Halliburton stock because he *personally* observed Halliburton's work overseas, and even he believes that there is not "another person in the class" who invested for these reasons. App. 35-36 (Murphey Dep. 133–34).

[122]   *See* App. 42 (Murphey Dep. 164-65) (admitting that he profited on every sale of Halliburton stock during the class period and therefore had a 100 percent success rate); *see also* App. 255 (Ben Alan Murphey Class Period Trades).

today. Those shares have grown through stock splits and dividend reinvestments to over 600 shares and are worth considerably more than Murphey paid.[123]

Third, the timing of Murphey's transactions demonstrates Murphey's atypical position with respect to reliance and injury.[124] All of Murphey's class period trades occurred between March 14, 2000 and September 13, 2000,[125] and before the only two instances of a statistically significant price increase that AMSF's expert has tied to any Halliburton-specific statement.[126] Thus, Murphey is subject to the defense that he cannot benefit from the fraud-on-the-market presumption because he did not trade any shares "between the time [any actionable] misrepresentations were made and the time the truth was revealed."[127] *See Greenberg*, 364 F.3d at 661.

### 2. Murphey cannot satisfy the adequacy requirement.

Murphey sued Halliburton many months after this class action was first filed,[128] and he did so only after being contacted by Neil Rothstein, AMSF's "special counsel" with whom he had had no prior contact.[129] Murphey's testimony shows that he lacks the necessary understanding of the allegations and the procedural history of this case to serve as a class representative.[130]

---

[123]   *See* App. 42-44 (Murphey Dep. 165-70); *see also* App. 158-254, (Yahoo! Finance Stock Price Chart).

[124]   Plaintiffs purport to rely on the fraud-on-the-market theory to establish a "class-wide presumption of reliance." Motion at 16. "Ordinarily, under a fraud-on-the-market theory, there is a presumption that an investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Safeguard*, 216 F.R.D. at 582 (internal quotations omitted). However, a defendant may rebut the presumption by "showing that . . . the plaintiff would have made the purchase regardless of the misstatement/omission." *Id.*

[125]   App. 38, 42-44 (Murphey Dep. 152-54, 165-66, 171).

[126]   *See* AMSF App. 20-23 (Nettesheim Rep. ¶ 45) (identifying first such increase on April 26, 2001).

[127]   Moreover, all of Murphey's trades occurred on or after the day that Halliburton issued its 1999 Form 10-K, which disclosed Halliburton's accounting for unapproved claims and therefore cannot be based on the alleged misrepresentations related to those claims. *See* App. 38 (Murphey Dep. 152:3-153:16); App. 76 (1999 Form 10-K at 34).

[128]   App. 26-27 (Murphey Dep. 53-55).

[129]   App. 25, 29-30 (Murphey Dep. 34-35, 64-66).

[130]   App. 30, 32, 34, 45 (Murphey Dep. 62; 106-08; 109; 122-23; 201).

He is not in control of the litigation.[131] He does not remember having any input into the filing of the original complaint filed in his name;[132] he admits it was not his decision to file the Fourth Complaint;[133] and he does not know if he reviewed the class certification motion before it was filed with the Court.[134] In fact, Murphey does not even actively contact his lawyers.[135] He is unfamiliar with the parties to the suit, the remaining claims at issue, or whether any claims have been dismissed.[136] Accordingly, Murphey is not an "active, able class representative[] who [is] informed and can demonstrate that [he is] directing the litigation." *Berger*, 257 F.3d at 483; *see also Kase*, 218 F.R.D. at 159 (finding named plaintiff an inadequate representative because he had "not participated in many of the key strategic decisions" in the case and he had "stated that he would permit class counsel to pursue [the] lawsuit as they saw fit"); *Krim*, 210 F.R.D. at 588 ("An example of an adequate class representative is one with 'commendable familiarity with the complaint . . . .'") (quoting *Horton*, 690 F.2d at 484).

A putative class representative is also inadequate if he has "an insufficient stake in the outcome." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).[137] As discussed above, Murphey did not lose money; he actually profited by purchasing Halliburton stock. Because Murphey, by his own admission, does not have enough at stake in the outcome "to ensure zealous advocacy," he will not adequately protect the interests of the unnamed class

---

[131]   App. 46 (Murphey Dep. 211).

[132]   App. 28 (Murphey Dep. 59–60).

[133]   App. 33 (Murphey Dep. 119).

[134]   App. 33 (Murphey Dep. 120-21).

[135]   App. 32 (Murphey Dep. 109).

[136]   App. 45, 34, 32 (Murphey Dep. 201, 122-23, 106-08).

[137]   The rebuttable presumption in the PSLRA that the most adequate plaintiff is the person with "the largest financial interest in the relief sought by the class" further illustrates the importance of a class representative's financial interest in the outcome of the litigation. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(bb) (2000).

members. *See Vodak v. City of Chicago*, No. 03 C 2463, 2006 WL 1037151, at *6 (N.D. Ill. Apr. 17, 2006).

### C.     AMSF cannot satisfy the typicality and adequacy requirements.

#### 1.     AMSF's complete reliance on money managers renders it atypical and/or inadequate.

Because AMSF decided to grant unfettered authority over its investment decisions to third parties, it cannot satisfy the typicality requirement. Courts have recognized that plaintiffs who rely solely upon third parties to make investments are subject to a unique defense—namely that they have not relied upon the misrepresentations and omissions allegedly made by the defendant to the market. *See In re Caremark Int'l, Inc. Sec. Litig.*, No. 94 C 4751, 1996 WL 351182, at *6 (N.D. Ill. June 24, 1996); *see also Fry v. UAL Corp.*, 136 F.R.D. 626, 635-36 (N.D. Ill. 1991).[138]   As such, they may be atypical or inadequate and cannot serve as class representatives.

In *Fry*, the court refused to allow plaintiff Marra to be a class representative because (1) Marra stated that a third party had "complete discretionary authority over his account'" (2) Marra did not follow the affairs of UAL; and (3) Marra "was not even aware that his funds had been invested" in UAL. *Fry*, 136 F.R.D. at 636. The court reasoned that "someone who abdicated complete authority over his relevant financial affairs" could not be found an adequate representative. *Id.*   Similarly, in *Caremark*, the court held that "a certain minimal level of

---

[138]   No court within the Fifth Circuit has addressed whether a proposed class representative who delegates authority over its investments to a third party satisfies the typicality and/or adequacy requirements of Rule 23(a). But the *Caremark* and *Fry* decisions holding that plaintiffs who abdicate their investment decisions to others are not adequate or typical are consistent with the Fifth Circuit's careful approach to the Rule 23 requirements. In contrast, some courts have found such plaintiffs adequate and typical in circumstances not present in this case. *See In re Vicuron Pharm., Inc. Sec. Litig.*, 233 F.R.D. 421, 426-27 (E.D. Pa. 2006) (approving class representative that delegated investment decisions to a manager but created investment guidelines and monitored investment activities); *Dorchester Invs. v. Peak Trends Trust*, 2002 WL 272404, at *8-9 (S.D.N.Y. Feb 26, 2002) (approving class representatives despite discretionary accounts because it did not appear that they had never followed the affairs of the company or had learned about the investment only after the fact).

participation by the plaintiff in the relevant stock transaction must be demonstrated" in order for that plaintiff to satisfy the typicality or adequacy requirements of Rule 23(a). *Caremark*, 1996 WL 351182, at *6 (quoting *Fry*, 136 F.R.D. at 635). In refusing to certify one of the plaintiffs as a class representative, the *Caremark* court stated that "[p]lainttiffs have not been permitted to act as class representative in securities litigation where they did not participate in the investment decision *at issue*." *Id.* (emphasis added). Because the plaintiff in *Caremark* "had no input into the decision to purchase the Caremark Stock and learned of it only after it had occurred," he was precluded from being a class representative. *Id.*

AMSF, like the plaintiffs in *Fry* and *Caremark*, made no decisions whatsoever regarding the purchase of the stock at issue in this case.[139] Instead, AMSF relied exclusively on its money managers during the class period to make any and all decisions related to the purchase or sale of *any* stock. AMSF granted these money managers "full discretionary authority."[140] AMSF therefore never made the most basic decisions about whether or when to purchase or sell its Halliburton stock.[141] In fact, AMSF could not recall how or when it first learned that it owned Halliburton stock,[142] and was not even aware that it owned Halliburton stock until AMSF was informed by its money managers that it had been purchased on AMSF's behalf.[143] Moreover, AMSF did not know why its money managers purchased Halliburton stock,[144] or what its money managers intended to do with it once it was purchased.[145]

---

[139] App. 14 (AMSF Dep. 113). AMSF continues to this date to completely delegate authority over its investments to third parties. App. 3, 14 (AMSF Dep. 23, 113).

[140] App. 5, 19 (AMSF Dep. 30, 133).

[141] App. 15-16 (AMSF Dep. 117-18).

[142] App. 6 (AMSF Dep. 47).

[143] App. 4, 6, 16 (AMSF Dep. 26-27, 47-48, 118-19).

[144] App. 16, 17, 20 (AMSF Dep. 118, 124; 167).

[145] App. 16, 18 (AMSF Dep. 119, 127).

AMSF relied exclusively on its money managers not only to make stock purchase and sale decisions, but also to monitor all of its investments. AMSF admitted that because its "investment strategy is handled completely by consultants," it did not know other basic information about its investments, including whether AMSF employs money managers who buy and sell stock on the same day,[146] or what "general strategy" the money managers follow.[147]

The facts surrounding AMSF's delegation of unfettered discretion to its money managers in connection with its investments are identical to those in both *Fry* and *Caremark*. As a result, AMSF does not meet the typicality requirement of Rule 23(a) and it cannot serve as a class representative. *In re Caremark*, 1996 WL 351182, at * 6.

### 2.     AMSF Is Not an Adequate Representative of the Putative Class.

Throughout this litigation Paula John, AMSF's President and CEO and former law school classmate of AMSF's special counsel, Neil Rothstein,[148] has been the client representative of AMSF. Naturally, Halliburton's counsel expected (as AMSF's counsel had represented) that John would appear for the Rule 30(b)(6) deposition of AMSF. Instead, upon arriving at the deposition, Halliburton learned that AMSF would offer Patrick Byrne, who could not answer a number of questions that were integral to issues related to class certification and AMSF's adequacy as a class representative.[149]

John's absence from the AMSF deposition is indicative of who is actively directing the litigation: AMSF's lawyers, not AMSF. *Berger*, 257 F.3d at 483-84. AMSF also admitted that it had very limited knowledge about the confidential sources upon which part of its complaint

---

[146]   App. 12-13 (AMSF Dep. 93-94).

[147]   App. 13 (AMSF Dep. 95-96).

[148]   *See* App. 156 (Roger Parloff, *Lerach Firm Will Fight Client to Stay in Halliburton Case, Fortune*, Dec. 13, 2006, at 2, available at http://legalpad.blogs.fortune.cnn.com/2006/12/13/lerach-firm-will-fight-client-to-stay-in-halliburton-case (last visited Nov. 15, 2007).

[149]   App. 7-8, 9 (AMSF Dep. 53, 54, 59).

relies and could not even confirm whether AMSF had previously been in contact with those sources.[150]   Quite simply, it appears as though the idea for the lawsuit, as well as the development of the factual allegations on which it is based, came from counsel, not AMSF.   A proposed class representative, even if aware of the facts regarding the lawsuit, is an inadequate representative if he has left it to the attorneys to direct and develop the case.   *See Kase v. Salomon Smith Barney, Inc.*, 218 F.R.D. 149 (S.D. Tex. 2003).

## CONCLUSION

The Court should deny AMSF's motion for class certification.   There is no evidence of loss causation.   In fact, AMSF's expert demonstrates that Halliburton's stock price was not inflated due to any alleged misrepresentation.   Additionally, the proposed class representatives are neither adequate nor typical of the proposed class.

---

[150]   App. 10-11 (AMSF Dep. 73-76).

## CERTIFICATE OF SERVICE

This will certify that a true and correct copy of the above document was served on this the 16th day of November, 2007, via the U.S. District Court's ECF Filing System for All Counsel of Record.

/s/ Robb L. Voyles
Robb L. Voyles