IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, INC., et al., On Behalf of itself and All Others Similarly Situated,<br><br>    Lead Plaintiff,<br>v.<br><br>HALLIBURTON COMPANY, et al.,<br><br>    Defendants. | § § § § § § § § § § § § | Civil Action No. 3:02-CV-1152-M |

**LEAD PLAINTIFF'S MOTION TO
STRIKE THE EXPERT REPORT OF LUCY ALLEN AND INCORPORATED
<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP


/s/ David Boies
David Boies
333 Main Street
Armonk, NY  10504
Telephone:  (914) 749-8200
Facsimile:  (914) 749-8300

**LEAD COUNSEL FOR LEAD PLAINTIFF,
THE ARCHDIOCESE OF
MILWAUKEE SUPPORTING FUND, INC.**

Caryl L. Boies, TSB # 02565420
Sashi B. Boruchow, FSB #0398276
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022

*Additional counsel appear on signature page*

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION .......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 1

    A.    Ms. Allen's Criticism of Ms. Nettesheim's Event Study Demonstrates a Fundamental Lack of Understanding of Ms. Nettesheim's Methodology ............ 2

    B.    Ms. Allen's Criticism Regarding Ms. Nettesheim's Calculation of Statistical Significance is Not Based in Sound Economic Theory ........................................ 5

    C.    Ms. Allen's Criticisms of Ms. Nettesheim's Industry Index Are Contrary to the Methodology Endorsed by Ms. Allen's Colleagues at NERA ........................ 7

    D.    Ms. Allen's Selection of a Post-Class Control Period Is Not Supported by Academic Literature .................................................................................................. 10

    E.    Ms. Allen's Report Is Results-Oriented and Should Be Excluded ...................... 11

CONCLUSION ............................................................................................................................. 11

## TABLE OF AUTHORITIES

Page

**Cases**

*Advance v. Kerr-McGee Chem. LLC,*
  No. 5:04CV209, 2006 WL 3912471 (E.D. Tex. Dec. 6, 2006) .............................................. 2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993) ................................................................................................... passim

*Moore v. Ashland Chemical, Inc.,*
  151 F.3d 269 (5th Cir. 1998) ............................................................................................ 2, 5

*Ryan v. Flowserve Corp.,*
  No. 245 F.R.D. 560, 2007 WL 3357692 (N.D. Tex. Nov. 13, 2007) ..................................... 5

*U.S. v. 14.38 Acres of Land, More or Less, Situated in Lefore County, Mississippi,*
  80 F.3d 1074 (5th Cir. 1996) ................................................................................................. 2

*Watkins v. Telsmith,*
  121 F.3d 984 (5th Cir. 1997) ..................................................................................... 1, 2, 11

**Rules**

Federal Rule of Evidence 702 ................................................................................................. 1

## INTRODUCTION

The Expert Report of Lucy R. Allen (hereinafter cited as "Allen Rep.") submitted in support of Defendants' Motion to Strike the Expert Report of Jane Nettesheim ("Nettesheim Rep.") fails the Fifth Circuit's test for the admission of expert testimony, and this Court should therefore grant Plaintiff's Motion to Strike the Allen Report. The Allen Report rests on a basic misunderstanding of Ms. Nettesheim's methodology; fails to provide the necessary data and information to allow this Court to gauge the validity of Ms. Allen's methodology, and therefore her conclusions; and is premised on principles that are contrary to academic literature, even that of her NERA peers. For these reasons, the Allen Report lacks relevancy and reliability and should be excluded.

## ARGUMENT

The admissibility of expert evidence is governed by Federal Rule of Evidence 702, which requires district courts to ensure that expert testimony is (1) "relevant to the task at hand" and (2) "rests on a reliable foundation." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held:

> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability-of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Id.* at 594-95. *See also*, *Watkins v. Telsmith*, 121 F.3d 984 (5th Cir. 1997).

*Daubert* and its progeny, including the revised F.R.E. 702, assign the trial court a key gatekeeping function for admission of expert testimony. The Fifth Circuit has confirmed that "application of the *Daubert* factors is germane to evaluating whether the expert is a hired gun or

1

a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers." *Watkins,* 121 F.3d at 991.

District courts enjoy wide latitude in determining the admissibility of expert testimony, and "the discretion of the trial judge and his or her decision will not be disturbed on appeal unless 'manifestly erroneous.'" *Id.* at 988. However, *Daubert* "did not work a[n] overriding change in federal evidence law, and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" *Advance v. Kerr-McGee Chem. LLC*, No. 5:04CV209, 2006 WL 3912471 (E.D. Tex. Dec. 6, 2006) (*quoting U.S. v. 14.38 Acres of Land, More or Less, Situated in Lefore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996)). Under normal circumstances, final determinations regarding the credibility of expert witnesses and the weight to be afforded their opinions remain within the province of the trier of fact. *Id.*

When expert testimony is challenged under *Daubert*, the burden of proof rests with the party seeking to present the testimony. *See Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998). To meet this burden, defendants cannot simply rely on their expert's assurances that she has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required. *Id.* While Plaintiff recognizes that the exclusion of expert testimony is the exception rather than the rule, the Allen Report is precisely the type of "hired gun" report that *Daubert* was intended to address. *Watkins*, 121 F.3d at 991. Accordingly, the Allen Report should be stricken.

A. Ms. Allen's Criticism of Ms. Nettesheim's Event Study Demonstrates a Fundamental Lack of Understanding of Ms. Nettesheim's Methodology.

Ms. Allen's criticism of Ms. Nettesheim's event study is based on either a misunderstanding, or intentional mischaracterization, of Ms. Nettesheim's methodology. Ms. Allen contends that Ms. Nettesheim's event study methodology is "fundamentally backwards"

2

22615

and "does not adhere to the standards of academic literature." Allen Rep. at 1. These statements are based on the inaccurate presumption that Ms. Nettesheim "first" identified dates during the Class Period with statistically significant stock price movements and "only then" looked for disclosures on those specific days. Allen Rep. at 5-6, 10. This assessment misleadingly characterized the *results* of the event study analysis presented in the Nettesheim Report as the sum total of the *process* used to arrive at the results and conclusions in the Nettesheim Report.[1]

As Ms. Nettesheim testified at her deposition, she began her analysis by reviewing the allegations of the Complaint to obtain an understanding of the allegations of misrepresentations and to identify dates with alleged partial disclosures.[2] As noted in footnote 3 of the Nettesheim Report, Ms. Nettesheim assumed that the allegations in the Complaint were true and thus, her analysis is based on the allegations in the Complaint and not on a narrow review of news and information only published on statistically significant residual return dates, as Defendants suggest.

Ms. Nettesheim then reviewed news articles and analyst reports related to the allegations in the Complaint, especially around the alleged partial corrective disclosures, and reviewed

---

[1] Indeed, Ms. Allen's misunderstanding of the Nettesheim Report may stem from the fact that Ms. Allen did not review the appendix to that report in which Ms. Nettesheim detailed her methodology. For example, when asked whether she reviewed certain materials attached to the Nettesheim Report, Ms. Allen responded: "I don't believe she attached any material period to her report." Allen Dep. at 31:23-24, Plaintiff's Appendix to Lead Plaintiff's Reply in Support of its Motion for Class Certification, Motion to Strike the Expert Report of Lucy Allen, and Opposition to Motion to Strike Expert Report of Jane Nettesheim ("Pl. App.") at 092. In fact, Ms. Nettesheim provided a significant and detailed appendix.

[2] Nettesheim Dep. at 16:11–17:2, Pl. App. at 114:

> Q. When you were retained in this case, how did you begin your work on the loss causation part of the engage meant?
>
> A. Well, at the very beginning I read the complaint.
>
> Q. What did you do after that?
>
> A. Then I asked to have information and data gathered for example stock prices, data on market indices or a market index, data on competitor companies. I also had news reports, news headlines analyst reports and those titles. I asked for those things to be gathered.

Halliburton stock price to see, in a general sense, how it reacted on dates of alleged partial corrective disclosures. After this initial analysis of the allegations, news and information related to the allegations, and a general review of changes in Halliburton's stock price during the Class Period, Ms. Nettesheim performed the market efficiency regression, the results of which appear on pages 16 to 22 of the Nettesheim Report.[3] Although she examined dates on which alleged disclosures were made, Ms. Nettesheim's analysis was not limited to those dates because she was asked to examine loss causation (*i.e.*, why did Halliburton stock price decline over the class period and were any of the declines related to partial corrective disclosures of the misrepresentations and omissions alleged in the Complaint?).[4] Nettesheim ¶ at 81, First App. at 054-055.

Through her loss causation analysis, Ms. Nettesheim identified other dates of possible partial corrective disclosures. The purpose of the loss causation analysis is to determine whether the alleged fraud caused the loss. Thus, the discussion in the Nettesheim Report was logically limited to dates with large downward stock price movements that were associated with

---

[3] Nettesheim Dep. at 37:8–23, Pl. App. at 115:

> Q. What is an event study?
>
> A. It's an analysis of the—well, it encompasses regression analysis that we have discussed. And core relates the news and information that comes out with the stock movements of a company.
>
> Q. And how does it do that?
>
> A. Collect the information about a company from various sources, any number of sources and you look at the stock reactions to various pieces of information and that's basically by putting together the—what I would call the output from the regression analysis collating that with the output of the news gathering analysis.

Nettesheim Dep. at 39:19–40:2, Pl. App. at 116:

> Q. How did you go about breaking down then the returns on a daily basis between the different pieces of information that was disclosed to the market about Halliburton on that particular day?
>
> A. There are certain days that I discuss in my report, but I didn't discuss every day in the class period.

[4] Nettesheim Rep. at 3; Nettesheim Dep. at 43:25–44:5, Pl. App. at 117:

> A. In the loss causation section, I was focusing on the combination of the determinants of the decline in the price and those declines that related to the allegations in the complaint.

information and news about Halliburton that were partial corrective disclosures of the alleged fraud. Ms. Nettesheim's event study methodology is the same methodology that she has employed in other securities actions and has been accepted by courts in other actions, as she explains in her rebuttal report ("Nettesheim Reb. Rep.") ¶ 11 n.18 and n.20, Pl. App. at 013-014.

While Ms. Allen claims that Ms. Nettesheim's event study methodology is flawed, Ms. Allen's *ipse dixit* assertion does not make it so. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998). Moreover, Ms. Allen's failure to conduct a market efficiency or loss causation analysis here, and her equivocal testimony and uncertain experience in conducting such analysis elsewhere, severely undercut whatever weight her assertions might otherwise carry.[5]

Ms. Allen's entire report is based on her criticism of Ms. Nettesheim's methodology. However, Ms. Nettesheim's methodology is sound and is widely accepted in litigation and academic literature.[6] Because Ms. Allen's criticisms are based on an inaccurate reading of Ms. Nettesheim's methodology, the criticism contained in Ms. Allen is unreliable and irrelevant and, should be stricken.

> B.  Ms. Allen's Criticism of Ms. Nettesheim's Calculation of Statistical Significance Is Not Based in Sound Economic Theory.

In her deposition, Ms. Allen admits that Ms. Nettesheim's use of the 95% statistical significance level is the commonly used and accepted confidence interval:

---

[5] Ms. Allen did not think she has ever even tried to determine whether a stock trades in an efficient market, an essential preliminary step in a loss causation analysis, Allen Dep. at 45, Pl. App. at 095, and did not conduct a loss causation analysis here, *id.* at 83-84. Pl. App. at 097. While Ms. Allen says she has performed a loss causation analysis in other cases, she could not identify any case other than *Ryan v. Flowserve Corp.*, 245 F.R.D. 560 (N.D. Tex. 2007), and was equivocal as to whether she had ever done such an analysis in any other case. *id.* at 86. Moreover, even though *Flowserve* was recently decided, Ms. Allen could not answer basic questions about the methodology she used in that case, such as whether she employed one or multiple industry indices, *id.* at 137-139, or even whether she used an industry index at all. *Id.* at 147. Pl. App. at 108. ("I don't know. I think I did but I'm not sure.") Plaintiffs' counsel requested Halliburton's counsel produce the *Flowserve* report so that Plaintiff could test the validity of Ms. Allen's criticisms, but Halliburton's counsel refused, claiming confidentiality, and refused even to produce a redacted version of the methodology section, which could not possibly be privileged.

[6] *See also,* Plaintiffs' Opposition to Motion to Strike the Expert Report of Jane Nettesheim, which Plaintiff incorporates herein by reference.

22615

> A. Well, you would have to say statistically significant relative to what. Often times what we're doing is an event study and we mean statistically significant given the historical movement in the stock price and a common standard is the 95 percent statistical significance level which is often used in the finance literature and often used in litigation.

Allen Dep. at 163:13-21. Pl. App. at 109.

Contrary to this admission in her deposition, the Allen Report criticizes Ms. Nettesheim's use of the 95% confidence level as "improper." Allen Rep. at 8. Specifically, Ms. Allen postulates that since "Ms. Nettesheim performs her tests of hypothesis at the 95% confidence level, 5% of the time a 'statistically significant' effect will occur for no identifiable reason purely as a function of the normal fluctuation in stock prices." Allen Rep. at 8. Thus, according to the Allen Report, the 31 days of statistically significant price variations found in the Nettesheim Report are just "the number one would expect to find, if stock price movements reflect only normal daily variation, rather than some noteworthy event or announcement." *Id.* at 8-9. This is so, according to Ms. Allen, because 100% confidence less the 95% confidence of Ms. Nettesheim's hypothesis multiplied by the 633 days in the class period equals 31 days. This simple calculation is misleading, and viewed objectively, it cannot withstand the scrutiny of Ms. Allen's own deposition, let alone that required by *Daubert*.

As an initial matter, Ms. Allen's claim that one would expect 5% of the days during the Class period to have a statistically significant return with a 95% confidence interval is true only if the control period is the same as the Class period. *See* Nettesheim Reb. Rep. ¶ 34. Pl. App. at 028. Here, since the control period and Class period are different, "the fact that approximately 5% of the days during the Class Period are statistically significant is not relevant – whether there are more than or less than 5% of days with statistically significant stock price changes does not contribute to or detract from the statistical significance of those days." *Id.*

Moreover, even assuming that at a 95% confidence level there would be 31 days in which there would be statistically significant price movements as a result of "normal variations," Ms. Allen offers no explanation for why Nettesheim found those 31 days to frequently correlate with major news days. In a controlled environment, one would expect those 31 days to be completely random, and not correlated to major news days as Ms. Nettesheim found. That is because statistical significance in an event study indicates that the change in the stock price was almost certainly not due to market or industry effects only and that it is more probable than not that the change was caused by company-specific information. Nettesheim Reb. Rep. ¶ 35. Pl. App. at 028.

Ms. Allen criticizes Ms. Nettesheim's use of the 95% confidence level as improper. However, as discussed above, that critique is contrary to Ms. Allen's acknowledgment of its propriety under questioning and, in any event, is not supported by reference to any objective, independent authority and would not withstand the scrutiny of Ms. Allen's peers. Accordingly, Ms. Allen's criticisms of Ms. Nettesheim's calculation of statistical significance should be excluded.

    C.    Ms. Allen's Criticisms of Ms. Nettesheim's Industry Index Are Contrary to the Methodology Endorsed by Ms. Allen's Colleagues at NERA.

Ms. Allen levies several criticisms at Nettesheim's construction of an industry index, yet cites no authority for those criticisms. First, Ms. Allen criticizes Ms. Nettesheim's industry index as "based on statistical results rather than a theoretical basis," yet Ms. Allen does not provide any basis for the Court to test this assertion, such as by explaining what purportedly makes Ms. Nettesheim's Report "statistical" rather than "theoretical," or why, assuming Ms. Allen's assertion is true, that would make Ms. Nettesheim's analysis flawed.

7

22615

In fact, Ms. Allen's criticism is again based on a misunderstanding or mischaracterization of Ms. Nettesheim's methodology. Ms. Nettesheim appropriately, and as endorsed by David I. Tabak and Frederick C. Dunbar, two of Ms. Allen's NERA colleagues, used both theoretical measures and statistical measure. *See* David I. Tabak and Frederick C. Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom*, April 19, 1999, National Economic Research Associates ("Tabak/Dunbar Article"). Pl. App. at 195. Ms. Nettesheim started her selection of companies to consider for the industry index by identifying those listed as competitors in analyst reports. *See* Tabak/Dunbar Article at 10, Pl. App. at 205. This is the same initial step that Ms. Allen employed, except that Ms. Allen looked at only one analyst report that pre-dated the class period by more than a year, whereas Ms. Nettesheim reviewed all of the available reports that were issued during the class period. Ms. Nettesheim also looked at companies identified in the same industry index as Halliburton, as determined by Bloomberg Oil & Gas Services Index, Bloomberg United States Oil & Gas Services Index, FactSet's Index of Oil Service and Equipment Companies, Morgan Stanley Oil Services Index, Oil Service HOLDRS Index, Philadelphia Oil Service Sector Index, S&P 150 Super Composite Oil & Gas Equipment & Services Index, and Standard and Poor's Supercomposite Energy Equipment & Services Index. Nettesheim Rep. App. ¶ 20, Pl. App. at 020; Tabak/Dunbar Article at 10, Pl. App. at 205. From these, Ms. Nettesheim excluded companies that were involved in securities class actions during the control or class period. These were the "theoretical" measures employed by Ms. Nettesheim and endorsed by NERA.

After employing the theoretical measures to select potential companies to include in the industry index, only then did Ms. Nettesheim employ statistical measures. Of the 72 companies rendered by theoretical measures, only those companies whose stock price returns had some

explanatory power with respect to Halliburton's stock price returns (i.e., each company's stock price returns were correlated with Halliburton's stock price returns) were used in the industry index. Testing for statistical significance during the estimation period (also called the control period) ensures that the returns on a particular company's stock does in fact explain the returns on Halliburton's stock. After employing both theoretical and statistical measures, the final industry index used was comprised of 52 companies in similar businesses to Halliburton and whose stock price returns were correlated with Halliburton stock price returns. These statistical measures are also endorsed by Tabak and Dunbar (at 10).

While Ms. Allen refers to Ms. Nettesheim statistical testing as "cherry-picking," Ms. Allen's colleagues at NERA have criticized the failure to employ Ms. Nettesheim's methods.[7] As stated in an article authored by one of Ms. Allen's colleagues at NERA:

> If the expert chooses one index with less statistical explanatory power than a second index, he or she should be prepared to defend this choice.

Tabak/Dunbar Article at 10, Pl. App. at 205.

While the Allen Report criticizes the Nettesheim Report's methodology, under the accepted standards, it is Ms. Allen's "industry index" that is flawed. Significantly, Ms. Allen, in constructing her "E & C" industry index – on which her criticisms of Ms. Nettesheim's index is based – does not comply (at least not so that the Court can test her methodology) with the procedures endorsed by her NERA colleagues in that the statistical measure is entirely lacking.[8] Because Ms. Allen's criticisms of Ms. Nettesheim's industry index would not even withstand the

---

[7] Referring to Ms. Nettesheim as "cherry-picking" her industry index is ironic since Ms. Allen inexplicably chose just three companies, mentioned in a single analyst report, that preceded the class period by well over a year, and did not even identify those three companies as Halliburton peers. Ms. Allen cites no authority that would support the construction of such an industry index.

[8] As discussed more fully in Plaintiff's Opposition to Motion to Strike, one of the companies in Allen's "E & C Index" was included in Nettesheim's industry index and adding the other two had no statistically significant effect on Ms. Nettesheim's analysis of loss causation as to either the Dresser merger allegations or the unapproved claims accounting allegations. Nettesheim Reb. Rep. ¶ 24-25, Pl. App. at 022-023.

9

22615

professional scrutiny of Ms. Allen's NERA colleagues, those criticisms cannot withstand the scrutiny required by *Daubert*. Ms. Allen's criticism of Ms. Nettesheim's industry index should be stricken.

As discussed in the Nettesheim Rebuttal Report, ¶ 47-49 (Pl. App. at 033-034), Ms. Allen's criticisms of Ms. Nettesheim's market index are without merit. Ms. Nettesheim obtained her index from CRSP, and any differences in the data received by Ms. Nettesheim and that received by Mr. Allen are – as Ms. Allen at least should have known – insignificant and had no material effect on Ms. Nettesheim's analysis.

    D.    Ms. Allen's Selection of a Post-Class Control Period Is Not Supported by <u>Academic Literature.</u>

Ms. Allen criticizes Ms. Nettesheim's findings as not being "robust." This criticism is based solely on Ms. Allen's supposed "testing" of Ms. Nettesheim's model using a one-year period starting after the class period as a control period. Ms. Allen's criticism should be excluded for two reasons. First, Ms. Allen's criticism are based on a supposed "testing" of Ms. Nettesheim's model. However, Ms. Allen provides no explanation or methodology for how the testing was conducted. As such, there is no basis to test whether Allen's findings are accurate, and her results are not verifiable.

Second, utilizing a post-class period control period is contrary to academic literature, which recognizes that:

> In securities fraud cases, estimations [control] windows are often placed before the beginning of the alleged class period, . . . so that the estimation window would cover a "clean" period that could not have been tainted by any alleged stock price inflation.

Tabak/Dunbar article at 9, Pl. App. at 204. Indeed, even Ms. Allen acknowledged that the post-class period was not a better control period than the pre-class period utilized by Ms. Nettesheim. Allen Dep. at 211:25-213:14, Pl. App. at 111.

10

22615

E.     Ms. Allen's Report Is Results-Oriented and Should Be Excluded.

As discussed above, Ms. Allen did not perform a market efficiency analysis, prepare a proper industry index, or undertake a loss causation analysis in this case, all of which would be necessary to properly gauge Ms. Nettesheim's conclusions. Instead, Ms. Allen took a results-oriented approach, putting her conclusions before her analysis. For example, when asked whether, in this case, it would be possible to perform a loss causation analysis without constructing an industry index, Ms. Allen responded that an industry index would not be necessary in this case:

> A.     You're asking is it essential to establish loss causation to having an industry index and I'm not seeing how you're going to establish loss causation period so I don't see that the industry index is essential or inessential, I'm not seeing how it's going to help you.

Allen Dep. at 149:13-19, Pl. App. at 108. Ms. Allen's "hired gun" results-oriented analysis of the Nettesheim Report should be excluded. *Watkins*, 121 F.3d at 991.

## CONCLUSION

As discussed above, the Allen Report is in large part based on a fundamental misunderstanding of the Nettesheim Report. Moreover, Ms. Allen fails to provide data and information sufficient for the Court to test the validity, and thus the evidentiary relevance and reliability, of Ms. Allen's conclusions. While Ms. Allen criticizes Ms. Nettesheim's methodologies, it is in fact Ms. Allen's methodologies that do not withstand the scrutiny of her professional peers, and even her colleagues at NERA. In the end, Ms. Allen's results-oriented approach is precisely the type of "hired gun" expert report that *Daubert* was meant to address.

For these reasons, and the reasons stated in Plaintiff's Opposition to Motion Strike, the Allen Report should be stricken in its entirety.

        Respectfully submitted,

        David Boies
        BOIES, SCHILLER & FLEXNER LLP
        333 Main Street
        Armonk, NY  10504
        Telephone:  (914) 749-8200
        Facsimile:  (914) 749-8300

        Caryl L. Boies, TSB # 02565420
        Sashi B. Boruchow, FSB #0398276
        BOIES, SCHILLER & FLEXNER LLP
        401 E. Las Olas Blvd., Suite 1200
        Ft. Lauderdale, FL 33301
        Telephone:  (954) 356-0011
        Facsimile:  (954) 356-0022
        **LEAD COUNSEL FOR LEAD PLAINTIFF,**
        **THE ARCHDIOCESE OF**
        **MILWAUKEE SUPPORTING FUND, INC.**

        Neil Rothstein, Esq.
        Truth in Corporate Justice LLC
        8721 Santa Monica Blvd., Suite 41
        Los Angeles, CA 90069
        Telephone:  (800) 610-4998
        Facsimile:  (310) 246-1175
        **SPECIAL COUNSEL TO LEAD PLAINTIFF,**
        **THE ARCHDIOCESE OF**
        **MILWAUKEE SUPPORTING FUND, INC.**

        E. Lawrence Vincent, SBN 20585590
        208 N. Market Street, Suite 200
        Dallas, Texas 75202
        Telephone:  (214) 680-1668
        Facsimile:  (972) 491-2417
        **ATTORNEY FOR LEAD PLAINTIFF,**
        **THE ARCHDIOCESE OF**
        **MILWAUKEE SUPPORTING FUND, INC.**

22615

## CERTIFICATE OF CONFERENCE

Plaintiff's counsel conferred with counsel for Defendants via email on December 21, 2007, and Defendants oppose this motion.

/s/ Caryl L. Boies
CARYL L. BOIES

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the ____ day of December 2007, I served the attached document via electronic mail and certified mail, return receipt requested to the following counsel of record, and via electronic mail and/or first class U.S. Mail to the remaining individuals on the attached service list.

Robb L. Voyles
Jessica B. Pulliam
BAKER BOTTS, LLP
2001 Ross Avenue, Suite 600
Dallas, TX 75201-2980
Tel.: (512) 322-2500
Fax: (512) 322-2501
Robb.Voyles@bakerbotts.com
Jessica.Pulliam@bakerbotts.com

David D. Sterling
Rebecca Robertson
BAKER BOTTS, LLP
910 Louisiana Street
Houston, Texas 77002-4995
Tel: (713) 229-1234
Fax: (713) 229-2099
David.Sterling@bakerbotts.com
Rebecca.Robertson@bakerbotts.com

Donald E. Godwin
Marcos G. Ronquillo
Jose L. Gonzalez
GODWIN PAPPAS RONQUILLO, LLP
1201 Elm Street, Suite 1700
Dallas, Texas 75270
Tel.: (214) 939-4400
Fax: (214) 760-7332
MRonquillo@godwinpappas.com
JGonzalez@godwinpappas.com
DGodwin@godwinpappas.com

/s/ Caryl L. Boies
CARYL L. BOIES