# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| THE ARCHDIOCESE OF MILWAUKEE | § | |
| SUPPORTING FUND, INC., et al., on Behalf | § | |
| of Itself and All Others Similarly Situated, | § | |
| | § | **Civil Action No.** |
| **Lead Plaintiff,** | § | **3:02-CV-1152-M** |
| **v.** | § | |
| | § | |
| HALLIBURTON COMPANY, et al., | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the Plaintiffs' Motion to Certify Class [Docket Entry #341].  The Court held a hearing on this Motion on March 21, 2008, and approved The Archdiocese of Milwaukee Supporting Fund, Inc. ("AMS") as Class Representative.[1]  The Court also noted the parties' agreement, and finds independently, that the Proposed Class satisfies Federal Rule of Civil Procedure 23 as to numerosity, commonality, typicality, and adequacy of AMS as a class representative.  The parties did not dispute, and the Court also finds, that but for the single issue discussed below, a class action would be the superior method for adjudicating the claims of these class members.

The sole issue in dispute is the application of the requirement that, in a securities fraud class action, loss causation must be proven at the class certification stage.[2]  Absent this requirement, the Court would certify the class.  However, having considered the parties' extensive briefing, oral argument, and the applicable law, the Court is of the opinion that Plaintiffs have not demonstrated loss causation as to any of their claims.  For that reason, Plaintiffs' Motion to Certify is **DENIED**.

---

[1] The Court did not approve Plaintiff Ben Alan Murphey as a Class Representative.
[2] *See Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 269 (5th Cir. 2007).

## BACKGROUND

Plaintiffs' Fourth Consolidated Amended Complaint ("Complaint") against Defendant Halliburton Company, et al ("Halliburton"), alleges misrepresentations with respect to three issues:  (1) the expense of asbestos litigation; (2) changes to the accounting methodology used by Halliburton and their effect on earnings; and (3) the benefits of Halliburton's merger with Dresser Industries ("Dresser").  The class period is June 3, 1999 to December 7, 2001.  Plaintiffs allege that during this period Halliburton, under the guidance of Dick Cheney (CEO until July 2000) and David Lesar (CEO since July 2000), downplayed the company's estimated asbestos liabilities, falsified earnings statements, and overstated the benefits of a merger with Dresser, in an effort to inflate Halliburton's stock price.

Plaintiffs point to eight specific disclosures, accompanied by a drop in Halliburton's stock price, as evidence of the inflationary effects of alleged misrepresentations on Halliburton's stock price.  Plaintiffs rely on an expert witness, Jane Nettesheim ("Nettesheim"), who prepared a statistical model of Halliburton's stock price during the class period.  Nettesheim asserts that each of these eight disclosures resulted in a company-specific decline in the stock price that cannot be attributed to general market trends or other external factors.  Halliburton argues that Nettesheim's model is inadequate to satisfy the requirements for loss causation in the Fifth Circuit.  The parties do not dispute that there was an efficient market in this case.

## LEGAL STANDARD REGARDING LOSS CAUSATION

To establish a securities claim under Securities and Exchange Commission ("SEC") Rule 10b-5, a plaintiff must establish six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, "i.e., a causal connection between the material misrepresentation and the

loss."[3]  In class action securities cases such as this one, plaintiffs can satisfy the reliance requirement through the fraud-on-the-market theory.

The fraud-on-the-market theory presumes that in an open and developed securities market, a company's stock price is determined by all available material information.  Thus, buyers or sellers can be defrauded even if they cannot prove they personally relied on the alleged misstatements.[4]  In *Greenberg v. Crossroads Systems, Inc.*, the Fifth Circuit held that class-wide reliance is rebuttably presumed where: "(1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed."[5]

The Fifth Circuit recently tightened the first *Greenberg* requirement by requiring "proof that the [defendant's] misstatement *actually moved* the market."[6]  As a result, Plaintiffs in this case must demonstrate loss causation in order to trigger the fraud-on-the-market presumption of class reliance.[7]  The Fifth Circuit requires loss causation to be "established at the class certification stage by a preponderance of all admissible evidence."[8]  The Court must make an empirical judgment on loss causation "drawing largely from publicly available data thereby leaving minimal need for discovery."[9]

This approach to loss causation imposes an exceedingly high burden on Plaintiffs at an early stage of the litigation, but the Fifth Circuit determined that such a high burden was justified because of "the *in terrorem* power of class certification, the extraordinary leverage bestowed

---

[3] *See Ind. Elec. Workers' Pension Trust Fund IBEW, et al, v. Shaw Group Inc.*, et al, 537 F.3d 527, 532 (5th Cir. 2008) (citations omitted); *Dura Pharm., Inc.  v. Broudo*, 544 U.S. 336, 341-42 (2005) (citations omitted).
[4] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (citation omitted).
[5] 364 F.3d 657, 661 (5th Cir. 2004).
[6] *Oscar,* 487 F.3d at 265.
[7] *Id.*
[8] *Id.* at 269.
[9] *Ryan v. Flowserve Corp.*, 245 F.R.D. 560, 569 (N.D. Tex. 2007) (Boyle, J.) (citing *Oscar,* 487 F.3d at 267).

upon plaintiffs with certification and the due process rights of the parties."[10]  This Court is bound

to follow the Fifth Circuit's precedent, but notes that the bar is now extremely high for all

plaintiffs seeking class certification in securities litigation.

      Plaintiffs can show that an alleged misrepresentation actually affected the market in one

of two ways: (1) demonstrating an increase in the stock price after the release of false positive

news; or (2) demonstrating a decrease in price following a corrective disclosure.[11]  Confirmatory

statements, or information already known to the market, are deemed not to actually affect the

stock price, because an efficient market does not respond to information already known.[12]  An

efficient securities market fully responds to new information the first time it is made public, so

misrepresentations cannot be actionable unless they are non-confirmatory, and complete

corrective disclosures will only affect the stock price when they are first made.

      The burden on claimants like Plaintiffs is further enhanced by the requirement that when

relying on a *decline* in the company's stock price to prove that the price had been inflated by

false positive information, they "must show that the false statement causing the increase was

related to the statement causing the decrease."[13]  This burden is derived from the theory of

proximate loss—plaintiffs must show that the loss resulting from the corrective disclosure is

proximately derived from the earlier misrepresentation.  The absence of such a requirement

would "bring about harm of the very sort the statutes seek to avoid" and would "tend to

transform a private securities action into a partial downside insurance policy."[14]

---

[10] *Id.* (citing *Oscar*, 487 F.3d at 266-67 ("class certification creates insurmountable pressure on defendants to settle")).
[11] *Nathenson v. Zonagen*, 267 F.3d 400, 418-19 (5th Cir. 2001).  Here, Plaintiffs rely only on the second method of proving stock price inflation—showing the stock price decreased following alleged corrective disclosures.  They do not point to *any* stock price increases resulting from positive misrepresentations.
[12] *Flowserve*, 245 F.R.D. at 568 (citing *Nathenson*, 267 F.3d at 419); *Greenberg*, 364 F.3d at 665-66 ("confirmatory information has already been digested by the market and will not cause a change in stock price").
[13] *Greenberg*, 364 F.3d at 665.
[14] *Dura Pharm., Inc.,* 544 U.S. at 347.

When a company makes corrective disclosures and combines them with a discussion of unrelated negative information, plaintiffs must also "demonstrate that there is a reasonable likelihood that the cause of the decline in price is due to the revelation of the truth and not the release of the unrelated negative information."[15]  Although at the class certification stage plaintiffs need not quantify the portion of loss that resulted from the false information rather than the unrelated disclosure, or prove that "some percentage of the drop was attributable to the corrective [portion of the] disclosure—the plaintiffs must, in order to establish loss causation at this stage, offer some empirically-based showing that the corrective disclosure was more than just present at the scene."[16]

Expert analysis can provide evidence to support the causation requirement, but it is not sufficient to carry plaintiffs' burden "without reference to any post-mortem data [the experts] have reviewed or conducted."[17]  However, in some cases it may be so evident that a stock decline is driven by a particular corrective disclosure that no empirical analysis would be necessary to disaggregate the effect of the corrective disclosure from other unrelated disclosures.[18]  For example, in *Greenberg,* the Fifth Circuit compared information about company earnings to "news of temporary interoperability problems," and concluded that:

> [U]nlike the news of temporary interoperability problems, we are persuaded the news that a company's revenue will be 66% below estimates satisfies the plaintiffs [sic] burden.  News that a company's earnings will be two-thirds short of analysts [sic] estimates is the type of negative information most likely to cause a sharp decline in stock price.[19]

As a result, even though the "plaintiffs offer[ed] no evidence or analysis tending to show that the drop in price following the [corrective disclosure] was likely caused by the negative

---

[15] *Greenberg*, 364 F.3d at 665.
[16] *Oscar*, 487 F.3d at 271.
[17] *Id.*
[18] *See Greenberg*, 364 F.3d at 669.
[19] *Id.*

financial news" the court found "that [the defendant's] statements … may form the basis for the plaintiffs [sic] fraud-on-the-market claim."[20]

In *Flowserve*, Judge Boyle clarified the plaintiffs' burden at the class certification phase:

> Plaintiffs who seek class status by showing collective reliance through the fraud-on-market presumption must show that the defendant made public, material misstatements, that the stocks traded in an efficient market, and that the stock price was actually affected by the purported fraud. To show that a stock price was actually affected, plaintiffs must show that false, non-confirmatory positive statements caused a positive effect on the stock price. Alternatively, plaintiffs must show: (1) that an alleged corrective disclosure causing the decrease in price is *related to* the false, non-confirmatory positive statement made earlier, and (2) that it is *more probable than not* that it was this related corrective disclosure, and not any other unrelated negative statement, that caused the stock price decline.[21]

Because the Plaintiffs in this case have presented no evidence of false, non-confirmatory positive statements causing a *positive* effect on the stock price, it is this second, alternative burden that Plaintiffs must meet.

## ANALYSIS

Plaintiffs claim that Halliburton made material misrepresentations, and then later made corrective disclosures with respect to three different issues: first, that Halliburton knowingly minimized its prospective liabilities from asbestos litigation to maintain its attractiveness to investors; second, that Halliburton employed fraudulent accounting practices to overstate its revenue; and third, that Halliburton executives made false statements about the anticipated success of Halliburton's merger with Dresser, to inflate the price of Halliburton's stock.

### I. Asbestos Liabilities

Plaintiffs allege that Halliburton "intentionally concealed and affirmatively misrepresented the true significance of Halliburton's exposure to asbestos liabilities in Halliburton's financial statements, [SEC] [sic] filings, press releases and communications with

---

[20] *Id.*
[21] *Flowserve*, 245 F.R.D. at 569 (emphasis added).

analysts and investors." Plaintiffs point to four separate statements they claim are corrective disclosures, each addressed in greater detail below. First, on June 28, 2001, Halliburton disclosed that Harbison-Walker,[22] a former subsidiary of Halliburton's new subsidiary (Dresser), had requested financial assistance from Halliburton to cover potential losses from asbestos lawsuits. David Lesar and Gary Morris, Halliburton's Executive Vice President and Chief Financial Officer through August of 2001, stated during a conference call with analysts that as a result, the "worst case scenario" would be a net exposure of $50 to $60 million in asbestos liabilities, a considerable increase over the previous month's estimate of $30 million. On June 28, 2001, Halliburton increased its asbestos reserves by $30 million to include this "worst case scenario," for total reserves of $60 million.

Second, Plaintiffs point to a Form 10-Q filed by Halliburton with the SEC on August 9, 2001, in which it further increased its asbestos liability reserves to $124 million in response to the request for assistance from Harbison-Walker. Third, on October 30, 2001, Halliburton issued a press release announcing a $150 million jury verdict in an asbestos lawsuit, for which Halliburton would be responsible for $21.3 million. Fourth, on December 7, 2001, Halliburton issued a press release detailing the recent asbestos verdicts returned against it. Nettesheim asserts that each of these disclosures was accompanied by a company-specific, statistically significant decline in Halliburton's stock price, and therefore proves loss causation.

The Court concludes that Plaintiffs' arguments with respect to the asbestos issue are legally insufficient to establish loss causation. Defendants correctly argue that Plaintiffs' expert must link the alleged corrective disclosures with prior actionable misrepresentations in order to establish loss causation.[23] Here, Plaintiffs do not actually link *any* alleged misrepresentations

---

[22] Harbison-Walker Refactories Company
[23] *See Greenberg*, 364 F.3d at 666.

with the four asbestos disclosures.  Instead, Plaintiffs claim that the aggregate of Halliburton's SEC filings, financial statements, press releases, and conferences with analysts artificially inflated the value of Halliburton's stock price.  Plaintiffs then argue that each of the four disclosures corrected some of the inflation caused by the aggregate of Halliburton's prior statements.  However, this "fraud in the aggregate" argument simply fails to satisfy the Fifth Circuit's loss causation requirements.

In *Greenberg*, the court identified five distinct actionable statements regarding the interoperability of the defendant's routers that directly correlated with alleged corrective disclosures.[24]  Here, Plaintiffs cite four "partial" corrective disclosures and argue that each disclosure led to a partial market correction of the aggregate inflation in Halliburton's stock price.  Plaintiffs do not identify specific statements that were revealed to be fraudulent by these corrective disclosures.  Importantly, it is the misrepresentations themselves, not the corrective disclosures, which form the basis of a valid securities fraud claim.

Prior to the class period, Halliburton had in fact made significantly lower asbestos liability estimates in a number of its public filings.  Plaintiffs point to these prior financial statements as creating an inflated stock price, without either identifying particular statements revealed to be fraudulent or eliminating confirmatory statements from the analysis.[25]  Unless actionable statements, which were later corrected, are identified, Plaintiffs cannot establish loss causation.

However, even if the Court were to accept Plaintiffs' generalized approach as satisfying the initial requirements of loss causation, Plaintiffs' specific arguments with respect to each of the four alleged corrective disclosures are also insufficient to meet the loss causation burden.

---

[24]  *Id.*
[25]  *See Flowserve*, 245 F.R.D. at 568 (citing *Nathenson*, 267 F.3d at 419).

### A.  June 28, 2001 Partial Corrective Disclosure

To establish an inflated stock price, Plaintiffs rely on those portions of Halliburton's SEC filings from 1999 to 2001, which reported the company's reserves for asbestos liabilities. Halliburton's latest SEC filing prior to the June 28, 2001 disclosure, filed in May 2001, reported liability reserves totaling $30 million and stated that Halliburton had reserved sufficient funds for its estimated asbestos liabilities.  However, in June 2001, Harbison-Walker asked Halliburton for financial assistance with potential asbestos claims.[26]  Plaintiffs cite a conference call with analysts on June 28, 2001, where "Lesar and Morris stated that the 'worst case scenario' would be exposure, after insurance, of $50 to $60 million—not the $30 million that they had reported to be 'adequate' the previous month."  Nettesheim opines that the drop in Halliburton's stock price following this alleged corrective disclosure establishes loss causation because the disclosure "related to Halliburton's misstatements—specifically misstatements concerning the significance of Halliburton's exposure to asbestos liabilities."

However, the disclosure does not "specifically reveal[]" any misrepresentation or fraud in Halliburton's prior asbestos estimates.[27]  In *Greenberg*, the company's corrective disclosure about the interoperability of its routers "specifically revealed" that the prior representations about interoperability were incorrect.[28]  Here, Plaintiffs do not allege, or prove, that Halliburton's prior asbestos liability estimates were revealed by the June 28 disclosure to be fraudulent or even

---

[26] Harbison-Walker asked Halliburton for financial assistance with its potential asbestos claims, which Harbison-Walker assumed in 1992 as part of its spin-off from Dresser.  Dresser agreed to handle asbestos claims filed prior to the spin-off, and Harbison-Walker agreed to handle asbestos claims filed afterward.  Dresser and Harbison-Walker agreed that Harbison-Walker could access Dresser's historical insurance coverage for the asbestos-related liabilities it assumed.  The companies were, in effect, co-insured, so Halliburton had a direct interest in how Harbison-Walker's claims were resolved.  If Harbison-Walker exhausted the insurance available to protect Dresser/Halliburton, or if Dresser was named as a party to a lawsuit along with Harbison-Walker and Harbison-Walker was unable to fund the claims, then Halliburton would be responsible for these claims.  Understandably, Halliburton stated to analysts that it had a "substantial interest" in resolving the asbestos claims against Harbison-Walker.
[27] *See Greenberg*, 364 F.3d at 666.
[28] *Id.*

incorrect.  In fact, it is just as likely that Halliburton revised its estimated asbestos liability figures based on newly acquired information about the Harbison-Walker situation.   Halliburton is correct in arguing that "[t]here is no allegation in the Fourth Complaint—and certainly no evidence—that Harbison-Walker required Dresser's assistance prior to this disclosure."

In *Flowserve*, Judge Boyle granted summary judgment for the defendants because the alleged corrective disclosures did not "disclose the truth about the alleged misrepresentations at the center of Plaintiffs' claims."[29]  Judge Boyle found that lowering the company's earnings estimates did not show that Flowserve had previously misstated its financials or misrepresented its internal controls.[30]  Likewise, adjusting Halliburton's estimated asbestos liability (especially in the context of Harbison-Walker's recent request for financial assistance) does not constitute evidence that Halliburton previously fraudulently misrepresented its asbestos liability estimates.  Without citing an actionable prior misrepresentation, Plaintiffs cannot meet the requirements of loss causation.[31]

Quite simply, countless external factors can cause a company to incur a loss, fail to meet earnings forecasts, or adjust liability estimates—each of which will very likely affect the company's stock price.  However, Plaintiffs cannot establish loss causation by simply speculating that fraud caused the loss.[32]  Plaintiffs must provide actual evidence of an unlawful scheme which inflated the stock price.[33]  The corrective disclosure cited by the Plaintiffs does not reveal that Halliburton made an initial false statement about its asbestos liability.  This flaw is apparent from Nettesheim's report, which states that "the stock price decline on June 29 was caused by information [provided on June 28] that partially corrected *investors' erroneous*

---

[29] *Flowserve*, 245 F.R.D. at 578.
[30] *Id.* at 579.
[31] *See Greenberg*, 364 F.3d at 661.
[32] *See Oscar*, 487 F.3d at 271.
[33] *See Flowserve*, 245 F.R.D. at 579.

*assessments* [of] Halliburton's asbestos liability."  Plaintiffs' own expert failed to opine that the June 28 disclosure corrected intentionally *fraudulent information* produced by Halliburton regarding its asbestos liability.

The circumstances would be different if it were alleged, for example, that Halliburton previously stated that it was including Harbison-Walker's asbestos exposure in its liability estimates but in fact was not, or that Halliburton had no exposure to the Harbison-Walker claims and had agreed never to cover them, when in fact it had made such an agreement.  In contrast, Plaintiffs seek a finding of loss causation based on speculation, a step Fifth Circuit precedent bars this Court from taking.[34]  In short, Plaintiffs have not established loss causation with respect to the first disclosure.

## B.  August 9, 2001 Partial Corrective Disclosure

Similarly, Plaintiffs cannot establish loss causation with respect to the August 9, 2001 partial corrective disclosure.  On August 9, 2001, Halliburton filed a Form 10-Q with the SEC, revealing that its accrued liability reserves had been increased from $64 million, as disclosed in its June 28, 2001 disclosure, to $124 million.  Plaintiffs argue that the increase in Halliburton's reserves to $124 million, in response to Harbison-Walker's request for assistance, contradicted Halliburton's earlier statement on July 25, 2001 that it would be "'prudent to accrue $60 million" to cover "potential exposure" for asbestos litigation after Harbison-Walker asked Halliburton for financial assistance with potential asbestos claims.[35]

Plaintiffs cannot establish loss causation with respect to the August 9, 2001 disclosure

---

[34] *See Oscar*, 487 F.3d at 271.

[35] On July 25, 2001, Halliburton held a conference call for analysts and money managers, where Lesar stated: "As we've previously reported in a press release on June 28, in a response [sic] to a request from Harbison-Walker for assistance to fund settlements of asbestos claims that Harbison had assumed at the time they were spun-off from Dresser Industries, we went in and took a look at the situation… Based on our analysis of Harbison's claims at this point in time and our concern that they may not be able to perform under their obligations, however, we thought it was prudent to accrue $60 million after-tax against the gain on the discontinued operations which, we believe, in our best judgment, is the potential exposure we have for this asbestos litigation…"

because they have not shown that the disclosure had a *corrective* effect, as opposed to simply a *negative* effect, on the stock price.[36]  If the release of negative information to the market "does not disclose the scheme [to drive up stock prices]," then the information "cannot correct the artificial inflation caused by the scheme."[37]  The Court is "unwilling to infer loss causation" from mere speculation of fraud.[38]

The sudden and substantial increase in Halliburton's asbestos liability reserves is the *sine qua non* of Plaintiffs' allegation; however, there is nothing in the August 9 disclosure to suggest that Halliburton or Lesar were lying about the company's prior analysis of Harbison-Walker's asbestos liabilities.  Rather, Plaintiffs point to the substantial difference between the two numbers and ask the Court to bridge the gap with an inference of fraud.  While the Court recognizes that there was a significant increase in the amount of asbestos liability reserves which occurred over a very short period of time, it cannot speculate about Halliburton's motivation behind suddenly increasing the reserves, and is in fact barred from doing so by applicable precedent.  Plaintiffs have not demonstrated that the August 9 disclosure *revealed a scheme* to inflate stock prices, as opposed to merely revealing a change in circumstances.[39]  The Court will not infer fraud where there is no evidence of a scheme to inflate the stock price.[40]

In *Flowserve*, Judge Boyle did not certify a class, and granted summary judgment in favor of the defendants, because the alleged corrective disclosures did not "disclose the truth about the alleged misrepresentations at the center of Plaintiffs' claims."[41]  There, releases that corrected previous earnings estimates did not establish that the company had either misstated its

---

[36] *See Flowserve*, 245 F.R.D. at 579 (citing *In re Initial Pub. Offering Sec. Litig.*, 339 F. Supp. 2d 261, 266 (S.D.N.Y. 2005)).
[37] *Id.*
[38] *See Oscar*, 487 F.3d at 271.
[39] *See Greenberg*, 364 F.3d at 665 ("plaintiffs cannot trigger the presumption of reliance by simply offering evidence of any decrease in price following the release of negative information").
[40] *See Flowserve*, 245 F.R.D. at 579.
[41] *Id.* at 578.

previous financial statements or misrepresented its internal controls.[42]  Likewise, the mere

existence of SEC filings that alter previous asbestos liability estimates cannot establish that the

company misstated its previous asbestos liability estimates or misrepresented its potential

asbestos liability.

While it is within the realm of possibility that Halliburton executives deliberately

understated the company's asbestos liability a mere two weeks before doubling the reserve,

Plaintiffs offer no disclosure that actually "*reveal[s]*" any such improper behavior to the

market.[43]  Plaintiffs' argument is, at best, "well-informed speculation."[44]  Although the loss

causation requirements imposed by the Fifth Circuit are significant, that is the law which this

Court must follow, and it bars certification of the class with respect to the second disclosure.

### C.  October 30, 2001 Partial Corrective Disclosure

Plaintiffs similarly cannot establish loss causation with respect to the October 30, 2001

disclosure.  After the market closed on that day, "Halliburton announced that on October 26,

2001, a jury in Mississippi found Dresser (through Harbison-Walker) liable in two of six

asbestos cases for total compensatory damages of $21.3 million."[45]  Plaintiffs claim that "[t]he

stock price declines on October 31 and November 1, 2001 were caused by information that

partially corrected investors' erroneous assessments [of] Halliburton's asbestos liability."

This allegation focuses on the timing of the disclosure of a number of sizeable asbestos

verdicts for which Halliburton was responsible.  On September 12, 2001, a Texas jury returned a

---

[42] *Id.* at 579.
[43] *See Greenberg*, 364 F.3d at 665 (emphasis added).
[44] *See Oscar*, 487 F.3d at 271.
[45] No judgment on the verdict had been entered against Halliburton as of that date.  Plaintiffs provide conflicting information regarding this asbestos verdict, first stating that a *Mississippi jury* returned the verdict in the Complaint, and later stating that a "*second Texas jury*" returned this verdict in its reply brief.  However, this discrepancy is not significant to the Court's loss causation inquiry.

$130 million verdict against Halliburton and its co-defendants in an asbestos lawsuit.[46]  On

October 26, 2001, a Mississippi jury returned an adverse asbestos verdict of $150 million, $21.3

million of which was Halliburton's responsibility.  Plaintiffs cite a press release issued by

Halliburton on October 30, 2001, which discussed only the October verdict, as a corrective

disclosure.  Plaintiffs claim generally that Halliburton executives artificially inflated its stock

price by making positive statements to analysts regarding Halliburton's estimated asbestos

liabilities, and by failing to disclose the entire truth about the asbestos verdicts.  Plaintiffs

identify one statement that could qualify as a misrepresentation: on October 23, 2001, after the

September verdict was returned, Lesar stated that "there have been no adverse developments at

all with respect to the Harbison-Walker situation."

However, the Court cannot certify a class based on the October 30 disclosure because it

lacks one necessary element: the corrective disclosure must reveal to the marketplace the truth

behind the alleged misrepresentation.[47]  The October 30 disclosure does not reveal to the market

the truth of the alleged misrepresentation of October 23, because the correction does not

reference the September verdict.  If any misrepresentation occurred on October 23, it necessarily

went to the failure to disclose the September verdict, because the October verdict had not yet

---

[46] Plaintiffs also provide inconsistent information about this asbestos verdict.  First, Plaintiffs claim in the Complaint that asbestos claims *relating to Harbison-Walker* led to the September 12 verdict, but Plaintiffs also allege in the Complaint that "a jury returned a $130 million verdict *against Halliburton* and a co-defendant for five asbestos plaintiffs" (emphasis added), and again in their reply brief state that "*Halliburton* learned that a jury had returned a $130 million verdict *against it*" (emphasis added).  Plaintiffs also initially allege only one "co-defendant" but later in the Complaint assert that the verdict was rendered against multiple "co-defendants."  Finally, Plaintiffs allege that the Texas jury returned a *$130 million* verdict against Halliburton and a co-defendant for five asbestos plaintiffs, but later point to analysts' knowledge of the Texas jury award of *$65 million* in compensatory and punitive damages to five plaintiffs (and Nettesheim in fact refers to the fact that "a Texas District Court had entered a judgment against Dresser on a $65 million jury verdict rendered in September 2001").  These discrepancies could be important, given that Plaintiffs rely on Lesar's statement that "there have been no adverse developments at all with respect to the *Harbison-Walker* situation" (emphasis added) as a prior misstatement, and do not specifically allege that the September jury verdict was in fact a Harbison-Walker claim.  However, assuming that the September verdict arose from a *Harbison-Walker claim* (and Halliburton does in fact state that the Texas court entered judgment "against Dresser"), the Plaintiffs still fail to meet the requirements of loss causation, as explained in greater detail below.
[47] *See Greenberg*, 364 F.3d at 661.

been returned.  But only the October verdict, not the September verdict, was revealed in the October 30, 2001 disclosure.

The requirement that there be a corrective disclosure of the alleged misrepresentation is not a mere triviality.  To establish a presumption of reliance, the Plaintiffs must show that the misrepresentation actually moved the market.[48]  Such a showing may be made by Plaintiffs (1) showing an increase in stock price following the alleged misrepresentation, or (2) showing a decrease in the stock price following a corrective disclosure.[49]  Without a corrective disclosure regarding the September verdict, the *only* verdict the alleged misrepresentation could relate to, Plaintiffs cannot show that the stock price declined as a result of a *corrective* disclosure.[50]

Plaintiffs argue that the October 30, 2001 disclosure in fact related to the September verdict, because it demonstrated that Halliburton's anticipated asbestos liabilities were higher than generally reported.  Plaintiffs argue that Lesar's statement on October 23 falsely suggested to the marketplace that Halliburton's prospective asbestos liabilities were under control, while the subsequent disclosure of the October verdict proved they were not.  However, Halliburton's previous warning in its Form 10-K filings that a series of high asbestos verdicts remained a possibility directly contradicts this theory.[51]

---

[48] *See Oscar*, 487 F.3d at 265.

[49] *Flowserve*, 245 F.R.D. at 568 (citing *Nathenson*, 267 F.3d at 418-19).  The Plaintiffs have not alleged an increase in stock price following any of the alleged misrepresentations, and therefore only the second mode of proving the misrepresentation actually moved the market is available to them.

[50] *See id.*  There are two ways for the Plaintiffs to satisfy the *Oscar* requirement that the misrepresentation actually moved the market, and only one requires the existence of a corrective disclosure.  If Nettesheim's model demonstrated an increase in Halliburton's stock price following Lesar's statement, one could argue that a corrective disclosure was not required.  However, because Plaintiffs rely only on the decline in the stock price, this avenue is closed.

[51] For example, in Halliburton's 1999 Form 10-K filing with the SEC, it stated in the "Notes to Annual Financial Statements" section that "W*e recognize the uncertainties of litigation and the possibility that a series of adverse court rulings could materially impact the expected resolution of asbestos related claims.*  However, based on our historical experience with similar claims, the time elapsed since Dresser and its former divisions or subsidiaries discontinued sale of products containing asbestos, and our understanding of the facts and circumstances that give rise to such claims, we believe that the pending asbestos claims will be resolved without material effect on our financial position or results of operations" (emphasis added).

Plaintiffs do not satisfy *Greenberg's* requirement of demonstrating that Halliburton made a misrepresentation that moved the market, which was related to the later correction.[52] Lesar stated that "there have been no adverse developments," not "there *will be* no adverse developments." Plaintiffs do not present opinions, much less any that reference "post-mortem data," to suggest that the market perceived the October 30, 2001 disclosure as having a *corrective* effect after any earlier *fraudulent* statement by Lesar.[53] Plaintiffs ignore the distinction between negative and corrective disclosures.[54] A negative disclosure does not necessarily have a corrective effect on the stock price.

Although Nettesheim concludes that the October 30, 2001 announcement had a negative effect on the stock price, she does not show that the resulting decline in the stock price was proximately caused by a prior misstatement. In fact, Nettesheim cites to the opinion of an A.G. Edwards analyst, who stated "[w]e expect a vigorous defense by [Halliburton's] [sic] and remain optimistic that the asbestos liability will remain under control." Thus, the market perception of the disclosure of the recent verdict was not that Halliburton fraudulently concealed its potential asbestos liabilities, but that the verdict was a surprising event against which Halliburton would vigorously defend. The market did not perceive the revelation of the verdict as evidence of prior fraud. As a result, the October 30 disclosure does not satisfy the requirements of loss causation.

In *Flowserve*, the plaintiffs argued that the "true financial condition" of the company was not accurately reflected by the company's prior earnings estimates.[55] Likewise, Plaintiffs argue that Lesar's statement suggested that Halliburton's asbestos liabilities were under control, which was not an accurate reflection of the "true asbestos condition" of the company. In *Flowserve*, the

---

[52] *Greenberg*, 364 F.3d at 661.
[53] *See Oscar*, 487 F.3d at 271.
[54] *See Flowserve*, 245 F.R.D. at 579.
[55] *Id.* at 573.

plaintiffs argued that subsequent financial statements demonstrated the company's "true financial condition;" here, Plaintiffs argue that subsequent asbestos verdicts revealed that Halliburton's true asbestos condition was not under control.  The court rejected the argument in *Flowserve*, and this Court similarly rejects the argument here.[56]

For yet another reason, the October 30, 2001 disclosure is insufficient to establish loss causation:  Plaintiffs have not separated the negative effect of the *new* information—the recent October verdict—from any corrective effect flowing from the revelation of increased *existing* asbestos exposure, if the corrective disclosure in fact related to Lesar's failure to reveal the September verdict.  In short, Plaintiffs have not demonstrated loss causation as to the third asbestos disclosure.

### D.  December 4-7, 2001 Partial Corrective Disclosures

From December 4 through December 7, Halliburton disclosed a number of recent adverse asbestos jury verdicts in its Form 8-K SEC filings.  On December 4, Halliburton filed a Form 8-K with the SEC, in which it disclosed that a Texas district court entered a judgment against Halliburton/Dresser on a jury verdict rendered in September 2001.[57]  This filing also disclosed that the same district court entered three additional judgments against Dresser in favor of 100 other asbestos plaintiffs, for an aggregate amount of $35.7 million, due to a an "alleged breach of a purported settlement agreement."  Then, on December 7, 2001, Halliburton issued a press release detailing the recent asbestos verdicts rendered against it.[58]

---

[56] *See id.* at 574 ("the 'true financial condition' theory, if accepted, threatens to undermine the objective of securities law and disregards precedent").

[57] *See supra* footnote 46.

[58] Plaintiffs' Complaint and reply brief each identify a "release detailing all the recent asbestos verdicts" issued by Halliburton on December 7, 2001 as the corrective disclosure.  However, Nettesheim's report only refers to a Form 8-K filed by Halliburton on December 7, 2001, disclosing a $30 million verdict rendered by a Maryland jury on December 5, 2001, in favor of five plaintiffs and against Halliburton/Dresser, as the corrective disclosure.  For the purposes of its loss causation analysis, the Court will refer to both of these disclosures collectively as the December 7 disclosure.

Plaintiffs argue that the decline in Halliburton's stock price on December 4, 5, and 7 demonstrates loss causation because Halliburton intentionally minimized the market's perception of its asbestos liabilities.  However, Nettesheim's report appears to treat only the December 7 filing as a corrective disclosure, stating "[t]he cause of the large decline in Halliburton's stock price on December 7 was directly related to the disclosure regarding its asbestos exposure and subsequent market assessments at [sic] to the possible financial consequences to the Company of that asbestos exposure."  Further, Plaintiffs' reply brief, while briefly noting the December 4 filing, only attempts to link the December 7 disclosure to prior representations that Halliburton's asbestos reserves were "adequate," "prudent," and "conservative."  As a result, the Court will treat only the December 7 disclosure as an alleged corrective disclosure.  However, even assuming that Plaintiffs properly alleged that the December 4 filing also qualified as a corrective disclosure, the Plaintiffs' loss causation argument must still fail.

With respect to the December 4 filing, Nettesheim's report states that "this [September] verdict was known to the public before December 4… an analyst for Salomon Smith Barney referred to this verdict in his November 9, 2001 report."  Plaintiffs' Complaint also admits that "a few analysts did find out about the large Texas verdict," and cites to the same Salomon Smith Barney report.  Information already known to the market cannot actually affect the stock price because an efficient market will not respond to information that is already known.[59]  As a result, the December 4 filing does not meet the loss causation requirements with respect to revelation of the September verdict.  Additionally, the information about the judgment entered due to Dresser's breach of a purported settlement agreement qualifies as nothing more than new negative information, rather than a corrective disclosure, because there are no identifiable prior statements relating to any such settlement agreement.

---

[59] *See id.* at 568.

Further, Plaintiffs cannot establish loss causation with respect to the December 4 disclosure because they have not shown that the filing had a *corrective* effect, as opposed to simply a *negative* effect, on the stock price.[60]  If the release of negative information to the market "does not disclose the scheme [to drive up stock prices]," then the information "cannot correct the artificial inflation caused by the scheme."[61]  Halliburton correctly argues that disclosures relating to asbestos verdicts, especially those revealed within days of judgment being entered, "merely confirmed the Company's previous and repeated warnings that a series of such results 'could materially impact' its expectations regarding resolutions of its asbestos claims."  As previously stated, the Fifth Circuit is "unwilling to infer loss causation" from mere speculation of fraud.[62]

Nettesheim opines that "the Company released several pieces of negative news, all of which were concerning the asbestos claims," but does not allege that this information had a corrective effect on the stock price.  The Court cannot simply speculate about previous fraudulent statements that may or may not have inflated the stock price, and that were allegedly later corrected by this December 4 disclosure.  The Plaintiffs must prove that the disclosure actually revealed to the market prior fraud.[63]

The only identifiable misstatement that could relate to the December 4 disclosure, even though not even identified by Plaintiffs with respect to the December 4 filing, would be Lesar's statement on October 23, 2001, that there had been no "adverse developments" with respect to the Harbison-Walker situation, which ignored the September verdict that had been rendered.  But the December 4 disclosure actually provides a justification for the delay in announcing the

---

[60] *See id.* at 579 (citing *In re Initial Pub. Offering Sec. Litig.*, 339 F. Supp. 2d 261, 266 (S.D.N.Y. 2005)).
[61] *Id.*
[62] *Oscar*, 487 F.3d at 271.
[63] *See Greenberg*, 364 F.3d at 666.

September verdict: while the jury returned its verdict in September 2001, the Court did not enter judgment against Halliburton/Dresser until November 29, 2001.  The verdict was revealed a few days later in the December 4 filing.  As a result, the December 4 filing reveals nothing fraudulent to the market, and the Plaintiffs have failed to demonstrate loss causation with respect to the December 4 filing.

With respect to the December 7 disclosure, Plaintiffs again fail to distinguish between the negative and corrective effects of the disclosure.[64]  To establish loss causation, Plaintiffs must show that it was "more probable than not" that the decline in stock price was caused by the corrective portion of the disclosure, rather than the new information.[65]  For example, in *Greenberg*, the corrective disclosure regarding the interoperability of routers also stated the company had lost one of its biggest customers.[66]  The plaintiffs in *Greenberg* failed to establish loss causation because they did not demonstrate that the decline in stock price was caused by the disclosure regarding interoperability, rather than the loss of a major customer.[67]

There are two distinct components driving the decline in stock price following the December 7, 2001 disclosure: the corrective effect resulting from the alleged prior minimization of asbestos liabilities; and the negative effect following the announcement of a new asbestos verdict, rendered on December 5.  Plaintiffs must demonstrate that it was "more probable than not" that the subsequent decline in stock price was caused by a *correction* of a prior inflated value, rather than constituting a normal market response to a sizeable adverse verdict.[68]

The December 7, 2001 disclosure references the recent December verdict, which was *new* negative information, unrelated to previous disclosures, and also negative information about the

---

[64] *See id.* at 665.
[65] *See id.*; *see also Flowserve*, 245 F.R.D. at 569.
[66] *Greenberg*, 364 F.3d at 666-67.
[67] *Id.* at 667.
[68] *See id.* at 666.

September verdict, which was already known to the market.[69]  Plaintiffs make no effort to distinguish any *corrective* effects from the effects of new negative information.  With respect to mixed disclosures, the plaintiff's burden is heightened—Plaintiffs must separate actual corrective effects from effects of new negative events.[70]  Here, Plaintiffs merely point to a decline in Halliburton's stock price following the mixed disclosure and then presume loss causation.  The Fifth Circuit has made clear that this is insufficient to carry the Plaintiffs' burden at the class certification phase.[71]

Plaintiffs argue that the December 7, 2001 disclosure corrects Halliburton's previous representations of its estimated asbestos liabilities as "manageable" and "a nuisance."[72] However, construing an adjustment of potential liability as inherently fraudulent would discourage companies from addressing changed conditions, for fear of exposing themselves to securities fraud lawsuits.[73]  Even though Halliburton had previously warned investors that its asbestos reserves could possibly be affected by a series of high verdicts, Plaintiffs argue that Halliburton's disclosure of these new asbestos verdicts shows that the company's previous estimates were fraudulent.  As noted earlier, the Court will not infer fraud where there is no evidence of a scheme to inflate the stock price.[74]  Plaintiffs do not cite any analyst reports or other information indicating that the market perceived the December 7, 2001 disclosure as revealing fraud, rather than just delivering bad news.  Without any evidence of a fraudulent scheme, Plaintiffs' mere "well-informed speculation" is, again, insufficient to establish loss

---

[69] As stated above, Halliburton filed a Form 8-K with the SEC on December 4 disclosing the jury verdict rendered against Dresser in September 2001.  Plaintiffs also admit that "this verdict was known to the public before December 4…an analyst for Salomon Smith Barney referred to this verdict in his November 9, 2001 report."
[70] *Greenberg*, 364 F.3d at 666.
[71] *Id.*
[72] For example, on September 4, 2001, Lesar stated that Halliburton "takes our exposure seriously," but that it sees asbestos claims against the company as a "manageable problem."
[73] *See Flowserve*, 245 F.R.D. at 577 (rejecting plaintiff's argument on the grounds that "in practical terms, if any corporate defendant ever files a restatement, it will virtually guarantee investors the ability to recoup for any loss").
[74] *Id.* at 579.

causation.[75]

Plaintiffs have failed to establish loss causation with respect to any of the four disclosures relating to asbestos liabilities.  Therefore, the Court cannot certify a class with respect to the asbestos claims.

## II.  Accounting Methodology

With respect to the accounting claims, Plaintiffs argue that Halliburton changed its accounting methodology sometime in late 1997 or early 1998, inflating its balance sheet by recognizing as revenue claims for cost overruns that had a low probability of collection. Plaintiffs claim that these actions were accompanied by changes to the language of Halliburton's financial statements, which did not comply with the requirements of generally accepted accounting principles, because the reasons for and impact of the changes were not adequately disclosed.

Plaintiffs allege in the Complaint that over a period of at least five years, dating back to 1993, "Halliburton had consistently represented that all *'anticipated' losses on contracts were provided for currently* and that revenues represented by cost overrun/change order charges, i.e., Unapproved Claims, *were recognized only when the customer had agreed to pay the Unapproved Claim.*"[76]  Plaintiffs argue this means that:

> [B]efore an Unapproved Claim was resolved, the Company recorded losses caused by project cost overruns or unpaid Unapproved Claims. According to the company's stated accounting practice, only after the claim *was resolved with an agreement to pay* would the Company recognize revenue on the claim as an offset against the project's cost overruns.[77]

Plaintiffs claim that in late 1997 to early 1998, Halliburton secretly began to include in revenue amounts that customers had *not* agreed to pay, where Plaintiffs claim the likelihood of

---

[75] *Oscar*, 487 F.3d at 271.
[76] Emphasis in original.
[77] Plaintiff's Fourth Amended Complaint, P. 137 (emphasis in original).

collection was "dubious," to offset and conceal cost overruns and unpaid Unapproved Claims, and to pad profit margins.  Plaintiffs argue that as a result Halliburton's financial statements, which stated that claims were included as revenue only "when collection is deemed probable," in fact contained amounts not likely to be collected, thereby overstating Halliburton's revenue and artificially inflating its stock price.

Plaintiffs cite Halliburton's statement, from a press release issued December 21, 2000, that it was taking a $120 million charge in the fourth quarter of 2000 as the requisite corrective disclosure.  Plaintiffs argue that this fourth quarter charge was the manifestation of Halliburton's previous inclusion in revenue of claims with a low probability of collection.  The statement itself attributed $95 million of the expected $120 million loss to uncollectable cost overrun claims.  It attributed the uncollectable cost overruns to labor disturbances in Venezuela and West Africa, and also mentioned that cost overruns on seven other projects had not been resolved in Halliburton's favor, as was originally anticipated.

The first major flaw in Plaintiffs' argument is that Plaintiffs fail to identify specific misrepresentations "that are capable of moving the market."[78]  Nettesheim simply did not identify any specific misrepresentations that correlate to the December 21, 2000 disclosure.[79] Nettesheim merely contends that the disclosure caused a company-specific decline in Halliburton's stock price that was unrelated to industry or market conditions.  While *Nathenson* held that a plaintiff may rely on a decline in the stock price following a corrective disclosure to establish loss causation, *Greenberg* clarified that a plaintiff must still show the existence of earlier misrepresentations that actually moved the market.[80]  Thus, when relying on a decline in stock price, Plaintiffs must still relate the disclosure causing the fall to an earlier

---

[78] *See Flowserve*, 245 F.R.D. at 571.
[79] *See Greenberg*, 364 F.3d at 666.
[80] *Id.*; *Nathenson*, 267 F.3d at 418-19.

misrepresentation that was corrected by the disclosure.  Plaintiffs have identified no such earlier misrepresentation.

Along with failing to identify an earlier misrepresentation, Plaintiffs have commingled evidence of inflation of the stock price during the class period with impermissible evidence of inflation of the stock price prior to the class period.  Specifically, any alleged misrepresentations made by Halliburton that may have actually moved the market could have occurred before the class period.  If Halliburton changed its accounting practices in late 1997, as Plaintiffs contend, then the financial statements in late 1997 and 1998 would have inflated the stock price if they included in revenue claims not likely collectable.  The class period in this case commences on June 3, 1999.  Without accounting for possible inflation prior to the class period, any later financial statements reasserting the accounting methodology are at least partially and unquantifiably confirmatory in nature.[81]  Confirmatory statements cannot support a showing of loss causation.  Plaintiffs do not address the possibility that inflation in the stock price would have occurred, at least in part, before the beginning of the class period.

Plaintiffs attempt to meet the *Greenberg* requirement of pinpointing earlier misrepresentations that "actually moved the market" by citing language found in one of Halliburton's financial statements, and then repeated in later financial statements.  The language of these financial statements is addressed in greater detail below.  However, Plaintiffs fail to distinguish between confirmatory and non-confirmatory statements within these documents.  The only alleged misrepresentation during the class period cited by Plaintiffs comes from Halliburton's 1999 Annual Report, issued in early April 2000:

> All known or anticipated losses on contracts are provided for currently.  Claims and change orders which are in the process of being negotiated with customers for extra work or changes in the scope of work are included in revenue when

---

[81] *See Greenberg*, 364 F.3d at 665-66.

collection is *deemed probable*.

This passage cannot form the basis for an actionable misrepresentation for a number of reasons.

In *Flowserve*, Judge Boyle rejected "re-publications of financial statements, earnings projections, and confirmation of debt covenant compliance" as actionable statements capable of moving the market, because such material is confirmatory in nature.[82]  Here, the republication of Halliburton's accounting methodology in its financial statements is similarly confirmatory.[83] Halliburton's 1998 Annual Report identically stated that "[a]ll known or anticipated losses on contracts are provided for currently."  The 1998 Annual Report was filed on March 23, 1999— more than two months before the beginning of the class period.  The alleged inflationary effects caused by the "all known or anticipated losses" language therefore occurred before the class period.

Plaintiffs do not allege that specific losses on contracts were incurred between the 1998 and 1999 annual reports, so that the 1999 report was somehow materially different from the first. The market will not "double-count" information it already knows.[84]  Plaintiffs make no effort to distinguish between the confirmatory language and other non-confirmatory language in the 1999 Annual Report, which precludes a finding of loss causation attributable to the language regarding current provision for losses.

Comparing the plain language of the 1999 Annual Report with the language of the 1998 Annual Report reveals that one additional sentence was added to the 1999 filing.  The 1999 filing states that "[c]laims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work are included in revenue when collection is deemed probable," immediately after the "known or anticipated losses" language

---

[82] *See Flowserve*, 245 F.R.D. at 571.
[83] *See Greenberg*, 364 F.3d at 665-66.
[84] *Flowserve*, 245 F.R.D. at 568.

appears.  However, Plaintiffs have not explained why this "deemed probable" language is not substantively encompassed within the previous confirmatory statement about "known or anticipated losses."  Instead, Plaintiffs merely argue that as early as July 1999, "significant cost overruns and unapproved claims. . . were undermining Halliburton's earnings," without distinguishing the content and effect of the new language in the 1999 Annual Report from the "known or anticipated losses" language found in the earlier financial statements.

Therefore, Plaintiffs' position runs afoul of *Greenberg's* requirements in two respects. First, Plaintiffs fail to identify any specific misrepresentation that allegedly inflated the stock price beginning in July 1999.  Instead, Plaintiffs offer only a conclusory statement that such inflation occurred.  In doing so, Plaintiffs attempt to prove loss causation without ever showing that the company made material misrepresentations that affected the market, like those present in *Greenberg*.[85]  It is insufficient to establish loss causation simply by proving that the stock price declined after negative news, like that of a fourth quarter charge, was released.

Second, confirmatory positive statements do not actually affect the market.[86]  The class period began on June 3, 1999.  Plaintiffs allege that Halliburton's stock price was inflated in July 1999, without identifying a specific cause for that inflation.  Any inflation could likely have been caused by an alleged misrepresentation made before the class period.  To establish loss causation, Plaintiffs must cite actual misrepresentations made *during* the class period that were not confirmatory.[87]

Even if the Court were to look only at the 1999 Annual Report, the *only* alleged falsehood cited by Plaintiffs is in the fine print about accounting practices which had appeared in a prior financial statement, that "[a]ll known or anticipated losses on contracts are provided for

---

[85] *Greenberg*, 364 F.3d at 661.
[86] *Id.* at 665-66.
[87] *See id.*

currently." That is a "classic example[s] of confirmatory information."[88] Here, nothing in the record explains in what manner the language in the 1999 Annual Report is materially different from statements in any of Halliburton's previous financial statements with regards to misrepresenting Halliburton's accounting practices. The additional language in the 1999 Annual Report does not significantly alter the nature of the assurances found in the 1998 Annual Report, or in other prior financial statements. The comparison is analogous to false public announcements about the interoperability of routers that were present in *Greenberg*.[89]

Plaintiffs have not shown loss causation for a third critical reason: the alleged corrective disclosure on December 21 does not "specifically reveal" to the market any misrepresentation or fraud that may have appeared in Halliburton's prior financial statements.[90] On December 21, 2000, Halliburton issued a press release stating that $95 million of its $120 million fourth quarter loss was attributable to cost overruns. In *Flowserve*, Judge Boyle rejected the plaintiffs' argument that a failure to meet earnings forecasts rendered previous statements about historical financials internal auditing controls fraudulent.[91] While it is possible for the fraud to be revealed to the market indirectly, the plaintiff must make such a showing in the loss causation analysis.[92]

Halliburton's loss in the fourth quarter of 2000 does not establish loss causation without proof of a revelation of fraud by Halliburton or an indirect revelation of fraud to the market.[93] Halliburton's disclosure does not *directly* reveal a fraud; the disclosure reiterates that Halliburton had believed that collection of the cost overruns was probable and states that external factors, such as labor unrest in Venezuela and Africa, had contributed to the losses.

---

[88] *Flowserve*, 245 F.R.D. at 571.
[89] *See Greenberg*, 364 F.3d at 660.
[90] *See id.* at 666.
[91] *Flowserve*, 245 F.R.D. at 578-79.
[92] *Id.* at 579.
[93] *See id.* at 578-79.

Where fraud is revealed to the market *indirectly*, plaintiffs must show that the market recognized a relationship between the disclosure and the indirectly-revealed fraud.[94]  In this case, the Plaintiffs must demonstrate that the market recognized a relationship between the December 21, 2000 disclosure of the $120 million fourth quarter charge, attributed to cost overruns and labor unrest, and the 1999 Annual Report that stated:

> All known or anticipated losses on contracts are provided for currently.  Claims and change orders which are in the process of being negotiated with customers for extra work or changes in the scope of work are included in revenue when collection is deemed probable.

Plaintiffs make no such showing here.  There is no evidence that the market perceived a relationship between this fourth quarter charge and the new language in the 1999 Annual Report. Plaintiffs offer no evidence that Halliburton did not believe it was complying with proper accounting practices, nor do Plaintiffs contend that the market recognized such evidence and linked it to the December 21, 2000 disclosure, or to the 1999 Annual Report.  Plaintiffs merely ask the Court to infer fraud from Halliburton's substantial fourth quarter charge.[95]  This the Court cannot do.

The Plaintiffs' argument is simply a nuanced version of the "true financial condition" argument that Judge Boyle rejected in *Flowserve*.[96]  Plaintiffs argue that Halliburton's financial statements, in the aggregate, misrepresented the true financial condition of the company and that the announcement of a fourth quarter loss served as a corrective disclosure of the company's true financial health.  However, Plaintiffs cannot establish loss causation merely by pointing to lower financial projections and then concluding without proof that Halliburton's previous revenue statements were fraudulent.  The burden of proving loss causation cannot be satisfied with such

---

[94] *Id.*
[95] *See Oscar*, 487 F.3d at 271.
[96] *Flowserve*, 245 F.R.D. at 573.

"well-informed speculation."[97]

The Fifth Circuit has made plain that securities fraud suits are not an "insurance policy for investors," whereby Plaintiffs can simply "surmise[] what the market knew . . . with the benefit of hindsight and from the comfort of a litigation armchair."[98]  In light of the failure of Plaintiffs to satisfy their burden on loss causation, class certification is denied with respect to the accounting methodology claim.

### III. The Dresser Merger

Plaintiffs argue that in early 1998, Halliburton misstated the benefits of its acquisition of Dresser Industries, in order to inflate the price of Halliburton stock.  Plaintiffs cite four disclosures as correcting the inflation caused by the alleged misstatements regarding Dresser, each addressed in greater detail below.  First, on October 4, 1999, "Halliburton unexpectedly warned that its 1999 third-quarter earnings would be less than the previous estimates," caused in part by the lower than expected profits from the Dresser business units.  Second, on January 5, 2000, two investment analysts lowered their estimates of Halliburton's annual earnings for 2000 and 2001, caused in part by "less powerful synergies from the Dresser merger."  Third, on October 24, 2000, Halliburton CEO Lesar told analysts in a conference call that Halliburton planned a massive restructuring in light of operational problems and management inefficiencies caused by the Dresser merger.  Fourth, Halliburton officially unveiled the restructuring plan on December 21, 2000, the same day it announced that it expected to incur a $120 million dollar charge in the fourth quarter of 2000, $95 million of which was attributed to accounting claims adjustments.  The remaining $25 million in losses was attributed to the costs of reorganization after the Dresser merger.

---

[97] *Oscar*, 487 F.3d at 271.
[98] *Id*. at 574.

**A.  October 4, 1999 Disclosure**

Plaintiffs have not established loss causation with respect to the October 4, 1999

disclosure because the underlying alleged misrepresentations are confirmatory and thus not

actionable.[99]  Plaintiffs point to statements made on July 22, 1999, and September 13, 1999, in

which Halliburton executives estimated annualized savings of $500 million from the Dresser

merger, as misrepresentations that actually moved the market.

Defendants correctly argue that these alleged misrepresentations were confirmatory, and

thus not actionable, because on March 1, 1999, prior to the class period, Halliburton stated that:

"[c]osts from the merger and the downturn in activity should yield over $500 million by the end

of 1999…"  An efficient market will not "double-count" the effects of a confirmatory positive

statement, and inflate the stock price twice.[100]  Plaintiffs argue that the March 1999 statement

does not render the later statements confirmatory because it encompassed the Dresser integration

as well as a "downturn," and thus did not *solely* address the Dresser merger.

The Court is not persuaded that the March 1999 statement and the later alleged

misrepresentations about the Dresser merger are materially different such that the market would

respond to the later statements about saving $500 million after it already responded to the March

1999 statement.  Plaintiffs have provided no evidence that the content of the March 1999

statement would have caused the market to respond twice to the same information about cost

savings, just because it also noted a "downturn" when identifying the source of the $500 million

savings.  Thus, Plaintiffs cannot establish loss causation with respect to this issue because the

actionable misrepresentations are confirmatory in nature.

Also, while Plaintiffs argue that attributing the savings to the Dresser merger alone

---

[99] *See Greenberg*, 364 F.3d at 665-66.
[100] *Flowserve*, 245 F.R.D. at 568.

somehow changed the market's perception of the Dresser merger, the alleged corrective disclosure also reveals nothing *fraudulent* about the statements.[101]  Nettesheim states in her report that "[t]his is an instance where the Company released negative news, which concerned the lack of benefits arising from the Dresser merger."  However, the mere release of negative information is simply not enough to prove that the previous positive statements were fraudulent.  Plaintiffs cannot establish loss causation by speculating about fraud.  A failure to meet earnings estimates does not show to the market the existence of a fraudulent scheme.[102]  Since there is no evidence supporting an inference of fraud, and because the alleged misrepresentations were confirmatory in nature, the Court will not certify the class based on the October 4, 1999 disclosure.

### B.  January 5, 2000 Corrective Disclosure

The Court rejects class certification with respect to this disclosure because Plaintiffs again fail to show loss causation.  Plaintiffs rely on two analysts' reduction of Halliburton's earnings estimates on January 5, 2000, in alleging loss causation for the stock decline that occurred that particular day.  Plaintiffs allege that "[l]ooking behind the analysts' conclusions to the underlying data, Ms. Nettesheim concluded that 'a significant portion of the stock price decline on January 5, 2000 was caused by information that partially corrected investors' erroneous assessments of the profitability of overseas construction projects and the benefits of the Dresser merger."  Plaintiffs rely on the "July and September misrepresentations" which this Court in its earlier analysis found to be confirmatory and thus not actionable.  Plaintiffs point to no misrepresentations in particular following the October 4, 1999 disclosure.  Halliburton correctly argues that "[t]he first step is to isolate the alleged actionable, nonconfirmatory

---

[101] *See Greenberg*, 364 F.3d at 666.

[102] *Flowserve*, 245 F.R.D. at 579 (distinguishing such statements as negative rather than corrective disclosures).

misstatements." However, in this case Plaintiffs argue that the analysts' downgrading of Halliburton stock amounts to a new corrective disclosure without identifying any actionable misrepresentation.

Plaintiffs rely on the reports of two analysts: Carol Lau of Brown Brothers Harriman & Co., and K. Simpson of Merrill Lynch. K. Simpson attributed his downward adjustment to "reduced expectations for offshore construction results, a reduced growth estimate for oilfield spending outside North America, and less powerful synergies from the Dresser merger than… envisioned." Plaintiffs cite no statements by Lau explaining her adjustment, and rely only on the existence of the adjustment as evidence of a corrective disclosure.[103]

Plaintiffs fail to establish loss causation with respect to this "disclosure." First, Plaintiffs fail to cite any actionable misrepresentation that correlates to it.[104] Plaintiffs cannot establish loss causation without such a showing. Instead, Plaintiffs rely on the same confirmatory statements that were supposedly corrected by the October 4, 1999 disclosure. However, Plaintiffs cannot establish loss causation by citing confirmatory information. Just as Plaintiffs' argument fails with respect to the October 4, 1999 disclosure, it also fails here.

Additionally, Plaintiffs do not cite any public release as correcting a misrepresentation, but rather point only to the analysts' adjusting their own earlier estimates of Halliburton's earnings. The Court cannot determine whether this "disclosure" specifically revealed a fraudulent scheme because Plaintiffs provided limited evidence about why these analysts changed their forecasts, and no evidence that the market perceived these adjustments as evidence

---

[103] Nettesheim alludes to a "partial disclosure related to the Company's booking of unapproved claims on fixed-price contracts and the lack of benefits realized from the Dresser merger as revealed in a conversation with analyst Carol Lau," but cites no source for or further information about this alleged conversation. The Court cannot establish a specific alleged misrepresentation or corrective disclosure without more.
[104] *See Greenberg*, 364 F.3d at 666.

of prior fraud.[105]

In *Oscar*, the court rejected the plaintiffs' approach of relying solely on analysts' opinions to show that a specific disclosure corrected a prior misrepresentation.[106]  The *Oscar* court required that the plaintiffs' expert make some sort of "empirically-based showing that the corrective disclosure was more than just present at the scene."[107]  Plaintiffs argue that in this case the two analysts' adjustments of their financial estimates prove that there must have been a corrective disclosure somewhere.

Plaintiffs offer no evidence of a fraudulent scheme, as required by *Oscar*.  Plaintiffs cannot even claim to have the "well-informed speculation" which the court rejected in *Oscar*.[108]  In *Oscar*, the plaintiffs also relied solely on analyst opinions, but the analyst commentary in *Oscar* at least provided concrete examples of disclosures that could potentially be perceived as corrective by the market.[109]

Plaintiffs simply speculate that Simpson's earnings adjustment was due to the Dresser merger.  Although Simpson mentioned the Dresser merger as one of three reasons for his adjustment, Plaintiffs make no effort to distinguish between the Dresser issue and the two other reasons for the adjustment.[110]  Nettesheim concedes that she did not distinguish between the effects of Simpson's concerns regarding oilfield spending and those regarding the Dresser merger.  Furthermore, Nettesheim admits, "I do not have Simpson's breakout of his reduction of 2000 and 2001 earnings estimates between the segments…"  As a result, Nettesheim failed to differentiate between not only the stated reasons for the rating cut, but also failed to account for

---

[105] *See id.*
[106] *Oscar*, 487 F.3d at 261.
[107] *Id.*
[108] *Id.*
[109] *Id.* at 270 (the analysts revealed that the company adjusted the line count between billing and order management platforms).
[110] *See Greenberg*, 364 F.3d at 666.

long-term versus short-term adjustments to the earnings estimates in her analysis.  This approach

falls well short of *Oscar's* requirement that the Plaintiffs' expert make an empirically-based

showing that the corrective disclosure was more than just present at the scene.[111]

The *Oscar* court's admonition that the class certification decision "bears due-process

concerns for… [the] defendants" is especially pertinent here.[112]  There, the court explained, "an

empirical inquiry into loss causation better addresses these [due process] concerns than an

impenetrable finding akin to a reasonable man assessment.  And analyst speculation about

materiality, while better informed than a layman, more closely resembles the latter."[113]  This

Court cannot simply infer loss causation without, at the very least "reference to…post-mortem

data [the analysts] have reviewed or conducted" to support the determination, in this case, that

Simpson's earnings adjustment was due to the Dresser merger.  To hold otherwise would result

in exactly the type of "impenetrable finding" the Fifth Circuit has warned against.

Simply put, Plaintiffs' burden of identifying corrective disclosures is not satisfied by

citing the mere existence of an earnings adjustment by outside analysts.  Analysts unaffiliated

with Halliburton could have previously overestimated Halliburton's performance, and then a

subsequent modification would certainly not qualify as a corrective disclosure.  Once more,

Plaintiffs attempt to trigger the presumption of reliance by simply offering evidence of a

decrease in price following the release of negative information,[114] without citing any actionable

misrepresentation or disclosure by Halliburton.  Plaintiffs' reliance on the decline in

Halliburton's stock price after analysts reduced their forecasts does not establish loss causation.

---

[111] *See Oscar*, 487 F.3d at 261.
[112] *Id.* at 271.
[113] *Id.*
[114] *See Greenberg*, 364 F.3d at 665.

### C. October 24, 2000 Corrective Disclosures

Plaintiffs have not established loss causation with respect to the October 24, 2000 disclosure.  Unlike the prior disclosure, Plaintiffs satisfy the *Greenberg* requirement by identifying what they allege to be a prior misstatement.[115]  Plaintiffs cite a letter from Dick Cheney included in the 1999 Annual Report, released in April 2000, which told investors that "[t]he merger with Dresser Industries is now behind us.  The potential rewards to our shareholders are vast."  Then on October 24, 2000, Lesar stated that Halliburton planned to restructure its construction operations due to operational problems, management inefficiencies, and excessive costs related to the Dresser merger.

However, Plaintiffs fail to establish loss causation because nothing in the alleged corrective disclosure "specifically reveal[s]" to the market any fraudulent scheme.[116]  Cheney's statement that the Dresser merger was "behind us" is not proven fraudulent based only on the fact that Halliburton restructured its construction operations six months later.  Just as a failure to meet earnings expectations does not reveal misstatements in previous financial documents, a failure to meet business expectations will not reveal that prior optimistic expectations were *fraudulent*.  Indeed, it is entirely possible that six months after the announcement of the completion of the Dresser acquisition, Halliburton executives realized that the business units were not functioning as well as anticipated.  The burden falls on Plaintiffs to show that Lesar's statement communicated to the market that Cheney's previous statement about the Dresser merger was fraudulent, in order to prove loss causation.  Because Plaintiffs fail to make such a showing, they have not established loss causation with respect to the October 24, 2000 disclosure.

---

[115] *See id.* at 666.

[116] *Id.*

**D.  December 21, 2000 Disclosure**

Plaintiffs allege that Halliburton's official unveiling of its Dresser restructuring plan on December 21, 2000, the same day it announced that it expected to incur a $120 million dollar charge in the fourth quarter of 2000, constitutes an actionable corrective disclosure.  The disclosure blamed $95 million of the loss on cost overruns on fixed-price contracts, leaving $25 million attributable to the expected costs of the Dresser reorganization.

Plaintiffs have not established loss causation with respect to this disclosure.  The announcement of the expected costs of reorganization did not "specifically reveal[]" to the market any fraudulent scheme.[117]  The announcement of the loss attributable to restructuring is entirely consistent with Halliburton's October 24, 2000 statement that it planned to restructure.  Despite Plaintiffs' claim that Halliburton "again surprised the market," Nettesheim recognized that the announcement "does not appear to have been a surprise or a concern to analysts as some charge was expected after the Company announced the restructuring plan in its third quarter earnings conference call."

The market will not "double-count" the negative effects of a restructuring plan that had already been made public.  Plaintiffs do not argue that the formal announcement of the plan further changed the market's perception of Halliburton or that the expected cost of the restructuring had previously been fraudulently misrepresented.  Any inflation in the value of Halliburton's stock price caused by Cheney's alleged misrepresentation would have been removed by the initial disclosure of the planned restructuring in October 2000.

Additionally, the expected cost of the restructuring qualifies as a *negative*, as opposed to a *corrective* disclosure.  The release of negative information to the market does not necessarily have a corrective effect.  The information about the cost of restructuring did not *correct* any

---

[117] *See Greenberg*, 364 F.3d at 666.

previously released information; it was simply negative information relating to the costs of the Dresser merger.  In fact, this information actually comported with and elaborated upon Halliburton's prior disclosure that it planned to restructure the Dresser business units.

Because the announcement of the costs of restructuring confirmed the market's prior knowledge that Halliburton was planning to restructure, this announcement cannot support a finding of loss causation.  Any corrective effect upon the price of Halliburton stock would have occurred with the disclosure on October 24, 2000, not with the formal confirmation two months later.  Therefore, the Court will not certify a class with respect to the December 21, 2000 disclosure.

## CONCLUSION

Plaintiffs have failed to establish loss causation with respect to any of the three issues in this lawsuit.  For that reason, the Court will not certify the class.  The Court reiterates that the Fifth Circuit has placed an extremely high burden on plaintiffs seeking class certification in a securities fraud case.  Even though the Court finds that all other elements required for class certification under Rule 23 have been met in this case, it is unable to certify the class because of Plaintiffs failure to meet this stringent loss causation requirement.

**SO ORDERED.**

Signed this 4th day of November, 2008.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS