**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| THE ERICA P. JOHN FUND, INC., | § | |
| On Behalf of Itself and All Others | § | |
| Similarly Situated, | § | |
| | § | |
| Lead Plaintiff, | § | |
| | § | Civil Action No. 3:02-CV-1152-M |
| vs. | § | |
| | § | |
| HALLIBURTON COMPANY and DAVID J. | § | |
| LESAR, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' BRIEF ON PRICE IMPACT
<u>DEMONSTRATING THAT CLASS CERTIFICATION MUST BE DENIED</u>**

# TABLE OF CONTENTS

PRICE IMPACT STANDARD ....................................................... 1

I.    There is no price impact when the alleged misrepresentations did not "actually affect" the market price of the stock. ................................................ 1

II.   A defendant bears only the burden of production, and a plaintiff bears the ultimate burden of persuasion. ................................................................. 3

SUMMARY OF ARGUMENT ..................................................... 4

ARGUMENT ............................................................................ 5

I.    The alleged misrepresentations concerning Halliburton's asbestos liability did not impact the stock price. .............................................................. 6

    A.    There is no price impact from the alleged misrepresentations contained in Halliburton's quarterly reporting of its estimated asbestos liability. ...................... 9

    B.    There is no price impact from any alleged misrepresentation concerning Halliburton's liability for asbestos claims filed against Harbison-Walker. ........... 13

    C.    There is no price impact from any alleged misrepresentation concerning the asbestos cases that resulted in the late 2001 adverse verdicts and judgments. ...... 16

II.   The alleged misrepresentations concerning Halliburton's accounting for claims on fixed-price construction contracts did not impact the stock price. ............................ 17

III.  The alleged misrepresentations concerning cost savings from the Dresser merger did not impact the stock price. .................................................... 23

CONCLUSION ......................................................................... 28

## TABLE OF AUTHORITIES

                                                                                    **Page(s)**

CASES

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) .............................................................................2, 24

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co. ("AMSF I")*,
   No. 3:02-CV-1152-M, 2008 WL 4791492 ...................4, 10, 14, 15, 17, 21, 24, 25, 26, 27, 28

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co. ("AMSF II")*,
   597 F.3d 330 (5th Cir. 2010) ............................................2, 4, 7, 10, 12, 15, 16, 19, 20, 25, 28

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ..................................................................................................1, 3

*Berks Cnty. Emps' Ret. Fund v. First Am. Corp.*,
   734 F. Supp. 2d 533 (S.D.N.Y. 2010) .......................................................10, 16, 17

*Catogas v. Cyberonics, Inc.*,
   292 F. App'x 311 (5th Cir. 2008) ...............................................................................2

*Erica P. John Fund, Inc. v. Halliburton Co. ("EPJF II")*,
   718 F.3d 423 (5th Cir. 2013) .......................................................................................2

*Greenberg v. Crossroads Sys., Inc.*,
   364 F.3d 657 (5th Cir. 2004) ...............................................................................2, 24

*Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*,
   134 S. Ct. 2398 (2014) ...................................................................1, 2, 3, 4, 5, 14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) ........................................................................................20

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) .............................................................................2, 3

*Katyle v. Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) .......................................................................................2

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ........................................................................................2

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ....................................................................................24

*N. Port Firefighters' Pension–Local Option Plan v. Temple-Inland, Inc.*,
   936 F. Supp. 2d 722 (N.D. Tex. 2013) (Boyle, J.) ...................................................22

*Nathenson v. Zonagen, Inc.*,
    267 F.3d 400 (5th Cir. 2001) ................................................................................................25

*Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*,
    499 F. App'x 345 (5th Cir. 2012) ........................................................................................25

**OTHER AUTHORITIES**

FED R. CIV. P. 23(c)(1)(A)(B) ........................................................................................................5

FED R. EVID. 301 ...........................................................................................................................3

Defendants have demonstrated that the alleged misrepresentations had no price impact. Because the Fund cannot prove otherwise, this Court must deny class certification.

## PRICE IMPACT STANDARD

**I.**   **There is no price impact when the alleged misrepresentations did not "actually affect" the market price of the stock.**

"The reliance element [of a 10b-5 fraud action] ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 134 S. Ct. 2398, 2407 (2014).[1]  A plaintiff's "reliance on any public material misrepresentations . . . may be presumed" if the defendant's stock trades on an efficient market reflecting all publicly available information. *Id.*  If "reliance is to be shown through the *Basic* presumption," however, the "misrepresentation [must be] reflected in the market price at the time of the transaction." *Id.* at 2416.

The *Basic* presumption is rebuttable at class certification: "'[A]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption' because 'the basis for finding that the fraud had been transmitted through market price would be gone.'" *Id.* at 2415–16 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988)).  "[E]vidence that [the] alleged misrepresentation did not actually affect the market price" rebuts the presumption. *Id.* at 2417.  A defendant's rebuttal may include evidence about the market price (1) at the time of the alleged misrepresentation or (2) at the time the plaintiff claims there was a correction of the alleged misrepresentation. *Id.* at 2414 (a defendant may rebut the presumption with "evidence that the asserted misrepresentation (or its correction) did not affect the market price").

---

[1]      Internal quotations marks are omitted and emphasis is added in all citations unless otherwise noted.

If the "stock price did not increase" following the alleged misrepresentation, that is evidence of no price impact. *Erica P. John Fund, Inc. v. Halliburton Co. ("EPJF II")*, 718 F.3d 423, 434 (5th Cir. 2013).   Additionally, there is evidence of no price impact if the alleged misrepresentation merely disclosed information that was already known to the market. *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665–66 (5th Cir. 2004) ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.").

With respect to a claim that a subsequent disclosure corrected a misrepresentation, there are at least two types of rebuttal evidence.   First, a defendant rebuts the presumption if there is no "correction" that "affect[ed] the market price." *Halliburton II*, 134 S. Ct. at 2414.   In the absence of a "correction to a prior misleading statement," there is "no inference raised that the original, allegedly false statement caused an inflation in the price to begin with." *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co. ("AMSF II")*, 597 F.3d 330, 336 (5th Cir. 2010).[2]   Second, the stock price must drop following the claimed correction.   If it does not, there is evidence that the price at the time of the alleged misrepresentation was not inflated, rebutting the fraud-on-the-market presumption. *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 490, (S.D.N.Y. 2011).

---

[2]    To be "corrective," the disclosure must constitute a "revelation of the truth" concerning the misrepresentation. *AMSF II*, 597 F.3d at 336; *see also Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) (corrective disclosures must present "new facts" that "reveal to the market in some sense the fraudulent nature of the practices about which a plaintiff complains"); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (corrective disclosures "must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements"); *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314–15 (5th Cir. 2008) (corrective disclosures must "reveal[] the falsity of . . . previous representations," not "merely 'touch[] upon' them"); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (corrective disclosures must "reveal to the market the falsity of the prior [misrepresentations]"); *Greenberg*, 364 F.3d at 665–66 (corrective disclosures must reveal "the alleged 'truth' of earlier false statements").

## II.     A defendant bears only the burden of production, and a plaintiff bears the ultimate burden of persuasion.

A defendant rebuts the presumption "*through evidence* that the misrepresentation did not in fact affect the stock price." *Halliburton II*, 134 S. Ct. at 2414; *id*. at 2407 ("rebut . . . with evidence"), 2413 ("rebut . . . with evidence"), 2416 ("evidence" of no price impact shows "presumption does not apply"); 2417 ("defeat" the presumption with "price impact evidence").[3] A defendant's burden is one of evidentiary production, not ultimate persuasion.   Neither the Supreme Court nor Justice Ginsburg's concurrence (which is not binding in any event) ever stated a defendant must "prove" a lack of price impact by the preponderance of the evidence.

This is consistent with Federal Rule of Evidence 301, which applies to all presumptions "unless a federal statute or these rules provide otherwise." FED. R. EVID. 301.   Under Rule 301, cited in *Basic* itself, the defendant has the burden of "producing evidence to rebut the presumption." *Id*.   The terminology is virtually identical to that used by the Supreme Court to describe Halliburton's burden to rebut the presumption of reliance.

Rule 301 clarifies that the "burden of persuasion . . . remains on the party who had it originally." *Id*.   "The *Basic* presumption does not relieve plaintiffs of the burden of proving— before class certification—that [the Rule 23(b)(3) predominance] requirement is met." *Halliburton II*, 134 S. Ct. at 2412.   And "price impact . . . has everything to do with the issue of predominance," *id*. at 2416, for "[i]n the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse." *Id*. at 2414.

---

[3]      The only evidence relevant to the rebuttal (or to the proof of price impact) is that which is publicly available.  The presumption rests on the premise that the market price "reflects all *publicly available* information." *Basic*, 485 U.S. at 246; *Halliburton II*, 134 S. Ct. at 2415 (evidence relevant to price impact relates to "publicly reported events"); *see also* Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," 25 J. FINAN. 383, 383 (May 1970) ("prices efficiently adjust to other information that is obviously *publicly* available"); David Tabak & Frederick Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, in LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT 19.1, 19.2 (Roman L. Weil, et al. eds., 3rd ed. 2001) ("the semi-strong version of the Efficient Market Hypothesis . . . states that stock prices in an actively traded security reflect all *publicly* available information").

Accordingly, once a defendant rebuts the presumption, a class may not be certified unless the plaintiff proves price impact.  *See, e.g.*, *Moody's*, 274 F.R.D. at 490, 492–93 (denying class certification because in "no period within the proposed class period" did an "alleged misrepresentation cause[] a statistically significant increase" or "a corrective disclosure cause[] a statistically significant decline in the price").

## SUMMARY OF ARGUMENT

Halliburton has more than satisfied its burden to present evidence demonstrating the absence of price impact.  Because the Fund cannot prove price impact as to any of its alleged misrepresentations, this Court must deny class certification.

The Fund's theory of price impact is that the stock price dropped when Halliburton made a myriad of supposedly corrective disclosures.  The glaring problem with this theory is the same problem that existed when this Court and the Fifth Circuit first analyzed the issues:  The disclosures are not, as a matter of law, corrective of the alleged misrepresentations.  This Court found that the price declines on which the Fund relies followed disclosures concerning "newly acquired information," "external factors" unrelated to the alleged fraud, changes in "business expectations," and other information "unrelated to previous disclosures."  *See, e.g.*, *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co. ("AMSF I")*, No. 3:02-CV-1152-M, 2008 WL 4791492, at **5–6, 11, 15, 18–19 (N.D. Tex. Nov. 4, 2008).  On appeal, the Fifth Circuit agreed that none of the price declines gives rise to "an inference that the price was actually affected by . . . alleged misrepresentations."  *AMSF II*, 597 F.3d at 336, 339–44.

While this Court and the Fifth Circuit reached these conclusions as part of their "loss causation" analyses, the conclusions are equally relevant to price impact.  *Halliburton II*, 134 S. Ct. at 2414 (noting that a defendant may rebut price impact by demonstrating the absence of a "correction" that "affect[ed] the market price").  Nothing has changed to make disclosures,

which were not corrective before, somehow corrective now.  For this reason alone, Halliburton has satisfied its rebuttal burden; the Fund cannot establish price impact; and the class cannot be certified.  *Id.* at 2415 ("[a]ny showing that severs the link" is sufficient to rebut the presumption).

Halliburton's evidence, however, also demonstrates the absence of price impact in a variety of additional ways.  First, the evidence at the time of the alleged misrepresentations shows the lack of price impact.  The Fund must rely on alleged corrective disclosures because its own expert demonstrated that, at the time of the alleged misrepresentations, there was no statistically significant increase in the stock price.  Halliburton's expert, Lucy Allen, has now conducted her own event study and analysis confirming the absence of statistically significant stock price increases following the alleged misrepresentations.  In addition, a number of the alleged misrepresentations were incapable of impacting the stock price because they disclosed information already known to the market.

Second, additional evidence at the time of the supposed corrective disclosures also severs the link between the alleged misrepresentations and the price the putative class paid for the shares.  To be sure, the disclosures are not, as a matter of law, "corrective" of the alleged misrepresentations.  But there is more.  The evidence—described at length in Ms. Allen's report—also demonstrates that the stock price was reacting to something other than the correction of a fraud.  Additionally, with respect to certain supposed corrective disclosures, Ms. Allen found that there was no statistically significant stock price drop.

Consequently, the evidence shows no price impact, and the class cannot be certified.

## ARGUMENT

The Fund claims that Halliburton's statements concerning three disparate topics— (1) estimated liability for asbestos claims; (2) accounting for claims on fixed-price construction contracts; and (3) projected cost savings from Halliburton's 1998 merger with Dresser—inflated

the value of Halliburton's stock price.  Given the Court's duty to "define the class," FED R. CIV.

P. 23(c)(1)(A)(B), a class may be certified only as to any misrepresentation that impacted the

price at which putative class members purchased the stock.  Because none of the alleged

misrepresentations impacted the stock price, this Court must deny class certification.

## I.   The alleged misrepresentations concerning Halliburton's asbestos liability did not impact the stock price.

For more than 20 years before the class period, Halliburton or its subsidiaries defended

asbestos lawsuits.  On a quarterly basis during the class period, Halliburton reported estimates

for its liability for the known/pending asbestos claims that had been filed against it.  Halliburton

reported the amount of its "reserve estimating [its] liability for known asbestos claims"[4] and

stated the bases for its estimates—"historical litigation experience, settlements and expected

recoveries from insurance carriers."[5]  Halliburton also disclosed the following:

- The number of claims Halliburton had settled or resolved in the prior quarter, the cost of resolving those claims, and the amount of that cost for which Halliburton was responsible after expected insurance recoveries.

- The total number of pending claims—claims that had been filed but that Halliburton had not yet resolved—including the number of new claims filed during each quarter.

- The estimated total liability for all pending claims.

- The estimated receivables from insurance companies for all pending claims.

- The amount of the net reserve Halliburton maintained, which equaled the estimated liability for all pending claims, net of expected insurance recoveries.[6]

Emphasizing that it could not *know* the ultimate liability for claims that were not yet resolved

and that its numbers were only *estimates*, Halliburton stated that it "believe[d] that the open

---

[4]     *See, e.g.*, APP 307 (5/15/00 Halliburton 10-Q at 10).
[5]     *See, e.g.*, *id.*; *see also* APP 70 (9/10/14 Report of Lucy Allen ("Allen Rpt.") ¶¶ 155–56).
[6]     APP 268–69 (11/15/99 Halliburton 10-Q at 8);  APP 282–83 (3/14/00 Halliburton 10-K at 43–44); APP 305–07 (5/15/00 Halliburton 10-Q at 9–10); APP 318–22 (8/10/00 Halliburton 10-Q at 9–11); APP 330–32 (11/9/00 Halliburton 10-Q at 9–11);  APP 347–49 (3/27/01 Halliburton 10-K at 36–38);  APP 360–62 (5/11/01 Halliburton 10-Q at 8–10);  APP 380–84, 388 (8/9/01 Halliburton 10-Q at 9–13, 26);  APP 401–06, 416 (11/8/01 Halliburton 10-Q at 8–12, 25).

asbestos claims asserted against [it] w[ould] be resolved without a material adverse effect on [its] financial position."[7]

Halliburton also repeatedly warned of "the uncertainties of asbestos litigation," and cautioned that "a series of adverse court rulings . . . could materially impact our expected resolution" of the pending claims.[8]  This Court and the Fifth Circuit rejected the Fund's attempts to portray these warnings as "mere boilerplate disclaimers."  *See AMSF II*, 597 F.3d at 340.

Additionally, prior to the class period, Halliburton informed investors that its subsidiary, Dresser Industries, Inc., had potential liability for asbestos claims filed against Harbison-Walker Refractories Company, a former Dresser subsidiary that spun off in 1992.[9]  Investors were aware that, at the time of that spinoff, Harbison assumed responsibility and agreed to indemnify Dresser for all Harbison-related asbestos claims filed against Dresser after the 1992 spinoff.[10] Halliburton disclosed that in early 1999 Harbison commenced an arbitration in which it disputed that it owed Dresser any indemnity for these claims.[11]  Halliburton kept investors abreast of developments in this dispute, including that Harbison was claiming it was owed $40 million for amounts it had previously paid to resolve post-1992 asbestos claims.[12]  Halliburton later reported that, in November 2000, the parties reached a settlement whereby Harbison agreed to continue defending the post-1992 claims and acknowledged its obligation to indemnify Dresser.[13]

Just months after Harbison had acknowledged its indemnity obligation, on June 28, 2001, Halliburton informed investors of a "new development"—Harbison had approached Halliburton

---

[7]     *See, e.g.*, APP 362 (5/11/01 Halliburton 10-Q at 10).
[8]     *See, e.g.*, *id.*
[9]     APP 255 (5/14/99 Halliburton 10-Q at 7).
[10]    *Id.*; *see also* APP 128 (Allen Rpt. ¶ 283).
[11]    *Id.*
[12]    *See, e.g.*, APP 261 (8/13/99 Halliburton 10-Q at 8).
[13]    APP 330–32 (11/9/00 Halliburton 10-Q at 10–11).

seeking claims management and financial assistance concerning the post-1992 claims.[14]  Then, in July 2001, Halliburton disclosed that it would take over the management of the post-1992 claims that had been filed against Dresser (but for which Harbison had agreed to indemnify Dresser) and that Halliburton would take a $60 million *after-tax* reserve for those claims.[15]

Halliburton began taking over the defense of these claims.  Halliburton had a long history of resolving asbestos claims (through settlement and trial) for very small amounts,[16] and it had never commented on the potential outcome of any particular asbestos claim or made any representations about whether it would win a particular case.  In the fall of 2001, Halliburton suffered adverse results in several of the cases the defense of which it had just taken over from Harbison.  It for the first time experienced the possibility about which it had repeatedly warned investors—"a series of adverse court rulings" inconsistent with its history.

First, on September 12, 2001, the day after the 9/11 attacks, a south Texas jury reached a verdict against Dresser and a co-defendant for which Dresser's share amounted to $65 million.  News of the verdict reached the market soon thereafter.[17]  Analysts commented on the verdict, including in reports that followed an asbestos presentation to investors by Halliburton's CFO in early October 2001.[18]  In late October, a Mississippi jury reached another significant verdict against Dresser and two co-defendants.  On October 30, Halliburton issued a press release announcing the verdict, Dresser's share of which was $21.25 million.[19]  On December 4, Halliburton announced that the Texas court had entered a judgment on the September 12 jury

---

[14]     APP 367–68 (6/28/01 Halliburton Press Release at 1–2).
[15]     APP 370 (7/25/01 Halliburton Press Release at 2).
[16]     APP 82–84 (Allen Rpt. ¶¶ 172–74).
[17]     APP 91–92, 96–97, 134–35 (Allen Rpt. ¶¶ 195–97, 215, 303–04); *see also* APP 1637–39 (Melissa Renteria, *Orange jury awards record amount in asbestos case*, BEAUMONT ENTERPRISE, Sept. 20, 2001); APP 1640–41 (Mealey's Litig. Rpt., Sept. 21, 2001).
[18]     *See, e.g.*, APP 1321 (10/5/01 Deutsche Banc Rpt. at 1); APP 1329 (10/23/01 Salomon Rpt. at 2).
[19]     APP 396 (10/30/01 Halliburton Press Release at 5).

verdict.[20]  Halliburton also announced that the same court entered an additional judgment against Dresser totaling $35.7 million.  This judgment did not follow a jury trial but instead enforced against Dresser a settlement agreement, which Harbison (but not Dresser) had signed before it requested Halliburton's assistance.[21]  Finally, on December 7, Halliburton issued another press release announcing that a Baltimore jury had returned a $30 million verdict against Dresser.[22]  That day, Halliburton's stock price dropped by approximately 40%.

### A.  There is no price impact from the alleged misrepresentations contained in Halliburton's quarterly reporting of its estimated asbestos liability.

The Fund's principle allegation is that Halliburton's quarterly reporting of its estimated liability for pending asbestos claims was misleading for a variety of reasons.  According to the Fund, Halliburton's estimates were not "objectively determined";[23] the estimates erroneously assumed that Halliburton would be able to continue disposing of claims for the same amounts that the Company had historically been able to dispose of claims; and the estimates improperly assumed Halliburton would recover more from insurers than it actually could.[24]

Even taking these allegations as true, the claimed misrepresentations cannot form the basis for certification of the class because they had no impact on the stock price.  The crucial connection between the alleged fraud and inflation of the stock price is absent.  No alleged misstatement about Halliburton's asbestos liability caused a stock price increase.  Indeed, both

---

[20]     APP 421 (12/4/01 Halliburton 8-K at 2).

[21]     *Id.*

[22]     APP 424 (12/7/01 Halliburton Press Release at 2).

[23]     Compl. ¶¶ 116, 128, 140, 153, 168, 173, 190.  The Fund also claims that Halliburton misrepresented to the market that its asbestos liability estimates included amounts for future claims not yet filed against the Company.  Halliburton's public disclosures were consistently transparent that its liability estimates only included amounts for pending claims, a fact which the market well understood throughout the class period.  APP 74, 75–77 (Allen Rpt. ¶¶ 152, 158–60); *see, e.g.*, APP 361 (5/11/01 Halliburton 10-Q at 9).

[24]     The Fund's allegations include that Halliburton's insurance recovery estimates were overstated because the Company continued to record an expected recovery from one of its insurers, Highlands Insurance Company, both after Highlands filed suit alleging it did not owe Halliburton indemnity on certain asbestos claims, and while the trial court's ruling in Highlands' favor was on appeal.  Compl. ¶¶ 245–46.  None of the purported corrective disclosures are related to the alleged misrepresentations concerning Highlands, nor did any of those disclosures reveal to the market that Halliburton made any misrepresentations concerning its insurance.  APP 86–87 (Allen Rpt. ¶ 181).

the Fund's own expert and Ms. Allen's analysis have demonstrated the opposite.[25]  The Fund's theory, instead, is that the stock price dropped at the end of the class period because "investors . . . realized that the Company had been affirmatively misleading them . . . regarding the Company's asbestos exposure."[26]

The evidence disproves the Fund's theory.  The announcements at the end of the class period concerned adverse litigation results, the possibility of which Halliburton had expressly warned.  The announcements represented new information that could not have been announced before those results occurred.  The announcements did not mention Halliburton's previously reported estimates of its liability for pending asbestos claims, much less provide any indication to investors that those estimates were false when made.  To the contrary, they informed investors of the Company's intent to challenge those verdicts due to the trial courts' errors, and confirmed that Halliburton would "continue [its] current claim strategy."[27]  As a matter of law, the litigation announcements were not corrective of Halliburton's quarterly estimates of its asbestos liability for pending claims.  This Court and the Fifth Circuit both reached this same conclusion. *AMSF I*, 2008 WL 4791492, at *8–9; *AMSF II*, 597 F.3d at 340–41.

Because there is no connection between the litigation announcements and the alleged misleading estimates, Halliburton has satisfied its burden to submit evidence showing the absence of price impact.  Ms. Allen's report, however, provides further evidence demonstrating that the stock price drop was caused by factors other than the revelation of a fraud.

***First***, analyst commentary before and after the litigation announcements provides evidence that those announcements did not reveal a fraud.  Market analysts did not view the

---

[25]    APP 72–73, 139–44 (Allen Rpt. ¶¶ 148–49, Ex. 1a, Ex. 1b).
[26]    Compl. ¶ 191.
[27]    APP 423 (12/07/01 Halliburton Press Release at 1); *see also* APP 396 (10/30/01 Halliburton Press Release at 5); APP 421 (12/4/01 Halliburton 8-K at 2).

disclosures of jury verdicts and judgments as corrective of Halliburton's previously reported estimates of its liability for pending asbestos claims.  To the contrary, analysts had confidence in the veracity of Halliburton's estimates before and after the litigation announcements—even though the estimates did not change substantially as a result of the adverse litigation results.

Throughout the class period, analysts commented that it was "very difficult for the company to accurately predict the outcome"[28] of the claims pending against it, and that the reserve was only management's "best estimate of the company's financial exposure"[29] on pending claims.  Halliburton's disclosures allowed analysts to track trends in Halliburton's asbestos liability.[30]  From the disclosures, analysts understood that "there [wa]s no guarantee that asbestos litigation . . . will not become a bigger problem in the future,"[31] and that multiple factors beyond the company's control "could quickly alter HAL's position,"[32] including the possibility that "claimants could become more aggressive."[33]  Analysts further understood that there was a risk of adverse litigation results because of Halliburton's aggressive defense strategy,   and commented that "[g]iven that some of Halliburton's asbestos cases will end up being tried in court, the company always runs the risk of losing . . . a large jury award."[34]

After the verdict announcements, analysts "remain[ed] optimistic that the asbestos liability w[ould] remain under control."[35]  They also "expect[ed] a vigorous defense" on appeal by Halliburton[36] and noted the "unpredictability and apparent irrationality of the asbestos

---

[28]   APP 1267 (8/10/01 A.G. Edwards  Rpt. at 3); *see also* APP 78 (Allen Rpt. ¶¶ 166–67).
[29]   APP 1262 (7/26/01 Robinson-Humphrey Rpt. at 2).
[30]   *See, e.g.*, APP 1173 (11/13/00 Jefferies Rpt. at 2 (tracking Halliburton asbestos data over time)).
[31]   APP 1135–36 (10/25/00 A.G. Edwards Rpt. at 62–63); APP 1178 (12/21/00 A.G. Edwards Rpt. at 4); APP 1238.4 (4/27/01 A.G. Edwards Rpt. at 4); APP 1326 (10/23/01 A.G. Edwards Rpt. at 4); APP 1381.3 (12/5/01 A.G. Edwards Rpt. at 3).
[32]   APP 1267 (8/10/01 A.G. Edwards Rpt. at 3).
[33]   APP 1250 (6/29/01 Salomon Rpt. at 2); APP 1312 (8/22/01 Salomon Rpt. at 44).
[34]   APP 1348 (10/24/01 UBS Warburg Rpt. at 15); *see also* APP 88–90 (Allen Rpt. ¶¶ 188–92).
[35]   APP 1361 (10/31/01 A.G. Edwards Rpt. at 2).
[36]   *Id.*

11

litigation environment."[37]  Following the December 7 announcement—and the 40% stock price drop—analysts did not, as the Fund alleges, "realize[] that the Company had been affirmatively misleading them."[38]  To the contrary, they commented that "HAL management has been *very forthright* with the pending litigation procedures while aggressively managing the risk."[39]  The Fifth Circuit analyzed Halliburton's disclosures during the class period and agreed, asserting: "We see in the evidence concerning the asbestos litigation a pattern of Halliburton keeping the market abreast of asbestos developments as they occurred."  *AMSF II*, 597 F.3d at 341.  Days after the end of the class period, analysts—aware of the series of multimillion dollar verdicts and judgments—still viewed Halliburton's reserves as "appropriate."[40]  And they were not surprised when, in Halliburton's next quarterly filing, there was no change to the Company's estimated total net reserve for all pending asbestos claims.[41]  This evidence is contrary to the Fund's theory and demonstrates that changed circumstances—not the correction of a fraud—caused Halliburton's stock price to drop.[42]

> **Second**, the evidence demonstrates that the stock price dropped on December 7, 2001

---

[37]   APP 1363 (10/31/01 Salomon Rpt. at 2); *see also* APP 102–07 (Allen Rpt. ¶¶ 230–37).

[38]   *See* Compl. ¶ 191.

[39]   APP 1425 (12/10/01 SunTrust Rpt. at 2); *see also* APP 80–81 (Allen Rpt. ¶ 167); APP 1445 (12/11/01 Salomon Rpt. at 1 ("Halliburton . . . has consistently reported periodic developments associated with its asbestos liabilities")); APP 1402 (12/10/01 A.G. Edwards Rpt. at 5 ("we believe management is proactively managing this issue")); APP 1434 (12/11/01 CIBC Rpt. at 1 ("the asbestos litigation . . . has been effectively handled by the company since 1976")).  In the face of these analyst reports, the Fund has relied on a posting made by unnamed "staff" working for TV personality Jim Cramer's website in support of its argument that investors "stop[ped] believing" Halliburton on December 7. Compl. ¶ 191.  But the posting did not claim investors stopped believing any Halliburton representation concerning its asbestos reserves.  Instead, the posting stated that investors stopped believing "the company's claims that asbestos litigation would never catch up with it."  APP 1646 (12/7/01 TheStreet.com Article).  Halliburton never made such a claim, and in fact affirmatively warned investors throughout the class period of the possibility that a series of adverse rulings could result in a "material[] impact."  *See, e.g.*, APP 362 (5/11/01 Halliburton 10-Q  at 10); *see also* APP 81–82 (Allen Rpt. ¶ 168–71).

[40]   APP 1425 (12/10/01 SunTrust Rpt. at 2).

[41]   APP 85 (Allen Rpt. ¶¶ 175–77).

[42]   APP 75–102 (Allen Rpt. ¶¶ 155–228).  The Fund also claims that the stock price dropped following an announcement on October 30, 2001 of a jury verdict in Mississippi.  Ms. Allen found, however, that there was no statistically significant stock price drop following that announcement.  APP 95 (Allen Rpt. ¶ 210).  Furthermore, for the reasons stated below, any such announcement was not corrective of the alleged misrepresentations.  APP 93–95 (Allen Rpt. ¶¶ 202–10).

because of uncertainty, not the revelation of fraud.   It was the "increasing uncertainty surrounding asbestos litigation"[43] that led analysts to downgrade the stock on December 7.  Days later, analysts stated that the selloff had been "driven by fear and irrational concerns."[44]  The large increase in the stock's implied volatility following the announcement demonstrates that uncertainty drove the stock price decline.  As Ms. Allen explains, implied volatility shows what the market "implies" about the stock's future volatility.[45]  The more than 100% spike in implied volatility after December 7 demonstrates that the market believed the stock's price would continue to move wildly.[46]  This shows that the market did not believe that the already digested news of the recent adverse asbestos verdict was causing the movement in Halliburton's stock price, but rather that what the market *did not yet know* was weighing on the stock.[47]

That Ms. Allen found no statistically significant price drop following the disclosure of adverse results in other Halliburton asbestos suits further demonstrates that the verdict announcement was not what the market reacted to.[48]

***Third***, other companies with asbestos liability had significant stock price drops on December 7 even though Halliburton's announcement did not apply to those companies.[49]  If, as the Fund alleges, this disclosure revealed to the market that Halliburton had misrepresented its asbestos liability, it would not have resulted in declines in other companies' stocks.

## B.  There is no price impact from any alleged misrepresentation concerning Halliburton's liability for asbestos claims filed against Harbison-Walker.

The Fund contends that Halliburton's representations concerning its liability for pending asbestos claims were misleading because, until the second quarter of 2001, Halliburton did not

---

[43]     APP 1389 (12/7/01 Hibernia Rpt. at 1).
[44]     APP 1434 (12/11/01 CIBC Rpt. at 1).
[45]     APP 105 (Allen Rpt. ¶ 235).
[46]     APP 105 (Allen Rpt. ¶¶ 235–36).
[47]     APP 105 (Allen Rpt. ¶ 236).
[48]     APP 91–99 (Allen Rpt. ¶ 224; *see also* ¶¶ 193–220).
[49]     APP 107–09 (Allen Rpt. ¶¶ 239–43).

include in its estimates amounts for a certain category of claims—the post-1992 claims for which Harbison agreed to indemnify Halliburton's subsidiary, Dresser. The Fund's theory is that price impact of this alleged fraud can be shown through stock price drops following announcements on June 28, 2001 and August 9, 2001. Neither announcement demonstrates price impact.

Starting before the class period, Halliburton had disclosed detailed information about the post-1992 Harbison claims. Halliburton never made any representation that it would not be liable for those claims. Rather, Halliburton disclosed the nature of Harbison's obligation, and the market knew that if Harbison could not make good on its indemnity agreement then Halliburton would be on the hook for the post-1992 claims.[50] The market was well aware that Halliburton's asbestos liability estimates did not include those claims because Harbison continued to pay "with its own funds" the portion of those post-spinoff asbestos costs uncovered by insurance.[51] Halliburton further disclosed the arbitration in which Harbison disputed its indemnity obligation and sought at least $40 million for the amounts Harbison had already paid in defense costs.[52] Then, in November 2000, the market became aware that pursuant to a settlement Harbison had acknowledged its obligations and agreed to continue defending claims and indemnifying Dresser.[53]

Halliburton's June 28, 2001 disclosure of Harbison's request for claims management and financial assistance did not correct any alleged misrepresentation, and thus does not demonstrate that any alleged misrepresentation "actually affect[ed] the stock's market price." *Halliburton II*, 134 S. Ct. at 2416. As this Court has already held, this release did "not reveal that Halliburton made an initial false statement about its asbestos liability." *AMSF I*, 2008 WL 4791942, at *6.

---

[50]   *See, e.g.*, APP 255 (5/14/99 Halliburton 10-Q at 7); APP 261 (8/13/99 Halliburton 10-Q at 8).
[51]   *See, e.g.*, APP 261 (8/13/99 Halliburton 10-Q at 8).
[52]   *See, e.g.*, *id.*
[53]   APP 331–32 (11/9/00 Halliburton 10-Q at 11).

The Fifth Circuit agreed:

> The June 28, 2001 press release does not correct any specific misrepresentation by revealing a previously obscured truth. . . . At most, the release relates to prior estimates that asbestos reserve levels were adequate generally, but it does not correct a specific prior alleged statement. . . . [W]e can discern no indication from the June 28, 2001 press release that Halliburton's prior asbestos estimates were misleading or deceptive.

*AMSF II*, 597 F.3d at 339–40.  While the situation "could be different if . . . Halliburton previously stated it was including Harbison[] claims in its asbestos reserve estimates but did not do so, or if Halliburton had previously stated it had no exposure from Harbison[] claims and that it would not cover them," there is no such alleged misrepresentation.  *Id*. at 340; *see also AMSF I*, 2008 WL 4791942, at *6.  These rulings are consistent with Ms. Allen's opinion, which found no evidence that market analysts viewed the June 28 disclosure as one indicating that Halliburton's prior representations had been misleading.[54]

Not only was the June 28, 2001 announcement not corrective (and therefore incapable of demonstrating price impact) but it also was not followed by a statistically significant stock price drop.  Ms. Allen's event study found no statistically significant stock price drop that day.[55]

Less than a month after disclosing Harbison's request for assistance, Halliburton provided investors with an update.  On July 25, 2001, Halliburton announced that it would not relieve Harbison of its indemnity obligation for the post-spinoff claims, but would "separately and aggressively assert its own defense to those claims where Dresser is a named defendant."[56]  The Company told investors that, based on "analysis of Harbison's asbestos claims management and concern that Harbison w[ould] not be able to fully perform its obligation to defend and

---

[54]    APP 129 (Allen Rpt. ¶¶ 286–87).
[55]    APP 130–31 (Allen Rpt. ¶¶ 289–90).
[56]    APP 370 (7/25/01 Halliburton Press Release at 2).

indemnify Dresser," it would indeed accrue the "$60 million after-tax" charge that it advised investors on June 28 may be necessary.[57]

The Fund has previously asserted that on August 9, 2001, when Halliburton filed its Form 10-Q, it allegedly "increased its reserves for asbestos liability to $124M – over twice the $60 million that, only two weeks prior, the Company had assured investors would be adequate.[58] But as the Fifth Circuit recognized, this disclosure was "actually confirmatory" of the information "Halliburton had previously reported." *AMSF II*, 597 F.3d at 340.[59]  The release of confirmatory information is not a "corrective disclosure" and cannot demonstrate the price impact of any prior alleged misrepresentations. *See Berks Cnty. Emps' Ret. Fund v. First Am. Corp.*, 734 F. Supp. 2d 533, 540–41 (S.D.N.Y. 2010) (refusing to certify a class because alleged corrective disclosure consisted of information "disclosed publicly six weeks earlier").

### C.      There is no price impact from any alleged misrepresentation concerning the asbestos cases that resulted in the late 2001 adverse verdicts and judgments.

The Fund also alleges that, following the announcements concerning the Harbison request for assistance and the addition of the Harbison claims to Halliburton's asbestos liability estimates, Halliburton made a misrepresentation on an October 23, 2001 conference call with analysts.  This alleged misrepresentation had no price impact.

First, the Fund suggests that Halliburton misleadingly stated "there have been no adverse developments" with respect to the Harbison situation even though the jury in south Texas had rendered a verdict in September for which Halliburton's share was $65 million.[60]  This alleged

---

[57]     *Id.*

[58]     D.E. 347 (12/21/07 Lead Pl.'s Reply in Supp. of its Mot. for Class Cert. at 21).

[59]     At the end of the first quarter of 2001, Halliburton's asbestos reserve stood at $30 million.  The Company's July 25, 2001 press release told investors that "during the second quarter 2001 Halliburton accrued $60 million after-tax" related to the Harbison asbestos claims.  "The August 9, 2001 Form 10-Q reported, consistent with Halliburton's prior statements, that the company 'recorded as discontinued operations . . . an accrual of $92 million ($60 million, after tax)." *AMSF II*, 597 F.3d at 340 (quoting Halliburton Co. Form 10-Q (Aug. 9, 2001) at 12).

[60]     Compl. ¶ 185.

misrepresentation could not have impacted the market because the verdict was already known to the market from a variety of sources by October 23, 2001.[61]

Second, the statement was not a prediction that there would be no adverse developments.[62]  As this Court recognized, the statement was that "'there have been no adverse developments,' not 'there *will be* no adverse developments.'"  *AMSF I*, 2008 WL 4791942, at *9. Thus, the subsequent litigation results and announcements in October and December were not corrective of this statement.[63]

## II.  The alleged misrepresentations concerning Halliburton's accounting for claims on fixed-price construction contracts did not impact the stock price.

In its 1999 10-K, Halliburton disclosed that it recognized revenue from claims on fixed-price construction contracts when the revenue was deemed probable of recovery.  Halliburton stated: "Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work are included in revenue when collection is deemed probable."[64]  Halliburton also warned investors of "risks" from "claim negotiations."[65]

The Fund concedes that a company may record revenue on claims that are probable of collection and reliably estimable, but contends that the disclosure in Halliburton's 1999 10-K and Halliburton's financial statements before and after it were false because Halliburton allegedly included claims in revenue that were not probable of collection and could not be reliably estimated.[66]  The evidence shows that the alleged misrepresentations had no price impact.

---

[61]    APP 129–30 (Allen Rpt. ¶¶ 303–05); *see supra* notes 17–18.
[62]    *See* APP 868 (10/23/01 Conf. Call Tr. at 24).
[63]    APP 129–30 (Allen Rpt. ¶¶ 301–06).
[64]    APP 281 (3/14/00 Halliburton 10-K at 34).
[65]    APP 277–277.1 (3/14/00 Halliburton 10-K at 13–14).
[66]    *See, e.g.*, Compl. ¶¶ 210–13.

*First*, there was no statistically significant price increase after any of the alleged misrepresentations concerning Halliburton's accounting for unapproved claims.[67]

*Second*, the Fund alleges that "[p]rior to the filing of Halliburton's 99 10-K—a period spanning six quarters—none of Halliburton's SEC filings or other releases or reports to shareholders disclosed [that the Company was including claims in revenue] or the impact of that [accounting treatment] on the Company's reported financials."[68]   Yet there was no statistically significant price reaction on March 14, 2000, when Halliburton released its 1999 10-K and disclosed both that it was including claims in revenue and the amounts of claim revenue booked in 1998 and 1999.[69]   Not a single analyst report around this disclosure commented on the Company's accounting for claims or the amounts booked.[70]   This evidence demonstrates that how Halliburton accounted for claims did not impact the stock price.[71]

*Third*, the Fund alleges that the truth about Halliburton's accounting for claims was revealed on December 21, 2000, when Halliburton announced it was taking a $120 million charge in part due to losses on construction projects.[72]   But again, there was no statistically significant price reaction on December 21.[73]   This evidence shows that, if the Fund were correct that the December 21 announcement was a corrective disclosure, Halliburton's accounting for claims did not impact its stock price.

In fact, no corrective link exists between the alleged misstatements concerning

---

[67]     APP 20–23, 52 (Allen Rpt. ¶¶ 28–30, 95).
[68]     Compl. ¶ 213.
[69]     APP 20–23, 65–66 (Allen Rpt. ¶¶ 28–30, 135–37).   The Fund alleges that the 1999 10-K inaccurately represented that claim revenue was $89 million in 1998 and $98 million in 1999 because the 1999 figure allegedly omitted $34 million in unapproved claims in connection with joint venture projects.   Compl. ¶¶ 215, 233.   This alleged misrepresentation did not impact Halliburton's stock price when it was made, and it was never corrected. APP 51 (Allen Rpt. ¶ 94 n.101).
[70]     APP 66 (Allen Rpt. ¶ 138).
[71]     APP 66 (Allen Rpt. ¶ 139).
[72]     Compl. ¶ 150.
[73]     APP 63 (Allen Rpt. ¶¶ 128).

Halliburton's accounting for claims and any purported corrective disclosure.  Halliburton never restated a previous estimate of revenue from claims, and no statement from Halliburton or anyone else indicated that the Company had misrepresented that any claims were probable of collection when they were recorded.[74]   As the Fifth Circuit recognized, none of the alleged corrective disclosures "corrected any prior misleading statements and revealed deceptive practices in Halliburton's accounting assumptions."  *AMSF II*, 597 F.3d at 342.

*October 4, 1999.*   The Fund's previous expert, Jane Nettesheim, claimed that Halliburton's October 4, 1999 press release corrected alleged misstatements regarding its accounting for claims.  There is no corrective link between this press release and any statement concerning Halliburton's accounting for claims.  The release announced the sale of Dresser Equipment Group's interests in two joint ventures, lower-than-expected profits from DEG, "a decline in the downstream Engineering and Construction business," and "low spending levels by the company's energy industry customers."[75]   It did not mention claims or the accounting treatment for them, and commentary reacting to the release did not discuss these topics.[76]

*January 5, 2000.*   Ms. Nettesheim also claimed that two January 5 analyst reports, in which Brown Brothers Harriman and Merrill Lynch reduced their earnings estimates for Halliburton, amounted to corrective disclosures.[77]   These reports provide no basis on which to certify a class for two reasons.  First, there is no relationship between the reports and the purported misrepresentations concerning Halliburton's accounting for claims.  Neither report mentioned claims or the accounting treatment for them,[78] and the market did not perceive the

---

[74]     APP 54 (Allen Rpt. ¶ 97).
[75]     APP 264 (10/4/99 Press Release at 2).
[76]     APP 55 (Allen Rpt. ¶ 100).
[77]     APP 56 (Allen Rpt. ¶¶ 102–03).
[78]     APP 1117–18 (1/5/00 Brown Brothers Rpt.); APP 1119-22 (1/5/00 Merrill Lynch Rpt.).

reports as related in any way to these issues.[79]  Second, there was no statistically significant price reaction on January 5.[80]

*October 24, 2000.*  On this day, Halliburton released its third quarter earnings, along with multiple other pieces of news, including its decision to restructure its engineering and construction business.[81]  There is no connection between these disclosures and the alleged misstatements concerning Halliburton's accounting for claims.

First, Halliburton did not say anything about its accounting for claims in either the press release issued or earnings call held on October 24.[82]  The Company did warn investors that the restructuring "may impair our ability to negotiate outstanding claims on jobs,"[83] but this statement about the possible effect of the restructuring on *future claims negotiations* did not indicate whether the claims discussed were previously included in revenue, much less suggest that Halliburton had misrepresented that any claims were probable of collection when they were recorded months earlier.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) (disclosures were not corrective because none "revealed the truth about the subject of any of Defendants' alleged misstatements").

Second, no comments by analysts linked Halliburton's statements on October 24 to any issues relating to the Company's accounting for claims.[84]  Analysts asked at least 37 questions during Halliburton's October 24 earnings call and issued 17 reports following the call, but none asked any questions about or discussed claims on fixed-price construction contracts or the accounting treatment for such claims.[85]  Rather, "the news reports . . . discuss[ed] only problems

---

[79]     APP 56 (Allen Rpt. ¶¶ 102–03).
[80]     APP 56–57 (Allen Rpt. ¶ 105).
[81]     APP 325–27 (10/24/00 Press Release); APP 800, 815 (10/24/00 Conf. Call Tr. at 8, 17).
[82]     *Id.*; *see also* APP 58 (Allen Rpt. ¶ 108).
[83]     APP 815 (10/24/00 Conf. Call. Tr. at 17).
[84]     APP 58 (Allen Rpt. ¶ 109).
[85]     APP 58 (Allen Rpt. ¶ 109); APP 486–527 (10/24/00 Conf. Call Tr.).

and weak results generally in Halliburton's engineering and construction business."  *AMSF II*, 597 F.3d at 343.  As the Fifth Circuit remarked, the Fund "makes too great a leap" in concluding that news of weakness in Halliburton's engineering and construction business revealed that Halliburton was improperly recognizing revenue from claims.  *Id*.  "[N]o such relationship [is] evident in the statements [made on October 24]."  *Id.*

**December 21, 2000.**  On this day, Halliburton issued a press release formally unveiling the restructuring it had announced on October 24, and explaining that "the restructuring and charges on projects of the engineering and construction businesses" would result in a $120 million after-tax charge.[86]  The press release attributed $95 million of the charge to cost overruns on fixed-price construction contracts, and the remaining $25 million to restructuring costs.[87]

The Fund ignores that a portion of the $95 million charge was due to the fact that "*[d]uring the [fourth] quarter [of 2000]*," "several large fixed fee engineering and construction projects . . . incurred significant additional costs"—mainly "relate[d] to labor disturbances in Venezuela and West Africa."[88]  The Fund does not allege that Halliburton should have anticipated these costs, or that they had anything to do with previously booked claims.

Instead, the Fund focuses exclusively on the one sentence in the three-page press release announcing that "negotiations with customers regarding cost increases on seven other projects" had "not resulted in resolution of certain claims as originally anticipated."[89]  This statement "reiterate[d] that Halliburton had believed that collection of the cost overruns was probable."  *AMSF I*, 2008 WL 4791492, at *15.  It did not state or infer that Halliburton had misrepresented that any claims were probable of collection when they were recorded.

---

[86]     APP 336–37 (12/21/00 Press Release).
[87]     *Id.*
[88]     *Id.*
[89]     *Id.*

In addition, "[t]here is no evidence that the market perceived a relationship between this [part of the] fourth quarter charge and the new language" in Halliburton's 1999 10-K that the Company was including claims in revenue when collection was deemed probable. *Id.* at *16. To the contrary, one analyst understood this news not to have revealed any prior misrepresentation, but instead to inform the market that "relationships with some customers have deteriorated," and that certain claims "have not resolved as expected."[90]   The market did not consider this disclosure to be corrective of anything but instead to reflect new information about customers' positions on certain claims.[91]   *See N. Port Firefighters' Pension–Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 762 (N.D. Tex. 2013) (Boyle, J.) (disclosures explaining that company's losses were growing and its mortgage-backed securities portfolio was declining in value were not corrective because they did "nothing to suggest that [company's] prior statements were false," that company's "previously reported valuations were incorrect," or that company "was engaged in improper accounting practices").

Even more fundamentally, the December 21 press release—which was issued before the market opened—provides no basis for class certification because there was no statistically significant stock price decrease on December 21.  Ms. Allen and Ms. Nettesheim agree the decrease on December 21 was not statistically significant.[92]   This shows the absence of price impact.

In an attempt to circumvent this evidence, Ms. Nettesheim stated in her rebuttal report:

> I am not relying on news released on December 21, 2000, as Defendants suggest. Rather, I am relying on additional analyst commentary from December 22, 2000 related to the restructuring charge announced on December 21, 2000.[93]

---

[90]   APP 1182 (12/21/00 CIBC Rpt. at 3).
[91]   APP 60–62 (Allen Rpt. ¶¶ 115–22).
[92]   APP 63 (Allen Rpt. ¶ 128).
[93]   D.E. 350-2 (12/20/07 Nettesheim Rebuttal Rpt. at 24–25).

But looking to the day *after* the December 21 alleged corrective disclosure does not provide evidence of price impact. No new news regarding claims was released on December 22. Any allegation that the market did not react to the news in the December 21 press release for an entire day, and then reacted to it the next day, is inconsistent with the Fund's claim of market efficiency.[94]   In addition, there is no corrective link between the analyst commentary from December 22 and the alleged misrepresentations regarding accounting for claims. That commentary contains no suggestion that Halliburton had misrepresented that any claims were probable of collection when they were recorded.[95]   Finally, there was no statistically significant price reaction on December 22.[96]

*January 30, 2001.*   On this day, Halliburton reported that the charge announced on December 21 was $193 million before tax.[97]   This disclosure provides no basis on which to certify a class for two reasons. First, the disclosure contained no new information related to Halliburton's accounting for claims. The $193 million *pre-tax* charge ($118 million after tax) was consistent with the $120 million *after-tax* charge announced the prior month.[98]   Second, there was no statistically significant price reaction on January 30.[99]

## III.   The alleged misrepresentations concerning cost savings from the Dresser merger did not impact the stock price.

Finally, the Fund contends that Halliburton misstated projected savings from cost cutting measures following its merger with Dresser in 1998.[100]   The Fund has identified only four alleged misrepresentations regarding the Dresser merger made during the class period: (1) a July 23, 1999 statement that "[m]anagement expects that annualized merger cost savings are

---

94      APP 63–64 (Allen Rpt. ¶ 129).
95      APP 60–64 (Allen Rpt. ¶¶ 115–22, 129 n.134).
96      APP 64 (Allen Rpt. ¶ 130).
97      APP 340 (1/30/01 Press Release).
98      APP 65 (Allen Rpt. ¶ 133).
99      *Id.*
100     Compl. ¶¶ 110, 115, 121–22.

approximately $500 million"; (2) a September 13, 1999 statement that Halliburton was "projecting annual benefits of $500 million" from the merger; (3) a January 27, 2000 statement that "cost savings are real;" and (4) a March 14, 2000 statement that the merger was "behind us" and that the "potential rewards to our shareholders are vast."[101]   None of these alleged misrepresentations impacted Halliburton's stock price.

This Court previously held that the first two alleged misrepresentations were confirmatory of information previously released, and thus "deemed not to actually affect the stock price." *AMSF I*, 2008 WL 4791492, at **2, 17.   Because Halliburton first disclosed the estimated $500 million in cost savings on March 1, 1999—three months before the class period began on June 3, 1999—this Court held the market would not "double-count" the effects of the subsequent confirmatory statements. *Id.* (citing *Greenberg*, 364 F.3d at 665–66 ("confirmatory information has already been digested by the market and will not cause a change in stock price")).[102]

In fact, the estimated $500 million in cost savings was disclosed to the market multiple times before the class period:

- On March 1, 1999, an analyst report stated: "Cost savings from the merger and the downturn in activity should yield over $500 million by the end of 1999."[103]

- On April 26, 1999, Halliburton stated that there "could be . . . upwards of $500 million worth of merger related savings coming from 1999."[104]

- In late April and early May of 1999, analysts stated that "[r]evised estimates of the merger consolidation savings have increased to $500m,"[105] and "[m]anagement

---

[101]   Compl. ¶¶ 110, 115, 121–22.

[102]   *See also Alaska Elec. Pension Fund*, 572 F.3d at 232 ("information already known to the market will not change a stock's price"); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 256 n.19 (5th Cir. 2009) (under fraud-on-the-market theory, plaintiff must prove that the "decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier").

[103]   APP 943 (3/1/99 Donaldson  Rpt. at 1); *see also* Compl. ¶ 93.

[104]   APP 556 (4/26/99 Conf. Call Tr. at 23).

[105]   APP 968 (4/27/99 Salomon Rpt. at 4).  Salomon Smith Barney repeated this statement in its May 4, 1999 report.  APP 980–81 (5/4/99 Salomon Rpt. at 4–5).

expects to realize more than $500 million of cost savings from the Dresser merger."[106]

The statement that "cost savings are real" was also confirmatory of information previously released. Before the class period, Halliburton announced that it had vacated approximately 270 properties and reduced head-count by approximately 10,850.[107]

As for the statement that "the merger with Dresser Industries is now behind us" and "the potential rewards to our shareholders are vast," the Fifth Circuit held that this "generalized positive statement about [Halliburton's] progress [is] not a basis for liability." *AMSF II*, 597 F.3d at 342. Such "broad, general statements" are "precisely the type of 'puffery' that [the Fifth Circuit] and other circuits have consistently held to be inactionable." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 419 (5th Cir. 2001); *see also Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*, 499 F. App'x 345, 347–48 (5th Cir. 2012).

Because an "efficient market will not 'double-count' the effects of a confirmatory positive statement," *AMSF I*, 2008 WL 4791492, at *17, it is no surprise that there was no statistically significant price increase after any alleged misrepresentation regarding Dresser cost savings.[108]

According to the Fund, the truth behind the alleged misstatements regarding projected cost savings from the Dresser merger was revealed to the market on five days. However, none of the alleged corrective disclosures indicated that Halliburton failed to achieve its cost-savings projections, much less that the projections were false when made. Far from revising its projections, Halliburton repeatedly told the market that the cost-saving measures were "on or

---

[106]   APP 962 (4/27/99 First Union Rpt. at 3).
[107]   APP 35 (Allen Rpt. ¶¶ 53–54).
[108]   APP 20–24 (Allen Rpt. ¶¶ 28–30, 32).

Active 16788672                                    25

ahead of schedule" or "essentially complete and behind us."[109]

*October 4, 1999.*   There is no corrective link between Halliburton's statements concerning projected cost savings from the Dresser merger and its October 4 announcement of the sale of DEG's interests in two joint ventures and lower-than-expected profits from the DEG segment.   Halliburton's October 4 press release did not mention the projected $500 million in cost savings from headcount reductions and facility closures following the Dresser merger,[110] and no analyst report called those projections into question due to the release.[111]   Instead, analysts reacted *positively* to the news that Halliburton was selling its interest in the two joint ventures,[112] and continued to reiterate that the Company expected "$500 million" in "cost savings."[113]   This Court previously held that the press release "reveals nothing *fraudulent* about the [cost-savings] statements."   *AMSF I*, 2008 WL 4791492, at *17 (emphasis in original).

*January 5, 2000.*   There is no corrective link between the two analyst reports issued on this day and Halliburton's purported misrepresentations concerning projected cost savings from the Dresser merger.   The Brown Brothers report said nothing about the merger.[114]

As for the Merrill Lynch report, it did not state or even suggest that the earlier projected cost savings had not been or could not be achieved.   Merrill Lynch explained that it was downgrading its rating on Halliburton in part due to news that "major deepwater development projects continue[d] to be delayed," and that major customers had "indicated relatively cautious spending plans for 2000."[115]   These reasons were unrelated to merger cost savings.[116]   While Merrill Lynch also commented that the "[s]ynergies from the Dresser merger appear to be less

---

[109]   APP 27–29, 36 (Allen Rpt. ¶¶ 36, 56).
[110]   APP 263–64 (10/4/99 Press Release).
[111]   APP 38 (Allen Rpt. ¶ 61).
[112]   APP 40 (Allen Rpt. ¶ 66).
[113]   APP 1053 (10/22/99 Robinson Humphrey Rpt. at 3).
[114]   APP 1117–18 (1/5/00 Brown Brothers Rpt.).
[115]   APP 1120 (1/5/00 Merrill Lynch Rpt. at 2).
[116]   APP 43 (Allen Rpt. ¶ 74).

Active 16788672                                    26

powerful than *we* had envisioned," Merrill Lynch did not question Halliburton's statements concerning projected cost savings from the merger.[117] To the contrary, Merrill Lynch reaffirmed that the "cost savings estimated by management [were] $500 million."[118] Nothing in the report indicated that the merger had not resulted in the $500 million in savings Halliburton had estimated since before the start of the class period, and there is "no evidence that the market perceived [the report] as evidence of prior fraud." *AMSF I*, 2008 WL 4791492, at *18.[119]

This Court previously held that the January 5 analyst reports were not corrective and that an earnings adjustment by outside analysts, without more, does not "specifically reveal a fraudulent scheme." *Id.* at *18. "Analysts unaffiliated with Halliburton could have previously overestimated Halliburton's performance," and "a subsequent modification would certainly not qualify as a corrective disclosure." *Id.* at *19.[120]

***October 24, 2000.*** There is no corrective link between Halliburton's announcement of its decision to restructure its engineering and construction business and the Company's alleged misstatements concerning the Dresser merger. Halliburton's only reference to the Dresser merger on October 24 was positive,[121] and the market did not link the Company's statements on that day to any issues relating to the merger.[122] Rather, analysts noted that the planned restructuring was motivated by the weak market environment at the time.[123] As this Court previously recognized, "nothing in the alleged corrective disclosure[s] specifically reveal[ed] to the market any fraudulent scheme." *AMSF I*, 2008 WL 4791492, at *19.

---

[117] APP 1120 (1/5/00 Merrill Lynch Rpt. at 2).
[118] *Id.*
[119] *See also* APP 43 (Allen Rpt. ¶ 74).
[120] In addition, as noted in Section II, there was no statistically significant price reaction on January 5.
[121] APP 808 (10/24/00 Conf. Call Tr. at 10 (stating that "[t]he Dresser Equipment Group's results continue to benefit from the restructuring and the cost reduction activities related to the merger and that we took towards the end of last year")).
[122] APP 45–46 (Allen Rpt. ¶ 80).
[123] APP 46 (Allen Rpt. ¶ 81).

***December 21, 2000.***   The Fund claims that the $25 million restructuring charge announced on  December 21 was due to losses stemming from the Dresser merger.  But the press release does not even mention the merger,[124] and no analyst attributed the restructuring of Halliburton's construction business to problems with the merger.[125]   Halliburton's reported reasons for the restructuring consisted entirely of what the Fifth Circuit labeled "clearly non-culpable negative information," including "the poor near term market outlook for the downstream engineering and construction business."  *AMSF II*, 597 F.3d at 343.

This Court previously held that "[t]he announcement of the expected costs of reorganization did not 'specifically reveal' to the market any fraudulent scheme."  *AMSF I*, 2008 WL 4791492, at *20.  It "qualifies as a *negative*, as opposed to a *corrective* disclosure."  *Id.* (emphasis in original).  Citing Ms. Nettesheim's admission that the $25 million charge "does not appear to have been a surprise or a concern" to the market because some charge was already expected due to the October 24 announcement,[126] this Court and the Fifth Circuit also concluded that the "market [would] not 'double-count' the negative effects of a restructuring plan that had already been made public."  *Id.*; *see also AMSF II*, 597 F.3d at 343 n.50.[127]

***January 30, 2001.***   Halliburton's January 30 press release provides no basis on which to certify a class for the reasons explained in Section II.

**CONCLUSION**

The Court should deny the Fund's Motion.  The evidence shows that Halliburton's stock price was not inflated due to any alleged misrepresentation.

---

[124]     APP 336–37 (12/21/00 Press Release).
[125]     APP 48 (Allen Rpt. ¶ 85).
[126]     D.E. 341-2 (9/17/07 Nettesheim Rpt. at 54).
[127]     As explained in Section II, the December 21 disclosure also does not provide a basis on which to certify a class because there was no statistically significant price reaction.

Respectfully submitted,

BAKER BOTTS L.L.P.


s/ *Jessica B. Pulliam*
Jessica B. Pulliam
State Bar No. 24037309
Thomas E. O'Brien
State Bar No. 24046543
John B. Lawrence
State Bar No. 24055825
2001 Ross Avenue, Suite 600
Dallas, Texas  75201-2980
Telephone No. (214) 953-6500
Facsimile No.  (214) 953-6503

David Sterling
State Bar No. 19170000
One Shell Plaza
910 Louisiana Street
Houston, Texas  77002-4995
Telephone No. (713) 229-1234
Facsimile No.  (713) 229-2099

*Counsel For Defendants Halliburton
Company and David J. Lesar*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served on all counsel of record via the Court's ECF system on September 10, 2014.

s/ *Jessica B. Pulliam*
Jessica B. Pulliam