# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

THE ARCHDIOCESE OF MILWAUKEE
SUPPORTING FUND, INC., et al.,
                                   Plaintiff,

vs.                                                         No. 3:02-CV-1152-M

HALLIBURTON COMPANY, et al.,
                                   Defendants.


# EXPERT REPORT

# OF

# LUCY P. ALLEN

**September 10, 2014**

APP 000001

**TABLE OF CONTENTS**

I.     Scope of Assignment ...................................................................................................1

II.    Qualifications and Remuneration ...............................................................................1

       A.  Qualifications..................................................................................................1

       B.  Remuneration .................................................................................................2

III.   Materials Considered ...................................................................................................2

IV.    Summary of Report.......................................................................................................2

V.     Background ....................................................................................................................3

VI.    Methodology for Analyzing the Price Impact of the Alleged Misrepresentations ..............8

VII.   There Was No Statistically Significant Positive Price Reaction After Any of the
       Alleged Misrepresentations ......................................................................................15

VIII.  The Alleged Misrepresentations Regarding the Cost Savings from the Dresser Merger
       Did Not Impact Halliburton's Stock ......................................................................18

       A.  The alleged misrepresentations during the class period regarding cost savings
           from the Dresser merger did not impact Halliburton's stock price because they
           contained no new information regarding the cost savings..........................................22

           1.  Before the class period, the Company announced that it expected $500 million
               in cost savings related to the merger and numerous analysts repeated the
               Company's expectations ......................................................................................25

           2.  The Company was clear that the expected benefit of $250 million (and later
               $500 million) from the Dresser merger related to expected cost savings rather
               than revenue enhancements ...............................................................................26

           3.  The Company disclosed before the start of the class period that the cost-
               reduction measures announced at the time of merger had been substantially
               achieved ...............................................................................................................27

           4.  Because subsequent alleged misrepresentations made during the class period
               did not contain new information regarding cost savings from the merger or
               indicate that the cost-reduction measures had not been achieved, these alleged
               misrepresentations had no price impact.............................................................27

       B.  The alleged partial corrective disclosures provide no evidence of price impact
           from the alleged misrepresentations because they were not corrective of any
           alleged misrepresentation regarding the cost savings from the Dresser merger.........32

           1.  The October 4, 1999 alleged corrective disclosure—when the Company
               announced it was selling two joint ventures and preannounced lower 3Q

earnings—was not corrective of any alleged misrepresentation regarding cost savings from the Dresser merger and thus provides no evidence of price impact ................................................................................................................... 32

2. The January 5, 2000 alleged corrective disclosure—when Merrill Lynch and Brown Brothers Harriman lowered their earnings estimates—was not corrective of any alleged misrepresentation regarding cost savings from the Dresser merger and thus provides no evidence of price impact ........................... 37

3. The October 24, 2000 alleged corrective disclosure—when the Company announced it was planning to restructure its engineering and construction business—was not corrective of any alleged misrepresentation regarding cost savings from the Dresser merger and thus provides no evidence of price impact ................................................................................................................... 40

4. The December 21, 2000 alleged corrective disclosure—when the Company formally announced the restructuring of its engineering and construction business and a $120M after-tax charge—was not corrective of any alleged misrepresentation regarding cost savings from the Dresser merger and thus provides no evidence of price impact ................................................................... 42

5. The January 30, 2001 alleged corrective disclosure—when the Company announced a $193 million pre-tax charge—was not corrective of any alleged misrepresentation regarding cost savings from the Dresser merger and thus provides no evidence of price impact ................................................................... 45

IX. The Alleged Misrepresentations Regarding Halliburton's Accounting for Unapproved Claims on Fixed-Price Construction Projects Did Not Impact Halliburton's Stock Price ................................................................................................................... 46

A. The October 4, 1999 alleged corrective disclosure—which did not mention accounting for unapproved claims—was not corrective of any alleged misrepresentation regarding unapproved claims and thus is not evidence of price impact ................................................................................................................... 50

B. The January 5, 2000 alleged corrective disclosure—which did not mention accounting for unapproved claims—was not corrective of any alleged misrepresentation regarding unapproved claims and thus not evidence of price impact ................................................................................................................... 51

C. The October 24, 2000 alleged corrective disclosure—which did not mention accounting for unapproved claims—was not corrective of any alleged misrepresentation regarding unapproved claims and thus not evidence of price impact ................................................................................................................... 52

D. Because there was no statistically significant price reaction on December 21, 2000 and no indication that the market learned any information corrective of the alleged misrepresentations regarding accounting for unapproved claims, the December 21, 2000 alleged corrective disclosure provides no evidence of price impact............. 54

1. There is no evidence that the market learned any corrective information regarding Halliburton's accounting policy of including claims in revenues only when their collection was "deemed probable" ...............................................55

2. Analysts focused on non-culpable negative information in the alleged corrective disclosure ...........................................................................................57

3. There was no statistically significant price reaction to the December 21, 2000 disclosure ............................................................................................................58

E. Because the alleged corrective disclosure on January 30, 2001 contained no new information and was not corrective of any alleged misrepresentation regarding unapproved claims, it provides no evidence of price impact from the alleged misrepresentations....................................................................................................60

F. There was no statistically significant price reaction when the Company first disclosed to the market on March 14, 2000 its policy for accounting for unapproved claims – evidence that the accounting treatment had no impact on Halliburton's stock price.................................................................................................60

G. Analyst commentary after the announcement of the SEC investigation regarding Halliburton's accounting for unapproved claims further demonstrates that the alleged misrepresentations had no price impact ............................................................62

X. There Is No Price Impact from the Alleged Misrepresentations Regarding Asbestos ......64

A. There is no price impact from the alleged misrepresentations regarding Halliburton's reported asbestos liability .....................................................................69

1. Halliburton publicly disclosed detailed information about its estimated asbestos liability, including making clear that the Company estimated and reported asbestos liability for pending claims, not future claims ..........................70

2. According to market commentary, the Company was particularly forthcoming regarding its asbestos liability during and after the class period ...........................73

3. The disclosures and analyst commentary before and after the alleged corrective disclosures demonstrate the absence of price impact ...........................75

4. The net asbestos liability that the Company reported after the end of the class period was unchanged and analysts did not express any surprise .........................80

5. The verdict announcements offer no support to the Fund's claim of price impact and demonstrate lack of price impact from the alleged asbestos misrepresentations................................................................................................80

6. Halliburton's stock decline at the end of the class period was attributed to an increase in uncertainty and the change in the economic and asbestos environment that also affected other companies.....................................................97

B. There is no price impact from any alleged misrepresentation regarding the risk that Halliburton would have to pay post-1992 Harbison-Walker claims .................122

1. The June 28, 2001 alleged corrective disclosure—when the Company disclosed that Harbison-Walker had requested that Halliburton provide

Harbison-Walker with financial assistance for the post-1992 claims—was not corrective of any alleged misrepresentation ..........................................................122

2. The August 9, 2001 alleged corrective disclosure—in which the Company's Form 10-Q reported an increase in its reported asbestos liability—can provide no evidence of price impact because the alleged corrective information was not new................................................................................................................126

C. There is no price impact from the alleged misrepresentation on October 23, 2001 that "there have been no adverse developments" with respect to the Harbison-Walker situation ...................................................................................................129

## I.   SCOPE OF ASSIGNMENT

1.      I have been asked by Counsel for Halliburton Company ("Halliburton" or "the Company") and David J. Lesar to analyze the price impact of the alleged misrepresentations in the Fourth Consolidated Amended Complaint ("Complaint") filed by the Erica P. John Fund, Inc. ("the Fund").  In particular, I was asked to analyze the price impact of the alleged misrepresentations in three areas:

    a) cost savings from Halliburton's merger with Dresser Industries;

    b) accounting for unapproved claims on fixed-price construction contracts; and

    c) reporting of estimated financial liability arising out of Halliburton's exposure to asbestos claims.

## II.   QUALIFICATIONS AND REMUNERATION

### A.  Qualifications

2.      I am a Senior Vice President of NERA Economic Consulting ("NERA") and member of NERA's Securities and Finance Practice.  NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation.  It was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide.  NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics, finance, and mathematics.  The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

3.      I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University.  Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues.  In my 19 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics.  In the course of this work, I have analyzed the effect of

1

information on the stock prices of over 100 companies. My resume with recent publications and testifying experience is included as Appendix A.

### B. Remuneration

4.      NERA is being compensated for the time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $725 per hour. NERA's fees are not in any way contingent upon the outcome of this matter.

## III.   MATERIALS CONSIDERED

5.      Materials considered in preparing this report are listed in Appendix B.

## IV.   SUMMARY OF REPORT

6.      I found there was no price impact from any of the alleged misrepresentations as discussed in detail in each section below.

7.      In this report, I discuss my general methodology, the statistical analysis of the price reactions after each alleged misrepresentation, and the analysis of the price impact of each of the three categories of alleged misrepresentations. This report is structured as follows:

- **Section VI** – Methodology.

- **Section VII** – Statistical analysis of the alleged misrepresentation dates:

   07/22/99, 08/13/99, 09/13/99, 10/21/99, 11/15/99, 01/27/00, 03/14/00, 04/26/00, 05/15/00, 07/26/00, 08/10/00, 11/09/00, 01/30/01, 03/27/01, 04/25/01, 05/11/01, 05/25/01, 06/28/01, 07/25/01, 08/09/01, 08/22/01, 09/04/01, 10/04/01, 10/23/01, 11/08/01.

- **Section VIII** – Alleged misrepresentations regarding cost savings from the Dresser merger, including alleged corrective disclosure dates:

   07/22/99, 08/13/99, 09/13/99, 10/04/99, 10/21/99, 11/15/99, 01/05/00, 01/27/00, 03/14/00, 04/26/00, 05/15/00, 07/26/00, 08/10/00, 10/24/00, 11/09/00, 12/21/00, 12/22/00, 01/30/01.

- **Section IX** – Alleged misrepresentations regarding accounting for unapproved claims, including alleged corrective disclosure dates:

2

07/22/99, 08/13/99, 09/13/99, 10/04/99, 10/21/99, 11/15/99, 01/05/00, 01/27/00, 03/14/00, 04/26/00, 05/15/00, 07/26/00, 08/10/00, 10/24/00, 11/09/00, 12/21/00, 12/22/00, 01/30/01.

- **Section X** – Alleged misrepresentations regarding reported asbestos liability, including alleged corrective disclosure dates:

07/22/99, 08/13/99, 09/13/99, 10/21/99, 11/15/99, 01/27/00, 03/14/00, 04/26/00, 05/15/00, 07/26/00, 08/10/00, 11/09/00, 01/30/01, 03/27/01, 04/25/01, 05/11/01, 05/25/01, 06/28/01, 07/25/01, 08/09/01, 08/22/01, 09/04/01, 10/04/01, 10/23/01, 10/30/01, 11/01/01, 11/08/01, 12/04/01, 12/05/01, 12/07/01.

## V.   BACKGROUND

8.      The Fund alleges that Halliburton's stock price was inflated between June 3, 1999 and December 7, 2001 (the "class period") as a result of Halliburton's purportedly false and misleading statements.[1]  According to the Complaint, these alleged misrepresentations fall into three categories:[2]

- **Cost savings from Halliburton's merger with Dresser Industries**: The Fund alleges Halliburton falsely stated that cost savings from the merger were expected to be approximately $500 million and that the merger was "behind us."[3]

- **Accounting for unapproved claims on fixed-priced construction contracts**: The Fund alleges that Halliburton misrepresented its accounting for unapproved claims on fixed-priced construction contracts.  According to the Fund, the Company first disclosed to investors its new policy for accounting for unapproved claims in its 1999 10-K.[4]  The Company's 1999 10-K stated, "Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work are included in revenue when collection is deemed probable."[5]  The Fund claims that this

---

[1]   Complaint, ¶1.

[2]   Complaint, ¶2.

[3]   Complaint, ¶¶110, 115, 121, 122.

[4]   Complaint, ¶¶213, 231.

[5]   Halliburton 1999 Form 10-K, filed March 14, 2000, p.34.

3

statement and Halliburton's financial statements were misleading because Halliburton allegedly included unapproved claims in revenue even when their collection was not probable.[6]

- **Reporting of asbestos liability arising out of Halliburton's exposure to asbestos claims:** The Fund alleges that Halliburton misrepresented its reported asbestos liability.[7]

9.      The Complaint alleges 25 separate dates on which Halliburton made misrepresentations that purportedly inflated its stock price.  The chart below shows Halliburton's stock price along with the 25 dates on which the Fund alleges misrepresentations occurred.  The chart also shows the 13 alleged corrective disclosures—dates on which either the Fund or the Fund's previous expert, Jane Nettesheim, claims part of the alleged "truth" regarding the alleged misrepresentations was disclosed to the market.  Six of these alleged corrective disclosures are alleged in the Complaint (D3, D4, D6, D7, D11, and D13 in the chart below). The other seven are alleged to be corrective disclosures only by Ms. Nettesheim.  Note that three dates are alleged to be both misrepresentations and corrective disclosures.  Overall, there are 35 separate dates that are alleged to be either misrepresentations and/or corrective disclosures.

---

[6]    Complaint, ¶¶213, 231.

[7]    Complaint, ¶¶16, 38.

APP 000009



**Alleged Misrepresentations and Alleged Corrective Disclosures**

Class period: June 3, 1999 - December 7, 2001

Notes and Sources:
Price data collected from Factset Research Systems, Inc.
Alleged misrepresentations and alleged corrective disclosures aggregated from the Complaint and the Nettesheim reports.

10.    The table below summarizes the 25 dates on which the Fund alleges misrepresentations occurred:

| | | **Alleged Misrepresentations** | **Allegation Category[8]** |
|---|---|---|---|
| M1 | 7/22/99 | Halliburton reported 2Q99 results and held earnings call. | All |
| M2 | 8/13/99 | Halliburton filed its 2Q99 10-Q. | All |
| M3 | 9/13/99 | Halliburton presented at Dain Rauscher Wessels conference. | All |
| M4 | 10/21/99 | Halliburton reported 3Q99 results and held earnings call. | All |

---

[8]    The Complaint discusses alleged misrepresentations in groups, and each group is followed by a list of reasons detailing why the group of alleged misrepresentations is false and misleading. The reasons fall into three categories of allegations: merger-related cost savings ("Merger"), accounting for unapproved claims ("Unapproved"), or reporting of asbestos liability ("Asbestos"). The individual misrepresentations in each group are categorized based on the list of reasons following the respective group, which may contain reasons falling into one, some or all of the allegation categories. Following the last alleged corrective disclosure related to cost savings and accounting for unapproved claims, all subsequent alleged misrepresentations are categorized as "Asbestos."

5

| | | Alleged Misrepresentations | Allegation Category[8] |
|---|---|---|---|
| M5 | 11/15/99 | Halliburton filed its 3Q99 10-Q. | All |
| M6 | 1/27/00 | Halliburton reported 4Q99 results and held earnings call. | All |
| M7 | 3/14/00[9] | Halliburton issued its 1999 Annual Report. | All |
| M8 | 4/26/00 | Halliburton reported 1Q00 results and held earnings call. | All |
| M9 | 5/15/00 | Halliburton filed its 1Q00 10-Q. | All |
| M10 | 7/26/00 | Halliburton reported 2Q00 results and held earnings call. | All |
| M11 | 8/10/00 | Halliburton filed its 2Q00 10-Q. | All |
| M12 | 11/9/00 | Halliburton filed its 3Q00 10-Q. | All |
| M13 | 1/30/01 | Halliburton reported 4Q00 results and held earnings call. | Asbestos |
| M14 | 3/27/01[10] | Halliburton issued its 2000 Annual Report. | Asbestos |
| M15 | 4/25/01 | Halliburton reported 1Q01 results. | Asbestos |
| M16 | 5/11/01 | Halliburton filed its 1Q01 10-Q. | Asbestos |
| M17 | 5/25/01 | Robinson-Humphrey issued report after discussion with Halliburton management. | Asbestos |
| M18 | 6/28/01 | Halliburton announced Harbison-Walker claims could require an additional reserve of $60 million. | Asbestos |
| M19 | 7/25/01 | Halliburton reported 2Q01 results and held earnings call. | Asbestos |
| M20 | 8/9/01 | Halliburton filed its 2Q01 10-Q. | Asbestos |
| M21 | 8/22/01 | Salomon Smith Barney, after discussions with Halliburton management, issued a report on Halliburton's asbestos exposure. | Asbestos |

---

[9]  According to the Complaint, the 1999 Annual Report was issued "[i]n early 4/00" (Complaint, ¶122). The 1999 Annual Report is not dated but it is my understanding it was filed along with Halliburton's 1999 Form 10-K with the Securities and Exchange Commission ("SEC") on March 14, 2000.

[10]  According to the Complaint, the 2000 Annual Report was issued "[i]n early 4/01" (Complaint, ¶158). The analyses in this report have been conducted under two assumptions regarding when the 2000 Annual Report first became public: first, assuming it became public on March 27, 2001, when Halliburton's 2000 Form 10-K was filed with the SEC; second, as an alternative, assuming it became public on March 20, 2001, the date on the 2000 Annual Report. I have reported the results using the first date but my conclusions do not change if the second date is used.

6

| | | **Alleged Misrepresentations** | **Allegation Category[8]** |
|---|---|---|---|
| M22 | 9/4/01 | *Platt's* report on asbestos liability. | Asbestos |
| M23 | 10/4/01 | Halliburton management discussed Halliburton's asbestos liability situation at a Deutsche Bank seminar. | Asbestos |
| M24 | 10/23/01 | Halliburton reported 3Q01 results and held earnings call. | Asbestos |
| M25 | 11/8/01 | Halliburton filed its 3Q01 10-Q. | Asbestos |

11.     The table below summarizes the 13 dates on which the Fund or Ms. Nettesheim

alleges a corrective disclosure occurred:

| | | **Alleged Corrective Disclosures** | **Allegation Category[11]** | **Source** |
|---|---|---|---|---|
| D1 | 10/4/99 | Halliburton announced sale of Dresser joint ventures and lower-than-expected 3Q99 earnings. | Merger / Unapproved | Nettesheim |
| D2 | 1/5/00 | Merrill Lynch and Brown Brothers Harriman reduced their earnings per share estimates. | Merger / Unapproved | Nettesheim |
| D3 | 10/24/00 | Halliburton announced it planned to restructure its Engineering & Construction ("E&C") segment by combining its E&C businesses into one entity. | Merger / Unapproved | Complaint & Nettesheim |
| D4 | 12/21/00 | Halliburton announced a general negative near-term outlook, E&C restructuring, and a total $120 million after-tax charge related to the E&C restructuring and project losses. | Merger / Unapproved | Complaint & Nettesheim |
| D5 | 12/22/00 | Alleged continuation of 12/21/00 alleged corrective disclosure. | Merger / Unapproved | Nettesheim |
| D6 | 1/30/01 | Halliburton announced $193 million pre-tax charge related to E&C restructuring and project losses. | Merger/ Unapproved | Complaint & Nettesheim |
| D7 | 6/28/01 | Halliburton disclosed that Harbison Walker had asked for financial and asbestos claims management assistance. | Asbestos | Complaint & Nettesheim |
| D8 | 8/9/01 | Halliburton's 2Q01 10-Q stated that the Company's reported net liability for known open asbestos claims was $124 million. | Asbestos | Nettesheim |

---

[11]   *See* footnote 8 for explanation of how the allegations were categorized based on the Complaint.

APP 000012

| | | Alleged Corrective Disclosures | Allegation Category[11] | Source |
|---|---|---|---|---|
| D9 | 10/30/01 | Halliburton announced $21.3 million Mississippi verdict. | Asbestos | Nettesheim |
| D10 | 11/1/01 | Alleged continuation of 10/30/01 alleged corrective disclosure. | Asbestos | Nettesheim |
| D11 | 12/4/01 | Halliburton announced Texas judgments. | Asbestos | Complaint & Nettesheim |
| D12 | 12/5/01 | Alleged continuation of 12/4/01 alleged corrective disclosure. | Asbestos | Nettesheim |
| D13 | 12/7/01 | Halliburton announced $30 million Maryland verdict. | Asbestos | Complaint & Nettesheim |

12.     I have previously submitted two reports in this matter—a report dated November 16, 2007, and a supplemental report dated January 18, 2008.

13.     The Fund's expert, Ms. Nettesheim, previously submitted two reports in this matter—a report dated September 17, 2007, and a rebuttal report dated December 20, 2007 (collectively, "Nettesheim Reports.").  Ms. Nettesheim attempted to establish market efficiency and loss causation using an event study analysis.  As discussed in my previous reports, her event study analysis is flawed because (among other things) Ms. Nettesheim used an unreliable method to construct her market model to estimate Halliburton's stock price reactions, and she cherry-picked the alleged corrective disclosure dates by *first* finding dates that she claimed were statistically significant price reactions and *then* trying to find news that according to her was corrective of the alleged misrepresentations.[12]

## VI.   METHODOLOGY FOR ANALYZING THE PRICE IMPACT OF THE ALLEGED MISREPRESENTATIONS

14.     Below is a summary of the methodology used in this report to analyze the price impact of the alleged misrepresentations.  Note that the analysis was generally conducted in the order described below, but some parts to the analysis were iterative and/or simultaneous.

---

[12]   Allen Report dated November 16, 2007, pp.7-15; Supplemental Allen Report dated January 18, 2008, pp. 3-5.

8

15.     The first step was to understand the Fund's allegations.  In particular, I reviewed the Complaint, the Fund's expert's reports, and the Fund's other pleadings to understand the details of each of the alleged misrepresentations, including for each alleged misrepresentation: 1) when was it allegedly made, 2) what was allegedly false, 3) when was the alleged "truth" purportedly revealed to the market, and 4) with respect to each claimed corrective disclosure, what is alleged to be corrective.

16.     There is a lack of clarity and logic to the Fund's claims.  For example, the alleged corrective disclosures are not logically linked to the alleged misrepresentations, and the corrective disclosures alleged in the Complaint are different than those alleged by the Fund's expert, Ms. Nettesheim.[13]  Between all of the Fund's pleadings and expert reports, the Fund has alleged 25 dates on which misrepresentations occurred and 13 dates on which corrective disclosures occurred.  Three dates are alleged as both misrepresentations or corrective disclosures, so overall there are 35 separate dates on which the Fund or Ms. Nettesheim has alleged a misrepresentation and/or a corrective disclosure.

17.     The second step was to collect publicly available information regarding Halliburton, its peers, and issues affecting their stock prices during the class period.  My team and I collected this information for the class period as well as several months before and after the class period.  In particular, for Halliburton and its peers, we collected the following categories of publicly available information commonly used to analyze a company's stock price:

a)  Press releases;

b)  Conference calls;

c)  SEC filings: Publicly traded companies such as Halliburton are required to submit certain forms on a periodic basis to the SEC, including the following:

---

[13]   The Complaint, Ms. Nettesheim, and other pleadings filed by the Fund contend that there were corrective disclosures on different dates.  The Complaint alleges 6 corrective disclosure dates while Ms. Nettesheim alleges the corrective information was released on 13 separate corrective disclosure dates.  For example, January 5, 2000 is a date that Ms. Nettesheim claims is a corrective disclosure of the alleged misrepresentations regarding the accounting for unapproved claims.  Yet, the Complaint makes no mention of this date and there is no mention of the unapproved claims or related issues in any news or announcements on that date.

9

- Form 10-Ks are submitted annually and provide a detailed description of a company's business and financial condition, and contain audited financial statements;

- Form 10-Qs are submitted quarterly and provide a continuing view of a company's financial position during the year;

- Form 8-Ks are filed periodically to announce major events that occur between quarterly filings;[14]

d) Analyst reports: Analyst reports are typically issued by financial analysts at brokerage firms who perform research and analysis on specific industries and companies.  Analysts analyze companies by studying publicly available information, such as SEC filings, as well as participating on conference calls where they can ask questions directly to management.  Analysts use this information to model and value companies and industries, using financial techniques such as a discounted cash flow models and valuation multiples.  Using these valuations, analysts typically issue price targets (i.e., what price they expect the stock of a company to be in a certain time period) and earnings per share estimates (a company's expected future profits divided by its shares outstanding), and give recommendations to buy, hold or sell the stock.  Analysts typically issue reports when new information about the company is released;[15]

e) News stories;[16]

f) Reports by credit rating agencies such as Moody's and S&P;

g) Trade publications, including Mealey's Litigation Reports and RAND reports.  Mealey's Litigation Reports provide coverage of litigation and asbestos news.

---

[14]   *See*, for example, http://www.sec.gov/answers/form10k.htm, http://www.sec.gov/answers/form10Q.htm, and http://www.sec.gov/answers/form8k.htm (Accessed August 2014).

[15]   We collected and reviewed all analyst reports on Halliburton during the class period, as well as several months before and after the class period, that were available from Thomson Reuters and Ms. Nettesheim's production.

[16]   We reviewed news stories discussing Halliburton downloaded from Factiva, an online news reporting service and archive. We also reviewed news stories that discussed Halliburton using Bloomberg L.P., a commonly used provider of financial data and news, as well as all news stories cited in the Complaint.

10

RAND reports provide information and analysis on policy issues including asbestos-related issues; and

h)  Data on expected future volatility of stock prices.

18.     The third step was to review the public information and commentary to understand the following:

- What general market factors were driving Halliburton's stock price;

- With a specific focus on the alleged misrepresentations and the alleged corrective disclosures, what information was publicly known at various points throughout the class period;

- With a specific focus on the alleged misrepresentations, how did analysts and other market commentators interpret publicly known information about the subject of the alleged misrepresentations; and

- With a specific focus on the claimed corrective disclosures, what did analysts and other market commentators consider important and new information at the time of the claimed corrective disclosures.

19.     The fourth step was to develop a market model and perform an event study to test whether there was a statistically significant price movement on the dates of the alleged misrepresentations and alleged corrective disclosures, as well as other relevant dates.  Academics often use an event study to determine whether and how stock prices respond to new information.[17]  An event study is a commonly accepted statistical analysis that measures the movement in a stock's price after an event, typically adjusting for the movement in the overall market and/or industry.[18]

---

[17]  *See*, for example, Craig A. MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. XXXV (March 1997), 13-39; Robert G. Bowman, "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting*, Vol. 10,4 (1983), 561-584.

[18]  *See*, for example, Janet C. Alexander, "The Value of Bad News in Securities Class Actions," *UCLA Law Review*, Vol. 41 (1994), 1421-1469; Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, Vol. 38 (Nov. 1982), 1-20; Frederick Dunbar & David Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," in *Litigation Services Handbook: The Role of the Financial Expert*, edited by Roman L. Weil, Michael J. Wagner & Peter B. Frank (John Wiley & Sons, Inc., 3rd ed., 2001), ch.19.

11

20.     Using an event study model, I tested the statistical significance of the price reactions following the alleged misrepresentations, the alleged corrective disclosures, and other potentially relevant dates.  First, to adjust for movement in Halliburton's industries, I selected an index for each of Halliburton's two main lines of business, which were 1) energy services and 2) engineering and construction ("E&C").  To control for the energy services business, I used the S&P 500 Energy Index.  The S&P 500 Energy Index is the index Halliburton compares its stock performance to in its SEC filings.[19]   To control for the E&C part of Halliburton's business, I used an E&C index composed of the Fortune 1000 companies classified by Fortune as being in the E&C industry.[20]  Fortune includes Halliburton in this list.  In addition, I tested whether Halliburton's stock price movement during the class period was explained by an index comprised of companies whose asbestos exposure was discussed by analysts.[21]  I found that during the class period the asbestos index did not add further explanatory power to the model beyond that of the energy and E&C indices and thus did not include the asbestos index in the model.[22] *See* Exhibit 2.

---

[19]    *See,* for example, Halliburton 2006 Form 10-K, filed February 27, 2007, p. 14.  Halliburton did not compare its stock performance to any index during the class period in its 10-K filings.  Because Halliburton was included in the S&P 500 Energy Index during the class period (according to Bloomberg), we used this index after removing Halliburton from the index.

[20]    Fortune 1000 classification as of April 17, 2000.  In addition to an E&C index based on the Fortune 1000 classification, I considered E&C indices constructed using analyst reports and financial press issued before and during the class period. Specifically, I considered indices based on a list of E&C companies in Merrill Lynch's March 13, 1998 report titled "Engineering & Construction," as well as a list of E&C companies in Credit Suisse First Boston's November 24, 1999 report titled "The Engineering and Construction Monthly."  I also considered the S&P 500 Construction & Engineering Index. *See* the Original Allen Report, section VIII.D, and the Allen Supplemental Report, section V.C.2.  The E&C index based on the Fortune 1000 classification was the index with the best fit during the class period.  The companies included in this index are those for which price information is available during the class period: Beazer Homes USA, Centex, Champion Enterprises, Clayton Homes, Comfort Systems USA, D.R. Horton, Emcor Group, Foster Wheeler, Granite Construction, Jacobs Engineering Grp., Lennar, MDC Holdings, NVR, Oakwood Homes, Pulte, Ryland Group, Standard Pacific, Stone & Webster, Toll Brothers, U.S. Home, URS, and IT Group.  Fluor was excluded because of a spin-off during the class period.

[21]    We identified the companies with asbestos exposure in 2001 and 2002 using a search of analyst reports. Specifically, the titles of analyst reports issued in 2001 and 2002 were searched for the word "asbestos." The search was performed across all analyst reports from Thomson Reuters issued about specific companies (rather than, for example, industry reports). Using the list of analyst reports created by this search, we identified the companies about which the reports were issued, focusing on U.S. companies. We excluded companies that did not have stock prices throughout the whole class period and companies that went bankrupt during the class period. This search resulted in the following companies: 3M, Allstate Corporation, American Financial Group, Ashland Inc. (Ashland Oil), Chubb Corporation, CNA Financial Corp., Cooper Industries, Inc., Corning, Inc., Crane Co., Crown Holdings Inc., Dow Chemical Co., Duke Energy, DuPont, Eastman Chemical, Fortune Brands Inc., Georgia-Pacific Group, Goodrich Corp., Goodyear Tire & Rubber, Hartford Financial Services Group Inc., Honeywell International Inc., International Paper Co., McDermott International, Nationwide Financial Services, Owens-Illinois Inc., Pfizer, PPG Industries, Inc., Sealed Air Corp., Travelers Property Casualty Corp., USG Corp., Viacom, Inc., and W.R. Grace & Co. An equal weighted index was constructed using the stock prices of these companies. *See* Section X.A.6.c below for more details.

[22]    Note that after the class period, the asbestos index did provide further explanatory power beyond the other two indices. See Exhibit 2.

12

21.     After selecting two indices to control for movements in the industry, I used a statistical analysis called a regression to estimate the relationship between Halliburton's daily stock price returns and the daily returns of the two industry indices.[23]  Based on these regression results and the returns of the two indices, the market model predicts Halliburton's stock price movement.  This "predicted return" is the portion of Halliburton's stock price return explained by movements in the industry on the date.  The difference between Halliburton's actual stock price return and its predicted return is its excess return, or the portion of Halliburton's stock price movement not explained by contemporaneous movements in the industry.  I tested the statistical significance of Halliburton's excess stock price movement (or price reaction) following each of the alleged misrepresentations, alleged corrective disclosures, and other potentially relevant dates.

22.     When analyzing the statistical significance of a price reaction to an event, the 95% statistical confidence level is the commonly applied standard.[24]  Using the 95% confidence level means that there is a 5% chance of finding a statistically significant price reaction even when there is no company-specific news of importance to the market, and the stock price moves solely due to its normal daily fluctuations.  In other words, for every 100 price reactions analyzed at the 95% confidence level, on average, 5 will be statistically significant for no reason other than the normal daily variation in the stock price.

23.     An issue arises when a large number of price reactions are tested for statistical significance, since the more price reactions that are tested, the greater the probability of finding statistical significance simply due to chance (e.g., when there is no company-specific news of importance to the market).  This issue is known in statistics as "multiple comparisons."  As one popular scientific publication explains, "Many scientific papers make 20 or 40 or even hundreds of comparisons."  In such instances, researchers "are *virtually guaranteed* to find statistical

---

[23]   Regression analysis is used to estimate the relationship between two or more variables.  The regression estimation period used in the event study is the class period, excluding the days of the alleged misrepresentations and alleged corrective disclosures.

[24]   The 95% level is the level most commonly applied by courts and academics to test statistical significance. For a discussion of confidence levels, *see,* for example, David H. Kaye & David A. Freedman, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence*, (Federal Judicial Center, 3rd ed., 2011), 243-246; Franklin M. Fisher, "Multiple Regression in Legal Proceedings," 80 *Columbia Law Review* 702 (1980), 717.

APP 000018

significance [at the 95% confidence level] in results that are *meaningless statistical flukes.*"[25] Textbooks and other academic sources describe the issue of multiple comparisons similarly: when multiple tests of statistical significance are done without any adjustment, finding a spurious statistically significant result is not surprising.[26]

      24.     As an illustrative example, imagine rolling a 20-sided die with 19 white sides and 1 red side.  If the die is rolled once, it would be surprising if the die landed red-side up since the likelihood of this occurring is only 5% (1 out of 20).  However, if the die is rolled 100 times, it would be much less surprising that the die landed red-side up 1 time since, on average, the die should land red-side up 5 times for every 100 rolls.

      25.     The problem of multiple comparisons is particularly relevant in this case because the Fund and its expert, Ms. Nettesheim, have asserted a total of 35 dates on which the alleged fraud either inflated the stock price because of an alleged misrepresentation or deflated the stock price because of an alleged corrective disclosure.[27]  This means that there are 35 price reactions being tested for statistical significance, each with a 5% chance of being statistically significant simply as a result of normal fluctuations in the stock price (assuming the 95% confidence level is used).  Given the number of tests performed, it would not be surprising to find a statistically significant result even when there is no company-specific news of importance to the market.[28]

---

[25]    Charles Seife, "The Mind-Reading Salmon," *Scientific American*, Aug. 2011, 30 (emphasis added).  The article goes on to provide the example of neuroscientists who presented a salmon with pictures of people expressing emotions and found that certain regions of the fish's brain lit up when certain types of pictures were shown.  The result was statistically significant at the 99.9% confidence level.  Yet, as the neuroscientists pointed out, "there are so many possible patterns that a statistically significant result was virtually guaranteed, so the result was totally worthless."  Further emphasizing the meaningless result is the fact that the fish was dead. *Id.*

[26]    *See,* for example, John A. Rice, *Mathematical Statistics and Data Analysis,* (3rd ed.), 458 ("Suppose that 100 independent two-sample t tests are conducted at the .05 level and that, in fact, all the null hypotheses are true.  We would expect that five of the tests would produce a 'significant' result."); "Reference Guide to Statistics," *Reference Manual on Scientific Evidence,* (Federal Judicial Center, 3rd ed., 2011), 290 ("[M]ultiple comparison.  Making several statistical tests on the same data set.  Multiple comparisons complicate the interpretation of a p value.  For example, if 20 divisions of a company are examined, and one division is found to have a disparity 'significant' at the 0.05 level, the result is not surprising; indeed, it should be expected under the null hypothesis.").  *See also* Peter C. Austin et al., "Testing multiple statistical hypotheses resulted in spurious associations: a study of astrological signs and health," *Journal of Clinical Epidemiology* 59 (2006), 964-969; Hervé Abdi, "Bonferroni test" in *Encyclopedia of Measurement and Statistics*, edited by Neil J. Salkind (Sage, 2007), 103-107; David Tabak "Multiple Comparisons and the Known or Potential Error Rate," *Journal of Forensic Economics* 19(2), 2006, 231-236.

[27]    The Fund has alleged 25 dates on which alleged misrepresentations occurred and 13 dates on which alleged corrective disclosures occurred, including 3 dates with both an alleged misrepresentation and alleged corrective disclosure.

[28]    The multiple comparison problem is exacerbated because Ms. Nettesheim added to the list of alleged corrective disclosures using an unscientific procedure of *first* testing the statistical significance of Halliburton's price reaction on each of the 633 days during the class period and *then* attempting to determine whether, in her view, any of the statistically significant price reactions related to any of the alleged misrepresentations. (Nettesheim Report, ¶¶41-45.)

14

26.     A commonly accepted method to correct for the multiple comparisons problem is the Bonferroni adjustment.[29]  The Bonferroni adjustment is based on the number of tests performed so that the overall statistical significance takes into account the number of tests performed and adjusts the statistical threshold of individual tests accordingly.[30]  In this report, statistical significance is discussed both before and after adjusting for multiple comparisons.  For all days on which Halliburton's stock price reaction is tested, the multiple comparisons adjustment assumes there were 35 multiple comparisons.[31]

27.     The fifth and final step of my analysis involved using the information and analyses described above to examine whether there is any evidence that the alleged misrepresentations impacted the price of Halliburton's stock.  The focus of this report is on the main allegations but also includes an exhaustive and detailed price impact analysis of all the alleged misrepresentations mentioned in the Complaint and the Nettesheim Reports.  This report also includes an analysis of all alleged corrective disclosures for evidence of price impact of the alleged misrepresentations.

## VII.   THERE WAS NO STATISTICALLY SIGNIFICANT POSITIVE PRICE REACTION AFTER ANY OF THE ALLEGED MISREPRESENTATIONS

28.     The Complaint alleges 25 dates on which Halliburton made misrepresentations that purportedly inflated its stock price.  Three of the dates are alleged by the Fund to be both misrepresentations and corrective disclosures.  I analyzed the price reactions after all 25 alleged misrepresentation dates using the event study described in the section above.  I found that there was no statistically significant price reaction after any of the alleged misrepresentations after making the appropriate adjustment for multiple comparisons.  Even before making such adjustment, there was only one date with statistically significant positive movement: April 25, 2001, on which the Fund alleges Halliburton misrepresented its first quarter 2001

---

[29]  For example, in discussing the issue of multiple comparisons, the *Encyclopedia of Measurement and Statistics* discusses two methods: the Bonferroni and the Sidak adjustment. *See* Hervé Abdi, "Bonferroni test" in *Encyclopedia of Measurement and Statistics*, edited by Neil J. Salkind (Sage, 2007), 103-107.  As an alternative, I have tested the price reactions discussed in this report, using the Sidak adjustment in place of the Bonferroni adjustment and my conclusions do not change.

[30]  *See,* for example, details on the Bonferroni adjustment in Hervé Abdi, "Bonferroni test" in *Encyclopedia of Measurement and Statistics*, edited by Neil J. Salkind (Sage, 2007), 103-107.

[31]  35 is the total number of dates on which alleged misrepresentations and/or alleged corrective disclosures occurred.  (In addition, when the date tested is merely the result of Ms. Nettesheim's unscientific procedure, a second Bonferroni adjustment is discussed that corrects for the 633 multiple comparisons that Ms. Nettesheim performed to arrive at her list of alleged corrective disclosures.)

15

APP 000020

earnings.[32]  The Complaint does not include any allegation that Halliburton made any misstatement discussing asbestos on that day and as discussed in section X below, I found no evidence of price impact.

29.     Moreover, after making the appropriate adjustment for 35 multiple comparisons, there was no statistically significant price reaction following the April 25, 2001 alleged misrepresentation.  Thus, I found, after appropriately adjusting for multiple comparisons, that there was no statistically significant positive price reaction after any of the alleged misrepresentations.  The lack of statistically significant positive price reactions after the alleged misrepresentations does not support the Fund's claim of price impact.

30.     The following table summarizes the results of the event study for the 25 dates on which an alleged misrepresentation occurred (before and after adjusting for 35 multiple comparisons).

| | | Alleged Misrepresentations | Allegation Category[34] | Positive and Statistically Significant?[33] | |
|---|---|---|---|---|---|
| | | | | Before MC Adjustment | After MC Adjustment[35] |
| M1 | 7/22/99 | Halliburton reported 2Q99 results and held earnings call. | All | No | No |
| M2 | 8/13/99 | Halliburton filed its 2Q99 10-Q. | All | No | No |
| M3 | 9/13/99 | Halliburton presented at Dain Rauscher Wessels conference. | All | No | No |
| M4 | 10/21/99 | Halliburton reported 3Q99 results and held earnings call. | All | No | No |
| M5 | 11/15/99 | Halliburton filed its 3Q99 10-Q. | All | No | No |
| M6 | 1/27/00 | Halliburton reported 4Q99 results and held earnings call. | All | No | No |

---

[32]   Complaint, ¶161.

[33]   Price reaction is positive and statistically significantly at the 5% level.

[34]   *See* footnote 8 for explanation of how the alleged misrepresentations were categorized based on the Complaint.

[35]   Adjusted for 35 multiple comparisons, based on the number of dates tested given the Fund's alleged misrepresentation and alleged corrective disclosure dates.

16

| | | Alleged Misrepresentations | Allegation Category[34] | Positive and Statistically Significant?[33] | |
|---|---|---|---|---|---|
| | | | | Before MC Adjustment | After MC Adjustment[35] |
| M7 | 3/14/00[36] | Halliburton issued its 1999 Annual Report. | All | No | No |
| M8 | 4/26/00 | Halliburton reported 1Q00 results and held earnings call. | All | No | No |
| M9 | 5/15/00 | Halliburton filed its 1Q00 10-Q. | All | No | No |
| M10 | 7/26/00 | Halliburton reported 2Q00 results and held earnings call. | All | No | No |
| M11 | 8/10/00 | Halliburton filed its 2Q00 10-Q. | All | No | No |
| M12 | 11/9/00 | Halliburton filed its 3Q00 10-Q. | All | No | No |
| M13 | 1/30/01 | Halliburton reported 4Q00 results and held earnings call. | Asbestos | No | No |
| M14 | 3/27/01[37] | Halliburton issued its 2000 Annual Report. | Asbestos | No | No |
| M15 | 4/25/01 | Halliburton reported 1Q01 results. | Asbestos | Yes | No |
| M16 | 5/11/01 | Halliburton filed its 1Q01 10-Q. | Asbestos | No | No |
| M17 | 5/25/01 | Robinson-Humphrey issued report after discussion with Halliburton management. | Asbestos | No | No |
| M18 | 6/28/01 | Halliburton announced Harbison-Walker claims could require an additional reserve of $60 million. | Asbestos | No | No |
| M19 | 7/25/01 | Halliburton reported 2Q01 results and held earnings call. | Asbestos | No | No |
| M20 | 8/9/01 | Halliburton filed its 2Q01 10-Q. | Asbestos | No | No |

---

[36] *See* footnote 9.

[37] *See* footnote 10.

APP 000022

|   |   | Alleged Misrepresentations | Allegation Category[34] | Positive and Statistically Significant?[33] | |
|---|---|---|---|---|---|
|   |   |   |   | Before MC Adjustment | After MC Adjustment[35] |
| M21 | 8/22/01 | Salomon Smith Barney, after discussions with Halliburton management, issued a report on Halliburton's asbestos exposure. | Asbestos | No | No |
| M22 | 9/4/01 | *Platt's* report on asbestos liability. | Asbestos | No | No |
| M23 | 10/4/01 | Halliburton management discussed Halliburton's asbestos liability situation at a Deutsche Bank seminar. | Asbestos | No | No |
| M24 | 10/23/01 | Halliburton reported 3Q01 results and held earnings call. | Asbestos | No | No |
| M25 | 11/8/01 | Halliburton filed its 3Q01 10-Q. | Asbestos | No | No |

## VIII. THE ALLEGED MISREPRESENTATIONS REGARDING THE COST SAVINGS FROM THE DRESSER MERGER DID NOT IMPACT HALLIBURTON'S STOCK

31.     The Fund alleges that the Company misrepresented the cost savings resulting from the Dresser merger, which caused Halliburton's stock to trade at inflated prices during the class period.  In particular, the Fund claims that during the class period, the Company falsely stated that cost savings from the merger were expected to be approximately $500 million and that the merger was "behind us."[38]  According to the Fund, the truth about the cost savings from the merger was revealed to the market over a series of partial corrective disclosures, causing the stock price to decline.  The chart below shows Halliburton's stock price along with the Fund's alleged misrepresentations and alleged corrective disclosures regarding the cost savings from the Dresser merger:

---

[38]   Complaint, ¶¶110, 115, 121, 122.

18

APP 000023



32.     The Complaint alleges Halliburton made misrepresentations regarding the cost savings from the merger on 12 dates, as summarized in the table below.[39]  However, only 4 of these dates (M1, M3, M6 and M7 in the table below) contain any specific alleged misrepresentations regarding the cost savings from merger.[40]  As discussed above, there was no statistically significant price reaction after any of the alleged misrepresentations.

| Alleged Misrepresentations - Dresser Merger | | |
|---|---|---|
| M1 | 7/22/99 | Halliburton reported 2Q99 results and held earnings call. On 7/23/99, Dain Rauscher Wessels stated, "Management expects that annualized merger costs savings are approximately $500 million." |
| M2 | 8/13/99 | Halliburton filed its 2Q99 10-Q. |

---

[39]   Complaint, ¶¶108-154.

[40]   Complaint, ¶¶110, 115, 121-122.

APP 000024

| Alleged Misrepresentations - Dresser Merger | | |
|---|---|---|
| M3 | 9/13/99 | After a presentation by Halliburton management, Dain Rauscher Wessels reported, "[T]he company is now projecting annual benefits of $500 million." |
| M4 | 10/21/99 | Halliburton reported 3Q99 results and held earnings call. |
| M5 | 11/15/99 | Halliburton filed its 3Q99 10-Q. |
| M6 | 1/27/00 | Halliburton reported 4Q99 results and held earnings call. On 1/28/00, Morgan Stanley issued a report saying, "Cost Savings are Real." |
| M7 | 3/14/00[41] | Halliburton's 1999 Annual Report included a letter that stated, "The merger with Dresser Industries is now behind us." |
| M8 | 4/26/00 | Halliburton reported 1Q00 results and held earnings call. |
| M9 | 5/15/00 | Halliburton filed its 1Q00 10-Q. |
| M10 | 7/26/00 | Halliburton reported 2Q00 results and held earnings call. |
| M11 | 8/10/00 | Halliburton filed its 2Q00 10-Q. |
| M12 | 11/9/00 | Halliburton filed its 3Q00 10-Q. |

33.     According to the Fund, the truth about the cost savings from the Dresser merger emerged over partial corrective disclosures on six dates: October 4, 1999; January 5, 2000; October 24, 2000; December 21-22, 2000; and January 30, 2001.[42]  The table below summarizes the six alleged corrective disclosure dates, of which only three were alleged in the Complaint.[43] The Fund's expert, Ms. Nettesheim, added three additional dates after her procedure of *first* searching for statistically significant price reactions across all 633 days during the class period and *then* attempting to relate the statistically significant price reactions to alleged misrepresentations.[44]

---

[41]  *See* footnote 9.

[42]  Complaint, ¶¶144, 150, 155; Nettesheim Report, ¶¶84-112, including footnote 71 on page 51.

[43]  Complaint, ¶¶144, 150, 155.

[44]  Nettesheim Report, ¶¶41-45, 84-112, including footnote 71 on page 51.

20

| | | Alleged Corrective Disclosures – Dresser Merger | Source |
|---|---|---|---|
| D1 | 10/4/99 | Halliburton announced sale of Dresser joint ventures and lower-than-expected 3Q99 earnings. | Nettesheim |
| D2 | 1/5/00 | Merrill Lynch and Brown Brothers Harriman reduced their earnings per share estimates. | Nettesheim |
| D3 | 10/24/00 | Halliburton announced it planned to restructure its E&C segment by combining its E&C businesses into one entity. | Complaint & Nettesheim |
| D4 | 12/21/00 | Halliburton announced a general negative near-term outlook, E&C restructuring, and a total $120 million after-tax charge related to the E&C restructuring and project losses. | Complaint & Nettesheim |
| D5 | 12/22/00 | Alleged continuation of 12/21/00 alleged corrective disclosure. | Nettesheim |
| D6 | 1/30/01 | Halliburton announced a $193 million pre-tax charge related to the E&C restructuring and project losses. | Complaint & Nettesheim |

34.     As discussed in the sections below, there was no price impact from the alleged misrepresentations during the class period regarding the cost savings from the Dresser merger. The alleged misrepresentations did not contain new information regarding the cost savings from the merger, and the market did not interpret the alleged misrepresentations as containing new information regarding cost savings.  Moreover, the disclosures that the Fund alleges were corrective of the Company's misrepresentations were not, in fact, corrective, and thus provide no evidence of price impact.

35.     In addition, there were no statistically significant price reactions after the following alleged corrective disclosures:

–   01/05/2000 (after making the appropriate adjustment for multiple comparisons);

–   12/21/2000 (both before and after making the appropriate adjustment for multiple comparisons);

–   12/22/2000 (after making the appropriate adjustment for multiple comparisons); and

–   01/30/2001 (both before and after making the appropriate adjustment for multiple comparisons).

21

**A.** **The alleged misrepresentations during the class period regarding cost savings from the Dresser merger did not impact Halliburton's stock price because they contained no new information regarding the cost savings**

36.     The table below summarizes the Company's statements regarding its estimated cost savings from the Dresser merger before and during the class period.

APP 000027

## Halliburton Statements Regarding Cost Savings From Dresser Merger

← Class Period Statements →

| 10/1/1998 *After Closing of Merger* | 4/26/1999 *1Q99 Earnings Call* | 7/22/1999 *2Q99 Earnings Call* | 9/13/1999 *Dain Rauscher Conference* | 10/21/1999 *3Q99 Earnings Call* | 1/27/2000 *4Q99 Earnings Call* | 3/14/2000 *1999 10-K & Annual Report* |
|---|---|---|---|---|---|---|
| • "at least $250 million per year in annual savings by virtue of the merger" | • "upwards of $500 million worth of merger-related savings" | • "total cost reductions and synergies from the merger […] now exceed $500 million on an annualized basis" | • "the company is now projecting annual benefits of $500 million" | | | • "we will ultimately reduce our costs by an estimated $500 million on an annual basis" |
| | • "we're basically ahead of plan" | • "on or ahead of schedule" | | • "essentially complete and behind us" | • "pretty much have those behind us" | • "merger with Dresser Industries is now behind us" |
| • "initial headcount reductions […] related to the merger […] are going to be about 7500 people" | • "headcount reductions of approximately 10,850" | • "original plan of about 10,850 severance reductions" | • "further headcount reductions" | | | • "planned headcount reductions of over 10,000" |

23

APP 000028

# Halliburton Statements Regarding Cost Savings From Dresser Merger

←———————————————— Class Period Statements ————————————————→

| 10/1/1998<br>*After Closing of Merger* | 4/26/1999<br>*1Q99 Earnings Call* | 7/22/1999<br>*2Q99 Earnings Call* | 9/13/1999<br>*Dain Rauscher Conference* | 10/21/1999<br>*3Q99 Earnings Call* | 1/27/2000<br>*4Q99 Earnings Call* | 3/14/2000<br>*1999 10-K & Annual Report* |
|---|---|---|---|---|---|---|
| • "2600 have been actioned in the third quarter of this year" | • "completed about 85% of those planned reductions" | • "about 1,400 of those in our plan to go [or about 87% completed]" | | • "substantially completed our planned head count reductions related to the merger" | • "headcount […] declined about 13,000 […] from where we were in the fourth quarter of 1998" | • "headcount reductions of 13,000 were achieved during 1999" |
| • "we're looking at closing and consolidating over 400 locations" | • "on schedule to close over 400 properties" | • "400 facilities to be closed"<br><br>• "in addition to […] the merger plan […] closing 100 additional properties […] 80 of which have been vacated" | • "significant facility consolidations" | • "Initially we thought we were going to close about 400"<br><br>• "Because of the industry downturn and additional opportunities […] we have in fact identified 500 facilities" | • "our plans were to close 500 facilities" | • "program to exit approximately 500 properties" |
| | • "approximately 270 properties [or about 68% of 400] have been vacated" | • "270 of these have been vacated" | | • "80% of these we have already exited" | • "88% of those are closed and exited" | • "have vacated 452 of the approximate 500 total facilities [or 90%]" |

24

37.     After the closing of the merger in October 1998, the Company announced that it expected at least $250 million in cost savings by virtue of the Dresser merger. In April 26, 1999, three months before the beginning of the class period, the Company announced upwards of $500 million of merger-related savings.

**1.  Before the class period, the Company announced that it expected $500 million in cost savings related to the merger and numerous analysts repeated the Company's expectations**

| Pre-Class Period Statements | Alleged Misrepresentation |
|---|---|
| [I]t's fair to say that we're now seeing [cost savings] that are much higher than we initially indicated, and that that number could be, you know, upwards of $500 million worth of merger-related savings.  [Halliburton Conference Call, 4/26/1999]<br><br>Revised estimates of the merger consolidation savings have increased to $500 million. [Salomon Smith Barney, 4/27/1999]<br><br>Management expects to realize more than $500 million of cost savings from the Dresser merger. [First Union, 4/27/1999]<br><br>Substantial cost savings from the Dresser merger and downsizing ($500MM +) sets the stage for strong margin improvement during the recovery. [Donaldson, Lufkin & Jenrette, 5/4/1999] | Management expects approximately $500 million in cost savings from the Dresser merger. |

38.     On April 26, 1999, three months before the class period began, the Company announced that cost savings specifically related to the merger were "higher than we initially indicated" and "upwards of $500 million":

> I think it's fair to say that we're now seeing numbers that are much higher than we initially indicated, and that that number could be, you know, **upwards of $500 million worth of merger-related savings coming from 1999, despite the fact that the revenue base will be down**.  [Halliburton Conference Call, 4/26/1999, emphasis added]

39.     In late April and early May of 1999 (also before the class period), multiple analysts reiterated Halliburton's statements regarding the expected $500 million in savings:

APP 000030

Revised estimates of the merger consolidation savings have increased to $500m […] [Salomon Smith Barney, 4/27/1999, repeated on 5/4/1999]

Management expects to realize more than $500 million of cost savings from the Dresser merger, although progress-to-date has been masked by market weakness.  [First Union, 4/27/1999]

Substantial cost savings from the Dresser merger and downsizing ($500MM +) sets the stage for strong margin improvement during the recovery.  [Donaldson, Lufkin & Jenrette, 5/4/1999]

40.     As the Company and analyst statements demonstrate, the expectation of $500 million in merger-related cost savings was disclosed to and known by the market before the class period commenced on June 3, 1999.

**2.  The Company was clear that the expected benefit of $250 million (and later $500 million) from the Dresser merger related to expected cost savings rather than revenue enhancements**

41.     At the time that the merger closed in 1998, the Company made clear that the $250 million expected benefit from the Dresser merger referred to expected cost savings rather than revenue enhancements from the merger.  The Company stated in its October 1, 1998, conference call with analysts:

And lastly, the cost reductions, and there are enormous cost reductions that are going to come out of this merger that we executed yesterday. And I think that **even though we are not going to get any help on the revenue side, we will be able to execute on the cost reduction side.** And those numbers will drop to the bottom line.  [Halliburton Conference Call, 10/1/1998, emphasis added]

42.     Particularly, the cost reductions were focused on consolidating facilities and reducing headcount.  The Company elaborated in its conference call with analysts that it was "looking at closing and consolidating over 400 locations around the world."  The Company also stated that it was initially targeting over 7,500 in headcount reductions "on first pass."[45]

43.     Similarly, when the Company increased the expected benefits of the Dresser merger to $500 million, it made clear that the $500 million referred to expected cost savings. The Company stated in its April 26, 1999, conference call:

---

[45]   Halliburton Conference Call, October 1, 1998.  On its conference call on January 25, 1999, the Company identified additional headcount reductions.  Halliburton Conference Call, January 25, 1999 ("We also have another 3,350 people that will come out of our various overhead shared services and downstream operations.")

APP 000031

I think it's fair to say that we're now seeing numbers that are much higher than we initially indicated, and that that number could be, you know, **upwards of $500 million worth of merger-related savings coming from 1999, despite the fact that the revenue base will be down**. [Halliburton Conference Call, 4/26/1999, emphasis added]

> **3.  The Company disclosed before the start of the class period that the cost-reduction measures announced at the time of merger had been substantially achieved**

44.     Before the beginning of the class period, the Company disclosed that most of the cost-saving measures announced at the time of the merger—including the stated headcount reductions and facility closures—had been achieved.  Specifically, the Company noted that it had completed a vast majority of its stated headcount reductions, vacated 270 properties, and was "on schedule" to close over 400 facilities as previously announced.

> Since the merger, **approximately 270 properties have been vacated,** of which over 60 have been returned to the owner.  We are **still on schedule to close over 400 facilities**, as we previously discussed […]
>
> The **total announced headcount reductions of approximately 10,850**, most of which are included in the Energy Services Group […] Overall, the company has **completed about 85% of those planned reductions in headcounts.**  [Halliburton Conference Call, 4/26/1999, emphasis added]

45.     Thus, not only was the expectation of $500 million in merger-related cost savings not new information by the beginning of the class period, the cost-saving measures that the Company expected to result in $500 million of savings—including the headcount reductions and facility closures—had already been substantially achieved.

> **4.  Because subsequent alleged misrepresentations made during the class period did not contain new information regarding cost savings from the merger or indicate that the cost-reduction measures had not been achieved, these alleged misrepresentations had no price impact**

46.     Subsequent statements made by the Company during the class period, which the Fund claims were misrepresentations regarding the cost savings from the merger, contained no new information with respect to such cost savings.  These alleged misrepresentations had no impact on Halliburton's stock price because, as the Fund has concluded, Halliburton's stock traded in an efficient market over the class period, and in an efficient market only new information impacts the stock price.  According to finance theory, the market for a security is

27

APP 000032

said to be efficient if the price of the security fully and rapidly incorporates new information.[46] Similarly, the Fund's expert, Ms. Nettesheim, points out that a stock trading in an efficient market reacts to new and material information, and therefore, "successive announcements of the same information will have no additional effect on share price."[47]  Given the Fund's conclusion of market efficiency, alleged misrepresentations during the class period containing no new information could have no impact on Halliburton's stock price.

47.     The Fund alleges four specific misrepresentations during the class period with respect to the cost savings from the Dresser merger.  On July 23, 1999, after Halliburton's 2Q99 earnings call, analysts at Dain Rauscher Wessels stated, "Management expects that annualized merger cost savings are approximately $500 million."[48]  Likewise, on September 14, 1999, analysts at Dain Rauscher Wessels again stated that "the company is now projecting annual benefits of $500 million" from the merger.[49]  On January 28, 2000, after the Company's 4Q99 earnings call, analysts at Morgan Stanley stated, "Cost Savings are Real."[50]  In its 1999 Annual Report, after additional headcount reductions and facility closures had been accomplished, Halliburton characterized the merger as "behind us."[51]

48.     As shown in the table of Company statements above, these alleged misrepresentations contained no new information with regard to the cost savings from the merger that was not already disclosed before the beginning of the class period.  In an efficient market, these alleged misrepresentations could have had no impact on Halliburton's stock price during the class period.

> ### a.  The alleged misrepresentations on July 22, 1999 that the merger was ahead of schedule and cost savings were approximately $500 million was not new information

49.     According to the Fund, on July 22, 1999, during its 2Q99 earnings call, the Company allegedly misrepresented that the merger was "on or ahead of schedule" and that

---

[46]  *See*, for example, Richard A. Brealey, Stewart C. Myers & Franklin Allen, *Principles of Corporate Finance*, (McGraw-Hill: New York, 11th ed., 2014), 321-341.

[47]  Nettesheim Report, ¶40.

[48]  Complaint, ¶110; Dain Rauscher Wessels, July 23, 1999.

[49]  Complaint, ¶115; Dain Rauscher Wessels, September 14, 1999.

[50]  Complaint, ¶121; Morgan Stanley, January 28, 2000.

[51]  Complaint, ¶122; Halliburton 1999 Annual Report, p.2.

28

merger-related savings would be approximately $500 million annually.  The Fund points to a Dain Rauscher Wessels report released on July 23, 1999, based on management's statements made during the Company's 2Q99 earnings call.[52]  The Dain Rauscher Wessels report stated:

> The merger results from the Halliburton-Dresser merger are on or ahead of schedule….  Management [now] expects that annualized merger cost savings are approximately $500 million.  [Dain Rauscher Wessels, 7/23/1999, cited in Complaint, ¶110]

50.     Yet, in an efficient market there can be no price impact from this alleged misrepresentation because the Company had *already* stated on April 26, 1999—over a month before the beginning of the class period—that the merger was ahead of plan in terms of the announced headcount reductions and facility closures, and that the cost savings were approximately $500 million.[53]

51.     The July 23, 1999 Dain Rauscher Wessels analyst report was also not the first analyst report to note that Halliburton was projecting $500 million in merger-related savings.  For example, in late April and early May of 1999, analysts stated that "[r]evised estimates of the merger consolidation savings have increased to $500m,"[54] and that "[m]anagement expects to realize more than $500 million of cost savings from the Dresser merger."[55]

---

[52]  Complaint, ¶¶109-110.

[53]  Halliburton Conference Call, April 26, 1999 ("Basically, if you look at the plan that we put in place last September to effect the merger of (Dresser) and Halliburton, **in terms of facility closures and headcount reductions we're basically ahead of plan** that we had in place at that point in time, due because of the market conditions that are out there […] But I think it's fair to say that we're now seeing numbers that are much higher than we initially indicated, and that that number could be, you know, **upwards of $500 million worth of merger-related savings** coming from 1999, despite the fact that the revenue base will be down.") (emphasis added).

[54]  Salomon Smith Barney, April 27, 1999.  Salomon Smith Barney repeated this statement in its May 4, 1999 report.

[55]  First Union, April 27, 1999.

APP 000034

#### b.   The alleged misrepresentation on September 13, 1999 that the company was projecting $500 million of cost savings from the merger was not new information

52.      The Fund alleges that on September 13, 1999, at a Dain Rauscher Wessels conference, the Company again misrepresented that cost savings from the merger would be $500 million.[56]  There can be no price impact from this alleged misrepresentation because the Company was confirming *the same information* disclosed in its April 1999 earnings call[57] and repeated by analysts in late April and early May of 1999.[58]

#### c.   The alleged misrepresentation on January 27, 2000 about cost savings from the merger was not new information

53.      According to the Fund, on January 28, 2000 (after the Company's January 27 earnings call) Morgan Stanley released a report based on statements made during the call.[59] This report stated:

> Cost Savings are Real
> Regarding the cost savings issue, management continues to stress that costs have been permanently reduced in-line with prior guidance, and the company's revenue potential cycle-over-cycle has not changed… [Morgan Stanley, 1/28/2000, cited in Complaint, ¶121]

54.      There can be no price impact from this alleged misrepresentation because the Company was reiterating the same information from its April 1999 earnings call, when it reported that the cost saving measures announced at the time of the merger had been substantially achieved.[60]

---

[56]  Complaint, ¶115.  On September 14, 1999, Dain Rauscher Wessels stated, "Management originally targeted cost savings and related synergies from the Dresser merger totaling $250 million per annum, but following further headcount reductions and significant facility consolidations, the company is now projecting annual benefits of $500 million."

[57]  Halliburton Conference Call, April 26, 1999 ("But I think it's fair to say that we're now seeing numbers that are much higher than we initially indicated, and that that number could be, you know, **upwards of $500 million worth of merger-related savings** coming from 1999, despite the fact that the revenue base will be down.") (emphasis added).

[58]  Salomon Smith Barney, April 27, 1999, repeated on May 4, 1999 ("Revised estimates of the merger consolidation savings have increased to $500m […]"); First Union, April 27, 1999 ("Management expects to realize more than $500 million of cost savings from the Dresser merger, although progress-to-date has been masked by market weakness."); Donaldson, Lufkin & Jenrette, May 4, 1999 ("Substantial cost savings from the Dresser merger and downsizing ($500MM +) sets the stage for strong margin improvement during the recovery.").

[59]  Complaint, ¶121.

[60]  Halliburton Conference Call, April 26, 1999 ("Since the merger, **approximately 270 properties have been vacated,** of which over 60 have been returned to the owner. We are **still on schedule to close over 400 facilities,** as we previously discussed […]  The **total announced headcount reductions of approximately 10,850,** most of which are included in the

30

### d. The alleged misrepresentation in the 1999 Annual Report that the merger was "behind" the Company was not new information

55.     The Fund alleges that the Company's 1999 Annual Report in April 2000 falsely stated that the merger was now behind the Company:

> The merger with Dresser Industries is now behind us. Integrating the operations of the two companies … [has] been an important part of our transition to the future… [1999 Shareholder Annual Report, cited in Complaint, ¶122]

56.     Yet, this alleged misrepresentation contained no new information since the Company had stated in October 1999, on its 3Q99 earnings call, that the merger was "essentially complete and behind us."[61]  The statement that the merger was "essentially complete and behind us" specifically related to the cost-saving measures announced at the time of the merger, including the headcount reductions and facility closures, which the Company stated on its April 1999 earnings call—before the start of the class period—had substantially been achieved.[62]

57.     In short, the alleged misrepresentations during the class period did not contain new information about the cost savings from the merger.  The expectation of $500 million in merger-related cost savings was known to the market before the class period, and before the start of the class period, the Company disclosed that the cost-saving measures, including the headcount reductions and facility closures, had been substantially achieved.  Subsequent statements made by the Company during the class period did not contain new information regarding the cost savings from the merger or indicate that the cost-saving reductions had not been achieved.  In an efficient market, where "successive announcements of the same

---

Energy Services Group […]  Overall, the company has **completed about 85% of those planned reductions in headcounts.**") (emphasis added).

[61]  Halliburton Conference Call, October 21, 1999 ("In terms of the merger, we are now a year past the consummation of the Dresser merger. Our integration efforts are **essentially complete and behind us** at this point in time.  In terms of our cost reduction efforts, we have closed over 500 facilities.  Initially we thought we were going to close about 400. Because of the industry downturn and additional opportunities that we saw, we have in fact identified 500 facilities that will be closed. About 80% of these we have already exited.  And we have disposed and returned to the owner, and essentially have gotten off our books over 50% of them at this point in time.  In the third quarter, we **exited an additional 52, and disposed of 69 of these facilities**. In addition, we have **substantially completed our planned head count reductions** related to the merger.") (emphasis added).

[62]  Halliburton Conference Call, April 26, 1999 ("Since the merger, **approximately 270 properties have been vacated,** of which over 60 have been returned to the owner.  We are **still on schedule to close over 400 facilities**, as we previously discussed […]  The **total announced headcount reductions of approximately 10,850**, most of which are included in the Energy Services Group […]  Overall, the company has **completed about 85% of those planned reductions in headcounts.**") (emphasis added).

31

APP 000036

information will have no additional effect on share price,"[63] the alleged misrepresentations during the class period could have had no price impact.

**B.  The alleged partial corrective disclosures provide no evidence of price impact from the alleged misrepresentations because they were not corrective of any alleged misrepresentation regarding the cost savings from the Dresser merger**

58.     The Fund claims that news correcting Halliburton's alleged misrepresentations regarding the cost savings from the Dresser merger was disclosed on October 4, 1999, January 5, 2000, October 24, 2000, December 21-22, 2000, and January 30, 2001.[64]  Contrary to the Fund's claims, these alleged corrective disclosures were not, in fact, corrective of Halliburton's alleged misrepresentations regarding the cost savings from the Dresser merger.  Moreover, they did not reveal any information to the market with respect to the alleged misrepresentations.  These alleged corrective disclosures provide no evidence of price impact from the alleged misrepresentations.

**1.  The October 4, 1999 alleged corrective disclosure—when the Company announced it was selling two joint ventures and preannounced lower 3Q earnings—was not corrective of any alleged misrepresentation regarding cost savings from the Dresser merger and thus provides no evidence of price impact**

| Alleged Misrepresentation | Alleged Corrective Disclosure |
|---|---|
| Management expects approximately $500 million in cost savings from the Dresser merger. | Halliburton planned to sell two joint ventures in which Dresser had participated and preannounced lower 3Q99 earnings. |

59.     The Complaint does not allege October 4, 1999 as a corrective disclosure date. This date was added by the Fund's expert, Ms. Nettesheim, after her unscientific procedure of *first* searching for statistically significant price reactions across all 633 days during the class period and *then* attempting to relate the statistically significant price reactions to alleged misrepresentations.[65]

---

[63]   Nettesheim Report, ¶40.

[64]   Complaint, ¶¶144, 150, 155; Nettesheim Report, ¶¶84-112, including footnote 71 on page 51.

[65]   Nettesheim Report, ¶¶41-45, 84-87.

APP 000037

60.     On October 4, 1999, Halliburton reported several developments: first, that Halliburton planned to sell its interests in two joint ventures—Dresser-Rand and Ingersoll-Dresser Pump—to Ingersoll-Rand Company;[66] second, that the Dresser Equipment Group was experiencing lower-than-expected profits;[67] third, that Halliburton's Energy Services Group anticipated being negatively affected by "continued low spending;"[68] and finally, that a decline in the downstream E&C business would impact third quarter earnings.[69] The alleged corrective disclosure on October 4, 1999, was not corrective of any alleged misrepresentation regarding cost savings from the Dresser merger for at least four reasons.

61.     First, Halliburton's October 4 press release did not discuss cost savings from the Dresser merger, and no analyst report in the days following the release interpreted it as an indication that merger-related cost savings had not been achieved or that such cost savings had previously been misstated. Quite the opposite, Robinson Humphrey stated that Halliburton's merger-related cost savings would lead to increased profitability in the following year:

> Halliburton recently acknowledged its deeper than anticipated cost cuts following the 1998 Dresser merger and we believe HAL's incremental profit margin will significantly add to profitability next year. [Robinson Humphrey, 10/5/1999]

62.     The market's continued belief in Halliburton's previous estimates of $500 million in merger-related cost savings is evidenced by the fact that on October 22, 1999—18 days after the October 4, 1999 release—multiple analysts continued to reiterate the estimated $500 million in merger-related savings. Robinson Humphrey stated:

> Management announced that at the end of the quarter, the company was 85% through with the closure of an expected 500 facilities in the cost reduction initiatives. Management now expects cost savings to reach $500 million by the end of next year, up from the $250 million the company forecast at the time of the merger. [Robinson Humphrey, 10/22/1999]

63.     Other analysts noted that Halliburton was on track with the planned headcount reductions and facility closures following the Dresser merger:

---

[66]   Halliburton Press Release, October 4, 1999.

[67]   Halliburton Press Release, October 4, 1999.

[68]   Halliburton Press Release, October 4, 1999.

[69]   Halliburton Press Release, October 4, 1999.

APP 000038

> A year after the Dresser merger was completed, the integration is now complete. Head-count has been reduced by 10,000 and 400 of a targeted 500 facilities have been closed. [Salomon Smith Barney, 10/22/1999]

> On the merger front, Halliburton noted that its merger with Dresser Industries is essentially complete, with more than 500 facilities closed. [Brown Brothers Harriman, 10/28/1999]

64.     Second, following the alleged partial corrective disclosure on October 4, 1999, the Company did not change its estimate of the cost savings from the merger.[70]

65.     Third, the joint ventures that the Company announced it was selling were related to Halliburton's Dresser Equipment Group, a non-core part of the business that the Company had indicated all along it might divest (and analysts expected the Company would). For example, before and during the class period, analysts stated:

> It is our understanding that **Halliburton's long-term strategy does not envision the continuation of the Dresser Energy Group.** Each of the units that make up this group has a respectable market position within its industry. However, **none represents clear growth opportunities or long-term synergies for Halliburton's core oilfield business**. [CIBC, 11/9/1998, emphasis added]

> **Dresser's energy equipment business** consists of companies that provide a variety of products to the pipeline, refining, chemical and petrochemical industries. However, some of these are likely to be **non-core businesses for Halliburton**. As such, within the constraints of a pooling of interests merger, we expect Halliburton to divest, joint venture or spin off segments of the unit in the near future. **We believe its two joint ventures with Ingersoll-Rand could be among the first segments to be restructured**. [Donaldson, Lufkin & Jenrette, 3/1/1999, emphasis added]

> We have also **assumed that the Dresser Energy Equipment group will be sold** during 2000 and have included this group's earnings at half the level of 1999. While we don't know the timing of a sale or, more likely, sales of individual segments of this business, there is already significant interest and **a clear inclination by HAL management to get out**. [Merrill Lynch, 7/23/1999, emphasis added]

> We view the sale of the joint ventures as a **favorable exit strategy** for the company, **which had been reviewing the divisions within the Dresser Equipment Group for the possible divestiture of some or all of its businesses**. [Brown Brothers Harriman, 10/5/1999, emphasis added]

---

[70]   *See*, for example, Halliburton 1999 Form 10-K, filed March 14, 2000.

34

66.      Following the October 4, 1999 press release, analysts noted that the sale of the joint ventures was generally a positive development:

We view the sale of the joint ventures as a **favorable exit strategy** for the company [...] [Brown Brothers Harriman, 10/5/1999, emphasis added]

The decision by management to sell, rather than buy, the joint ventures interests is the **correct thing to do** to create shareholder value.  More important, this action puts HAL in a stronger financial position to take advantage of other opportunities to build the company in areas that have greater stock market value.  [CIBC, 10/5/1999, emphasis added]

We view the recent announcement by Halliburton that the company will sell its interests in Dresser-Rand […] and Ingersoll-Dresser Pumps […] as a **strategic positive** […] [Deutsche Bank, 10/5/1999, emphasis added]

The **positive [development]** is that HAL will sell its interests in Dresser-Rand and IR Dresser Pump to Ingersoll-Rand for $1.1 billion (pretax).  [Merrill Lynch, 10/5/1999, emphasis added]

[W]e view these transactions **positively** and applaud the company for seizing the opportunity to shed underperforming assets and deploy the proceeds to fortify an already strong balance sheet.  [Dain Rauscher Wessels, 10/5/1999, emphasis added]

The planned disposition of [Halliburton's] underperforming Dresser Equipment Group joint ventures with Ingersoll-Rand […] appears a **good strategic move** […]  [Jefferies, 10/5/1999, emphasis added]

67.      Thus, the Company's announcement that it was selling its Dresser joint ventures was not corrective of any alleged misrepresentation regarding cost savings from the merger because, as analysts before and during the class period indicated, this non-core part of the Company's business did not represent clear growth opportunities or long-term synergies.  In fact, analysts generally viewed the sale of the joint ventures as positive.

68.      Fourth, the pre-announcement of lower 3Q99 earnings was not corrective of any alleged misrepresentation regarding cost savings from the merger because the reduced earnings was primarily related to lower-than-expected profits from the two joint ventures that were being sold, as well as overall market weakness:

HAL announced that third-quarter EPS would come in $0.06-$0.07 less than expected and attributed the **entire shortfall to the disappointing performance of the two joint**

35

**ventures**.  The company also stated that its other business segments should perform according to expectations set at the end of the previous quarter.  [Dain Rauscher Wessels, 10/5/1999, emphasis added]

Also announced was a **lower-than-expected third quarter earnings** outlook, in the range of $0.11-$0.13 (or $0.09, excluding the non-recurring benefit), which includes a $20 million pretax (or $0.03 after taxes) benefit relating to the interest income from a tax refund.  The negative surprise is **due primarily to a $40 million disappointment in DR and IDP**.  To a lesser extent, the quarter was negatively affected by the timing of the revenue recognition of new orders in the Engineering and Construction division.  [Salomon Smith Barney, 10/15/1999, emphasis added]

As discussed above, it was understood from the time of the merger that the joint ventures were not expected to create growth opportunities or synergies.

69.     Other analyst statements show that downward pressure on earnings estimates and the stock price was caused by market factors that had nothing to do with merger-related cost savings.  For example, analysts noted that the industry was experiencing a slower-than-expected recovery due, in part, to low oil prices:

The company's announcement of weakness across virtually every business line in 3Q is not surprising, given the slower than anticipated oilfield industry recovery . . . We have been warning of this situation, but the oilfield service stock prices have ignored this possibility all summer.  Now that the results are starting to be reported, and crude oil and natural gas prices are seasonally weaker, investors are quick to bail out of these stocks."  [CIBC, 10/5/1999]

Stocks pulled back sharply yesterday on Halliburton's earnings preannouncement and escalating concerns about oil price declines.  [Brown Brothers Harriman, 10/6/1999]

70.     Other analysts highlighted concerns with overall market conditions specifically in Halliburton's E&C business:

Revenues and operating profits within the Engineering & Construction business were also weak in the quarter, primarily due to timing issues (several large projects have not progressed sufficiently to recognize significant profits).  [Morgan Stanley, 10/5/1999]

With expectation of a delayed recovery in both the oilfield services as well as engineering and construction businesses, we are reducing our 2000 EPS estimates... [Dresdner Kleinwort Benson, 10/6/1999]

71.     In short, the alleged corrective disclosure on October 4, 1999 was not corrective of any alleged misrepresentation.  Neither the Company nor analysts indicated that the alleged

36

disclosure revealed anything about the merger-related cost savings not being achieved.  To the contrary, the Company and analysts continued to reiterate that the cost-saving measures announced at the time of the merger had been substantially completed.  Additionally, the two Dresser joint ventures being sold were non-core to Halliburton's business and had not previously been expected to create long-term synergies, and the market generally viewed their divestiture as positive.  Finally, the lower-than-expected quarterly earnings were unrelated to merger cost savings and, as analysts indicated, caused by other factors, including overall market weakness. For all these reasons, the October 4, 1999 alleged corrective disclosure was not corrective and thus provides no evidence that the alleged misrepresentations had price impact.

> **2. The January 5, 2000 alleged corrective disclosure—when Merrill Lynch and Brown Brothers Harriman lowered their earnings estimates—was not corrective of any alleged misrepresentation regarding cost savings from the Dresser merger and thus provides no evidence of price impact**

| Alleged Misrepresentation | Alleged Corrective Disclosure |
|---|---|
| Management expects approximately $500 million in cost savings from the Dresser merger. | Brown Brothers Harriman and Merrill Lynch reduce earnings per share estimates. |

72.     The Complaint does not allege January 5, 2000 as a corrective disclosure date. This date was added by the Fund's expert, Ms. Nettesheim, after her unscientific procedure of *first* searching for statistically significant price reactions across all 633 days during the class period and *then* attempting to relate the statistically significant price reactions to alleged misrepresentations.[71]  Ms. Nettesheim found two analyst reports released on January 5, 2000, which announced lowered earnings estimates for Halliburton.[72]  These reports were not corrective of the alleged misrepresentations regarding the cost savings from the Dresser merger.

73.     The first report by Brown Brothers Harriman & Co. announced lowered earnings expectations that reflected decreased revenue and operating profit across Halliburton's three business segments (as summarized in the table below).[73]  Brown Brothers Harriman's lowered

---

[71]   Nettesheim Report, ¶¶41-45, 88-92.

[72]   Brown Brothers Harriman & Co., January 5, 2000; Merrill Lynch, January 5, 2000.

[73]   Brown Brothers Harriman & Co., January 5, 2000.

APP 000042

earnings expectations were not in any way corrective or related to the alleged misrepresentations regarding the merger cost savings.  The report did not mention cost savings from the Dresser merger or indicate that lowered expectations were due to reduced cost savings.

| Business Segment | Revenue Decrease | Operating Profit Decrease |
|---|---|---|
| Energy Services | $200 million | $95 million |
| Engineering & Construction | $50 million | $40 million |
| Dresser Equipment Group | No decrease | $4 million |

74.    Merrill Lynch also issued a January 5, 2000 report noting decreases to earnings estimates.[74]  Merrill Lynch cited three reasons for its lowered expectations.  Two of these reasons were related to weak market conditions that had nothing to do with the Dresser merger— in particular, (1) reduced offshore construction results due to a sharp drop in North Sea activity and the delayed start of deepwater development projects,[75] and (2) reduced growth estimates for upstream activity outside the United States due to low predicted spending by Halliburton's large customers.[76]  When discussing its third reason for the downgrade, Merrill Lynch did not question management's estimated $500 million in cost savings or suggest that a different amount of cost savings had actually been achieved.  Rather, Merrill Lynch stated that the synergies from the Dresser merger "appear to be less powerful than *we had envisioned*," and continued to state that management estimated savings of $500 million.[77]

75.    Merrill Lynch's prior reports demonstrate that the analyst had previously expected cost savings higher than that indicated by the Company.  In a report almost a year before January 5, 2000, the Merrill Lynch analyst stated that he expected cost savings of $350 million, which at the time was $100 million higher than the Company's stated $250 million estimate of savings.[78]

---

[74]   Merrill Lynch, January 5, 2000.

[75]   Merrill Lynch, January 5, 2000 ("**$0.10 of our 2000 reduction comes from a big cut in our assumptions for HAL's offshore construction business**. The **North Sea likely will be very weak** in 2000 and this has historically been a stronghold for HAL. Also, **awards of major deepwater development projects continue to be delayed**. While HAL should benefit from stronger deepwater earnings in 2001, the biggest positive impact on results may not be until 2002…") (emphasis added).

[76]   Merrill Lynch, January 5, 2000 ("We are **reducing our forecast of the 2000 growth rate for upstream** outside the U.S. from 12% to 10% because the **super-majors have indicated relatively cautious spending** plans for 2000.") (emphasis added).

[77]   Merrill Lynch, January 5, 2000 ("**Synergies** from the Dresser merger appear to be **less powerful than we had envisioned** both in oilfield and offshore construction operations. HAL's earnings from operations have again underperformed those of Schlumberger in the downcycle **even with cost savings estimated by management of $500 million**.") (emphasis added).

[78]   Merrill Lynch, January 27, 1999 ("**Our estimates include steady earnings improvement in the last three quarters of 1999 as combination benefits are realized.** We have assumed a modest sequential increase in oilfield revenues during the second

38

76.     Furthermore, Halliburton did not reduce its estimate of cost savings from the Dresser merger before or following the alleged corrective disclosures on January 5, 2000. Instead, it maintained the estimate of $500 million.[79]

77.     Moreover, after making an appropriate multiple comparison adjustment, there was no statistically significant price reaction following the alleged corrective disclosure on January 5, 2000.  When tested in isolation, the price reaction following the alleged corrective disclosure on January 5, 2000 was statistically significant.  However, this result should not be surprising since this date was added by Ms. Nettesheim to the list of alleged corrective disclosures using her unscientific procedure that *starts* by searching for statistically significant price reactions across all 633 days during the class period and *then* attempts to relate the statistically significant price reactions to alleged misrepresentations.  After performing 633 statistical tests, it is not at all surprising to find a price reaction that in isolation is statistically significant at the 5% level – with no material news one would expect to find over 30 such dates.  Given that January 5, 2000 was added as an alleged corrective disclosure as result of searching across 633 days on which Ms. Nettesheim performed statistical tests, it is appropriate to adjust for 633 multiple comparisons when testing the statistical significance of the price reaction on this date. After the proper adjustment, the price reaction following the alleged corrective disclosure on January 5, 2000 was not statistically significant.  *See* Exhibit 1.  This lack of statistical significance does not support price impact of the alleged misrepresentations.

78.     In short, there was no corrective information released on January 5, 2000 related to the alleged misrepresentations regarding the cost savings from the merger and, after making an appropriate multiple comparisons adjustment, no statistically significant price reaction. Brown Brothers Harriman gave no indication its lowered expectations were due to reduced merger-related cost savings, while Merrill Lynch lowered its expectations because of market weakness and *its own* reduced estimates of merger-related synergies.  Merrill Lynch did not dispute the $500 million in cost savings that management expected.  Thus, the January 5, 2000 alleged corrective disclosure provides no evidence of price impact from the alleged misrepresentations.

---

half, which would clearly be at risk if oil prices do not recover to the mid teens or better by mid year […]  **We are estimating consolidation savings of $350 million (pretax)**.") (emphasis added).

[79]    *See,* for example, Halliburton 1999 Form 10-K, filed March 14, 2000.

APP 000044

**3. The October 24, 2000 alleged corrective disclosure—when the Company announced it was planning to restructure its engineering and construction business—was not corrective of any alleged misrepresentation regarding cost savings from the Dresser merger and thus provides no evidence of price impact**

| Alleged Misrepresentation | Alleged Corrective Disclosure |
|---|---|
| Management expects approximately $500 million in cost savings from the Dresser merger.<br><br>The Dresser merger is "behind us." | Halliburton planned to combine its E&C segments into one entity. |

79.     On October 24, 2000, Halliburton announced its plans to restructure its E&C business.[80] This news was received favorably by analysts.[81] The same day, Halliburton disclosed several negative developments, none of which mentioned or related to cost savings from the Dresser merger:

- Brown & Root Energy Services' ("BRES'") operating income was negatively affected by continuing low capacity utilization and by customer delays.

- The E&C segment's revenue decreased 21% from the previous year, largely due to reduced customer spending associated with Kellogg Brown & Root's ("KBR") downstream petroleum industry business.

- Operating income from the E&C Group in the third quarter was flat compared to the previous year.[82]

80.     Public statements from the Company on October 24, 2000 did not revise merger-related cost savings or retract management's general observations that the merger is "behind us." Likewise, analysts did not interpret the October 24, 2000 announcements as a correction of the Company's prior statements. Several analysts issued reports in response to the Company's

---

[80]  Halliburton Conference Call, October 24, 2000.

[81]  A.G. Edwards & Sons, Inc., October 25, 2000 ("Restructuring is positive and oilfield service recovery continues."); Frost Securities, October 25, 2000 ("We applaud Halliburton's intention to reorganize and consolidate its three E&C business units to improve profitability.  This move is precisely the type of aggressive positive action we expect from Dave Lesar and the rest of Halliburton's management to drive the company's earnings significantly higher."); Merrill Lynch, October 25, 2000 ("On the positive side, management is combining its E&C businesses to reduce overhead and increase efficiencies for common engineering tasks."); Morgan Stanley, October 25, 2000 ("We candidly support [the restructuring] . . . Our guess is that the cost savings associated with the restructuring will be meaningful.").

[82]  Halliburton Press Release, October 24, 2000.

APP 000045

restructuring announcement and none mentioned merger-related cost savings.  Rather, analysts were focused on multiple negative factors influencing the Company's performance that had no relationship to cost savings from the merger.  These included: a depressed outlook for customer spending and the lack of predictability;[83] reduced customer spending in the KBR downstream petroleum business;[84] delays in the initiation of construction projects;[85] lower international spending;[86] and decreased activity by newly consolidated customers.[87]

81.     Analysts specifically noted that the planned restructuring was motivated by the weak market environment, not by any failed cost savings:

**Engineering and Construction Group Faces A Challenging Market, Leading To Reorganization**  [Prudential Securities, 10/25/2000]

The re-combination of Brown & Root will reduce duplicative overhead and should allow more efficient use of the pool of engineers who can work on common functions across upstream and downstream projects.  The **split up seemed to work in strong markets, but appears to be hurting profitability in the weaker market**.  This has been particularly true at BRES.  [Merrill Lynch, 10/25/2000, emphasis added]

In spite of a $6.1 billion backlog at ELC (up from $5.5 billion at the end of 2Q2000), the **operating environment remains weak** and revenues are expected to decline in 2001.  Although maintenance has picked up, **large projects continued to be delayed and consolidation among the major oil companies may cause additional delays**.  As a result, Halliburton has decided to consolidate the E&C businesses into one entity and focus on cost cutting.  The goal is to generate consistent and growing profitability within the segment.  [A.G. Edwards, 10/25/2000, emphasis added]

82.     Thus, the alleged corrective disclosure on October 24, 2000 did not disclose any corrective information regarding the alleged misrepresentations concerning the cost savings from the merger.  The planned restructuring was not viewed as a correction of the merger or the Company's prior statements regarding the merger-related cost savings.  In fact, analysts viewed

---

[83]   CIBC World Markets, October 25, 2000.

[84]   CIBC World Markets, October 25, 2000; Frost Securities, October 25, 2000.

[85]   Jefferies, October 25, 2000; Salomon Smith Barney, October 25, 2000; Jefferies, October 26, 2000.

[86]   Dain Rauscher Wessels, October 25, 2000.

[87]   Note that while the contemporaneous movements in the stock of other industry participants are controlled for by the industry indices, it is possible that industry-related information affected Halliburton's stock more than other companies in the same industry.  For example, news of weak international spending could have a larger effect on Halliburton than on other companies in the same industry given that the "real leverage" of Halliburton's core energy business segment is in overseas markets, and this segment generally derives about 60-70% of its revenues from international markets.  Prudential Securities, October 25, 2000; Dain Rauscher Wessels, October 25, 2000.

41

APP 000046

the planned restructuring positively and as a response to the challenging market conditions that were impacting the Company's performance. Thus, the October 24, 2000 alleged corrective disclosure provides no evidence that the alleged misrepresentations had a price impact.

> **4. The December 21, 2000 alleged corrective disclosure—when the Company formally announced the restructuring of its engineering and construction business and a $120M after-tax charge—was not corrective of any alleged misrepresentation regarding cost savings from the Dresser merger and thus provides no evidence of price impact**

| Alleged Misrepresentation | Alleged Corrective Disclosure |
|---|---|
| Management expects approximately $500 million in cost savings from the Dresser merger.  The Dresser merger is "behind us." | Halliburton noted a general negative near-term outlook, confirmed its plan to restructure its E&C business, and announced a $120 after-tax charge related to this restructuring and project losses. |

83.     In a December 21, 2000 press release, Halliburton expressed concerns regarding the near-term market outlook, confirmed its intention to restructure its E&C business, and announced a $120 million after-tax charge related to the restructuring and ongoing construction projects.[88] The press release explained the reasons for the negative outlook, the charge, and the restructuring. These reasons included a consolidating customer base, difficult relationships with certain customers, financially stressed competitors, and a "fiercely competitive environment."[89] None of these reasons had anything to do with cost savings from the Dresser merger. Such cost savings were never mentioned in the press release. The only mention of Dresser is a reference to positive results from the Dresser Equipment Group and a confirmation that the sale of the Dresser Equipment Group (announced earlier in the year) was in process.[90]

84.     The announcement regarding the restructuring was a reiteration of the Company's statement on the 3Q earnings call.

The **announced restructuring**, in which parts of the mid-stream Brown and Root Energy Services (BRES) businesses will be combined with the E&C segment, is **consistent with**

---

[88]   Halliburton Press Release, December 21, 2000.

[89]   Halliburton Press Release, December 21, 2000.

[90]   Halliburton Press Release, December 21, 2000.

42

APP 000047

**indications made on the third quarter earnings conference call**.  [Salomon Smith Barney, 12/21/2000, emphasis added]

85.    In the two days immediately following the press release, no analyst mentioned cost savings from the Dresser merger.

86.    In addition, there was no statistically significant price reaction after the December 21, 2000 announcement (both before and after the adjustment for multiple comparisons).  Ms. Nettesheim also did not find a statistically significant price reaction on December 21, 2000.  Yet, she examined the price reaction on December 22, 2000, found a statistically significant price reaction on this date, and with no valid justification attributed this reaction to the alleged corrective disclosure on December 21, 2000.[91]  As shown in the chart below, Halliburton's price decline on December 22, 2000 occurred at the end of the trading day while the alleged corrective disclosure was announced at the *beginning of the prior* trading day, thus essentially two full trading days earlier.[92]  The allegation that the market did not react to a piece of news for two trading days, and then reacted to it, is inconsistent with the conclusion that Halliburton's stock traded in an efficient market.  Research has shown that stock prices in an efficient market react very quickly to new information. For example, according to a frequently cited study, after company announcements of earnings or dividends, the majority of the stock market response *is already completed* within 5 to 10 minutes.[93]  The chart also shows that there is a large spike in trading volume just around the price decline, suggesting that something new

---

[91]    In her rebuttal report, Ms. Nettesheim claims that she did not rely on the Company disclosure on December 21 to test her price reaction, but that she relied on the analyst commentary the following day, December 22. Nettesheim Rebuttal Report, ¶38.  However, her first report seems to clearly indicate that the information released to the market on December 21 is the alleged corrective disclosure: "This is an instance where the Company released negative news, all of which appears to be related to cost overruns on the fixed-price contracts at its engineering and construction units," and this is the information that the Fund alleges "could have been and should have been disclosed earlier." Nettesheim Report, ¶106.  Moreover, all the quotes that Ms. Nettesheim includes from analysts regarding this alleged corrective disclosure were from December 21 rather than December 22.  In addition, I reviewed the analyst commentary on December 22 and did not find new information disclosed on that day that was any more potentially corrective of alleged misrepresentations than what was already disclosed on December 21.

[92]    Halliburton Press Release, December 21, 2000, 8:59 AM.

[93]    *See,* for example, Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* (McGraw-Hill: New York, 7th ed., 2003) 351-353 ("To analyze the semistrong form of the efficient-market hypothesis, researchers have measured how rapidly security prices respond to different items of news, such as earnings or dividend announcements, news of a takeover, or macroeconomic information […] A study by Patell and Wolfson shows just how fast prices move when new information becomes available.  They found that, when a firm publishes its latest earnings or announces a dividend change, the **major part of the adjustment in price occurs within 5 to 10 minutes of the announcement**.") (emphasis added).  *See also* James M. Patell & Mark A. Wofson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13 (1984), 223-252.

43

APP 000048

may have happened in the market at the end of December 22.  There is no reasonable link between the alleged corrective disclosure and any price movement two trading days later.



87.     Moreover, after making the appropriate adjustment for 35 multiple comparisons, there was no statistically significant price reaction on December 22, 2000.  *See* Exhibit 1 for details.

88.     In short, the December 21, 2001 alleged corrective disclosure contained no corrective information related to the alleged misrepresentations concerning the Dresser merger, and the market did not react.  The announced restructuring was consistent with the Company's announcement on its 3Q earnings call in October, and the reasons for the announced restructuring, charge and general negative outlook were unrelated to the merger-related cost savings.  The December 21, 2000 alleged corrective disclosure provides no evidence that the alleged misrepresentations had a price impact.

44

**5. The January 30, 2001 alleged corrective disclosure—when the Company announced a $193 million pre-tax charge—was not corrective of any alleged misrepresentation regarding cost savings from the Dresser merger and thus provides no evidence of price impact**

| Alleged Misrepresentation | Alleged Corrective Disclosure |
|---|---|
| Management expects approximately $500 million in cost savings from the Dresser merger.<br><br>The Dresser merger is "behind us." | Halliburton announced $193 million pre-tax charge related to E&C restructuring and project losses. |

89. The Fund and its expert, Ms. Nettesheim, allege that on January 30, 2001, Halliburton increased the $120 million charge announced on December 21, 2000 to $193 million.[94]

90. Yet, the Company stated that this $193 million charge was pre-tax, with the after-tax charge being only $118 million.[95] This announcement was consistent with the $120 million after-tax charge announced on December 21, 2000.

91. Moreover, there was no statistically significant price reaction following the January 30, 2001 alleged corrective disclosure (both before and after the adjustment for multiple comparisons). *See* Exhibit 1. Ms. Nettesheim's event study similarly did not find a statistically significant price reaction following this alleged corrective disclosure.[96]

92. Thus, the alleged corrective disclosure on January 30, 2001 contained no new information related to the cost savings from the merger and was not corrective of the alleged misrepresentations, and the market did not react. This alleged corrective disclosure provides no evidence of price impact from the alleged misrepresentations.

---

[94]   Complaint, ¶155 and Nettesheim Report, ¶106, footnote 71.

[95]   Halliburton Press Release, January 30, 2001 ("The 2000 fourth quarter **pre-tax charge** related to the engineering and construction businesses **was $193 million**, with $36 million related to severance and restructuring and **$157 million for project losses**.") (emphasis added). *See also* Halliburton's earnings call on January 30, 2001 ("**As we announced in late December**, we recorded charges in relation to the Engineering and Construction businesses of **$193 million before tax or $118 million net of tax**, which is about 27 cents per share. The charge included 36 million for before tax for severance and other restructuring charges and 157 million before tax in relation to cost increases on several projects, including two large [fixed] projects where Kellogg Brown and Root participates as a member of construction joint ventures.") (emphasis added).

[96]   Nettesheim Report, Exhibit 17. This exhibit reports the statistical significance of the price reaction on every day of the class period and shows no statistically significant price reaction on January 30, 2000.

APP 000050

93.     In summary, the alleged misrepresentations during the class period regarding the cost savings from the Dresser merger did not impact Halliburton's stock.  Before the beginning of the class period, numerous statements by the Company and analysts reflected an expectation of $500 million in merger-related cost savings, and the Company disclosed that the cost-saving measures announced at the time of the merger had substantially been achieved.  The alleged misrepresentations during the class period did not contain new information related to the cost savings from the merger, and the market did not interpret the alleged misrepresentations as containing new information.  Additionally, the disclosures that the Fund alleges were corrective were not, in fact, corrective and provide no evidence of price impact from the alleged misrepresentations.

## IX.   THE ALLEGED MISREPRESENTATIONS REGARDING HALLIBURTON'S ACCOUNTING FOR UNAPPROVED CLAIMS ON FIXED-PRICE CONSTRUCTION PROJECTS DID NOT IMPACT HALLIBURTON'S STOCK PRICE

94.     The Fund alleges that Halliburton engaged in "pervasive accounting manipulations"[97] by using unapproved claims for cost overruns on fixed-price construction contracts to increase revenues and inflate the value of its stock.  According to the Fund, the Company changed its accounting for unapproved claims without disclosing this change to investors until its 1999 Annual Report.[98]  The Company's 1999 Form 10-K, released on March 14, 2000, disclosed: "Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work are included in revenue when collection is deemed probable."[99]  The Fund alleges that this disclosure and Halliburton's financial statements before and after it were misleading because Halliburton allegedly included claims in revenues even when their collection was not probable.[100,101]  According to the Fund and its expert, the truth behind the Company's accounting for unapproved claims was revealed to the market in a series of alleged corrective disclosures, causing the stock price to decline.  The chart

---

[97]   Complaint, ¶2.

[98]   Complaint, ¶¶211, 213.

[99]   Halliburton 1999 Form 10-K, filed March 14, 2000, p.34.

[100]  Complaint, ¶¶213, 231.

[101]  The Fund also alleges that the 1999 Form 10-K inaccurately represented that claim revenue was $89 million in 1998 and $98 million in 1999 because the 1999 figure omitted $34 million in unapproved claims in connection with joint venture projects. Complaint, ¶¶215, 233.  The Fund does not contend that the alleged misrepresentation regarding the joint venture claim revenue reported in the 1999 Form 10-K was ever corrected during the class period, and I have found no evidence that it was.

46

below summarizes the alleged misrepresentations and alleged corrective disclosures regarding the accounting for unapproved claims.



95.     The Complaint alleges there were misrepresentations concerning the accounting for unapproved claims on 12 dates, summarized in the table below.[102]  As discussed above in Section VII, there was no statistically significant price reaction after any of these alleged misrepresentations (before and after adjusting for multiple comparisons).

| Alleged Misrepresentations – Unapproved Claims | | |
|---|---|---|
| M1 | 7/22/99 | Halliburton reported 2Q99 results and held earnings call. |
| M2 | 8/13/99 | Halliburton filed its 2Q99 10-Q. |
| M3 | 9/13/99 | Halliburton presented at Dain Rauscher Wessels conference. |

---

[102]  Complaint, ¶¶108-154.

APP 000052

| Alleged Misrepresentations – Unapproved Claims | | |
|---|---|---|
| M4 | 10/21/99 | Halliburton reported 3Q99 results and held earnings call. |
| M5 | 11/15/99 | Halliburton filed its 3Q99 10-Q. |
| M6 | 1/27/00 | Halliburton reported 4Q99 results and held earnings call. |
| M7 | 3/14/00[103] | Halliburton's Annual Report stated that claims are accounted for as revenue only when collection is "deemed probable." |
| M8 | 4/26/00 | Halliburton reported 1Q00 results and held earnings call. |
| M9 | 5/15/00 | Halliburton filed its 1Q00 10-Q. |
| M10 | 7/26/00 | Halliburton reported 2Q00 results and held earnings call. |
| M11 | 8/10/00 | Halliburton filed its 2Q00 10-Q. |
| M12 | 11/9/00 | Halliburton filed its 3Q00 10-Q. |

96.     According to the Fund and its expert, the alleged "truth" behind the alleged misrepresentations regarding Halliburton's accounting for unapproved claims was revealed to the market on the following dates: October 4, 1999; January 5, 2000; October 24, 2000; December 21-22, 2000; and January 30, 2001.[104]  The table below summarizes the alleged corrective disclosures.  Three were alleged in the Complaint.[105]  The Fund's expert, Ms. Nettesheim, added three additional dates after her procedure of *first* searching for statistically significant price reactions across all 633 days during the class period and *then* attempting to relate the statistically significant price reactions to alleged misrepresentations.[106]

| Alleged Corrective Disclosures – Unapproved Claims | | | Source |
|---|---|---|---|
| D1 | 10/4/99 | Halliburton announced sale of Dresser joint ventures and lower-than-expected 3Q99 earnings. | Nettesheim |
| D2 | 1/5/00 | Merrill Lynch and Brown Brothers Harriman reduced their earnings per share estimates. | Nettesheim |

---

[103]  *See* footnote 9.

[104]  Complaint, ¶¶144, 150, 155; Nettesheim Report, ¶¶84-112, including footnote 71 on page 51.

[105]  Complaint, ¶¶144, 150, 155.

[106]  Nettesheim Report, ¶¶41-45, 84-112, including footnote 71 on page 51.

48

| Alleged Corrective Disclosures – Unapproved Claims | | | Source |
|---|---|---|---|
| D3 | 10/24/00 | Halliburton announced it planned to restructure its E&C segment by combining its E&C businesses into one entity. | Complaint & Nettesheim |
| D4 | 12/21/00 | Halliburton announced $120 million after-tax charge related to E&C restructuring and project losses. Losses were in part due to negotiations with customers that were not resolved as originally anticipated. | Complaint & Nettesheim |
| D5 | 12/22/00 | Alleged continuation of 12/21/00 alleged corrective disclosure. | Nettesheim |
| D6 | 1/30/01 | Halliburton announced $193 million pre-tax charge related to E&C restructuring and project costs. | Complaint & Nettesheim |

97.    As discussed in the sections below, the disclosures that the Fund alleges as corrective were not, in fact, corrective of any alleged misrepresentation regarding accounting for unapproved claims.  During the class period, Halliburton never restated revenues and specifically never restated revenue from unapproved claims.  Moreover, the market never questioned the Company's accounting practices with respect to unapproved claims during the class period.  In fact, when the Company first disclosed its policy for accounting for unapproved claims, the market did not react.

98.    Additionally, there were no statistically significant price reactions after the following alleged corrective disclosures:

–   01/05/2000 (after making the appropriate adjustment for multiple comparisons);

–   12/21/2000 (both before and after making the appropriate adjustment for multiple comparisons);

–   12/22/2000 (after making the appropriate adjustment for multiple comparisons); and

–   01/30/2001 (both before and after making the appropriate adjustment for multiple comparisons).

49

**A. The October 4, 1999 alleged corrective disclosure—which did not mention accounting for unapproved claims—was not corrective of any alleged misrepresentation regarding unapproved claims and thus is not evidence of price impact**

| Alleged Misrepresentation | Alleged Corrective Disclosure |
|---|---|
| Halliburton's financial statements, which included unapproved claim revenue. | Halliburton announced sale of Dresser joint ventures and lower-than-expected 3Q99 earnings. |

99.     The Company's statements in its October 4, 1999 press release and the market commentary reacting to those statements demonstrate that this press release was not corrective of the alleged misrepresentations regarding the Company's accounting for unapproved claims.

100.     Halliburton's October 4, 1999 press release announced that the Company was selling its two Dresser joint ventures and anticipated lower-than-expected 3Q99 earnings.[107]  The joint ventures Halliburton planned to sell were in the pump, turbine, and compressor manufacturing business—not the fixed-price construction business.[108]  The press release announcing the sale contained no discussion of unapproved claims on fixed-price construction projects or the accounting treatment of such claims.[109]  Analyst reports issued after the release did not discuss claims or accounting for claims,[110] nor were these topics discussed on Halliburton's October 4, 1999 conference call.[111]

101.     Thus, the October 4, 1999 disclosure was not corrective of the alleged misrepresentations regarding unapproved claims and is not evidence of price impact from such alleged misrepresentations.

---

[107]  Halliburton Press Release, October 4, 1999.

[108]  *See*, for example, Dresdner Kleinwort Benson, October 6, 1999, ("By divesting its stake in D-R, which manufactures gas and steam turbines and compressors, and in IDP, which is into [the] manufactur[ing] of specialty pumps...").

[109]  Halliburton Press Release, October 4, 1999.

[110]  13 analysts issued reports after October 4, 1999, and none discussed unapproved claims or accounting for such claims.

[111]  Halliburton Conference Call, October 4, 1999.

50

APP 000055

**B. The January 5, 2000 alleged corrective disclosure—which did not mention accounting for unapproved claims—was not corrective of any alleged misrepresentation regarding unapproved claims and thus not evidence of price impact**

| Alleged Misrepresentation | Alleged Corrective Disclosures |
|---|---|
| Halliburton's financial statements, which included unapproved claim revenue. | Merrill Lynch and Brown Brothers Harriman reduced their earnings per share estimates. |

102.    The Complaint does not allege that corrective information related to accounting for unapproved claims reached the market on January 5, 2000.  This date was added by Ms. Nettesheim.[112]  Yet, the Company did not make any statement on this date, and a review of analyst reports and news shows that no information corrective of the alleged misrepresentations about the accounting for unapproved claims reached the market on this date.

103.    Ms. Nettesheim alleges that the reduction of earnings estimates by two analysts on this date, Brown Brothers Harriman and Merrill Lynch, is a corrective disclosure of alleged misrepresentations about the accounting for unapproved claims.  None of the reasons for the analysts' estimates reduction related to or mentioned unapproved claims on fixed-priced construction contracts or the accounting for such claims.  The two analysts cited multiple reasons for their reduction in estimates, including reduced E&C revenue and profit estimates due to expected weakness in the North Sea that had historically been a stronghold for Halliburton, and delays in the awarding of major deep water development projects.  Neither analyst mentioned claims submitted to customers or the accounting treatment of such claims.

104.    As discussed above in Section VIII.B.2, when tested in isolation, the price reaction on January 5, 2000 was statistically significant.  This result should not be surprising since this date was added by Ms. Nettesheim to the list of alleged corrective disclosures on the basis of her unscientific procedure that *starts* by searching for statistically significant dates across all 633 days during the class period and *then* attempts to relate them to alleged misrepresentations.

105.    Given that January 5, 2000 was added as an alleged corrective disclosure as a result of searching across 633 days, it is appropriate to adjust for 633 multiple comparisons when

---

[112]  Nettesheim Report, ¶¶41-45, 88-92.

51

testing the statistical significance of the price reaction on this date.  After the proper adjustment, the price reaction following the January 5, 2000 announcement was not statistically significant. *See* Exhibit 1.  This lack of statistical significance does not support price impact of the alleged misrepresentations.

106.    In summary, the January 5, 2000 alleged corrective disclosure was not corrective of the alleged misrepresentations regarding unapproved claims, and after making an appropriate multiple comparison adjustment, there was no statistically significant price reaction.  This alleged corrective disclosure provides no evidence of price impact from the alleged misrepresentations regarding Halliburton's accounting for unapproved claims.

**C.    The October 24, 2000 alleged corrective disclosure—which did not mention accounting for unapproved claims—was not corrective of any alleged misrepresentation regarding unapproved claims and thus not evidence of price impact**

| Alleged Misrepresentation | Alleged Corrective Disclosure |
|---|---|
| Halliburton's financial statements, which included unapproved claim revenue. | Halliburton planned to restructure its E&C segment by combining its E&C businesses into one entity. |

107.    The Fund's expert, Ms. Nettesheim, alleges that the information released on October 24, 2000 was corrective of the alleged misrepresentations about the accounting for unapproved claims.[113]  However, Ms. Nettesheim does not point to any specific corrective information and only alleges (with no valid support) that information related to problems in Halliburton's E&C business was corrective of the alleged misrepresentations about accounting for unapproved claims.[114]  Similarly, the Complaint offers no indication of how the information disclosed on this date is corrective of the alleged misrepresentations regarding Halliburton's accounting for unapproved claims.

---

[113] "After market close on October 24, 2000, while announcing its third quarter earnings release, the Company made a partial disclosure concerning the Company's booking unapproved claims on fixed-price contracts and lack of benefits from the Dresser merger." Nettesheim Report, ¶93.

[114] Specifically, Ms. Nettesheim states, "A significant portion of the negative news, as attributed to the Company, in news reports and by analysts, was related to the problems with the engineering and construction units that the Fund alleges could have been and should have been revealed earlier. Thus, a significant portion of the stock price decline on October 25, 2000 was related to the Company's booking unapproved claims on fixed-price contracts and lack of benefits from the Dresser merger alleged in the Complaint."  Nettesheim Report, ¶93.

52

108.    There is no indication that the Company's announcement of 3Q99 earnings or planned E&C restructuring on October 24, 2000 was corrective of, or even related to, the alleged misrepresentations regarding claims being included in revenues only when their collection was deemed probable.  Halliburton's press release did not mention fixed-price construction contracts, unapproved claims, or the accounting for such claims.[115]  During its conference call with analysts, Halliburton announced plans to consolidate its E&C business, but there was no discussion of the accounting for unapproved claims.  During the call, the Company did state that "[t]his action [the E&C restructuring] may result in the redeployment of some of our assets, may impair our ability to negotiate outstanding claims on jobs and certainly will result in additional severance costs as well as potential other restructuring costs."[116]  But that disclosure about potential impairment of the Company's ability to negotiate claims did not state that previously booked unapproved claims were not probable of collection when booked.  Even if that disclosure had referred to previously booked unapproved claims, it referred to the ability to negotiate those claims on a going-forward basis, not to whether previously booked claims were deemed probable when booked.  Moreover, in the Q&A section of the conference call, analysts asked a number of questions, but none asked about the ability to negotiate claims or the accounting for unapproved claims.[117]

109.    Additionally, 17 analysts issued reports following Halliburton's October 24, 2000 press release and conference call.  None discussed unapproved claims or the accounting treatment for such claims.

110.    In fact, as explained in further detail above in Section VIII.B.3, after October 24, 2000, analysts were focused on negative factors influencing the Company's performance—none of which related to the accounting for unapproved claims.  These included: a depressed outlook for customer spending and the lack of predictability;[118]  reduced customer spending in the KBR downstream petroleum business;[119] delays in the initiation of construction projects;[120] lower international spending;[121] and decreased activity by newly consolidated customers.[122]

---

[115]   Halliburton Press Release, October 24, 2000.

[116]   Halliburton Conference Call, October 24, 2000.

[117]   Halliburton Conference Call, October 24, 2000.

[118]   CIBC World Markets, October 25, 2000.

[119]   CIBC World Markets, October 25, 2000; Frost Securities, October 25, 2000.

APP 000058

111.     In short, the October 24, 2000 alleged corrective disclosure was not corrective of the alleged misrepresentations regarding claims being included in revenues only when their collection was deemed probable, and thus, this alleged corrective disclosure provides no evidence of price impact from such alleged misrepresentations.

   **D.  Because there was no statistically significant price reaction on December 21, 2000 and no indication that the market learned any information corrective of the alleged misrepresentations regarding accounting for unapproved claims, the December 21, 2000 alleged corrective disclosure provides no evidence of price impact**

| Alleged Misrepresentation | Alleged Corrective Disclosure |
|---|---|
| Halliburton's financial statements, which included unapproved claim revenue. | Halliburton announced $120 million after-tax charge related to E&C restructuring and project losses.  Losses were in part due to negotiations with customers that were not resolved as originally anticipated. |

112.     On December 21, 2000, Halliburton issued a press release disclosing that the Company would take a $120 after-tax charge in 4Q00 related to the restructuring of its E&C businesses and losses on E&C projects.  Of this $120 million, $25 million related to the restructuring, while the remaining $95 million was attributed to project losses.[123]

113.     The Company further specified that some of the $95 million in project losses was due to cost overruns "[d]uring the quarter," mostly as a result of labor disturbances in Venezuela and West Africa.  The rest of the $95 million charge was due to "negotiations with customers regarding cost increases on seven other projects [that] ha[d] not resulted in resolution of certain claims as originally anticipated."[124]

---

[120]  Jefferies, October 25, 2000; Salomon Smith Barney, October 25, 2000; Jefferies, October 26, 2000.

[121]  Dain Rauscher Wessels, October 25, 2000.

[122]  Note that while the contemporaneous movements in the stock of other industry participants are controlled for by the industry indices, it is possible that industry-related information affected Halliburton's stock more than other companies in the same industry.  For example, news of weak international spending could have a larger effect on Halliburton than on other companies in the same industry given that the "real leverage" of Halliburton's core energy business segment is in overseas markets, and this segment generally derives about 60-70% of its revenues from international markets.  Prudential Securities, October 25, 2000; Dain Rauscher Wessels, October 25, 2000.

[123]  Halliburton Press Release, December 21, 2000.

[124]  Halliburton Press Release, December 21, 2000.

54

APP 000059

114.    As discussed below, there is no indication that the market learned any corrective information about the previous alleged misrepresentations that unapproved claims would be booked as revenues only when their collection was "deemed probable."  In fact, analysts focused on unrelated negative information released on this date.  Moreover, the market did not react to the alleged disclosure on December 21, 2000.

>    **1.  There is no evidence that the market learned any corrective information regarding Halliburton's accounting policy of including claims in revenues only when their collection was "deemed probable"**

115.    The Company's alleged disclosure on December 21, 2000 attributed $95 million in project losses to cost overruns during the quarter on several large fixed-fee construction projects (mostly as a result of labor disturbances in Venezuela and West Africa) and to unresolved negotiations with customers regarding cost increases on seven other projects.  Neither of these disclosures corrected the alleged misrepresentation about booking unapproved claims only when their collection was "deemed probable."

116.    First, the cost overruns incurred on projects "[d]uring the quarter"[125] (mostly as a result of labor disturbances in Venezuela and West Africa) could not logically have been booked as revenue in previous quarters and are therefore clearly unrelated to the alleged misrepresentations regarding unapproved claims.  Moreover, the risk of cost overruns connected to fixed-price contracts had been disclosed by the Company in its SEC filings before the beginning of the class period[126] and was known by the market.  As analyst commentary shows, the market knew (even before the beginning of the class period) that fixed-price construction contracts carry a risk of cost overruns, and that Halliburton was subject to that risk as part of its business.[127]

---

[125]  Halliburton Press Release, December 21, 2000.

[126]  *See*, for example, Halliburton 1998 Form 10-K, filed on March 23, 1999, p.18 ("[There are] risks that result from entering into fixed fee engineering, procurement and construction projects of the types provided by Halliburton Company where failure to meet schedules, cost estimates or performance targets could result in non-reimbursable costs which cause the project not to meet expected profit margins").

[127]  *See,* for example, Prudential Securities, April 7, 1998 ("The company will be undertaking large, lump sum fixed price contracts.  **The potential for cost overruns**, and lower earnings from some of this work, **will be an ever-present risk**.") (emphasis added); Robinson-Humphrey, October 3, 1998 ("Engineering and construction is an inherently risky business, as any number of problems can arise when transforming a project idea into a physical reality. … The segment also began accepting a **greater level of project risk by offering** gain sharing or **fixed price contracts**.") (emphasis added); Prudential Securities, October 7, 1998 ("The company will be undertaking large, lump-sum fixed-price contracts.  **The potential for cost overruns is an inherent risk** of those businesses.") (emphasis added).

APP 000060

117.    Second, on the unresolved negotiations, there is no indication that this alleged disclosure revealed to the market that the Company had not followed its stated accounting policy of booking unapproved claims only when their revenues were "deemed probable" at the time of booking.  To the contrary, Halliburton stated in the release that a positive resolution had originally been anticipated for these claims.[128]

118.    I conducted a review of the market commentary following December 21, 2000 to determine whether there was any indication that the market inferred that the collection of the unapproved claims was not deemed probable when booked.  None of the analysts indicated that they learned anything corrective with respect to the previously stated accounting policy that unapproved claims would be included in Halliburton's revenues only when their collection was deemed probable.  Nor did analysts indicate that they believed Halliburton was engaging in the "pervasive accounting manipulations" that the Fund alleges.

119.    Instead, most analysts just repeated Halliburton's disclosure.  For example, one analyst wrote:

> The balance of the write-off for cost overruns is related to negotiations with customers regarding cost increases on seven other projects, which have not resulted in resolution of certain claims that were originally anticipated.  [Jefferies, December 22, 2000][129]

120.    One analyst suggested that deterioration of customer relationships led to difficulties in claim resolution:

> Additionally, relationships with some customers have deteriorated and the cost increase claims on seven other projects have not resolved as expected.  [CIBC Report, December 21, 2000]

121.    Another analyst suggested that these types of charges were an expected cost of doing business in the construction industry.  The analyst noted that "one could consider these profit adjustments on existing projects to be normal operating events in the E&C business" but "HAL has chosen to characterize these items as non-recurring."[130]

---

[128]   Halliburton Press Release, December 21, 2000.

[129]   *See also* CIBC, December 21, 2000 ("Additionally, relationships with some customers have deteriorated and the cost increase claims on seven other projects have not resolved as expected."); Salomon Smith Barney, December 21, 2000 ("The remainder is project related, related to cost overruns on 2 large projects and disputes on 7 other projects that have not been settled.").

[130]   A.G. Edwards & Sons, Inc., December 21, 2000.

APP 000061

122.     Thus, there is no indication that the market learned anything corrective of the previously stated accounting policy of including claims in revenues only when their collection was "deemed probable."  Rather, the evidence suggests that, to the extent in which market analysts paid attention to this part of the charge at all, they understood it to be due to new information regarding customer's positions on certain claims, not the revelation of alleged fraud.

### 2.   Analysts focused on non-culpable negative information in the alleged corrective disclosure

123.     The thrust of the December 21, 2000 press release focused on news that had nothing to do with the one sentence in the press release regarding developments in claims negotiations.  For example, the release informed the market about "the poor near term market outlook for the downstream engineering and construction business," which Halliburton attributed to a "consolidating customer base, difficult relationships with certain customers, some financially stressed competitors and a fiercely competitive environment."[131]

124.     This other non-culpable negative information dominated analyst discussion. Analysts discussed the Company's concerns regarding general market weakness:

> ...the operating environment remains weak... [A.G. Edwards, 12/21/2000]

> We remain concerned about the outlook for Halliburton's engineering and construction business, particularly in light of the current market conditions.  [CIBC, 12/21/2000]

125.     Analysts also noted that Halliburton's customer base was consolidating and customer spending was low:

> Despite the rise in oil and natural gas prices, HAL has experienced weak performance in its shallow-water marine construction and downstream E&C businesses.  The customer base for E&C is consolidating . . . [CIBC, 12/21/2000]

> General industry-wide issues are also impacting the E&C business.  Despite high oil and natural gas prices, spending for engineering and construction projects remains depressed. [CIBC, 12/21/2000]

126.     Analysts observed that pressure on Halliburton's customer base was coupled with increased competition from other construction companies in the industry:

---

[131]   Halliburton Press Release, December 21, 2000.

APP 000062

...[F]inancially pressured competitors have intensified competition and pricing in the marketplace.  [CIBC, 12/21/2000]

The difficult operating environment has forced some of Halliburton's E&C competition to cut prices and increase competitiveness.  [CIBC, 12/21/2000]

127.    The market also noted that delays in the initiation of construction projects, due to depressed capital spending, were negatively impacting Halliburton:

Lower activity levels at Kellogg Brown & Root's (KBR) downstream business continues to have a negative impact on revenues, as projects remain in the planning stage and capital spending remains depressed in the downstream business.  [A.G. Edwards, 12/21/2000]

The weakness in the near-term outlook for the Engineering & Construction businesses stems from the delay but not the cancelation of major Downstream and Offshore Construction projects by the Major International Oil Companies.  [Jefferies, 12/22/2000]

Engineering and Construction (E&C) experienced a 21% decline in revenues year over year.  The disappointment was due to a lack of commitment to new projects by its customers.  [PNC Advisors, 12/26/2000]

### 3. There was no statistically significant price reaction to the December 21, 2000 disclosure

128.    The press release containing the alleged corrective disclosure was released before the market opened on December 21, 2000.[132]  There was no statistically significant price reaction on December 21, 2000 (before and after the adjustment for multiple comparisons).  Ms. Nettesheim's event study found no statistically significant price reaction on December 21, 2000.[133]   The lack of a statistically significant price reaction does not support price impact of the alleged misrepresentations.

129.    Even though Ms. Nettesheim found no statistically significant price reaction on December 21, 2000, she examined Halliburton's price reaction on December 22, 2000, found a statistically significant price reaction, and with no valid justification, attributed it to the disclosure on December 21.[134]  As discussed above in Section VIII.B.4, Halliburton's price

---

[132]  Halliburton Press Release, December 21, 2000, 8:59 AM.

[133]  Nettesheim Report, ¶109.

[134]  In her rebuttal report, Ms. Nettesheim claims that she did not rely on the Company disclosure on December 21 to test her price reaction, but that she relied on the analyst commentary the following day, December 22. Nettesheim Rebuttal Report, ¶38.  However, her first report seems to clearly indicate that the information released to the market on December 21 is the

APP 000063

decline on December 22, 2000 occurred at the end of the trading day, essentially two full trading days after the announcement. The allegation that the market did not react to a piece of news for almost two full trading days, and then reacted to it, is inconsistent with the conclusion that Halliburton's stock traded in an efficient market. As noted above, research has shown that stock prices in an efficient market react very quickly to new information – finding, for example, that within 5 to 10 minutes the majority of the stock market response is already completed for many company announcements.[135] Thus, here there is no reasonable link between the alleged corrective disclosure and any price movement two trading days later.

130.    Additionally, while the price movement on December 22, 2000 was statistically significant when tested on its own, after making the appropriate adjustment for 35 multiple comparisons, there was no statistically significant price reaction on that day either. *See* Exhibit 1 for details.

131.    In summary, the alleged corrective disclosure on December 21, 2000 provides no evidence of price impact from the alleged misrepresentations regarding unapproved claims. Not only was there no statistically significant price reaction, but analysts also did not indicate they had learned anything corrective with respect to the Company's prior representations regarding the accounting for unapproved claims.

---

alleged corrective disclosure: "This is an instance where the Company released negative news, all of which appears to be related to cost overruns on the fixed-price contracts at its engineering and construction units," and this is the information that the Fund alleges "could have been and should have been disclosed earlier." Nettesheim Report, ¶106. Moreover, all the quotes that Ms. Nettesheim includes from analysts regarding this alleged corrective disclosure were from December 21 rather than December 22. In addition, I reviewed the analyst commentary on December 22 and did not find new information disclosed on that day that was any more potentially corrective of alleged misrepresentations than what was already disclosed on December 21.

[135]  *See*, for example, Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* (McGraw-Hill: New York, 7th ed., 2003), 351-353 ("To analyze the semistrong form of the efficient-market hypothesis, researchers have measured how rapidly security prices respond to different items of news such as earnings or dividend announcements, news of a takeover, or macroeconomic information […] A study by Patell and Wolfson shows just how fast prices move when new information becomes available. They found that, when a firm publishes its latest earnings or announces a dividend change, the **major part of the adjustment in price occurs within 5 to 10 minutes of the announcement.**") (emphasis added). *See also* James M. Patell & Mark A. Wofson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13 (1984), 223-252.

APP 000064

**E. Because the alleged corrective disclosure on January 30, 2001 contained no new information and was not corrective of any alleged misrepresentation regarding unapproved claims, it provides no evidence of price impact from the alleged misrepresentations**

| Alleged Misrepresentation | Alleged Corrective Disclosure |
|---|---|
| Halliburton's financial statements, which included unapproved claim revenue. | $193 million pre-tax charge related to E&C restructuring and project costs. |

132.    According to the Fund and its expert, Ms. Nettesheim, on January 30, 2001, Halliburton increased the $120 million charge announced on December 21, 2000 to $193 million.  Of the $193 million, $157 million was specifically related to project losses.[136]

133.    As discussed in Section VIII.B.5 above, this $193 million was pre-tax and only $118 million after tax.  In other words, the charge announced on January 30, 2000 was consistent with the charge announced on December 21, 2000.  Moreover, there was no statistically significant price reaction following the January 31, 2001 disclosure (before and after the adjustment for multiple comparisons).  *See* Exhibit 1.  Ms. Nettesheim's event study similarly did not find a statistically significant price reaction following this alleged corrective disclosure.[137]

134.    In short, the alleged disclosure on January 30, 2001 contained no new information related to the accounting for unapproved claims and was not corrective of any alleged misrepresentation, and thus not evidence of price impact from the alleged misrepresentations.

**F. There was no statistically significant price reaction when the Company first disclosed to the market on March 14, 2000 its policy for accounting for unapproved claims – evidence that the accounting treatment had no impact on Halliburton's stock price**

135.    On March 14, 2000, Halliburton disclosed its policy for accounting for unapproved claims.  The Company's 1999 Form 10-K, issued on March 14, 2000, stated:

> Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work are included in revenue when collection is deemed probable.[138]

---

[136]  Complaint, ¶155 and Nettesheim Report, ¶106, footnote 71.

[137]  Nettesheim Report, Exhibit 17.

[138]  Halliburton Form 10-K, filed March 14, 2000, p. 34.  The same disclosure is included in the 1999 Annual Report.

APP 000065

136.    The 1999 Form 10-K also stated:

These claims and change orders, included in unbilled receivables, amounted to $98 million and $89 million at December 31, 1999 and 1998, respectively and are generally expected to be collected in the following year.[139]

137.    There was no statistically significant price reaction on March 14, 2000 (before or after adjusting for multiple comparisons).  *See* Exhibit 1.[140]  Ms. Nettesheim's event study similarly did not find a statistically significant price reaction following the March 14, 2000 disclosure.[141]

138.    A review of the analyst reports around the March 14, 2000 disclosure shows that no analyst commented on the Company's accounting policy for unapproved claims or the specific amounts booked.  Only one analyst issued a report on March 14, 2000,[142] and this analyst made no mention of the accounting issue.  Instead, the analyst focused on a comparison of Baker Hughes, Halliburton, and Schlumberger.  No other analyst reports covering Halliburton were issued until nine days later, and those later reports made no mention of the change in accounting for unapproved claims or any amounts booked for this purpose.

139.    In short, following March 14, 2000, analysts did not issue reports; they did not discuss unapproved claims or the change in accounting for such claims; and there was no price reaction.  The lack of analyst commentary or a statistically significant price reaction to the disclosure on March 14, 2000 is evidence that how Halliburton accounted for the unapproved claims on fixed-price contracts did not impact Halliburton's stock price.

140.    This lack of market reaction is not surprising because, according to finance theory, accounting changes that do not affect cash flows should have no effect on a company's stock price.  The accounting for unapproved claims did not affect Halliburton's actual cash flows (with the possible exception of tax effects) because, in simple terms, the amount of cash that came in or went out of the Company remained the same regardless of the accounting

---

[139]  Halliburton Form 10-K, filed March 14, 2000, p. 34.

[140]  This analysis of the price reaction to the "deemed probable" disclosure is not confounded by financial information in the 10-K filing—such as revenues or income—because such information had already been disclosed in the earnings announcement on January 27, 2000.

[141]  Nettesheim Report, Exhibit 17.

[142]  It is not clear whether this report was published before or after the 10-K was released.

61

treatment.[143]  Finance theory tells us that, in an efficient market, the price of a stock reflects the expected discounted value of future cash flows.  It is cash flows—not earnings—that affect the stock price.[144]

141.    Empirical finance research has found that, as the theory of efficient markets predicts, when cash flows and accounting changes diverge, it is only the change in cash flows—not accounting numbers—that matters to the investors.  For example Bradford Cornell's book, *Corporate Valuation*, discusses the empirical findings as follows:[145]

> The argument that "only cash matters" has more than theoretical backing; it is also supported by extensive research.  This research focuses on listed companies for which it is possible to conduct direct tests of the relation between value and various measures of income, including cash flow and accounting earnings […] The results of these tests overwhelmingly support the view that corporate value is based on cash flow.  When cash flow and earnings diverge, changes in value are associated with changes in cash flow, not changes in earnings.

142.    Halliburton's March 14, 2000 announcement of the change in accounting treatment for unapproved claims did not affect the Company's actual cash flows, and the lack of analyst commentary or a statistically significant price reaction to the disclosure on March 14, 2000 is evidence that how Halliburton accounted for these claims did not impact its stock price.

### G.   Analyst commentary after the announcement of the SEC investigation regarding Halliburton's accounting for unapproved claims further demonstrates that the alleged misrepresentations had no price impact

143.    After the end of the class period, in May 2002, the Company announced an SEC investigation regarding Halliburton's accounting for unapproved claims.[146]  There was no statistically significant price reaction to this announcement.  *See* Exhibit 1 for more details.  Analysts stated after the announcement that Halliburton's accounting for unapproved claims was "unremarkable," the issues were "a non-event," and the amounts at issue were not material:

---

[143]  Note that different accounting treatments could affect the amount of tax paid and therefore affect after tax cash flows.

[144]  *See,* for example, Richard A. Brealey, Stewart C. Myers & Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, 11th ed., 2014).

[145]  Bradford Cornell, *Corporate Valuation* (McGraw-Hill: New York, 1993), 104.

[146]  Halliburton Press Release, May 28, 2002.

APP 000067

Most of Halliburton's competitors use this accounting treatment, making Halliburton's use of it **unremarkable.** [Salomon Smith Barney, 5/30/2002, emphasis added]

We reviewed the accounting treatment in question, and while it does appear aggressive, it is revealed in footnotes, and the amounts involved **would not materially change operating income**, in our assessment. [RBC, 5/29/2002, emphasis added]

This is the result of a May 22 New York Times article that we believe left out pertinent details and may have had a political agenda targeting ex-CEO and current Vice President Dick Cheney. **The unapproved claims in question only total $98 million, less than 1% of total revenue.** [CIBC, 5/30/2002, emphasis added]

We believe these accounting issues are largely a **non-event.** [Deutsche Bank, 5/30/2002, emphasis added]

**Amounts at issue were modest**: HAL recognized $89 million in 1998 and $91 million in 1999 under this approach, both **less than 1% of revenues**. More importantly, when the company took a charge of $191 million in 2000 for uncollected claims at the e&c and oilfield construction businesses, only about $8 million ($0.01/share) were previously recognized as collectible. The estimate[s] therefore appear to have been only very modestly optimistic, and not out of line with the normal variance in percentage of completion estimates. [Deutsche Bank, 5/30/2002, emphasis added]

Accounting Concerns Unwarranted, we believe. [Morgan Stanley, 5/30/2002]

144.    In addition, the analysts commented that they believed the SEC investigation was prompted by a *New York Times* article published on May 22, 2002. There was no statistically significant price reaction after the *New York Times* article was published. See Exhibit 1 for details. The lack of price reaction to both the *New York Times* article and the announcement of the SEC investigation, along with the analyst commentary indicating that the accounting issues were "a non-event," are further indication that the alleged misrepresentations regarding accounting of unapproved claims had no price impact.

APP 000068

## X.    THERE IS NO PRICE IMPACT FROM THE ALLEGED MISREPRESENTATIONS REGARDING ASBESTOS

145.    The Fund claims that throughout the class period Halliburton misrepresented its reported asbestos liability.  As summarized in the table below, the Complaint alleges 25 dates on which Halliburton allegedly misrepresented its reported asbestos liability.[147]

| Alleged Misrepresentations – Asbestos | | |
|---|---|---|
| M1 | 7/22/99 | Halliburton reported 2Q99 results and held earnings call. |
| M2 | 8/13/99 | Halliburton filed its 2Q99 10-Q. |
| M3 | 9/13/99 | Halliburton presented at Dain Rauscher Wessels conference. |
| M4 | 10/21/99 | Halliburton reported 3Q99 results and held earnings call. |
| M5 | 11/15/99 | Halliburton filed its 3Q99 10-Q. |
| M6 | 1/27/00 | Halliburton reported 4Q99 results and held earnings call. |
| M7 | 3/14/00[148] | Halliburton issued its 1999 Annual Report. |
| M8 | 4/26/00 | Halliburton reported 1Q00 results and held earnings call. |
| M9 | 5/15/00 | Halliburton filed its 1Q00 10-Q. |
| M10 | 7/26/00 | Halliburton reported 2Q00 results and held earnings call. |
| M11 | 8/10/00 | Halliburton filed its 2Q00 10-Q. |
| M12 | 11/9/00 | Halliburton filed its 3Q00 10-Q. |
| M13 | 1/30/01 | Halliburton reported 4Q00 results and held earnings call. |
| M14 | 3/27/01[149] | Halliburton issued its 2000 Annual Report. |
| M15 | 4/25/01 | Halliburton reported 1Q01 results. |
| M16 | 5/11/01 | Halliburton filed its 1Q01 10-Q. |
| M17 | 5/25/01 | Robinson-Humphrey issued report after discussions with management. |

[147] Complaint, ¶¶108-190.

[148] *See* footnote 9.

[149] *See* footnote 10.

64

| Alleged Misrepresentations – Asbestos | | |
|---|---|---|
| M18 | 6/28/01 | Halliburton announced Harbison-Walker claims could require an additional reserve of $60 million. |
| M19 | 7/25/01 | Halliburton reported 2Q01 results and held earnings call. |
| M20 | 8/9/01 | Halliburton filed its 2Q01 10-Q. |
| M21 | 8/22/01 | Salomon Smith Barney, after discussions with the Company's management, issued a report on Halliburton's asbestos exposure, stating that "concerns appear to be overblown." |
| M22 | 9/4/01 | *Platt's* reported, "Halliburton sees asbestos claims as 'manageable.'" |
| M23 | 10/4/01 | Halliburton discussed the Company's asbestos liability situation at a Deutsche Bank seminar but allegedly did not disclose a recent $130 million verdict. |
| M24 | 10/23/01 | Halliburton reported 3Q01 results and held earnings call, stating that "there have been no adverse developments" with respect to the Harbison-Walker situation. |
| M25 | 11/8/01 | Halliburton filed its 3Q01 10-Q. |

146.    The Fund and Ms. Nettesheim claim there are seven partial corrective disclosures related to Halliburton's allegations regarding asbestos liability: June 28, 2001; August 9, 2001; October 30-November 1, 2001; December 4-5, 2001; and December 7, 2001.[150]  The Complaint alleges only three corrective disclosures related to the reported asbestos liability: June 28, 2001; the beginning of December (which I assume relates to December 4, 2001);[151] and December 7, 2001.[152]  The other four dates—August 9, 2001; October 30, 2001; November 1, 2001; and December 5, 2001—are found in the Nettesheim Reports.[153]  The table below summarizes the dates on which the Fund alleges corrective disclosures.

| Alleged Corrective Disclosures – Asbestos | | | Source |
|---|---|---|---|
| D7 | 6/28/01 | Halliburton disclosed that Harbison Walker had asked for financial and asbestos claims management assistance. | Complaint & Nettesheim |

---

[150]  Complaint, ¶¶170, 191; Nettesheim Report, ¶¶114-132.

[151]  Complaint, ¶191.

[152]  Complaint, ¶¶170, 191.

[153]  Nettesheim Report, ¶¶114-132.

APP 000070

| | | Alleged Corrective Disclosures – Asbestos | Source |
|---|---|---|---|
| D8 | 8/9/01 | Halliburton's 2Q01 10-Q states that its reported net liability for known open asbestos claims is $124 million. | Nettesheim |
| D9 | 10/30/01 | Halliburton announced $21.3 million Mississippi verdict. | Nettesheim |
| D10 | 11/1/01 | Alleged continuation of 10/30/01 alleged corrective disclosure. | Nettesheim |
| D11 | 12/4/01 | Halliburton announced Texas judgments. | Complaint & Nettesheim |
| D12 | 12/5/01 | Alleged continuation of 12/4/01 alleged corrective disclosure. | Nettesheim |
| D13 | 12/7/01 | Halliburton announced $30 million Maryland verdict. | Complaint & Nettesheim |

147.    The chart below shows Halliburton's stock price along with the alleged misrepresentations and alleged corrective disclosures related to the asbestos allegations.



148.     There is no price impact from the alleged misrepresentations concerning Halliburton's reported asbestos liability.  As discussed above, I found that after making the appropriate adjustment for multiple comparisons, there was no statistically significant price reaction after any of the alleged misrepresentations.

149.     Before making an appropriate adjustment for multiple comparisons, only one date had a statistically significant positive movement: April 25, 2001, on which the Fund alleges Halliburton misrepresented its first quarter 2001 earnings.[154]  The Complaint does not include any allegation that Halliburton made any specific misstatement regarding asbestos on that day.  There was no mention of asbestos in the Company's press release announcing quarterly results.  Halliburton briefly mentioned asbestos on its earnings call, stating that it was "adding about 18,000 [asbestos] cases for the first quarter."[155]  Only one out of twelve analysts that issued reports on April 25 or April 26 discussed asbestos.[156]  This analyst stated:  "Asbestos outlook unchanged." [157]  The analysts instead focused on a number of positive developments, including price increases in North America and improvement in the international oil market:

> The outlook for the remainder of the year is sharply stronger in all business segments led by HES. We are raising our estimates for 2001, 2002 and 2003. Rising international activity is the principal driver of the stronger outlook, especially in Latin America, Middle East and West Africa. [Salomon Smith Barney, 4/25/2001]

> Business trends and outlook comments by management support our thesis of a recovery of international activity becoming the principal driver of HAL'S earnings in 2H01 and thereafter. [CIBC, 4/26/2001]

> HAL is seeing strong improvement in HES in North America as a result of an 8-10% price increase early in the year and planned further price increases this summer. More importantly, the company is also seeing early signs of a strong recovery internationally, particularly in the Middle East Latin America and West Africa. [Deutsche Bank, 4/26/2001]

---

[154] Complaint, ¶161.

[155] Halliburton Conference Call, April 25, 2001.

[156] Twelve analysts issued a report on April 25 or April 26, 2001: Salomon Smith Barney, April 25, 2001; CIBC, April 26, 2001; Credit Suisse, April 26, 2001; Dain Rauscher Wessels, April 26, 2001; Deutsche Bank, April 26, 2001; Dresdner, April 26, 2001; Lehman Brothers, April 26, 2001; Morgan Stanley, April 26, 2001; PNC, April 26, 2001; Prudential, April 26, 2001; Robinson Humphrey, April 26, 2001; and UBS Warburg, April 26, 2001.

[157] Deutsche Bank, April 26, 2001.

67

The continued strength in the North American oilfield environment, improved pricing, and a recovering international market for oilfield-related activity should materially impact HAL'S operating results. [Prudential, 4/26/2001]

150.    In addition, there were no statistically significant price reactions after any of the following alleged corrective disclosures:

–   06/28/2001 (after making the appropriate adjustment for multiple comparisons);

–   08/09/2001 (after making the appropriate adjustment for multiple comparisons);

–   10/30/2001 (after making the appropriate adjustment for multiple comparisons);

–   11/01/2001 (after making the appropriate adjustment for multiple comparisons);

–   12/04/2001 (both before and after making the appropriate adjustment for multiple comparisons); and

–   12/05/2001 (both before and after making the appropriate adjustment for multiple comparisons).

151.       For purposes of discussion, I have grouped the alleged misrepresentations into three sections: 1) Section A (¶¶152-280) addresses the alleged misrepresentations concerning Halliburton's reported asbestos liability (including its reserves for pending claims, its receivables from insurance companies for those claims, and its asbestos liability net of insurance receivables).  2) Section B (¶¶281-300) addresses the alleged misrepresentations concerning the risks that the former subsidiary, Harbison-Walker, would not be able to satisfy its indemnification obligation for certain asbestos claims.  3) Section C (¶¶301-306) addresses the alleged misrepresentations on an October 23, 2001 conference call with analysts.

68

APP 000073

**A.  There is no price impact from the alleged misrepresentations regarding Halliburton's reported asbestos liability**

| Alleged Misrepresentation | Alleged Corrective Disclosure |
|---|---|
| Halliburton misrepresented its reported asbestos liability. | Halliburton announced on October 30, 2001 an adverse verdict rendered on October 25, 2001 in Holmes County, Mississippi.<br><br>Halliburton announced on December 4, 2001 adverse judgments rendered on November 29, 2001 in Orange County, Texas.<br><br>Halliburton announced on December 7, 2001, an adverse verdict rendered on December 5, 2001 in Baltimore, Maryland. |

152.    As detailed below, I found no price impact from the alleged misrepresentations regarding Halliburton's reported asbestos liability.  Halliburton disclosed detailed information about its estimated asbestos liability and, contrary to the Fund's implications, it was clear that the Company estimated and reported asbestos liability for pending claims, not future claims. Moreover, Halliburton warned investors that a series of adverse rulings could have a material adverse effect on the Company.

153.    The Company's estimates of its asbestos liability depended on the average historical cost to settle or dispose of claims.  During the class period, there was no negative trend in this key metric and Halliburton's average cost remained low relative to other companies. Moreover, the Company's reported asbestos liability net of insurance did not change after the end of the class period and analysts did not express surprise at this lack of change in reported numbers.  The fact that analysts did not comment or express any surprise that the Company's net asbestos liability was unchanged means that the alleged corrective disclosures could not have disclosed to the market that the prior reported asbestos liability was understated or misleading.

154.    According to market commentary, Halliburton was particularly forthcoming regarding its reported asbestos liability throughout the class period.  After the last alleged corrective disclosure, analysts did not indicate any belief that Halliburton had misled the market, and the analysts continued to think Halliburton was effectively managing its asbestos liability.

69

**1. Halliburton publicly disclosed detailed information about its estimated asbestos liability, including making clear that the Company estimated and reported asbestos liability for pending claims, not future claims**

155.    Halliburton disclosed detailed information about its estimated asbestos liability. Throughout the class period, Halliburton disclosed that its estimates were based on the number of open claims pending against the Company at that time and Halliburton's historical experience with similar claims.  The Company's SEC filings detailed information including: 1) the number of open asbestos claims pending against the Company; 2) the historical number of claims that had been settled or otherwise disposed of; 3) the number of new claims filed; 4) the gross cost (before insurance recoveries) of the claims that had already been settled or otherwise disposed of; and 5) the average historical cost to dispose of each claim.

156.    Halliburton also disclosed in its SEC filings an estimate of the amount it expected to recover from insurance for the pending asbestos claims.  According to the filings, these estimates were based on agreements Halliburton had reached with some carriers, its historical experience, and its understanding of disputes raised by certain carriers.  The Company's SEC filings included the following information: 1) the historical net amount the Company actually paid after insurance recoveries; 2) its estimate of the amount it would recover for claims that were still pending; and 3) discussion of disputes with certain insurance carriers.

157.    Though Halliburton "believe[d] that the open asbestos claims asserted against [it] w[ould] be resolved without a material adverse effect,"[158] it also repeatedly disclosed that there was uncertainty surrounding its reported estimates of its asbestos liability.  For example, in Halliburton's 2000 10-K, the Company stated:

> We recognize the uncertainties of litigation and **the possibility that a series of adverse court rulings** or new legislation affecting the claims settlement process **could materially impact the expected resolution of asbestos related claims.**
> [2000 10-K, filed on 3/27/2001, emphasis added]

158.    Contrary to the Fund's implication, Halliburton did not estimate or report liability for its future asbestos claims but only reported estimated liability for pending, or open, claims. Halliburton made clear throughout the class period that it estimated its asbestos liability only for

---

[158]  Complaint, ¶ 189.

APP 000075

currently pending asbestos claims.  These estimates did not include amounts for asbestos claims that would be filed in the future.[159]

159.    The Company disclosed in its SEC filings that the reported asbestos liability was for pending claims. For example, in Halliburton's first quarter 2001 10-Q, the Company stated:

> At March 31, 2001, there were about 129,000 open asbestos claims asserted against us, including about 26,000 associated with insurance recoveries we expect to collect from Highlands. Open claims at March 31, 2001 also include 15,000 claims for which settlements are pending […] We have accrued reserves for our estimate of our liability for known asbestos claims that have been asserted against us. Our estimate of the cost of resolving asserted asbestos claims is based on our historical litigation experience, our prior completed settlements and our estimate of amounts we will recover from insurance companies […] Our reserves for open asbestos claims and corresponding estimated insurance recoveries included in noncurrent assets are as follows:

| Millions of dollars | March 31 2001 | December 31 2000 |
|---|---|---|
| Accrued liability for open claims | $ 84 | $ 80 |
| Estimated insurance recoveries: | | |
|   Highlands Insurance Company | (40) | (39) |
|   Other insurance carriers | (14) | (12) |
| Net liability for known open asbestos claims | $ 30 | $ 29 |

---

[159] The Fund, in its Supplemental Responses to Halliburton's Second Set of Interrogatories, claims that the Company made statements about liabilities for claims other than pending by citing a Jefferies analyst report on January 31, 2001 that stated "management reiterated that prospective asbestos liabilities . . . should have minimal adverse impact on company going forward." The same analyst used the term, "prospective asbestos liabilities," in a prior report in which the context makes clear that the language is not referring to asbestos claims filed in the future:

"However, management reiterated several times that the prospective asbestos liabilities had not changed materially from the second quarter and should have minimal adverse impact on the company going forward. (At the end of the 2Q 260,900 claims had been filed against Halliburton's current and former divisions and subsidiaries and the company had settled approximately two thirds of the claims at a total cost of $99 million and all but $23 million was covered by Insurance.)" [Jefferies, October 25, 2000]

Moreover, this analyst report is discussing the prior day's earnings announcement and conference call. In the conference call, management clearly stated that they were not talking about future asbestos liabilities and that the 3Q pending claims are not materially different than the 2Q pending claims:

"We don't think you're going to see any material change in that disclosure in the third quarter versus the second quarter. And I mean, you know, as to proving what might or might not happen in the future, we can't get into this predicting but we felt strongly that we needed to tell the street today that, you know, the second quarter disclosure details it all. Third quarter's going to have some minor changes in the numbers that we see but nothing that materially impacts the trends or the values of anything that you've seen so far in our asbestos litigation." [Halliburton Conference Call, October 24, 2000]

APP 000076

…[W]e believe that the open asbestos claims asserted against us will be resolved without a material adverse effect on our financial position or results of operations. [10-Q, filed on 5/11/2001]

160.    Similar language had been used in the Company's SEC filings before the class period and as far back as October 1998, shortly after the completion of the Dresser merger.[160]

161.    Halliburton first disclosed estimates of asbestos liability for *future* claims, more than eight months after the end of the class period in August 2002.[161]   At that point, the Company had "sufficient information to make a reasonable estimate of future claims."[162]

162.    In 2002, after the class period, other public companies with asbestos exposure had a similar change in their asbestos disclosures – going from reporting estimates for only pending claims to reporting estimates for both pending and future claims.   For example, Albany International reported during the class period that "while the Company anticipates that additional claims may be filed, it cannot control or predict the number or timing of future claims."[163]   Eight months after the end of the class period, on August 14, 2002, Albany International reported reserves for future claims for the first time.[164]   This was the day after Halliburton disclosed estimates including future claims for the first time.

163.    Similarly, 3M, Georgia Pacific, Allegheny Energy, Quaker Chemical, and General Cable Corp. estimated reserves for pending claims during the class period but did not start projecting and reserving for future asbestos claims until after the end of the class period.[165]

---

[160]  *See* Halliburton Form 8-K, filed on October 23, 1998; Halliburton 1998 Form 10-K, filed on March 23, 1999.

[161]  *See* Halliburton Form 10-Q, filed on August 13, 2002.

[162]  Halliburton included the following language in its 2001 Form 10-K, filed on March 12, 2002:

Uncertainty about future asbestos claims and jury awards has caused much of the recent volatility in our stock price and recent downgrades in our credit ratings. We have not accrued reserves for unknown claims that may be asserted against us in the future. We have not had sufficient information to make a reasonable estimate of future claims. However, we recently retained a leading claim evaluation firm to assist us in making an estimate of our potential liability for asbestos claims that may be asserted against us in the future. When the evaluation firm's analysis is completed it is likely that we will accrue a material liability for future claims that may be asserted against us. We expect the analysis will be completed during the second quarter of 2002 and that we will accrue the liability at the end of the quarter.

[163]  Albany International Form 10-Q, filed November 13, 2001.

[164]  Albany International Form 10-Q, filed August 14, 2002.

[165]  *See* Forms 10-Q and 10-K filed in 2001 to 2003 for 3M, Georgia Pacific, Allegheny Energy, Quaker Chemical, and General Cable Corp. 3M disclosed reserves for pending claims in its Form 10-Q filed November 13, 2001 and reserves for future claims starting on March 11, 2002 in its Form 10-K filing. Georgia Pacific disclosed that it estimated reserves for pending claims in its Form 10-Q filed on November 5, 2001 and reserves for future claims starting on March 22, 2002 in its Form 10-

72

164.    Note, some companies did explicitly report reserves that included amounts for future claims during the class period.  For example, ABB reported on April 3, 2001 that its reserve of $430 million is "based on historical data and estimates of asbestos claims that might be made in the future."[166]  Another company, Crown Cork & Seal reported on November 14, 2001 that its "accrual of $420 [million] recorded at December 31, 2000 for asbestos claims constituted management's best estimate at that time of such costs for pending and future claims that were probable and estimable."[167]

165.    Analyst commentary shows that the market was aware of the Company's approach to its estimation of its asbestos liability and that the estimates were solely for its currently pending claims.  For example:

> More important, Halliburton believes that insurance should cover most of the litigation costs or settlements and **Halliburton has established reserves to cover liabilities for known asbestos claims.**  [Jefferies, 10/9/2000, emphasis added]

> Asbestos claims declined to 13,000 from 27,000 in Q2 2001 and 11,000 claims were settled during the quarter.  **HALs reserves for all open asbestos claims** rose to $704 million from $699 million, and its estimated insurance recoveries rose to $579 million from $575 million.  Hence, the company's estimated net exposure rose by $1 million to $125 million.  [Wachovia, 10/24/2001, emphasis added]

> The second quarter charge was taken to reserve for the potential that H-W may fail to fulfill its responsibility due to financial constraints.  The **charge was figured by taking the best estimate of the H-W cases still outstanding and multiplying by its historical settlement rate and insurance recovery rate.** [Salomon Smith Barney, 11/9/2001, emphasis added]

### 2.    According to market commentary, the Company was particularly forthcoming regarding its asbestos liability during and after the class period

166.    Analysts and news stories commented positively that Halliburton was particularly forthcoming regarding its asbestos liability during the class period.  This positive commentary

---

K filing. Quaker Chemical disclosed that it made accruals for pending claims in its Form 10-K filed on March 29, 2001 and reserves for future claims starting on March 28, 2003 in its Form 10-K. General Cable disclosed reserves for pending claims in its Form 10-K filed March 30, 2001 and reserves for future claims starting on February 20, 2004 in its Form S-3/A filing. Allegheny Energy disclosed reserves for pending claims in its Form 10-Q filed on August 14, 2001 and reserves for future asbestos claims starting on March 11, 2004 in its Form 10-K filing.

[166]  ABB, Form 20FR12B, filed April 3, 2001.

[167]  Crown Cork & Seal, Form 10-Q, filed November 14, 2001.

APP 000078

continued after the end of the class period, refuting the Fund's theory that the alleged corrective disclosures revealed to the market that Halliburton's prior statements concerning its reported asbestos liability were false.  For example:

> While we are still modestly concerned about the asbestos litigation, **we believe the company has fairly disclosed all the relevant data**... [ABN, 4/30/2001, emphasis added]

> The "asbestos issue" first became a focus of investor attention for Halliburton late in 2000.  Although **the company had been routinely disclosing its claims and settlement activity**, the issue was not a factor of significance before that time. [Salomon Smith Barney, 8/22/2001, emphasis added]

> The **company gave a detailed review of its asbestos situation**....  [UBS Warburg, Oilfield Services, 10/24/2001, emphasis added]

> **Halliburton's exposure to asbestos liabilities has been well documented over the last year.**  Indeed, it has been a large factor in our Neutral rating during times of very solid company performance. [RBC, 12/10/2001, emphasis added]

> We believe there are no indications that the suits filed against the company are spiraling out of control and we believe **HAL management has been very forthright with the pending litigation procedures while aggressively managing the risk with appropriate reserves and the appeals process**. [SunTrust Robinson Humphrey, 12/10/2001, emphasis added]

> **I think it's really important to recognize that management has been very, very forthcoming and proactive in getting disclosure out to investors** on the asbestos situation as it has been developing.  [Salomon Smith Barney analyst on CNN, 12/10/2001, emphasis added]

> Halliburton, and Dresser before it, **has consistently reported periodic developments associated with its asbestos liabilities**, in both its quarterly SEC filings and, when applicable, through press releases.  [Salomon Smith Barney, 12/11/2001, emphasis added]

> In addressing the issues, Dow Chemical […] and Halliburton […] couldn't be further apart […]  [Dow] hasn't mentioned asbestos litigation in either its own financial reports or those of its Union Carbide unit, which files separate reports [...]  **By contrast, Halliburton spends more than four pages of its financial filings giving the history and background of its asbestos litigation, […] [as well as] outlining its strategy and its estimated liabilities.** [*WSJ*, 2/11/2002, emphasis added]

74

### 3. The disclosures and analyst commentary before and after the alleged corrective disclosures demonstrate the absence of price impact

#### a. After the last alleged corrective disclosure, no analyst indicated that Halliburton had misled the market, and the analysts continued to indicate that Halliburton was effectively managing its asbestos liability

167.    The Fund claims that after the December 7, 2001 alleged corrective disclosure, when Halliburton reported adverse litigation results in certain pending cases, investors "instantly realized that the Company had been affirmatively misleading them in its assurances regarding the Company's asbestos exposure."[168]  However, none of the analysts covering Halliburton indicated after the Company's announcement on December 7, 2001 that they had been misled. On the contrary, analysts continued to think, after the end of the class period, that Halliburton was effectively managing its asbestos liability:

> We believe management is proactively managing this issue [asbestos]… We anticipate continued full disclosure on the issue by the company in the future. [A.G. Edwards, 12/10/2001]

> Halliburton employs an effective and aggressive legal strategy to defend its asbestos liabilities.  [Jefferies, 12/10/2001]

> Halliburton's exposure to asbestos liabilities has been well documented over the last year.  [RBC, 12/10/2001]

> Although we do not pretend to have legal insight into the outstanding litigations, **we believe that HAL has set aside substantial reserves**, has a solid balance sheet, and healthy cash flow, **to enable the company to absorb negative judgements [sic] against the company well in excess of estimated claims outstanding at this time.** [SunTrust Robinson Humphrey, 12/10/2001, emphasis added]

> We believe the sell-off was overdone and that the asbestos litigation, **which has been effectively handled by the company since 1976**, will not materially impact HAL's future financial condition.  [CIBC, 12/11/2001, emphasis added]

> In the past six months, Halliburton shares have been under nearly constant pressure as investors first soured on the outlook for oilfield service companies and then really hammered the stock based on perceptions that Halliburton's asbestos related liabilities would be building to a point that threatened Halliburton's

---

[168]   Complaint, ¶39.

APP 000080

financial viability.  **We do not agree that Halliburton's viability is really in question**, **but we do understand where the concern and the fear comes from and we also understand the reluctance of investors to make a bet on an issue that is so difficult to game as asbestos**.  Based on the known risks and liabilities, we think that Halliburton shares are significantly undervalued, but we retain our Hold rating due to our inability to quantify the unknown risks and future liabilities that could arise from pending asbestos related litigation.  [UBS, 1/24/2002, emphasis added]

The company will still have about 70,000 claims related to exposure for employees working for its Kellogg Brown & Root subsidiary. **These claims have been handled extremely well under Halliburton's management** and have been settled for about $200 per claim, after insurance reimbursement. [CIBC, 2/15/2002, emphasis added]

**HAL has a better track record in managing asbestos claims**. Historically, HAL's gross settlement cost per claim (before insurance payment) has averaged $720, while for Harbison the comparable number is about $6,500. With increased cooperation between HAL and Harbison, **we expect lower costs going forward.** [Jefferies, 2/15/2002]

168.    Note the Complaint quotes a couple of phrases from a December 7, 2001 post to TheSteet.com that are not consistent with analyst commentary. In particular, the Complaint states: "TheStreet.com reported: 'Halliburton Buried as Investors Stop Believing': Halliburton's shares dove to nine-year lows Friday as investors lost faith in the company's claims…'."[169]

169.    The Complaint does not complete the sentence that, in full, reads "Halliburton's shares dove to nine-year lows Friday as investors lost faith in the company's claims that asbestos litigation would never catch up with it."[170] I found no evidence that the Company ever made a statement that "asbestos litigation would never catch up with it" and the Complaint does not allege that the Company made such a representation.

170.    TheStreet.com is not an analyst report and there is no indication that it was authored by an analyst specifically following Halliburton. (In fact, there is no named author.) The article consists of only six sentences and contains no analysis or support for the quoted statements.

---

[169]  Complaint, ¶39.

[170]  "Halliburton Buried As Investors Stop Believing," *TheStreet.com*, December 7, 2001.

APP 000081

171.    The parts of the post quoted by the Complaint are inconsistent with contemporaneous analyst reports and other market commentary.  The quotes and the Fund's interpretation of their meaning are also inconsistent with the fact that Halliburton disclosed the possibility of a series of adverse litigation results that could have a material impact on the Company's financial position.  The Fund's assertion that this article supports its claim that it was "clear to all" that the $125 million accrued liability was "grossly inadequate"[171] is directly contradicted by the contemporaneous analyst commentary, as well as by the fact that analysts did not comment or express any surprise that the Company's reported $125 million in net liability the quarter after this alleged corrective disclosure.

> **b.  Halliburton's average cost per claim did not change substantially during the class period, and remained low relative to other companies**

172.    Halliburton's average cost per settled or otherwise disposed of claim remained steady throughout the entire class period, and actually decreased slightly during 2001. According to its SEC filings, Halliburton settled or disposed of approximately 36,000 claims in 2001 at a gross cost of $26 million, or $722 per claim.[172]  By comparison, Halliburton's historical average cost per claim was $752 as of December 31, 2000, and $764 as of December 31, 1999.[173]  The chart below shows Halliburton's historical cost per closed claim each quarter from the fourth quarter of 1998 through the fourth quarter of 2001.

---

[171]  Complaint, ¶39.

[172]  Halliburton 2001 Form 10-K, filed March 12, 2002, pp. 48-49; Halliburton 2000 Form 10-K, filed March 27, 2001, p.37.

[173]  As of December 31, 2000, Halliburton had settled approximately 165,000 claims since 1976 at a gross cost of $124 million. Halliburton 2000 Form 10-K, filed March 27, 2001, p.37.  As of December 31, 1999, Halliburton had settled approximately 129,650 since 1976 at a gross cost of $99 million. Halliburton 1999 Form 10-K, filed March 14, 2000, p.44.

APP 000082



173.    Analysts mentioned that Halliburton's cost per settled or otherwise disposed of claim remained at historical values during and after the class period.

Halliburton had been settling claims for less than $25 million per year in gross payout, **with no identifiable trend**, and had been recovering around 70% from insurers and carried a modest net liability on the balance sheet of around $30 million.  [Salomon Smith Barney, 8/22/2001, emphasis added]

During the quarter, the rate of new asbestos litigation claims filed declined to 13,000 from 27,000 in 2Q2001 and **11,000 claims were settled at close to the historic settlement cost.**  [A.G. Edwards, 10/23/2001, emphasis added]

[C]laims continue to be settled and/or paid at levels near HAL's historical net cost of less than $200/claim [net of insurance recoveries].  [Deutsche Bank, 10/24/2001]

Claims filings in the current quarter continue to show the slowdown trend seen in the third quarter and **the company continues to dispose of cases at or near its historical settlement costs.**  [UBS Warburg, 12/10/2001, emphasis added]

Importantly, **Halliburton's cumulative gross cost per claim has been flat to down over the past several years**…**which is not typical of other large asbestos defendants, we believe**.  [Morgan Stanley, 1/29/2002, emphasis added]

78

174.    Halliburton's historical cost per claim was much lower than most other companies that had asbestos liability, even after the end of the class period.[174]  Morgan Stanley analyzed this issue in a report on Halliburton issued after the end of the class period:

> Obviously, one of the more critical variables in estimating Halliburton's total asbestos exposure is the cost per claim associated with disposing of the claims that are filed against it.  **Historically, Halliburton has paid out much less on a per claim basis than most of the other well known asbestos defendants (see Exhibit 13).**  [Morgan Stanley, 1/29/2002, emphasis added]

Below is the chart from the Morgan Stanley analyst report.



**Chart from Morgan Stanley Analyst Report Dated January 29, 2002**

Exhibit 13
**Cost/Claim Comparison**

Source: Morgan Stanley Estimates, Company data

---

[174]  In addition, during the class period, analysts also commented that Halliburton's historical cost per claim was much lower than most other companies that had asbestos liability. *See,* for example, Jefferies, November 13, 2000. ("Halliburton's average settlement per claim is still way below the $20,000 or $30,000 per claim being paid out by other companies (such as Owens Corning) with more significant asbestos liabilities.")

APP 000084

**4.   The net asbestos liability that the Company reported after the end of the class period was unchanged and analysts did not express any surprise**

175.     The Company's asbestos liability net of insurance receivables did not change in the quarterly announcement following the end of the class period.  Halliburton's estimated net asbestos liability at the end of the fourth quarter of 2001, announced January 23, 2002, over a month after the end of the class period, was $125 million, the same number reported in the prior quarter.[175]

176.     The fact that analysts did not comment or express any surprise that the Company's net asbestos liability was unchanged demonstrates that the alleged corrective disclosures could not have disclosed to the market that the prior reported asbestos liabilities were understated or misleading.  If analysts believed that the December verdict announcements revealed that Halliburton's previously disclosed estimates were wrong and misleading, they would have been surprised by the lack of change in the following quarter.

177.     When the fourth quarter and year end 2001 net asbestos liabilities were announced on January 23, 2002 there was no commentary by the market suggesting that these amounts were misleading or incorrect even though these numbers were the same as the prior quarter's net asbestos liability (*i.e.*, these numbers were the same as the net asbestos liability booked in the quarter *before* Halliburton's press releases about the verdicts).  The fact that the analysts did not comment or express any surprise when Halliburton announced net asbestos liability that was unchanged is direct evidence that 1) the alleged corrective disclosures could not have disclosed to the market that the prior estimates of reported asbestos liability were understated or misleading and 2) there is no price impact from the alleged misrepresentations regarding Halliburton's reported asbestos liability.

**5.   The verdict announcements offer no support to the Fund's claim of price impact and demonstrate lack of price impact from the alleged asbestos misrepresentations**

178.     The evidence discussed in the section above demonstrates that the alleged misrepresentations concerning Halliburton's disclosed asbestos liability had no price impact.  The

---

[175]  *See* Halliburton Conference Call, January 23, 2002.

APP 000085

evidence concerning the alleged corrective disclosures (which relate to the announcement of adverse verdicts and judgments in asbestos cases) also demonstrates the absence of price impact.

179.    Other than the Harbison-Walker related announcements, which I address below, the only events the Fund claims are corrective of the alleged fraud regarding asbestos are the announcements in late 2001 regarding verdicts.  These announcements related to three verdicts in Texas, Mississippi, and Maryland, which are summarized in the table below:

| Asbestos Verdicts ($ in millions) | | | | | | |
|---|---|---|---|---|---|---|
| Verdict Date | Location | Total Verdict | Co Defendants | Halliburton Verdict Share | Number of Plaintiffs | Alleged Disease |
| 9/12/2001 | Texas | $130 | NARCO (Honeywell) | $65 | 5 | Lung Cancer, Colon Cancer, Asbestosis |
| 10/26/2001 | Mississippi | $150 | 3M, AC&S | $21 | 6 [1] | Asbestosis |
| 12/5/2001 | Maryland | $40 | AP Green, AC&S | $30 | 5 | Mesothelioma |

Notes:
[1] Halliburton's subsidiary Dresser Industries was defendant in two of the six claims.

180.    The Fund and its expert allege that corrective disclosures of the alleged asbestos misrepresentations occurred on the following days: October 30, 2001 (and the November 1, 2001 alleged continuation of the disclosure), December 4, 2001 (and the December 5, 2001 alleged continuation of the disclosure) and December 7, 2001.

181.    However, these announcements contained no new information regarding the Company's alleged misrepresentations (including any alleged misrepresentation about the Company's expected insurance recovery for asbestos claims).  As discussed below, the Company had disclosed and the market understood that there was a risk of adverse verdicts from its "aggressive" strategy of defending asbestos claims.  The only potential new information is the litigation result itself—such as the actual verdict or judgment.  But as discussed further below, several of the announcements of verdicts or judgments that the Fund claims are corrective were actually announced earlier to no reaction.  Even after the adverse verdicts were announced, analysts still commented positively on the Company's strategy and believed that there was a

81

good possibility the verdicts would be overturned or adjusted and, regardless of outcome, primarily covered by insurance.

182.    The Fund claims that the first of these verdicts, the Texas verdict on September 12, 2001, was "stunning confirmation" that Halliburton's prior statements regarding its asbestos exposure were "completely false."[176] Yet, I found there was no price reaction after the public announcement of this verdict, and therefore no price impact.  I similarly found no price reaction to the public announcement of the Mississippi verdict or the Texas judgment.

183.    Moreover, as discussed in the next section, I found the stock decline at the end of the class period was attributed to an increase in uncertainty and change in the economic and asbestos environment that also affected other companies.  I found that analysis of other companies with asbestos exposure demonstrated that Halliburton's price decline at the end of the class period was due to changing conditions and not the alleged fraud.

### a.  Halliburton's risk of adverse asbestos verdicts was disclosed to and known by the market

184.    There is no price impact from the alleged failure to disclose the risk that verdicts such as those occurring in late 2001 could occur because the risk of adverse asbestos verdicts was disclosed to the market before the class period.  Moreover, there was no price reaction or analyst commentary when Halliburton first discussed this risk.  In an efficient market, corrective information should affect the market when first disclosed[177] and if there is no price reaction, that is direct evidence that the alleged misinformation had no price impact.

185.    The Company disclosed the risk of adverse asbestos verdicts on October 23, 1998, before the beginning of the class period.  The Company's October 23, 1998 8-K filing stated in its asbestos litigation section that:

> **Management recognizes the uncertainties of litigation and the possibility that a series of adverse rulings could materially impact operating results.**
> However, based upon the Company's historical experience with similar claims, the time elapsed since the Company discontinued sale of products containing asbestos, and management's understanding of the facts and circumstances that

---

[176]   Complaint, ¶182.

[177]   *See*, for example, Richard A. Brealey, Stewart Myers & Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, 11th ed., 2014), 321-341.

APP 000087

gave rise to such claims, management believes that the pending asbestos claims
will be resolved without material effect on the Company's financial position or
results of operations.  [Form 8-K, filed on 10/23/1998, emphasis added]

186.    There was no price reaction following this disclosure, and no analyst or news
story discussed the announcement of the risk.

187.    After, this date, the risk of adverse asbestos verdicts was repeatedly disclosed by
the Company in numerous filings before and during the class period, including in its 1998 10-K,
1999 10-K, and 2000 10-K.

> **b.    The market knew during the class period that Halliburton's
> "vigorous" strategy of defending asbestos claims created the
> risk of adverse verdicts**

188.    During the class period, analysts commented positively on Halliburton's
"aggressive" strategy to fight claims:

> Asbestos issue is marginal: HAL currently has accrued $50 MM of asbestos
> liability, which is miniscule, compared to recent problem cases like MDR.  There
> are a number of differences between the 2 that cause this liability to be small.
> These include the fact that Dresser spun off this business to Global Industrial
> Technologies several years back, used finished (not raw) asbestos and
> **aggressively litigated claims**.  [Donaldson Lufkin Jenrette, 4/5/2000, emphasis
> added]

> One of the reasons Halliburton decided to step in and defend itself on the claims
> filed against Harbison-Walker since 1992, was its belief that Harbison was not
> providing adequate defense and was settling its claims at too high a cost.  Since a
> significant majority of Halliburton's defense costs are covered by insurance**, its
> defense strategy is one of the most aggressive in the industry.  This is one of
> the reasons why its settlement costs per claim is so much lower than those of
> other defendants.  If Halliburton is successful in executing this strategy vis-a-
> vis the Harbison-Walker claims, then investors should feel more comfortable
> that the company can limit the future potential liability and perhaps even
> shrink the current liability on its balance sheet**.  [UBS, 10/24/2001, emphasis
> added]

189.    Analysts following the Company also understood that litigation brought with it
uncertainties, and that Halliburton's strategy could result in adverse verdicts:

> **[T]he pending asbestos litigation remains unresolved, and it could severely
> impact the company financially if punitive damages are rewarded to
> plaintiffs.**  [ING Barings, 10/25/2000, emphasis added]

APP 000088

**The inherent uncertainty of litigation as well as the possibility of a series of adverse court rulings** or new legislation could quickly alter HAL's position, **makes it very difficult for the company [to] accurately predict the outcome**. [A.G. Edwards, 8/10/2001, emphasis added]

Given that some of Halliburton's asbestos cases will end up being tried in court, the **company always runs the risk of losing and being hurt with large jury awards**. [UBS Warburg, 10/24/2001, emphasis added]

190.    After the class period, analysts continued to comment positively on Halliburton's "aggressive" strategy to fight claims, even though it had resulted in adverse verdicts and could continue to result in adverse verdicts in the future.  For example, the Morgan Stanley analyst discussed in detail Halliburton's "aggressive" strategy to fight claims, including its success in getting claims dismissed and the risk of adverse verdicts:

**Halliburton's willingness to contest claims it views as weak does leave it vulnerable to occasional negative jury verdicts, although we like the company's strategy in handling the issue.**  As a result, the newsflow related to asbestos is inherently asymmetrical, which makes the company's strategy appear more risky than it is, in our view.  Large negative verdicts grab headlines; there are no headlines related to the 40–50% of claims that Halliburton closes without paying a penny to claimants
[…]
Unlike many asbestos defendants […] Halliburton continues to aggressively assert a defense against a significant number of the claims filed against it.  **We believe Halliburton's approach to managing its asbestos liabilities is both prudent and appropriate and is the best option available to it.**  The mass settlement programs employed by numerous other asbestos defendants have generally led to an increase in claims and liability for those employing them
[…]
Halliburton has managed to close 40% of its refractory-related claims and 50% of its non-refractory claims without any payment to Plaintiff.  **The downside to the legal strategy employed by Halliburton is that it exposes the company to adverse trial court decisions**.  [Morgan Stanley, 1/29/2002, emphasis added]

191.    Other analysts also commented positively after the end of the class period on Halliburton's asbestos litigation strategy:

**HAL's aggressive defense strategy intact** and vigorous appeals expected – Bankruptcy risk very low given strong financial position… Despite the recent negative jury awards, Halliburton is **committed to continuing to pursue a vigorous defense strategy** in fighting the pending asbestos claims and any future

84

asbestos claims… **[W]e believe management is proactively managing this issue**.  [A.G. Edwards, 12/10/2001, emphasis added]

**Halliburton employs an effective and aggressive legal strategy to defend its asbestos liabilities.** The company has historically settled majority of its cases at reasonable amounts.  Since 1976, the company has resolved approximately 194,000 claims at an average cost, after expected insurance reimbursement, of less than $200 per case.  In the most serious asbestos cases involving mesothelioma (lung cancer), Halliburton has faced 400 claims since last year, with an average cost of $12,500 per case (prior to 3 recent decisions). [Jefferies, 12/10/2001, emphasis added]

Moody's downgrades Halliburton's long-term ratings […] [and] is maintaining a negative outlook on Halliburton's ratings in light of the risk that the company's asbestos-related costs could rise in the future.  **Moody's noted that Halliburton has maintained a solid track record in managing its claims despite the recent adverse jury verdicts**, that it has substantial insurance coverage, and that its asbestos-related liabilities have not altered its business prospects.  [Moody's, 1/23/2002, emphasis added]

**Halliburton's track record in court has been very good.**  [SunTrust Robinson Humphrey, 1/28/2002, emphasis added]

192.    Not only did Halliburton disclose the risk of adverse asbestos verdicts to no price reaction or market commentary before the class period, but analysts, throughout and after the class period, commented positively on Halliburton's "aggressive" strategy to fight claims even though it created the risk of adverse verdicts.  The fact there was a risk of adverse verdicts was known and disclosed to no price reaction or market commentary.  The strategy of defending asbestos claims aggressively was known to the market and considered a good strategy even after the end of the class period.  Thus, there is no price impact from any alleged misrepresentation regarding the strategy or risks for handling asbestos claims.

85

c. **The lack of price reaction following the large Texas verdict demonstrates that the information the Fund claims is corrective actually had no price impact; moreover, the verdict itself is not corrective of the alleged fraud**

193.    The Fund claims that the September 12, 2001 Orange County, Texas verdict for $130 million was a "stunning confirmation" that Halliburton's prior statements regarding its asbestos exposure were "completely false."[178]

194.    If the Fund's claim is true—that the alleged misrepresentations regarding asbestos impacted Halliburton's stock and that this verdict was "stunning confirmation" that the prior statements were "completely false"—then one would expect to see a negative stock price reaction to the first public disclosure of this verdict.  Yet, there was no such reaction by the market.  There was no statistically significant price reaction to the public announcement of this verdict.

195.    The earliest published news story I found of the Texas verdict was a September 20, 2001 article printed and posted on the website of *The Beaumont Enterprise*, the Hearst Corporation daily newspaper covering Orange County, Texas.  The article was titled "Orange jury set record for damages in asbestos lawsuit" and reported that Dresser, Halliburton's subsidiary, was one of two defendants in the case.  There was no statistically significant price reaction after this public disclosure despite it mentioning the verdict's record size and the Company's involvement (before and after a multiple comparisons adjustment). *See* Exhibit 1.  Ms. Nettesheim's event study similarly did not find a statistically significant price reaction after this announcement.[179]

196.    The Texas verdict was again publicly discussed the following day, September 21, 2001, in a report issued by Mealey's, a commonly-used source of litigation and asbestos news.[180]  Again, there was no statistically significant price reaction after the news of the verdict was released in the Mealey's report titled "Texas Jury Awards 5 Plaintiffs $130 Million Against NARCO, Dresser Industries For Exposure" (before or after the adjustment for multiple

---

[178]  Complaint, ¶38.

[179]  Nettesheim Report, Exhibit 17.

[180]  Mealey's is a trusted source and premier provider of litigation and asbestos news.

86

comparisons).  *See* Exhibit 1.  Ms. Nettesheim's event study similarly did not find a statistically significant price reaction after this announcement.[181]

197.    After a later verdict was announced in December 2001, an analyst noted that there had been no decline in Halliburton's stock price after the earlier Texas verdict:

> **Note that Hal's share didn't fall when the news on these cases [Texas and Mississippi verdicts] came out** […]
>
> **Looking at Halliburton's share price performance over the past year it is interesting to note that it didn't move – up or down – when the first high profile case was announced in September** (we didn't find the SEC filing for that case) or when the company made the filing for the second case, on the 30th of October. [Credit Suisse, 12/10/2001, report on Cooper industries, emphasis added]

198.    There also was no statistically significant price reaction following the Company's December 4, 2001 disclosure that the court had issued a judgment on the Texas verdict (before or after the adjustment for multiple comparisons).  *See* Exhibit 1.

199.    The total amount of $130 million in the Texas verdict was a record amount at the time it was rendered in September 2001.[182]  Halliburton had not previously had a verdict in which its share was near $65 million, and this amount is larger than any of the three large verdicts that the Fund claims are alleged corrective disclosures.[183]

200.    Despite being a record verdict, there was no statistically significant price reaction when the verdict was publicly announced for the first time, or when Halliburton announced the judgment months after the verdict had been publicly announced, indicating that the allegedly corrective information in the large verdict had no price impact.

201.    If the Texas verdict itself was "stunning confirmation" that the Company had misled the market about its asbestos liability, as the Fund claims, then the fact that there is no price reaction to the public disclosure of the verdict is evidence that the alleged misrepresentations had no price impact.  In truth, however, contrary to the Fund's claim, the

---

[181]   Nettesheim Report, Exhibit 17.

[182]   "Orange jury sets record for damages in asbestos lawsuit," *The Beaumont Enterprise*, September 20, 2001.

[183]   Based on a review of asbestos verdicts against Halliburton disclosed in Halliburton's SEC filings and announced in Mealey's Litigation Reports.

APP 000092

adverse Texas verdict was not corrective of any alleged misrepresentation. As discussed above, the Company had disclosed and the market understood that there was a risk of such adverse verdicts.

### d. The October 30, 2001 alleged corrective disclosure—when the Company announced the $150 million Mississippi verdict— was announced earlier to no price reaction and was not corrective of any prior alleged misrepresentation

202.    On October 30, 2001, Halliburton announced that on October 26, 2001 a jury in Mississippi found Dresser liable for combined compensatory damages of $21.25 million for two of six plaintiffs that had asbestosis claims.  The total verdict for the six plaintiffs against all defendants was for $150 million, "one of the largest compensatory verdicts in the history of asbestos litigation."[184]  The verdict was against three defendants: Dresser Industries, AC&S Inc. and 3M Corp.  The Complaint does not make any allegation about the Mississippi lawsuit, or Halliburton's October 30, 2001 disclosure.

### i. The Mississippi verdict was announced two days earlier to no price reaction

203.    The first publicly available news I could find about the Mississippi verdict was released on Sunday, October 28, 2001, two days before Halliburton's announcement.  The news article was published in the Clarion-Ledger, a Mississippi state-wide newspaper, and noted that Dresser Industries was a codefendant in the verdict:

> A Holmes County Circuit Court jury awarded $150 million in compensatory damages to six laborers from Attala and Holmes counties who were exposed to asbestos as far back as the 1950s, their attorney said Saturday.  Before the three-week trial began, Jackson attorney Issac Byrd said his clients settled with two of the 15 manufacturers named in the lawsuit. AC&S and Dresser Industries in Pennsylvania and 3m Corp. in Minnesota chose a jury trial.[185]

204.    The following day, Dresser's codefendant in the case, 3M Corp., made a public announcement about the verdict and mentioned Dresser as a codefendant:

> 3M Corp. said Monday [October 29] that it will appeal a jury's award of compensatory damages to six Mississippi laborers who were exposed to asbestos

---

[184]  "Asbestos case leads to $150 M jury award," *The Clarion Ledger,* October 28, 2001.

[185]  "Asbestos case leads to $150 M jury award," *The Clarion-Ledger*, October 28, 2001.

88

as far back as the 1950s.  A jury in Lexington, Miss., on Friday **awarded $150 million to the laborers in the lawsuit involving 3M and two Pennsylvania companies, AC&S and Dresser Industries.**  3M's share of the verdict was $22.5 million.[186]

205.    Halliburton's stock did not have a statistically significant price reaction on Monday, October 29, 2001, following the October 28 and October 29 news releases (before or after the adjustment for multiple comparisons).  *See* Exhibit 1.  Ms. Nettesheim's event study similarly did not find a statistically significant price reaction after this announcement.[187]

206.    As already noted, after a later verdict was announced in December 2001, an analyst noted that there had been no decline in Halliburton's stock price after the earlier Mississippi verdict:

> **Note that Hal's share didn't fall when the news on these cases [Texas and Mississippi verdicts] came out** […]
>
> **Looking at Halliburton's share price performance over the past year it is interesting to note that it didn't move – up or down –** when the first high profile case was announced in September (we didn't find the SEC filing for that case) **or when the company made the filing for the second case, on the 30th of October**.  [Credit Suisse, 12/10/2001, report on Cooper industries, emphasis added]

207.    The October 28, 2001 news article on the Mississippi verdict reported the asbestos plaintiffs' lawyers claim that this was "the largest compensatory damage award for asbestos exposure in the nation."[188]  A report by the RAND Corporation, a non-profit think tank, also noted that the October 26, 2001 verdict was for "far more than any asbestosis award ever before delivered."[189]  Making the verdict arguably more surprising was that it was for "unimpaired" asbestosis claims rather than claims for a deadly disease such as mesothelioma.[190]

208.    Despite the verdict's unprecedented size, especially given that it was for "unimpaired" claims, only two Halliburton analysts issued reports following the alleged

---

[186]  "3M to appeal asbestos case ruling," *Associated Press*, October 28, 2001 (emphasis added).

[187]  Nettesheim Report, Exhibit 17.

[188]  "Asbestos case leads to $150 M jury award," *The Clarion-Ledger*, October 28, 2001.

[189]  Stephen J. Carroll et al., *Asbestos Litigation*, (RAND: Santa Monica, CA, 2005).

[190]  Morgan Stanley, January 29, 2002 ("Another interesting point of reference is that each of the (unimpaired) plaintiffs in the Mississippi trial were awarded $25 million (payment of which is allocated between Halliburton and several other defendants, Halliburton's share is about $21 million).").

APP 000094

corrective disclosure.  These analysts noted that the *verdict itself* did not change the asbestos liability for the Company but that the size of the verdict was surprising and the asbestos litigation environment was unpredictable and irrational.

> This jury award sets new precedents; the size of award is enormous and jury finding was based on shortness of breath and spots on the lung, not actual presence of asbestosis, a form of asbestos-related lung cancer.  [A.G. Edwards, 10/31/2001]

> The disclosure itself is a change of procedure for Halliburton but **does not appear to signal a meaningful change in the pattern of asbestos litigation for the company…** We continue to monitor the situation closely and **we recognize the unpredictability and apparent irrationality of the asbestos litigation environment** in general.  [Salomon Smith Barney, 10/31/2001, emphasis added]

209.    Thus, the October 30, 2001 alleged corrective disclosure—when the Company announced the $150 million Mississippi verdict—was not corrective of any prior alleged misrepresentation regarding the Company's reported asbestos liability and was announced earlier to no price reaction.

### ii.    There was no statistically significant price reaction following the October 30, 2001 announcement, after adjusting for multiple comparisons

210.    My findings show that there was no statistically significant price decrease following the October 30, 2001 announcement.  When tested in isolation, the price reaction following the October 30, 2001 announcement was statistically significant.  However, this result should not be surprising given the 35 dates on which the Fund has alleged a misrepresentation and/or a corrective disclosure and the 35 tests of statistical significance performed.  After the appropriate adjustment for 35 multiple comparisons, the price reaction after this announcement was not statistically significant.  *See* Exhibit 1 for details.  Additionally, after the appropriate adjustment for 35 multiple comparisons, there was no statistically significant price reaction on November 1, 2001, which Ms. Nettesheim considers to be a continuation of the price reaction after the October 30, 2001 announcement**.**  *See* Exhibit 1.  This lack of statistical significance does not support price impact of the alleged asbestos misrepresentations.

90

**e. The December 4, 2001 alleged corrective disclosure—when the Company announced the judgment of the Texas verdict—was not corrective of any alleged misrepresentation**

211.     On December 4, 2001, the Company announced in an 8-K filing that on November 29, 2001 a Texas district court had entered a judgment against Dresser for its $65 million share of the Texas jury verdict rendered on September 12, 2001. This is the same Texas verdict discussed above. In the same filing, the Company disclosed that the same district court also entered three additional judgments against Dresser in favor of 100 other asbestos plaintiffs in the aggregate amount of $35.7 million related to an alleged breach of a purported settlement agreement signed earlier in the year by Harbison-Walker.

212.     As discussed below, after examination of this alleged corrective disclosure, I find that there was no price impact from this announcement.

**i. There was no statistically significant price reaction after the announcement of the Texas judgments on December 4, 2001 or December 5, 2001**

213.     There was no statistically significant price reaction after the Company's announcement of the Texas judgments on December 4, 2001 (before or after the adjustment for multiple comparisons). In addition, there was no statistically significant price reaction (before or after the adjustment for multiple comparisons) on December 5, 2001, which Ms. Nettesheim considers to be a continuation of the price reaction after the December 4, 2001 announcement.

**ii. The Texas verdict was announced more than two months earlier to no statistically significant price reaction**

214.     The Fund's allegations imply that the Texas verdict was first made public after the December 4, 2001 announcement of the judgment. However, as discussed above, the Texas verdict had been rendered on September 12, 2001, more than two months before the December 4, 2001 announcement and publicly disclosed in several news articles, trade publications, and analyst reports.

215.     As discussed above, the first public announcements of the verdict that I could find were on September 20, 2001 and September 21, 2001. *The Beaumont Enterprise* printed and posted to its website an article discussing the verdict on September 20, 2001, and Mealey's released a report on the verdict on September 21, 2001. There were no statistically significant

APP 000096

price reactions to Halliburton's stock on either date (before or after the adjustment for multiple comparisons). *See* Exhibit 1. Ms. Nettesheim's event study similarly did not find a statistically significant price reaction on either of these dates.[191]

216.    The Texas verdict was also discussed in several analyst reports on Halliburton before the December 4, 2001 alleged corrective disclosure, including the following:

> Although some investors are concerned over the implications of a recent large jury award to an asbestos claimant, the facts of the case remain unclear and HAL believes that the ruling is highly likely to be overturned on appeal. [Deutsche Bank, 10/5/2001]

> [D]uring the quarter the company was subject to an adverse jury verdict in Orange County, Texas.  [Salomon Smith Barney, 10/23/2001]

> In the last month or so, the company lost a case in Texas, in which five Plaintiff were awarded $65 million by a jury.  [UBS, 10/24/2001]

> However, during the quarter the company was subject to an adverse jury verdict in Orange County, Texas.  The jury found in favor of five Plaintiff and awarded $15 million in compensatory damages and $50 million in punitive damages. [Salomon Smith Barney, 11/9/2001]

217.    An analysts also commented, after the December 4, 2001 announcement, that this verdict "had been widely known" for weeks, and thus was not "incremental news":

> We do not believe this is incremental news, as the verdict had been rendered several weeks ago and the information on the case had been widely known. [SunTrust Robinson Humphrey, 12/5/2001]

### iii.  The disclosure on December 4, 2001 of judgments related to an alleged breach of contract was not corrective of any alleged misrepresentation

218.    In the same 8-K filing that disclosed the Texas verdict on December 4, 2001, the Company also announced that a Texas district court entered three judgments against Dresser in favor of 100 asbestos plaintiffs in the aggregate amount of $35.7 million related to an alleged breach of a purported settlement agreement signed earlier in the year by a lawyer hired by Harbison-Walker.  These three judgments are not corrective of any alleged misrepresentation.

---

[191]   Nettesheim Report, Exhibit 17.

Halliburton made no prior representations about these cases in which the Texas court entered the judgments.  And as I discuss above, the Company had disclosed and the market was aware of the possibility of adverse rulings regarding asbestos litigation.

219.    Market commentary concerning these judgments indicates the market did not find them corrective of any prior misrepresentation. One analyst noted that "[v]igorous appeals [were] expected" and reminded investors that "HAL has been able to settle similar claims at much lower costs."[192]  Another analyst discussing the judgment on the verdict also announced that day (which it concluded was "not . . . incremental news" because "the information on the case had been widely known" for weeks), but included no mention whatsoever of the separate judgments on the breach of settlement agreement claims.[193]

220.    Moreover, there was no price reaction after this announcement (before or after the adjustment for multiple comparisons).  Thus, this alleged corrective disclosure offers no support for price impact of the alleged asbestos misrepresentation.

          **f.   The December 7, 2001 alleged corrective disclosure—when the Company announced the Maryland verdict—was not corrective of any alleged misrepresentation**

221.    On December 7, 2001, Halliburton announced a December 5, 2001 jury verdict in Baltimore, Maryland of which Dresser's share was $30 million.[194] The verdict awarded five plaintiffs $40 million and was against three defendants: Dresser Industries, AC&S Inc. and A.P. Green Industries.[195]

222.    Halliburton's stock price had a statistically significant price decline on December 7, 2001.  The stock rebounded a statistically significant amount on the following trading date, December 10, 2001.  According to the event study, after controlling for market and industry conditions, on December 10, 2001 Halliburton's stock rebounded 17% or approximately $900 million in market value.  *See* Exhibit 1.

---

[192]  A.G. Edwards, December 5, 2001.

[193]  SunTrust, December 5, 2001.

[194]  *See* Halliburton Press Release, December 7, 2001.

[195]  *See* "Asbestos Verdict is $40 Million," *The Baltimore Sun,* December 7, 2001.

APP 000098

223.    Halliburton's December 7, 2001 announcement did disclose the two-day-old Maryland verdict but did not include any new information regarding any of the alleged misrepresentations concerning the Company's asbestos liability.

224.    The Fund's theory that the December 7 disclosure caused investors to "realize[] that the Company had been affirmatively misleading them . . . regarding the Company's asbestos exposure"[196] is contradicted by the market's reaction to the disclosure of the previous, larger verdicts and judgment.  As discussed above, there was no statistically significant price reaction to the Texas and Mississippi verdicts.  By many measures, these prior verdicts were larger than the Maryland verdict.  The prior verdicts were larger in terms of total amount, Halliburton's share of the verdict and average verdict per plaintiff:

- The total verdict in Maryland was $40 million, while the total verdict in Texas was more than three-times as large at $130 million and the total verdict in Mississippi was almost four-times as large at $150 million;

- The verdict amount per plaintiff in Maryland was $8 million, while the verdict amount per plaintiff in Texas was more than three-times as large at $26 million and the verdict amount per plaintiff in Mississippi was more than three-times as large at $25 million; and

- Halliburton's share of the verdict in Maryland was $30 million while the Company's share of the verdict in Texas was more than twice as large at $65 million.

225.    Moreover, the Maryland verdict was for plaintiffs with mesothelioma, the type of claim that would be expected to have higher dollar awards as it is considered a fatal disease caused only by asbestos, and thus would not be expected to have a bigger price reaction than the earlier verdicts.  Mesothelioma claims were considered the most meritorious of all asbestos claims and have historically received higher settlement and jury awards than other asbestos claims.  Analyst and trade publication reports discussed this issue:

> The most serious of asbestos-related diseases, mesothelioma (meso) is a cancer of the membranes that cover and protect the lungs. Meso is the hallmark asbestos disease; asbestos is the only known cause and the disease has an extremely long latency period (30–40 years, in some cases).  Meso is generally fatal within 18 months of diagnosis.  Fortunately, it is also rather rare, even among individuals

---

[196]   Complaint, ¶ 191.

with a long history of asbestos exposure. **Meso claims are considered the most meritorious of all asbestos claims**, due to both the severity of the illness and the fact that asbestos is the only known cause. **Meso patients generally receive the highest settlements and jury awards on their claims**. [Morgan Stanley, 1/29/2002, emphasis added]

As a result of the differences in average jury awards by injury type, although Plaintiff with noncancerous diseases accounted for the largest number of plaintiff verdicts, **mesothelioma Plaintiff obtained the largest proportion of dollars awarded**. As Figure 3.11 illustrates, **60 percent of all dollars awarded by juries went to mesothelioma Plaintiff, who accounted for only 30 percent of all plaintiff verdicts.** In contrast, Plaintiff with diseases other than cancer or asbestosis, who accounted for 20 percent of plaintiff verdicts, got 5 percent of the total dollars awarded. [RAND Report, 2005, emphasis added]

226.     Plaintiff's allegation that the disclosure of the Maryland verdict was corrective of the alleged misrepresentations is also contradicted by analysts' reactions after December 7. Analysts continued to believe that Halliburton had been "managing the [asbestos] risk with appropriate reserves"[197] and that the verdicts would get overturned or adjusted, especially since the verdicts related to Harbison-Walker claims for which Halliburton did not become involved until late in the process and thus did not have the opportunity to fully defend.[198] Moreover, analysts believed that the verdicts would be largely covered by insurance.

HAL has ample liquidity and insurance coverage to deal with any asbestos claims:…  Harbison Walker (the former Dresser sub) has $2 billion of insurance coverage and HAL has Equitas backing it, which has over $10 billion in assets. [Deutsche Bank, 12/10/2001]

We are not concerned about the effects of these liabilities on Halliburton's financial health at this time. [RBC, 12/10/2001]

The three multi-million dollar jury verdicts of the past two months relate to Harbison-Walker cases filed since 1992…However, Halliburton has approximately $2 billion of insurance recoverables related to H-W cases, and intends to vigorously appeal the three aforementioned cases. [Salomon Smith Barney 12/11/2001]

---

[197] SunTrust, December 10, 2001.

[198] *See,* for example, A.G. Edwards, December 10, 2001 ("In all of the cases, HAL's grounds for appeal could results [*sic*] in favorable outcomes in the courts of appeal […] Importantly, all of the recent juror awards have come in H-W cases where HAL did not become involved until late in the process and its typical defense strategy was not fully utilized."); RBC, December 10, 2001 ("Management is very confident and certainly makes a convincing case that all of the recent verdicts will be significantly reduced or overturned on appeal. Following the appeals process, Halliburton has never paid more than $1.8 million to settle a claim.").

95

Importantly, all of the recent juror awards have come in H-W cases where **HAL did not become involved until late in the process and its typical defense strategy was not fully utilized**. [A.G. Edwards, 12/10/2001, emphasis added]

While the recent verdicts clearly stand out from the company's past settlement practice, **it is fair to say that the new verdicts were delivered against Harbison-Walker's legal team, not Halliburton's.** [SWS Securities, 12/10/2001, emphasis added]

Although **we think the Maryland, Texas and Mississippi cases will be overturned or adjusted in Halliburton's favor**, the jury verdicts in these totaled $116 million for 16 plaintiffs. [CIBC, 12/11/2001, emphasis added]

**Halliburton believes, with justification (in our view), that its ultimate payouts in the three verdicts rendered last week will be a fraction of the $131 million** in total assessed damages. [Bear Stearns, 12/11/2001, emphasis added]

It is important to note that Halliburton was brought into these H-W cases in June 2001, well after they were underway. This **prevented Halliburton from employing their typical defense strategy, which has proven to be effective to date**. Halliburton was not able to get witnesses listed for trial, nor were they able to use documents they would have liked because of the status of the cases when Halliburton came on board. [CIBC, 12/11/2001, emphasis added]

[T]he **four judgments are almost immaterial on their own, as each would be reimbursable at a 95% rate under insurance, if they were affirmed.** [Morgan Stanley, 1/29/2002, emphasis added]

227.     Analysts did not believe that the verdicts revealed any flaw in or misrepresentation of Halliburton's asbestos strategy or reserves for pending claims:

HAL's **aggressive defense strategy intact.** [A.G. Edwards, 12/10/2001, emphasis added]

Halliburton employs an **effective and aggressive legal strategy** to defend its asbestos claims. [Jefferies, 12/10/2001, emphasis added]

While the recent verdicts clearly stand out from the company's past settlement practice, it is **fair to say that the new verdicts were delivered against Harbison-Walker's legal team, not Halliburton's**. [SWS Securities, 12/10/2001, emphasis added]

We believe there are no indications that the suits filed against the company are spiraling out of control and we believe **HAL management has been very forthright** with the pending litigation procedures while aggressively **managing**

96

**the risk with appropriate reserves** and the appeals process.  [SunTrust Robinson Humphrey, 12/10/2001, emphasis added]

228.    In summary, the price reaction after the announcement of the Maryland verdict is not evidence of price impact of the alleged misrepresentations regarding asbestos.  First, the announcement contained no information corrective of the alleged misrepresentations. Second, the lack of price impact following the disclosure of the earlier verdicts and judgments refutes the notion that a large verdict itself offered "stunning confirmation" that Halliburton's prior statements regarding its asbestos liability were false.  And third, analyst commentary following the December 7 announcement shows that the market did not view it as indicating that Halliburton had misled the market about its asbestos liability.

> **6.  Halliburton's stock decline at the end of the class period was attributed to an increase in uncertainty and the change in the economic and asbestos environment that also affected other companies**

229.    On the last day of the class period, no new information was disclosed regarding the alleged misrepresentations, other than an adverse verdict, which is not corrective.  Halliburton's price decline at the end of the class period was attributed to an increase in uncertainty and the change in the economic and asbestos environment at the end of the class period, rather than to an alleged corrective disclosure of prior alleged misrepresentations about the Company's asbestos liability.  The fact that other companies with asbestos exposure were similarly affected demonstrates that Halliburton's price decline at the end of the class period was not due to the revelation of alleged fraud but to the change in the economic and asbestos environment.

> **a.  There was increased uncertainty and volatility at the end of the class period**

230.    According to analysts and options pricing data, Halliburton's price decline after the December 7, 2001 announcement was due to an increase in uncertainty and irrationality.  In addition, Enron's recent bankruptcy reportedly further increased uncertainty, which affected the price of Halliburton's stock at the end of the class period.

97

231.    Investors are generally risk-averse and to the extent that risk or uncertainty increase, values will fall. It is a basic financial principle that "[a] safe dollar is worth more than a risky one."[199] As explained by a textbook on investment analysis:

> "Most investors require higher rates of return on investments if they perceive there is any uncertainty about the expected rate of return. This increase in the required rate of return over the NRFR [nominal risk-free rate of return] is the risk premium."[200]

232.    The evidence is contrary to the Fund's claim of price impact of the alleged misrepresentations. Rather than commenting at the end of the class period that they had been misled, analysts covering Halliburton focused on the increasing uncertainty and irrationality:

> However, **the current climate is sufficiently uncertain to merit more caution** on our part.  [UBS Warburg, 12/7/2001, emphasis added]

> We continue to monitor the situation closely and **we recognize the unpredictability and apparent irrationality of the asbestos litigation environment in general**.  [Salomon Smith Barney, 12/7/2001, emphasis added]

> Downgrading Halliburton's short and long-term rating, **due to increasing uncertainty surrounding asbestos litigation.**  [Hibernia, 12/7/2001, emphasis added]

> Our **cautious view on HAL was based upon ongoing asbestos-rated [*sic*] legal uncertainty** and our view of some near-term earnings risk.  [Jefferies, 12/10/2001, emphasis added]

> In our opinion, the recent sell-off in the shares is excessive based on the known facts.  However, **it is the "unknown" when it comes to asbestos liabilities that causes us concern.** [RBC Capital Markets, 12/10/2001, emphasis added]

> **Results of asbestos litigation have proven to be unpredictable and often irrational.**  The number of claims submitted to Halliburton doubled in 2Q01 sequentially, then dropped in the following quarter.  Overall, claims have risen in recent years and show no signs of subsiding.  **Also, while the settlement process tends to produce reasonable and predictable results, venue shopping and unpredictable juries increase the likelihood of occasional large judgments, as recently seen.**  Future cost per claim could be materially higher compared to the historical cost of $200 per claim (net to HAL).  [Jefferies, 12/10/2001, emphasis added]

---

[199]  Richard A. Brealey, Stewart C. Myers & Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, 11th ed., 2014), 22.

[200]  Frank K. Reilly & Keith C. Brown, *Investment Analysis and Portfolio Management* (Thomson: Boston, 6th ed., 2000), 19.

APP 000103

We believe near-term, potentially negative, asbestos-related events include: 1) Additional **large jury verdicts that, by their nature, are unpredictable as to timing and amount.** [RBC, 12/10/2001, emphasis added]

It is also difficult to predict the sometimes irrational civil court system. [CIBC, 12/11/2001]

Asbestos, in our opinion, is not the fault of [Crown Cork & Seal]. Rather, it can be attributed, in our opinion, to a U.S. legal system that has run amok when it comes to asbestos litigation. [Bear Stearns, 12/13/2001, report on Crown Cork & Seal]

If the claims are manageable, why are investors still selling the stock at depressed levels? Beyond the fear that the claims and lawsuits could escalate substantially, **many investors appear to be selling just to avoid the lingering uncertainty.** Some investors hold the view that even if the oil service group rebounds this year in an economic recovery with higher energy prices and drilling activity, **Halliburton stock price could lag behind, dogged by continuing uncertainty about asbestos.** [SunTrust Robinson Humphrey, 1/28/2002, emphasis added]

233.    Analysts lowered their expectations of Halliburton's stock price because of increased uncertainty. For example, on December 7, 2001, the analyst from Salomon Smith Barney lowered his price target for Halliburton from $36 to $20, a 44% decrease. According to the analyst, the reduction in the price target was due to uncertainty. The report stated: "We are further dropping our price target to $20 from $36 […] due to the uncertainty surrounding the asbestos liabilities."[201] The analyst made no mention of being misled by the Company about its asbestos liability, and, in fact, three days later stated, "[M]anagement has been very, very forthcoming and proactive in getting disclosure out to investors on the asbestos situation."[202] This demonstrates that Halliburton's stock price decline at the end of the class period is not evidence of price impact due to the alleged fraud but rather a product of increasing uncertainty and changing market conditions.

234.    The expected volatility of Halliburton's stock price dramatically increased at the end of the class period. In particular, there was a huge increase in Halliburton's implied volatility, a measure of expected stock price volatility, after the December 7, 2001 announcement.

---

[201]   Salomon Smith Barney, December 7, 2001.

[202]   Salomon Smith Barney analyst on CNN, December 10, 2001. This was part of a CNN interview of Geoff Kieburtz, an analyst with Salomon Smith Barney.

APP 000104

235.    Implied volatility is a measure of the market's expectation of the future variability in the stock price. It is derived from the price of options traded on that stock.[203]  By examining option prices, one can back out the market's expectations of future volatility. In simple terms, options are contracts to buy or sell a stock in the future at a predetermined price.  The value of options is in large part determined by the expected volatility of the stock price.  In general, higher volatility means higher option prices because the higher the volatility, the greater the likelihood the option will be "in-the-money."  An increase in implied volatility indicates that the market expects the stock price to become more variable in the near future.  The higher the implied volatility of a stock, the greater variability the market expects to see in that stock's price.

236.    The chart below shows Halliburton's stock price and implied volatility during the class period.  Importantly, there is a large spike in implied volatility right after the end of the class period, but there is no similar increase after any announcement of the Texas or Mississippi verdicts and judgments, indicating that the increase in volatility was not driven by the announcement of a large verdict (which the Fund claims is corrective) but by a change in the market's expectations about future uncertainty.  In other words, the market was reacting to an increased perceived variability in the future stock price, not the realization that the Company "had been affirmatively misleading them" in prior disclosures regarding the Company's asbestos liability.[204]  This demonstrates that Halliburton's stock price decline at the end of the class period is not evidence of price impact due to the alleged fraud but rather a product of increasing uncertainty.

---

[203]   *See*, for example, Aswath Damodaran, *Investment Valuation*, (John Wiley & Sons, Inc.: New York, 2nd ed., 2002), 99.

[204]   Complaint, ¶ 191.

APP 000105



237. The bankruptcy of Enron in December 2001 also contributed to the increasing uncertainty in the market at the end of the class period. Analysts believed that the drop in Halliburton's stock price at the end of the class period was in part caused by the increasing uncertainty in the market created by the Enron bankruptcy:

A series of asbestos related verdicts against Halliburton, the large oil field service business based in Dallas, has caused a major decline in the value of its stocks. **Analysts say that investors are also responding to the recent collapse of Enron** in their fears that Halliburton could face a steadily mounting volume of asbestos liabilities. [Insurance Information Institute, 12/8/2001, emphasis added]

**Call it the Enron aftershock**. **Investors frightened by Enron's rapid demise** jettisoned shares of the Halliburton Company yesterday after the latest in a string of asbestos-related verdicts against the company stoked fears of mounting liabilities, analysts said... **"It has to do with Enron,"** said Wesley Maat, a stock analyst who follows oil field services companies at Dresdner Kleinwort

Wasserstein. "After what happened there, investors seem to feel that anything is possible." [*New York Times*, 12/8/2001, emphasis added]

Although we understand the inclination to sell Halliburton based on the increased uncertainty of the asbestos litigation, **we believe that a portion of the stock price decline was due to the enormous losses as a result of the recent Enron bankruptcy filing**. Understandably, investors are extremely skittish and more inclined to exit first and ask questions later. Although we recognize that this developing situation is likely to cap the upside potential of Halliburton's stock price, we continue to believe that the market has overreacted and the current valuation of HAL is attractive. [A.G. Edwards, 12/10/2001, emphasis added]

Some investors hold the view that even if the oil service group rebounds this year in an economic recovery with higher energy prices and drilling activity, Halliburton stock price could lag behind, dogged by continuing uncertainty about asbestos. **We believe this fear has been exacerbated by the fallout from the Enron debacle.** It appears that institutions that lost millions in Enron are less willing to risk the potential loss in other stocks with widely known problems, such as asbestos. [SunTrust Robinson Humphrey, 1/28/2002, emphasis added]

> **b. Analysis of other companies with asbestos exposure demonstrates that Halliburton's price decline at the end of the class period was due to changing conditions and not the alleged fraud**

238.     The increased uncertainty and changing market conditions at the end of the class period were not specific to Halliburton but also affected other companies with asbestos exposure. The fact that other companies were affected demonstrates that Halliburton's price decline at the end of the class period was due to changing conditions and not the alleged fraud.

> **i. The stock of other companies with asbestos exposure declined after the December 7, 2001 alleged corrective disclosure on fears of asbestos and uncertainty—evidence that changing conditions, rather than the alleged fraud, was the cause of Halliburton's stock price decline**

239.     The stock price of other companies with asbestos exposure also declined after December 7, 2001 alleged corrective disclosure reportedly on uncertainty and fears about asbestos. The stock decline of these companies is evidence that Halliburton's price reaction at the end of the class period is not related to the alleged misrepresentations since Halliburton did not make any statements about the asbestos liabilities of these other companies.

APP 000107

240.    News stories and analyst reports after December 7, 2001 discussed the stock price "plunge" of several companies in a variety of different industries due to widespread fears regarding asbestos.  Companies including CBS Viacom, Sealed Air, Pfizer, Goodrich, Cooper Industries, ABB, Georgia-Pacific, Crown Cork & Seal had price declines at the end of the class period.[205]  For example, according to Dow Jones, ABB "fell around 9% Monday on fears of rising asbestos claims in the U.S. following a court verdict against Halliburton Co. (HAL) in an asbestos-related lawsuit."[206]  Similarly, according to Reuters, "Growing fears that asbestos liabilities could be worse than expected have hammered shares within a disparate range of industries in the past week, including media giant Viacom Inc. and oil services group Halliburton Co."[207]

241.    The stock price declines of some of the other asbestos defendants after the December 7, 2001 alleged corrective disclosure were even larger than Halliburton's decline in terms of market capitalization (total value of the stock).  For example, CBS-Viacom stock declined almost $12 billion–versus Halliburton's decline of $3 billion–in the two days after the December 7, 2001 alleged corrective disclosure. Market commentators discussed the decline in CBS-Viacom's market capitalization together with Halliburton's stock price decline, and attributed it to the fears and uncertainty regarding asbestos:

> Shares of a wide range of U.S. companies, from media giant Viacom Inc. to Bubble Wrap maker Sealed Air Corp., plunged on Monday amid widespread fears that their asbestos liability exposures could be larger than anticipated.  [*Reuters*, 12/10/2001]

> Viacom stock was down on Friday largely due to fears of asbestos liability. [Deutsche Bank, 12/7/2001, report on Viacom]

> Viacom's potential asbestos liability, inherited from the CBS purchase, came back to the forefront on Friday as Halliburton lost an asbestos related lawsuit highlighting the potential cost of these claims.  [Salomon Smith Barney, 12/10/2001, report on Viacom]

---

[205]  *See,* for example, "Anxious investors sell stock in asbestos defendants," *Reuters*, December 10, 2001; "Asbestos Exposure: How Well Are Companies Insulated?" *Barron's*, December 22, 2001; Analyst report on B.F. Goodrich, Buckingham Research Group, December 7, 2001; "Asbestos Claims," *Dow Jones Newswires*, December 10, 2001.

[206]  "Asbestos Claims," *Dow Jones Newswires*, December 10, 2001.

[207]  "Asbestos worries snare wider range of U.S. firms," *Reuters*, December 13, 2001.

APP 000108

242.    The chart below shows the stock value decline of Halliburton and several other companies with asbestos liabilities on the two days after the December 7, 2001 alleged corrective disclosure.



243.    The fact that these other companies' stocks declined more in value than Halliburton's stock is direct evidence that the alleged misrepresentations regarding Halliburton's asbestos liability was not the cause of Halliburton's stock price decline at the end of the class period.  Therefore, Halliburton's stock price decline at the end of the class period provides no basis for price impact of the alleged misrepresentations regarding asbestos.

                  **ii.  Similar to Halliburton, the implied volatility of other companies with asbestos exposure increased after the end of the class period—demonstrating increased uncertainty and changing conditions**

244.    Further evidence that Halliburton's stock price decline at the end of the class period was caused by increasing uncertainty regarding asbestos (rather than the alleged fraud) is

104

that the implied volatility of the stock of other companies with asbestos exposure increased dramatically following the December 7, 2001 alleged corrective disclosure.  The increased implied volatility of other companies cannot be due to Halliburton's alleged fraud and thus, is further evidence of increased uncertainty in the market.  Moreover, because Halliburton's price decline is due to this increased uncertainty, Halliburton's price decline is not evidence of price impact.

245.    The charts below show the implied volatility of three other companies with asbestos exposure after the December 7, 2001 alleged corrective disclosure.  These three companies were reported to have stock declines after the end of the class period due to asbestos fears and uncertainty.[208]



---

[208]    *See,* for example, "Anxious investors sell stock in asbestos defendants," *Reuters,* December 10, 2001; "Asbestos Exposure: How Well Are Companies Insulated?" *Barron's,* December 22, 2001.

APP 000110





**Source**: Data from Bloomberg, L.P.

**Source**: Data from Bloomberg, L.P.

### iii. Other companies with asbestos exposure had no statistically significant price reactions attributable to asbestos news during the class period, but had significant price reactions after the class period –demonstrating that price reactions to asbestos news at the end of the class period are not evidence of how the market would have reacted earlier

246.    Companies other than Halliburton with asbestos exposure had no statistically significant price reactions attributable to asbestos news during the class period but had significant price reactions after the end of the class period.  This demonstrates that the market viewed asbestos news for companies with asbestos exposure differently after the class period than it did at the time of the alleged misrepresentations. Thus, any price reaction to asbestos news at the end of the class period is not evidence of how the market reacted to related information earlier in the class period.  Therefore, even if the verdict news announced at the end of the class period were corrective (which my analysis shows it was not), the price decline after this announcement is not evidence that the purportedly related alleged misrepresentations had any price impact on the stock price.

247.    Honeywell and 3M were codefendants in Halliburton's Texas and Mississippi verdicts, respectively.  As detailed below, Honeywell and 3M had large verdicts during the class period but no statistically significant price reactions attributable to these verdicts. In contrast, after the end of the class period, both Honeywell and 3M experienced statistically significant price reactions to asbestos news and verdicts.[209]  Additionally, Dow Chemical was another company with large asbestos exposure, yet no analyst or news story commented on its asbestos exposure until after the end of the class period.  According to market commentary, asbestos exposure only became an issue for Dow Chemical after the class period.

**Honeywell**

248.    Honeywell, a codefendant in Halliburton's Texas case, had no statistically significant negative price reactions after several large verdicts in 2001, but had statistically significant negative price reactions after several smaller verdicts in 2002.

---

[209]  The examples in this section—Honeywell, 3M, and Dow Chemical—were tested for statistically significant price reactions by controlling for the S&P 500 index and using a regression period of 52 weeks prior to the announcement of each event.

APP 000112

249.    Honeywell's asbestos liability stemmed from its relationship with Bendix, a former unit of Allied Signal that merged with Honeywell in 1999, and NARCO, a subsidiary Honeywell owned from 1979-1986.[210]

250.    Despite Honeywell's asbestos liability, no news stories between January 1, 2001 and December 7, 2001, discussed Honeywell's asbestos liability,[211] and no analyst reports covering Honeywell in 2001 mentioned asbestos.[212]  Moreover, Honeywell had two large verdicts against its subsidiaries in 2001, before the end of the class period.  Honeywell had no statistically significant price reaction after the first verdict was publicly disclosed. The negative price reaction after the second verdict was disclosed was attributed not to the asbestos verdict but rather to the downturn in the commercial air transport market.

- **January 11, 2001 verdict:**  Honeywell's subsidiary NARCO was a codefendant in a $17.5 million verdict awarded to five plaintiffs in New York.  The verdict was rendered January 11, 2001 and discussed in a Mealey's report on January 19, 2001.[213] There was no statistically significant price reaction after this announcement.

- **September 12, 2001 verdict:** NARCO was a codefendant in the $130 million Texas verdict rendered September 12, 2001, with an equal share of the verdict. The first disclosure of the verdict I found was the *Beaumont Enterprise* article dated September 20, 2001. There was a statistically significant negative price reaction on this date, but no analyst report or news article, other than the *Beaumont* article itself, discussed Honeywell's asbestos liability or the asbestos verdict around this time including through the end of the year. Instead, news articles and analyst reports on September 20, 2001 and the surrounding days focused on Honeywell's plans to cut jobs and its earnings estimates, which were revised downward due to the downturn in

---

[210]  "Thinking About Asbestos," Lehman Brothers, March 20, 2002.

[211]  The news search was done through Factiva, a provider of news and information sources. A search for the words "Honeywell" and "asbestos" in headlines and lead paragraphs of articles published in 2001 produced one news story. This news story provided "news highlights" from that day and the mention of asbestos referred to another company, not Honeywell.

[212]  The analyst report search was done through Thomson Reuters, a provider of company analyst reports from brokers. A search for the word "asbestos" in Honeywell analyst reports published in 2001 produced zero results.

[213]  15 Mealey's Litigation Report: Asbestos, No. 24 (January 19, 2001).

APP 000113

the commercial air transport market after the terrorist attacks on 9/11.[214]  Honeywell's
stock price did not have a statistically significant price reaction following the news of
the Texas judgment on December 4, 2001.

251.    In contrast to no news or analyst reports mentioning Honeywell and asbestos in
2001, I found over 200 news stories, along with over 50 analyst reports, that discussed
Honeywell's asbestos liability in 2002, after the end of the class period.[215]

252.    Additionally, Honeywell had negative statistically significant price reactions
following news of an asbestos verdict and a settlement against its subsidiaries in 2002, even
though the total size of the verdict was less than half the Texas verdict announced in 2001:

- **February 8, 2002 verdict:** Honeywell's subsidiary Bendix was the defendant in a
  $53 million verdict that was announced on February 8, 2002.[216] In spite of this
  understatement, Honeywell's stock had a statistically significant drop on February 8,
  2002 and a larger intraday price decline.[217]

- **On April 18, 2002**, Honeywell clarified that it was responsible for at least $11
  million of the $53 million verdict.[218]  Honeywell's stock had a statistically significant
  drop after this announcement.

- **September 13, 2002 settlement:** Honeywell announced a settlement with at least 12
  claimants in Illinois for an undisclosed sum.  Although the sum of the settlement was
  undisclosed, Honeywell "indicated the payout [wouldn't] hurt the company's bottom

---

[214]  *See,* for example, "Honeywell International Inc. Lowers Q3, Full Year Earnings Guidance; Plans More Job Cuts," *Reuters Significant Developments*, September 19. 2001; "Honeywell lowers forecast, plans to cut jobs," *MediaCorp News*, September 20, 2001; Analyst report on Honeywell, UBS Warburg, September 21, 2001.

[215]  A search for "Honeywell" and "asbestos" in headlines and lead paragraphs of articles published in 2002 produced 242 news stories. The news search was done through Factiva, a provider of news and information sources. A search for the word "asbestos" in Honeywell analyst reports published in 2002 produced 69 results. The search was done through Thomson Reuters, a provider of company analyst reports from brokers.

[216]  "New York City jury awarded $53.5 million to a family of a man who died of asbestos exposure," *CNBC*, February 8, 2002.

[217]  "Honeywell says asbestos verdict was more than it had disclosed," *New York Times*, April 18, 2002 ("Honeywell's **stock dropped as much as 11 percent on Feb 8 when judgment was announced, shaving $3 billion off its market value**; shares quickly rebounded after company said it has been found liable for less than $1.1 million of verdict.") (emphasis added).

[218]  "Honeywell says asbestos verdict was more than it had disclosed," *New York Times*, April 18, 2002.

APP 000114

line."[219]  Honeywell's stock price had a statistically significant price drop after the announcement of this settlement.

253.    The chart below summarizes Honeywell's asbestos news during and after the class period:



**Honeywell International
Timeline of Asbestos News**

HAL Class Period ends December 7, 2001

$17.5 million verdict, 1/19/01
No statistically significant price reaction

Texas Judgment, 12/4/01
No statistically significant price reaction after news of judgment.

$130 million verdict, 9/20/01
Statistically significant price reaction attributed to news of downturn in the commerical air transport market that caused Honeywell to reduce earnings estimates.

$53 million verdict, 2/8/02
Statistically significant price reaction
Honeywell's market cap dropped $3 billion intraday on the news.

Further information about $53 million verdict, 4/18/02
Statistically significant price reaction
Honeywell's market cap dropped $2 billion on the news.

Honeywell settled asbestos claims for undisclosed sum, 9/13/02
Statistically significant price reaction
Honeywell 's market cap dropped $4 billion on the news.

**Dow Chemical**

254.    Dow Chemical did not report or discuss its asbestos liabilities at all in 2001 despite having a large exposure to asbestos.  Starting right after the end of the class period, Dow had statistically significant price reactions and sharp increases in implied volatility attributed to fears about its asbestos liabilities.

---

[219] "Honeywell settles asbestos lawsuits with several plaintiffs," *Associated Press*, September 13, 2002.

255.    Dow Chemical's asbestos liability stemmed from its acquisition of Union Carbide completed on February 6, 2001.[220]  At the end of 2001, Dow Chemical had $233 million in estimated asbestos liability.[221]

256.    Dow Chemical made no disclosures about its asbestos liability in its SEC filings until after the class period and there was no mention of Dow Chemical's or Union Carbide's asbestos exposure in news stories or analyst reports during the class period.[222]  In contrast, from the end of the class period through 2002, there were over 100 news articles and over 100 analyst reports discussing Dow Chemical's asbestos exposure.[223]  The chart below illustrates this dramatic shift in news coverage about Dow Chemical's asbestos exposure:

---

[220]  Dow Chemical 2001 Form 10-K405, filed March 20, 2002.

[221]  "Thinking About Asbestos," Lehman Brothers, March 20, 2002.

[222]  A search for "Dow Chemical" and "asbestos" in headlines and lead paragraphs of articles published from January 1, 2001 to December 7, 2001 produced 4 news stories. None of these articles discuss Dow Chemical's asbestos exposure. A similar search for "Union Carbide" and "asbestos" produced one news story. This news story did not discuss Union Carbide's asbestos exposure. The news search was done through Factiva, a provider of news and information sources. A search for the word "asbestos" in Dow Chemical analyst reports issued from January 1, 2001 to December 7, 2001 produced zero results. The search was done through Thomson Reuters, a provider of company analyst reports from brokers.

[223]  A search for "Dow Chemical" and "asbestos" in headlines and lead paragraphs of articles published from December 8, 2001 to December 31, 2002 produced 168 news stories. A search for the word "asbestos" in Dow Chemical analyst reports issued between December 8, 2001 and December 31, 2002 produced 150 results.

APP 000116



257.    In addition to an increase in news coverage about Dow Chemical's asbestos exposure, starting a month after the end of the class period, Dow Chemical stock began reacting with statistically significant negative price reactions following asbestos events and news.

258.    On January 9, 2002, Dow Chemical announced that it had reached an undisclosed settlement in an asbestos lawsuit in Texas.[224]  Dow Chemical's stock had a statistically significant negative price reaction after the announcement and implied volatility of its stock increased 18%.  Like Halliburton (but on different dates), Dow's implied volatility increased sharply following news of uncertainty regarding asbestos liability.  News stories attributed the price drop to fears over the company's asbestos liabilities.

**Dow Chemical Co's stock slid 8.65% Thursday amid investors fears over the company's asbestos liabilities**.  Dow reached an undisclosed settlement Wednesday in an asbestos lawsuit filed in Texas against Union Carbide Corp,

---

[224]  "Dow Chemical Settles Texas Asbestos-Related Suit," *Dow Jones Business News*, January 9, 2002.

112

which Dow acquired last year.  But the suit raised concerns about other possible liabilities.[225]

259.    On January 14, 2002, UBS downgraded Dow Chemical because of uncertainty surrounding the company's asbestos liabilities.[226]  Dow Chemical had a statistically significant negative price reaction after the downgrade and the implied volatility of its stock increased 14%. News stories attributed the price drop to fears over the company's asbestos liabilities:

> Dow Chemical shares on the NYSE **fell another 10.58%** ($3.20) to close at $27.05 Monday **amid concerns over asbestos related liabilities.**  Its stock, which had been as high as $35.50 as recently as Jan 3, has been on a free-fall since Jan 9 when it reached an undisclosed settlement on an asbestos-related case in Texas.  **The drop accelerated Monday when UBS Warburg downgraded it to hold from a strong buy**, and reduced its price target to $30 from $45/share.  Dow Chemical's 52-week high on the NYSE was $39.67.  **The UBS report said it downgraded Dow Chemical because of "uncertainty surrounding asbestos, including concerns triggered by increased court filings against wholly-owned Union Carbide,"** which Dow Chemical acquired last year.  **The report noted an acceleration in asbestos-related court filings: it said that number averaged 30 from January through October 2001, but picked up to 400 in November - and soared to 905 in December**.  "Since raising the asbestos issue with Dow Chemical in early December 2001, we have yet to resolve our concerns despite ongoing conversations with Dow, advice from the legal community, and other intense research efforts," the UBS report said.  **UBS said that "absent comforting details" its reduced its price target "may continue to reflect uncertainties and investor sentiment.  One could argue the stock already reflects a worst imaginable asbestos liability, losing about $5-bil in value recently.**  However, potential economic liability and stock behavior are not necessarily connected in the expansive world of asbestos litigation."[227]

> **"Fears that Dow Chemical Co. could face huge asbestos liabilities knocked as much as 14 percent off the company's already battered stock price on Monday**, while a leading analyst downgraded the second largest U.S. chemical concern.** The drop is the latest in a steep slide that began after the Midland, Michigan-based company reached a settlement last Wednesday in an asbestos lawsuit filed in Texas against Union Carbide Corp., which it acquired last year.  **Since the settlement, shares have dropped about 22 percent, wiping almost $7 billion from the company's stock market value."[228]**

---

[225]  "Dow Chemical share price slides on asbestos concerns," *Platts Comomodity News*, January 10, 2002.

[226]  Analyst report on Dow Chemical, UBS Warburg, January 14, 2002.

[227]  "Dow stock keeps sliding as asbestos questions go unanswered," *Platts Commodity News*, January 14, 2002.

[228]  "Dow stock battered by asbestos concerns," *Reuters*, January 14, 2002.

260.    On October 24, 2002, a jury in West Virginia found Dow Chemical liable in an asbestos case.  Although only potential liability had been found and an award had yet to be determined, Dow Chemical's stock had a statistically significant negative price reaction after the news, and its implied volatility increased 9%.  News stories attributed the price drop to the negative verdict and the uncertainty surrounding the company's asbestos liabilities.[229]

261.    The chart below summarizes Dow Chemical asbestos news before and after the class period. As shown below, starting right after the end of the class period, Dow had statistically significant price reactions and sharp increases in implied volatility attributed to fears about asbestos liabilities.



---

[229] "Dow found liable in West Virginia asbestos case," *Agence France-Presse*, October 24, 2002; "'Potential liability' found in UCC asbestos case," *Platts Commodity News*, October 24, 2002.

114

**3M**

262.    3M, a codefendant in Halliburton's Mississippi verdict, had no price reaction after the Mississippi verdict was announced, but had a price reaction weeks after the end of the class period on fears of asbestos without any additional specific news.

263.    3M was a codefendant with Halliburton's subsidiary Dresser Industries in the verdict rendered October 26, 2001 in Mississippi, which awarded $150 million to six plaintiffs. As discussed above, the news of this verdict was first announced on October 28, 2001 in the *Clarion-Ledger*, a Mississippi state-wide newspaper.[230]  On the following day, October 29, 2001, 3M announced the $150 million verdict award and its $22.5 million share of the verdict.[231] 3M had no statistically significant price reaction following the announcement.

264.    Only after Halliburton's December 7, 2001 announcement did analysts covering 3M analysts start focusing on 3M's asbestos liabilities, and 3M's stock price began experiencing statistically significant declines following asbestos news and events.  For example, on January 16, 2002, analysts expressed concern about 3M's asbestos uncertainty.[232] On this date, 3M shares had a statistically significant price decline, and its implied volatility spiked 32%.  Like Halliburton (but on different dates), 3M's implied volatility increased sharply following news of uncertainty regarding asbestos liability:

> **Wall Street analysts are also seeking any hint that liabilities are rising […]
> The stigma spread to others with current asbestos exposure, such as
> manufacturing conglomerate 3M and Dow, the world's largest chemicals
> group.** Since settling a Texas lawsuit for an undisclosed amount, Dow's shares
> have fallen about 30 per cent from about $34 to $25.66 per share yesterday.  **In
> one week, 3M shares have fallen about 9 per cent to near $104 per share,
> despite no new developments on asbestos since a $22.5m verdict against it in
> October.**[233]
>
> 3M Co. moved quickly Friday [January 18] to subdue fears that asbestos litigation
> involving its masks and respirators could spiral out of control.  **The legal issues
> aren't new -** 3M has handled tens of thousands of similar cases over two decades,
> it revealed recently **-** and 3M insists the problem is manageable […]  **But the**

---

[230] "Asbestos case leads to $150 M jury award," *The Clarion-Ledger*, October 28, 2001.

[231] "3M to appeal asbestos case ruling," *Associated Press*, October 29, 2001.

[232] "3M raises earnings outlook, but stock falls on analyst's cut," *Associated Press*, January 16, 2002.

[233] "Asbestos casts shadow over US corporations," *Financial Times*, January 18, 2002 (emphasis added).

115

**fever among investors is real, and so is the pressure on 3M's stock.** On Jan. 4, 3M's shares closed at a generous $117.10 as investors looked past expected weak results to a global recovery. On Thursday, the stock traded as low as $100, **a 14.6 percent slide. Analysts attributed the lions' share of the fall to litigation concerns.** One analyst, otherwise enthusiastic about 3M's prospects, went so far as to suspend his 'strong buy' rating.[234]

> **c.   Statistical analysis of price movements of companies with asbestos exposure confirms the change in asbestos environment at the end of the class period**

265.    Further evidence that expectations about asbestos litigation were changing at the end of the class period is provided by the analysis of the relationship between the movements of Halliburton's stock price and the movements of the stock prices of companies whose asbestos liability was discussed by analysts. Halliburton's stock and the stock of companies whose asbestos exposure was discussed by analysts moved more tightly together in the year following the class period than during the class period, *i.e.*, they moved in the same direction more often in the year following the class period than during the class period.[235]

266.    The analysis was conducted using three statistical techniques. All use the index of companies with asbestos exposure described in the methodology section above. (As a reminder, the index of asbestos companies is comprised of 31 companies with asbestos exposure in 2001 and 2002 based on a search of analyst reports in those years with asbestos in the title.[236]) All three techniques lead to the same conclusion: the relationship between the stock price of Halliburton and the stock prices of other companies with asbestos exposure changed and became tighter after the end of the class period.

267.    The first technique is correlation: the index of companies with asbestos exposure shows a marked increase in the correlation with Halliburton after the class period. Specifically, the correlation between Halliburton and the asbestos index went from 25% during the class

---

[234] 3M Moves to Subdue Fears Over Asbestos Lawsuits Involving Masks, Respirators" *Pioneer Press*, January 19, 2002 (emphasis added).

[235] During the class period the asbestos index did not add further explanatory power to the model beyond that of the energy and E&C indices. See Exhibit 2. When it is the only index used, then the asbestos index does have some explanatory power during the class period.

[236] *See* footnote 21 in the methodology section.

116

period to 61% in the year after the class period, indicating a tighter relationship after the class period.[237,238]

268.     The second technique is based on the estimation of the percent of movement in Halliburton's stock price that is explained by the movement in the asbestos index; this percent is known as the R-squared. A comparison of the R-squared during the class period to the R-squared in the year after the class period also shows that the relationship was tighter after the class period: the amount of movement in Halliburton's stock price that is explained by the movement in the asbestos index went from 6% during the class period to 37% in the year after the class period.

269.     The third technique uses a commonly accepted statistical test devised to detect changes in statistical relationship, known as a Chow test.[239]  Specifically, I tested whether the relationship during the class period is different from the relationship in the year that followed the end of the class period.[240] The results of the Chow test show that the relationship between Halliburton's stock price and the asbestos index during the class period was statistically significantly different from the relationship in the year that followed the end of the class period at the 99.99% level and that the latter relationship was tighter.[241]

270.     Importantly, further analysis shows it was *not* just Halliburton that had a tighter relationship with companies with asbestos exposure after the class period: generally the other companies with asbestos exposure also moved more tightly together. Specifically, we analyzed whether each of the 31 companies with asbestos exposure had a higher or lower correlation with the other 30 during the class period or after. Each of the 31 companies with asbestos exposure was positively correlated with the index of the other 30 companies both during and in the year

---

[237]  Excluded are the days of the alleged misrepresentations, alleged corrective disclosures and December 10, 2001 (day on which Halliburton's stock price rebounded).

[238]  As a robustness check, I repeated the analysis by using only the subset of companies identified with analyst reports issued before the end of the class period and found results that are qualitatively similar.

[239]  *See*, for example, William H. Greene, *Econometrics Analysis* (Pearson, 7th ed., 2012), 168-175.

[240]  I excluded alleged misrepresentations, alleged corrective disclosures and December 10, 2001 (day on which Halliburton's stock price rebounded) from the analysis.

[241]  As a robustness check, we performed additional Chow tests: we added to the Chow tests described above the energy index and the E&C index described in the methodology section. Again the Chow test shows that the relationship between Halliburton's stock price and the indices during the class period was statistically significantly different from the relationship in the year that followed the end of the class period at the 99.99% level and that the latter relationship was stronger for the asbestos index.

APP 000122

after the class period, but the correlation in the year after the class period was higher for 29 of these companies, demonstrating that companies with asbestos exposure generally moved more tightly together after the class period.

271.    In sum, these statistical analyses of the stock prices of Halliburton and other companies whose asbestos exposure was discussed by analysts show that there was a change at the end of the class period affecting companies other than Halliburton and suggesting that the stock prices of companies with asbestos exposure were more affected by asbestos issues after the end of the class period than during the class period.  This is further evidence that there was a change regarding the effect of asbestos on stock prices at the end of the class period.  The fact that this change affected companies other than Halliburton is evidence that the change was not due to Halliburton's alleged misrepresentations.

> ### d.  Mentions of asbestos in business publications and analyst reports shows a dramatic change in the focus on asbestos occurring right at the end of the class period

272.    Further evidence that a change in the asbestos environment occurred at the end of the class period is the dramatically increased focus on asbestos in business publications occurring right at the end of the class period. This change in the stock market's perception of the importance of asbestos demonstrates that a price reaction after asbestos news at the end of the class period is not evidence that the market would have reacted earlier to the same information (even if that information could have been disclosed earlier). Therefore, even if the verdict news announced at the end of the class period were corrective, the price decline after this announcement is not evidence that the same announcement would have any price impact earlier in the class period (including at the time of the alleged misrepresentations).

273.    The number of articles in business publications mentioning asbestos increased substantially right after the end of the class period.[242]

274.    In particular, during the class period there were on average 42 articles each month mentioning asbestos while during the year immediately following the end of the class period this number increased to 219 articles—more than five times the class period average.

---

[242]    News articles obtained through Factiva, an online news reporting service and archive, based on search for "asbestos" in print articles published by *Barron's*, *Dow Jones Institutional News*, *The Financial Times*, *Forbes*, *Reuters News*, and *The Wall Street Journal*.

APP 000123

275.    During the two months preceding the December 7, 2001 alleged corrective disclosure, there were 111 articles in business publications mentioning asbestos.  In the first two months after the end of the class period, this number increased to 442 articles—almost four times as many.



276.    Similarly, the number of articles mentioning asbestos in Bloomberg L.P., a commonly used provider of financial data and news, increased substantially right after the end of the class period.[243]

277.    In particular, during the class period there were on average 38 articles in Bloomberg each month mentioning asbestos, while during the year immediately following the end of the class period this number increased to 216 articles—more than five times the class period average.

---

[243]   News articles obtained from Bloomberg L.P. based on search for "asbestos" in articles published by *Bloomberg News*.

278.    During the two months preceding the December 7, 2001 alleged corrective disclosure, there were 137 articles mentioning asbestos in Bloomberg.  In the first two months after the end of the class period, 447 articles were published—more than three times as many.



279.    Additionally, the number of analyst reports mentioning asbestos increased substantially right after the end of the class period.[244]  In particular, during the class period there were on average 74 analyst reports each month mentioning asbestos.  During the year immediately following the end of the class period, this number increased to 293 articles, four times the class period average.

---

[244]    Analyst reports obtained from Thomson Reuters, a media and financial information firm, based on search for "asbestos" in the title or text.

APP 000125

280.     During the two month preceding the December 7, 2001 alleged corrective disclosure, there were 245 analyst reports mentioning asbestos.  In the first two months after the end of the class period, 442 articles were published—almost twice as many.



### B. There is no price impact from any alleged misrepresentation regarding the risk that Halliburton would have to pay post-1992 Harbison-Walker claims

| Alleged Misrepresentation | Alleged Corrective Disclosure |
|---|---|
| Halliburton misrepresented its asbestos liability because it failed to account for post-1992 claims against Harbison-Walker.<br><br>After it disclosed Harbison-Walker's request for assistance, Halliburton understated its liability for the Harbison-Walker claims.[245] | Halliburton announced on June 28, 2001, that Harbison-Walker requested the Company provide claims management and financial assistance.<br><br>Halliburton reported on August 9, 2001, that it increased its asbestos reserve to $124 million.<br><br>Halliburton announced on October 30, 2001 an adverse verdict rendered on October 25, 2001 in Holmes County, Mississippi.<br><br>Halliburton announced on December 4, 2001 adverse judgments rendered on November 29, 2001 in Orange County, Texas.<br><br>Halliburton announced on December 7, 2001, an adverse verdict rendered on December 5, 2001 in Baltimore, Maryland. |

### 1. The June 28, 2001 alleged corrective disclosure—when the Company disclosed that Harbison-Walker had requested that Halliburton provide Harbison-Walker with financial assistance for the post-1992 claims—was not corrective of any alleged misrepresentation

281.    The Fund alleges that on June 28, 2001, Halliburton issued a press release that "for the first time revealed that a former Dresser subsidiary [Harbison-Walker] had been requesting Halliburton's financial help in dealing with an increasing number of asbestos claims, even though they had known this throughout the Class Period."[246]

282.    The Complaint does not allege that Halliburton made any statement prior to June 28, 2001 that misrepresented any communication between Harbison-Walker and Halliburton, or the relationship between Harbison-Walker's and Halliburton's asbestos liabilities.  There is no

---

[245] While this section focuses on the June 28, 2001 and August 9, 2001 announcements, the analysis discussed above in Section A applies to all of the allegations concerning Halliburton's disclosed asbestos liability, including the Fund's allegations that Halliburton misstated its liability for the Harbison-Walker claims.

[246] Complaint, ¶37. To the extent the Fund claims that Halliburton's misrepresented its liability for the Harbison-Walker claims from June 28, 2001 to the end of the class period, such allegations are addressed in Part A above.

APP 000127

indication from my review of the public record that the market believed Halliburton released information on June 28, 2001 that revealed a prior falsity.

283.    To the contrary, investors were aware of the indemnity relationship between Harbison-Walker and Halliburton-subsidiary Dresser throughout the class period.  The risk that Halliburton would have to pay Harbison-Walker post-1992 claims was previously disclosed to no statistically significant price reaction (before or after the adjustment for multiple comparisons)[247] and to no market commentary.  In particular, this risk was disclosed prior to the class period in Halliburton's first quarter 1999 10-Q filed on May 14, 1999.  The 10-Q stated:

> Pursuant to an agreement entered into at the time of the spin-off, Global [Harbison-Walker's parent company] assumed liability for asbestos related claims filed against Dresser after July 31, 1992 relating to refractory products manufactured or marketed by the Harbison-Walker-Refractories Division of Dresser. These asbestos claims are subject to certain agreements with insurance carriers that cover expense and indemnity payments. **Global now disputes that it assumed responsibility for any of such asbestos claims based on negligence.** Global also now asserts certain other claims relating to the insurance coverage responding to asbestos claims. [Halliburton 1Q99 10-Q filing, 5/14/1999, emphasis added]

284.    Halliburton continued to update the status of this litigation in its SEC filings. Halliburton stated in a 10-Q filed on August 13, 1999 that it expected Global (Harbison-Walker's parent company) to claim in excess of $40 million for post-1992 asbestos claims it had already resolved, informing investors about the potential magnitude of Harbison-Walker's post-1992 liability almost two years prior to the alleged corrective disclosure.  There was no statistically significant price reaction after this announcement (before or after adjustment for multiple comparisons)[248] and no analyst commented on this issue.

> Global assumed liability for all asbestos related claims filed against Dresser after July 31, 1992 relating to refractory products manufactured or marketed by the former Harbison-Walker Refractories division of Dresser…  Global now disputes that it assumed liability for any of these asbestos claims…  Global has not claimed a specific amount of damages. We expect that Global's claim for reimbursement will be in excess of $40 million.  [10-Q, filed August 13, 1999]

---

[247]  *See* Exhibit 1. Ms. Nettesheim's event study did not analyze the price reaction following this announcement.

[248]  *See* Exhibit 1. Ms. Nettesheim's event study similarly did not find a statistically significant price reaction after this announcement. Nettesheim Report, Exhibit 17.

123

285.    The Company disclosed in its third quarter 2000 10-Q filed on November 9, 2000 that the dispute over the Harbison-Walker post-1992 claims had been resolved and that Global acknowledged its obligation to assume responsibility for these claims.  Again, there was no statistically significant price movement (before or after the adjustment for multiple comparisons)[249] or market commentary when the Company disclosed that the dispute over the Harbison-Walker post-1992 claims had been resolved.  This is evidence that there was no price impact from any alleged misrepresentation concerning Harbison-Walker.

286.    Analysts' reaction to the Company's June 28, 2001 press release also supports a lack of price impact from any related alleged misrepresentation.  Analysts did not indicate that they were previously misled by Halliburton, or give any indication that they did not believe management's representation that this was "an unexpected development:"[250]

> **We do not believe that Halliburton's asbestos exposure, including HW [Harbison Walker], presents a material risk** and reiterate our Buy opinion.  [Salomon Smith Barney, 6/29/2001, emphasis added]

> While **insignificant by itself,** it does remind people of HAL's asbestos liabilities and could depress its multiple as these concerns rear their head again.  [Deutsche Bank, 6/29/2001, emphasis added]

> **We do not believe HAL will be materially impacted by this case**.  However, asbestos will be a recurring issue.  [Merrill Lynch, 6/29/2001, emphasis added]

> **We continue to believe asbestos is a virtual non-issue for HAL**.  Since 1976 the company has settled or disposed of 165,000 claims at a total cost of $124 mm ($32 mm, net of insurance), with another $29 mm reserved for additional claims.  [Morgan Stanley Dean Witter, 6/29/2001, emphasis added]

287.    Subsequent analyst commentary discusses why Halliburton did not previously include post-1992 Harbison-Walker claims in its liability estimates, and that changed circumstances led to the change in disclosure:

> In its previous SEC filings, Halliburton did not include any of the above H-W asbestos claims, or its estimated liability, due to its reliance on the defense and indemnity obligations H-W assumed under its 1992 spin-off agreement.  However, H-W no longer

---

[249]  *See* Exhibit 1. Ms. Nettesheim's event study similarly did not find a statistically significant price reaction after this announcement. Nettesheim Report, Exhibit 17.

[250]  Halliburton Form 8-K, filed on July 28, 2001.

124

appears to have the financial ability to comply with its defense and indemnity obligations. [A.G. Edwards, 8/10/2001]

288.     Harbison-Walker's costs per resolved claim were substantially higher than Halliburton's.  Analysts stated that it may be a positive for Halliburton to step in to manage Harbison-Walker's asbestos claims because the Company had a better strategy for managing claims than Harbison-Walker:

> Dresser/Halliburton has historically been successful in managing the asbestos claims against it; and […] Harbison has had no coordinated defense strategy in dealing with these claims, resulting in higher settlement and disposal costs to Harbison than have been historically realized by Dresser/Halliburton.  [Morgan Stanley, 6/29/2001]

> If the company determines that it is in its interest to do so, it may take over the management and resolution of the claims against Harbison.  At present, there are about 165,000 open claims, for which approximately 52,000 are in the process of being settled. [Salomon Smith Barney, 6/29/2001]

> H-W's [Harbison-Walker] average historical claim settlements have been significantly higher than HAL's experience with similar claim settlements.  [A.G. Edwards, 8/10/2001]

> One of the reasons Halliburton decided to step in…was its belief that Harbison was not providing adequate defense and was settling its claims at too high a cost…[Halliburton's] defense strategy is one of the most aggressive in the industry.  This is one of the reasons why its settlement costs per claim is so much lower than those of other defendants.  If Halliburton is successful in executing this strategy vis-a-vis the Harbison-Walker claims, then investors should feel more comfortable that the company can limit the future potential liability and perhaps even shrink the current liability on its balance sheet.  [UBS Warburg, 10/24/2001]

289.     After making an appropriate multiple comparison adjustment, there is no statistically significant price reaction following the June 28, 2001 announcement.  When tested in isolation, the price reaction following the June 28, 2001 announcement is statistically significant, but that may likely be a statistical fluke because there were 35 tests of statistical significance performed.  After the appropriate adjustment for 35 multiple comparisons, the price reaction after this announcement was not statistically significant.  *See* Exhibit 1 for details.  This lack of statistical significance does not support price impact of the alleged asbestos misrepresentations.

125

290.     In summary, there is no analyst commentary after Halliburton's June, 28, 2001 press release indicating that the market believed that the announcement revealed any falsity of a prior statement concerning Halliburton's asbestos liability.  Rather, analysts explained why Halliburton did not previously include any post-1992 Harbison-Walker claims in its reported asbestos liability, and that changed circumstances led to the change in disclosure.  Also, the fact that after making an appropriate statistical adjustment for multiple tests, there is no statistically significance price reaction after the June 28, 2001 alleged corrective disclosure demonstrates that that there was no price impact from the Fund's alleged misrepresentations regarding an undisclosed risk that Halliburton would have to pay Harbison-Walker post-1992 claims.  Finally, when Halliburton had previously disclosed that it could potentially be held liable for post-1992 Harbison-Walker claims, the stock price did not react significantly.  Therefore, the June 28, 2001 alleged corrective disclosure provides no evidence of price impact from the alleged misrepresentations regarding an undisclosed risk that Halliburton would have to pay Harbison-Walker post-1992 claims.

> **2.  The August 9, 2001 alleged corrective disclosure—in which the Company's Form 10-Q reported an increase in its reported asbestos liability—can provide no evidence of price impact because the alleged corrective information was not new**

291.     The Fund claims that on August 9, 2001, "Halliburton filed its second quarter 2001 10-Q in which it increased reserves for asbestos liability to $124 – over twice the $60 million that, only two weeks prior, the company had assured investors would be accurate.[] The market then became alerted to the fact that the Company's asbestos situation was not in fact 'under control.'"[251]

292.     There are several reasons why the alleged corrective disclosure on August 9, 2001 is not evidence that there was a price impact from Halliburton's alleged misrepresentations regarding an undisclosed risk that Halliburton would have to pay Harbison-Walker post-1992 claims.

293.     First, there was *no new information* in the 10-Q regarding Halliburton's asbestos reserves or its liability for Harbison-Walker claims.  Halliburton's reported asbestos liability as

---

[251]   Lead Plaintiff's Reply in Support of its Motion for Class Certification, filed December 21, 2007, p. 21.

APP 000131

of the end of the second quarter 2001 had already been disclosed more than two weeks before Halliburton filed its 10-Q.  Halliburton's net asbestos liability as of March 31, 2001 was $30 million.  The $124 million in net liabilities reported in the August 9, 2001 10-Q thus represented an increase of $94 million from the prior period.  This increase was almost entirely due to the $92 million *pre-tax* (or $60 million *after-tax*) amount the Company decided to record for pending Harbison-Walker claims, which it announced a few weeks earlier in July.

294.    On July 25, 2001, Halliburton announced in a press release and conference call that it was going to add to its reserves an estimate for liability for post-1992 asbestos claims against Harbison-Walker.  Halliburton disclosed that it had decided not to provide Harbison-Walker with financial assistance but thought it "was prudent to accrue [a] $60 million *after-tax*" charge:[252]

> Based on Halliburton's analysis of Harbison's asbestos claims management and concern that Harbison will not be able to fully perform its obligation to defend and indemnify Dresser, during the 2001 second quarter Halliburton accrued $60 million after-tax ($0.14 per diluted share) under discontinued operations which represents management's judgment of potential exposures, net of insurance recovery.[253]

295.    The August 9, 2001 Form 10-Q then repeated this information, reporting that Halliburton "recorded as discontinued operations in the 2001 second quarter an accrual of $92 million ($60 million, after tax) for potential liabilities for open and settled asbestos claims at June 30, 2001."

296.    The $60 million figure announced in the August 9, 2001 alleged corrective disclosure is not new information as it refers to the exact same amount announced in the July 25, 2001 press release.  In an efficient market only new news should affect the stock price[254] and given the Fund's own conclusion that Halliburton traded in an efficient market where "successive announcements of the same information will have no additional effect on share price,"[255] this information would have already been reflected in the stock price.  In addition, there was no statistically significant price movement on July 25, 2001, when the allegedly

---

[252]  Halliburton Conference Call, July 25, 2001.

[253]  Halliburton Press Release, July 25, 2001.

[254]  *See,* for example, Richard A. Brealey, Stewart Myers & Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, 11th ed., 2014), 321-341.

[255]  Nettesheim Report, ¶40.

127

corrective information was first announced.  This affirmatively demonstrates that the allegedly corrective information announced on August 9, 2001 did not have a price impact.

297.    Analysts understood from the July 25, 2001 press release and conference call that Halliburton decided it would not relieve Harbison-Walker from its obligations, and that the $60 million charge was an estimate of Harbison-Walker pending claims in case Harbison-Walker became financially insolvent:

> Dresser **has reviewed this request and decided that it will not relieve Harbison from its obligation to indemnify and defend Dresser from such claims**, and it will not assist Harbison in paying settlements of asbestos claims Harbison has assumed.  However, **given the likelihood that Harbison will not be able to fulfill its obligation, Halliburton decided that it would be prudent to accrue an amount that represents its potential liability.**  [Dain Rauscher Wessels, 7/26/2001, emphasis added]

> Asbestos issue continues to bedevil the company: **Although HAL decided not to cover Harbison-Walker for its share of asbestos liabilities, it took a charge of $60 million to protect itself against the eventuality that it may have to.**  HAL continues to pursue a strategy of litigating asbestos claims and so far this has paid off as only a few small claims have been paid out.  We believe, however, that this issue is likely to be around for some time and may impact the multiple the stock is able to command.  [Deutsche Bank, 7/26/2001, emphasis added]

> HAL **accrued $60 million after tax**, or $0.14 per share, under discontinued operations in order to reduce the company's financial exposure to potential litigation regarding asbestos claims against Harbison-Walker refractories, formerly owned by a Halliburton subsidiary, Dresser Industries.  This **amount is management's best estimate of the company's financial exposure net insurance recovery in the event Halliburton must resolve Harbison's claims**.  [Robinson Humphrey, 7/26/2001, emphasis added]

298.    Second, the $60 million reserve discussed in the July 25, 2001 press releases was not represented by the Company or understood by the market to be Halliburton's total reserves for its pending asbestos liabilities.  Instead the $60 million was related only to pending Harbison-Walker claims.

299.    Finally, even though when tested in isolation the price reaction following the August 9, 2001 announcement was statistically significant, after the appropriate adjustment for 35 multiple comparisons, the price reaction after this announcement was not statistically significant.  *See* Exhibit 1 for details.  This, coupled with the reasons discussed above, shows that the August 9, 2001 alleged corrective disclosure provides no evidence of price impact from the

128

alleged misrepresentations regarding an undisclosed risk that Halliburton would be responsible for post-1992 Harbison-Walker claims.

300.    In addition, for the same reasons explained above, October and December, 2001 verdict and judgment announcements were not corrective of the alleged misrepresentations related to Harbison-Walker liability.

### C.   There is no price impact from the alleged misrepresentation on October 23, 2001 that "there have been no adverse developments" with respect to the Harbison-Walker situation

| Alleged Misrepresentation | Alleged Corrective Disclosures |
|---|---|
| Halliburton statement on October 23, 2001 that "there have been no adverse developments" was a misrepresentation. | Halliburton announced on October 30, 2001 an adverse verdict rendered on October 25, 2001 in Holmes County, Mississippi.<br><br>Halliburton announced on December 4, 2001 adverse judgments rendered on November 29, 2001 in Orange County, Texas.<br><br>Halliburton announced on December 7, 2001, an adverse verdict rendered on December 5, 2001 in Baltimore, Maryland. |

301.    Until the alleged corrective disclosures dated October 30, 2001, December 4, 2001, and December 7, 2001, Halliburton never made any statement during the class period about particular asbestos cases or the Texas, Mississippi, or Maryland cases, in particular, or any statements predicting the outcome of any particular case.

302.    During an October 23, 2001 earnings call, Halliburton made no statement about any particular asbestos case and did not predict the outcome of any of the cases in Texas, Mississippi, or Maryland that the Company discussed in subsequent disclosures.  Rather, the Company stated that "there have been no adverse developments" with respect to the "Harbison-Walker situation" and that there was not anything new to report with respect to Harbison-Walker other than new claim count information.

303.    To the extent the Fund contends this statement was a misrepresentation because the Company did not discuss the September 2001 jury verdict in Texas, there could be no price

APP 000134

impact from any such misrepresentation.  By the time of the October 23, 2001 earnings call, the Texas verdict was already disclosed and known to the market. As mentioned above, a September 20, 2001 Beaumont Enterprise article entitled "Orange jury set record for damages in asbestos lawsuit" reported that Dresser, Halliburton's subsidiary, was one of two defendants in the case. Further, the Texas verdict was publicly discussed the following day, September 21, 2001, in a report issued by Mealey's.

304.    Analyst reports after the alleged misrepresentation explicitly mention the Texas verdict, including a Salomon Smith Barney analyst report issued on the very same day of the alleged misrepresentation and a UBS analyst report the following day:

> Although some investors are concerned over the implications of a recent large jury award to an asbestos claimant, the facts of the case remain unclear and HAL believes that the ruling is highly likely to be overturned on appeal. [Deutsche Bank, 10/5/2001]

> [D]uring the quarter the company was subject to an adverse jury verdict in Orange County, Texas.  The jury found in favor of five plaintiffs and awarded $15 million in compensatory damages and $50 million in punitive damages.  [Salomon Smith Barney, 10/23/2001]

> In the last month or so, the company lost a case in Texas, in which five Plaintiff were awarded $65 million by a jury.  [UBS, 10/24/2001]

305.    Analysts therefore knew of the Texas verdict, and there is no indication that analysts understood the Company's October 23, 2001 statement to indicate that there had been no adverse verdict in September.

306.    Moreover, there was no statistically significant price reaction after the October 23, 2001 conference call (before and after the adjustment for multiple comparisons).[256] Accordingly, it could not have had any price impact.

Lucy P. Allen

---

[256] *See* Exhibit 1.  Note that Ms. Nettesheim's event study similarly does not find a statistically significant price reaction after this announcement. Nettesheim Report, Exhibit 17.

APP 000135

**Exhibit 1a**
**Statistical Significance of the Price Reactions Following the**
**Alleged Misrepresentations, Alleged Corrective Disclosures and Other Key Events**

| Event Date[1] | Test Date | Alleged Misrep, Disclosure, or Other Date | Daily Returns (in logs) | | | Excess Return[4] | t-stat[5] | Nettesheim Report[6] | | Statistically Significant?[7] | |
| | | | Halliburton | S&P 500 Energy Index[2] | Fortune E&C Index[3] | | | z-score | Significant? | Before MC Adjustment | After MC Adjustment[8] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/14/99 | 5/17/99 | O1 | -0.012 | -0.003 | -0.007 | -0.006 | -0.28 | - | - | No | No |
| 7/22/99 | 7/23/99 | M1 | 0.001 | 0.006 | -0.003 | -0.006 | -0.26 | (0.59) | No | No | No |
| 8/13/99 | 8/16/99 | M2 | -0.007 | -0.008 | -0.011 | 0.007 | 0.31 | 0.40 | No | No | No |
| 9/13/99 | 9/14/99 | M3 | -0.025 | -0.004 | 0.000 | -0.019 | -0.84 | 0.92 | No | No | No |
| 10/4/99 | 10/5/99 | D1 | -0.142 | -0.021 | -0.029 | -0.109 | -4.77 | (4.94) | Yes | Yes | Yes |
| 10/21/99 | 10/22/99 | M4 | 0.036 | 0.014 | 0.010 | 0.015 | 0.67 | 0.05 | No | No | No |
| 11/15/99 | 11/16/99 | M5 | -0.010 | 0.019 | 0.027 | -0.041 | -1.80 | (1.25) | No | No | No |
| 1/5/00 | 1/5/00 | D2 | -0.045 | 0.032 | 0.008 | -0.090 | -3.96 | (2.48) | Yes | Yes | No[9] |
| 1/27/00 | 1/28/00 | M6 | -0.046 | -0.023 | -0.016 | -0.011 | -0.50 | (1.00) | No | No | No |
| 3/14/00 [10] | 3/15/00 | M7 | -0.015 | 0.007 | 0.025 | -0.028 | -1.23 | 1.00 | No | No | No |
| 4/26/00 | 4/27/00 | M8 | 0.042 | 0.011 | 0.004 | 0.027 | 1.18 | 0.77 | No | No | No |
| 5/15/00 | 5/16/00 | M9 | -0.001 | -0.014 | 0.011 | 0.017 | 0.75 | 0.85 | No | No | No |
| 7/26/00 | 7/27/00 | M10 | 0.041 | 0.042 | -0.012 | -0.014 | -0.63 | 0.54 | No | No | No |
| 8/10/00 | 8/11/00 | M11 | -0.022 | -0.007 | 0.028 | -0.017 | -0.75 | (0.84) | No | No | No |
| 10/24/00 | 10/25/00 | D3 | -0.116 | -0.012 | -0.015 | -0.097 | -4.27 | (3.60) | Yes | Yes | Yes |
| 11/9/00 | 11/10/00 | M12 | -0.022 | -0.002 | -0.015 | -0.016 | -0.72 | 0.43 | No | No | No |
| 12/21/00 | 12/21/00 | D4 | -0.020 | 0.004 | -0.006 | -0.025 | -1.09 | (1.47) | No | No | No |
| 12/22/00 | 12/22/00 | D5 | -0.027 | 0.019 | 0.035 | -0.059 | -2.58 | (2.26) | Yes | Yes | No |
| 1/30/01 | 1/31/01 | M13 | 0.023 | 0.017 | -0.003 | 0.000 | -0.02 | 0.71 | No | No | No |
| 1/30/01 | 1/31/01 | D6 | 0.023 | 0.017 | -0.003 | 0.000 | -0.02 | 0.71 | No | No | No |
| 3/27/01 [11] | 3/28/01 | M14 | -0.032 | -0.024 | -0.003 | 0.001 | 0.05 | 0.42 | No | No | No |

APP 000136

**Exhibit 1a**
**Statistical Significance of the Price Reactions Following the**
**Alleged Misrepresentations, Alleged Corrective Disclosures and Other Key Events**

| Event Date[1] | Test Date | Alleged Misrep, Disclosure, or Other Date | Daily Returns (in logs) | | | Excess Return[4] | t-stat[5] | Nettesheim Report[6] | | Statistically Significant?[7] | |
| | | | Halliburton | S&P 500 Energy Index[2] | Fortune E&C Index[3] | | | z-score | Significant? | Before MC Adjustment | After MC Adjustment[8] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/25/01 | 4/26/01 | M15 | 0.087 | 0.010 | 0.015 | 0.071 | 3.13 | 2.26 | Yes | Yes | No |
| 5/11/01 | 5/14/01 | M16 | 0.050 | 0.015 | 0.003 | 0.030 | 1.32 | 1.39 | No | No | No |
| 5/25/01 | 5/25/01 | M17 | 0.020 | 0.000 | -0.011 | 0.022 | 0.97 | 0.41 | No | No | No |
| 6/28/01 | 6/29/01 | M18 | -0.043 | 0.015 | -0.006 | -0.063 | -2.78 | (2.64) | Yes | Yes | No |
| 6/28/01 | 6/29/01 | D7 | -0.043 | 0.015 | -0.006 | -0.063 | -2.78 | (2.64) | Yes | Yes | No |
| 7/25/01 | 7/26/01 | M19 | 0.036 | 0.014 | -0.001 | 0.017 | 0.76 | 1.98 | Yes | No | No |
| 8/9/01 | 8/9/01 | M20 | -0.046 | 0.000 | 0.008 | -0.047 | -2.05 | (3.03) | Yes | Yes | No |
| 8/9/01 | 8/9/01 | D8 | -0.046 | 0.000 | 0.008 | -0.047 | -2.05 | (3.03) | Yes | Yes | No |
| 8/22/01 | 8/22/01 | M21 | -0.019 | 0.007 | -0.011 | -0.027 | -1.19 | (1.13) | No | No | No |
| 9/4/01 | 9/5/01 | M22 | 0.005 | 0.005 | -0.010 | 0.000 | -0.01 | 0.76 | No | No | No |
| 9/20/01 | 9/20/01 | O2 | -0.049 | -0.030 | -0.066 | 0.002 | 0.10 | (1.84) | No | No | No |
| 9/21/01 | 9/21/01 | O3 | 0.046 | -0.013 | -0.012 | 0.067 | 2.93 | 0.93 | No | Yes | No |
| 10/4/01 | 10/4/01 | M23 | 0.062 | 0.025 | -0.017 | 0.030 | 1.33 | 0.42 | No | No | No |
| 10/23/01 | 10/24/01 | M24 | 0.004 | -0.010 | -0.010 | 0.019 | 0.84 | 0.93 | No | No | No |
| 10/29/01 | 10/29/01 | O4 | -0.004 | -0.006 | -0.022 | 0.007 | 0.30 | 0.16 | No | No | No |
| 10/30/01 | 10/31/01 | D9 | -0.065 | -0.003 | 0.041 | -0.067 | -2.95 | (2.82) | Yes | Yes | No |
| 11/1/01 | 11/1/01 | D10 | -0.029 | 0.021 | 0.038 | -0.063 | -2.79 | (2.12) | Yes | Yes | No |
| 11/8/01 | 11/9/01 | M25 | 0.002 | 0.023 | -0.006 | -0.029 | -1.28 | (2.07) | Yes | No | No |
| 12/4/01 | 12/4/01 | D11 | -0.007 | 0.014 | 0.019 | -0.029 | -1.29 | (2.20) | Yes | No | No |
| 12/5/01 | 12/5/01 | D12 | 0.005 | 0.020 | 0.040 | -0.029 | -1.26 | (2.27) | Yes | No | No |

APP 000137

## Exhibit 1a
## Statistical Significance of the Price Reactions Following the
## Alleged Misrepresentations, Alleged Corrective Disclosures and Other Key Events

| Event Date[1] | Test Date | Alleged Misrep, Disclosure, or Other Date | Daily Returns (in logs) | | | Excess Return[4] | t-stat[5] | Nettesheim Report[6] | | Statistically Significant?[7] | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Halliburton | S&P 500 Energy Index[2] | Fortune E&C Index[3] | | | z-score | Significant? | Before MC Adjustment | After MC Adjustment[8] |
| 12/7/01 | 12/7/01 | D13 | -0.552 | 0.014 | -0.013 | -0.570 | -25.05 | (24.81) | Yes | Yes | Yes |
| 12/10/01 | 12/10/01 | O5 | 0.154 | -0.017 | -0.014 | 0.180 | 7.90 | - | - | Yes | Yes |
| 5/22/02 | 5/22/02 | O6 | 0.032 | 0.015 | -0.023 | 0.015 | 0.68 | - | - | No | No |
| 5/28/02 | 5/29/02 | O7 | -0.033 | 0.004 | 0.006 | -0.040 | -1.74 | - | - | No | No |

**Notes and Sources:**

Data from FactSet Research Systems, Inc. and Bloomberg, L.P.

[1] Certain alleged misrepresentations and alleged corrective disclosures were made in analyst reports, SEC filings, presentations or annual reports, for which the time of publication was unavailable. For alleged misrepresentations, I assumed that analyst reports and presentations were made before or during market hours, and that SEC filings and annual reports occurred after market hours. Even under the alternative assumptions, my conclusions do not change. For alleged corrective disclosures (and for days containing both an alleged corrective disclosure and an alleged misrepresentation) for which the time of publication was unavailable, I assumed the alleged corrective disclosure (and alleged misrepresentation) occurred using the time Ms. Nettesheim assumed.

[2] Halliburton's returns are removed from the S&P 500 Energy Index using Halliburton's weight in the index at the start of each month. Index weights obtained from Bloomberg, L.P.

[3] The Fortune E&C index is an equal-weighted index of companies classified by Fortune as being in the E&C industry. Fortune 1000 classification as of April 17, 2000. The companies included in this index are those for which price information is available during the class period: Beazer Homes USA, Centex, Champion Enterprises, Clayton Homes, Comfort Systems USA, D.R. Horton, Emcor Group, Foster Wheeler, Granite Construction, Jacobs Engineering Grp., Lennar, MDC Holdings, NVR, Oakwood Homes, Pulte, Ryland Group, Standard Pacific, Stone & Webster, Toll Brothers, U.S. Home, URS, and IT Group.  Fluor was excluded because of a spin-off during the class period.

[4] Calculated as the difference between Halliburton's return and Halliburton's predicted return using the regression detailed in Exhibit 2a.

[5] Calculated as the daily excess return divided by the standard error of the regression over the regression period. See Exhibit 2a.

[6] Data from Exhibit 17 of the Nettesheim Report dated September 17, 2007.

[7] Statistically significant at the 5% level.

[8] Unless otherwise noted, reactions adjusted for 35 multiple comparisons, based on the number of dates tested given by the Fund's alleged misrepresentation and alleged corrective disclosure dates.

[9] Corrected for 633 multiple comparisons.

[10] According to the Complaint, the 1999 annual report was issued in "early 4/00" (Complaint, ¶122). The 1999 Annual Report is not dated but it is my understanding it was filed along with Halliburton's 1999 Form 10-K with the SEC on March 14, 2000.

APP 000138

**Exhibit 1a**

**Statistical Significance of the Price Reactions Following the**

**Alleged Misrepresentations, Alleged Corrective Disclosures and Other Key Events**

| Event Date[1] | Test Date | Alleged Misrep, Disclosure, or Other Date | Daily Returns (in logs) | | | Excess Return[4] | t-stat[5] | Nettesheim Report[6] | | Statistically Significant?[7] | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Halliburton | S&P 500 Energy Index[2] | Fortune E&C Index[3] | | | z-score | Significant? | Before MC Adjustment | After MC Adjustment[8] |

[11] According to the Complaint, the 2000 Annual Report was issued "[i]n early 4/01" (Complaint, ¶158).  The analyses in this report have been conducted under two assumptions regarding when the 2000 Annual Report first became public: first, assuming it became public on March 27, 2001, when Halliburton's 2000 Form 10-K was filed with the SEC; second, as an alternative, assuming it became public on March 20, 2001, the date on the 2000 Annual Report. I have reported the results using the first date but my conclusions do not change if the second date is used.

APP 000139

**Exhibit 1b**
**Statistical Significance of the Price Reactions Following the**
**Alleged Misrepresentations, Alleged Corrective Disclosures and Other Key Events**

| Event Date[1] | Test Date | Alleged Misrep, Disclosure, or Other Date | Description | Allegation Category[2] | Nettesheim Report[3] | | Statistically Significant?[4] | |
|---|---|---|---|---|---|---|---|---|
| | | | | | z-score | Significant? | Before MC Adjustment | After MC Adjustment[5] |
| 5/14/99 | 5/17/99 | O1 | Halliburton's first quarter 1999 10-Q. | - | - | - | No | No |
| 7/22/99 | 7/23/99 | M1 | Halliburton reported 2Q99 results and held earnings call. | All | (0.59) | No | No | No |
| 8/13/99 | 8/16/99 | M2 | Halliburton filed its 2Q99 10-Q. | All | 0.40 | No | No | No |
| 9/13/99 | 9/14/99 | M3 | Halliburton presented at Dain Rauscher Wessels conference. | All | 0.92 | No | No | No |
| 10/4/99 | 10/5/99 | D1 | Halliburton announced sale of Dresser joint ventures and lower than expected 3Q99 earnings. | Merger / Unapproved | (4.94) | Yes | Yes | Yes |
| 10/21/99 | 10/22/99 | M4 | Halliburton reported 3Q99 results and held earnings call. | All | 0.05 | No | No | No |
| 11/15/99 | 11/16/99 | M5 | Halliburton filed its 3Q99 10-Q. | All | (1.25) | No | No | No |
| 1/5/00 | 1/5/00 | D2 | Merrill Lynch and Brown Brothers Harriman reduced their earnings per share estimates. | Merger / Unapproved | (2.48) | Yes | Yes | No[6] |
| 1/27/00 | 1/28/00 | M6 | Halliburton reported 4Q99 results and held earnings call. | All | (1.00) | No | No | No |
| 3/14/00 [7] | 3/15/00 | M7 | Halliburton issued its 1999 Annual Report. | All | 1.00 | No | No | No |
| 4/26/00 | 4/27/00 | M8 | Halliburton reported 1Q00 results and held earnings call. | All | 0.77 | No | No | No |
| 5/15/00 | 5/16/00 | M9 | Halliburton filed its 1Q00 10-Q. | All | 0.85 | No | No | No |

APP 000140

**Exhibit 1b**
**Statistical Significance of the Price Reactions Following the**
**Alleged Misrepresentations, Alleged Corrective Disclosures and Other Key Events**

| Event Date[1] | Test Date | Alleged Misrep, Disclosure, or Other Date | Description | Allegation Category[2] | Nettesheim Report[3] | | Statistically Significant?[4] | |
|---|---|---|---|---|---|---|---|---|
| | | | | | z-score | Significant? | Before MC Adjustment | After MC Adjustment[5] |
| 7/26/00 | 7/27/00 | M10 | Halliburton reported 2Q00 results and held earnings call. | All | 0.54 | No | No | No |
| 8/10/00 | 8/11/00 | M11 | Halliburton filed its 2Q00 10-Q. | All | (0.84) | No | No | No |
| 10/24/00 | 10/25/00 | D3 | Halliburton announced it planned to restructure its Engineering & Construction ("E&C") segment by combining its E&C businesses into one entity. | Merger / Unapproved | (3.60) | Yes | Yes | Yes |
| 11/9/00 | 11/10/00 | M12 | Halliburton filed its 3Q00 10-Q. | All | 0.43 | No | No | No |
| 12/21/00 | 12/21/00 | D4 | Halliburton announced a general negative near-term outlook, E&C restructuring, and a total $120 million (after-tax) charge related to the E&C restructuring and project losses. | Merger / Unapproved | (1.47) | No | No | No |
| 12/22/00 | 12/22/00 | D5 | Alleged continuation of 12/21/00 alleged corrective disclosure. | Merger / Unapproved | (2.26) | Yes | Yes | No |
| 1/30/01 | 1/31/01 | M13 | Halliburton reported 4Q00 results and held earnings call. | Asbestos | 0.71 | No | No | No |
| 1/30/01 | 1/31/01 | D6 | Halliburton announced $193 million (pre-tax) charge related to E&C restructuring and project losses. | Merger/ Unapproved | 0.71 | No | No | No |
| 3/27/01 [8] | 3/28/01 | M14 | Halliburton issued its 2000 Annual Report. | Asbestos | 0.42 | No | No | No |
| 4/25/01 | 4/26/01 | M15 | Halliburton reported 1Q01 results and held earnings call. | Asbestos | 2.26 | Yes | Yes | No |
| 5/11/01 | 5/14/01 | M16 | Halliburton filed its 1Q01 10-Q. | Asbestos | 1.39 | No | No | No |

APP 000141

**Exhibit 1b**
**Statistical Significance of the Price Reactions Following the**
**Alleged Misrepresentations, Alleged Corrective Disclosures and Other Key Events**

| Event Date[1] | Test Date | Alleged Misrep, Disclosure, or Other Date | Description | Allegation Category[2] | Nettesheim Report[3] | | Statistically Significant?[4] | |
|---|---|---|---|---|---|---|---|---|
| | | | | | z-score | Significant? | Before MC Adjustment | After MC Adjustment[5] |
| 5/25/01 | 5/25/01 | M17 | Robinson-Humphrey issued report after discussion with management. | Asbestos | 0.41 | No | No | No |
| 6/28/01 | 6/29/01 | M18 | Halliburton announced Harbison-Walker claims could increase the Company's reported asbestos liability by $60 million. | Asbestos | (2.64) | Yes | Yes | No |
| 6/28/01 | 6/29/01 | D7 | Halliburton disclosed that Harbison Walker had asked for financial and asbestos claims management assistance. | Asbestos | (2.64) | Yes | Yes | No |
| 7/25/01 | 7/26/01 | M19 | Halliburton reported 2Q01 results and held earnings call. | Asbestos | 1.98 | Yes | No | No |
| 8/9/01 | 8/9/01 | M20 | Halliburton filed its 2Q01 10-Q. | Asbestos | (3.03) | Yes | Yes | No |
| 8/9/01 | 8/9/01 | D8 | Halliburton's 2Q01 10-Q stated that the Company's accrued net liability for known open asbestos claims was $124 million. | Asbestos | (3.03) | Yes | Yes | No |
| 8/22/01 | 8/22/01 | M21 | Salomon Smith Barney, after discussions with Halliburton management, issued a report on Halliburton's asbestos exposure. | Asbestos | (1.13) | No | No | No |
| 9/4/01 | 9/5/01 | M22 | *Platt's* report on asbestos liability. | Asbestos | 0.76 | No | No | No |
| 9/20/01 | 9/20/01 | O2 | Beaumont Enterprise story on Texas verdict. | - | (1.84) | No | No | No |
| 9/21/01 | 9/21/01 | O3 | Mealey's article on Texas verdict. | - | 0.93 | No | Yes | No |
| 10/4/01 | 10/4/01 | M23 | Halliburton management discussed Halliburton's asbestos liability situation at a Deutsche Banc seminar. | Asbestos | 0.42 | No | No | No |

APP 000142

**Exhibit 1b**
**Statistical Significance of the Price Reactions Following the**
**Alleged Misrepresentations, Alleged Corrective Disclosures and Other Key Events**

| Event Date[1] | Test Date | Alleged Misrep, Disclosure, or Other Date | Description | Allegation Category[2] | Nettesheim Report[3] | | Statistically Significant?[4] | |
|---|---|---|---|---|---|---|---|---|
| | | | | | z-score | Significant? | Before MC Adjustment | After MC Adjustment[5] |
| 10/23/01 | 10/24/01 | M24 | Halliburton reported 3Q01 results and held earnings call. | Asbestos | 0.93 | No | No | No |
| 10/29/01 | 10/29/01 | O4 | 3M announcement mentions Dresser as co-defendant. | - | 0.16 | No | No | No |
| 10/30/01 | 10/31/01 | D9 | Halliburton announced Mississippi verdict. | Asbestos | (2.82) | Yes | Yes | No |
| 11/1/01 | 11/1/01 | D10 | Alleged continuation of 10/30/01 alleged corrective disclosure. | Asbestos | (2.12) | Yes | Yes | No |
| 11/8/01 | 11/9/01 | M25 | Halliburton filed its 3Q01 10-Q. | Asbestos | (2.07) | Yes | No | No |
| 12/4/01 | 12/4/01 | D11 | Halliburton announced Texas judgments. | Asbestos | (2.20) | Yes | No | No |
| 12/5/01 | 12/5/01 | D12 | Alleged continuation of 12/4/01 alleged corrective disclosure. | Asbestos | (2.27) | Yes | No | No |
| 12/7/01 | 12/7/01 | D13 | Halliburton announced Maryland verdict. | Asbestos | (24.81) | Yes | Yes | Yes |
| 12/10/01 | 12/10/01 | O5 | Halliburton stock price rebound after 12/7/2001 alleged disclosure. | - | - | - | Yes | Yes |
| 5/22/02 | 5/22/02 | O6 | New York Times article about accounting policy. | - | - | - | No | No |
| 5/28/02 | 5/29/02 | O7 | Halliburton announces SEC investigation. | - | - | - | No | No |

**Notes and Sources:**

Data from FactSet Research Systems, Inc. and Bloomberg, L.P.

[1] Certain alleged misrepresentations and alleged corrective disclosures were made in analyst reports, SEC filings, presentations or annual reports, for which the time of publication was unavailable. For alleged misrepresentations, I assumed that analyst reports and presentations were made before or during market hours, and that SEC filings and annual reports occurred after market hours. Even under the alternative assumptions, my conclusions do not change. For alleged corrective disclosures (and for days containing both an alleged corrective disclosure and an alleged misrepresentation) for which the time of publication was unavailable, I assumed the alleged corrective disclosure (and alleged misrepresentation)

APP 000143

**Exhibit 1b**
**Statistical Significance of the Price Reactions Following the**
**Alleged Misrepresentations, Alleged Corrective Disclosures and Other Key Events**

| Event Date[1] | Test Date | Alleged Misrep, Disclosure, or Other Date | Description | Allegation Category[2] | Nettesheim Report[3] | | Statistically Significant?[4] | |
|---|---|---|---|---|---|---|---|---|
| | | | | | z-score | Significant? | Before MC Adjustment | After MC Adjustment[5] |

occurred using the time Ms. Nettesheim assumed.

[2] The Complaint discusses alleged misrepresentations in groups, and each group is followed by a list of reasons detailing why the group of alleged misrepresentations is false and misleading. The reasons fall into three categories of allegations: "Merger," "Unapproved [Claims]," or "Asbestos." The individual misrepresentations in each group are categorized based on the list of reasons following the respective group, which may contain reasons falling into one, some or all of the allegation categories. Following the last alleged corrective disclosure related to "Merger" and "Unapproved [Claims]," all subsequent alleged misstatements were categorized as "Asbestos."

[3] Data from Exhibit 17 of the Nettesheim Report dated September 17, 2007.

[4] Statistically significant at the 5% level.

[5] Unless otherwise noted, reactions adjusted for 35 multiple comparisons, based on the number of dates tested given by the Fund's alleged misrepresentation and alleged corrective disclosure dates.

[6] Corrected for 633 multiple comparisons.

[7] According to the Complaint, the 1999 annual report was issued in "early 4/00" (Complaint, ¶122). The 1999 Annual Report is not dated but it is my understanding it was filed along with Halliburton's 1999 Form 10-K with the SEC on March 14, 2000.

[8] According to the Complaint, the 2000 Annual Report was issued "[i]n early 4/01" (Complaint, ¶158).  The analyses in this report have been conducted under two assumptions regarding when the 2000 Annual Report first became public: first, assuming it became public on March 27, 2001, when Halliburton's 2000 Form 10-K was filed with the SEC; second, as an alternative, assuming it became public on March 20, 2001, the date on the 2000 Annual Report. I have reported the results using the first date but my conclusions do not change if the second date is used.

APP 000144

**Exhibit 2a**
**Regression of Halliburton's Returns on the Returns of**
**the S&P Energy Index and the Fortune E&C Index**

| Regression Statistics | |
|---|---|
| Multiple R | 0.70 |
| R Square | 0.49 |
| Adjusted R Square | 0.49 |
| Standard Error | 0.02 |
| Observations | 598 |

| | Coefficients | Standard Error | t Stat |
|---|---|---|---|
| Intercept | 0.00 | 0.00 | -0.09 |
| S&P Energy Index[1] | 1.38 | 0.06 | 23.30 |
| Fortune E&C Index[2] | 0.16 | 0.06 | 2.78 |

**Notes and Sources:**

Data from Bloomberg, L.P. and FactSet Research Systems, Inc.

Regression run on log returns from June 3, 1999 to December 6, 2001, excluding the days

of the alleged misrepresentations and alleged corrective disclosures.

[1] Halliburton's returns are removed from the S&P 500 Energy Index using Halliburton's

weight in the index at the start of each month. Index weights obtained from Bloomberg, L.P.

[2] The Fortune E&C index is an equal-weighted index of companies classified by Fortune as

being in the E&C industry. Fortune 1000 classification as of April 17, 2000.

The companies included in this index are those for which price information is available during

the class period: Beazer Homes USA, Centex, Champion Enterprises, Clayton Homes, Comfort

Systems USA, D.R. Horton, Emcor Group, Foster Wheeler, Granite Construction, Jacobs

Engineering Grp., Lennar, MDC Holdings, NVR, Oakwood Homes, Pulte, Ryland Group,

Standard Pacific, Stone & Webster, Toll Brothers, U.S. Home, URS, and IT Group.

Fluor was excluded because of a spin-off during the class period.

**Exhibit 2b**
**Regression of Halliburton's Returns on the Returns of**
**the S&P Energy Index, the Fortune E&C Index, and an Asbestos Index**

**Regression Period: Class Period**

| Regression Statistics | |
|---|---|
| Multiple R | 0.70 |
| R Square | 0.49 |
| Adjusted R Square | 0.49 |
| Standard Error | 0.02 |
| Observations | 598 |

| | Coefficients | Standard Error | t Stat |
|---|---|---|---|
| Intercept | 0.00 | 0.00 | -0.11 |
| S&P Energy Index[1] | 1.38 | 0.06 | 22.48 |
| Fortune E&C Index[2] | 0.17 | 0.07 | 2.45 |
| Asbestos Index[3] | -0.02 | 0.08 | -0.23 |

**Regression Period: One Year After the Class Period**

| Regression Statistics | |
|---|---|
| Multiple R | 0.66 |
| R Square | 0.43 |
| Adjusted R Square | 0.42 |
| Standard Error | 0.03 |
| Observations | 250 |

| | Coefficients | Standard Error | t Stat |
|---|---|---|---|
| Intercept | 0.00 | 0.00 | 0.84 |
| S&P Energy Index[1] | 0.75 | 0.15 | 4.94 |
| Fortune E&C Index[2] | -0.06 | 0.09 | -0.61 |
| Asbestos Index[3] | 0.92 | 0.16 | 5.80 |

**Notes and Sources:**

Data from Bloomberg, L.P. and FactSet Research Systems, Inc.

Regressions run on log returns excluding the days of the alleged misrepresentations and alleged corrective disclosures. December 10, 2001 is also excluded.

[1] Halliburton's returns are removed from the S&P 500 Energy Index using Halliburton's weight in the index at the start of each month. Index weights obtained from Bloomberg, L.P.

[2] The Fortune E&C index is an equal-weighted index of companies classified by Fortune as being in the E&C industry. Fortune 1000 classification as of April 17, 2000.

[3] Asbestos index comprised of companies whose asbestos exposure was discussed by analysts. Specifificlly, we searched "asbestos" in the title of analyst reports covering companies in 2001 and 2002. Using the list of analyst reports created by this search, we identified the companies about which the reports were issued, focusing on U.S. companies. We excluded companies that did not have stock prices throughout the whole class period and companies that went bankrupt during the class period. This search resulted in the following companies: 3M, Allstate Corporation, American Financial Group, Ashland Inc. (Ashland Oil), Chubb Corporation, CNA Financial Corp., Cooper Industries, Inc., Corning, Inc., Crane Co., Crown Holdings Inc., Dow Chemical Co., Duke Energy, DuPont, Eastman Chemical, Fortune Brands Inc., Georgia-Pacific Group, Goodrich Corp., Goodyear Tire & Rubber, Hartford Financial Services Group Inc., Honeywell International Inc., International Paper Co., McDermott International, Nationwide Financial Services, Owens-Illinois Inc., Pfizer, PPG Industries, Inc., Sealed Air Corp., Travelers Property Casualty Corp., USG Corp., Viacom, Inc., and W.R. Grace & Co. An equal weighted index was constructed using the stock prices of these companies.

APP 000146

**NERA**
ECONOMIC CONSULTING

**Lucy P. Allen**
Senior Vice President

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# Appendix A

# LUCY P. ALLEN
## SENIOR VICE PRESIDENT

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

| | |
|---|---|
| 1994-Present | **National Economic Research Associates, Inc.**<br>Senior Vice President. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.<br>Vice President.<br>Senior Consultant. |
| 1992-1993 | **Council of Economic Advisers, Executive Office of the President**<br>Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force. |
| 1986-1988<br>1983-1984 | **Ayers, Whitmore & Company (General Management Consultants)**<br>Senior Associate. Formulated marketing, organization, and overall business strategies including:<br>Plan to improve profitability of chemical process equipment manufacturer.<br>Merger analysis and integration plan of two equipment manufacturers.<br>Evaluation of Korean competition to a U.S. manufacturer.<br>Diagnostic survey for auto parts manufacturer on growth obstacles.<br>Marketing plan to increase international market share for major accounting firm. |

Lucy P. Allen

Summer 1985      **WNET/Channel Thirteen, Strategic Planning Department**
                 <u>Associate</u>.  Assisted in development of company's first long-term strategic
                 plan. Analyzed relationship between programming and viewer support.

1981-1983        **Arthur Andersen & Company**
                 <u>Consultant</u>.    Designed,   programmed   and   installed   management
                 information systems.   Participated in redesign/conversion of New York
                 State's accounting system.   Developed municipal bond fund management
                 system, successfully marketed to brokers.   Participated in President's
                 Private Sector Survey on Cost Control (Grace Commission).   Designed
                 customized tracking and accounting system for shipping company.

**Teaching**
1989- 1992       <u>**Teaching Fellow**</u>**, Yale University**
                 Honors Econometrics
                 Intermediate Microeconomics
                 Competitive Strategies
                 Probability and Game Theory
                 Marketing Strategy
                 Economic Analysis

## Publications, Speeches and Conference Papers

Participant in panel on "Expert Reports and Depositions" at *PLI Expert Witness 2014*,
hosted by the Practising Law Institute, New York, New York, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA
Report, 2014.

Participant in panel on "Use of Experts" at *PLI Pretrial Practice 2014*, hosted by the
Practising Law Institute, New York, New York, 2014.

"High Frequency Trading --A Primer in 1,800,000 Milliseconds" before the Litigation
Group at Morrison Foerster, New York, New York, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA
Report, 2013.

Participant in panel on "Use of Experts" at *PLI Pretrial Practice 2013*, hosted by the
Practising Law Institute, New York, New York, 2013.

Participant in panel on "Use of Experts" at *PLI Pretrial Practice 2012*, hosted by the
Practising Law Institute, Chicago, Illinois, 2012.

Lucy P. Allen

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

 "2011 & Beyond–Predicting Mass Tort Litigation: with a Focus on Pharmaceutical Torts" presented at *Emerging Insurance Coverage and Allocation Issues*, hosted by Perrin Conferences, New York, New York, 2011.

Presented recent trends in settlements, predicting settlement amounts, and the use of economic analysis at mediation in the "Settlement Trends & Tactics" panel at *Securities Litigation & Enforcement: Current Developments & Strategies*, hosted by the New York City Bar, New York, New York, 2010.

"Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at *Securities Litigation During the Financial Crisis: Current Development & Strategies*, hosted by the New York City Bar, New York, New York, 2009.

"GM and Chrysler Bankruptcies: Potential Impact on Other Asbestos Defendants" presented at *Asbestos Litigation Conference: A Comprehensive National Overview and Outlook*, hosted by Perrin Conferences, San Francisco, California, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"Emerging Economies and Product Recall -- Are the Claims Coming?" presented at *The International Reinsurance Summit 2008*, Hamilton, Bermuda, 2008.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

 "Recent Trends in Securities Litigation" presented at *Strategies, Calculations & Insurance in Complex Business Litigation*, hosted by the Directors Roundtable, New York, New York, 2008.

"The Current Landscape" presented at *Mealey's Product Recall Liability Conference: Made in China and Beyond*, Washington, DC, 2007.

"China Product Recalls: What's at Stake and What's Next" presented at *China Product Recalls*, sponsored by National Economic Research Associates, New York, New York, 2007.

Lucy P. Allen

"Damages and Loss Causation in Shareholder Class Actions after *Dura*" presented at *Securities Litigation: Emerging Trends in Enforcement and Winning Litigation Strategies* hosted by the International Quality & Productivity Center, New York, New York, 2006.

"Damages per Share in Shareholder Class Actions after *Dura*," presented at the 9th Annual Finance, Law and Economics Securities Litigation Seminar, sponsored by National Economic Research Associates, Deer Valley, Utah, 2006.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), *The International Comparative Legal Guide to Product Liability*, 2006.

"*Loss Causation*," presented at the 7th Annual Finance, Law and Economics Securities Litigation Seminar, sponsored by National Economic Research Associates, Beaver Creek, Colorado, 2004.

"Recent Trends in Securities Class Action Litigation," presented at The Class Action Litigation Summit program, *Class Action in the Securities Industry*, Washington, D.C., 2003.

"Product Liability Claims Estimation – Four Steps, Four Myths" presented at Standard & Poor's Seminar, New York, New York, 2001.

"How Bad Can It Be? The Economics of Damages and Settlements in Shareholder Class Actions," *Balancing Disclosure and Litigation Risks for Public Companies (Or Soon-To-Be Public Companies)* seminar sponsored by Alston & Bird LLP and RR Donnelley Financial, Nashville, Tennessee, 2000.

"Securities Litigation Reform: Problems and Progress," *Viewpoint,* November 1999, Issue No. 2 (co-authored).

"Trends in Securities Litigation and the Impact of the PSLRA," *Class Actions & Derivative Suits*, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," *Regulation*, Winter 1997, pp. 6-7 (co-authored). "Adverse Selection in the Market for Used Construction Equipment," presented at the NBER Conference on Research in Income and Wealth, Federal Reserve Board, June 1992.

## Expert Reports, Depositions & Testimony (4 years)

Expert Report before the United States District Court Southern District of New York in *Marek Socha v. 110 Church LLC, et al. (In re Lower Manhattan Disaster Site Litigation)*, 2014.

Lucy P. Allen

Expert Report before the United States District Court Southern District of New York in *Waldemar Ropel and Krystyna Ropel v. The Bank of New York., et al. (In re Lower Manhattan Disaster Site Litigation)*, 2014.

Expert Report before the United States District Court Southern District of New York in *Wladyslaw Kwasnik v. 160 Water Street, Inc., et al. (In re Lower Manhattan Disaster Site Litigation)*, 2014.

Expert Report before the United States District Court Southern District of New York in *In re Lower Manhattan Disaster Site Litigation*, 2014.

Deposition Testimony before the United States District Court Southern District of Florida in *Atul Kumar Sood, et al. v. Catalyst Pharmaceutical Partners Inc., et al.*, 2014.

Expert Report before the United States District Court for the Eastern District of Pennsylvania in *Power Restoration International, Inc. v. PepsiCo, Inc., Bottling Group, LLC, and Frito-Lay Trading Company (Europe), Gmbh*, 2014.

Declaration before the Superior Court of Gwinnett County State of Georgia in *City of Riviera Beach General Employees Retirement System, et al. v. Aaron's Inc., et al., Norfolk County Retirement System, et al. v. Aaron's Inc., et al.*, 2014.

Expert Report before the United States District Court Southern District of Florida in *Atul Kumar Sood, et al. v. Catalyst Pharmaceutical Partners Inc., et al.*, 2014.

Deposition Testimony, Surrebuttal Report and Expert Report before the United States District Court Middle District of Tennessee Nashville Division in *Garden City Employees' Retirement System and Central States, Southeast and Southwest Areas Pension Fund, et al. v. Psychiatric Solutions, Inc., et al.*, 2014.

Declaration before the United States District Court Northern District of California San Jose Division in *Fyock, et al. v. The City of Sunnyvale, et al.*, 2014.

Deposition Testimony and Expert Report before the United States District Court for the District of Maryland (Northern Division) in *Kolbe, et al. v. O'Malley, et al.*, 2014.

Declaration before the United States District Court Northern District of California in *San Francisco Veteran Police Officers Association, et al. v. The City and County of San Francisco, et al.*, 2014.

Testimony before the United States Bankruptcy Court Southern District of New York in *In re Residential Capital, LLC, et al.*, 2013.

Deposition Testimony and Expert Report before the United States District Court for the Eastern District of Michigan Southern Division in *Timothy Hennigan, Aaron McHenry, and Christopher Cocks et al. v. General Electric Company*, 2013.

Lucy P. Allen

Declaration before the United States Bankruptcy Court Southern District of New York in *In re Residential Capital, LLC, et al.*, 2013.

Declaration before the United States District Court for the Western District of New York in *New York State Rifle and Pistol Association, Inc. et al. v. Cuomo, et al.*, 2013.

Expert Report  before the United States District Court for the District of New Jersey in *Charles Stanziale, Jr. v. PepsiCo, Inc., et al.*, 2013.

Deposition Testimony before the United States District Court for the Southern District of New York, *In re Winstar Communications Securities Litigation*, 2013.

Supplemental Report before the United States District Court for the District of New Jersey in *Howmedica Osteonics Corp. v. Zimmer, Inc. et al.*, 2013.

Expert Report before the United States District Court of New Jersey in *Boris Goldenberg, et al. v. Indel, Inc., et al.*, 2013.

Deposition Testimony before the United States Court of Federal Claims in *Starr International Company, Inc. v. the United States of America*, 2013.

Expert Report before the United States Court of Federal Claims in *Starr International Company, Inc. v. the United States of America*, 2013.

Expert Report before the Circuit Court for the County of Fairfax in *John DeGroote as liquidating trustee for and on behalf of the BearingPoint, Inc. Liquidating Trust v. F. Edwin Harbach, et al.*, 2013.

Expert Report before the United States District Court for the Southern District of New York, *In re Winstar Communications Securities Litigation*, 2012.

Expert Report before the United States District Court for the Northern District of Georgia, *In re Synovus Financial Corp.*, 2012.

Deposition Testimony before the United States District Court for the District of New Jersey in *Howmedica Osteonics Corp. v. Zimmer, Inc. et al.*, 2012.

Deposition Testimony before the United States District Court of New Jersey in *Boris Goldenberg, et al. v. Indel, Inc., et al.*, 2012.

Expert Report before the United States District Court of New Jersey in *Boris Goldenberg, et al. v. Indel, Inc., et al.*, 2011.

Expert Report before the United States District Court for the District of New Jersey in *Howmedica Osteonics Corp. v. Zimmer, Inc. et al.*, 2011.

Lucy P. Allen

Expert Report before the United States District Court for the Southern District of New York, *In re IMAX Corporation Securities Litigation*, 2011.

Testimony, Supplemental Declaration and Declaration before the American Arbitration Association International Centre for Dispute Resolution in *Eurotire, Inc. v. Komatsu America Corp.*, 2011.

Deposition Testimony before the Superior Court Department of the Trial Court, Suffolk County, Commonwealth of Massachusetts in *Lexington Insurance Company v. Clearwater Insurance Company*, 2011.

Deposition Testimony and Expert Report before the United States District Court for the Southern District of New York, *In re IMAX Corporation Securities Litigation*, 2010.

Expert Report and Rebuttal Expert Report before the Court of the Chancery of the State of Delaware in *Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, et al. and Landry's Restaurants, Inc.*, 2010.

Deposition Testimony before the United States District Court for the Southern District of New York in *Adelphia Recovery Trust v. Bank of America N.A., et al.*, 2010.

September 2014

## APPENDIX B: MATERIALS CONSIDERED

**Case Documents**
1. April 4, 2006 Fourth Consolidated Amended Complaint for Violation of the Securities Exchange Act of 1934
2. September 17, 2007 Lead Plaintiff's Motion for Class Certification and Incorporated Memorandum of Points and Authorities in Support Thereof
3. September 17, 2007 Expert Report of Jane D. Nettesheim and materials considered
4. October 16, 2007 Deposition of Jane Nettesheim
5. November 16, 2007 Expert Report of Lucy P. Allen
6. December 3, 2007 Deposition of Lucy P. Allen
7. December 20, 2007 Rebuttal Report of Jane D. Nettesheim and materials considered
8. January 18, 2008 Supplemental Report of Lucy P. Allen
9. February 7, 2014 Lead Plaintiff's Supplemental Responses and Objections to Halliburton's Second Set of Interrogatories
10. May 14, 2014 Lead Plaintiff's Responses and Objections to Halliburton's Third Set of Interrogatories
11. July 7, 2014 Lead Plaintiff's Opposition to Defendants' Emergency Motion to Stay Discovery Pending Determination on Class Certification and supporting materials

**Court Decisions**
1. November 4, 2008 Memorandum Opinion and Order
2. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U. S. ____ (2011)
3. January 27, 2012 Order
4. *Halliburton Co. v. Erica P. John Fund, Inc*, 573 U. S. ___ (2014)

**Data**
1. Price and trading volume data for Halliburton, industry and market indices, and peer companies from FactSet Research Systems, Inc. and Bloomberg, L.P.
2. Implied volatility data for Halliburton and peer companies from Bloomberg, L.P.
3. Short interest data for Halliburton from Bloomberg, L.P.
4. Institutional holdings data for Halliburton from FactSet Research Systems, Inc.
5. Intraday trading data for Halliburton from TAQ.
6. Analyst EPS estimates from I/B/E/S for Halliburton obtained from FactSet Research Systems Inc.

**Analyst Reports on Halliburton**
1. Robinson Humphrey, 01/24/1996
2. Paine Webber, 01/29/1996
3. Salomon Brothers, 01/29/1996
4. Robinson Humphrey, 04/19/1996
5. Robinson Humphrey, 04/23/1996
6. Salomon Brothers, 05/08/1996
7. Bernstein Research, 05/17/1996
8. Robinson Humphrey, 07/01/1996
9. Brown Brothers Harriman, 07/02/1996
10. Goldman Sachs, 07/10/1996

APP 000154

## APPENDIX B: MATERIALS CONSIDERED

11. Robinson Humphrey, 07/24/1996
12. Salomon Brothers, 08/27/1996
13. Robinson Humphrey, 08/30/1996
14. Robinson Humphrey, 10/23/1996
15. Salomon Brothers, 12/03/1996
16. Goldman Sachs, 01/09/1997
17. Merrill Lynch, 01/23/1997
18. Robinson Humphrey, 01/23/1997
19. WMJ & Co, 01/28/1997
20. Salomon Brothers, 02/11/1997
21. Simmons & Company, 02/24/1997
22. Paine Webber, 04/21/1997
23. WMJ & Co, 04/23/1997
24. Merrill Lynch, 04/24/1997
25. Credit Suisse, 06/11/1997
26. Simmons & Company, 06/11/1997
27. Goldman Sachs, 07/01/1997
28. Merrill Lynch, 07/25/1997
29. Salomon Brothers, 08/07/1997
30. Stephens, 08/07/1997
31. Credit Suisse, 09/25/1997
32. Goldman Sachs, 10/23/1997
33. Merrill Lynch, 10/23/1997
34. Morgan Stanley, 11/04/1997
35. Stephens, 11/21/1997
36. Goldman Sachs, 01/12/1998
37. Goldman Sachs, 01/23/1998
38. Prudential, 01/23/1998
39. Merrill Lynch, 01/26/1998
40. Prudential, 02/19/1998
41. Jefferies, 02/26/1998
42. Prudential, 02/26/1998
43. Simmons & Company, 02/26/1998
44. Paine Webber, 03/05/1998
45. Prudential, 03/23/1998
46. Prudential, 04/07/1998
47. Merrill Lynch, 04/24/1998
48. Lehman Brothers, 05/05/1998
49. Stephens, 06/04/1998
50. Prudential, 07/23/1998
51. Stephens, 08/17/1998
52. Prudential, 08/21/1998
53. NationsBanc Montgomery, 09/10/1998
54. Prudential, 09/30/1998
55. Prudential, 10/02/1998

APP 000155

## APPENDIX B: MATERIALS CONSIDERED

56. Robinson Humphrey, 10/03/1998
57. Prudential, 10/07/1998
58. Simmons & Company, 10/15/1998
59. Prudential, 10/28/1998
60. Prudential, 10/30/1998
61. Robinson Humphrey, 10/30/1998
62. Salomon Smith Barney, 10/30/1998
63. NationsBanc Montgomery, 11/02/1998
64. Merrill Lynch, 11/03/1998
65. CIBC, 11/09/1998
66. Southcoast Capital, 11/12/1998
67. Prudential, 11/13/1998
68. Prudential, 12/01/1998
69. CIBC, 12/08/1998
70. CIBC, 12/29/1998
71. Paine Webber, 12/29/1998
72. Prudential, 12/29/1998
73. Robinson Humphrey, 12/29/1998
74. Prudential, 01/04/1999
75. Paine Webber, 01/13/1999
76. CIBC, 01/26/1999
77. Paine Webber, 01/26/1999
78. Prudential, 01/26/1999
79. Robinson Humphrey, 01/26/1999
80. Merrill Lynch, 01/27/1999
81. Deutsche Bank, 01/28/1999
82. SunTrust Robinson Humphrey, 01/29/1999
83. Prudential, 02/08/1999
84. Paine Webber, 02/10/1999
85. Salomon Smith Barney, 02/12/1999
86. Prudential-1, 02/17/1999
87. Prudential-2, 02/17/1999
88. First Union, 02/19/1999
89. Donaldson, Lufkin & Jenrette, 03/01/1999
90. Thomson, 04/17/1999
91. Southwest Securities, 04/26/1999
92. CIBC, 04/27/1999
93. Dain Rauscher Wessels, 04/27/1999
94. Donaldson, Lufkin & Jenrette, 04/27/1999
95. First Union, 04/27/1999
96. Merrill Lynch, 04/27/1999
97. Prudential, 04/27/1999
98. Robinson Humphrey, 04/27/1999
99. Salomon Smith Barney-1, 04/27/1999
100. Salomon Smith Barney-2, 04/27/1999

APP 000156

## APPENDIX B: MATERIALS CONSIDERED

101. Deutsche Bank, 05/04/1999
102. Donaldson, Lufkin & Jenrette, 05/04/1999
103. Salomon Smith Barney, 05/04/1999
104. Stephens, 06/03/1999
105. Mergent, 06/12/1999
106. CIBC, 06/14/1999
107. Salomon Smith Barney, 06/15/1999
108. Mergent, 06/27/1999
109. CIBC, 07/23/1999
110. Credit Suisse, 07/23/1999
111. Dain Rauscher Wessels, 07/23/1999
112. Deutsche Bank, 07/23/1999
113. Donaldson, Lufkin & Jenrette, 07/23/1999
114. Merrill Lynch, 07/23/1999
115. Morgan Stanley, 07/23/1999
116. Prudential, 07/23/1999
117. Salomon Smith Barney, 07/23/1999
118. SunTrust Robinson Humphrey, 07/23/1999
119. Merrill Lynch, 07/26/1999
120. Prudential, 07/28/1999
121. Dain Rauscher Wessels, 07/30/1999
122. Jefferies, 07/30/1999
123. Robinson Humphrey, 07/30/1999
124. SunTrust Robinson Humphrey, 08/05/1999
125. SunTrust Robinson Humphrey, 08/12/1999
126. Credit Suisse, 08/13/1999
127. Deutsche Bank, 08/13/1999
128. Donaldson, Lufkin & Jenrette, 08/13/1999
129. Merrill Lynch, 08/13/1999
130. Morgan Stanley, 08/13/1999
131. PNC, 08/16/1999
132. Salomon Smith Barney, 08/16/1999
133. Southwest Securities, 08/19/1999
134. Salomon Smith Barney, 08/23/1999
135. CIBC-1, 08/25/1999
136. CIBC-2, 08/25/1999
137. Morgan Stanley, 08/25/1999
138. Brown Brothers Harriman-1, 09/03/1999
139. Brown Brothers Harriman-2, 09/03/1999
140. Morgan Stanley, 09/09/1999
141. Dain Rauscher Wessels-1, 09/14/1999
142. Dain Rauscher Wessels-2, 09/14/1999
143. SunTrust Robinson Humphrey, 09/15/1999
144. PNC, 09/23/1999
145. Warburg Dillon Read, 09/23/1999

APP 000157

APPENDIX B: MATERIALS CONSIDERED

146. SunTrust Robinson Humphrey, 09/24/1999
147. Stephens, 10/01/1999
148. Banc Of America, 10/05/1999
149. Brown Brothers Harriman, 10/05/1999
150. CIBC, 10/05/1999
151. Dain Rauscher Wessels, 10/05/1999
152. Deutsche Bank, 10/05/1999
153. Jefferies, 10/05/1999
154. Merrill Lynch-1, 10/05/1999
155. Merrill Lynch-2, 10/05/1999
156. Morgan Stanley, 10/05/1999
157. Prudential, 10/05/1999
158. SunTrust Robinson Humphrey, 10/05/1999
159. Brown Brothers Harriman, 10/06/1999
160. Credit Suisse, 10/06/1999
161. Dresdner, 10/06/1999
162. PNC, 10/06/1999
163. First Union, 10/11/1999
164. Banc Of America, 10/22/1999
165. CIBC, 10/22/1999
166. Credit Suisse, 10/22/1999
167. Dain Rauscher Wessels, 10/22/1999
168. Deutsche Bank, 10/22/1999
169. Donaldson, Lufkin & Jenrette, 10/22/1999
170. Morgan Stanley, 10/22/1999
171. PNC, 10/22/1999
172. Prudential, 10/22/1999
173. Robinson Humphrey, 10/22/1999
174. Salomon Smith Barney-1, 10/22/1999
175. Salomon Smith Barney-2, 10/22/1999
176. Merrill Lynch, 10/25/1999
177. Merrill Lynch, 10/26/1999
178. Brown Brothers Harriman, 10/27/1999
179. Brown Brothers Harriman, 10/28/1999
180. Stephens, 11/01/1999
181. SunTrust Robinson Humphrey, 11/05/1999
182. Salomon Smith Barney, 11/10/1999
183. Prudential, 11/18/1999
184. SunTrust Robinson Humphrey, 11/18/1999
185. Prudential, 11/22/1999
186. SunTrust Robinson Humphrey, 12/03/1999
187. Morgan Stanley, 12/09/1999
188. Salomon Smith Barney, 12/16/1999
189. Dain Rauscher Wessels, 01/03/2000
190. Brown Brothers Harriman-1, 01/05/2000

APP 000158

APPENDIX B: MATERIALS CONSIDERED

191. Brown Brothers Harriman-2, 01/05/2000
192. CIBC, 01/05/2000
193. Merrill Lynch, 01/05/2000
194. Stephens, 01/05/2000
195. A.G. Edwards, 01/10/2000
196. Deutsche Bank, 01/10/2000
197. Deutsche Bank, 01/11/2000
198. Bear Stearns, 01/24/2000
199. Dain Rauscher Wessels, 01/24/2000
200. Morgan Stanley, 01/26/2000
201. A.G. Edwards, 01/27/2000
202. Banc Of America, 01/27/2000
203. Brown Brothers Harriman, 01/28/2000
204. CIBC, 01/28/2000
205. Credit Suisse, 01/28/2000
206. Dain Rauscher Wessels, 01/28/2000
207. Deutsche Bank, 01/28/2000
208. Merrill Lynch, 01/28/2000
209. Morgan Stanley, 01/28/2000
210. Prudential, 01/28/2000
211. Salomon Smith Barney-1, 01/28/2000
212. Salomon Smith Barney-2, 01/28/2000
213. SunTrust Robinson Humphrey, 01/28/2000
214. Goldman Sachs, 01/31/2000
215. Johnson Rice & Comp, 02/02/2000
216. ING Barings, 02/10/2000
217. Salomon Smith Barney, 02/14/2000
218. Stephens, 02/16/2000
219. Dain Rauscher Wessels, 03/08/2000
220. Salomon Smith Barney, 03/08/2000
221. Morgan Stanley, 03/10/2000
222. PNC, 03/13/2000
223. Warburg Dillon Read, 03/14/2000
224. SunTrust Robinson Humphrey, 03/23/2000
225. Jefferies-1, 03/24/2000
226. Jefferies-2, 03/24/2000
227. Prudential, 03/27/2000
228. A.G. Edwards, 03/29/2000
229. Dain Rauscher Wessels, 03/31/2000
230. Brown Brothers Harriman, 04/03/2000
231. Jefferies, 04/04/2000
232. Donaldson, Lufkin & Jenrette, 04/05/2000
233. Banc Of America, 04/10/2000
234. SunTrust Robinson Humphrey, 04/11/2000
235. Banc Of America, 04/26/2000

APPENDIX B: MATERIALS CONSIDERED

236. Jefferies, 04/26/2000
237. A.G. Edwards, 04/27/2000
238. CIBC, 04/27/2000
239. Credit Suisse, 04/27/2000
240. Dain Rauscher Wessels-1, 04/27/2000
241. Dain Rauscher Wessels-2, 04/27/2000
242. Deutsche Bank, 04/27/2000
243. Donaldson, Lufkin & Jenrette, 04/27/2000
244. Goldman Sachs, 04/27/2000
245. Lehman Brothers, 04/27/2000
246. Merrill Lynch, 04/27/2000
247. PNC, 04/27/2000
248. Salomon Smith Barney, 04/27/2000
249. SunTrust Robinson Humphrey, 04/27/2000
250. Prudential, 04/28/2000
251. Prudential, 05/03/2000
252. Salomon Smith Barney, 05/03/2000
253. Deutsche Bank, 05/04/2000
254. Brown Brothers Harriman, 05/05/2000
255. SunTrust Robinson Humphrey, 05/17/2000
256. Donaldson, Lufkin & Jenrette, 05/22/2000
257. Brown Brothers Harriman, 05/23/2000
258. Jefferies, 05/30/2000
259. Donaldson, Lufkin & Jenrette, 06/09/2000
260. Salomon Smith Barney, 06/28/2000
261. Donaldson, Lufkin & Jenrette, 07/11/2000
262. Donaldson, Lufkin & Jenrette, 07/24/2000
263. Jefferies, 07/24/2000
264. Argus, 07/26/2000
265. CIBC, 07/26/2000
266. Jefferies, 07/26/2000
267. Paine Webber, 07/26/2000
268. Salomon Smith Barney, 07/26/2000
269. A.G. Edwards, 07/27/2000
270. Banc Of America, 07/27/2000
271. Credit Suisse, 07/27/2000
272. Deutsche Bank-1, 07/27/2000
273. Deutsche Bank-2, 07/27/2000
274. Donaldson, Lufkin & Jenrette, 07/27/2000
275. ING Barings, 07/27/2000
276. Merrill Lynch, 07/27/2000
277. Morgan Stanley, 07/27/2000
278. Paine Webber, 07/27/2000
279. Prudential, 07/27/2000
280. RBC, 07/27/2000

APP 000160

APPENDIX B: MATERIALS CONSIDERED

281. Salomon Smith Barney-1, 07/27/2000
282. Salomon Smith Barney-2, 07/27/2000
283. SunTrust Robinson Humphrey, 07/27/2000
284. UBS Warburg, 07/27/2000
285. Dain Rauscher Wessels, 07/28/2000
286. PNC, 07/28/2000
287. UBS Warburg, 07/28/2000
288. Deutsche Bank, 08/01/2000
289. Salomon Smith Barney, 08/07/2000
290. Prudential, 08/08/2000
291. A.G. Edwards, 08/17/2000
292. ABN AMRO, 08/31/2000
293. Robinson Humphrey, 09/01/2000
294. ABN AMRO, 09/05/2000
295. PNC, 09/08/2000
296. Prudential, 09/14/2000
297. Dain Rauscher Wessels, 09/19/2000
298. Jefferies, 09/25/2000
299. Salomon Smith Barney, 10/06/2000
300. Jefferies, 10/09/2000
301. PNC, 10/10/2000
302. A.G. Edwards, 10/25/2000
303. ABN AMRO-1, 10/25/2000
304. ABN AMRO-2, 10/25/2000
305. Banc Of America, 10/25/2000
306. CIBC, 10/25/2000
307. Credit Suisse, 10/25/2000
308. Dain Rauscher Wessels, 10/25/2000
309. Frost Securities, 10/25/2000
310. ING Barings, 10/25/2000
311. Jefferies, 10/25/2000
312. Merrill Lynch, 10/25/2000
313. Morgan Stanley, 10/25/2000
314. Paine Webber, 10/25/2000
315. Prudential, 10/25/2000
316. Salomon Smith Barney, 10/25/2000
317. Southwest Securities, 10/25/2000
318. Jefferies, 10/26/2000
319. Lehman Brothers, 10/26/2000
320. PNC, 10/26/2000
321. ING Barings, 10/27/2000
322. Deutsche Bank, 11/07/2000
323. Jefferies, 11/13/2000
324. Deutsche Bank, 11/21/2000
325. Merrill Lynch, 11/22/2000

APP 000161

## APPENDIX B: MATERIALS CONSIDERED

326. Salomon Smith Barney, 11/28/2000
327. Dain Rauscher Wessels, 12/12/2000
328. A.G. Edwards, 12/21/2000
329. CIBC, 12/21/2000
330. Salomon Smith Barney, 12/21/2000
331. Thomson, 12/21/2000
332. UBS Warburg, 12/21/2000
333. ABN AMRO, 12/22/2000
334. CIBC, 12/22/2000
335. Deutsche Bank, 12/22/2000
336. Jefferies, 12/22/2000
337. PNC, 12/26/2000
338. Prudential, 01/30/2001
339. CIBC, 01/31/2001
340. Credit Suisse, 01/31/2001
341. Dain Rauscher Wessels, 01/31/2001
342. Jefferies, 01/31/2001
343. Lehman Brothers-1, 01/31/2001
344. Lehman Brothers-2, 01/31/2001
345. PNC, 01/31/2001
346. Salomon Smith Barney, 01/31/2001
347. SunTrust Robinson Humphrey-1, 01/31/2001
348. SunTrust Robinson Humphrey-2, 01/31/2001
349. UBS Warburg-1, 01/31/2001
350. UBS Warburg-2, 01/31/2001
351. A.G. Edwards, 02/20/2001
352. SunTrust Robinson Humphrey, 03/09/2001
353. Dain Rauscher Wessels, 03/23/2001
354. Salomon Smith Barney, 04/25/2001
355. CIBC, 04/26/2001
356. Credit Suisse, 04/26/2001
357. Dain Rauscher Wessels, 04/26/2001
358. Deutsche Bank, 04/26/2001
359. Dresdner, 04/26/2001
360. Lehman Brothers, 04/26/2001
361. Morgan Stanley, 04/26/2001
362. PNC, 04/26/2001
363. Prudential, 04/26/2001
364. Robinson Humphrey, 04/26/2001
365. UBS Warburg, 04/26/2001
366. A.G. Edwards, 04/27/2001
367. Thomson, 04/28/2001
368. ABN AMRO, 04/30/2001
369. Deutsche Bank, 04/30/2001
370. Deutsche Bank, 05/06/2001

APP 000162

## APPENDIX B: MATERIALS CONSIDERED

371. Lehman Brothers, 05/15/2001
372. Deutsche Bank, 05/16/2001
373. Robinson Humphrey, 05/25/2001
374. Deutsche Bank, 05/29/2001
375. Prudential, 06/07/2001
376. Deutsche Bank, 06/29/2001
377. Merrill Lynch, 06/29/2001
378. Morgan Stanley, 06/29/2001
379. Salomon Smith Barney, 06/29/2001
380. Deutsche Bank, 07/17/2001
381. First Global, 07/25/2001
382. Prudential, 07/25/2001
383. Robinson Humphrey, 07/25/2001
384. ABN AMRO, 07/26/2001
385. CIBC, 07/26/2001
386. Dain Rauscher Wessels, 07/26/2001
387. Deutsche Bank-1, 07/26/2001
388. Deutsche Bank-2, 07/26/2001
389. Johnson Rice & Comp, 07/26/2001
390. Robinson Humphrey, 07/26/2001
391. SWS Securities, 07/26/2001
392. UBS Warburg, 07/26/2001
393. Hibernia, 07/27/2001
394. Hornblower, 07/30/2001
395. SWS Securities, 08/06/2001
396. A.G. Edwards, 08/10/2001
397. Salomon Smith Barney, 08/22/2001
398. Jefferies-1, 09/05/2001
399. Jefferies-2, 09/05/2001
400. Credit Suisse, 09/20/2001
401. Deutsche Bank, 10/01/2001
402. Deutsche Bank, 10/02/2001
403. Deutsche Bank, 10/05/2001
404. Deutsche Bank, 10/08/2001
405. JP Morgan, 10/15/2001
406. Deutsche Bank, 10/22/2001
407. A.G. Edwards, 10/23/2001
408. Salomon Smith Barney, 10/23/2001
409. ABN AMRO, 10/24/2001
410. CIBC, 10/24/2001
411. Dain Rauscher Wessels, 10/24/2001
412. Deutsche Bank, 10/24/2001
413. Dresdner, 10/24/2001
414. Frost Securities, 10/24/2001
415. Jefferies, 10/24/2001

APP 000163

APPENDIX B: MATERIALS CONSIDERED

416. Morgan Stanley, 10/24/2001
417. SunTrust Robinson Humphrey, 10/24/2001
418. SWS Securities, 10/24/2001
419. UBS Warburg-1, 10/24/2001
420. UBS Warburg-2, 10/24/2001
421. Wachovia Securities, 10/24/2001
422. Deutsche Bank, 10/29/2001
423. Johnson Rice & Comp, 10/29/2001
424. A.G. Edwards-1, 10/31/2001
425. A.G. Edwards-2, 10/31/2001
426. Salomon Smith Barney, 10/31/2001
427. Deutsche Bank, 11/05/2001
428. Hibernia, 11/06/2001
429. Salomon Smith Barney, 11/09/2001
430. Deutsche Bank, 11/12/2001
431. Deutsche Bank, 11/19/2001
432. Jefferies, 11/21/2001
433. Merrill Lynch, 12/04/2001
434. A.G. Edwards, 12/05/2001
435. Deutsche Bank, 12/05/2001
436. SunTrust Robinson Humphrey, 12/05/2001
437. ABN AMRO, 12/07/2001
438. Hibernia, 12/07/2001
439. Jefferies, 12/07/2001
440. JP Morgan, 12/07/2001
441. Merrill Lynch, 12/07/2001
442. Salomon Smith Barney, 12/07/2001
443. UBS Warburg, 12/07/2001
444. A.G. Edwards, 12/10/2001
445. ABN AMRO, 12/10/2001
446. Deutsche Bank-1, 12/10/2001
447. Deutsche Bank-2, 12/10/2001
448. Deutsche Bank-3, 12/10/2001
449. Deutsche Bank-4, 12/10/2001
450. Jefferies, 12/10/2001
451. RBC, 12/10/2001
452. SunTrust Robinson Humphrey-1, 12/10/2001
453. SunTrust Robinson Humphrey-2, 12/10/2001
454. SWS Securities, 12/10/2001
455. UBS Warburg, 12/10/2001
456. Bear Stearns, 12/11/2001
457. CIBC, 12/11/2001
458. Salomon Smith Barney, 12/11/2001
459. Merrill Lynch, 12/12/2001
460. Merrill Lynch, 12/13/2001

APP 000164

### APPENDIX B: MATERIALS CONSIDERED

461. Prudential, 12/17/2001
462. UBS Warburg, 01/07/2002
463. UBS Warburg, 01/24/2002
464. Credit Suisse, 01/25/2002
465. PNC, 01/28/2002
466. SunTrust Robinson Humphrey, 01/28/2002
467. Morgan Stanley-1, 01/29/2002
468. Morgan Stanley-2, 01/29/2002
469. Prudential, 01/30/2002
470. Salomon Smith Barney, 02/14/2002
471. ABN AMRO, 02/15/2002
472. CIBC, 02/15/2002
473. Deutsche Bank, 02/15/2002
474. Jefferies, 02/15/2002
475. Salomon Smith Barney, 02/15/2002
476. Bear Stearns, 02/19/2002
477. Credit Suisse-1, 02/19/2002
478. Credit Suisse-2, 02/19/2002
479. RBC, 02/26/2002
480. Deutsche Bank, 03/05/2002
481. RBC, 03/06/2002
482. Morgan Stanley, 03/12/2002
483. CIBC, 03/14/2002
484. Credit Suisse, 03/14/2002
485. Deutsche Bank, 03/14/2002
486. Lehman Brothers, 03/14/2002
487. Morgan Stanley, 03/14/2002
488. RBC, 03/14/2002
489. Salomon Smith Barney, 03/14/2002
490. Bear Stearns, 03/15/2002
491. Lehman Brothers, 03/18/2002
492. Credit Suisse, 03/20/2002
493. Deutsche Bank, 03/20/2002
494. CIBC, 03/21/2002
495. Hibernia, 03/28/2002
496. Deutsche Bank, 04/02/2002
497. Morgan Stanley, 04/02/2002
498. CIBC, 04/10/2002
499. CIBC, 04/12/2002
500. Credit Suisse, 04/15/2002
501. Lehman Brothers, 04/15/2002
502. UBS Warburg, 04/15/2002
503. Salomon Smith Barney, 05/03/2002
504. UBS Warburg, 05/03/2002
505. CIBC, 05/07/2002

APP 000165

## APPENDIX B: MATERIALS CONSIDERED

506. Credit Suisse, 05/07/2002
507. Dain Rauscher Wessels, 05/07/2002
508. Frost Securities, 05/07/2002
509. RBC, 05/07/2002
510. Bear Stearns, 05/08/2002
511. Credit Suisse, 05/08/2002
512. Deutsche Bank, 05/08/2002
513. Dresdner-1, 05/08/2002
514. Dresdner-2, 05/08/2002
515. Jefferies, 05/08/2002
516. Morgan Stanley, 05/08/2002
517. Salomon Smith Barney, 05/08/2002
518. UBS Warburg, 05/08/2002
519. Bear Stearns, 05/14/2002
520. Jefferies, 05/15/2002
521. UBS Warburg, 05/15/2002
522. Morgan Stanley, 05/17/2002
523. Deutsche Bank-1, 05/22/2002
524. Deutsche Bank-2, 05/22/2002
525. Salomon Smith Barney-1, 05/22/2002
526. Salomon Smith Barney-2, 05/22/2002
527. Salomon Smith Barney-3, 05/22/2002
528. Bear Stearns, 05/23/2002
529. Credit Suisse, 05/23/2002
530. Deutsche Bank, 05/23/2002
531. Dresdner, 05/23/2002
532. Jefferies, 05/23/2002
533. Lehman Brothers, 05/23/2002
534. RBC, 05/23/2002
535. Salomon Smith Barney-1, 05/23/2002
536. Salomon Smith Barney-2, 05/23/2002
537. UBS Warburg, 05/23/2002
538. Salomon Smith Barney, 05/24/2002
539. RBC, 05/29/2002
540. CIBC, 05/30/2002
541. Deutsche Bank, 05/30/2002
542. Morgan Stanley, 05/30/2002
543. Salomon Smith Barney, 05/30/2002
544. UBS Warburg, 05/30/2002
545. Credit Suisse, 07/25/2002
546. Morgan Stanley, 11/14/2002

## Industry Reports

1. Smith Barney, 06/24/1997
2. Merrill Lynch, 03/13/1998

APPENDIX B: MATERIALS CONSIDERED

3. Fahnestock, 12/30/1998
4. Credit Suisse, 03/16/1999
5. Jefferies-1, 06/03/1999
6. Jefferies-2, 06/03/1999
7. Jefferies-3, 06/03/1999
8. CIBC, 06/07/1999
9. Jefferies, 06/07/1999
10. Jefferies-1, 06/09/1999
11. Jefferies-2, 06/09/1999
12. CIBC, 06/14/1999
13. Jefferies-1, 06/16/1999
14. Jefferies-2, 06/16/1999
15. Jefferies-3, 06/16/1999
16. Jefferies, 06/21/1999
17. Jefferies, 06/22/1999
18. SunTrust Robinson Humphrey, 06/22/1999
19. Jefferies, 06/23/1999
20. Credit Suisse, 06/25/1999
21. Jefferies, 06/25/1999
22. CIBC, 06/28/1999
23. Jefferies, 06/29/1999
24. CIBC, 06/30/1999
25. CIBC, 07/01/1999
26. Dain Rauscher Wessels, 07/01/1999
27. Jefferies-1, 07/01/1999
28. Jefferies-2, 07/01/1999
29. Jefferies, 07/02/1999
30. CIBC, 07/06/1999
31. Jefferies, 07/06/1999
32. Jefferies, 07/07/1999
33. Jefferies-1, 07/08/1999
34. Jefferies-2, 07/08/1999
35. CIBC, 07/12/1999
36. Jefferies-1, 07/14/1999
37. Jefferies-2, 07/14/1999
38. Jefferies, 07/15/1999
39. Jefferies, 07/16/1999
40. ING Barings, 07/20/1999
41. Dain Rauscher Wessels, 07/23/1999
42. Jefferies, 07/23/1999
43. CIBC, 07/26/1999
44. Jefferies, 07/27/1999
45. Jefferies-1, 07/28/1999
46. Jefferies-2, 07/28/1999
47. Dain Rauscher Wessels, 07/30/1999

APP 000167

APPENDIX B: MATERIALS CONSIDERED

48. Jefferies, 07/30/1999
49. CIBC, 08/02/1999
50. Jefferies-1, 08/02/1999
51. Jefferies-2, 08/02/1999
52. Jefferies-1, 08/04/1999
53. Jefferies-2, 08/04/1999
54. SunTrust Robinson Humphrey, 08/06/1999
55. CIBC, 08/09/1999
56. Jefferies, 08/09/1999
57. SunTrust Robinson Humphrey, 08/09/1999
58. Jefferies-1, 08/11/1999
59. Jefferies-2, 08/11/1999
60. CIBC, 08/16/1999
61. SunTrust Robinson Humphrey, 08/17/1999
62. Jefferies-1, 08/18/1999
63. Jefferies-2, 08/18/1999
64. Dain Rauscher Wessels, 08/19/1999
65. SunTrust Robinson Humphrey, 08/19/1999
66. CIBC, 08/23/1999
67. CIBC-1, 08/25/1999
68. CIBC-2, 08/25/1999
69. Jefferies-1, 08/26/1999
70. Jefferies-2, 08/26/1999
71. Jefferies-1, 08/27/1999
72. Jefferies-2, 08/27/1999
73. CIBC, 08/30/1999
74. Jefferies, 09/01/1999
75. CIBC, 09/07/1999
76. Jefferies, 09/08/1999
77. CIBC, 09/09/1999
78. Jefferies, 09/13/1999
79. Jefferies, 09/15/1999
80. Dain Rauscher Wessels, 09/17/1999
81. CIBC, 09/20/1999
82. CIBC, 09/27/1999
83. Dain Rauscher Wessels, 09/28/1999
84. Deutsche Banc, 09/28/1999
85. Jefferies, 09/28/1999
86. Deutsche Banc, 09/29/1999
87. Bear Stearns, 10/01/1999
88. CIBC-1, 10/04/1999
89. CIBC-2, 10/04/1999
90. Brown Brothers Harriman, 10/06/1999
91. Dain Rauscher Wessels, 10/06/1999
92. Jefferies, 10/06/1999

APP 000168

APPENDIX B: MATERIALS CONSIDERED

93.  Jefferies, 10/07/1999
94.  Brown Brothers Harriman, 10/08/1999
95.  CIBC, 10/08/1999
96.  SunTrust Robinson Humphrey, 10/08/1999
97.  CIBC, 10/11/1999
98.  Jefferies, 10/11/1999
99.  Jefferies, 10/12/1999
100. Jefferies-1, 10/13/1999
101. Jefferies-2, 10/13/1999
102. CIBC, 10/14/1999
103. Jefferies, 10/14/1999
104. Bear Stearns, 10/15/1999
105. Salomon Smith Barney, 10/15/1999
106. Stephens-1, 10/15/1999
107. Stephens-2, 10/15/1999
108. Credit Suisse, 10/21/1999
109. Credit Suisse, 10/25/1999
110. Credit Suisse, 11/24/1999
111. Merrill Lynch, 12/02/1999
112. SunTrust Robinson Humphrey, 01/04/2000
113. SunTrust Robinson Humphrey, 01/10/2000
114. Thomson, 02/12/2000
115. Credit Suisse, 03/20/2000
116. Jefferies, 04/04/2000
117. Deutsche Bank, 08/01/2000
118. Jefferies, 10/09/2000
119. Credit Suisse, 11/01/2000
120. Deutsche Banc, 11/12/2000
121. Jefferies, 11/13/2000
122. Deutsche Banc, 11/26/2000
123. Deutsche Banc, 11/30/2000
124. Deutsche Banc, 12/04/2000
125. Salomon Smith Barney, 12/18/2000
126. Credit Suisse, 01/09/2001
127. Salomon Smith Barney, 01/12/2001
128. JM Laffferty-Jacobs, 04/09/2001
129. JM Laffferty-Jacobs, 04/16/2001
130. Instinet Research, 04/27/2001
131. Deutsche Banc, 04/30/2001
132. ABN AMRO, 05/08/2001
133. Jefferies, 09/17/2001
134. A.G. Edwards, 10/01/2001
135. Jefferies, 11/28/2001
136. Lehman Brothers, 12/07/2001
137. A.G. Edwards, 12/10/2001

**APPENDIX B: MATERIALS CONSIDERED**

138.  ABN ABRO, 12/10/2001
139.  Bear Stearns, 12/10/2001
140.  CIBC, 12/10/2001
141.  Credit Suisse, 12/10/2001
142.  Deutsche Banc, 12/10/2001
143.  Ferriss, Baker Watts, 12/10/2001
144.  Morgan Stanley, 12/10/2001
145.  Raymond James, 12/10/2001
146.  SSW, 12/10/2001
147.  Bear Stearns, 12/11/2001
148.  Credit Suisse, 12/11/2001
149.  Lehman, 03/20/2002

**Analyst Reports On Other Companies**

1.   Donaldson, Lufkin & Jenrette - BHI, 05/04/1999
2.   CIBC - Stolt, 06/28/1999
3.   Morgan Keegan - FMC, 07/13/1999
4.   Salomon Smith Barney - Ingersol Rand, 01/05/2000
5.   SunTrust Robinson Humphrey - National Oilwell, 12/10/2000
6.   UBS - Honeywell, 09/21/2001
7.   HSBC - United Technologies, 09/25/2001
8.   Salomon Smith Barney - Viacom, 12/03/2001
9.   Buckingham Research Group - Goodrich Corporation, 12/07/2001
10.  Deutsche Bank - Viacom, 12/07/2001
11.  Lehman Brothers - ABB, 12/07/2001
12.  Salomon Smith Barney - Goodrich Corporation, 12/07/2001
13.  Salomon Smith Barney - Sealed Air, 12/07/2001
14.  ABN-AMRO - 3M, 12/10/2001
15.  ABN-AMRO - ABB, 12/10/2001
16.  BNP Paribas - ABB, 12/10/2001
17.  Credit Suisse - ABB, 12/10/2001
18.  Dresdner - ABB, 12/10/2001
19.  Morgan Stanely - ABB, 12/10/2001
20.  Raymond James - Horizon, 12/10/2001
21.  Salomon Smith Barney - Goodrich Corporation, 12/10/2001
22.  Salomon Smith Barney - Sealed Air-, 12/10/2001
23.  Salomon Smith Barney - Sealed Air-1, 12/10/2001
24.  Salomon Smith Barney - Viacom, 12/10/2001
25.  SunTrust Robinson Humphrey - Cooper Cameron, 12/10/2001
26.  Bear Stearns - Viacom, 12/11/2001
27.  PNC - Viacom, 12/11/2001
28.  Salomon Smith Barney - Pfizer, 12/11/2001
29.  SG Securities - ABB, 12/11/2001
30.  SunTrust Robinson Humphrey - Tidewater, 12/11/2001

APP 000170

APPENDIX B: MATERIALS CONSIDERED

31.  UBS - Dow, 12/11/2001
32.  Burkenroad - Newpark, 12/12/2001
33.  Morgan Stanely - Technip Coflexip, 12/12/2001
34.  Bear Stearns - Crown Cork & Seal, 12/13/2001
35.  ABN-AMRO - Pfizer, 12/14/2001
36.  Pacific Growth - SeeBeyond, 12/14/2001
37.  Wachovia - Goodrich Corporation, 12/14/2001
38.  Credit Suisse - Dow, 12/17/2001
39.  Salomon Smith Barney - Goodrich Corporation, 12/17/2001
40.  UBS - Dow, 12/17/2001
41.  Credit Suisse - Dow, 01/09/2002
42.  Salomon Smith Barney - Dow, 01/09/2002
43.  Salomon Smith Barney - Dow, 01/10/2002
44.  UBS - Dow, 01/10/2002
45.  Deutsche Banc - Dow, 01/11/2002
46.  Credit Suisse - Dow, 01/14/2002
47.  Salomon Smith Barney - Dow-1, 01/14/2002
48.  Salomon Smith Barney - Dow-2, 01/14/2002
49.  UBS - Dow, 01/14/2002
50.  Salomon Smith Barney - Dow, 03/25/2002
51.  Credit Suisse - Dow, 10/24/2002

**Annual Reports and SEC-Filings**
1.  Halliburton 1998 Annual Report
2.  Halliburton 1999 Annual Report
3.  Halliburton 2000 Annual Report
4.  Halliburton 2001 Annual Report
5.  Halliburton 2002 Annual Report
6.  Halliburton SEC form 10-K filed on 03/11/1994
7.  Halliburton SEC form 10-K filed on 03/24/1995
8.  Halliburton SEC form 10-K filed on 03/11/1996
9.  Halliburton SEC form 10-K filed on 03/28/1997
10.  Halliburton SEC form 8-K filed on 12/31/1997
11.  Halliburton SEC form 8-K filed on 01/22/1998
12.  Halliburton SEC form 8-K filed on 02/17/1998
13.  Halliburton SEC form 8-K filed on 02/19/1998
14.  Halliburton SEC form 10-K filed on 02/24/1998
15.  Halliburton SEC form 8-K filed on 02/26/1998
16.  Halliburton SEC form 8-K filed on 03/17/1998
17.  Halliburton SEC form 8-K filed on 04/20/1998
18.  Halliburton SEC form 8-K filed on 04/22/1998
19.  Halliburton SEC form 10-Q filed on 05/07/1998
20.  Halliburton SEC form 8-K filed on 05/08/1998
21.  Halliburton SEC form 8-K filed on 05/19/1998
22.  Halliburton SEC form 8-K filed on 06/01/1998

APP 000171

APPENDIX B: MATERIALS CONSIDERED

23. Halliburton SEC form 8-K filed on 06/12/1998
24. Halliburton SEC form 8-K filed on 06/25/1998
25. Halliburton SEC form 8-K filed on 07/06/1998
26. Halliburton SEC form 8-K filed on 07/07/1998
27. Halliburton SEC form 8-K filed on 07/09/1998
28. Halliburton SEC form 8-K filed on 07/16/1998
29. Halliburton SEC form 8-K filed on 07/22/1998
30. Halliburton SEC form 10-Q filed on 08/12/1998
31. Halliburton SEC form 8-K filed on 08/21/1998
32. Halliburton SEC form 8-K filed on 08/31/1998
33. Halliburton SEC form 8-K filed on 09/29/1998
34. Halliburton SEC form 8-K filed on 09/29/1998
35. Halliburton SEC form 8-K filed on 09/29/1998
36. Halliburton SEC form 8-K filed on 10/29/1998
37. Halliburton SEC form 8-K filed on 10/30/1998
38. Halliburton SEC form 10-Q filed on 11/16/1998
39. Halliburton SEC form 8-K filed on 11/19/1998
40. Halliburton SEC form 8-K filed on 11/24/1998
41. Halliburton SEC form 8-K filed on 11/30/1998
42. Halliburton SEC form 8-K filed on 12/28/1998
43. Halliburton SEC form 8-K filed on 01/22/1999
44. Halliburton SEC form 8-K filed on 01/25/1999
45. Halliburton SEC form 8-K filed on 02/18/1999
46. Halliburton SEC form 8-K filed on 02/19/1999
47. Halliburton SEC form 8-K filed on 03/04/1999
48. Halliburton SEC form 8-K filed on 03/11/1999
49. Halliburton SEC form 10-K/A filed on 03/18/1999
50. Halliburton SEC form 10-K filed on 03/23/1999
51. Halliburton SEC form 8-K filed on 03/29/1999
52. Halliburton SEC form 8-K filed on 04/13/1999
53. Halliburton SEC form 8-K filed on 04/21/1999
54. Halliburton SEC form 8-K filed on 04/26/1999
55. Halliburton SEC form 10-Q filed on 05/14/1999
56. Halliburton SEC form 8-K filed on 05/18/1999
57. Halliburton SEC form DEF-14A filed on 05/18/1999
58. Halliburton SEC form 8-K filed on 05/24/1999
59. Halliburton SEC form 8-K filed on 06/04/1999
60. Halliburton SEC form 8-K filed on 06/16/1999
61. Halliburton SEC form 8-K filed on 07/15/1999
62. Halliburton SEC form 8-K filed on 07/22/1999
63. Halliburton SEC form 8-K filed on 08/12/1999
64. Halliburton SEC form 10-Q filed on 08/13/1999
65. Halliburton SEC form 8-K filed on 09/29/1999
66. Halliburton SEC form 8-K filed on 09/30/1999
67. Halliburton SEC form 8-K filed on 10/04/1999

APP 000172

## APPENDIX B: MATERIALS CONSIDERED

68. Halliburton SEC form 8-K filed on 10/21/1999
69. Halliburton SEC form 8-K filed on 10/26/1999
70. Halliburton SEC form 8-K filed on 10/27/1999
71. Halliburton SEC form 8-K filed on 10/28/1999
72. Halliburton SEC form 10-Q filed on 11/15/1999
73. Halliburton SEC form 8-K filed on 12/30/1999
74. Halliburton SEC form 8-K filed on 01/04/2000
75. Halliburton SEC form 10-QA filed on 01/11/2000
76. Halliburton SEC form 8-K filed on 01/23/2000
77. Halliburton SEC form 8-K filed on 01/25/2000
78. Halliburton SEC form 8-K filed on 01/27/2000
79. Halliburton SEC form 8-K filed on 01/27/2000
80. Halliburton SEC form 8-K filed on 02/01/2000
81. Halliburton SEC form 8-K filed on 02/02/2000
82. Halliburton SEC form 8-K filed on 02/16/2000
83. Halliburton SEC form 8-K filed on 02/17/2000
84. Halliburton SEC form 10-K filed on 03/14/2000
85. Halliburton SEC form 8-K filed on 03/27/2000
86. Halliburton SEC form 8-K filed on 03/31/2000
87. Halliburton SEC form DEF-14A filed on 04/03/2000
88. Halliburton SEC form 8-K filed on 04/10/2000
89. Halliburton SEC form 8-K filed on 04/12/2000
90. Halliburton SEC form 8-K filed on 04/17/2000
91. Halliburton SEC form 8-K filed on 04/26/2000
92. Halliburton SEC form 8-K filed on 05/02/2000
93. Halliburton SEC form 10-Q filed on 05/15/2000
94. Halliburton SEC form 8-K filed on 05/16/2000
95. Halliburton SEC form 8-K filed on 07/05/2000
96. Halliburton SEC form 8-K filed on 07/20/2000
97. Halliburton SEC form 8-K filed on 07/25/2000
98. Halliburton SEC form 8-K filed on 07/26/2000
99. Halliburton SEC form 8-K filed on 08/03/2000
100. Halliburton SEC form 8-K filed on 08/09/2000
101. Halliburton SEC form 10-Q filed on 08/10/2000
102. Halliburton SEC form 8-K filed on 08/16/2000
103. Halliburton SEC form 8-K filed on 08/23/2000
104. Halliburton SEC form 8-K filed on 10/23/2000
105. Halliburton SEC form 8-K filed on 10/24/2000
106. Halliburton SEC form 8-K filed on 10/26/2000
107. Halliburton SEC form 10-Q filed on 11/09/2000
108. Halliburton SEC form 8-K filed on 12/21/2000
109. Halliburton SEC form 8-K filed on 01/02/2001
110. Halliburton SEC form 8-K filed on 01/02/2001
111. Halliburton SEC form 8-K filed on 01/30/2001
112. Halliburton SEC form 8-K filed on 01/31/2001

APP 000173

## APPENDIX B: MATERIALS CONSIDERED

113. Halliburton SEC form 8-K filed on 01/31/2001
114. Halliburton SEC form 8-K filed on 02/15/2001
115. Halliburton SEC form 8-K filed on 03/12/2001
116. Halliburton SEC form 8-K filed on 03/22/2001
117. Halliburton SEC form 10-K filed on 03/27/2001
118. Halliburton SEC form DEF-14A filed on 04/02/2001
119. Halliburton SEC form 8-K filed on 04/10/2001
120. Halliburton SEC form 8-K filed on 04/10/2001
121. Halliburton SEC form 8-K filed on 04/25/2001
122. Halliburton SEC form 8-K filed on 04/30/2001
123. Halliburton SEC form 10-Q filed on 05/11/2001
124. Halliburton SEC form 8-K filed on 05/15/2001
125. Halliburton SEC form 8-K filed on 06/04/2001
126. Halliburton SEC form 8-K filed on 06/28/2001
127. Halliburton SEC form 8-K filed on 07/12/2001
128. Halliburton SEC form 8-K filed on 07/16/2001
129. Halliburton SEC form 8-K filed on 07/19/2001
130. Halliburton SEC form 8-K filed on 07/25/2001
131. Halliburton SEC form 8-K filed on 07/25/2001
132. Halliburton SEC form 10-Q filed on 08/09/2001
133. Halliburton SEC form 8-K filed on 10/18/2001
134. Halliburton SEC form 8-K filed on 10/23/2001
135. Halliburton SEC form 8-K filed on 10/26/2001
136. Halliburton SEC form 8-K filed on 10/30/2001
137. Halliburton SEC form 8-K filed on 11/01/2001
138. Halliburton SEC form 10-Q filed on 11/08/2001
139. Halliburton SEC form 8-K filed on 11/21/2001
140. Halliburton SEC form 8-K filed on 11/29/2001
141. Halliburton SEC form 8-K filed on 12/05/2001
142. Halliburton SEC form 8-K filed on 12/07/2001
143. Halliburton SEC form 8-K filed on 12/11/2001
144. Halliburton SEC form 8-K filed on 12/17/2001
145. Halliburton SEC form 8-K filed on 01/04/2002
146. Halliburton SEC form 8-K filed on 01/23/2002
147. Halliburton SEC form 8-K filed on 01/23/2002
148. Halliburton SEC form 8-K filed on 01/30/2002
149. Halliburton SEC form 8-K filed on 02/07/2002
150. Halliburton SEC form 8-K filed on 02/13/2002
151. Halliburton SEC form 8-K filed on 02/14/2002
152. Halliburton SEC form 10-K filed on 03/12/2002
153. Halliburton SEC form 10-Q filed on 05/08/2002
154. Halliburton SEC form 10-Q filed on 08/13/2002
155. Halliburton SEC form 10-Q filed on 11/12/2002
156. Halliburton SEC form 10-K filed on 03/28/2003
157. Halliburton SEC form 10-K filed on 02/28/2007

APP 000174

## APPENDIX B: MATERIALS CONSIDERED

158. Halliburton SEC form DEF-14A filed on 05/16/2007

**Conference Call Transcripts**
1. Halliburton 01/22/1997 conference call transcript
2. Halliburton 04/23/1997 conference call transcript
3. Halliburton 06/10/1997 conference call transcript
4. Halliburton 07/23/1997 conference call transcript
5. Halliburton 10/22/1997 conference call transcript
6. Halliburton 01/22/1998 conference call transcript
7. Halliburton 02/26/1998 conference call transcript
8. Halliburton 04/22/1998 conference call transcript
9. Halliburton 07/22/1998 conference call transcript
10. Halliburton 10/01/1998 conference call transcript
11. Halliburton 10/29/1998 conference call transcript
12. Halliburton 01/25/1999 conference call transcript
13. Halliburton 04/26/1999 conference call transcript
14. Halliburton 07/22/1999 conference call transcript
15. Halliburton 10/04/1999 conference call transcript
16. Halliburton 10/21/1999 conference call transcript
17. Halliburton 01/27/2000 conference call transcript
18. Halliburton 04/26/2000 conference call transcript
19. Halliburton 07/26/2000 conference call transcript
20. Halliburton 10/24/2000 conference call transcript
21. Halliburton 01/30/2001 conference call transcript
22. Halliburton 04/25/2001 conference call transcript
23. Halliburton 07/24/2001 conference call transcript
24. Halliburton 07/25/2001 conference call transcript
25. Halliburton 10/23/2001 conference call transcript
26. Halliburton 12/10/2001 conference call transcript
27. Halliburton 01/23/2002 conference call transcript
28. Halliburton 03/14/2002 conference call transcript
29. Halliburton 05/07/2002 conference call transcript
30. Halliburton 07/24/2002 conference call transcript
31. Halliburton 11/07/2002 conference call transcript
32. Halliburton 12/18/2002 conference call transcript

**Credit Ratings Agency Reports**
1. "Moody's Upgrades Halliburton Company's ratings," Moody's, 06/14/1999
2. "Moody's Assigns Prime 1," Moody's, 09/23/1999
3. "Moody's Confirms Rating," Moody's, 04/26/2000
4. "Moody's Downgrades Halliburton," Moody's, 02/02/2001
5. "Moody's Downgrades Halliburton," Moody's, 05/29/2001
6. "Moody's Assigns A1," Moody's, 09/05/2001
7. "Moody's Confirms Halliburton's Rating at A1," Moody's, 12/07/2001
8. "Moody's Downgrades Halliburton's Long Term Rating," Moody's, 12/14/2001

APP 000175

APPENDIX B: MATERIALS CONSIDERED

9.  "Moody's Downgrades Halliburton's Long Term Rating," 01/23/2002
10. "Kemper Insurance, Lumbermens Mutual," Moody's, 03/06/2002
11. "ABB," Moody's, 03/25/2002
12. "Dow Chemical," Moody's, 04/09/2002
13. "Georgia Pacific," Moody's, 05/08/2002
14. "Ratings of Halliburton Co Are Affirmed," Standard and Poor's, 08/18/1999
15. "Halliburton Co Ratings Lowered," Standard and Poor's, 05/01/2000
16. "Ratings on Halliburton Co and Affiliates," Standard and Poor's, 02/01/2001
17. "Summary Halliburton," Standard and Poor's, 02/02/2001
18. "May Bulletin Halliburton to Buy," Standard and Poor's, 05/01/2001
19. "Summary Halliburton," Standard and Poor's, 06/07/2001
20. "Outlook on Halliburton," Standard and Poor's, 10/17/2001
21. "Summary Halliburton," Standard and Poor's, 10/17/2001
22. "SP Halliburton Ratings Action," Standard and Poor's, 12/11/2001
23. "SP Halliburton," Standard and Poor's, 12/11/2001
24. "SP Halliburton," Standard and Poor's, 01/03/2002

**News Articles**
1.  News stories downloaded from Factiva
2.  News stories from Bloomberg, L.P.
3.  "Dow Found Liable in West Virginia Asbestos Case," Agence France-Presse, 10/24/2002
4.  "3M to Appeal Asbestos Case Ruling," Associated Press, 10/28/2001
5.  "Honeywell Settles Asbestos Lawsuits with Several Plaintiffs," Associated Press, 9/13/2002
6.  "3M Raises Earnings Outlook, But Stock Falls On Analyst's Cut," Associated Press, 1/16/2002
7.  "Asbestos Verdict is $40 Million," The Baltimore Sun, 12/7/2001
8.  "Asbestos Exposure: How Well Are Companies Insulated?" Barron's, 12/22/2001
9.  "Orange Jury Sets Record for Damages in Asbestos Lawsuit," Beaumont Enterprise, 9/20/2001
10. "Asbestos Case Leads to $150 M Jury Award," Clarion-Ledger, 10/28/2001
11. "New York City Jury Awarded $53.5 Million to a Family of a Man who Died of Asbestos Exposure," CNBC, 2/8/2002
12. "Halliburton Analysis," CNN, 12/10/2001
13. "ABB Sags on Fears of Rising Asbestos Claims," Dow Jones Newswires, 12/10/2001
14. "Asbestos Claims," Dow Jones Newswires, 12/10/2001
15. "Dow Chemical Settles Texas Asbestos-Related Suit," Dow Jones Newswires, 1/9/2002
16. "Asbestos Casts Shadow Over US Corporations," Financial Times,  1/18/2002
17. "America's Largest Corporations," Fortune, 4/17/2000
18. "Halliburton Battered As Asbestos Verdict Stirs Deep Anxieties," Insurance Information Institute, 12/8/2001

APP 000176

APPENDIX B: MATERIALS CONSIDERED

19. "Honeywell Lowers Forecast, Plans to Cut Jobs," MediaCorp News, 9/20/2001
20. "Halliburton Battered As Asbestos Verdict Stirs Deep Anxieties," New York Times, 12/8/2001
21. "Honeywell Says Asbestos Verdict Was More Than It Had Disclosed," New York Times, 4/18/2002
22. "3M Moves to Subdue Fears Over Asbestos Lawsuits Involving Masks, Respirators," Pioneer Press, 1/19/2002
23. "Dow Chemical Share Price Slides on Asbestos Concerns," Platts Commodity News, 1/10/2002
24. "Dow Stock Keeps Sliding as Asbestos Questions go Unanswered," Platts Commodity News, 1/14/2002
25. "Potential Liability Found in UCC Asbestos Case," Platts Commodity News, 10/24/2002
26. "Honeywell International Inc. Lowers Q3, Full Year Earnings Guidance; Plans More Job Cuts," Reuters Significant Developments, 9/19/2001
27. "Anxious Investors Sell Stock in Asbestos Defendants," Reuters News, 12/10/2001
28. "Asbestos Worries Snare Wider Range of U.S. Firms," Reuters News, 12/13/2001
29. "Dow Stock Battered by Asbestos Concerns," Reuters News, 1/14/2002
30. "Halliburton Buried As Investors Stop Believing," *TheStreet.com*, 12/7/2001
31. "Dow Chemical Is Tight Lipped About Asbestos," Wall Street Journal, 2/11/2002
32. "Jury Verdict of $30 Million on Asbestos Leads to Surge in Implied Volatility of Halliburton," Wall Street Journal, 12/10/2001

**Press Releases**
1. Halliburton 01/22/1998 press release
2. Halliburton 02/26/1998 press release
3. Halliburton 04/22/1998 press release
4. Halliburton 07/22/1998 press release
5. Halliburton 09/29/1998 press release
6. Halliburton 10/29/1998 press release
7. Halliburton 12/28/1998 press release
8. Halliburton 01/25/1999 press release
9. Halliburton 04/26/1999 press release
10. Halliburton 07/22/1999 press release
11. Halliburton 10/04/1999 press release
12. Halliburton 10/21/1999 press release
13. Halliburton 01/27/2000 press release
14. Halliburton 04/26/2000 press release
15. Halliburton 07/05/2000 press release
16. Halliburton 07/26/2000 press release
17. Halliburton 10/24/2000 press release
18. Halliburton 12/21/2000 press release
19. Halliburton 01/30/2001 press release
20. Halliburton 03/22/2001 press release
21. Halliburton 04/17/2001 press release

APP 000177

## Appendix B: Materials Considered

22.  Halliburton 04/25/2001 press release
23.  Halliburton 06/28/2001 press release
24.  Halliburton 07/25/2001 press release
25.  Halliburton 07/25/2001 press release
26.  Halliburton 10/23/2001 press release
27.  Halliburton 10/30/2001 press release
28.  Halliburton 12/07/2001 press release
29.  Halliburton 12/11/2001 press release
30.  Halliburton 12/14/2001 press release
31.  Halliburton 01/04/2002 press release
32.  Halliburton 01/23/2002 press release
33.  Halliburton 01/23/2002 press release
34.  Halliburton 01/30/2002 press release
35.  Halliburton 02/13/2002 press release
36.  Halliburton 02/22/2002 press release
37.  Halliburton 03/14/2002 press release
38.  Halliburton 03/19/2002 press release
39.  Halliburton 05/20/2002 press release
40.  Halliburton 05/22/2002 press release
41.  Halliburton 05/28/2002 press release
42.  Halliburton 05/30/2002 press release
43.  Halliburton 06/04/2002 press release
44.  Halliburton 07/16/2002 press release
45.  Halliburton 07/22/2002 press release
46.  Halliburton 07/24/2002 press release
47.  Halliburton 08/13/2002 press release
48.  Halliburton 12/11/2002 press release
49.  Halliburton 12/18/2002 press release
50.  Halliburton 12/18/2002 press release
51.  Halliburton 12/18/2002 press release
52.  Halliburton 12/20/2002 press release
53.  Halliburton 06/29/2004 press release
54.  Halliburton 08/03/2004 press release
55.  Halliburton 10/13/2004 press release
56.  Halliburton 12/22/2004 press release
57.  Halliburton 01/03/2005 press release
58.  Halliburton 01/25/2005 press release
59.  Halliburton 02/28/2005 press release
60.  Halliburton 04/05/2007 press release
61.  Halliburton 02/11/2009 press release
62.  Halliburton 09/28/2011 press release

**SEC Filings of Other Companies**
1.  3M SEC form 10-Q filed 11/13/2001
2.  3M SEC form 10-K filed 03/11/2002

APP 000178

## APPENDIX B: MATERIALS CONSIDERED

3. ABB SEC form 20FR12B filed 04/03/2001
4. Albany International SEC form 10-Q filed 11/13/2001
5. Albany International SEC form 10-Q filed 08/14/2002
6. Allegheny Energy SEC form 10-Q filed 08/14/2001
7. Allegheny Energy SEC form 10-K filed 03/11/2004
8. Crown Cork & Seal SEC form 10-Q filed 11/14/2001
9. Dow Chemical 2001 form 10-K, filed 03/20/2002
10. General Cable SEC form 10-K filed 03/30/2003
11. General Cable SEC form S-3/A filed 02/20/2004
12. Georgia Pacific SEC form 10-Q filed 11/5/2001
13. Georgia Pacific SEC form 10-K filed 03/22/2002
14. Quaker Chemical SEC form 10-K filed 03/29/2001
15. Quaker Chemical SEC form 10-K filed 03/28/2003

**Academic Literature**

1. Alexander, Janet C., "The Value of Bad News in Securities Class Actions," *UCLA Law Review*, Vol. 41 (1994)
2. Austin, Peter C. et al. "Testing Multiple Statistical Hypotheses Resulted in Spurious Associations: a Study of Astrological Signs and Health," *Journal of Clinical Epidemiology* 59 (2006)
3. Bowman, Robert G., "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting*, Volume 10, Issue 4 (1983)
4. Dunbar, Frederick and Tabak, David, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert*, edited by Roman L. Weil, Michael J. Wagner and Peter B. Frank (John Wiley & Sons, Inc., 2001)
5. Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, Vol. 38 (November 1982)
6. Fisher, Franklin M., "Multiple Regression in Legal Proceedings," 80 *Columbia Law Review* 702 (1980)
7. Hong, Hai, Kaplan, Robert S. and Mandelker, Gershon, "Pooling vs. Purchase: The Effects of Accounting for Mergers on Stock Prices," *The Accounting Review*, Vol. III, No.1 (January 1978)
8. MacKinlay, Craig A., "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol.XXXV (March 1997)
9. James M. Patell and Mark A. Wofson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13 (1984)
10. Reamer, Jay, Comiskey, Eugene E. and Groves, Roger E.V., "A Test of Market Response to a Tax-Accounting Change," *Journal of Business Research*, Vol. 3, No. 3 (July 1975)
11. Seife, Charles, "The Mind-Reading Salmon", *Scientific American*, August 2011, Vol. 305 Issue 2

APP 000179

APPENDIX B: MATERIALS CONSIDERED

12. Stevenson, Francis L., "New Evidence on LIFO Adoptions:  The Effect of More Precise Event Dates," *Journal of Accounting Research*, Vol. 25, No. 2 Autumn, (1987)
13. Sunder, S., "Stock Price and Risk Related Accounting Changes in Inventory Valuation," *Accounting Review* 50 (April 1973)
14. David Tabak, "Multiple Comparisons and the Known or Potential Error Rate," *Journal of Forensic Economics* 19(2), 2006

**Textbooks**
1. Hervé Abdi, "Bonferroni Test," *Encyclopedia of Measurement and Statistics*, edited by Neil J. Salkind (Sage, 2007)
2. Bradford Cornell, *Corporate Valuation* (New York: McGraw-Hill, 1993)
3. William H. Greene, *Econometrics Analysis* (Pearson PLC, 7th ed., 2012)
4. Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance* (McGraw-Hill: New York, 7th ed., 2003)
5. Richard A. Brealey, Stewart Myers, and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, 11th Ed., 2014)
6. Damodaran, Aswath, *Investment Valuation* (John Wiley & Sons, Inc., 2nd ed., 2002)
7. Kaye, David H. and David A. Freedman, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Federal Judicial Center, 3rd Ed., 2011)
8. Frank K. Reilly and Keith C. Brown, *Investment Analysis and Portfolio Management* (Thomson: Boston, 6th Ed., 2000)
9. John A. Rice, *Mathematical Statistics and Data Analysis*, (Brooks/Cole, 3rd ed., 2007)

**Trade Publications**
1. "Mealey's Litigation Report: Asbestos," Mealey's, May 2002
2. "Consolidated Trial of 5 Meso Victims Produces $17.5 Million Verdict By New York Jury," Mealey's, 01/19/2001
3. "Texas Jury Awards 5 Plaintiffs $130 Million Against NARCO, Dresser Industries For Exposure," Mealey's, 09/21/2001
4. "Miss. Jury Returns $150M Against AC&S, Dresser Industries, 3M Corp," Mealey's, 11/9/2001
5. "Baltimore Jury Awards 5 Plaintiffs $40 Million; $30 Million Against Halliburton," Mealey's, 12/21/2001
6. "Asbestos Litigation," RAND Institute for Civil Justice, 2005
7. "Asbestos Litigation in the US," RAND Institute for Civil Justice, 2001
8. "Asbestos Litigation Costs and Compensation," RAND Institute for Civil Justice, 2002

APP 000179.001