# EXHIBIT
# 147

**Target Price Change ☑**

SunTrust Robinson Humphrey℠
Capital Markets
A Division of
SunTrust Capital Markets, Inc.

# Halliburton Company

**HAL-$14.33**

**BUY (1L)**

## HAL: Comments from Conference Call; Maintaining BUY Rating

**December 10, 2001**

**Diversified Oil Service**

**Tom Escott CFA**
404 926-5159
*thomas_escott@rhco.com*

Carrie Montague
404 926-5154

## Summary

- HAL held a conference call this morning to outline the company's outstanding asbestos litigation and legal strategies.
- We are confident that HAL will be able to absorb the outstanding liabilities without having material adverse financial implications for the company.
- Management appears confident that rendered verdicts can be settled for significantly less than the current judgment and is considering a share repurchase once the price stabilizes.
- We believe Friday's drop in HAL's share price more than discounted the company's liability and we maintain our BUY (1L) rating. However, we are reducing our 12-month price target from $40 to $30 to remain conservative and to account for increased potential asbestos risk.

| Fundamentals | |
|---|---|
| Price (12/10/2001-11:30 AM) | $14.33 |
| 52-Week Range | $49.20-$12.00 |
| Mkt. Cap. (mil.) | $6,147.6 |
| Shares Out. (mil.) | 429.0 |
| Dividend/Yield | $0.50/3.5% |
| Revenue-12/01E (mil.) | $13,169.0 |
| Book Value/Share | $9.99 |
| ROE (12/00A) | NA |
| Debt/Cap. | 26.0% |
| Est. Five-Year EPS Growth | 15% |
| Technical Rating | 4 |

| Valuation | 12/01E | 12/02E |
|---|---|---|
| P/E | 11.0x | 11.0x |
| PEG | 0.7x | 0.7x |
| Mkt. Cap./Revenue | 0.5x | NA |
| EV/EBITDA | NA | NA |

| Recommendation | |
|---|---|
| **Current Rating** | **1L** |
| Prior Rating | 1L |
| **Current Target Price** | **$30.00** |
| Previous Target Price | $40.00 |

| EPS | | Q1 | Q2 | Q3 | Q4 | Year |
|---|---|---|---|---|---|---|
| 12/00A | **Actual** | **$0.11A** | **$0.17A** | **$0.24A** | **$0.28A** | **$0.80A** |
| 12/01E | **Current** | **$0.20A** | **$0.33A** | **$0.42A** | **$0.35E** | **$1.30E** |
| | Previous | $0.20A | $0.33A | $0.42A | $0.35E | $1.30E |
| 12/02E | **Current** | **$0.30E** | **$0.31E** | **$0.33E** | **$0.36E** | **$1.30E** |
| | Previous | $0.30E | $0.31E | $0.33E | $0.36E | $1.30E |
| 12/03E | **Current** | **NA** | **NA** | **NA** | **NA** | **NA** |
| | Previous | NA | NA | NA | NA | NA |

First Call Consensus EPS: 12/01E $1.31; 12/02E $1.33; 12/03E NA

## Opinion

After a more than 40% drop in HAL's share price Friday as a result of a recent negative verdicts against the company totaling $150 million, management held a conference call this morning to detail the company's financial exposure, liquidity, and legal strategies. After listening to the call, we feel even more confident that HAL will be able to resolve outstanding claims without material adverse impact to the company.

***Strong Financial Position***

HAL has a healthy balance sheet with nearly $250 million cash and $2.7 billion in other working capital. In addition, the company has $700 million in senior revolving credit facilities and management indicated that they have been in contact with the lead banks and all are still committed. In addition, note that HAL has A1 and A+ credit ratings in the company's long-term debt and A1 and P1 ratings on commercial paper, all of which have been confirmed within the last month. Furthermore, management's estimate for after-tax, pre-capital spending free cash flow next year is $1.2 billion. As a result, we believe HAL is well positioned to absorb the negative verdicts filed against the company. HAL has accrued $704 million in reserves for the liability on the 146,000 open claims outstanding, with the value based on historical settlement rates. Insurance is estimated to cover $579 million of this total, giving HAL only $0.18 per share after-tax liability with the insurance coverage. We believe the market reaction on Friday more than discounted the outstanding asbestos litigation risk.

***Legal Strategies***

The company gave very detailed information regarding the negative verdicts that have been rendered and outlined the points of appeal for each case, indicating significant confidence of reducing the settlement amounts. Management noted that most claims in the past had been settled at a fraction of the recent judgments, and in fact 40% of cases associated with Harbison-Walker and 50% associated with Dresser had been settled at no cost to the company. In fact, in the case of several of the plaintiffs involved in the cases rendered last week, there had been no positive product identification for the cause of asbestos exposure. In addition, we do not believe there will be any cash pay-outs from any of the outstanding settlements for at least 18 months due to lengthy appeals proceedings.

Although new claims are still being filed against the company, the new claim rate appears to be slowing. In fact, total open claims at the period ended September 30 were basically flat with the previous June quarter. We believe there are no indications that the suits filed against the company are spiraling out of control and we believe HAL management has been very forthright with the pending litigation procedures while aggressively managing the risk with appropriate reserves and the appeals process.

***Summary***

While we acknowledge that HAL shares could experience volatility and pressure in the intermediate term as new verdicts are rendered, we believe that the drop in HAL shares on Friday was exaggerated. It appears that these cases could be settled for significantly less than rendered, while we believe that HAL is well positioned to absorb the outstanding liability without material adverse financial implications to the company.

We believe HAL shares are discounted for much more than the asbestos liability. In fact management indicated that the company was considering buying back shares at current attractive levels once the market stabilized. However, in order to remain conservative and account for any potential increased risk from litigation, we are reducing our 12-month price target on HAL shares from $40 to $30. This price target uses a mid-20 times year-forward multiple that is equivalent to other large players in the industry. Despite the reduction, the target still represents more than 100% upside to current trading levels. As a result, we are maintaining our BUY (1L) rating.

## Company Description

Halliburton was founded in 1919 and is currently based in Dallas, Texas. Following the 1998 merger with Dresser Industries, Halliburton is now the largest oil services company in the industry. The company currently has operations in over 100 countries worldwide and is a leading diversified energy services, engineering, construction, maintenance and energy equipment company.

NOTES
D = An employee of SunTrust Capital Markets, Inc. is a director of this company.
U = SunTrust Capital Markets, Inc. or its affiliates managed or co-managed an offering of this company's securities within the last three years.
+ = The Robinson-Humphrey Company, LLC managed or co-managed an offering of this company's securities within the last three years. The institutional business of the The Robinson-Humphrey Company, LLC was sold to SunTrust Capital Markets, Inc. on July 27, 2001, and SunTrust Capital Markets, Inc. is not affiliated with The Robinson-Humphrey Company, LLC.

RATING = SunTrust Robinson Humphrey's rating system assigns a number code (1 = BUY, 2 = OUTPERFORM, 3 = NEUTRAL, 4 = UNDERPERFORM, 5 = SELL) for our 12-month fundamental rating as well as for our technical ratings. Our BUY and OUTPERFORM ratings indicate that we expect the stock to beat appropriate market indices over the next 12 months. A NEUTRAL rating suggest in line with market-type performance. Our UNDERPERFORM and SELL ratings indicate underperformance is expected over the next 12 months. Also included is our risk rating: L = Low, M = Medium, H = High, S = Speculative. We also infrequently use a risk rank of V = Venture, which is defined as risk and return consistent with venture capital; only for well-diversified portfolios. All references to the rating appear in the following order: fundamental – risk rank – technical.

SunTrust Capital Markets, Inc. is a registered broker-dealer. It is owned by SunTrust Banks, Inc. ("SunTrust"). Despite this affiliation, securities recommended, offered, sold by, or held at SunTrust Capital Markets, Inc. (i) are not insured by the Federal Deposit Insurance Corporation; (ii) are not deposits or other obligations of any insured depository institution (including SunTrust) and (iii) are subject to investment risks, including the possible loss of the principal amount invested. SunTrust may have a lending relationship with companies mentioned herein.

SunTrust Robinson Humphrey is a service mark of SunTrust Capital Markets, Inc. Information contained herein has been derived from sources believed to be reliable but is not guaranteed as to accuracy and does not purport to be complete analysis of the security, company or industry involved. This report is not to be construed as an offer to sell or a solicitation of an offer to buy any security. SunTrust Capital Markets, Inc. or one or more of its officers or employees may have positions in any securities or options. For over-the-counter securities recommended in this report, the firm usually makes a market. The firm and/or one or more of its officers or employees may buy from or sell to customers on a principal basis. Investors may be prohibited in certain states from purchasing some over-the-counter securities mentioned herein. Opinions expressed are subject to change without notice. The information herein is for persons residing in the United States only and is not intended for any person in any other jurisdiction.

© SunTrust Capital Markets, Inc. 2001. All rights reserved. Reproduction or quotation in whole or part without permission is forbidden.

# EXHIBIT 148

SWS SECURITIES

Institutional Sales: (800) 404-2226
Trading: (800) 922-7739

*Equity Research Brief*

# Halliburton Company (HAL – $12.00)

**December 10, 2001**

Fred A. Mutalibov, (214) 859-6445, fmutalibov@swst.com

**BUY**

**Industry: Oilfield Services**

## EPS REDUCED GOING FORWARD. CONTINUE WITH BUY.

| | | | | | |
|---|---|---|---|---|---|
| Last Close (12/7/01): | $12.00 | Avg Daily Vol: | 4 mil. | Div: | $0.50 |
| 52-Week Price Range: | $10.94 - $49.25 | Debt/Total Cap: | 27.0% | Yield: | 4.2% |
| Shares Out : | 429.8 Million | ROE (2000): | 6.3% | | |
| Mkt Cap (millions): | $5,157.5 | Proj. 3 yr. Grth Rate: | 21.3% | | |

| **EPS (FY 12-31)** | **FY00** | **Prior FY01E** | **New FY01E** | **Prior FY02E** | **New FY02E** |
|---|---|---|---|---|---|
| 1Q (Mar) | $0.06 | **$0.20** A | **$0.20** A | **$0.33** | **$0.30** |
| 2Q (Jun) | 0.12 | **0.33** A | **0.33** A | **0.35** | **0.27** |
| 3Q (Sep) | 0.18 | **0.42** A | **0.42** A | **0.39** | **0.32** |
| 4Q (Dec) | 0.22 | **0.37** | **0.33** | **0.43** | **0.36** |
| **Year End** | **$0.58** | **$1.32** | **$1.29** | **$1.50** | **$1.25** |
| **Price/Earnings** | **20.7 x** | | **9.3 x** | | **9.6 x** |
| Revenue (millions) | $11,944 | $13,174 | $13,049 | $13,700 | $12,650 |
| Cash Flow/Share | $1.91 | $2.79 | $2.76 | $2.82 | $2.56 |
| **Price/Cash Flow** | **6.3 x** | | **4.3 x** | | **4.7 x** |

**Company Description**
Halliburton Company, the world's second largest oilfield service company, operates in more than 120 countries providing products and services to energy, industrial and governmental customers through its Energy Services, and Engineering and Construction business groups.

**Upcoming Releases:**
Q4:01 EPS: Late January
Consensus Q4:01: $0.35
Consensus 2001: $1.31
Consensus 2002: $1.33
Price Target $19 per share

***HIGHLIGHTS:***

- Halliburton has reiterated that it has enough resources to withstand the burden of the asbestos litigation through its legal strategy, substantial insurance coverage, and existing and projected financial resources.
- Halliburton sees earnings in Q4:01 similar to those in Q2:01, despite a substantial decline in oilfield service activities in North America. The company expects robust international spending to continue through 2002.
- Engineering & Construction Group should improve its performance next year, and is expected to see profitability growth in 2003.
- We have reduced our Q4:01 EPS estimate from $0.37 to $0.33 and 2002 EPS estimate from $1.50 to $1.25 to largely reflect the ongoing weakness in the North American oilfield services market and a slightly lower spending rate in international markets.
- We continue coverage of HAL shares with a **BUY** rating. Our new 12-month target price is $19 per share (down from the previous target of $23), which is a multiple of 15x our new 2002 EPS estimate of $1.25.

SWS SECURITIES

**EQUITY RESEARCH BRIEF**

- **Asbestos Issue:** On an upbeat conference call, Halliburton reiterated its belief that, with the use of their legal strategy, insurance coverage and existing and projected financial resources, the company will NOT have a material adverse impact from the asbestos litigation, at least in the near-term. While the recent verdicts clearly stand out from the company's past settlement practice, it is fair to say that the new verdicts were delivered against Harbison-Walker's legal team, not Halliburton's. Halliburton believes it does have better legal representation and will appeal the recent verdicts (two in Texas and one in Maryland). Hence, the company believes that the multi-million-dollar verdict and judgments could be reduced substantially. Regardless, it will take at least 18 months to finalize the legal proceedings on these cases and before any cash from Halliburton is dispensed to pay the plaintiffs. Halliburton's highest settlement payment in the asbestos litigation was $1.8 million in the past.

  At the end of Q3:01, Halliburton had $704 million in outstanding asbestos litigation claims, with estimated insurance coverage of $579 million, leaving the company with a net liability of $125 million for known open asbestos claims. We believe that over 82% insurance coverage is adequate for Halliburton to avoid any material liquidity problems in the near-term. On the conference call, the company reiterated its main insurance providers' intention to continue to pay for the majority of the asbestos claims.

  Halliburton expects to have approximately $4 billion in financial resources available to deal with the asbestos issue in 2002, which includes cash on hand, available credit facilities, projected free cash flow (based on the current consensus estimate) and other working capital over the next 12 months.

  We believe the asbestos litigation is a serious issue that substantially increases the risk profile of HAL shares, going forward. Earlier today, we revised our forward earnings multiple for HAL shares from 25x to 15x to reflect the increased risk profile of Halliburton's stock.

- **Outlook for Halliburton's Operations in 2002:** The demand for oilfield services has clearly slowed down in North America, with the latest U.S. rig count now at 928 versus 1168 at the end of Q3:01. We have reduced our Q4:01 EPS estimate from $0.37 to $0.33 to largely reflect the slowing oilfield service activity levels in North America. Halliburton believes that the recovery in North America may begin as soon as spring 2002. We have also reduced our 2002 EPS estimate from $1.50 to $1.25 to largely reflect the ongoing weakness in the North American oilfield services market and a slightly lower spending rate in international markets. Engineering & Construction Group should improve its performance next year, and is expected to see profits grow in 2003.

- **Investment Rating, Valuation and Target Price:** We continue coverage of HAL shares with a **BUY** rating. Our new 12-month target price is $19 per share (down from the previous target of $23), which is a multiple of 15x our new 2002 EPS estimate of $1.25.

**SWS Securities, Inc. makes a market in the securities on this company and may have a long or short position in these securities.**

**SWS Securities initiated coverage of Halliburton Company on April 26, 1999. The initial report and subsequent reports are available upon request.**

SWS Securities is not responsible for the marketability or price performance of these securities. The information contained herein has been obtained from sources which we believe to be reliable, but we do not guarantee its accuracy or completeness. The opinions expressed herein reflect the judgment of the author at this date and are subject to change without notice. SWS Securities and its officers, directors, shareholders, employees and affiliates and members of their families may make investments in a company or securities mentioned herein before, after or concurrently with the publication of this report. SWS Securities may from time to time perform or seek to perform investment banking or other services for any company, person or entities mentioned herein. Member NYSE and SIPC.

**Additional information on the securities discussed herein is available upon request.**

Copyright © 2001 SWS Securities, Inc. All rights reserved.

*Fred Mutalibov*
*(214) 859-6445*

# Halliburton Company (HAL - NYSE)

## Statement of Operations

December 10, 2001

($ in millions, except per share data)

| Fiscal Year Ending December 31 | Mar-00 | Jun-00 | Sep-00 | Dec-00 | 2000 | Mar-01 | Jun-01 | Sep-01 | Dec-01E | 2001E | Mar-02E | Jun-02E | Sep-02E | Dec-02E | 2002E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | | |
| Energy Services Group | 1,723.0 | 1,897.0 | 2,021.0 | 2,275.0 | 7,916.0 | 2,031.0 | 2,214.0 | 2,309.0 | 2,125.0 | 8,679.0 | 2,100.0 | 2,000.0 | 2,100.0 | 2,200.0 | 8,400.0 |
| Engineering and Construction Group | 1,136.0 | 971.0 | 1,003.0 | 918.0 | 4,028.0 | 1,113.0 | 1,125.0 | 1,082.0 | 1,050.0 | 4,370.0 | 1,000.0 | 1,050.0 | 1,100.0 | 1,100.0 | 4,250.0 |
| **Total Revenue** | 2,859.0 | 2,868.0 | 3,024.0 | 3,193.0 | 11,944.0 | 3,144.0 | 3,339.0 | 3,391.0 | 3,175.0 | 13,049.0 | 3,100.0 | 3,050.0 | 3,200.0 | 3,300.0 | 12,650.0 |
| **Cost and Expenses** | | | | | | | | | | | | | | | |
| Energy Services Group | 1,661.0 | 1,790.0 | 1,876.0 | 2,092.0 | 7,419.0 | 1,831.0 | 1,947.0 | 1,988.0 | 1,870.0 | 7,636.0 | 1,869.0 | 1,790.0 | 1,864.8 | 1,936.0 | 7,459.8 |
| Engineering and Construction Group | 1,100.0 | 935.0 | 962.0 | 883.0 | 3,880.0 | 1,095.0 | 1,100.0 | 1,043.0 | 1,013.3 | 4,251.3 | 965.0 | 1,013.3 | 1,059.3 | 1,059.3 | 4,096.9 |
| General Corporate | 17.0 | 17.0 | 17.0 | 18.0 | 69.0 | 20.0 | 20.0 | 18.0 | 19.0 | 77.0 | 20.0 | 20.0 | 21.0 | 21.0 | 82.0 |
| **Total Cost and Expenses** | 2,778.0 | 2,742.0 | 2,855.0 | 2,993.0 | 11,368.0 | 2,946.0 | 3,067.0 | 3,049.0 | 2,902.3 | 11,964.3 | 2,854.0 | 2,823.3 | 2,945.1 | 3,016.3 | 11,638.7 |
| **Operating Income** | 81.0 | 126.0 | 169.0 | 200.0 | 576.0 | 198.0 | 272.0 | 342.0 | 272.8 | 1,084.8 | 246.0 | 226.8 | 254.9 | 283.7 | 1,011.4 |
| Interest Expense | (33.0) | (33.0) | (38.0) | (42.0) | (146.0) | (47.0) | (34.0) | (34.0) | (32.0) | (147.0) | (30.0) | (30.0) | (28.0) | (28.0) | (116.0) |
| Interest Income | 7.0 | 3.0 | 6.0 | 9.0 | 25.0 | 4.0 | 6.0 | 8.0 | 8.0 | 26.0 | 6.0 | 6.0 | 6.0 | 6.0 | 24.0 |
| Foreign Currency Losses | (4.0) | (3.0) | 4.0 | (2.0) | (5.0) | (3.0) | (1.0) | (2.0) | (1.0) | (7.0) | (2.0) | (2.0) | (2.0) | (2.0) | (8.0) |
| Other Non-operating Income (Loss) | - | - | (1.0) | - | (1.0) | - | - | - | - | - | - | - | - | - | - |
| Pretax Income | 51.0 | 93.0 | 140.0 | 165.0 | 449.0 | 152.0 | 243.0 | 314.0 | 247.8 | 956.8 | 220.0 | 200.8 | 230.9 | 259.7 | 911.3 |
| Income Taxes | (20.0) | (36.0) | (53.8) | (64.4) | (174.1) | (61.0) | (98.0) | (126.0) | (99.1) | (384.1) | (85.8) | (78.3) | (90.1) | (101.3) | (355.4) |
| Minority Interest | (4.0) | (5.0) | (4.0) | (4.0) | (17.0) | (5.0) | (2.0) | (7.0) | (5.0) | (19.0) | (5.0) | (5.0) | (5.0) | (5.0) | (20.0) |
| **Net Income** | 27.0 | 52.0 | 82.2 | 96.7 | 257.9 | 86.0 | 143.0 | 181.0 | 143.7 | 553.7 | 129.2 | 117.5 | 135.8 | 153.4 | 535.9 |
| Basic Shares Outstanding | 442.0 | 444.0 | 445.0 | 435.0 | 441.5 | 426.0 | 427.0 | 428.0 | 428.0 | 427.3 | 428.0 | 428.0 | 428.0 | 428.0 | 428.0 |
| **Basic Earnings Per Share** | **$0.06** | **$0.12** | **$0.18** | **$0.22** | **$0.58** | **$0.20** | **$0.33** | **$0.42** | **$0.34** | **$1.30** | **$0.30** | **$0.27** | **$0.32** | **$0.36** | **$1.25** |
| Fully Diluted Shares Outstanding | 444.0 | 449.0 | 451.0 | 435.0 | 444.8 | 430.0 | 430.0 | 429.0 | 429.0 | 429.5 | 429.0 | 429.0 | 429.0 | 429.0 | 429.0 |
| **Fully Diluted Earnings Per Share** | **$0.06** | **$0.12** | **$0.18** | **$0.22** | **$0.58** | **$0.20** | **$0.33** | **$0.42** | **$0.33** | **$1.29** | **$0.30** | **$0.27** | **$0.32** | **$0.36** | **$1.25** |
| Sequential Revenue Growth (Contr.) | -5.5% | 0.3% | 5.4% | 5.6% | -3.0% | -1.5% | 6.2% | 1.6% | -6.4% | 9.3% | -2.4% | -1.6% | 4.9% | 3.1% | -3.1% |
| **Operating Margins:** | | | | | | | | | | | | | | | |
| Energy Services Group | 3.6% | 5.6% | 7.2% | 8.0% | 6.3% | 9.8% | 12.1% | 13.9% | 12.0% | 12.0% | 11.0% | 10.5% | 11.2% | 12.0% | 11.2% |
| Engineering and Construction Group | 3.2% | 3.7% | 4.1% | 3.8% | 3.7% | 1.6% | 2.2% | 3.6% | 3.5% | 2.7% | 3.5% | 3.5% | 3.7% | 3.7% | 3.6% |
| Corporate Expenses as % of revenue | 0.59% | 0.59% | 0.56% | 0.56% | 0.58% | 0.64% | 0.60% | 0.53% | 0.60% | 0.59% | 0.65% | 0.66% | 0.66% | 0.64% | 0.65% |
| **Overall Operating Margin** | 2.8% | 4.4% | 5.6% | 6.3% | 4.8% | 6.3% | 8.1% | 10.1% | 8.6% | 8.3% | 7.9% | 7.4% | 8.0% | 8.6% | 8.0% |
| Income Taxes | 39.2% | 38.7% | 38.4% | 39.0% | 38.5% | 40.1% | 40.3% | 40.1% | 40.0% | 38.5% | 39.0% | 39.0% | 39.0% | 39.0% | 39.0% |
| **Industry Drivers** | | | | | | | | | | | | | | | |
| Average Oil Prices (WTI-NYMEX) | $28.83 | $28.78 | $31.59 | $31.92 | $30.28 | $28.68 | $27.98 | $26.70 | $22.50 | $26.47 | $23.00 | $24.00 | $25.00 | $25.00 | $24.25 |
| Average Natural Gas (HH-NYMEX) | $2.62 | $3.67 | $4.53 | $6.46 | $4.32 | $6.24 | $4.39 | $2.83 | $3.00 | $4.11 | $3.00 | $2.75 | $2.75 | $3.00 | $2.88 |
| Average Drilling Rig Count Worldwide | 1,826 | 1,680 | 1,987 | #REF! | #REF! | #REF! | #REF! | #REF! | 2,250 | #REF! | 2,200 | 2,250 | 2,300 | 2,350 | 2,275 |
| *Sequential Increase (Decrease)* | 8.6% | -8.0% | 18.3% | #REF! | #REF! | #REF! | #REF! | #REF! | #REF! | #REF! | -2.2% | 2.3% | 2.2% | 2.2% | #REF! |
| Average U.S Workover Rig Count | 1,000 | 1,075 | 1,027 | 1,121 | 1,056 | 1,191 | 1,227 | 1,281 | 1,200 | 1,225 | 1,100 | 1,150 | 1,200 | 1,250 | 1,175 |
| *Sequential Increase (Decrease)* | 1.2% | 7.5% | -4.5% | 9.2% | 26.4% | 6.3% | 3.0% | 4.5% | -6.3% | 16.0% | -8.3% | 4.5% | 4.3% | 4.2% | -4.1% |

# EXHIBIT 149



OILFIELD SERVICES AND EQUIPMENT

UBS Warburg
RESEARCH NOTE

James Stone
+1 212 713 1467/james.stone@ubsw.com
David Wright, Associate Analyst (+1 212 713 1342)

December 10, 2001

## Halliburton Co (HAL-$12.00)

Rating: Hold

### Halliburton Provides Update on Asbestos--Discloses Larger Insurance Asset

| Key Data | |
|---|---|
| 52-Wk Range | $49-12 |
| Eq.Mkt.Cap.(MM) | $5,153 |
| Sh.Out.(MM) | 429.4 |
| Float | 100% |
| Inst.Hldgs. | 76.9% |
| Av.Dly.Vol.(K) | 6,619 |
| Curr. Div./Yield | $0.50/4.2% |
| Sec.Grwth.Rate | NA |
| 12-mo. Tgt Price | $24.00 |
| 12-mo. Ret. Pot'l | 104.2% |
| Convertible? | No |
| Debt/Capital | 26.9% |

**Quarterly Earnings Per Share** (fiscal year ends December)

| | 2000A | 2001E | *Prev* | 2002E | *Prev* |
|---|---|---|---|---|---|
| 1Q | $0.06 | $0.20A | | | |
| 2Q | 0.12 | 0.33A | | | |
| 3Q | 0.18 | 0.42A | | | |
| 4Q | 0.22 | 0.36 | | | |
| **Year** | **$0.56** | **$1.30** | | **$1.28** | |
| FC Cons.: | $0.57 | $1.31 | | $1.33 | |
| P/E: | 21.4x | 9.2x | | 9.4x | |
| **Revs.(MM):** | $11,944 | $13,035 | | $12,593 | |
| Cash flow/sh.: | $1.79 | $2.63 | | $2.64 | |
| P/CF: | 6.7x | 4.6x | | 4.5x | |

Halliburton, through subsidiaries, provides services and products for the exploration, development and production segments of the petroleum industry; and provides engineering, construction, project management, facilities operation and maintenance for industrial and governmental customers.

Earnings exclude all extraordinary and one-time gains and losses.

## KEY POINTS

- Halliburton held a conference call this morning to discuss its asbestos-related liabilities and the recent jury verdicts and court judgments against the company.
- During the call Halliburton reviewed the recent cases in Maryland, Texas and Mississippi, and in all three cases made persuasive arguments as to why it believes these verdicts and judgments will either be reversed on appeal or significantly reduced.
- For the first time, the company disclosed the size of its insurance asset on Dresser-related claims as being at least $2 billion, which is more than twice the size that we had previously assumed.
- HAL also gave details about its most recent settlement history for cases in which the plaintiffs have mesothelioma (most common asbestos-related cancer). In the last 400 cases, the company's average cost per claim is $12,500, which includes a single case for $1.8 million. Excluding this one case (the highest payout in HAL history), the average cost per claim is $8,000.
- The costs on these mesothelioma cases are more than 10x the amount of the average settlement for HAL and people that are sick represent between 5%-10% of all claims filed against the company. However, the concern is that recent judgments could lead to less willingness to settle or higher settlement or payouts in future cases.
- Claims filings in the current quarter continue to show the slowdown trend seen in the third quarter and the company continues to dispose of cases at or near its historical settlement costs.
- The company reiterated and detailed the strength of its balance sheet. The company has $250 million, $700 million in undrawn revolving credit that has been reaffirmed over the past weekend. The debt/capital ratio is still about 27% and the company has no significant off-balance sheet debt or vehicles. Based on our estimates, the company should generate at least $500 million in free cash flow in 2002 and this figure could be low depending on what happens to working capital.

- HAL indicated that it has bought back shares this year and would be willing to buy more stock in at or near current levels once market conditions stabilize.
- In our opinion, the degree to which Halliburton shares declined on December 7, 2001 was likely an overreaction to the news of additional jury verdicts against the company, but the news was the proverbial straw that broke the camel's back, adding significant uncertainty to the ultimate size of the company's liability. It is clear to us that absent the asbestos issue, Halliburton shares are significantly undervalued, but the size of the future liability is more uncertain than we thought as recently as last week. As a result, we are going to maintain our Hold rating on the stock in the near-term as we continue to try to get our arms around this issue. Our 12-month price target is based on a multiple of 'normalized' earnings.

**RISKS**

In our opinion, the major risks are as follows: 1) oil and gas prices turn out to be substantially below our current expectations; 2) oil company exploration and development spending does not live up to our expectations of 10–15% growth per year; 3) service industry cost increases outpace price improvements causing undue margin pressure; 4) oilfield valuations, remain mired below historical normal levels; and 5) Halliburton's asbestos liabilities are significantly larger than our estimates, which could cause the company to significantly increase its provisions and perhaps strain its future liquidity.

Additional information available upon request.

**UBS Warburg LLC, 1285 Avenue of the Americas, New York, NY 10019 Phone: +1-212-713-2000**

This material has been prepared by a group, subsidiary or affiliate of UBS AG ("UBS"). UBS Warburg is a business group of UBS AG. It has no regard to the specific investment objectives, financial situation or particular needs of any specific recipient. This material is based on information obtained from sources believed to be reliable but no independent verification has been made, nor is its accuracy or completeness guaranteed. This report is published solely for informational purposes and is not to be construed as a solicitation or an offer to buy or sell any securities or related financial instruments. Opinions expressed herein are subject to change without notice and UBS is under no obligation to update or keep the information current. The securities described herein may not be eligible for sale in all jurisdictions or to certain categories of investors. UBS and/or its directors, officers and employees or clients may take positions in, and may make purchases and/or sales as principal or agent or UBS may act as market-maker in the securities or related financial instruments discussed herein. UBS may provide corporate finance and other services to and/or serve as directors of the companies referred to in this report. UBS accepts no liability for any loss or damage of any kind arising out of the use of this report. United Kingdom and rest of Europe: Except as otherwise specified herein, this material is communicated by UBS Warburg Ltd., a subsidiary of UBS AG, to persons who are market counterparties or intermediate customers (as detailed in the FSA Rules) and is only available to such persons. The information contained herein does not apply to, and should not be relied upon by, private customers. US: This report is being distributed to US persons by either UBS Warburg LLC or UBS PaineWebber Inc., subsidiaries of UBS AG, or by a group, subsidiary or affiliate of UBS AG, that is not registered as a US broker-dealer (a "non-US affiliate"), to major US institutional investors only. UBS Warburg LLC or UBS PaineWebber Inc. accepts responsibility for the content of a report prepared by another non-US affiliate when distributed to US persons by UBS Warburg LLC or UBS PaineWebber Inc. Canada: This report is being distributed by UBS Bunting Warburg Inc., a subsidiary of UBS AG and a member of the principal Canadian stock exchanges & CIPF. Singapore: This report is being distributed in Singapore by UBS Warburg Pte. Ltd. For investment advice or trade execution please contact your local sales representative. Additional information will be made available upon request.

© 2001 UBS AG. All rights reserved. This report may not be reproduced or distributed in any manner without the permission of UBS.

# EXHIBIT 150

BEAR STEARNS

**Equity Research**
Oil Service and Equipment
*December 11, 2001*

**Robin Shoemaker**
212-272-6475
rshoemaker@bear.com

**Gordon Washburn**
212-272-4256
gwashburn@bear.com

# Halliburton (HAL-$14.00) - Attractive

## Provides More Detail on Asbestos Liabilities

## Data

| | | | | | |
|---|---|---|---|---|---|
| Target Price | $20.00 | Shares Out | 429.4 | Book Value | $10.43 |
| Dividend/Yield | 3.6% | Market Cap (MM) | $6,011 | Net Debt | (1,540.0) |

## Key Points

*** After a 42% drop in HAL shares on Friday, management spoke to analysts in a conference call yesterday.

*** The company provided additional useful information on its settlements and an update on the fourth quarter.

*** The largest award paid to date is $1.8 million, a fraction of the $131 million in awards announced last week.

*** Halliburton's grounds for appealing recent jury verdicts are strong, but the process will be at least 18 months.

*** The sell-off in HAL shares is overdone, we maintain our Attractive rating, our price target is lowered to $20.

| | | | Earnings Estimates | | | P/E |
|---|---|---|---|---|---|---|
| | **Q1 Mar** | **Q2 Jun** | **Q3 Sep** | **Q4 Dec** | **Year** | **Year** |
| **1999** | $0.18 | $0.19 | $0.13 | $0.17 | $0.47 | 30.1 x |
| **2000** | $0.11 | $0.17 | $0.23 | $0.28 | $0.69 | 20.4 x |
| **2001** | $0.20 | $0.33 | $0.42 | $0.32 | $1.27 | 11.0 x |
| **2002** | | | | | $1.20 | 11.6 x |

| | **EBITDA Year** | **EV/ EBITDA** |
|---|---|---|
| **1999** | $1.89 | 5.5 x |
| **2000** | $1.95 | 5.3 x |
| **2001** | $3.65 | 2.9 x |
| **2002** | $3.50 | 3.0 x |

**"DAMAGE CONTROL" IS IN FULL SWING AT HALLIBURTON**

The severity of the sell-off in Halliburton shares last Friday was characterized by CEO Dave Lasar as a major overreaction to the asbestos trial rulings announced last week. Halliburton believes, with justification (in our view), that its ultimate payouts in the three verdicts rendered last week will be a fraction of the $131 million in total assessed damages. Halliburton pointed out numerous errors and faulty judgments that led to the large jury awards. The company will aggressively appeal the verdicts and believes that the verdicts will be dismissed upon appeal.

The company decided to share more information with analysts regarding its 25 year history of settling claims relating to asbestos exposure. The first such claims were filed against the company in 1976 and through September 30, 2001, a total of 194,000 claims have been settled. The largest cash award paid by the company to date was $1.8 million. This amount was paid to a claimant who had



Bear Stearns may be a market maker or be associated with a specialist that makes a market in the common stock or options of the issuer(s) in this report, and Bear Stearns or such specialist may have a position (long or short) and may be on the opposite side of public orders in such common stock or options.Any recommendation contained in this report may not be suitable for all investors. Moreover, although the information con-tained herein has been obtained from sources believed to be reliable, its accuracy and completeness cannot be guaranteed. Bear Stearns may make markets and effect transactions, including transactions contraryto any recommendations herein, or have positions in the securities mentioned herein (or options with respect thereto) and may also have performed investment banking services for the issuers of such securities. In addition, employees of Bear Stearns may have positions and effect transactions in the securities or options of the issuers mentioned herein and may serve as directors of such issuers. Copyright © 2001. All rights reserved by Bear, Stearns & Co. Inc. Bear Stearns® is the registered trademark of The Bear Stearns Companies Inc.

cancer related to asbestos exposure. Out of the 194,000 cases settled to date, 40% were settled with no payment at all. The average payment, which includes the “no payments” as well as the largest payments, is $737 per claim (gross) and $195 per claim (net to Halliburton) after insurance recoveries.

**NEW CLAIMS FILED SHOWS NO UP TREND**

Halliburton also provided information about the pace of new asbestos claims filed in the current quarter. The pace is approximately the same as in the third quarter, when 13,000 new claims were filed. This is important because in the second quarter of 2001 a total 27,000 claims were filed, prompting fears of a major surge in new claims above historical trends. But it appears that the number of new claims filed in the second half of 2001 will equal the number of claims filed in the second quarter alone. This is an encouraging sign, but it must be viewed cautiously because the recent high damages awards by juries could prompt a resurgence in claims.

It would seem that the average payout of $195 (net to Halliburton) per claim is a low figure that is bound to increase over time. Nonetheless, it does not appear that there will be a sharp, sustained increase in the next few years due to the appeals process that Halliburton will pursue in the wake of the recent large damage awards.

**THE STOCK IS TOO CHEAP TO DOWNGRADE**

We are maintaining our Attractive rating on Halliburton because the stock is too cheap to downgrade, given the fact that roughly $10 billion in market capitalization already has vanished in response to worries about asbestos exposure. We are, however, lowering our price target to $20 on the view that the stock will recover, but only modestly while the appeals process runs its course. Although it is an excellent oil service company, we expect Halliburton to significantly underperform its peers when a rebound in the sector gets underway.

# EXHIBIT 151

CIBC World Markets

**Equity Research**

December 11, 2001

# Halliburton Co.

**Management Calms Asbestos Fears**

## Oilfield Service

**Allen Brooks** (713) 650-2505
**Jordan Horoschak** (713) 650-2506

## Investment Conclusion

- **Management comes out swinging on asbestos issue.** Halliburton hosted a conference call on December 10, aggressively and effectively confronting its exposure to asbestos litigation. A flurry of recent jury awards against HAL (ranging from $21 million to $65 million) caused the stock to be widely sold on Friday. We believe the sell-off was overdone and that the asbestos litigation, which has been effectively handled by the company since 1976, will not materially impact HAL's future financial condition.

- **HAL appears to have legitimate appeal opportunities.** HAL provided excellent information on the call detailing its grounds for appeal in the four large cases/verdicts that have caused us the most concern. The grounds for appeal or settlement reductions on some cases include: the plaintiff was unable to identify the Harbison-Walker (H-W) product responsible; H-W did not sell asbestos products to the workplace of the plaintiff; and no medical bills or lost wages were presented by the plaintiffs. In the Maryland case, HAL's defense lawyers believe they could get the $30 million judgement reduced to just $5 million.

- **Negative impact limited by insurance and solid balance sheet.** HAL has $2 billion in insurance to cover 95% of asbestos claims. As for the costs that are not covered by insurance, HAL is financially solid with a strong balance sheet and $250 million in cash. In its annual report, HAL's insurer, Equitas, stated that it could withstand 26 years of claims at the current rate. The strong financial resources help reassure us that asbestos will not cripple the company.

- **Friday's 42% sell-off was overdone.** We reiterate our Buy rating and $24 price target on HAL. We believe the massive sell-off on Friday was driven by fear and irrational concerns. With the stock trading at 9.5X our 2002 EPS estimate of $1.50, and at lows not seen since 1994, we believe it represents a good value and attractive risk/reward.

**Rating: BUY**

| | |
|---|---|
| HAL-NYSE (12/10/2001): | $14.00 |
| 52-week Range: | $49.25-10.94 |
| Shares Outstanding: | 429 Million |
| Float: | 427 Million Shares |
| Market Capitalization: | $6 Billion |
| Dividend/Yield: | $0.50/3.6% |
| Fiscal Year Ends: | December |
| Book Value: | $10.71 per Share |
| 2001E ROE: | 13.9% |
| LT Debt: | $1.5 Billion |
| Preferred: | Nil |
| Common Equity: | $4.6 Billion |

**Earnings per Share**

| | |
|---|---|
| 2000 | $0.80 |
| 2001E | $1.30 |
| 2002E | $1.50 |

**P/E Ratio**

| | |
|---|---|
| 2000 | 17.5X |
| 2001E | 10.8X |
| 2002E | 9.3X |

**Cash Flow per Share**

| | |
|---|---|
| 2000 | $1.82 |
| 2001E | $2.60 |
| 2002E | $2.78 |

**P/CF Ratio**

| | |
|---|---|
| 2000 | 7.7X |
| 2001E | 5.4X |
| 2002E | 5.0X |

**Company Description:**
*Halliburton Co. is a diversified energy services, engineering and construction and maintenance company.*

**01-13273** © 2001

**The Asbestos Cases**

Halliburton is not alone in its struggle against asbestos litigation. About half of the companies in the Dow Jones Industrial Average have exposure to asbestos and about 2,000 companies in the United States are fighting asbestos litigation. However, Halliburton's past four asbestos trial court decisions/settlements have been very unusual and significantly different than those experienced by Halliburton in the past. In early December, a jury in Baltimore, Maryland, issued a verdict against Dresser Industries and several other defendants, which resulted in a $30 million judgement against Halliburton. As recently as this past week, there were other awards against Halliburton, which included a $65 million judgement in Orange, Texas, and a $21 million judgement in Mississippi. In addition, the court in Orange, Texas, assigned $36 million in settlements to Halliburton. These cases pertain to Harbison-Walker (H-W), a subsidiary of Dresser sold by Dresser years before Dresser was acquired by Halliburton. Of the 194,000 cases settled by Halliburton to date, it has never had to pay more than $1.8 million for any one claim—and that payout was for a person with mesothelioma (cancer). About 90% of the remaining 266,000 open claims are from people who have exhibited no signs of sickness. Industry statistics indicate that approximately 3% of filed asbestos claims are from individuals with cancer.

This report is issued and approved for distribution by (i) in the US, CIBC World Markets Corp., a member of the NYSE and SIPC, (ii) in Canada, CIBC World Markets Inc., a member of the IDA and CIPF, (iii) in the UK, CIBC World Markets plc, which is regulated by the SFA, and (iv) in Australia, CIBC World Markets Australia Limited, a member of the Australian Stock Exchange and regulated by the ASIC. Any questions should be directed to your sales representative.

Every state in the United States, province in Canada and most countries throughout the world have their own laws regulating the types of securities and other investment products which may be offered to their residents, as well as the process for doing so. As a result, some of the securities discussed in this report may not be available to every interested investor. Accordingly, this report is provided for informational purposes only, and does not constitute an offer or solicitation to buy or sell any securities discussed herein in any jurisdiction where such would be prohibited. No part of any report may be reproduced in any manner without the prior written permission of CIBC World Markets.

The information and any statistical data contained herein have been obtained from sources which we believe to be reliable, but we do not represent that they are accurate or complete, and they should not be relied upon as such. All opinions expressed and data provided herein are subject to change without notice. A CIBC World Markets company or its shareholders, directors, officers and/or employees, may have a long or short position or deal as principal in the securities discussed herein, related securities or in options, futures or other derivative instruments based thereon. A CIBC World Markets company may have acted as initial purchaser or placement agent for a private placement of any of the securities of any company mentioned in this report, may from time to time solicit from or perform financial advisory, investment banking or other services for such company, or have lending or other credit relationships with the same. The securities mentioned in this report may not be suitable for all types of investors; their prices, value and/or income they produce may fluctuate and/or be adversely affected by exchange rates. Since the levels and bases of taxation can change, any reference in this report to the impact of taxation should not be construed as offering tax advice; as with any transaction having potential tax implications, clients should consult with their own tax advisors. Past performance is no guarantee of future results.

This document and any of the products and information contained herein are not intended for the use of private investors in the UK. Such investors will not be able to enter into agreements or purchase products mentioned herein from CIBC World Markets plc.

The comments and views expressed in this document are meant for the general interests of clients of CIBC World Markets Australia Limited. In preparing the advice given in this document, CIBC World Markets did not take into account the investment objectives, financial situation and particular needs of any particular client of CIBC World Markets. Before making an investment decision on the basis of any recommendation made in this document, the recipient should consider how appropriate the recommendation is to their particular investment needs, objectives and financial circumstances. To allow CIBC World Markets to take into consideration a recipient's objectives, financial situation and particular needs, CIBC World Markets requests that, prior to acting on any of the recommendations herein, you contact one of our client advisers to discuss your particular circumstances.

Although each company issuing this report is a wholly owned subsidiary of Canadian Imperial Bank of Commerce ("CIBC"), each is solely responsible for its contractual obligations and commitments, and any securities products offered or recommended to or purchased or sold in any client accounts (i) will not be insured by the Federal Deposit Insurance Corporation, the Canada Deposit Insurance Corporation or other similar deposit insurance, (ii) will not be deposits or other obligations of CIBC, (iii) will not be endorsed or guaranteed by CIBC, and (iv) will be subject to investment risks, including possible loss of the principal invested. The CIBC trademark is used under license.

© 2001 CIBC World Markets Corp. and CIBC World Markets Inc. All rights reserved.

Halliburton's defense team believes the company has a strong case for appeal on numerous points for the three jury decisions and the one settlement situation mentioned above.

**Case Location:** Baltimore, Maryland
**Date:** December 5, 2001
**Number of Plaintiffs:** Five
**Judgement:** $30 million judgement against Halliburton.

Grounds For Appeal: Three of the five plaintiffs in the case had no product identification against H-W. One of the other plaintiffs identified a H-W product, but Halliburton's defense team claims that it could not have possibly been used in the manner he described. Halliburton has had success in the appellate court in challenging prior Maryland cases on the product identification issues that are mentioned above. In addition, there is a question as to whether the plaintiffs' cancer developed before or after July 1, 1986. If was after July 1, 1986, non-economic damages would have been limited to $500,000.

**Case Location:** Orange, Texas
**Date:** November 29, 2001
**Number of Plaintiffs:** Five
**Judgement:** $65 million judgement against Halliburton.

Grounds For Appeal: All the five plaintiffs were employees of U.S. Pipe. The only product identification that took place was a H-W product that had just 1% asbestos and another product that records show was never sold to U.S. Pipe. H-W products were sold to the facility in question, but all products were non-asbestos. Halliburton believes that numerous other errors were made in the trial.

**Case Location:** Orange, Texas
**Date:** November 29, 2001
**Number of Plaintiffs:** One hundred
**Judgement:** $35.7 million judgement against Halliburton.

Detail: This was three additional judgements made against Halliburton. Following the spin-off of H-W by Dresser, H-W was to handle its own asbestos cases. However, at the beginning of June 2002, H-W was experiencing financial difficulties and not honoring commitments it had made to plaintiffs to settle cases tendered by Dresser. The plaintiffs brought a motion to hold Dresser responsible for several settlements entered into by H-W. The result was the assignment of $35.7 million in settlements against Dresser and, ultimately, Halliburton.

Grounds For Appeal: H-W's own lawyer and claims manager testified that they settled these claims on behalf of H-W, not Dresser. The lawyers were not retained by Dresser, had not contacted Dresser about the settlement, and were not authorized by Dresser to make the settlements. Halliburton does not believe that this judgement will be affirmed on appeal.

| | |
|---|---|
| **Case Location:** | Holmes County, Mississippi |
| **Date:** | October 30, 2001 |
| **Number of Plaintiffs:** | Six |
| **Judgement:** | $21.25 million judgement against Halliburton. |

Grounds For Appeal: Plaintiffs alleged that they were harmed by a H-W product, but two individuals provided no identification of any H-W product. Instead, they identified types of products that H-W never made. In addition, Halliburton's defense team asserts that the plaintiffs did not provide any of the legally required testimony that showed that the H-W products were defective. There was also no testimony on asbestos fiber release, no medical bills were submitted, and not a single day's lost wages were claimed.

It is important to note that Halliburton was brought into these H-W cases in June 2001, well after they were underway. This prevented Halliburton from employing their typical defense strategy, which has proven to be effective to date. Halliburton was not able to get witnesses listed for trial, nor were they able to use documents they would have liked because of the status of the cases when Halliburton came on board.

**Financial Strength Offers Protection Against Claims**
Halliburton is financially sound and should be able to withstand the cost of the asbestos litigation. There is $250 million in cash on the balance sheet, and, as of October 31, Halliburton has $2.7 billion in other positive working capital, which can serve as another source of liquidity. Currently, Halliburton has $700 million in unknown committed credit lines. None of the jury decisions in the past few weeks have triggered any adverse changes to the covenants of these lines. On the positive side, Halliburton's long-term debt ratings, which are A1/A+, were reaffirmed by both Moody's and Standard & Poor's, respectively, within the past month. Moody's affirmation occurred on Friday amid the 42% plunge in Halliburton's stock price, which helps reassure investors of Halliburton's financial strength and health. While the ratings remain on negative watch due to weakening fundamentals in the oilfield service industry and asbestos litigation, it is important to note that they have not been downgraded and remain well above investment grade.

**Estimated Future Asbestos Liability**
While it is very difficult to forecast the company's asbestos exposure, we attempted to calculate the financial impact of the 266,000 open claims against Halliburton. It is also difficult to predict the sometimes irrational civil court system. However, Halliburton's track record can serve as a guide. Applying Halliburton's historical metrics for claim resolution and cancer incidence among claimants, we arrive at a $63 million liability for existing Dresser and H-W open claims. (See Exhibit 1 on page 6.) We then ran a model assuming that the recently experienced mega-lawsuits against Halliburton are not overturned on appeal and set a new precedent in settling asbestos cases. (See Exhibit 2 on page 8.) In the second model, we arrived at a $169 million liability for Halliburton. In the following pages, we detail our assumptions.

Asbestos estimates using historical figures: Halliburton is receiving and settling claims on an ongoing basis. At the end of September, there were 146,000 open claims, a net increase of 1,000 claims from June 30, 2001. Although new claims continue to be filed in the fourth quarter, the company is experiencing them at a declining rate, in line with the declining net additions in the third quarter. In addition to these claims, it is estimated that there are approximately 120,000 open and unresolved post spin-off refractory claims naming Dresser as a defendant where H-W has failed to provide Dresser with adequate defense and indemnification. Halliburton plans to handle these claims as open claims.

The assumptions that we used to estimate Halliburton's financial exposure to future asbestos claims reflect management's comments on the conference call and our own estimations. There are 266,000 open claims against Halliburton. Approximately 1% to 3% of asbestos claimants have mesothelioma (the most serious illness associated with asbestos). The highest amount ever actually paid on one of these cases by Halliburton was $1.8 million. That case represented just one of four hundred mesothelioma claims made against Halliburton. To be conservative, we assumed that this type of record-setting award would be occur *four times as frequently* in the future, or once for every one hundred mesothelioma cases. However, about 25% of the mesothelioma claims made were settled for no payment due to trials, dismissals and summary judgements. The average payment for a mesothelioma case since the beginning of last year (excluding the one $1.8 million decision) was $10,700 before insurance.

We estimated that approximately 7% of total claimants have an illness, but do not have mesothelioma. We settled those claims in our model at a rate between a mesothelioma claim and Halliburton's historical settlement rate. We assumed that 90% of total claimants show no signs of illness (the industry average is 90% to 95%). We forecasted that these claims would be settled at Halliburton's historical rate of $4,000 per claim. This is probably pretty aggressive since the historical rate includes people who were truly sick and not just those with no visible signs of harm.

Our total estimated future asbestos liability for Halliburton, after insurance covers 95% of defense costs and settlement payments, is just $63 million, or $0.15 per share. While this may seem like a ridiculously small amount given the $152 million in gross judgements against the company just in the past few weeks, Halliburton's defense team believes that the high recent judgements will be revised downward significantly. For example, Halliburton expects to have the $30 million Maryland verdict reduced to less than $5 million on appeal. With five plaintiffs in that case, that works out to $1 million per severe mesothelioma claimant, or 44% below our $1.8 million assumption. Our asbestos impact model based on historical metrics can be seen in Exhibit 1 on the following page.

**Exhibit 1. Estimating The Financial Impact Of Future Asbestos Claims (Assumes Historical Metrics Are Still Valid)**

| Classification of Claims | Claims | HAL's Portion of Gross Settlement | Amount Paid By Insurance | Halliburton's Cost After Insurance |
|---|---|---|---|---|
| Open Dresser claims as of September 30, 2001 | 146,000 | | | |
| Estimated open Harbison-Walker claims | 120,000 | | | |
| Total Open Claims | 266,000 | | | |
| | | | | |
| 3% are Mesothelioma claims (the most serious) | 7,980 | | | |
| 1% of Meso claims are severe; settle at highest rate ever paid of $1.8 million | 80 | $143,640,000 | $136,458,000 | $7,182,000 |
| 74% of Meso claims are less severe; settle at H-W's historical Meso rate of $10,700 ea. | 5,905 | $63,185,640 | $60,026,358 | $3,159,282 |
| 25% of Meso claims resolved with no payment through trials, dismissals, etc | 1,995 | $0 | $0 | $0 |
| | | | | |
| 7% are not Meso claims, but have other illness | 18,620 | | | |
| 75% of these claims are legitimate; settle at $7,350, rate halfway between Meso & historical | 13,965 | $102,642,750 | $97,510,613 | $5,132,138 |
| 25% of these claims resolved with no payment through trials, dismissals, etc | 4,655 | $0 | $0 | $0 |
| | | | | |
| 90% of claims show no visible signs of illness; settle at Dresser's historical rate of $4,000 ea. | 239,400 | $957,600,000 | $909,720,000 | $47,880,000 |
| | | | | |
| **Totals** | **266,000** | **$1,267,068,390** | **$1,203,714,971** | **$63,353,420** |
| | | $4,764 per claim | | $0.15 per share |

Source: Company data and CIBC World Markets Corp. estimates

Asbestos estimates using higher jury awards: This model uses the same actuarial assumptions as the historical model. The recent jury awards do not change the historical incidence of mesothelioma and we don't think that will change. What could change, however, is the amount of money that juries award in these types of cases. Although we think the Maryland, Texas and Mississippi cases will be overturned or adjusted in Halliburton's favor, the jury verdicts in these totaled $116 million for 16 plaintiffs. That averages about $7.3 million for each claimant. In our model in Exhibit 2 on page 8, we changed our severe mesothelioma cases from a payout of $1.8 million to a payout of $7.3 million, to coincide with the three recent jury verdicts. We then adjusted upward the remaining payouts for the other claims classifications, which assumes that Halliburton's historical settlement rate will be too low and will rise on the introduction of settling H-W cases.

Our total estimated future asbestos liability for Halliburton, after insurance covers 95% of defense costs and settlement payments, is $169 million, or $0.39 per share. In this scenario, the company exhausts its insurance coverage at $2 billion and is liable for 100% of every dollar above that. If claims continued to come in, it would definitely spell trouble for the company's long-term viability. Our asbestos impact model based on higher jury and H-W settlements can be seen in Exhibit 2 on the following page.

**Exhibit 2. Estimating The Financial Impact Of Future Asbestos Claims (Assumes Higher Jury Awards And H-W Liability)**

| Classification of Claims | | Claims | HAL's Portion of Gross Settlement | Amount Paid By Insurance | Halliburton's Cost After Insurance |
|---|---|---|---|---|---|
| Open Dresser claims as of September 30, 2001 | | 146,000 | | | |
| Estimated open Harbison-Walker claims | | 120,000 | | | |
| Total Open Claims | | 266,000 | | | |
| | | | | | |
| 3% are Mesothelioma claims (the most serious) | | 7,980 | | | |
| 1% of Meso claims are severe; settled at headline-making rates of $7.3 million ea. | | 80 | $579,796,875 | $550,807,031 | $28,989,844 |
| 74% of Meso claims are less severe; settle at H-W's historical Meso rate of $16,700 ea. | | 5,905 | $98,616,840 | $93,685,998 | $4,930,842 |
| 25% of Meso claims resolved with no payment through trials, dismissals, etc | | 1,995 | $0 | $0 | $0 |
| | | | | | |
| 7% are not Meso claims, but have other illness | | 18,620 | | | |
| 75% of these claims are legitimate; settle at $11,138, rate halfway between Meso & historical | | 13,965 | $155,535,188 | $147,758,428 | $7,776,759 |
| 25% of these claims resolved with no payment through trials, dismissals, etc | | 4,655 | $0 | $0 | $0 |
| | | | | | |
| 90% of claims show no visible signs of illness; settle at HAL/W-H weighted avg. hist. rate of $5,575 | | 239,400 | $1,334,655,000 | $1,267,922,250 | $66,732,750 |
| | | | | | |
| | **Totals** | **266,000** | **$2,168,603,903** | **$2,000,000,000** | **$168,603,902** |
| | | | $8,143 per claim | (insurance max) | $0.39 per share |

Source: Company data and CIBC World Markets Corp. estimates

**Conclusion**

We believe that it is important to note that even under our more pessimistic asbestos liability scenario, Halliburton is not likely to go bankrupt any time soon. The liability, even if it occurs at the higher rate assumed from massive jury decisions, will be spread out over many years—and that is after the years it will take for Halliburton to exhaust the appeal process. Our belief is that the real asbestos liability lies somewhere between our two different scenarios. More information about the direction of future settlements will be revealed in about 18 months, when the appeals on these recent cases will finally be rendered.

We believe the sell-off on December 7 was overdone, and the rebound on December 10 was too modest. However, the stock is not likely to quickly rebound, especially in the face of faltering fundamentals in the oilfield service industry. Management did a good job addressing the asbestos issue, and our belief is that too much emphasis is being placed on the litigation. The company is fundamentally sound relative to the industry. With the shares hitting lows not seen since 1994, we think the risk/reward ratio is weighted well in favor of investors, although it may take some time to reap those rewards.

**Our quarterly EPS estimates are shown below.**

| | | 1 Qtr. | 2 Qtr. | 3 Qtr. | 4 Qtr. | Year |
|---|---|---|---|---|---|---|
| 2000 | Actual | $0.11 | $0.17 | $0.24 | $0.28 | $0.80 |
| 2001E | Current | $0.20A | $0.33A | $0.42A | $0.34E | $1.30E |
| 2002E | Current | --- | --- | --- | --- | $1.50E |

**Our quarterly cash flow per share estimates are shown below.**

| | | 1 Qtr. | 2 Qtr. | 3 Qtr. | 4 Qtr. | Year |
|---|---|---|---|---|---|---|
| 2000 | Actual | $0.34 | $0.43 | $0.50 | $0.56 | $1.82 |
| 2001E | Current | $0.56A | $0.66A | $0.73A | $0.66E | $2.60E |
| 2002E | Current | --- | --- | --- | --- | $2.78E |

## Exhibit 3. Earnings Model

### Halliburton Company

**Symbol: HAL-NYSE**
**Fiscal Year End: December 31**
**(Amounts in MM)**

| | 2000 | | | | | 2001 | | | | | 2002 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | FY | Q1 | Q2 | Q3 | Q4E | FYE | FYE |
| Revenues: | | | | | | | | | | | |
| Energy Services | 1,423.0 | 1,615.0 | 1,736.0 | 2,002.0 | 6,776.0 | 2,031.0 | 2,214.0 | 2,309.0 | 1,982.0 | 8,536.0 | 8,792.1 |
| Engineering & Construction Group | 1,436.0 | 1,253.0 | 1,288.0 | 1,191.0 | 5,168.0 | 1,113.0 | 1,125.0 | 1,082.0 | 893.3 | 4,213.3 | 4,634.6 |
| Total revenues | 2,859.0 | 2,868.0 | 3,024.0 | 3,193.0 | 11,944.0 | 3,144.0 | 3,339.0 | 3,391.0 | 2,875.2 | 12,749.2 | 13,426.6 |
| Operating Income: | | | | | | | | | | | |
| Energy Services | 49.0 | 113.0 | 163.0 | 192.0 | 517.0 | 200.0 | 267.0 | 321.0 | 247.7 | 1,035.7 | 1,090.2 |
| Engineering & Construction Group | 49.0 | 30.0 | 32.0 | 26.0 | 137.0 | 18.0 | 25.0 | 39.0 | 40.2 | 122.2 | 162.2 |
| Special Charges And Credits | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| General Corporate | (17.0) | (17.0) | (26.0) | (18.0) | (78.0) | (20.0) | (20.0) | (18.0) | (18.0) | (76.0) | (75.0) |
| Total Operating Income | 81.0 | 126.0 | 169.0 | 200.0 | 576.0 | 198.0 | 272.0 | 342.0 | 269.9 | 1,081.9 | 1,177.4 |
| Interest Expense | 33.0 | 33.0 | 38.0 | 39.0 | 143.0 | 48.0 | 34.0 | 34.0 | 30.0 | 146.0 | 105.0 |
| Interest Income | 7.0 | 3.0 | 6.0 | 7.0 | 23.0 | 5.0 | 6.0 | 8.0 | 9.0 | 28.0 | 35.0 |
| Foreign Currency Gain (Loss) | (4.0) | (3.0) | 4.0 | (1.0) | (4.0) | (4.0) | (1.0) | (2.0) | (2.0) | (9.0) | (8.0) |
| Other Nonoperating | 0.0 | 0.0 | (1.0) | 2.0 | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Income Before Taxes | 51.0 | 93.0 | 140.0 | 169.0 | 453.0 | 151.0 | 243.0 | 314.0 | 246.9 | 954.9 | 1,099.4 |
| Provision For Taxes | 20.0 | 36.0 | 53.9 | 65.9 | 175.8 | 60.2 | 98.0 | 126.0 | 98.8 | 383.0 | 439.8 |
| Minority Interest | (4.0) | (5.0) | (5.0) | (5.0) | (19.0) | (5.0) | (2.0) | (7.0) | (2.0) | (16.0) | (15.0) |
| Net Income | 27.0 | 52.0 | 81.1 | 98.1 | 258.2 | 85.8 | 143.0 | 181.0 | 146.2 | 556.0 | 644.7 |
| Income from Discontinued ops | 22.0 | 23.0 | 27.0 | 26.3 | 98.3 | 22.2 | 0.0 | (2.0) | 0.0 | 20.2 | 0.0 |
| Extraordinary gain (after tax) | 215.0 | 0.0 | 48.0 | 0.0 | 263.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **EPS: Diluted** | | | | | | | | | | | |
| Operating EPS from Continuing Ops | $0.06 | $0.12 | $0.18 | $0.22 | $0.58 | $0.20 | $0.33 | $0.42 | $0.34 | $1.30 | $1.50 |
| EPS from Discontinued Ops | $0.05 | $0.05 | $0.06 | $0.06 | $0.22 | $0.05 | $0.00 | ($0.00) | $0.00 | $0.05 | $0.00 |
| **Total Operating EPS** | **$0.11** | **$0.17** | **$0.24** | **$0.28** | **$0.80** | **$0.25** | **$0.33** | **$0.42** | **$0.34** | **$1.34** | **$1.50** |
| EPS from Extraordinary Items | $0.48 | $0.00 | $0.11 | $0.00 | $0.59 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Net reported EPS** | **$0.59** | **$0.17** | **$0.35** | **$0.28** | **$1.38** | **$0.25** | **$0.33** | **$0.42** | **$0.34** | **$1.34** | **$1.50** |
| Basic shares outstanding | 442 | 444 | 441 | 441 | 442 | 426 | 427 | 428 | 428 | 427 | 428 |
| Diluted Shares | 444 | 449 | 451 | 451 | 449 | 430 | 430 | 429 | 429 | 430 | 429 |
| Depreciation And Amortization | 122.0 | 140.0 | 145.0 | 153.0 | 560.0 | 155.0 | 140.0 | 132.0 | 135.0 | 562.0 | 550.0 |
| Operating Cash Flow | 149.0 | 192.0 | 226.1 | 251.1 | 818.2 | 240.8 | 283.0 | 313.0 | 281.2 | 1,118.0 | 1,194.7 |
| **CFPS: Diluted** | **$0.34** | **$0.43** | **$0.50** | **$0.56** | **$1.82** | **$0.56** | **$0.66** | **$0.73** | **$0.66** | **$2.60** | **$2.78** |
| EBITDA | 203.0 | 266.0 | 314.0 | 353.0 | 1,136.0 | 353.0 | 412.0 | 474.0 | 404.9 | 1,643.9 | 1,727.4 |
| EBITDA Per Share | $0.46 | $0.59 | $0.70 | $0.78 | $2.53 | $0.82 | $0.96 | $1.10 | $0.94 | $3.83 | $4.03 |

Source: Company data and CIBC World Markets Corp. estimates

# EXHIBIT 152

SALOMON SMITH BARNEY

# Halliburton Company (HAL)#

## HAL: Highlights from Asbestos Conference Call

**3H** *(Neutral, High Risk)*
**Mkt Cap: $6,020.0 mil.**

United States

**December 11, 2001**

**OILFIELD EQUIPMENT & SERVICES**

**Geoff Kieburtz**
+1-212-816-3139
*geoff.kieburtz@ssmb.com*

Robert J. MacKenzie
+1-212-816-6629

**SUMMARY**

- Halliburton held a conference call to discuss its asbestos situation and legal strategy, reflecting a proactive approach toward disclosure.
- The three recent multi-million dollar awards all relate to H-W, a former subsidiary of Dresser. Claims against Harbison-Walker (H-W), spun off by Dresser in 1992, had not been monitored by Halliburton until June of this year.
- The company has substantial financial resources, and $2 billion of insurance for H-W-related asbestos claims.
- Uncertainty about the size, nature, and frequency of future H-W cases raises doubts that historically low claims payout averages can be maintained, and could dampen the stock's performance in the coming months.
- However, we believe the stock overreacted on Friday. We maintain our 3H investment rating and $20 price target.

**FUNDAMENTALS**

| | |
|---|---|
| P/E (12/01E) | 10.6x |
| P/E (12/02E) | 12.2x |
| TEV/EBITDA (12/01E) | 9.0x |
| TEV/EBITDA (12/02E) | 9.9x |
| Book Value/Share (12/01E) | $11.18 |
| Price/Book Value | 1.3x |
| Dividend/Yield (12/01E) | $0.50/3.6% |
| Revenue (12/01E) | $12,940.7 mil. |
| Proj. Long-Term EPS Growth | NA |
| ROE (12/01E) | 12.9% |
| Long-Term Debt to Capital(a) | 26.8% |

HAL is in the S&P 500® Index.

(a) Data as of most recent quarter

**SHARE DATA**

| | |
|---|---|
| Price (12/10/01) | $14.00 |
| 52-Week Range | $49.20-$12.00 |
| Shares Outstanding(a) | 430.0 mil. |
| Convertible | No |

**RECOMMENDATION**

| | |
|---|---|
| **Current Rating** | **3H** |
| Prior Rating | 3H |
| **Current Target Price** | **$20.00** |
| Previous Target Price | $20.00 |

**EARNINGS PER SHARE**

| FY ends | | 1Q | 2Q | 3Q | 4Q | Full Year |
|---|---|---|---|---|---|---|
| **12/00A** | **Actual** | **$0.11A** | **$0.17A** | **$0.24A** | **$0.28A** | **$0.80A** |
| **12/01E** | **Current** | **$0.20A** | **$0.33A** | **$0.42A** | **$0.36E** | **$1.32E** |
| | Previous | $0.20A | $0.33A | $0.42A | $0.36E | $1.32E |
| **12/02E** | **Current** | **$0.30E** | **$0.27E** | **$0.27E** | **$0.31E** | **$1.15E** |
| | Previous | $0.30E | $0.27E | $0.27E | $0.31E | $1.15E |
| **12/03E** | **Current** | **NA** | **NA** | **NA** | **NA** | **$1.60E** |
| | Previous | NA | NA | NA | NA | $1.60E |

First Call Consensus EPS: 12/01E $1.30; 12/02E $1.32; 12/03E NA

**OPINION**

Halliburton, and Dresser before it, has consistently reported periodic developments associated with its asbestos liabilities, in both its quarterly SEC filings and, when applicable, through press releases. Furthermore, management has improved its disclosure over time, as evidenced by this morning's conference call.

During the call, devoted entirely to the issue of Halliburton's asbestos liabilities, management outlined its current liquidity position, which appears more than sufficient to meet any near-term asbestos liability claims. As of October 31, the company had $250 million in cash on the balance sheet, of which none is restricted. We expect the company to generate $614 million of free cash flow net of dividends during 2002, and management this weekend reconfirmed its $700 million (currently unused) credit facility. Furthermore, Halliburton has flexible debt covenants, debt to capitalization of just 26%, and over $2 billion of insurance coverage specifically related to claims against Harbison-Walker, a former subsidiary of Dresser Industries.

The three multi-million dollar jury verdicts of the past two months relate to Harbison-Walker cases filed since 1992. Until June of this year, Halliburton had not tracked the progress of cases against H-W. This was because, at the time of H-W's spin-off in 1992, it was determined that all future cases were H-W's responsibility. The sudden acceleration of major verdicts has ignited investor concerns, as the full extent of future claims potential is highly uncertain. However, Halliburton has approximately $2 billion of insurance recoverables related to H-W cases, and intends to vigorously appeal the three aforementioned cases. We expect the appeals to take at least 18 months to be decided. Moreover, if H-W, or its parent, RHI, were to declare bankruptcy, it appears likely that the recent verdicts, as well as future claims, could be set aside at least temporarily.

Prior to these awards, the largest judgment against the company post appeals was $1.8 million for a plaintiff with mesothelioma, allegedly related to pump gaskets sold to the U.S. Navy. In terms of prior H-W claims, the largest award that has been paid out was $150,000, again for a plaintiff that had contacted mesothelioma. Of all the claims filed against the company, management has indicated in the past that less than 5%, probably in the nature of 1% to 3%, are actually sick. Halliburton has historically settled claims for an average of under $750/claim and recovered over 75% of this amount from insurance. However, it is now unclear if historical averages are a good reference.

We believe the stock overreacted to the news on Friday and were not surprised to see a rebound yesterday. A move to our $20 price target is possible in the near-term, in our view, especially if oilfield service stocks rise solidly. In the absence of a significant movement in the group, however, we expect the stock price to settle in the mid-teens.

For a myriad of reasons, including the uncertainty noted above, we believe stock performance will remain muted over the near-term. It is difficult to speculate as to which events could lift this burden off the stock. However, if HW or its parent, RHI, were to declare bankruptcy, it appears likely that the recent verdicts, and potentially future cases, would be temporarily stayed, which could be viewed positively. We are maintaining our 3H rating and $20 price target on the stock, pending additional developments in this matter.

## COMPANY DESCRIPTION

Halliburton provides a comprehensive scope of products and services in well construction, production infrastructure, engineering and construction, and energy-related capital equipment. The company has been organized into three groups - the Energy Services Group (ES), and Engineering and Construction Group (E&C). The ES Group provides discrete services and products and integrated solutions to customers in the exploration, development and production of oil and gas and has two segments: Halliburton Energy Services (HES), and the midstream operations of the former Brown and Root Energy Services (BRES), combined with Landmark Graphics (LMRK). The E&C group provides services to energy and industrial customers and government entities worldwide and consists of Kellogg, Brown and Root, which includes the marine E&C activities of the former BRES and the former Brown & Root Services.

ADDITIONAL INFORMATION AVAILABLE UPON REQUEST
# Within the past three years, Salomon Smith Barney, including its parent, subsidiaries and/or affiliates, has acted as manager or co-manager of a public offering of the securities of this company.
Salomon Smith Barney ("SSB"), including its parent, subsidiaries and/or affiliates ("the Firm"), usually makes a market in the U.S.-traded over the counter securities recommended in this report and may sell to or buy from customers, as principal, securities recommended in this report. The Firm or employees preparing this report may have a position in securities or options of any company recommended in this report. An employee of the Firm may be a director of a company recommended in this report. The Firm may perform or solicit investment banking or other services from any company recommended in this report.
Securities recommended, offered, or sold by SSB: (i) are not insured by the Federal Deposit Insurance Corporation; (ii) are not deposits or other obligations of any insured depository institution (including Citibank); and (iii) are subject to investment risks, including the possible loss of the principal amount invested. Although information has been obtained from and is based upon sources SSB believes to be reliable, we do not guarantee its accuracy and it may be incomplete or condensed. All opinions and estimates constitute SSB's judgment as of the date of the report and are subject to change without notice. This report is for informational purposes only and is not intended as an offer or solicitation for the purchase or sale of a security. Investing in non-U.S. securities, including ADRs, by U.S. persons may entail certain risks. Investors who have received this report may be prohibited in certain U.S. states from purchasing securities mentioned in this report from SSB. Please ask your financial consultant for additional details. This report has been approved for distribution in the United Kingdom by Salomon Brothers International Limited, which is regulated by the Securities and Futures Authority. The investments and services contained herein are not available to private customers in the UK and South Africa. This report was prepared by SSB and, if distributed in Japan by Nikko Salomon Smith Barney Limited, is being so distributed under license. This report is made available in Australia through Salomon Smith Barney Australia Securities Pty Ltd. (ABN 64 003 114 832), a Licensed Securities Dealer, and in New Zealand through Salomon Smith Barney New Zealand Limited, a member firm of the New Zealand Stock Exchange. This report does not take into account the investment objectives or financial situation of any particular person. Investors should obtain advice based on their own individual circumstances before making an investment decision. Salomon Smith Barney Securities (Proprietary) Limited is incorporated in the Republic of South Africa (company registration number 2000/025866/07) and its registered office is at Grosvenor Corner, 195 Jan Smuts Avenue, Rosebank, 2198, Republic of South Africa. Salomon Smith Barney is a service mark of Salomon Smith Barney Inc.
© Salomon Smith Barney Inc., 2001. All rights reserved. Any unauthorized use, duplication or disclosure is prohibited by law and may result in prosecution.

# EXHIBIT 153

STANDARD & POOR'S

Global Credit Portal®
RatingsDirect®

December 11, 2001

# Halliburton Co. Ratings Lowered to 'A-'; Short-Term Ratings Lowered to 'A-2'

**Credit Analyst:**
Daniel Volpi, New York (1) 212-438-7688

NEW YORK (Standard & Poor's) Dec. 11, 2001--Standard & Poor's today lowered its corporate credit and senior unsecured ratings on Halliburton Co. to single-'A'-minus from single-'A'-plus. At the same time, Standard & Poor's lowered Halliburton's short-term corporate credit and commercial paper ratings to 'A-2' from 'A-1'.

The outlook remains negative.

The rating actions reflect what Standard & Poor's views as increased uncertainty surrounding Halliburton's ongoing asbestos litigation. On Oct. 17, 2001, Standard & Poor's revised its outlook on Halliburton to negative from stable, pointing to the uncertainty surrounding the cost of future liabilities, the possibility of material adverse awards, and the ultimate recoverability of current insurance in place. Since that time, Halliburton has announced a number of adverse litigation results, with jury verdicts and judgments against the company totaling $152 million. While it is recognized that the ultimate outcome of the recent verdicts and judgments is subject to further legal proceedings, the latest awards were significantly above Halliburton's historical experience. Standard & Poor's is concerned that the recent results and award amounts could portend a material increase in the resolution costs of asbestos-related claims. In addition, recent events could further burden the company with intensified litigation and increased plaintiff expectations. Ratings could be further lowered on Standard &

Poor's future assessment of asbestos litigation risk.

The current ratings are supported by Halliburton's considerable financial wherewithal and substantial insurance coverage. Although the increased litigation risk will likely reduce financial flexibility, the company maintains strong liquidity with approximately $250 million in cash on hand and access to $700 million of credit facilities. Halliburton also maintains more than $2.0 billion of insurance coverage, which to date has reimbursed a substantial percentage of asbestos-related payments.

The ratings on Dallas, Texas-based Halliburton reflect the company's strong global market position as one of the largest integrated oilfield services providers and moderate financial policies. Halliburton is organized into two business segments: energy services and engineering and construction. The energy services segment caters to oil and gas exploration, development, and production companies, providing products and services such as pressure pumping, directional drilling, logging, drilling fluid systems, reservoir management, seismic software, and data management. Halliburton also offers integrated oilfield management and technical expertise capabilities. The engineering and construction segment provides engineering, construction, and project management services to the industrial, marine, civil, and energy-related markets.

OUTLOOK: NEGATIVE

The negative outlook reflects concerns over the ultimate resolution costs of existing and future asbestos litigation. Standard & Poor's will continue to closely monitor the situation.

Copyright © 2014 Standard & Poor's Financial Services LLC, a part of McGraw Hill Financial. All rights reserved.

No content (including ratings, credit-related analyses and data, valuations, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of Standard & Poor's Financial Services LLC or its affiliates (collectively, S&P). The Content shall not be used for any unlawful or unauthorized purposes. S&P and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Parties are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, for the results obtained from the use of the Content, or for the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED, OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related and other analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact. S&P's opinions, analyses, and rating acknowledgment decisions (described below) are not recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P does not act as a fiduciary or an investment advisor except where registered as such. While S&P has obtained information from sources it believes to be reliable, S&P does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.

To the extent that regulatory authorities allow a rating agency to acknowledge in one jurisdiction a rating issued in another jurisdiction for certain regulatory purposes, S&P reserves the right to assign, withdraw, or suspend such acknowledgement at any time and in its sole discretion. S&P Parties disclaim any duty whatsoever arising out of the assignment, withdrawal, or suspension of an acknowledgment as well as any liability for any damage alleged to have been suffered on account thereof.

S&P keeps certain activities of its business units separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain business units of S&P may have information that is not available to other S&P business units. S&P has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P reserves the right to disseminate its opinions and analyses. S&P's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription) and www.spcapitaliq.com (subscription) and may be distributed through other means, including via S&P publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

McGRAW-HILL

# EXHIBIT 154

03:58pm EST 13-Dec-01 Bear Stearns ( Schneider, Gary 212 272-4261) CCK HAL OWC
CCK: Sale Of Assets Begins

Gary Schneider 212 272-4261 gschneider@bear.com 12/13/01

Subject: Company Update
Industry: Packaging

BEAR, STEARNS & CO. INC.
EQUITY RESEARCH

Crown Cork & Seal (CCK $2.20) - Neutral
Sale Of Assets Begins

---

Data
Shares Out 125.7mm Market Cap (MM) $300mm

---

Key Points
*** Risdon Manufacturing Facility To Be Sold
*** Selling Best Performing Assets Is Not The Way To Run A Business
*** Crown Cork Still Has Financial Difficulties
*** Pennsylvania Asbestos Legislation Likely To Be Of Little Help

---

Earnings Estimates

| | Q1 Mar | Q2 Jun | Q3 Sep | Q4 Dec | Year |
|---|---|---|---|---|---|
| 2000 | $0.17 | $0.50 | $0.35 | $(0.30) | $0.30 |
| 2001 | $(0.37) | $0.05 | $(0.10) | $(0.30) | $(0.72) |
| 2002 | | | | | $0.25 |

---

On December 12, 2001, Crown Cork & Seal announced that it had agreed to sell its fragrance pump manufacturing business located in Thomaston, Connecticut for approximately $107 million. The Thomaston plant is one of nine facilities operated by CCK s Risdon-AMS cosmetics packaging subsidiary. For the twelve months ended October 31, 2001, this business had revenues of some $55 million and EBITDA of $16 million. Following this divestiture, Risdon s remaining product lines will include highly decorated, injection molded and assembled plastic packaging and related metal packaging products used largely by the cosmetics industry.

In our First Call piece dated February 16, 2001, we stated that from our perspective, Crown Cork through little fault of its own, is beginning to move down the slippery road toward court protection. If we had this report to do over again, we would refine the phrase through little fault of its own since in retrospect, the company is partially at fault. The heavy debt load coming due in the foreseeable future was part of a program to expand internationally. The program has not provided the benefits expected and now the debt is maturing. In 2002, some $750 million needs to be handled. Another $100 million, or so, will be needed to pay asbestos litigation settlements. As an aside, another $600 million of debt matures in 2003 and some $300 million comes due in 2004 and another $300 million matures in 2005. This all excludes the $2.5 billion revolver coming due in 2003. Asbestos, in our opinion, is not the

fault of CCK. Rather, it can be attributed, in our opinion, to a U.S. legal system that has run amok when it comes to asbestos litigation. Still, Crown Cork will likely be short of cash when it comes to meeting these obligations. Even if the company generates $100 million in net free cash from operations and another $150 million from reductions in working capital, there would be a shortfall. Sale of assets is one way of raising needed cash and the sale of the Risdon Thomaston facility is part of this program.

In 1997, Owens-Corning started to sell what we regarded as important assets to try to maintain itself as a going concern, defined to mean a non-bankrupt company. It also faced a heavy debt load and rising asbestos claims. The sale of assets kept the company away from Court protection for some three years, after which it capitulated. We think Crown Cork may be in a somewhat similar position. This initial asset sale involves a unit generating an EBITDA margin of some 29%, or about double what we believe CCK is generating as a total company. An apparently very good asset is being sold to generate cash. Net proceeds will be used to reduce outstanding short-term indebtedness. We won t be surprised if the program continues and includes the remainder of Risdon, Crown Cork s Constar PET plastic container business and some specialized packaging assets. The continuing sale of assets can provide time and if there is time, then there is hope that finances can come into better balance and something can happen to limit spiraling asbestos litigation liabilities.

In reference to the latter, the state of Pennsylvania has passed a legislative measure limiting the asbestos liability of Crown Cork. However, legal counsel we have dealt with suggest that (1) legislation in one state does not have standing in other states and (2) Pennsylvania is not a state deemed to be dangerous by counsel to defendants so the financial impact may be unimportant. States deemed to be dangerous include Florida, Mississippi, Louisiana and Texas. By now, everyone should be familiar with the Halliburton situation. We quote from a Wall Street Journal article dated December 10, 2001. Since Oct. 30, Halliburton has reported a total of $122 million in court judgments in Mississippi, Texas and Maryland from asbestos-related lawsuits. Its units are appealing all of those verdicts. Mississippi and Texas are dangerous venues and legislation passed in Pennsylvania will not likely change that. Legislation is needed at the federal level to restrict huge awards and lobbyists we talk with tell us that such legislation is unlikely, at least right now. In our opinion, owners of CCK should not look to Pennsylvania legislation for the answer to the company s asbestos problems.

Companies Mentioned: Owens Corning (OWC-$1.71); Halliburton (HAL-$13.61).

Bear Stearns may be a market maker or be associated with a specialist that makes a market in the common stock or options of the issuer(s) in this report, and Bear Stearns or such specialist may have a position (long or short) and may be on the opposite side of public orders in such common stock or options.

Bear Stearns may be a market maker or be associated with a specialist that makes a market in the common stock or options of the issuer(s) in this report, and Bear Stearns or such specialist may have a position (long or short) and may be on the opposite side of public orders in such common stock or options.

Bear Stearns may be a market maker or may be associated with a specialist that makes a market in the common stock or options of the issuer(s) in this report, and Bear Stearns or such specialist may have a position (long or short) and may be on the opposite side of public orders in such common stock or options.

Any recommendation contained in this report may not be suitable

for all investors. Moreover, although the information contained herein has been obtained from sources believed to be reliable, its accuracy and completeness cannot be guaranteed. Bear Stearns may make markets and effect transactions, including transactions contrary to any recommendations herein, or have positions in the securities mentioned herein (or options with respect thereto) and may also have performed investment banking services for the issuers of such securities.
In addition, employees of Bear Stearns may have positions and effect transactions in the securities or options of the issuers mentioned herein and may serve as directors of such issuers.
Copyright 2001.All rights reserved by Bear, Stearns & Co. Inc.
First Call Corporation, a Thomson Financial company.
All rights reserved. 888.558.2500

# EXHIBIT 155

# Pfizer

## 2002 Forecasts and Pipeline to Highlight Analyst Meeting

ABN·AMRO

**USA Pharmaceuticals** | **NYSE: PFE - $38.980** | **Buy**

Flashnote

**December 14, 2001**


**Girish Tyagi, MD, CFA** **617/951-3213** **girish.tyagi@abnamro.com**
Scott R. Henry, CFA 617/951-3240 scott.r.henry@abnamro.com


**Market Profile**

| | | | |
|---|---|---|---|
| 52-Week Range | $48 - $34 | EPS Growth Rate (3-5 Yrs.) | 22% |
| Avg. Daily Volume | 11,611 M | ROAE (LTM) | 45.0% |
| Shares Outstanding | 6,372.0 MM | Debt to Total Capital | 28% |
| Market Capitalization | 248,381 MM | Book Value Per Share | $2.80 |
| Floating Market Cap. | 245,897 MM | Indicated Dividend/Yield | $0.44/1.13% |
| Institutional Owner. | 61% | Revenue (LTM) | $31,335 MM |
| Insider Holdings | 1% | | |

**Earnings/Share**

| | 1Q/Mar | 2Q/Jun | 3Q/Sep | 4Q/Dec | Fiscal Year | Calendar Year | Calendar P/E Ratio |
|---|---|---|---|---|---|---|---|
| **2000** | $0.25A | $0.23A | $0.27A | $0.27A | $1.02A | $1.02 | 38.2x |
| **2001** | $0.33A | $0.30A | $0.34A | $0.35E | $1.32E | $1.32 | 29.5x |
| **2002** | $0.39E | $0.37E | $0.41E | $0.43E | $1.60E | $1.60 | 24.4x |

**Highlights**

- **Pfizer is to hold its annual analyst meeting at 9:30AM EST Tuesday, December 18th in New York City. A web link can be found at www.pfizer.com.**
- **We expect management to highlight the company's drug pipeline, including the soon-to-be filed Spiriva for COPD, the anti-seizure drug Pregabalin, and new compounds in development.**
- **In contrast to some other large-cap pharmaceuticals, PFE's CEO recently announced comfort with 2002 growth of 20+%.**
- **We further look for increased information on the potential asbestos liability to PFE, which has plagued the shares over recent weeks. Failure to provide color could dampen enthusiasm on the meeting.**
- **Pfizer remains well positioned in the large-cap group with little near-term patent exposure and upcoming product launches. We maintain our Buy rating and 01-02 EPS forecasts of $1.32 and $1.60, respectively.**

**Reason for note:** Analyst Meeting Preview

**Analyst Meeting on Tuesday, December 18th in New York City**

Pfizer is to hold its annual analyst meeting on Tuesday, December 18th in New York City. A link to the meeting is available at Pfizer’s web site (www.pfizer.com). We expect PFE’s presentations to be largely upbeat. Management recently confirmed its 2002 earnings guidance, and the company has a wealth of developmental compounds to highlight at the meeting. In contrast to the recent earnings revisions at some of the other pharmaceuticals, PFE’s CEO Hank McKinnell stated that the company is “comfortable with forecasts of 20% plus growth next year to $1.59 or possibly better” as recently as December 12th.

Further, on a fundamental basis, PFE does not face new generic competition in 2002 that has plagued other companies within the sector. We maintain our 2002 EPS forecast of $1.60, although we are not expecting upside given the current environment. We do not expect the company to be tested until 2003, when generic competition could emerge for the anti-seizure drug Neurontin. That said, we expect that investor enthusiasm could be dampened if the company fails to quantify its exposure to asbestos litigation. While we believe that this issue is largely overblown given Pfizer's extensive capital base and strong cash flow, uncertainity could make investors cautious.

**Robust Pipeline**
Pfizer's pipeline ranks among the industry best. The meeting is expected to provide updates on the company's 5 filed/or recently approved products including Relpax (for migraines), Vfend (antifungal), Bextra (COX-2 inhibitor, co-marketed with PHA), Neurontin (expanded neuropathic pain indication), and Geodon (new intramuscular indication). Further, the company is expected to focus on the soon-to-be filed Spiriva for COPD (chronic obstructive pulmonary disease that includes bronchitis and emphysema) and Pregabalin (anti-seizure/pain compound). Among earlier-stage compounds, we await updates on the status of inhaled insulin, Exubera, for diabetes and the cholesterol reducer Avasimibe.

**Key Late Stage Pipeline**

| Compound | Stage | Therapeutic area | Comment |
|---|---|---|---|
| Relpax | Filed | Migraines | Additional safety study being done |
| Vfend | Has panel recommendation | Antifungal | Aspergillosis |
| Neurontin (pain) | Filed | Neuropathic pain | Off label use ongoing |
| Geodon (IM delivery) | Phase III | Antipsychotic | Approvable letter |
| Spiriva | Phase III | COPD | Filed Dec 2000 in Europe |
| Pregabalin | Phase III | Anti-seizure | Filing expected soon |
| Darifenacin | Phase III | Incontinence | M3 antagonist |
| Inhaled insulin | Phase III | Diabetes | Safety issues remain |
| Avasimibe | Phase III | Cholesterol | ACAT inhibitor |
| Lasofoxifene | Phase III | Osteoporosis / breast cancer | SERM type drug |

Source: ABN AMRO Inc., and Company reports

**Asbestos Overhang Likely Overdone, But Difficult to Quantify**
Shares of PFE have come under pressure following the recent verdict against Halliburton (NYSE: HAL, $13.03-Hold) in an asbestos case suit. Since this suit, the shares of Pfizer have lost roughly 3-4 points, equating to almost $22 billion in market cap. Given that in PFE recent 10-Q, the company states "that the actions (related to asbestos litigation) should not have a material adverse effect on the financial position or results of the company. While the actual number is not easily quantifiable, according to the 10-Q, there are slightly over 100K cases against Pfizer (from PFE's Quigley division and WLA's old American Optical Company). Simply applying the last verdict to the outstanding cases greatly overestimates the total cost, as settlements are regularly reduced to substantially lower actual cash outlays. While we do not like this uncertainty, we would highlight that investors willing to take the litigation-related risk for American Home Products (NYSE: AHP, $58.36, Add rating) in the phen-fen diet pill case were rewarded with a healthy comeback performance following the announcement of a settlement.

**Maintain Buy**
Pfizer continues to sustain leadership in the large-cap pharma sector. The company has posted 25%+ EPS growth for the last three quarters, and is expected to post compounded earnings growth in excess of 20% through 2002. Pfizer combines manageable generic exposure with one of the broadest pharmaceutical platforms in the group (containing 8 blockbuster products, including Lipitor, Norvasc, Viagra, Zoloft, Neurontin in neuropathic pain, Diflucan, Zithromax, and Celebrex). Further, the company contains one of the strongest near-term pipelines in the group. We believe that prices in the lower $40's represent an appealing entry point for investors. Our 12-month price target is $55, which equates to a P/E/G ratio approaching 1.7, in-line with the group average. Our 2001-02 earnings forecasts remain unchanged at $1.32 and $1.60, respectively.

## Additional Companies Mentioned: AHP, HAL

**© Copyright 2001 ABN AMRO Incorporated ("AAI"). All rights reserved.**

This report is for informational purposes only and, while based on information believed to be reliable, no guaranty is given that it is accurate or complete. Information, opinions and estimates contained in this report constitute our judgement as of the report date and are subject to change without notice. This report is not intended as an offer or solicitation to buy or sell any securities or related financial instruments. The investments discussed or recommended in this report may not be suitable for the specific investment objectives, financial situation or individual needs of recipients and should not be relied upon in substitution for the exercise of independent judgement. This report may not be distributed to others or reproduced in any form without our prior consent.

AAI, its affiliates and/or their employees from time to time may maintain a long or short position in, act as market maker for, or purchase or sell as agent or principal a position in, securities or other financial products discussed herein. AAI or its affiliates may from time to time solicit from or perform investment banking, commercial banking, advisory or other services for, or within the last three years may have acted as manager or co-manager for a public offering of securities of, companies mentioned herein.

Outside the United States, this report is intended solely for distribution to professional investors and not for private customers. To ask questions or effect transactions, please contact your local sales representative.

**Additional information available upon request.**

# Pfizer

## Historical and Project Consolidated Income Statement

($ Millions except EPS)

| | 2000A | | | | | 2001E | | | | | 2002E | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1QA | 2QA | 3QA | 4QA | Year | 1QA | 2QA | 3QA | 4QE | Year | 1QE | 2QE | 3QE | 4QE | Year |
| Revenues | | | | | | | | | | | | | | | |
| Pharmaceutical | 5,223 | 4,982 | 5,224 | 5,985 | 21,415 | 5,765 | 5,690 | 5,861 | 6,713 | 24,029 | 6,550 | 6,507 | 6,609 | 7,508 | 27,174 |
| Alliance | 248 | 264 | 298 | 348 | 1,158 | 286 | 306 | 375 | 415 | 1,382 | 426 | 395 | 484 | 523 | 1,828 |
| Capsugel | 101 | 104 | 98 | 103 | 406 | 101 | 106 | 98 | 108 | 413 | 105 | 110 | 102 | 112 | 429 |
| Consumer | 1,325 | 1,352 | 1,330 | 1,377 | 5,384 | 1,273 | 1,337 | 1,311 | 1,410 | 5,330 | 1,329 | 1,397 | 1,370 | 1,474 | 5,569 |
| Animal Health | 264 | 287 | 208 | 292 | 1,051 | 220 | 247 | 254 | 256 | 977 | 242 | 272 | 279 | 282 | 1,074 |
| **Total Revenues** | **7,161** | **6,989** | **7,158** | **8,105** | **29,414** | **7,645** | **7,686** | **7,898** | **8,901** | **32,131** | **8,651** | **8,681** | **8,844** | **9,898** | **36,074** |
| **Expenses** | | | | | | | | | | | | | | | |
| Cost of goods sold | 1,238 | 1,154 | 1,159 | 1,351 | 4,903 | 1,224 | 1,325 | 1,177 | 1,335 | 5,061 | 1,332 | 1,337 | 1,282 | 1,465 | 5,416 |
| Gross profit | 5,923 | 5,835 | 5,999 | 6,754 | 24,511 | 6,421 | 6,361 | 6,721 | 7,566 | 27,069 | 7,319 | 7,344 | 7,561 | 8,433 | 30,658 |
| SG&A expense | 2,732 | 2,824 | 2,650 | 3,075 | 11,281 | 2,580 | 2,810 | 2,601 | 3,115 | 11,106 | 2,907 | 2,926 | 2,857 | 3,395 | 12,084 |
| Research and development | 1,060 | 1,086 | 1,025 | 1,264 | 4,435 | 1,028 | 1,116 | 1,188 | 1,513 | 4,845 | 1,125 | 1,259 | 1,256 | 1,435 | 5,074 |
| Operating income (loss) cont ops. | 2,131 | 1,925 | 2,324 | 2,415 | 8,795 | 2,813 | 2,435 | 2,932 | 2,937 | 11,118 | 3,288 | 3,160 | 3,449 | 3,603 | 13,499 |
| Other (income) expense incl interest | (46) | (65) | (28) | 8 | (131) | (76) | (87) | (5) | (13) | (181) | (27) | (36) | (47) | (61) | (172) |
| Earnings Before Taxes | 2,177 | 1,990 | 2,352 | 2,407 | 8,926 | 2,889 | 2,522 | 2,937 | 2,950 | 11,298 | 3,315 | 3,196 | 3,496 | 3,664 | 13,671 |
| Income tax expense (benefit) | 592 | 542 | 638 | 644 | 2,415 | 757 | 623 | 749 | 752 | 2,881 | 845 | 815 | 892 | 923 | 3,475 |
| Minority income | 1 | 4 | 3 | 7 | 15 | 2 | 9 | 3 | 2 | 16 | 3 | 3 | 4 | 5 | 14 |
| **Net income cont. ops.** | **1,584** | **1,444** | **1,711** | **1,756** | **6,496** | **2,130** | **1,890** | **2,185** | **2,200** | **8,405** | **2,472** | **2,383** | **2,609** | **2,746** | **10,210** |
| Net income (loss) - reported | (204) | 1,150 | 1,361 | 1,420 | 3,728 | 1,930 | 1,829 | 2,078 | 2,200 | 8,037 | 2,472 | 2,383 | 2,609 | 2,746 | 10,210 |
| **EPS from cont. ops.* (F.D.)** | **$0.25** | **$0.23** | **$0.27** | **$0.27** | **$1.02** | **$0.33** | **$0.30** | **$0.34** | **$0.35** | **$1.32** | **$0.39** | **$0.37** | **$0.41** | **$0.43** | **$1.60** |
| EPS - reported (F.D.) | ($0.03) | $0.18 | $0.21 | $0.22 | $0.59 | $0.30 | $0.29 | $0.33 | $0.35 | $1.26 | $0.39 | $0.37 | $0.41 | $0.43 | $1.60 |
| Weighted avg. shares (F.D.) | 6,322 | 6,344 | 6,361 | 6,390 | 6,368 | 6,381 | 6,378 | 6,372 | 6,370 | 6,375 | 6,370 | 6,375 | 6,380 | 6,385 | 6,378 |
| **Margin & expense analysis** | | | | | | | | | | | | | | | |
| Cost of goods sold | 17.3% | 16.5% | 16.2% | 16.7% | 16.7% | 16.0% | 17.2% | 14.9% | 15.0% | 15.8% | 15.4% | 15.4% | 14.5% | 14.8% | 15.0% |
| SG&A expense | 38.1% | 40.4% | 37.0% | 37.9% | 38.4% | 33.7% | 36.6% | 32.9% | 35.0% | 34.6% | 33.6% | 33.7% | 32.3% | 34.3% | 33.5% |
| Research and development | 14.8% | 15.5% | 14.3% | 15.6% | 15.1% | 13.4% | 14.5% | 15.0% | 17.0% | 15.1% | 13.0% | 14.5% | 14.2% | 14.5% | 14.1% |
| Gross margin | 82.7% | 83.5% | 83.8% | 83.3% | 83.3% | 84.0% | 82.8% | 85.1% | 85.0% | 84.2% | 84.6% | 84.6% | 85.5% | 85.2% | 85.0% |
| Operating margin cont. ops. | 29.8% | 27.5% | 32.5% | 29.8% | 29.9% | 36.8% | 31.7% | 37.1% | 33.0% | 34.6% | 38.0% | 36.4% | 39.0% | 36.4% | 37.4% |
| Net margin cont. ops. | 22.1% | 20.7% | 23.9% | 21.7% | 22.1% | 27.9% | 24.6% | 27.7% | 24.7% | 26.2% | 28.6% | 27.5% | 29.5% | 27.7% | 28.3% |
| Tax rate | 27.2% | 27.2% | 27.1% | 26.8% | 27.1% | 26.2% | 24.7% | 25.5% | 25.5% | 25.5% | 25.5% | 25.5% | 25.5% | 25.2% | 25.4% |
| **Year-over-year change** | | | | | | | | | | | | | | | |
| Net Revenue | 8.8% | 7.3% | 6.1% | 7.6% | 7.4% | 6.8% | 10.0% | 10.3% | 9.8% | 9.2% | 13.2% | 13.0% | 12.0% | 11.2% | 12.3% |
| Operating income cont. ops. | 21.9% | 11.4% | 23.5% | 3.7% | 14.4% | 32.0% | 26.5% | 26.2% | 21.6% | 26.4% | 16.9% | 29.8% | 17.6% | 22.6% | 21.4% |
| Net income cont. ops. | 30.5% | 21.4% | 30.3% | 19.5% | 25.3% | 34.5% | 30.9% | 27.7% | 25.3% | 29.4% | 16.1% | 26.1% | 19.4% | 24.8% | 21.5% |
| EPS | 31.3% | 21.3% | 29.5% | 18.0% | 24.3% | 31.7% | 30.1% | 27.5% | 27.4% | 29.3% | 18.2% | 24.9% | 19.5% | 22.9% | 21.3% |

Source: Company reports and ABN AMRO, Inc. estimates

# EXHIBIT 156

MOODY'S
INVESTORS SERVICE

# Rating Action: CORRECTION TO TEXT: MOODY'S DOWNGRADES HALLIBURTON'S LONG-TERM RATINGS TO Baa2; MAINTAINS NEGATIVE OUTLOOK (4TH PARAGRAPH; RATINGS FOR DRESSER INDUSTRIES ARE NOT ON REVIEW FOR POSSIBLE FURTHER DOWNGRADE.)

Global Credit Research - 23 Jan 2002

Moody's downgraded the senior unsecured debt rating of Halliburton Company to Baa2 from A3 based on the current pressure on the company's share price and the reduction in its financial flexibility as a result of recent adverse asbestos-related jury verdicts. The rating downgrade also reflects Moody's concern that the rating triggers in the company's bank credit agreements will increase its reliance on alternative financing arrangements as part of its liquidity risk insurance. Moody's is maintaining a negative outlook on Halliburton's ratings in light of the risk that the company's asbestos-related costs could rise in the future.

Moody's noted that Halliburton has maintained a solid track record in managing its claims despite the recent adverse jury verdicts, that it has substantial insurance coverage, and that its asbestos-related liabilities have not altered its business prospects. The company currently has a large cash balance and a highly discretionary capital budget, and its credit quality remains strong. However, Halliburton faces significant legal risk, which raises its default probability and expected loss levels above those implied by its solid financial position.

Ratings downgraded are Halliburton Company's senior unsecured debentures, notes, and medium-term notes to Baa2 from A3; its shelf registration for senior unsecured debt to (P)Baa2 from (P)A3; its shelf registration for subordinated debt to (P)Baa3 from (P)Baa1, and its shelf registration for preferred stock to (P)Ba1 from (P)Baa2. Also downgraded are the senior unsecured notes and debentures of Dresser Industries, Inc. to Baa2 from A3 and the guaranteed senior notes issued by Baroid Corporation to Baa2 from A3. Halliburton's Prime-2 ratings for commercial paper and for extendible commercial notes were not under review.

Several of Halliburton's subsidiaries, particularly Dresser Industries and Kellogg Brown & Root, are defendants in a large number of asbestos-related lawsuits. The number of open claims pending against these entities has risen substantially over the past year. Halliburton recently took over the defense of claims previously defended by Harbison-Walker, a former subsidiary.

Halliburton's accrued liability for known asbestos claims currently stands at $125 million, reflecting its strong track record in defending its asbestos claims. However, the recently announced adverse jury verdicts, and the unusual size of the judgements, might ultimately lead to higher settlement amounts. Also, recent bankruptcy filings have reduced the number of companies that law firms active in asbestos litigation can target, which could make law firms more aggressive in looking for plaintiffs against other companies. This could potentially result in a substantial rise in the number of asbestos claims filed against Halliburton and others. Another concern is the risk that outstanding asbestos claims relating to Harbison-Walker (in which Halliburton has been named a defendant) will turn out to be materially higher than expected.

Halliburton has a $350 million 364-day revolving credit agreement due August 15, 2002 and a $350 million 5-year revolving credit facility. There are currently no outstandings under these facilities. Borrowings are subject to a MAC clause concerning litigation events arising after the date of the credit agreements, and to Halliburton maintaining investment-grade senior unsecured long-term debt ratings. A breach of the requirement to maintain investment-grade ratings would also constitute an event of default under the agreements. Moody's believes the MAC clause and rating triggers weaken the liquidity risk insurance supporting Halliburton's short-term obligations, including its commercial paper.

Headquartered in Dallas, Texas, Halliburton Company is one of the world's largest diversified energy services, engineering, maintenance, and construction companies.

MOODY'S INVESTORS SERVICE

© 2014 Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

**CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATION") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. MOODY'S PUBLICATIONS MAY ALSO INCLUDE QUANTITATIVE MODEL-BASED ESTIMATES OF CREDIT RISK AND RELATED OPINIONS OR COMMENTARY PUBLISHED BY MOODY'S ANALYTICS, INC. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL, WITH DUE CARE, MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.**

MOODY'S CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT INTENDED FOR USE BY RETAIL INVESTORS AND IT WOULD BE RECKLESS FOR RETAIL INVESTORS TO CONSIDER MOODY'S CREDIT RATINGS OR MOODY'S PUBLICATIONS IN MAKING ANY INVESTMENT DECISION. IF IN DOUBT YOU SHOULD CONTACT YOUR FINANCIAL OR OTHER PROFESSIONAL ADVISER.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the

information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process or in preparing the Moody's Publications.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability to any person or entity for any indirect, special, consequential, or incidental losses or damages whatsoever arising from or in connection with the information contained herein or the use of or inability to use any such information, even if MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers is advised in advance of the possibility of such losses or damages, including but not limited to: (a) any loss of present or prospective profits or (b) any loss or damage arising where the relevant financial instrument is not the subject of a particular credit rating assigned by MOODY'S.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability for any direct or compensatory losses or damages caused to any person or entity, including but not limited to by any negligence (but excluding fraud, willful misconduct or any other type of liability that, for the avoidance of doubt, by law cannot be excluded) on the part of, or any contingency within or beyond the control of, MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers, arising from or in connection with the information contained herein or the use of or inability to use any such information.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

For Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of

section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail clients. It would be dangerous for "retail clients" to make any investment decision based on MOODY'S credit rating. If in doubt you should contact your financial or other professional adviser.

# EXHIBIT 157

# Global Equity Research

UBS Warburg

January 24, 2002 | Oilfield Services and Equipment | United States

## Halliburton Co (HAL) — Hold

### Key Statistics

| | |
|---|---|
| Price | $10.80 |
| 52-Wk Range | $49-10 |
| Price Target | $24.00 |
| Return Pot'l. | 126.8% |
| Mkt. Cap(MM) | $4,644 |
| Sh. Out.(MM) | 430.0 |
| Float | 100% |
| Inst. Hldgs. | 76.9% |
| Avg. Volume(K) | 10,850 |
| Curr.Div./Yield | $0.50/4.6% |
| Sec.Grwth.Rate | NA |
| Convertible? | No |
| Debt/Capital | 24.0% |
| TEV(MM) | $6,093 |

### Quarterly Earnings Per Share (fiscal year ends December)

| | 2001A | 2002E | *Prev* | 2003E | *Prev* |
|---|---|---|---|---|---|
| 1Q | $0.20 | $0.25 | *$0.31* | | |
| 2Q | 0.33 | 0.21 | *0.27* | | |
| 3Q | 0.42 | 0.28 | *0.36* | | |
| 4Q | 0.33 | 0.34 | *0.43* | | |
| **Year** | **$1.28** | **$1.07** | ***$1.38*** | **$1.50** | ***$1.70*** |
| FC Cons.: | $1.29 | $1.19 | | NA | |
| P/E: | 8.4x | 10.1x | | 7.2x | |
| Revs.(MM): | $13,046 | $12,676 | | $13,838 | |
| EBITDA(MM): | $1,652 | $1,423 | | $1,719 | |
| TEV/EBITDA: | 3.7x | 4.3x | | 3.5x | |

Halliburton, through subsidiaries, provides services and products for the exploration, development and production segments of the petroleum industry; and provides engineering, construction, project management, facilities operation and maintenance for industrial and governmental customers.

Source: UBS Warburg LLC and First Call consensus estimates

## Haliburton: 4Q:01 Earnings Review and 2002 Outlook

### Summary and Action

- Halliburton reported EPS of $0.33, in line with our estimate of $0.33 and the Street consensus of $0.33.
- The quarter was mostly affected by a decline in North American revenues due to the decline in drilling activity compounded by declining prices for pressure pumping. In addition, the Subsea/Surface segment of Energy Services posted a large loss.
- Oilfield service revenues were $2.2 billion and EBIT margins were 10.5% versus $2.3 billion and 13.9% last quarter and $2.0 billion and 9.6% a year-ago.
- The outlook for Halliburton is for a weaker first half in 2002 due to the lower rig count in North America. We are reducing our 2002 forecast to reflect softer margins than previously anticipated.
- The cloud of uncertainty hanging over Halliburton with regard to the magnitude of its asbestos liability remains firmly in place and we are extremely cautious and diligent in monitoring this aspect of their business. In this regard, management's comments about its settlement trends, filing trends, and trial outcomes are moderately encouraging.

**James Stone**
+1 212 713 1467
james.stone@ubsw.com
**David Wright, Associate Analyst**
+1 212 713 1342
david-m.wright@ubsw.com

### Valuation



In addition to the **UBS Warburg** web site, **www.ubswarburg.com/researchweb,** our research products are available over third-party systems provided or serviced by: Bloomberg, First Call, I/B/E/S, IFIS, Multex, QUIC and Reuters. **UBS Warburg is a business group of UBS AG**

- The stock is currently valued at 6.2 times normalized EPS, which is roughly 68% below its 10-year historical average. HAL is the least expensive stock in our universe in terms of ongoing enterprise valuation. Asbestos clouds the issue.
- We are maintaining our Hold rating on the stock and our $24 price target, which is based on our normalized valuation model. However, the asbestos issue will likely keep the stock from our target for the foreseeable future.

## Additional Information

### Fiscal 1Q Results Review

- Halliburton revenues for the fourth quarter of 2001 were $3.2 billion and EBIT margins were 8.6% versus $3.4 billion and 10.1% last quarter and $3.2 billion and 6.3% last year. Energy Services Group revenues were $2.2 billion and EBIT margins were 10.5% versus $2.3 billion and 13.9% last quarter and $2.0 billion and 9.6% a year-ago. Engineering and Contruction revenues were $1.0 billion and EBIT margins were 6.1% versus $1.1 billion and 3.6% last quarter and $1.2 billion and 2.2% last year.
- Within the Energy Services Group, HES revenues increased 8% y-y to about $1.7 billion while operating income increased 46%. HES accounts for about 78% of the Energy Services Group's revenues. Landmark's revenues increased dramatically over last year and produced operating income, but not enough to offset a loss in the Subsea division. Subsea's revenues dropped 20% y-y and had an operating loss during the quarter.
- The company generated 66% of its revenues from international operations during the quarter, down from 67% last year. Energy Services saw increases in most product lines throughout almost all international areas. HES saw a decrease from Q3 levels only in North and Latin America. Landmark had a record year and saw increases in all geographic areas except the Middle East.
- The company took a $4 million dollar currency adjustment due to the Argentinian peso problems.
- At the end of the quarter, Halliburton had $1.5 billion in debt and had reduced its debt/capital ratio to 24%. Cash on hand at the end of the quarter was $290 million but that has increased to $600 million as of this note's date due to a reduction in working capital and the sale of the company's interest in European Marine Contractors.

### 2002 Earnings Outlook and Key Investment Issues

The earnings outlook for Halliburton is worse than we previously expected. Due to greater than expected margin pressure in the HES segment, Halliburton's earnings are likely to fall nearly 20% from 2001 levels even accounting for the $0.10 improvement from the elimination of goodwill amortization. Our estimate for 2002 is now $1.07 down from $1.38 and our 2003 forecast falls to $1.50 from $1.70

Our estimates continue to reflect our belief that global capital spending will decline by about 6% this year, which includes a 20% reduction in U.S. upstream spending. The expected decline in the U.S. will have a significant impact on Halliburton's oilfield services business, which derives close to 40% of its revenue from the U.S. market. In addition to the volume pressures that are anticipated in 2002, we also expect that pricing for services will continue to weaken relative to the 2001 levels. There is already considerable evidence that price in the core pressure pumping segment have eroded by at least 5% since last summer and should fall further from here.

Offsetting some of the decline in the U.S. oilfield market should be improved results from Halliburton's international oilfield operations and improved results from the Engineering & Construction related businesses. On the international front, we expect that overall international spending will be flat with 2001 levels, but even in a flat spending environment Halliburton should be able to generate modest revenue growth and margin expansion. On the E&C side of the business, it appears that Halliburton's business is finally emerging from several lean years. Since 1998 E&C operating profits have fallen from $237million to $143 million. The sharp fall in profits has come from a combination of declining revenues and tighter margins. During the past 12 months, Halliburton has been quite successful in signing new contracts in the E&C sector, particularly for projects related to international natural gas projects. At year-end the E&C backlog was $7.4 billion versus $6.0 billion a year-ago. In addition to a stronger backlog of work, the company's focus on restructuring the E&C operations and lowering costs should also bode well for margin improvement. In fact, while we expect margins to stay above 3% in 2002 this segment could actually become a source of positive surprises.

While Halliburton's earnings outlook is certainly important, it is clearly not the dominant investment issue surrounding the stock these days. The dominant issue is asbestos and the degree to which the company's exposure to asbestos litigation will impact the future viability and financial soundness of the company. In previous reports we have tried to quantify the company's potential future liability and its net present value. In this analysis, we used several sets of assumptions about the number of future claims and the cost to settle or dispose of each claim. The results of that analysis had led us to believe that the company's asbestos liability did not represent a threat to the financial viability of the firm and that the stock market was placing too large a discount on the share price for the future liability. That was before the company was hit with judgments or jury verdicts in four separate cases totaling $150 million or about $3 million per plaintiff. The sheer size of these awards was enough for us to step back and reevaluate our methodology and our conclusions. It also confirmed for us that this problem is potentially much larger and more intractable than we had assumed.

Since early December, we have continued to research asbestos issues, particularly those that relate to litigation and bankruptcy to better understand what options Halliburton has to try to resolve its asbestos problems, at least in the eyes of investors. At this point, we still believe that a bankruptcy filing for former Dresser subsidiary Harbison-Walker (currently up for sale from current owner RHI AG) would be a significant positive for Halliburton. Beyond this event, Halliburton would obviously benefit from Federal tort reform legislation that included or focused on asbestos. However, we do not believe that this will occur during the current election year, but could emerge in 2003 as a significant possibility, especially since so many other "non-traditional" asbestos defendents (Dow Chemical, 3M, Viacom, Georgia-Pacific, among others) are seeing their shares decline due to investor perceptions about asbestos liabilities. Other potential positives could include a string of litigation victories, a sharp drop in claims outstanding, and a victory for Halliburton in its appeal of its litigation against Highlands Insurance (former subsidiary). However, investors are likely to remain nervous about the "headline risk" of another significant jury verdict or lost appeal for the foreseeable future. This nervousness will manifest itself in a volatile stock price with limited upside.

Management gave a detailed review of its asbestos litigation information. Its comments focused on its settlement, filing, and trial outcome trends during the fourth quarter and full year 2001. New claims totaling 13,800 were filed in the quarter but this includes 4,400 claims related to Harbison-Walker. Management indicated that Haribison related claims were 3,500 in the third quarter, but the Halliburton claims filed in the third quarter were 11,000. Halliburton does not have Harbison quarterly claims data prior to the third quarter. This was the second quarter in a row that claims filed decreased, giving credence to the theory that filing rates peaked in the first half of 2001. During the quarter, Halliburton also settled about 7,000 claims for an average settlement cost of $720 per claim of which insurance covered all but $220. The company gave settlement data for all of 2001 and broke out its litigation results from its settlement figures to give investors an idea regarding the magnitude of cases that actually end up going before a judge. Of the 36,000 cases settled in 2001 only 52 made it into court: 35 were dismissed with summary judgment, 17 more went to trial. Of the 17, Halliburton won 11 and lost two for less than $5 million each and lost four for a total of $150 million. The losses are all on appeal and the company continues to believe that all the recent negative verdicts will be significantly reduced or reversed. The company also maintains its posture of being willing to try cases where it believes unreasonable settlement claims are being made. At the end of the year, 274,000 claims were outstanding, including the Harbison-Walker related cases.

### Valuation Analysis – Asbestos Clouds Halliburton's Valuation

Given the overhang of the concerns regarding asbestos, it is difficult to look at the valuation of Halliburton on a standalone basis. If one were to exclude the wide ranging guesses as to the magnitude of the company's exposure to asbestos litigation, one would easily conclude that Halliburton shares are at all-time lows in terms of our valuation metrics. For example the stock is currently trading at 6.2 times normalized EPS versus a ten-year average of 19.4 times and prior to the last two months, a 10-year low normalized P/E of 6.3 times (in 1992). Even compared to projected EPS for 2002, the stock appears to be very inexpensive.

The current normalized EV/EBITD multiple is 3.2 times and this compares to a historical average of 8.1 times. Using our estimate of EBITD for 2002, the EV/EBITD multiple is 4.3 times compared to a peer group average of 11.1 times. In fact, if Halliburton shares were to trade without the asbestos liability, it is likely that the share price would be closer to $30 per share in the current environment. Therefore, the current market discount for Halliburton's asbestos problems is around $20 per share or a whopping $8.6 billion.

## Investment Conclusion

In the past six months, Halliburton shares have been under nearly constant pressure as investors first soured on the outlook for oilfield service companies and then really hammered the stock based on perceptions that Halliburton's asbestos related liabilities would be building to a point that threatened Halliburton's financial viability. We do not agree that Halliburton's viability is really in question, but we do understand where the concern and the fear comes from and we also understand the reluctance of investors to make a bet on an issue that is so difficult to game as asbestos. Based on the known risks and liabilities, we think that Halliburton shares are significantly undervalued, but we retain our Hold rating due to our inability to quantify the unknown risks and future liabilities that could arise from pending asbestos related litigation.

## Statement of Risk

In our opinion, the major risks for Halliburton are as follows: 1) oil and gas prices turn out to be substantially below our current expectations; 2) oil company exploration and development spending does not live up to our expectations of 10–15% growth per year; 3) service industry cost increases outpace price improvements causing undue margin pressure; 4) oilfield valuations, remain mired below historical normal levels; and 5) Halliburton's asbestos liabilities are significantly larger than our estimates, which could cause the company to significantly increase its provisions and perhaps strain its future liquidity.

### Table 1: Halliburton Income Statement

*(Earnings exclude all extraordinary and one-time gains and losses.*

| | 2001 | | | | 2002E | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Mar-01** | **Jun-01** | **Sep-01** | **Dec-01** | **Mar-02** | **Jun-02** | **Sep-02** | **Dec-02** | **1999** | **2000** | **2001** | **2002E** | **2003E** |
| **Segment Income Statements** | | | | | | | | | | | | | |
| Revenues | | | | | | | | | | | | | |
| Energy Services | 2031.0 | 2214.0 | 2309.0 | 2168.0 | 2002.2 | 1786.2 | 2066.3 | 2331.3 | 6994.0 | 6776.0 | 8722.0 | 8186.1 | 9258.3 |
| Engineering & Construction | 1113.0 | 1125.0 | 1082.0 | 1004.0 | 1077.6 | 1032.7 | 1167.4 | 1212.3 | 5314.0 | 5168.0 | 4324.0 | 4490.0 | 4579.8 |
| Energy Equipment | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2585.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total revenues** | **3144.0** | **3339.0** | **3391.0** | **3172.0** | **3079.8** | **2818.9** | **3233.8** | **3543.6** | **14893.0** | **11944.0** | **13046.0** | **12676.1** | **13838.2** |
| Operating Income | | | | | | | | | | | | | |
| Energy Services | 200.0 | 267.0 | 321.0 | 227.0 | 196.0 | 166.6 | 208.6 | 249.1 | 248.6 | 582.0 | 1015.0 | 820.4 | 1080.3 |
| Engineering & Construction | 18.0 | 25.0 | 39.0 | 61.0 | 32.3 | 31.0 | 40.9 | 42.4 | 203.7 | 151.0 | 143.0 | 146.6 | 183.2 |
| Energy Equipment | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 249.7 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other | -20.0 | -20.0 | -18.0 | -16.0 | -20.0 | -20.0 | -20.0 | -20.0 | -71.0 | -69.0 | -74.0 | -80.0 | -85.0 |
| **Total operating income** | **198.0** | **272.0** | **342.0** | **272.0** | **208.3** | **177.6** | **229.5** | **271.6** | **631.0** | **664.0** | **1084.0** | **887.0** | **1178.5** |
| Operating Margins (%) | | | | | | | | | | | | | |
| Energy Services | *9.8* | *12.1* | *13.9* | *10.5* | *12.0* | *11.6* | *12.2* | *12.8* | *3.6* | *8.6* | *11.6* | *10.0* | *11.7* |
| Engineering & Construction | *1.6* | *2.2* | *3.6* | *6.1* | *3.0* | *3.0* | *3.5* | *3.5* | *3.8* | *2.9* | *3.3* | *3.3* | *4.0* |
| Energy Equipment | *NM* | *NM* | *NM* | *NM* | *0.0* | *0.0* | *0.0* | *0.0* | *9.7* | *NM* | *NM* | *0.0* | *0.0* |
| Total operating margin (%) | *6.3* | *8.1* | *10.1* | *8.6* | *6.8* | *6.3* | *7.1* | *7.7* | *4.2* | *5.6* | *8.3* | *7.0* | *8.5* |
| Depr.& Amort. (not for calc.) | 142.0 | 142.0 | 143.0 | 141.0 | 133.0 | 134.0 | 134.0 | 135.0 | 599.0 | 528.0 | 568.0 | 536.0 | 540.0 |
| Interest expense | -47.0 | -34.0 | -34.0 | -32.0 | -31.6 | -31.6 | -31.6 | -31.6 | -144.0 | -146.0 | -147.0 | -126.5 | -126.5 |
| Interest income | 4.0 | 6.0 | 8.0 | 9.0 | 7.3 | 8.5 | 9.1 | 8.8 | 76.0 | 25.0 | 27.0 | 33.7 | 47.1 |
| Foreign currency gains (losses) | -3.0 | -1.0 | -2.0 | -4.0 | -1.3 | -1.3 | -1.3 | -1.3 | -8.0 | -5.0 | -10.0 | -5.0 | 0.0 |
| Asset sales/writedowns gain (loss) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other nonoperating income (loss) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7.0 | -1.0 | 0.0 | 0.0 | 0.0 |
| Income before tax & minority int. | 152.0 | 243.0 | 314.0 | 245.0 | 182.8 | 153.2 | 205.7 | 247.4 | 562.0 | 537.0 | 954.0 | 789.1 | 1099.1 |
| Income taxes | 61.0 | 98.0 | 126.0 | 99.0 | 70.4 | 59.0 | 79.2 | 95.3 | 220.0 | 174.0 | 384.0 | 303.8 | 428.7 |
| Tax rate (%) | *40.1%* | *40.3%* | *40.1%* | *40.4%* | *38.5%* | *38.5%* | *38.5%* | *38.5%* | *39.1%* | *32.4%* | *40.3%* | *38.5%* | *39.0%* |
| Minority interest | -5.0 | -2.0 | -7.0 | -5.0 | -6.0 | -6.0 | -6.0 | -7.0 | -43.0 | -19.0 | -19.0 | -25.0 | -25.0 |
| Income before accounting changes | 86.0 | 143.0 | 181.0 | 141.0 | 106.4 | 88.2 | 120.5 | 145.2 | 299.0 | 344.0 | 551.0 | 460.3 | 645.5 |
| Cum. effect of acctg. changes | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | -19.0 | 0.0 | 1.0 | 0.0 | 0.0 |
| Extra. items & discon. Ops. | 22.0 | 239.0 | -2.0 | -2.0 | 0.0 | 0.0 | 0.0 | 0.0 | 158.0 | 244.0 | 257.0 | 0.0 | 0.0 |
| Net income (loss) | **109.0** | **382.0** | **179.0** | **139.0** | **106.4** | **88.2** | **120.5** | **145.2** | 438.0 | 588.0 | 809.0 | 460.3 | 645.5 |
| **Per Share Data, Diluted** | | | | | | | | | | | | | |
| **EPS, operations** | **0.20** | **0.33** | **0.42** | **0.33** | **0.25** | **0.21** | **0.28** | **0.34** | **0.67** | **0.77** | **1.28** | **1.07** | **1.50** |
| Extra. items & discon. ops | 0.05 | 0.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.55 | 0.60 | 0.00 | 0.00 |
| **EPS, reported** | **0.25** | **0.89** | **0.42** | **0.32** | **0.25** | **0.21** | **0.28** | **0.34** | **0.99** | **1.32** | **1.88** | **1.07** | **1.50** |
| Dividend per share | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 |
| Basic shares outstanding | 426.0 | 427.0 | 428.0 | 429.0 | 429.0 | 429.0 | 429.0 | 429.0 | 440.5 | 441.5 | 427.5 | 429.0 | 429.0 |
| Diluted shares outstanding | 430.0 | 430.0 | 429.0 | 430.0 | 430.0 | 430.0 | 430.0 | 430.0 | 443.5 | 444.8 | 429.8 | 430.0 | 430.0 |
| EBIT | 198.0 | 272.0 | 342.0 | 272.0 | 208.3 | 177.6 | 229.5 | 271.6 | 631.0 | 664.0 | 1084.0 | 887.0 | 1178.5 |
| EBITD | 340.0 | 414.0 | 485.0 | 413.0 | 341.3 | 311.6 | 363.5 | 406.6 | 1230.0 | 1192.0 | 1652.0 | 1423.0 | 1718.5 |
| Operating cash flow per share | 0.53 | 0.66 | 0.76 | 0.66 | 0.56 | 0.52 | 0.59 | 0.65 | 2.02 | 1.96 | 2.60 | 2.32 | 2.76 |

Source: UBS Warburg and company financials.

**UBS Warburg LLC, 1285 Avenue of the Americas, New York, NY 10019 Phone: +1-212-713-2000**

This material has been prepared by a group, subsidiary or affiliate of UBS AG ("UBS"). UBS Warburg is a business group of UBS AG. It has no regard to the specific investment objectives, financial situation or particular needs of any specific recipient. This material is based on information obtained from sources believed to be reliable but no independent verification has been made, nor is its accuracy or completeness guaranteed. This report is published solely for informational purposes and is not to be construed as a solicitation or an offer to buy or sell any securities or related financial instruments. Opinions expressed herein are subject to change without notice and UBS is under no obligation to update or keep the information current. The securities described herein may not be eligible for sale in all jurisdictions or to certain categories of investors. UBS and/or its directors, officers and employees or clients may take positions in, and may make purchases and/or sales as principal or agent or UBS may act as market-maker in the securities or related financial instruments discussed herein. UBS may provide corporate finance and other services to and/or serve as directors of the companies referred to in this report. UBS accepts no liability for any loss or damage of any kind arising out of the use of this report. United Kingdom and rest of Europe: Except as otherwise specified herein, this material is communicated by UBS Warburg Ltd., a subsidiary of UBS AG, to persons who are market counterparties or intermediate customers (as detailed in the FSA Rules) and is only available to such persons. The information contained herein does not apply to, and should not be relied upon by, private customers. US: This report is being distributed to US persons by either UBS Warburg LLC or UBS PaineWebber Inc., subsidiaries of UBS AG, or by a group, subsidiary or affiliate of UBS AG, that is not registered as a US broker-dealer (a "non-US affiliate"), to major US institutional investors only. UBS Warburg LLC or UBS PaineWebber Inc. accepts responsibility for the content of a report prepared by another non-US affiliate when distributed to US persons by UBS Warburg LLC or UBS PaineWebber Inc. Canada: This report is being distributed by UBS Bunting Warburg Inc., a subsidiary of UBS AG and a member of the principal Canadian stock exchanges & CIPF. Singapore: This report is being distributed in Singapore by UBS Warburg Pte. Ltd. For investment advice or trade execution please contact your local sales representative. Additional information will be made available upon request.

© 2002 UBS AG . All rights reserved. This report may not be reproduced or distributed in any manner without the permission of UBS.

# EXHIBIT 158

SunTrust Robinson Humphrey℠
Capital Markets
A Division of SunTrust Capital Markets, Inc.

**Diversified Growth**

# Halliburton Company

## Answering Asbestos Questions

January 28, 2002

Rating
**BUY (1H)**

NYSE
**HAL-$10.80**

| Price and Trading Data | | Projections | 12/00A | 12/01A | 12/02E |
|---|---|---|---|---|---|
| 52-Week Range | $49-$9 | Revenues (bil.) | $13.3 | $13.0 | $12.4 |
| Market Cap. (bil.) | $46.4 | Pre-tax Inc. (bil.) | $0.6 | $1.0 | $0.8 |
| Shares Out. (mil.) | 430.0 | EPS | $0.80 | $1.28 | $1.05 |

- We believe the discount for outstanding asbestos liability on HAL shares is overdone. With a healthy balance sheet and strong cash flow we believe HAL is well positioned to absorb the liabilities without material adverse financial implications.
- We believe there is ultimately $27-$35 per share of going concern value in HAL shares if the current asbestos claims can be settled in line with 25 years of historic experience. Trading at historically low valuation levels, we recommend HAL shares for investors with relatively high-risk tolerance looking to invest in a leader in the oil service sector.
- In the following report, we examine the key investment issues surrounding the litigation that has caused HAL's stock price to fall 79% from the one-year high, creating what we believe is a compelling investment opportunity.

??

**Oilfield Services**

**Thomas Escott, CFA**
(404) 926-5159
thomas_escott@rhco.com

**Carrie Montague**
(404) 926-5154
carrie_montague@rhco.com

# Halliburton at a Glance

| Price and Trading Data | | Projections | 12/00A | 12/01A | 12/02E |
|---|---|---|---|---|---|
| Stock Price (1/23/02) | $10.80 | Revenues (bil.) | $13.3 | $13.0 | $12.4 |
| 52-Week Range | $49-$9 | Pre-tax Inc. (bil.) | $0.60 | $1.0 | $0.79 |
| Market Cap. (bil.) | $46.4 | EPS: Q1 | $0.11 | $0.20 | $0.24 |
| Shares Out. (mil.) | 430.0 | Q2 | $0.17 | $0.33 | $0.23 |
| Avg. Daily Volume (000) | 5,461 | Q3 | $0.24 | $0.42 | $0.26 |
| Avg. Daily $ Volume (000) | $58,978.8 | Q4 | $0.28 | $0.33 | $0.32 |
| Estimated Float | 100% | Full Year | $0.80 | $1.28 | $1.05 |
| Institutional Holdings | 76% | First Call Consensus | $0.80 | $1.28 | $1.19 |
| Dividend/Yield | $0.50/5.0% | Projected Five-Year Growth | | | 15% |

**Balance Sheet Highlights as of September 30, 2001 (mil.)**

| | | | |
|---|---|---|---|
| Cash and Equivalents | $227.0 | Current Liabilities | $2,777.0 |
| Net Receivable | $4,215.0 | Long-Term Debt | $1,470.0 |
| Net PP&E | $2,569.0 | Shareholders' Equity | $4,597.0 |
| Total Assets | $10,692.0 | Total Liabilities & SE | $10,692.0 |

| Financials | | Valuation | | | |
|---|---|---|---|---|---|
| Book Value/Share | $10.71 | Price/Earnings | 13.5x | 8.4x | 10.3x |
| Cash/Share | $0.52 | P/E to Growth Rate | 90% | 56% | 69% |
| LTD/Capitalization | 24% | Ent. Value/EBITDA | NA | NA | NA |
| ROE | 8% | Mkt. Cap./Revenue | 3.5x | 3.6x | 3.7x |

**Company Description**

Halliburton was founded in 1919 and is currently based in Dallas, Texas. Following the 1998 merger with Dresser Industries, Halliburton became the largest oil services company in the world, with operations in 120 countries worldwide. HAL is the leading diversified energy services, engineering, construction, maintenance and energy equipment company.

**Investment Opinion**

(1) We estimate that the outstanding asbestos liability, net of insurance coverage on an after-tax basis, is only $0.18 per share. At year end with $600 million in cash, $2.7 billion in working capital, and a debt-to-capitalization ratio of 24%, we believe HAL is well positioned to absorb the outstanding liabilities without material adverse financial implications.

(2) In the December quarter, the number of new asbestos claims filed was down for the second consecutive period and total claims outstanding were up only 2%. In addition, of the 201,000 claims settled in the last 20 years, the average settlement rate is only $200 per claim after insurance coverage. We believe this indicates that the asbestos liability has been contained and has not gotten out of control as investors may have feared.

(3) Trading at a nearly 50% discount to other large-cap energy players, we believe the discount on HAL shares for the asbestos liability is excessive. In fact, HAL shares are trading at a 60% discount to the company's 10-year average trading range. As a result, we maintain our BUY (1H) rating on HAL shares for investors with relatively high risk tolerance looking to invest in a leader in the oil service sector.

**Competitors**

Schlumberger
Baker Hughes
BJ Services

**Revenue Breakdown (2002E)**

| | |
|---|---|
| Energy Services | 67% |
| Engineering & Construction | 33% |

**Stock Price Performance (FactSet)**



## Answering Asbestos Questions

With Halliburton stock price down 79% from the one-year high and down 55% in just a month over the swirling controversy regarding asbestos litigation, we think it is important to examine the key investment issues. We have chosen the narrative question and answer format, as it reflects the range of questions investors are asking. We believe this is what they really want to know.

We are not dismissing the possible risks and we certainly offer no legal expertise on the issues. We do, however, offer a seasoned analysis of the factors that have depressed HAL stock to the lowest level in over a decade. Our conclusion is that asbestos fear has wiped out as much as $10 billion of after-tax equity value for a liability that could ultimately be only a fraction of that amount. We show how the company has already dealt with a lawsuit much greater than this and emerged successful and stronger than ever before. Accordingly, we continue to recommend HAL shares for investors who can tolerate the risk. We believe there is ultimately at least $27-$35 per share of going concern value and that this valuation can be realized if the current asbestos claims can be settled in line with the 25 years of historic experience.

***What are HAL shares worth excluding the asbestos problem?***

In order to estimate the stock's value excluding the outstanding liability, we use other large-cap, diversified oil service providers in the industry as comparables (Baker Hughes, BJ Service, and Schlumberger). These companies trade at an average of 26.0 times 2002 P/E estimates and 11.6 times 2002 projected P/EBITDA and over three times book value. Applying these comparable multiples to our reduced 2002 EPS and EBITDA estimates for HAL, we derive a $27 to $35 going concern value for Halliburton shares excluding the asbestos liability.

***What is the implied stock market discount due to the asbestos?***

HAL shares have traded in the $10 to $12 range since the first of the year. According to our estimate above, this implies at least a $17-$24 per share, or $7 billion -$10 billion discount on the stock due to fear of asbestos liability. This is significantly more than the stated value of the liability in the company's 10-K filing and is twice the book value of the entire company.

***How much is the estimated asbestos liability? How much insurance coverage do they have?***

Wrong # ??

At the end of the December quarter, the company disclosed that there were 149,000 open asbestos claims still outstanding. The value of these claims, based on historical settlement rates, is estimated to total $737 million. Of this total, insurance is estimated to cover $612 million, resulting in a modest $125 million or $0.18 per share after-tax liability for HAL. Note that this estimated asbestos liability is a fraction of the implied stock market discount we derived above. Since 1976, the company has resolved 200,000 claims with an average payment after insurance of $200 per claim. Note that of the claims outstanding, 95% of the people have no symptoms and are not sick. Only 5% of the plaintiffs are battling asbestos-related illness.

We believe that with $600 million in cash, $2.7 billion in working capital, and a debt-to-capitalization ratio of 24%, HAL is well positioned to absorb the outstanding liabilities without adverse financial implications.

***How did HAL get involved in asbestos to begin with?***

Halliburton became involved in asbestos claims through the acquisitions of Kellogg Brown & Root and Dresser Industries. Asbestos was used in several products manufactured by

Harbison-Walker, which Dresser acquired in 1967 and then spun off in 1992. At the time of the spin-off, Harbison-Walker was to assume liability for asbestos claims filed from that date forward, indemnifying Dresser from those claims, while Dresser retained responsibility for claims filed before the spin-off. As of September 30, 2001, there were approximately 7,000 open claims filed before the spin-off and 109,000 filed after the spin-off.

However, it has come to the attention of HAL that Harbison-Walker is no longer financially able to cover post-spin off claims. Because Dresser becomes liable for claims that are not indemnified by Harbison-Walker, Dresser is pursuing its own defense when named as defendant in these cases. Dresser and Harbison-Walker are also engaged in litigation where Harbison-Walker has claimed that Dresser and Halliburton have breached the spin-off agreement and insurance coverage-in-place agreements that had been established. Halliburton and Dresser asked that this suit be dismissed and has asked that arbitration be conducted according to the original agreement. In addition, Dresser has filed a lawsuit to protect its insurance coverage against attempts by Harbison-Walker to fraudulently access and erode coverage that both companies can access for these claims.

It is worth noting that the facilities cited in the suits have been closed for over 25 years. The alleged problems and asbestos exposure happened more than 25 years ago.

Claims from the company's Engineering & Construction group are from businesses formerly operated by the M.W. Kellogg Company and Brown & Root, Inc., now combined as Kellogg Brown & Root. As of the end of the September quarter, there were 30,000 open and unresolved claims alleging injury from asbestos in materials used in construction and maintenance projects. The primary coverage for these claims was written by Highlands Insurance Company, formerly a HAL subsidiary that was spun off in 1996. In April 2000, Highlands filed a lawsuit claiming the insurance it wrote that had covered Brown & Root was terminated at the time of the Highlands spin-off. The lower court ruled that Highlands was not obligated to provide such coverage, but HAL is in the process of appealing the ruling and anticipates a reversal of the ruling in 2002.

***How could this problem get worse?***

If we accept the notion that the stock market has wiped out $7 billion -$10 billion of equity value for a liability of $125 million - $737 million, depending on insurance, then clearly investors fear the problem could get much bigger. First, this could occur with an escalation in claims. 9,400 new claims were filed in the December 2001 quarter (down 28% from the September quarter) and at the end of the period there were a total 149,000 claims outstanding. Although new claims have fallen for two consecutive quarters, new claims could escalate if attorneys are emboldened by recent jury awards.

Second, there is the risk of additional multi-million dollar jury awards. HAL has acknowledged that numerous claims are currently at trial. If other juries render similar $20 million -$50 million awards in several more suits, it could increase the risk and perception of asbestos liability spiraling out of control.

Third, some investors fear that the company could file Chapter 11 in order to avoid financial liability for the claims. We will not attempt to analyze whether that would be a good strategy or not. However, HAL President Dave Lesar has stated publicly that they do not contemplate such action at this time, so Chapter 11 appears not to be an option. The stock rallied after the denial was issued.

***With all the asbestos gloom, can anything positive happen?***

Despite the widespread investor focus on the worst of the asbestos problem, we believe there are several potential events that would be perceived as more positive this year. First, if HAL continues to show that total claims and potential dollar liability remained steady and has not escalated significantly, investors may become more confident that the asbestos claims remain manageable.

Second, any resolution of the disputed insurance responsibility, whether with the Highlands or others, could offer more assurance that HAL may not carry an unbearable financial burden. HAL stock jumped almost $1.00 per share when a New Orleans court ruled in favor of McDermott International, another energy services company with outstanding asbestos claims. The court ruled against insurance underwriters attempting to annul agreements that obligate coverage for asbestos claims.

Third, if any of the four recent multi-million-dollars court awards are settled for much smaller amounts, it could alleviate the fear that $20 million - $50 million judgments are normal. Clearly, although it could be several years away, if any of these are overturned on appeal, it would be seen as a victory for HAL. The company is vigorously defending these suits and believes there are good reasons for the awards to be reversed on appeal.

Halliburton's track record in court has been very good. In 2001, the company settled 36,000 claims at just over $200 per claim. HAL had 35 cases dismissed by the courts and 17 went to trial. Of these 17, HAL won 11, lost two for small amounts, and lost four that are currently being appealed. The total losses appear quite a small percent of the total claims settled.

In addition, any movement toward tort reform to limit product liability would be a big positive for HAL. *The Wall Street Journal* ran a feature editorial on January 23 noting how asbestos litigation is out of control. Perhaps the higher awareness could prompt some improvement toward curbing serious abuses of the legal system.

***If the claims are manageable, why are investors still selling the stock at depressed levels?***

Beyond the fear that the claims and lawsuits could escalate substantially, many investors appear to be selling just to avoid the lingering uncertainty. Some investors hold the view that even if the oil service group rebounds this year in an economic recovery with higher energy prices and drilling activity, Halliburton stock price could lag behind, dogged by continuing uncertainty about asbestos. We believe this fear has been exacerbated by the fallout from the Enron debacle. It appears that institutions that lost millions in Enron are less willing to risk the potential loss in other stocks with widely known problems, such as asbestos. This view is often reflected in the comment, "I can only own five or six stocks in this group. Why do I need to own Halliburton?"

***Has HAL ever dealt with major litigation before? How was it resolved?***

Yes, 20 years ago, HAL faced a lawsuit much larger than they have today and it was ultimately settled with no lasting negative effects.

In 1981, HAL was sued for $6.3 billion by Houston Lighting & Power and others for cost overruns and other charges on construction of a nuclear power plant called the South Texas Nuclear Project. Litigation was brought under the Texas Deceptive Trade Practices Act, which allowed for triple damages, or over $18 billion. At the time, $6.3 billion represented twice the book value of the entire company.

HAL contested the suit, and four years later, settled for $750 million of pre-tax payments to be paid over a seven-year period. In 1985, the company took a $368 million net after-tax charge for the present value of an annuity to fund the settlement. This eventual charge represented just 6% of the original suit amount and just 11% of the book value of the company.

During the four-year litigation period, HAL's financial position remained strong. Debt was a modest 11%-17% of capital, the dividend was raised during three out of the four years, and the company bought back $320 million worth of stock. The stock price ranged from $5.25 to $13, split adjusted, during this period.

This narrative is not intended to compare the legal issues 20 years ago to today, but rather to illustrate that the company has faced far worse legal challenges in the past, has managed through them, and gone on to achieve new record performance thereafter.

## Recent Results

HAL reported December Q EPS of $0.33 vs. $0.28, two cents below our estimate but in line with the consensus estimate. The earnings decline from the previous September quarter was a result of lower Energy Services revenue and operating profit, as the Engineering & Construction segment posted near record high profitability despite lower segment revenue.

Total revenue decreased 6.5% sequentially to $3.2 billion, just below our forecast, with Energy Services accounting for 64% of the decline. Total operating profit fell 20.5% sequentially to $272 million, due entirely to margin erosion in Energy Services. Total operating profit margin fell from 10.1% in the September quarter to 8.6%. This was modestly below our forecast, with outperformance in Engineering Construction only partially offsetting weak Energy Services results.

***Energy Services Group***

Revenue was down 6.1% sequentially to $2.2 billion. The decline was due entirely to sluggish domestic activity, as revenue generated in the U.S. was down 21% while international revenue increased 6% compared to the September quarter. Total Energy Service revenue was 2.1% below our forecast.

With a relatively high fixed-cost base, operating profit declined more significantly than revenue, down 29.3% to $227 million, nearly 16% below our forecast. As a result, Energy Services operating profit margin fell 340 basis points to 10.5%. However, despite the significant sequential decline in profitability, Energy Services operating profit margin was 250 basis points higher than the previous year.

***Engineering & Construction***

Although Engineering & Construction revenue was down 7.2% from the September quarter and 7.0% below our forecast, operating profit increased 56.4% to $61 million. This represents a 6.1% operating profit margin, a 250 basis point sequential improvement on top of a 140 basis points improvement in the September quarter. Management indicated that this level of profitability is higher than normal and we should expect to see operating profit margin in the 3%-4% range in 2002.

## Outlook and Valuation

Although we are impressed by the outperformance of the Engineering & Construction segment in the December quarter, we believe the Energy Services revenue and profitability will continue to be under pressure for the next several periods with the continuing decline of domestic rig activity and low natural gas prices. As a result, we cut our 2002 EPS estimate from $1.30 to $1.05, forecasting sequential earnings reductions for the March and June quarters.

However, despite the earnings outlook reduction we believe the discount on HAL shares for the outstanding asbestos litigation is overdone. Even on our reduced 2002 EPS estimate, HAL shares trade at a 42% discount to our oil service universe and at a 50% discount to other large-cap names. In fact, HAL shares are trading at a 60% discount to the company's 10-year average trading range. We believe this discount is excessive relative to the estimated $0.18 per share after-tax asbestos liability. As a result, we maintain our BUY (1H) rating on HAL shares for investors with a relatively high risk tolerance looking to invest in a leader in the oil services sector.

## Figure 1: Consolidated Income Statement pro forma for Dresser merger

(In Millions)

| | 2000 A | | | | | 2001 A | | | | | 2002 E | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1-A | Q2-A | Q3-A | Q4-A | Year Total | Q1-A | Q2-A | Q3-A | Q4-A | Year Total | Q1 | Q2 | Q3 | Q4 | Year Total |
| REVENUES | | | | | | | | | | | | | | | |
| Energy Services | 1,723 | 1,897 | 2,021 | 2,275 | 7,916 | 2,031 | 2,214 | 2,309 | 2,168 | 8,722 | 2,035 | 2,020 | 2,070 | 2,185 | 8,310 |
| Engineering & Construction | 1,136 | 971 | 1,003 | 918 | 4,028 | 1,113 | 1,125 | 1,082 | 1,004 | 4,324 | 1,000 | 1,000 | 1,050 | 1,050 | 4,100 |
| Energy Equipment | 337 | 354 | 346 | 363 | 1,400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 3,196 | 3,222 | 3,370 | 3,556 | 13,344 | 3,144 | 3,339 | 3,391 | 3,172 | 13,046 | 3,035 | 3,020 | 3,120 | 3,235 | 12,410 |
| OPERATING PROFIT | | | | | | | | | | | | | | | |
| Energy Services | 62 | 107 | 145 | 183 | 497 | 200 | 267 | 321 | 227 | 1,015 | 180 | 175 # | 192 # | 232 | 779 |
| Engineering & Construction | 36 | 36 | 41 | 35 | 148 | 18 | 25 | 39 | 61 | 143 | 45 | 45 | 50 | 50 | 190 |
| Energy Equipment | 36 | 37 | 42 | 43 | 158 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| General corporate | (17) | (17) | (26) | (18) | (78) | (20) | (20) | (18) | (16) | (74) | (18) | (20) | (20) | (18) | (76) |
| TOTAL | 117 | 163 | 202 | 243 | 725 | 198 | 272 | 342 | 272 | 1,084 | 207 | 200 | 222 | 264 | 893 |
| INTEREST EXPENSE | 26 | 33 | 32 | 35 | 126 | 43 | 34 | 34 | 32 | 143 | 32 | 32 | 32 | 30 | 126 |
| OTHER INC (EXP) | (4) | 2 | 3 | (1) | 0 | (3) | 5 | 6 | 5 | 13 | 5 | 5 | 5 | 5 | 20 |
| PRETAX INCOME | 87 | 131 | 173 | 207 | 598 | 152 | 243 | 314 | 245 | 954 | 180 | 173 | 195 | 239 | 787 |
| INCOME TAX | 34 | 51 | 61 | 80 | 226 | 61 | 98 | 126 | 99 | 384 | 72 | 69 | 78 | 96 | 315 |
| TAX RATE | 39.1% | 38.9% | 35.3% | 38.6% | 37.8% | 40.0% | 40.3% | 40.1% | 40.4% | 40.3% | 40.0% | 40.0% | 40.0% | 40.0% | |
| NET INCOME | 53 | 80 | 112 | 127 | 372 | 91 | 145 | 188 | 146 | 570 | 108 | 104 | 117 | 143 | 472 |
| MINOR INT/ DISC OPS | (4) | (5) | (5) | (4) | (18) | (5) | (2) | (7) | (5) | (19) | (5) | (5) | (5) | (5) | (20) |
| NET INCOME | 49 | 75 | 107 | 123 | 354 | 86 | 143 | 181 | 141 | 551 | 103 | 99 | 112 | 138 | 452 |
| DILUTED SHARES OUTSTANDING | 444.0 | 449.0 | 450.0 | 435.0 | 444.5 | 430.0 | 430.0 | 429.0 | 430.0 | 429.8 | 430.0 | 430.0 | 430.0 | 430.0 | 430.0 |
| EPS | $0.11 | $0.17 | $0.24 | $0.28 | $0.80 | $0.20 | $0.33 | $0.42 | $0.33 | $1.28 | $0.24 | $0.23 | $0.26 | $0.32 | $1.05 |
| OPERATING PROFIT MARGIN | | | | | | | | | | | | | | | |
| Energy Services | 3.6% | 5.6% | 7.2% | 8.0% | 6.3% | 9.8% | 12.1% | 13.9% | 10.5% | 11.6% | 8.8% | 8.7% | 9.3% | 10.6% | 9.4% |
| Engineering & Construction | 3.2% | 3.7% | 4.1% | 3.8% | 3.7% | 1.6% | 2.2% | 3.6% | 6.1% | 3.3% | 4.5% | 4.5% | 4.8% | 4.8% | 4.6% |
| Energy Equipment | 10.7% | 10.5% | 12.1% | 11.8% | 11.3% | | | | | | | | | | |
| TOTAL | 3.7% | 5.1% | 6.0% | 6.8% | 5.4% | 6.3% | 8.1% | 10.1% | 8.6% | 8.0% | 6.8% | 6.6% | 7.1% | 8.2% | 7.2% |

Note: 2000 actual results include operations from the Energy Equipment segment. Estimates for 2001 do not include these operations.
Source: Company reports and SunTrust Robinson Humphrey Capital Markets estimates

## Figure 2: Oil Service Valuation Table

| Recommendation Fun | Risk | Tec | Company | FYE (Notes) | Symbol | Price Last | 1-Year Target | 2001 E EPS | 2001 E P/E | 2001 E EBITDA | 2001 E P/EBITDA | 2002 E EPS | 2002 E P/E | 2002 E EBITDA | 2002 E P/EBITDA | Shares (mm) | Market Cap. (mm) | 2002E Sales (mm) | Price/ Sales | Book Value | Price/ Bk Val |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DIVERSIFIED OIL SERVICE** | | | | | | | | | | | | | | | | | | | | | |
| 1 | M | 4 | BJ Services Co. | 9 | BJS | 28.79 | $38 | 2.05 | 14.0 | 3.90 | 7.3 | 1.25 | 23.0 | 2.64 | 10.8 | 160.8 | 4,631 | 1,930 | 2.4 | $8.45 | 3.4 |
| 1 | H | 4 | Halliburton | 12 | HAL | 10.80 | $20 | 1.28 | 8.4 | 3.60 | 3.7 | 1.05 | 10.3 | 3.60 | 3.7 | 429.0 | 4,633 | 13,900 | 0.3 | $10.72 | 1.0 |
| 3 | L | 4 | Schlumberger | 12 | SLB | 52.39 | – | 1.43 | 36.6 | 5.07 | 11.3 | 1.80 | 29.1 | 5.08 | 11.3 | 579.9 | 30,381 | 15,567 | 2.0 | $14.45 | 3.6 |
| AVERAGE | | | | | | | | | 19.7 | | 7.4 | | 20.8 | | 8.6 | | | | 1.6 | | 2.7 |
| **CONTRACT DRILLING** | | | | | | | | | | | | | | | | | | | | | |
| 1 | M | 4 | Nabors Industries | 12 | NBR | 30.15 | $40 | 2.17 | 13.9 | 4.41 | 7.5 | 1.30 | 23.2 | 3.08 | 10.8 | 167.4 | 5,047 | 2,248 | 2.2 | $10.62 | 2.8 |
| 1 | H | 4 | Noble Drilling | 12 | NE | 30.30 | $38 | 1.99 | 15.2 | 3.77 | 8.4 | 1.75 | 17.3 | 3.48 | 9.1 | 132.8 | 4,024 | 976 | 4.1 | $12.95 | 2.3 |
| 3 | H | 4 | Rowan Companies | 12 | RDC | 17.46 | – | 0.80 | 21.8 | 1.99 | 8.6 | 0.00 | | 0.76 | 22.5 | 95.4 | 1,666 | 636 | 2.6 | $11.75 | 1.5 |
| 1 | M | 4 | Transocean Sedco Forex | 12 (U) | RIG | 29.40 | $48 | 0.83 | 35.4 | 2.95 | 14.1 | 1.40 | 21.0 | 3.93 | 10.6 | 322.7 | 9,487 | 3,426 | 2.8 | $33.65 | 0.9 |
| AVERAGE | | | | | | | | | 21.6 | | 9.7 | | 20.5 | | 13.2 | | | | 2.9 | | 1.9 |
| **CAPITAL EQUIPMENT** | | | | | | | | | | | | | | | | | | | | | |
| 3 | H | 4 | CARBO Ceramics | 12 (+) | CRR | 31.82 | – | 1.90 | 16.7 | 3.35 | 8.0 | 1.60 | 19.9 | 2.94 | 9.2 | 15.0 | 479 | 134 | 3.6 | $8.67 | 3.7 |
| 1 | M | 4 | Cooper Cameron | 12 | CAM | 38.76 | $55 | 1.98 | 19.6 | 4.24 | 9.7 | 1.90 | 20.4 | 4.40 | 9.3 | 59.6 | 2,310 | 1,689 | 1.4 | $15.03 | 2.6 |
| 1 | M | 4 | National-Oilwell | 12 | NOI | 18.30 | $25 | 1.27 | 14.4 | 2.40 | 9.4 | 1.25 | 14.6 | 2.40 | 9.4 | 81.4 | 1,490 | 1,738 | 0.9 | $10.36 | 1.8 |
| 2 | H | 4 | Varco International | 12 | VRC | 14.52 | $16 | 0.95 | 15.3 | 2.42 | 7.0 | 0.80 | 18.2 | 2.23 | 7.6 | 96.6 | 1,402 | 1,204 | 1.2 | $8.32 | 1.7 |
| AVERAGE | | | | | | | | | 16.5 | | 8.5 | | 18.3 | | 8.9 | | | | 1.7 | | 2.4 |
| **OFFSHORE MARINE SERVICES** | | | | | | | | | | | | | | | | | | | | | |
| 3 | H | 4 | GulfMark Offshore | 12 | GMRK | 29.70 | – | 2.62 | 11.3 | 6.17 | 7.7 | 3.60 | 8.3 | 7.75 | 6.1 | 8.4 | 250 | 132 | 1.9 | $13.51 | 2.2 |
| 2 | H | 4 | Oceaneering Intl. | 12 | OII | 20.90 | $30 | 1.31 | 16.0 | 4.24 | 6.8 | 1.50 | 13.9 | 4.53 | 6.4 | 24.0 | 502 | 598 | 0.8 | $9.96 | 2.1 |
| 2 | M | 4 | Seacor Smit | 12 | CKH | 42.72 | $52 | 3.27 | 13.1 | 7.13 | 6.3 | 3.30 | 12.9 | 8.00 | 5.6 | 21.5 | 920 | 404 | 2.3 | $32.82 | 1.3 |
| 1 | M | 4 | Tidewater Inc. | 3 | TDW | 32.86 | $40 | 2.23 | 14.7 | 4.59 | 6.9 | 1.90 | 17.3 | 4.07 | 7.8 | 56.0 | 1,840 | 726 | 2.5 | $22.11 | 1.5 |
| 1 | H | 4 | Trico Marine | 12 | TMAR | 6.38 | $12 | 0.31 | 20.6 | 2.41 | 5.5 | 0.40 | 16.0 | 2.58 | 5.1 | 36.9 | 235 | 210 | 1.1 | $7.99 | 0.8 |
| AVERAGE | | | | | | | | | 15.1 | | 6.6 | | 13.7 | | 6.2 | | | | 1.7 | | 1.6 |
| **TUBULAR PRODUCTS** | | | | | | | | | | | | | | | | | | | | | |
| 2 | H | 4 | Grant Prideco | 12 | GRP | 9.10 | $25 | 0.48 | 19.0 | 1.02 | 10.5 | 0.55 | 16.5 | 1.14 | 9.4 | 110.5 | 1,006 | 775 | 1.3 | $3.96 | 2.3 |
| 3 | H | 4 | Lone Star Technologies | 12 (+) | LSS | 14.65 | – | 0.91 | 16.1 | 2.44 | 5.1 | (0.15) | – | 1.18 | 10.5 | 25.3 | 371 | 587 | 0.6 | $12.46 | 1.2 |
| 3 | H | 4 | Maverick Tube | 12 | MVK | 12.26 | – | 1.31 | 9.4 | 2.64 | 5.4 | 0.50 | 24.5 | 1.54 | 9.2 | 34.2 | 419 | 464 | 0.9 | $6.61 | 1.9 |
| 3 | S | 4 | NS Group | 12 | NSS | 7.89 | – | 0.26 | 30.3 | 1.18 | 4.2 | 0.40 | 19.7 | 1.35 | 3.6 | 21.7 | 171 | 366 | 0.5 | $6.83 | 1.2 |
| AVERAGE | | | | | | | | | 18.7 | | 6.3 | | 20.3 | | 8.2 | | | | 0.8 | | 1.6 |
| CUMULATIVE AVERAGE | | | | | | | | | 18.1 | | 7.7 | | 18.1 | | 8.9 | | | | 1.8 | | 2.0 |

**NOTE: Price to EBITDA is on a Total Firm Value basis.**

Source: Company reports and SunTrust Robinson Humphrey Capital Markets estimates

## Footnotes

D = An employee of SunTrust Capital Markets, Inc. is a director of this company.

U = SunTrust Capital Markets, Inc. or its affiliates managed or co-managed an offering of this company's securities within the last three years.

+ = The Robinson-Humphrey Company, LLC managed or co-managed an offering of this company's securities within the last three years. The institutional business of The Robinson-Humphrey Company, LLC was sold to SunTrust Capital Markets, Inc. on July 27, 2001, and SunTrust Capital Markets, Inc. is not affiliated with The Robinson Humphrey Company, LLC.

SunTrust Robinson Humphrey Capital Markets' rating system assigns a number code (1 = BUY, 2 = OUTPERFORM, 3 = NEUTRAL, 4 = UNDERPERFORM, 5 = SELL) for our 12-month fundamental rating as well as for our technical ratings. Our BUY and OUTPERFORM ratings indicate that we expect the stock to beat appropriate market indices over the next 12 months. A NEUTRAL rating suggest in line with market-type performance. Our UNDERPERFORM and SELL ratings indicate underperformance is expected over the next 12 months. Also included is our risk rating: L = Low, M = Medium, H = High, S = Speculative. We also infrequently use a risk rank of V = Venture, which is defined as risk and return consistent with venture capital; only for well-diversified portfolios. All references to the rating appear in the following order: fundamental – risk rank – technical.

SunTrust Capital Markets, Inc. is a registered broker-dealer. It is owned by SunTrust Banks, Inc. ("SunTrust") and affiliated with SunTrust Securities, Inc. Despite this affiliation, securities recommended, offered, sold by, or held at SunTrust Capital Markets, Inc. and at SunTrust Securities, Inc. (i) are not insured by the Federal Deposit Insurance Corporation; (ii) are not deposits or other obligations of any insured depository institution (including SunTrust) and (iii) are subject to investment risks, including the possible loss of the principal amount invested. SunTrust may have a lending relationship with companies mentioned herein.

SunTrust Robinson Humphrey is a service mark of SunTrust Capital Markets, Inc. Information contained herein has been derived from sources believed to be reliable but is not guaranteed as to accuracy and does not purport to be complete analysis of the security, company or industry involved. This report is not to be construed as an offer to sell or a solicitation of an offer to buy any security. SunTrust Capital Markets, Inc., SunTrust Securities, Inc. or one or more of their officers or employees may have positions in any securities or options. For over-the-counter securities recommended in this report, the firm usually makes a market. The firm and/or one or more of its officers or employees may buy from or sell to customers on a principal basis. Investors may be prohibited in certain states from purchasing some over-the-counter securities mentioned herein. Opinions expressed are subject to change without notice. The information herein is for persons residing in the United States only and is not intended for any person in any other jurisdiction.

© SunTrust Capital Markets, Inc. 2002. All rights reserved. Reproduction or quotation in whole or part without permission is forbidden.

**ADDITIONAL INFORMATION AVAILABLE UPON REQUEST**

## Notes

# EXHIBIT 159

**Equity Research**
North America

United States of America

Energy: Oil Services & Equipment

# Halliburton Co.

Reuters: HAL.N Bloomberg: HAL NYSE: HAL

Ole Slorer
+1 (1)212 761 6198
Ole.Slorer@morganstanley.com
James R. Lewis
+1 (1)713 512 4485
James.R.Lewis@morganstanley.com
David S. Havens
+1 (1)212 761 3953
David.Havens@morganstanley.com

**Company Update**

January 29, 2002

## *Asbestos Discount Too Wide; Reiterate Outperform-V*

**OUTPERFORM–V**

| | |
|---|---|
| Price (January 28, 2002): | $13.49 |
| Price Target: | $25 |
| 52-Week Range: | $49.25 - 8.75 |

- **Current discount in the stock due to asbestos is $6-8 billion, we estimate**
  We believe the present value of the company's future payments to asbestos claimants is likely to be less than $1 billion.
- **A wealth of detail is included in this report**
  We have analyzed the roots of the company's asbestos exposure, the recent claims experience, and its insurance coverage. A detailed scenario analysis is presented.
- **Reiterating Outperform-V rating and $25 target price**
  We view the shares as attractive, but investors need to understand the asbestos-related issues and weigh the risks. Risk-tolerant, value-oriented investors should take particular note.

**Price: Abs. and Rel. To Market & Industry**




| FY ending Dec 31: | 2001A | 2002E | 2003E | 2004E |
|---|---|---|---|---|
| EPS ($) | 1.33 | 1.05 | 1.40 | – |
| Prior EPS Ests. ($) | – | – | – | – |
| Consensus EPS Ests. ($) | – | 1.06* | 1.51* | – |
| CEPS ($) | 2.48 | 2.22 | 2.61 | – |
| P/E | 10.1 | 12.9 | 9.6 | – |
| P/CE | 5.4 | 6.1 | 5.2 | – |
| Yield (%) | 3.7 | 3.7 | 3.7 | 0.0 |

| | |
|---|---|
| Market Cap ($ m) | 5,787 |
| Enterprise Value ($ m) | 6,987.0 |
| Debt/Cap (12/01) (%) | 25.0 |
| Shares Outstanding (m) | 429.0 |

| Q'trly EPS | 2001A actual | 2002E curr | 2002E prior | 2003E curr | 2003E prior |
|---|---|---|---|---|---|
| Q1 | 0.25 | 0.27 | – | – | – |
| Q2 | 0.33 | 0.23 | – | – | – |
| Q3 | 0.42 | 0.26 | – | – | – |
| Q4 | 0.33 | 0.29 | – | – | – |

*E = Morgan Stanley Research Estimate*
** Consensus EPS estimates from First Call.*

**Company Description**

Halliburton is the largest oilfield services company in the world with products, services, and integrated solutions for oil and gas exploration, development, and production. Capabilities range from the initial evaluation of producing formations to drilling, completion, production enhancement, and well maintenance.

**Please see the important disclosures at the end of this report.**

# Asbestos Discount Too Wide; Reiterate Outperform-V

**Summary & Investment Conclusion**

**We continue to believe that the market is over-discounting Halliburton on the basis of its asbestos exposure,** despite the strong rally in the stock in recent trading sessions. By our estimates, the current discount (relative to its peers) imbedded in the stock is in the $6–8 billion range ($14–19/share); we believe the present value of the company's future asbestos claims is likely less than $1 billion (about $2.30/share).

**Furthermore, we see no risk of financial distress at the company in the near term.** Based on the *facts* that are *known* today about HAL's asbestos liabilities, we find it highly unlikely that the liabilities will have a significant impact on the company's balance sheet and liquidity situation in the foreseeable future. A sharp increase in new claims, coupled with a dramatic increase in the average cost/claim, could put some significant strain on its financial flexibility in the future, but only after insurance coverage is exhausted.

**Halliburton's insurance program provides significant protection to the company (and equity investors)**, in our opinion. Its insurance coverage for asbestos claims is substantially more than $2 billion, we believe. This insurance reimburses a very significant portion (sometimes up to 95%) of all of the costs associated with disposing of asbestos claims. We believe a large portion, if not all, of this coverage will be available to Halliburton, due to the strong reserve position of its top insurance carrier.

**New claims filed against Halliburton rose substantially in 2001, but have fallen for two consecutive quarters** since spiking in 2Q01. The increase in claims filings against Halliburton witnessed over the past few years mirrors a wider trend seen across most asbestos defendants. Although it is premature to predict that new claims filings are in permanent decline, we view the simple fact that they have declined for two quarters in a row as a positive data point.

**Halliburton's average cost to close outstanding claims has remained virtually constant for the past four years** and actually shows a declining trend over the last seven years. On a gross basis (before insurance), Halliburton/Dresser has cumulatively spent just $746/claim over its 25+ year history in closing over 200,000 claims. The gross cost/claim averaged only $722 in 2001.

**Halliburton's average gross cost per claim is a fraction of what has been paid by a number of other asbestos defendants**, including several that have filed for bankruptcy protection. We believe that this stems from two main factors: (1) differences in the inherent character of the legal liability exposure; and (2) Halliburton's effective claims management strategy.

**Halliburton's willingness to contest claims it views as weak does leave it vulnerable to occasional negative jury verdicts**, although we like the company's strategy in handling the issue**.** As a result, the newsflow related to asbestos is inherently asymmetrical, which makes the company's strategy appear more risky than it is, in our view. Large negative verdicts grab headlines; there are no headlines related to the 40–50% of claims that Halliburton closes without paying a penny to claimants.

**The recent jury verdicts against Dresser/Halliburton mean very little, even if they are upheld on appeal,** unless they signal the beginning of an avalanche of like-size judgements. Despite totaling more than $150 million, the four judgements are almost immaterial on their own, as each would be reimbursable at a 95% rate under insurance, even if they were affirmed. Furthermore, these jury verdicts represent aberrations and will prove to be significant statistical outliers, in our view.

**We expect some or all of these recent judgements to be vacated or sharply reduced on appeal**, due to substantial legal irregularities in each trial. A jury can award almost anything, what is ultimately paid out after the appellate process runs its course is another matter entirely.

**We are maintaining our Outperform-V rating and our $25 price target.** We should emphasize that investors considering Halliburton need to understand and carefully weigh the issues related to asbestos, but we continue to view the shares as attractive for value-oriented investors with a tolerance for risk and volatility. If asbestos were not an issue at Halliburton, we believe the shares would currently be trading in the $28–32 range, based on historical multiples relative to its peers. Factoring in our view that Halliburton's asbestos liability is probably worth no more than about $1 billion in NPV terms, we believe that our $25 price target is achievable on a 12-month time horizon.



**Please see the important disclosures at the end of this report.**

# Framing the Asbestos Issue at Halliburton

The questions related to asbestos liabilities are not easy to answer, neither in a specific company context, nor on a national level. There is a reason why it is the longest running mass tort in the history of the American legal system.

In this report we endeavor to shed some light on the sources and character of Halliburton's asbestos exposure, the potential future scenarios, and the appropriate valuation of Halliburton's asbestos liability. In so doing we will address the following issues/questions in sections that follow:

- **Valuation.** What is the stock currently discounting and how does that compare to our view of Halliburton's likely liability?

- **Context/background.** How does Halliburton's situation fit into the context of the broader asbestos issue?

- **History.** What are the roots of the company's asbestos exposure?

- **Claims management experience.** What is the company's historical experience in managing its exposure and how effective has that management been?

- **Trial court decisions.** What happened in the recent trial court decisions and what are their implications?

- **Financial resources.** What is Halliburton's insurance, balance sheet, and cash flow situation?

- **Scenario analysis.** How might the asbestos issue play out at Halliburton?

- **Risks & "signposts."** What could go wrong and how/when would we know that something is amiss?

## Report Guide


- **Current Valuation -** page 4
- **Context/Background -** pages 5–6
- **History -** pages 7–8
- **Claims Mgmt. Experience -** pages 9–11
- **Trial Court Decisions -** pages 12–14
- **Financial Resources -** pages 14–16
- **Scenario Analysis -** pages 17–29
- **Risks & "Signposts" -** pages 31–32
- **Appendix -** pages 33–46




**Please see the important disclosures at the end of this report.**

# Current Valuation

**Asbestos Discount Approximates $7 billion**

Based on our analysis, we believe the discount in the market capitalization of Halliburton due to asbestos issues is in the range of $6–8 billion (or about $14–19/share). This estimate is based on our analysis of HAL's historical valuation multiples (see Exhibit 1), relative to its major oil service peers (Baker Hughes and Schlumberger).

**Current Asbestos Discount Appears Excessive**

Theoretically speaking, we believe the current discount for asbestos in Halliburton's equity value should represent the net present value of future cash outflows (related to asbestos) adjusted for the probability of severe dilution to equity holders due to the risk of bankruptcy.

While we believe some discount in valuation versus its peers is appropriate, given Halliburton's asbestos exposure, *we believe the current discount in the stock is excessive.* Based on the scenario analysis we conducted (detailed in a later section), we believe the present value of the company's future asbestos claims is likely less than $1 billion (about $2.30/share).

Exhibit 1

**Current Peer Valuation vs. Halliburton**

| | Price | First Call 02E EPS | 02E P/E | First Call 02E CFPS | 02E P/CF |
|---|---|---|---|---|---|
| **Peers:** | | | | | |
| SLB | $53.69 | $1.74 | 30.9x | $4.43 | 12.1x |
| BHI | $33.34 | $1.28 | 26.0x | $2.48 | 13.4x |
| **Peer Avg** | | | **28.5x** | | **12.8x** |
| **HAL** | **$13.49** | **$1.06** | **12.7x** | **$2.50** | **5.4x** |
| **Relative Multiple:** | | | | | |
| *Current* | | | *45%* | | *42%* |
| Historical Mean | | | 89% | | 108% |

*Source: First Call, Morgan Stanley Research Estimates*

Exhibit 2 provides a summary illustration of the results of our scenario analysis. The red-dotted line represents the average NPV of the nine scenarios we studied, based on an equal probability-weighting. Based on the facts as we see them, we are of the strong opinion that Halliburton's asbestos liability is toward the lower end of the range established in our scenario analysis.

Exhibit 2

**Estimated NPV of Asbestos Claims Based on Scenario Analysis**




*Source: Morgan Stanley Research Estimates*



**Please see the important disclosures at the end of this report.**

# Context/Background

**General Asbestos Background Information**

While a comprehensive discussion of the history and broader context of asbestos litigation is beyond the scope of this report, we believe some background information on the issue is useful and necessary to understand the circumstances confronting Halliburton. To that end, we hosted a conference call on December 17, 2001 with a leading torts expert, Victor E. Schwartz of Shook, Hardy, & Bacon LLP, a Kansas City-based law firm. Mr. Schwartz has extensive experience with product liability issues and particularly relevant experience related to asbestos litigation. The conference call is archived as a Webcast on Morgan Stanley's ClientLink Website and an edited transcript of the conference call is included in Appendix 1 of this report.

Asbestos litigation is the longest-running mass tort litigation in US history, according to the RAND Institute for Civil Justice, which issued the first phase of a new study on the issue in August 2001. Because asbestos litigation is essentially characterized by an amorphous blob of individual claims and lawsuits, rather than by a few large class-action suits, there is relatively little comprehensive and accurate data available on the number of plaintiffs, number of total claims filed, the total costs associated with disposing of those claims, etc..

In the absence of truly reliable data, we have relied upon studies and articles authored by reputable sources in pulling together a thumbnail sketch of the asbestos issue. Following are a few of our key observations.

• Several high-profile asbestos defendants (Owens Corning, US Gypsum, W.R. Grace, Federal Mogul, etc.) have declared bankruptcy over the past two years due to asbestos liabilities. Most of these companies had pursued a mass settlement strategy in managing their asbestos liabilities.

• New asbestos-related claims filed annually have risen sharply since 1990 and appear to have accelerated further in the late-1990s.

• Informed observers (including asbestos defendants, insurance actuaries, and even judges) have consistently been surprised over the past several years by the number of asbestos claimants and the growth in asbestos claims.

• As a result of the unmanageable number of asbestos claims clogging the legal system, many courts have emphasized expediency and efficiency over the due process rights of defendants.

• Thousands of companies have been sued over asbestos issues. The roster of defendants goes far beyond the companies that manufactured asbestos-containing products. *Companies in over half of the industry classifications within the US economy have had claims filed against them.*

• Claims against non-traditional or peripheral defendants appear to have increased as a result of bankruptcies among those companies most closely associated with manufacturing products containing asbestos.

• The majority of claimants have no objective symptomatology (they are "unimpaired") at all. While most of these claimants may individually receive relatively little from the defendants, collectively they represent a \huge cash cow for the plaintiffs' bar, due to their large numbers.

• A small number of people with very serious illness (and those which may contract such illnesses in the future) have seen the financial resources available to pay their claims dwindle, due to bankruptcies among traditional asbestos defendants.

**Potential for Legislative or Judicial Relief**

We believe there are a wide range of potential reforms that could have a positive impact on the situation faced by defendants, while still preserving the rights of those who were seriously injured by asbestos or who may become ill. These reforms could take the form of legislation or by changes in the way courts handle asbestos-related litigation.

Comprehensive tort reform would be beneficial, but would not necessarily be required to improve the situation substantially for many asbestos defendants. Some of the less sweeping reforms that would likely have a positive impact on the situation include:

• caps on the damages that may be assigned in cases where plaintiffs exhibit no objective impairment;

• establishment of registries or inactive dockets for claimants exhibiting little or no impairment;

• limitations on the liability faced by corporations that bought companies with existing asbestos liabilities; and/or

• a rollback of liberal joinder rules that allow mass cases to be brought in jurisdictions friendly to plaintiffs, despite a

lack of connection to the cause of injuries ("forum shopping").

We believe the prospect of useful federal legislation on the matter is fairly bleak in the near term, due to partisan politics and the large lobbying influence of the plaintiffs' bar on some key members of both Houses of Congress. However, we believe potential legislation at the state level and/or reforms mandated by the judiciary could have just as significant an impact on the general course of asbestos litigation.

Unfortunately, state legislation and reforms coming out of the courts would be more of gradual, piece-meal solution and would not provide the visible and satisfying catalyst for stocks such as Halliburton that passage of federal legislation would, in our opinion.

**Asbestos-related Illnesses**

Exposure to asbestos fibers is known to cause several medical conditions, ranging from serious cancers to minor, and often asymptomatic, scarring of lung tissues. Following is a brief description of conditions most closely associated with asbestos:

*Mesothelioma.* The most serious of asbestos-related diseases, mesothelioma (meso) is a cancer of the membranes that cover and protect the lungs. Meso is the hallmark asbestos disease; asbestos is the only known cause and the disease has an extremely long latency period (30–40 years, in some cases). Meso is generally fatal within 18 months of diagnosis. Fortunately, it is also rather rare, even among individuals with a long history of asbestos exposure. Meso claims are considered the most meritorious of all asbestos claims, due to both the severity of the illness and the fact that asbestos is the only known cause. Meso patients generally receive the highest settlements and jury awards on their claims.

*Lung cancer.* Lung cancer is a cancer of the bronchial covering and can be caused by asbestos. It obviously can also be caused by smoking, among other things. Like meso, lung cancer also can have a very long period of latency (20–30 years). Although lung cancer is generally a very serious illness, the fact that asbestos plaintiffs with lung cancer often were also smokers tends to limit the liability faced by asbestos defendants in these cases.

*Other cancers.* Plaintiffs with several other forms of cancer (including cancers of the larynx and throat) have been moderately successful in securing jury verdicts and settlements from asbestos defendants, though the medical evidence is decidedly mixed on whether asbestos can cause such illnesses.

*Asbestosis.* Asbestosis is a non-cancerous illness related to scarring of the interior lung tissues. Asbestosis cases can vary in severity from extremely mild (little or no impairment) to very serious (and sometimes fatal). As the name implies, it is closely related to asbestos exposure, particularly intense and prolonged exposure. The condition generally appears between 15 and 30 years after exposure to asbestos.

*Pleural plaques.* This condition is essentially a scarring or thickening of the pleural tissue surrounding the lungs. In general, the mere existence of pleural plaques causes the plaintiff no detectable symptoms or injury.



**Please see the important disclosures at the end of this report.**

# Halliburton's Asbestos History

**Roots of Halliburton's Asbestos Exposure**

Like many large industrial companies, Halliburton owns (or owned) subsidiaries which made or sold products containing asbestos fibers, prior to the general discontinuation of the use of asbestos in the late-1970s. In addition, a Halliburton subsidiary installed asbestos in buildings and facilities it constructed and renovated for clients. As a result, the Halliburton organization (including Dresser Industries, which was acquired in 1998) has been managing asbestos liabilities for over 25 years.

Halliburton's exposure to asbestos liability stems from three separate historical business activities:

**Refractory products.** A former subsidiary of Dresser Industries, Harbison-Walker, manufactured *refractory* (capable of enduring high temperatures) products, which were used in boiler rooms, refineries, and chemical plants, and other applications. A small number of these products contained asbestos fibers. Asbestos was commonly used in these types of products until the late-1970's, due to its malleability and high resistance to heat. Dresser Industries acquired Harbison-Walker in 1967 and spun it off in 1992.

**Pump gaskets.** Another Dresser subsidiary manufactured pumps that used gaskets containing asbestos fibers. These gaskets were manufactured by a third party. These pumps were marketed under the Worthington brand name and were used in broad industrial application.

**Engineering & Construction (E&C).** The predecessors to Halliburton's Kellogg Brown & Root E&C subsidiary (Brown & Root and M.W. Kellogg) installed asbestos products in certain construction and maintenance projects. The majority of these installations were conducted by Brown & Root.

**Harbison-Walker Situation**

In late-June 2001 Halliburton announced that a former subsidiary of Dresser Industries (Dresser), Harbison-Walker Refractories Company (Harbison), had approached Halliburton with a request for financial and claims management assistance on its asbestos-related liabilities. Harbison was spun off to shareholders by Dresser Industries, along with other non-core assets, as Indresco, Inc. in 1992. Harbison is currently a subsidiary of an Austrian industrial company, RHI AG.

At the time of the spin-off, Indresco agreed to assume all asbestos claims related to refractory products that were filed after the date of the spin-off and indemnified Dresser against those claims. Following the spin-off, Dresser and Indresco entered into coverage-in-place agreements with carriers covering refractory claims. These agreements allowed both Indresco and Dresser access to coverage for refractory claims. This coverage reimburses the vast majority of the costs (about 95%) associated with asbestos-related court judgments and settlements, as well as legal expenses.

As noted above, Harbison manufactured and sold refractory products, which were used in boiler rooms, refineries, and chemical plants, in addition to other applications. A small number of these products contained asbestos fibers.

Many of the claims filed against Harbison also name Dresser Industries as a co-defendant. In addition, because Dresser and Harbison are co-insured by the same carriers, Halliburton has a significant interest in seeing that the claims against Harbison are managed as cost-effectively as possible.

After subsequent investigation of the claims against Harbison, Harbison's historical experience in managing those claims, and the financial resources available to Harbison and its parent company, Halliburton concluded that Harbison is no longer able to able to provide defense and indemnity to Dresser, as stipulated in the 1992 agreement. Following this determination, Halliburton did *not* agree to render financial assistance to Harbison nor did it relieve Harbison of its obligation under the 1992 agreement to provide indemnity to Dresser. However, Halliburton has begun to assert its own defense in refractory claims naming Dresser as a defendant.

Following Halliburton's rejection of Harbison's request for assistance, Harbison brought suit against Dresser and Halliburton, alleging breach of the 1992 spin-off agreement, tortuous interference with contracts, and commercial disparagement. Halliburton has counter-sued RHI, Harbison's parent corporation, on the basis that it has not performed its duty to provide an adequate defense of Dresser as stipulated in the spin-off agreement. Halliburton further alleges that RHI, Harbison, and their agents conspired to fraudulently bill Dresser's insurance carriers for unpaid asbestos settlements.

Although Halliburton did not agree to render Harbison financial assistance, it has established a reserve for Harbison's outstanding asbestos claims, due to its belief that Harbison is unlikely to be able to pay these claims. This additional reserve was added to Halliburton's own asbestos reserve in its 2Q01 financial filings. The incremental funds reserved for Harbison's liabilities were $92 million (net of insurance recoveries, but before tax) and increased the total size of Halliburton's asbestos reserve from $32 million to $124 million. A more complete analysis of Halliburton's claims history and reserve situation is presented in a later section.

We also believe the establishment of the reserve is consistent with the likely legal reality that claims against Harbison are, for all intents and purposes, Dresser's liabilities as well. Based on some preliminary investigation conducted by our legal consultants, we do not believe that any extraordinary legal mechanisms or structures were put in place at the time of the spin-off to shield Dresser Industries from the legal liabilities of Harbison. Nor did our investigation find any such measures in the 1998 merger agreement between Halliburton and Dresser Industries. While Harbison agreed to indemnify Dresser against asbestos claims filed after the date of the spin-off, the indemnification appears to be an economic agreement between the parties, rather than a complete transfer of ultimate legal liability.

Based on the information we have available, we believe that the liabilities faced by Harbison would ultimately be the responsibility of Dresser and Halliburton, should Harbison be unable to service them. While this conclusion is debatable (and we are certain Halliburton will contest such an interpretation in court if and when it becomes necessary), we believe it to be a reasonable one, based on the due diligence we have conducted and the information available to us at this time.



**Please see the important disclosures at the end of this report.**

# Claims Management Experience

**Halliburton's Claims Management Strategy**
Unlike many asbestos defendants who have chosen to engage in mass settlement programs as their primary method of managing asbestos claims, Halliburton continues to aggressively assert a defense against a significant number of the claims filed against it. We believe Halliburton's approach to managing its asbestos liabilities is both prudent and appropriate and is the best option available to it.

The mass settlement programs employed by numerous other asbestos defendants have generally led to an increase in claims and liability for those employing them, rather than a limitation of the problem. Several of the companies that have recently filed for bankruptcy protection were pursuing a mass settlement strategy.

Halliburton does not fight every claim filed against it, rather it evaluates the merits and risks posed by each claim and decides whether to settle or contest the claim. The company makes this decision based purely on the merits of each case and not on the particular venue in which a trial might occur. In doing so, it accepts that lengthy appeals may be required, particularly in some jurisdictions.

Through its willingness to take plaintiffs with weak or spurious claims to court, Halliburton has managed to close 40% of its refractory-related claims and 50% of its non-refractory claims without any payment to plaintiffs.

The downside to the legal strategy employed by Halliburton is that it exposes the company to adverse trial court decisions, such as those announced recently. The inherently asymmetrical news flow that results gives the impression that Halliburton's strategy is more risky than it really is, in our opinion.

The company recently provided some detail on its claims resolution experience in 2001, which we think lends some insight into the dynamics of its strategy. Of approximately 36,000 claims that were closed during the year, only 52 claims went to court (that is one-tenth of 1%). This is despite Halliburton's willingness to assert a defense in any claims it deems to lack legal merit that cannot be settled for a merely nominal sum.

Of those 52 claims that reached a court, 35 were dismissed through summary judgements in favor of Halliburton before a trial ever occurred. Of the 17 that went to trial, Halliburton received favorable judgements (either a complete win for the company or a judgement for the plaintiff with only nominal damages) in 11 cases. Two trials were won by plaintiffs with damages were in the sub-$2 million range, which the company will appeal. The remaining cases are detailed in the next section.

**Claims History and Outstanding Claims**
Halliburton's experience with asbestos claims dates back to 1976. Over those 25 years, Halliburton, its predecessors, and subsidiaries have had approximately 349,000 claims filed against it, of which they have closed a total of around 201,000 claims (see Exhibit 7). Between 1995 and 2001 Halliburton (and Dresser) closed an average of about 27,000 claims yearly and received an annual average of 40,000 new claims.

Halliburton currently has about 148,000 open and unresolved asbestos claims, not including post spin-off Harbison refractory claims. The distribution of these claims between Halliburton's subsidiaries is shown in Exhibit 3.

Exhibit 3
**Distribution of Open Claims by Source**




*Source: Company filings*

Harbison-Walker has 182,000 claims against it that are currently open, including approximately 125,000 claims that also name Dresser Industries as a defendant. Since Halliburton is now actively asserting its own defense in suits naming Dresser, and given that Harbison and its parent may be unable to provide indemnity to Dresser for financial reasons, we believe *at least* those claims naming Dresser should be considered active claims against Halliburton. We believe it is also reasonably arguable that a significant portion of the additional claims against Harbison will ultimately become claims against Dresser and Halliburton.

It is worth noting that new claims filings against Halliburton have accelerated meaningfully over the past two years (see Exhibit 4). New claims received in 2001 were up about 50% over claims filed in 2000.



**Please see the important disclosures at the end of this report.**

Exhibit 4
**New Claims Filed Annually Against Dresser/Halliburton**




*Source: Company data, Morgan Stanley Research*

Despite the jump in claims filings for the full-year 2001, the rate of new filings decreased sharply in the second half of the year (see Exhibit 5). Although it is too early to conclude that new claims filings have peaked for good, we view the simple fact that new claims have declined for two quarters in a row as a positive data point.

Exhibit 5
**New Claims Filed: Quarterly Trend**




*Source: Company data, Morgan Stanley Research*

The increase in claims filings has not been isolated to Halliburton. Most asbestos defendants have experienced a very significant increase in new claims filings since 1998 and some have seen claims grow at a higher rate than Halliburton has, we believe. Although there are no concrete data available, most participants in asbestos litigation cite growth in claims from “unimpaired” plaintiffs as the chief cause for the rapid acceleration in new claims filings.

**Cost of Claims**

Since 1976, Halliburton’s cumulative cost of disposing of asbestos claims has totaled $150 million (approximately $746 per claim closed), before insurance recoveries. Net of insurance recoveries, total costs have added up to just $40 million (or $199/claim).

Importantly, Halliburton’s cumulative gross cost per claim has been flat to down over the past several years (see Exhibit 6), which is not typical of other large asbestos defendants, we believe.

Exhibit 6
**Historical Cost/Claim**




Note: Data for periods prior to calendar year 1998 are from Dresser Industries. Halliburton did not disclose its asbestos liabilities prior to merging with Dresser during 1998.

*Source: Company data*



**Please see the important disclosures at the end of this report.**

Exhibit 7

**Halliburton/Dresser: Historical Claims Data**

| | Oct-93 | Oct-94 | Oct-95 | Oct-96 | Oct-97 | Dec-98 | Dec-99 | Dec-00 | Dec-01 |
|---|---|---|---|---|---|---|---|---|---|
| New Claims | 12,000 | 3,000 | 36,000 | 27,000 | 22,000 | 36,400 | 46,400 | 45,000 | 67,400 |
| Cumulative Claims Filed | 55,800 | 59,000 | 110,000 | 137,000 | 154,100 | 190,000 | 237,300 | 282,000 | 349,400 |
| Claims Closed | NAV | 6,000 | 22,000 | 28,000 | 25,000 | 32,200 | 9,650 | 35,350 | 36,000 |
| Cumulative Claims Closed | 13,000 | 19,000 | 41,000 | 68,000 | 87,800 | 120,000 | 129,650 | 165,000 | 201,000 |
| Open Claims | 42,800 | 40,000 | 69,000 | 69,000 | 66,300 | 70,500 | 107,700 | 117,000 | 148,400 |
| **Cost of Claims:** | | | | | | | | | |
| Cumulative Gross Cost (mm) | $29 | $40 | $48 | $56 | $74 | $89 | $99 | $124 | $150 |
| Cumulative Cost/Claim | $2,231 | $2,105 | $1,161 | $826 | $846 | $743 | $764 | $752 | $746 |
| Incremental Gross Cost (mm) | NAV | $11 | $8 | $9 | $18 | $15 | $10 | $25 | $26 |
| Incremental Cost/Claim | NAV | $1,833 | $345 | $307 | $724 | $460 | $1,026 | $707 | $722 |
| **Cost of Claims After Insurance:** | | | | | | | | | |
| Cumulative Net Cost (mm) | NAV | NAV | NAV | NAV | $28 | $30 | $23 | $32 | $40 |
| Cumulative Net Cost/Claim | NAV | NAV | NAV | NAV | $320 | $250 | $177 | $194 | $199 |

Note: Data from 1993 through 1997 are based on Dresser Industries filings (fiscal year ending October 31) and do not include asbestos claims associated with historical Brown & Root activities. Data for 1998 to present are from Halliburton filings and do not include Harbison-Walker claims filed after the spin off in 1992.

NAV= Data Not Available

*Source: Company filings, Morgan Stanley Research*

**Asbestos Reserves**

Halliburton accrues reserves for the known asbestos claims against it, based on its historical experience in settling and litigating cases and its estimate of future insurance recoveries. The gross reserve for asbestos litigation approximates the number of open claims multiplied by the historical average cost per claim. The company's estimate of its recovery from insurance is then netted against the gross asbestos liability to arrive at the reserve. The company makes no attempt to reserve for unknown future claims.

Until 2Q01, Halliburton's reserve for asbestos liability was a relatively small number ($20–30 million) that had remained fairly static for about 18 months. Following its determination that Harbison-Walker was no longer effectively defending Dresser on the post-1992 refractory claims and was unlikely to be able to provide indemnity for those claims, Halliburton accrued additional reserves to reflect the claims outstanding against Harbison-Walker (see Exhibit 8). As a result, Halliburton's net reserve for asbestos liabilities quadrupled from $30 million at the end of 1Q01 to $124 million at the end of 2Q01.

Exhibit 8

**Halliburton: Net Asbestos Reserve**




*Source: Company data*

Looking at the accrual for Harbison-Walker's liabilities lends some insight into why Halliburton is unhappy with Harbison's management of its asbestos liabilities and use of its insurance coverage, we believe. Halliburton's estimate of Harbison's gross asbestos liability was $576 million as of June 30, 2001, based on 112,000 claims outstanding at that time. We presume that this estimate must have been based on Harbison's settlement and litigation history as it represents an average (gross) cost per claim of about $5,142, versus Halliburton's historical average cost of $746/claim.

# Recent Trial Court Decisions

**Recent Verdicts Against Halliburton**
Halliburton recently received two large jury awards against it in trials in Orange County, Texas and Baltimore, Maryland. These verdicts came about a month after a large verdict was delivered against the company in Holmes County, Mississippi.

In total, the recent judgements against Halliburton aggregate to over $150 million. This compares with a cumulative gross (before insurance) pay-out of $150 million over the company's previous 25-year history with asbestos litigation. Another interesting point of reference is that each of the (unimpaired) plaintiffs in the Mississippi trial were awarded $25 million (payment of which is allocated between Halliburton and several other defendants, Halliburton's share is about $21 million). The highest payment to a single claimant Halliburton has ever made is $1.8 million, and that was a mesothelioma case.

It is notable that each of these cases was against Harbison Walker and that the legal process was at a very advanced stage when Halliburton's legal team became involved. Halliburton's management and general counsel believe that the outcomes in these trials could have been significantly different if its legal team had been involved in them from the outset.

Although the facts in each case were quite different, one thing all three awards have in common is that they are highly atypical of Halliburton's historical trial experience. Two of the awards also represented large aberrations (in terms of their size relative to the injuries sustained), versus decisions rendered against all other asbestos defendants. Halliburton further contends that there were substantial errors in law in each of these trials and plans to contest each of the rulings with post-trial motions and appeals.

Although the appeals process is inherently uncertain, based on the facts of the cases as we understand them, we believe there is a substantial likelihood that each verdict could be vacated and/or substantially reduced on appeal. Our legal consultant concurs with this opinion. Additionally, there is also the possibility that one or more of these cases could be settled prior to appeal, on terms which are much more favorable to Halliburton.

Furthermore, we believe the recent jury verdicts against Dresser/Halliburton will have very little impact on the company, even if they are upheld on appeal. Despite totaling more than $150 million, the four judgements are almost immaterial on their own, as each would be reimbursable at a 95% rate under insurance, if they were affirmed.

The risk is that, as a result of these verdicts, the company will see a dramatic increase in the size of court judgements against it or will experience a significant step-change in the average cost of closing all cases. At this point, we see little reason to believe that these judgements were not statistical outliers, and we believe that Halliburton will take a similar stance in its continuing settlement negotiations with claimants.

Below is a brief summary of the pertinent facts in each of the recent cases, along with views presented by Halliburton's management on legal errors present in each of the verdicts.

**Holmes County, Mississippi**
Dresser Industries and two other defendants were found liable by a jury in a case involving six plaintiffs in a Holmes County, Mississippi court in late October. The total awarded by the jury for compensatory damages was $150 million, with Halliburton's share of the verdict amounting to $21 million. No punitive damages were assigned.

None of the plaintiffs had any established impairment. All had some signs of scarring on their chest X-rays, consistent with the formation of *pleural plaques*, which are caused by exposure to asbestos. The basis for damages was apparently the anxiety and fear of becoming seriously ill that the plaintiffs felt as a result of their past asbestos exposure. We believe the case represents a record jury award to plaintiffs in a pleural plaques case.

According to Halliburton's general counsel, there were several serious errors in law during the trial, including the absence of a legitimate cause of action. Following is a list of the key issues raised by Halliburton:

• **Lack of product identification.** No positive identification of a Harbison-Walker product was given. It is a general principle of product liability law that the product that was alleged by the plaintiff to have caused harm must be identified as having been manufactured by the defendant. According to Halliburton, the type of products identified by the plaintiffs were never manufactured by Harbison-Walker.



**Please see the important disclosures at the end of this report.**

• **No proof of defect.** No expert testimony was provided establishing a product defect. Proof of a product defect is required under Mississippi law to establish a cause of action in a product liability case.

• **Absence of proof of damages.** The only expert witness who testified that the plaintiffs had an asbestos-related condition was a doctor hired by the plaintiffs' attorneys to screen potential clients for asbestos-related conditions. None of the plaintiffs entered medical bills as evidence, nor did any of them claim even a single day's lost work due to illness.

• **Irregularities in venue determination and jury selection.** The entire jury was comprised of individuals who had previously been screened for asbestos illness by the law firm representing the plaintiffs.

**Orange County, Texas**

In late September a jury in the Texas 128th District Court in Orange County delivered a verdict against Dresser Industries and several other defendants. In December, the jury awarded five plaintiffs $65 million. The plaintiffs had been employees of US Pipe in Birmingham, Alabama, where they alleged they were exposed to defective products and received inadequate warnings about the danger posed by asbestos. Two of the plaintiffs have mesothelioma.

Halliburton asserts that the fact that the trial even took place in Texas was the result of abusive forum shopping. The plaintiffs alleged injuries took place in Birmingham; the trial should have been held in Alabama, Halliburton contends. Under tort rules now in place, the case could not have been brought in a Texas court.

According to Halliburton's general counsel, the trial court committed numerous errors in delivering these judgements, including the inappropriate application of Alabama law, and errors in evidentiary rulings. Following is a list of the key issues raised by Halliburton:

• **Faulty product identifications.** The plaintiffs identified a Harbison-Walker product that was never sold to US Pipe, Halliburton claims.

• **Misapplication of Alabama law.** Under Alabama law, this case should have been barred due to statutory limitations. The Texas court chose to ignore this fact, but applied the Alabama's theory of joint and several liability in the case.

In addition, the same district court also entered three additional judgements (totaling $36 million) against Dresser in favor of 100 other plaintiffs. These judgements were based on an alleged breach of settlement agreements between Harbison-Walker and the plaintiffs. Recent financial difficulties at Harbison and its parent company have apparently led to some settlements not being honored by Harbison.

Under the indemnification agreement between Harbison and Dresser, Dresser tendered new claims related to Harbison products to Harbison for handling. Dresser had been tendering refractory claims it received to Harbison in this manner for eight years. The settlements in question were reached earlier in the year and were between the plaintiffs and a New Orleans attorney hired by Harbison.

Halliburton asserts that the settlements entered into by Harbison were done so on its own behalf and that the attorney hired by Harbison had no authorization to offer a settlement on behalf of Dresser. Harbison's attorney even testified to the fact that he was acting on behalf of Harbison (and not Dresser) when he entered into the settlements.

**Baltimore, Maryland**

In early December, a jury in Baltimore returned verdicts in favor of five plaintiffs, against Dresser Industries, and other defendants. Dresser's share of the verdicts totaled $30 million. In this case, each of the plaintiffs had *mesothelioma*, the most serious illness associated with asbestos exposure.

Halliburton's general counsel contends that the court made several errors during the trial. Halliburton would cite the following issues:

• **Faulty product identification.** Three of five plaintiffs offered no product identification. One plaintiff identified a Harbison-Walker product that could not possibly have been used in the manner described in the plaintiff's testimony.

• **Failure to establish liability.** According to the Maryland Supreme Court, the mere presence of asbestos in the workplace is insufficient to prove liability. Proximity of the product as well as frequency and intensity of exposure must be examined in establishing liability. Halliburton contends the plaintiffs failed to meet this standard.

• **Cap on damages should have been applied.** Halliburton contends that the trial court was in error in allowing the jury to conclude definitively that the plaintiffs' cancers arose prior to July 1, 1986. That is the cut-off date for Maryland's $500,000 statutory cap on non-economic damages.

# Financial Resources

**Overview of Insurance Coverage**

Halliburton has a substantial insurance program covering its asbestos liabilities. The company has existing insurance covering each of the historical activities that have given rise to asbestos liabilities, although the coverage varies in magnitude and quality among each type of liability. It appears that Halliburton's insurance coverage for refractory claims is the strongest and most secure and that its coverage for construction-related claims is the least secure. We believe that the quality and amount of insurance coverage available to Halliburton is an important differentiating factor between it and many other asbestos defendants.

The insurance program is comprised of a large number of insurance policies written by dozens of different carriers. Halliburton's insurance coverage reimburses a large portion of the company's legal costs, court judgements entered against it, and negotiated settlements. The exact amount of these costs that are reimbursed by insurance varies, based on the activities that gave rise to the alleged asbestos exposure and the specific subsidiary against which the claim is asserted. Significant portions of the company's coverage are subject to coverage-in-place agreements with carriers, which resolve issues relating to amounts and terms of coverage.

Although the company has not disclosed the magnitude of its total coverage, it has disclosed that the coverage for refractory claims alone (shared by Dresser and Harbison) exceeds $2 billion. This coverage reimburses 95% of legal costs, settlements, and judgements. Even if you assume that every one of Harbison-Walker's 182,000 outstanding claims were closed at an average cost of around $5,000/claim (our estimate of Harbison's historical claims experience), it would leave over $1.1 billion of additional insurance coverage for new claims and/or increases in the cost per claim.

**Refractory Coverage and Equitas**

London-based Equitas, the run-off vehicle for Lloyds of London's long-tailed liabilities arising from pre-1993 underwriting years, provides a substantial amount (we presume the majority) of the coverage for refractory claims, as well as some additional coverage for Dresser's non-refractory related asbestos liabilities.

Although Equitas' recent increase of its reserves for asbestos liabilities generated some unfavorable publicity, we believe it is adequately capitalized to provide insurance reimbursements to Halliburton for the foreseeable future. As of March 31, 2001, Equitas had a three-year asbestos survival ratio of 26.5. In other words, it would take 26 1/2 years before Equitas' asbestos reserves would be exhausted, provided asbestos claims were paid at a rate equal to the average of the previous three years. While this simplistic and backward-looking analysis does not provide absolute assurances about its ability to pay future claims, we believe it is a useful yardstick.

For comparison, Equitas estimates that an average comparable survival ratio for a representative sample of US insurers at 2000 year-end was 6.8. A recent study by A.M. Best, which rates US insurers, pegged the average survival ratio for US insurers at 7.9 (see Exhibit 9). Based on that data, it appears that Equitas' asbestos reserve position would rank in the top quartile of US insurers and exceeds three times that of the average US insurer.

Exhibit 9

**Annual Asbestos Survival Ratios: US Insurers**

| | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|
| Top Quartile | 21.2 | 35.6 | 19.7 | 22.3 |
| Average | 11.2 | 7.6 | 7.7 | 7.9 |

*Source: National Underwriter Property & Casualty-Risk & Benefits Management, A.M. Best*

Recently, Equitas and other London-based carriers have increased their documentation requirements for asbestos claims. These new requirements limit reimbursement of settlements to claims that are supported by medical evidence of an asbestos-related impairment and identification of the product that caused the exposure. Reimbursement for court judgements and legal costs were not affected by this change in policy.

Halliburton contends that these new requirements are contrary to existing coverage-in-place agreements and unenforceable. In August 2001, Dresser asserted its rights under existing agreements in lawsuits against Equitas and other carriers. Importantly, these carriers have not refused to pay claims where documentation has been obtained or where court judgements are entered.

Ironically, we believe the new documentation requirements are aimed at companies that pursue indiscriminate mass settlement strategies, which Halliburton does not. As a side note, Equitas cited the exact legal strategy employed by



**Please see the important disclosures at the end of this report.**

Halliburton (although it did not name the company) as an example of one of its insureds that has been particularly effective in managing its asbestos liabilities.

**Construction Coverage and Highlands Situation**

Coverage for Halliburton's construction-related asbestos claims, which primarily relate to Brown & Root activities prior to 1980, is provided by Highlands Insurance Company, an arm of the Highlands Insurance Group (HIGP, $0.06, not rated) and a former subsidiary of Halliburton that was spun-off in 1996.

Currently, Highlands is refusing payment on all of Halliburton's asbestos claims, and the two companies are involved in litigation over whether it was agreed that coverage of Brown & Root would be terminated at the time Highlands was spun off. The primary court case on this matter was resolved in favor of Highlands in Delaware Chancery Court in March 2001. The matter is now before the Delaware Supreme Court, which is expected to issue a ruling on the matter in early 2002.

Even if Halliburton ultimately receives the ruling it is seeking (that coverage was not terminated), we believe that the ability of Highlands to provide reimbursement on Halliburton's construction-related asbestos claims is uncertain, at best. Highlands is currently in violation of some of its debt covenants, is in the process of restructuring, and recently announced that it has discontinued both writing new policies and renewing existing ones. A.M. Best recently lowered its rating on the company from "B" (fair) to "C-" (weak). Currently, Halliburton estimates that reimbursements outstanding from Highlands total about $38 million.

In the event that the Delaware courts rule that Highlands' coverage of Halliburton is still effective, but Highlands is unable to pay due to financial distress, Halliburton can seek reimbursement from the Texas Property and Casualty Insurance Guaranty Association (TPCIGA). The TPCIGA is an association of all insurance companies licensed to sell insurance in Texas that provides (limited) protection to insureds and claimants in the event of an insurance company insolvency. The TPCIGA may levy assessments (subject to statutory limits) against all property & casualty insurers licensed in the state of Texas as a source of funds to pay reimbursements.

Although there are statutory caps on the amount that may be paid to any single claimant, the existence of the TPCIGA mitigates the risk to Halliburton of a potential Highlands bankruptcy, in our opinion.

It is also worth noting that although liabilities associated with former Brown & Root activities comprise about 21% of outstanding claims against Halliburton, we believe they likely represent a smaller (perhaps significantly smaller) proportion of the total current (and future) liability, in dollar terms.

**Balance Sheet & Liquidity**

We believe that some investors have misinterpreted the recent publicity related to asbestos as a warning of a impending liquidity crunch at the company. We believe that, in the near term anyway, asbestos liabilities are unlikely to have a measurable impact on the company's liquidity and/or balance sheet strength.

Longer term, these items could become more of a concern, if new claims filings continue to accelerate and claims costs jump substantially (see next section). But at present the company's balance sheet and liquidity position are very strong, in our opinion. As a result, we do not see a need for Halliburton to raise cash in the capital markets in the foreseeable future.

Halliburton currently had about $300 million of invested cash on the balance sheet and an additional $2.7 billion of positive non-cash working capital at year-end. Currently it has cash on hand of around $600 million. On the debt side of the equation, there is a total of $1.5 billion of debt, with only $364 million of long-term debt maturing over the next four years (see Exhibit 10).

Exhibit 10

**Future Debt Maturities**

| *$ in millions* | 2002E | 2003E | 2004E | 2005E | 2006E |
|---|---|---|---|---|---|
| Principal Due | $75 | $289 | $0 | $0 | $275 |

*Source: Morgan Stanley Research Estimates, Company data*

In terms of Halliburton's current ability to generate cash, management recently estimated that it would generate in excess of $1 billion in cash from operations (including changes in working capital) in 2002, if its earnings match consensus estimates. The company generated about $1.1 billion in cash from operations in 2001. Given that the company has a significant amount of discretion over its level of capital expenditures and that it has invested meaningfully more than its sustaining level of capex in the business over the past five years, we believe that it will have significant flexibility in deploying its cash flow over the next few years.



**Please see the important disclosures at the end of this report.**

With its current financial flexibility, there is no reason to believe the current dividend is in danger of being cut, in our view. On the other hand, management has indicated that it is unlikely to either raise the cash dividend or repurchase significant amounts of its own stock in the immediate future, because management's goal in the near term is to preserve maximum financial flexibility.

**Debt Ratings**

The company's current debt ratings are still in investment grade territory, although they have been downgraded recently due to asbestos concerns and increased conservatism within the ratings agencies, following the Enron collapse. Moody's recently reaffirmed Halliburton's investment grade status, although it lowered the long-term rating to "Baa2" from "A3". S&P currently has a rating of "A-" on Halliburton's debt, but has kept the company on its "watch list" for potential negative developments.

The company's outstanding bonds are currently trading at about $0.85 on the dollar, suggesting that bond market investors view the company's credit as slightly below investment grade. This is considerably better than the current view of the equity market, in our opinion. None of these bonds have particularly distant maturities, which could explain why they are not more steeply discounted.

Exhibit 11

**Cash Flows and Liquidity: 1998–2001**

| *In millions of US$* | 1998 | 1999 | 2000 | Through 3Q01 |
|---|---|---|---|---|
| Net Cash Flow from Continuing Operations | 150 | (58) | (57) | 556 |
| Net Cash Flow from Discontinued Ops | 235 | 234 | (87) | (66) |
| Total Cash From Operations | 385 | 176 | (144) | 490 |
| Asset Sales | 83 | 118 | 209 | 77 |
| Business Dispositions | 19 | 291 | 920 | 1,267 |
| Capital Expenditures (sustaining) | (350) | (400) | (450) | (338) |
| Free Cash Flow | 137 | 185 | 535 | 1,497 |
| | | | | |
| *Discretionary Uses of Cash:* | | | | |
| Capital Expenditures (expansion) | (491) | (120) | (128) | (231) |
| Acquisitions | (40) | (7) | (10) | (115) |
| Stock Repurchases | (20) | (10) | (769) | (33) |
| Total Discretionary Uses of Cash | (551) | (137) | (907) | (379) |
| | | | | |
| *Other Sources & Uses of Cash:* | | | | |
| Stock Options Activity | 49 | 49 | 105 | 25 |
| Dividends | (254) | (221) | (221) | (161) |
| Other | (15) | 5 | (71) | (20) |
| Effect of Exchange Rates | (5) | 5 | (9) | (19) |
| Total Other Sources & Uses | (225) | (162) | (196) | (175) |
| **Net Change in Liquidity** | **(639)** | **(114)** | **(568)** | **943** |
| Add Back: Discretionary Uses | 551 | 137 | 907 | 379 |
| Total Discretionary Cash Flow Available | (88) | 23 | 339 | 1,322 |

*Source: Company data, Morgan Stanley Research*



**Please see the important disclosures at the end of this report.**

# Scenario Analysis

**Introduction**

Although estimating Halliburton's ultimate asbestos liability with any precision is impossible (due to the number of variables involved and their, well, variability), we believe it is still a useful to go through the exercise of establishing some reasonable estimates. By doing this, we can at least establish some orders of magnitude about potential liability and compare those figures to the current discount in the stock. Such an analysis is also helpful in terms of establishing just how bad the situation would have to become for Halliburton to be put under significant financial duress.

**Important Assumptions**

Any thoughtful analysis of Halliburton's asbestos liability requires that some judgements and assumptions be made about a number of key variables, including:

- total number of future filings;
- distribution of future filings over time;
- average time between receipt and resolution of claims;
- average cost per claim; and
- availability of reimbursements under insurance.

We address each of these variables in the sections that follow.

***Future Filings***

Most sources peg the number of individuals who have filed asbestos claims to date in the 500,000 range. Typically, each individual asserts claims against several, if not dozens, of defendants.

A recent study by actuaries from Milliman USA, an actuarial and consulting firm, estimates that the total number of claimants will ultimately reach 1.1 million. Some other estimates have been considerably higher.

We have used the 1.1 million estimate as our baseline for total eventual claimants, and have also evaluated scenarios based on significantly higher, and lower, totals. We have also made the extremely conservative assumption that all new claimants file a claim against a Halliburton-related entity.

In terms of Halliburton's existing claims backlog, we have considered both the claims outstanding against Halliburton (currently 146,000) and all of the open claims against Harbison-Walker (about 182,000).

***Distribution of Future Filings***

Most epidemiological studies on the topic indicate that the occurrence of asbestos-related should peak within the next five years, if it has not peaked already. This is intuitively logical, since use of asbestos was generally discontinued in the US in the late-1970s and asbestos diseases sometimes remain latent for 30+ years.

Notwithstanding that fact, asbestos-related claims are expected to continue to be filed for the next 20–50 years. The same study by Milliman actuaries included an estimated distribution of future claims shown in Exhibit 12.

Exhibit 12
**Estimated Distribution of Asbestos Claims over Time**




*Source: Milliman USA, A.M. Best*

In each of our scenarios, we have generally relied on the above data as a guide for the distribution of future claims over time against Halliburton.

***Claims Cycle***

Halliburton estimates that its average claims cycle (the time between initial receipt of a claim and its ultimate resolution) is four to five years. In cases where claims are litigated, the process can take 5–10 years, including appeals. As an example, Halliburton has disclosed that 7,000 of the pre-1992 refractory claims against it remain open and unresolved.

As a result of the increase in new claims filings recently, we believe that the claim cycle will lengthen in the near term, due to the limits on Halliburton's capacity to evaluate and process claims and the added burden on the court system.

In the scenarios we have evaluated, we have assumed an average claim cycle of five years (which could prove conservative). We have also made the logical simplifying assumption that claims are handled on a first-in, first out (FIFO) basis. We have further assumed that the capacity of Halliburton and the legal system to process claims is not limited. Although anecdotal evidence suggests that the courts are currently straining under the weight of the cases already in the system, we have conservatively assumed that there is no set limit to the number of cases Halliburton can close in any one year.

***Average Cost per Claim***

Obviously, one of the more critical variables in estimating Halliburton's total asbestos exposure is the cost per claim associated with disposing of the claims that are filed against it. Historically, Halliburton has paid out much less on a per claim basis than most of the other well known asbestos defendants (see Exhibit 13). Certainly the recent jury verdicts against Halliburton are data points suggesting increased costs in the future. What is not known, however, is just how large the ultimate payout on these cases will be, or whether these cases represent a larger trend (or are statistical outliers).

Exhibit 13

**Cost/Claim Comparison**




*Source: Morgan Stanley Estimates, Company data*

The reasons for this are twofold, in our opinion. First, the character of Halliburton's asbestos liabilities is different than that of many other large asbestos defendants, we believe. All asbestos liabilities are not created equal. The legal culpability of companies that distributed asbestos products versus those that manufactured them can be very different. The past knowledge about the potential risks of asbestos also varies dramatically by company. Those companies that knew (or should have known) about the dangers of asbestos many years ago, but continued to manufacture products containing it anyway without warning the public, are most liable. We would presume, based on Halliburton's historical experience, that plaintiffs have had a difficult time proving that executives at Halliburton or Dresser were in possession of such "guilty" knowledge.

Second, Halliburton's strategy in managing its liabilities has been to aggressively assert a defense in cases it deemed to have little or no merit. As a result, 40–50% of the claims against the company have been disposed of with no payment whatsoever to the claimants. We believe Halliburton's legal strategy has had a very significant impact in keeping a lid on the sums paid out to claimants.

In evaluating potential future scenarios, we believe that Halliburton's historical experience should serve as the baseline. We have also evaluated the outlook on the basis of the cost per claim experience of the other major asbestos defendants. In all cases, we have assumed *at least* a modest (5%) annual growth rate in cost/claim.

***Availability of Insurance***

As described earlier, Halliburton has considerable insurance covering its asbestos liabilities. Unfortunately, beyond the $2+ billion in insurance for refractory claims, we do not know exactly how much insurance Halliburton has available to it. Nor do we know much about which carriers wrote the policies, beyond the fact that a large proportion of the coverage is with Equitas, which looks like it has a strong reserve position, and a small portion is with Highlands Insurance, which is likely to become insolvent.

We have made the conservative assumption that Halliburton has $2.5 billion of total coverage available to it, excluding Highlands.

Another complication is the fact that the proportion of costs reimbursed varies depending on the type of liability and the particular subsidiary against which the claim is filed. In the case of refractory claims, 95% of costs are reimbursable. For other types of claims, that ratio is lower. Currently, Halliburton estimates that 82% of its gross asbestos liability will be reimbursed by insurance, including reimbursements due from Highlands. Going forward, we do not expect Highlands to provide reimbursements to Halliburton. Our working assumption is that Halliburton's average future reimbursement rate over its entire insurance program will approximate 80%.

**Scenario Analysis**

We believe scenario analysis is a useful tool for gaining a greater understanding of the sensitivities of Halliburton's potential liability to changes in the key variables. We would emphasize that the scenarios we present in this report in no way cover all of the potential outcomes. Doing so would be impossible. But we believe the scenario analysis presented below is the best tool for understanding the situation, short of building a sophisticated Monte Carlo simulation based on detailed actuarial data, which is an impractical alternative.

In all, we have evaluated nine total scenarios in three separate cases (a base case, higher number of claims case, and rapid cost growth case) . Each case includes scenarios based on a 2002 cost per claim of $750, $2,500, and $5,000. As a reminder, Halliburton's recent historical experience in disposing of claims has been in the $700–800 per claim range. We believe Harbison Walker's historical cost per claim has been closer to $5,000. Several large primary asbestos defendants pursuing mass settlement strategies have spent in the range of $8,000–11,000 per claim.

Before presenting the conclusions, we believe it is instructive to review the important assumptions that remained constant throughout all nine scenarios. In all cases, we have erred on the side of using assumptions that we view as understandable and conservative.

## Key Assumptions

- **25-year time horizon.** Despite expectations that claims could be filed for the next 50 years, we have compressed future filings into a 20-year window. This assumption is conservative and improves the presentation of the data.
- **Harbison-Walker claims.** We have assumed that all existing claims against Harbison-Walker are effectively claims against Halliburton.
- **Claims cycle.** We assume claims are disposed of on a FIFO basis, with a fixed claim cycle of five years. We have ignored practical capacity limitations on the number of claims that can be closed in a given year, a simplifying assumption that is conservative.
- **Insurance.** We have conservatively estimated $2.5 billion in total coverage available and have assumed a constant reimbursement rate of 80%.
- **Discount and tax rates.** We have used an 8% discount rate and a 35% tax rate throughout.

Exhibit 14

**Scenario Analysis Summary**

| | Key Variables | | | Key Outputs | | | |
|---|---|---|---|---|---|---|---|
| | Future Claims (thous.) | Base Cost/ Claim | Annual Cost Escalator | NPV of Claims (mm) | NPV/ Share | Peak Outflow (mm) | Year of Peak Outflow |
| **"Base" Case** | | | | | | | |
| Scenario 1 | 600 | $750 | 5% | $68 | $0.16 | $11 | 2007 |
| Scenario 2 | 600 | $2,500 | 5% | $265 | $0.62 | $77 | 2026 |
| Scenario 3 | 600 | $5,000 | 5% | $1,127 | $2.63 | $264 | 2010 |
| **"Higher Claims" Case** | | | | | | | |
| Scenario 4 | 1,000 | $750 | 5% | $98 | $0.23 | $25 | 2007 |
| Scenario 5 | 1,000 | $2,500 | 5% | $613 | $1.43 | $165 | 2012 |
| Scenario 6 | 1,000 | $5,000 | 5% | $2,090 | $4.87 | $634 | 2008 |
| **"Lower Claims/ Rapid Cost Growth" Case** | | | | | | | |
| Scenario 7 | 400 | $750 | 20% | $149 | $0.35 | $31 | 2026 |
| Scenario 8 | 400 | $2,500 | 20% | $1,431 | $3.34 | $517 | 2026 |
| Scenario 9 | 400 | $5,000 | 20% | $3,753 | $8.75 | $1,033 | 2026 |

*Source: Morgan Stanley Research, Company data*



**Please see the important disclosures at the end of this report.**

**Base case.** Our base case contemplates the receipt of 600,000 additional claims, with modest (5%) constant growth in cost per claim. Under Scenario 1 ($750 per claim), the NPV of future claims borders on insignificant, at $68 million or $0.16/share. The peak outflow (in 2007) is also nearly immaterial, at just $11 million

Under Scenario 2 ($2,500 per claim), net outflows remain manageable throughout the entire time horizon of the analysis, peaking in 2026 at $77 million. The NPV of the estimated liabilities is a modest $265 million or $0.62/share.

Under Scenario 3 ($5,000 per claim), future outflows are more challenging, but would seem manageable. The peak estimated outflow of $264 million does not occur until 2010. Even under this scenario the NPV of future outflows approximates only about 14–19% of the discount imbedded in the stock.

**Higher claims case.** In this case, we assume 1 million new claims over the next 20 years, with a more front-loaded weighting than in the base case. Growth in cost/claim is again assumed to be 5% annually.

Despite the acceleration in claims and the higher number of total claims, Scenario 4 ($750 per claim) still closely resembles Scenario 1. The NPV of future claims is $98 million, or $0.23/share. The peak outflow once again occurs in 2007 and is only $25 million.

Under Scenario 5 ($2,500 per claim), cash paid out peaks in 2012, following the exhaustion of insurance coverage, at $165 million. The NPV of estimated future outflows is $613 million under this scenario, or $1.43/share.

Under Scenario 6 ($5000 per claim), peak outflows occur in 2008, reaching $634 million, and exceed $300 million per year from 2008–2012. In this scenario, the NPV of future outflows totals about $2 billion, or 25–33% of the current discount imbedded in the stock.

**Lower claims/rapid cost escalation case.** This case contemplates the impact of lower (400,000) future claims (still front-end loaded, relative to the base case), combined with a rapid increase in cost/claim of 20% per year. Under all three of these scenarios peak outflows occur in the final year (2026), due to the extreme compounding of growth in cost/claim.

Scenario 7 ($750 per claim) results in a NPV of future claims of $149 million, or $0.35/share, and the peak outflow (in 2026) is just $31 million.

Under Scenario 8 ($2,500 per claim), estimated outflows exceed $100 million beginning in 2011 and remain quite significant through to the end of the time horizon. However, the NPV of these outflows is “only” $1.4 billion, because they are fairly back-end loaded.

In Scenario 9 ($5,000 per claim), the NPV of future outflows is around $3.7 billion and cash paid out exceeds $300 per year million for 19 straight years (2008–2026). This is obviously an extremely daunting scenario.

### Conclusions

Of the nine scenarios we analyzed, only two of them (Scenarios 6 and 9) resulted in outcomes which would almost certainly challenge Halliburton’s long-term viability as a going concern, in our view. Both of these scenarios contemplated a more than six-fold increase in cost per claim in the near term. While nothing is impossible, we view the probability of such a development as *very* low.

One other scenario (Scenario 8) results in a cash flow pattern that would prove quite challenging to manage beyond 2010, but is by no means unsurvivable, in our opinion. None of the other scenarios we looked at appear the least bit daunting, we believe.

We believe that the discount in the stock price is far in excess of what is reasonable, based on our scenario analysis. All of the scenarios we looked at are built upon a set of base assumptions that we believe are quite conservative. Within that framework, only two of the most extreme (and least probable, in our estimation) scenarios resulted in outcomes that would almost certainly challenge Halliburton’s long-term viability as a going concern.

Obviously, we cannot predict with any degree of certainty which scenario will most closely resemble the shape of future events. It is conceivable that the future could be significantly better than any of these estimates, it is also possible that it could be worse. Our belief, however, is that the actual liability will ultimately lie at the more modest end of the range established within our scenario analysis. We think the assumptions needed to get beyond that are simply too draconian to make, at this point, based on the facts at hand.

Exhibit 15

**Estimated Present Value of Asbestos Liability (Scenario 1)**

| | 2002E | 2003E | 2004E | 2005E | 2006E | 2007E | 2008E | 2009E | 2010E | 2011E | 2012E | 2013E | 2014E | 2015E | 2016E | Next 10 Yrs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Claims (thous.):** | | | | | | | | | | | | | | | | |
| New Claims | 85 | 76 | 65 | 55 | 47 | 37 | 30 | 24 | 19 | 15 | 15 | 15 | 15 | 15 | 15 | 73 |
| Open Claims (yr. End) | 347 | 358 | 357 | 346 | 328 | 280 | 234 | 193 | 157 | 126 | 103 | 88 | 78 | 74 | 73 | |
| Claims Closed | 66 | 66 | 66 | 66 | 66 | 85 | 76 | 65 | 55 | 47 | 37 | 30 | 24 | 19 | 15 | 146 |
| Cost/Claim | $750 | $788 | $827 | $868 | $912 | $957 | $1,005 | $1,055 | $1,108 | $1,163 | $1,222 | $1,283 | $1,347 | $1,414 | $1,485 | $1,961 |
| **Cost of Claims ($, mm):** | | | | | | | | | | | | | | | | |
| Gross Pre-tax Cost | 49 | 52 | 54 | 57 | 60 | 81 | 77 | 68 | 61 | 54 | 46 | 38 | 32 | 27 | 23 | 287 |
| Insurance Recoveries | (39) | (41) | (43) | (46) | (48) | (65) | (61) | (55) | (49) | (44) | (37) | (31) | (26) | (22) | (18) | (230) |
| Net Pre-tax Cost | 10 | 10 | 11 | 11 | 12 | 16 | 15 | 14 | 12 | 11 | 9 | 8 | 6 | 5 | 5 | 57 |
| Tax Shield (t=35%) | (3) | (4) | (4) | (4) | (4) | (6) | (5) | (5) | (4) | (4) | (3) | (3) | (2) | (2) | (2) | (20) |
| After-tax Cost | 6 | 7 | 7 | 7 | 8 | 11 | 10 | 9 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 37 |

| **Net Present Value (at 8% ):** | |
|---|---|
| NPV (2002-2016) | $61 |
| NPV (2017-2026) | $8 |
| **Total NPV** | **$68** |
| NPV per Share | $0.16 |

**Key Assumptions:**

-All outstanding Harbison-Walker claims included.

-600,000 new claims over next 25 years.

-Average cost of $750/claim in 2002, escalating at 5% per year.

-$2.5 billion in insurance coverage, reimbursed at 80%.

*Source: Morgan Stanley Estimates, Company data*



**Please see the important disclosures at the end of this report.**

Morgan Stanley



Exhibit 16

**Estimated Present Value of Asbestos Liability (Scenario 2)**

| | 2002E | 2003E | 2004E | 2005E | 2006E | 2007E | 2008E | 2009E | 2010E | 2011E | 2012E | 2013E | 2014E | 2015E | 2016E | Next 10 Yrs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Claims (thous.):** | | | | | | | | | | | | | | | | |
| New Claims | 85 | 76 | 65 | 55 | 47 | 37 | 30 | 24 | 19 | 15 | 15 | 15 | 15 | 15 | 15 | 73 |
| Open Claims (yr. End) | 347 | 358 | 357 | 346 | 328 | 280 | 234 | 193 | 157 | 126 | 103 | 88 | 78 | 74 | 73 | |
| Claims Closed | 66 | 66 | 66 | 66 | 66 | 85 | 76 | 65 | 55 | 47 | 37 | 30 | 24 | 19 | 15 | 146 |
| Cost/Claim | $2,500 | $2,625 | $2,756 | $2,894 | $3,039 | $3,191 | $3,350 | $3,518 | $3,694 | $3,878 | $4,072 | $4,276 | $4,490 | $4,714 | $4,950 | $6,537 |
| **Cost of Claims ($, mm):** | | | | | | | | | | | | | | | | |
| Gross Pre-tax Cost | 164 | 172 | 181 | 190 | 199 | 270 | 255 | 228 | 203 | 182 | 153 | 128 | 108 | 90 | 76 | 958 |
| Insurance Recoveries | (131) | (138) | (145) | (152) | (159) | (216) | (204) | (182) | (163) | (145) | (122) | (102) | (86) | (72) | (61) | (421) |
| Net Pre-tax Cost | 33 | 34 | 36 | 38 | 40 | 54 | 51 | 46 | 41 | 36 | 31 | 26 | 22 | 18 | 15 | 537 |
| Tax Shield (t=35%) | (11) | (12) | (13) | (13) | (14) | (19) | (18) | (16) | (14) | (13) | (11) | (9) | (8) | (6) | (5) | (188) |
| After-tax Cost | 21 | 22 | 24 | 25 | 26 | 35 | 33 | 30 | 26 | 24 | 20 | 17 | 14 | 12 | 10 | 349 |

| **Net Present Value (at 8% ):** | |
|---|---|
| NPV (2002-2016) | $202 |
| NPV (2017-2026) | $62 |
| **Total NPV** | **$265** |
| NPV per Share | $0.62 |

**Key Assumptions:**

-All outstanding Harbison-Walker claims included.

-600,000 new claims over next 25 years.

-Average cost of $2,500/claim in 2002, escalating at 5% per year.

-$2.5 billion in insurance coverage, reimbursed at 80%.

*Source: Morgan Stanley Estimates, Company data*



**Please see the important disclosures at the end of this report.**

Exhibit 17

**Estimated Present Value of Asbestos Liability (Scenario 3)**

| | 2002E | 2003E | 2004E | 2005E | 2006E | 2007E | 2008E | 2009E | 2010E | 2011E | 2012E | 2013E | 2014E | 2015E | 2016E | Next 10 Yrs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Claims (thous.):** | | | | | | | | | | | | | | | | |
| New Claims | 85 | 76 | 65 | 55 | 47 | 37 | 30 | 24 | 19 | 15 | 15 | 15 | 15 | 15 | 15 | 73 |
| Open Claims (yr. End) | 347 | 358 | 357 | 346 | 328 | 280 | 234 | 193 | 157 | 126 | 103 | 88 | 78 | 74 | 73 | |
| Claims Closed | 66 | 66 | 66 | 66 | 66 | 85 | 76 | 65 | 55 | 47 | 37 | 30 | 24 | 19 | 15 | 146 |
| Cost/Claim | $5,000 | $5,250 | $5,513 | $5,788 | $6,078 | $6,381 | $6,700 | $7,036 | $7,387 | $7,757 | $8,144 | $8,552 | $8,979 | $9,428 | $9,900 | $13,074 |
| **Cost of Claims ($, mm):** | | | | | | | | | | | | | | | | |
| Gross Pre-tax Cost | 328 | 344 | 362 | 380 | 399 | 541 | 511 | 456 | 407 | 363 | 305 | 256 | 215 | 181 | 152 | 1,915 |
| Insurance Recoveries | (262) | (276) | (289) | (304) | (319) | (432) | (409) | (209) | - | - | - | - | - | - | - | - |
| Net Pre-tax Cost | 66 | 69 | 72 | 76 | 80 | 108 | 102 | 247 | 407 | 363 | 305 | 256 | 215 | 181 | 152 | 1,915 |
| Tax Shield (t=35%) | (23) | (24) | (25) | (27) | (28) | (38) | (36) | (86) | (142) | (127) | (107) | (90) | (75) | (63) | (53) | (670) |
| After-tax Cost | 43 | 45 | 47 | 49 | 52 | 70 | 66 | 160 | 264 | 236 | 198 | 167 | 140 | 118 | 99 | 1,245 |

| **Net Present Value (at 8% ):** | |
|---|---|
| NPV (2002-2016) | $872 |
| NPV (2017-2026) | $255 |
| **Total NPV** | **$1,127** |
| NPV per Share | $2.63 |

**Key Assumptions:**

-All outstanding Harbison-Walker claims included.

-600,000 new claims over next 25 years.

-Average cost of $5,000/claim in 2002, escalating at 5% per year.

-$2.5 billion in insurance coverage, reimbursed at 80%.

*Source: Morgan Stanley Estimates, Company data*

Morgan Stanley



Exhibit 18

**Estimated Present Value of Asbestos Liability (Scenario 4)**

| | 2002E | 2003E | 2004E | 2005E | 2006E | 2007E | 2008E | 2009E | 2010E | 2011E | 2012E | 2013E | 2014E | 2015E | 2016E | Next 10 Yrs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Claims (thous.):** | | | | | | | | | | | | | | | | |
| New Claims | 200 | 150 | 130 | 100 | 78 | 62 | 40 | 30 | 32 | 20 | 24 | 24 | 24 | 24 | 10 | 50 |
| Open Claims (yr. End) | 462 | 547 | 611 | 646 | 658 | 520 | 410 | 310 | 242 | 184 | 146 | 131 | 125 | 118 | 108 | |
| Claims Closed | 66 | 66 | 66 | 66 | 66 | 200 | 150 | 130 | 100 | 78 | 62 | 40 | 30 | 32 | 20 | 158 |
| Cost/Claim | $750 | $788 | $827 | $868 | $912 | $957 | $1,005 | $1,055 | $1,108 | $1,163 | $1,222 | $1,283 | $1,347 | $1,414 | $1,485 | $1,858 |
| **Cost of Claims ($, mm):** | | | | | | | | | | | | | | | | |
| Gross Pre-tax Cost | 49 | 52 | 54 | 57 | 60 | 191 | 151 | 137 | 111 | 91 | 76 | 51 | 40 | 45 | 30 | 293 |
| Insurance Recoveries | (39) | (41) | (43) | (46) | (48) | (153) | (121) | (110) | (89) | (73) | (61) | (41) | (32) | (36) | (24) | (234) |
| Net Pre-tax Cost | 10 | 10 | 11 | 11 | 12 | 38 | 30 | 27 | 22 | 18 | 15 | 10 | 8 | 9 | 6 | 59 |
| Tax Shield (t=35%) | (3) | (4) | (4) | (4) | (4) | (13) | (11) | (10) | (8) | (6) | (5) | (4) | (3) | (3) | (2) | (21) |
| After-tax Cost | 6 | 7 | 7 | 7 | 8 | 25 | 20 | 18 | 14 | 12 | 10 | 7 | 5 | 6 | 4 | 38 |

| **Net Present Value (at 8% ):** | |
|---|---|
| NPV (2002-2016) | $89 |
| NPV (2017-2026) | $9 |
| **Total NPV** | **$98** |
| NPV per Share | $0.23 |

**Key Assumptions:**

-All outstanding Harbison-Walker claims included.

-One million new claims over next 25 years (more skewed toward front-end).

-Average cost of $750/claim in 2002, escalating at 5% per year.

-$2.5 billion in insurance coverage, reimbursed at 80%.

*Source: Morgan Stanley Estimates, Company data*

Exhibit 19

**Estimated Present Value of Asbestos Liability (Scenario 5)**

| | 2002E | 2003E | 2004E | 2005E | 2006E | 2007E | 2008E | 2009E | 2010E | 2011E | 2012E | 2013E | 2014E | 2015E | 2016E | Next 10 Yrs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Claims (thous.):** | | | | | | | | | | | | | | | | |
| New Claims | 200 | 150 | 130 | 100 | 78 | 62 | 40 | 30 | 32 | 20 | 24 | 24 | 24 | 24 | 10 | 50 |
| Open Claims (yr. End) | 462 | 547 | 611 | 646 | 658 | 520 | 410 | 310 | 242 | 184 | 146 | 131 | 125 | 118 | 108 | |
| Claims Closed | 66 | 66 | 66 | 66 | 66 | 200 | 150 | 130 | 100 | 78 | 62 | 40 | 30 | 32 | 20 | 158 |
| Cost/Claim | $2,500 | $2,625 | $2,756 | $2,894 | $3,039 | $3,191 | $3,350 | $3,518 | $3,694 | $3,878 | $4,072 | $4,276 | $4,490 | $4,714 | $4,950 | $6,195 |
| **Cost of Claims ($, mm):** | | | | | | | | | | | | | | | | |
| Gross Pre-tax Cost | 164 | 172 | 181 | 190 | 199 | 638 | 503 | 457 | 369 | 303 | 254 | 171 | 135 | 151 | 99 | 977 |
| Insurance Recoveries | (131) | (138) | (145) | (152) | (159) | (511) | (402) | (366) | (295) | (201) | - | - | - | - | - | - |
| Net Pre-tax Cost | 33 | 34 | 36 | 38 | 40 | 128 | 101 | 91 | 74 | 101 | 254 | 171 | 135 | 151 | 99 | 977 |
| Tax Shield (t=35%) | (11) | (12) | (13) | (13) | (14) | (45) | (35) | (32) | (26) | (36) | (89) | (60) | (47) | (53) | (35) | (342) |
| After-tax Cost | 21 | 22 | 24 | 25 | 26 | 83 | 65 | 59 | 48 | 66 | 165 | 111 | 88 | 98 | 64 | 635 |

| **Net Present Value (at 8% ):** | |
|---|---|
| NPV (2002-2016) | $471 |
| NPV (2017-2026) | $142 |
| **Total NPV** | **$613** |
| NPV per Share | $1.43 |

**Key Assumptions:**

-All outstanding Harbison-Walker claims included.

-One million new claims over next 25 years (more skewed towards front-end).

-Average cost of $2,500/claim in 2002, escalating at 5% per year.

-$2.5 billion in insurance coverage, reimbursed at 80%.

*Source: Morgan Stanley Estimates, Company data*

Exhibit 20

**Estimated Present Value of Asbestos Liability (Scenario 6)**

| | 2002E | 2003E | 2004E | 2005E | 2006E | 2007E | 2008E | 2009E | 2010E | 2011E | 2012E | 2013E | 2014E | 2015E | 2016E | Next 10 Yrs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Claims (thous.):** | | | | | | | | | | | | | | | | |
| New Claims | 200 | 150 | 130 | 100 | 78 | 62 | 40 | 30 | 32 | 20 | 24 | 24 | 24 | 24 | 10 | 50 |
| Open Claims (yr. End) | 462 | 547 | 611 | 646 | 658 | 520 | 410 | 310 | 242 | 184 | 146 | 131 | 125 | 118 | 108 | |
| Claims Closed | 66 | 66 | 66 | 66 | 66 | 200 | 150 | 130 | 100 | 78 | 62 | 40 | 30 | 32 | 20 | 158 |
| Cost/Claim | $5,000 | $5,250 | $5,513 | $5,788 | $6,078 | $6,381 | $6,700 | $7,036 | $7,387 | $7,757 | $8,144 | $8,552 | $8,979 | $9,428 | $9,900 | $12,389 |
| **Cost of Claims ($, mm):** | | | | | | | | | | | | | | | | |
| Gross Pre-tax Cost | 328 | 344 | 362 | 380 | 399 | 1,276 | 1,005 | 915 | 739 | 605 | 508 | 342 | 269 | 301 | 198 | 1,953 |
| Insurance Recoveries | (262) | (276) | (289) | (304) | (319) | (1,021) | (29) | - | - | - | - | - | - | - | - | - |
| Net Pre-tax Cost | 66 | 69 | 72 | 76 | 80 | 255 | 976 | 915 | 739 | 605 | 508 | 342 | 269 | 301 | 198 | 1,953 |
| Tax Shield (t=35%) | (23) | (24) | (25) | (27) | (28) | (89) | (342) | (320) | (259) | (212) | (178) | (120) | (94) | (105) | (69) | (684) |
| After-tax Cost | 43 | 45 | 47 | 49 | 52 | 166 | 634 | 594 | 480 | 393 | 330 | 222 | 175 | 196 | 129 | 1,270 |

| **Net Present Value (at 8% ):** | |
|---|---|
| NPV (2002-2016) | $1,807 |
| NPV (2017-2026) | $283 |
| **Total NPV** | **$2,090** |
| NPV per Share | $4.87 |

**Key Assumptions:**

-All outstanding Harbison-Walker claims included.

-One million new claims over next 25 years (more skewed toward front-end).

-Average cost of $5,000/claim in 2002, escalating at 5% per year.

-$2.5 billion in insurance coverage, reimbursed at 80%.

*Source: Morgan Stanley Estimates, Company data*

Exhibit 21

**Estimated Present Value of Asbestos Liability (Scenario 7)**

| | 2002E | 2003E | 2004E | 2005E | 2006E | 2007E | 2008E | 2009E | 2010E | 2011E | 2012E | 2013E | 2014E | 2015E | 2016E | Next 10 Yrs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Claims (thous.):** | | | | | | | | | | | | | | | | |
| New Claims | 80 | 60 | 52 | 40 | 31 | 25 | 16 | 12 | 13 | 8 | 10 | 10 | 10 | 10 | 4 | 20 |
| Open Claims (yr. End) | 342 | 337 | 323 | 298 | 263 | 208 | 164 | 124 | 97 | 74 | 59 | 52 | 50 | 47 | 43 | |
| Claims Closed | 66 | 66 | 66 | 66 | 66 | 80 | 60 | 52 | 40 | 31 | 25 | 16 | 12 | 13 | 8 | 63 |
| Cost/Claim | $750 | $900 | $1,080 | $1,296 | $1,555 | $1,866 | $2,239 | $2,687 | $3,225 | $3,870 | $4,644 | $5,573 | $6,687 | $8,024 | $9,629 | $24,697 |
| **Cost of Claims ($, mm):** | | | | | | | | | | | | | | | | |
| Gross Pre-tax Cost | 49 | 59 | 71 | 85 | 102 | 149 | 134 | 140 | 129 | 121 | 116 | 89 | 80 | 103 | 77 | 1,557 |
| Insurance Recoveries | (39) | (47) | (57) | (68) | (82) | (119) | (107) | (112) | (103) | (97) | (93) | (71) | (64) | (82) | (62) | (1,246) |
| Net Pre-tax Cost | 10 | 12 | 14 | 17 | 20 | 30 | 27 | 28 | 26 | 24 | 23 | 18 | 16 | 21 | 15 | 311 |
| Tax Shield (t=35%) | (3) | (4) | (5) | (6) | (7) | (10) | (9) | (10) | (9) | (8) | (8) | (6) | (6) | (7) | (5) | (109) |
| After-tax Cost | 6 | 8 | 9 | 11 | 13 | 19 | 17 | 18 | 17 | 16 | 15 | 12 | 10 | 13 | 10 | 202 |

| **Net Present Value (at 8% ):** | |
|---|---|
| NPV (2002-2016) | $107 |
| NPV (2017-2026) | $41 |
| **Total NPV** | **$149** |
| NPV per Share | $0.35 |

**Key Assumptions:**

-All outstanding Harbison-Walker claims included.

-400,000 claims over next 25 years (more skewed toward front-end).

-Average cost of $750/claim in 2002, escalating at 20% per year.

-$2.5 billion in insurance coverage, reimbursed at 80%.

*Source: Morgan Stanley Estimates, Company data*



**Please see the important disclosures at the end of this report.**

Exhibit 22

**Estimated Present Value of Asbestos Liability (Scenario 8)**

| | 2002E | 2003E | 2004E | 2005E | 2006E | 2007E | 2008E | 2009E | 2010E | 2011E | 2012E | 2013E | 2014E | 2015E | 2016E | Next 10 Yrs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Claims (thous.):** | | | | | | | | | | | | | | | | |
| New Claims | 80 | 60 | 52 | 40 | 31 | 25 | 16 | 12 | 13 | 8 | 10 | 10 | 10 | 10 | 4 | 20 |
| Open Claims (yr. End) | 342 | 337 | 323 | 298 | 263 | 208 | 164 | 124 | 97 | 74 | 59 | 52 | 50 | 47 | 43 | |
| Claims Closed | 66 | 66 | 66 | 66 | 66 | 80 | 60 | 52 | 40 | 31 | 25 | 16 | 12 | 13 | 8 | 63 |
| Cost/Claim | $2,500 | $3,000 | $3,600 | $4,320 | $5,184 | $6,221 | $7,465 | $8,958 | $10,750 | $12,899 | $15,479 | $18,575 | $22,290 | $26,748 | $32,098 | $82,324 |
| **Cost of Claims ($, mm):** | | | | | | | | | | | | | | | | |
| Gross Pre-tax Cost | 164 | 197 | 236 | 283 | 340 | 498 | 448 | 466 | 430 | 403 | 386 | 297 | 267 | 342 | 257 | 5,192 |
| Insurance Recoveries | (131) | (157) | (189) | (227) | (272) | (398) | (358) | (373) | (344) | (51) | - | - | - | - | - | - |
| Net Pre-tax Cost | 33 | 39 | 47 | 57 | 68 | 100 | 90 | 93 | 86 | 352 | 386 | 297 | 267 | 342 | 257 | 5,192 |
| Tax Shield (t=35%) | (11) | (14) | (17) | (20) | (24) | (35) | (31) | (33) | (30) | (123) | (135) | (104) | (94) | (120) | (90) | (1,817) |
| After-tax Cost | 21 | 26 | 31 | 37 | 44 | 65 | 58 | 61 | 56 | 229 | 251 | 193 | 174 | 222 | 167 | 3,375 |

| **Net Present Value (at 8% ):** | |
|---|---|
| NPV (2002-2016) | $741 |
| NPV (2017-2026) | $690 |
| **Total NPV** | **$1,431** |
| NPV per Share | $3.34 |

**Key Assumptions:**

-All outstanding Harbison-Walker claims included.

-400,000 claims over next 25 years (more skewed towards front-end).

-Average cost of $2,500/claim in 2002, escalating at 20% per year.

-$2.5 billion in insurance coverage, reimbursed at 80%.

*Source: Morgan Stanley Estimates, Company data*

Exhibit 23

**Estimated Present Value of Asbestos Liability (Scenario 9)**

| | 2002E | 2003E | 2004E | 2005E | 2006E | 2007E | 2008E | 2009E | 2010E | 2011E | 2012E | 2013E | 2014E | 2015E | 2016E | Next 10 Yrs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Claims (thous.):** | | | | | | | | | | | | | | | | |
| New Claims | 80 | 60 | 52 | 40 | 31 | 25 | 16 | 12 | 13 | 8 | 10 | 10 | 10 | 10 | 4 | 20 |
| Open Claims (yr. End) | 342 | 337 | 323 | 298 | 263 | 208 | 164 | 124 | 97 | 74 | 59 | 52 | 50 | 47 | 43 | |
| Claims Closed | 66 | 66 | 66 | 66 | 66 | 80 | 60 | 52 | 40 | 31 | 25 | 16 | 12 | 13 | 8 | 63 |
| Cost/Claim | $5,000 | $6,000 | $7,200 | $8,640 | $10,368 | $12,442 | $14,930 | $17,916 | $21,499 | $25,799 | $30,959 | $37,150 | $44,581 | $53,497 | $64,196 | $164,648 |
| **Cost of Claims ($, mm):** | | | | | | | | | | | | | | | | |
| Gross Pre-tax Cost | 328 | 394 | 472 | 567 | 680 | 995 | 896 | 932 | 860 | 805 | 773 | 594 | 535 | 684 | 514 | 10,383 |
| Insurance Recoveries | (262) | (315) | (378) | (453) | (544) | (547) | - | - | - | - | - | - | - | - | - | - |
| Net Pre-tax Cost | 66 | 79 | 94 | 113 | 136 | 448 | 896 | 932 | 860 | 805 | 773 | 594 | 535 | 684 | 514 | 10,383 |
| Tax Shield (t=35%) | (23) | (28) | (33) | (40) | (48) | (157) | (314) | (326) | (301) | (282) | (271) | (208) | (187) | (239) | (180) | (3,634) |
| After-tax Cost | 43 | 51 | 61 | 74 | 88 | 291 | 582 | 606 | 559 | 523 | 502 | 386 | 348 | 445 | 334 | 6,749 |

| **Net Present Value (at 8% ):** | |
|---|---|
| NPV (2002-2016) | $2,372 |
| NPV (2017-2026) | $1,380 |
| **Total NPV** | **$3,753** |
| NPV per Share | $8.75 |

**Key Assumptions:**

-All outstanding Harbison-Walker claims included.

-400,000 claims over next 25 years (more skewed towards front-end).

-Average cost of $5,000/claim in 2002, escalating at 20% per year.

-$2.5 billion in insurance coverage, reimbursed at 80%.

*Source: Morgan Stanley Estimates, Company data*

[This page intentionally left blank.]

# Risk Factors and Signposts

**Risk Factors**

Although we are confident that our analysis is reasonable, based on the information we have available to us, we believe it is prudent to look at some of the potential risk factors that could invalidate our conclusions or negatively impact the stock.

**Halliburton could receive additional large jury verdicts against it.** In this case, we believe the risk involved is not if but when and how many. Halliburton's legal strategy makes some trial losses almost a certainty, in our view. Some of those cases may be large. But as long as they are few and far between and not so large that they completely overwhelm all of the cases that are settled for nominal or modest amounts, we will not become particularly concerned.

Even if there is not a landslide of new high-dollar verdicts against Halliburton, the impact of even one could be significantly negative for the stock, depending on the timing. Big jury verdicts grab headlines of the type that make investors quite nervous. As a result, investors' perception of risk is typically skewed by these headlines, often to the point where the perceived risk is much greater than the reality, we believe.

**Our estimate of the ultimate number of asbestos claimants could be too low.** Estimates of the total number of people who received occupational exposure to asbestos has expanded dramatically over the years. Early epidemiological studies estimated 20 million received occupational exposure; more recent estimates tab the total at more than 100 million.

The scenarios we analyzed were based on between 400,000 and one million new asbestos claims over the next 25+ years. Although we based this range on actuarial data, actuaries have been consistently surprised with the number of new asbestos claims over the past 10 years. If the number of new claims were to eventually overshoot our estimate by a factor of two or more times, the financial impact on Halliburton could be much more significant than any of the scenarios we contemplated.

**Continued bankruptcy filings among primary asbestos defendants could make plaintiffs' attorneys more aggressive in their pursuit of Halliburton.** The priorities of the plaintiffs' attorneys are driven by economics, we believe. Being paid on a contingency basis, most would prefer not to go to court due to the cost and risk involved. Negotiating settlements is comparatively "easy money," particularly when mass settlement programs are involved.

Historically, pursuing claims against Halliburton has been a relatively low return activity for plaintiffs' attorneys. The company has not written settlement checks indiscriminately and has been willing to go to court to fight claims it believed were lacking in merit. As a result, many plaintiffs' attorney focused their attention on defendants who were more likely to settle easily.

As additional asbestos defendants file for bankruptcy protection, staying all asbestos claims against them, plaintiffs' attorneys may find themselves forced (by their search for deep pockets) into pursuing Halliburton more vigorously. This could result in a higher number of new claims filings and/or higher costs per claim.

**Financial woes in the insurance industry could affect the coverage available to Halliburton to reimburse asbestos related costs.** Although we believe the considerable insurance coverage available to Halliburton is an important positive for the stock, the long-term accessibility of that coverage could be undermined in the future. Halliburton's largest insurance carrier, Equitas, appears to be well-reserved for asbestos liabilities. Others in the industry are less well-reserved, we believe, and may strain under the burden of paying asbestos-related claims in the future.

We believe this is already the case for Highlands Insurance, which carries Halliburton's coverage for construction-related liabilities. Others may follow.

**Key Signposts**

Since we do not expect the asbestos issue to go away anytime soon, we need to develop a framework for keeping abreast of important developments relating to the company's asbestos liabilities. Following are a few of the most important things we are watching:

• **High-profile trials.** We think trials only become high-profile for one reason: large jury awards. Unfortunately, it is impractical to attempt to monitor trial court dockets all over the country, and Halliburton has shown only a limited willingness to discuss upcoming trial schedules. For this reason, we subscribe to the view that "no news is good news." The longer the time period between unfavorable

publicity related to trials, the better for the stock, we believe.

• **Quarterly disclosures related to asbestos.** Halliburton has regularly disclosed updates on the asbestos situation for many years. As a result, we have a good base of historical data to compare to new disclosures. We will continue to monitor new disclosures, with a particular emphasis on the number of new claims filed and the ongoing cost of closing claims (both on a gross basis and net of insurance).

• **Ongoing suits between Halliburton and other key parties.** Halliburton is engaged in litigation with a number of its insurance carriers and with RHI AG, the parent company of Harbison-Walker. The outcome of these suits could have an important impact, either positive or negative, on the ultimate size and value of the Halliburton's asbestos liability. We will continue to monitor these events closely.

• **Developments relating to insurance coverage.** In particular, we will continue to play close attention to the finances of Equitas, Halliburton's largest insurer. Of particular note will be the adequacy of the company's reserves for asbestos liabilities. Currently, Equitas has a survival ratio of 26.5. Substantial degradation in the adequacy of its reserves would be a concern. Likewise, financial trouble at other large insurers could signal potential risks to Halliburton's additional asbestos coverage.

• **Underlying business fundamentals and balance sheet.** One of the reasons we are fairly sanguine about Halliburton's asbestos exposure is the relative strength of its core businesses and balance sheet. Although the recent decline in North American drilling activity has had (and will likely continue to have) a negative impact on the company's financial results, the ongoing strength in the international oil service business and the resurgence of the company's E&C division are significant offsets. Meaningful decline across all of the company's business lines would be cause for concern, particularly if they resulted in stress on the balance sheet, which currently looks quite strong to us.



**Please see the important disclosures at the end of this report.**

# Appendix 1: Asbestos Conference Call Transcript

In order to provide investors with some background information on the asbestos issue, we hosted a conference call on December 17, 2001 with a leading torts expert. Our guest was Victor E. Schwartz of Shook, Hardy, & Bacon LLP, a Kansas City-based law firm. Mr. Schwartz has extensive experience with product liability issues and particularly relevant experience related to asbestos litigation.

Ole Slorer: **In the context of the recent news on Halliburton, we decided to organize this asbestos call. With me on the call is James Lewis, my Houston-based oil services colleague.**

**We also have the pleasure of having an asbestos expert on the call. Victor Schwartz is a partner in the Washington office of Shook, Hardy and Bacon L.L.P., an international law firm based in Kansas City, and he chairs its Public Policy Group. Mr. Schwartz has an active appellate practice, and advises product manufacturers on liability issues, including medical, tobacco, and asbestos liability.**

**First of all, Mr. Schwartz, thank you for joining us. Could you please give us a summary of how you are involved in the asbestos issues, and whether you represent Halliburton, or any subsidiary of the company?**

Victor Schwartz: I do not represent Halliburton, or any subsidiary. Let me briefly share with you how I have been and am currently involved in asbestos issues. Some years ago, in the early 1980s, when I was at my prior firm, Crowell and Moring, one of my clients was Eagle Pitcher Corporation. They made asbestos-containing products. They are now in bankruptcy. My role was to defend them in so-called property cases. These cases did not involve personal injury. These cases involved claims by school districts that alleged that people who made the products that were in their roofs and insulation had to pay the cost of removing that material.

We were successful. We won every case. In fact, we even put legal costs on the plaintiff in one case. But personal injury claims, which we were not handling — and I am not at all suggesting we could have done better than what was done — caused the company to go into bankruptcy. We also provided some political advice to Keene Corporation, which bought a subsidiary that it was unaware had liability exposure. Keene went into bankruptcy.

Two years ago, a number of large insurers asked us to try to develop some strategies that would help improve the asbestos situation. This is not litigation, but public policy, and new ideas that might help curb what is an ever-increasing disaster for more and more companies.

For the first 15 years of my legal life, I was a law professor and dean of a law school. I co-authored (and still do) the major torts casebook used by our law students. But I was a plaintiffs' lawyer back then. For the past 22 years, I have been on the defense side. So that is my background.

Ole Slorer: **Could you start off maybe by describing the evolution of asbestos litigation over the past 20 years, and describe any important recent trends that you see?**

Victor Schwartz: Sure. Asbestos litigation really began in earnest in the late 1970s and early 1980s, and the focus was two-fold. First, it was on companies like Johns-Manville or Owens Corning Fiberglas that made products that contained asbestos, or products that were used by workers, usually in shipyards or in other places that had tight enclosures.



**Please see the important disclosures at the end of this report.**

The workers breathed the fibers, and some of them (many, many years after they used the product) became ill. Workers from 1945 became sick in 1980 and had very serious illnesses. For example, the most serious of these illnesses is a form of cancer called mesothelioma. And good scientific evidence proved that mesothelioma was caused by asbestos exposure. It really had not been seen before, other than in very rare and remote situations. So you had an easy case of causation.

The second type of case was lung cancer, and the third type of case was asbestosis. Asbestosis is another asbestos signature disease like mesothelioma — you can tell by its name — and this involved very serious lung impairment, so a person had difficulty breathing. A person would have difficulty performing even the simplest of tasks. So you had very serious diseases. You had companies that made asbestos products. And then you had another thing. You had documents in the possession of the defendants that strongly suggested that as early as the late 1930s, the companies knew that asbestos might cause serious, long-term health risks if it were inhaled, and the companies did not tell the people who were using the asbestos about this risk.

And this is what made the case so dramatically different from smoking cases. In smoking cases, the smoker is generally aware of some risk. They may not know as much as the companies allegedly knew, but they knew that smoking is bad for you. The asbestos-exposed workers knew absolutely nothing.

Second, what differentiated these cases from tobacco is that the workers were engaged in trying to make out a livelihood for themselves and their families when they were allegedly exposed. They were extremely sympathetic plaintiffs, and still are. Whereas smokers are engaging in a hedonistic activity, a pleasure activity, and in general — I am making generalizations here — they are not as sympathetic to a jury as asbestos plaintiffs.

In general, that was 20 years ago: seriously ill plaintiffs and defendants who made products that contained asbestos that could float in the ambient air. Let me flash to today, 2001. In 2001, you have two major changes. Number one, most of the claims (and we are still trying to find out how many) do not involve a plaintiff with mesothelioma or lung cancer, or even asbestosis. They have something called pleural plaques. And plaques is spelled P-L-A-Q-U-E-S, just like dental plaques. This is a marking on the lung that suggests that the person has been exposed to asbestos.

But here is what is really new about pleural plaques. The person who may have been exposed to asbestos has no physical disability. He or she can walk and play and run just like the rest of us. And the big issue in litigation in asbestos today is what to do about these plaintiffs.

In a case that was brought against Halliburton, 3M, and several other companies in Mississippi, six plaintiffs who had pleural plaques, no objective symptomatology, were able to obtain between $21 and $25 million each. I believe that those verdicts eventually will be reduced substantially. But if substantial damages are allowed for people who are not sick, this result will be very serious for many companies.

Second, in 2001, many of the defendants did not make asbestos-containing products. Most of the companies that made those products are now in bankruptcy. In asbestos litigation jargon, these companies that did not make asbestos-containing products are called peripheral defendants. Many of them merely had a workplace in which asbestos appeared somewhere. The company may not even have known about it. DuPont would be an example of a peripheral defendant. Who is peripheral, and who is not, is an important issue that we will discuss more. But that is by way of introduction.

Ole Slorer: **In summary, what are the legal theories underlying asbestos litigation and what must be shown to establish a course of action?**

Victor Schwartz: Most cases proceed on product liability theories, and the allegation is that the defendant knew about a dangerous risk associated with its product, and it failed to adequately warn persons who were exposed to the product. So that would be the theory of liability, and that is fundamentally that the defendant knew (or should have known) about a serious risk and failed to disclose that risk. In most of the cases against the original group of defendant, plaintiffs offered evidence that the defendants knew.

Today, in some situations, plaintiffs are trying to show that the defendant "should have known," a difference in terms of guilt. The second element — and this one is sometimes not scrutinized enough by some judges, is that it was the defendant's product that caused the harm.

In most jurisdictions, the law still is that the plaintiff has to identify who made the product that injured the plaintiff. The third element is damages, and that the plaintiff was harmed.

In the cases of mesothelioma, lung cancer, and asbestosis, it is very easy to show the third element, damages. But in the fourth type of case [pleural plaques], the damage is more psychological than it is economic. The person has not lost any days of work. He or she has had very little medical costs. So most of the damages are for what lawyers call pain and suffering damages.

And what has been extraordinary in some of the recent asbestos cases, although it is part of a general trend in the law right now, is very large awards for pain and suffering damages.

James Lewis: **You talked a little bit about the difference between primary defendants, as the people who mined and manufactured asbestos, and the so-called peripheral defendants. In terms of the size, or the magnitude of liabilities, can you just go into a little more detail?**

Victor Schwartz: Well, James, you made one statement there I want to make sure that every listener understands. People who mined asbestos, the people who pulled it out of the earth, have generally not had a great deal of liability exposure. They are merely a supplier of a raw material, as people who mined lead have never been involved in any meaningful way in lead paint litigation.

Raw material suppliers, in general, do not have serious product liability exposures. They do not know what the end use of the product is going to be and cannot control how it is used. So liability exposure is directed to the people who manufactured the product. If you make a product, you basically have to know what is in it, and you are responsible for what is in it. And if you know that there is something dangerous in it, and you do not tell people about it, you are encountering what can be monumental liability exposure at potentially bankruptcy level.

Now, everybody who is listening on this call is probably in an office. They are unlikely to know everything about the composition of materials that are in that office. And while people who run factories know a bit more, they are not in a position of as great a responsibility, or guilt, as a manufacturer. It is harder to show that these people really have engaged in serious wrongdoing. It has been done, but it is harder to do.

And I do not have the verdicts in front of me right now. But some substantial verdicts have been rendered against peripheral defendants who controlled premises where asbestos exposure occurred. But it is more difficult to get a jury in a frame of mind where it is going to make very

substantial awards, the more peripheral, the more removed the defendant is from the party that actually made the product.

James Lewis: **The next piece of legal information that we could use is an explanation of the legal principle of joint and several liability, and its importance to asbestos litigation, and its impact on Halliburton's situation.**

Victor Schwartz: Now, this is what joint and several liability means: If two or more defendants commit a wrongful act — think of two drivers who are driving too fast, they crash and glass flies up, and you are crossing the street and you are hit by glass — each defendant is going to be responsible for the entire damage.

So if one of those drivers is bankrupt, and has no insurance, the other driver has full responsibility. Even though a jury might find that he was only 50 percent responsible. That is joint liability. Several liability would say that each party is only 50 percent liable. In about 11 states — Wyoming is one of them (most of them are less populated states) — the law is several liability. In those jurisdictions, Peter does not pay for the sins of Paul.

But in the majority of states, there is some form of joint liability. Now, it has become very complex as to what form. For example, in some states, if the defendant is found below 30 percent at fault, there is no joint liability, or below 40 percent, there is no joint liability.

Some states — Illinois, for example — still have full and complete joint liability among defendants. Now, we get to asbestos. In asbestos cases, frequently, plaintiffs' lawyers claim that a worker had multiple exposures to asbestos in different places and different times. They were exposed to a product that was made by a subsidiary of Halliburton. They were also exposed to a product that was made by OCF, Owens Corning Fiberglass.

Whether the workers were really exposed or not is often contested in court. Some defendants in asbestos cases believe that at least some of the plaintiffs' lawyers have fabricated the testimony about exposure as they search for a solvent defendant. Unfortunately, some trial judges, especially in certain parts of Mississippi and Texas and other jurisdictions around the country, have not scrutinized testimony about exposure as much as they should. Because if a worker has been exposed to three different asbestos-containing products, and he gets a disease, and a jury determines that each defendant's exposure substantially contributed to his harm, what happens is, the surviving solvent defendant picks up the liability of everybody else.

In asbestos litigation, there has been a kind of domino effect, as more and more companies go into bankruptcy. There are fewer and fewer companies left, absorbing sometimes the liability created partially by the companies now in bankruptcy.

James Lewis: **In terms of this problem, what are the different approaches that are being used by defendants in managing their asbestos liabilities?**

Victor Schwartz: Well, take a company like OCF (Owens Corning Fiberglass), which is now in bankruptcy. They tried to manage their exposure by settling cases on a regular, periodic basis, with an agreement with at least some substantial number of plaintiffs' attorneys that they would wait, year by year, and not hit them with all the claims all at once. And that by settling the cases, maybe 50,000 a year, they could reserve enough money to take care of the cases.

The other approach is, we would rather fight than settle. We will settle cases when we are clear that we are liable, and for a settlement that we believe is fair. And that, as reflected in its conference call, is the approach that was taken by Halliburton.

If I were dealing in the abstract, with no knowledge of particular details of a particular company, I would believe the second approach is better. But there may be situations where the first approach is better. One danger with the first approach is like giving somebody two potato chips. That person is going to want more. A second danger is that there will be some plaintiffs' lawyers who will not be part of the deal, who will feel they want more.

The third danger with the settlement approach is that it may bring in claimants with very weak claims. If you were a plaintiffs' lawyer and you knew you could get $30,000, and you did not have to work very hard for it, you could work five hours to get $30,000, and then your contingency fee was $10,000, you may be making something like over $1,000 an hour. Not quite the salary of a star basketball player, but not bad.

In sum, the block settlement approach is fraught with dangers. And based on the experience of companies that have used it, it can create serious problems. The fight approach also has risk: if you fight, you may end up getting very substantial jury verdicts against you.

That happened to Halliburton recently. When that happens, the plaintiffs' demands and settlement go up. The marker for what your target settlement is going to be is going to go up. The plaintiffs' lawyer figures, "Well, if my friend Bob Catchem, from Catchem, Cheatem and Howe, was able to hit 'em for $30 million, maybe they'll settle with me for five million, instead of $500,000." And that is the danger with the second approach.

Ole Slorer: **Halliburton in its conference call claimed that no product liability had been proved in the Mississippi case. So therefore, what would you say its chances are of totally winning on an appeal?**

Victor Schwartz: Well, in Mississippi I think that the damages may be reduced. I have not reviewed the trial transcript so I cannot evaluate what was proven. The plaintiffs' lawyers believe that they showed that the product was defective, that the plaintiffs were exposed to the product, and that now they had on their lungs a marker indicating asbestos exposure. The plaintiffs went on to use victims and sometimes expert testimony to make the jury believe that these people were so terribly frightened that every single day of their lives, they would be in anguish worrying about whether they would die of mesothelioma.

Data suggest that less than three percent of people who are exposed the way these plaintiffs were exposed would get mesothelioma. That is a fundamental weakness in the case. A second issue is whether they really were exposed to the defendant's product. That is a factual question.

A major weakness in those cases focuses on damages. It is very difficult to imagine, although in Mississippi, it seems unimaginable to me that a $25 million per person verdict will be upheld on appeal. It is likely to be substantially reduced. But it is total speculation as to whether it will be reduced to zero.

How much is a pleural plaque case worth? Well, five years ago people might have said it is not worth $500. But let us say the verdicts are reduced to $100,000 apiece. You are giving $100,000 to people who have nothing wrong with them. We anticipate — now this is not just Halliburton's

exposure — based on whatever data are available that there will be about half a million new asbestos claims overall in the next ten years.

The overwhelming majority of these claimants, in my judgment, probably around 93 percent, will have nothing wrong with them. How these people are going be handled in the law really is the difference between a very serious liability exposure problem and just a problem, in my view, if we really get to the heart of it.

James Lewis: **Do you think that Halliburton's future experience will differ meaningfully from its historical one, given the situation with Harbison-Walker?**

Victor Schwartz: All I can say now is that some plaintiffs' lawyers will view it that way. We are likely to see them demand more in settlement.

Now Halliburton can say, "We won't pay it and we are going to make you sue us and we are going to make you work." Most plaintiffs' lawyers, in spite of what you see on television, do not like to go to trial; it is very expensive for them to go to trial. So we may have to see the result of a few other cases before the dynamic of settlement really changes. Halliburton will have to explain its strategy; I am only offering a guess. But my guess is it is not going to substantially raise the amount it is offering in settlement of these cases right now. It is going to fight these appeals and then fight other cases, and not at this point in time make things any easier for plaintiffs' lawyers who have not brought cases to trial.

One of the big differences between plaintiffs' lawyers and defense lawyers is simply this: defense lawyers are paid by the hour, they have these clocks running and it can be very, very expensive. Plaintiffs' lawyers are only paid if they win. The trial in one of these cases on the defense side costs companies $300,000 or $400,000 or more. The plaintiffs' lawyer only gets his hit if he wins. So I think right now, there is probably the irresistible force, plaintiff demand, and the immovable object, defendant resistance, when it comes to settlement.

Ole Slorer: **If Harbison-Walker or its parent company went into Chapter 11, what would be the impact on Halliburton? Would any of the claims be stayed during the bankruptcy?**

Victor Schwartz: Well, if we look to the past, for example in the W.R. Grace bankruptcy, companies that possibly might have liability that stems from their relationship with Grace, for example Sealed Air, have had stayed all claims against them. So if the liability of Halliburton on a particular case flowed from its corporate relationship with Harbison-Walker, if we look to what has occurred in the past with bankruptcies, those claims would be stayed pending a judge deciding how much responsibility should be thrust on Halliburton.

James Lewis: **Victor, you touched on an important point, which is that a number of these seemingly aberrant verdicts have come out of the same jurisdictions recently. Can you talk about how and why this happens?**

Victor Schwartz: Yes, I can. I outlined how this has occurred in an article called, "How Efficiency In Asbestos Cases Is Hurting You And Victims Of Asbestos," 24 Am. J. of Trial Advoc. 247 (2000). It is written in terms of a letter to the trial judges of America.

Trial judges in certain jurisdictions have, in asbestos cases, either eliminated or greatly reduced certain fundamental rules of law or procedures that protect defendants. For example, having the right to truly take an in-depth deposition of the plaintiff to find out how much exposure he or she

had, where he or she actually worked; to have an opportunity to ask the plaintiff those tough questions. Courts sometimes do not allow that.

If a doctor gets on the stand and he looks at an x-ray and he says, "This x-ray shows that this man has an asbestos exposure," you are entitled to have the judge, in good jurisdictions, act as a “gatekeeper” to make sure that that person is qualified to make that investigation of that x-ray. In certain parts of Mississippi and certain parts of Texas, that type of scrutiny simply does not go on. People make these judgments on the stand; the attitude of the judge is, "That is for the jury to decide. I, as a judge, am not going to block the testimony of that expert witness."

Often identification of the manufacturer and evidence of it is skimpy, or really not even there. Anyone on this call would say, "This defendant is not responsible for that." But some judges allow the issue of whether the defendant’s product caused the plaintiff’s injury to go to the jury. Certain trial judges give the jury in these jurisdictions (e.g., Jefferson County, Mississippi, and certain counties of Texas), an extraordinary latitude in determining the amount of damages.

Automobile cases, ordinary cases, so-called pain and suffering damages that are compensatory in nature but have no market value, are at three or four times actual economic losses. Economic losses or economic damages are the amount of money that a plaintiff spent because of an illness. So, three or four dollars pain and suffering damages to one dollar economic damages became the standard. But in Mississippi, asbestos and other claims are being allowed where they may be 100 to one or 1,000 to one damages of pain and suffering to economic damages.

People who are in tort reform groups, people who are interested in improving our legal system, are focusing on these jurisdictions to try to improve things. But it may be that the only way these things are going to be improved is when certain elected judges who are there and have very strong feelings for plaintiffs are replaced by judges who are more restrained.

James Lewis: **I've read that something like 16% of all asbestos claims nationally have been brought in Mississippi and that seemed extraordinary given its relatively low population, even considering that there are lots of shipyards there. Can you talk a little bit about how the extremely liberal joinder rules within Mississippi allow virtually anyone to sue for asbestos there?**

Victor Schwartz: Sure. All you need is one Mississippi plaintiff. And since Alabama, which used to be [very plaintiff-friendly, has recently enacted reforms], some plaintiffs' lawyers in Alabama will get one Mississippi plaintiff, round up some people from Alabama and other states and bring their cases in Jefferson County.

I do not have the exact numbers, but somehow I remember the number of 21,000 plaintiffs in that county, a number of asbestos claims that far dwarfs the population, which is relatively small. The only court really that can straighten out all of this is the Supreme Court of Mississippi.

And the Supreme Court of Mississippi ultimately will get some of these cases. That Court will have to decide whether it wants to have this current reputation, whether it wants the business climate in Mississippi to be such that any rational businessperson would be frightened to do business there. The Court could help reform the joinder rules, so that the plaintiffs who bring the cases are plaintiffs who are Mississippians. The justices may need some help from the legislature. That would be fair. Those are the ones that people pay taxes for when they build the courts. But right now, these liberal joinder rules are allowing thousands and thousands of claims to be brought in Mississippi as long as you have one plaintiff from the State of Mississippi.



**Please see the important disclosures at the end of this report.**

James Lewis: **We alluded earlier to the fact that Halliburton's management has stated that it is real confident in the merits of its appeals for some of these recent cases. Can you kind of as a practical matter explain the appeals process briefly and what its risks are?**

Victor Schwartz: Well, the risk is that the higher courts will simply affirm the lower courts. I would have to more closely examine the Maryland case. I am just looking at it from the outside and cannot say with any degree of certainty that any particular case will be reversed. Now, the plaintiffs in Maryland were actually sick, and they had cancer. These were not cases of people who had pleural plaques. There were some multiple defendants. The verdicts were around $30 million.

I would expect that the verdicts will be challenged on identification grounds and other factual grounds such as identification. Halliburton will say that was not our product. That the verdict is excessive. In Mississippi, as we have discussed, the $21.8 million verdict is an outrageous amount for a person who was not impaired. Halliburton probably has a reasonably good likelihood in both cases of having the amounts reduced.

But it is a big difference between having the amounts reduced and having the cases actually thrown out. At least from what I know now (I am open-minded, would like to listen, would like to learn), you cannot predict with any degree of certainty that those verdicts will be thrown out on appeal.

If things are sustained after appeal, again, the risk is that a verdict becomes a marker to raise the settlement value of claims against that particular company.

James Lewis: **If you appeal at state level and, for instance, get an adverse judgment against you, is there a method to move onto the federal courts, which I understand are traditionally a little more evenhanded when it comes to asbestos cases?**

Victor Schwartz: In general, federal courts are fair and evenhanded. For example, in the Third Federal Circuit Court of Appeals, there has been a ruling that there are no more punitive damages in asbestos cases. And I agree with that. The companies have learned their lesson. Why punish somebody who has already been punished several times? Why use punitive damages to push a company into bankruptcy and leave thousands of people who have compensation claims stranded against that particular defendant?

But in general, you cannot get into the federal courts in these cases. Sometimes defendants should be entitled to get the case in federal court. In high damage cases, federal courts have jurisdiction if the plaintiff is from one state and defendants are from another. But what some plaintiffs' lawyers do to bust federal courts of jurisdiction is to name a local store as a defendant. For example, in pharmaceutical litigation, a little pharmacy in Mississippi has been named about 1,600 times in cases. It is a small store. No verdict has ever been entered against it.

In sum, the reason the plaintiffs' lawyers sue nominal local defendants is if you have a plaintiff from Mississippi and you have a defendant from Mississippi, you cannot have the case in federal court. The plaintiffs' lawyers will do everything they can to stay out of the federal courts. In my judgment, federal courts are neither pro-plaintiff nor pro-defendant; they provide evenhanded justice.

The only thing these companies can do is after all the appeals are over at the state supreme court level is to find some ground under which they can appeal to the Supreme Court of the United

States. The only way they can do that is to argue that the verdict and the way the case was handled violated their due process rights.

This is extremely difficult to do. It can be done, but it is very hard, because the Supreme Court of the United States takes very few cases. When there are very large punitive damage awards, the Supreme Court, on occasion, has intervened and set standards for punitive damages and reversed lower state court awards.

So, in sum, they cannot get into any federal court at this point. They could petition for a writ of certiorari to the Supreme Court of the United States once either the Maryland Court of Appeals, which is the highest court of Maryland, or the Supreme Court of Mississippi, which is the highest court in Mississippi, has spoken.

Ole Slorer: **Is there anything we can hope for from Washington in terms of clarifying asbestos litigation across the United States?**

Victor Schwartz: When Congress returns in January, there may be a substantial effort to have enacted at the federal level a national asbestos registry. This would be a registry for people who have been exposed to asbestos, that is proven, but currently are not sick. Criteria, that would be medical criteria, that the College of Physicians and Surgeons agree upon would determine whether somebody is sick or not sick currently.

But in lay terms, if you have a person who has no objective symptoms, as I said, he can run, he can pass, he can have children, he can do everything somebody who is healthy can do, his name would be placed in the registry. The federal law would have a second effect apart from registration. It would suspend statutes of limitations in all states. So, if the person got sick 10 years from now and 15 years from now, he would not lose his claim. There also may be an effort to set national venue rules so that a person could only sue in a jurisdiction where he has been exposed to asbestos or where he lives.

I support this legislative effort and will lobby for it. But I know that in the Senate, the plaintiffs' bar is one of the strongest lobbies in the United States. They are very powerful, and generate a lot of political action committee money. A bill of this type would have to go through the Judicial Committee. And it is unlikely that its chairman, Senator Leahy, or Majority Leader Senator Daschle would allow that bill to pass, especially as the unions are likely to come in against it. And the unions frequently, but not always do what the trial lawyers suggest they do.

There is one sliver of hope. I mean it is like a tiny beam. And that is this: Prominent plaintiffs' lawyers on this issue are split. There are some plaintiffs' lawyers who believe that a federal registry is a sound idea. These lawyers have as the bulk of their claims people who are really sick. They have Meso, lung cancer, or asbestosis.

If you were a plaintiffs' lawyer and 95% of your cases were people who were really sick, you would be very legitimately concerned that if courts allow substantial awards to people who are not sick, your clients will not get paid. So, the slim hope is that some of these plaintiffs' lawyers who have that type of case may create a battle among the plaintiffs' lawyers and those who are supporting this legislation may have their way.

But as of today, I would say the political hills seem almost insurmountable to climb because of the trial lawyers' chokehold on the key points that this legislation has to pass to be enacted. They both focus on the Senate where, as a practical matter, one needs 60 votes to pass a bill. One, getting



**Please see the important disclosures at the end of this report.**

out of the Judiciary Committee. Democratic Chairman Leahy would have the right to simply not hold hearings on the subject, or if hold hearings, not bring the bill to a vote. And if he ever did bring it to a vote and it was voted out of his committee, Majority Leader Senator Daschle, as he is doing with the stimulus bill, even though there is 54 votes for it, would say, I am not going to bring it forward.

Ole Slorer: **In absence of Washington's stepping in, is there any practical way that Halliburton can limit its asbestos exposure?**

Victor Schwartz: It can join with others and work to have state courts on their own or state legislatures on their own establish registries in the states in which Halliburton and other companies are in litigation. Halliburton is in the same boat as a lot of other defendants. Defendants need to work together on these goals. Second (I am sure it is doing this right now), it needs to reassess its defense strategy.

Ole Slorer: Well, Victor, thank you very much. At this point, I think we have time for maybe one or two questions from the audience.

Question: **Victor, about the comments relating to getting these claims into federal court, I had heard something to the effect of that at least in some of the cases. I think the auto companies have been trying to do this, because there are defendants in bankruptcy like Federal Mogul, they are trying to argue that there is a federal question, since at least part of the claims are being dealt with under federal bankruptcy code. And that means that they should get all of the asbestos claims into federal court. I do not know much beyond what I just described to you. And I am wondering if you are familiar with that?**

Victor Schwartz: If you had a situation where one of the defendants in a particular case went into bankruptcy, and say, General Motors, were a co-defendant, General Motors may try to steer its cases into a federal court. And I can understand why companies are trying to do that and some of the legal theories underlying it.

But I cannot comment more than that on whether they will be able to do it. If the cases were originally vested in state court, there are many examples where one defendant has gone bankrupt in a case and the case continued against the other defendant in the state court. So, all I can comment on that is that it is an interesting theory. I have not examined it in detail. It is not an outlandish or silly theory. It might work, but that is all one could say is "might."

Question: **Is there, in fact, a trend in place toward the reduction of awards that are considered egregious? I mean, it took ten years, and we just saw the Exxon Valdez award remanded as being too high. Is that unique? Or is that part of a new reasonableness?**

Victor Schwartz: Well, that is a very helpful question. There is a trend among responsible courts for reducing punitive damages. But in the cases that we have been talking about this morning — the Halliburton exposures — these have not involved punitive damages. The big hit in the Exxon case was a punitive damage award. It was not pain and suffering. Also, it was a property damage case.

A few years ago, the Supreme Court of the United States in a case called BMW v. Gore, established certain criteria with respect to the constitutionality of punitive damages. The justices have also indicated that there are certain strict procedural due process rules with punitive damages such as a right to have these awards reviewed in totality on appeal.



**Please see the important disclosures at the end of this report.**

There is a broader trend, beyond the rules relating to the constitutionality of punitive damages, to reduce such damages on appeal. In light of the growing restrictions on punitive damages, plaintiffs' lawyers are trying to place punitive damage evidence to inflate pain and suffering awards. It is old wine of defendant wrongdoing in new bottles: pain and suffering damages. Plaintiffs' lawyers believe that they will be less vulnerable to be reduced or mitigated on appeal. They are correct.

Question: **Thank you for the call. Can you give me an average settlement number for the serious Meso cases that have been settled or a range?**

Victor Schwartz: That is a good question. We have been trying to get that data. And defendants, as you might expect, are very reluctant to make that data public, because they would be really educating the plaintiffs' lawyers who are coming against them about how much a defendant is willing to pay. A RAND study is going to be coming out in late January, which may have some of that data. Whether it will or it will not depends on RAND's judgment about the study's content and how much data they can obtain. But I would say that if you had a Meso case where it can be shown you were at fault, verdicts can be in the millions of dollars.

So, for settling a Meso case where you are clearly responsible, it could be as much as one million dollars. In many of the Meso cases, it is clear that the plaintiff has the illness, but it is unclear whether the defendant is responsible.

The plaintiff may have had multiple exposures to asbestos, and it is unclear whether a particular defendant's product causes this severe injury.

And so the value of the Meso case can go down from a million or a million and a half to $5,000 or even less, if a defendant believes that it was not its product that caused the harm.

Follow-up question: **I appreciate that. If a million dollars is the talking number and I think you said three percent of the pleural plaques cases turn into Meso cases, then is not an average value of a pleural case no less than $30,000?**

Victor Schwartz: You know that is kind of playing tricks with math. I mean the plaintiffs' lawyers would say "use that math." A person with pleural plaques may have nothing wrong with him. Why should he receive compensation now?

Question: **How does the change in insurance company policies with respect to paying claims affect what the lawyers are doing? I am specifically thinking about the Lloyds' run-off, which has basically increased dramatically the requirements to get paid from the policyholders. That is No. 1. And you are seeing also that in the Manville Trust.**

**And a related question to that is you mentioned that nothing can be done at the federal level because it cannot get out of Leahy's committee. Well, what would be your odds for a bill that would limit the unimpaired claimants and, therefore, free up money for the people that really need it?**

Victor Schwartz: Well, these are very interesting questions. Let me discuss insurance and claims first. Some plaintiffs' lawyers are going to go after a particular defendant until it gives its last drop of blood regardless of whether there is insurance. And it is a game of golden goose, where they will take the eggs until the company goes into bankruptcy.

But until that moment, the attitude of many plaintiffs' lawyers is "Regardless of what the company says about insurance, I am going to push this claim to the absolute maximum."

A bill that would only limit claims for people who are unimpaired makes sense for everyone. But you cannot overestimate the plaintiffs' lawyers' power with Senators Leahy and Majority Leader Daschle. The plaintiffs' bar was able to kill the terrorism insurance bill. Plaintiffs' lawyers opposed the bill because it had modest tort reforms. The reforms would have protected tax dollars from exposure. If they could block that one, they could do the same with a modest asbestos reform bill, unless they really are really divided.

James Lewis: Well, on that note, I want to thank Victor for taking the time to speak with us this morning. I want to thank all our callers who participated, and also all the clients who sent in questions ahead of time. And my colleague, Ole, do you have anything else to add?

Ole Slorer: No James, I think we can round it up at this point. And of course, Victor, thank you very much.


**Please see the important disclosures at the end of this report.**

# Appendix 2: Earnings Model and Comparable Table

Exhibit 24

**Halliburton: Summary Annual Earnings Model**

| *In millions of US$* | 1998A | 1999A | 2000A | 2001E | 2002E | 2003E |
|---|---|---|---|---|---|---|
| Revenues: | | | | | | |
| Energy Service Group | 9,009 | 5,921 | 6,776 | 8,722 | 7,797 | 8,584 |
| E & C Group | 5,495 | 6,392 | 5,168 | 4,324 | 4,173 | 4,674 |
| Dresser Equip Group | 2,849 | 2,585 | 1,400 | 359 | - | - |
| Total Revenues | 17,353 | 14,898 | 13,344 | 13,405 | 11,970 | 13,258 |
| EBIT Breakdown: | | | | | | |
| Energy Service Group | 971 | 250 | 582 | 1,015 | 764 | 970 |
| *EBITMargin (%)* | *10.8%* | *4.2%* | *8.6%* | *11.6%* | *9.8%* | *11.3%* |
| E & C Group | 237 | 175 | 150 | 143 | 151 | 187 |
| *EBIT Margin (%)* | *4.3%* | *2.7%* | *2.9%* | *3.3%* | *3.6%* | *4.0%* |
| Dresser Equip Group | 248 | 249 | 158 | 37 | - | - |
| General Corporate | (79) | (71) | (78) | (74) | (69) | (75) |
| EBIT | 1,377 | 603 | 812 | 1,121 | 845 | 1,082 |
| Net Interest & Other | (118) | (95) | (127) | (131) | (80) | (65) |
| EBT | 1,259 | 508 | 685 | 990 | 765 | 1,017 |
| Income Taxes | (481) | (197) | (262) | (398) | (291) | (386) |
| *Tax Rate (%)* | *38%* | *39%* | *38%* | *40%* | *38%* | *38%* |
| Minority Interests | (49) | (43) | (19) | (19) | (24) | (30) |
| **Net Income (Operating)** | **729** | **268** | **404** | **573** | **450** | **600** |
| Diluted Shares (mm) | 439 | 443 | 446 | 430 | 429 | 429 |
| **Operating EPS ($)** | **1.66** | **0.60** | **0.91** | **1.33** | **1.05** | **1.40** |
| Operating CFPS ($) | 3.00 | 1.96 | 2.25 | 2.48 | 2.22 | 2.61 |
| Depreciation & Amort. ($ mm) | 587 | 599 | 600 | 492 | 500 | 520 |
| Dividend per Share ($) | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 |

*Source: Company data, Morgan Stanley Research Estimates*

Exhibit 25

**Halliburton: Balance Sheet Information**

| *In millions of US$* | Dec-99 | Dec-00 | Sep-01 |
|---|---|---|---|
| **Assets:** | | | |
| Cash & equivalents | 466 | 231 | 227 |
| Notes and accounts receivable, net | 2,349 | 3,029 | 3,244 |
| Unbilled work on uncompleted contracts | 625 | 816 | 971 |
| Inventories | 723 | 723 | 831 |
| Current deferred income taxes | 171 | 235 | 249 |
| Net current assets of discontinued operations | 793 | 298 | - |
| Other current assets | 235 | 236 | 265 |
| Total current assets | 5,362 | 5,568 | 5,787 |
| Net property, plant and equipment | 2,390 | 2,410 | 2,569 |
| Equity in and advances to related companies | 384 | 400 | 476 |
| Goodwill, net | 505 | 597 | 592 |
| Noncurrent deferred income taxes | 398 | 340 | 304 |
| Net noncurrent assets of discontinued operations | 310 | 391 | - |
| Insurance for asbestos litigation claims | - | - | 579 |
| Other assets | 290 | 397 | 385 |
| **Total assets** | **9,639** | **10,103** | **10,692** |
| **Liabilities:** | | | |
| Short-term notes payable | 939 | 1,570 | 213 |
| Current maturities of long-term debt | 308 | 8 | 4 |
| Accounts payable | 665 | 782 | 899 |
| Accrued employee compensation and benefits | 137 | 267 | 313 |
| Advanced billings on uncompleted contracts | 286 | 288 | 448 |
| Deferred revenues | 44 | 98 | 64 |
| Income taxes payable | 120 | 113 | 223 |
| Other current liabilities | 534 | 700 | 613 |
| Total current liabilities | 3,033 | 3,826 | 2,777 |
| Long-term debt | 1,056 | 1,049 | 1,470 |
| Employee compensation and benefits | 672 | 662 | 528 |
| Asbestos litigation claims | - | - | 704 |
| Other liabilities | 547 | 600 | 565 |
| Minority interest in consolidated subsidiaries | 44 | 38 | 51 |
| **Total liabilities** | **5,352** | **6,175** | **6,095** |
| **Shareholders' equity:** | | | |
| Common shares at par value | 1,120 | 1,132 | 1,138 |
| Paid-in capital in excess of par value | 68 | 259 | 333 |
| Deferred compensation | (51) | (63) | (74) |
| Accumulated other comprehensive income | (204) | (288) | (200) |
| Retained earnings | 3,453 | 3,733 | 4,242 |
| Subtotal | 4,386 | 4,773 | 5,439 |
| Treasury stock | (99) | (845) | (842) |
| **Total shareholders' equity** | **4,287** | **3,928** | **4,597** |
| **Debt summary:** | | | |
| Total debt | 2,303 | 2,627 | 1,687 |
| Net debt (total debt less cash & equivalents) | 1,837 | 2,396 | 1,460 |
| **Capital structure:** | | | |
| Debt/Capital | 35% | 40% | 27% |
| Net debt/Capital | 28% | 37% | 23% |
| **Working capital balances:** | | | |
| Total working capital | 2,329 | 1,742 | 3,010 |
| Cash & equivalents | (466) | (231) | (227) |
| Non-cash working capital | 1,863 | 1,511 | 2,783 |

*Source: Company data, Morgan Stanley Research Estimates*



**Please see the important disclosures at the end of this report.**

Exhibit 26

**Oil Services & Equipment: Comparable Valuation**

| Company | Recent Price | Mkt. Cap. ($MM) | Earnings Per Share 00A | 01E | 02E | P/E Ratios 00A | 01E | 02E | Cash Flow Per Share 00A | 01E | 02E | P/CF Ratios 00A | 01E | 02E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil Services: | | | | | | | | | | | | | | |
| SLB | $53.69 | $30,910 | $1.25 | $1.41 | $1.45 | 43.0 | 38.1 | 37.0 | $3.35 | $4.74 | $4.07 | 16.0 | 11.3 | 13.2 |
| HAL | $13.49 | $5,787 | $0.91 | $1.33 | $1.05 | 14.8 | 10.1 | 12.8 | $2.25 | $2.48 | $2.22 | 6.0 | 5.4 | 6.1 |
| BHI | $33.34 | $11,198 | $0.60 | $1.27 | $1.25 | 55.6 | 26.3 | 26.7 | $2.42 | $2.28 | $2.22 | 13.8 | 14.6 | 15.0 |
| BJS (1) | $29.19 | $4,685 | $0.70 | $2.06 | $1.20 | 41.7 | 14.2 | 24.3 | $1.30 | $2.69 | $1.87 | 22.5 | 10.9 | 15.6 |
| WFT | $36.92 | $4,673 | $0.71 | $1.78 | $1.72 | 52.0 | 20.7 | 21.5 | $2.48 | $3.17 | $2.88 | 14.9 | 11.6 | 12.8 |
| SII | $51.75 | $2,556 | $1.45 | $3.00 | $2.48 | 35.7 | 17.3 | 20.9 | $3.05 | $4.83 | $4.05 | 17.0 | 10.7 | 12.8 |
| OSCA | $17.25 | $256 | $0.57 | ††† | ††† | 30.3 | ††† | ††† | $1.05 | ††† | ††† | 16.4 | ††† | ††† |
| WHES | $16.82 | $433 | $0.67 | $1.55 | $1.15 | 25.1 | 10.9 | 14.6 | $1.42 | $2.56 | $2.15 | 11.8 | 6.6 | 7.8 |
| *Average* | | | | | | *37.3* | *19.6* | *22.5* | | | | *14.8* | *10.2* | *11.9* |
| Equipment: | | | | | | | | | | | | | | |
| CAM | $40.11 | $2,164 | $1.53 | $1.97 | $2.08 | 26.2 | 20.4 | 19.3 | $2.90 | $3.28 | $3.25 | 13.8 | 12.2 | 12.3 |
| NOI | $18.03 | $1,458 | $0.51 | $1.25 | $1.20 | 35.4 | 14.4 | 15.0 | $0.94 | $1.72 | $1.69 | 19.2 | 10.5 | 10.7 |
| GRP | $8.94 | $978 | $0.12 | $0.49 | $0.61 | 74.5 | 18.2 | 14.7 | $0.29 | $0.82 | $0.95 | 30.8 | 10.9 | 9.4 |
| DRQ | $19.34 | $334 | $0.63 | $0.70 | $0.88 | 30.7 | 27.6 | 22.0 | $1.05 | $1.19 | $1.41 | 18.4 | 16.3 | 13.7 |
| *Average* | | | | | | *41.7* | *20.2* | *17.7* | | | | *20.6* | *12.5* | *11.5* |
| Contract Drillers: | | | | | | | | | | | | | | |
| RIG | $29.60 | $9,435 | $0.67 | $0.79 | $1.58 | 44.2 | 37.5 | 18.7 | $1.90 | $2.79 | $3.23 | 15.6 | 10.6 | 9.2 |
| GSF | $27.80 | $6,477 | $0.66 | $1.77 | $1.68 | 42.1 | 15.7 | 16.5 | $1.25 | $2.83 | $2.76 | 22.2 | 9.8 | 10.1 |
| NBR | $30.32 | $4,271 | $0.89 | $2.20 | $1.22 | 34.1 | 13.8 | 24.9 | $1.89 | $3.30 | $2.45 | 16.0 | 9.2 | 12.4 |
| NE | $30.51 | $4,035 | $1.22 | $1.97 | $2.01 | 25.0 | 15.5 | 15.2 | $2.04 | $2.84 | $2.92 | 15.0 | 10.7 | 10.4 |
| DO | $27.78 | $3,670 | $0.46 | $1.32 | $0.99 | 60.4 | 21.0 | 28.1 | $1.47 | $2.48 | $2.21 | 18.9 | 11.2 | 12.6 |
| ESV | $22.63 | $3,060 | $0.61 | $1.41 | $0.67 | 37.1 | 16.0 | 33.8 | $1.32 | $2.25 | $1.53 | 17.1 | 10.1 | 14.8 |
| PDE | $12.55 | $1,667 | $0.39 | $0.97 | $0.74 | 32.2 | 12.9 | 17.0 | $1.76 | $2.32 | $2.21 | 7.1 | 5.4 | 5.7 |
| PTEN | $20.57 | $1,570 | $0.50 | $2.14 | $0.43 | 41.1 | 9.6 | 47.8 | $1.33 | $3.23 | $1.62 | 15.5 | 6.4 | 12.7 |
| *Average* | | | | | | *39.5* | *17.8* | *25.2* | | | | *15.9* | *9.2* | *11.0* |
| Offshore Construction/Supply: | | | | | | | | | | | | | | |
| CDIS | $22.56 | $735 | $0.72 | $0.87 | $0.94 | 31.3 | 25.9 | 24.0 | $1.69 | $1.96 | $2.01 | 13.3 | 11.5 | 11.2 |
| CKH | $42.12 | $846 | $1.78 | $3.15 | $2.02 | 23.7 | 13.4 | 20.9 | $3.93 | $5.17 | $4.27 | 10.7 | 8.1 | 9.9 |

*(1) BJS has a September 30 fiscal year end*

*E = Morgan Stanley Research Estimates, NAV = Not Available, NM = Not Meaningful*

*Source: Company Reports, ILX*

*††† Estimates for this company have been removed from consideration in this report because, under applicable law and/or Morgan Stanley policy, Morgan Stanley may be precluded from issuing such information with respect to this company at this time.*



**Please see the important disclosures at the end of this report.**

*V = More volatile. We estimate that this stock has more than a 25% chance of a price move (up or down) of more than 25% in a month, based on a quantitative assessment of historical data, or in the analyst's view, it is likely to become materially more volatile over the next 1-12 months compared with the past three years. Stocks with less than one year of trading history are automatically rated as more volatile (unless otherwise noted). We note that securities that we do not currently consider "volatile" can still perform in that manner.*

---

The following analysts, strategists, or research associates (or members of their household) own securities in a company that they cover or recommend in this report: James R. Lewis - Noble Drilling.

The information and opinions in this report were prepared by Morgan Stanley & Co. Incorporated ("Morgan Stanley"). Morgan Stanley has no obligation to tell you when opinions or information in this report change. Morgan Stanley and its affiliate companies are involved in many businesses that may relate to companies mentioned in this report. These businesses include market making and specialized trading, risk arbitrage and other proprietary trading, fund management, investment services and investment banking.

This report is based on public information. Morgan Stanley makes every effort to use reliable, comprehensive information, but we make no representation that it is accurate or complete. We are not offering to buy or sell the securities mentioned or soliciting an offer to buy or sell them.

Within the last three years, Morgan Stanley, Morgan Stanley DW Inc. and/or their affiliate companies managed or co-managed a public offering of the securities of Baker Hughes, Smith International Inc., OSCA, Inc., W-H ENERGY SERVICES, National Oilwell Inc. and Nabors Industries Inc..

Morgan Stanley, Morgan Stanley DW Inc. and/or their affiliate companies make a market in the securities of Smith International Inc., W-H ENERGY SERVICES and Patterson-UTI Energy.

Morgan Stanley, Morgan Stanley DW Inc., affiliate companies, and/ or their employees may have an investment in securities and derivatives of securities of companies mentioned in this report. These derivatives may be issued by Morgan Stanley or others associated with it.

The securities discussed in this report may not be suitable for all investors. Investors must make their own investment decisions based on their own investment objectives and financial position. Morgan Stanley recommends that investors independently evaluate each issuer, security or instrument discussed, and use any independent advisers they believe necessary. The value of and income from your investment may vary because of changes in interest rates or foreign exchange rates, changes in the price of securities or other indexes in the securities markets, changes in operational or financial conditions of companies and other factors. There may be time limitations on the exercise of options or other rights in your securities transactions. Past performance is not necessarily a guide to future performance.

This publication is disseminated in Japan by Morgan Stanley Japan Limited and/or Morgan Stanley Nippon Securities Limited; in Singapore by Morgan Stanley Dean Witter Asia (Singapore) Pte., regulated by the Monetary Authority of Singapore; in Australia by Morgan Stanley Dean Witter Australia Limited A.B.N. 67 003 734 576, a licensed dealer, which accepts responsibility for its contents; in certain provinces of Canada by Morgan Stanley Canada Limited, which has approved of, and has agreed to take responsibility for, the contents of this publication in Canada; in Spain by Morgan Stanley Dean Witter, S.V., S.A., a Morgan Stanley group company, which is supervised by the Spanish Securities Markets Commission (CNMV) and states that this document has been written and distributed in accordance with the rules of conduct applicable to financial research as established under Spanish regulations; in the United States by Morgan Stanley & Co. Incorporated and Morgan Stanley DW Inc., which accept responsibility for its contents; and in the United Kingdom, this publication is approved by Morgan Stanley & Co. International Limited, solely for the purposes of section 21 of the Financial Services and Markets Act 2000. Private U.K. investors should obtain the advice of their Morgan Stanley & Co. International Limited representative about the investments concerned.

This report may not be sold or redistributed without the written consent of Morgan Stanley Dean Witter & Co. Morgan Stanley is a service mark of Morgan Stanley Dean Witter & Co.

**Additional information on recommended securities is available on request.**

Morgan Stanley

**The Americas**
1585 Broadway
New York, NY 10036-8293
United States
Tel: +1 (1)212 761 4000

**Europe**
25 Cabot Square, Canary Wharf
London E14 4QA
United Kingdom
Tel: +44 (0)20 7513 8000

**Japan**
20-3, Ebisu 4-chome
Shibuya-ku,
Tokyo 150-6008, Japan
Tel: +81 (0)3 5424 5000

**Asia/Pacific**
Three Exchange Square
Central
Hong Kong
Tel: +852 2848 5200

© Copyright 2002 Morgan Stanley Dean Witter & Co.

# EXHIBIT
# 160

CIBC World Markets

**Equity Research**

February 15, 2002

# Halliburton Co.

**Bankruptcy Court Stays Asbestos Claims; Potential Positive For The Stock**

## Oilfield Service


**Allen Brooks** (713) 650-2505
**Jordan Horoschak** (713) 650-2506


## Investment Conclusion

- **Temporary restraining order for asbestos claims issued.** A U.S. Bankruptcy Court has issued a temporary restraining order staying more than 200,000 pending asbestos claims against Halliburton and its former subsidiary, Harbison-Walker. In the world of stock prices driven by events, this action represents a significant positive for Halliburton's stock price. There is no impact on our earnings estimates. We maintain our Buy rating and our $20 price target.

- **A plan of attack to limit asbestos damages.** Halliburton has agreed to work with Harbison-Walker and its parent, Austrian-based RHI AG, to propose and have confirmed a plan of reorganization under Chapter 11 provisions of the U.S. Bankruptcy Code that will include the establishment of a trust to provide distributions to legitimate asbestos claimants. This trust arrangement is provided for under Section 524(g)/105 the Code. To be established, this trust must have the approval of 75% of the asbestos plaintiffs. This approval threshold may prove a stumbling block since the establishment of a trust will effectively take bread off the table of plaintiff lawyers who may urge their clients to continue to sue in the courts.

- **The present value cost appears attractive.** Halliburton will provide $35 million of debtor-in-protection financing to Harbison-Walker, if approved by the Bankruptcy Court. Halliburton will also pay RHI $40 million to facilitate the Chapter 11 filing It will pay an additional $35 million if an acceptable reorganization plan is filed with the court and another $85 million if the plan and a trust are confirmed by the court. These payments total $195 million which, given Halliburton's potential exposure for asbestos damages, represents, in our view, an extremely attractive discounted present value cost. Halliburton and Harbison-Walker still have, as of the date of the Chapter 11 filing, approximately $2.1 billion of products liability insurance.

### Rating: BUY

| | |
|---|---|
| HAL-NYSE (2/14/2002): | $14.66 |
| 52-week Range: | $49.25-8.60 |
| Shares Outstanding: | 429 Million |
| Float: | 427 Million Shares |
| Market Capitalization: | $6.3 Billion |
| Dividend/Yield: | $0.50/3.4% |
| Fiscal Year Ends: | December |
| Book Value: | $10.71 per Share |
| 2002E ROE: | 13.9% |
| LT Debt: | $1.5 Billion |
| Preferred: | Nil |
| Common Equity: | $4.8 Billion |

**Earnings per Share**

| | |
|---|---|
| 2001 | $1.28 |
| 2002E | $1.10 |
| 2003E | $1.55 |

**P/E Ratio**

| | |
|---|---|
| 2001 | 11.5X |
| 2002E | 13.3X |
| 2003E | 9.5X |

**Cash Flow per Share**

| | |
|---|---|
| 2001 | $2.59 |
| 2002E | $2.29 |
| 2003E | $2.88 |

**P/CF Ratio**

| | |
|---|---|
| 2001 | 5.7X |
| 2002E | 6.4X |
| 2003E | 5.1X |

**Company Description:**
*Halliburton Co. is a diversified energy services, engineering and construction and maintenance company.*

**02-2009** © 2002

- A hearing on the TRO should be held within the next two weeks. While there remains a high threshold of approvals and conditions before this plan can be approved and confirmed by the court, this development is a significant positive in potentially "fencing off" the bulk of the asbestos liabilities for Halliburton. The company will still have about 70,000 claims related to exposure for employees working for its Kellogg Brown & Root subsidiary. These claims have been handled extremely well under Halliburton's management and have been settled for about $200 per claim, after insurance reimbursement.

- We are not experts in asbestos claims, but we have viewed positively Halliburton's management of this exposure. As we stated in our December 11, 2001, report (*Management Calms Asbestos Fears*), we do not believe "asbestos will cripple the company." This development may be first concrete action to support our view and to begin to lift the "asbestos cloud" overhanging the company.

**Our quarterly EPS estimates are shown below.**

This report is issued and approved for distribution by (i) in the US, CIBC World Markets Corp., a member of the NYSE and SIPC, (ii) in Canada, CIBC World Markets Inc., a member of the IDA and CIPF, (iii) in the UK, CIBC World Markets plc, which is regulated by the FSA, and (iv) in Australia, CIBC World Markets Australia Limited, a member of the Australian Stock Exchange and regulated by the ASIC. Any questions should be directed to your sales representative.

Every state in the United States, province in Canada and most countries throughout the world have their own laws regulating the types of securities and other investment products which may be offered to their residents, as well as the process for doing so. As a result, some of the securities discussed in this report may not be available to every interested investor. Accordingly, this report is provided for informational purposes only, and does not constitute an offer or solicitation to buy or sell any securities discussed herein in any jurisdiction where such would be prohibited. No part of any report may be reproduced in any manner without the prior written permission of CIBC World Markets.

The information and any statistical data contained herein have been obtained from sources which we believe to be reliable, but we do not represent that they are accurate or complete, and they should not be relied upon as such. All opinions expressed and data provided herein are subject to change without notice. A CIBC World Markets company or its shareholders, directors, officers and/or employees, may have a long or short position or deal as principal in the securities discussed herein, related securities or in options, futures or other derivative instruments based thereon. A CIBC World Markets company may have acted as initial purchaser or placement agent for a private placement of any of the securities of any company mentioned in this report, may from time to time solicit from or perform financial advisory, investment banking or other services for such company, or have lending or other credit relationships with the same. The securities mentioned in this report may not be suitable for all types of investors; their prices, value and/or income they produce may fluctuate and/or be adversely affected by exchange rates. Since the levels and bases of taxation can change, any reference in this report to the impact of taxation should not be construed as offering tax advice; as with any transaction having potential tax implications, clients should consult with their own tax advisors. Past performance is no guarantee of future results.

This document and any of the products and information contained herein are not intended for the use of private investors in the UK. Such investors will not be able to enter into agreements or purchase products mentioned herein from CIBC World Markets plc.

The comments and views expressed in this document are meant for the general interests of clients of CIBC World Markets Australia Limited. In preparing the advice given in this document, CIBC World Markets did not take into account the investment objectives, financial situation and particular needs of any particular client of CIBC World Markets. Before making an investment decision on the basis of any recommendation made in this document, the recipient should consider how appropriate the recommendation is to their particular investment needs, objectives and financial circumstances. To allow CIBC World Markets to take into consideration a recipient's objectives, financial situation and particular needs, CIBC World Markets requests that, prior to acting on any of the recommendations herein, you contact one of our client advisers to discuss your particular circumstances.

Although each company issuing this report is a wholly owned subsidiary of Canadian Imperial Bank of Commerce ("CIBC"), each is solely responsible for its contractual obligations and commitments, and any securities products offered or recommended to or purchased or sold in any client accounts (i) will not be insured by the Federal Deposit Insurance Corporation, the Canada Deposit Insurance Corporation or other similar deposit insurance, (ii) will not be deposits or other obligations of CIBC, (iii) will not be endorsed or guaranteed by CIBC, and (iv) will be subject to investment risks, including possible loss of the principal invested. The CIBC trademark is used under license.

© 2002 CIBC World Markets Corp. and CIBC World Markets Inc. All rights reserved.

| | | 1 Qtr. | 2 Qtr. | 3 Qtr. | 4 Qtr. | Year |
|---|---|---|---|---|---|---|
| 2001 | Actual | $0.20 | $0.33 | $0.42 | $0.33 | $1.28 |
| 2002E | Current | $0.24E | $0.24E | $0.28E | $0.33E | $1.10E |
| 2003E | Current | --- | --- | --- | --- | $1.55E |

**Our quarterly cash flow per share estimates are shown below.**

| | | 1 Qtr. | 2 Qtr. | 3 Qtr. | 4 Qtr. | Year |
|---|---|---|---|---|---|---|
| 2001 | Actual | $0.56 | $0.66 | $0.73 | $0.64 | $2.59 |
| 2002E | Current | $0.54E | $0.53E | $0.58E | $0.64E | $2.29E |
| 2003E | Current | --- | --- | --- | --- | $2.88E |

## Exhibit 1. Halliburton Company Earnings Model.

# Halliburton Company

**Symbol: HAL-NYSE**
**Fiscal Year End: December 31**
**(Amounts in MM)**

| | 2000 | 2001 | | | | | 2002 | | | | | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY | Q1 | Q2 | Q3 | Q4 | FY | Q1E | Q2E | Q3E | Q4E | FYE | FYE |
| Revenues: | | | | | | | | | | | | |
| Energy Services | **6,776.0** | 2,031.0 | 2,214.0 | 2,309.0 | 2,168.0 | **8,722.0** | 1,970.1 | 1,881.9 | 2,124.3 | 2,207.0 | **8,183.3** | **9,154.4** |
| Engineering & Construction Group | **5,168.0** | 1,113.0 | 1,125.0 | 1,082.0 | 1,004.0 | **4,324.0** | 990.6 | 1,001.3 | 1,136.1 | 1,204.8 | **4,332.7** | **4,766.0** |
| Total revenues | **11,944.0** | 3,144.0 | 3,339.0 | 3,391.0 | 3,172.0 | **13,046.0** | 2,960.6 | 2,883.2 | 3,260.4 | 3,411.8 | **12,516.0** | **13,920.4** |
| Operating Income: | | | | | | | | | | | | |
| Energy Services | **517.0** | 200.0 | 267.0 | 321.0 | 227.0 | **1,015.0** | 185.2 | 184.4 | 210.3 | 238.4 | **818.3** | **1,095.9** |
| Engineering & Construction Group | **137.0** | 18.0 | 25.0 | 39.0 | 61.0 | **143.0** | 34.7 | 35.0 | 39.8 | 42.2 | **151.6** | **214.0** |
| Special Charges And Credits | **0.0** | 0.0 | 0.0 | 0.0 | 0.0 | **0.0** | 0.0 | 0.0 | 0.0 | 0.0 | **0.0** | **0.0** |
| General Corporate | **(78.0)** | (20.0) | (20.0) | (18.0) | (16.0) | **(74.0)** | (16.0) | (17.0) | (17.0) | (18.0) | **(68.0)** | **(77.0)** |
| Total Operating Income | **576.0** | 198.0 | 272.0 | 342.0 | 272.0 | **1,084.0** | 203.9 | 202.5 | 233.1 | 262.5 | **901.9** | **1,232.9** |
| Interest Expense | **143.0** | 48.0 | 34.0 | 34.0 | 32.0 | **148.0** | 32.0 | 32.0 | 32.0 | 32.0 | **128.0** | **120.0** |
| Interest Income | **23.0** | 5.0 | 6.0 | 8.0 | 9.0 | **28.0** | 9.0 | 9.5 | 10.0 | 11.0 | **39.5** | **40.0** |
| Foreign Currency Gain (Loss) | **(4.0)** | (4.0) | (1.0) | (2.0) | (4.0) | **(11.0)** | (2.0) | (2.0) | (2.0) | (2.0) | **(8.0)** | **(8.0)** |
| Other Nonoperating | **1.0** | 0.0 | 0.0 | 0.0 | 0.0 | **0.0** | 0.0 | 0.0 | 0.0 | 0.0 | **0.0** | **0.0** |
| Income Before Taxes | **453.0** | 151.0 | 243.0 | 314.0 | 245.0 | **953.0** | 178.9 | 178.0 | 209.1 | 239.5 | **805.4** | **1,144.9** |
| Provision For Taxes | **175.8** | 60.2 | 98.0 | 126.0 | 99.0 | **383.2** | 71.5 | 71.2 | 83.6 | 95.8 | **322.2** | **458.0** |
| Minority Interest | **(19.0)** | (5.0) | (2.0) | (7.0) | (5.0) | **(19.0)** | (2.0) | (2.0) | (3.0) | (3.0) | **(10.0)** | **(20.0)** |
| Net Income | **258.2** | 85.8 | 143.0 | 181.0 | 141.0 | **550.8** | 105.3 | 104.8 | 122.4 | 140.7 | **473.3** | **666.9** |
| Income from Discontinued ops | **98.3** | 22.2 | 0.0 | (2.0) | (2.0) | **(42.0)** | 0.0 | 0.0 | 0.0 | 0.0 | **0.0** | **0.0** |
| Extraordinary gain (after tax) | **263.0** | 0.0 | 0.0 | 0.0 | 0.0 | **299.0** | 0.0 | 0.0 | 0.0 | 0.0 | **0.0** | **0.0** |
| **EPS: Diluted** | | | | | | | | | | | | |
| **Operating EPS from Continuing Ops** | **$0.58** | **$0.20** | **$0.33** | **$0.42** | **$0.33** | **$1.28** | **$0.24** | **$0.24** | **$0.28** | **$0.33** | **$1.10** | **$1.55** |
| EPS from Discontinued Ops | $0.22 | $0.05 | $0.00 | ($0.00) | ($0.01) | ($0.10) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Operating EPS | $0.80 | $0.25 | $0.33 | $0.42 | $0.32 | $1.19 | $0.24 | $0.24 | $0.28 | $0.33 | $1.10 | $1.55 |
| EPS from Extraordinary Items | $0.59 | $0.00 | $0.00 | $0.00 | $0.00 | $0.70 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Net reported EPS | $1.38 | $0.25 | $0.33 | $0.42 | $0.32 | $1.88 | $0.24 | $0.24 | $0.28 | $0.33 | $1.10 | $1.55 |
| Basic shares outstanding | 442 | 426 | 427 | 428 | 429 | 428 | 429 | 429 | 429 | 429 | 429 | 429 |
| Diluted Shares | 449 | 430 | 430 | 429 | 430 | 430 | 430 | 430 | 430 | 430 | 430 | 430 |
| Depreciation And Amortization | 560.0 | 155.0 | 140.0 | 132.0 | 135.0 | 562.0 | 125.0 | 123.0 | 127.0 | 135.0 | 510.0 | 570.0 |
| Operating Cash Flow | 818.2 | 240.8 | 283.0 | 313.0 | 276.0 | 1,112.8 | 230.3 | 227.8 | 249.4 | 275.7 | 983.3 | 1,236.9 |
| **CFPS: Diluted** | **$1.82** | **$0.56** | **$0.66** | **$0.73** | **$0.64** | **$2.59** | **$0.54** | **$0.53** | **$0.58** | **$0.64** | **$2.29** | **$2.88** |
| EBITDA | 1,136.0 | 353.0 | 412.0 | 474.0 | 407.0 | 1,646.0 | 328.9 | 325.5 | 360.1 | 397.5 | 1,411.9 | 1,802.9 |
| EBITDA Per Share | $2.53 | $0.82 | $0.96 | $1.10 | $0.95 | $3.83 | $0.76 | $0.76 | $0.84 | $0.92 | $3.28 | $4.19 |

Source: Company data and CIBC World Markets Corp. estimates.

# EXHIBIT 161

# JEFFERIES

Oil Service Group

Update – February 15, 2002

Asit K. Sen, CFA (212) 284-2167 asen@jefco.com Ken Geren (212) 284-2176 kgeren@jefco.com

## Halliburton Company

NYSE: HAL - $16.50*

Rating: Hold

| | | | 2000 | 2001 | 2002E | 2003E |
|---|---|---|---|---|---|---|
| 52-Week Range | $49.25-$8.60 | | | | | |
| Average Daily Vol (000's) | 3,740 | 1Q | $0.06 | $0.20 | $0.26 | $0.30 |
| Shares Out –FD (MM) | 429.8 | 2Q | 0.12 | 0.33 | 0.21 | 0.33 |
| Equity Market Cap (MM) | 7,092 | 3Q | 0.17 | 0.42 | 0.24 | 0.35 |
| Institutional Holdings | 82% | 4Q | 0.22 | 0.33 | 0.29 | 0.37 |
| Insider Holdings | 1% | EPS | $0.56 | $1.28 | $1.00 | $1.35 |
| Debt to Total Capital | 27% | P/E | 29.3x | 12.9x | 16.5x | 12.2x |
| Book Value per Share | 10.42 | CFPS | $1.74 | $2.52 | $2.30 | $2.65 |
| Revenue (2001) | 13,046 | EBITDA/Shr. | $2.46 | $3.76 | $3.25 | $4.40 |
| | | * Priced intra-day 2/15/02 | | | | |
| | | ($MM), except per share data. | | | | |

## Halliburton: Light at the End of the Tunnel?

- While we are very encouraged by the recent positive asbestos news, we are maintaining our Hold rating on Halliburton.
- The anticipated legal process will likely be prolonged (expected to take more than 2 years). During this time frame, HAL will essentially be a "special situation" story, in our opinion. Also, HAL shares will likely underperform their peers, as an anticipated oil services industry recovery unfolds in 2H02.
- In conjunction with a voluntary Chapter 11 bankruptcy filing by Harbison-Walker, the U.S. Bankruptcy Court issued a temporary restraining order staying more than 200,000 pending asbestos cases against HAL's Dresser Industries unit.
- Halliburton, along with RHI Refractories, Harbison-Walker's current parent company, have agreed to work together to establish a special trust for resolution and payment of Harbison-Walker asbestos claims.
- We view this as an extremely positive development for HAL, primarily because it would remove some enormous uncertainties that have clouded HAL shares over the past several quarters.
- We do note that the bankruptcy code allows the creation of this type of trust as long as 75% of Harbison-Walker's asbestos plaintiffs approve its creation.
- Our target price on HAL is $23 based on our 8.2 our EV/EBITDA multiple, reflecting a 35% discount to the group target multiple. HAL shares are currently selling at a 50% discount.

## Positive Asbestos Development for Halliburton

In conjunction with a voluntary Chapter 11 bankruptcy filing by Harbison-Walker, the U.S. Bankruptcy Court issued a temporary restraining order staying more than 200,000 pending asbestos cases against HAL's Dresser Industries unit. Halliburton, along with RHI Refractories, Harbison-Walker's current parent company have agreed to work together to establish a special trust for resolution and payment of Harbison-Walker asbestos claims. The special trust plan would be allowed by the court, if approved by 75% of Harbison-Walker's asbestos plaintiffs.

## How Significant Are Harbison-Walker Claims?

At the end of 2001, there were roughly 125,000 claims against Harbison, naming Dresser as a co-defendant. Traditionally, Harbison's average gross cost per claim has been about $6,500, while HAL's gross cost has averaged roughly $720.

**Table 1: Halliburton claims**

| New Claims (filed during quarter) | 1Q01 | 2Q01 | 3Q01 | 4Q01 |
|---|---|---|---|---|
| Halliburton | 18,000 | 27,000 | 13,000 | 9,400 |
| Harbison-Walker* | | | 3,500 | 4,400 |
| | | | | |
| Open Claims (end of quarter) | | | | |
| Halliburton | 129,000 | 145,000 | 146,000 | 149,000 |
| Harbison-Walker* | | | | 125,000 |
| Total | | | | 274,000 |

* Harbison-Walker cases where Dresser is named as a co-defendant

## We View This as Positive for 3 Reasons

1) Reduces the potential risk of bankruptcy. With nine companies having filed for asbestos-related bankruptcy in less that 2 years, investors have been extremely jittery with asbestos-tainted companies.

2) Helps investors better quantify Harbison-Walker related liability. With ongoing litigation between Harbison and Halliburton very limited new financial information was provided to the investment community. We now hope to get some more clarity.

3) HAL has a better track record in managing asbestos claims. Historically, HAL's gross settlement cost per claim (before insurance payment) has averaged $720, while for Harbison the comparable number is about $6,500. With increased cooperation between HAL and Harbison, we expect lower costs going forward.

## Shares Should React Favorably Near-term

While we are very encouraged by the recent positive asbestos news, we are maintaining our Hold rating on Halliburton. The anticipated legal process will likely be prolonged (expected to take more than 2 years). During this time frame HAL will essentially be a "special situation" story, in our opinion. Also, HAL shares will likely underperform their peers, as an anticipated oil services industry recovery unfolds in 2H02. On a 2002 EV/EBITDA basis, HAL is currently selling at 5.7x, a 50% discount to the peer group multiple. We anticipate that discount to narrow, based on the positive asbestos developments. Our price target of $23 is based on HAL shares selling at an 8.2x 2002 EV/EBITDA, or roughly a 35% discount to the group target multiple of 12.5x.

## Risks

Asbestos litigation has proven to be unpredictable and often irrational. The number of claims submitted to Halliburton doubled in 2Q01 sequentially, then dropped in the following quarter. Overall, claims have risen in recent years and show no signs of subsiding. Also, while the settlement process tends to produce reasonable and predictable results, venue shopping and unpredictable juries increase the likelihood of occasional large judgments, as recently seen. Future cost per claim could be materially higher compared to the historical cost of $200 per claim (net to HAL). The possibility of asbestos-related litigation reform may not materialize over the near-term.

© 2002 Jefferies & Company, Inc. All rights reserved.

This material has been prepared by Jefferies & Company, Inc. ("Jefferies") a U.S.-registered broker-dealer, employing appropriate expertise, and in the belief that it is fair and not misleading. It is approved for distribution in the United Kingdom by Jefferies International Limited ("JIL") regulated by the Financial Services Authority ("FSA"). The information upon which this material is based was obtained from sources believed to be reliable, but has not been independently verified. Therefore except for any obligations under the rules of the FSA, we do not guarantee its accuracy. Additional and supporting information is available upon request. This is not an offer or solicitation of an offer to buy or sell any security or investment. Any opinion or estimates constitute our best judgment as of this date, and are subject to change without notice. Jefferies and JIL and their affiliates and their respective directors, officers and employees may buy or sell securities mentioned herein as agent or principal for their own account. This material is intended for use only by professional or institutional investors falling within articles 19 or 49 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001and not the general investing public. None of the investments or investment services mentioned or described herein are available to other persons in the U.K. and in particular are not available to "private customers" as defined by the rules of the FSA or to anyone in Canada who is not a "Designated Institution" as defined by the Securities Act (Ontario)."

# EXHIBIT 162

# Thinking About Asbestos

Jeffrey M. Applegate
Charles L. Reinhard

Kim N. Wallace
Steven Soukup

J. Paul Newsome, CFA
Robin B. Albanese
Vincent W. Foley

Kenneth R. Pierce

Peter Ruschmeier

Peter D. Ward, CFA

Sergey Vasnetsov

C. Anthony Butler, Ph.D.

Joel G. Tiss

Robert T. Cornell

Joseph F. Campbell, Jr.

Donald Zwyer, CFA

Darren S. Kimball, CFA

Daniel F. Ford, CFA

March 20, 2002

http://www.lehman.com

## Scope and History

The cost of settling asbestos-related cases has risen as an increasing number of defendants have filed for bankruptcy protection, shifting much of the remaining liability to still solvent firms under current tort law. Actuarial firm, Tillinghast-Towers Perrin, estimates that the total U.S. asbestos liability will ultimately approach $200 billion, with some 60% being absorbed by the global insurance industry. By scanning through plaintiff attorney Web sites and consulting with our analysts, we identified S&P SuperComposite firms with varying degrees of potential liability. Today's asbestos economics reflect a chess match played between plaintiffs and defendants over the past two decades.

## Legislative Outlook in 2002 and Beyond

Although some bipartisan support exists for the "Fairness in Asbestos Compensation Act," which may be reintroduced in 2002, the outlook for passage this year is not favorable. The longer-term outlook for a legislative solution may improve after the fall elections, especially if the Republicans regain control of the Senate and if the Enron debacle occupies less public mind share.

## Insurance Industry In-Depth Analysis

Asbestos is a well known never-ending drag on insurance company earnings. The related earnings drag differs for each company, but generally it is 8% to 12% of earnings for insurers with significant asbestos exposure. Any reform or a lessening of the claims inflation would be a positive for the insurers' future earnings. The insurers appear to have been increasing their asbestos-related reserves in a quiet, but significant way over recent years and, in particular, in 2001, when most of the estimates related to ultimate asbestos reserves were recalculated and projected to be higher than the amounts originally estimated. It is estimated that the U.S. property and casualty industry will ultimately pay between $55 billion and $70 billion in asbestos claims.

## Nonlegislative Risk Management

Waiting for a legislative solution is like "Waiting for Godot." In the meanwhile, firms are deploying individual solutions combining insurance, corporate restructurings and more stringent injury requirements to reduce frivolous claims. In the future, capital market solutions may be employed, as well.

## Industry and Company Analysis

Asbestos affects sectors and companies in different ways. Those grasping for a one-size-fits-all interpretation will find such an approach lacking. Investors really need to look at each company's specific situation, in addition to possessing a general understanding of the broader context. Ten industry analysts review the company-specific highlights in their space.

## Table of Contents


| Analysts | Section | Page |
|---|---|---|
| Jeffrey M. Applegate<br>Charles L. Reinhard<br>*U.S. Portfolio Strategy* | Executive Summary | 5 |
| | Scope and History | 6 |
| Kim N. Wallace<br>Steven Soukup<br>*Politics* | Legislative Solutions | 15 |
| J. Paul Newsome, CFA<br>Robin B. Albanese<br>Vincent W. Foley<br>*Life Insurance* | Insurance: A Well Known Never-Ending Drag on Earnings | 21 |
| Kenneth R. Pierce<br>*Reinsurance Products* | Nonlegislative Risk Mitigation Strategies | 31 |


## Appendix: Industry and Company Analysis


| Analyst | Section | Page |
|---|---|---|
| | List of Discussed Companies | 33 |
| Peter Ruschmeier | Asbestos Exposure: Paper and Forest Products Companies | 35 |
| Peter D. Ward, CFA | Asbestos Exposure: Metals and Mining Companies | 37 |
| Sergey Vasnetsov | Asbestos Exposure: Major Chemicals Companies | 39 |
| C. Anthony Butler, Ph.D. | Asbestos Exposure: Major Pharmaceuticals Companies | 41 |
| Joel G. Tiss | Asbestos Exposure: Packaging Companies | 43 |
| Robert T. Cornell | Asbestos Exposure: Electrical Equipment Companies | 45 |
| Joseph F. Campbell, Jr. | Asbestos Exposure: Aerospace & Defense Companies | 47 |
| Donald Zwyer, CFA | Asbestos Exposure: Multi-Industry Companies | 49 |
| Darren S. Kimball, CFA | Asbestos Exposure: Auto & Auto Parts Companies | 51 |
| Daniel F. Ford, CFA | Asbestos Exposure: Power Companies | 53 |


Note: Special thanks to Scott Smith and Phil Buffa for their contributions.

March 2002

To Our Clients:

Many of you have been struggling to draw inferences and conclusions from the recent acceleration in asbestos-related Chapter 11 bankruptcy filings. In an era of class action lawsuits, mass settlements and environmental hazards, litigation risk that can materially alter the value of a multi-billion dollar company has become something to think about.

That is exactly what we asked our U.S. Equity Research department to do. The result of this effort, “Thinking About Asbestos,” is intended to be a practical guide that will help you navigate through a complex issue.

The way we think about the topic of asbestos has evolved over time and remains in flux today. In this report, we will take you through the risk, history and scope of the issue, where exposure is known to exist based on our primary research, the outlook for a legislative solution, and examples of the nonlegislative risk mitigation strategies being deployed.

One issue that became clear to us as we put this research report together is that asbestos affects different sectors and companies in very different ways. Those grasping for a one-size-fits-all interpretation will find such an approach lacking. Successfully negotiating through this particular issue requires effort. Investors really need to look at each company’s specific situation, in addition to possessing a general understanding of the broader context.

We hope you find this report useful, and we wish you success with your investments.

Joe Amato
Director of Global Equity Research

Steve Hash
Director of U.S. Equity Research

*This page intentionally left blank*

**U.S. INVESTMENT STRATEGY**

Jeffrey M. Applegate
1.212.526.4585
japplega@lehman.com

Charles L. Reinhard
1.212.526.3066
creinhar@lehman.com

## Executive Summary

The way people think about asbestos has certainly changed over the years, from a useful fireproof substance, to a health hazard replete with litigation risk. The cost of settling asbestos-related cases has risen as an increasing number of defendants have filed for bankruptcy protection, shifting much of the remaining liability to still solvent firms under current tort law. The universe of firms with potential liability has broadened over the years to include the users of asbestos in products last made close to 30 years ago. Indeed, some of today's defendants never actually made any products with asbestos, but successor liability has resulted from mergers, acquisitions and consolidations involving past users. An actuarial firm, Tillinghast-Towers Perrin, estimates that the total U.S. asbestos liability will ultimately approach $200 billion, with some 60% being absorbed by the global insurance industry. The insurance rating agency A.M. Best recently revised its ultimate cumulative cost estimate for U.S. insurers to $65 billion, up from its prior estimate of $40 billion made back in 1997. Asbestos litigation has proven to be an enormous challenge to the federal and state courts, demonstrating that the current tort system is ill-suited for settling mass asbestos class action suits. Although some bipartisan support exists for the "Fairness in Asbestos Compensation Act," which may be reintroduced in 2002, the outlook for passage this year is not favorable. The longer-term outlook for a legislative solution may improve after the fall elections, especially if the Republicans regain control of the Senate and if the Enron debacle occupies less public mind share. In the meanwhile, nonlegislative solutions such as insurance, corporate restructurings and more stringent injury requirements to reduce frivolous claims play a role in managing costs.

Asbestos is a complex issue that affects different sectors and companies in different ways. Investors struggling to reach conclusions really need to look at each company's specific situation, in addition to possessing a general understanding of the broader context.

**Asbestos-Related Chapter 11 Bankruptcy Filings Have Nearly Doubled in the Last Five Years**




Sources: Lehman Brothers, Plevin, Mark D. Kalish, Paul W. "Where Are They Now? A History of Companies That Have Sought Bankruptcy Protection Due to Asbestos Claims"; American Academy of Actuaries.

## Scope and History

It is hard to think of asbestos in this light now, but there was once a time when asbestos was simply thought of as an indestructible and fireproof substance. As a result, asbestos was incorporated into a wide array of consumer and industrial products such as barbeque mittens, ironing board covers, floor tiles, ducts, electrical wiring insulation, plaster, wallboard, insulation for home heating and boiling systems, shingles, sidings and brake linings. The water from municipal supplies often came through concrete pipes reinforced with asbestos. Schools regularly used small asbestos squares in science labs to rest gas burners upon.

Today, asbestos is primarily associated with the health risks it can engender when asbestos fibers break apart and are inhaled. The inhalation of asbestos fibers can result in progressive diseases, such as asbestosis or mesothelioma. Asbestosis is an irritation of the lungs caused by very fine asbestos fibers being lodged deeply in the lungs, leading to breathing difficulty and sometimes cancer. Asbestos fibers can cause a severe thickening of the lung tissue and eventually choke those inflicted.

Mesothelioma is the most severe asbestos-related disease, and about 2500 cases are diagnosed each year in the United States. It is a malignancy of the membranes that separate the rib cage from the outer surface of the lungs (the pleura) or those that surround the abdominal cavity (the peritoneum). The latency period averages 40 years and can be as long as 60 years. It is fatal, and there is no treatment. Since millions of workers were exposed to asbestos on the job from the 1940s through the early 1970s, when legislation was passed prohibiting the use of asbestos in most products, Milliman USA, an actuarial and consulting firm, expects new cases to be diagnosed through 2015-2025.

The severity of mesothelioma and its association with asbestos make for meritorious claims that are very costly to settle. As a result, plaintiff attorneys often bundle a few mesothelioma claimants with an inventory of weaker claimants to negotiate more favorable mass settlements. The settlements typically award mesothelioma victims with less than they would have received if adjudicated individually, with larger awards going to the weaker claimants. Indeed, most of the claims filed today are by people with little physical impairment from asbestos exposure.

The recent acceleration of bankruptcy filings is further transforming the way people think about asbestos—it is now synonymous with litigation risk. Initially, most asbestos cases were filed on behalf of workers at asbestos mines and factories. The next round of litigation filed against shipyards, refineries, railroads and power plants involved the workers injured by exposure while installing asbestos-related products. After that came a series of lawsuits filed by workers in the construction industry who were exposed to products that contained asbestos. But as more firms filed for Chapter 11 bankruptcy protection, new defendants, such as contractors, distributors, owners of refineries and power plants, were named in suits. According to the Rand Institute for Civil Justice, the number of defendants today ranks in the thousands and consists mostly of long-ago users rather than the manufacturers of asbestos.

## Sixty-Two and Climbing: Asbestos-Related Bankruptcies and Filing Dates

| Number | Company | Date | Number | Company | Date |
|---|---|---|---|---|---|
| 1 | North American Asbestos Corp. | 1976 | 32 | Rock Wool Manufacturing | Nov-96 |
| 2 | Forty-Eight Insulations | Apr-82 | 33 | Todd Shipyard | Jun-97 |
| 3 | UNR Industries | Jul-82 | 34 | M.H. Detrick | Jan-98 |
| 4 | Johns Manville | Aug-82 | 35 | Raymark Industries | Mar-98 |
| 5 | Amatex | Nov-82 | 36 | Brunswick Fabricators, Inc. | Sep-98 |
| 6 | Waterman Steamship Corp. | Dec-83 | 37 | Atlas Corp. | Sep-98 |
| 7 | Wallace & Gale Company | Apr-84 | 38 | Fuller-Austin | Sep-98 |
| 8 | Pacor | Jul-86 | 39 | SGL Carbon | Dec-98 |
| 9 | Standard Insulations Inc. | Aug-86 | 40 | Joy Technologies | Jun-99 |
| 10 | First Colony Farms [1] | Nov-86 | 41 | Harnischfeger Corp. | Jun-99 |
| 11 | McLean Industries [2] | Nov-86 | 42 | Rutland Fire & Clay | Oct-99 |
| 12 | Prudential Lines | Nov-86 | 43 | Babcock & Wilcox[8] | Feb-00 |
| 13 | Gatke Corp | Mar-87 | 44 | Pittsburgh Corning | Apr-00 |
| 14 | Nicolet/Keasby-Mattison | Jul-87 | 45 | Owens Corning[9] | Oct-00 |
| 15 | Raytech[3] | Mar-89 | 46 | Armstrong World Industries Inc.[10] | Dec-00 |
| 16 | Delaware Insulations | May-89 | 47 | Burns & Roe Enterprises | Dec-00 |
| 17 | UNARCO | Jul-89 | 48 | G-I Holdings Inc.[11] | Jan-01 |
| 18 | Hilsgorough Holdings[4] | Dec-89 | 49 | Eastco Industrial Safety Corp. | Feb-01 |
| 19 | Standard Asbestos Mfg. & Insulation | Jan-90 | 50 | EJ Bartells | Apr-01 |
| 20 | Carey Canada | Oct-90 | 51 | Skinner Engine Company | Apr-01 |
| 21 | Celtotex[5] | Oct-90 | 52 | W R Grace | Apr-01 |
| 22 | National Gypsum[6] | Oct-90 | 53 | Washington Group International | May-01 |
| 23 | Eagle-Picher Industries | Jan-91 | 54 | USG Corporation[12] | Jun-01 |
| 24 | H.K. Porter | Feb-91 | 55 | United States Mineral Products | Jul-01 |
| 25 | Cassiar Mines | 1992 | 56 | Bethlehem Steel | Oct-01 |
| 26 | Kentile Floors | Dec-92 | 57 | Federal Mogul Corp. | Oct-01 |
| 27 | American Shipbuilding | Nov-93 | 58 | Swan Transportation Co. | Dec-01 |
| 28 | Baldwin Ehret Hill | Dec-93 | 59 | North American Refractory Co. | Jan-02 |
| 29 | Keene[7] | Dec-93 | 60 | A.P. Green Industries | Feb-02 |
| 30 | Walter Industries | Mar-95 | 61 | Harbison-Walker | Feb-02 |
| 31 | Lykes Brothers Steamship | Dec-95 | 62 | Kaiser Aluminum | Feb-02 |

*Sources: Lehman Brothers, Plevin, Mark D. Kalish, Paul W. "Where Are They Now? A History of Companies That Have Sought Bankruptcy Protection Due to Asbestos Claims"; American Academy of Actuaries.*

*Notes: [1]Exposure from United States Lines (S.A.), [2]Exposure from U.S. Lines, [3]Formed from Raymark, the Raybestos Successor, [4]Parent of Walter Industries, [5]Formed from Philip Carey, [6]Exposure from Ancor Holdings, [7]Exposure mainly from Baldwin-Ehret Hill, [8]Exposure from the following subsidiaries: Americon, B&W Construction Company and Diamond Power Int'l., [9]Exposure from Fibreboard, Owen Corning Fiberglas Technology Corp. and CDC Corp., [10]Exposure from Nitram Liquidators and Desseaux Corp., [11]Successor to GAF Group, [12]Exposure from United States Gypsum Co., USG Interiors and L&W Supply Corp.*

A Lehman Brothers search through several plaintiff attorney Web sites located hundreds of firms with possible asbestos litigation exposure. We augmented this with input from our analysts. The S&P SuperComposite (S&P 500, S&P MidCap 400 and S&P SmallCap 600) constituent subset of 48 firms is listed below. Understandably, firms with litigation exposure tend to be quite mindful that the information they disclose could potentially alter the course of pending or future settlements. Information not already released to the public is generally quite guarded. A succinct summary of the material information we were able to obtain, mainly via direct contact, is included in the table below; a more extensive look into firm-specific liabilities can be found in the industry analysis section of the report, prepared by our research analysts.

## S&P SuperComposite Companies With Possible Asbestos Liabilities and Comments

| Company Name | Comments |
|---|---|
| Alcoa* | Believes that between its reserves and insurance it is adequately covered for its known asbestos exposures. For the period from 1997 through the end of 2001, Alcoa's net out-of-pocket costs in payments on asbestos claims has averaged a little over $1 million per year. For a company with over $23 billion in annual revenue, asbestos is not believed to be a material issue. |
| Aliant Techsystems* | No expected liability or exposure. |
| ArvinMeritor* | Since 1996 paid $40 million in asbestos-related settlements; currently has $71million in liabilities booked with $60 million in insurance recoverables. 46,000 cases pending at the end of 2001 of which 15,000 are awaiting final payment. |
| AT&T | No expected liability or exposure. |
| Boeing* | Has settled approximately 100 claims since the 1980s averaging $4,000-$6,000 each; currently has 108 claims; believes it has minimal liability. |
| Boise Cascades | Has 120 pending premises and product claims; are named with numerous other defendants and these claims have no legitimate connection to Boise Cascades, but they continue to defend 15-20 cases per year. Since 1984 they have spent a total of $100,000 on all claims with most costs covered by insurance. An immaterial issue for them. |
| BorgWarner | Exposure is not material and they believe they have adequate insurance to cover any associated costs. |
| Con Edison | Accrued $169.4 million for its utility subsidiaries' exposure to asbestos and other hazardous substances. Pending lawsuits are in the billions of dollars; but they believe these amounts to be greatly exaggerated. So far, lawsuits have generally been unsuccessful or settled for immaterial amounts. |
| Crane Company | Named as a codefendant in approximately 5,460 cases; should not have a material impact on its financial position. |
| Crown Cork and Seal* | Has paid out $300 million-$400 million, net of insurance proceeds, over the past ten years and may have well over $1 billion of total liability remaining. The current run rate for payments is roughly $100 million per annum with an average payout of $2,500. |
| Dana | 100,000 claims outstanding at the end of 2001, including 27,000 that were settled but are pending payment. $102 million liability relating to claims with $89 million in insurance recoverables. Contingent liabilities of $44 million with $39 million in insurance recoverables. |
| Dow Chemical | $233 million in estimated liability at the end of 2001; expected to pay $10 million after insurance. Liability stems from the acquisition of Union Carbide and AmChem. |
| Duke Energy* | Settling claims individually and not the subject of any class action suits. |
| DuPont | Primarily limited to premises liability; does not expect many asbestos lawsuits or material liability. |
| Eastman Kodak | No expected liability or exposure. |
| Ford Motor | Currently has 15,000-20,000 pending claims that they are trying to consolidate with GM. Declined official comment. |
| Foster Wheeler* | 110,800 claims outstanding at end of 2001. Stringent criteria is used in paying claims, 55-58% are dismissed. Almost all costs covered by insurance. |
| General Electric | GE has never paid a penny out of pocket and does not expect to. GE Capital Insurance Group has $585 million in Asbestos and Environmental reserves as of 2000, up 6% from 1999. |
| General Motors | Considers cases immaterial and believes lawsuits have little validity. Currently has 15,000-20,000 pending claims that they are trying to consolidate with Ford. Annual related expenses are $10 million; this cost may increase due to a rising number of claims, it should not have a material adverse effect. |
| Georgia-Pacific | 297,000 total claims filed; 235,000 claims settled or dismissed; 62,000 claims pending. Total exposure expected to be less than $1 billion, mostly covered by insurance. |
| Goodrich | Paid $74.8 million, $36.4 million and $19.3 million for the defense and disposition of the cases net of the amounts received from insurance, in 2001,2000 and 1999, respectively. |
| Goodyear Tire | 61,000 pending claims as of October 31, 2001. |

## S&P SuperComposite Companies With Possible Asbestos Liabilities and Comments(Continued)

| Company Name | Comments |
|---|---|
| Halliburton | 201,000 claims settled in the past with 274,000 claims pending. $150 million paid on claims. Past settlements have averaged $750 ($200 after insurance) per claim. Plans to split its energy—services business from its Kellogg Brown & Root construction and engineering unit to help investors better understand its businesses and ease concern over asbestos-liability litigation. |
| Honeywell* | Did not manufacture asbestos related products; liability stems from relationship with Bendix and NARCO (owned from 1979-1986). Over the last 20 years, 53,000 Bendix cases have been resolved at $1,000 per case with 74% of cases being dismissed without merit. Over the past 18 years, NARCO has settled 176,000 cases at $2,200 per case where 43% of cases were dismissed without merit, according to management. In January 2002, NARCO filed for reorganization under Chapter 11, with Honeywell's consent, faced with a decline in the steel industry and increasing asbestos liability. At this point, all 116,000 claims outstanding against NARCO, of which 7% also name Honeywell, have been staid in Federal Bankruptcy Court. |
| International Business Machines | No claims outstanding; last case was settled years ago (amount undisclosed). No future cases are expected. |
| International Paper* | International Paper has very minimal exposure to asbestos. The exposure resides within a wood products distribution business that was wholly owned by Champion International. IP acquired Champion during 2000. |
| ITT Industries | Believes asbestos is not a material risk; never required to make payments for settlements or defense costs. Has substantial insurance protection. Have vendor agreements that shift product liability to the manufacturer. |
| L-3 Communications* | No current litigation or liability. |
| Lockheed Martin* | No current meaningful asbestos exposure. |
| McDermott International | As of February 2000 had 340,000 claims settled for $1.6 billion (inclusive of insurance); additional 220,000 new claims in 2001. Has begun scanning new claims for validity. Under Babcock & Wilcox's plan of reorganization, the cost of claims is $1.3 billion with $1.15 billion covered by insurance. Exposure stems from Babcock & Wilcox, which filed for bankruptcy in February 2000. |
| Metropolitan Life | Has never manufactured, produced, distributed or sold asbestos or asbestos-containing products. Received approximately 54,500 asbestos-related claims in 2000. During the first nine months of 2001, Metropolitan Life received approximately 49,500 asbestos-related claims. |
| Minnesota Mining and Manufacturing | 200,000 claims in the past with 80,000 claims outstanding; average settlement is less than $1,000 per claim. Insurance recoverable is near 95%. |
| Navistar International | Consider exposure to be immaterial; significant percentage of claims have resulted in no awards being granted. Liability stems from brakes and clutches on trucks that contained asbestos; filed by mechanics who worked on their trucks. |
| Owens Illinois* | Disposed of 250,000 claims at an average cost of $4,900 resulting in total payments well over a billion dollars. Projected to spend $240 million in 2002. |
| Phillips Petroleum | Number of past claims is undisclosed, but the cost was deemed immaterial. Asbestos was used as an insulator in refineries, which may have led to exposure. |
| Phelps Dodge | "No settlement" policy has resulted in just $520,000 paid out in last 10 years; 15,000-20,000 claims pending. |
| Pfizer | 170,000 claims pending against Pfizer (Quigley) and 59,000 against American Optical. Believes most cases are spurious and therefore insignificant. The number and amount of past settlements was not disclosed. |
| Procter & Gamble | Although they have appeared on trial lawyer Web sites, they have no asbestos exposure. |
| PPG Industries | 115,000 claims outstanding but have gone to trial only a few times. Litigation stems from premises claims (undisclosed amount paid in past) and from a venture with Pittsburgh Corning in the 1930s for which they have never paid associated claims. |
| Raytheon* | No litigation or liability. |
| Sears Roebuck & Company | Have no material exposure and therefore no reserves for asbestos-related claims. Undisclosed number of cases in the past, but very few in number. Liability stems from products sold in stores (e.g. brake pads, floor tiles, iron board covers) and have fought all cases; exposure is minimal. |
| Sealed Air | Have faced very few claims and costs have been on legal services only. Liability stems from the structure of the contract with WR Grace to acquire Cyrovac in 1998-99. |
| TRW* | Liability linked to Kelsey-Hayes Wheel Co. brake business acquired in 1999. Roughly 20 cases filed. Average annual settlement costs over the past five years is under $10,000. |
| United Defense* | No litigation or liability. |
| United Technologies* | Small number of cases; insubstantial costs. |
| Verizon Communications | Insignificant number of cases; believed to have no material exposure. |
| Wyeth (formerly American Home Products) | Believes they have minimal exposure. Have had very few claims; estimate $100,000 spent (including legal fees) to settle all cases. Liability stems from Cytec—a former subsidiary of a company they acquired. |
| York International | Immaterial exposure. Have had a few hundred claims. Roughly 10 settlements averaging less than $1,000. Exposure results from encapsulated gaskets. |

*Sources: Lehman Brothers, The Law Offices of Christopher E. Grell, The Murad Law Firm, Mesothelioma Legal Information Center – Law offices of David A. Shaw, L.L.C. and Baron & Budd, P.C., Early, Ludwick, Sweeney, Strauss.*

*Note: *These companies were not mentioned on the trial lawyer Web sites cited, but are discussed by our analysts in the following sections.*

How much will the U.S. asbestos tab run? The actuarial firm Tillinghast-Towers Perrin estimates the total U.S. asbestos liability to be $200 billion, with the global insurance industry absorbing $122 billion of that amount. But, the true cost will not be known for years due to the long-term nature of the issue and its moving parts. The U.S. insurance industry estimates that it has already paid more than $20 billion to settle asbestos-related claims. The insurance company rating agency A.M. Best expects the ultimate cumulative cost to be another $65 billion in the United States, a considerable increase from its 1997 estimate of $40 billion; by extension, it argues that the U.S. insurance industry will need to boost reserves by $33 billion over time to cover its costs.

The economics of today's asbestos liabilities reflect a legal chess match that has been played out over the decades between plaintiffs and defendants; in and out of a tort system that most agree is ill-suited for handling mass class action asbestos cases. The early victims of asbestos-related illnesses confronted state laws that prevented workers from suing their employers for occupational disease. As a result, many seriously debilitated workers never received anything beyond modest workman compensation benefits for their injuries. To maneuver around this hardship, plaintiff attorneys crafted product-liability suits against asbestos manufacturers. In 1973, a jury award in connection with an asbestos claim was upheld for the first time by the U.S. Court of Appeals for the Fifth Circuit. By the mid-1970s, the race to the courthouse was under way.

The seeds were planted for a major shift in the playing field against the asbestos firms in 1978 when a Johns-Manville Corp. plant manager admitted to a company policy of suppressing knowledge regarding the hazards of asbestos. Subsequent document findings proved fraud and conspiracy. Asbestos caseloads accelerated as punitive-damage verdicts were awarded. To slow down the onslaught, asbestos firms deployed a statue-of-limitations defense. But plaintiffs counteracted by filing cases for employees who had been exposed to asbestos, even if they did not show any signs of illness, and most judges permitted these cases.

In 1981, the California Supreme Court ruled that workers could sue their employers for occupational diseases under circumstances where the employers had engaged in fraud and conspiracy. This enabled workers to proceed with cases against their employers in civil court. In February 1982, a Johns-Manville Corp. employee was awarded a verdict of $150,000. Thousands of additional cases were brought against the company, and by August 1982, Johns-Manville Corp., a Fortune 500 firm, opted to leave the tort system by filing for bankruptcy in what is arguably the most complex Chapter 11 case in history.

Johns-Manville Corp. had taken advantage of an obscure bankruptcy law change that allowed liable companies to discharge personal injury claims that had not been reduced to a sum certain via a jury verdict, the prior requirement. The company was split into two halves, a reorganized company—sans its asbestos operations and liabilities—and a trust funded to pay awards to current and future claimants based upon their asbestos-related

medical conditions. The basic bankruptcy model would become codified into U.S. bankruptcy law and followed by other asbestos defendants.

The complexity of the Johns-Manville Corp. case showed that the U.S. tort system was ill-suited for asbestos class action suits due to conflicts of law that cannot be disposed of without a federal statute. The *Erie* doctrine, which has been extended by the Supreme Court to nationwide class actions, requires federal courts to apply the substantive laws of the states. Asbestos class-action suits typically involve claimants from all 50 states with differing tort laws. Although rare exceptions to the *Erie* doctrine do exist, the U.S. Court of Appeals for the Fifth Circuit held that in the absence of congressional action in connection with asbestos, federal courts remained constrained by the substantive laws of the states—putting the ball into the congressional court.

The most cogent argument for a federal asbestos statute rests on conflicts over limited resources, the interstate nature of the asbestos dilemma and that federal conflict also exists with state law when it comes to asbestos. Each state involved in asbestos litigation has an interest in promoting the full recovery of its citizens to reduce the resources it will eventually deploy in caring for the injured parties. In asbestos cases, states are competing for a finite resource where the adjudication of a case in one state can potentially affect the litigants in every other state in the United States: now and in the future. Furthermore, differing substantive state laws in place lead to varying costs and unequal recoveries among identically injured victims, making it possible that some asbestos victims can go completely uncompensated for their injuries. The absence of a federal statute creates high transaction costs, wholesale state-by-state forum shopping by plaintiffs for the best location to bring a suit, and contributes to excessive court delays.

Although some bipartisan support exists for the "Fairness in Asbestos Compensation Act," which may be reintroduced in 2002, our Washington Research team does not think passage is likely this year. Longer term, the outlook may improve, especially if the Republicans retake control of the Senate and if the Enron debacle occupies less public mind share.

In the absence of a federal statute, litigation since the early 1980s has centered on mass settlements as the most logical way of addressing an enormous caseload dilemma. In a mass settlement, an attorney representing many plaintiffs reaches an agreement with a defendant on an award schedule for different illnesses and levels of severity. In utilizing this approach, companies reduce their transaction costs in defending asbestos cases but give up the ability to closely evaluate the merits of each claim. It has been alleged over the years that this arrangement has encouraged the settlement of numerous frivolous claims as a quid pro quo for settling the more meritorious ones out of court.

In the mid-1980s, the Asbestos Claims Facility (ACF) was formed by several of the larger asbestos defendants and their insurance companies. The aim was to achieve bargaining leverage and lower transaction costs by pooling their resources and litigating as a group. Internal disputes inevitably took place, leading some key members to splinter

away. The ACF formally dissolved; some founding members opted to reorganize as the Center for Claims Resolution (CCR) with the same mission in mind. The CCR would settle some 350,000 claims at a cost of $5 billion before it stopped brokering bulk settlements for its members in February 2001.

The next twist in asbestos litigation took place in the procedural realm in 1990 when a group of federal judges known as the Judicial Panel on Multidistrict Litigation (MDL) stayed, or froze, all personal injury asbestos cases in the federal courts and transferred them to a single judge in Philadelphia for pretrial procedures. The MDL transfer effectively halted asbestos litigation in federal courts; suits filed in state courts were not directly affected by the MDL action, at least initially. However, plaintiffs responded by moving their suits to the state courts, where the MDL had no jurisdiction, adding to an existing state court case backlog that would take years to overcome, as an infrastructure to handle the case loads was lacking.

Faced with long delays, in 1993, the CCR members and a cadre of resolute plaintiff attorneys crafted an involuntary "class action" outside of the court system, using an injury award schedule similar to those deployed in mass settlements. The case was known as the "Georgine" class-action settlement. Under Georgine, plaintiffs agreed to a system for processing future claims, but frivolous cases were not to receive awards until showing signs of asbestos-related illness. Georgine was opposed by most plaintiff attorneys and raised constitutional issues because it attempted to circumvent the substantive tort laws of the 50 states.

The Supreme Court struck down Georgine in June 1997, putting the claims back into the court system. In July 1999, the Supreme Court rejected a second proposed settlement by a 7-2 vote, declaring at that time that only the Congress could sort out an asbestos solution because the plaintiffs came in two classes with irreconcilable interests: those with asbestos-related illnesses today and those exposed to asbestos but not yet showing symptoms of disease. To wit, no universal settlement of all claims could be equitable to both groups.

Given the rise in bankruptcies and the concern over funding for legitimately injured parties, nonlegislative solutions have increasingly focused on reducing the costs borne by frivolous claims. For example, since the CCR ceased brokering bulk settlements for its members, the defendants have begun to work individually or with their insurance companies to craft solutions for managing their asbestos litigation costs. Many of these defendants and their insurance firms have vowed to resist settling with claimants that have been exposed to asbestos but have yet to exhibit asbestos-related illnesses. Other steps have also been taken, such as using insurance in conjunction with corporate restructuring to transfer catastrophic risk. In the future, capital market solutions might also be a possibility.

In January 2002, the federal judge presiding over the pretrial proceedings of all federal asbestos cases in the United States ordered that nonmalignant cases initiated through

mass screenings be dismissed unless corroborated with independent evidence of asbestos exposure and illness. Indeed, there appears to be some movement by multiple parties towards reducing frivolous cases to preserve funding for current and future meritorious cases.

Is this the beginning of a solution that might change the way we think about asbestos for a final time? Do not get too excited. If the last two decades of asbestos litigation have revealed a single bromide, it is that "it's not over until it's over."

*This page intentionally left blank*

Kim N. Wallace
Political Strategy
1.202.452.4785
kwallace@lehman.com

Stephen Soukup
Washington Research
1.202.452.4700
ssoukup@lehman.com

## Legislative Solutions

There was, both on Wall Street and in Washington, a fairly persistent rumor that George W. Bush, celebrated Texas "tort reformer," would address the topic of asbestos litigation reform in his State of the Union speech, delivered on January 29. The rumor, of course, turned out to be just that, nothing more. Despite the advance speculation, President Bush neither said the word "asbestos" nor addressed the more general issue of tort reform in that speech.

This, we think, should be taken as a prelude of things to come. While the Street and, perhaps, much of Washington will buzz with concern about asbestos litigation and the hope of legislative relief, those whose voices really matter (e.g., the Administration, the Senate majority) will remain silent, at least for the remainder of this, an election year. As on January 29, the word asbestos will scarcely merit a mention. Though the asbestos issue may scream out for a legislative solution, the atmosphere in Washington will, we think, preclude such.

There is little doubt that the issues raised by asbestos litigation can and likely should be addressed with legislation. Most reasonable people, on both the political right and left, acknowledge that there is, in this case, a set of problems the solutions to which should come from Washington. In the now famous Supreme Court decision that threw out the Amchem (Georgine) comprehensive settlement, Justice Ruth Bader Ginsburg wrote in her opinion for the court, "The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure." The problem, she continued, is that "Congress . . . has not adopted such a solution."

According to *The Wall Street Journal*, her colleague on the bench, Justice Souter, "pleaded with Congress to shed its lethargy and resolve an 'elephantine mass' of claims that 'defies customary judicial administration.'"

On the other side of the political aisle, in a series of recent editorials, the *Journal*'s editorial staff, likely the ideological polar opposite of Justices Ginsburg and Souter, has nevertheless echoed their sentiments, exhorting both Congress and the Bush administration to contain the economic damage done by "the asbestos Blob."

We note that Congress has, in fact, made several attempts to address this issue, most recently in the wake of the court's Amchem ruling. In the 106th Congress (1999-2000), then-House Judiciary Committee Chairman Henry Hyde (R-IL) introduced two pieces of legislation: H.R. 1283, The Asbestos Compensation Act of 2000, and H.R. 4543, a proposed amendment to the 1986 Internal Revenue Code, providing tax relief for funds set up to pay asbestos-related claims. The Fairness in Asbestos Compensation Act of 1999 (S. 758), the Senate's version of Hyde's bill, was introduced by then-Senator John Ashcroft (R-MO).

Both principal bills (the Asbestos Compensation Act, and the Fairness in Asbestos Compensation Act) proposed providing relief from the crushing weight of asbestos claims through the creation of a new Office of Asbestos Compensation, which was to be part of the Justice Department. Key components of the legislation included the creation of an Asbestos Compensation Fund, the details of which were unclear; the preclusion of court action prior to participation in the federal compensation procedure; and the establishment of rules of medical eligibility. The latter two provisions were considered by many observers to be the most important, as they were designed to eliminate the most egregious abuses of the tort system: venue shopping and the collection of substantial settlements for plaintiffs with no medical impairment.

And while the Hyde legislation was considered by many observers to provide a palatable solution, it was not perfect. The Asbestos Compensation Fund, for example, was to be funded initially by a loan from the Office of Asbestos Compensation. This loan was to be drawn from an appropriation of, according to the bill, up to $100 million. In this sense, Hyde's bill followed the format of previous mass liability legislation (in this case, the most practical example is the Superfund legislation), removing some of the financial burden from the industry and placing it instead on the federal treasury, otherwise known as the taxpayers.

In any case, none of the bills made it very far. H.R. 1283 was narrowly reported out of Hyde's Judiciary Committee on March 16, 2000, but was never brought to the House floor. Hyde's tax bill fared even worse, never even receiving a hearing in the Ways and Means Committee. Ashcroft's bill was essentially shelved by then-Majority Leader Trent Lott (R-MS), who announced early in the session that the Senate simply would not have time to address the issue. Though he co-sponsored the bill, Lott clearly showed no desire to push too aggressively.

In the nearly two years since this previous attempt to establish a legislative solution failed, much has changed. Most notably, several more companies, including Babcock & Wilcox, Owens Corning, G-I Holdings, and W.R. Grace, have been forced into bankruptcy protection because of their exposure to asbestos liability. Several others, including Georgia-Pacific, 3M, and Halliburton, are considered by some to be on shaky footing because of asbestos.

That said, we urge interested parties not to hold their breath waiting for Washington to address the problem, for several reasons.

The first is that this is an election year. It is unlikely that anyone, either in the administration or on Capitol Hill, will have either the time or the energy to push such potentially contentious legislation during an election year. This is especially so, given the historically tight margins in both houses. The loss of a few House seats and one Senate seat would alter the balance of power, shifting the majority. It is unlikely that either party will be willing to risk the loss of that one seat that could flip the majority.

The second reason (actually an extension of the first) can be summed up in five letters: E-N-R-O-N. The Bush administration and its allies on Capitol Hill should be ideological proponents of any sort of tort reform. This year, however, they can hardly afford the luxury of appearing too industry-friendly, given the heat they are already taking for being too close to Ken Lay and the rest of the folks at Enron. Any attempt by the Bush administration or congressional Republicans to provide relief for companies with asbestos-related liability would undoubtedly be met with gleeful choruses of “there they go again.”

This problem is, of course, exacerbated by the fact that one of the companies most desperately seeking redress, the aforementioned Halliburton, was once run by Vice President Cheney. In a February 6, *Wall Street Journal* piece, lobbyist Victor Schwartz, who now represents a group called the Coalition for Asbestos Justice, summed up the problem his clients face, noting, “No matter what [the White House] does, you would see the headline, ‘Bailout for Halliburton.’”

A third reason not to expect Washington to take action this year is that the balance of power on Capitol Hill has shifted since legislation was last introduced. Specifically, the Democrats now control the Senate. In 2000, Republican Trent Lott could not find the time to tackle asbestos legislation, and he was undoubtedly far more motivated to do so than current Majority Leader Tom Daschle (D-SD) is likely to be.

Democrats have ideological and practical reasons to oppose a legislative solution at this point. First, as the self-described champions of the “common man,” Democrats have little motivation to be perceived as taking the side of big industry over the thousands of individual plaintiffs who may eventually die from asbestos-related diseases. It can be argued that a legislative settlement might actually help said plaintiffs by preventing asbestos-connected companies from filing for bankruptcy before they pay out claims, but such an explanation is not likely to carry much weight, particularly because, as we noted above, this is an election year.

In more practical terms, congressional Democrats have a vested financial interest in the current status quo. The current asbestos tort system has been a financial boon to trial lawyers, who contribute heavily and overwhelmingly to Democratic political candidates. In supporting asbestos legislation, Democrats would run the risk of crossing one of their most generous and most consistent constituencies.

Again, this is unlikely in an election year.

A final reason not to expect Washington to move too terribly far or too quickly toward resolution of the asbestos issue is that those who pushed the legislation previously no longer occupy the positions they once did. Hyde, for example, is no longer chairman of the Judiciary Committee. And while he could request that his successor, James Sensenbrenner (R-WI) schedule hearings, he does not have control over the committee’s agenda, as he did in 2000. Additionally, the author of the Senate bill is now the current

Attorney General of the United States. This is arguably a more powerful position, but it does not exactly help in the push for legislation.

Now, given all these factors stacked against the passage of a sweeping asbestos bill, the National Association of Manufacturers (NAM), which is leading the lobbying charge on behalf of industry, has indicated that it would be satisfied with the enactment of less comprehensive legislation. The Asbestos Alliance (of which NAM is a part) has developed prototype legislation proposing a narrower fix. According to an article in the March 4, 2002, issue of *Fortune* magazine, the Alliance would be willing to settle for establishment of standard medical criteria and restrictions on venue shopping.

This proposal seems reasonable enough, given the current political environment, but we still think it is unlikely to be accepted. The Bush administration is fighting with one hand tied behind its back (and depending on how bad Enron gets, it could be both hands), and Tom Daschle could manage the Senate agenda well enough to keep legislation off the table for this year. House Republicans can possibly make some noise, but the bottom line is this: without Daschle or Bush on board, nothing will likely happen.

Our assessment could, of course, change, depending on the outcome of November's election. Given the current margins, though, there is no way to know right now whether any post-election reassessment will be positive or negative for those seeking a legislative remedy.

If the Republicans can manage to hold the House this November (which is expected by most observers) and can wrestle control of the Senate back from the Democrats (a proposition that is a "toss-up," at this point), prospects for a legislative solution will increase, though by how much it is hard to say.

If the Democrats hold the Senate, regardless of what happens in the House, we believe that the long-term prospects for a legislative remedy to the asbestos problem will be little different from the short-range prospects, in a word, unlikely. In the absence of an unforeseen occurrence, Democrats will, we think, remain unlikely to alienate their ideological and financial backers by signing on to legislation that *could* be construed as industry friendly and potentially damaging to average Americans.

Beyond Congress, the Bush administration's position is unlikely to change, even after November. It will remain a bit gun-shy with regard to overtly industry-friendly legislation. Yes, George W. Bush is a noted tort reformer, and yes, he would like to push tort legislation (particularly in the case of unified GOP rule). That said, he has his own reelection to think about, and many of the same factors preventing his administration from taking on this issue now ("Halliburton bail out bill") will still be around, regardless of the results of the midterm. This problem could be exacerbated or ameliorated to an extent by the emergence of a front-runner for the Democratic nomination. If it is someone like Daschle, Bush will not touch asbestos with a ten foot pole. If its Lieberman, Bush may

rightly assume that tort reform benefiting insurance companies is something that his opponent will not bash.

Additionally, all of this must be considered in light of the Enron mess. Anyone's ability to do anything with regard to asbestos may well be affected by the length, breadth, and depth of the Enron investigation(s). A long, broad, and deep investigation would, we think, portend ill for those hoping for industry-friendly reform.

Yet another factor that may affect the long-term likelihood of asbestos legislation; financial considerations and the outcome of the asbestos-related issues at Ground Zero in New York. Although most of the funding for a federally-overseen asbestos settlement would come from the companies involved, some of the costs would be borne by the U.S. treasury and, by extension, American taxpayers. In the current political atmosphere, charged as it is with concern about the reemergence of budget deficits, new federal obligations seem unlikely. Similarly, the possible emergence of asbestos-related illness associated with the clean up of Ground Zero will also, we think, compound the problems associated with reform. Who, after all, would want to sponsor, much less vote for, a bill that can be painted as "anti fire fighter," in the sense that precludes individual law suits prior to participation in the federal settlement procedure?

All things considered, then, even after November's election, the prospects for enactment of asbestos legislation appear fairly slim. Under certain conditions (e.g. unified GOP control) that could change, though how much change is possible is rather uncertain at this point.

*This page intentionally left blank*

**FINANCIAL SERVICES**
Insurance / Non-Life

J. Paul Newsome, CFA
1.212.526.6019
jpnewsom@lehman.com

Robin B. Albanese
1.212.526.6121
roalbane@lehman.com

Vincent W. Foley
1.212.526.4926
vfoley@lehman.com

## Insurance: A Well Known Never-Ending Drag on Earnings

Asbestos losses represent the property/casualty (P/C) industry's largest single claim exposure. In the mid-1990s the industry felt that its losses to asbestos had stabilized, but with the recent surge in claims the issue has come to the forefront of the industry. The increased number of claims, typically by individuals that have been exposed to asbestos but are often uninjured, and the reopening of claims by more active asbestos litigators have caused the insurance industry to reexamine its total exposure.

Investors should first recognize that this is a very old issue for the insurers and their indirect liability with many policyholders gives them a unique position to assess their risk. The real asbestos liability experts are the insurers' lawyers and actuaries that have been dealing with the issue for the last 20 years. Unfortunately, these individuals tend to be closed mouthed about the issue for fear of jeopardizing their litigation strategy.

Insurance analysts (including ourselves) generally have an ongoing increase in asbestos reserves built into their earnings estimates. The related earnings drag differs for each company, but generally it is 8%-12% of earnings for insurers with significant asbestos exposure. Any reform or a lessening in the claims inflation rate would be a positive for the insurer's future earnings.

The insurers appear to have been increasing their asbestos-related reserves in a quiet, but significant way in recent years. In 2001, in particular, most of the estimates related to ultimate asbestos reserves were recalculated and projected to be higher than originally estimated; and we have identified an additional $2.5 billion added in 2001. Based on estimates by A.M. Best and others, we believe there could be roughly $5 billion in asbestos reserve additions—a good dent in the $23 billion-$38 billion in estimated additional needed reserves.

In our view, no public insurer will need to increase significantly its asbestos reserves in 2002. The first step for investors trying to create a list of insurers they think will likely need to greatly increase asbestos reserves is to compare the company's three-year survival ratio to A.M. Best's view that the survival ratio should be roughly 12x. It is important to note that some companies have been aggressively settling claims in the last year, which artificially lowers the survival ratio.

It is estimated that the U.S. P/C industry will ultimately pay between $55 billion-$70 billion in asbestos claims. As points of reference, this is equal to 1.4x-1.8x the estimated losses expected from the P/C industry's largest man-made catastrophe, the September 11 events, and 3.0x-3.9x its largest weather-related catastrophe, Hurricane Andrew.

What Will Asbestos Cost the U.S. P/C industry?
($ In Billions)

| | A.M. Best | Tillinghast | Milliman |
|---|---|---|---|
| Ultimate Asbestos Cost for U.S. P/C Industry | $65 | $55 - $65 | $70 |
| Less: Incurred Asbestos Losses To Date | $32 | $32 | $32 |
| Reserve Shortfall | $33 | $23 - $33 | $38 |
| Combined Ratio Impact | | | |

*Source: A.M. Best, Tillinghast, Milliman*

There are several different reliable industry loss estimates. We have concentrated on A.M. Best whose estimates have considerable creditability with the insurers, as well as the well regarded actuarial consulting firms of Tillinghast-Towers Perrin and Milliman & Robertson.

The results from the studies suggest that the U.S. P/C industry's asbestos reserves were deficient by $23 billion-$38 billion at year-end 2000. According to A.M. Best in their special report on asbestos published last year, the U.S. P/C industry will have to ultimately pay an additional $43.4 billion on top of the $21.6 million it has already paid for asbestos-related claims as of year end 2000, bringing the total ultimate asbestos price tag to $65 billion. According to a recent study released by Tillinghast-Towers Perrin, settlements to individuals exposed to asbestos in the United States and related expenses will reach $200 billion. Of the $200 billion, the P/C insurance industry will pay $110 billion (55%) to $130 billion (65%) of the costs, split between both the United States and foreign insurers and reinsurers. Based on Milliman's study, also released last year, their estimated ultimate cost of asbestos claims including legal expenses of $275 billion is 37.5% higher than the Tillinghast estimate. Milliman expects that $175 billion (64.5% of the $275 billion), will be uninsured (paid by non-insurance companies), but the U.S. insurers could shell out $70 billion, while the non-U.S. insurers pay $30 billion of their worldwide insured loss estimate of $100 billion.

While virtually all P/C insurers will pay some part of the asbestos-related costs, the lion's share of the costs will be borne by the 30 most exposed insurers commonly referred to as the "dirty thirty". On the list of the dirty thirty are companies in our universe including ACE, AIG, Hartford Financial, Allstate, Safeco, St. Paul, Everest Re and Chubb. The publicly traded companies that we do not cover include Berkshire Hathaway, Citigroup and CNA. In our universe, Allmerica Financial is affected, but did not make the list of the top 30, and Cincinnati Financial, HCC Insurance Holdings, Progressive, and XL Capital are relatively untouched.

## P/C Companies/Groups Ranked by Total Asbestos and Environmental Reserves

Top-30 Property/Casualty Groups Ranked by Total Asbestos and Environmental Reserves

| Net A&E Reserve Rank | Group | Net A&E Reserve Share | 2000 Net A&E Reserve Composition: Net A&E Loss Reserves ($ millions) | Net Reserve Growth (%) | Asbestos Mix %) | Environ-mental Mix (%) | A&E Reserve Retention (%) | 2000 Net A&E Paid Losses: Net A&E Paid Loss ($ millions) | Asbestos Mix (%) | Environ-mental Mix (%) | Survival Ratios 1-Yr | Survival Ratios 3-Yr | Earnings Drag (pts) 1-Yr | Earnings Drag (pts) 3-Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Berkshire Hathaway | 6.7% | $1,500 | 6% | 42% | 58% | 51% | $82 | 26% | 74% | 18.3 | 27.9 | 1.7 | 1.2 |
| 2 | Nationwide Group | 6.6% | $1,469 | -1% | 51% | 49% | 100% | $117 | 66% | 34% | 12.6 | 51.1 | 0.8 | 1.6 |
| 3 | Travelers P&C | 6.1% | $1,362 | -9% | 59% | 41% | 82% | $253 | 28% | 72% | 5.4 | 3.1 | 1.2 | 1.7 |
| 4 | Brandywine (ACE INA Group) | 6.1% | $1,359 | 14% | 46% | 54% | 62% | $244 | 31% | 69% | 5.6 | 5.3 | 26.0 | 13.6 |
| 5 | Hartford Ins. Group | 5.6% | $1,261 | -7% | 34% | 66% | 46% | $109 | 41% | 59% | 11.6 | 9.0 | 0.1 | 0.1 |
| 6 | Liberty Mut Ins Cos | 5.4% | $1,215 | -11% | 62% | 38% | 55% | $229 | 62% | 38% | 5.3 | 2.9 | 1.0 | 1.0 |
| 7 | Allstate | 4.8% | $1,066 | -15% | 60% | 40% | 75% | $227 | 68% | 32% | 4.7 | 7.7 | 0.2 | 0.6 |
| 8 | Allianz of America | 4.4% | $996 | 12% | 31% | 69% | 54% | $199 | 25% | 75% | 5.0 | 5.3 | 8.9 | 3.1 |
| 9 | AIG | 3.8% | $855 | -2% | 40% | 60% | 35% | $71 | 67% | 33% | 12.1 | 7.7 | 0.5 | 1.2 |
| 10 | CNA Ins Companies* | 3.8% | $851 | -15% | 71% | 29% | 72% | $275 | 58% | 42% | 3.1 | 2.9 | 1.6 | 3.6 |
| 11 | St. Paul | 3.8% | $851 | -4% | 35% | 65% | 91% | $82 | 39% | 61% | 10.4 | 11.1 | 1.0 | 0.9 |
| 12 | American Re (Munich Re) | 3.7% | $837 | -11% | 49% | 51% | 67% | $162 | 51% | 49% | 5.2 | 5.8 | 1.9 | 9.0 |
| 13 | OneBeacon Group | 3.6% | $796 | -17% | 20% | 80% | 73% | $163 | 30% | 70% | 4.9 | 7.2 | NM | 4.8 |
| 14 | Swiss Re Group | 3.4% | $765 | 0% | 43% | 57% | 85% | $5 | NM | NM | 166.0 | 13.8 | 0.4 | 0.3 |
| 15 | Fairfax Fin (C&F; Int'l Ins. Co.) | 2.8% | $632 | -6% | 50% | 50% | 36% | $89 | 45% | 55% | 7.1 | 9.2 | 2.2 | 3.4 |
| 16 | Zurich/Farmers Group | 2.6% | $589 | -2% | 31% | 69% | 80% | $24 | 6% | 94% | 24.3 | 17.3 | 0.1 | NM |
| 17 | GE Capital Ins Group | 2.6% | $585 | 6% | 67% | 33% | 73% | $57 | 61% | 39% | 10.3 | 4.9 | 1.9 | 2.3 |
| 18 | Home Ins Companies (Run-Off) | 2.3% | $506 | -1% | 48% | 52% | 53% | $74 | 41% | 59% | 6.9 | 5.8 | NM | NM |
| 19 | Chubb Grp of Ins Cos* | 2.0% | $443 | -15% | 46% | 54% | 98% | $106 | 33% | 67% | 4.2 | 5.5 | 0.5 | 1.3 |
| 20 | Royal & SunAlliance | 1.6% | $369 | -13% | 37% | 62% | 84% | $62 | 41% | 59% | 5.9 | 6.1 | 0.2 | 0.4 |
| 21 | Great American | 1.6% | $351 | -12% | 40% | 60% | 77% | $46 | 15% | 85% | 7.7 | 10.1 | NM | 2.5 |
| 22 | FM Global Group | 1.4% | $321 | -7% | 65% | 35% | 48% | $24 | 72% | 28% | 13.3 | 19.8 | NM | 1.0 |
| 23 | Everest Reins Group** | 1.4% | $317 | -54% | 68% | 32% | 33% | $68 | 75% | 25% | 4.7 | 9.4 | NM | NM |
| 24 | SAFECO | 1.3% | $287 | -5% | 32% | 68% | 91% | $24 | 25% | 75% | 11.7 | 13.5 | 0.2 | 0.2 |
| 25 | Kemper | 0.8% | $179 | -26% | 57% | 43% | 87% | $89 | 52% | 48% | 2.0 | 2.8 | 1.1 | NM |
| 26 | Duke's Place Hldg (Seaton; Stonewall) | 0.8% | $176 | 5% | 47% | 53% | 43% | $8 | 51% | 49% | 21.2 | 13.8 | NM | NM |
| 27 | Reliance (In Liquidation)*** | 0.8% | $175 | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 28 | Phila Reins Corp (Run-Off) | 0.8% | $173 | 4% | 69% | 31% | 67% | -$7 | NM | NM | NM | 0.0 | 0.0 | NM |
| 29 | Argonaut | 0.7% | $155 | -7% | 52% | 48% | 79% | $22 | 63% | 37% | 7.2 | 9.8 | 7.7 | 0.8 |
| 30 | Gerling Gllobal | 0.7% | $152 | 2% | 30% | 70% | 36% | $9 | 35% | 65% | 17.8 | 12.1 | 1.3 | NM |
| | Top 30* | 92.0% | $20,593 | -6% | 47% | 53% | 61% | $2,912 | 45% | 55% | 7.0 | 6.6 | 1.0 | 1.6 |
| | All Others | 8.0% | $1,790 | -1% | 42% | 51% | 56% | $207 | 42% | 58% | 9.6 | 9.3 | 0.2 | 0.2 |
| | Total P/C Industry * | 100.0% | $22,383 | -6% | 47% | 53% | 61% | $3,119 | 44% | 55% | 7.2 | 6.7 | 0.6 | 1.0 |

*Source: A.M. Best*

We compiled a list (primarily composed of the dirty thirty) of U.S. P/C insurers that notably (and not surprisingly) increased their asbestos reserves in 2001. The collective total asbestos reserves incurred by these companies totaled $1.6 billion in 2001.

### Which Companies Have Recently Strengthened their Asbestos Reserves?

| (In Millions) | Pre-Tax Charges |
|---|---|
| U.S. Companies (subsidiaries): | |
| C.N.A. | $1,000.0 |
| Royal & Sun Alliance (U.S.) | $241.0 |
| American Financial (Great American) | $136.0 |
| GE Global | $99.0 |
| Safeco | $70.0 |
| Allmerica Financial | $33.0 |
| Markel | $20.0 |
| Everest Re | $10.0 |
| Ohio Casualty | $9.2 |
| Total U.S. Companies (subsidiaries) | $1,618.2 |

*Source: Lehman Brothers*

We also were alerted in 2001 to an unexpected asbestos-related charge from an old voluntary excess and reinsurance pool, known as the Excess Casualty Reinsurance Association (ECRA). This came about after Allmerica Financial announced that it would be taking a $33 million asbestos-related charge in the fourth quarter as a result of its modest 3% participation in the ECRA pool.

According to Allmerica, a recent reserve study (conducted by the actuarial consulting firm, Milliman and Robertson), suggests that asbestos and environmental (A&E) reserves set aside for ECRA are inadequate. In February, we learned that the reserve study has not been acted upon or approved yet by the pool's board of directors and, therefore, many insurers may have not strengthened their reserves due to the study's results. According to A.M. Best reports, Aetna (Travelers), Eagle Star (W.R. Berkley), Great American (American Financial) and St. Paul are among the pool participants in this run-off reinsurance pool in 1982. We also understand Cincinnati Financial has some exposure to the pool. The pool has been in existence since the 1930s and pool participants do not often change. We do not know the extent that the individual insurers participated in the pool nor the level of A&E reserves previously set aside for such liabilities (actually reserve assumptions vary by company), so it is not clear just how much a financial impact this will have on the individual companies. But some insurers will need to increase A&E reserves if the Milliman and Robertson report is accepted by the reinsurance pool's board.

Excess and Casualty Reinsurance Association

Companies participating in the pool in 1982:

Abeille-Paix General Ins. Co. (U.S. Branch)
Aetna Ins. Co. (Travelers)
Alabama Farm Bureau Mutual Ins. Co.
American Agrucultural Ins. Co.
Atlas Assurance Co. of America
Continental Casualty Co. (C.N.A.)
Copenhagen Reinsurance Co. of America
Dorinco Reinsurance Co.
Eagle Star Ins. Co. of America (W.R. Berkley)
Employers Ins. Of Wausau A Mutual Co.
Excess and Treaty Reinsurance Corp.
Farmers Home Mutual Ins. Co.
Farmers Mutual Hail Ins. Co. of Iowa
Folksamerica Reinsurance Co.
General Accident Ins. Co. of America
Great American Ins. Co. (American Financial)
Guarantee Ins. Co.
Hanover Ins. Co. (Allmerica)
Hanseco Ins. Co.
Hastings Mutual Ins. Co.
Highlands Ins. Co.
Home Ins. Co.
Inland Ins. Co.
Insurance Corp. of Hannover
Liberty Mutual Ins. Co.
Liberty National Fire Ins. Co.
Merchants and Business Men's Mutual Ins. Co.
Merrimack Mutual Fire Ins. Co.
Metropolitan Reinsurance Co.
Mutual Fire, Marine, and Inland Ins. Co.
National Reinsurance Corp.
New England Reinsurance Corp.
Nippon Fire Y Marine Ins. Co., Ltd. (U.S. Branch)
Northeastern Ins. Co. of Hartford
Philadelphia Manufacturers Mutual Ins. Co.
Providence Washington Ins. Co.
Provident General Ins. Co.
Republic Ins. Co.
Royal Ins. Co. of America (Royal and Sun)
St. Paul Fire & Marine Ins. Co. (St. Paul)
Security Ins. Co. of Hartford
Shelby Mutual Ins. Co.
Taisho Marine and Fire Ins. Co., Ltd. (U.S. Branch)
Tokio Marine and Fire Ins. Co. Ltd. (U.S. Branch)
United Fire & Casualty Co.
Winterthur Swiss Ins. Co. (U.S. Branch)
Zurich Ins. Co. (U.S. Branch)

*Source: A.M. Best*

If we gross up Allmerica's 3% participation in the pool, the reserve charge related to the ECRA pool has the potential of costing the P/C industry in excess of $1 billion. This would bring the total potential asbestos reserve strengthening for the U.S. P/C industry to at least $2.5 billion in 2001.

Total Potential Reserve Strengthening

| (In Millions) | Pre-Tax Charges |
|---|---|
| Total U.S. Companies (subsidiaries) | $1,618.2 |
| ECRA (estimate) | $967.0 |
| Total U.S. Companies (Subs) and ECRA | $2,585.2 |

*Source: Lehman Brothers*

The $2.5 billion is likely a low number even with the ECRA estimate (which may or may not be $1 billion), since we expect that there are plenty other P/C insurers that increased their asbestos reserves in 2001, as well.

We will not know the amount of reserve strengthening nor who contributed to the increase in 2001 until a review of 2001 year-end statutory annual reports are filed.

A.M. Best estimates that the U.S. P/C industry incurred $4.6 billion in losses related to asbestos claims (or approximately 1.4 percentage points on the combined ratio) in 2001. Standard and Poor's also expects that the P/C industry has increased asbestos-related reserves $5 billion-$10 billion in 2001. Our guess is that the S&P estimate is for both domestic and foreign companies. Regardless, the reserve charge for 2001 will likely represent the biggest hit that the P/C industry has taken to shore up asbestos reserves (the entire 1.4 percentage point A&E impact on the 2001 estimated combined ratio–the P/C industry's measure of underwriting profitability) in any given year.

Below, we illustrate A.M. Best's estimates for the industry's asbestos-related earnings drag.

Combined Ratio Impact (1997-2002E) – Pretax Earnings Drag

| (%) | 1997 | 1998 | 1999 | 2000 | 2001E | 2002E |
|---|---|---|---|---|---|---|
| Combined Ratio (Reported) | 101.6 | 105.6 | 107.8 | 110.1 | 117.0 | 107.5 |
| Less: Catastrophe Losses | 1.0 | 3.6 | 2.9 | 1.5 | 8.8 | 3.0 |
| Combined Ratio (x Cat Losses) | 100.6 | 102.0 | 104.9 | 108.6 | 108.2 | 104.5 |
| Less: | | | | | | |
| Asbestos Losses | 0.4 | 0.6 | 0.8 | 0.5 | NA | NA |
| Environmental Losses | 0.4 | 0.4 | 0.2 | 0.1 | NA | NA |
| Total A&E | 0.7 | 1.0 | 1.0 | 0.6 | 1.4 | 1.5 |
| Combined Ratio (Normalized) | 99.9 | 101.0 | 103.9 | 108.1 | 106.8 | 103.1 |

Note: Represents the net point impact on the p/c industry's combined ratio.

*Source: A.M. Best*

If we apply the estimated asbestos losses incurred totaling $4.6 billion in 2001, the reserve shortfall for the U.S. P/C industry at year-end 2001 would be $11 billion-$33 billion. On an after-tax basis for the same period, we are looking at an asbestos reserve deficiency that represents 3.9%-7.7% of the U.S. P/C industry's estimated statutory surplus. However, since the majority of the asbestos claims will be paid by the top 30 most exposed companies, the hit to their individual and/or combined surplus would be more significant. However, looking at the P/C industry's net ultimate asbestos exposure as a percentage of surplus tends to be a worse-case scenario considering that the P/C industry will likely be funding asbestos claims over many years to come.

Building Estimated Net Asbestos Reserve Shortfall and Impact on Statutory Surplus at Year-End 2001

($ In Billions)

| | A.M. Best | Tillinghast | Milliman |
|---|---|---|---|
| Ultimate Asbestos Cost for U.S. P/C Industry | $65 | $55 - $65 | $70 |
| Less: Incurred Asbestos Losses To Date* | $37 | $37 | $37 |
| Reserve Shortfall (pre-tax) | $28 | $18 - $28 | $33 |
| Reserve Shortfall (after-tax) | $18 | $12 - $18 | $21 |
| % of Best's est. statutory surplus at y-e 2001 | 6.5% | 3.9% - 6.5% | 7.7% |

*Source: A.M. Best, Lehman Brothers estimates, Tillinghast, and Milliman*

While we saw many P/C insurers increase their reserves for the such potential future asbestos-related claims this past year, the amount was not as much as we would have considered likely as the P/C industry was unexpectedly hard hit by September 11 and other adverse events (i.e. prior year reserve deficiencies from pricing wars of the 1990s and Tropical Storm Allison) during 2001. As a result, the funding of asbestos claims will

likely continue to be an ongoing earnings drag for the P/C industry for quite sometime. However, we believe that the asbestos issue has been a long running problem that is largely baked into earnings estimates and valuation for publicly traded P/C insurers.

The impact to earnings on P/C insurers varies from one company to the next but, for the most part, we expect to see asbestos exposures being offset somewhat by a couple of things over the next couple of years. The increased need for asbestos reserves is just one more reason to justify continued price increases to customers. It is also believed that the reserves that were set aside for environmental (pollution) claims years ago when such exposures were the hot issue for the P/C industry are, for some companies, becoming superfluous. In addition, there are some legislative solutions being pursued by insurers to reduce asbestos exposures. We will not hold our breath but, asbestos reform of some sort would mean earnings would increase significantly by virtually every publicly traded insurer.

Asbestos incurred losses as a percent of net premiums earned has averaged 0.6 percentage points on the P/C industry's combined ratio from 1997 to 2000. We and A.M. Best believe the impact on future earnings from asbestos losses will get much worse, as incurred losses are estimated to be roughly $5 billion in 2001 or about 1.4 percentage points on the P/C industry's combined ratio.

For 2002, if we assume that the P/C industry has a projected earnings drag of 1 percentage point, we estimate a net asbestos incurred loss of $3.5 billion. If we assume that the P/C industry has a projected earnings drag of 1.5% points (splitting the difference with A.M. Best's estimate of 1%-2%), it would record a net asbestos incurred loss of approximately $5.3 billion.

Top-30 Property/Casualty Groups Ranked by Total 2000 Asbestos Reserves & Estimated Net Asbestos Incurred Losses for 2002 Based on Market Share

($ millions)

| Net A&E Reserve Rank | Group | Net A&E Reserve Share | Net A&E Loss Reserves ($ millions) | Asbestos Mix %) | 2000 Net Asbestos Loss Reserves | Net Asbestos Reserve Share | 2002 Net Asbestos Estimated Incurred Losses: Assumes 1% point impact on combined ratio | 2002 Net Asbestos Estimated Incurred Losses: Assumes 1.5% point impact on combined ratio |
|---|---|---|---|---|---|---|---|---|
| 1 | Travelers P&C | 6.1% | 1,362 | 59% | $804 | 8% | $267 | $405 |
| 2 | Liberty Mut Ins Cos | 5.4% | 1,215 | 62% | 753 | 7% | 251 | 380 |
| 3 | Nationwide Group | 6.6% | 1,469 | 51% | 749 | 7% | 249 | 377 |
| 4 | Allstate | 4.8% | 1,066 | 60% | 640 | 6% | 213 | 322 |
| 5 | Berkshire Hathaway | 6.7% | $1,500 | 42% | 630 | 6% | 210 | 317 |
| 6 | Brandywine (ACE INA Group) | 6.1% | 1,359 | 46% | 625 | 6% | 208 | 315 |
| 7 | CNA Ins Companies | 3.8% | 851 | 71% | 604 | 6% | 201 | 304 |
| 8 | Hartford Ins. Group | 5.6% | 1,261 | 34% | 429 | 4% | 143 | 216 |
| 9 | American Re (Munich Re) | 3.7% | 837 | 49% | 410 | 4% | 136 | 207 |
| 10 | GE Capital Ins Group | 2.6% | 585 | 67% | 392 | 4% | 130 | 197 |
| 11 | AIG | 3.8% | 855 | 40% | 342 | 3% | 114 | 172 |
| 12 | Swiss Re Group | 3.4% | 765 | 43% | 329 | 3% | 109 | 166 |
| 13 | Fairfax Fin (C&F; Int'l Ins. Co.) | 2.8% | 632 | 50% | 316 | 3% | 105 | 159 |
| 14 | Allianz of America | 4.4% | 996 | 31% | 309 | 3% | 103 | 156 |
| 15 | St. Paul | 3.8% | 851 | 35% | 298 | 3% | 99 | 150 |
| 16 | Home Ins Companies (Run-Off) | 2.3% | 506 | 48% | 243 | 2% | 81 | 122 |
| 17 | Everest Reins Group | 1.4% | 317 | 68% | 216 | 2% | 72 | 109 |
| 18 | FM Global Group | 1.4% | 321 | 65% | 209 | 2% | 69 | 105 |
| 19 | Chubb Grp of Ins Cos | 2.0% | 443 | 46% | 204 | 2% | 68 | 103 |
| 20 | Zurich/Farmers Group | 2.6% | 589 | 31% | 183 | 2% | 61 | 92 |
| 21 | OneBeacon Group | 3.6% | 796 | 20% | 159 | 2% | 53 | 80 |
| 22 | Great American | 1.6% | 351 | 40% | 140 | 1% | 47 | 71 |
| 23 | Royal & SunAlliance | 1.6% | 369 | 37% | 137 | 1% | 45 | 69 |
| 24 | Phila Reins Corp (Run-Off) | 0.8% | 173 | 69% | 119 | 1% | 40 | 60 |
| 25 | Kemper | 0.8% | 179 | 57% | 102 | 1% | 34 | 51 |
| 26 | SAFECO | 1.3% | 287 | 32% | 92 | 1% | 31 | 46 |
| 27 | Duke's Place Hldg (Seaton; Stonewall) | 0.8% | 176 | 47% | 83 | 1% | 28 | 42 |
| 28 | Argonaut | 0.7% | 155 | 52% | 81 | 1% | 27 | 41 |
| 29 | Gerling Gllobal | 0.7% | 152 | 30% | 46 | 0% | 15 | 23 |
| 30 | Reliance (In Liquidation)* | 0.8% | 175 | NA | NA | NA | NA | NA |
| | **Top 30** | **91%** | **20,593** | **47%** | **$9,679** | **92%** | **$3,220** | **$4,876** |
| | All Others | 8% | 1790 | 42% | 752 | 7% | 250 | 379 |
| | **Total P/C Industry** | **99%** | **22,383** | **47%** | **$10,520** | **100%** | **$3,500** | **$5,300** |

* Reliance did not file 2000 statutory statements

*Source: A.M. Best and Lehman Brothers*

## Impact on Individual Companies

We estimate the 2002 cost per company by allocating the net asbestos incurred losses for the P/C industry (assuming both the 1% earnings drag or $3.5 billion and 1.5% earnings drag or $5.3 billion) to the most exposed commercial lines insurers based on their proportionate net asbestos loss reserve market share at year-end 2000.

If we assume that reform eliminates the need to add to current reserves, the 1.0% point or 1.5% pretax earnings drag is eliminated in 2002. The companies most affected are principally commercial insurers like Chubb ($0.31 to $0.51 per share estimated 2002 EPS upside, St. Paul ($0.31 to $0.47), ACE ($0.61 to $0.92) and Hartford Financial ($0.38 to $0.58). But there are a few personal lines companies that once wrote commercial lines like Allstate that are also affected ($0.22 to $0.32).

## Potential Earnings Upside – 1% Impact on P/C Industry's Combined Ratio

**Assumes 1% point impact on the p/c industry's combined ratio or net asbestos incurred losses for the industry of $3.5 billion for 2002 and allocate the loss proportionately based on companies net asbestos reserve market share at year end 2000:**

($ millions)

| Company | 2000 Net Asbestos Loss Reserves | Net Asbestos Reserve Share | 2002E Net Asbestos Incurred Losses | Net Premiums Earned | Pt. Impact on Combined Ratio (%) | Published EPS | Adjusted EPS | Upside Earnings |
|---|---|---|---|---|---|---|---|---|
| Hartford Financial | $429 | 4.08% | $143 | $7,826 | 1.8% | $4.93 | $5.31 | $0.38 |
| St. Paul Companies | $298 | 2.83% | $99 | $6,160 | 1.6% | $3.02 | $3.33 | $0.31 |
| Allstate | $640 | 6.08% | $213 | $23,874 | 0.9% | $2.60 | $2.82 | $0.22 |
| Everest Re | $216 | 2.05% | $72 | $1,821 | 3.9% | $5.70 | $6.71 | $1.01 |
| American International Group | $342 | 3.25% | $114 | $22,906 | 0.5% | $3.50 | $3.53 | $0.03 |
| ACE Ltd. | $625 | 5.94% | $208 | $6,986 | 3.0% | $3.54 | $4.15 | $0.61 |
| Safeco Corp. | $92 | 0.87% | $31 | $4,614 | 0.7% | $1.65 | $1.81 | $0.16 |
| Chubb | $204 | 1.94% | $68 | $7,215 | 0.9% | $4.61 | $4.92 | $0.31 |
| Cincinnati Financial | $28 | 0.27% | $9 | $2,258 | 0.4% | $1.66 | $1.69 | $0.03 |
| Total Industry | $10,520 | | $3,500 | $351,976 | 1.0% | | | |

*Source: Lehman Brothers*

## Potential Earnings Upside – 1.5% Impact on P/C Industry's Combined Ratio

**Assumes 1.5% point impact on the p/c industry's combined ratio or net asbestos incurred losses for the industry of $5.3 billion for 2002 and allocate the loss proportionately based on companies net asbestos reserve market share at year end 2000:**

($ millions)

| Company | 2000 Net Asbestos Loss Reserves | Net Asbestos Reserve Share | 2002E Net Asbestos Incurred Losses | Net Premiums Earned | Pt. Impact on Combined Ratio (%) | Published EPS | Adjusted EPS | Upside Earnings |
|---|---|---|---|---|---|---|---|---|
| Hartford Financial | $429 | 4.08% | $216 | $7,826 | 2.8% | $4.93 | $5.51 | $0.58 |
| St. Paul Companies | $298 | 2.83% | $150 | $6,160 | 2.4% | $3.02 | $3.49 | $0.47 |
| Allstate | $640 | 6.08% | $322 | $23,874 | 1.3% | $2.60 | $2.92 | $0.32 |
| Everest Re | $216 | 2.05% | $109 | $1,821 | 6.0% | $5.70 | $7.26 | $1.56 |
| American International Group | $342 | 3.25% | $172 | $22,906 | 0.8% | $3.50 | $3.55 | $0.05 |
| ACE Ltd. | $625 | 5.94% | $315 | $6,986 | 4.5% | $3.54 | $4.46 | $0.92 |
| Safeco Corp. | $92 | 0.87% | $46 | $4,614 | 1.0% | $1.65 | $1.88 | $0.23 |
| Chubb | $204 | 1.94% | $103 | $7,215 | 1.4% | $4.61 | $5.12 | $0.51 |
| Cincinnati Financial | $28 | 0.27% | $14 | $2,258 | 0.6% | $1.66 | $1.71 | $0.05 |
| Total Industry | $10,520 | | $5,300 | $351,976 | 1.5% | | | |

*Source: Lehman Brothers*

Throughout our analysis we assume that if there is reform, the asbestos reform would limit the extent of any future exposures to asbestos settlement. This could mean that the industry may already have adequate reserves set aside to settle their existing asbestos claims.

We also assume that if legislation passes, that the P/C industry reserves should be sufficient to fund asbestos-related claims and litigation, and that companies will no longer need to set aside future reserves for unfunded liabilities. The exact amount of earnings benefit, however, will ultimately depend on the reform and the companies' reserve position.

*This page intentionally left blank*

Kenneth R. Pierce
Lehman Risk Advisors
1.212.526.0789
kpierce@lehman.com

## Nonlegislative Risk Mitigation Strategies

Asbestos begs for a legislative solution. While much has been written about the public health toll from asbestos, the flood of claims in recent years also has led to a surge in corporate fatalities—there have now been 62 corporate bankruptcies producing a different type of human suffering in the form of lost jobs and decimated 401k plans. With 2,000 defendants facing an estimated 1,000,000 claims still to come, the havoc will continue unless Congress acts.

Whether Congressional action is something that can be counted upon is a different story. As Lehman's Washington-based political analysts noted earlier, tort reform is unlikely even under the most optimistic scenarios. Companies who base their asbestos strategy on imminent legislation may find themselves like the characters in Samuel Beckett's absurd classic, "Waiting for Godot"—endlessly waiting for salvation, which often appears tantalizingly close but never actually arrives.

Some forward-looking companies have chosen a different path for dealing with the asbestos scourge: hoping for the best, but planning for the worst by adopting various strategies to mitigate risk.

One strategy has been to transfer varying degrees of risk to large insurance or reinsurance counterparties. There have been several such transactions—some widely publicized, some not. One example is T&N PLC, formerly the United Kingdom's largest asbestos manufacturer. In 1996, T&N arranged for an insurance policy with three insurers, which provided $835 million of coverage excess of the first $469 million of loss, paying the insurers a premium of $154 million. T&N's stock price jumped 30% on the news that it had purchased the policy.

Insurance has been particularly useful in conjunction with corporate restructurings, mergers and acquisitions. By transferring catastrophic risk, crystallizing the liability for buyers, and helping sellers avoid long-term indemnities, insurance removes an impediment to deals. For example, in the September 2000 sale of the U.S. subsidiary of British insurer CGNU, the buyer, White Mountains, was concerned about exposure to the U.S. company's asbestos and environmental liabilities (notwithstanding a $1 billion reserve on the U.S. company's books). A $2.5 billion "stop loss" reinsurance policy was purchased for the $1 billion reserve, plus a $250 million premium.

Similarly, in the July 1999 purchase of Cigna's property and casualty division by ACE, a reinsurer stepped up to provide ACE significant coverage to protect against adverse development of Cigna's asbestos and environmental liabilities. More recently, Winterthur Swiss successfully used reinsurance in conjunction with its sale of troubled subsidiary Republic Insurance. Republic, like other insurers, faced significant asbestos and environmental exposure from business written years ago. For a $220 million premium, Winterthur secured a $700 million policy. Partly on the strength of this policy, the Texas

insurance regulators cancelled Winterthur's surplus maintenance agreement with Republic, giving Winterthur a complete exit.

Although no deals have yet been completed, insurance may enable bankrupt asbestos defendants to discharge their liabilities and emerge from bankruptcy or sell their operations cleansed of the liability. The Federal Bankruptcy Code now provides for the creation of a special trust to which existing and future claims are "channeled" through a court ordered injunction. What has prevented the widespread use of this vehicle has been disagreement among plaintiff attorneys, commercial creditors and corporate management over the valuation of future asbestos claims (75% of the class of asbestos claimants must approve the trust, which must hold at least a majority of the company's voting stock). By transferring the risk of future claim valuation to an Insurer or Reinsurer, insurance may facilitate deals among clashing creditor classes and accomplish the asbestos trust's worthy goal.

Apart from insurance, it has been suggested that capital markets tools such as catastrophe bonds, swaps or contingent capital may be applied to asbestos risk. For example, it may be possible to establish a liquidity facility which provides capital at precisely the time when companies need it the most: When asbestos claims have overwhelmed the company's existing sources of liquidity.

Unfortunately, there is no panacea that can make asbestos liability vanish, but depending on the company's particular situation, there are strategies to mitigate risk—not magic elixirs, but better than waiting for Congress.

## Appendix: Discussed Companies

Georgia-Pacific ..... 35
International Paper ..... 35
The Phelps Dodge Corporation ..... 37
Dow Chemical Company..... 39
PPG Industries, Inc. ..... 39
DuPont ..... 40
Pfizer, Inc. ..... 41
Owens-Illinois..... 43
Crown Cork and Seal ..... 43
Sealed Air Corp ..... 44
Foster Wheeler..... 45
Honeywell ..... 45
United Technologies..... 47
Aliant Techsystems ..... 47
Lockheed Martin ..... 47
Boeing ..... 47
L-3 Communications ..... 47
Raytheon ..... 47
United Defense..... 47
Goodrich ..... 47
Minnesota Mining & Manufacturing Co..... 49
Crane Co...... 49
ITT Industries..... 50
Dana Corporation..... 51
ArvinMeritor..... 51
Ford ..... 51
General Motors..... 51
Con Edison..... 53
Duke Energy Corp ..... 53

*This page intentionally left blank*

**BASIC INDUSTRIES**
Paper & Forest Products

Peter Ruschmeier
1.212.526.9898
pruschme@lehman.com

## Asbestos Exposure: Paper & Forest Product Companies

Few paper and forest product companies have exposure to asbestos. However, Georgia-Pacific manufactured a product that contained asbestos and International Paper acquired a company that distributed a product containing asbestos.

### Georgia-Pacific

The most significant exposure resides with Georgia-Pacific, which manufactured asbestos-containing "joint systems compound" (similar to spackle compound), used in construction. The product was manufactured by GP's gypsum wallboard business starting in the mid-1960s through 1977.

G-P recently provided clarity on their asbestos exposure. Using analysis performed by National Economic Research Associates and Peterson Consulting, G-P's estimated asbestos exposure for the 10-year period through 2011 is expected to be less than $1 billion and most of its liability will be covered by insurance. Given "gaps in coverage" resulting from insolvency of some of G-P's previous insurers, GP booked a $350 million ($0.96 per share after-tax) charge during the fourth quarter of 2001. We would summarize additional key points as follows:

- To date, approximately 297,000 asbestos claims have been filed against GP, of which 235,000 have been settled or dismissed. At the end of 2001, approximately 62,000 claims were pending.
- To date, substantially all of the asbestos settlements have been covered by GP's insurance.
- The number of new claims filed decreased last year to less than 40,000. A third-party analysis expects the number of new claims to continue to fall over the next decade.

### International Paper

International Paper has minimal exposure to asbestos. The exposure resides within a wood products distribution business that was wholly owned by Champion International. IP acquired Champion during 2000. Champion's distribution business did not manufacture any asbestos-containing products but they did distribute "countertops" that contained asbestos and were delivered to shipyards. Shipyards have proven to be an easy target for lawyers as various asbestos products were used to build the ships. However, the good news is that the exposure is confined. We do not believe IP's exposure presents any material financial risk to the company.

*This page intentionally left blank*

**BASIC INDUSTRIES**
Metals & Mining
Peter D. Ward, CFA
1.212.526.4016
pward1@lehman.com

## Asbestos Exposure: Metals & Mining Companies

### The Phelps Dodge Corporation

The Phelps Dodge Corporation is facing ongoing litigation related to its past production of asbestos-containing products. Phelps Dodge management does not believe that this litigation represents a material risk to the firm. Phelps Dodge holds litigation insurance, which management believes is sufficient to protect the company against the risks related to this litigation.

Phelps Dodge manufactured asbestos-insulated wire and cable for approximately 30 years until the early 1960s. The asbestos-bearing wire and cable was produced by Phelps Dodge subsidiaries. The subsidiaries involved in manufacturing these products were sold during the 1980s.

Phelps Dodge management believes that the pending asbestos litigation is not a material threat based, in part, on studies that have shown that the wire and cable insulation is stable and is not friable, even after extended periods of time. To date, over 48,000 claims have been filed against Phelps Dodge, most in the form of mass-tort litigation. Of these claims, over 33,000 have been disposed of without a legal defeat. The “no settlement” policy employed by Phelps Dodge has resulted in the firm paying out only $520,000 for claims over the last 10 years, amounting to $16 per claim. There are currently about 15,000 unresolved asbestos claims against Phelps Dodge. This number has remained fairly constant over the past few years, with new claims approximating disposals. Furthermore, Phelps Dodge management believes the number of total claims outstanding will remain on the order of 15,000 for the next few years.

Legal defense costs are approximately $1 million to $2 million per year. Phelps Dodge’s litigation insurance policies cover a substantial portion of these costs, but the company declined comment on the exact proportion. Importantly, this insurance will also mitigate the cost of adverse decisions against Phelps Dodge. In the opinion of management, this insurance would be sufficient to cover any adverse rulings, although they would not divulge the actual dollar amount of coverage. Again, according to management, Phelps Dodge has yet to lose a case in court over the current asbestos litigation. Furthermore, management does not believe the pending claims to be a material threat to the ongoing viability of the firm. However, the legal costs that are not covered by insurance will likely represent an ongoing expense.

*This page intentionally left blank*

**BASIC INDUSTRIES**
Major Chemicals

Sergey Vasnetsov
1.212.526.3212
svasnets@lehman.com

## Asbestos Exposure: Major Chemical Companies

### Dow Chemical Company

Dow Chemical itself never sold any asbestos products, and all cases came with Union Carbide, which Dow bought in February 2001. Union Carbide had $230 million in asbestos liability in 2001, with asbestos insurance coverage of $220 million, as disclosed on Dow's 4Q01 conference call.

Two Sources of Asbestos Liability

- Carbide owned a mine in King City, California, and an asbestos mill (making short-length fibers), which it ran from 1963-1986. Union Carbide sold actual asbestos pellets made from the mine to other companies in order to make ceiling and floor tiles. The mine was sold to King City Asbestos in 1986, and it continues to operate today.
- The other case is from AmChem. Products, an acquisition made by Union Carbide in 1977 from HB Fuller. AmChem was later sold to Rhone-Poulenc. AmChem did not sell any asbestos products when under Carbide's control, but had sold adhesives that contained small amounts of asbestos before the 1977 acquisition. When Carbide acquired AmChem., the asbestos liability came with it. After the 1986 sale of the unit to Rhone-Poulenc, Carbide retained the asbestos liability.

Dow's insurance policy is very large for both cases, and supported by several strongly solvent insurers, not just with one company. Insurance companies are readily paying for clients' liability to asbestos. Dow is reluctant to disclose the total value of their insurance coverage because it is concerned that it will lead plaintiffs to seek total claims of that amount.

A recent lawsuit in Beumont, TX, was settled for an undisclosed amount on January 9, and Dow's insurance policy seems large enough to pay the settlement. The full value of the coverage from the policies is not known. There are several other cases in the pipeline, but we do not know how many. Moreover, the timing and the actual outcome of these cases are difficult to predict.

There are also other companies mentioned in the Texas lawsuit. In a pending case in California, the plaintiff still needs to prove that the asbestos in the products they were exposed to was the same asbestos sold by Carbide from its asbestos mine.

### PPG Industries, Inc.

PPG's involvement in asbestos is related to "premises" liability from using asbestos products as insulation, which every chemical, energy, refining company has done, due to asbestos being a good insulator of hot pipes in chemical processes. The exposure is due to 50% ownership in a joint venture (JV) called Pittsburgh-Corning (PC), where PPG claims to have been involved only at "arms-length" as a financial partner. This is similar to

that of Dow Chem in the Dow Corning JV breast implants bankruptcy, which did not impact Dow Chem due to the corporate veil concept. PPG's involvement in PC was as limited as Dow's in Dow Corning; thus, we believe the corporate veil concept should also apply to PPG.

PC filed for bankruptcy on April 16, 2000. The bankruptcy judge stayed all cases against PC, until the lawyers, creditors, and suppliers could fathom the division of PC's assets. The stay has been extended many times, but it will be lifted when the parties either come to a decision or to a complete dead end. The next time the stay is to be reviewed is on or about April 15. This stay order freezes consideration of all cases against PC; although lawyers can file new claims, they will not go to court until after the stay is lifted.

Over the past 30 years, PPG has been a defendant in many cases, and was successful in getting them dismissed. The total amount of settlements has been immaterial. PPG is one of the defendants in cases involving 115,000 plaintiffs, this number has been stable over the past two years.

So far, PPG has been found partially liable in only one lawsuit (10% of the $15 million judgment for five plaintiffs in Beaumont, TX, in January 2000). PPG plans to appeal it, but can not proceed until after the stay is lifted. The appeal could take 12-18 months.

The bottom line, in our view, is that PPG's asbestos "cloud" seems to be much less serious than for many others, including Dow, but we will be watching it closely.

## DuPont

DuPont's exposure to asbestos litigation is primarily limited to "premises" liability, which most chemical companies encounter since asbestos products are commonly used in chemical plants, as it is a good insulator of hot pipes in chemical processes. We believe DuPont will not have many asbestos lawsuits brought against it and that the claims will be for relatively small amounts. Thus, we do not expect DuPont's earnings or operations to be materially affected by asbestos litigation.

**HEALTH CARE**
Major Pharmaceuticals
C. Anthony Butler, Ph. D
1.212.526.4410
abutler1@lehman.com

## Asbestos Exposure: Major Pharmaceuticals

### Pfizer, Inc.

There has been some concern over Pfizer's potential liability as a defendant in a number of asbestos-related lawsuits. These claims seem to come from three (historical) sources:

- Pfizer itself (via the sale of asbestos-containing talc);
- Quigley (a wholly-owned subsidiary of PFE that sold "construction products;" and
- American Optical (which was owned by WLA, which sold safety equipment (such as gloves) that contained asbestos).

The reason for some heightened concern is that the Center for Claims Resolution (CCR), a joint defense organization of several defendants that has been defending these claims, has been dissolved. Thus, Pfizer will defend its remaining claims itself and could be seen as having deep pockets. Pfizer claims to have sufficient insurance to cover all claims, although the company has not provided specific coverage amounts. At this point, we regard this not as a serious cause for alarm, but as something to monitor.

The number of asbestos cases is increasing and the body to distribute them, the CCR, has disbanded (this occurred some time ago). Grace and Owens Corning have filed for chapter 11, and, therefore, some litigants are seeking deep pockets like Pfizer. Pfizer, because the CCR disbanded, will litigate some of these cases. At the December 2001 analyst meeting, Pfizer CEO Hank McKinnel claimed that there are many issues that pose a risk to Pfizer, but this is not one of them. CFO David Shedlarz claimed that while this issue is an administrative nightmare, they will work through these issues and that there are sufficient reserves and cash flow for litigation.

### Asbestos Excerpt from Form: 10-Q (Filing Date: 11/13/2001)

Through the early 1970s, Pfizer Inc. (Minerals Division) and Quigley Company, Inc. ("Quigley"), a wholly owned subsidiary, sold a minimal amount of one construction product and several refractory products containing some asbestos. These sales were discontinued thereafter. Although these sales represented a minor market share, the Company has been named as one of a number of defendants in numerous lawsuits. These actions, and actions related to the Company's sale of talc products in the past, claim personal injury resulting from exposure to asbestos-containing products, and nearly all seek general and punitive damages. In these actions, the Company or Quigley is typically one of a number of defendants, and both have been members of the Center for Claims Resolution (the "CCR"), a joint defense organization of several defendants that has been defending these claims. The Company and Quigley have been responsible for varying percentages of defense and liability payments for all members of the CCR. With the reformation and/or dissolution of CCR, the Company and Quigley will defend the litigation separately from other CCR members. A number of cases alleging property damage from asbestos-containing products installed in buildings have also been brought against the Company, but most have been resolved and none are active.

As of September 30, 2001, there were 90,227 personal injury claims pending against Quigley and 59,071 such claims against the Company (excluding those that are inactive or have been settled in principle), and 74 talc cases against the Company.

The Company believes that its costs incurred in defending and ultimately disposing of the asbestos personal injury claims, as well as the property damage and talc claims, will be largely covered by insurance policies issued by several primary insurance carriers and a number of excess carriers that have agreed to provide coverage, subject to deductibles, exclusions, retentions and policy limits. Litigation against excess insurance carriers seeking damages and/or declaratory relief to secure their coverage obligations has been largely resolved.

From 1967 to 1982, a Warner-Lambert subsidiary owned American Optical Company, which at certain times manufactured a line of personal protective clothing and respirators for use in general industrial settings. Certain of the protective clothing items (e.g., certain gloves) contained asbestos. American Optical discontinued production of protective clothing in 1976, and sold its protective clothing business in its entirety in 1977. In May 1982, Warner-Lambert sold American Optical. As part of that sale, the Warner-Lambert subsidiary agreed to indemnify the purchaser against product liability claims arising out of alleged use or exposure to American Optical products up to the date of closing.

As of September 30, 2001, American Optical was named a defendant in lawsuits involving approximately 64,046 individual plaintiffs. Approximately two-thirds of these lawsuits involve claims for asbestos-related disease developed as a result of exposure to asbestos-containing protective clothing allegedly manufactured by American Optical. The remaining one-third consists of claims for silica-related disease developed as a result of exposure to silica while using allegedly defective respirators manufactured by American Optical.

Based on the Company's experience in defending the claims to date and considering its insurance and reserves, the Company is of the opinion that the actions should not have a material adverse effect on the financial position or results of the Company.

*Source: Pfizer*

**INDUSTRIAL**
Packaging

Joel G. Tiss
1.212.526.3521
jtiss@lehman.com

## Asbestos Exposure: Packaging Companies

### Owens-Illinois

Owens-Illinois made insulation products between 1948 and 1958 with annual average sales of $4 million. The company sold the business in 1958 and has been receiving lawsuits since the mid 1980s. The average age of the plaintiff is now 74 years and based on demographics, there is a 12-year tail on the liability after which most plaintiffs will expire from either asbestos or natural causes. Since its first claim, the company has disposed of 250,000 claims at an average cost of $4900 resulting in total payments well north of a billion dollars. Nobody outside of the population of workers that would have been of working age and exposed to OI's products during this time has successfully sued the company. Lawyers are now working on families of potentially exposed workers that could have been exposed to fibers through the workers' clothing, but there have been no successful cases to date. Owens' average cost per case five years ago was below $5000 and has since risen toward $10,000, partly because as the suing population ages, the incidence of actual sickness is amplified, and the cases have become more costly. That said, however, the vast majority of the cases (over 95%) are still without merit and settled at minimal cost. Owens is projected to spend some $240 million in 2002, roughly flat with 2001 levels. As of September 2001, the liability reserve on the balance sheet had declined to roughly $140 million, which will most likely be increased as management forecasts asbestos payments in 2002 running in excess of $200 million. During 2000, 20,000 cases were filed with 18,000 being disposed at an average cost of roughly $10,000 per case.

### Crown Cork and Seal

Crown Cork and Seal acquired Mundet Cork Company in 1963 and closed down the small division three months later. Unfortunately, this investment made a product that contained asbestos. Crown has paid out $300 million-$400 million, net of insurance proceeds, over the past 10 years and may have well over $1 billion of total liability left. The current run rate for payments is roughly $100 million per annum with an average payout of roughly $2500. During 2000, roughly 44,000 claims were filed with 40,000 being disposed; not to mention an additional 30,000 or so that are pending as management believes they are without merit. As of September 2001, the reserve was roughly $330 million with management assessing whether or not to adjust it. For now, the reserve appears reasonable, but in all likelihood it will be revisited on an annual basis. Crown has won a landmark agreement with the state of Pennsylvania that potentially shields the company from any further liability, however that ruling has yet to be court tested. While we believe that the amounts that Crown has paid out and the potential for further payouts ignore the past business profits or contribution to the overall issue, the company's tremendous debt burden makes the asbestos liability somewhat more important than otherwise.

## Sealed Air Corp

Sealed Air is a special case in that it is uncertain whether they will end up with asbestos exposure or not. In 1999, Sealed Air borrowed some $5 billion and was acquired by then WR Grace. Grace took the proceeds and spun out their chemical and other divisions leaving behind the old Sealed Air and their Cryovac division. The remaining company was renamed Sealed Air and was shielded from any potential asbestos liability by WR Grace. Then Grace went bankrupt reducing the potential for them to honor their agreement, longer term. The current lawsuits claim that Sealed Air and Grace coconspired to favor shareholders (who were given the spinouts) over the asbestos claimants, which because the two companies were combined, even if for a short period, may have some validity.

**INDUSTRIAL**
Electrical Equipment
Robert T. Cornell
1.212.526.2498
rcornell@lehman.com

## Asbestos Exposure: Electrical Equipment Companies

### Foster Wheeler

For the February 2002 quarter, the company reported total new claims of approximately 9,600. Roughly one-third of the new claims are related to a single lawsuit, which the company believes is without merit and expects to dismiss without payment. The 9,600 new claims compares with 11,100 from 2Q01, and 20,700 from 3Q01 and shows a pattern of new claims on the decline. The company resolved 17,200 cases in the quarter, compared to 6,100 claims resolved in 4Q00 and 5,700 resolved claims in 3Q01. Over the last two years, the rate of claims dismissed without payment has increased to 55%-58% and looks to be continuing upward. The number of outstanding claims at the end of 2001 stood at 110,800 versus 92,100 at the end of 2000 and 118,400 at the end of 3Q01. Management believes Foster Wheeler's asbestos strategy has, so far, been effective in conserving insurance assets and avoiding high risk situations. Claims are settled only when the cases meet stringent criteria. Foster Wheeler notes that almost all indemnity and defense costs have been paid by insurance and anticipates substantially all disbursements related to asbestos claims would be reimbursed by insurance coverage going forward.

### Honeywell

During Honeywell's January analyst meeting, the management summarized the company's asbestos situation. There are two businesses that have or had some peripheral connection with asbestos (Honeywell did not mine or manufacture asbestos but installed products that contained asbestos): 1) Bendix – a business currently part of Honeywell that sold encapsulated brake pads containing small amounts of asbestos; and 2) North American Refractory Company (NARCO) – a business that Honeywell owned between 1979-1986, but is now owned by RHI AG (an Austrian company). The company noted that Honeywell was named in lawsuits along with other companies in the auto industry, but it is difficult to establish that a claimant, usually an auto mechanic, was exposed to a Bendix product. Over the last 20 years, management resolved 53,000 cases at $1,000 per case with 74% of cases being dismissed without merit, and it won 116 out of 119 cases that went to court. Honeywell stated that it has not made asbestos related pay outs for a number of years since satisfying the insurance deductible. Even under conservative estimates, management believes the company is sufficiently covered by the existing $2 billion insurance coverage for Bendix, and does not expect outlays going forward.

NARCO is the other business with a connection with asbestos and Honeywell. This company manufactures bricks and cement for high temperature applications mostly in the steel industry with approximately 2% of products containing asbestos. Upon the sale of NARCO in 1986, Honeywell indemnified NARCO for discontinued products prior to 1986 and NARCO, in turn, indemnified Honeywell for products after 1986. Over the past 18 years, NARCO has settled 176,000 cases at $2200 per case where 43% of

cases were dismissed without merit, according to management. In January 2002, NARCO filed for reorganization under Chapter 11, with Honeywell's consent, faced with a decline in the steel industry and increasing asbestos liability. At this point, all 116,000 claims outstanding against NARCO, of which 7% also name Honeywell, have been staid in Federal Bankruptcy Court. The court has curtailed claims against Honeywell until the bankruptcy case has been resolved. If the reorganization plan is approved, an injunction would become effective such that all future claims would be taken care of by the court. Honeywell holds a $1.3 billion insurance policy, which combined with the assets of NARCO, would be used to fund a trust that the company estimates would be sufficient in covering any claims. Bottom line, Honeywell does not expect any expenditures related to NARCO's asbestos issue for at least three years or until the reorganization is resolved, and the company could make a similar case for subsequent periods.

**INDUSTRIAL**
Aerospace & Defense Electronics
Joseph F. Campbell, Jr.
1.212.526.3277
jcampbel@lehman.com

## Asbestos Exposure: Aerospace and Defense Electronics

### United Technologies

United Technologies does have a small number of asbestos cases, but according to the company, they do not amount to anything meaningful and the company has insurance policies in place. In other words, its exposure does not have any material financial impact. The company is not aware of any customers filing asbestos suits.

### Aliant Techsystems

All public companies are required to disclose all material exposure or litigation in their 10-K filings. In review of ATK's 10-K filings, there is no reference to any asbestos exposure or litigation.

### Lockheed Martin

No current meaningful asbestos exposure. Lockheed takes pride in the diligence of disclosing their legal contingencies in their SEC filings, and there is no mention of material asbestos exposure in these filings outside of an immaterial $315,000 civil penalty in the first quarter of 2000 related to the mishandling of asbestos-containing demolition debris in Lockheed's former aircraft manufacturing facilities in Burbank, CA.

### Boeing

Asbestos was used in the past in certain components of aerospace products. In the late 1970s Boeing began to identify the components and materials that contained asbestos, and to introduce substitute materials. Nearly all use of asbestos in Boeing products had been eliminated by the early 1990s. Claims for asbestos-related damages against Boeing have typically been dismissed or settled for a nominal amount. Most of the claims have been insured. Boeing has no basis to believe that asbestos-related claims are, or will be, a material factor in the company's financial performance.

### L-3 Communications

No current litigation or liability.

### Raytheon

No litigation or liability.

### United Defense

No litigation or liability.

### Goodrich

The only aerospace and defense electronics company in our universe that has meaningful asbestos exposure is Goodrich. Although asbestos exposure is an important element of Goodrich's investment thesis, we do not currently cover this company, therefore we do

not feel comfortable singling it out. We can, however, provide some factual information regarding its exposure. The asbestos exposure associated with its industrial subsidiary, Coltec, is discussed in Goodrich's most recent 10-K. More specifically, Coltec's historical subsidiary operations of Garlock Sealing Technologies LLC and the Anchor Packing Company, which made and/or distributed industrial-sealing products, primarily gaskets, have resulted in a substantial volume of asbestos litigation. The company believes that pending actions are not likely to have a material adverse effect on its financial condition, but could, at some point, harm its profitability or cash flows.

Garlock believes its exposure is well managed and it is currently covered by insurance. At this time, Goodrich is in the process of spinning off its industrial unit (EnPro) to its shareholders. It believes this will separate the parent company from the asbestos liability contained in the industrial unit. The company believes that EnPro is viable, has a strong capital structure, healthy cash flows and that it can manage all of its liabilities, including asbestos. It has hired external experts to evaluate EnPro and it is the experts' opinion that EnPro satisfies all legal requirements to remove future asbestos liability from Goodrich and that it is both liquid and solvent with respects to its liabilities.

Since 1999, Garlock has implemented a short-term aggressive settlement strategy, with the goal of achieving a permanent reduction in the number of overall asbestos claims at current settlement rates. When a settlement demand is not reasonable given the totality of the circumstances, Garlock generally will try the case and has been successful in winning a substantial majority of the cases it has tried to verdict and has paid roughly $7 million in compensatory damages in cases that have gone to verdict in 1999, 2000, and 2001.

Anchor is an inactive and insolvent subsidiary of Coltec. The insurance coverage available to it is fully committed. Anchor continues to pay settlement covered by its insurance, but has not committed to settle any further actions since 1998. As cases reach the trial stage, Anchor is typically dismissed without payment.

From a cash standpoint, Garlock has about $1.0 billion of insurance coverage. The amount of insurance receivable to the company in any given year was limited to $80 million per year in 2001 and 2000. This limit automatically increases by 8% every three years. As a result, Garlock has to pay out its own cash to settle the claims in excess of the annual limit and collect these amounts from its insurance carriers in subsequent years.

At the end of 2001, Goodrich had 95,400 pending cases. It paid $74.8 million, $36.4 million, and $19.3 million for the defense and disposition of the cases net of the amounts received from insurance, in 2001, 2000, and 1999, respectively.

**INDUSTRIAL**
Multi-Industry

Donald Zwyer, CFA
1.212.526.2008
dzwyer@lehman.com

## Asbestos Exposure: Multi-Industry Companies

### Minnesota Mining & Manufacturing Co.

According to 3M's 10-Q filing for 3Q01, the jury in the Circuit Court of Holmes County, Mississippi, ruled against the company that its respirator and masks did not protect the plaintiffs against contracting claimed asbestos-related diseases. Consequently, the jury awarded $25 million in compensatory damages to each of four plaintiffs. 3M estimated its share of the total liability to be $22.5 million, but had limited visibility as to whether its liability would increase if any of the codefendants were unable to pay its share of damages.

3M said it never had a negative asbestos award of this magnitude in the past. Also, only two other cases ever went to trial. Those cases, in Texas, were awarded in 3M's favor. The Mississippi case is almost identical, according to 3M, and it is the first trial case to go against the company.

As of September 30, 2001, 3M had approximately 20,000 asbestos lawsuits and claims remaining (as a defendant with multiple codefendants), representing approximately 85,000 individuals. 3M had about $122 million in estimated accrued liabilities related to asbestos claims, and about $184 million in receivables for expected insurance recoveries, with the difference between the two items relating to time delay between payment of claims, and receipt of insurance reimbursement.

3M noted that the asbestos issue is not likely to have a material impact on its financial position, but future unfavorable rulings or developments could lead to material negative impact on its financial position. However, 3M expects to challenge the jury's verdict, and believes that it will ultimately be overturned. In the past 20 years, 3M noted that it had successfully defended and resolved about 200,000 similar claims and lawsuits, with an average settlement of less than $1,000.

On the asbestos issue, 3M recently commented that it has not witnessed any acceleration in claims and that there are no pending trials. At the end of December 2001, 3M had about 80,000 claims outstanding, down from about 85,000 at the end of 3Q01. The number of claims filed in 4Q01 was fewer than those filed during the same period last year. Further, 3M noted that insurance recovery has been around 95% and that its top five insurance companies have strong credit ratings.

### Crane Co.

Crane Co. has disclosed its asbestos litigation in its annual reports since 1995. According to Crane's annual report for 2000, the company was a codefendant (along with 15-40 other companies) in approximately 5,460 asbestos-related cases. The plaintiffs have alleged injury or death due to exposure to asbestos in products allegedly manufactured or sold by Crane.

Our understanding is that most of Crane's exposure to asbestos came from gaskets and packing used in the company's valves between 1957-86. Crane claims that it was never involved in the manufacturing of asbestos products per se, and in the early 1980s, the company refrained from using any asbestos-related product in its manufacturing. Crane has indicated that the asbestos issue is not expected to have a material impact on its financial position.

## ITT Industries

ITT is involved in asbestos litigation, but the company believes that it is not a material risk. ITT noted that it has never been required to make any payments for settlements or defense costs with respect to asbestos litigation. Further, the company believes that it has substantial insurance coverage and that this issue would not have any material effect on its financial position.

**INDUSTRIAL**
Auto & Auto Parts

Darren S. Kimball, CFA
1.212.526.5627
dkimball@lehman.com

## Asbestos Exposure; Auto and Auto Parts Companies

### Dana Corporation

Dana had about 100,000 claims outstanding at the end of 2001, including about 27,000 claims that were settled and pending payment. The company has accrued a $102 million liability relating to these claims as well as an $89 million insurance recoverable asset, indicating that the vast majority of the claims are covered by insurance policies. The net liability has not increased significantly, having risen only $2 million since 2000.

Dana also has contingent liabilities of $44 million (offset by a $39 million insurance recoverable) related to shared settlements among former CCR members who have defaulted over the past year.

### ArvinMeritor

ArvinMeritor has paid out a total of $40 million in asbestos-related settlements since 1996, almost all of which have been covered by insurance. The company currently has a $71 million liability booked, mostly offset by a $60 million insurance recoverable. ArvinMeritor had about 46,000 cases pending at the end of 2001, 15,000 of which are awaiting final payment.

### Bottom Line on Dana and ArvinMeritor

Given what we know right now, we do not believe asbestos liabilities will have a material impact on Dana's or ArvinMeritor's financial condition. The disclosures to date do not indicate a material risk. However, we are not in a position to predict the outcome of future litigation either in terms of claim activity or magnitude of settlements. In particular, both companies have been left to fight claims on their own following the dissolution of the CCR.

Our biggest concern related to asbestos is related to the caps on the companies' insurance policies. Because neither company has disclosed the terms of its insurance coverage, we do not know if they are adequately covered. While both companies have expressed a reasonable level of confidence that they are adequately insured, we would feel more comfortable if we had greater transparency on the terms of coverage.

### Ford and General Motors

Although asbestos liability has always been an issue for the automakers, it has only recently come to the forefront subsequent to the Federal-Mogul bankruptcy filing. Both Ford and General Motors (and numerous other automakers) have been named as codefendants, as plaintiffs are now looking for deep pockets. Although Ford and GM are named as codefendants, there are many other automakers named, including DaimlerChrysler, BMW and Volkswagen.

While Ford declines to comment officially, in its 10-K, it states that these claims have arisen as a result of plaintiffs "alleged contact with certain Ford parts and other products containing asbestos". GM-related claims are primarily auto / brake pad related, although some stem from GM locomotives (railroad workers exposed to asbestos used in brake linings) and some older GM buildings (and contractors who worked on them).

Ford and GM had requested that roughly 15,000 to 20,000 brake-related asbestos claims to be consolidated into the bankruptcy proceedings of auto parts maker Federal Mogul Corp. These claims represent the majority of asbestos-related lawsuits against the automakers. Had this occurred, they were prepared to argue that the claims be dismissed as a group, on grounds that the claims lacked scientific evidence linking products to asbestos-related illnesses.

However, on February 2, 2002, a U.S. District Court Judge ruled that he did not have jurisdiction to make such a move, that it would hurt Federal Mogul's bankruptcy case and it would disrupt many asbestos claims in state courts that are nearing trial. The decision was a defeat for the automakers, which sought to limit legal costs and avoid litigating the cases in state courts across the country.

Recently, $53 million was awarded to a claimant, the highest amount ever for an asbestos case. GM, Ford and five other defendants settled out of court for an undisclosed amount before the ruling was issued.

GM will not comment on financial exposure, except to say that it is not material to its financial results. Further, GM would not comment on whether or not it had established legal reserves or had insurance coverage for its asbestos liability.

Ford stated in its 10-K that as of December 31, 2001, plaintiffs sought both actual and punitive damages of approximately $1.7 billion . Like GM, it would not comment on whether or not it had established legal reserves or had insurance coverage for its asbestos liability.

**ENERGY/POWER**
Power

Daniel F. Ford, CFA
1.212.526.0836
daford@lehman.com

## Asbestos Exposure: Power Companies

### Con Edison

Con Edison has accrued $169.4 million for its utility subsidiaries' exposure to asbestos and other hazardous substances including polychlorinated biphenyls (PCBs) and coal tar based on cases where they have received process as of September 30, 2001. This includes $130.9 million at the Con Edison of New York subsidiary and $38.5 million at Orange & Rockland. Also, under current rate plans, ED is able to defer for potential recovery site investigation and remediation costs with respect to hazardous waste. At the end of September, this amount totaled $100.7 million ($60.6 million for Con Ed NY and $40.1 million for O&R). Amounts specified in pending lawsuits are in the billions of dollars, however ED believes that these amounts are greatly exaggerated and notes that, so far, lawsuits have generally been unsuccessful or settled for immaterial amounts.

### Duke Energy Corp

Duke Energy's asbestos exposure stems from construction and maintenance activities conducted by the company on its electric generation plants during the 1960s and 1970s. During the late 1990s Duke Energy experienced a significant increase in the number of these claims, which prompted the company to record an $800 million accrual in 4Q99 to reflect the purchase of a third-party insurance policy as well as estimated amounts for future claims not recoverable under such policy. The insurance policy, combined with amounts covered by self-insurance reserves, provides for claims paid up to an aggregate of $1.6 billion.

We believe that Duke's asbestos exposure is unique because it has an identified finite population (i.e. confined to current and former employees) and it is settling claims on an individual basis and not in a class action lawsuit.

GLOBAL EQUITY RESEARCH

New York
745 Seventh Avenue
New York, NY 10019 USA
1.212.526.7000

London
One Broadgate
London EC2M 7HA England
44.20.7260.2241

Tokyo
Ark Mori Building
Minato-ka Tokyo 107 Japan
813.5571.7355

Hong Kong
One Pacific Place
Queensway, Hong Kong
852.2869.3198

Lehman Brothers Inc. has managed or co-managed within the past three years a public offering of the securities of United Defense, Sears Roebuck, MetLife, McDermott International, Halliburton, General Electric, Eastman Kodak, AT&T, L-3 Communications, Raytheon, ArvinMeritor, Ford, General Motors, Duke Energy.

An employee of Lehman Brothers Inc. is a director of L-3 Communications.

An analyst who contributed to this report (or a member of his or her household) owns shares of Alcoa, Pfizer.

Any OTC security mentioned herein may not be blue skied in all states; brokers should check the FCI system or call the Blue Sky department before placing any order.

Key to Investment Rankings: This is a guide to expected total return (price performance plus dividend) relative to the total return of the stock's local market over the next 12 months. **1 = Strong Buy** (expected to outperform the market by 15 or more percentage points); **2 = Buy** (expected to outperform the market by 5-15 percentage points); **3 = Market Perform** (expected to perform in line with the market, plus or minus 5 percentage points); **4 = Market Underperform** (expected to underperform the market by 5-15 percentage points); **5 = Sell** (expected to underperform the market by 15 or more percentage points).

This material has been prepared and/or issued by Lehman Brothers Inc., member SIPC, and/or one of its affiliates ("Lehman Brothers") and has been approved by Lehman Brothers International (Europe), regulated by the Securities and Futures Authority, in connection with its distribution in the European Economic Area. This material is distributed in Japan by Lehman Brothers Japan Inc., and in Hong Kong by Lehman Brothers Asia Limited. This material is distributed in Australia by Lehman Brothers Australia Pty Limited, and in Singapore by Lehman Brothers Inc., Singapore Branch. This document is for information purposes only and it should not be regarded as an offer to sell or as a solicitation of an offer to buy the securities or other instruments mentioned in it. No part of this document may be reproduced in any manner without the written permission of Lehman Brothers. We do not represent that this information, including any third party information, is accurate or complete and it should not be relied upon as such. It is provided with the understanding that Lehman Brothers is not acting in a fiduciary capacity. Opinions expressed herein reflect the opinion of Lehman Brothers and are subject to change without notice. The products mentioned in this document may not be eligible for sale in some states or countries, and they may not be suitable for all types of investors. If an investor has any doubts about product suitability, he should consult his Lehman Brothers' representative. The value and the income produced by products may fluctuate, so that an investor may get back less than he invested. Value and income may be adversely affected by exchange rates, interest rates, or other factors. Past performance is not necessarily indicative of future results. If a product is income producing, part of the capital invested may be used to pay that income. Lehman Brothers may make a market or deal as principal in the securities mentioned in this document or in options, futures, or other derivatives based thereon. In addition, Lehman Brothers, its shareholders, directors, officers and/or employees, may from time to time have long or short positions in such securities or in options, futures, or other derivative instruments based thereon. One or more directors, officers, and/or employees of Lehman Brothers may be a director of the issuer of the securities mentioned in this document. Lehman Brothers may have managed or co-managed a public offering of securities for any issuer mentioned in this document within the last three years, or may, from time to time, perform investment banking or other services for, or solicit investment banking or other business from any company mentioned in this document. © 2002 Lehman Brothers. All rights reserved.

Additional information is available on request. Please contact a Lehman Brothers' entity in your home jurisdiction.

US02-0689

LEHMAN BROTHERS

# EXHIBIT 163

RBC Capital Markets

**Halliburton Company (NYSE:HAL)** May 29, 2002

**Sector Perform ; 12 Mo. Price Target: $21.00 ; Speculative Risk**

**OILFIELD SERVICES**

Kurt Hallead (512) 708-6356 kurt.hallead@rbccm.com

**HALLIBURTON ANNOUNCES SEC INVESTIGATION INTO ACCOUNTING PRACTICES**

- Halliburton announced the initiation of an SEC investigation into its accounting treatment on construction projects.
- A recent article in the *New York Times* alleged improper accounting practices.
- We reviewed the accounting treatment in question, and while it does appear aggressive, it is revealed in footnotes, and the amounts involved would not materially change operating income, in our assessment.
- We believe Halliburton is a lightning rod due to Vice President Cheney's former role as CEO.

| | |
|---|---|
| **Price:** | $19.35 |
| **52-Wk Range:** | $48 -$8 |
| **Tr. 12 ROE:** | 17.3% |
| **3 Yr EPS Gr.:** | NA |
| **Shares Out:** | 430.00 million |
| **Book Value:** | $10.89 |
| **Market Cap:** | $8.32 billion |

| **Fiscal Yr** | **Prev** | **EPS** | **P/E** |
|---|---|---|---|
| Dec/2001A | | $1.28 | 15.1x |
| Dec/2002E | | $0.78 | 24.8x |
| Dec/2003E | | $1.40 | 13.8x |
| 2002 Q2 | | $0.15 | |
| EPS from continuing operations | | | |

| **Cash Flow** | **Prev** | **CFPS** | **P/CF** |
|---|---|---|---|
| 2001A | | $2.52 | 7.7x |
| 2002E | | $1.99 | 9.7x |
| 2003E | | $2.75 | 7.0x |
| 2002 Q1 | | $0.49 | |
| EPS from continuing operations | | | |

**SEC Inquiry:**

- Halliburton announced the initiation of an SEC investigation into its accounting treatment of cost overruns on construction projects.
- The company expects to receive a formal request for documents or a subpoena sometime in the next few days.
- Halliburton believes the inquiry results from a May 22, 2002 article in the *New York Times* alleging improper accounting practices.
- Many of the company's construction projects are "fixed price" projects for which cost overruns and costs associated with changes in project scope must be negotiated with its customers.
- Beginning in 1998, Halliburton began to book revenue and accounts receivable for cost overruns on construction projects despite ongoing negotiations with its customers over the amounts in question.

**Accounting Review:**

- The company does not disclose the amount of revenue included in the Engineering & Construction (E&C) revenues related to unresolved claims and change orders.
- However, a review of the accounts receivables provides some color on the amount of unresolved claims revenues.
- At the end of fiscal 2000 the company had $113 million in receivables (out of total receivables of $2.95 billion) related to unresolved claims. This number increased to $234 million (out of $3.0 billion in total receivables) by the end of 2001.
- This would imply total revenues, net of actual collections on accrued amounts in 2001 of $121 million on a total E&C revenue base of $4.3 billion.
- Additionally, the company has booked no profits from the revenue accrued using this accounting methodology.
- In fact, Halliburton took a significant loss in Q4 of 2000 when it became clear that some accrued receivables related to these claims would not be recoverable, resulting in a loss for the quarter.
- Finally, the operating margin in the E&C division has been approximately 3% over the last couple of years, suggesting that any operating income benefits from this accounting would be minimal.

**Outlook:**

- After reviewing the accounting treatment in question, we must admit that it certainly appears "aggressive."
- However, it has been fully disclosed in the footnotes for over three years, and Halliburton's auditors have signed off on the accruals.
- Most importantly, in our opinion, the amounts in question appear to be relatively immaterial when viewed in the context of the total E&C division.

- Following the questions raised in the *New York Times* article, we believe the SEC really had no choice but to open an inquiry given the lingering accounting concerns following the Enron collapse, Vice President's Cheney's former role as CEO, and the high profile nature of Halliburton's asbestos issues.
- While the outcome of the investigation remains unclear, we believe it is safe to assume that Halliburton will continue to be a lightning rod for scrutiny due to Vice President Cheney's former role as CEO.

**Stock Opinion:**
We maintain our Sector Perform with a Speculative Risk. Our 12-month price target of $21, or 15x our 2003 EPS estimate, is based on a discount from prior cycle averages to reflect our assessment of the uncertainty surrounding the ultimate outcome of Halliburton's asbestos liabilities.

**Company Description:**
Halliburton Co. is a provider of products and services to the petroleum and energy industries. The company serves its customers with a broad range of products and services through its Energy Services Group and Engineering and Construction Group business segments.

---

The author is employed by RBC Dain Rauscher Inc., a securities broker-dealer with principal offices located in Minnesota, USA.
Our Research Ratings Legend can be viewed at www.rbcdrw.com/researchratings. The information contained in this report has been compiled by RBC Capital Markets (RBC CM), a business name used by subsidiaries of the Royal Bank of Canada including RBC Dain Rauscher Inc., RBC Dominion Securities Inc., RBC Dominion Securities Corp., and Royal Bank of Canada Europe Limited, from sources believed to be reliable, but no representation or warranty, express or implied, is made by RBC CM, its affiliates or any other person as to its accuracy, completeness or correctness. All opinions and estimates contained in this report constitute RBC CM's judgment as of the date of this report and are subject to change without notice. This report is not an offer to sell or a solicitation of an offer to buy or sell any securities. RBC CM and its affiliates may have an investment banking or other relationship with some or all of the issuers mentioned herein and may trade in any of the securities mentioned herein either for their own account or the accounts of their customers. Accordingly, RBC CM or its affiliates may at any time have a long or short position in any such security or option thereon. The securities discussed in this report may not be eligible for sale in some jurisdictions. This report is not, and under no circumstances should be construed as, a solicitation to act as securities broker or dealer in any jurisdiction by any person or company that is not legally permitted to carry on the business of a securities broker or dealer in that jurisdiction. This material is prepared for general circulation to all clients of the Royal Bank Financial Group and does not have regard to the particular circumstances or needs of any specific person who may read it. Neither RBC CM, or any of its affiliates, nor any other person, accepts any liability whatsoever for any direct or consequential loss arising from any use of this report or the information contained herein. The entities comprising RBC Capital Markets are indirect wholly owned subsidiaries of the Royal Bank of Canada and are members of the Royal Bank Financial Group. Additional information is available on request. Copyright © 2002 RBC Dain Rauscher Inc. All rights reserved.

# EXHIBIT 164

CIBC World Markets

**Equity Research**

May 30, 2002

*Company Update* *Buy*

# Halliburton Co.

## SEC Inquiry Is More Bark Than Bite, We Believe

**Oilfield Service**

| HAL-NYSE (5/30/02) | $18.00 |
|---|---|
| **Key Indices:** S&P 500, NYSE, Oil Srvc, S&PEngy | |
| 3-5-Yr. EPS Gr. Rate (E): | 15.0% |
| 52-week Range | $8.75-$49.25 |
| Shares Outstanding | 432M |
| Float | 430.2M shrs |
| Avg. Daily Trading Vol. | 4,726,045 |
| Market Capitalization | $7.8B |
| Dividend/Yield | $0.50/2.8% |
| Fiscal Year Ends | December |
| Book Value | 11.00 per Shr |
| 2002 ROE | 7.8% |
| LT Debt | $1,500M |
| Preferred | $ |
| Common Equity | 4,752.0M |
| Convertible Available | No |

- On May 28, Halliburton announced the SEC had launched a preliminary investigation into its accounting treatment of cost overruns on construction jobs. This inquiry will overhang the stock, but an improving asbestos situation and oil service fundamentals should outweigh it.

- HAL believes it adhered to proper guidelines involving its unapproved claims revenue. Collection rates illustrate the conservative approach: In 1998, only 50% of unapproved claims were booked, but 100% were collected. Other project claims were not booked, but still collected.

- This is the result of a May 22 New York Times article that we believe left out pertinent details and may have had a political agenda targeting ex-CEO and current Vice President Dick Cheney. The unapproved claims in question only total $98 million, less than 1% of total revenue.

- The SEC investigation is not surprising, because the Enron scandal has politically necessitated the investigation into any of the accounting matters that come to light in the media. We do not view the SEC's involvement as confirmation of an impropriety on the part of Halliburton.

**Company Description**

Halliburton Co. is a diversified energy services, engineering and construction and maintenance company.

| **Earnings per Share** | | |
|---|---|---|
| 2001A | | $1.28A |
| 2002E | | $0.85E |
| 2003E | | $1.45E |
| **P/E** | | |
| 2001A | | 14.1x |
| 2002E | | 21.2x |
| 2003E | | 12.4x |

| **CF per Share** | | |
|---|---|---|
| 2001A | | $2.59A |
| 2002E | | $2.03E |
| 2003E | $2.64E | $2.77E |
| **P/CF** | | |
| 2001A | | 6.9x |
| 2002E | | 8.9x |
| 2003E | 6.8x | 6.5x |

**Stock Price Performance**




**Allen Brooks**
1 (713) 650-2505
Allen.Brooks@us.cibc.com

**Jordan Horoschak**
1 (713) 650-2506
Jordan.Horoschak@us.cibc.com

**Our EPS estimates are shown below:**

| | *1 Qtr.* | *2 Qtr.* | *3 Qtr.* | *4 Qtr.* | *Yearly* |
|---|---|---|---|---|---|
| **2001A Actual** | $0.20A | $0.33A | $0.42A | $0.33A | $1.28A |
| **2002E Current** | $0.19A | $0.17E | $0.22E | $0.27E | $0.85E |
| **2003E Current** | -- | -- | -- | -- | $1.45E |

**Our CF estimates are shown below:**

| | *1 Qtr.* | *2 Qtr.* | *3 Qtr.* | *4 Qtr.* | *Yearly* |
|---|---|---|---|---|---|
| **2001A Actual** | $0.56A | $0.66A | $0.73A | $0.64A | $2.59A |
| **2002E Current** | $0.42A | $0.48E | $0.54E | $0.59E | $2.03E |
| **2003E Current** | -- | -- | -- | -- | $2.77E |

4) Halliburton Co. has a convertible included in the CIBC World Markets Corp. convertible universe.

**Stock prices as of 05/29/2002 of other companies mentioned in this report:**
Enron Corp., ENRNQ-Suspended, $0.165 (2)

2) CIBC World Markets, or one of its affiliated companies, has performed investment banking services for this company.
9) Solicitation of Enron Corp. is restricted to non-US and/or qualified institutional buyers only

This report is issued and approved for distribution by (i) in the US, CIBC World Markets Corp., a member of the NYSE and SIPC, (ii) in Canada, CIBC World Markets Inc., a member of the IDA and CIPF, (iii) in the UK, CIBC World Markets plc, which is regulated by the FSA, and (iv) in Australia, CIBC World Markets Australia Limited, a member of the Australian Stock Exchange and regulated by the ASIC (collectively, "CIBC World Markets"). Any questions should be directed to your local sales representative.

Every state in the United States, province in Canada and most countries throughout the world have their own laws regulating the types of securities and other investment products which may be offered to their residents, as well as the process for doing so. As a result, some of the securities discussed in this report may not be available to every interested investor. Accordingly, this report is provided for informational purposes only, and does not constitute an offer or solicitation to buy or sell any securities discussed herein in any jurisdiction where such offer or solicitation would be prohibited. No part of any report may be reproduced in any manner without the prior written permission of CIBC World Markets.

This document and any of the products and information contained herein are not intended for the use of private investors in the UK. Such investors will not be able to enter into agreements or purchase products mentioned herein from CIBC World Markets plc.

The comments and views expressed in this document are meant for the general interests of clients of CIBC World Markets Australia Limited.

The information and any statistical data contained herein were obtained from sources that we believe to be reliable, but we do not represent that they are accurate or complete, and they should not be relied upon as such. All estimates, opinions and recommendations expressed herein constitute CIBC World Markets' judgement as of the date of this report and are subject to change without notice. The securities mentioned in this report may not be suitable for all types of investors; their prices, value and/or income they produce may fluctuate and/or be adversely affected by exchange rates. Since the levels and bases of taxation can change, any reference in this report to the impact of taxation should not be construed as offering tax advice; as with any transaction having potential tax implications, clients should consult with their own tax advisors. Past performance is no guarantee of future results.

This report does not take into account the investment objectives, financial situation and particular needs of any particular client of CIBC World Markets. Before making an investment decision on the basis of any recommendation made in this report, the recipient should consider whether such recommendation is appropriate given the recipient's particular investment needs, objectives and financial circumstances. To allow CIBC World Markets to take into consideration a recipient's objectives, financial situation and particular needs, CIBC World Markets suggests that, prior to acting on any of the recommendations herein, you contact one of our client advisers in your jurisdiction to discuss your particular circumstances.

A CIBC World Markets company or its shareholders, directors, officers and/or employees, may have a long or short position or deal as principal in the securities discussed herein, related securities or in options, futures or other derivative instruments based thereon. A CIBC World Markets company may (i) have acted as initial purchaser or placement agent for a private placement of the securities of any company mentioned in this report, (ii) from time to time solicit from or perform financial advisory, investment banking or other services for any such company, or (iii) have lending or other credit relationships with the same

Although each company issuing this report is a wholly owned subsidiary of Canadian Imperial Bank of Commerce ("CIBC"), each is solely responsible for its contractual obligations and commitments, and any securities products offered or recommended to or purchased or sold in any client accounts (i) will not be insured by the Federal Deposit Insurance Corporation ("FDIC"), the Canada Deposit Insurance Corporation or other similar deposit insurance, (ii) will not be deposits or other obligations of CIBC, (iii) will not be endorsed or guaranteed by CIBC, and (iv) will be subject to investment risks, including possible loss of the principal invested. The CIBC trademark is used under license.

© 2002 CIBC World Markets Corp. and CIBC World Markets Inc. All rights reserved. Unauthorized use, duplication or disclosure is prohibited by law and may result in prosecution.

# EXHIBIT
# 165

01:05pm EDT 29-May-02 Deutsche Bank Securities Inc. (A. Sanger/M. Urban/R. F)
HAL: Accounting Non-Issue Rears Its Head Again-Buy

Sanger, Arvind S. CFA 212-469-2998
Urban, Michael W. 212-469-3113
Franson, Robert D. 212-469-3123
Rinaldi, Thomas 212-469-5696
Deutsche Bank Securities Inc.

05/29/2002

---

HALLIBURTON COMPANY (HAL) "BUY"
Accounting Non-Issue Rears Its Head Again

---

| | | | | | |
|---|---|---|---|---|---|
| Date: | 05/28/2002 | EPS: | 2001A | 2002E | 2003E |
| Price: | 19.35 | 1Q | 0.20 | 0.19A | NE |
| 52-Wk Range: | 48 - 9 | 2Q | 0.33 | 0.16 | NE |
| Ann Dividend: | 0.5 | 3Q | 0.42 | 0.24 | NE |
| Ann Div Yld: | 2.58% | 4Q | 0.33 | 0.33 | NE |
| Mkt Cap (mm): | 8,321 | FY(Dec.) | 1.28 | 0.92 | 1.60 |
| 3-Yr Growth: | | FY P/EPS | 15.1X | 21.X | 12.1X |
| | | CY EPS | NENE | NE | NE |
| Est. Changed | No | CY P/EPS | NM | NM | NM |

---

Industry: Oil Services & Equipment
Shares Outstanding(Mil.): 430.0
Return On Equity (2001) : 0.0%

---

HIGHLIGHTS:

The SEC informed HAL yesterday that it was opening an investigation into the revenue recognition issues at the e&c business that were highlighted in last week's New York Times article. As we stated then, we believe these accounting issues are largely a non-event but the SEC is wanting to not seem to be influenced by political connections since Dick Cheney was the CEO of HAL then. Some of the key reasons why we expect this issue to be resolved without any real fallout for HAL are:

* Revenue recognition policy changed after company switched focus in 1997: In 1997 HAL switched emphasis in its e&c business to more turnkey (rather than cost plus) work. Subsequently, it started recognizing revenues from uncollected claims that it estimated to be collectible, a not unusual approach for an e&c company.
* Amounts at issue were modest: HAL recognized $89 million in 1998 and $91 million in 1999 under this approach, both less than 1% of revenues. More importantly, when the company took a charge of $191 million in 2000 for uncollected claims at the e&c and oilfield construction businesses, only about $8 million ($0.01/share) were previously recognized as collectible. The estimated therefore appear to have been only very modestly optimistic, and not out of line with the normal variance in percentage of completion estimates.
* Continue to rate the stock a Buy: We continue to rate HAL Buy with a 12-month target price of $24.

DETAILS:

Information herein is believed to be reliable and has been obtained from sources believed to be reliable, but its accuracy and completeness cannot be guaranteed. Opinions, estimates, and projections constitute our judgement and are subject to change without notice. This publication is provided to you for information purposes only and is not intended as an offer or solicitation for the sale of any financial instrument. Deutsche Bank Securities Inc. and its affiliates worldwide, may hold a position or act as market maker in the financial instruments of any issuer discussed herein or act as advisor or lender to such issuer. Transactions should be executed through a Deutsche Bank entity in the client's home jurisdiction unless otherwise permitted by law.

Deutsche Bank Securities Inc. is a member of NYSE and NASD. Copyright 2002 Deutsche Bank Securities Inc.

Additional Information Available Upon Request
First Call Corporation, a Thomson Financial company.
All rights reserved. 888.558.2500

# EXHIBIT
# 166

Morgan Stanley

**Comment** | Page 1

**Equity Research**
North America

United States of America

Oil Services & Equipment

# Halliburton Co.

Reuters: HAL.N Bloomberg: HAL NYSE: HAL


Ole Slorer
+1 (1)212 761 6198
Ole.Slorer@morganstanley.com
James R. Lewis
+1 (1)713 512 4485
James.R.Lewis@morganstanley.com
David S. Havens
+1 (1)212 761 3953
David.Havens@morganstanley.com


**Company Update**

May 30, 2002

## *Accounting Concerns Unwarranted, we believe*

| STOCK RATING | EQUAL-WEIGHT–V |
|---|---|
| Price (May 29, 2002) | $18.72 |
| Price Target | $25 |
| 52-Week Range | $48.20 - 8.75 |

*Stock ratings are relative to the analyst's industry (or industry team's) coverage universe.*

| MSCI SECTOR | ENERGY |
|---|---|
| US Strategist Weight | 8% |
| S&P 500 Weight | 7% |

- **The SEC will conduct an inquiry into HAL's accounting for E&C projects.** The policy in question relates to revenue recognition on unapproved claims for lump-sum turnkey contracts.
- **We believe the company's accounting policies are allowable under GAAP.** We expect the SEC to find no wrongdoing on the part of the company. We believe the revenue recognition policy in question is allowable under GAAP and that it has been applied correctly.
- **We continue to view the shares of HAL as significantly undervalued.** Our Equal-weight-V rating and $25 price target are unchanged.
- **We view the Oil Services & Equipment industry as Attractive.** We believe the group is entering the second stage of a cyclical expansion which could last two years or more.

### Stock Price Performance




| FY ending Dec 31: | 2001A | 2002E | 2003E | 2004E |
|---|---|---|---|---|
| EPS ($) | 1.33 | 0.80 | 1.40 | – |
| Prior EPS Ests. ($) | – | – | – | – |
| Consensus EPS Ests. ($) | – | – | – | – |
| CEPS ($) | 2.48 | 1.98 | 2.61 | – |
| P/E | 14.0 | 23.3 | 13.4 | – |
| P/CE | 7.6 | 9.4 | 7.2 | – |
| Yield (%) | 2.7 | 2.7 | 2.7 | 0.0 |

| | |
|---|---|
| Market Cap ($ m) | 8,087 |
| Enterprise Value ($ m) | 9,310.0 |
| Debt/Cap (03/02) (%) | 24.0 |
| Shares Outstanding (m) | 432.0 |

| Q'trly EPS | 2001A actual | 2002E curr | 2002E prior | 2003E curr | 2003E prior |
|---|---|---|---|---|---|
| Q1 | 0.25 | 0.19A | – | – | – |
| Q2 | 0.33 | 0.16E | – | – | – |
| Q3 | 0.42 | 0.20E | – | – | – |
| Q4 | 0.33 | 0.25E | – | – | – |

*E = Morgan Stanley Research Estimate*

### Company Description

Halliburton is the largest oilfield services company in the world with products, services, and integrated solutions for oil and gas exploration, development, and production. Capabilities range from the initial evaluation of producing formations to drilling, completion, production enhancement, and well maintenance.

**Please see the important disclosures at the end of this report.**

# *Accounting Concerns Unwarranted, we believe*

**Summary and Investment Conclusion**

Halliburton announced that it has received notification from the Securities and Exchange Commission (SEC) that the SEC has launched a preliminary inquiry into the company's accounting practices related to lump-sum engineering and construction (E&C) contracts. The accounting policy in question has to do with the recognition of revenues for claims and change orders on turnkey contracts.

In some cases, the company recognizes revenues associated with cost overruns on turnkey projects, before they have been approved by the customer. These revenues are only recognized when Halliburton believes that it is likely to be paid and where the cost overruns were a result of some unforeseeable circumstance or change in the scope of work requested by the customer.

The SEC inquiry was launched in response to the article that appeared in the *New York Times* last week which questioned Halliburton's change in accounting treatment for these items while Vice President Dick Cheney was Chief Executive Officer, in our view. We believe that, politically speaking, the SEC could not afford to ignore any such allegations of improprieties at Halliburton, however flimsy, given the company's perceived connection with the current administration.

The company's accounting policies in this area are compliant with Generally Accepted Accounting Policies (GAAP) and are in line with accepted industry practice, in our opinion. We believe the inquiry will prove to be relatively short-lived and will find that Halliburton's revenue recognition policies are allowable under GAAP. We also expect that the company's application of the accounting standards will be accepted as appropriate.

We continue to view the shares of Halliburton as significantly undervalued, as a result of concerns over the company's asbestos liabilities, and believe they represent a very attractive investment opportunity for value-oriented investors who are willing to take the time to understand the risk/reward trade-off. Our $25 price target and Equal-weight-V rating are unchanged.

**Details**

Halliburton changed its revenue recognition policy on unapproved claims in 1998. The change in policy was driven by a change in the company's business mix, we believe. Prior to 1997, the company had emphasized time and materials (or cost-plus) E&C contracts. In the 1997 annual report the company highlighted that it was increasingly targeting turnkey or lump-sum EPC (engineering, procurement, and construction) contracts.

The 1999 Halliburton annual report summarized its revenue recognition policy related to unapproved claims as follows:

***"Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work are included in revenue when collection is deemed probable."***

According to management, since the policy was adopted the vast majority of unapproved claims have been collected at or above the amount recorded as revenues.

Another point to consider is standard industry practice. Based on a quick survey (about five minutes in total), we turned up other companies, with substantial turnkey E&C revenues, which have similar revenue recognition policies, including Foster Wheeler (FWC, $2, Not Rated) and the Shaw Group (SGR, $34, Not Rated).

Halliburton's policies and historical experience seem to be very much in line with the applicable accounting standards, in our opinion. The **American Institute of Certified Public Accountants Statement of Position 81-1** (*Accounting for Performance of Construction-Type and Certain Production-Type Contracts*) states (in paragraph 65) that recognition of revenues on unapproved claims and change orders is appropriate if collection is deemed **probabl**e and the collectible amount can be **reliably estimated**.

The standard also contains four questions which must be answered in the affirmative in order for the claim to be recognized as revenue:

(1) the contract or other evidence provides a legal basis for the claim;



**Please see the important disclosures at the end of this report.**

(2) additional costs are caused by circumstances that were unforeseen at the contract date and are not the result of deficiencies in the contractor's performance;

(3) costs associated with the claim are identifiable or otherwise determinable and are reasonable in view of the work performed; and

(4) the evidence supporting the claim is objective and verifiable.

Based on the above, we find it difficult to foresee a serious problem arising in this area as a result of the SEC inquiry.

We firmly believe that the company's revenue recognition policies are allowable under GAAP. We also believe that the company is applying the standards correctly. As a result, we would expect that the SEC inquiry will find no wrongdoing on the part of Halliburton. Unfortunately, with the considerable backlog of investigations currently underway at the SEC, there may be a substantial delay before the investigators get a chance to look through the documentation that Halliburton will be providing, which means that the inquiry could remain open for a period of several months.



**Please see the important disclosures at the end of this report.**

The information and opinions in this report were prepared by Morgan Stanley & Co. Incorporated ("Morgan Stanley"). Morgan Stanley has no obligation to tell you when opinions or information in this report change. Morgan Stanley and its affiliate companies are involved in many businesses that may relate to companies mentioned in this report. These businesses include market making and specialized trading, risk arbitrage and other proprietary trading, fund management, investment services and investment banking.

This report is based on public information. Morgan Stanley makes every effort to use reliable, comprehensive information, but we make no representation that it is accurate or complete. We are not offering to buy or sell the securities mentioned or soliciting an offer to buy or sell them.

Within the last three years, Morgan Stanley, Morgan Stanley DW Inc. and/or their affiliate companies managed or co-managed a public offering of the securities of Baker Hughes, Cal Dive International, Cooper Cameron, Nabors Industries Inc., National Oilwell Inc., OSCA, Inc., Schlumberger, Smith International Inc., Teekay Shipping, W-H ENERGY SERVICES and Weatherford International.

Morgan Stanley, Morgan Stanley DW Inc. and/or their affiliate companies make a market in the securities of Cal Dive International, Patterson-UTI Energy, Smith International Inc. and W-H ENERGY SERVICES.

Morgan Stanley, Morgan Stanley DW Inc., affiliate companies, and/ or their employees may have an investment in securities and derivatives of securities of companies mentioned in this report. These derivatives may be issued by Morgan Stanley or others associated with it.

The securities discussed in this report may not be suitable for all investors. Investors must make their own investment decisions based on their own investment objectives and financial position. Morgan Stanley recommends that investors independently evaluate each issuer, security or instrument discussed, and use any independent advisers they believe necessary. The value of and income from your investment may vary because of changes in interest rates or foreign exchange rates, changes in the price of securities or other indexes in the securities markets, changes in operational or financial conditions of companies and other factors. There may be time limitations on the exercise of options or other rights in your securities transactions. Past performance is not necessarily a guide to future performance.

This publication is disseminated in Japan by Morgan Stanley Japan Limited and/or Morgan Stanley Nippon Securities Limited; in Singapore by Morgan Stanley Dean Witter Asia (Singapore) Pte., regulated by the Monetary Authority of Singapore; in Australia by Morgan Stanley Dean Witter Australia Limited A.B.N. 67 003 734 576, a licensed dealer, which accepts responsibility for its contents; in certain provinces of Canada by Morgan Stanley Canada Limited, which has approved of, and has agreed to take responsibility for, the contents of this publication in Canada; in Spain by Morgan Stanley, S.V., S.A., a Morgan Stanley group company, which is supervised by the Spanish Securities Markets Commission (CNMV) and states that this document has been written and distributed in accordance with the rules of conduct applicable to financial research as established under Spanish regulations; in the United States by Morgan Stanley & Co. Incorporated and Morgan Stanley DW Inc., which accept responsibility for its contents; and in the United Kingdom, this publication is approved by Morgan Stanley & Co. International Limited, solely for the purposes of section 21 of the Financial Services and Markets Act 2000. Private U.K. investors should obtain the advice of their Morgan Stanley & Co. International Limited representative about the investments concerned.

This report may not be sold or redistributed without the written consent of Morgan Stanley Dean Witter & Co. Morgan Stanley is a service mark of Morgan Stanley Dean Witter & Co.

**Additional information on recommended securities is available on request.**

Morgan Stanley

**The Americas**
1585 Broadway
New York, NY 10036-8293
United States
Tel: +1 (1)212 761 4000

**Europe**
25 Cabot Square, Canary Wharf
London E14 4QA
United Kingdom
Tel: +44 (0)20 7513 8000

**Japan**
20-3, Ebisu 4-chome
Shibuya-ku,
Tokyo 150-6008, Japan
Tel: +81 (0)3 5424 5000

**Asia/Pacific**
Three Exchange Square
Central
Hong Kong
Tel: +852 2848 5200

## INDUSTRY COVERAGE: OIL SERVICES & EQUIPMENT

| Company | Ticker | Rating | as of | Price at 5/28/02 |
|---|---|---|---|---|
| Baker Hughes | BHI.N | E | 3/18/02 | $36.41 |
| BJ Services | BJS.N | O | 3/18/02 | $37.68 |
| Cal Dive International | CDIS.O | E | 3/18/02 | $23.76 |
| Cooper Cameron | CAM.N | O | 3/18/02 | $56.55 |
| Diamond Offshore | DO.N | U | 3/18/02 | $33.70 |
| Dril Quip Inc. | DRQ.N | E | 3/18/02 | $23.25 |
| ENSCO | ESV.N | U | 3/18/02 | $33.23 |
| GlobalSantaFe Corp. | GSF.N | E | 3/18/02 | $34.60 |
| Grant Prideco, Inc. | GRP.N | U | 3/18/02 | $14.50 |
| Halliburton Co. | HAL.N | E | 3/18/02 | $19.35 |
| Nabors Industries Inc. | NBR.A | O | 3/18/02 | $44.10 |
| National Oilwell Inc. | NOI.N | O | 3/18/02 | $25 |
| Noble Corporation | NE.N | E | 3/18/02 | $41.80 |
| OSCA, Inc. | OSCA.O | NR | 3/18/02 | $27.96 |
| Patterson-UTI Energy | PTEN.O | O | 3/18/02 | $31.75 |
| Pride International Inc. | PDE.N | O | 5/28/02 | $19.50 |
| Schlumberger | SLB.N | E | 3/18/02 | $52.25 |
| Seacor Smit Inc. | CKH.N | U | 3/18/02 | $48.66 |
| Smith International Inc. | SII.N | O | 3/18/02 | $73.44 |
| Teekay Shipping | TK.N | U | 3/18/02 | $40 |
| Transocean | RIG.N | E | 3/18/02 | $38.25 |
| Weatherford International | WFT.N | O | 3/18/02 | $50.44 |
| W-H ENERGY SERVICES | WHES.O | E | 3/18/02 | $22.99 |

*Stock ratings are subject to change. Please see latest research for each company.*

## ANALYST STOCK RATINGS

Overweight (O). The stock's total return is expected to exceed the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Equal-weight (E). The stock's total return is expected to be in line with the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Underweight (U). The stock's total return is expected to be below the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

More volatile (V). We estimate that this stock has more than a 25% chance of a price move (up or down) of more than 25% in a month, based on a quantitative assessment of historical data, or in the analyst's view, it is likely to become materially more volatile over the next 1-12 months compared with the past three years. Stocks with less than one year of trading history are automatically rated as more volatile (unless otherwise noted). We note that securities that we do not currently consider "more volatile" can still perform in that manner.

## ANALYST INDUSTRY VIEWS

Attractive (A). The analyst expects the performance of his or her industry coverage universe to be attractive vs. the relevant broad market benchmark over the next 12-18 months.

In-Line (I). The analyst expects the performance of his or her industry coverage universe to be in line with the relevant broad market benchmark over the next 12-18 months.

Cautious (C). The analyst views the performance of his or her industry coverage universe with caution vs. the relevant broad market benchmark over the next 12-18 months.

©2002 Morgan Stanley

# EXHIBIT 167

SALOMON SMITH BARNEY

# Halliburton Company (HAL)#

## HAL: Recent Accounting Questions Appear Benign

**2S** *(Outperform, Speculative)*
**Mkt Cap: $8,320.5 mil.**

United States

**May 30, 2002**

**OILFIELD EQUIPMENT & SERVICES**

**Geoff Kieburtz**
+1-212-816-3139
*geoff.kieburtz@ssmb.com*

Robert J. MacKenzie
+1-212-816-6629

**SUMMARY**

- Halliburton announced that it has received notification from the SEC that it has initiated an investigation into the company's accounting for cost overruns on construction jobs.
- In 1998, Halliburton changed its accounting to recognize revenue on some claims for additional reimbursement on construction projects as they occur, as opposed to its prior practice of not recognizing claim revenue until collected.
- The impetus for this change was an industry shift away from cost plus contracts towards fixed price contracts, making such claims more common.
- The current revenue recognition method appears to be consistent with GAAP under AICPA SOP 81-1, assuming Halliburton has met the proscribed tests. The company believes that its accounting has been in accordance with GAAP.
- Based on our analysis, we believe Halliburton's accounting is appropriate, and thus we maintain our 2S rating on the shares with a $24 target.

**FUNDAMENTALS**

| | |
|---|---|
| P/E (12/02E) | 20.4x |
| P/E (12/03E) | 12.1x |
| TEV/EBITDA (12/02E) | 7.1x |
| TEV/EBITDA (12/03E) | 5.2x |
| Book Value/Share (12/02E) | $11.24 |
| Price/Book Value | 1.7x |
| Dividend/Yield (12/02E) | $0.50/2.6% |
| Revenue (12/02E) | $12,372.0 mil. |
| Proj. Long-Term EPS Growth | NA |
| ROE (12/02E) | 8.7% |
| Long-Term Debt to Capital(a) | 24.5% |

HAL is in the S&P 500® Index.

(a) Data as of most recent quarter

**SHARE DATA**

| | |
|---|---|
| Price (5/28/02) | $19.35 |
| 52-Week Range | $47.51-$10.06 |
| Shares Outstanding(a) | 430.0 mil. |
| Convertible | No |

**RECOMMENDATION**

| | |
|---|---|
| **Current Rating** | **2S** |
| Prior Rating | 2S |
| **Current Target Price** | **$24.00** |
| Previous Target Price | $24.00 |

**EARNINGS PER SHARE**

| FY ends | | 1Q | 2Q | 3Q | 4Q | Full Year |
|---|---|---|---|---|---|---|
| 12/01A | Actual | $0.20A | $0.33A | $0.42A | $0.33A | $1.29A |
| 12/02E | Current | $0.19A | $0.16E | $0.26E | $0.35E | $0.95E |
| | Previous | $0.19A | $0.16E | $0.26E | $0.35E | $0.95E |
| 12/03E | Current | NA | NA | NA | NA | $1.60E |
| | Previous | NA | NA | NA | NA | $1.60E |
| 12/04E | Current | NA | NA | NA | NA | $2.20E |
| | Previous | NA | NA | NA | NA | $2.20E |

First Call Consensus EPS: 12/02E $0.87; 12/03E $1.43; 12/04E NA

**OPINION**

Halliburton announced that it has received notification from the Fort Worth office of the SEC that it has initiated a preliminary investigation into the company's accounting for cost overruns on construction jobs. The company indicated that it expects to receive either a formal request for documents or a subpoena over the next few days, and that it expects to cooperate fully. This inquiry comes on the back of a New York Times article on May 22, which raised questions about Halliburton's change in accounting during 1998.

The issue in question is a change in Halliburton's accounting for claims in excess of the contracted price for lump sum contracts. Such claims typically arise out of customer actions that result in delays, errors in design or engineering, change orders, or other unanticipated costs. Prior to 1998, and the merger with Dresser, Halliburton recorded recoveries associated with such claims as revenue as they were collected.

Following the Dresser merger, Halliburton changed its accounting to recognize some claims as revenue (offsetting the expense) as they occur. While this change occurred at this time, it was primarily driven by a shift in industry contracting practices to fixed cost contracts away from cost plus work. As the proportion of fixed cost contracts in Halliburton's workload increased, the company decided that it needed to change its accounting practices.

Halliburton's practice or recognizing some claims revenue appears consistent with GAAP under AICPA (American Institute of Certified Public Accountants) Statement of Position (SOP) 81-1 "Accounting for Performance of Construction Type and Certain Production Type Contracts". Under SOP 81-1, claim revenue is allowed to be recognized as long as it is probable that the company will collect on the claim and the amount can be accurately estimated. In addition, the amount of revenue recognized is not allowed to exceed the contract costs incurred. These conditions are determined to have been met if the claim passes four specific tests, quoted below:

- The contract or other evidence provides a legal basis for the claim; or a legal opinion has been obtained, stating that under the circumstances there is reasonable basis to support the claim.
- Additional costs are caused by circumstances that were unforeseen at the contract date and are not the result of deficiencies in the contractor's performance.
- Costs associated with the claim are identifiable or otherwise determinable and are reasonable in view of the work performed.
- The evidence supporting the claim is objective and verifiable, not based on management's "feel" for the situation or on unsupported representations.

If all of these conditions are met SOP 81-1 permits the recognition of revenue to offset the costs. If one or more of the conditions are not met, no revenues are permitted to be recognized.

The practice of recognizing claims revenue that meets the aforementioned four tests is prevalent throughout the engineering and construction industry. Most of Halliburton's competitors use this accounting treatment, making Halliburton's use of it unremarkable.

During 2001, Halliburton recognized $234 million of total claims revenue, consisting of $137 million of claims for payment on seven jobs and $97 million for which the company may be contingently liable due to project delays on two jobs. The company has booked the matching $97 million contingent liability on the balance sheet. The $137 million of claims revenue compares to total revenue for the Engineering and Construction Group of $4.3 billion during 2001, representing just 3% of the total revenues. Furthermore, this revenue did not carry any profit.

Halliburton believes that it has accounted for its claims and change orders in accordance with GAAP. The company has not only never recorded any profits with respect to claims, but it has never recorded any profits on any contract where an unapproved claim or change order has been recorded in revenue, deferring profit recognition until resolution of the claims. Furthermore, the company indicated that it has collected more than it has booked since the accounting change took place.

Based upon our review of SOP 81-1 and relying on the company's assertion that it believes it has met the tests for using its current accounting treatment, we believe the SEC investigation is not likely to lead to any substantive action. However, should the SEC determine that Halliburton did not meet the four tests for each case in which it recognized claims revenue, some action could possibly be taken. Yet, given that Halliburton has never recorded a profit on a job with unpaid claims outstanding, it seems highly unlikely that any restatement of profits will occur. We maintain our 2S rating on the shares with a $24 target.

ADDITIONAL INFORMATION AVAILABLE UPON REQUEST

The # symbol signifies that within the past three years, Salomon Smith Barney ("SSB"), including its parent, subsidiaries and/or affiliates ("the Firm"), has acted as manager or co-manager of a public offering of this company. The Firm usually makes a market in the U.S.-traded over the counter securities recommended in this report and may sell to or buy from customers, as principal, securities recommended in this report. The Firm may have a position in securities or options of any company recommended in this report. An employee of the Firm may be a director of a company recommended in this report. The Firm may perform or solicit investment banking or other services from any company recommended in this report.

Securities recommended, offered, or sold by SSB: (i) are not insured by the Federal Deposit Insurance Corporation; (ii) are not deposits or other obligations of any insured depository institution (including Citibank); and (iii) are subject to investment risks, including the possible loss of the principal amount invested. Although information has been obtained from and is based upon sources SSB believes to be reliable, we do not guarantee its accuracy and it may be incomplete or condensed. All opinions and estimates constitute SSB's judgment as of the date of the report and are subject to change without notice. This report is for informational purposes only and is not intended as an offer or solicitation for the purchase or sale of a security.

Investing in non-U.S. securities, including ADR's, may entail certain risks. Investors who have received this report from the Firm may be prohibited in certain U.S. states from purchasing securities mentioned in this report from the Firm. Please ask your Financial Consultant for additional details.

This report is distributed in the United Kingdom by Salomon Brothers International Limited. This material is directed exclusively at market professional and institutional investor customers and is not for distribution to private customers, as defined by the rules of the Financial Services Authority, who should not rely on this material. Moreover, any investment or service to which the material may relate will not be made available to such private customers. This material may relate to investments or services of a person outside of the United Kingdom or to other matters which are not regulated by the Financial Services Authority and further details as to where this may be the case are available upon request in respect of this material. If this publication is being made available in certain provinces of Canada by Salomon Smith Barney Canada Inc. ("SSB Canada"), SSB Canada has approved this publication. This report was prepared by SSB and, if distributed in Japan by Nikko Salomon Smith Barney Limited, is being so distributed under license. This report is made available in Australia through Salomon Smith Barney Australia Securities Pty Ltd (ABN 64 003 114 832), a Licensed Securities Dealer, and in New Zealand through Salomon Smith Barney New Zealand Limited, a member firm of the New Zealand Stock Exchange. This report does not take into account the investment objectives, financial situation or particular needs of any particular person. Investors should obtain advice based on their own individual circumstances before making an investment decision. Salomon Smith Barney Securities (Proprietary) Limited is incorporated in the Republic of South Africa (company registration number 2000/025866/07) and its registered office is at Grosvenor Corner, 195 Jan Smuts Avenue, Rosebank, 2198, Republic of South Africa. The investments and services contained herein are not available to private customers in South Africa. This publication is made available in Singapore through Salomon Smith Barney Singapore Pte Ltd, a licensed Dealer and Investment Advisor.

Salomon Smith Barney is a registered service mark of Salomon Smith Barney Inc. Schroders is a trademark of Schroders Holdings plc and is used under license. Nikko is a service mark of Nikko Cordial Corporation. © Salomon Smith Barney Inc., 2002. All rights reserved. Any unauthorized use, duplication, redistribution or disclosure is prohibited by law and will result in prosecution.