# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| THE ERICA P. JOHN FUND, INC., et al., *On Behalf of Itself and All Others Similarly Situated*, | |
| Plaintiff, | **CIVIL ACTION NO.: 3:02-CV-1152-M** |
| vs. | |
| HALLIBURTON COMPANY and DAVID J. LESAR, | **CLASS ACTION** |
| Defendants. | **FILED UNDER SEAL** |

**APPENDIX IN SUPPORT OF LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR A PROTECTIVE ORDER**

Respectfully submitted,

_____/s/ Carl E. Goldfarb_____

Kim E. Miller
*(admitted pro hac vice)*
KAHN SWICK & FOTI, LLC
250 Park Avenue, Suite 2040
New York, NY 10177
Tel: (212) 696-3730
Fax: (504) 455-1498

Lewis S. Kahn
Michael Swick
Neil Rothstein
*(admitted pro hac vice)*
KAHN SWICK & FOTI, LLC
206 Covington Street
Madisonville, LA 70447
Tel: (504) 455-1400
Fax: (504) 455-1498

David Boies
*(admitted pro hac vice)*
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8300

Carl E. Goldfarb
*(admitted pro hac vice)*
BOIES, SCHILLER & FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
Tel: (954) 356-0011
Fax: (954) 356-0022

***SPECIAL COUNSEL TO LEAD PLAINTIFF, THE ERICA P. JOHN FUND, INC., AND THE CLASS***

***LEAD COUNSEL TO LEAD PLAINTIFF, THE ERICA P. JOHN FUND, INC., AND THE CLASS***

E. Lawrence Vincent
THE LAW OFFICE OF JOE H. STALEY, JR., P.C.
3100 Monticello Ave., Suite 850
Dallas, Texas 75205
Tel:  (214) 739-3700
Fax: (214) 739-1919

***ATTORNEY FOR LEAD PLAINTIFF, THE ERICA P. JOHN FUND, INC., AND THE CLASS***

# TABLE OF CONTENTS

Appendix Page

Declaration of Carl E. Goldfarb ......................................................................... App. i - ii

Excerpt from Halliburton's Responses to Plaintiff's
Second Set of Interrogatories ..................................................... App. 000001 - 000003

Excerpt from the December 3, 2013 Hearing Transcript ............................ App. 000004 - 000005

A true and correct copy of AA AMSF 00000838-46 ................................. App. 000006 - 000014

Excerpt from Halliburton Company's
2003 10-K Dated May 12, 2004 ................................................ App. 000015 - 000016

Mendes 005094-102 .................................................................. App. 000017 - 000025

SCA00131568-70 ..................................................................... App. 000026 - 000028

SCA00272376-82 ..................................................................... App. 000029 – 000035

SCA00156140-43 ..................................................................... App. 000036 - 000039

SCA00433497 ......................................................................... App. 000040

SCA00448359-60 ..................................................................... App. 000041 - 000042

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 28, 2015, I served the foregoing document via

CM/ECF System on all counsel of record.

/s/ Carl E. Goldfarb
Carl E. Goldfarb

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| THE ERICA P. JOHN FUND, INC., et al., *On Behalf of Itself and All Others Similarly Situated*, | |
| Plaintiff, | **CIVIL ACTION NO.: 3:02-CV-1152-M** |
| vs. | |
|  | **CLASS ACTION** |
| HALLIBURTON COMPANY and DAVID J. LESAR, | **FILED UNDER SEAL** |
| Defendants. | |

## DECLARATION OF CARL E. GOLDFARB

I, Carl E. Goldfarb, hereby declare as follows:

1.    I am an attorney duly licensed to practice law in the State of Florida and am a partner with the law firm of Boies, Schiller & Flexner, LLP, Lead Counsel for the Plaintiff and the Class.  I am admitted in this case *pro hac vice*.  The matters stated herein are based on my personal knowledge and, if called upon to testify, I could and would testify competently thereto.

2.    Attached hereto at Plaintiff's Appendix 000001 – 000003 is a true and correct copy of an excerpt from Halliburton's Responses to Plaintiffs' Second Set of Interrogatories.

3.    Attached hereto at Plaintiff's Appendix 0000015 – 000016 is a true and correct copy of an excerpt from Halliburton Company's 2003 10-K Dated May 12, 2004.

4.    Attached hereto at Plaintiff's Appendix 000004 – 000005 is a true and correct copy of an excerpt from the December 3, 2013 Hearing Transcript.

5.    Attached hereto at Plaintiff's Appendix 000006 – 000014 is a true and correct copy of AA AMSF 00000838-46.

6.	Attached hereto at Plaintiff's Appendix 000017 – 000025 is a true and correct copy of Mendes 005094-102.

7.	Attached hereto at Plaintiff's Appendix 000026 – 000028 is a true and correct copy of SCA00131568-70.

8.	Attached hereto at Plaintiff's Appendix 000029 – 000035 is a true and correct copy of SCA00272376-82.

9.	Attached hereto at Plaintiff's Appendix 000040 is a true and correct copy of SCA00433497.

10.	Attached hereto at Plaintiff's Appendix 000041 – 000042 is a true and correct copy of SCA00448359-60.

11.	Attached hereto at Plaintiff's Appendix 000036 – 000039 is a true and correct copy of SCA 00156140-43.

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that I executed this declaration on October 28, 2015 in Fort Lauderdale, Florida.

_____/s/ Carl E. Goldfarb_____
CARL E. GOLDFARB

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, INC., et al., On Behalf Of Itself and All Others Similarly Situated, | § § § § | |
| | § | Civil Action No. 3:02-CV-1152-M |
| Lead Plaintiff, | § § | |
| v. | § | |
| HALLIBURTON COMPANY and DAVID J. LESAR, | § § | |
| | § | |
| Defendants. | § | |
| | § | |

## HALLIBURTON'S RESPONSES TO PLAINTIFFS'
## SECOND SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Halliburton Company ("Halliburton") responds as follows to Lead Plaintiffs' Second Set of Interrogatories.

### GENERAL OBJECTIONS AND RESPONSES

1.      Halliburton objects to these Interrogatories to the extent they seek information that is subject to the attorney-client privilege, work product doctrine, joint-defense privilege, or other applicable legal protection or privilege.

2.      Halliburton objects to these Interrogatories to the extent they purport to require Halliburton to produce information regarding privileged documents and communications beyond such information as may be required by the Court in determining the privileged status of the document or communication.

PL. APP. 000001

## OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 8

Please describe in detail all facts as well as all projections, estimates, studies, or similar analyses that Halliburton relied upon as a basis for the following statement made in Halliburton's June 28, 2001 press release regarding Harbison's request for claims management and financial assistance for asbestos claims Harbison assumed when it was spun-off from Dresser in 1992: "Based on the information it has developed to date and its own experience in managing asbestos claims, Halliburton believes that if such a decision is made it would require an additional reserve for estimated known claims at June 30, 2001, net of insurance recoveries, of approximately $50 to $60 million, after tax."

### ANSWER:

In addition to the general objections, Halliburton objects to this interrogatory as overly broad and unduly burdensome to the extent that it requests a detailed description of all facts, documents, etc., relied upon by Halliburton in making the identified statement. Halliburton further objects because the interrogatory seeks information that is protected by the attorney-client privilege and other applicable protections.

Subject to the foregoing objections, Halliburton responds as follows:

In calculating the additional estimated asbestos reserve, Halliburton multiplied the number of open Harbison-Walker claims that it was aware of by an estimated cost per claim. Halliburton then added the cost of settled, but unpaid claims and offset the resulting amount by a percentage of insurance proceeds slightly less than the percentage that Harbison-Walker had historically recovered to pay asbestos claims.

To determine the number of Harbison-Walker claims, Halliburton first looked to spreadsheets prepared by Commonwealth Claims (consultants hired by Harbison-Walker to handle its asbestos litigation). After Halliburton learned that these spreadsheets contained inaccuracies, Halliburton's outside counsel, Gollatz, Griffin & Ewing and Godwin & Ronquillo P.C. (then Godwin, White, & Gruber P.C.), investigated the extent of Harbison-Walker claims that had not been paid. Outside counsel gathered information from Commonwealth Claims, Connecticut Valley Claims Service, Marsh, and other entities handling Harbison-Walker's asbestos litigation. On June 25, 2001, Halliburton's information showed that as of April 30, 2001, Harbison-Walker had approximately 167,000 open claims, about 52,000 of which were subject to settlement negotiations or agreements. This yielded 115,000 filed but unresolved claims through April 30, 2001; Halliburton added an estimated 9,000 claims to account for claims to be filed in May and June 2001. Thus, Halliburton estimated that Harbison-Walker would have approximately 124,000 open claims as of June 30, 2001.

Halliburton estimated a gross cost per claim of $4,060 based on Harbison-Walker's average cost per claim for 2001. This was over $1,800 more than the $2,200 average gross cost per claim of Dresser's Harbison-Walker asbestos claims and Harbison-Walker's (Indresco) asbestos claims from 1988 through 2000. Halliburton further assumed an insurance recovery slightly lower than

PL. APP.  000002

the percentage that Harbison-Walker had historically recovered. Specifically, Halliburton assumed a 90% recovery, whereas historically, 92% of similar claims had been covered.

Halliburton multiplied the total number of open Harbison-Walker claims (124,000) times the estimated cost per claim ($4,060), yielding a gross settlement cost of $503,440,000 for those claims. Halliburton estimated a gross settlement cost of $225,000,000 for the total number of settled, but unpaid claims (52,000). Halliburton added these gross settlement costs together for a total gross settlement cost of $728,440,000. Assuming that 90% of this cost would be covered by insurance, the remaining 10% amounted to $72,844,000. Halliburton then added $20,000,000 to this figure to account for allegations of a large settlement in Orange, Texas, yielding a total net settlement cost of $92,844,000. Subtracting the tax effect (35%) from this number left Halliburton with an estimated reserve of $60,348,600.

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, *see also, e.g.,* records previously produced, including, but not limited to, the following: SCA00050535; OAKPARK300000201; CONFIDENTIAL AA AMSF 00001113.

## INTERROGATORY NO 9.

Please describe in detail all facts as well as all projections, estimates, studies, or similar analyses that Halliburton or Doug Foshee relied upon as a basis for Foshee's statements in an October 23,2001, conference call with analysts, in which he said of Halliburton' asbestos situation and reserve, "[w]ith regard to asbestos, we've said consistently that we take this issue very seriously but that we believe we're adequately reserved and adequately insured[;]" "[W]e believe the discount in our current stock price associated with asbestos is significantly larger than the liability itself[;]" regarding asbestos reserves, "The gross liability went up $5 million from 699 to 704 million and estimated insurance recoveries went up by $4 million from 575 to 579 million[;]" and "[W]e have no indication that any of our other significant non-construction related insurers will be unable to fulfill their obligations under our policies."

## ANSWER:

This interrogatory contains four discrete subparts. In addition to the general objections, Halliburton objects to this interrogatory as overly broad and unduly burdensome to the extent that it requests a detailed description of all facts, documents, etc., relied upon by Halliburton or Doug Foshee in making the identified statement. Halliburton further objects because the interrogatory seeks information that is irrelevant and unlikely to lead to the discovery of admissible evidence, and because it seeks information that is protected by the attorney-client privilege and other applicable protections.

Subject to the forgoing objections, Halliburton responds as follows:

Halliburton hosted the October 23, 2001 conference call to discuss its most recent quarterly earnings release with analysts. As noted in the conference call transcript, Halliburton cautioned the audience that some of the statements in the conference call would be forward-looking or provide other than historical information and involve risks and uncertainties that might impact Halliburton's future actual results of operations. *See* HAL 060361. Halliburton directed the

PL. APP. 000003

1

08:20:21   1

<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE NORTHERN DISTRICT OF TEXAS</u>

  2

<u>DALLAS DIVISION</u>

  3

THE ERICA P. JOHN FUND, INC.  (  CIVIL ACTION NUMBER
et al., On Behalf of Itself  (

  4

and All Others Similarly  (
Situated,  (

  5

          Plaintiff,  (
  (  3:02-CV-1152-M

  6

VERSUS  (
  (

  7

HALLIBURTON COMPANY and  (  December 3, 2013
DAVID J. LESAR,  (

08:20:21   8

         Defendant.  (  9:30 a.m.

  9

  10

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE BARBARA M.G. LYNN
UNITED STATES DISTRICT JUDGE

  11

  12

<u>A P P E A R A N C E S:</u>
FOR THE PLAINTIFF:

  13

                    CARL E. GOLDFARB
                    BOIES SCHILLER & FLEXNER LLP

  14

                    401 East Las Olas Boulevard
                    Suite 1200

  15

                    Fort Lauderdale, Florida 333301
                      954.356-0011

  16

                    cgoldfarb@bsfllp.com

  17

                    KIM E. MILLER
                    KAHN SWICH & FOTI LLC

  18

                    250 Park Avenue
                    Suite 2040

  19

                    New York, New York 10177
                      212.696.3730

  20

                    kim.miller@ksfcounsel.com

  21

FOR THE DEFENDANT:

  22

                    DAVID D. STERLING
                    BAKER BOTSS LLP

  23

                    One Shell Plaza
                    910 Louisiana Street

  24

                    Suite 3000
                    Houston, Texas 77002

  25

                      713.229.1946
                    david.sterling@bakerbotts.com

10:02:50  1   in the record that establishes that the production of those

2   documents is burdensome.  I have nothing.

3        Did I miss it?  Because I have a declaration, but it

4   doesn't say anything about this being burdensome production.

5             MR. STERLING:  That's correct, your Honor, and it's

6   four projects.

7             THE COURT:  Okay.  But this relates then -- the only

8   issue, as I understand it, that's before me today is a

9   question of relevancy as to those transactions and that's it.

10       You're not going to win on the issue of burden, because

11   you didn't prove that it was burdensome.

12            MR. STERLING:  Correct, your Honor.

13            MS. MILLER:  Your Honor, if I could just speak very

14   briefly on that.

10:03:30 15            THE COURT:  Yes.

16            MS. MILLER:  If I can speak over here -- not that it

17   will take much more time, but it will be better for my back.

18            THE COURT:  Sure.

19            MS. MILLER:  So there are four projects at issue,

20   as you said.  They are Cardinal, Brazil Suzano, Brazil VCP and

21   South Arne Barmac.

22       So the issue is under the liberal discovery rule should

23   the defendants be compelled to provide these documents which

24   relate to projects for which unapproved claim revenue was

25   recorded during the class period.  So June 3, '99 to December

*Attorneys*
*A Professional Corporation*

D A L L A S
901 Main Street, Suite 2500
Dallas, Texas 75202-3727
214.939.4400
214.760.7332 Fax

T E L E C O M   C O R R I D O R ®
972.238.7160

godwingruber.com

January 17, 2002

Arthur Andersen LLP
Suite 5600
901 Main Street
Dallas, Texas 75202

Attention:   <u>Mr. D. Craig Kesler</u>

Re:   <u>Halliburton Company</u>

Gentlemen:

We have been asked by Albert O. Cornelison, Jr., Vice President and Associate General Counsel of Halliburton Company (the "Company"), to furnish you with certain information concerning the Company and its subsidiaries in connection with an audit of the financial statements of the Company as of December 31, 2001 and for the year then ended.

That request and our response are limited to pending or overtly threatened litigation, claims and assessments at December 31, 2001, and as of the date hereof, (1) with respect to which we have been engaged to provide legal representation, (2) with respect to which we devoted substantive attention on behalf of the Company and/or any of its subsidiaries in the form of legal consultation or representation and (3) that individually represent maximum potential loss exposure in excess of $1,000,000. We have identified those matters by making inquiry of lawyers presently in our Firm who, according to our records, have been engaged in providing legal services on behalf of the Company and/or any of its subsidiaries subsequent to December 31, 2000 and by examining certain current records that we maintain for our internal operations. In that identification process, we have not undertaken any independent review of documents or records concerning the Company and its subsidiaries that are in our possession.

While we have performed a variety of legal services for the Company and its subsidiaries, our representation has been limited to specific matters as to which we have been consulted, and we are not, as counsel, generally familiar with the affairs of the Company and its subsidiaries requiring legal advice or legal representation.

This response is limited by, and in accordance with, the American Bar Association's Statement of Policy Regarding Lawyers' Responses to Auditors' Requests For Information (December 1975) (the "Statement"). Without limiting the generality of the foregoing, the limitations set forth in the Statement on the scope and use of this response (Paragraphs 2 and 7 thereof) are specifically

CONFIDENTIAL AA AMSF 00000838

incorporated herein by reference, and any description herein of any "loss contingencies" is qualified in its entirety by Paragraph 5 of the Statement and the accompanying Commentary (which is an integral part of the Statement).

Subject to the foregoing, as of December 31, 2001 we were not, and we are not now, engaged on behalf of the Company and/or any of its subsidiaries to give substantive attention in the form of legal consultation or representation in connection with any "loss contingencies" coming within the scope of clause (a) of Paragraph 5 of the Statement that individually represent, or at December 31, 2001 individually represented, maximum potential loss exposure in excess of $1,000,000, except as follows:

1. <u>Dresser Industries, Inc. v. Underwriters at Lloyd's, London and Certain London Market Companies, et al.</u>; Cause No. 98-44026; In the 333rd District Court, Harris County, Texas Ⓐ

    This is a declaratory judgment action involving potential reimbursement by Dresser Industries, Inc. ("Dresser") of paid insurance claims stemming from certain excess coverage policies for periods in the years 1982 through 1986. A significant portion of those claims were filed by Dresser's former subsidiary, Harbison-Walker Refractories Company ("Harbison-Walker"), and were paid to Harbison-Walker, not Dresser. On September 26, 2001, the Court signed a summary judgment in favor of the London Market Insurers which would result in the potential reimbursement of amounts approximating $27,000,000. The judgment is interlocutory as it does not dispose of all issues in the case. However, should the summary judgment become final, we believe that the Company has meritorious positions, and the Company intends to appeal. In addition, it is the Company's position that Harbison-Walker is responsible for a significant portion of any required reimbursement. Because of the uncertainties of the merits of any such position, we cannot express an opinion as to the probable outcome of this case.

2. <u>Harbison-Walker Refractories Company v. Halliburton Company and Dresser Industries, Inc.</u>; Cause No. A 165,429; In the 58th Judicial District Court, Jefferson County, Texas.

    This is an action brought by Harbison-Walker for breach of the agreement by which Dresser spun-off Harbison-Walker in 1992. Harbison-Walker has also asserted claims for tortious interference with contractual relations and commercial disparagement. The petition does not state an amount in controversy, but the amounts in controversy may exceed $1,000,000. Discovery has not commenced as the parties have engaged in negotiations whereby their disputes will be submitted to binding arbitration, and Harbison-Walker has agreed to dismissal of this case without prejudice. We believe that the Company has meritorious defenses and counterclaims which it intends to vigorously prosecute. Due to the fact that the case is at an early stage without any discovery completed, we cannot express an opinion as to the probable outcome.

*[handwritten note in right margin: Refer to asbestos awps. WB 1/02]*

*[handwritten note at bottom:] Ⓐ P/D/W Brent Cornelison, inhouse counsel, if unsuccessful on appeal, reimbursement will likely be paid by RHE Harbison Walker (Global) given that they receive the insurance proceeds at issue in the case. No estimate of an exposure is deemed probable or estimable at yearend. WB 1/02*

*[handwritten: Ⓐ]*

CONFIDENTIAL AA AMSF 00000839

**Godwin Gruber, P.C.**

Arthur Andersen LLP
January 17, 2002
Page 3

3.    Leon County Well Site Incident on Clute Diehl #2 Well site in Buffalo, Texas

*[handwritten: insured]*

This matter involves a blowout on the Clute Diehl #2 gas well site in Buffalo, Leon County, Texas. The blowout occurred on July 18, 2001. A Halliburton Energy Services, Inc. ("HES") fracturing crew had performed a nitrogen assist fracturing job on the well site, which is owned by Scottish Oil Company and operated by Stallion Oil Company. Stinger Wellhead Protection, Inc. ("Stinger") and Key Energy Services ("Key Energy") were also working on the well site. Stinger was performing isolation services with its 'stinging' equipment and was in control of the master valve for the well head. Key Energy had fluid trucks and operators on location.

HES's "frac" crew was in the process of rigging down from the frac job on the Clute Diehl #2 Well site when an unexpected surge of pressure shot through the prime-up/bleed-off line. Two HES employees were killed in the incident and five HES employees were seriously injured when the intense pressure from the wellhead caused the prime-up/bleed-off line to bend and whip.

Two lawsuits have been filed to date as a result of this incident:

(1)    Estate of Patric Paul Pritchard By and Through His Personal Representative, Thomas Pritchard v. Halliburton Energy Services, Inc.; Cause No.0-01-325A; In the 278th Judicial District Court, Leon County, Texas (a suit for discovery). This lawsuit has been dismissed.

(2)    Francisco Hilburn and Debra Hilburn v. Stinger Wellhead Protection, Inc. and Stallion Oil Company; Cause No. PI-01-341B; In the 87th Judicial District Court, Leon County, Texas. Neither the Company nor HES has been named as a defendant in this lawsuit. However, Stinger Wellhead Protection, Inc. has subpoenaed documents from the Company. We are in the process of assisting the Company in responding to this discovery request.

*[handwritten: No exposure deemed probable or estimable at yearend LK'S 1/02]*

The Company has also retained us for the purposes of assisting in evaluating the cause of this incident, participating in Occupational Safety and Health Administration ("OSHA") proceedings, evaluating liability risks, and representing the Company and/or HES in litigation. We believe that the Company has substantial and meritorious defenses to the potential claims that may be alleged against the Company and/or HES as a result of this incident by persons at the site and/or their representatives, as well as by other parties and OSHA.

4.    Clint Miller, Individually and as Next Friend of Bradley Wayne Miller, et al. v. Sonat Exploration Company and Cudd Pressure Control, Inc.; Cause No. 99-03588; In the 295th Judicial District Court of Harris County, Texas

*[handwritten: insured]*

Teresa Creel v. Sonat Exploration Company, Inc., Cudd Pressure Control, Inc. and Mark Johnson; Cause No. 99-01999; In the 71st Judicial District Court of Harrison County, Texas

*[handwritten: CM]*

CONFIDENTIAL AA AMSF 00000840

Lynn Vaught, Individually and as Personal Representative of the Heirs and Estate of Cody Vaught, Deceased, and Carla Daniel v. Sonat Exploration Co. and Mark Johnson; Cause No. 99-0634; In the 71st Judicial District Court of Harrison, County, Texas

Donna G. Farmer, Individually and as the Independent Administratix of the Estate of Brady Dale Brownlow, Deceased v. Sonat Exploration Company, Key Energy Services, Inc., Mark Johnson, Rickey Mosley, a.k.a. James Richard Mosley, Brooks Well Servicing, Inc., Guiberson AVA, a Division of Dresser Industries, Inc. and Halliburton Energy Services, Inc.; Cause No. 99-0491; In the 71st Judicial District Court of Harrison, County, Texas

James Crooks, Rebecca Crooks and Dependable Pressure Testers, Inc. v. Sonat Exploration Company, Cudd Pressure Control, Inc., Mark Johnson, Halliburton Energy Services, Inc., Dresser Industries, Inc., Key Energy Services, Inc. and Brooks Well Services, Inc. f/k/a Mosley Well Service, Inc.; Cause No. 99-0634; In the 71st Judicial District Court of Harrison, County, Texas

Several actions were filed against Sonat Exploration Company ("Sonat") and Cudd Pressure Control, Inc. ("Cudd") related to an oil well blowout in Bienville Parish, Louisiana in October 1998. The blowout resulted in the deaths of seven men and caused serious injuries to four others. Sonat was the owner and operator of the subject oil well. Cudd was contracted by Sonat to perform a "snubbing" operation, which is a dangerous method of completing a well under pressure. Most of the plaintiffs sued Sonat and Cudd for negligence and gross negligence related to the operation of the well and the design of the completion string. One plaintiff sued the Company and/or one or more of its subsidiaries directly as the manufacturer of a Guiberson G77 Packer that was used by Sonat and Cudd on the completion string.

Sonat and Cudd brought the Company into all of the actions as a third-party defendant, claiming that the oil well blowout resulted, at least in part, from alleged defective marketing of an unsuitable packer and/or an improperly designed packer. Company engineers, outside experts retained by the Company and experts retained by the plaintiffs believe that the blowout was caused by Sonat and Cudd failing to reduce pressure in the well, an improperly designed completion string, and by loading an unsupported 20 foot column to excessive downward pressure. Accordingly, management believes that it has substantial and meritorious defenses to claims being alleged against the Company and its subsidiaries.

During 2000, all plaintiffs in the *Clint Miller* and *Teresa Creel* lawsuits settled all claims with Sonat and El Paso Energy Company (which have now been merged). In July 2000, Sonat and the Company entered into a confidential settlement agreement for a release from all plaintiffs in the *Clint Miller*, *Teresa Creel*, *Donna Farmer* and *Lynn Vaught* (excluding the estate of Cody Vaught) lawsuits for $2,000,000 in cash and a $6,250,000 million credit towards future services performed by the Company for Sonat, El Paso Energy Company, or, upon completion of an anticipated merger, Coastal Corp. The credit is a 3.5% rebate on all future work for these companies, to be computed and refunded on a quarterly

CONFIDENTIAL AA AMSF 00000841

Ⓑ Loss contingency
not deemed
probable or estimable
CB 1/02

Ⓒ not used

basis, until the $6.25 million amount is achieved in credits. **The terms and amounts of this** Ⓑ
**settlement agreement are strictly confidential, and the Company asks Arthur Andersen**
**to maintain the confidentiality of its terms.**

The *Crooks* lawsuit is still pending, and the plaintiffs' depositions were taken in
August 2000. Sonat and El Paso Energy Company also settled with the *Crooks* plaintiffs in
2000 for an undisclosed amount. Neither James nor Rebecca Crooks implicated the Company
or any of its subsidiaries in the blowout during their depositions, and neither could testify that
the Company or any of its subsidiaries committed any wrongful act related to the blowout.
Plaintiffs have not been particularly active in prosecuting this matter, and no trial date has been
set. We believe that the Company has substantial and meritorious defenses to the claims being
alleged against it and its subsidiaries in this action.

5. Asbestos and Silica Litigation.                                                      Ⓓ

The Firm currently represents the Company and its subsidiaries in a total of
approximately 9,980 pending asbestos, silica and mixed dust cases involving claims by
approximately 51,260 separate plaintiffs. The cases can be broken down into approximately
9,780 pending asbestos cases with a total of approximately 49,800 plaintiffs, approximately
200 pending silica cases with a total of approximately 1,440 plaintiffs and three mixed dust
cases with 14 plaintiffs. The numbers of pending cases and plaintiffs change frequently as new
cases are filed and cases are settled.

Except as provided below, we do not have the information at the present time to
determine if any one of these cases involves potential loss exposure in excess of $1,000,000.
In general terms, there are three areas of inquiry in these types of cases. The first is to
determine whether the claimant is suffering from a disease process. The second inquiry is to
determine whether the claimant was exposed to asbestos, silica or mixed dust and whether this
exposure is related to the plaintiff's condition. The third inquiry is to determine whether the
plaintiff was exposed to any of the Company's or its subsidiaries' products or work practices
which could have possibly caused the disease. Since there are numerous plaintiffs and
multiple defendants, the courts do not allow individual discovery. These cases are subject to
various scheduling orders which allow only group discovery and then individual depositions
to supply the missing information needed. The courts will generally schedule hearings to
determine how many cases to set in a trial group out of the thousands that are pending. The
court will then allow discovery as to the next pending trial group. Therefore, we are only able
to develop the above-mentioned discovery as the various trial groups are determined by the
courts. For that reason, except as provided below, we are unable at the present time to
determine the exposure, if any, on each or all of the cases. In those cases where the plaintiff
cannot show a serious physical condition, or where the plaintiff cannot prove exposure to the
Company's or its subsidiaries' products or work practices, the exposure is very small and these
cases are generally either dismissed as discovery is completed, or settled for nominal amounts.
However, in those cases where the plaintiff is seriously ill and can show exposure to one of
the Company's or its subsidiaries products or work practices, exposure can then be considered
potentially substantial or, perhaps, material. Thus, except as provided below, it is presently

CA7

CONFIDENTIAL AA AMSF 00000842

**Godwin Gruber, P.C.**

Arthur Andersen LLP
January 17, 2002
Page 6

*See asbestos awps for work performed and related reserve clz 1/02* Ⓓ

impossible to determine whether the Company's exposure in any of these cases will exceed $1,000,000.

    a.    <u>Shelton v. Brown & Root, Inc., k/n/a Kellogg Brown & Root, Inc.</u>; Cause No. 00-0016-C; In the 241st Judicial District Court, Smith County, Texas. Ⓑ

This case was tried in January 2001. The jury awarded compensatory damages of $2,766,000 and exemplary damages of $1,250,000 against Kellogg Brown & Root, Inc. ("Brown & Root"). Other defendants in the case had paid in excess of $3,950,000 prior to trial to settle the claims against them, and Brown & Root believes that it is entitled to offset this amount against the compensatory damages awarded by the jury. However, the plaintiff died during trial, the complaint was amended to include a wrongful death claim, and the plaintiff's attorney argued that the wrongful death claims should not be offset by claims settled during the plaintiff's lifetime. Although Brown & Root argued that the full amount of the settlements should be credited against the damages awarded, the trial court awarded credit of only $70,000. On June 22, 2001, the trial court entered a judgment against Brown & Root in the amount of $3,089,690 in compensatory damages and $1,250,000 in exemplary damages, plus court costs and post-judgment interest. Brown & Root is appealing the trial court's judgment. We believe there are meritorious points on the appeal, based on errors committed by the trial court, that lead us to conclude that it is probable that the plaintiff will not recover the full amount of the judgment. However, because of the uncertainty of litigation we are unable to estimate a range of potential loss in the event of an unfavorable outcome on appeal.

    b.    <u>Dresser Industries, Inc. v. Willie Jasper Allen, et al.</u>; Cause No. 13-01-723 CV; In the Thirteenth Court of Appeals at Corpus Christi, Texas.

*paid NFWR d7 1/02*

On June 22, 2001, the court signed a default judgment against Dresser in favor of 13 plaintiffs/appellees for the total sum of $985,675 based upon Dresser's alleged breach of a settlement agreement. The Company has appealed, and we believe that it has meritorious arguments that will result in reversal of the judgment and a remand of the case for further proceedings.

    c.    <u>Farley James Archer, et al v. Harbison-Walker Refractories Company and Dresser Industries, Inc.</u>; Cause No. 01-0865-D; In the 94th District Court, Dallas County, Texas. Ⓓ

This is an action brought by 109 asbestos plaintiffs alleging breach of settlement agreements, fraud and, alternatively, personal injury for exposure to Dresser's products containing asbestos. The total unpaid settlements approximate $16,169,000. This case has only recently been filed and discovery is at an early stage. We believe that the Company has meritorious defenses to the lawsuit. However, because no discovery has been completed and because of the uncertainties of litigation, we cannot express an opinion as to the probable outcome of this case.

*GV*

CONFIDENTIAL AA AMSF 00000843

    d.    <u>Floyd Douglas, Jr., et al v. North American Refractories Company, et al.;</u>
Cause No. A-920,961-SC(14-DR);
<u>Floyd Douglas, Jr., et al v. North American Refractories Company, et al.;</u> Cause No. A-920,961-SC(14-FD);
<u>Dock Shaheen Farris, Deceased, et al v. Dresser Industries, Inc.;</u> Cause No. 920,961-SC(16-DR);
All in the 128th District Court, Orange County, Texas.

These lawsuits were originally brought by approximately 100 plaintiffs asserting claims for personal injury from alleged exposure to products containing asbestos. Based upon a purported settlement agreement with Harbison-Walker, Dresser's former subsidiary which had been defending Dresser pursuant to the agreement by which Harbison-Walker was spun-off by Dresser, the plaintiffs filed a motion to enforce the settlement against Dresser. On November 29, 2001, the court granted the plaintiffs' motion and entered three judgments against Dresser for breach of the purported settlement totaling $35,675,000 in actual damages. The Company intends to appeal the judgments. We believe there are meritorious points on the appeal, based on errors committed by the trial court, that lead us to conclude that it is probable that the plaintiffs will not recover the full amounts of the judgments. However, because of the uncertainty of litigation we are unable to estimate a range of potential loss in the event of an unfavorable outcome on appeal.

    e.    <u>Dorothy A. Lehmann, et al. v. Able Supply Company, et al.;</u> Cause No. 26,342B; In the 20th District Court, Milam County, Texas.

This lawsuit was brought by multiple plaintiffs against Dresser and other, unrelated entities asserting claims for personal injury from alleged exposure to products containing asbestos. After a jury trial, a judgment was entered on December 21, 2001, awarding a total of $2,011,304 in damages in favor of four plaintiffs. The Company intends to appeal this judgment. We believe there are meritorious points on the appeal, based on errors committed by the trial court, that lead us to conclude that it is probable that the plaintiffs will not recover the full amount of the judgment. However, because of the uncertainty of litigation we are unable to estimate a range of potential loss in the event of an unfavorable outcome on appeal.

    f.    <u>Bell v. Dresser Industries, Inc., et al.;</u> Cause No. A-920,961-SC (19-FJ); In the 128th Judicial District Court, Orange County, Texas.

In this case, which was tried in September, 2001, the jury awarded damages of $79,322,357 against Dresser, as the alleged successor-in-interest to Harbison-Walker. Of the judgment, a total of $11,720,246 was awarded to Mildred Freeman ("Freeman") and Martha Harris ("Harris"), as the alleged personal representatives of the estates of their deceased husbands and in their respective individual capacities (Freeman - $3,794,203 as personal representative and $2,000,000 in her individual capacity; Harris - $3,926,043 as personal representative and $2,000,000 in her individual capacity).

CONFIDENTIAL AA AMSF 00000844

**Godwin Gruber, P.C.**

Arthur Andersen LLP
January 17, 2002
Page 8

Additionally, Freeman and Harris were each awarded $10 million in exemplary damages. The total actual and exemplary damages awarded to Freeman and Harris is $31,720,246.

The three remaining plaintiffs in this case, Oscar Kelly Bell ("Bell"), William Benford ("Benford") and Noah Harris Johnson ("Johnson"), who were living at the time of trial, were awarded a total of $17,602,111 in actual damages (Bell - $5,795,951; Benford - $5,911,032; and Johnson - $5,895,128). The court also awarded Bell, Benford and Johnson exemplary damages totaling $30,000,000 ($10 million each).

The Company intends to appeal the judgment in this case. We believe there are meritorious points on the appeal, based on numerous errors committed by the trial court, that lead us to conclude that it is probable that the plaintiffs will not recover the full amounts of the judgment. However, because of the uncertainty of litigation, we are unable to estimate a range of potential loss in the event of an unfavorable outcome on appeal.

The opinions expressed herein are based on our review and assessment of the facts relating to the matters referred to above, as derived from sources indicated herein. Those opinions involve a substantial number of professional judgments by us, based upon the applicable facts as developed to this date. Additional relevant facts that are unknown to us at this time may be developed in the future, which may result in conclusions relative to one or more of the foregoing matters varying from the assessments contained herein, for and with respect to which we cannot, of course, assume responsibility.

Furthermore, the information and opinions regarding the matters referred to above reflect our knowledge of the status of such matters as of the date of this letter, and we disclaim any undertaking to advise you of changes with respect thereto that may be brought to our attention subsequent to the date of this letter.

The Company has not specifically identified, and specifically requested that we comment to you concerning, any unasserted possible claims or assessments. Consistent with the last sentence of Paragraph 6 of the Statement, and pursuant to the Company's request, this will confirm as correct the Company's understanding as set forth in its letter to us that whenever, in the course of performing legal services for the Company with respect to a matter recognized to involve an unasserted possible claim or assessment that may call for financial statement disclosure, we have formed a professional conclusion that the Company must disclose or consider disclosure concerning such possible claim or assessment, we, as a matter of professional responsibility to the Company, will so advise the Company and will consult with the Company concerning the question of such disclosure and the applicable requirements of Statement of Financial Accounting Standards No. 5.

As of December 31, 2001, the Company and its subsidiaries were indebted to us for services and expenses billed as of that date in the amount of $2,683,784.08 and for recorded, but unbilled fees and expenses in the amount of $2,243,429.47. It is not possible for us to determine all unbilled fees and expenses as of December 31, 2001.

This letter has been furnished to you solely for your information in connection with your audit of the financial statements of the Company and is not to be quoted in whole or in part or otherwise referred to in any financial statement of the Company or related documents, and it is not to be filed with or otherwise furnished to any governmental agency or other person, without our prior written consent. Notwithstanding the foregoing, this letter may be furnished to others in compliance with court process or when necessary to defend yourself against a challenge of your audit by the Company or a regulatory agency, provided that we are given written notice of the circumstances reasonably before this letter is furnished.

Sincerely,

*Godwin Gruber, P.C.*

GODWIN GRUBER, P.C.

EAR/elk

cc:     Albert O. Cornelison, Jr., Esq.
        Donald E. Godwin, Esq.

S:\busli\10732\0008\CORRES\ANDERS04.wpd

CONFIDENTIAL AA AMSF 00000846

(Mark One)

☒    Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
**For the fiscal year ended December 31, 2003**

**OR**

☐    Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
For the transition period from ___ to ___

Commission File Number 1-3492

# HALLIBURTON COMPANY

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **75-2677995** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**5 Houston Center**
**1401 McKinney, Suite 2400**
**Houston, Texas 77010**
(Address of principal executive offices)
**Telephone Number - Area code (713)759-2600**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each Exchange on which registered** |
|---|---|
| Common Stock par value $2.50 per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).
Yes ☒   No ☐

The aggregate market value of Common Stock held by nonaffiliates on June 30, 2003, determined using the per share closing price on the New York Stock Exchange Composite tape of $23.00 on that date was approximately $10,022,000,000.

As of February 27, 2004, there were 439,713,236 shares of Halliburton Company Common Stock, $2.50 par value per share, outstanding.

Portions of the Halliburton Company Proxy Statement dated March 23, 2004 (File No. 1-3492), are incorporated by reference into Part III of this report.

PL. APP. 000015

**Asbestos and Silica Obligations and Insurance Recoveries**

*Pre-packaged Chapter 11 proceedings.* DII Industries, LLC (DII Industries), Kellogg Brown & Root, Inc. (Kellogg Brown & Root) and our other affected subsidiaries filed Chapter 11 proceedings on December 16, 2003 in bankruptcy court in Pittsburgh, Pennsylvania. With the filing of the Chapter 11 proceedings, all asbestos and silica personal injury claims and related lawsuits against Halliburton and our affected subsidiaries have been stayed.

Our subsidiaries sought Chapter 11 protection because Sections 524 (g) and 105 of the Bankruptcy Code may be used to discharge current and future asbestos and silica personal injury claims against us and our subsidiaries. Upon confirmation of the plan of reorganization, current and future asbestos and silica claims against us and our affiliates will be channeled into trusts established for the benefit of claimants under Sections 524(g) and 105 of the Bankruptcy Code, thus releasing Halliburton and its affiliates from those claims.

A pre-packaged Chapter 11 proceeding is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for Chapter 11 protection. Prior to proceeding with the Chapter 11 filing, our affected subsidiaries solicited acceptances from known present asbestos and silica claimants to a proposed plan of reorganization. In the fourth quarter of 2003, valid votes were received from approximately 364,000 asbestos claimants and approximately 21,000 silica claimants, representing substantially all known claimants. Of the votes validly cast, over 98% of voting asbestos claimants and over 99% of voting silica claimants voted to accept the proposed plan of reorganization, meeting the voting requirements of Chapter 11 of the Bankruptcy Code for approval of the proposed plan. The pre-approved proposed plan of reorganization was filed as part of the Chapter 11 proceedings.

The proposed plan of reorganization, which is consistent with the definitive settlement agreements reached with our asbestos and silica personal injury claimants in early 2003, provides that, if and when an order confirming the proposed plan of reorganization becomes final and non-appealable, in addition to the $311 million paid to claimants in December 2003, the following will be contributed to trusts for the benefit of current and future asbestos and silica personal injury claimants:

- up to approximately $2.5 billion in cash;
- 59.5 million shares of Halliburton common stock (valued at approximately $1.6 billion for accrual purposes using a stock price of $26.17 per share, which is based on the average trading price for the five days immediately prior to and including December 31, 2003);
- a one-year non-interest bearing note of $31 million for the benefit of asbestos claimants;
- a silica note with an initial payment into a silica trust of $15 million. Subsequently the note provides that we will contribute an amount to the silica trust balance at the end of each year for the next 30 years to bring the silica trust balance to $15 million, $10 million or $5 million based upon a formula which uses average yearly disbursements from the trust to determine that amount. The note also provides for an extension of the note for 20 additional years under certain circumstances. We have estimated the amount of this note to be approximately $21 million. We will periodically reassess our valuation of this note based upon our projections of the amounts we believe we will be required to fund into the silica trust; and
- insurance proceeds, if any, between $2.3 billion and $3.0 billion received by DII Industries and Kellogg Brown & Root.

In connection with reaching an agreement with representatives of asbestos and silica claimants to limit the cash required to settle pending claims to $2.775 billion, DII Industries paid $311 million on December 16, 2003. Halliburton also agreed to guarantee the payment of an additional $156 million of the remaining approximately $2.5 billion cash amount, which must be paid on the earlier to occur of June 17, 2004 or the date on which an order confirming the proposed plan of reorganization becomes final and non-appealable. As a part of the definitive settlement agreements, we have been accruing cash payments in lieu

PL. APP. 000016

**Kirkpatrick & Lockhart** LLP

Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312
412.355.6500
www.kl.com
Michael G. Zanic
412.355.6219
Fax: 412.355.6501
mzanic@kl.com

January 15, 2002

RECEIVED
JAN 16 2002
R'.. & M., LLP
Answered            FILE

VIA FED EX

Richard C. Milazzo, Esq.
Mendes & Mount, LLP
750 Seventh Avenue
New York, NY 10019-6829

Re:   Reaud, Morgan & Quinn/Orange County, Texas

Dear Rich:

As we discussed briefly before the close of 2001, Dresser Industries, Inc. ("Dresser") believes that a unique settlement opportunity exists for the next several months to resolve all of the asbestos ,related lawsuits that Glen Morgan of the Reaud, Morgan & Quinn law firm has filed against Dresser. Given this unique opportunity, Dresser would like to, and in fact needs to, incorporate the London Market Insurers into the settlement process.

Background - Harbison Settlement Efforts

As the London Market Insurers may recall from the "failed" global settlement between Harbison-Walker Refractories Company ("Harbison") and Mr. Morgan, Mr. Morgan represents 8,112 plaintiffs that allege exposure to alleged asbestos-containing products manufactured by Harbison at a variety of manufacturing facilities in a variety of cities.'  According to Mr. Morgan, the disease mix for his clients is as follows:



'    Attached as Exhibit "A" to this letter is a listing, provided to us by Mr. Morgan's office, of plant sites where Mr. Morgan's clients were allegedly exposed to alleged asbestos-containing products manufactured by Harbison.

BOSTON · DALLAS · HARRISBURG · LOS ANGELES · MIAMI · NEWARK · NEW YORK · PITTSBURGH · SAN FRANCISCO · WASHINGTON

**CONFIDENTIAL**                                                    **Mendes 005094**

PL. APP.  000017

| Disease | No. of Plaintiffs |
|---|---|
| Mesothelioma | 19 |
| Lung Cancer | 607 |
| Other Cancer | 442 |
| Non-Malignant | |
| 2/2-3/3 profusion/pathology | 259 |
| 1/0-2/1 profusion | 6,264 |
| 0/0 - 0/1 profusion | 521 |
| Total | 8,112 |

In early 2001, as the London Market Insurers are well aware, Harbison attempted to settle all of Mr. Morgan's cases for a total settlement amount of $199,500,000. That settlement figure was calculated utilizing the following matrix:

| Disease | Settlement Amount Per Plaintiff | No. of Plaintiffs | Total |
|---|---|---|---|
| Mesothelioma | $220,000 | 19 | $ 4,180,000 |
| Lung Cancer | 70,000 | 607 | 42,490,000 |
| Other Cancer | 30,000 | 442 | 13,260,000 |
| 2/2-3/3 Profusion | 25,000 | 259 | 6,475,000 |
| 1/0-2/1 Profusion | 20,000 | 6,264 | 125,280,000 |
| 0/0-0/1 Profusion | 15,000 | 521 | 7,815,000 |
| Total | | 8,112 | $199,500,000 |

When presented with this settlement opportunity, the London Market' Insurers refused to agree to the settlement.

Background - Jury Verdict

As a result of certain matters concerning Harbison's inability to adequately defend Dresser's interests, during the summer of 2001, Dresser resumed the defense of all asbestos-related lawsuits alleging exposure to Harbison products where Dresser was a named defendant. Those cases, which total approximately 116,000 nationwide, include all of the 8,112 cases filed by Mr. Morgan.

As you will recall, Mr. Morgan's first tactic against Dresser was to file a motion seeking to have Dresser be responsible for the $199,500,000 "settlement" allegedly entered into by Harbison. Dresser successfully defeated that motion. The

CONFIDENTIAL

most immediate consequence of that victory was that Judge Clark immediately put Dresser to trial in Orange County, Texas in what is referred to as the Tucker trial, where Oscar Kelly Bell was the lead plaintiff. That jury trial consisted of 12 trial days, plus 3 days of jury deliberations, and spanned the period August 20 to September 11.

The Tucker trial group consisted of five (5) plaintiffs. The jury awarded multi-million dollar verdicts against Dresser for each plaintiff. Certain important information concerning the trial plaintiffs are listed below:

| Plaintiff | Disease | Jury Award |
|---|---|---|
| Oscar Kelly Bell | Lung cancer | $ 5,795,951.45 |
| | | 10,000,000.00 3 |
| William Benford | Asbestosis, pleural disease | 5,911,031.83 - |
| | | 10,000,000.00 1 |
| Noah Harris Johnson | Asbestosis, pleural disease | 5,895,127.84 - |
| | | 10,000,000.00 3 |
| Samuel Freeman | Lung cancer, pleural disease | 3,794,203.46 1 |
| | | 2,000,000.00 4 |
| | | 10,000,000.00 3 |
| Elbert Harris | Colon cancer, asbestosis | 3,926,043.28 1 |
| | | 2,000,000.00 4 |
| | | 10,000,000.00 3 |
| Total | | $79,322,357.88 |

On November 29, 2001, Judge Clark entered Final Judgment for the amounts listed in the above chart. A copy of that Final Judgment is enclosed herewith as Exhibit "B". Dresser has filed a variety of post-trial motions and a hearing is currently scheduled for January 24, 2002 concerning Dresser's motion for a new trial and its second motion for a judgment notwithstanding the verdict. If Dresser's post-trial motions are all denied, which is a likely outcome given Mr. Morgan's relationship with Judge Clark, Dresser will file a timely notice of appeal.

---

Jointly and severally liable with North American Refractories Company ("NARCO"), which filed for Chapter 11 protection on January 4, 2002.

3    For punitive damages.

4    For wife, individually.

CONFIDENTIAL

Kirkpatrick & Lockhart LLP

Richard C. Milazzo, Esq.
January 15, 2002
Page 4

## Background - Settlement-Related Judgments

After being unsuccessful in enforcing the alleged global Harbison "settlement" against Dresser, Mr. Morgan moved to enforce against Dresser the trial setting-related settlement that he entered into with Harbison that Harbison has not paid. Over Dresser's objections, Judge Clark signed a series of Judgments on November 29, 2001 against Dresser. The relevant details of those Judgments are set forth in the following chart:

| Plaintiff | Diseas | Judgment Amount |
|---|---|---|
| Leon Dixon | Non-Malignant | $ 225,000 |
| Flo d Douglas, Jr. | Lung Cancer | 1,000,000 |
| Ernest Pitts | Non-Malignant | 225,000 |
| Woodrow Taylor | Non-Malignant | 225,000 |
| Andrew/Rosa Butera | Lung Cancer | 1,000,000 |
| Walter/Willie Withers oon | Non-Malignant | 225,000 |
| Arlie Richard Able | Other Cancer | 500,000 |
| Dollet Alexander | Non-Malignant | 150,000 |
| John/Rub Alexander | Non-Malignant | 150,000 |
| Gorman/Linda/Claude Armstrong | Other Cancer | 500,000 |
| Davis/Ross Barrett | Other Cancer | 500,000 |
| Eugene/Nancy Gaines | Non-Malignant | 150,000 |
| Harvey Britton | Non-Malignant | 150,000 |
| John B ant/Ma Ann McNear | Non-Malignant | 150,000 |
| Woodrow/Ether Carter | Lung Cancer | 750,000 |
| George/Helen Chamberlain | Other Cancer | 500,000 |
| John Hen Cotton | Non-Malignant | 150,000 |
| Maurice Eugene Crocker | Non-Malignant | 150,000 |
| James/Mar'orie Harbuck | Non-Malignant | 150,000 |
| John/Ma Johnson | Non-Malignant | 150,000 |
| Allen Jones | Non-Malignant | 150,000 |
| Lamar Jones | Non-Malignant | 150,000 |
| Carl/Mar aret Kantor | Non-Malignant | 150,000 |
| Ralph Kno f/Barbara McCaffert | Mesothelioma | 2,500,000 |
| Calvin Stewart Laird | Non-Malignant | 150,000 |
| John/Susie Lewis | Non-Malignant | 150,000 |
| James Walter Mor an | Non-Malignant | 150,000 |
| Ro /Eula Morrison | Other Cancer | 500,000 |
| Lehman Nesbitt/Geraldine McClain | Non-Malignant | 150,000 |

| Plaintiff | Disease | Judgment Amount |
|---|---|---|
| Ive   Monroe Pickens | Lung Cancer | 750,000 |
| Sam E. Ra land | Lung Cancer | 750,000 |
| Joe L. Reed | Non-Malignant | 150,000 |
| Woodrow Wilson Reeves | Non-Malignant | 150,000 |
| William Reynolds | Non-Malignant | 150,000 |
| George/Ruby Ro ers | Lung Cancer | 750,000 |
| Charlie Smith, Jr. | Non-Malignant | 150,000 |
| Philip Snow | Non-Malignant | 150,000 |
| Coster/Julia Spencer | Other Cancer | 500,000 |
| Robert Cleveland Stevenson | Non-Malignant | 150,000 |
| William Steward | Non-Malignant | 150,000 |
| James Alton Stokes | Non-Malignant | 150,000 |
| Dave Tarver | Non-Malignant | 150,000 |
| Herman Alfred Taylor | Lung Cancer | 750,000 |
| Gene/Sarah Tri lett | Lung Cancer | 750,000 |
| Joseph V. Vizzinia | Other Cancer | 500,000 |
| Brooks Warmle | Non-Malignant | 150,000 |
| Jerry/Patricia Washington | Non-Malignant | 150,000 |
| Dudle /Arcola Williams | Lung Cancer | 750,000 |
| Frank Williams | Non-Malignant | 150,000 |
| Vonda/Uleus Wilson | Other Cancer | 500,000 |
| Jim Amison, Jr. | Non-Malignant | 225,000 |
| Charles David Ave | Non-Malignant | 150,000 |
| Ton Houston Bell, Jr. | Non-Malignant | 225,000 |
| Jesse Brown | Non-Malignant | 150,000 |
| Willie Chamblin, Jr. | Lung Cancer | 750,000 |
| Ralph Donald Collins | Non-Malignant | 150,000 |
| Richard Deed | Non-Malignant | 225,000 |
| Marshall Dowdell | Non-Malignant | 150,000 |
| R.J. Dole | Other Cancer | 500,000 |
| Geor e/Mattie Dudley | Other Cancer | 750,000 |
| Carl Edwards | Non-Malignant | 150,000 |
| Dock/James Meehan | Mesothelioma | 2,500,000 |
| Lewis/Robert Fox | Non-Malignant | 150,000 |
| Adam/Re inald Green | Lung Cancer | 750,000 |
| Per /Lois Harris | Lung Cancer | 750,000 |
| Lewis/Flora Hart | Non-Malignant | 150,000 |
| Henry Lee Howard | Non-Malignant | 150,000 |

**CONFIDENTIAL**

**Mendes 005098**

| Plaintiff | Disease | Judgment Amount |
|---|---|---|
| Thomas/Thomas Howard | Non-Malignant | 150,000 |
| Claud Arthur Hue | Non-Malignant | 150,000 |
| Eddie Lee Hu ins | Non-Malignant | 150,000 |
| Johnnie Hughes | Non-Malignant | 225,000 |
| Rufus Lawrence Jones | Non-Malignant | 150,000 |
| Sam Jones | Non-Malignant | 150,000 |
| Alton/Jettie Kirkpatrick | Non-Malignant | 150,000 |
| Ike/Be  Li  kin | Other Cancer | 500,000 |
| Hard  Douglas Marlin | Other Cancer | 500,000 |
| John Elmore Marshall | Non-Malignant | 150,000 |
| Joseph William Massen  ale | Other Cancer | 500,000 |
| Leon Comealius McMillan, Jr. | Non-Malignant | 150,000 |
| Joe Daniel Miles | Non-Malignant | 225,000 |
| William Robert M ers | Non-Malignant | 150,000 |
| Gene Hubert Olive | Non-Malignant | 150,000 |
| Robert/Rosie Patterson | Non-Malignant | 150,000 |
| Bennie/Minnie Perdue | Lung Cancer | 750,000 |
| Fred/Susie Perdue | Non-Malignant | 150,000 |
| Joe/Betty Roscoe | Lung Cancer | 750,000 |
| William Pollard, Sr. | Non-Malignant | 150,000 |
| Jesse Price, Jr. | Non-Malignant | 150,000 |
| Alton Pu  h | Non-Malignant | 150,000 |
| Willie Lee Raine | Non-Malignant | 150,000 |
| Odies Ray | Non-Malignant | 150,000 |
| Frank Roper, Sr. | Non-Malignant | 150,000 |
| Gene Saulters/Emil  Gri  s | Lung Cancer | 1,000,000 |
| C. B. Scott, Jr. | Non-Malignant | 150,000 |
| Melvin Curtis Story | Non-Malignant | 225,000 |
| Garfield Trannon | Non-Malignant | 150,000 |
| Melvin Tyson | Non-Malignant | 150,000 |
| Mardis Bryan Wallace, Jr. | Non-Malignant | 225,000 |
| Jesse Warren, Jr. | Non-Malignant | 150,000 |
| John/Bernice Young | Lung Cancer | 750,000 |
| Total | | $35,675,000 |

The three (3) Judgments, and other relevant orders signed by Judge Clark, reflecting the above amounts are enclosed herewith as Exhibits "C", "D" and "E". Dresser has filed a series of motions with the trial court concerning these Judgments. If Judge Clark

CONFIDENTIAL

Mendes 005099

denies all of such motions, which is likely given Mr. Morgan's relationship with Judge Clark, Dresser will file timely notices of appeal.

<u>Dresser Settlement Negotiations with Glen Moraan</u>

Dresser never has been opposed to settling with Mr. Morgan. Rather, Dresser's position always has been that it would settle with Mr. Morgan on reasonable terms. If Mr. Morgan was not willing to accept a reasonable settlement, then Dresser would be prepared to try every one of Mr. Morgan's cases. Dresser also understands that the London Market Insurers are not opposed to a settlement with Mr. Morgan, the terms of any such settlement are reasonable.

In an attempt to further settlement negotiations with Mr. Morgan, which would also have the effect of eliminating all of the final judgments described above which, if not reversed, would obligate Dresser to pay Mr. Morgan's clients in excess of $114,997,357.88 in order to dispose of only 105 of Mr. Morgan's 8,112 cases, Dresser proposed a settlement with Mr. Morgan utilizing the following matrix which would yield a total settlement amount of $10,922,000, provided Mr. Morgan's disease counts are accurate:

| Disease | Matrix Amount | No. of Plaintiffs | Total |
|---|---|---|---|
| Mesothelioma | $15,000 | 19 | $ 285,000 |
| Lung Cancer | 7,000 | 607 | 4,249,000 |
| Other Cancer | 2,500 | 442 | 1,105,000 |
| Asbestotics and Pleurals | 750 | 7,044 | 5,283,000 |
| Total | | 8,112 | $10,922,000 |

Dresser made this settlement proposal, even though it knew that Mr. Morgan would never accept it, in order to create the appropriate atmosphere wherein a settlement dialogue could begin. Dresser's strategy worked and a settlement dialogue has begun with Mr. Morgan. In an effort to facilitate the possibility of settlement, Dresser and Mr. Morgan have entered into an oral Rule 11 agreement (which should be reduced to writing soon) whereby Mr. Morgan will not set any trials against Dresser in either Orange County or Jefferson County until May 1, 2002 provided Dresser agrees not to attempt to remove any of Mr. Morgan's cases to federal court. Dresser has also told Mr. Morgan that it would use its best efforts to convince the London Market Insurers (or their attorneys/representatives) to meet with Mr. Morgan to

[5] A copy of the settlement offer letter to Mr. Morgan is enclosed as Exhibit T".

[6] A copy of the Rule 11 agreement will be provided to you as soon as it is finalized and signed.

CONFIDENTIAL

discuss settlement. Dresser believes that Mr. Morgan agreed to the Rule 11 agreement in large part because of Dresser's representation that it would attempt to schedule such a meeting where Mr. Morgan would be permitted to present his case "directly" to the London Market Insurers.

### "Waiver" from Documentation Requirements

As we have discussed on several occasions and as a representative of Dresser has discussed directly with representatives of the London Market Insurers on two occasions in your offices, Dresser: (1) does not accept the Documentation Requirements ("DRs") as being binding or having any legal effect on Dresser; (2) the DRs are not part of the Dresser/Harbison Coverage-In-Place Settlement Agreement entered into in 1998 (or any other settlement agreement between Dresser and the London Market Insurers); and (3) does agree with the London Market Insurers that many policyholders, not including Dresser, overpay in settlement of asbestos-related claims, particularly those involving non-malignancies. Dresser, therefore, while not agreeing that the DRs can be unilaterally imposed on it by the London Market Insurers, does understand that it is possible that the DRs can have a positive effect on the settlement dynamic for asbestos-related claims and, accordingly, Dresser is willing to work with the London Market Insurers to bolster or strengthen the London Market Insurers' position concerning the DRs.

In that light, Dresser is willing to seek a "waiver" from the DRs, provided Dresser need not agree that the DRs are binding on it.' In that regard, Dresser, without agreeing that the DRs have an application under the 1998 CIP, seeks settlement "authority" from the London Market Insurers in the amount of up to $85,000,000 to settle the entire inventory of 8,112 Glen Morgan claims. Dresser believes that there is a reasonable likelihood of convincing Mr. Morgan to accept such an offer, notwithstanding the fact that he is holding $114,997,357.88 in judgments, provided the settlement payment is made immediately.

Concerning that payment, Dresser would make that payment and would bill the London Market Insurers in accordance with the requirements of the 1998 CIP. The London Market Insurers would need to agree to pay the bill in accordance with the timing requirements set forth in the 1998 CIP and would need to agree to pay the

As was discussed previously, Dresser would be willing to agree to a modified set of DRs provided a global resolution of the issues dividing the parties can be resolved. Dresser may also be willing to "accept" the DRs as written if the London Market Insurers are willing to grant to Dresser an "upfront" waiver of certain of the requirements in light of Dresser's historic claims-handling practices and/or in light of the contractual protections already present in the two CIPs that Dresser has entered into with the London Market Insurers.

**CONFIDENTIAL**

amounts due directly to Dresser (and not in to any interpleader "account" with any court.)

Dresser would like to meet with representatives of the London Market Insurers as soon as possible to discuss this proposal and to discuss more fully the reasons why Dresser believes that the current situation with Mr. Morgan is deserving of a "waiver" from the DRs. Those reasons include, but are not limited to: (1) the $114,997,357.88 in outstanding judgments against Dresser; (2) the "special" relationship that Mr. Morgan has with Judge Clark in Orange County, Texas; (3) the Chapter 11 filing by NARCO; and (4) the cost of defending Mr. Morgan's cases, which is in excess of $1,300,000 as of December 31, 2001 and which will only continue to grow.

Dresser is available to meet with the London Market Insurers in New York or in London. As a representative of Dresser and its counsel are already scheduled to be in London for a meeting on Tuesday, February 19, 2002, Dresser would be willing to meet with representatives of the London Market Insurers on February 18, 19 or 20 to accommodate a meeting in London on the Glen Morgan matter.

Further, Mr. Morgan is anxious to meet with representatives, whether principals or counsel, of the London Market Insurers. We would appreciate hearing from you as to whether such a meeting can be arranged, either before or after representatives of Dresser and the London Market Insurers meet. Dresser believes that a meeting with Mr. Morgan would be beneficial in this particular situation. For instance, Dresser believes that it is essential in this settlement dynamic for Mr. Morgan to understand the London Market Insurers' resolve and to also understand the informational requirements, i.e., doctor's reports and x-rays, that Mr. Morgan needs to meet. Dresser also believes that it would be beneficial from the London Market Insurers' perspective for the London Market Insurers to hear directly from Mr. Morgan what he believes to be the strength of his cases and the risks that his cases present to Dresser and the London Market Insurers.

We look forward to hearing from you soon concerning the scheduling of a meeting both with Dresser and with Mr. Morgan.

Very truly yours,

Michael G. Zanic

MGZ/kak
Enclosures

**CONFIDENTIAL**

# HALLIBURTON



ENERGY SERVICES

KBR
ENGINEERING & CONSTRUCTION

INVESTOR RELATIONS
NEWS
SUPPLIER RELATIONS
CAREERS
OFFICE LOCATIONS
ABOUT HALLIBURTON

## 2001 Press Releases

FOR IMMEDIATE RELEASE: December 7, 2001

### HALLIBURTON COMMENTS ON ASBESTOS JUDGMENTS

**DALLAS, Texas** - This week Halliburton announced three adverse asbestos litigation results. Those announcements are set forth in full at the end of this press release. We would like to provide some background for those announcements to put them into context.

Our strategy in managing asbestos cases is to achieve settlement of valid claims for reasonable amounts. When we believe that settlement demands by plaintiffs are not reasonable we go to trial. This strategy has resulted in resolution of over 194,000 asbestos claims during the last 25 years for reasonable aggregate amounts. Our Form 10-Q quarterly report for the period ending on September 30, 2001 contains more information about our asbestos claims and the results of our claims management.

The verdicts and judgments we reported this week were significantly outside our past experience. During the last several months Dresser and Kellogg Brown & Root have achieved favorable results in a number of other asbestos lawsuits where Dresser and Kellogg Brown & Root have been found to have no liability or relatively small amounts of liability. We believe that our management of asbestos claims is reasonable and effective and, over time, produces better results than the strategies followed by some other asbestos defendants.

As we previously announced, we believe that the $65 million dollar judgment in the district court in Orange, Texas is based on serious error during the trial and that the trial evidence does not support the judgment. Separately the same district court judge rendered the $35.7 million of judgments against our subsidiary Dresser Industries, Inc. based on settlement agreements to which Dresser was not a party and did not authorize. We believe that both of these actions are contrary to applicable law and we will appeal both of them. If our appeals do not succeed, we have substantial insurance that we expect will pay most of these judgments.

Our previous trial experience in the Baltimore court has been substantially better. We have a good basis for an appeal of this verdict if judgment on the verdict is rendered, although we cannot be certain of the result of such appeal. In any event, if our appeals do not succeed we have substantial insurance that we expect will pay most of any verdict amount.

During the coming weeks and months we expect Dresser and Kellogg Brown & Root will be involved in a number of other

**Contact Inf**
Public Relatic

**Related Inf**
FAQs
Media Events
Logos
Corporate Of
Board of Dire
History of Ha
Health, Safet
Environment
Community
University

Archived Pre
2003
2002
2001
2000
1999
1998
1997
1996
1995
1994

SCA00131568

asbestos claim trials in several states. We cannot predict the outcome in these trials but we are confident of our strategy. We will continue to provide timely material information about the results of those trials. We are managing asbestos claims aggressively. We will continue our current claim strategy and seek to minimize any adverse financial impact on our company to the maximum extent possible. Our businesses are strong and healthy and our financial disclosure is accurate and complete.

Halliburton management will hold a telephone conference on Monday, December 10, 2001 at 7:00 am (CST) to discuss these matters.

If you plan to participate in the teleconference, please telephone (913) 981-5583 ten to fifteen minutes prior to starting time and refer to confirmation code 471264.

The following is a restatement of the information in the two Form 8-K filings we made earlier this week.

**December 4, 2001**
Halliburton announced that on November 29, 2001, a Texas district court in Orange, Texas entered a judgment against its subsidiary, Dresser Industries, Inc., on a $65 million jury verdict rendered in September 2001 in favor of five plaintiffs following a trial of several weeks. Dresser believes that the trial court committed numerous errors, including the application of Alabama law and its evidentiary rulings during the trial. Additionally, the trial court denied Dresser the right to present evidence that the alleged illnesses of the plaintiffs were not caused by Dresser products, but instead could have been caused by the products of other companies which had previously settled with the plaintiffs. Dresser intends to appeal this judgement and believes that the trial evidence did not support the verdict and that its legal defenses will result in judgment on appeal in Dresser's favor.

The same district court also entered three additional judgments against Dresser in the aggregate amount of $35.7 million in favor of 100 other asbestos plaintiffs. These judgments related to an alleged breach of purported settlement agreements signed earlier this year by a New Orleans lawyer hired by Harbison-Walker Refractories Company, which had been defending Dresser pursuant to the agreement by which Harbison-Walker was spun-off by Dresser in 1992. These settlement agreements purportedly bind Harbison-Walker Refractories Company as the obligated party, not Dresser. Dresser intends to appeal these three judgements on the grounds that it was not a party to the settlement agreements and it did not authorize anyone to settle on its behalf. Dresser believes that these judgments are contrary to applicable law and that its appeal will be successful.

**December 7, 2001**
Halliburton announces that on December 5, 2001, a jury in Baltimore, Maryland returned verdicts against its subsidiary, Dresser Industries, Inc., and other defendants following a trial of several weeks involving asbestos claims. Each of five plaintiffs alleged exposure to Harbison-Walker Refractories products. Dresser's portion of the verdicts totals $30 million. Dresser believes that the trial court committed numerous errors, and that the trial evidence did not support the verdicts. Dresser intends to

SCA00131569

challenge the verdicts by post trial motion and, if those motions are not successful, to pursue an appeal aggressively.

Halliburton, founded in 1919, is the world's largest provider of products and services to the petroleum and energy industries. The company serves its customers with a broad range of products and services through its Energy Services Group and Engineering and Construction Group business segments.

*Editor's Note: In accordance with the Safe Harbor provisions of the Private Securities Litigation Reform Act of 1995, Halliburton cautions that statements in this press release which are forward looking and which provide other than historical information involve risks and uncertainties that may impact the company's actual results of operations. Please see Halliburton's Form 10-Q for the quarter ended September 30, 2001 for a more complete discussion of such risk factors.*

**Contact**
Wendy Hall
wendy.hall@halliburton.com
Halliburton
Public Relations
(p) 713.676.5227

**Employment Contact**
jobs@halliburton.com
(p) 800.888.7668
ext. 8005

**Supplier/Procurement Contact**
Dave Ireland
dave.ireland@halliburton.com

**Supplier Diversity Contact**
Linda Holloway
linda.holloway@halliburton.com

Back to Top

Printer Friendly Version of this Page

SCA00131570

**Asbestos FAQs**

Q.   You say that this is 'good news' for all Halliburton constituents-why is that?
A.   If this settlement is implemented, it will provide a permanent resolution to a difficult and complicated problem. It removes significant uncertainty regarding the company's future, and it also allows us to concentrate our resources on serving our customers and further growing the business. It is an agreement that addresses both current and future personal injury asbestos claims against the company. Halliburton and all of its subsidiaries, including KBR and DII, will remain strong and healthy, with good growth prospects. And, implementation of the plan should mean that there would be NO negative effects on our customers, suppliers, subcontractors, lenders, bondholders, or employees. It's a definite win for the people who care about Halliburton


Q.   Is it true that you plan to implement the asbestos settlement through a Chapter 11 bankruptcy filing for certain Halliburton companies?
A.   Yes. We expect to use a pre-packaged Chapter 11 filing for DII and KBR to implement the asbestos settlement. A pre-packaged filing means that we are bringing to the court a settlement that has pre-agreement with the asbestos claimants. This should expedite the plan's approval and remove many uncertainties.


Q.   Why did the Company choose the Chapter 11 process?
A.   The Chapter 11 process and the oversight of a bankruptcy court is the only means available today to fully and permanently resolve all personal injury asbestos liability, including potential future claims.


Q.   In Europe and many other countries when a company is "bankrupt," it means that it is going out of business. What is different here?
A.   This is a U.S. operations issue only. We will not be commencing any proceedings under local law in Europe or any country other than the U.S. The European bankruptcy laws, as in many countries, are very different from the laws in the U.S. Chapter 11 has been created so that a filing company can restructure its debt (or in our case resolve its asbestos liability) and remain in business. It is not a liquidation; it is a reorganization. Neither Halliburton, KBR nor any business unit of Halliburton is going out of business.


Q.   Which subsidiaries are included in the filing?
A.   DII Industries, LLC (DII) and Kellogg Brown & Root, Inc. (KBR), as well as certain other subsidiaries of those entities with U.S. operations.

KBR Services, Inc., which includes the U.S. government operations business, and KBR's entities with no U.S. operations, will be excluded from the Chapter 11 filing. Halliburton, Halliburton Energy Services, Landmark Graphics and most other Halliburton subsidiaries will also be excluded from the filing.


Q.   What is DII Industries and how is it related to KBR?
A.   DII Industries, LLC is the former Dresser Industries, Inc. This is the company that Halliburton acquired in 1998. In the current corporate structure, Halliburton Company

CONFIDENTIAL

SCA00272376

owns 100% of DII Industries. DII Industries, in turn, owns 100% of Kellogg Brown & Root, Inc., the principal U.S. operating entity of KBR.

Q. Why won't any other Halliburton Company subsidiaries file for Chapter 11?
A. Only those entities that have asbestos liabilities will file for the pre-packaged Chapter 11. Under the proposed agreement with attorneys for the asbestos plaintiffs, the settlement would be implemented through a pre-packaged Chapter 11 filing of DII Industries, LLC, KBR and certain other subsidiaries of DII and KBR with U.S. operations.

Q. Why is KBR's government operations business not part of the filing?
A. The government work, although historically part of Brown & Root, was never associated with any of the activities surrounding the asbestos claims.

Q. Will Halliburton have to give up equity or lose control of any of the filing subsidiaries?
A. Up to 59.5 million shares, or approximately 12%, of Halliburton stock will be used for the settlement. However, under the plan, Halliburton would retain 100 percent ownership of KBR and all other filing subsidiaries (subject to pledges of certain Halliburton debtor subsidiaries as collateral of loans as required by the U.S. bankruptcy code).

Q. Does the Chapter 11 filing mean that Halliburton and/or any of its subsidiaries are going out of business?
A. No. Halliburton and all of its subsidiaries, including DII and KBR, are expected to remain financially strong and continue to have significant competitive advantages. The Chapter 11 petitions are being filed for the sole purpose of facilitating a global settlement of Halliburton's personal injury asbestos litigation claims. In other words, outside of the global asbestos settlement, it will be business as usual.

Q. When will the Pre-packaged Chapter 11 be filed
A. We anticipate that the pre-packaged Chapter 11 filing for DII and KBR will take place late in the first quarter of 2003.

Q. How long will DII and KBR remain in Chapter 11?
A. It is impossible to predict exactly how long the reorganization will take. Our goal is to have DII and KBR emerge from Chapter 11 as quickly as possible, with a comprehensive and final resolution to our asbestos liability. One of the key advantages of a pre-packaged Chapter 11 filing is that it typically is a much quicker process. It is possible that the process could be completed this summer.

Q. In the past Halliburton chose to litigate claims that it thought were weak or spurious. Why isn't the Company litigating the asbestos claims?
A. The legal environment has totally changed, and therefore the company had to address this issue in a new way. In addition, until now, the global settlement was not an option for us. Now that it is, we believe we should do this because the price of the

transaction is less than the discount in our stock price. We changed our approach because we believe it is the right thing to do and in the best interest of our shareholders.


Q. Since the Republicans have now taken over the Congress, shouldn't you wait to see if you get some legislation that is helpful to companies with asbestos issues?
A. It's impossible to predict what Congress may or may not do. All we can do is make the best decisions for the company based on what we know now. Bottom line, this settlement for us is a "bird in the hand". It is the right decision at the right time because it removes the uncertainty about our future.


Q. Doesn't this settlement encourage more lawsuits against Halliburton Company and its subsidiaries?
A. No. All future claims will be channeled to the trust.


Q. Will the settlement resolve all of Halliburton's personal injury asbestos claims?
A. If the plan is implemented, YES. There are a number of hurdles yet to clear, including entering into a definitive agreement covering additional details, acceptances of holders of asbestos claims to a plan of reorganization, financing the cost of the settlement on terms acceptable to Halliburton, final approval by Halliburton, DII, and KBR, and court approval. We are optimistic.
If the plan is implemented, YES. There are a number of hurdles yet to clear, including entering into a definitive agreement covering additional details, acceptances of holders of asbestos claims to a plan of reorganization, financing the cost of the settlement on terms acceptable to Halliburton, final approval by Halliburton, DII, and KBR, and court approval. We are optimistic.
There are a number of key issues that must be resolved even before we file the case with the bankruptcy court, including:
Acceptance by at least 75% of the holders of asbestos claims to a plan of reorganization
Financing the cost of the settlement on terms acceptable to Halliburton
Final approval by the boards of Halliburton Company, DII and KBR
Court approval and final confirmation.

Q. How do you reach agreement to settle future claims?
A. First, the court, the present claimants and the debtor must agree on selecting an independent expert who represents future claimants. The futures representative must then propose a solution to meet the needs of the future claimants. The debtor, the present claimants and the court must approve this solution. The plaintiffs' attorneys and we have jointly agreed to select Professor. Eric D. Green as the future claims representative. This selection is subject to court approval. Professor Green is a professor of law at Boston University and an expert in this field. He received his J.D. degree magna cum laude from Harvard Law School, and is a recognized international leader in alternative dispute resolution. He served as the futures representative in the Fuller Austin Chapter 11 proceeding and currently is the futures representative in the Babcock & Wilcox Chapter 11 proceeding. Further, Professor Green, the present claimants and the debtor have agreed on the terms necessary to meet the needs of future claimants, as defined in our 12/18/02 press release. This too will be subject to court approval.

Q. What are the chances the deal will succeed?
A. We've worked hard on this. We've reached agreement with attorneys for substantially more than the required 75% of known present claimants and with the proposed representative of future claims. If we implement this agreement, creditors would be paid in full on normal terms, customers will continue to be served, and employees wouldn't see any change. So we believe it ought to succeed, on its merits. However, until a number of issues are resolved and we obtain final court approval, nothing is certain.

Q. What will happen if the deal doesn't happen?
A. We won't speculate about what happens if the deal doesn't go through, because we are focused on trying to make it happen. We expect that this deal will work. So do the current claimants and the future claimants' representative as we've said. This agreement is fair for everyone involved, and our collective energies are focused on making it happen.

Q. Would Halliburton Company itself file for Chapter 11?
A. No. Neither Halliburton Company nor its Halliburton Energy Services (HES) business unit will be involved in the Chapter 11 filing. It will involve KBR and DII - the parts of our business with substantially all the asbestos liabilities. However, even in those business units that do file, it will be "business as usual" for all our customers, employees, and vendors. In fact, business should be more normal than it has been in a long time. As we said, this is a unique Chapter 11 filing - it makes things better for every constituency, rather than worse.

Q. What will happen to equity investors?
A. We believe this Chapter 11 is very good news for our investors, if we succeed in implementing it. Uncertainty over the asbestos issue has weighed heavily on Halliburton's share price for some time. This restructuring would resolve that uncertainty and at a price that we believe is less than the discount in our stock price. Therefore, this is good news for our shareholders.

Q. How does this settlement benefit your shareholders?
A. If it is implemented, it would permanently resolve the personal injury asbestos liability for the company. This is the only way to fully cleanse the company under current U.S. law. There has been a significant discount in our stock price because of our asbestos liability. We believe the proposed global settlement is on terms significantly below the discount in our stock price. We owe it to our shareholders to remove that weight from our share price, which we are attempting to do with this agreement in principle.

Q. Who is running the Company? Will management remain in place?
A. There is no change to Halliburton or KBR's management team contemplated now or in the pre-pack plan. Dave Lesar continues as Chairman, President and Chief Executive Officer of Halliburton and his management team will remain in place.

CONFIDENTIAL

Q. What impact will today's announcement have on employees?
A. There should be no impact on employees. There will be no employee layoffs resulting from the filing and all salaries and benefits, including retirement benefits, will remain untouched and unchanged. Halliburton, DII and KBR are expected to remain financially strong and continue to have significant competitive advantages. The Chapter 11 petition is being filed for the sole purpose of facilitating a global settlement of Halliburton's asbestos litigation claims. In other words, outside of the global asbestos settlement, it will be business as usual.

Q. Will there be any employee layoffs as a result of the filing?
A. There will be no employee layoffs as a result of the filing. Employment levels will continue to be a function of business conditions, as they have in the past.

Q. Are you closing any operations?
A. No. Halliburton and its subsidiaries intend to continue to grow their businesses.

Q. How will the filing affect day-to-day operations?
A. The only people affected on a day-to-day basis are the attorneys and our other employees who are solely dedicated to resolving this matter. All of our operations will continue in the normal course of business, without interruption. It's business-as-usual: daily operations will continue, plants and facilities will remain open and transactions which occur in the normal course of business will go on as before.

Q. Will you continue to pursue new business?
A. Absolutely. We have excellent employees, a strong asset base, a premiere position in the industry and a long track record of success. Consequently, we intend to pursue business that meets our Company's strategic criteria.

Q. Why are you reorganizing the company at the same time you plan to file for Chapter 11?
A. These are really two separate and important events for the company. The restructuring was begun months before the global asbestos settlement was contemplated. We undertook it to save costs and to run our businesses more efficiently. In fact, we are reducing costs by an estimated $200 million annually through the new business organization. Of course, once we started down the road toward a global settlement, we were careful to take that into account in all the steps we undertook in our restructuring.

Supplier/Subcontractor-specific
Q. What impact will today's announcement have on KBR's suppliers or subcontractors?
A. It's business as usual. The filing will have no effect on KBR's suppliers or these subcontractors. The plan calls for us to honor in full all pre- and post-petition obligations, purchase orders, agreements and subcontracts in accordance with the terms of those

CONFIDENTIAL

SCA00272380

agreements. Outside of the global asbestos settlement, it will be normal day to day operations.

Q. What impact will today's announcement have on ESG, HES and Landmark suppliers or subcontractors?
A. None. They are not part of this filing so it will be business as usual for them as well.

Q. Would payments to suppliers and subcontractors be impacted in any way?
A. Our suppliers and subcontractors will be paid in the normal course of business within the terms of their agreements with the company. It will be business as usual.

Q. Will you attempt to negotiate new terms with suppliers when you have petitioned for reorganization under Chapter 11?

A. No. KBR as well as all Halliburton entities will continue to provide goods and services just as before the filing, on the same terms and conditions.

Q. Will suppliers and subcontractors have a new contact?

A. No. Our suppliers and subcontractors will continue to communicate with their current representative.

Q. What can suppliers and subcontractors expect in the future? Will you maintain the same level of quality as you have in the past?

A. Absolutely. In fact, our global settlement of the asbestos claims and reorganization will allow us to improve and enhance customer service and serve our constituents better than before.

Q. Will your suppliers and subcontractors continue to supply you with the goods and services necessary to run the business?

A. Of course. This is good news for everyone: vendors, suppliers, employees, etc. All of these companies are in very strong financial condition and have a strong future.

Customer-specific
Q. What impact will today's announcement have on customers?

A. The filing should have no effect on our customers. Outside of the global asbestos settlement, it will be business as usual.
The plan calls for us to honor all pre- and post-petition obligations, commitments and contracts. The Chapter 11 filing should have no effect on any of our present or future projects.
It is important to realize that Halliburton and all of its subsidiaries, including the filing subsidiaries, remain financially strong and continue to have significant competitive

CONFIDENTIAL

advantages. The settlement of our asbestos claims will not only remove a significant financial cloud from over the company's head, but also allow management to concentrate all of its resources on further growing the business. Therefore, we expect that all the Halliburton companies will emerge stronger and better positioned to serve and add value to our customers.

Q.   Will customers have a new contact?

A.   No. Our customers will continue their working relationship with their current representative.

Q.   Will you continue to pursue new business?
A.   Yes. We have excellent employees, a strong asset base, a premier position in the industry and a long track record of success. Consequently, we intend to pursue business that meets our Company's strategic criteria.

CONFIDENTIAL

| From: | Don Godwin. | | Sent:10/17/2002 11:29 AM. |
| To: | dabrams@kazanlaw.com. | | |
| Cc: | skazan@kazanlaw.com. | | |
| Bcc: | . | | |
| Subject: | RE: Settlement of Certain Harbison-Walker Claims. | | |

Denise, it is my recollection that the discussions between and among Steve and/or you , Mike Zanic, Preston Holsinger and myself provided that Halliburton, et al would pay 100% of the H-W settled but unpaid money but would need to condition that upon obtaining satisfactory financing and obtaining approval from the pls. attys. of our proposed prepack. My agreement with you did provide that we would pay your clients additional amounts which would not be conditional. We have paid the $1,922,730 amount and will pay the $2MM on Nov. 30. Our intention is to also pay the H-W settled monies also on that date, but if there is any delay(which we do not expect at this time) I will contact you right away. Again, we don't expect that to happen, but there are a lot of things to do between now and Nov. 30. Please be patient and work with us . Let's discuss if we need to. Thanks.

************************
Donald E. Godwin
Godwin Gruber, P.C.
214.939.4412
dgodwin@godwingruber.com


>>> "Denise A. Abrams" <dabrams@kazanlaw.com> 10/17/02 12:43PM >>>

Don,
I believe your recollection is in error and ask that you take another look at the documents. Our agreement was for $1,922,730.00 within 30 days (which we have received- thank you). The next installment, on November 30, was for approximately $7,600,000 - payment of the Scott and Wallstrom cases ($2,000,000.00) and payment of our outstanding unpaid Harbison Walker settlements (approximately $5,600,000.00- later itemized in Steven Kazan's letter to you, and totalling $7,375,000.000). These payments were not contingent on prepack approval. The remaining $5,950,000, new settlement money to settle the rest of the cases in our office, was to be received upon approval of the prepack.
Kindly refer to my email, your confirmation, and Steven Kazan's letter. I just reviewed these and they confirm the above.
Hope this clears up any confusion. If you need copies of the emails or letter, please let me know.
Denise
-----Original Message-----
From: Don Godwin [mailto:Don@godwingruber.com]
Sent: Thursday, October 17, 2002 9:09 AM
To: Denise A. Abrams
Cc: Steven Kazan
Subject: RE: Settlement of Certain Harbison-Walker Claims


Denise, it is my understanding of our agreement that Halliburton/Dresser will pay $2MM on Nov. 30 for the Wallstrom and Scott cases. We also agreed to pay $1,922,730. within 30 days of Sept. 8, which we did , although the payment was delayed for a couple of days due to administrative issues on our end. I apologize for the delay. With regard to the H-W settled but unpaid amounts of approx. $5.6MM, it is my client's intention to pay by Nov. 30 the referenced amount. However, I recall making it clear that such payment would be conditioned upon our receiving approval from at least 75% of the pls. attys of our prepack plan, which we do believe will occur. Please see my e-mail to me of Sept. 8 and Steve's letter to me of Sept. 10. We are treating all pls. attys the same with regard to the H-W settled but unpaid amounts. The payment of the approx. $5.6MM in H-W settled but unpaid claims is NOT conditioned upon final approval of the plan which we expect to receive in the Spring of 2003. Again, the $2MM will be paid on Nov. 30, as those amounts are for cases not protected by the stay order in the H-W bankruptcy action. Our intention is to also pay the $5.6MM on that date. If I learn of any delay of that payment, I will notify you right away. As you can appreciate, we are working every day to fit all the pieces together in this very complex puzzle. By way of information, Eric Green will be the futures representative. His atty. will be Jim Patton. We are already working with them and others to move this project/process forward. We expect to make a public annoucement in the next few weeks of our overall plan. In the meantime, please treat all of this confidentially as Halliburton is a public company. Hopefully, this will give you and Steve comfort that my client intends to do everything it can to cause the prepack to be filed as soon as practically possible and seek final confirmation of the plan at the earliest possible date. That will be in everyones'

interests. Please let me know if we need to discuss. Thanks for working with us.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Donald E. Godwin
Godwin Gruber, P.C.
214.939.4412
dgodwin@godwingruber.com

>>> "Denise A. Abrams" <dabrams@kazanlaw.com> 10/16/02 06:52PM >>>

Don,
I thought we had a deal that you would pay these claims on November 30, 2002. Our deal was not contingent on any prepack approval, or anything else other than receipt of the information Adrian from my office has already sent to you. If you are not going to honor the deal, please let me know. Otherwise, we will ignore this email and assume it is not meant for us.
Denise

-----Original Message-----
From: Tom Hoekstra [mailto:tomh@godwingruber.com]
Sent: Tuesday, October 15, 2002 4:13 PM
To: Steven Kazan
Subject: Settlement of Certain Harbison-Walker Claims

Dear Steve:

In connection with the global discussions regarding resolution of claims against DII/KBR, we have discussed the Harbison-Walker ("HW") "settled but unpaid" claims. As part of a global resolution, our client has, in essence, agreed to do what we understand that Harbison-Walker ("HW") agreed to do, but did not. To assist us in resolving your settlement(s) with HW, it is absolutely essential that we receive the following information from you at your earliest convenience:

(1) Evidence of the terms of your settlement with HW regarding DII/KBR shared liabilities, in the form of a signed settlement agreement or letter, or an executed judgment;

(2) All data and documents you are obligated to provide to HW pursuant to the settlement letter or judgment referred to immediately above;

(3) A fully completed Claim Submission Form in the form attached hereto for each claimant for whom you are seeking payment, in electronic format for ease in processing; and

(4) Your form of Covenant Not to Sue for our review and comment, which Covenant must include the representation that you have a valid power of attorney to execute such Covenant on behalf of all of the persons that will be listed on an attached Exhibit "A" to such Covenant.

We are looking to you and need your help to accomplish the following tasks:

* More than seventy-five (75%) percent approval of the bankruptcy plan of DII and KBR;
* The assignment of all of the HW claims dealt within this matter to my client or its designee;
* Execution of the Covenant Not to Sue referenced above covering Halliburton, DII, affiliates and any other entity to whom Halliburton, DII or any affiliate may owe an indemnification obligation in a form acceptable to Halliburton. This Covenant Not to Sue shall not run in favor of Harbison-Walker Refractories Company, Global Industrial Technologies, Inc. or any of their affiliates;
* Delivery of an executed Settlement Agreement regarding your claims, which we are preparing and will forward to you.

As you are aware, the agreement to pay your settlement with HW is subject to final approval of the appropriate boards of directors of Halliburton Company and its relevant subsidiaries, agreement with the legal representative for the future claimants of DII/KBR, obtaining of appropriate funding, definitive documentation, requisite votes accepting a disclosure statement and a prepackaged plan of reorganization under Section 524(g) of the United States

CONFIDENTIAL

Bankruptcy Code for DII, KBR and certain of their affiliates, agreement on the manner and amount of funding of a trust for present and future claimants; and further subject to your clients executing appropriate claim documents and other settlement agreements.

Due to the extremely tight deadlines under which we are working, it is critical that you return the above-referenced information to us at your earliest possible convenience. We look forward to working with you to resolve this matter in the most expeditious and efficient manner possible.

Please feel free to call me on my direct phone at 214.939.4496 with any questions you may have. Our legal assistant, Melissa Barras, has been assigned to work on this matter exclusively. Please call her direct at 214.939.4863 for any logistical issues.

Tom Hoekstra

*************************
Thomas S. Hoekstra
Godwin Gruber, P.C.
214.939.4496
thoekstra@godwingruber.com

**********NOTE**********
This Email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged. The information contained in this Email is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (Collect)(214-939-4400), and destroy the original message.
Thank You.

**************************************************
Email Virus Scanning Service by www.infinet1.com
**************************************************

"MMS <kmesa.com>" made the following
annotations on 10/16/2002 04:53:07 PM
-------------------------------------------------------------------------------

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

To reply to our email administrator directly, send an email to postmaster@kazanlaw.com
KAZAN, McCLAIN, EDISES, ABRAMS, FERNANDEZ, LYONS & FARRISE, A Law Corporation
http://www.kazanlaw.com

==========================================================================

**********NOTE**********
This Email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged. The information contained in this Email is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is

strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (Collect)(214-939-4400), and destroy the original message.
Thank You.

**********************************************
Email Virus Scanning Service by www.infinet1.com
**********************************************

"MMS <kmesa.com>" made the following
annotations on 10/17/2002 10:43:38 AM
---------------------------------------------------------------------------
This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

To reply to our email administrator directly, send an email to postmaster@kazanlaw.com
KAZAN, McCLAIN, EDISES, ABRAMS, FERNANDEZ, LYONS & FARRISE, A Law Corporation
http://www.kazanlaw.com

=========================================================================


**********NOTE**********
This Email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged. The information contained in this Email is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (Collect)(214-939-4400), and destroy the original message.
Thank You.

CONFIDENTIAL

SCA 00156143

| | |
|---|---|
| **From:** | Les Coleman |
| **Sent:** | Friday, June 29, 2001 6:48:59 AM |
| **To:** | 'mzanic@kl.com'; Bert Cornelison |
| **Subject:** | Some thoughts about Harbison |

<u>Privileged and Confidential</u>

Bert and Michael:

I am thinking about a possible bold strategy of using a Chapter 11 bankruptcy of Harbison as potential opportunity to get rid of all of the refractory claims and maybe some Dresser non-refractory claims that are covered by the same insurance program. I am re-reading the K&L long draft memos dated June 19, 2001. I would like to be able to brief our CEO on the possible benefits and risks to having Harbison go into an un-prepackaged Chapter 11 and then using that proceeding as a vehicle to dispose of as much of our exposure as possible. We need to do this analysis in any event so we know ( and can covey to Lesar and the Board) the down side of not doing Option 1 or 2.    Michael, can you join our telephone call on Tuesday morning? We can talk about this then.

Les Coleman
Executive Vice President & General Counsel
Halliburton Company
Tel:    (214) 978 2634
Fax:    (214) 978-2658
Les.Coleman@Halliburton.com

This email, including any attached files, may contain confidential and privileged information for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive information for the recipient), please contact the sender by reply email and delete all copies of this message. Thank you

MEMO

CONFIDENTIAL
ATTORNEY CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

TO:     LES COLEMAN
FROM:   JOSIAH DANIEL, VINSON & ELKINS L.L.P.
DATE:   JULY 18,2001
RE:     HARBISON-WALKER

Les, Mike Zanic and I conferred by telephone, and the following summarizes our thoughts on the run:

I.      **How to get H-W into Ch. 11 quickly**

- Via an involuntary petition

  o   Dresser does not have a liquidated claim, and three claimants must sign the petition.

  o   We should promptly obtain a D&B and other information as to the identity and amounts of H-W's commercial creditors.

      ▪   Either such debts might be in arrears and such creditors perhaps amenable to sign such petition, or Dresser could consider purchasing such claims so a to become a petitioner holding a liquidated claim.  (Having three separate Halliburton subsidiaries buy claims and sign an involuntary petition seems risky to us.)

      ▪   Three petitioners are needed, but even if only Dresser were to sign the initial petition, the bankruptcy court would afford a reasonable opportunity for Dresser to recruit two other petitioners after H-W provides a full list of all creditors.

  o   The alternative of whispering in plaintiffs' ears (encouraging them to file an involuntary petition) seems unwise.  The plaintiffs' will not keep any confidences.

  o   Once an involuntary petition is filed, if H-W controverts it, the issue to be adjudicated by the Bankruptcy Court will be whether H-W is "generally paying its debts as such debts become due unless such debts are the subject of a bona fide dispute."  This is not a mathematical inquiry; it is somewhat subjective.  This is another reason we should obtain a D&B or other information as to H-W's commercial debts as soon as possible.

  o   Downside of Dresser initiating an involuntary petition is that the Bankruptcy Code provides for award of costs, actual damages, and even punitive damages in the event that the petition is not granted.

- Via litigation

  o   Mike Zanic posits potential lawsuits that would be "catatrophic" for H-W and would either incentivize H-W to file a voluntary Ch. 11 petition or else motivate the plaintiffs to file an involuntary petition against H-W:

      ▪   suit against H-W, probably in Texas state court, for breach of covenant of cooperation and assistance in the Dresser-H-W settlement agreement;

      ▪   either suit against H-W for breach of the CIP agreements, and join the insurers as necessary parties or suit against insurers under CIP agreements alleging that

all settlements have been made in bad faith so that Dresser retains full access to the full coverage amount.

## II.    Potential benefits to Dresser of getting H-W into Ch. 11 quickly

- Put a stop to H-W making further giveaway settlements with plaintiffs.  In Ch. 11, the debtor is forbidden to pay prepetition claims (at least not without a prior court order), and all postpetition settlements are subject to court approval.  We believe that a bankruptcy court would neither permit H-W to continue to cut deals with plaintiffs nor authorize it to pay prepetition claims, pending the formulation and confirmation of a plan of reorganization.

- Perhaps persuade H-W to accept the proposal that Dresser made to it at the meeting of July 10th in Dallas.  H-W could well structure its Ch. 11 case around such proposal (much more desirable outcome for the Ch. 11 debtor than the prospect of a conventional or "free fall" Ch. 11 proceeding).

- Obtain injunctive relief (extension of the debtor's automatic stay) and centralize all of the litigation and claims in one forum, a federal Bankruptcy Court.

- Suit could be filed against the insurers in a favorable forum, the Bankruptcy Court.

- At the end of the day, Dresser could obtain a release and injunction, via H-W's Ch. 11 plan, to protect Dresser in the future from such claims and such litigation.

- Refer to Mike's prior memoranda and emails to elucidate these points.

## III.    Conclusion

- We assume that H-W will not have a change of heart and become agreeable either to the Dresser proposal of July 10th or to the notion of filing a voluntary Ch. 11 petition..

- There is not a perfect solution to this problem..

- The above seem to be the two methodologies to get H-W into Ch. 11 sooner rather than later

CONFIDENTIAL