# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| THE ERICA P. JOHN FUND, INC., et al., *On Behalf of Itself and All Others Similarly Situated*, | |
| Plaintiff, | **CIVIL ACTION NO.: 3:02-CV-1152-M** |
| vs. | **CLASS ACTION** |
| HALLIBURTON COMPANY and DAVID J. LESAR, | |
| Defendants. | |

# LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL
# OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ......................... 3

    A.    The Law Favors and Encourages Class Action Settlements.................................. 4

    B.    The Proposed Settlement Is Fair, Reasonable, and Adequate ............................... 5

        1.    The Settlement is the Product of Arm's-Length Negotiations Involving a Respected and Experienced Mediator........................................................ 5

        2.    The Complexity, Expense, and Likely Duration of Continued Litigation in this Securities Class Action Support Final Approval ................................ 7

        3.    The Stage of the Litigation and Exhaustive Discovery Support Final Approval ............................................................................................... 10

        4.    The Risks to Prevailing on the Merits at Trial Support Final Approval ... 11

        5.    The Range of Possible Recovery and Certainty of Damages Support Final Approval ............................................................................................... 14

        6.    The Opinions of Class Counsel, the Lead Plaintiff, and Absent Class Members Support Final Approval ........................................................... 16

II.   THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE.......... 18

III.  THE NOTICE PROVIDED TO THE CLASS SATISFIES THE REQUIREMENTS OF BOTH DUE PROCESS AND RULE 23 ....................................................................... 20

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                                      **Pages**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ....................................................................................... 13

*Ayers v. Thompson*,
    358 F.3d 356 (5th Cir. 2004) ................................................................................... 7, 10

*Braud v. Transport Service Co. of Illinois*,
    2010 WL 3283398 (E.D. La.  Aug. 17, 2010) .......................................................... 17

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981)...................................................................................................... 12

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir.1974)........................................................................................ 15

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*,
    2015 WL 965693 (W.D. La. Mar. 3, 2015) ................................................... passim

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ............................................................................... 4, 16

*DeHoyos v. Allstate Corp.*,
    240 F.R.D. 269 (W.D. Tex. 2007) ...................................................................... 12, 16

*Duncan v. JPMorgan Chase Bank, N.A.*,
    No. SA-14-CA-00912-FB, 2016 WL 4419472 (W.D. Tex. May 24, 2016)............................. 6

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................... 19

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)................................................................................................... 13

*Feder v. Electronic Data Systems Corp.*,
    248 Fed.Appx. 579 (5th Cir. 2007)........................................................................... 17

*Garza v. Sporting Goods Properties, Inc.*, No. CIV. A. SA-93-CA-108,
    1996 WL 56247 (W.D. Tex. Feb. 6, 1996)............................................................... 15

*In re 2014 Radioshack Erisa Litig.*,
    No. 4:14-CV-00959-O, 2016 WL 6561597 (N.D. Tex. Jan. 25, 2016).................................... 22

*In re Chicken Antitrust Litig. Am. Poultry*,
    669 F.2d 228 (5th Cir. 1982) ........................................................................ 18

*In re Corrugated Container Antitrust Litig.*,
    643 F.2d 195 (5th Cir. 1981) .................................................................. 4, 14

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) .................................................................. 4, 5

*In re Dell Sec. Litig.*,
    2010 WL 2371834 (W.D. Tex. June 10, 2010) .......................................... 7, 18, 20

*In re Enron Corp.*,
    *Sec.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008)............................................ 13

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    228 F.R.D. 541 (S.D. Tex. 2005)................................................................ 15

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    279 F.R.D. 151 (S.D.N.Y. 2011) ................................................................ 18

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
    851 F. Supp. 2d 1040 (S.D. Tex. 2012) ........................................... passim

*In re Indep. Energy Holdings PLC Sec. Litig.*,
    2003 U.S. Dist. LEXIS 17090, at *11-*12 (S.D.N.Y. Sept. 29, 2003).................... 13

*In re IPO Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009)........................................................ 15

*In re Lease Oil Antitrust Litig.*,
    186 F.R.D. 403 (S.D. Texas 1999) ............................................................ 15

*In re OCA, Inc. Sec. & Derivative Litig.*,
    No. 05-2165, 2009 WL 512081 (E.D. La. Mar. 2, 2009) ............................ 20

*In re OCA, Inc. Sec. & Derivative Litig.*,
    No. CIV A 05-2165, 2008 WL 4681369 (E.D. La. Oct. 17, 2008) ................ 22

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*,
    910 F.Supp.2d 891 (E.D. La. 2010)............................................................ 17

*In re Pool Prod. Distribution Mkt. Antitrust Litig.*,
    No. 2328, 2016 WL 235781 (E.D. La. Jan. 20, 2016)............................... 11

*In re Veeco Instruments Secs. Litig.*,
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)................................................ 19

*Jarallah v. Sodexo, Inc.*,
   452 F. App'x 465 (5th Cir. 2011) ....................................................................... 4

*Jenkins v. Trustmark Nat. Bank*,
   300 F.R.D. 291 (S.D. Miss. 2014) ................................................................... 22

*Klein v. O'Neal, Inc.*,
   705 F. Supp. 2d 632 (N.D. Tex. 2010) ............................................................ 7

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) ..................................................................... 7, 14

*Miller v. Republic Nat'l Life Ins. Co.*,
   559 F.2d 426 (5th Cir. 1977) .......................................................................... 4

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ..................................................................................... 21

*Newby v. Enron Corp.*,
   394 F.3d 296 (5th Cir. 2004) .......................................................................... 5

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ................................................................................... 9

*Parker v. Anderson*,
   667 F.2d 1204 (5th Cir. 1982) ...................................................................... 15

*Purdie v. Ace Cash Express, Inc.*,
   No. CIV.A. 301CV1754L, 2003 WL 22976611 (N.D. Tex. Dec. 11, 2003) ........... 11

*Reed v. General Motors Corp.*,
   703 F.2d 170 (5th Cir. 1983) ..................................................................... 5, 12

*Rodriguez v. West Pub'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ........................................................................ 10

*Schwartz v. TXU Corp.*,
   No. 3:02-2243, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ............................. 7

*Shapiro v. JPMorgan Chase & Co.*,
   2014 WL 1224666 (S.D.N.Y. Mar. 21, 2014) ................................................. 12

*Slipchenko v. Brunel Energy, Inc.*,
   No. CIV.A. H-11-1465, 2015 WL 338358 (S.D. Tex. Jan. 23, 2015) .................... 6

*Stott v. Capital Fin. Servs., Inc.*,
   277 F.R.D. 316 (N.D. Tex. 2011) .............................................................. 10, 16

*Strougo v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003)..................................................................... 9

*Torrisi v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) ................................................................................. 22

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
    669 F.3d 632 (5th Cir. 2012) ........................................................................... 5, 18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)............................................................................... 6, 20

## **Statutes**

28 U.S.C. §§ 1711–15........................................................................................... 5

## **Rules**

Fed. R. Civ. P. 23(c) and (e) ............................................................................... 22

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................ 20, 22

Fed. R. Civ. P. 23(e)(1) ....................................................................................... 20

Fed. R. Civ. P. 23(e)(2) ......................................................................................... 5

Fed. R. Civ. P. 23(e)(4) ......................................................................................... 5

Rule 23 ............................................................................................................... 22

Rule 23(e)...................................................................................................... 5, 20

Rule 23(e)(1)(B)................................................................................................. 20

## **Other Authorities**

4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002) ....... 4

MANUAL FOR COMPLEX LITIGATION § 21.312, at 414 (4th Ed. 2004) ......................................... 21

MANUAL FOR COMPLEX LITIGATION, § 30.42 (3rd Ed. 1995)........................................................ 6

Lead Plaintiff, the Erica P. John Fund, Inc. (the "EPJ Fund"), on behalf of itself and the certified Class, respectfully submits this motion for final approval of the $100,000,000 all cash Settlement[1] reached between Lead Plaintiff and Defendants Halliburton Company ("Halliburton") and David J. Lesar ("Lesar") (together, "Defendants"), on behalf of the certified Class. For the reasons discussed below and in the Joint Declaration of Counsel,[2] the EPJ Fund believes the Settlement is "fair, reasonable, and adequate" under Rule 23(e) and requests that Court now grant final approval of the Settlement, the Plan of Allocation of Settlement Proceeds ("Plan of Allocation"), and the notice to the Class.

## INTRODUCTION

The Settlement is the culmination of over a decade of hard-fought litigation that generated three trips to the Fifth Circuit and two appeals to the United States Supreme Court, resulting in landmark decisions on securities-fraud, class actions, which not only paved the way to the successful settlement in this action but will also help plaintiffs in countless other securities-fraud class actions. In addition to dueling in the appellate courts, the parties engaged in heated battles over many years in the trial Court, with Lead Plaintiff filing eight motions to compel and reviewing 1.3 million pages of documents. Collectively, the parties took some 40 fact depositions and 11 expert depositions. Both sides moved for summary judgment and to exclude the other side's experts in whole or part. Collectively, the summary judgment motions included 267 pages of briefing with 364 exhibits (9,432 pages), and the *Daubert* briefs spanned 480 pages with 228 exhibits (6,535 pages) in this complex class action, which has resulted in

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings as set forth in the Stipulation of Settlement ("Stipulation") filed on February 21, 2017. *See* D.E. 794.

[2] *See* Joint Declaration of Carl E. Goldfarb and Kim E. Miller in Support of Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds, and Approval of Class Action Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, dated July 3, 2017 ("Joint Declaration"), filed contemporaneously herewith.

over 800 docket entries at the District Court.   After this massive investment of time and resources, and in the face of significant risk, Lead Counsel has reached a $100,000,000 settlement, an excellent result for the Class.

Because of the juncture at which this action settled, the parties have a full appreciation of the strengths and weaknesses of the claims and defenses in this action.  The Settlement resulted from arm's-length negotiations conducted with the substantial assistance of Hon. Layn R. Phillips (Ret.) as mediator, including multiple in-person mediation sessions over a period of years (in which Lead Plaintiff participated in person) and extensive communications between the parties.   It provides for a substantial payment of $100,000,000 in cash (the "Settlement Amount") for the benefit of the Class.

In reaching the Settlement, Lead Plaintiff and Class Counsel considered, among other pertinent facts, the numerous risks associated with continuing the litigation in this case in which the Court's class certification order was subject to a pending interlocutory appeal, including the risk of recovering less than the Settlement Amount after a substantial delay and the very real risk of no recovery at all.  If it continued to litigate, Lead Plaintiff faced numerous hurdles presented by Defendants' top-notch counsel.  To win through litigation, Lead Plaintiff had to prevail on an interlocutory appeal currently pending in the United States Court of Appeals for the Fifth Circuit, defeat Defendants' summary judgment challenges, beat back Defendants' *Daubert* challenges, obtain favorable jury verdicts on liability and damages, and defend those verdicts through multiple rounds of post-trial proceedings and appeals, none of which was guaranteed to result in a favorable outcome for Lead Plaintiff and the Class.

Instead, the $100,000,000 Settlement provides an immediate and concrete benefit to the Class.  Moreover, Class Counsel, in consultation with Lead Plaintiff's damages expert, estimates

that the Settlement Amount represents a meaningful portion of the recoverable damages assuming favorable rulings for the Lead Plaintiff from the Court on the parties' pending *Daubert* motions and motions for summary judgment.  Lead Plaintiff and Class Counsel respectfully submit that this is an outstanding result for the Class that easily satisfies the "fair, reasonable and adequate" standard required for final approval of the Settlement.

This Court granted preliminary approval of the Settlement on March 31, 2017 (D.E. 805), and at the same time approved the process by which potential Class Members would receive notice of the Settlement and submit claims, objections, or requests for exclusion.  That process is now substantially underway, and, as of today, not a single Class Member has objected to the Settlement Amount, the Plan of Allocation, or the Notice program, though one non-class member filed an objection.  Furthermore, only four potential Class Members requested exclusion from the Settlement and each failed to include the required information that would allow Class Counsel to confirm membership in the Class.  App. 161-64.  Given the sheer volume of shares traded during the Class Period and the size of the Class, this represents an overwhelming endorsement of the Settlement, and should weigh heavily in favor of the Court's approval.  As explained in more detail below, Lead Plaintiff respectfully requests that the Court grant final approval of the Settlement.

## BACKGROUND

The Court is respectfully referred to the accompanying Joint Declaration, incorporated herein by reference, for a detailed history of the litigation and a more extensive discussion of the factors bearing on the reasonableness of the Settlement, Plan of Allocation, and fee request.

## ARGUMENT

## I.      THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

This is a case that predecessor counsel attempted to settle many years ago for $6,000,000. App. 017. The proposed $100,000,000 settlement is orders of magnitude better and is an excellent settlement for the Class and warrants final approval.

### A.      The Law Favors and Encourages Class Action Settlements

The Fifth Circuit has long recognized that there is a strong public policy in favor of the pretrial settlement of class action lawsuits. *See, e.g.*, *In re Deepwater Horizon*, 739 F.3d 790, 807 (5th Cir. 2014) (2014) (noting that there is an "overriding public interest in favor of settlement that we have recognized particularly in class action suits") (internal quotations, modifications, and citations omitted); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207 (5th Cir. 1981) (noting "strong judicial policy favoring settlement of disputes"); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement."); *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977) (settlements of class actions are "highly favored in the law and will be upheld whenever  possible because they are a means of amicably resolving doubts and preventing lawsuits") (quotation omitted); *see also Jarallah v. Sodexo, Inc.*, 452 F. App'x 465, 468 (5th Cir. 2011) ("[S]ettlement agreements are highly favored by the law and will be upheld whenever possible[.]").

Settlements of class actions possess multiple virtues including allowing the parties to resolve their disputes themselves, subject to court approval.  "It is often said that litigants should be encouraged to determine their respective rights between themselves."  *Cotton*, 559 F.2d at 1330-31.  Settlements have the added advantage of saving judicial resources. *See* 4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002) ("[T]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.").

Rule 23 permits class action settlements even when the class is certified only for purposes of the settlement.  *See* Fed. R. Civ. P. 23(e)(4); *see also In re Deepwater Horizon*, 739 F.3d at 807 ("The legitimacy of class settlements is reflected not only in Rule 23(e) but also in the special regime that Congress has created to govern class settlements under 28 U.S.C. §§ 1711–15.").  Here, however, there is already a certified class in place, and the strong public policy favoring settlements and the particular reasons for that policy all weigh in favor of approving the proposed Settlement here.

**B.     The Proposed Settlement Is Fair, Reasonable, and Adequate**

Under Federal Rule of Civil Procedure 23(e), the Court should grant final approval of the Settlement if it finds that it is "fair, reasonable, and adequate."  *See* Fed. R. Civ. P. 23(e)(2); *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, 2015 WL 965693, at *10 (W.D. La. Mar. 3, 2015); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1063 (S.D. Tex. 2012).  Courts in the Fifth Circuit, in making this assessment, consider what are known as the *Reed* factors, named after *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983):

> (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs' prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members.

*Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (citing *Reed*, 703 F.2d at 172).  Here, those five factors all weigh heavily in favor of approval.

1.     <u>The Settlement is the Product of Arm's-Length Negotiations Involving a Respected and Experienced Mediator</u>

A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement

reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting MANUAL FOR COMPLEX LITIGATION, § 30.42 (3rd Ed. 1995)); *Slipchenko v. Brunel Energy, Inc.*, No. CIV.A. H-11-1465, 2015 WL 338358, at *7 (S.D. Tex. Jan. 23, 2015) (same). That is precisely the case here, where the Settlement was reached by experienced counsel after extensive discovery. Accordingly, the first *Reed* factor—that the Settlement is not the product of fraud or collusion—is readily satisfied and weighs in favor of approval.

Not only was the Settlement reached by experienced counsel after more than a decade of hard fought litigation, it was also reached only after extensive, arm's-length, settlement negotiations, presided over by Judge Layn R. Phillips (Ret.), an experienced and well-respected mediator, which further demonstrates the first *Reed* factor is satisfied. *See Duncan v. JPMorgan Chase Bank, N.A.*, No. SA-14-CA-00912-FB, 2016 WL 4419472, at *7 (W.D. Tex. May 24, 2016), ("Tellingly, both sides are represented by counsel experienced in class action litigation and statutory consumer finance class actions. Moreover, the fact that the parties reached a settlement with the assistance of a qualified mediator followed by three months of negotiations and discovery demonstrates a likelihood that the settlement was the result of informed, good faith, arm's length negotiations rather than fraud or collusion.") *report and recommendation adopted*, No. SA-14-CA-912-FB, 2016 WL 4411551 (W.D. Tex. June 17, 2016); *In re Heartland*, 851 F. Supp. 2d at 1063 (describing arm's-length negotiations that led to approved settlement).

Furthermore, the Lead Plaintiff was substantially involved in the negotiations, including by attending in-person the final, full-day mediation session, and the Lead Plaintiff approved the Settlement. *See* Declaration of Paula John on Behalf of Lead Plaintiff the Erica P. John Fund, Inc., dated June 29, 2017, App. 146-157. Lead Plaintiff's substantial involvement in the

6

Settlement negotiation and approval process provides additional evidence that the Settlement is not the product of fraud or collusion and readily meets the first factor in the *Reed* test.

2.    The Complexity, Expense, and Likely Duration of Continued Litigation in this Securities Class Action Support Final Approval

Courts have consistently recognized the complexity, expense, and likely duration of litigation as critical factors in evaluating the reasonableness of a settlement, especially in securities class action cases. *See, e.g.*, *In re Dell Sec. Litig.*, 2010 WL 2371834, at *7 (W.D. Tex. June 10, 2010) ("[S]ecurities litigation on the whole is 'notoriously difficult and unpredictable' . . . . [t]hus, the complexity, expense, and likely duration of the suit weighs in favor of approval of the settlement.") (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983)); *City of Omaha*, 2015 WL 965693, at *7-8 (approving securities class action settlement and finding *Reed* factors met, noting that the case was "extremely complex" and that securities law "is a highly technical and specialized area of law"); *Schwartz v. TXU Corp.*, No. 3:02-2243, 2005 WL 3148350, at *19 (N.D. Tex. Nov. 8, 2005). As this case has demonstrated, securities fraud issues are often litigated aggressively at substantial expense to the parties, and "[w]hen the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010) (citing *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004)).

The fact that an interlocutory appeal was pending at the Fifth Circuit at the time of the Settlement is just one indication that this litigation was likely to continue for some time and perhaps a considerable period of time, at significant expense, absent a settlement. Defendants' most recent appeal to the Fifth Circuit regarding the price impact of the December 7, 2001 disclosure had been fully briefed, oral argument had been held, and the Fifth Circuit had the

7

matter under consideration at the time of settlement.  Because of the importance of that appeal, this Court deferred ruling on all pending motions until that appeal was resolved.  *See* D.E. 774 ("In light of the appeal, the Court will not now rule on the parties' pending Motions for Summary Judgment [ECF Nos. 705, 710] and Daubert Motions [ECF Nos. 693, 695, 697, 699, 701, 703, 708].")  After reaching a proposed settlement, the parties requested a stay before the panel issued a decision, and the Fifth Circuit agreed to stay the appeal, which raised important and unsettled issues regarding how the fraud-on-the-market presumption can be rebutted at class certification, what arguments are permissible at that stage, and who bears the burden of persuasion.  Lead Plaintiff faced a substantial risk of either having the Fifth Circuit deny class certification outright or remand the case for a fourth ruling on class certification, which would have led to a significant delay in prosecution of the case and led to substantial additional expenses and increased risk.  Had that happened, even a third trip to the Supreme Court was not out of the question, which would also have caused a significant delay and increased expenses.

Assuming Lead Plaintiff prevailed on the interlocutory appeal at the Fifth Circuit, and the Supreme Court declined to hear the case for a third time, the litigation would have continued in this Court.  Lead Plaintiff would have had to survive Defendants' *Daubert* motions and motion for summary judgment and prevail at a complex, expensive, and risky trial.  Given the stakes involved and Defendants' resources and entrenched positions, if Lead Plaintiff prevailed at trial, there would be inevitable, lengthy post-trial proceedings, including perhaps years of appellate litigation.  At each of those junctures, while Lead Plaintiff believed it had strong arguments and should prevail, Lead Plaintiff recognized it faced significant risks.  In their summary judgment motion, Defendants attacked all six elements of Plaintiff's claim, challenging whether Defendants made any actionable misstatements under the Supreme Court's decision in

8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), as well as the elements of scienter, materiality, loss causation, reliance, and damages. Defendants also sought summary judgment on the Section 20(a) claims and argued that the claims were time-barred.  In their *Daubert* motions, Defendants sought to exclude the testimony of Lead Plaintiff's four experts *in toto*, and mounted multiple attacks against each expert.  At the trial itself, a jury would have had to resolve substantial and complex issues of liability, causation and damages, and a trial of this highly complex action would have taken enormous resources, costing millions of dollars.  And, regardless of the outcome of the trial, there almost certainly would have been numerous issues that would have remained for either side to pursue in post-verdict proceedings or on appeal, likely delaying any payment to the Class for years.

The Settlement not only spares the litigants the delay and expense of continued litigation, but also saves the time and resources of this Court and the appellate courts.  The Settlement obviates the need for the Court to rule on the pending summary judgment and *Daubert* motions, as well as preside over the ensuing pre-trial, trial, and post-trial process.  Even if the Class could recover a larger judgment after a trial, the additional delay through post-trial motions and appellate review could deny the Class any recovery for years, further reducing its value.  The Settlement, if approved, ensures and advances the recovery to the Class, possibly by as much as several years or more.  *See Strougo v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation…the passage of time would introduce yet more risks…and would, in light of the time and value of money, make future recoveries less valuable than this current recovery."); *In re Heartland*, 851 F. Supp. 2d at 1064 ("Litigating this case to trial would be time consuming, and '[i]nevitable appeals would likely prolong the litigation, and any

9

recovery by class members, for years.'") (quoting *Rodriguez v. West Pub'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009)).

At this juncture, the $100,000,000 Settlement results in an immediate, substantial, and tangible recovery without the considerable risk, expense, and delay of trial and likely appeals. Thus, the second *Reed* factor also strongly supports final approval.

### 3. The Stage of the Litigation and Exhaustive Discovery Support Final Approval

The third *Reed* factor examines whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369. The parties and the Court need such information so that they may "gauge the strengths and weaknesses of the claims and defenses," "determine the settlement's adequacy in relation to the probability of success on the merits," and understand the "legal issues" involved with continued litigation. *In re Heartland*, 851 F. Supp. 2d at 1065 (citing *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 344 (N.D. Tex. 2011)).

The lengthy history of this case demonstrates Class Counsel's detailed knowledge of the merits and potential weaknesses of the Class's claims and leaves no question that this *Reed* factor speaks overwhelmingly in favor of final settlement approval. This action was first filed in 2002 and the parties have been litigating this case for more than a decade. The parties have briefed and argued issues regarding class certification in the Fifth Circuit three times and in the United States Supreme Court twice. As detailed in the Joint Declaration, fact and expert discovery have been completed, and entailed the collection and review of over 1.3 million pages of documents; at least 40 fact or Rule 30(b)(6) depositions, including four depositions that were set for two days each per this Court's order; 19 expert reports; and 11 expert depositions. App. 24-30. Moreover, the parties briefed voluminous, fact-intensive and competing summary

10

judgment motions, which cover virtually all the key issues in this action.  App. 38-41. The parties have also fully briefed numerous *Daubert* motions for all seven experts on a variety of issues.  App. 34-38.

As a result of the extensive fact and expert discovery and motion practice, and the late stage at which this matter settled, Class Counsel is well-informed about the strengths and weaknesses of their case and was well positioned to engage in effective settlement discussions with Defendants.  *See In re Pool Prod. Distribution Mkt. Antitrust Litig.*, No. 2328, 2016 WL 235781, at *8 (E.D. La. Jan. 20, 2016) (noting "settlement occurred after three years of litigation and extensive fact discovery" and that counsel had taken numerous expert and factual depositions, reviewed millions of pages of documents, briefed two rounds of motions to dismiss, several *Daubert* motions and motions for summary judgment and stating: "Because of the advanced stage of the litigation, counsel for all parties were familiar with the factual and legal issues in the case.  Therefore, the Court is satisfied that the parties were sufficiently informed to assess the strengths and weaknesses of their positions and to make a reasoned evaluation of whether and on what terms to settle."); *Purdie v. Ace Cash Express, Inc.,* No. CIV.A. 301CV1754L, 2003 WL 22976611, at *6 (N.D. Tex. Dec. 11, 2003) (noting "at the time settlement was achieved, the parties had engaged in extensive discovery").  Here, having more than sufficient information to critically evaluate their case, Class Counsel were equipped to properly negotiate the terms of the Settlement before the Court.  Accordingly, the Court should find that this factor weighs heavily in favor of final approval.

4.    The Risks to Prevailing on the Merits at Trial Support Final Approval

The fourth *Reed* factor requires the court to assess "the likelihood of plaintiffs' success on the merits if the case were to proceed to trial," taking into consideration "the rewards the class would have been likely to receive" upon such success, and measuring "the terms of the

settlement" against those factors. *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007). There is some "internal tension" in making this inquiry, *Reed* notes, as the Court "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed*, 703 F.2d at 172 (internal quotation marks and alteration omitted). In other words, the Court should not "decide the merits of the case or resolve unsettled legal questions," *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981), or attempt to "foresee with absolute certainty the outcome of the case." *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *10 (S.D.N.Y. Mar. 21, 2014). "Rather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *Id.*

While Lead Plaintiff and Class Counsel believe that the claims asserted have substantial merit and while they believe there was a good chance that they would prevail at trial, Lead Plaintiff and Class Counsel also realize that they faced numerous and significant hurdles before prevailing on the merits. First, they had to prevail on Defendants' class certification appeal, which was pending before the Fifth Circuit at the time of the Settlement. As noted, the appeal raised important and unsettled questions, and an adverse ruling would either have required Lead Plaintiff to go through the class certification process again, with an uncertain outcome as the result, or could even have spelled the end of the case if the Fifth Circuit denied the motion for class certification outright. Second, Lead Plaintiff faced significant risks presented by Defendants' pending motion *Daubert* motions and their motion for summary judgment. Again, the outcome of those motions was uncertain, and an adverse ruling or rulings could have hamstrung Lead Plaintiff's presentation of its case or even have ended the case altogether.

Third, trial presented serious risks.  At trial, Lead Plaintiff would have been required to prove that Defendants made misstatements or omissions of material fact with scienter in connection with the sale or purchase of Halliburton securities.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  Whatever the precise likelihood of a jury verdict on the merits in Lead Plaintiff's favor, there was a meaningful risk that a jury would decide that, for example, the alleged misrepresentations (or certain of them) were either not false, not material, not made with scienter, or all of the above.  App. 45-47, 49.  Moreover, there would remain substantial risk that the jury would rule against Lead Plaintiff on loss causation or reject Lead Plaintiff's damage analysis.  *Id.* at 47-51.  Indeed, Lead Plaintiff could successfully establish liability at trial, but then fail to prove the existence and amount of damages, which is especially challenging in securities fraud litigation.  *See In re Indep. Energy Holdings PLC Sec. Litig.*, 2003 U.S. Dist. LEXIS 17090, at *11-*12 (S.D.N.Y. Sept. 29, 2003) (noting difficulty of proving damages in securities cases); App. 52-54.  Any adverse jury findings on loss causation or damages would have meant no recovery or a substantially reduced recovery for the class.

Thus, there can be little doubt that the road ahead contained various potential pitfalls.  As the Fifth Circuit has recognized, "[t]o be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action."  *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) (O'Connor, A.J., sitting by designation); *see also In re Enron Corp. Sec.*, 586 F. Supp. 2d 732, 788 (S.D. Tex. 2008) ("various binding, higher-court decisions" have made "individual investors' securities actions under the PSLRA generally, increasingly difficult").

By contrast, the Settlement provides for a prompt and certain payment of $100,000,000 to resolve the claims of the Class.  The aforementioned risks and uncertainties of success on the

merits at trial (and on any appeals likely to follow), when balanced against the immediate benefits of this Settlement, favor a finding that the Settlement is fair, reasonable and adequate.

5.   The Range of Possible Recovery and Certainty of Damages Support Final Approval

Under the fifth *Reed* factor, the district court must consider "the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors."  *Maher v. Zapata Corp.*, 714 F.2d 436, 460 (5th Cir. 1983) (internal quotation marks omitted) (quoting *In re Corrugated Container*, 643 F.2d at 213).  The Court need not determine "exactly the remedy they would have asked the Court to enter absent the settlement," but only "whether the settlement's terms fall within a reasonable range of recovery, given the likelihood of the plaintiffs' success on the merits."  *In re Heartland*, 851 F. Supp. 2d at 1067 (internal quotation marks omitted); *accord City of Omaha*, 2015 WL 965693, at *10 ("The proposed settlement need only reflect a fair, reasonable, and adequate estimation of the value of the case in view of what might happen at trial.").

Here, the $100,000,000 all cash recovery constitutes approximately 11.8% of the maximum recoverable damages for the Class (approximately $848 million, as determined in consultation with Lead Plaintiff's damages expert), which includes a maximum recovery for all alleged misrepresentations and omissions related to both present and future asbestos claims liability.  App. 66.  That represents a meaningful portion of the total recoverable damages assuming the Court denied Defendants' *Daubert* and summary judgment motions in full. Throughout the case, however, Defendants presented strong arguments that the alleged misrepresentations and omissions regarding future asbestos claims liability were not actionable, and Lead Plaintiff faced a substantial risk that these claims would have been lost at or before

14

trial, limiting the maximum recoverable damages to as low as $233 million according to Lead Plaintiff's damages expert.  App. 66-67.  Under this scenario, the $100,000,000 Settlement constitutes 42.9% of the maximum recoverable damages for the Class, which is an exceptional result in light of the substantial litigation risks remaining in the action.  App. 66-67.

Lead Plaintiff and Class Counsel submit that this is thus well within the range of reasonableness in light of the risks, and, indeed, is an excellent result.  *See, e.g.*, *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 228 F.R.D. 541, 566 (S.D. Tex. 2005) (granting final approval of partial settlement even though "the settlement amount is a very small fraction of the damages amount projected by the Plaintiffs"); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 435, n.47 (S.D. Texas 1999) (citing studies showing that "investors recover only 7 to 14 cents for every dollar lost as a result of securities fraud" in class actions); *Garza v. Sporting Goods Properties, Inc.*, No. CIV. A. SA-93-CA-108, 1996 WL 56247, at *6, *9, *18 (W.D. Tex. Feb. 6, 1996) (finding "the amount of the proposed settlement is within the range of possible recovery" where the monetary relief requested is $1.5 billion in compensatory and $300 million in exemplary damages and Defendants agreed to pay $31.5 million in settlement of the Action); *see also In re IPO Sec. Litig.*, 671 F. Supp. 2d 467, 483 (S.D.N.Y. 2009) (approving settlement based on a 2% recovery).

As the Fifth Circuit has recognized, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not" indicate that the settlement is not fair and reasonable.  *Parker v. Anderson*, 667 F.2d 1204, 1210, n. 6 (5th Cir. 1982) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir.1974)).  Here, however, the Settlement constitutes a meaningful percent of the maximum damage award following a successful trial.

15

Thus, Lead Plaintiffs and Lead Counsel submit that the Settlement is clearly within the range of reasonableness.

        6.        <u>The Opinions of Class Counsel, the Lead Plaintiff, and Absent Class Members Support Final Approval</u>

"The final factor is the opinions of class counsel, class representatives, and absent class members." *Stott*, 277 F.R.D. at 346.  Here, Class Counsel, Lead Plaintiff, and Class Members all strongly support final approval.

Class Counsel endorses the Settlement, and have submitted a detailed declaration to that effect, setting forth their reasons for doing so.  App. 62-70.  In this action, Class Counsel is composed of lawyers from two experienced and accomplished firms, which have handled numerous high-stakes class actions, and which believe the Settlement is an excellent result for the Class in light of the risks that remained.  App. 67.  "The endorsement of class counsel is entitled to deference, especially in light of class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims."  *DeHoyos*, 240 F.R.D. at 292; *see also Stott*, 277 F.R.D. at 346 ("As class counsel tends to be the most familiar with the intricacies of a class action lawsuit and settlement, 'the trial court is entitled to rely upon the judgment of experienced counsel for the parties.'") (quoting *Cotton*, 559 F.2d at 1330).

Lead Plaintiff also strongly recommends the approval of the Settlement.  App. 147.  Lead Plaintiff's endorsement carries special weight because this is the same Lead Plaintiff that vigorously and successfully opposed the effort by predecessor counsel to settle this matter early on for $6,000,000, without engaging in any meaningful discovery and while excluding Lead Plaintiff from the settlement negotiations.  App. 149.  Here, by contrast, a representative of Lead Plaintiff participated in and directed the settlement negotiations both at in-person mediation

sessions and through guiding the ensuing communications that led to the Settlement. Thus, the endorsement of Lead Plaintiff weighs strongly in favor of approval of the Settlement.

The response of Class Members also strongly weighs in favor of final approval. *City of Omaha*, 2015 WL 965693, at \*10 (W.D. La. Mar. 3, 2015) ("The attitude of absent class members, expressed either directly or indirectly by their failure to object after notice or high level of participation in the proposed settlement program, is an additional factor on which district courts generally place heavy emphasis."). As mentioned above, not a single Class Member has objected to the $100,000,000 Settlement amount or the Plan of Allocation.[3] Only one alleged Class Member filed an objection to the request for attorneys' fees, but raised no issue with all other aspects of the Settlement. *See* D.E. 808. Moreover, only four purported Class Members have requested exclusion from the Settlement, none of whom have submitted sufficient documentation or information to determine whether or not they would even be entitled to participate in the Settlement.[4] App. 161-177. Additionally, no notices of intent to appear at the

---

[3] Patricia A Magruder, who is not a Class member filed a purported objection to the Settlement. *See* D.E. 810 & 811. Because Magruder is not a Class Member, she lacks standing to object to the Settlement. *Feder v. Electronic Data Systems Corp.*, 248 Fed. Appx. 579, 579-80 (5th Cir. 2007) (because purported objector "did not prove his membership in the class, he lacks standing to object"); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, 910 F.Supp.2d 891,941 (E.D. La. 2010) ("Plaintiffs falling outside the settlement class are entirely unaffected by the Settlement, and thus lack standing to challenge it."); *Braud v. Transport Service Co. of Illinois*, 2010 WL 3283398, \*5 (E.D. La. Aug. 17, 2010)("only class members have standing to object to a settlement"). Lead Plaintiff will address Magruder's "objection," along with any other objections, in its July 24, 2017 reply submission.

[4] The first exclusion request, dated May 1, 2017, App. 165-167, fails to "state the date(s), price(s), and number of shares of all [] purchases and sales of Halliburton common stock during the Class Period" and therefore fails to comply with Notice procedures or establish Class membership. *See* D.E. 806-1 at 7-8. The Claims administrator received the second exclusion request on May 30, 2017, App. 168-171, which only generally states that the Class Member "purchased 28,000 shares of Halliburton common stock in 2000." Counsel at KSF spoke to the author of the second exclusion request regarding deficiencies in his request and the import of the Supreme Court's recent decision in *Calpers v. Anz Securities, Litig.,* No. 16-373 (2016). App. 163. The third exclusion request, dated May 29, 2017, App. 172-174, is not an exclusion request

Final Fairness Hearing and object to the Settlement by Class Members have been received to date.  With a pool of thousands of potential Class Members, the small number of objections and requests for exclusion in a Class of thousands demonstrate that Class Members overwhelmingly support the Settlement, which also weighs in favor of final approval.  *See, e.g.*, *In re Dell Inc.*, No. A-06-CA-726-SS, 2010 WL 2371834, at *8 (W.D. Tex. June 11, 2010) ("Out of 1.7 million class notices sent to potential settlement class members, only 21 have so far filed objections in this Court—about 0.001% of the total potential class members. . . .  Thus, it appears the potential class members have been given every chance to object, but the large majority have simply chosen not to."), *aff'd, appeal dismissed sub nom.  Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012).

## II.     THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

A plan for allocating settlement proceeds should be approved if it is "fair, reasonable and adequate."  *City of Omaha*, 2015 WL 965693 at *15 (quoting *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982).  To be fair, reasonable and adequate, "[t]he allocation formula 'need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.'"  *In re Dell Inc., Sec. Litig.*, 2010 WL 2371864, at *10; *see also In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[I]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel.").

The Plan of Allocation, which was fully described in the Notice, has a rational basis and was formulated by Class Counsel in consultation with their retained damages expert, ensuring its

---

at all.  The author says "to the best of my knowledge I have not owned, acquired or sold any Halliburton stocks and/or shares during this period."  There is no further information in the letter regarding any shares.  The fourth exclusion request, dated June 19, 2017, App. 175-177, is not an exclusion request either.  The author states:  "I have no idea what shares I might have owned." The letter contains no additional information regarding any shares.

fairness and reliability.  *See In re Veeco Instruments Secs. Litig.*, 2007 WL 4115809, at *13 (S.D.N.Y. Nov. 7, 2007) (approving plan of allocation in securities case developed by counsel with the assistance of damages expert).  The Plan of Allocation provides for distribution of the Net Settlement Fund (i.e., the settlement consideration less taxes, approved costs, fees, and expenses) to Class Members who have a recognized loss on their transactions in Halliburton stock purchased or otherwise acquired during the Class Period.  App. 57-59.  To have a recognized loss, a Class Member must have held his, her, or its eligible Halliburton shares at least until the opening of the market on December 7, 2001, the date of the alleged corrective disclosure.  App. 58.  Thus, if Class Members sold their stock prior to the corrective disclosure on December 7, 2001, the recognized loss for each share shall be zero.  *See generally Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005).  Under the proposed Plan of Allocation, each Authorized Claimant (as defined in paragraph 1.14 of the Stipulation) will receive a *pro rata* share of the Net Settlement Fund, with that share to be determined by the ratio that the Authorized Claimant's allowed claim bears to the total allowed claims of all Authorized Claimants.  App. 59.

The formula to apportion the Net Settlement Fund among Authorized Claimants is based on Class Members' purchase price of Halliburton stock and whether and when they sold their stock in relation to the Company's alleged corrective disclosure on December 7, 2001.  The Plan of Allocation sets forth the estimated alleged artificial inflation in the price of Halliburton common stock during that Class Period that will be used to calculate each claimant's *pro rata* share of the Settlement.  App. 68.  The computation of the estimated alleged artificial inflation in the price of Halliburton common stock during the Class Period is based on certain misrepresentations alleged by Lead Plaintiff and the price change of Halliburton common stock,

19

net of market-wide and industry-wide factors, in reaction to the public announcement that allegedly corrected Defendants' material misrepresentations and omissions.  App. 68.  This Plan of Allocation, developed in accordance with Lead Plaintiff's expert damages and loss causation reports in the action, applies equally to and compensates all Class Members, including Lead Plaintiff, fairly.  *See In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 WL 512081, at *11 (E.D. La. Mar. 2, 2009) (granting final approval to plan of allocation that "does not give unfair or preferential treatment to the lead plaintiff or any segment of the class").

The structure of the Plan of Allocation is comparable to plans of allocation that have been used in numerous securities class actions.  *See, e.g.*, *City of Omaha*, 2015 WL 965693 at *15; *In re Dell*, 2010 WL 2371834, at *10.  Class Counsel and Lead Plaintiff submit that the Plan of Allocation is fair and reasonable, and respectfully submits that it should be approved by the Court.

## III.   THE NOTICE PROVIDED TO THE CLASS SATISFIES THE REQUIREMENTS OF BOTH DUE PROCESS AND RULE 23

Rule 23(c)(2) requires notice of a proposed class action settlement be provided to the Class through "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also* Fed. R. Civ. P. 23(e)(1).  While "'[t]here are no rigid rules to determine whether a settlement notice satisfies constitutional or Rule 23(e) requirements…the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings[.]'" *In re Heartland*, 851 F. Supp. 2d at 1060 (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005)).  "Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal,

or compromise.'"  MANUAL FOR COMPLEX LITIGATION § 21.312, at 414 (4th Ed. 2004).  To satisfy due process requirements, notice to Class Members must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

Here, notice was disseminated in accordance with the Court's Preliminary Approval Order. On or before April 14, 2017, JND Legal Administration ("JND" or the "Claims Administrator"), the Court-appointed Claims Administrator, mailed 42,194 copies of the Summary Notice to potential Class Members identified through Halliburton's transfer agent records and their nominees, and as of June 28, 2017, mailed an additional 67,008 copies. Declaration of Robert Cormio, D.E. 806, at ¶¶ 3-7; Supplemental Declaration of Robert Cormio at ¶ 3, App. 158-159.  The Notice mailed to Class Members provided a detailed background and history of the litigation, fully apprised Class Members of the terms of the Settlement, and included a discussion of options available to them in connection with the proceedings, including their right to personally appear and/or object to any aspect of the relief requested or to request exclusion form the Class and the procedures for doing so.  *See* D.E. 795 Ex. A-1 at pp. 2, 6-12. In addition, the Claims Administrator caused the Summary Notice to be published in *Investor's Business Daily* and disseminated on PR Newswire and copies of the Long-Form Notice and Claim Form have been made available on a dedicated website maintained by the Claims Administrator.  D.E. 806 at ¶¶ 8-10.  As of April 27, 2017, the website has received 174 hits.  *Id.* at 10.  This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely-circulated publication, and set forth on an Internet website, is "the best notice . . . practicable under the circumstances" and

21

satisfies the requirements of due process and Rule 23.  *See* Fed. R. Civ. P. 23(c)(2)(B); *In re 2014 Radioshack Erisa Litig.*, No. 4:14-CV-00959-O, 2016 WL 6561597, at *4 (N.D. Tex. Jan. 25, 2016) (approving notice "to be provided by first-class mail, postage prepaid, to the last known address of each Settlement Class member", publishing notice on a website, and causing the notice to be published once in a news publication and on PR Newswire); *City of Omaha*, 2015 WL 965693, at *5 (approving notice that included individual notice packages to potential class members and publishing a summary notice in *Investor's Business Daily* and *PR Newswire*); *Jenkins v. Trustmark Nat. Bank*, 300 F.R.D. 291, 302 (S.D. Miss. 2014) (approving use of postcards, publication notice in newspaper, and internet publication on a settlement website); *In re OCA, Inc. Sec. & Derivative Litig.*, No. CIV A 05-2165, 2008 WL 4681369, at *16 (E.D. La. Oct. 17, 2008) ("The Court finds that the direct mailing of notice, along with publication of Summary Notice in print and on the web, is reasonably calculated to apprise class members of the settlement.").

The timing of the Notice is also sound.  Class Members had 87 days following the initial mailing of the Notice to determine whether they would object to any aspect of the Settlement or the Plan of Allocation, and 87 days to request exclusion from the Class.  This period is more than sufficient.  *See In re OCA, Inc.*, 2008 WL 468139, at *16 (39 days between mailing and deadline for written objection held sufficient); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) (31 days between mailing and objection deadline held sufficient).  Accordingly, the Notice sent to Class Members in this case complies with the Court's directives in the Preliminary Approval Order, and the Notice satisfies the requirements of due process and Fed. R. Civ. P. 23(c) and (e).

22

In conjunction with the aforementioned notice and claims administration, JND has incurred $105,000 in costs and fees. App. 160.  Lead Plaintiff respectfully requests that these administration costs be paid out of the Net Settlement Fund.[5]

## **CONCLUSION**

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the Settlement, Plan of Allocation, and Notice to the Class as fair, reasonable, and adequate, and authorize payment of claims administration costs and fees to JND from the Net Settlement Fund.

Dated this 3rd day of July, 2017.                    Respectfully submitted,


/s/ Carl E. Goldfarb                                 /s/ Kim E. Miller
Carl E. Goldfarb                                     Kim E. Miller

David Boies, Esq.                                    Kim E. Miller, Esq.
*(admitted pro hac vice)*                            *(admitted pro hac vice)*
BOIES, SCHILLER & FLEXNER LLP                        KAHN SWICK & FOTI, LLC
333 Main Street                                      250 Park Avenue, Suite 2040
Armonk, NY 10504                                     New York, NY 10177
Tel: (914) 749-8200                                  Tel: (212) 696-3730
Fax: (914) 749-8300                                  Fax: (504) 455-1498
dboies@bsfllp.com                                    kim.miller@ksfcounsel.com

Carl E. Goldfarb, Esq.                               Lewis S. Kahn, Esq.
*(admitted pro hac vice)*                            Neil Rothstein, Esq.
Eli Glasser, Esq.                                    *(admitted pro hac vice)*
BOIES, SCHILLER & FLEXNER LLP                        KAHN SWICK & FOTI, LLC
401 E. Las Olas Blvd., Suite 1200                    206 Covington Street
Ft. Lauderdale, FL 33301                             Madisonville, LA 70447
Tel: (954) 356-0011                                  Tel: (504) 455-1400
Fax: (954) 356-0022                                  Fax: (504) 455-1498
cgoldfarb@bsfllp.com                                 bbgwwt@gmail.com

*LEAD COUNSEL TO LEAD PLAINTIFF,*                    *SPECIAL COUNSEL TO LEAD*
*THE ERICA P. JOHN FUND, INC., AND*                  *PLAINTIFF, THE ERICA P. JOHN*
*THE CLASS*                                          *FUND, INC., AND THE CLASS*

---

[5] Should the Court grant final approval of the proposed Settlement, Lead Plaintiff will make a subsequent motion to distribute Net Settlement Funds and will include a request for JND's additional costs incurred through the first distribution at that time.

23

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on July 3, 2017, I served the foregoing document via

CM/ECF System to all counsel of record.

*/s/ Carl E. Goldfarb, Esq.*
Carl E. Goldfarb

24